1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                     --oOo--

4

5   STEFFON BARBER, an individual,

6          Plaintiff,

7   v.                    Case No.   5:22-cv-00625-JWH-SHK

8   COUNTY OF SAN BERNARDINO, a
    Municipal entity, and DOES 1
9   through 10, inclusive,

10         Defendants.
    _____/

11

12

13

14

15

16          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17       REMOTE VIDEO DEPOSITION OF CHRISTOPHER ALFRED

18              TUESDAY, AUGUST 26, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  19050

25

Christopher Alfred

```
 1        Q.    Who was your supervisor that you gave that
 2   statement to?
 3        A.    Sergeant Taylor Long.
 4        Q.    And did you essentially tell him how many shots
 5   you fired in which direction?
 6        A.    Correct.
 7        Q.    And what did you tell him in that regard?
 8        A.    How many shots were fired and what direction,
 9   and we coordinated a plan to check on the nearby
10   residence.
11        Q.    How many shots did you tell him you fired?
12        A.    Six.
13        Q.    And which direction did you tell him you fired
14   the shots?
15        A.    In a south direction.
16        Q.    Aside from the public safety statement, that
17   just has limited information; correct?
18        A.    Correct.
19        Q.    Did you give an interview explaining why you
20   shot, for example, in the first week after the shooting?
21        A.    The only interview I gave with details about
22   the incident was to Detective Hernandez.
23        Q.    And do you know why the interview was sometime
24   after the shooting, as opposed to closer to the
25   shooting?
```

1        A.    Yes.

2        Q.    Have you reviewed any policies related to the

3   use of deadly force?

4        A.    Yes.

5        Q.    Which policy or policies have you reviewed?

6        A.    The San Bernardino County Sheriff's

7   Department's use of force guideline.

8        Q.    And when was the last time you reviewed that

9   policy?

10        A.    Last week, middle of last week.

11        Q.    Do they have a particular section that applies

12   to deadly force?

13        A.    Yes.

14        Q.    And related to that section, is there a

15   particular section that applies to shooting at or from

16   moving vehicles?

17        A.    Yes.

18        Q.    Were you familiar with that policy at the time

19   of the shooting incident we're here to talk about?

20        A.    Yes.

21        Q.    And what -- I don't expect a verbatim, but what

22   is your general understanding of what that policy says?

23        A.    Pertaining to use of deadly force or shooting

24   at moving vehicles?

25        Q.    Good clarification, Deputy Alfred.    I'm talking

Christopher Alfred

1  about the shooting at moving vehicles.

2      A.   At the time of the incident, it was a

3  "shall-not" policy.  It was written as that:  "shall not

4  be conducted under any circumstances."  Shortly after,

5  there was a revision to that policy.

6      Q.   Okay.  Well, let's talk about the policy that

7  was in effect at the time.  "Shall not" do what?

8      A.   Shoot at a moving vehicle.

9      Q.   Okay.  Was there any discussion in the policy,

10  if you recall, about staying out of the path or getting

11  out of the path, rather than shooting?

12      A.   If -- if feasible, yes.

13      Q.   Was that your understanding of the policy at

14  the time of this incident; if feasible, get out of the

15  path of a moving vehicle, rather than shooting at it?

16      A.   Correct.

17      Q.   And obviously, part of your training, I would

18  assume, is don't necessarily, tactically position

19  yourselves in a bad spot, if you can avoid it, with

20  respect to moving vehicles.  Is that generally a fair

21  statement?

22      A.   Correct.

23      Q.   Now, are you saying the policy changed in some

24  respects after this shooting incident?

25      A.   Yes.

1    Q.    What do you recall to be the date of the

2  shooting incident we're here to talk about?

3    A.    April 27th of 2021.

4    Q.    And do you have an estimate, Deputy, as to when

5  the policy changed, to your knowledge?

6    A.    I do not, no.

7    Q.    Do you know the nature of the policy change?

8    A.    There was some slight verbiage that was changed

9  from a "shall not" to "generally," and it further

10  explained under other certain circumstances.

11          MR. GALIPO:    Hold on.

12          You need to mute yourself, Rodney.

13          (Rodney Diggs has joined.)

14          MR. GALIPO:    I think, for the record, Rodney

15  Diggs has joined us.

16          Go ahead.

17          THE WITNESS:    It changed in the form of

18  verbiage from "shall not" to "generally," under certain

19  circumstances.

20  BY MR. GALIPO:

21    Q.    Okay.    But it sounds like that policy change

22  was after the incident?

23    A.    From my understanding, yes.

24    Q.    So at the time of the incident, your

25  understanding of the policy regarding shooting at moving

1   vehicles essentially is:   You should move out of the way

2   if you can, and you shall not shoot at moving vehicles,

3   or words to that effect?

4        A.   Correct.

5        Q.   And you said you fired six shots altogether?

6        A.   Correct.   Yes.

7        Q.   At any time before you fired your shots, did

8   you see a gun or what you believed to be a gun on the

9   person you shot's person?

10       A.   I did not see a firearm.   I observed movements

11  consistent with someone who's armed with a firearm.

12       Q.   Okay.   Obviously, as a trained law enforcement

13  officer, you're familiar with what a firearm looks like?

14       A.   Correct.

15       Q.   So if I'm understanding you, you considered

16  that the person might have a firearm, but you didn't

17  actually see one; is that fair?

18       A.   Correct.

19       Q.   Did you give any verbal warning you were going

20  to shoot at any point?

21       A.   I did not.

22       Q.   When you fired your shots, were you moving or

23  stationary?

24       A.   Stationary.

25       Q.   Were you stationary for all your shots?

Christopher Alfred

1    A.    Correct.  Yes.

2    Q.    How much time would you estimate passed from

3    your first shot to your last shot?

4    A.    Roughly, four to six seconds.

5    Q.    When you fired the first shot, how far were you

6    from the back of the vehicle?

7    A.    Approximately, 10 to 15 feet.

8    Q.    What part of the vehicle were you shooting

9    through?

10    A.    The rear hatch of the SUV.

11    Q.    Was it dark outside at the time?

12    A.    Yes.

13    Q.    Was there some illumination in the area?

14    A.    Very limited, ambient lighting.

15    Q.    Do you know what the source of that lighting

16    was?

17    A.    One of the lights was affixed to a street

18    posting throughout the alleyway, in between both

19    apartment complexes.

20    Q.    Did you have a tac light on your weapon?

21    A.    Yes.

22    Q.    Do you recall if it was illuminated?

23    A.    I do not.

24    Q.    You just don't recall whether you had it on or

25    not at the time of the shooting?

Christopher Alfred

1    A.    That is correct.   I -- I had a handheld light

2    that I used for a light source.

3    Q.    Did you have a flashlight with you, as well?

4    A.    Yes.   That's the handheld light, yes.

5    Q.    Are you right-handed or left?

6    A.    Right-handed.

7    Q.    So at some point, did you have the flashlight

8    in your left hand?

9    A.    Yes, for the duration of this incident.

10   Q.    So that was providing some illumination?

11   A.    Yes.

12   Q.    So when you fired your first shot, the back of

13   the vehicle would have been approximately 10 or 15 feet

14   from you; is that correct?

