1  RODNEY S. DIGGS, Esq. (SBN 274459)
Email: RDiggs@imwlaw.com
2  IVIE MCNEILL WYATT PURCELL & DIGGS
444 South Flower Street, Suite 3200
3  Los Angeles, California 90071
Tel:   (213) 489-0028
4  Fax:   (213) 489-0552

5  LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
6  dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
7  rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
8  Woodland Hills, CA 91367
Tel:   (818) 347-3333
9  Fax:   (818) 347-4118

10  Attorneys for Plaintiff STEFFON BARBER

11

12                 **UNITED STATES DISTRICT COURT**

13                 **CENTRAL DISTRICT OF CALIFORNIA**

14

15  STEFFON BARBER, an individual,          Case No. 5:22-cv-00625-KK-DTB
                                            Assigned to:
16              Plaintiff,                  District Judge Kenly Kiya Kato
                                            Magistrate Judge, David T. Bristow
17       vs.
                                            **PLAINTIFF'S RESPONSIVE**
18                                          **STATEMENT OF GENUINE**
                                            **DISPUTES OF MATERIAL FACTS**
19  COUNTY OF SAN BERNARDINO and            **AND ADDITIONAL MATERIAL**
    CHRISTOPHER ALFRED,                     **FACTS IN OPPOSITION TO**
20                                          **DEFENDANTS' MOTION FOR**
                                            **SUMMARY JUDGMENT**
21              Defendants.
                                            Date:       11/13/2025
22                                          Time:       9:30 a.m.
                                            Crtrm:      3
23
                                            *[Memorandum of Points and*
24                                          *Authorities in opposition to Defendants'*
                                            *motion for summary judgment;*
25                                          *Declaration of Renee V. Masongsong*
                                            *and Exhibits thereto; Declaration of*
26                                          *Scott DeFoe; Declaration of Robert*
                                            *Morales filed concurrently herewith]*
27

28

---

**TO THE HONORABLE COURT AND DEFENDANTS, COUNTY OF SAN BERNARDINO AND CHRISTOPHER ALFRED THROUGH THEIR ATTORNEYS OF RECORD:**

Pursuant to Local Rule 56-2 and the Court's Civil Standing Order, Plaintiff respectfully submits this Responsive Statement of Genuine Disputes of Material Facts and Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment.

