1  RODNEY S. DIGGS, Esq. (SBN 274459)
Email: RDiggs@imwlaw.com
2  IVIE y WYATT PURCELL & DIGGS
444 South Flower Street, Suite 3200
3  Los Angeles, California 90071
Telephone:   (213) 489-0028
4  Facsimile:   (213) 489-0552

5  LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
6  dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
7  rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
8  Woodland Hills, CA 91367
Tel:   (818) 347-3333
9  Fax:   (818) 347-4118

10  Attorneys for Plaintiff STEFFON BARBER

11

12

13  **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**
14

15

16  STEFFON BARBER, an individual,          Case No. 5:22-cv-00625-KK-DTB

17          Plaintiff,                      **DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
          v.
18  COUNTY OF SAN BERNARDINO,
and CHRISTOPHER ALFRED,
19
20          Defendants.

21

22

23

24

25

26

27

28

-1-                     Case No. 5:22-cv-00625-KK-DTB

## DECLARATION OF ROBERT MORALES

I, Robert Morales, hereby declare as follows:

1.     I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so. I make this declaration in support of Plaintiff's opposition to Defendants' motion for summary judgment.

2.     I am a mechanical engineer, with a master's degree in mechanical engineering, controlled systems, from California State University, Los Angeles.  I have a certification for accident reconstruction from Society of Automotive Engineering. I also have a certification as a video analyst from the Association of Law Enforcement and Video Analyst. I receive continuous education yearly at accident reconstruction conferences. I have training and experience as an accident reconstructionist.  I currently work for Young & Associates Engineering Services, where I have been employed as an accident reconstructionist for approximately fourteen years. I have constructed more than one thousand vehicle accidents throughout the course of my career. I have expertise in audio analysis, video analysis, and accident reconstruction. As part of my expertise in audio analysis, I listen to audio to determine the movement of objects and people.

3.     My photogrammetry training is reflected in my CV, attached hereto as "Exhibit 1," and I have successfully applied these techniques in hundreds of previous cases involving precise distance and movement analysis. My measurements have been subjected to cross-examination and accepted by courts in California cases. The precision of my measurements reflects the mathematical capabilities of the photogrammetry software combined with the quality of reference data

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    provided by law enforcement's scene investigation. I have documented

2    all input variables, assumptions, and calculations used to derive the

3    stated measurements, including margins of error inherent in the

4    photogrammetric method.

5    4.    My opinions articulated below are based in part on my training,

6    professional experience and education. I apply my knowledge to make

7    analyses by using a combination of physical evidence, photographs,

8    audio, and/or video, in conjunction with research, engineering,

9    computations, simulations, and calculations. My qualifications to

10    review this case are set forth in detail in my CV, attached hereto as

11    "Exhibit 1."

12    5.    In this case, I reached opinions regarding the vehicle dynamics, vehicle

13    movement, and location and analysis of physical evidence. Before

14    reaching my opinions in this case, I reviewed the following materials:

15    statement of Deputy Alfred; deposition of Deputy Alfred; deposition of

16    Steffon Barber; photographs of the scene and the evidence;

17    measurements of the scene of the incident; police investigation reports

18    relating to the incident; audio belt recording of Deputy Alfred; research

19    regarding the make and model of Mr. Barber's vehicle (2003 Chevrolet

20    Trailblazer SUV); research regarding the make and model of Deputy

21    Alfred's firearm; Google aerial imagery of the scene. In this case, I

22    reviewed consumer reports of Mr. Barber's vehicle to understand its

23    mechanical capacity to estimate its movements. I also conducted a

24    photogrammetry analysis of the scene. In analyzing the audio

25    recording, I used Adobe Audition and After Effects. In analyzing the

26    audio recording, I used specialized software including Audition for

27    precise audio timing analysis, sound isolation, and spectral analysis to

28

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    distinguish between tire spinning sounds, vehicle movement, and

2    gunshots, and After Effects for synchronizing audio events with visual

3    timeline analysis. These tools allowed me to create detailed timing

4    sequences measuring intervals in tenths of seconds, isolate distinct

5    audio signatures of tire spinning versus vehicle movement, and

6    correlate audio events with physical evidence to establish the precise

7    chronology of events during the incident.

8    6.    I conducted a comprehensive photogrammetry analysis of the scene

9    using industry-standard techniques and software. This analysis

10    involved: (1) establishing fixed reference points using known

11    measurements from the police investigation; (2) calibrating scale using

12    measured distances between evidence markers and physical structures;

13    (3) correcting for lens distortion and camera angle variations; (4)

14    triangulating vehicle positions using multiple photographic

15    perspectives; (5) cross-referencing measurements against surveyed

16    distances provided by law enforcement; and (6) validating calculations

17    through independent measurement using a three-dimensional laser scan

18    of the incident site obtained during the site inspection. The

19    photogrammetry methodology I employed follows established

20    engineering protocols, ensuring measurement accuracy within

21    acceptable engineering tolerances. All underlying calculations,

22    reference measurements, and validation data are preserved in my case

23    files and available for independent verification.

24    7.    Based on my review of the evidence, it is my opinion that Deputy

25    Alfred had ample time and room to move out of the path of the

26    Trailblazer, as described in detail below. The driveway narrows from

27    north to south: at the north end it measures approximately 15 feet 7

28

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1                  inches in width, while at the south end it is approximately 13 feet 8

2                  inches.

3      8.      Before beginning to travel in reverse, the subject vehicle was parked in

4                  a slightly southwest-facing orientation. The vehicle's front end was

5                  positioned approximately sixteen feet north of the south end of the

6                  driveway, which is bordered by a white wooden fence. The left-front

7                  tire was located about 12.5 feet west of the chain-link fence, and the

8                  left-rear tire was positioned about 10 feet west of the same fence.

9      9.      The subject vehicle came to rest facing south approximately 27 feet

10                  north of the south end of the driveway. The left-front tire was located

11                  approximately 8 feet west of the chain-link fence, and the left-rear tire

12                  was positioned about 6 feet west of the same fence. Prior to coming to

13                  rest, the vehicle traveled a total of 16 feet approximately.

14     10.      The Trailblazer was parked on a low-friction surface consisting of dirt

15                  and gravel. The Trailblazer could not have moved as soon as the

16                  accelerator was engaged because the rear tires experienced a loss of

17                  traction, and the front tires had to overcome static friction.

18                  Additionally, based on the sound of the tires spinning, Mr. Barber may

19                  have been pressing the gas pedal and brake pedal simultaneously. My

20                  analysis of the surface conditions reveals a mixed composition driving

21                  surface that significantly impacted vehicle traction capabilities. Based

22                  on photographic evidence and witness descriptions, the driveway

23                  consisted of loose topsoil over a harder-packed dirt base, with scattered

24                  gravel and rock formations creating an uneven, low-friction surface.

25                  Using standard engineering coefficients for such mixed surfaces, I

26                  calculated the coefficient of friction to be approximately 0.4 to 0.5,

27                  substantially lower than the 0.7 to 0.9 coefficient typically found on

28

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1      paved surfaces. This low-friction environment explains why the 5,000-

2      pound Chevrolet Trailblazer experienced immediate rear wheel

3      slippage upon acceleration attempt, requiring the tires to spin for

4      approximately 0.75 seconds before gaining sufficient traction to initiate

5      vehicle movement. The surface composition created a mechanical

6      limitation that prevented rapid acceleration and restricted maximum

7      achievable speeds, regardless of accelerator input.

8    11.    Based on my review of the digital and physical evidence analyzed, the

9      Trailblazer was either not in motion when Deputy Alfred started firing

10      his shots or was moving at a slow speed of under 1 mile per hour. At

11      the time of the first shot, the Trailblazer had moved backwards less

12      than one foot. At the time of the second shot, the vehicle still had not

13      traveled backwards more than one foot. At the time of the last shot, the

14      vehicle had started decelerating and was moving at approximately

15      under 1 mile per hour before coming to rest.

16    12.    Based on my analysis of vehicle dynamics and timing, the evidence is

17      consistent with Mr. Barber releasing his foot from the brake in reaction

18      to the gunshots. This conclusion is supported by the correlation

19      between the audio timeline of the shots fired and the subsequent vehicle

20      movement patterns I observed in the physical evidence. Based on my

21      analysis of the deputy's positioning relative to the vehicle's trajectory

22      and my assessment of the vehicle's slow speed (maximum 3.4 mph),

23      Deputy Alfred had sufficient time and available space to move laterally

24      out of the vehicle's path. My analysis of the audio, combined with

25      physical evidence, indicates that Deputy Alfred was likely in motion

26      and moving toward the Trailblazer during the shooting sequence, which

27

28

     Case No. 5:22-cv-00625-KK-DTB

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    is inconsistent with the scenario in which the deputy was trapped or

2    otherwise incapable to move to safety.

3    13.    When Mr. Barber's vehicle rolled backwards, it moved in a straight

4    line. The resting position of the vehicle after the incident shows that the

5    wheels are straight, meaning that Mr. Barber never changed the

6    direction of the vehicle.

7    14.    The significance of the vehicle's maximum speed of 3.4 miles per hour

8    becomes apparent when compared to normal human locomotion

9    speeds. Based on standard biomechanical data, the average human

10    walking speed ranges from 3.0 to 3.5 miles per hour, meaning the

11    vehicle's maximum speed was equivalent to or slightly faster than a

12    person walking at normal pace. This comparison is technically relevant

13    because it demonstrates that any individual in the vehicle's path would

14    have had ample opportunity to move out of the way, given that the

15    vehicle was not traveling faster than a human could walk.

16    15.    The vehicle decelerated and came to a stop because Mr. Barber

17    reapplied the brakes at some point after being shot. The evidence

18    indicates that Mr. Barber applied the brakes mildly, as opposed to

19    slamming on the brakes. No tire screeches can be heard in the provided

20    audio. The vehicle gradually decelerated after the brakes were pressed

21    while remaining in reverse gear.

22    16.    The spatial distribution of the shell casings provides critical forensic

23    evidence of Deputy Alfred's positioning and movement during the

24    shooting sequence. Shell casings ejected from a Glock 21 typically

25    follow predictable ballistic patterns, ejecting to the right and slightly

26    rearward of the shooter's position. The clustered pattern of four shell

27    casings at placards #2 to #5, followed by two additional casings at

28

Case No. 5:22-cv-00625-KK-DTB

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

placards #7 and #8, creates a linear progression that is consistent with

forward movement during firing rather than stationary shooting. The

15-feet differential between the first shell casing location

(approximately 51 feet with respect to the rear end of the vehicle rear's

initial position) and the final casing location (approximately 21 feet

with respect to the rear end of the vehicle's final position) demonstrates

Deputy Alfred's forward advancement of approximately 15-ft during

the shooting sequence. This ballistic evidence corroborates the audio

analysis findings that Deputy Alfred was likely in motion and

advancing toward the Trailblazer while discharging his weapon,

contradicting any assertion that he remained in a fixed, defensive

position throughout the encounter. The technical significance of this

shell casing trajectory analysis is that it provides objective physical

evidence of the deputy's movement pattern independent of testimonial

accounts, establishing through forensic science that Deputy Alfred was

likely pursuing rather than retreating during the critical moments of the

shooting. The ballistic trajectory evidence documented in the Scientific

Investigations Division laboratory report further corroborates Deputy

Alfred's forward advancement during the shooting sequence. The

trajectory analysis shows a progression from shots "consistent with the

shooter being located rear of the vehicle" (Observations 1-1B, 2-2C, 3-

3D, 4-4D) to a shot "consistent with the shooter being located rear of

the forward side of the vehicle" (Observation 5-5A). This change in

shooting angle, combined with the 15-foot shell casing progression,

provides multiple independent sources of objective ballistic evidence

establishing Deputy Alfred's movement toward the vehicle rather than

remaining stationary.

Case No. 5:22-cv-00625-KK-DTB
DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

17.   The spatial arrangement of the bullet casings demonstrates two distinct clusters. Casings labeled with placard #2 to #5 form a cohesive group, with a linear separation among them of approximately 5 feet. A clear gap of approximately 7 feet exists between casing #5 and casing #7, indicating a pause or shift in shooting location. Finally, casings #7 and #8 sit in close proximity, approximately 2 feet apart, forming the second distinct cluster.

18.   Furthermore, the 7-foot spatial separation between the two bullet-casing clusters indicates a more substantial pause between shots occurred between placards #5 and #7. That observation aligns with the audio analysis of the deputy belt recording, which records a longer interval of approximately 0.5 seconds between shots 4 and 5.

19.   Based on my analysis of the audio belt recording, the acoustic evidence indicates that Deputy Alfred was in motion and advancing toward the Trailblazer during the shooting sequence. My audio analysis reveals movement patterns and positioning changes consistent with forward locomotion at a pace faster than normal walking speed, based on the audio signatures and timing intervals captured in the recording.

20.   Based on my analysis of the tire impression evidence and scene documentation, the photographs indicate the final resting position of the Trailblazer following the incident. The physical evidence and investigative records indicate that when Mr. Barber was extracted from the vehicle, the brake pedal was in a depressed position. Upon removal of Mr. Barber from the vehicle, the Trailblazer moved in a rearward direction for an additional distance of approximately two to three feet. This movement is consistent with the vehicle transmission remaining in reverse gear and the removal of brake pressure, allowing the vehicle's

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    engine power to propel it rearward at idle acceleration until mechanical

2    intervention stopped the movement.

3

4    I declare under penalty of perjury that the foregoing is true and correct, and

5    that this was executed this 23 day of October 2025 at Los Angeles, California.

6

7

8

9

10

11    _____

12    Robert Morales

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:22-cv-00625-KK-DTB

DECLARATION OF ROBERT MORALES, MSME, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT