# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                   --oOo--

4

5   STEFFON BARBER, an individual,

6          Plaintiff,

7   v.                    Case No.   5:22-cv-00625-JWH-SHK

8   COUNTY OF SAN BERNARDINO, a
    Municipal entity, and DOES 1
9   through 10, inclusive,

10         Defendants.
    _____/

11

12

13

14

15

16        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17      REMOTE VIDEO DEPOSITION OF CHRISTOPHER ALFRED

18             TUESDAY, AUGUST 26, 2025

19

20

21

22  Reported Stenographically by:

23  KIMBERLY D'URSO, CSR 11372, RPR

24  Job No.  19050

25

1                    APPEARANCES (Remote)

2    FOR THE PLAINTIFF STEFFON BARBER:

3              LAW OFFICES OF DALE K. GALIPO
               BY:  DALE K. GALIPO, ESQ.
4                   RENEE MASONGSONG, ESQ.
               21800 Burbank Boulevard, Suite 310
5              Woodland Hills, California 91367
               818.347.3333
6              dalekgalipo@yahoo.com
               rvalentine@galipolaw.com
7
               IVIE MCNEILL WYATT PURCELL & DIGGS
8              BY:  RODNEY S. DIGGS, ESQ.
               444 S. Flower Street, Suite 3200
9              Los Angeles, CA 90071
               rdiggs@imwlaw.com
10
               THE COCHRAN FIRM CALIFORNIA
11             BY:  JAMES A. BRYANT, ESQ.
               4929 Wilshire Blvd., Suite 1010
12             Los Angeles, CA 90010
               323.435.8205
13             james.bryant@thecalawgroup.com

14   FOR THE DEFENDANTS COUNTY OF BERNARDINO and
     DEPUTY CHRISTOPHER ALFRED:
15
               MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
16             BY:  KAYLEIGH ANDERSEN, ESQ.
               801 S. Figueroa St, 15th Floor
17             Los Angeles, California 90017
               213.624.6900
18             kayleigh.andersen@manningkass.com

19
     ALSO PRESENT:  Soufou Lee, Videographer
20
                         --oOo--
21

22

23

24

25

1    Q.    You're very welcome.

2          Have you reviewed any documents to help prepare

3    for the deposition?

4    A.    Yes.

5    Q.    Can you tell me, please, what you have

6    reviewed?

7    A.    Transcripts and the audio recordings from the

8    incident.

9    Q.    Okay.  The audio recordings, was that like a

10   belt recorder you had?

11   A.    Correct.  Yes.

12   Q.    Was there any other audio recordings, or is

13   that the one you had in mind?

14   A.    Audio recordings from my initial interview, and

15   the interviews from other involved parties.

16   Q.    Okay.  And your initial interview, who was that

17   interview with, if you recall?

18   A.    Detective Hernandez.

19   Q.    And when did you give that interview in

20   relation to the shooting incident?

21   A.    Approximately, a couple weeks after.

22   Q.    Did you give any interview related to the

23   shooting on the day of the shooting?

24   A.    No, sir.  I gave a public safety statement to

25   my supervisor.

1      Q.    Who was your supervisor that you gave that

2   statement to?

3      A.    Sergeant Taylor Long.

4      Q.    And did you essentially tell him how many shots

5   you fired in which direction?

6      A.    Correct.

7      Q.    And what did you tell him in that regard?

8      A.    How many shots were fired and what direction,

9   and we coordinated a plan to check on the nearby

10   residence.

11      Q.    How many shots did you tell him you fired?

12      A.    Six.

13      Q.    And which direction did you tell him you fired

14   the shots?

15      A.    In a south direction.

16      Q.    Aside from the public safety statement, that

17   just has limited information; correct?

18      A.    Correct.

19      Q.    Did you give an interview explaining why you

20   shot, for example, in the first week after the shooting?

21      A.    The only interview I gave with details about

22   the incident was to Detective Hernandez.

23      Q.    And do you know why the interview was sometime

24   after the shooting, as opposed to closer to the

25   shooting?

1    A.    Yes.

2    Q.    Have you reviewed any policies related to the

3    use of deadly force?

4    A.    Yes.

5    Q.    Which policy or policies have you reviewed?

6    A.    The San Bernardino County Sheriff's

7    Department's use of force guideline.

8    Q.    And when was the last time you reviewed that

9    policy?

10    A.    Last week, middle of last week.

11    Q.    Do they have a particular section that applies

12    to deadly force?

13    A.    Yes.

14    Q.    And related to that section, is there a

15    particular section that applies to shooting at or from

16    moving vehicles?

17    A.    Yes.

18    Q.    Were you familiar with that policy at the time

19    of the shooting incident we're here to talk about?

20    A.    Yes.

21    Q.    And what -- I don't expect a verbatim, but what

22    is your general understanding of what that policy says?

23    A.    Pertaining to use of deadly force or shooting

24    at moving vehicles?

25    Q.    Good clarification, Deputy Alfred.   I'm talking

Christopher Alfred

1    about the shooting at moving vehicles.

2        A.    At the time of the incident, it was a

3    "shall-not" policy.  It was written as that:  "shall not

4    be conducted under any circumstances."  Shortly after,

5    there was a revision to that policy.

6        Q.    Okay.  Well, let's talk about the policy that

7    was in effect at the time.  "Shall not" do what?

8        A.    Shoot at a moving vehicle.

9        Q.    Okay.  Was there any discussion in the policy,

10   if you recall, about staying out of the path or getting

11   out of the path, rather than shooting?

12       A.    If -- if feasible, yes.

13       Q.    Was that your understanding of the policy at

14   the time of this incident; if feasible, get out of the

15   path of a moving vehicle, rather than shooting at it?

16       A.    Correct.

17       Q.    And obviously, part of your training, I would

18   assume, is don't necessarily, tactically position

19   yourselves in a bad spot, if you can avoid it, with

20   respect to moving vehicles.  Is that generally a fair

21   statement?

22       A.    Correct.

23       Q.    Now, are you saying the policy changed in some

24   respects after this shooting incident?

25       A.    Yes.

Christopher Offred

1      Q.    What do you recall to be the date of the

2    shooting incident we're here to talk about?

3      A.    April 27th of 2021.

4      Q.    And do you have an estimate, Deputy, as to when

5    the policy changed, to your knowledge?

6      A.    I do not, no.

7      Q.    Do you know the nature of the policy change?

8      A.    There was some slight verbiage that was changed

9    from a "shall not" to "generally," and it further

10    explained under other certain circumstances.

11            MR. GALIPO:    Hold on.

12            You need to mute yourself, Rodney.

13            (Rodney Diggs has joined.)

14            MR. GALIPO:    I think, for the record, Rodney

15    Diggs has joined us.

16            Go ahead.

17            THE WITNESS:    It changed in the form of

18    verbiage from "shall not" to "generally," under certain

19    circumstances.

20    BY MR. GALIPO:

21      Q.    Okay.  But it sounds like that policy change

22    was after the incident?

23      A.    From my understanding, yes.

24      Q.    So at the time of the incident, your

25    understanding of the policy regarding shooting at moving

1    vehicles essentially is:  You should move out of the way
2    if you can, and you shall not shoot at moving vehicles,
3    or words to that effect?
4         A.   Correct.
5         Q.   And you said you fired six shots altogether?
6         A.   Correct.  Yes.
7         Q.   At any time before you fired your shots, did
8    you see a gun or what you believed to be a gun on the
9    person you shot's person?
10        A.   I did not see a firearm.  I observed movements
11   consistent with someone who's armed with a firearm.
12        Q.   Okay.  Obviously, as a trained law enforcement
13   officer, you're familiar with what a firearm looks like?
14        A.   Correct.
15        Q.   So if I'm understanding you, you considered
16   that the person might have a firearm, but you didn't
17   actually see one; is that fair?
18        A.   Correct.
19        Q.   Did you give any verbal warning you were going
20   to shoot at any point?
21        A.   I did not.
22        Q.   When you fired your shots, were you moving or
23   stationary?
24        A.   Stationary.
25        Q.   Were you stationary for all your shots?

Christopher Alfred

1      A.    That is correct.    I -- I had a handheld light

2   that I used for a light source.

3      Q.    Did you have a flashlight with you, as well?

4      A.    Yes.    That's the handheld light, yes.

5      Q.    Are you right-handed or left?

6      A.    Right-handed.

7      Q.    So at some point, did you have the flashlight

8   in your left hand?

9      A.    Yes, for the duration of this incident.

10      Q.    So that was providing some illumination?

11      A.    Yes.

12      Q.    So when you fired your first shot, the back of

13   the vehicle would have been approximately 10 or 15 feet

14   from you; is that correct?

15      A.    Correct.

16      Q.    And how about when you fired your second shot?

17   What would you estimate the distance?    About the same?

18      A.    Roughly, around the same.

19      Q.    And how about your third shot?    Was the

20   distance about the same?

21      A.    Yes.    The distance was pretty consistent

22   throughout that course of fire.

23      Q.    Okay.    So the vehicle was about 10 to 15 feet

24   from you, meaning the rear of the vehicle, during your

25   six shots?

Christopher Alfred

```
 1        A.    Yes.

 2        Q.    And you're estimating that you fired from shots

 3   one through six was approximately four to six seconds?

 4        A.    Yes.

 5        Q.    And were you aiming through the same area of

 6   the vehicle for all the shots?

 7        A.    Correct.

 8        Q.    Which would be the back hatch?

 9        A.    It was the -- the hatch was lifted, which

10   exposed the driver's side's headrest, and that was the

11   point of aim.

12        Q.    You were essentially trying to strike the

13   driver; is that fair?

14        A.    Stop the threat.

15        Q.    And by stopping the threat, you were trying to

16   strike the driver with a bullet, to stop the threat?

17   Was that your thinking?

18        A.    That was the force option I was presented with,

19   yes.

20        Q.    Okay.  And so in terms of where you were

21   aiming, you're saying you were aiming towards the

22   headrest?

23        A.    That -- the headrest provided a silhouette, the

24   shape of a head and shoulders.

25        Q.    Okay.  So that gave you some information:  If
```

1    the driver was seated in the seat, as one normally would

2    be, his head or upper body would be in that area?

3        A.    Correct.

4        Q.    And you were generally aiming towards the head

5    and upper body, is that fair, or center mass?

6        A.    Center mass.

7        Q.    And your weapon is a semi-automatic weapon?

8        A.    Correct.   Yes.

9        Q.    You have to press the trigger for each shot?

10       A.    Correct.

11       Q.    So you would have, in this case, intentionally

12   pressed the trigger six times?

13       A.    Yes.

14       Q.    And obviously, as you indicated, you were

15   stationary for all six shots?

16       A.    Yes.   For the most part, yes.

17       Q.    And what -- you were standing in a driveway?

18       A.    Yes.

19       Q.    And was the front of the vehicle essentially

20   facing south?

21       A.    Correct.

22       Q.    And what was to your left as you were standing

23   in the driveway, if you recall?

24       A.    A chain-link fence.

25       Q.    Okay.   Do you recall what the surface of the

1  driveway was; whether it was cement, asphalt, or dirt?

2      A.   Gravel and dirt.

3      Q.   And I'm a little directionally challenged,

4  Deputy Alfred; but if the chain-link fence would be to

5  the east -- did I have that right -- your left would be

6  east?

7      A.   Yes.

8      Q.   Okay.  And how far would you estimate the

9  chain-link fence was from you when you were essentially

10  stationary, firing these six shots?

11      A.   Rough estimate would be maybe one- to two-arms'

12  length.

13      Q.   Okay.  I don't know whose arms' length you have

14  in mind, but what would you estimate like an arm's

15  length to be, in terms of feet?

16           Are you thinking like an arm's length is like 3

17  feet; or are you thinking something else?

18      A.   I would say 3 to 4 feet.

19      Q.   Okay.  So 6 to 8 feet the chain-link fence

20  would be, approximately, to your left?

21      A.   No, 3 to -- 3 to 4 feet for the chain-link

22  fence.

23      Q.   Oh, I'm sorry.  I got confused.  I thought you

24  said -- did you say two-arms' length or one?  That's

25  where I got confused.

1    A.    One to two.   But if we're going to -- if I

2    could give an approximate distance from my original

3    position, I would say 2 to 3 feet.

4    Q.    Okay.   I misunderstood you.   Because I was

5    thinking you were giving the estimate of an arm's length

6    to be 3 or 4 feet.   But you were thinking about it, and

7    you were saying the approximate estimate from where the

8    left side of your body to that chain-link fence -- I

9    think you first you said 3 to 4 feet, and then you said

10    2 to 3 feet.   Is that what you're thinking?

11    A.    Yes.

12    Q.    And the truck was backing up at some point;

13    right?

14    A.    Yes.

15    Q.    And how far was the truck from the chain-link

16    fence as it was coming backwards, the one on the east

17    side?

18    A.    I don't recall.

19    Q.    Do you have any estimate?

20    A.    Roughly, around the same -- same distance.  The

21    driveway is very narrow.  You have to reverse to

22    actually get out of that driveway.  So it's equivalent

23    to about one -- the length of a car lane, so...

24    Q.    Okay.   I guess what I'm trying to figure out,

25    you may have answered it, but it sounds like to the

1    driver's side of the truck would be the same chain-link

2    fence?

3        A.    Correct.

4        Q.    And when you were in the shooting position

5    firing your six shots, the chain-link fence was to your

6    left also?

7        A.    Correct.

8        Q.    And you've given me estimates:  3 to 4 feet, 2

9    to 3 feet from your left; is that fair?

10        A.    Correct.

11        Q.    What I'm wondering, if you know, was that about

12    the same distance, the 3 to 4 feet or 2 to 3 feet, that

13    the driver's side of the truck was from the chain-link

14    fence?

15        A.    I don't know for certain.  I can't answer that.

16        Q.    All right.  And then what would be to your

17    right?  If the chain-link fence was to your left, what

18    was to your right when you were in the shooting

19    position?

20        A.    The -- that would be the wall of the apartment

21    complex.

22        Q.    Some type of wall?  Do you know what it was

23    made out of?

24        A.    It appeared to be a stucco; and a portion of it

25    transitions into a picket fence.

1      Q.    Okay.    And how far would you estimate you were

2   when you were shooting your shots from this wall, which

3   I would guess to be to your right, or to the west?

4      A.    Correct.

5      Q.    What would you estimate that distance?

6      A.    Roughly, around the same distance, being

7   anywhere from 3 to 4 feet.

8      Q.    So you think you were, more or less, 3 to 4

9   feet from the chain-link fence, and 3 to 4 feet from the

10  stucco wall, approximately?

11     A.    Approximately, yes.

12     Q.    It sounds like you were -- when you were

13  shooting, did you feel you were more on the driver's

14  side or the passenger's side of the -- of the truck?

15     A.    Driver's side.

16     Q.    Okay.    Were you kind of inline with the

17  driver's side and the headrest, as you indicated

18  earlier?

19     A.    Correct.

20     Q.    So when you were shooting, were you, more or

21  less, shooting due south, towards the headrest?

22     A.    Towards the -- the driver's seat, in the south

23  direction, yes.

24     Q.    Okay.    How tall are you?

25     A.    Five foot, 10.

1    Q.    How much do you currently weigh?

2    A.    One hundred eight-five pounds.

3    Q.    How old are you, currently?

4    A.    Thirty-five.

5    Q.    I want to just find out a little bit about your

6    background, before we go more into this.

7          I'm assuming you graduated high school?

8    A.    Correct.

9    Q.    What year did you do that in?

10   A.    2009.

11   Q.    Did you play any sports in high school?

12   A.    Basketball, yes.

13   Q.    I'm assuming you played guard?

14   A.    Point guard, yes.

15   Q.    How many years did you play basketball?

16   A.    Four.

17   Q.    Were you essentially the starting point guard

18   on the varsity basketball team?

19   A.    Yes.

20   Q.    Any other sports, or just basketball?

21   A.    Just basketball.

22   Q.    And then did you go to college at all after

23   high school?  I don't necessarily need to know the name,

24   but whether you did or not?

25   A.    Online, I did.

1    Q.    During that field training, did you have to

2    become familiar with some of the policies?

3    A.    Yes.

4    Q.    Did that include, for example, the policy

5    related to the use of deadly force?

6    A.    Yes.

7    Q.    And the policy related to shooting at moving

8    vehicles that we talked about earlier?

9    A.    That encompasses it, yes.

10   Q.    So when was it, approximately, that you

11   finished field training and you were able to go on

12   patrol by yourself?

13   A.    Around July of 2018.

14   Q.    And I think you told me that this -- your

15   recollection is this incident happened in April of 2021?

16   A.    Correct.

17   Q.    So it would have been approximately three years

18   that you were on patrol by yourself when this incident

19   occurred?

20   A.    Yes.

21   Q.    And during that time frame, so I'm talking

22   about your time on patrol before this incident, had you

23   ever seen a suspect with a gun in their hand before?

24   A.    Yes.

25   Q.    On how many occasions, approximately?

1        A.    Probably 15.

2        Q.    Were you trained that you can shoot someone

3    merely for seeing a gun in their hand?

4        A.    No.

5        Q.    Had you ever seen a suspect with, for example,

6    a knife in their hand?

7        A.    Yes.

8        Q.    On how many occasions, approximately?

9        A.    Twenty to 30.

10        Q.    Were you trained that you can shoot someone

11    merely for seeing a knife in their hand?

12        A.    No.

13        Q.    Without going into all of it, had you seen

14    other objects in people's hands that could be weapons,

15    like pipes, or bats, or things of that nature?

16        A.    Yes.

17        Q.    In addition to your firearm, did you have a

18    Taser on you at the time?

19        A.    Yes.

20        Q.    Did you have a police baton?

21        A.    Yes.

22        Q.    Did you carry OC spray?

23        A.    Yes.

24        Q.    Prior to the date of the shooting incident, had

25    you ever used pepper spray in the field before?

1    A.    Yes.

2    Q.    Do you know if any of your shots hit the person

3  you were trying to shoot?

4    A.    During that time, I was not aware of that, no.

5    Q.    Did you learn at some point whether they did or

6  didn't?

7    A.    They did not, no.

8    Q.    You learned later that they did not?

9    A.    That's correct; yes.

10    Q.    You're saying, at the time, you weren't sure?

11    A.    At the time, I was not sure; yes.

12    Q.    And why were you shooting at that individual?

13    A.    A colleague was struck by gunfire in front of

14  me.

15    Q.    Do you know who fired the shot that struck the

16  colleague?

17    A.    No.  There were multiple suspects.

18    Q.    Okay.  So let's talk a little bit about the

19  incident here.

20    Do you know the name of the person you shot?

21    A.    Mr. Steffon Barber.

22    Q.    To your knowledge, had you ever seen that

23  person before the day of the incident?

24    A.    I had not, no.

25    Q.    Did you have any information whether that

1    person had a criminal history, for example, at the time

2    you shot him?

3        A.    Yes.

4        Q.    You did have information he had a criminal

5    history?

6        A.    Yes.

7        Q.    What information did you have?

8        A.    I received information through our sheriff's

9    dispatcher of the criminal history that pertains to

10   subjects in our county.

11       Q.    Okay.   I guess what I'm just wondering is, did

12   you have specific information regarding Mr. Barber?

13       A.    No, not specific information.

14       Q.    Okay.   So, for example, did you have any

15   specific information that Mr. Barber had any convictions

16   before the shooting?

17       A.    No.

18       Q.    Any specific information that he had ever

19   physically injured anyone?

20       A.    No.

21       Q.    Any specific information that he had ever

22   verbally threatened to harm anyone?

23       A.    Yes.   That was information I learned when I

24   spoke to the reporting party.

25       Q.    What did the reporting party tell you in that

1    regard?

2    A.    That Mr. Barber had threatened them at the side

3    of their vehicle.

4    Q.    In what way?  Did they say what words he had

5    used?

6    A.    I don't recall specifically what Mr. Barber

7    told them.  They mentioned that he had struck the hood

8    of their vehicle, and they feared for their safety, so

9    they remained inside.  And they believed that

10    Mr. Barber's behavior led them to believe that he was

11    armed with a weapon.

12    Q.    Did they say they ever saw a weapon?

13    A.    No.

14    Q.    Did they say Mr. Barber said he had a weapon?

15    A.    No.

16    Q.    Did you observe any visible damage to their

17    car?

18    A.    No.

19    Q.    Any other information that you had related to

20    Mr. Barber, prior to attempting contact, other than what

21    you told me?

22    A.    Where he was located and what he was wearing.

23    Q.    Okay.  Did you have any information, for

24    example, he was under the influence of drugs or alcohol?

25    A.    I did not, no.

1    Q.    Any information that he was related in any way

2    to a gang?

3    A.    No.

4    Q.    Did you have an understanding as to whose

5    residence that was that the -- his vehicle was in the

6    driveway?

7    A.    Yes.

8    Q.    What was your understanding?

9    A.    From my understanding, it was a shared driveway

10   between the reporting party and Mr. Barber.

11   Q.    So you understood that Mr. -- that driveway was

12   shared by the reporting party and Mr. Barber?

13   A.    Correct.

14   Q.    So was it your general understanding, at least,

15   that Mr. Barber had a right to be in that driveway?

16   A.    It was my understanding that he -- he lived

17   there.

18   Q.    Okay.  Where did you have your conversation

19   with the reporting party?

20   A.    Near the intersection of White Avenue and

21   Adelanto Road.

22   Q.    What city was this in?

23   A.    The city of Adelanto.

24   Q.    Was that conversation with the reporting party

25   recorded, if you know?

1        A.    Yes.

2        Q.    Is that part of what you listened to recently?

3        A.    Yes.

4        Q.    Did you request any backup before attempting to

5     make contact with Mr. Barber?

6        A.    No.

7        Q.    Is there a reason why you didn't request backup

8     after you had the conversation with the reporting party?

9        A.    Well, backup is discretionary.  Usually, the

10    individual or the deputy, themselves, gauges the

11    situation to determine what resources they needed.  And

12    given the situation, I felt that that was not necessary

13    at that time.

14        Q.    Okay.  I'm just wondering, because you

15    mentioned the reporting party said they thought he might

16    possibly have a gun, and whether you thought it might

17    have been better tactically to wait for another unit

18    before approaching?

19        A.    In this incident, no, I did not.  And that was

20    information that I didn't confirm.  It wasn't

21    corroborated.  In my training and my experience, that's

22    something that's said often to generate a fast law

23    enforcement response.  Therefore, you don't want to

24    create a hypervigilant situation because of what someone

25    says.

 1    Q.    Okay.    Your experience has been sometimes
 2    people will say, "I think someone has a gun," to try to
 3    expedite law enforcement response?
 4    A.    Correct.
 5    Q.    And you often find it turns out the person
 6    didn't have a gun?
 7    A.    Correct.
 8    Q.    So you don't necessarily accept as true what
 9    you're being told?  You consider it and then try to do a
10    follow-up investigation?
11    A.    Yeah.   I think when it pertains to safety, you
12    want to keep those ideas at the forefront, but you still
13    have to take everything for face value.
14    Q.    You did have information as to the address and
15    the clothing description, at least, of Mr. Barber?
16    A.    Yes.
17    Q.    What do you recall the clothing description to
18    be?
19    A.    Mr. Barber wore a short-sleeve, white T-shirt.
20    Q.    Any other clothing description you recall?
21    A.    Long pants, unknown color.
22    Q.    Did you have any age, height, or weight
23    information?
24    A.    I did not, no.
25    Q.    Did you have specifics of the type of vehicle

1    first seeing Mr. Barber outside the vehicle and him

2    getting in the vehicle?

3        A.    Roughly, around eight to ten seconds.

4        Q.    Was the door of the vehicle, the driver's door,

5    if you recall, opened or closed when you first saw

6    Mr. Barber?

7        A.    Open.

8        Q.    Could you tell if the vehicle was on or not

9    when you first saw Mr. Barber?

10       A.    The brake lights -- or the parking lights were

11   illuminated.

12       Q.    And what was your impression; that the vehicle

13   was on, because of that?

14       A.    That, or it contained some kind of power source

15   or accessory lighting.

16       Q.    Could you hear the engine of the vehicle at

17   that time?

18       A.    No, not at that point.

19       Q.    But your general impression was the vehicle was

20   on?

21       A.    Yes.

22       Q.    And you were, at that point, standing about 10

23   feet behind it?

24       A.    Approximately, yes.

25       Q.    Did you have anything in your hands at that

1    Mr. Barber before he got in the car?

2        A.    I gave him those commands a second time; and he

3    refused a second time, yes.

4        Q.    Same commands, again?

5        A.    Yes.   The second commands were followed by

6    explicit language, and he refused those commands.

7        Q.    And when you say "explicit language," did you

8    use some profanity?

9        A.    Correct.

10       Q.    And without necessarily repeating it, what was

11   the first letter of the profanity?

12       A.    "A."

13       Q.    All right.   Does the San Bernardino Sheriff's

14   Department have any policy regarding using profanity?

15       A.    Yes.

16       Q.    What is the policy, as you understand it?

17       A.    From my understanding, it falls under the lines

18   of conducting yourself in a professional manner, so the

19   profanity is generally prohibited.

20       Q.    Did you ever identify yourself as a police

21   officer?

22       A.    No, I do not.

23       Q.    Was your -- your -- you were probably assigned

24   a marked vehicle at the time?

25       A.    Correct.

1    ready?

2         A.    Correct.

3         Q.    Did you know or did you have an impression as

4    to whether Mr. Barber saw you pull out your gun; or

5    you're not sure?

6         A.    I am not sure.

7         Q.    When he gets in the car, does the door close at

8    some point?

9         A.    Yes.

10        Q.    Now, your impression was the car might be on;

11   is that fair?

12        A.    Correct.

13        Q.    And your impression was that Mr. Barber may be

14   wanting to leave?

15        A.    Correct.    Yes.

16        Q.    So did you then step out of the way to make

17   sure you wouldn't be in the path of the vehicle, if it

18   reversed?

19        A.    I did not.

20        Q.    At some point, do you see the reverse lights

21   come on?

22        A.    Yes.

23        Q.    Were you still about 10 feet from the back of

24   the car?

25        A.    Roughly, within the general area.

1    Q.    Did you then move to step out of the way, once

2    you saw the reverse lights come on?

3    A.    No.

4    Q.    How much time would you say passed from seeing

5    the reverse lights come on to you firing your first

6    shot?

7    A.    One to two seconds.

8    Q.    On the right side, I'm understanding there was

9    some break in the stucco, but you had passed that

10   position?

11   A.    I'm sorry, can you --

12   Q.    Yeah.  I'm probably using -- I'm sorry.  I'm

13   probably using the wrong description.

14         But it's my general understanding, from your

15   perspective, facing south, on the left is the chain-link

16   fence --

17   A.    Uh-huh.

18   Q.    -- is that correct?

19   A.    Correct.

20   Q.    Okay.  But on your right side, which would be

21   to your west, a little bit behind where you were, there

22   was some opening?

23   A.    Correct.  Yes.

24   Q.    Okay.  Am I using the right word; or are you

25   more comfortable with another word, other than an

Christopher Allfred

```
1        A.    Yes.
2        Q.    And you did not attempt to move out of the way
3   to the left or to the right, before you fired the shots;
4   is that also correct?
5        A.    That is correct.  With that being said, that --
6   that alleyway is a very -- it's a confined space, and
7   there's no ample space to go left and right, in terms of
8   fully making sure that I wouldn't be, you know, hit by
9   this vehicle.
10            As I previously stated, to one side of me
11  there's a chain-link fence; and to the other side, there
12  is a picket fence that doesn't offer me much security.
13  So there was really no proper avenue to retreat to.
14       Q.    Obviously, the truck did not physically strike
15  you; is that fair?
16       A.    Correct.
17       Q.    And you didn't, for example, dive out of the
18  way; is that also correct?
19       A.    That is correct.
20       Q.    And going back to the training -- and I think
21  we went over this a little bit -- but your understanding
22  of the training is, if feasible, step out of the way,
23  rather than shooting at the vehicle?  Is that generally
24  correct?
25       A.    Yes.
```

1    Q.    Is also part of the training, if feasible, not
2  to tactically position yourself behind a vehicle that
3  you think may be trying to reverse?
4    A.    Not necessarily.  I think that's kind of formed
5  on a case-by-case.  I had no immediate indication that
6  that vehicle would reverse until Mr. Barber entered it
7  and the reverse lights came on.
8    Q.    Okay.  Because I thought you at least had the
9  impression that that vehicle belonged to Mr. Barber; is
10  that right?
11    A.    I believed it was associated with him, yes.
12    Q.    And your impression was the vehicle was on?
13    A.    On, yes.
14    Q.    And your impression was, based on your dialogue
15  with him and seeing him getting back in the car, that he
16  may try to leave?
17    A.    Yes.  At that -- at that point, once I saw him
18  enter the vehicle, I believed that the purpose of that
19  vehicle going in reverse was to potentially harm me,
20  yes.
21    Q.    And I don't know, is -- in that driveway, can
22  you -- can you go forward to leave; or do you have to go
23  backwards to leave, if you know?
24    A.    You have to reverse.  It's one way in and one
25  way out.

1    Q.    Were you aware of that at the time?

2    A.    Yes.

3    Q.    So I'm going to try to just show you a few

4    photographs that I think were taken as part of the

5    investigation.

6          But am I understanding you correctly that,

7    after the shooting, you did not approach the vehicle?

8    A.    I did not, no.  For officer safety purposes, I

9    still gave commands to Mr. Barber.  I didn't receive a

10   response; and therefore, I needed to make sure I

11   maintained a visual on him as well, and delegate medical

12   resources when they arrived, where he was located.

13   Q.    How did you try to maintain a visual?  Where

14   did you go to maintain a visual?

15   A.    I stepped a couple of feet away from the

16   vehicle; so that would be to my north.

17   Q.    And when you say a "couple of feet," just --

18   did you go to one side or the other, or just straight

19   backwards?

20   A.    Straight backwards.  Initially, it was straight

21   backwards.  And then there was some short pacing from

22   left to right, kind of using Mr. Barber's vehicle as

23   cover, but also drifting a little bit to the left to

24   maintain a line of sight for him.

25   Q.    And to the left would be closer to the

1    continuing to roll backwards?

2        A.    The vehicle had wedged against one of the west

3    portions of the wall.  From my understanding, that

4    prevented the vehicle from traveling in reverse further.

5        Q.    At some point, did you see the vehicle make

6    contact with that area by the wall?

7        A.    Yes.

8        Q.    And was that contact made before or after your

9    last shot?

10       A.    After.

11       Q.    And how far do you think the vehicle moved from

12   your last shot to making that contact?

13       A.    Roughly, around a foot.  It was a short

14   distance.

15       Q.    Okay.  And once the vehicle made that contact,

16   it didn't go back any further?  Am I understanding that

17   correct?

18       A.    It didn't -- it didn't reverse any further

19   until we contacted Mr. Barber.

20       Q.    Okay.  And then during that contact, did,

21   somehow, the vehicle roll back slightly?

22       A.    Yes.

23       Q.    Can you explain how that happened, please?

24       A.    From my understanding, Mr. Barber's foot was on

25   the brake pedal, of some sort.  And once he was

1    extracted from the vehicle for medical services, the

2    vehicle slowly went in reverse, and one of my partners

3    was able to put it in park to stop it from reversing.

4        Q.    Okay.  Do you have an estimate, or do you have

5    an understanding as to how much further it went in

6    reverse when Mr. Barber's foot came off the brake?

7        A.    A couple of inches.  Just enough for us to

8    under -- to realize that the vehicle was still in

9    reverse gear.

10       Q.    So it was a short distance?

11       A.    Short distance, yes.

12       Q.    So is it your understanding that one of the

13   reasons the vehicle was not continuing to move backwards

14   because Mr. Barber's foot was on the brake?

15       A.    No.  It's my understanding the vehicle didn't

16   further go backwards because it had collided with a

17   portion of the wall.

18       Q.    I mean, I understand that part.  I guess what

19   I'm wondering is, why would it go backwards at all, if

20   you know, after his foot came off the brake?

21            MS. ANDERSEN:  I'll object to the extent it

22   calls for speculation.

23            But you can answer, if you know.

24            THE WITNESS:  I'm sorry.  So your question?

25            MR. GALIPO:  Yeah.  It may call for

1          You can answer.

2              THE WITNESS:   From my understanding and what I

3   observed, the vehicle was still in the reverse gear; and

4   his foot was removed from the brake, which led it to

5   travel a short distance.

6   BY MR. GALIPO:

7       Q.   Okay.  I'm going to show you just a few

8   exhibits.  These are pictures that were taken as part of

9   the investigation.  You may have seen some of these

10  before.

11          MR. GALIPO:  Can we start with Exhibit 1?

12          And we'll send these to you, Kayleigh.  They

13  have Bates stamp numbers on them.

14          MS. ANDERSEN:  Okay.  Fine.

15          MR. GALIPO:  This one ends in 289.

16          (Exhibit Number 1 was marked.)

17  BY MR. GALIPO:

18      Q.   Are you able to see this on your screen,

19  Deputy?

20      A.   Yes.

21      Q.   Is that essentially a photograph of yourself?

22      A.   Yes.

23      Q.   Is that how you were generally dressed at the

24  time of the shooting?

25      A.   Yes.  The face covering was lowered around my

1    neck.

2        Q.    Okay.    Was this kind of COVID time when this

3    happened?

4        A.    Yes.

5        Q.    And were you wearing some type of a face

6    covering or face mask?

7        A.    I was equipped with one, but during my --

8    during my contact with Mr. Barber, the face covering was

9    removed from my face.

10       Q.    And so you just simply lowered it down towards

11   your neck?

12       A.    Correct.    Yes.

13       Q.    And do you recall if Mr. Barber had some type

14   of face mask?

15       A.    I do not, no.

16       Q.    You don't recall one way or the other?

17       A.    No.

18            MR. GALIPO:    Okay.    Can we look at Exhibit 2,

19   please?

20            (Exhibit Number 2 was marked.)

21            MR. GALIPO:    Thank you.

22            I don't know if I'm seeing the whole -- or

23   maybe I am.

24   BY MR. GALIPO:

25       Q.    Okay.    Can you see that on your screen?

1   me that was open at the time of the shooting; is that

2   correct?

3       A.   Correct.  Yes.

4       Q.   There's some items, it looks like, on the

5   ground.  I can't tell if that's a fire extinguisher or

6   what it is.  Do you know if those were there after the

7   shooting or not?

8           MS. ANDERSEN:  I'll object.  Vague as to time.

9           But you can answer, if you understand.

10          MR. GALIPO:  That is a fair objection.

11  BY MR. GALIPO:

12      Q.   Let's say, like, before backup got there, do

13  you know if those were already on the ground?

14      A.   I do not recall seeing those items, no.

15      Q.   Okay.  And you indicated that part of the

16  vehicle came in contact with the -- is it the chain-link

17  fence on the gate there, to the right?

18      A.   That is correct, yes.

19      Q.   When the vehicle was backing up, could you tell

20  if it was backing straight up or slightly at an angle,

21  one way or the other?

22      A.   It appeared to be straight backwards.

23      Q.   Okay.  Did you notice it going more on the west

24  side of the driveway at some point?

25      A.   I did not, no.

1    Q.   When the vehicle was initially in the driveway,

2    before Mr. Barber got in, did it seem like it was

3    centered in the driveway, or more on one side or the

4    other?

5    A.   It appeared centered.

6         MR. GALIPO:   Can we look at Exhibit 6, please?

7         (Exhibit Number 6 was marked.)

8    BY MR. GALIPO:

9    Q.   Is this a longer view of the -- of the

10   driveway?

11   A.   Correct.  Yes.

12   Q.   Did you have an understanding as to where

13   Mr. Barber's residence was in relation to this driveway

14   or his vehicle?

15   A.   I did not.  I didn't associate Mr. Barber's

16   residence until a family member exited the apartment

17   after the shots were fired.

18   Q.   Did the family member say anything to you?

19   A.   Not to me directly, no.

20   Q.   Did you see hear the family member say

21   anything?

22   A.   Yes.

23   Q.   What did you hear the family member say?

24   A.   One of the family members yelled, "You shot

25   him."

1        A.    Roughly, eight to ten, yes.

2        Q.    Was it your understanding from the complaining

3   party, that they wanted Mr. Barber to move his vehicle

4   because it was blocking the driveway?

5        A.    Correct.  Yes.

6        Q.    So, in essence, they were complaining that they

7   couldn't get out because Mr. Barber's vehicle was

8   blocking their exit?

9        A.    They didn't share any information about being

10  able to leave.  They only shared with me that his

11  vehicle blocked theirs in some sort of fashion.

12       Q.    Okay.  So were you planning on asking

13  Mr. Barber, if he had cooperated, to move his car?

14       A.    No.  I was further there to speak with

15  Mr. Barber, to get his version of events and also

16  investigate a vandalism.

17       Q.    Do you recall at the time of your statement,

18  towards the end, them having you mark, like, where you

19  were at certain times, things of that nature?

20       A.    Yes.

21       Q.    And again, I'm looking at page 57 of your

22  statement.  But you indicate, again, that the vehicle

23  was idling and the brake lights were on, when you first

24  approached it?  Do you recall that?

25       A.    Yes.  The parking lights were on.

1    Q.    Okay.    And just so we're clear, because I don't

2    want to misstate the record, would you agree -- and I'm

3    reading from your statement, page 57, line 5.    You

4    stated:    "As the vehicle was idling and the brake lights

5    were on."

6         Do you recall saying that in your statement?

7    A.    Yes.

8    Q.    And obviously, that was before Mr. Barber got

9    in the vehicle?

10   A.    Yes.

11   Q.    And so you were aware that he could potentially

12   try to leave, is that fair, as one possibility?

13   A.    Yes.

14   Q.    And so I think you've answered this, but if I'm

15   understanding you correctly, the reason you positioned

16   yourself behind the vehicle as opposed to the side of

17   the vehicle, is to have some cover, but also to be in a

18   better position of mobility?

19   A.    Yes.    And that goes along with my observations

20   of Mr. Barber ignored my commands, reaching inside of

21   his vehicle when told not do so.    Given the fact that

22   I'm investigating a crime where he's been, you know,

23   mentioned as a potential suspect, yeah, all those

24   factors do come into play.    I would hate to stand out in

25   the open and be shot.

1    A.    No.

2    Q.    Okay.  Lastly, I just want to ask you about --

3    a little about your training with deadly force.  We

4    talked about the part about shooting at moving vehicles.

5         But first of all, it's your understanding that

6    deadly force is the highest level of force an officer

7    can use?

8    A.    Correct.  Yes.

9    Q.    And is it your understanding, based on your

10   training, if you're shooting center mass on a suspect,

11   that there's a probability of causing serious injury or

12   death?

13   A.    It's a possibility, yes.

14   Q.    Are you trained that deadly force should only

15   be used when the person has the ability, opportunity,

16   and apparent intent to immediately cause death or

17   serious bodily injury?

18   A.    No.  It's -- it's mainly based off of the

19   totality of the -- the circumstances, and you have to

20   look at that from a reasonable standpoint.  But it's

21   mainly based off of the totality and all of the facts

22   that are presented.

23   Q.    Were you trained in the academy that deadly

24   force should only be used if there's an immediate threat

25   of death or serious bodily injury?

1    A.    No.

2    Q.    Were you trained that you should only use

3 deadly force when there are no other reasonable options?

4    A.    No.    Once again, it's based off the totality.

5 We have other options, such as de-escalation, that we

6 try to utilize to reduce a violent outcome.

7    Q.    Were you trained to give a verbal warning

8 before using deadly force, when feasible?

9    A.    No.

10    Q.    Were you trained that you have to justify each

11 of your shots when using deadly force?

12    A.    Yes.

13    Q.    Were you trained that a weapon in someone's

14 hands, such as a gun, is not enough, in and of itself,

15 to use deadly force?

16    A.    That is correct.    Yes.

17    Q.    Were you trained that you should consider your

18 background or backdrop in using deadly force?

19    A.    Yes.

20    Q.    Do you know what your background or backdrop

21 was, beyond the vehicle in this case?

22    A.    The small south portion of the yard, followed

23 by an open field.

24    Q.    So do you kind of keep updated on deadly force

25 policies?

1    A.    Yes.    For any policy changes of any sort, our

2    training division sends out electronic learning material

3    for us to review; so, yes.

4        Q.    Okay.    Are you aware that the current Learning

5    Domain has been, for several years, says that there has

6    to be the ability, opportunity, and apparent intent to

7    immediately cause death or serious bodily injury?    And

8    that comes right out of the revised Penal Code Section

9    835(a)?

10       A.    Yes.

11       Q.    So I just -- because I asked you that before.

12   Is that part of your training?

13       A.    Yes.

14          MR. GALIPO:    Okay.    I think that's all the

15   questions I have.

16          Kayleigh, I don't know whether you have any

17   questions of your client today?

18          MS. ANDERSEN:    I have a couple clarifying

19   questions.

20          MR. GALIPO:    Sure.

21          MS. ANDERSEN:    Okay.

22                         EXAMINATION

23   MS. ANDERSEN:

24       Q.    When you estimate you were about 8 to 10 feet

25    from the rear of the vehicle at the time you fired your

1    first shot, are you estimating the distance from the

2    open hatch or the rear bumper?

3        A.    The open hatch.

4        Q.    What is the approximate distance from where you

5    were when you fired your first shot to the end of the

6    driveway, where it meets the main road?

7        A.    Roughly, about 60 feet.

8        Q.    Do you know whether that flashlight -- and I

9    forget which exhibit it's in, in the photograph.

10        MR. GALIPO:  Exhibit 2.

11        MS. ANDERSEN:  Thank you.

12    MS. ANDERSEN:

13        Q.    The flashlight that was depicted in Exhibit 2,

14    do you know whether that was moved after you dropped it?

15        A.    Yes.  Once the available resources were present

16    and medical services, there was personnel from AMR who

17    picked up the flashlight and asked who it belonged to,

18    and he was instructed to leave it where it was at.

19        Q.    But you saw him pick it up?

20        A.    Yes.

21        Q.    Do you know whether any of the bullet casings

22    that were depicted in the last exhibit, which may have

23    been 10 -- do you know if any of those were kicked or

24    moved before the casings were photographed?

25        A.    Yes.  There were medical personnel walking in

1  that area, along with the gurney and other deputies that

2  arrived.

3      Q.   And then to get to that opening in the fence to

4  the west of you, immediately before you fired your

5  shots, would you have had to move closer to the vehicle

6  to the south of you?

7      A.   Yes.

8           MS. ANDERSEN:  Okay.  Those are the clarifying

9  questions I had.  Thank you.

10          MR. GALIPO:  Okay.  You're welcome.  I just had

11 some follow-up on a few of those.

12               FURTHER EXAMINATION

13 BY MR. GALIPO:

14     Q.   The flashlight, am I understanding you

15 correctly that the person that picked it up was told to

16 put it back in its place?

17     A.   That's what I heard, yes.  Uh-huh.

18     Q.   Did you see the person do that?

19     A.   I only saw them pick it up.

20     Q.   The casings, did you actually see any casings

21 being moved?

22     A.   No.  I just saw the fire personnel and other

23 deputies walk along that path line of where those

24 casings were.

25     Q.   Don't law enforcement normally have training

```
1   STATE OF CALIFORNIA)
                       ) ss:
2   COUNTY OF BUTTE    )

3

            I, KIMBERLY E. D'URSO, do hereby certify:
4

5           That the witness named in the foregoing

6   deposition was present remotely and duly sworn to testify

7   to the truth in the within-entitled action on the day and

8   date and at the time and place therein specified;

9           That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 2nd day of September, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```