15   A.    Correct.

16   Q.    And how about when you fired your second shot?

17   What would you estimate the distance?   About the same?

18   A.    Roughly, around the same.

19   Q.    And how about your third shot?   Was the

20   distance about the same?

21   A.    Yes.   The distance was pretty consistent

22   throughout that course of fire.

23   Q.    Okay.   So the vehicle was about 10 to 15 feet

24   from you, meaning the rear of the vehicle, during your

25   six shots?

1    **A.    Yes.**

2        Q.    And you're estimating that you fired from shots

3    one through six was approximately four to six seconds?

4        A.    Yes.

5        Q.    And were you aiming through the same area of

6    the vehicle for all the shots?

7        A.    Correct.

8        Q.    Which would be the back hatch?

9        A.    It was the -- the hatch was lifted, which

10   exposed the driver's side's headrest, and that was the

11   point of aim.

12       Q.    You were essentially trying to strike the

13   driver; is that fair?

14       A.    Stop the threat.

15       Q.    And by stopping the threat, you were trying to

16   strike the driver with a bullet, to stop the threat?

17   Was that your thinking?

18       A.    That was the force option I was presented with,

19   yes.

20       Q.    Okay.  And so in terms of where you were

21   aiming, you're saying you were aiming towards the

22   headrest?

23       A.    That -- the headrest provided a silhouette, the

24   shape of a head and shoulders.

25       Q.    Okay.  So that gave you some information:  If

1    the driver was seated in the seat, as one normally would

2    be, his head or upper body would be in that area?

3        A.    Correct.

4        Q.    And you were generally aiming towards the head

5    and upper body, is that fair, or center mass?

6        A.    Center mass.

7        Q.    And your weapon is a semi-automatic weapon?

8        A.    Correct.  Yes.

9        Q.    You have to press the trigger for each shot?

10       A.    Correct.

11       Q.    So you would have, in this case, intentionally

12   pressed the trigger six times?

13       A.    Yes.

14       Q.    And obviously, as you indicated, you were

15   stationary for all six shots?

16       A.    Yes.  For the most part, yes.

17       Q.    And what -- you were standing in a driveway?

18       A.    Yes.

19       Q.    And was the front of the vehicle essentially

20   facing south?

21       A.    Correct.

22       Q.    And what was to your left as you were standing

23   in the driveway, if you recall?

24       A.    A chain-link fence.

25       Q.    Okay.   Do you recall what the surface of the

1    driveway was; whether it was cement, asphalt, or dirt?

2        A.    Gravel and dirt.

3        Q.    And I'm a little directionally challenged,

4    Deputy Alfred; but if the chain-link fence would be to

5    the east -- did I have that right -- your left would be

6    east?

7        A.    Yes.

8        Q.    Okay.  And how far would you estimate the

9    chain-link fence was from you when you were essentially

10   stationary, firing these six shots?

11       A.    Rough estimate would be maybe one- to two-arms'

12   length.

13       Q.    Okay.  I don't know whose arms' length you have

14   in mind, but what would you estimate like an arm's

15   length to be, in terms of feet?

16            Are you thinking like an arm's length is like 3

17   feet; or are you thinking something else?

18       A.    I would say 3 to 4 feet.

19       Q.    Okay.  So 6 to 8 feet the chain-link fence

20   would be, approximately, to your left?

21       A.    No, 3 to -- 3 to 4 feet for the chain-link

22   fence.

23       Q.    Oh, I'm sorry.  I got confused.  I thought you

24   said -- did you say two-arms' length or one?  That's

25   where I got confused.

1    A.    One to two.  But if we're going to -- if I

2    could give an approximate distance from my original

3    position, I would say 2 to 3 feet.

4    Q.    Okay.  I misunderstood you.  Because I was

5    thinking you were giving the estimate of an arm's length

6    to be 3 or 4 feet.  But you were thinking about it, and

7    you were saying the approximate estimate from where the

8    left side of your body to that chain-link fence -- I

9    think you first you said 3 to 4 feet, and then you said

10    2 to 3 feet.  Is that what you're thinking?

11    A.    Yes.

12    Q.    And the truck was backing up at some point;

13    right?

14    A.    Yes.

15    Q.    And how far was the truck from the chain-link

16    fence as it was coming backwards, the one on the east

17    side?

18    A.    I don't recall.

19    Q.    Do you have any estimate?

20    A.    Roughly, around the same -- same distance.  The

21    driveway is very narrow.  You have to reverse to

22    actually get out of that driveway.  So it's equivalent

23    to about one -- the length of a car lane, so...

24    Q.    Okay.  I guess what I'm trying to figure out,

25    you may have answered it, but it sounds like to the

1    Q.    Okay.    And how far would you estimate you were

2    when you were shooting your shots from this wall, which

3    I would guess to be to your right, or to the west?

4    A.    Correct.

5    Q.    What would you estimate that distance?

6    A.    Roughly, around the same distance, being

7    anywhere from 3 to 4 feet.

8    Q.    So you think you were, more or less, 3 to 4

9    feet from the chain-link fence, and 3 to 4 feet from the

10    stucco wall, approximately?

11    A.    Approximately, yes.

12    Q.    It sounds like you were -- when you were

13    shooting, did you feel you were more on the driver's

14    side or the passenger's side of the -- of the truck?

15    A.    Driver's side.

16    Q.    Okay.  Were you kind of inline with the

17    driver's side and the headrest, as you indicated

18    earlier?

19    A.    Correct.

20    Q.    So when you were shooting, were you, more or

21    less, shooting due south, towards the headrest?

22    A.    Towards the -- the driver's seat, in the south

23    direction, yes.

24    Q.    Okay.  How tall are you?

25    A.    Five foot, 10.

1    Q.    Okay.  And what did you study, if anything, in
2  particular?

3    A.    Criminal justice.

4    Q.    And did you get a degree at some point?

5    A.    Yes.

6    Q.    And what year did you get your degree in, if
7  you recall?

8    A.    2011, I believe.

9    Q.    Any military experience?

10    A.    No.

11    Q.    When did you go to the academy?

12    A.    October of 2016.

13    Q.    What type of work did you generally do before
14  going to the academy?

15    A.    I worked loss prevention and construction.

16    Q.    Okay.  Loss prevention, in retail stores, for
17  example?

18    A.    Correct.  Yes.

19    Q.    And what type of construction were you involved
20  in?

21    A.    I worked at a solar plant; so I was a heavy
22  equipment operator.

23    Q.    Okay.  Where did you go to the academy?  Was it
24  the San Bernardino County Sheriff's Academy?

25    A.    Correct.  Yes.

1    Q.    How long was that program, approximately?

2    A.    Twenty-three weeks.

3    Q.    Did you have to study some POST Learning

4    Domains?

5    A.    Yes.

6    Q.    You had instruction related to tactics?

7    A.    Yes.

8    Q.    And also the use of force?

9    A.    Correct.

10    Q.    And that included, obviously, the use of deadly

11    force?

12    A.    Correct.

13    Q.    After graduating the academy, where were you

14    first assigned?

15    A.    To the West Valley Detention Center.

16    Q.    What time frame were you there?

17    A.    I was there for a brief period of three months,

18    and then I was reassigned to the High Desert Detention

19    Center.

20    Q.    What time period were you at High Desert?

21    A.    2000 -- 2017.

22    Q.    When were you first assigned to patrol?

23    A.    I believe in March of 2018.

24    Q.    Did you have a period of field training?

25    A.    Yes.

1      Q.    During that field training, did you have to

2    become familiar with some of the policies?

3      A.    Yes.

4      Q.    Did that include, for example, the policy

5    related to the use of deadly force?

6      A.    Yes.

7      Q.    And the policy related to shooting at moving

8    vehicles that we talked about earlier?

9      A.    That encompasses it, yes.

10      Q.    So when was it, approximately, that you

11    finished field training and you were able to go on

12    patrol by yourself?

13      A.    Around July of 2018.

14      Q.    And I think you told me that this -- your

15    recollection is this incident happened in April of 2021?

16      A.    Correct.

17      Q.    So it would have been approximately three years

18    that you were on patrol by yourself when this incident

19    occurred?

20      A.    Yes.

21      Q.    And during that time frame, so I'm talking

22    about your time on patrol before this incident, had you

23    ever seen a suspect with a gun in their hand before?

24      A.    Yes.

25      Q.    On how many occasions, approximately?

1    A.    Probably 15.

2    Q.    Were you trained that you can shoot someone

3    merely for seeing a gun in their hand?

4    A.    No.

5    Q.    Had you ever seen a suspect with, for example,

6    a knife in their hand?

7    A.    Yes.

8    Q.    On how many occasions, approximately?

9    A.    Twenty to 30.

10    Q.    Were you trained that you can shoot someone

11    merely for seeing a knife in their hand?

12    A.    No.

13    Q.    Without going into all of it, had you seen

14    other objects in people's hands that could be weapons,

15    like pipes, or bats, or things of that nature?

16    A.    Yes.

17    Q.    In addition to your firearm, did you have a

18    Taser on you at the time?

19    A.    Yes.

20    Q.    Did you have a police baton?

21    A.    Yes.

22    Q.    Did you carry OC spray?

23    A.    Yes.

24    Q.    Prior to the date of the shooting incident, had

25    you ever used pepper spray in the field before?

Christopher Alfred

1        A.    Yes.

2        Q.    On how many occasions, approximately?

3        A.    Five to ten occasions.

4        Q.    How about the Taser?  Had you used that in the

5    field before?

6        A.    Yes.

7        Q.    On approximately how many occasions?

8        A.    About 20.

9        Q.    How about the baton as an impact weapon?  Had

10   you ever used that before?

11       A.    Yes.

12       Q.    On approximately how many occasions?

13       A.    About ten occasions.

14       Q.    Now, every time you used the Taser or the baton

15   or pepper spray, did you have to write some type of a

16   report documenting your use of force and the reasons

17   why?

18       A.    Yes.

19       Q.    And where would you submit these reports?

20       A.    They would go through our watch commander who

21   reviews the report.

22       Q.    If you know, are these reports kept somewhere?

23       A.    From my understanding, they are electronically

24   filed.

25       Q.    Had you ever used your firearm in the field

1    before the date of the April shooting?

2        A.    Yes.

3        Q.    On how many other occasions?

4        A.    Just once.

5        Q.    And when was that, approximately?

6        A.    October of 2018.

7        Q.    That would have been shortly after you finished

8    your field training?

9        A.    Yes.

10        Q.    And in that occasion, did you shoot at a

11    person?

12        A.    Yes.

13        Q.    And I only ask because sometimes officers are

14    put in a position where they have to shoot at a dog or

15    something else.   So, how many shots did you fire in that

16    incident?

17        A.    Roughly, 30 shots.

18        Q.    What type of weapon did you fire the shots

19    from?

20        A.    My department-issued semi-automatic pistol.

21        Q.    How many rounds did the pistol hold at the

22    time, if you recall?

23        A.    Roughly, 13.

24        Q.    Did you have to reload the magazine a couple

25    times during that shooting?

Christopher Alfred

1        A.    Yes.

2        Q.    Do you know if any of your shots hit the person

3   you were trying to shoot?

4        A.    During that time, I was not aware of that, no.

5        Q.    Did you learn at some point whether they did or

6   didn't?

7        A.    They did not, no.

8        Q.    You learned later that they did not?

9        A.    That's correct; yes.

10       Q.    You're saying, at the time, you weren't sure?

11       A.    At the time, I was not sure; yes.

12       Q.    And why were you shooting at that individual?

13       A.    A colleague was struck by gunfire in front of

14   me.

15       Q.    Do you know who fired the shot that struck the

16   colleague?

17       A.    No.   There were multiple suspects.

18       Q.    Okay.  So let's talk a little bit about the

19   incident here.

20             Do you know the name of the person you shot?

21       A.    Mr. Steffon Barber.

22       Q.    To your knowledge, had you ever seen that

23   person before the day of the incident?

24       A.    I had not, no.

25       Q.    Did you have any information whether that

1    regard?

2         A.    That Mr. Barber had threatened them at the side

3    of their vehicle.

4         Q.    In what way?  Did they say what words he had

5    used?

6         A.    I don't recall specifically what Mr. Barber

7    told them.  They mentioned that he had struck the hood

8    of their vehicle, and they feared for their safety, so

9    they remained inside.  And they believed that

10   Mr. Barber's behavior led them to believe that he was

11   armed with a weapon.

12        Q.    Did they say they ever saw a weapon?

13        A.    No.

14        Q.    Did they say Mr. Barber said he had a weapon?

15        A.    No.

16        Q.    Did you observe any visible damage to their

17   car?

18        A.    No.

19        Q.    Any other information that you had related to

20   Mr. Barber, prior to attempting contact, other than what

21   you told me?

22        A.    Where he was located and what he was wearing.

23        Q.    Okay.  Did you have any information, for

24   example, he was under the influence of drugs or alcohol?

25        A.    I did not, no.

1    Q.   Any information that he was related in any way

2    to a gang?

3    A.   No.

4    Q.   Did you have an understanding as to whose

5    residence that was that the -- his vehicle was in the

6    driveway?

7    A.   Yes.

8    Q.   What was your understanding?

9    A.   From my understanding, it was a shared driveway

10   between the reporting party and Mr. Barber.

11   Q.   So you understood that Mr. -- that driveway was

12   shared by the reporting party and Mr. Barber?

13   A.   Correct.

14   Q.   So was it your general understanding, at least,

15   that Mr. Barber had a right to be in that driveway?

16   A.   It was my understanding that he -- he lived

17   there.

18   Q.   Okay.  Where did you have your conversation

19   with the reporting party?

20   A.   Near the intersection of White Avenue and

21   Adelanto Road.

22   Q.   What city was this in?

23   A.   The city of Adelanto.

24   Q.   Was that conversation with the reporting party

25   recorded, if you know?

1    Q.   Okay.  Your experience has been sometimes

2   people will say, "I think someone has a gun," to try to

3   expedite law enforcement response?

4    A.   Correct.

5    Q.   And you often find it turns out the person

6   didn't have a gun?

7    A.   Correct.

8    Q.   So you don't necessarily accept as true what

9   you're being told?  You consider it and then try to do a

10   follow-up investigation?

11    A.   Yeah.  I think when it pertains to safety, you

12   want to keep those ideas at the forefront, but you still

13   have to take everything for face value.

14    Q.   You did have information as to the address and

15   the clothing description, at least, of Mr. Barber?

16    A.   Yes.

17    Q.   What do you recall the clothing description to

18   be?

19    A.   Mr. Barber wore a short-sleeve, white T-shirt.

20    Q.   Any other clothing description you recall?

21    A.   Long pants, unknown color.

22    Q.   Did you have any age, height, or weight

23   information?

24    A.   I did not, no.

25    Q.   Did you have specifics of the type of vehicle

1    he was driving?

2         A.    SUV.

3         Q.    Anything with regards to the color, the plate,

4    or anything like that?

5         A.    No, I don't recall.  No.

6         Q.    Now, at some point, you go up this driveway;

7    correct?

8         A.    Correct.

9         Q.    And at some point you see an individual who you

10   now know to be Mr. Barber?

11        A.    Yes.

12        Q.    Where was the individual when you first saw

13   him?

14        A.    By his driver's side door.

15        Q.    Where were you when you first saw the

16   individual?

17        A.    Towards the rear of his vehicle.

18        Q.    What would you estimate the distance you were

19   from the rear of the vehicle when you first saw the

20   individual?

21        A.    Probably 10 feet.

22        Q.    And that's about the same distance you were

23   when you fired your shots?

24        A.    Roughly, yes.

25        Q.    How much time would you say passed between you

Christopher Alfred

1  first seeing Mr. Barber outside the vehicle and him

2  getting in the vehicle?

3      A.    Roughly, around eight to ten seconds.

4      Q.    Was the door of the vehicle, the driver's door,

5  if you recall, opened or closed when you first saw

6  Mr. Barber?

7      A.    Open.

8      Q.    Could you tell if the vehicle was on or not

9  when you first saw Mr. Barber?

10     A.    The brake lights -- or the parking lights were

11  illuminated.

12     Q.    And what was your impression; that the vehicle

13  was on, because of that?

14     A.    That, or it contained some kind of power source

15  or accessory lighting.

16     Q.    Could you hear the engine of the vehicle at

17  that time?

18     A.    No, not at that point.

19     Q.    But your general impression was the vehicle was

20  on?

21     A.    Yes.

22     Q.    And you were, at that point, standing about 10

23  feet behind it?

24     A.    Approximately, yes.

25     Q.    Did you have anything in your hands at that

1    point?

2        A.    My flashlight.

3        Q.    And that was in your left hand?

4        A.    Correct.

5        Q.    And your gun was holstered at that point?

6        A.    Yes.

7        Q.    And would you have been standing more in line

8    with the driver's side, as we previously discussed?

9        A.    Yes.

10        Q.    And what, if anything, did you say to

11    Mr. Barber at that point?

12        A.    I requested he walk towards me and speak with

13    me.

14        Q.    And is this captured on the audio of your belt

15    recording?

16        A.    Yes.

17        Q.    Do you recall saying anything else to

18    Mr. Barber before he got in the car?

19        A.    I told him to step away from his vehicle.  He

20    had briefly reached his hands inside of the floorboard

21    of the vehicle, and I told him to step away.

22        Q.    Okay.  And you can hear that also on the

23    recording?

24        A.    Yes.

25        Q.    Do you recall saying anything else to

1    Mr. Barber before he got in the car?

2        A.    I gave him those commands a second time; and he

3    refused a second time, yes.

4        Q.    Same commands, again?

5        A.    Yes.    The second commands were followed by

6    explicit language, and he refused those commands.

7        Q.    And when you say "explicit language," did you

8    use some profanity?

9        A.    Correct.

10        Q.    And without necessarily repeating it, what was

11    the first letter of the profanity?

12        A.    "A."

13        Q.    All right.    Does the San Bernardino Sheriff's

14    Department have any policy regarding using profanity?

15        A.    Yes.

16        Q.    What is the policy, as you understand it?

17        A.    From my understanding, it falls under the lines

18    of conducting yourself in a professional manner, so the

19    profanity is generally prohibited.

20        Q.    Did you ever identify yourself as a police

21    officer?

22        A.    No, I do not.

23        Q.    Was your -- your -- you were probably assigned

24    a marked vehicle at the time?

25        A.    Correct.

1    Q.    But your vehicle was not in the driveway, it

2  was somewhere else?

3    A.    It was parked on the main road.

4    Q.    Did Mr. Barber say anything to you before he

5  got in the vehicle?

6    A.    Yes.

7    Q.    What did he say?

8    A.    He told me to, "Back up." And on the second set

9  of commands where I requested to see his hands, he told

10  me to show him my hands.

11    Q.    Okay.  At that point, were you illuminating him

12  with your flashlight?

13    A.    The general area, yes.

14    Q.    Do you know what type of flashlight you had?

15    A.    It's a -- it's a -- a Streamlight.

16    Q.    Was your gun still holstered at this time?

17    A.    After the second set of commands, it was

18  unholstered.

19    Q.    Okay.  And would you have pulled your gun out

20  with your right hand?

21    A.    Correct.

22    Q.    Did you ever point your gun at Mr. Barber

23  before he got in the car?

24    A.    No.

25    Q.    Was it, more or less, in like -- in like a low

1    ready?

2        A.    Correct.

3        Q.    Did you know or did you have an impression as

4    to whether Mr. Barber saw you pull out your gun; or

5    you're not sure?

6        A.    I am not sure.

7        Q.    When he gets in the car, does the door close at

8    some point?

9        A.    Yes.

10       Q.    Now, your impression was the car might be on;

11   is that fair?

12       A.    Correct.

13       Q.    And your impression was that Mr. Barber may be

14   wanting to leave?

15       A.    Correct.  Yes.

16       Q.    So did you then step out of the way to make

17   sure you wouldn't be in the path of the vehicle, if it

18   reversed?

19       A.    I did not.

20       Q.    At some point, do you see the reverse lights

21   come on?

22       A.    Yes.

23       Q.    Were you still about 10 feet from the back of

24   the car?

25       A.    Roughly, within the general area.

1    Q.    Did you then move to step out of the way, once

2    you saw the reverse lights come on?

3    A.    No.

4    Q.    How much time would you say passed from seeing

5    the reverse lights come on to you firing your first

6    shot?

7    A.    One to two seconds.

8    Q.    On the right side, I'm understanding there was

9    some break in the stucco, but you had passed that

10   position?

11   A.    I'm sorry, can you --

12   Q.    Yeah.  I'm probably using -- I'm sorry.  I'm

13   probably using the wrong description.

14         But it's my general understanding, from your

15   perspective, facing south, on the left is the chain-link

16   fence --

17   A.    Uh-huh.

18   Q.    -- is that correct?

19   A.    Correct.

20   Q.    Okay.  But on your right side, which would be

21   to your west, a little bit behind where you were, there

22   was some opening?

23   A.    Correct.  Yes.

24   Q.    Okay.  Am I using the right word; or are you

25   more comfortable with another word, other than an

1    Q.    You indicated earlier that during your six

2    shots, you were generally stationary; is that correct?

3    A.    Correct.  Yes.

4    Q.    And you would have been generally close to

5    where the flashlight was that you dropped?

6    A.    Within the area, yes.

7    Q.    And I think you told me that you were

8    approximately 10 to 15 feet from the back of the truck

9    when you fired?

10    A.    Correct.  Yes.

11    Q.    Did the truck -- was the truck, based on your

12    recollection, moving during shots four, five, and six?

13    A.    Yes.

14    Q.    It was moving backwards at the time of your

15    sixth shot?

16    A.    From my recollection, yes.

17    Q.    Could you tell if it had slowed or maintained

18    the same speed?

19    A.    It appeared to slow down.

20    Q.    And how far do you think the truck moved

21    backwards after your last shot?

22    A.    I don't recall or have a directed measurement

23    of how far to reference the last shot.

24    Q.    Okay.  Do you have any estimate at all as to

25    how far it moved back after your last shot?

1      A.     I do not know.

2      Q.     Do you know if it's more or less than 5 feet?

3      A.     Less.

4      Q.     Do you know if it's more or less than 3 feet

5  that it moved back, after your last shot?

6      A.     I do not know.

7      Q.     And after your six shots, did you tactically

8  reposition?

9      A.     I made an attempt to, yes.

10      Q.     Where did you reposition to?

11      A.     Well, I remained in that general area.  I

12  searched and assessed for potential cover and

13  concealment options.  There was no area for me to

14  relocate, so I moved shortly north through the driveway,

15  closer to the main road.

16      Q.     How about that opening area we talked about

17  earlier?  Did you ever move in that area?

18      A.     No.

19      Q.     Is there a reason why not?

20      A.     It obstructed my observations of Mr. Barber.

21      Q.     Was there at least cover there?

22      A.     There was a concealment.

23      Q.     What would be the concealment, the fence or

24  stucco?

25      A.     The -- the fence.

1        A.    Yes.

2        Q.    And you did not attempt to move out of the way

3   to the left or to the right, before you fired the shots;

4   is that also correct?

5        A.    That is correct.   With that being said, that --

6   that alleyway is a very -- it's a confined space, and

7   there's no ample space to go left and right, in terms of

8   fully making sure that I wouldn't be, you know, hit by

9   this vehicle.

10        As I previously stated, to one side of me

11   there's a chain-link fence; and to the other side, there

12   is a picket fence that doesn't offer me much security.

13   So there was really no proper avenue to retreat to.

14        Q.    Obviously, the truck did not physically strike

15   you; is that fair?

16        A.    Correct.

17        Q.    And you didn't, for example, dive out of the

18   way; is that also correct?

19        A.    That is correct.

20        Q.    And going back to the training -- and I think

21   we went over this a little bit -- but your understanding

22   of the training is, if feasible, step out of the way,

23   rather than shooting at the vehicle?   Is that generally

24   correct?

25        A.    Yes.

1    Q.    Is also part of the training, if feasible, not

2    to tactically position yourself behind a vehicle that

3    you think may be trying to reverse?

4    A.    Not necessarily.    I think that's kind of formed

5    on a case-by-case.    I had no immediate indication that

6    that vehicle would reverse until Mr. Barber entered it

7    and the reverse lights came on.

8    Q.    Okay.    Because I thought you at least had the

9    impression that that vehicle belonged to Mr. Barber; is

10   that right?

11   A.    I believed it was associated with him, yes.

12   Q.    And your impression was the vehicle was on?

13   A.    On, yes.

14   Q.    And your impression was, based on your dialogue

15   with him and seeing him getting back in the car, that he

16   may try to leave?

17   A.    Yes.    At that -- at that point, once I saw him

18   enter the vehicle, I believed that the purpose of that

19   vehicle going in reverse was to potentially harm me,

20   yes.

21   Q.    And I don't know, is -- in that driveway, can

22   you -- can you go forward to leave; or do you have to go

23   backwards to leave, if you know?

24   A.    You have to reverse.    It's one way in and one

25   way out.

1     Q.    Were you aware of that at the time?

2     A.    Yes.

3     Q.    So I'm going to try to just show you a few

4  photographs that I think were taken as part of the

5  investigation.

6           But am I understanding you correctly that,

7  after the shooting, you did not approach the vehicle?

8     A.    I did not, no.  For officer safety purposes, I

9  still gave commands to Mr. Barber.  I didn't receive a

10  response; and therefore, I needed to make sure I

11  maintained a visual on him as well, and delegate medical

12  resources when they arrived, where he was located.

13     Q.    How did you try to maintain a visual?  Where

14  did you go to maintain a visual?

15     A.    I stepped a couple of feet away from the

16  vehicle; so that would be to my north.

17     Q.    And when you say a "couple of feet," just --

18  did you go to one side or the other, or just straight

19  backwards?

20     A.    Straight backwards.  Initially, it was straight

21  backwards.  And then there was some short pacing from

22  left to right, kind of using Mr. Barber's vehicle as

23  cover, but also drifting a little bit to the left to

24  maintain a line of sight for him.

25     Q.    And to the left would be closer to the

1        A.    Yes.

2        Q.    Did you, at some point, observe or learn that

3    he had been struck by some of the shots?

4        A.    Yes.

5        Q.    And what did you see or hear to give you

6    information in that regard?

7        A.    There was blood in the interior of the vehicle,

8    and Mr. Barber was leaned over to the right on the

9    center console.

10       Q.    Okay.  Did you have any information as to where

11   he had been struck?

12       A.    From my understanding and where I saw the blood

13   come from, it was a head injury.

14       Q.    Okay.  And I think you said the headrest was at

15   least part of what you were looking at when you were

16   firing?

17       A.    It formed a silhouette, yes.

18       Q.    Do you know what -- what gear the truck was in

19   after the shooting?  In other words, when the vehicle

20   was approached, do you know whether it was in reverse or

21   some other gear?

22       A.    It was in the reverse gear.  One of my partners

23   had arrived and had to place the vehicle in park.

24       Q.    Okay.  And so do you recall if the brake lights

25   were on or there was something blocking the vehicle from

1    continuing to roll backwards?

2        A.    The vehicle had wedged against one of the west

3    portions of the wall.   From my understanding, that

4    prevented the vehicle from traveling in reverse further.

5        Q.    At some point, did you see the vehicle make

6    contact with that area by the wall?

7        A.    Yes.

8        Q.    And was that contact made before or after your

9    last shot?

10       A.    After.

11       Q.    And how far do you think the vehicle moved from

12   your last shot to making that contact?

13       A.    Roughly, around a foot.   It was a short

14   distance.

15       Q.    Okay.   And once the vehicle made that contact,

16   it didn't go back any further?   Am I understanding that

17   correct?

18       A.    It didn't -- it didn't reverse any further

19   until we contacted Mr. Barber.

20       Q.    Okay.   And then during that contact, did,

21   somehow, the vehicle roll back slightly?

22       A.    Yes.

23       Q.    Can you explain how that happened, please?

24       A.    From my understanding, Mr. Barber's foot was on

25   the brake pedal, of some sort.   And once he was

1    extracted from the vehicle for medical services, the

2    vehicle slowly went in reverse, and one of my partners

3    was able to put it in park to stop it from reversing.

4         Q.   Okay.  Do you have an estimate, or do you have

5    an understanding as to how much further it went in

6    reverse when Mr. Barber's foot came off the brake?

7         A.   A couple of inches.  Just enough for us to

8    under -- to realize that the vehicle was still in

9    reverse gear.

10        Q.   So it was a short distance?

11        A.   Short distance, yes.

12        Q.   So is it your understanding that one of the

13   reasons the vehicle was not continuing to move backwards

14   because Mr. Barber's foot was on the brake?

15        A.   No.  It's my understanding the vehicle didn't

16   further go backwards because it had collided with a

17   portion of the wall.

18        Q.   I mean, I understand that part.  I guess what

19   I'm wondering is, why would it go backwards at all, if

20   you know, after his foot came off the brake?

21             MS. ANDERSEN:  I'll object to the extent it

22   calls for speculation.

23             But you can answer, if you know.

24             THE WITNESS:  I'm sorry.  So your question?

25             MR. GALIPO:  Yeah.  It may call for

1    You can answer.

2         THE WITNESS:  From my understanding and what I

3    observed, the vehicle was still in the reverse gear; and

4    his foot was removed from the brake, which led it to

5    travel a short distance.

6    BY MR. GALIPO:

7         Q.   Okay.  I'm going to show you just a few

8    exhibits.  These are pictures that were taken as part of

9    the investigation.  You may have seen some of these

10   before.

11        MR. GALIPO:  Can we start with Exhibit 1?

12        And we'll send these to you, Kayleigh.  They

13   have Bates stamp numbers on them.

14        MS. ANDERSEN:  Okay.  Fine.

15        MR. GALIPO:  This one ends in 289.

16        (Exhibit Number 1 was marked.)

17   BY MR. GALIPO:

18        Q.   Are you able to see this on your screen,

19   Deputy?

20        A.   Yes.

21        Q.   Is that essentially a photograph of yourself?

22        A.   Yes.

23        Q.   Is that how you were generally dressed at the

24   time of the shooting?

25        A.   Yes.  The face covering was lowered around my

1   neck.

2        Q.   Okay.   Was this kind of COVID time when this

3   happened?

4        A.   Yes.

5        Q.   And were you wearing some type of a face

6   covering or face mask?

7        A.   I was equipped with one, but during my --

8   during my contact with Mr. Barber, the face covering was

9   removed from my face.

10        Q.   And so you just simply lowered it down towards

11   your neck?

12        A.   Correct.   Yes.

13        Q.   And do you recall if Mr. Barber had some type

14   of face mask?

15        A.   I do not, no.

16        Q.   You don't recall one way or the other?

17        A.   No.

18            MR. GALIPO:   Okay.   Can we look at Exhibit 2,

19   please?

20            (Exhibit Number 2 was marked.)

21            MR. GALIPO:   Thank you.

22            I don't know if I'm seeing the whole -- or

23   maybe I am.

24   BY MR. GALIPO:

25        Q.   Okay.   Can you see that on your screen?

1        A.    Yes.

2        Q.    Okay.   There appears to be some gravel and some

3    dirt on the driveway.

4              Do you see that?

5        A.    Yes.

6        Q.    The chain-link fence would be to the left side

7    of the photograph?

8        A.    Yes.

9        Q.    And as we discussed previously, that would be

10   the east?

11       A.    Yes.

12       Q.    And we can see the vehicle that Mr. Barber was

13   associated within this photo?

14       A.    Correct.   Yes.

15       Q.    I take it the door -- the driver's door, to

16   your knowledge, was closed at the time of the shooting?

17       A.    Yes.

18       Q.    And the back hatch was also closed?

19       A.    And the back hatch was open.

20       Q.    Oh.   It was open at the time of the shooting?

21       A.    Yes.

22       Q.    So you weren't shooting through the back hatch

23   window?   You were shooting through the open area?

24       A.    Correct.   Yes.

25       Q.    And was that back hatch open before Mr. Barber

1    got in the vehicle?

2         A.    Yes.

3         Q.    And so the position we see the vehicle in here,

4    it would have been slightly south before it moved back

5    that short distance, after his foot came off the brake?

6         A.    That is correct, yes.

7         Q.    And we can see your flashlight here, near item

8    number 9?

9         A.    Yes.

10        Q.    That would give us some information as to your

11   general position when you were firing?

12        A.    Correct.  Yes.

13        Q.    Do you know if you were standing on the dirt or

14   the gravel that we see here when you were firing?

15        A.    I do not recall, no.

16        Q.    And you would say there was approximately 3 to

17   4 feet between you and the chain-link fence at the time

18   you were firing?

19        A.    From what I estimated, yes.

20             MR. GALIPO:  I'd like to skip to Exhibit 4,

21   Renee.

22             (Exhibit Number 4 was marked.)

23   BY MR. GALIPO:

24        Q.    Are you able to see that on your screen, Deputy

25   Alfred?

1        A.    Yes.

2        Q.    That shows a bigger portion of the driveway?

3        A.    Yes.

4        Q.    And we can see the vehicle from a distance in

5    this image?

6        A.    Correct.  Yes.

7        Q.    And that opening we were talking about earlier,

8    to the right, we can kind of see it a little bit in this

9    image?

10       A.    Yes.

11       Q.    But was the opening directly to your right, or

12   was it somewhat north or south of you when you were

13   shooting, if you recall?

14       A.    From my recollection, it was south of me.

15       Q.    So you would have been north of the opening?

16       A.    Within that general area, yes.

17             MR. GALIPO:  Okay.  Could we look at Exhibit 5,

18   please?

19             (Exhibit Number 5 was marked.)

20   BY MR. GALIPO:

21       Q.    Do you believe this was the resting position of

22   Mr. Barber's vehicle after he was extracted from the

23   vehicle?

24       A.    Yes.

25       Q.    Now, the hatch is open.  And I think you told

1    Q.   When the vehicle was initially in the driveway,

2   before Mr. Barber got in, did it seem like it was

3   centered in the driveway, or more on one side or the

4   other?

5    A.   It appeared centered.

6        MR. GALIPO:   Can we look at Exhibit 6, please?

7        (Exhibit Number 6 was marked.)

8   BY MR. GALIPO:

9    Q.   Is this a longer view of the -- of the

10  driveway?

11   A.   Correct.  Yes.

12   Q.   Did you have an understanding as to where

13  Mr. Barber's residence was in relation to this driveway

14  or his vehicle?

15   A.   I did not.  I didn't associate Mr. Barber's

16  residence until a family member exited the apartment

17  after the shots were fired.

18   Q.   Did the family member say anything to you?

19   A.   Not to me directly, no.

20   Q.   Did you see hear the family member say

21  anything?

22   A.   Yes.

23   Q.   What did you hear the family member say?

24   A.   One of the family members yelled, "You shot

25  him."

1      Q.    Anything else?

2      A.    Not to my recollection, no.

3      Q.    And where did that family member come from, in

4   relation to the driveway or the vehicle?

5      A.    Just south of the driveway, on the passenger's

6   side of the vehicle.

7      Q.    We see what looks like a white or off-white

8   structure on the west side --

9      A.    Uh-huh.

10     Q.    -- in this photograph.  Do you see that?

11     A.    Yes.

12     Q.    Did the person come from that residence, if you

13  know, or somewhere else?

14     A.    No.  There is a secondary structure just south

15  of the first structure, and that's where the family

16  member exited from.

17     Q.    Okay.  Let's -- thank you for that.

18           MR. GALIPO:  Let's look at ==Exhibit 7==, please.

19           (==Exhibit Number 7== was marked.)

20  BY MR. GALIPO:

21     Q.    Does this again look to be, at least the

22  resting position, from the front perspective of

23  Mr. Barber's vehicle?

24     A.    Yes.

25     Q.    And these -- I don't know if you call it stucco

1    or something else.  I know you have a background in

2    construction, better than me; but what would you call

3    these wooden planks?

4        A.    They're just the wooden boards that affix to

5    the picket fence.  They're attached by a two-by-four.

6        MR. GALIPO:  Okay.  And then could we look at

7    Exhibit 8, please?

8            (Exhibit Number 8 was marked.)

9    BY MR. GALIPO:

10       Q.    Again, this is a slightly different angle, but

11   this shows the general resting position of Mr. Barber's

12   vehicle?

13       A.    Correct.

14       Q.    And would you at least agree that his vehicle

15   ended up more on the west side of the driveway?

16       A.    When it came to rest, yes.

17       Q.    Okay.  I'm going -- I have your statement here

18   in front of me.  I'm going to put on my glasses so I can

19   read.

20            There may be a few pauses now, because a lot of

21   this I've already asked you.  But if I see something

22   that I haven't touched on you, I'll ask you.  So if

23   there's like 10 or 20 seconds of silence, it's just

24   because I'm looking at the statement.  Okay?  So bear

25   with me.

1          A.    Yes.

2          Q.    Today, you more or less gave me 10 to 15 feet?

3          A.    Correct.  Yes.

4          Q.    Are you more comfortable, just knowing

5     everything you know now, with 10 to 15 feet?

6          A.    Eight to 10 feet.

7          Q.    Eight to 10.  Okay.

8                Do you recall saying in your statement that,

9     when you approached the vehicle, the engine was idling?

10         A.    Yes.

11         Q.    And then you're asked by Detective Hernandez,

12    that when you were positioned approximately 8 feet north

13    of the vehicle, there was an opening on the west side

14    that you had mentioned earlier in relation to you.  And

15    you say:  "Approximately, maybe 2 to 3 feet north of me,

16    but to the west."

17               So that's the opening we talked about earlier

18    on the west side?

19         A.    Correct.  Yes.

20         Q.    So when you say "2 to 3 feet north," it'd be

21    slightly behind your position?

22         A.    I was referring to --

23         Q.    Behind and to your right?

24         A.    No.  Ahead of me and to my right.  So it would

25    be south of me, and then north of the rear of the

1      A.    Roughly, eight to ten, yes.

2      Q.    Was it your understanding from the complaining

3    party, that they wanted Mr. Barber to move his vehicle

4    because it was blocking the driveway?

5      A.    Correct.  Yes.

6      Q.    So, in essence, they were complaining that they

7    couldn't get out because Mr. Barber's vehicle was

8    blocking their exit?

9      A.    They didn't share any information about being

10   able to leave.  They only shared with me that his

11   vehicle blocked theirs in some sort of fashion.

12     Q.    Okay.  So were you planning on asking

13   Mr. Barber, if he had cooperated, to move his car?

14     A.    No.  I was further there to speak with

15   Mr. Barber, to get his version of events and also

16   investigate a vandalism.

17     Q.    Do you recall at the time of your statement,

18   towards the end, them having you mark, like, where you

19   were at certain times, things of that nature?

20     A.    Yes.

21     Q.    And again, I'm looking at page 57 of your

22   statement.  But you indicate, again, that the vehicle

23   was idling and the brake lights were on, when you first

24   approached it?  Do you recall that?

25     A.    Yes.  The parking lights were on.

1    Q.   Why is it that you maintained a position -- and

2    this is before he got in the car.   Why is it that you

3    maintained a position behind the car, rather than

4    approaching him on the driver's side of the car?

5    A.   Essentially, in the event of a fire fight or an

6    exchange in gunfire, Mr. Barber's vehicle could serve as

7    a barrier for me.   As I previously indicated, there's no

8    area for any type of cover.   The reporting party

9    previously mentioned that he might be armed.

10        I didn't completely exclude that, but it's

11   something that I did consider as I spoke with him.   And

12   I felt the distance where I tried to speak with him was

13   safe for -- from my understanding, prior to this

14   incident transpiring.

15        Q.   Okay.   Like, for example, I'm just wondering --

16   because obviously, you could have moved closer to the

17   chain-link fence and closer to the side.   Would you at

18   least agree that was a possibility?

19        MS. ANDERSEN:   I'll object vague and ambiguous

20   as to time.

21   BY MR. GALIPO:

22        Q.   Before the shooting.

23        A.   No, it's not something that's practical,

24   because now I remove an avenue or an area.   In terms of

25   mobility, if I'm pressed up against a chain-link fence,

1    Q.    Okay.    And just so we're clear, because I don't

2    want to misstate the record, would you agree -- and I'm

3    reading from your statement, page 57, line 5.    You

4    stated:    "As the vehicle was idling and the brake lights

5    were on."

6            Do you recall saying that in your statement?

7    A.    Yes.

8    Q.    And obviously, that was before Mr. Barber got

9    in the vehicle?

10    A.    Yes.

11    Q.    And so you were aware that he could potentially

12    try to leave, is that fair, as one possibility?

13    A.    Yes.

14    Q.    And so I think you've answered this, but if I'm

15    understanding you correctly, the reason you positioned

16    yourself behind the vehicle as opposed to the side of

17    the vehicle, is to have some cover, but also to be in a

18    better position of mobility?

19    A.    Yes.    And that goes along with my observations

20    of Mr. Barber ignored my commands, reaching inside of

21    his vehicle when told not do so.    Given the fact that

22    I'm investigating a crime where he's been, you know,

23    mentioned as a potential suspect, yeah, all those

24    factors do come into play.    I would hate to stand out in

25    the open and be shot.

1      Q.   But it sounds like one of the reasons why you

2    didn't call for backup is because you didn't have enough

3    specifics as to him actually having a weapon?

4      A.   Not necessarily.  As I -- as I stated, it's

5    discretionary.  It's up to the individual deputy or

6    officer to determine what resources they need.  My plan

7    of action was to simply speak with Mr. Barber and have

8    him tell me his version of what occurred.

9      Q.   Okay.  Now, in this portion of your

10   statement -- I'm at the bottom of page 61, you're

11   saying -- and I guess you're marking -- when Barber gets

12   in the car, you're 8 feet north of the vehicle -- 8 feet

13   north of the back of the vehicle.

14        Do you recall saying that in your initial

15   interview?

16     A.   Yes.

17        MR. GALIPO:  And could we show Exhibit 2 again,

18   Renee?

19        MS. MASONGSONG:  Yes, sure.  Let me get that

20   up.

21   BY MR. GALIPO:

22     Q.   Can you see that on your screen?

23     A.   Yes.

24     Q.   Do you -- just from looking at this, do you

25   have an estimate as to how far your flashlight is to the

```
 1   10 on it.  Do you want to just make it 10, Renee?

 2              MS. MASONGSONG:  Okay.  Sounds good.

 3              (Exhibit Number 10 was marked.)

 4              MR. GALIPO:  Can we make it a little bigger,

 5   just so we can see that?  There's other stuff I'm seeing

 6   on the left.

 7   BY MR. GALIPO:

 8        Q.   In any event, this has drawings on it about

 9    your flashlight and footprint and bullet casings.  But

10    is the area on the right that opening that you've been

11    discussing?

12        A.   Yes.

13        Q.   And are you saying you did go in that area

14    after the shooting?

15        A.   Yes.

16        Q.   And part of the reason was to have some cover?

17        A.   That is correct -- or I'm sorry -- concealment.

18    And then that was the direction of travel we used to

19    extract Mr. Barber.

20        Q.   Okay.  I guess what I'm wondering, are you

21    saying that if you were in that area, that that would

22    not provide any cover or concealment?

23        A.   It wouldn't provide any cover.

24              So, for example, concealment, you know, I'm out

25    of sight.  I can kind of hide myself, but it doesn't
```

1        A.    No.

2        Q.    Okay.  Lastly, I just want to ask you about --

3    a little about your training with deadly force.  We

4    talked about the part about shooting at moving vehicles.

5            But first of all, it's your understanding that

6    deadly force is the highest level of force an officer

7    can use?

8        A.    Correct.  Yes.

9        Q.    And is it your understanding, based on your

10   training, if you're shooting center mass on a suspect,

11   that there's a probability of causing serious injury or

12   death?

13       A.    It's a possibility, yes.

14       Q.    Are you trained that deadly force should only

15   be used when the person has the ability, opportunity,

16   and apparent intent to immediately cause death or

17   serious bodily injury?

18       A.    No.  It's -- it's mainly based off of the

19   totality of the -- the circumstances, and you have to

20   look at that from a reasonable standpoint.  But it's

21   mainly based off of the totality and all of the facts

22   that are presented.

23       Q.    Were you trained in the academy that deadly

24   force should only be used if there's an immediate threat

25   of death or serious bodily injury?

1      A.    No.

2      Q.    Were you trained that you should only use

3   deadly force when there are no other reasonable options?

4      A.    No.    Once again, it's based off the totality.

5   We have other options, such as de-escalation, that we

6   try to utilize to reduce a violent outcome.

7      Q.    Were you trained to give a verbal warning

8   before using deadly force, when feasible?

9      A.    No.

10     Q.    Were you trained that you have to justify each

11  of your shots when using deadly force?

12     A.    Yes.

13     Q.    Were you trained that a weapon in someone's

14  hands, such as a gun, is not enough, in and of itself,

15  to use deadly force?

16     A.    That is correct.    Yes.

17     Q.    Were you trained that you should consider your

18  background or backdrop in using deadly force?

19     A.    Yes.

20     Q.    Do you know what your background or backdrop

21  was, beyond the vehicle in this case?

22     A.    The small south portion of the yard, followed

23  by an open field.

24     Q.    So do you kind of keep updated on deadly force

25  policies?

1    A.   Yes.  For any policy changes of any sort, our

2    training division sends out electronic learning material

3    for us to review; so, yes.

4    Q.   Okay.  Are you aware that the current Learning

5    Domain has been, for several years, says that there has

6    to be the ability, opportunity, and apparent intent to

7    immediately cause death or serious bodily injury?  And

8    that comes right out of the revised Penal Code Section

9    835(a)?

10   A.   Yes.

11   Q.   So I just -- because I asked you that before.

12   Is that part of your training?

13   A.   Yes.

14        MR. GALIPO:  Okay.  I think that's all the

15   questions I have.

16        Kayleigh, I don't know whether you have any

17   questions of your client today?

18        MS. ANDERSEN:  I have a couple clarifying

19   questions.

20        MR. GALIPO:  Sure.

21        MS. ANDERSEN:  Okay.

22                    EXAMINATION

23   MS. ANDERSEN:

24   Q.   When you estimate you were about 8 to 10 feet

25    from the rear of the vehicle at the time you fired your

1    first shot, are you estimating the distance from the

2    open hatch or the rear bumper?

3        A.    The open hatch.

4        Q.    What is the approximate distance from where you

5    were when you fired your first shot to the end of the

6    driveway, where it meets the main road?

7        A.    Roughly, about 60 feet.

8        Q.    Do you know whether that flashlight -- and I

9    forget which exhibit it's in, in the photograph.

10            MR. GALIPO:    Exhibit 2.

11            MS. ANDERSEN:    Thank you.

12    MS. ANDERSEN:

13        Q.    The flashlight that was depicted in Exhibit 2,

14    do you know whether that was moved after you dropped it?

15        A.    Yes.  Once the available resources were present

16    and medical services, there was personnel from AMR who

17    picked up the flashlight and asked who it belonged to,

18    and he was instructed to leave it where it was at.

19        Q.    But you saw him pick it up?

20        A.    Yes.

21        Q.    Do you know whether any of the bullet casings

22    that were depicted in the last exhibit, which may have

23    been 10 -- do you know if any of those were kicked or

24    moved before the casings were photographed?

25        A.    Yes.  There were medical personnel walking in

1    that area, along with the gurney and other deputies that

2    arrived.

3        Q.    And then to get to that opening in the fence to

4    the west of you, immediately before you fired your

5    shots, would you have had to move closer to the vehicle

6    to the south of you?

7        A.    Yes.

8            MS. ANDERSEN:  Okay.  Those are the clarifying

9    questions I had.  Thank you.

10           MR. GALIPO:  Okay.  You're welcome.  I just had

11   some follow-up on a few of those.

12                    FURTHER EXAMINATION

13   BY MR. GALIPO:

14       Q.    The flashlight, am I understanding you

15   correctly that the person that picked it up was told to

16   put it back in its place?

17       A.    That's what I heard, yes.  Uh-huh.

18       Q.    Did you see the person do that?

19       A.    I only saw them pick it up.

20       Q.    The casings, did you actually see any casings

21   being moved?

22       A.    No.  I just saw the fire personnel and other

23   deputies walk along that path line of where those

24   casings were.

25       Q.    Don't law enforcement normally have training



Exhibit

1

8-26-2025 C.ALFRED



Exhibit

2

8-26-2025 C.ALFRED







Exhibit

5

8-26-2025 C.ALFRED





Exhibit

7

8-26-2025 C.ALFRED



Exhibit

8

8-26-2025 C.ALFRED



Exhibit 10
8-28-2026 C.ALFRED

SCENE PHOTOGRAPHS

Bullet casings

Bullet casings

Alfred's flashlight

Left footprints

Looking South on 12015 White Ave Driveway

D.O.L.: 04/27/2021