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| 1. At approximately 11:12 pm, the San Bernardino County Sheriff's Dispatch Department ("Dispatch") received a call from Maria Gallo ("Ms. Gallo") and Joseph Cocchi ("Mr. Cocchi.") in Adelanto.<br><br>Ex. B.<br>Ex. D, p. 1 (23:12:53) | Undisputed. |
| 2. Ms. Gallo stated that their neighbor is "going crazy" and wouldn't let them enter their residence. She said the neighbor was asking her to take him somewhere. She was trying to park in her driveway and he keeps trying to open her doors.<br><br>Ex. A at p. 32:4-7, 14-17<br>Ex. B at 00:23-00:39; 02:47-02:51 | Objections: Hearsay (Federal Rules of Evidence ("FRE") 801, 802); Relevance (FRE 401, 402); FRE 403.<br><br>Otherwise, undisputed. |
| 3. Ms. Gallo stated that the neighbor lived on the same property but behind them at 12013.<br><br>Ex. B at 00:53-01:08 | Objection: Hearsay (FRE 801, 802).<br><br>Otherwise, undisputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| 4. Ms. Gallo provided a description of Plaintiff as a black male, last seen wearing a white t-shirt and jeans.<br><br>Ex. A at p. 34:14-21<br>Ex. B at 01:18-01:46 | Undisputed. |
| 5. Ms. Gallo then stated that he was taking things out of the vehicle.<br><br>Ex. B at 01:58-2:00 | Objections: Hearsay (FRE 801, 802). Relevance (FRE 401, 402); vague and ambiguous.<br><br>Otherwise, undisputed. |
| 6. Ms. Gallo stated that she believe he was possibly under the influence of alcoholic beverages and/or drugs.<br><br>Ex. B at 02:27-02:30 | Objections: Hearsay (FRE 801, 802); Relevance (FRE 401, 402); FRE 403; calls for speculation.<br><br>Disputed to the extent that Deputy Alfred did not have any information that Mr. Barber was under the influence of drugs or alcohol.<br>"Exhibit 1" (Alfred Depo) to the Declaration of Renee V. Masongsong at 31:23-25. |
| 7. Ms. Gallo reported that Plaintiff had a black Chevy Trailblazer.<br><br>Ex. B at 03:30-03:37 | Undisputed. |
| 8. Dispatch transmitted the report over the air that Plaintiff was not letting Ms. Gallo and Mr. Cocchi enter their residence and that Plaintiff lives behind Ms. Gallo and Mr. Cocchi.<br><br>Ex. D at p. 1 (23:12:53-23:13:58)<br>Ex. E (00:15-00:30) | Objections: Hearsay (FRE 801, 802); Relevance (FRE 401, 402); FRE 403.<br><br>Otherwise, undisputed. |
| 9. Deputy Alfred copied.<br><br>Ex. D at p. 1 (23:14:25; 2316:01) | Undisputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| Ex. E (00:34) | |
| 10. Dispatch transmitted over the air that Plaintiff lives behind the reporting parties and the neighbor was wearing white shirt and jeans.<br><br>Ex. D at p. 1 (23:14:46)<br>Ex. E (00:58-1:08) | Objections: Vague and ambiguous as to who was wearing the white shirt and jeans.<br><br>Otherwise, undisputed. |
| 11. Dispatch also transmitted over the air that Plaintiff was possibly intoxicated.<br><br>Ex. D at p. 1 (23:15:38) | Objections: Hearsay (FRE 801, 802); Relevance (FRE 401, 402); FRE 403; calls for speculation.<br><br>Disputed to the extent that Deputy Alfred did not have any information that Mr. Barber was under the influence of drugs or alcohol.<br>"Exhibit 1" (Alfred Depo) at 31:23-25. |
| 12. Shortly after 11:19 pm, Deputy Christopher Alfred arrived on the scene. He was the first to arrive and he was the only deputy to arrive<br><br>Ex. C at 00:27<br>Ex. D at p. 2 (23:19:45)<br>Ex. E at 02:39 | Objections: Vague and ambiguous.<br><br>Otherwise, undisputed that Deputy Alfred was the only deputy on scene at the time of the shooting. |
| 13. Ms. Gallo and Mr. Cocchi who advised him that Plaintiff was threatening them and slamming his hands on the car, striking the hood of their vehicle.<br><br>Ex. A at p. 31:6-11<br>Ex. C at 01:13-01:25; 02:14-02:15 | Objections: Hearsay (FRE 801, 802); Relevance (FRE 401, 402); FRE 403.<br><br>Undisputed. |
| 14. Mr. Cocchi told Deputy Alfred that it was our neighbor behind us. | Objection: Hearsay (FRE 801, 802).<br><br>Undisputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| Ex. C at 00:30-00:32 | |
| 15. Mr. Cocchi stated that Plaintiff might have a gun but did not see one.<br><br>Ex. A at p. 31:9-15<br>Ex. C at 01:35-02:08 | Objection: Hearsay (FRE 801, 802); Relevance (FRE 401, 402); calls for speculation; FRE 403.<br><br>Disputed to the extent that:<br><br>The reporting party did not report that they saw Mr. Barber with a weapon or that Mr. Barber said he had a weapon. "Exhibit 1" (Alfred Depo) at 31:12-18.<br><br>Deputy Alfred never saw a gun or other weapon either on Mr. Barber or in the Trailblazer at any time. "Exhibit 1" (Alfred Depo) at 13:7-18.<br><br>Based on Deputy Alfred's experience, a reporting party might state that a person has a gun in order to expedite law enforcement response, and then it often turns out that the person did not have a gun. "Exhibit 1" (Alfred Depo) at 34:1-7. |
| 16. Mr. Cocchi told Deputy Alfred that they were scared.<br><br>Ex. C at 02:33 | Objections: Hearsay (FRE 801, 802); Relevance (FRE 401, 402).<br><br>Undisputed. |
| 17. Deputy Alfred believed that Ms. Gallo and Mr. Cocchi feared for their safety.<br><br>Ex. A at p. 31:8 | Objection: Relevance (FRE 401, 402) to the extent that this is not the standard for using deadly force. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | |
| 18. Deputy Alfred walked up the driveway to talk to Mr. Plaintiff.<br><br>Ex. A at p. 35:6-8.<br>Ec. C at 02:34-02:40 | Undisputed. |
| 19. The surface of the driveway was gravel and dirt.<br><br>Ex. A at p. 17:25-18:2; 58:1-3<br>Exhibits 2-3, 8 to the Ex. 1 | Disputed to the extent that the Trailblazer was parked on a low-friction surface consisting of dirt and gravel. Morales Decl. at ¶ 10.<br><br>The Trailblazer could not have moved as soon as the accelerator was engaged because the rear tires experienced a loss of traction, and the front tires had to overcome static friction. The surface composition created a mechanical limitation that prevented rapid acceleration and restricted maximum achievable speeds, regardless of accelerator input. Morales Decl. at ¶ 10. |
| 20. The driveway was a shared driveway between Ms. Gallo and Mr. Plaintiff.<br><br>Ex. A at p. 32:9-10 | Undisputed. |
| 21. The driveway was narrow, equivalent to about one length of a car lane.<br><br>Ex. A at p. 19:20-23;<br>Exhibits 2-3, 8 to the Ex. 1. | Disputed.<br><br>Deputy Alfred had ample time and room to move out of the path of the Trailblazer. Morales Decl. at ¶ 7.<br><br>The driveway width was approximately 15 feet and 7 inches at the north end and 13 feet, 8 inches at the south end. DeFoe Decl. at ¶ 9(e); Morales Decl. at |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
|  | ¶ 7.<br><br>After the shooting, the left-front tire of the Trailblazer was located approximately 8 feet west of the chain-link fence, and the left-rear tire was positioned about 6 feet west of the same fence.<br>Morales Decl. at ¶ 9. |
| 22. In order to leave out of the driveway you have to reverse because it's one way in and one way out.<br><br>Ex. A at p. 49:21-50-2;<br>Exhibits 2-5 to Ex. A. | Undisputed. |
| 23. In order to leave out of the driveway you have to reverse because it's one way in and one way out.<br><br>Ex. A at p. 14:11-19 | Undisputed. |
| 24. On one side of the driveway, to the left (the east side) was a chain-link fence. On the other side of the driveway (the west side) was a picket fence.<br><br>Ex. A at p. 48:5-13; 58:6-11;<br>Exhibits 3, 4 | Disputed to the extent that there was an opening, three to four feet from the stucco on the west side.<br>Ex. A at p. 53:11-14. |
| 25. Alfred used a flashlight, light source illuminated between the ground and him.<br><br>Ex. A at p: 15:1-11 | Undisputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| 26. The colors of the uniform of the San Bernardino County Sheriff's Department are a tan top and green pants.<br><br>Ex. A at p. 56:16-57:12; Exhibit 1 to Ex. A Ex. G at p. 39:24-40: | Undisputed. |
| 27. Deputy Alfred dropped the face covering towards his neck.<br><br>Ex. A at pp. 56:25-57:12; Exhibit 1 to the Ex. A. | Undisputed that this is Alfred's testimony. |
| 28. Plaintiff's vehicle was parked in the driveway and the front was faced south.<br><br>Ex. A at p. 17:17-21; Exhibit 2 to Ex. 1 | Undisputed. |
| 29. The cargo hatch was open.<br><br>Ex. A at p. 58:15-59:2, Exhibit 2 to Ex. A Ex. G at p. 46:14-19 | Undisputed. |
| 30. Deputy Alfred stood approximately 10 feet from the back of Plaintiff's vehicle. on the north side of Plaintiff's vehicle when he started giving commands to Plaintiff.<br><br>Ex. A at p. 72:1-7; 35:15-24 | Disputed.<br><br>At the time of the first shot, Deputy Alfred was approximately 51 feet to the rear of the Trailblazer. Morales Decl. at ¶ 16.<br><br>At the time of the last shot, Deputy Alfred was approximately 21 feet to the rear of the Trailblazer. Morales Decl. at ¶ 16. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| 31. Deputy Alfred stayed behind the Trail Blazer because in the event of fire fight or an exchange in gunfire, Plaintiff's vehicle could serve as a barrier.<br><br>Ex. A at p. 72:1-9. | Disputed that a reasonable police officer would have employed these tactics.<br><br>After seeing the reverse lights come on, Deputy Alfred failed to step out of the way.<br>"Exhibit 1" (Alfred Depo) at 41:1-3, 49:8-50:2.<br><br>Deputy Alfred did not attempt to move out of the way to the left or to the right before he fired the shots.<br>"Exhibit 1" (Alfred Depo) at 48:2-5.<br><br>A reasonable officer in Deputy Alfred's position would have immediately moved to a position of cover and formulated an effective and safe tactical plan.<br>DeFoe Decl. at ¶ 10(c).<br><br>At the time of this incident, Deputy Alfred had been trained not to tactically position himself in a bad spot, if he can avoid it, with respect to moving vehicles.<br>"Exhibit 1" (Alfred Depo) at 11:17-22.<br><br>The reporting party did not report that they saw Mr. Barber with a weapon or that Mr. Barber said he had a weapon.<br>"Exhibit 1" (Alfred Depo) at 31:12-18. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | Deputy Alfred never saw a gun or other weapon either on Mr. Barber or in the Trailblazer at any time. "Exhibit 1" (Alfred Depo) at 13:7-18.<br><br>Based on Deputy Alfred's experience, a reporting party might state that a person has a gun in order to expedite law enforcement response, and then it often turns out that the person did not have a gun. "Exhibit 1" (Alfred Depo) at 34:1-7. |
| 32. To the left (east) was the chain-link fence approximately three to four feet away.<br><br>Ex. A at p. 17:22-24; 21:8-11 | Objection: Vague and ambiguous.<br><br>Otherwise, undisputed that there was approximately four feet of room on the left side of the Trailblazer. |
| 33. To the right (west) was the wall of the residence, approximately three to four feet away.<br><br>Ex. A at p. 20:17-25; 21:1-4 | Objection: vague and ambiguous. Otherwise, undisputed that there was approximately four feet of room on the right side of the Trailblazer. |
| 34. Deputy Alfred gave Plaintiff verbal commands. Multiple times, he told Plaintiff to come towards him and to display his hands.<br><br>Ex. A at p. 37:10-38:12; 39:4-10.<br>Ex. C at 02:39-03:02<br>Ex. G at p. 43:2-5; 14-17 | Disputed to the extent that when Deputy Alfred was attempting to contact Mr. Barber in his driveway prior to the shooting, Mr. Barber could not see Deputy Alfred. "Exhibit 2" (Barber Depo) to the Declaration of Renee V. Masongsong at 42:6-43:9, 48:13-19.<br><br>Prior to the shooting, Deputy Alfred did not identify himself as a police officer. "Exhibit 1" (Alfred Depo) at 38:20-22.<br><br>Mr. Barber heard a voice but did not see |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | anyone in the driveway. "Exhibit 2" (Barber Depo) at 44:19-45:5.<br><br>When Mr. Barber heard Deputy Alfred's voice, he thought it was his neighbor speaking. "Exhibit 2" (Barber Depo) at 35:10-20. |
| 35. Plaintiff did not comply and instead told Deputy Alfred to show his hands to Plaintiff and then told Deputy Alfred to "back up."<br><br>Ex. A at p. 39:8-10.<br>Ex. C at 03:02-03:03<br>Ex. G at p. 43:3-5 | Disputed to the extent that when Deputy Alfred was attempting to contact Mr. Barber in his driveway prior to the shooting, Mr. Barber could not see Deputy Alfred. "Exhibit 2" (Barber Depo) at 42:6-43:9, 48:13-19.<br><br>Prior to the shooting, Deputy Alfred did not identify himself as a police officer. "Exhibit 1" (Alfred Depo) at 38:20-22.<br><br>Mr. Barber heard a voice but did not see anyone in the driveway. "Exhibit 2" (Barber Depo) at 44:19-45:5.<br><br>When Mr. Barber heard Deputy Alfred's voice, he thought it was his neighbor speaking. "Exhibit 2" (Barber Depo) at 35:10-20. |
| 36. Plaintiff also heard Deputy Alfred say "Don't reach into your vehicle" and then Plaintiff intentionally reached into his vehicle.<br><br>Ex. G at p. 44 | Disputed to the extent that when Deputy Alfred was attempting to contact Mr. Barber in his driveway prior to the shooting, Mr. Barber could not see Deputy Alfred. "Exhibit 2" (Barber Depo) at 42:6-43:9, 48:13-19. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | Prior to the shooting, Deputy Alfred did not identify himself as a police officer. "Exhibit 1" (Alfred Depo) at 38:20-22. Mr. Barber heard a voice but did not see anyone in the driveway. "Exhibit 2" (Barber Depo) at 44:19-45:5. When Mr. Barber heard Deputy Alfred's voice, he thought it was his neighbor speaking. "Exhibit 2" (Barber Depo) at 35:10-20. |
| 37. At approximately 11:22, Deputy Alfred called out over the radio that Plaintiff was not complying with his commands. Ex. C at 03:04-03:08 Ex. D at p. 2 (23:22:31) | Disputed to the extent that when Deputy Alfred was attempting to contact Mr. Barber in his driveway prior to the shooting, Mr. Barber could not see Deputy Alfred. "Exhibit 2" (Barber Depo) at 42:6-43:9, 48:13-19. Prior to the shooting, Deputy Alfred did not identify himself as a police officer. "Exhibit 1" (Alfred Depo) at 38:20-22. Mr. Barber heard a voice but did not see anyone in the driveway. "Exhibit 2" (Barber Depo) at 44:19-45:5. When Mr. Barber heard Deputy Alfred's voice, he thought it was his neighbor speaking. "Exhibit 2" (Barber Depo) at 35:10-20. |
| 38. Deputy Alfred ordered Plaintiff not to enter his vehicle and told him to come towards him. | Disputed to the extent that when Deputy Alfred was attempting to contact Mr. Barber in his driveway prior to the |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| Ex. C at 03:09-03:11<br>Ex. G at p. 43:14-15; 50:18-51:2 | shooting, Mr. Barber could not see Deputy Alfred.<br>"Exhibit 2" (Barber Depo) at 42:6-43:9, 48:13-19.<br><br>Prior to the shooting, Deputy Alfred did not identify himself as a police officer. "Exhibit 1" (Alfred Depo) at 38:20-22.<br><br>Mr. Barber heard a voice but did not see anyone in the driveway.<br>"Exhibit 2" (Barber Depo) at 44:19-45:5.<br><br>When Mr. Barber heard Deputy Alfred's voice, he thought it was his neighbor speaking. "Exhibit 2" (Barber Depo) at 35:10-20. |
| 39. The vehicle was on and idling when Plaintiff got into the car.<br><br>Ex. A at 67:8-10; 71:21-23; 74:1-10<br>Ex. G at p. 46:21-47:3 | Undisputed. |
| 40. Deputy Alfred was still about 10 feet from the back of the vehicle.<br><br>Ex. A at p. 40:23-25. | Disputed.<br><br>At the time of the first shot, Deputy Alfred was approximately 51 feet to the rear of the Trailblazer.<br>Morales Decl. at ¶ 16.<br><br>At the time of the last shot, Deputy Alfred was approximately 21 feet to the rear of the Trailblazer.<br>Morales Decl. at ¶ 16. |
| 41. Deputy Alfred believed that Plaintiff's purpose of getting into the | Disputed that a reasonable police officer would have employed these tactics. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| car was to leave.<br><br>Ex. A at p. 40:10-14; 49:14-16. | After seeing the reverse lights come on, Deputy Alfred failed to step out of the way.<br>"Exhibit 1" (Alfred Depo) at 41:1-3, 49:8-50:2.<br><br>Deputy Alfred did not attempt to move out of the way to the left or to the right before he fired the shots.<br>"Exhibit 1" (Alfred Depo) at 48:2-5.<br><br>At the time of this incident, Deputy Alfred had been trained not to tactically position himself in a bad spot, if he can avoid it, with respect to moving vehicles.<br>"Exhibit 1" (Alfred Depo) at 11:17-22.<br><br>A reasonable officer in Deputy Alfred's position would have moved to a position of cover and formulated an effective and safe tactical plan.<br>DeFoe Decl. at ¶ 10(c). |
| 42. Deputy Alfred observed the reverse lights of Plaintiff's vehicle come on.<br><br>Ex. A at p. 40:20-22<br>Ex. G at p. 47:4-8 | Disputed that a reasonable police officer would have employed these tactics.<br><br>After seeing the reverse lights come on, Deputy Alfred failed to step out of the way.<br>"Exhibit 1" (Alfred Depo) at 41:1-3, 49:8-50:2.<br><br>Deputy Alfred did not attempt to move out of the way to the left or to the right |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | before he fired the shots. "Exhibit 1" (Alfred Depo) at 48:2-5. A reasonable officer in Deputy Alfred's position would have immediately moved to a position of cover and formulated an effective and safe tactical plan. DeFoe Decl. at ¶ 10(c). At the time of this incident, Deputy Alfred had been trained not to tactically position himself in a bad spot, if he can avoid it, with respect to moving vehicles. "Exhibit 1" (Alfred Depo) at 11:17-22. Deputy Alfred had ample time and room to move out of the path of the Trailblazer. Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9. |
| 43. Deputy Alfred had no immediate indication that the vehicle would reverse until Plaintiff entered it and the reverse lights came on. Ex. A at p. 49:4-7 | Disputed. Defendants' Fact No. 41. Ms. Gallo stated that Mr. Barber was asking her to take him somewhere, presumably because he wanted to leave. Ex. A at p. 32:4-7, 14-17 Ex. B at 00:23-00:39; 02:47-02:51 Disputed that a reasonable police officer would have employed these tactics. After seeing the reverse lights come on, |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | Deputy Alfred failed to step out of the way. "Exhibit 1" (Alfred Depo) at 41:1-3, 49:8-50:2. |
| | Deputy Alfred did not attempt to move out of the way to the left or to the right before he fired the shots. "Exhibit 1" (Alfred Depo) at 48:2-5. |
| | A reasonable officer in Deputy Alfred's position would have immediately moved to a position of cover and formulated an effective and safe tactical plan. DeFoe Decl. at ¶ 10(c). |
| | At the time of this incident, Deputy Alfred had been trained not to tactically position himself in a bad spot, if he can avoid it, with respect to moving vehicles. "Exhibit 1" (Alfred Depo) at 11:17-22. |
| | Deputy Alfred had ample time and room to stay out of the path of the Trailblazer. Morales Decl. at ¶ 7. |
| 44. The engine of the vehicle revved and then the car started moving in reverse.   Ex. A at p. 49. Ex. C: 03:13-03:14 Ex. G at p. 47:4-15; 48:17-22 | Objection: vague and ambiguous as to "revved."   Disputed to the extent that the Trailblazer was parked on a low-friction surface consisting of dirt and gravel. The surface conditions reveals a mixed composition driving surface that significantly impacted vehicle traction capabilities. Morales Decl. at ¶ 10. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | The Trailblazer could not have moved as soon as the accelerator was engaged because the rear tires experienced a loss of traction, and the front tires had to overcome static friction. The surface composition created a mechanical limitation that prevented rapid acceleration and restricted maximum achievable speeds, regardless of accelerator input. Morales Decl. at ¶ 10.<br><br>Disputed to the extent that The Trailblazer was either not in motion when Deputy Alfred started firing his shots or was moving at a slow speed of under 1 mile per hour. At the time of the first shot, the Trailblazer had moved backwards less than one foot. At the time of the second shot, the vehicle still had not traveled backwards more than one foot. At the time of the last shot, the vehicle had started decelerating and was moving at approximately under 1 mile per hour before coming to rest. Morales Decl. at ¶ 11. |
| 45. Deputy Alfred called out over the radio that Plaintiff was trying to reverse.<br><br>Ex. C at 03:13-03:15 | Undisputed. |
| 46. The tires gained traction on the hard packed dirt.<br><br>Ex. 2 to Ex. A.<br>Ex. C at 03:14:82- 03:16:277 | Disputed.<br><br>The Trailblazer was parked on a low-friction surface consisting of dirt and gravel. The surface conditions reveals a |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | mixed composition driving surface that significantly impacted vehicle traction capabilities. Morales Decl. at ¶ 10. |
| | The Trailblazer could not have moved as soon as the accelerator was engaged because the rear tires experienced a loss of traction, and the front tires had to overcome static friction. The surface composition created a mechanical limitation that prevented rapid acceleration and restricted maximum achievable speeds, regardless of accelerator input. Morales Decl. at ¶ 10. |
| | Disputed to the extent that The Trailblazer was either not in motion when Deputy Alfred started firing his shots or was moving at a slow speed of under 1 mile per hour. At the time of the first shot, the Trailblazer had moved backwards less than one foot. At the time of the second shot, the vehicle still had not traveled backwards more than one foot. At the time of the last shot, the vehicle had started decelerating and was moving at approximately under 1 mile per hour before coming to rest. Morales Decl. at ¶ 11. |
| 47. Deputy Alfred believed that Plaintiff's intention in reversing the vehicle was to harm him.<br><br>Ex. A at p. 49:14-20 | Disputed that a reasonable police officer would have formed this belief.<br><br>Deputy Alfred had ample time and room to move out of the path of the Trailblazer. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9. |
| | Disputed to the extent that the Trailblazer was parked on a low-friction surface consisting of dirt and gravel. The surface conditions reveals a mixed composition driving surface that significantly impacted vehicle traction capabilities. Morales Decl. at ¶ 10. |
| | The Trailblazer could not have moved as soon as the accelerator was engaged because the rear tires experienced a loss of traction, and the front tires had to overcome static friction. The surface composition created a mechanical limitation that prevented rapid acceleration and restricted maximum achievable speeds, regardless of accelerator input. Morales Decl. at ¶ 10. |
| | When Mr. Barber's vehicle rolled backwards, it moved in a straight line. The resting position of the vehicle after the incident shows that the wheels are straight, meaning that Mr. Barber never changed the direction of the vehicle. Morales Decl. at ¶ 13. |
| | Disputed to the extent that The Trailblazer was either not in motion when Deputy Alfred started firing his shots or was moving at a slow speed of under 1 mile per hour. At the time of the first shot, the Trailblazer had moved |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | backwards less than one foot. At the time of the second shot, the vehicle still had not traveled backwards more than one foot. At the time of the last shot, the vehicle had started decelerating and was moving at approximately under 1 mile per hour before coming to rest. Morales Decl. at ¶ 11.<br><br>The significance of the vehicle's maximum speed of 3.4 miles per hour becomes apparent when compared to normal human locomotion speeds. Based on standard biomechanical data, the average human walking speed ranges from 3.0 to 3.5 miles per hour, meaning the vehicle's maximum speed was equivalent to or slightly faster than a person walking at normal pace. This comparison is technically relevant because it demonstrates that any individual in the vehicle's path would have had ample opportunity to move out of the way, given that the vehicle was not traveling faster than a human could walk. Morales Decl. at ¶ 14. |
| 48. A couple of feet ahead of Deputy Alfred was an opening, three to four feet from the stucco on the west side.<br><br>Ex. A at p. 53:11-14. | Objections: vague and ambiguous as to time.<br><br>Disputed.<br><br>Deputy Alfred had ample time and room to move out of the path of the Trailblazer. Morales Decl. at ¶ 7.<br><br>At the time of the first shot, Deputy |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | Alfred was approximately 51 feet to the rear of the Trailblazer. Morales Decl. at ¶ 16.<br><br>At the time of the last shot, Deputy Alfred was approximately 21 feet to the rear of the Trailblazer. Morales Decl. at ¶ 16. |
| 49. In order to get to the opening on the west side to him, Alfred would have had to move closer to the car.<br><br>Ex. A at p. 60:7-16; 93:3-7; Exhibit 4 to Ex. A | Objection: vague and ambiguous.<br><br>Disputed.<br><br>Deputy Alfred had ample time and room to move out of the path of the Trailblazer. Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9.<br><br>At the time of the first shot, Deputy Alfred was approximately 51 feet to the rear of the Trailblazer. Morales Decl. at ¶ 16.<br><br>At the time of the last shot, Deputy Alfred was approximately 21 feet to the rear of the Trailblazer. Morales Decl. at ¶ 16. |
| 50. Deputy Alfred fired six shots at Plaintiff.<br><br>Ex. A at p. 7:11-12; 13:5-6<br>Ex. B at 03:47-49<br>Ex. C at 03:16-03:19 | Undisputed. |
| 51. After Deputy Alfred's last shot, the truck moved back approximately one | Disputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| foot and stopped after making contact with an area by the wall to the west.<br><br>Ex. A    at 44:24-45:6; 53:2-4 | After the shooting, Mr. Barber's foot was on the brake pedal.<br>"Exhibit 1" (Alfred Depo) at 53:24-54:3.<br><br>The vehicle came to a stop because Mr. Barber stepped on the brakes. The evidence indicates that Mr. Barber applied the brakes mildly, as opposed to slamming on the brakes. The vehicle gradually decelerated after the brakes were pressed while remaining in reverse gear.<br>Morales Decl. at ¶ 15.<br><br>When the deputies were removing Mr. Barber from the Trailblazer after the shooting, the Trailblazer moved backwards an additional two to three feet.<br>Morales Decl. at ¶ 20. |
| 52. Deputy Alfred called out over the radio that Plaintiff tried to reverse into him and requested medical services.<br><br>Ex. B at 03:37<br>Ex. C at 23:22:44 | Undisputed that this is Alfred's testimony. |
| 53. Plaintiff was injured in the head.<br><br>Ex. A at p. 52:12-13.<br>Ex. G at p. 52:18-22 | Disputed to the extent that Plaintiff was shot in the head. |
| 54. Because the car was in reverse gear, once Plaintiff was extracted from the vehicle for medical services, the vehicle slowly went in reverse because it was in reverse gear and | Undisputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| one of Deputy Alfred's partners placed it park to stop the vehicle from reversing.<br><br>Ex. A at p. 52:18-23; 53:24-54:3<br>Ex. C at 09:27-09:30 | |
| 55. Plaintiff was arrested and booked for PC 245(c), assault with a deadly weapon on a peace officer.<br><br>Ex. F | Disputed to the extent that Mr. Barber was not convicted of this offence. "Ex. I." |
| 56. Plaintiff was charged with the attempted murder of Deputy Alfred and Penal Code section 245(a) and convicted of Penal Code 245(a).<br><br>Ex. H; Ex. K | Disputed to the extent that Mr. Barber was charged with attempted murder of a peace officer, but was unanimously found not guilty by jurors. "Ex. I." |
| 57. Plaintiff sentenced to 14 years.<br><br>Ex. I | Disputed to the extent that Mr. Barber's sentencing included a prior and unrelated probation violation regarding an assault on a peace officer. Mr. Barber was found not guilty on attempted murder and assault on a peace officer as it relates to Deputy Alfred. "Ex. I." |
| 58. Deputy Alfred received training at the San Bernardino County Sheriff's Academy for use of force, including use of deadly force, the policy related to the use of deadly force, and the policy related to shooting at moving vehicles.<br><br>Ex. A, p. 10:2-13:4; 23:23-26:1; 89:14-92:12 | Undisputed. |
| 59. Deputy Alfred has used the firearm | Undisputed. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| in the field before the date of the April 27, 2021 shooting.<br><br>Ex. A, p. 25:25-29:17 | |
| 60. The San Bernardino County Sheriff's Department Manuel provides that "[t]he 'reasonableness' of the force used shall be evaluated from the perspective of a reasonable safety member in the same situation, based on the totality of the circumstances known or perceived by the safety member at the time, rather than with the benefit of hindsight. The totality of the circumstances shall account for occasions when safety members may be forced to make quick judgments about using force, and the amount of force that is necessary, in circumstances that are tense, uncertain and rapidly evolving."<br><br>Ex. L at COSB000672-COSB000673. | Undisputed that this is the County Policy.<br><br>Disputed to the extent that at the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle.<br><br>"Exhibit 1" (Alfred Depo) at 10:14-11:22. |
| 61. The San Bernardino County Sheriff's Department Manuel provides that the evaluation of whether a deputy has used reasonable force shall take into a consideration a number of factors including, but not limited to "behavior of the individual being confronted (as reasonably perceived by [him] at the time"; "[t]he availability of options (what | Undisputed that this is the County Policy.<br><br>Disputed to the extent that at the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle.<br><br>"Exhibit 1" (Alfred Depo) at 10:14-11:22. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| resources are reasonably available to the deputy under the circumstances); "[t]he training and experience of the deputy"; "[t]he potential for injury to citizens, [and himself]"; and "[t]he risk of escape."<br><br>Ex. L at COSB000673-4. | |
| 62. The San Bernardino County Sheriff's Department Manuel provide that "[a]lternatives to force are not required by a member when the member reasonably believes that immediate action must be taken to prevent injury to themselves, another member of public."<br><br>Ex. L at COSB000675. | Undisputed that this is the County Policy.<br><br>Disputed to the extent that at the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle.<br><br>"Exhibit 1" (Alfred Depo) at 10:14-11:22.<br><br>Disputed to the extent that Deputy Alfred had ample time and room to move out of the path of the Trailblazer rather than shooting.<br>Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9. |
| 63. The San Bernardino County Sheriff's Department Manuel provides "[a] safety member may use lethal force to protect himself or others from what he reasonably believes to be an immediate threat of death or serious bodily injury … [or] to accomplish the arrest or prevent the escape of a suspected felon, | Undisputed that this is the County Policy.<br><br>Disputed to the extent that at the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle. |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| when the member has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the deputy of others."<br><br>Ex. L at COSB000676. | "Exhibit 1" (Alfred Depo) at 10:14-11:22.<br><br>Disputed to the extent that Deputy Alfred had ample time and room to move out of the path of the Trailblazer rather than shooting.<br>Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9.<br><br>Disputed to the extent that the time of the shooting, Deputy Alfred had no information that Mr. Barber had ever physically injured anyone.<br>"Exhibit 1" (Alfred Depo) at 30:18-20. |
| 64. The San Bernardino County Sheriff's Department Manuel provides that "[f]irearms should not be discharged from or at a moving vehicle except in exigent circumstances. In these situations, a safety member must have articulable reason(s) for this use of lethal force, which include, but are not limited to … [t]he vehicle is operated in a manner which is likely to result in great bodily injury or death to a safety member or another person, and other reasonable means of defense have been exhausted, or are not available or practical. This may include, if time and circumstances allow, moving out of the path of the vehicle."<br><br>Ex. L at COSB000677-8. | Undisputed that this is the County Policy.<br><br>Disputed to the extent that at the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle.<br><br>"Exhibit 1" (Alfred Depo) at 10:14-11:22.<br><br>Disputed to the extent that police officers are trained that a threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | bodily injury to the peace officer or another person.<br><br>DeFoe Decl. at ¶ 6(c) (citing PC 835a); "Exhibit 1" (Alfred Depo) at 91:4-13.<br><br>Disputed to the extent that police standards instruct that subjective fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed.<br>DeFoe Decl. at ¶ 6(d). |
| 65. Alfred's understanding of training is if feasible, step out of the way, rather than shooting at the vehicle.<br><br>Ex. A at p. 48:20-25 | Disputed to the extent that at the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle.<br>"Exhibit 1" (Alfred Depo) at 10:14-11:22.<br><br>Otherwise, undisputed. |
| 66. Deputy Alfred was approximately 10 to 15 feet behind Plaintiff's vehicle as he fired the shots.<br><br>Ex. A at p. 14:5-7; 15:12-16:1. | Disputed.<br><br>At the time of the first shot, Deputy Alfred was approximately 51 feet to the rear of the Trailblazer.<br>Morales Decl. at ¶ 16.<br><br>At the time of the last shot, Deputy Alfred was approximately 21 feet to the |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| | rear of the Trailblazer.<br>Morales Decl. at ¶ 16.<br><br>Disputed to the extent that Deputy Alfred had ample time and room to move out of the path of the Trailblazer rather than shooting.<br>Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9. |
| 67. Deputy Alfred observed movements consistent with someone who's armed with a firearm.<br><br>Ex. A at p. 13:10 | Objections: Vague as to time.<br><br>Disputed.<br><br>The reporting party did not report that they saw Mr. Barber with a weapon or that Mr. Barber said he had a weapon. "Exhibit 1" (Alfred Depo) at 31:12-18.<br><br>Deputy Alfred never saw a gun or other weapon either on Mr. Barber or in the Trailblazer at any time. "Exhibit 1" (Alfred Depo) at 13:7-18.<br><br>Based on Deputy Alfred's experience, a reporting party might state that a person has a gun in order to expedite law enforcement response, and then it often turns out that the person did not have a gun. "Exhibit 1" (Alfred Depo) at 34:1-7. |
| 68. Plaintiff did not attend therapy or counseling or take any medication for any mental or emotional types of injuries. | Disputed to the extent that there is no evidence that Mr. Barber had the opportunity to attend therapy or counseling or take any medication for any mental or emotional types of |

| DEFENDANTS' UNCONTROVERTED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE |
|---|---|
| Ex. G at 65:1-6; 65:23-66:7 | injuries, given that he was incarcerated after the shooting. |

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

| PLAINTIFF'S ADDITIONAL MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| **Background** | |
| 69. Deputy Alfred had never seen Mr. Barber prior to this incident and had no specific information about him. | "Exhibit 1" (Alfred Depo) at 29:20-24, 30:11-17. |
| 70. At the time of the shooting, Deputy Alfred had no information that Mr. Barber had ever physically injured anyone. | "Exhibit 1" (Alfred Depo) at 30:18-20. |
| 71. The reporting party did not report that they saw Mr. Barber with a weapon or that Mr. Barber said he had a weapon. | "Exhibit 1" (Alfred Depo) at 31:12-18. |
| 72. Deputy Alfred never saw a gun or other weapon either on Mr. Barber or in the Trailblazer at any time. | "Exhibit 1" (Alfred Depo) at 13:7-18. |
| 73. Based on Deputy Alfred's experience, a reporting party might state that a person has a gun in order to expedite law enforcement response, and then it often turns out that the person did not have a gun. | "Exhibit 1" (Alfred Depo) at 34:1-7. |
| 74. Deputy Alfred did not have any information that Mr. Barber was under the influence of drugs or alcohol. | "Exhibit 1" (Alfred Depo) at 31:23-25. |
| 75. Deputy Alfred knew that Mr. Barber was in his own driveway. | "Exhibit 1" (Alfred Depo) at 32:11-17. |
| 76. The driveway width was approximately 15 feet and 7 inches at the north end and 13 feet and 8 inches at the south end. | DeFoe Decl. at ¶ 9(e); Morales Decl. at ¶ 7. |

| | |
|---|---|
| 77. During this incident, Deputy Alfred was armed with a Taser, a police baton, and OC spray. | "Exhibit 1" (Alfred Depo) at 26:17-23. |
| 78. During this incident, Deputy Alfred had a flashlight that provided some illumination. | "Exhibit 1" (Alfred Depo) at 15:1-11. |
| 79. Deputy Alfred was the starting point guard of his varsity high school basketball team. | "Exhibit 1" (Alfred Depo) at 22:11-19. |
| **The Shooting** | |
| 80. When Deputy Alfred was attempting to contact Mr. Barber in his driveway prior to the shooting, Mr. Barber could not see Deputy Alfred. | "Exhibit 2" (Barber Depo) at 42:6-43:9, 48:13-19. |
| 81. Mr. Barber heard a voice but did not see anyone in the driveway. | "Exhibit 2" (Barber Depo) at 42:6-43:8, 44:19-45:5. |
| 82. When Barber heard Deputy Alfred's voice, he thought it was his neighbor speaking. | "Exhibit 2" (Barber Depo) at 35:10-20. |
| 83. Prior to firing his shots, Deputy Alfred formed the impression that Mr. Barber's vehicle was on and that Mr. Barber wanted to leave. | "Exhibit 1" (Alfred Depo) at 36:19-21, 40:10-22, 74:1-13. |
| 84. The Trailblazer was parked on a low-friction surface consisting of dirt and gravel. | Morales Decl. at ¶ 10. |
| 85. The Trailblazer could not have moved as soon as the accelerator was engaged because the rear tires experienced a loss of traction, and the front tires had to overcome static friction. The surface composition created a mechanical limitation that prevented rapid acceleration and restricted maximum achievable | Morales Decl. at ¶ 10. |

| | |
|---|---|
| speeds, regardless of accelerator input. | |
| 86. Deputy Alfred was not struck by any gravel or dirt from the tires prior to the shooting. | "Exhibit 1" (Alfred Depo) at 68: |
| 87. Deputy Alfred intentionally fired six shots at Mr. Barber with the intent of striking him. | "Exhibit 1" (Alfred Depo) at 16:12-19, 17:7-16. |
| 88. At the time of the shooting, it was not the case that any person was about to be run over by the Trailblazer with no opportunity to get out of the way. | DeFoe Decl. at ¶ 9. |
| 89. Deputy Alfred had ample time and room to move out of the path of the Trailblazer rather than shooting. | Morales Decl. at ¶ 7; DeFoe Decl. at ¶ 9. |
| 90. At the time of the shooting, Deputy Alfred had approximately two to four feet between the left side of his body and the chain link fence to his left. | DeFoe Decl. at ¶ 9(f); "Exhibit 1" (Alfred Depo) at 18:8-22; "Exhibit 3" (scene photo). |
| 91. When the Trailblazer rolled backwards, it did so in a straight line. The resting position of the vehicle after the incident shows that the wheels are straight, meaning that Mr. Barber never changed the direction of the vehicle. | "Exhibit 1" (Alfred Depo) at 61:19-22; Morales Decl. at ¶ 13. |
| 92. Deputy Alfred failed to give Mr. Barber a verbal warning that he was prepared to use deadly force before shooting. | DeFoe Decl. at ¶ 9(c); "Exhibit 1" (Alfred Depo) at 13:19-21. |
| 93. When Deputy Alfred fired his first shot, the Trailblazer was either not in motion or was moving at a slow speed of under one mile per hour. | Morales Decl. at ¶ 11. |

| | |
|---|---|
| 94. At the time of the first shot, the Trailblazer had moved backwards less than one foot. | Morales Decl. at ¶ 11. |
| 95. At the time of the second shot, the Trailblazer still had not traveled backwards more than one foot. | Morales Decl. at ¶ 11. |
| 96. At the time of the last shot, the vehicle had started decelerating and was moving at approximately under one mile per hour before coming to rest. | Morales Decl. at ¶ 11. |
| 97. At the time of the first shot, Deputy Alfred was approximately 51 feet to the rear of the Trailblazer. | Morales Decl. at ¶ 16. |
| 98. At the time of the last shot, Deputy Alfred was approximately 21 feet to the rear of the Trailblazer. | Morales Decl. at ¶ 16. |
| 99. Deputy Alfred was in motion and advancing toward the Trailblazer during the shooting sequence, at a pace faster than normal human walking pace. | Morales Decl. at ¶ 19. |
| 100.   The vehicle came to a stop because Mr. Barber stepped on the brakes. The evidence indicates that Mr. Barber applied the brakes mildly, as opposed to slamming on the brakes. The vehicle gradually decelerated after the brakes were pressed while remaining in reverse gear. | Morales Decl. at ¶ 15. |
| 101.   The maximum speed the Trailblazer reached during the six shots was approximately 3.4 miles per hour. | Morales Decl. at ¶ 14. |

| | |
|---|---|
| 102. Based on standard biomechanical data, the average human walking speed ranges from 3.0 to 3.5 miles per hour, meaning the vehicle's maximum speed was equivalent to or slightly faster than a person walking at normal pace. | Morales Decl. at ¶ 14. |
| 103. Deputy Alfred never had to dive out of the way of the Trailblazer. | "Exhibit 1" (Alfred Depo) at 48:17-19. |
| 104. Deputy Alfred was not struck by the Trailblazer. | "Exhibit 1" (Alfred Depo) at 48:14-16. |
| 105. After the shooting, Mr. Barber's foot was on the brake pedal. | "Exhibit 1" (Alfred Depo) at 53:24-54:3. |
| 106. When the deputies were removing Mr. Barber from the Trailblazer after the shooting, the Trailblazer moved backwards an additional two to three feet. | Morales Decl. at ¶ 20. |
| **Pre-Shooting Negligence** | |
| 107. Police officers are expected to follow their own department policies. | DeFoe Decl. at ¶ 7. |
| 108. Deputy Alfred used profanity with Mr. Barber during this incident. | "Exhibit 1" (Alfred Depo) at 38:7-19. |
| 109. Deputy Alfred did not request backup before attempting to make contact with Mr. Barber. | "Exhibit 1" (Alfred Depo) at 33:4-6. |
| 110. Prior to the shooting, Deputy Alfred did not identify himself as a police officer. | "Exhibit 1" (Alfred Depo) at 38:20-22. |
| 111. After seeing the reverse lights come on, Deputy Alfred failed to step out of the way. | "Exhibit 1" (Alfred Depo) at 41:1-3, 49:8-50:2. |
| 112. Deputy Alfred did not attempt to move out of the way to the left or to the right before he fired the shots. | "Exhibit 1" (Alfred Depo) at 48:2-5. |

| 113.   A reasonable officer in Deputy Alfred's position would have moved to a position of cover and formulated an effective and safe tactical plan. | DeFoe Decl. at ¶ 10(c). |
|---|---|
| **Police Officer Training and Standards** | |
| 114.   Basic police officer training teaches that shooting at a moving vehicle has shown to be a poor tactic in most scenarios.  If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle. | DeFoe Decl. at ¶ 7. |
| 115.   An assaultive motor vehicle does not presumptively justify the use of deadly force. | DeFoe Decl. at ¶ 7. |
| 116.   At the time of this incident, Deputy Alfred understood that the County of San Bernardino's policy directed that deputies "shall not" shoot at a moving vehicle. | "Exhibit 1" (Alfred Depo) at 10:14-11:22. |
| 117.   At the time of this incident, Deputy Alfred had been trained to get out of the path of a moving vehicle, if feasible, rather than shooting at it. | "Exhibit 1" (Alfred Depo) at 10:14-11:22. |
| 118.   At the time of this incident, Deputy Alfred had been trained not to tactically position himself in a bad spot, if he can avoid it, with respect to moving vehicles. | "Exhibit 1" (Alfred Depo) at 11:17-22. |
| 119.   Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for Deputy Alfred to shoot at Mr. Barber for fleeing or | DeFoe Decl. at ¶ 8. |

| | |
|---|---|
| attempting to flee. Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area. | |
| 120. Basic police training and standards instruct that deadly force should only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. | "Exhibit 1" (Alfred Depo) at 41:24-42:2, 43:13-18; DeFoe Decl. at ¶ 6(d). |
| 121. Police officers are trained that a threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. | DeFoe Decl. at ¶ 6(c) (citing PC 835a); "Exhibit 1" (Alfred Depo) at 91:4-13. |
| 122. Police standards instruct that subjective fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed. | DeFoe Decl. at ¶ 6(d). |
| 123. Police officers are trained that deadly force should only be used when no reasonable alternative measures are available. | DeFoe Decl. at ¶ 6(i). |

| | |
|---|---|
| 124.    Police officers are trained to give a verbal warning prior to using deadly force. | DeFoe Decl. at ¶ 6(j). |
| 125.    Basic police training teaches that an overreaction in using deadly force is excessive force. | DeFoe Decl. at ¶ 6(h). |
| 126.    Deputy Alfred violated basic police officer training and standards with respect to the use of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a vehicle.  A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation.  Mr. Barber did not pose an immediate threat of death or serious bodily injury to Deputy Alfred or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way. | DeFoe Decl. at ¶ 9. |
| 127.    From the standpoint of police practices, including basic police training, POST standards, and the County of San Bernardino's own policies, Deputy Alfred's use of deadly force was improper, inappropriate, excessive and unreasonable, including (but not limited to) for the following reasons: (1) this was not an immediate defense of life situation; (2) subjective fear is insufficient to justify a use of deadly force; (3) the | DeFoe Decl. at ¶ 11. |

| | |
|---|---|
| shooting violated basic police training; (4) Mr. Barber committed no crime involving the infliction of serious injury or death; (5) Deputy Alfred could not justify shooting Mr. Barber under a fleeing felon theory; (6) Mr. Barber was not armed with a gun or other weapon during this incident; (7) Mr. Barber never verbally threatened to harm Deputy Alfred; (8) Deputy Alfred had reasonable alternative measures other than shooting; (9) Deputy Alfred showed no reverence for human life when he fired at Mr. Barber; (10) police officers are trained that they must justify every shot they fire, and all six of Deputy Alfred's shots were unjustified. | |
| ***Monell*** | |
| 128.   Contrary to basic police training, Deputy Alfred testified that he has not been trained to give a verbal warning prior to using deadly force. | "Exhibit 1" (Alfred Depo) at 90:7-9; DeFoe Decl. at ¶ 6(j). |
| 129.   Contrary to basic police training, Deputy Alfred testified that he has not been trained that deadly force should only be used if there is an immediate threat of death or serious bodily injury. | "Exhibit 1" (Alfred Depo) at 89:23-90:1; DeFoe Decl. at ¶ 6(b). |
| 130.   Contrary to basic police training, Deputy Alfred testified that he has not been trained that deadly force should only be used where there are no other reasonable options. | "Exhibit 1" (Alfred Depo) at 90:7-9; DeFoe Decl. at ¶ 6(i). |

| 131. Alfred also testified that at the time of the incident, he understood that the County's policy directed that deputies "shall not" shoot at a moving vehicle, and that after the April 2021 shooting of Barber, the verbiage of the policy changed from "shall not" to "generally." | "Exhibit 1" (Alfred Depo) at 11:9-13:6. |
|---|---|
| 132. Deputy Alfred's interview in this case was not conducted until approximately two weeks after the shooting. | "Exhibit 1" (Alfred Depo) at 6:16-25. |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' CONCLUSIONS OF LAW

1.     The Defendants are entitled to judgment on Plaintiff's first and second causes of (*sic*) brought under 42 U.S.C. § 1983 because those claims are barred under the doctrine of ***Heck v. Humphrey*, 512 U.S. 477 (1994)**. *See Heck*, 512 U.S. at 487; *Sanders v. City of Pittsburg*, 14 F.4th 968, 970–71 (9th Cir. 2021); *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022) (*en banc*).

**Plaintiff's Response:**

**Plaintiff's § 1983 claims are not barred under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994)**. Success on Plaintiff's excessive force claim would not undermine the validity of the PC §245(a)(1) conviction. *Beets v. County of Los Angeles*, 200 Cal. App. 4th 916, (2011); *People v. White*, 101 Cal. App. 3d 161, 167 (1980) (a peace officer cannot be engaged in the "lawful performance of his duties" where the officer used excessive force). *Rodriguez v. City of Long Beach*, 2011 WL 3757122, at *5 (C.D. Cal., Aug. 25, 2011, No. SACV 10-00271 DOC) (citing *Sanford v. Motts*, 258 F.3d 1117, 1120 (9th Cir. 2001))

/ / /

-38-

PLAINTIFF'S RESPONSIVE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

2.  **Deputy Alfred is entitled to judgment on Plaintiff's first cause of action under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment because undisputed facts demonstrate that the force used was reasonable under the totality of the circumstances facing the officers.** *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Furthermore, Deputy Alfred is entitled to qualified immunity because there is no evidence that the use of force violated any clearly-established law. *See Plumhoff v. Rickard*, 572 U.S. 765, 776–77 (2014); *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157–59 (9th Cir. 2020); *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010); *Estate of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023).

**Plaintiff's Response:**

**Deputy Alfred is not entitled to judgment on Plaintiff's § 1983 claim for excessive force in violation of the Fourth Amendment because a reasonable jury could find that Deputy Alfred used excessive and unreasonable force when he shot Mr. Barber.** *Vos. v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018); *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011); *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001); *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997); *Graham v. Connor*, 490 U.S. 386, 397 (1989). Deputy Alfred is not entitled to qualified immunity because: (1) where, as here, material facts are disputed, summary judgment is not available; (2) the law was clearly established that using deadly force under the facts of this case would violate Mr. Barber's constitutional right to be free from excessive force; and (3) the shooting violated basic police training with respect to the use of deadly force and shooting at moving vehicles. *Villanueva v. State of California*, 986 F.3d 1158 (9th Cir. 2021), *Orn v. City of Tacoma*, 949 F.3d 1167 (9th Cir. 2020); *A.D. v. California Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013); *Adams v. Speers*, 473 F.3d 989, 994 (9th Cir. 2007);  *Acosta v. City & Cnty. of S. F.*, 83 F.3d 1143, 1146 (9th Cir. 1996); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("training

1  materials are relevant not only to whether the force employed in this case was

2  objectively unreasonable . . . but also to whether reasonable officers would have

3  been on *notice* that the force employed was objectively unreasonable"); *Johnson v.*

4  *Jones*, 515 U.S. 304, 313 (1995).

5

6  **3.     The County is entitled to judgment on Plaintiff's second cause of**

7  **action for Monell liability based on unconstitutional custom, policy, or practice**

8  **because there is no underlying constitutional violation. Further, there is no**

9  **evidence of any longstanding unlawful custom, policy, or practice.** *See Lockett v.*

10 *Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020); *Gordon v. Cnty. of Orange*,

11 6 F.4th 961, 973–74 (9th Cir. 2021).

12    <u>**Plaintiff's Response:**</u>

13    **The County is not entitled to judgment on Plaintiff's *Monell* claim.**

14 **There is an underlying constitutional violation as described above. Further,**

15 **there is evidence of a longstanding unlawful custom, policy, or practice with**

16 **respect to the use of deadly force and a failure to provide adequate training**

17 **with respect to the use of deadly force and training with respect to shooting at**

18 **moving vehicles specifically.** *Monell v. Dep't Soc. Servs. of N.Y.*, 436 U.S. 658, 694

19 (2018); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992); *Larez v. City of Los*

20 *Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991); *City of St. Lous v. Praprotnik*, 485

21 U.S. 112, 127 (1988).

22

23    **4.     Deputy Alfred is entitled to judgment on Plaintiff's third cause of**

24 **action for battery because undisputed facts demonstrate that the force used by**

25 **Deputy Alfred was objectively reasonable. Furthermore, the County is not**

26 **vicariously liable because there are no underlying wrongful acts.** *See Johnson v.*

27 *Cnty. of L.A.*, 340 F.3d 787, 794 (9th Cir. 2003).

28 / / /

**Plaintiff's Response:**

**Alfred is not entitled to judgment on Plaintiff's battery claim because a reasonable jury could find that the force used by Deputy Alfred was objectively unreasonable and not necessary to defend human life. The County is vicariously liable on this claim.** *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121 n.6 (2004); Judicial Council Of California Civil Jury Instruction 1305B; Cal. Gov. Code § 815.2(a).

**5. Deputy Alfred is entitled to judgment on Plaintiff's fourth cause of action for negligence because undisputed facts demonstrate that Deputy Alfred acted reasonably under the totality of the circumstances and did not breach any duty of due care that they owed to Plaintiff. Furthermore, the County is not vicariously liable because there are no underlying wrongful acts.** *See Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 629–30 (2013).

**Plaintiff's Response:**

**Alfred is not entitled to judgment on Plaintiff's negligence claim because a reasonable jury could find that the force used by Deputy Alfred was negligent and not necessary to defend human life, and Deputy Alfred's tactics and conduct leading up to the shooting were negligent. The County is vicariously liable on this claim.** Judicial Council Of California Civil Jury Instruction 441; Cal. Gov. Code § 815.2(a); *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021); *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013).

/ / /

/ / /

/ / /

**6. Deputy Alfred is entitled to judgment on Plaintiff's fifth cause of action for violation of the Bane Act because undisputed facts demonstrate that there was no underlying constitutional violation. Furthermore, there is no evidence of any specific intent to violate Plaintiff's constitutional rights. In addition, the County is not vicariously liable because there are no underlying wrongful acts.** *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043–45 (9th Cir. 2018).

**Plaintiff's Response:**

**Alfred is not entitled to judgment on Plaintiff's Bane Act claim because a reasonable jury could find that Deputy Alfred acted with a reckless disregard for Mr. Barber's constitutional right to be free from excessive force. The County is vicariously liable on this claim.** *Reese v. County of Sacramento,* 888 F.3d 1030, 1045 (9th Cir. 2018). (quoting *United States v. Reese*, 2 F.3d 870, 855 (9th Cir. 1993)).

**7. Deputy Alfred is entitled to judgment on Plaintiff's sixth cause of action for intentional infliction of emotional distress because the undisputed facts demonstrate that there is no evidence that Deputy Alfred's conduct was "extreme and outrageous" or that he had the requisite intent. Furthermore, there is no evidence of Plaintiff's severe and emotional distress or causation. In addition, the County is not vicariously liable because there are no underlying wrongful acts.** *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043–45 (9th Cir. 2018).

**Plaintiff's Response:**

**Alfred is not entitled to judgment on Plaintiff's claim for intentional infliction of emotional distress because a reasonable jury could find that Deputy Alfred's conduct was extreme and outrageous and find that being shot in the head caused severe emotional distress to Mr. Barber. The County is vicariously liable on this claim.** *Warren v. Marcus*, 78 F.Supp.3d 1228, 1250 (N.D.

-42-

1   Cal. 2015) (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 n. 17 (9th Cir.

2   2007)); *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009).

3

4   DATED: October 23, 2025                    IVIE MCNEILL WYATT

5                                              PURCELL & DIGGS

6

7                                      By: _____ s/ Rodney S. Diggs

                                           Rodney S. Diggs

8                                          Attorney for Plaintiff, Steffon Barber

9

10  DATED: October 23, 2025                    LAW OFFICES OF DALE K. GALIPO

11

12                                     By: _____ *s/ Renee V. Masongsong*

                                           Dale K. Galipo

13                                         Renee V. Masongsong

                                           Attorneys for Plaintiff, Steffon Barber

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RESPONSIVE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL
MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT