Eugene P. Ramirez (State Bar No. 134865)
  eugene.ramirez@manningkass.com
Kayleigh Andersen (State Bar No. 306442)
  kayleigh.andersen@manningkass.com
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, COUNTY OF
SAN BERNARDINO and DEPUTY
CHRISTOPHER ALFRED

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| STEFFON BARBER, an individual,<br><br>              Plaintiff,<br><br>     v.<br><br>COUNTY OF SAN BERNARDINO, a municipal entity, and DOES 1 through 10, inclusive,<br><br>              Defendant. | Case No. 5:22-cv-00625-KK-DTBx<br><br>*[District Judge, Kenly Kiya Kato, Magistrate Judge, David T. Bristow]*<br><br>**[MOTION IN LIMINE NO. 2]**<br><br>**NOTICE OF MOTION AND MOTION *IN LIMINE* BY DEFENDANTS TO EXCLUDE PLAINTIFF'S EXPERTS SCOTT DEFOE AND ROBERT MORALES [DAUBERT MOTION]; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KAYLEIGH A. ANDERSEN**<br><br>Judge:  Hon. Kenly Kiva Kato<br>Date:   1/8/22026<br>Time:   10:30 a.m.<br>Crtrm.: 3, 3rd Floor<br><br>Trial Date: 1/26/26 |

///

**<u>TO THE HONORABLE COURT AND TO ALL PARTIES AND COUNSEL</u>:**

By and through their counsel of record in this action, defendants COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED (collectively herein after as "Defendants") will move this Court for an order to exclude the

following opinions and testimony of plaintiff's police practices expert, Scott DeFoe ("DeFoe"), and plaintiff's incident reconstruction expert Robert Morales ("Morales"), at trial regarding:

1.    Any testimony or opinions by the expert that are based on speculation and/or lack foundation; and

2.    Any testimony or opinions beyond the expert's scope of expertise.

This motion is made on the grounds that the above opinions lack evidentiary support pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and constitute nothing more than speculation.  DeFoe cannot state these opinions to a reasonable degree of scientific probability.  As such, his opinions are inadmissible under Fed. R. Evid. 702.   And, Morales cannot state these opinions to a reasonable degree of scientific probability.  As such, his opinions are inadmissible under Fed. R. Evid. 702.

This motion is based on all  pleadings, records and files in this action, and upon such further oral and documentary evidence as may be presented at the hearing on this motion.  This motion is made following conference of counsel which took place via telephone on December 4, 2025.

DATED:  December 11, 2025        Respectfully submitted,

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**


By:        /s/ Kayleigh Andersen
           Eugene R. Ramirez
           Kayleigh A. Andersen
           Attorneys for Defendant, COUNTY OF
           SAN BERNARDINO

DEFENDANTS' MOTION IN LIMINE NO. 2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

By this motion *in limine*, defendants seek to exclude certain opinions and testimony of plaintiff's police practices expert, Scott DeFoe, and plaintiff's incident reconstruction exeprt Robert Morales, at the time of trial, that:

1.    Any testimony or opinions by the expert that are based on speculation and/or lack foundation; and

2.    Any testimony or opinions beyond the expert's scope of expertise.

All of DeFoe's and Morales' opinions relate to the above categories (See Andersen Decl., Ex. A and B), and therefore all testimony by DeFoe and Morales should be excluded. The opinions offered by DeFoe and Morales are unreliable; they are lacking in evidentiary support and stated as speculation under the *Daubert* standard of admissibility.

## II. THE *DAUBERT* THRESHOLD FOR EXPERT OPINION EVIDENCE.

The trial court serves a gatekeeping function regarding the admissibility of expert evidence.  Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid, Rule 702 also provides that a witness may be qualified as an expert if "the testimony is based on sufficient facts or data."  "Where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question…, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  If the testimonial evidence fails in this regard, the expert opinion is inadmissible.  *Id.*

In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence." *In re Countrywide Fin. Corp. Mortgage-Backed*

1   *Sec. Litig.*, 984 F.Supp.2d 1021,1026 (C.D. Cal. 2013); (citing *Daubert v. Merrell*

2   *Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  The offering party must show by a

3   preponderance of the evidence that (1) the expert is qualified to render the opinion;

4   and (2) the opinion offered has adequate factual and scientific support for that

5   opinion.  *Daubert*, 509 U.S. at 592-93.

6   **III.    DEFOE LACKS THE REQUISITE EXPERTISE TO SUPPORT HIS**

7   **OPINIONS.**

8           Expert opinions are properly excluded if the *Daubert* standard is not met. *See*

9   *Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *12 (E.D. Mo. 2007) (plaintiff's expert

10  opinion on the effects of TASER ECD deployments was excluded under *Daubert*

11  because the court found plaintiff was not qualified to testify as an expert due to his

12  lack of familiarity with TASER devices and his reliance on only one scholarly

13  article on the effects of TASER ECD deployments).

14          An expert must stay "within the reasonable confines of his subject area."

15  *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (quoting

16  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969–70 (10th Cir. 2001))

17  (emphasis added).  "[M]erely possessing a medical degree is not sufficient to permit

18  a physician to testify concerning any medical-related issue.  [Citations]." *Ralston,*

19  *supra.*, 275 F.3d at 970.

20          "Rule 702 requires that expert testimony relate to scientific, technical, or

21  other specialized knowledge, which does not include unsupported speculation and

22  subjective beliefs." *Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825, 829

23  (9th Cir. 2001); *see Daubert*, 509 U.S. at 590.  Expert testimony is not admissible if

24  it too wide a reach exists between the expert's opinion and the evidentiary record.

25  *See: General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude

26  that there is simply too great an analytical gap between the data and the opinion

27  proffered.").

28          DeFoe is not qualified to testify not to render opinions as to mental health

**DEFENDANTS' MOTION IN LIMINE NO. 2**

issues of Plaintiff, if any. DeFoe is not a licensed psychologist. (Andersen Decl., Ex. A). DeFoe's opinion No. 7 starting on page 20 of his report is inappropriate as DeFoe is not qualified to render opinions on mental illness and whether Plaintiff was suffering from any alleged mental illness.

DeFoe's opinions that are beyond the scope of his expertise must be excluded. Allowing DeFoe to opine on any mental health issues based on no scientific data or qualifications to do so would be confusing to the jury and prejudicial to the Defendants.

## IV.    DEFOE'S OPINIONS LACK EVIDENTIARY SUPPORT.

In addition to DeFoe lacking the expertise to testify as to various matters addressed in his Rule 26 Report and at the time of trial, DeFoe bases all of his opinions on pure speculation and no admissible evidence. For this reason, all testimony by DeFoe related to the baseless opinions in his report and given at the time of deposition should be excluded.

Experts may not offer conclusory opinions, even in areas where they are highly qualified. Rather, experts must show their work. This allows the court and jury to evaluate the basis of the expert's opinion and determine whether the opinion is truly helpful, fact-based, and reliable. Otherwise an expert could offer his or her personal views as opinions, and the jury would have no way of knowing whether the opinions are trustworthy or representative of others in the field.

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, adv. comm. notes to 2000 amendments. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As the Ninth Circuit

MANNING | KASS

MK

explained on remand from the Supreme Court: "We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough." *Daubert v. Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1319 (9th Cir. 1995).

 "Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001); *see Daubert*, 509 U.S. at 590.  Additionally, under *Daubert*, an expert's opinion is inadmissible for unreliability where it is contrary to or unsupported by the weight of the evidence.

To elaborate, under Federal Rule of Evidence 702, expert opinion testimony is *only* admissible in federal court:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (l) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, in applying Rule 702, the trial court exercises its discretion regarding the admissibility of expert-technical evidence by performing a "'gatekeeping role...to all expert testimony....'" *Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1017 (9th Cir. 2004); *see Daubert, supra,* 509 U.S. at 590-592.  In this regard, it is the trial judge's role as gatekeeper to screen such testimony for relevance and reliability: that is, to make an assessment as to whether the reasoning and methodology underlying the expert testimony is scientifically valid and can be properly applied to the facts at issue.  *Daubert, supra*, 509 U.S. at 591-593.  "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question..., the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant]

1    discipline.'"  *Kumho Tire Co., supra,* 526 U.S. at 149.  If not, the expert opinion is

2    inadmissible.  *Id.*

3        In addition to being reliable, expert testimony must also be *relevant* in order

4    to be admissible.  *Daubert,* 509 U.S. at 589. Whether testimony is relevant depends

5    on whether the testimony can properly be applied to assist the trier of fact in

6    understanding and deciding *facts at issue*.  *Id*. at 589, 591; *Stilwell v. Smith &*

7    *Nephew, Inc.*, 482 F.3d 1187, 1191-1192 (9th Cir. 2007).  Thus, **to meet the**

8    **relevance standard, expert testimony must be '"sufficiently tied to the facts of**

9    **the case that it will aid the jury in resolving a factual dispute."'**  *Id*. (emphasis

10   added); *see also Daubert v. Merrell Dow Pharms*, 43 F.3d 1311, 1320 (9th Cir.

11   1995) (in assessing relevance, the court must look to the governing substantive legal

12   standard, and applying California's substantial factor causation standard).

13       Furthermore, the offering party must show by a preponderance of the

14   evidence that (1) the expert is qualified to render the opinion; and (2) the opinion

15   offered has **adequate factual and scientific support for that opinion**.  *See:*

16   *Daubert*, 509 U.S. at 588-90; *Joiner, supra*, 522 U.S. at 146 (holding that a court

17   may exclude expert opinion where it deems that the expert's opinion is *not*

18   sufficiently supported by the facts or evidence upon which the expert relies in

19   support of that opinion).  In other words, expert testimony is *not* admissible if it is

20   speculative.  *Id.* ("A court may conclude that there is simply too great an analytical

21   gap between the data and the opinion proffered."); *cf. Saelzler v. Advanced Group*

22   *400*, 25 Cal.4th 763, 771 (2001) ("proof of causation cannot be based on mere

23   speculation, conjecture and inferences drawn from other inferences to reach a

24   conclusion unsupported by any real evidence, or on an expert's opinion based on

25   inferences, speculation and conjecture"; applying a standard similar to *Daubert*).

26       In other words, to be admissible under *Daubert*, **an expert opinion must**

27   **have adequate factual and scientific support: where the gap between the data-**

28   **evidence and the expert opinion is too great, the opinion can only be viewed as**

1  **speculation or conjecture that cannot help the trier of fact, and it is thus**
2  **inadmissible**. *See: Joiner, supra*, 522 U.S. at 146; *Daubert*, 509 U.S. at 588-590.

3    Here, DeFoe's opinion and testimony is essentially that the use of force by
4  Deputy Alfred was inconsistent with generally accepted police practices and
5  objectively unreasonable because Plaintiff did not pose a threat to law enforcement
6  personnel. In forming this ultimate opinion, DeFoe failed to rely on any admissible
7  evidence and instead relied upon pure speculation and information that lacks
8  foundation in this case. This is partly due to the fact that DeFoe did not review much
9  of the evidence in this case.

10    In forming his opinions in this case, DeFoe relied on his own speculation of
11  the events. DeFoe admitted at deposition he did not read the criminal trial transcripts
12  and took an unknown "Mr. Landerville's" measurements as certain rather than using
13  all available evidence from investigators and personnel who were present at the
14  scene of the incident to form opinions about Deputy Alfred and his ability to
15  purportedly get out of the way of the reversing vehicle. (Andersen Decl., Ex. B at
16  40:21 – 41:9, 47:12 – 48:14, 50:5 – 56:4). DeFoe cannot and should not be able to
17  rely on incorrect or speculative information without any foundation in fact or reality
18  to assert opinions overriding the eyewitness accounts and the physical evidence.

19    Examples of DeFoe's numerous unsubstantiated claims and unsupported
20  opinions are included below.

21    DeFoe repeatedly refers to "fleeing felon", but this phrase is absent anywhere
22  else in this case. Deputy Alfred never testified that he used deadly force because
23  Plaintiff was trying to flee, and there is therefore no evidence that this use of force
24  arose out of the fleeing felon doctrine, whether an appropriate use of force or not.
25  DeFoe acknowledged this at the time of his deposition. (Andersen Decl., Ex. B at
26  34:19 – 35:1). Any reference to "fleeing felon" by DeFoe in the Report, including in
27  Opinion 3 (Andersen Decl., Ex. A at 12), Opinion 4 (Andersen Decl., Ex. A at 16),
28  and Opinion 5 (Andersen Decl., Ex. A at 17), is irrelevant, will confuse the issues in

the case and would confuse a jury as to the legal standard applicable to this incident, and is prejudicial to Defendants. DeFoe does not cite to one piece of evidence where Deputy Alfred stated or testified that he used deadly force to stop a fleeing felon, the Plaintiff. Thus, these opinions lack foundation and any reference to and opinions regarding "fleeing felon" should be excluded at the time of trial.

In Opinion 3 (Andersen Decl., Ex. A at 12) and Opinion 4 (Andersen Decl., Ex. A at 15), DeFoe addresses a vehicle as a deadly weapon and whether Deputy Alfred's use of deadly force was justified. DeFoe states is report, "A Deputy Sheriff should only discharge a firearm at a motor vehicle or its occupants when the Deputy Sheriff reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others." Andersen Decl., Ex. A at 12). DeFoe does not cite a basis for this opinion, and it is a gross misstatement of the law with respect to the use of deadly force, including the applicable case law and PC § 835a, as well as the policy of the San Bernardino County Sheriff's Department, which DeFoe cites to in Opinion 4 (Andersen Decl., Ex. A at 15). DeFoe admitted he did not know that Plaintiff was convicted of a felony for this incident, specifically Plaintiff was convicted of assault with a _deadly weapon_ on Deputy Alfred. (Andersen Decl., Ex. B at 59:15-24). A criminal jury has already determined that Plaintiff used a deadly weapon during this incident, namely his vehicle. To allow a police practices expert like DeFoe to tell a jury that a vehicle cannot be considered a deadly weapon to law enforcement, without any supporting citations of fact, law, or training, would undermine the criminal jury's conviction, would be prejudicial to Defendants, and would cause undue confusion to the jury.

Throughout his entire report, DeFoe ignores admissible evidence regarding how close Deputy Alfred was to the vehicle, how wide the vehicle was compared to the narrowness of the driveway, and how the vehicle accelerated backwards, all of which relate to the totality of the circumstances outlined in _Graham_ as to whether

9

the use of deadly force was reasonable. Instead, DeFoe simply repeatedly states that Deputy Alfred could have and should have moved out of the way of the vehicle without any supporting evidence or explanation to support this opinion. (Andersen Decl., Ex. A, Opinions 1, 3, 4, 5, and 6). At the time of deposition, DeFoe repeatedly testified he was not going to comment on timing and distance measurements because that was outside the scope of his designation, but in doing so, he refused to acknowledge where the measurements came from and failed to use those measurements to justify/support his opinions regarding whether the threat posed by Plaintiff was imminent or not. (Andersen Decl., Ex. B at 33:1 – 35:1). Again, DeFoe relies on a "Mr. Landerville" who is not a retained expert in this case and did not testify in the criminal trial, which DeFoe did not read anyway. DeFoe misses a crucial step in his analysis of the reasonableness of the force and that is applying the evidence to the opinions rather than just making bold, conclusory, and speculative statements.

Although discussed in the previous section, DeFoe's Opinion 7 is based on pure speculation and lacks any foundation. DeFoe admitted at deposition that there is no evidence in this case that Plaintiff was experiencing a mental health crisis of any kind, and DeFoe does not cite to any such evidence in support of this Opinion. (Andersen Decl., Ex. B at 55:4 – 56:23). Instead, Plaintiff was under the influence of methamphetamine at the time of this incident, which DeFoe acknowledged at deposition. This Opinion should be excluded in its entirely as it assumes facts not in evidence.

DeFoe's sole *Monell*-based Opinion 8 (Andersen Decl., Ex. A at 21) is also based on no cited evidence. DeFoe attempts to support this opinion by opining that because Deputy Alfred acted inappropriately in this circumstance (in his own opinion), the San Bernardino County Sheriff's Department *must not* have trained him properly. (Andersen Decl., Ex. B at 60:4 – 61:8). This is without any evidence of Deputy Alfred's training and how the Department trains its law enforcement

officers. Additionally, DeFoe opines that the Department must ratify inappropriate conduct simply because he does not believe there was any investigation into Deputy Alfred's conduct in this case. Again, no evidence is cited in support of this opinion as to whether Deputy Alfred was disciplined for a policy violation or the extent of any such investigation into the conduct.

While "'the application of extensive experience' is a 'method' that can reliably support expert testimony," *United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment), "reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony," *United States v. Valencia-Lopez,* 971 F.3d 891, 898 (9th Cir. 2020). Even assuming DeFoe has the requisite qualifications to testify on police practices based on his previous experience in law enforcement, the record, including the Report and deposition testimony, does not sufficiently demonstrate he employed reliable methods to identify law enforcement tactics and techniques. To the extent DeFoe's opinions are based on his vague and summarily described law enforcement experience during his deposition testimony and in his Report, such testimony and information are insufficient to demonstrate reliability.

As the Court knows, **the reasonableness of an officer's use of force/seizure can only be adjudged based on facts and circumstances known to the force-using officer at the time the force was used: facts unknown to him/her cannot play any role in the reasonableness analysis**. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Information gained after the fact cannot be relied upon in analyzing the propriety of the officers' conduct." *Scott v. Henrich*, 700 F.Supp. 498, 505 (D. Mont. 1988) *aff'd by Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994). *See, also*, *Baldridge v. City of Santa Rosa*, 1999 U.S. Dist. LEXIS 1414, at *20-21 (N.D. Cal. Feb. 9, 1999)

(holding that it was irrelevant that the decedent was unarmed as his actions alone "could cause a reasonable officer to fear imminent and serious physical harm."); *Sherrod v. Berry*, 856 F.2d 802, 805-807 (7th Cir. 2008) (whether a gun was found at the scene is irrelevant to a determination of whether an officer acted reasonably under the circumstances); *Rippey v. Dopp*, 19 Fed.Appx. 702, 703 (9th Cir. 2001) (citing *Sherrod* and declining to reverse the exclusion of the suspect being unarmed); *Barnes v. City of Pasadena*, 508 Fed. Appx. 663, 665 (9th Cir. 2013) ("Even if an issue of fact existed about the presence of a gun, the determinative issue was whether the officers reasonably believed [suspect] had a gun and posed an immediate threat to safety."); *Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 514; *Martinez v. County of L.A.* (1996) 47 Cal.App.4th 334, 343. DeFoe strays away from the relevant case law and statutes regarding the use of force by law enforcement in California and instead criticizes the actions of Deputy Alfred with the benefit of 20/20 hindsight, assuming Deputy Alfred knew or could have known that Plaintiff was not armed, that Plaintiff was simply trying to drive away rather than use his vehicle as a weapon, and that Deputy Alfred should have known Plaintiff was going to try to leave and should not have approached him that night as part of his investigation, placing himself in harm's way. These arguments did not work in front of the criminal jury and should not be allowed to be presented in this case.

In sum, as to DeFoe's opinions on the alleged practice of use of force, such opinions are conclusory and DeFoe fails to support any of his opinions with any evidence.

## V.    ROBERT MORALES LACKS THE REQUISITE EXPERTISE AND EVIDENTIARY FOUNDATION TO SUPPORT HIS OPINIONS.

First, Morales is not qualified to provide opinions as to the location of the fired cartridge casings as they relate to the location of Deputy Alfred at the time of the incident. During a Rule 402 hearing during the criminal trial of Plaintiff, Morales was

1    excluded from providing any opinions or testimony about the placement of Deputy

2    Alfred during the incident as they relate to the fired cartridge casings. (See Andersen

3    Decl., Ex. D at 443). The Court there determined Morales did not have the requisite

4    qualifications to provide such opinions, and the Court here should also determine that

5    Morales is not qualified to provide any such opinions. It must be noted that Morales

6    simply watched a video about how fired cartridge casings may be used to identify the

7    location of a person firing a gun without actually conducting a test with the gun used

8    by Deputy Alfred that night. (See Andersen Decl., Ex. D at 440-443). Morales also

9    did not account for any modifications to Deputy Alfred's gun, how old the gun is, and

10   how the springs inside the gun work, in providing any opinions about the location of

11   Deputy Alfred in relation to the fired cartridge casings. Notably, Morales' opinion as

12   to Deputy Alfred's location during the incident is simply: "The overall spatial

13   distribution of the bullet casings strongly suggests that Deputy Alfred was positioned

14   at least 50 ft away from the rear of the subject vehicle before it began to move." (See

15   Andersen Decl., Ex. C at 9). Not only is Morales not qualified to give an opinion like

16   this, Morales' opinion is not even certain as to the exact distance and is based on

17   completely unexplained and unreliable scientific methodology.

18        With respect to Morales' analysis of the audio, Morales relies on pure

19   speculation to opine that, "During the interval between the gunfire, Mr. Barber was

20   no longer in control of the vehicle, as evidenced by the absence of engine acceleration

21   sounds, suggesting that his foot was no longer on the accelerator pedal." (See

22   Andersen Decl., Ex. C at 11). There is zero evidence provided in support of this bold

23   statement, and as such this opinion lacks foundation as to whether Plaintiff was still

24   in control of the vehicle, where Plaintiff's foot was inside the vehicle, and the

25   unsupported statement that no acceleration sounds mean that Plaintiff was not in

26   control of the vehicle.

27        Next, there is no evidence to support Morales' opinions regarding the

28   movement of Plaintiff's vehicle in relation to each shot by Deputy Alfred. First, there

**DEFENDANTS' MOTION IN LIMINE NO. 2**

MANNING | KASS

MK

are no videos or photos of the incident itself. Second, Morales does not explain his methods to any degree of scientific certainty as to where the vehicle was on the driveway or in relation to Deputy Alfred at the time each shot was fired. Although Morales has several opinions in his report regarding how far the vehicle was from Deputy Alfred during each shot and how far the vehicle had traveled backwards at the time of each shot (See Andersen Decl., Ex. C at 12), Morales provides no explanation or analysis of how he arrived at such opinions based on the physical evidence. Additionally, Morales did not examine any black box from the vehicle as to location and speed at each moment in time, nor did he examine the vehicle in person. Morales' opinions regarding the vehicle's speeds at each moment in time are speculative and without reliable scientific methods.

As evidenced in Morales' stated expertise, Morales is not an expert in body dynamics and mobility and is unqualified to testify as to the capabilities of Deputy Alfred or any person during the incident. Further, Morales' opinion as to the capabilities of Deputy Alfred to move out of the way also notes that Deputy Alfred "had enough time to find cover or move out of the way instead of shooting." (See Andersen Decl., Ex. C at 14). Morales is not qualified to give this opinion as he is not a qualified or retained police practices expert. And, Morales opines as to the average walking speed for a person as it relates to his opinion that Deputy Alfred had time to move out of the way, but Morales fails to cite to any scientific evidence or any resources whatsoever for this opinion. (See Andersen Decl., Ex. C at 14).

For these reasons, the following "opinions" from Morales' report should be excluded as unreliable and speculative:

1. Deputy Alfred traveled a minimum distance of 15ft while shooting, which is inconsistent with the scenario in which the deputy was trapped or otherwise incapable to move to safety.

2. Deputy Alfred reacted to the sound of the engine sound rather than to the actual motion of the vehicle.

MANNING | KASS

MK

3. After the first shot, the vehicle engine cannot be heard operating.

4. The vehicle was either not in motion when Deputy Alfred started firing his shots or was moving at a slow speed of under 1 mile per hour.

5. At the time of the first shot, the vehicle had moved backwards less than one foot.

6. At the time of the second shot, the vehicle still had not traveled backwards more than one foot.

7. At the time of the last shot, the vehicle had started decelerating and was moving at approximately under 1 mile per hour before coming to rest.

8. The vehicle achieved a maximum traveling speed of approximately 3.4 mph. The significance of the vehicle's maximum speed of 3.4 miles per hour becomes apparent when compared to normal human locomotion speeds. Based on standard biomechanical data, the average human walking speed ranges from 3.0 to 3.5 miles per hour, meaning the vehicle's maximum speed was equivalent to or slightly faster than a person walking at normal pace.

9. Given the slow speed of the subject vehicle and the distance between Deputy Alfred and the vehicle, Deputy Alfred had enough time to find cover or move out of the way instead of shooting.

Pursuant to *Daubert*, Morales' opinions outlined in this section are not admissible.

## VI.    CONCLUSION

Based on the foregoing, defendants respectfully request that the Honorable Court exclude the testimony and opinions of plaintiff's police practices expert Scott DeFoe, and plaintiff's incident reconstruction expert Robert Morales, at trial, regarding:

1.    Any testimony or opinions by the expert that are based on speculation and/or lack foundation; and

///

DEFENDANTS' MOTION IN LIMINE NO. 2

1          2.      Any testimony or opinions beyond the expert's scope of expertise.

2  DATED:  December 11, 2025          Respectfully submitted,

3                                     **MANNING & KASS**
4                                     **ELLROD, RAMIREZ, TRESTER LLP**

5

6

7                                     By:  _____/s/ Kayleigh Andersen_____
8                                          Eugene R. Ramirez
                                           Kayleigh A. Andersen
9                                          Attorneys for Defendant, COUNTY OF
                                           SAN BERNARDINO

**DEFENDANTS' MOTION IN LIMINE NO. 2**

## <u>DECLARATION OF KAYLEIGH ANDERSEN</u>

I, Kayleigh Andersen, declare as follows:

1.      I am an attorney at law duly authorized to practice before all the courts of the State of California and in all of the United States District Courts within the Central District of California. I am a partner in the law firm of Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record herein for Defendants COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED (collectively "Defendants"). If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration, except as to those matters that are stated on information and belief herein.

2.      Attached hereto as **Exhibit A**, is a true and correct copy of Plaintiff's expert Scott DeFoe's Rule 26 expert report in this matter, which was served with the Plaintiff's expert disclosures on or about October 31, 2025.

3.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the December 1, 2025 deposition transcript of Scott DeFoe.

4.      Attached hereto as **Exhibit C** is a true and correct copy of Plaintiff's expert Robert Morales' Rule 26 expert report in this matter, which was served with the Plaintiff's expert disclosures on or about October 31, 2025.

5.      Attached hereto as **Exhibit D** is a true and correct copy of Pages of the transcript of the trial in *People of the State of California v. Steffon Todd Barber*, Case No. FVI21001037. See also Request for Judicial Notice filed concurrently.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 11, 2025 at Los Angeles, California.

*/s/ Kayleigh Andersen*
Kayleigh Andersen

# EXHIBIT A

# EXHIBIT A

# On-Scene Consulting

October 29, 2025

Ms. Renee Masongsong, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

## Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**STEFFON BARBER, an individual, Plaintiff,**
**vs.**
**COUNTY OF SAN BERNARDINO, a Municipal entity, and CHRISTOPHER ALFRED, Defendants.**
**Case No. 5:25-cv-00625-KK-DTB**

Dear Ms. Masongsong,

Thank-you for retaining me to analyze and render opinions regarding the April 27, 2021, Deputy-Involved Shooting of Mr. Steffon Barber by San Bernardino County Sheriff's Department, Deputy Sheriff Christopher Alfred, No. G9800. Pursuant to the requirements of Rule 26, I have studied reports, videos, photographs, San Bernardino County Sheriff's Department documents, Transcription of Digitally Recorded Deposition, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Second Amended Complaint for Damages, <u>Case No. 5:22-cv-00625-KK-SHK</u>.

2. San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, (<u>COSB 000947-956</u>).

3. San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, Report by Officer E. Hernandez, E, G4629, (<u>COSB 000957-
966</u>).

4, San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, Crime Scene Report by Detective G. Navarro, (<u>COSB 000967-
975</u>).

5. San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, Report by Detective A. Collins, #H7540, (<u>211-215</u>).

6. San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, Report by Detective J. Giles, #C9502, (<u>241-244</u>).

7. San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, Report by Detective J. Giles, #C9502, (<u>219-223</u>).

8. San Bernardino County Sheriff's Department, Crime Report, DR No.
242100897/H2021-053, (<u>15-28</u>),(<u>29-32</u>), (<u>34-54</u>), (<u>55-56</u>), (<u>58-61</u>), (<u>62-151</u>), (<u>153-167</u>),
(<u>180-181</u>), (<u>187-195</u>), (<u>207-208</u>), (<u>216-218</u>), (<u>224-231</u>), (<u>233-236</u>), (<u>238-239</u>), (<u>246</u>),
(<u>454-465</u>), (<u>466-472</u>), (<u>473-478</u>),(<u>480</u>), (<u>505-518</u>), (<u>976-979</u>), (<u>COSB 000976-1023</u>),
(<u>COSB 001032-1034</u>), (<u>COSB 001043-1055</u>), (<u>COSB 001057-1064</u>).

9. State of California Department of California Highway Patrol, Vehicle Report, (<u>197-
198</u>).

10. Sheriff's Department, County of San Bernardino, California, 03600, <u>Case No.
242210897</u>, (<u>209-210</u>).

11. Sheriff's Department, County of San Bernardino, California 03600,
Evidence/Property, (<u>453</u>).

On-Scene Consulting

12. Audio Analysis, San Bernardino County Sheriff's Department, DR#242100897/H#2021-053.

13. Audio-Recordings:
- Neighbor Marisela Garcia, (5:14).
- R. Gilford, (11:20).
- R. Murphy, (21:44).
- D. Tellez, (12:19).
- Maria Gallo, (30:13).
- Monique Granados, (1:26:36).
- _ Severo, (1:43).
- _Jones, (2:35).
- Deputy Christopher Alfred, (1:25:21).
- Deputy Joseph Mora, (1:06:50).
- Monique Granados, (4:03).
- Deputy Torres, (44:35).
- Neighbor Angelica_(16:04).
- Blake Coley, (43:05).
- J. Cocchi, (1:30:53).

14. 911 Audio-Recording, (4:19).

15. Dispatch Audio-Recording, (24:10).

16. Audio-Recording, Deputy Alfred, "Shots Fired," (13:17).

17. Audio-Recording, Re: Incident, (29:45).

18. Audio-Recording, Officer Mora, (12:26).

19. Audio-Recording, Officer Morales, (29:45).

20. Audio-Recording, Officer Torres, (6:18).

21. Air-Med Transport Records, Account No. 0321012884A, (PLTF ID 000896-908).

22. Detailed History for Police, Incident No. AD211170085, (199-206).

On-Scene Consulting

23. San Bernardino County Sheriff's Department Manual, (COSB 000001-946).

24. Deputy Alfred Belt Recording, (13:17).

25. San Bernardino County Sheriff's Department, DR No. 242100897, Crime Report & Miscellaneous Documents, (PLTF ID 001-288).

26. Audio-Recording, Morales, LFE, 04/27/21, (29:45).

27. Photographs of Deputy C. Alfred, (PLTF ID 000289-328).

28.. Photographs, Barber, (PLTF ID 000329-434).

29. Photographs of Scene, (PLTF ID 000435-659).

30. San Bernardino County Sheriff's Department Lethal Force Encounter, H#2021053/DR No. 242100897.

31. Deposition Transcript and Exhibits of Christopher Alfred taken on August 26, 2025.

32. Deposition Transcript of Steffon Barber, taken on September 9, 2025.

33. Protective Order.

**California POST Basic Learning Domains as Follows:**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #22: "Vehicle Pullovers."
7. #21: "Patrol Techniques."
8. #23: "Crimes in Progress."
9. #33: "Arrest and Control."
10. #35: "Firearms/Chemical Agents."
11. #37: "People with Disabilities."

On-Scene Consulting

**Summary**

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for Deputy Sheriff Christopher Alfred to shoot at Mr. Barber for fleeing or attempting to flee.  Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.

Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (2) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (3) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (4) the officer gives some warning that deadly force may be used, where feasible.  (*POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a; San Bernardino County Sheriff's Department Manual 3.608, The Use of Lethal Force*).

These four factors were not met in this case.  Mr. Barber did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident; Mr. Barber did not have a firearm, and Mr. Barber posed no immediate threat of death or serious bodily injury necessitating deadly force.

Deputy Sheriff Christopher Alfred violated basic police officer training and standards with respect to the use of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a vehicle.  A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation.  Mr. Barber did not pose an immediate threat of death or serious bodily injury to Sheriff's Deputy Christopher Alfred or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way.

**Opinions:**

<u>Note</u>: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  I hold the opinions below a reasonable degree of professional certainty.  The basis and reasons for my opinions are premised upon my education,

On-Scene Consulting

training and experience in law enforcement, my knowledge of law enforcement
standards, analysis and study; my familiarity with generally accepted police practices and
the professional and academic literature in the field; my review of relevant actions,
policies and procedures; and my understanding of the facts of this case based on my
comprehensive review of materials listed on Pages 2-4 of this report.  My opinions and
testimony regarding police procedure are relevant topics concerning issues of which lay
jurors are unaware or frequently have misconceptions.  My testimony on these topics is
relevant and would assist a jury in understanding the evidence presented to them.

## Opinion Number 1

It is my opinion based on my review of the facts, testimony, totality of the circumstances
and videos in this matter, a reasonable law enforcement officer acting consistent with
standard police practices would have moved to a position of cover and formulated a
tactical plan.  Based on my review of the facts in this matter, Deputy Sheriff Christopher
Alfred, No. G9800, had the requisite time and opportunity to move to a position of cover
and wait for additional San Bernardino County Sheriff's Department Deputy Sheriffs to
arrive.  In the event Mr. Steffon Barber left the scene in his vehicle, Deputy Sheriff
Christopher Alfred could simply take a report from the Person Reporting, (PR).  If the
investigation revealed that Mr. Steffon Barber committed a crime that necessitated a
detention, Deputy Sheriff Christopher Alfred could request assistance of San Bernardino
County Sheriff's Department Police Helicopter (40 King) to assist with containment and
formulated an effective and safe tactical plan.

In the event Mr. Steffon Barber did not flee in his vehicle or fled on foot, Deputy Sheriff
Christopher Alfred could have established a perimeter if there was Reasonable Suspicion
to detain Mr. Steffon Barber or Probable Cause to arrest Mr. Steffon Barber.

In addition, I base my opinion on California Police Officer Standards and Training
(POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach,
(2-8):

**First Unit at the Scene:** The first unit to arrive at the scene should take on the role of the
primary unit.  That officer should take the leadership responsibility to gather as much
information as is reasonably possible regarding the current status of the crime scene.  It is
the primary officer who must take charge and initiate the appropriate steps toward
controlling the situation.

The first officer to arrive should:

- Take a position to best observe and control the scene.

## On-Scene Consulting

- Advise dispatch and responding units of the arrival and location.
- Identification and location of reporting person.
- Interview of reporting person to determine if a crime occurred.
- Number of suspects and suspect(s) description.
- The type of weapon(s) involved.
- The number of persons injured by the suspect.
- Actions (propensity toward violence).
- Suspects current and prior mental health issues.
- Suspects current and prior medical issues.
- Other emergency vehicles responding to the scene.
- ***Communicate and coordinate with the other officers to establish perimeters to contain the suspect and prevent escape.***
- ***Request additional resources if necessary and available, (e.g., supervisor, additional units, canine unit, police helicopter).***

The Aviation Unit is one of the most technologically advanced and efficient law enforcement tools. The aircraft and their equipment are a "force multiplier" for law enforcement. One helicopter in the air can cover as much territory (more quickly) as 12 officers in patrol cars on the ground. The primary function continues to be that of support for ground units.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-10):

## **Establishment of a Perimeter:**

It is the responsibility of the primary officer to initiate the coordination of the security and containment of the crime scene. This can be done by establishing a boundary or perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.

Establishing a perimeter:
- Contains and isolates the crime scene.
- Prevents the suspect(s) from escaping the area.
- It prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(s).

On-Scene Consulting

There are two types of perimeters at a crime scene: **inner perimeter** and **outer perimeter**:

**Inner Perimeter**:
- Immediate area around the incident (e.g., private residence, commercial establishment, vehicle, etc.)
- Varying size depending on the purpose of the perimeter.

**Outer Perimeter:**
- Area surrounding the inner perimeter.
- May aid in apprehension if the suspect manages to breech the inner perimeter.

In addition, I base my opinion on my twenty-eight years of law enforcement experience as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of perimeters throughout all geographical patrol divisions to assist with containment, perimeter tactics and K9 searches. In addition, most of the K9 searches involved the assistance of an Air Unit(s).

In addition, it is my opinion based on my review of the facts, totality of the circumstances, testimony and videos in this matter, Deputy Sheriff Christopher Alfred's actions of remaining in the driveway without any cover or concealment was a poor tactical decision and unnecessarily escalated the situation. Deputy Sheriff Christopher Alfred failed to use Time and Distance.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided. Effective communication may enable a Police Officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- It can result in a reduction of injuries.
- Renders more effective public service and improves community relations.

On-Scene Consulting

- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

De-Escalation is a concept that involves an officer's use of time, distance and relative positioning in combination with Professional Communication Skills to attempt to stabilize a situation and reduce the immediacy of threat posed by an individual.

The tactical plan should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Conducted Energy Weapon, (CEW), Taser with an effective range of 7-15 feet and maximum range of 21-25 feet, Ballistic Shield, K9, Pepper Ball Round, 40MM Foam Baton Round and or Direct Impact CS Round,  ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 10-15 feet., or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round.  The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blended and filled with #9 shot.  The design utilizes four stabilizing tails and smokeless powder as the propellant.  The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet which could have effectively been deployed from a position of cover.

In addition, I base my opinion on POST Learning Domain 21, "Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**Cover**:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received (firearm, shotgun, rifle).

**Examples of Cover:**
- Cement block or brick walls.

On-Scene Consulting

- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific Crimes in Progress, 3-5:</u>

## **<u>Establish a Contact Officer and Cover Officers:</u>**

### **<u>Contact Officer:</u>**
The roles and responsibilities of each officer involved in a high-risk vehicle pullover must be clear.  The **<u>Contact Officer:</u>**
- Conducts the business of the pullover,
- Directs the driver and occupants(<u>s</u>) of the target vehicle,
- Takes necessary actions related to the investigation.

### **<u>Cover Officers:</u>**
<u>It is general responsibility of any cover officers to assist the primary officer at the scene of a high-risk vehicle pullover to</u>:
- Protect the primary officer who is conducting the business of the pullover,
- Take and maintain proper positions of cover and concealment,
- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

### **<u>Communications Between Officers:</u>**
In order to ensure officer safety and help ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to

On-Scene Consulting

reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 2**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Steffon Barber that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"  Based upon my review of the facts in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred, No. G9800, did not give a verbal warning to Mr. Steffon Barber that deadly force would be used and did not give Mr. Steffon Barber a reasonable opportunity to comply prior to firing his Glock, Model 21, .45 caliber, semi-automatic pistol unnecessarily shooting Mr. Steffon Barber.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department

On-Scene Consulting

Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

## **Opinion Number 3**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices would not have used lethal force in this situation. This was not an immediate defense of life situation, and, as explained further below, under the facts of this case, San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred, No. G9800, could not shoot Mr. Steffon Barber for fleeing.

In addition, it is my opinion that "Shooting at or from Moving Vehicles," which are shots fired at or from a moving vehicle, are rarely effective. Deputy Sheriffs should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. A Deputy Sheriff should only discharge a firearm at a motor vehicle or its occupants when the Deputy Sheriff reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others. Deputy Sheriffs should not shoot at any part of the vehicle in an attempt to disable the vehicle. "Shooting at or From Moving Vehicles" has shown to be a poor tactic in most scenarios. If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle.

It is my opinion that Deputy Sheriff Christopher Alfred, No. G9800, should not have used lethal force in this matter. This was not an immediate defense of life situation, including for the following reasons:

- Deputy Sheriff Christopher Alfred did not have any information that Mr. Barber was part of a gang. (*Deposition Transcript of Christopher Alfred, Page 32*).
- Deputy Sheriff Christopher Alfred did not have any information that Mr. Barber had any criminal convictions or had injured anyone prior to shooting him. (*Deposition Transcript of Christopher Alfred, Page 30*).
- Steffon Barber was committing no crime when Deputy Sheriff Christopher Alfred first approached him.
- Deputy Sheriff Christopher Alfred never saw a gun on Mr. Barber, nor did any citizen. Deputy Sheriff Christopher Alfred had no corroborated information that Mr. Barber had a gun, and in Deputy Sheriff Christopher Alfred's experience, a reporting party might report that a person has a gun in order to expedite law enforcement response. (*Deposition Transcript of Christopher Alfred*).

On-Scene Consulting

- Deputy Sheriff Christopher Alfred knew that Mr. Barber was in his own driveway. *(Deposition Transcript of Christopher Alfred, Page 32)*.
- Prior to firing his shots, Deputy Sheriff Christopher Alfred formed the impression that Mr. Barber's vehicle was on and that Mr. Barber wanted to leave, and he saw the reverse lights come on. (*Deposition Transcript of Christopher Alfred, Pages 40, 74*).
- Deputy Sheriff Christopher Alfred knew that the only way to leave the driveway was to reverse out. (*Deposition Transcript of Christopher Alfred, Pages 49-50*).
- Deputy Sheriff Christopher Alfred was not struck by any gravel or dirt from the tires prior to the shooting. (*Deposition Transcript of Christpher Alfred, Page 68*).
- The driveway width was approximately 15 feet and 7 inches, *(San Bernardino County Sheriff's Department Crime Report, Scene Description, PLTFID000274)*, and at the time of the shooting, Deputy Sheriff Christopher Alfred had approximately two to four feet between the left side of his body and the chain link fence to his left. (*Deposition Transcript of Christopher Alfred, Pages 19-20; photographs of the scene*).
- When Mr. Barber's vehicle moved backwards, it moved backwards approximately 16.9 feet, moving slowly in a straight line. *(Photographs and diagrams of the scene; investigative reports; belt recording; Deposition Transcript of Christopher Alfred, Pages 61-62)*.
- Deputy Sheriff Christopher Alfred was not struck by Mr. Barber's vehicle. (*Deposition Transcript of Christopher Alfred, Page 48*).
- Deputy Sheriff Christopher Alfred never had to dive out of the way of Mr. Barber's vehicle. (*Deposition Transcript of Christopher Alfred, Page 48*).
- Deputy Sheriff Christopher Alfred was the starting point guard of his high school basketball team. (*Deposition Transcript of Christopher Alfred, Page 22*).

From the standpoint of police practices, including basic police training, POST standards, and the County of San Bernardino's own policies, Deputy Sheriff Christopher Alfred's use of deadly force was improper, inappropriate, contrary to basic police training and POST standards, excessive, and unreasonable, including (but not limited to) for the following reasons:

- No Immediate Defense of Life Situation.  Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury.  A fear of future harm is not enough.  There was no immediate defense of life situation when Deputy Sheriff Christopher Alfred fired his shots.  No person was about to be

run over by Mr. Steffon Barber's vehicle at the time of the shots.

- <u>Subjective fear is insufficient</u>. Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." In this case, the record does not support any objectively reasonable explanation that Mr. Steffon Barber posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired. Mr. Barber was unarmed, and no person was about to be struck by Mr. Barber's vehicle.

- <u>Violation of basic police training.</u> Deputy Sheriff Christopher Alfred violated police training and standards surrounding shooting at vehicles and their driver when he shot Mr. Steffon Barber while Mr. Barber occupied the driver seat of a vehicle. There was no person about to be struck by Mr. Barber's vehicle when Deputy Alfred fired his shots. Therefore, there was no reason for Sheriff's Deputy Christopher Alfred to shoot.

- <u>No crime involving the infliction of serious injury or death.</u> Deputy Sheriff Christopher Alfred was not responding to a crime involving the infliction of death or serious bodily injury. Deputy Sheriff Christopher Alfred had no information that Mr. Barber was armed and no information that anyone had been injured.

- <u>Cannot shoot for fleeing</u>. As explained herein, Deputy Sheriff Christopher Alfred could not justify shooting Mr. Steffon Barber under a Fleeing Felon theory, including because Mr. Barber was unarmed, and Deputy Alfred had no information that Mr. Barber had killed or injured anyone prior to the shooting.

- <u>Unarmed</u>. Based on my review of the facts in this matter, at no time did Deputy Sheriff Christopher Alfred or any citizen observe Mr. Steffon Barber in possession of a firearm or any other weapon at the time of the shooting.

- <u>No verbal threats</u>. Mr. Barber never verbally threatened to harm Deputy Sheriff Christopher Alfred.

- <u>Reasonable alternative measures available</u>. Officers are trained that they can only use deadly force in a "last resort" situation. Deputy Sheriff Christopher Alfred had other reasonable measures available, including moving out of the way, waiting for backup, giving further commands, and setting up a perimeter for later apprehension.

- <u>No reverence for human life</u>. Police officers are trained that they must show a reverence for human life. Deputy Sheriff Christopher Alfred showed no reverence for human life when he fired at Mr. Steffon Barber.

- <u>Police officers are responsible for justifying every shot</u>. Police officers are trained that they must justify every shot they fire. Deputy Sheriff Christopher Alfred is responsible for every shot that he fired in this case, and all six of his shots were unjustified.

On-Scene Consulting

In addition, it is my opinion that even if the incident occurred as described by Deputy Sheriff Christopher Alfred, the use of deadly force would still not be appropriate in this incident as the movement would not have created an Immediate Defense of Life (IDOL) situation.

Lastly, I base my opinion on my twenty- eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


## Opinion Number 4

It is my opinion that San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred's use of lethal force violated police training and caused serious bodily injury to Mr. Steffon Barber, including but not limited to for the following reasons:

In addition, it is my opinion based on the facts and testimony in this matter, Department Deputy Sheriff Christopher Alfred violated basic police training with respect to shooting at vehicles and their drivers.

San Bernardino County Sheriff's Department Manual, Policy 3.608, The Use of Lethal Force,(COSB 000673-675),  states as follows:

> Firearms should not be discharged from or at a moving vehicle except in exigent circumstances. In these situations, a safety member must have articulable reason(s) for this use of lethal force, which include, but are not limited to the following: [1] A person in the vehicle is threatening the safety member or another person with lethal force by means other than the vehicle; or [2] The vehicle is operated in a manner which is likely to result in great bodily injury or death to a safety member or another person, and other reasonable means of defense have been exhausted, or are not available or practical. This may include, if time and circumstances allow moving out of the path of the vehicle.

Deputy Sheriffs are expected to follow their own department policies.

Deputy Sheriff Christopher Alfred's understanding of the policy in effect at the time of the incident was that deputies should get out of the path of a moving vehicle, rather than shooting at it, if feasible. (*Deposition Transcript of Christopher Alfred, Pages 11, 13,*

On-Scene Consulting

_48_). Deputy Sheriff Christopher Alfred had been trained, at the time of the incident, not to tactically position himself in a bad spot, with respect to moving vehicles. (_Deposition Transcript of Christopher Alfred, page 11_).

In addition to the San Bernardino County Sheriff's Department Manual, basic police officer training teaches that shooting at a moving vehicle has shown to be a poor tactic in most scenarios.  If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle.  Additionally, an assaultive motor vehicle does not presumptively justify the use of deadly force.

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for  Deputy Sheriff Christopher Alfred to shoot at Mr. Barber for fleeing or attempting to flee.  Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.

Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (_1_) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (_2_) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (_3_) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (_4_) the officer gives some warning that deadly force may be used, where feasible. (_POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a; San Bernardino County Sheriff's Department Manual 3.608, The Use of Lethal Force_).

**These four factors were not met in this case**.  Mr. Barber did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident; Mr. Barber did not have a firearm, and Mr. Barber posed no immediate threat of death or serious bodily injury necessitating deadly force.

Deputy Alfred _violated_ basic police officer training and standards with respect to the use of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a vehicle.  A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation.  Mr. Barber did not pose an immediate threat of death or serious bodily injury to Deputy Sheriff Christopher Alfred or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way.

On-Scene Consulting

Lastly I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 5**

It is my opinion that under the facts of this case, that San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred could not shoot Mr. Steffon Barber under a Fleeing Felon theory as described above, especially because Mr. Steffon Barber never inflicted death or serious bodily injury on anyone prior to the shooting.

In addition, it is my opinion based on the facts and testimony in this matter, Department Deputy Sheriff Christopher Alfred <u>violated</u> <u>San Bernardino County Sheriff's Department Manual, Policy 3.608, The Use of Lethal Force,</u>(COSB 000673-674): A safety member shall not fire at a person who is called upon to halt on mere suspicion and who simply runs away to avoid arrest.

## **Considerations Regarding the Use of Deadly Force**

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy, and the use of force must meet an *"Objectively Reasonable"* standard.  The following quotes from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner,"(Learning Domain #20; "<u>Introduction to the Use of Force,</u>" Pages 1-4).

On-Scene Consulting

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.  This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves*.  These powers come to the criminal justice system from the people they serve.  (Learning Domain #2: "<u>Criminal Justice System</u>," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "<u>Use of Force</u>," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (<u>Learning Domain #20</u>, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (<u>Learning Domain #20</u>, Chapter 3).

On-Scene Consulting

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

Per California Penal Code Section 835a(e)(2): "A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


### Opinion Number 6

It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a departure of from POST Standards Use of Force and Use of Deadly Force Training. In addition, I base my opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013 Cal LEXIS 6652.  In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly us of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force.  This includes but is not limited to the following:

Deputy Sheriff Christopher Alfred failed to identify himself as a police officer prior to shooting. (*Deposition Transcript of Christopher Alfred, Page 38*). Deputy Sheriff Christopher Alfred failed to request a back-up before attempting to make contact with Mr. Barber. (*Deposition Transcript of Christopher Alfred, Page 33)*, and a reasonable officer under these facts would have waited for additional San Bernardino County Sheriff's Department Sheriff's Deputies to assist with containment and tactical deployment to take Mr. Barber into custody. (*POST LD 23, Chapter 2: Basic Tactical Considerations Approach, Pages 2-8*). Deputy Sheriff Christopher Alfred exercised poor tactics when he: placed himself in a position behind the vehicle, did not step out of the way after Mr. Barber entered the vehicle, did not step out of the way when he saw the reverse lights come on the vehicle, and did not step out of the path of the vehicle to make

On-Scene Consulting

sure he would not be in the path of the vehicle. (*Deposition Transcript of Christopher Alfred, Pages 40-41).*

## **Opinion Number 7**

It is my opinion based on my review of the facts and videos in this matter that Deputy Sheriff Christopher Alfred, <u>No. G9800,</u> <u>failed</u> to initially determine that Mr. Steffon Barber was mentally ill and or experiencing a mental crisis.  Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such a**s** Mr. Steffon Barber who might be suffering from a mental illness and or experiencing a mental crisis.  Deputy Sheriff Christopher Alfred had information from the reporting party regarding Mr. Barber's behaviors that would indicate that he may have been mentally ill or experiencing a mental health crisis.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided.  It is my opinion that Deputy Sheriff Christopher Alfred, <u>No. G9800,</u> <u>failed</u> to create Time and Distance to de-escalate the situation. Effective communication may enable a Police Officer to gain cooperation and voluntary compliance in stressful situations.

In addition, <u>law enforcement officers should be taught the below listed De-escalation Techniques</u>:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (<u>voices</u>).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

On-Scene Consulting

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety.  Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

It is my expert opinion that a similarly trained San Bernardino County Sheriff's Department Deputy Sheriff would not have considered Mr. Steffon Barber to be a lethal threat in this set of facts.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


**Opinion Number 8**

It is my opinion based on my review of the facts, videos and totality of the circumstances, the San Bernardino County Sheriff's Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used by Deputy Sheriff Christopher Alfred in this matter was inappropriate, unreasonable, and excessive.  It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a failure by the San Bernardino County Sheriff's Department to properly train Deputy Sheriff Christopher Alfred on following subject matters: Verbal Strategies, Defusing and De-Escalation Techniques, Use of Cover and Contact Officers, Situational Awareness and the use of Less Lethal/Lethal/Deadly Force to include Shooting Into Moving Vehicles.  In addition, the San Bernardino County Sheriff's Department ratified the conduct of Deputy Sheriff Christopher Alfred by determining that his conduct was within policy and for failing to properly train them prior to this incident. These types of decisions tend to have a ripple effect in the Department because other Officers believe that they can engage in similar conduct without consequences.

On-Scene Consulting

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training and experience.  Upon my graduation in
June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal
Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion
of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training
Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task
Force where I functioned as an agent and undercover operative. The investigations
focused on targeting criminal organizations that were involved in large scale narcotic
smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from
August 1988 until I joined the Los Angeles Police Department in November of 1989.
While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon
my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to
being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast
Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I
was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked
a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I
functioned as an undercover operative targeting prostitution, gambling, bookmaking and
other Vice related offenses. While working Wilshire Vice, I was ambushed and received
two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries,
I attended mandated Field Training Officer School and was assigned as a Field Training
Officer at Wilshire Division.  I trained recruits upon their graduation from the Los
Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for
service, court testimony, emergency procedures, pursuit policy, accident investigations,
perimeters, Department policies and procedures, and effective communication skills.
While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of
Force incident, while working with a Probationary Police Officer who had recently
graduated from the Los Angeles Police Academy.

On-Scene Consulting

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

On-Scene Consulting

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, and Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training,

On-Scene Consulting

de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention

## On-Scene Consulting

Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies. Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal

## On-Scene Consulting

Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe

# EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

STEFFON BARBER, an              )
individual,                     )
                                )
            Plaintiff,          )
                                )
        vs.                     )    CASE NO.
                                )    5:22-cv-00625-KK-SHK
COUNTY OF SAN BERNARDINO, a     )
municipal entity, and DOES 1    )
through 10, inclusive,          )
                                )
            Defendants.         )
_____)

VOLUME I

REMOTE DEPOSITION BY ZOOM OF EXPERT WITNESS

SCOTT DE FOE

REMOTELY REPORTED FROM CALIFORNIA

MONDAY, DECEMBER 1, 2025

Reported by:
ANDREA RAMIREZ, CSR, CLR
CSR No. 13107
Job No. J13749808



1       UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5   STEFFON BARBER, an            )
    individual,                   )
6                                 )
              Plaintiff,          )
7                                 )
         vs.                      )   CASE NO.
8                                 )   5:22-cv-00625-KK-SHK
    COUNTY OF SAN BERNARDINO, a   )
9   municipal entity, and DOES 1  )
    through 10, inclusive,        )
10                                )
              Defendants.         )
11  _____)

12

13

14

15                  VOLUME I

16   REMOTE DEPOSITION OF SCOTT DE FOE, the expert

17   witness herein, taken on behalf of the defendant,

18   by Zoom, commencing at 1:35 p.m., on Monday,

19   December 1, 2025, before Andrea Ramirez, Certified

20   Shorthand Reporter No. 13107.

21

22

23

24

25

1       Q    You mentioned the "54 feet."  So I'm trying to

2  just -- as a basis for part of that opinion that -- when I

3  ask you that question.  That's what I'm trying to get at.

4          Do you know what that distance indicates?

5       A    Well, I can read it.  I'm looking at the

6  conclusions from his report, is where I derived that from.

7  If you'd like, I can read verbatim, which is what I

8  basically stated.

9          And that was when he initially fired.  And then

10  based on the interpretation of the combined evidence,

11  Officer Christopher Alfred ceased fire --

12          (Reporter interrupted for clarification

13          of the record.)

14          THE WITNESS:  What I'm -- what I'm reading from

15  is what Mr. Landerville testified to, is that based on the

16  interpretation of the combined evidence, Officer Alfred

17  ceased fire when he was next to Casing Number 8, which is

18  at 22 feet away from the 2003 Chevrolet Trailblazer EXT's

19  final position.

20  BY MS. ANDERSEN:

21       Q    So did you -- in reviewing the materials in this

22  case, including that -- that expert opinion, did you

23  interpret the evidence to also indicate that Deputy Alfred

24  moved 32 feet during his shots, forward towards the

25  vehicle?

1      A      Once again, you're asking me to either contradict

2   or somehow agree with Mr. Landerville's opinions.   That's

3   outside of my scope.

4            The distance that he moved towards the vehicle

5   when he fired is not within the scope of my opinions.   My

6   opinions were the -- "Was the shooting reasonable?" which

7   I clearly believe it was not objectively reasonable based

8   on the totality of the circumstances.   It had nothing to

9   do with based on the position.

10            There was an opportunity for him to move to a

11   position of cover.   There was an opportunity for him to

12   initially not stand behind a vehicle that you know is

13   running.   And there was an opportunity, based on my review

14   of the photographs in this matter, specifically directly

15   to where his flashlight was located, he simply could have

16   moved into that carport area and away from the vehicle

17   prior to the vehicle moving at all in this case.

18      Q      Did Deputy Alfred ever testify that he shot

19   Mr. Barber because he was fleeing?

20      A      I don't know if he used those words, that he shot

21   him because he was fleeing.

22      Q      Did he ever indicate in his investigation -- or

23   his interview after this incident or during the trial --

24   the criminal trial or during his deposition that he shot

25   Mr. Barber because Mr. Barber was trying to leave?

1     A     Not that I read anywhere, ma'am.

2     Q     And you read Mr. Barber's deposition testimony;

3  is that correct?

4     A     Yes, ma'am.

5     Q     And do you recall he testified that he heard

6  someone giving him commands, like not to get in the

7  vehicle and to show his hands?

8     A     I believe so.

9     Q     Do those sound like law enforcement commands,

10  based on your training and experience?

11     A     Yes.  I mean, it sounds like law enforcement

12  commands -- consistent with law enforcement commands.

13     Q     Did you read in Mr. Barber's deposition testimony

14  that he heard the police tell him not to get into the

15  vehicle but that he got into the vehicle anyway?

16     A     I don't recall that.  But, possibly.

17     Q     Does whether or not Mr. Barber knew he was

18  getting commands from a police officer change any of your

19  opinions in this case?

20     A     Not at all.  The fact of not complying with a

21  command is passive noncompliance, but not offering any

22  form of physical resistance would not justify the use of

23  lethal force based on the totality of the circumstances.

24     Q     Would you consider getting into a vehicle and

25  reversing backwards down the driveway a form of passive

1    one.

2             Would you agree with that?

3        A    Yes, ma'am.

4        Q    So if a criminal jury found him guilty of assault

5    with a deadly weapon, can you think of any other deadly

6    weapon that was involved in this incident other than

7    Mr. Barber's motor vehicle?

8        A    No, ma'am.  I did not know of any other weapon

9    other than the vehicle, which, once again, I don't find

10   was a deadly weapon at the time in which the shooting

11   occurred, even though a criminal trial occurred and a

12   jury, which are laypersons that don't have any background,

13   education, and training in law enforcement, have not been

14   trained as a law enforcement officer, came to that

15   conclusion.  But I'm not disputing or offering any legal

16   opinions in this matter.

17       Q    Did you review the criminal trial transcript?

18       A    I believe I did.

19       Q    Okay.  You saw there was a number of testimony

20   from experts in that criminal case?

21       A    I believe so.  I'm not a hundred percent sure.

22   I'm just checking to see if I even -- in fact, I even -- I

23   even reviewed the criminal trial.  I may not have.  Bear

24   with me one second, please.

25       Q    No problem.

 1         A     I don't believe I received the criminal trial in
 2    this case.  So I don't know who may have testified in
 3    this -- in that particular case.  I did not -- I did not
 4    receive or review it.  I just looked at my materials.
 5         Q     Did you request a copy of the criminal trial
 6    transcript for review in this case?
 7         A     I did not.  I don't even know if I knew that a
 8    criminal trial had occurred on this case, so I didn't ask
 9    for that.
10         Q     So is my question to you the first time that you
11    heard that he was found guilty of assault with a deadly
12    weapon?
13         A     You know, I know that there was a criminal trial.
14    I don't know the -- what actually he was found guilty of
15    in the criminal trial and what charge it was.  So I'm
16    unsure.
17              I believe that Mr. -- Ms. Masongsong mentioned
18    that there was a criminal trial at some point.  And I
19    don't know if she had mentioned the results of the
20    criminal trial or not.
21         Q     Did you have any understanding as to what the
22    criminal trial was for in this case?
23         A     I believe as it relates to the -- the allegation
24    of an assault with -- or it could have been a 148.  I'm
25    not sure -- as it relates to the attempting to flee in a

```
 1   position in a quick enough manner, then, no, he should

 2   have not approached and remained -- he should have

 3   remained at the mouth of the driveway area rather than

 4   walk up on the vehicle.

 5        Q    You agree that Mr. Barber was not inside the

 6   vehicle when Deputy Alfred first initiated verbal contact

 7   with him; correct?

 8        A    Correct.

 9        Q    Okay.  Mr. Barber was standing outside of the

10   running vehicle; right?

11        A    Yes, ma'am.

12        Q    Okay.  Do you still think it would have been

13   appropriate for Deputy Alfred to run up the driveway into

14   that side opening simply because the vehicle was running?

15        A    Well, you can move to that location, which is

16   adjacent to where his flashlight was located.  There was

17   an opportunity to clearly just use the barrier of that

18   fence as a position of cover and then, obviously, issue

19   commands to him back to your location, which would have

20   provided the opportunity to do that, to either speak with

21   him, or, once again, if you had reasonable suspicion to

22   detain him, then you could do so in that area rather than

23   in an area that -- especially knowing that the vehicle is

24   started and was idling at that point, was a poor tactical

25   choice.
```

1      Q     What was the width of the driveway?

2      A     Once again, I didn't -- I can read off of what

3   Mr. Landerville wrote in his report.  But, you know,

4   the -- I -- I -- it's really outside of my scope because I

5   did not provide -- I did not go out to the scene, did not

6   do any measurements.

7            So I don't want to misspeak.  And I said it again

8   that I'm not -- it's outside of my scope regarding any

9   type of measurements, width of the driveway.

10            I want to make sure that -- I don't know if

11   Mr. Landerville has been deposed yet.  And if so, I don't

12   want to do anything that would -- or say anything that

13   would conflict with what he is testifying to, as that is

14   really outside of my scope.

15      Q     Do you recall reading in Deputy Alfred's

16   testimony at deposition that somebody did, in fact, move

17   that flashlight after the shooting?

18      A     I believe he may have stated that.

19      Q     And same thing with the shell casings; do you

20   recall any testimony during Deputy Alfred's deposition

21   that the shell casings were stepped on by other deputies

22   and responding medical personnel?

23      A     You know, I'm not sure if he stated that or not.

24   I don't think that -- that -- once again, that would have

25   been -- even if they were -- I'm not purporting that they

1    were -- that the flashlight was moved or that any casings

2    were disrupted by any responding deputies or not, that

3    still wouldn't -- that still would be outside of my scope,

4    as I'm testifying to any and all of the six shots that

5    were fired were objectively unreasonable based on the

6    totality of the circumstances, regardless if the shell

7    casings somehow were moved as a result of Mr. Barber

8    receiving medical treatment or being extracted from his

9    vehicle.

10    Q    Is there any distance away from the vehicle for

11    Deputy Alfred that you would have found that the shooting

12    would be objectively reasonable?

13         Like, how -- how close would Deputy Alfred need

14    to be to the rear of a reversing vehicle for you to find

15    the shooting was justified, if at all?

16    A    Well, for one, I would not stand behind a moving

17    vehicle.  Officers are trained -- or should be trained to

18    avert the threat by moving away.

19         If I did make a poor tactical decision to stand

20    behind a vehicle, once I saw the lights engage to reverse

21    like we would if we were walking through a parking lot, we

22    simply would get out of the way.

23         And there was clearly an opportunity, based on

24    where the vehicle is positioned in the center of the

25    actual driveway, for him to avert the vehicle.

```
 1          If he didn't even want to go into the cutout area

 2  of the carport, he could have clearly averted the vehicle

 3  by moving to the right or to the left of the vehicle to

 4  avert the vehicle if it was, in fact, backing towards him.

 5      Q    With the Chevy Trailblazer that Mr. Barber was

 6  driving during this incident, how much space was there on

 7  each side of the vehicle?

 8      A    Once again, I did not do measurements on each

 9  side, and, once again, that was, you know, outside of my

10  scope.

11          But I'm looking at the photos.  I'm not providing

12  any type of estimate.  But clearly enough for him to move

13  to the right or the left to avert the vehicle.

14          But, once again, that's if he made a poor

15  tactical decision to stand behind the vehicle.  He clearly

16  could have just moved to the cutout area, which is to

17  the -- which was on the passenger side of the vehicle.

18      Q    Did you read in Deputy Alfred's deposition

19  testimony that he would have had to move closer to the

20  reversing vehicle in order to reach that cutout area on

21  the side?

22      A    Yes.  Still plenty of time based on the -- the

23  alleged speed of the vehicle based on Mr. Landerville's

24  opinions and based on where the vehicle was at rest at the

25  time in which the shooting occurred, clearly, an
```

1  opportunity to move to that cutout without putting himself

2  in any type of poor tactical position either prior to

3  Mr. Barber getting into the car or once he did get in the

4  car.

5       Once he got into the car, a reasonably-trained

6  officer would have to believe that he's potentially going

7  to leave the area, which would have afforded a

8  reasonably-trained officer the opportunity to move to that

9  position and not stand behind a vehicle that is, in fact,

10  you know to be idling, and now you know that there's a

11  driver in the driver's compartment, and that being

12  Mr. Barber.

13       Q    Did you see any evidence that Deputy Alfred knew

14  or should have known that Mr. Barber was simply trying to

15  leave rather than use his vehicle as a weapon?

16       A    Once again, there was no fast backing up of the

17  vehicle.  Mr. Barber testified he wasn't struck with

18  gravel or anything from the wheels spinning.

19       But, once again, it doesn't matter if he was

20  going in the vehicle for any reason.  The -- the issue

21  with that would be to take cover.

22       He has not been searched.  I don't know if --

23  what's in his vehicle.  I don't know what's on his person.

24  So I'm not going to stand behind the vehicle and -- and

25  wonder what he's going to do in the vehicle.  I'm going to

1    materials you reviewed that Mr. Barber was mentally ill at

2    the time of this incident?

3        A    Evidence, no, ma'am.

4        Q    Have you been provided any evidence that

5    Mr. Barber was, at any time during this incident,

6    experiencing a mental health crisis?

7        A    No.  Just the comments of the call, I think a

8    reasonably-trained officer would know that his actions or

9    behavior would be concerning; you know, banging on the car

10   allegedly, you know, not allowing the residents --

11   resident allegedly from getting into their residence,

12   allegedly opening -- attempting to open the RP's car

13   doors.

14           I think, based on the totality of the

15   circumstances, that a reasonably-trained officer would

16   consider or have to consider that Mr. Barber was

17   potentially mentally ill, potentially experiencing a

18   mental crisis, just based on the information that -- from

19   the reporting party.

20       Q    Are those behaviors in that report from the

21   reporting party also consistent with somebody who is under

22   the influence of a substance?

23       A    Possibly.  I mean, you have to consider -- we

24   know that, unfortunately, many of our mentally ill

25   self-medicate with controlled substances.  They fail to

1   take their psychotropic medications.

2         So you have to consider under the influence,

3   mentally ill, off psychotropic medications, under the

4   influence of alcohol, a compilation of all of the above.

5   I think a reasonably-trained officer would consider all of

6   those.

7      Q    And you're aware that at the time of this

8   incident, Mr. Barber was under the influence of

9   methamphetamine; correct?

10     A    After the fact, yes, ma'am, I did find that out.

11     Q    Okay.  And even POST teaches that drug use does

12  not constitute a mental disorder; correct?

13     A    Correct.  But as I mentioned, ma'am, many times

14  subjects will self-medicate due to the effects from taking

15  psychotropic medications, especially as they have on men.

16         So many men -- many men will at times

17  self-medicate with central nervous system stimulants, such

18  as methamphetamine, in lieu of taking their prescribed

19  psychotropic medication.

20     Q    But as you sit here today, have you reviewed any

21  materials that indicate Mr. Barber has any mental health

22  diagnoses?

23     A    Not that I received thus far, I don't believe.

24     Q    Okay.  And Learning Domain 37 covers individuals

25  with disabilities; correct?

```
 1              THE WITNESS:  Once again, if you're speaking to
 2     the parallels in this matter, you know, obviously,
 3     Deputy Alfred testified that he did not shoot Mr. Barber
 4     for fleeing.
 5              We know that Mr. Barber did not commit a violent
 6     and/or atrocious felony that would necessitate any type of
 7     lethal force for fleeing.
 8              So people flee from the police all the time.  The
 9     fact is using reasonable force to overcome resistance,
10     prevent escape, or effect an arrest.  The question would
11     be in this case, "Was there probable cause to arrest, even
12     reasonable suspicion to detain based on the totality of
13     the circumstances?"
14     BY MS. ANDERSEN:
15         Q    Assault with a deadly weapon is a felony;
16     correct?
17         A    Yes, it can be.  It's a felony and misdemeanor.
18         Q    And I know you didn't review the -- the
19     sentencing or orders.  But do you know whether he was
20     charged with a felony and convicted of a felony for
21     assault with a deadly weapon in this case?
22         A    Once again, I'll -- a 14-year prison sentence,
23     I'll make the assumption that's a "yes."  But I have not
24     read any of the court documents.
25         Q    Does the subject need to verbally threaten
```

THE SULLIVAN GROUP OF COURT REPORTERS

1    someone in order for a use of deadly force to be

2    justified?

3        A    No, ma'am.

4        Q    In Opinion 8, which is page 21, what do you base

5    your opinion on that the San Bernardino County Sheriff's

6    Department failed to train Deputy Alfred?

7        A    Based on his actions.

8        Q    Do you know the last time prior to this incident

9    Deputy Alfred received use-of-force training?

10       A    I believe he qualified with his pistol, I

11   believe, a month before prior to the shooting.  So if he

12   did qualify a month before -- I have not seen the lesson

13   plan associated with that.

14           But, typically, there may be a discussion of use

15   of lethal force at the time of the qualification.  I don't

16   know if it was simply a range qualification and/or there

17   was training associated with the qualification a month

18   before.

19       Q    Okay.  And do you know the last time

20   Deputy Alfred received training on deescalation -- the

21   last time before this incident?  I'm sorry.

22       A    I don't, ma'am.

23       Q    Okay.  And do you know what was taught in that

24   training?

25       A    I don't, ma'am.

1       Q    So the basis for your Opinion 8 is simply because

2   of Deputy Alfred's actions, he must not have been trained

3   correctly by the sheriff's department; is that -- is that

4   the summary of it?

5       A    Correct.  Based on the subject matters that I

6   outlined based on his actions preceding the use of lethal

7   force and then during and at the time of the use of lethal

8   force.

9       Q    Are you critical at all of the use-of-force

10  policy, itself, by the San Bernardino County Sheriff's

11  Department that was in effect at the time of this

12  incident?

13      A    No, ma'am.

14      Q    Do you know whether Deputy Alfred was trained on

15  that policy at any time before this incident?

16      A    He would have to be to graduate from their police

17  academy.

18      Q    Per 835a, law enforcement officers are required

19  to use alternative force options when feasible; correct?

20      A    Correct.

21      Q    There's no requirement that all force options

22  have to be exhausted prior to the use of deadly force;

23  correct?

24      A    Yes, ma'am, that's correct.

25      Q    According to standard police practices, to

# EXHIBIT C

# EXHIBIT C

# EXHIBIT 4

# YA ENGINEERING SERVICES

October 31, 2025                                                                 Via Email

Rodney S. Diggs, Esq.
Ivie, McNeill, Wyatt, Purcell & Diggs
444 South Flower Street, Suite 3200
Los Angeles, CA 90071

Re:   *Case Name:*           *Barber v. County of San Bernardino*
      *Date of Loss:*         *April 27, 2021*
      *YAES Project No:*      *AR-20251182*

Dear Mr. Diggs:

## INTRODUCTION

At your request, YA Engineering Services (YAES) conducted a forensic analysis of the incident involving a police shooting in which Mr. Barber was positioned inside his vehicle, parked at the far end of a long driveway that provided access to his residence. According to the involved deputy's statement, Mr. Barber reversed his vehicle, at which point the deputy discharged his firearm into Mr. Barber's vehicle from behind.

## SCOPE

The scope of this analysis is to assess the encounter involving Steffon Todd Barber, operating a 2003 Chevrolet Trailblazer, and Deputy Alfred of the San Bernardino County Police Department. Specifically, the analysis aims to:

- Reconstruct the chronological sequence of events

- Determine the total distance and time traveled, as well as the maximum speed reached by the Chevrolet Trailblazer during the subject incident.

- Determine the distance between the Chevrolet Trailblazer and Deputy Alfred before the first shot was fired and immediately after the final shot was fired.

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

**MATERIALS REVIEWED**

The following materials were provided for review:

- PD PHOTOS:
  - Hospital and Ofc Process-147 photos, recvd 10/28/2024
  - ISIExport_recvd 11/7/24
    - Photos of Barber and Alfred
    - 256 Scene Processing_recvd 11/7/24
    - Vehicle Processing_recvd 11/7/24
- Client Photos:
  - 14 photos extracted #1-14_recvd 11/7/24
- Media
  - 911 Call_recvd 11/12/24
  - Dispatch & Deputies Audio_recvd 11/12/24
  - Incident Dispatch Audio _recvd 10/28/24
- Investigative Reports:
  - A. Collins
  - A. Guerrero
  - A. Hood
  - B. Coley
  - C. Bonar
  - Det. A. Bustamante
  - Det. E. Hernandez
  - Det. G. Liang
  - Det. G. Navarro
  - Det. R. Ripley
  - J. Sandles
  - K. Russell
  - O. Domon
  - P. Green-Purba
  - R. Delgado
  - R. Morales
  - R. Rees
- Transcripts
  - Deposition of Deputy Alfred
  - Deposition of Steffon Barber
  - Interview of Deputy Alfred
- Protective Order in Federal Case

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

## INVESTIGATION

### Vehicle Specifications

The specifications of the vehicle involved in the subject incident are summarized in the table below:

|        | V-1 |
|--------|-----|
| Year   | 2003 |
| Make   | Chevrolet |
| Model  | Trailblazer |
| VIN    | 1GNES16SX36116636 |
| Plate  | CA 5AMC384 |
| Driver | Steffon Tood Barber |

### Investigative Reports

Det. G. Liang (Vehicle Processing)

Detective G. Liang prepared a report regarding processing the subject Chevrolet Trailblazer. Detective Liang met Sheriffs Automotive motor pool assistant John Arbogash at the crime lab and had him tow the Trailblazer to the San Bernardino County Weights and Measures vehicle scale. Arbogash weighed the tow truck and Trailblazer together to obtain a total weight of both vehicles. The total certified weight of the two vehicles together was 24,500 pounds. The weight of the sheriff's tow truck was 19,620 pounds. The weight of the Blazer (minus the solo occupant) was determined to be 4,980 pounds. (24,600-19,620 = 4,880 pounds). The driver of the vehicle at the time of the LFE was Barber. Barber weighed approximately 160 pounds. With the added weight of Barber in the vehicle at the time of the LFE, the Trailblazer weighed approximately 5,040 pounds (4,880+160 = 5,040).

Det. G. Navarro

Detective Navarro prepared a detailed report regarding their walk through of the incident scene. The report includes details and measurements regarding the scene and placement of placards identifying the locations of objects of evidentiary value.

K. Russell

Deputy Russell prepared a supplemental report regarding their participation in the subject incident. Russell controlled the front door of the residence while other deputies approached the suspect vehicle, gave commands and eventually handled the suspect. Deputy Russell observed Field Training Officer Mora removed the suspect from within his vehicle. As Mora did so, Russell observed that the vehicle moved in a reverse direction as it was idle and in reverse. Mora placed the vehicle transmission into park and guided the Barber onto the

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

ground. Russell observed Mora and Deputy Larry Torres rendering aid to the Barber whom appeared to have sustained a gunshot wound to the head. Russell taped off the scene was later tasked with documenting the crime scene log.

P. Green-Purba

Deputy Green-Purba prepared supplemental reports regarding shell casings, a lab report regarding the scene, and a report regarding the vehicle and bullet trajectories.

R. Rees

Deputy Rees prepared a supplemental report regarding the Gun Shot Residue Report.

**Incident Site**

The incident occurred in the driveway of the residence at 12013 White Avenue in the City of Adelanto, California. The driveway is surfaced with dirt and loose gravel, which impacts significantly vehicle traction and motion, and it gradually narrows from north to south. At its northern end, the width of the driveway is approximately 15 feet and 7 inches. At the southern end, the width contracts to approximately 13 feet and 8 inches. The driveway is bordered at its southern end by a white wooden fence, which stands approximately 6 feet tall.




**Exhibit #: Northen end of subject driveway**          **Exhibit #: Southern end of subject driveway**

Along its eastern boundary, the driveway is bordered by a chain link fence, while on the western side it is bordered by a wooden fence and the east-facing wall of the adjacent property 12015 White Avenue. At the time of the incident, the wooden fence featured an opening measuring roughly 15 feet in width, which provided both pedestrian and vehicular access to the rear of the property at 12015 White Avenue.

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025




**Exhibit #: Looking south on subject driveway**          **Exhibit #: Wooden fence opening**

## Site Inspection

On October 20, 2025, at approximately 11:00 a.m., YAES conducted an inspection of the incident site located at 12013 White Avenue in the City of Adelanto, California. Prior to this inspection, the surface of White Avenue had been repaved. Furthermore, the opening in the wooden fence adjacent to 12015 White Avenue has been permanently closed, and all damage that the fence sustained because of the incident has been fully repaired. During the inspection, the subject driveway and surrounding areas were photographed, measured, and 3D laser scanned. A total of 43 digital photographs were captured to document the scene. At the time of inspection, there were no physical markings on the driveway or residual evidence of the subject incident visible.




**Exhibit #: Looking south on 12015 White Avenue driveway – 10/20/2025**          **Exhibit #: Wooden fence opening closed – 10/20/2025**

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025



**Exhibit #: Point cloud of incident site – 10/20/2025**

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

## ANALYSIS

### Photogrammetry

The application of photogrammetry in reconstructing the incident site involved the process to accurately determine the positions of placards and the final resting point of the 2003 Chevrolet Trailblazer. Initially, the original photographs of the scene were corrected for lens distortion to ensure geometric fidelity. These corrected images were then integrated with the 3D point cloud of the incident site, allowing for precise spatial alignment of objects.



Exhibit #: Provided photograph corrected for lens distortion



Exhibit #: Point cloud overlay

To facilitate accurate positioning, camera solutions were generated through photogrammetric techniques, enabling the determination of the exact locations of the placards within the scene. A 3D box object was employed as a marker to aid in this precise localization of the placards. Furthermore, the point of rest of the Chevrolet Trailblazer was determined by utilizing a 3D model of the vehicle, ensuring an accurate representation of its point of rest.



Exhibit #: Location of placards and point of rest of subject vehicle – Looking north on subject driveway



Exhibit #: Location of placards – Looking south on subject driveway

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025





Exhibit #: Location of placards – Looking south on White Avenue

Exhibit #: Location of placards and point of rest of subject vehicle – Aerial view

**Site Diagram**

A site diagram was generated using the initial distance measurements provided in the scene walk-trough report. These measurements used two points as reference: the Edison utility pole No. 2184965E, located on the north curb of White Avenue, and the east-facing exterior wall of 12015 White Avenue. The measurements provided were subsequently contrasted with measurements derived via photogrammetric analysis.



Exhibit #: Accident site diagram – Law enforcement provided measurements

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

Notably, the positions of the numbered placards identified via photogrammetry did not correspond with those indicated by the police. Several factors could be the cause of this discrepancy. First, the original documentation lacks disclosure concerning the selection and verification of the two reference points, introducing uncertainty in the measuring process. Second, the instrumentation has inherent limitations with respect to resolution, calibration traceability, and repeatability, thereby reducing both the precision and accuracy of the recorded values. Third, any manual measurement process is subject to human-operator error: variations in wheel contact, surface irregularities, alignment with reference points, and ambient conditions can all introduce both random and systematic error. These factors diminish confidence in the original dataset and help explain the discrepancy observed when comparing the measurements provided by the police with those derived via photogrammetric analysis.



**Exhibit #: YAES Accident site diagram – Photogrammetry measurements**

Based on the site diagram, measurements were taken to determine the linear distances between individual bullet casings. For example, the spacing between each casing was assessed, revealing that most were consistently placed. However, casings #5 and #7 were approximately 7 feet apart, suggesting either a longer interval between these shots or a possible change in the position of the shooter. The overall linear distance from the first bullet casing at placard #2 to the last at placard #7 was measured to be approximately 15 feet.

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

 

| Exhibit #: Linear distance between bullet casings | Exhibit #: Linear distance between bullet casings clusters |
|---|---|

Additionally, the tire impressions left by the subject vehicle were measured to assist in reconstructing the scene and establishing vehicle placement. The track left by the vehicle's tires measured approximately 16 ft in length, which aligns closely with the prior documentation in the scene walk-through report, where the measurement was noted as 16 ft 8 in.

Using these tire impression measurements, the initial position of the vehicle at the scene was established. From that starting position of the subject vehicle, the bullet casing at placard #2 is located at an approximate distance of 51 ft from the rear of the vehicle. Similarly, from the final position of the subject vehicle, the bullet casing at placard #7 is located approximately 21 ft from the rear of the vehicle. It is important to note that this "final position" refers to the location of the subject vehicle after the removal of Mr. Barber, when the vehicle was backed an additional 2 to 3 feet.

 

| Exhibit #: Linear distance between bullet casing #2 and subject vehicle starting point | Exhibit #: Linear distance between bullet casing #8 and subject vehicle resting point |
|---|---|

The overall spatial distribution of the bullet casings strongly suggests that Deputy Alfred was positioned at least 50 ft away from the rear of the subject vehicle before it began to move. This significant distance is derived from the measured linear displacement of the casings and their relationship relative to the vehicle's initial and final positions. The linear placement of the casings

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

further indicates that Deputy Alfred advanced toward the vehicle or otherwise shifted his position during the shooting sequence. This conflicts with his stated account of remaining stationary and shooting from a defensive stance.

Moreover, the overall location of the bullet casings implies that Deputy Alfred had the option to take cover, specifically through the opening of the wooden fence located on the west side of the driveway. In other words, the geometry of the scene shows that a safer covered position was readily accessible. Additionally, the measured distance between the subject vehicle and the casings indicates that Deputy Alfred's firing position was proximate to the wooden fence opening at the time he began shooting, supporting the conclusion that he was near that fence opening rather than in a fixed, defensive posture adjacent to the vehicle.

**Audio Analysis**

The audio recording obtained from Deputy Alfred was subjected to a detailed forensic analysis to extract critical information pertinent to the incident. This audio recording, captured in Windows Media Audio (WMA) format, was encoded at a standard sampling rate of 44.1 kHz and has a total duration of 13 minutes and 17 seconds. By employing advanced spectral analysis techniques, significant acoustic events within a recording can be identified and isolated. For instance, gunshots are characterized by sharp, high-amplitude spikes, indicative of the rapid release of acoustic energy.



**Exhibit #: Waveform view of Deputy Alfred's belt recording**

A review of the temporal sequence within the recording reveals the following progression of audible events. First, Deputy Alfred arrives on scene in response to a 911 dispatch call. Upon arrival, he is heard speaking with the reporting party, who provides an explanation of the situation. Subsequently, Deputy Alfred's footsteps are audible as he proceeds toward the subject driveway. He then engages verbally with Mr. Barber, though he does not verbally identify himself

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

as law enforcement. The recording captures Deputy Alfred instructing Mr. Barber to step away from his vehicle. Shortly thereafter, the sound of the subject vehicle door closing is heard, immediately followed by the sound of the engine revving and tire spin, indicating that the vehicle was being placed into motion. Deputy Alfred is then heard discharging six rounds in rapid succession. Following the gunfire, the sounds of engine activity and vehicle movement cease, and Mr. Barber is not audibly present beyond that point in the recording.

| Deputy Alfred's Belt Recording Event Sequence | |
|---|---|
| Timestamp (MM:SS.SS) | Event Description |
| 02:48.00 | Deputy Alfred makes initial contact with Mr. Barber |
| 03:04.59 | Deputy Alfred informs dispatch that Mr. Barber is noncompliant |
| 03:12.60 | The Chevrolet Trailblazer door can be heard being closed |
| 03:14.35 | The Chevrolet Trailblazer engine can be heard revving |
| 03:15.01 | Chevrolet Trailblazer rear tires can be heard spinning |
| 03:15.73 | Chevrolet Trailblazer rear tires can no longer be heard spinning |
| 03:16.27 | **First shot** |
| 03:16.54 | Second shot |
| 03:16.84 | Third shot |
| 03:17.13 | Fourth shot |
| 03:17.55 | Fifth shot |
| 03:18.64 | **Sixth shot (Final)** |

From the audio analysis, it was determined that the entire interaction between Mr. Barber and Deputy Alfred spanned approximately 30 seconds. Notably, only 6 seconds elapsed between Mr. Barber entering his vehicle and the final shot fired by Deputy Alfred. Deputy Alfred discharged his firearm six times within a span of approximately 2.5 seconds. Assuming the vehicle began moving immediately upon the audible revving of the engine and continued until the first shot was fired, the vehicle would have accelerated over a period of under 2 seconds.

During the interval between the gunfire, Mr. Barber was no longer in control of the vehicle, as evidenced by the absence of engine acceleration sounds, suggesting that his foot was no longer on the accelerator pedal. Consequently, the vehicle had a maximum of 4 seconds to accelerate before braking started. Remarkably, the vehicle traveled and came to a complete stop within 13 feet, implying that it did not achieve significant speed prior to initiating braking.

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

## Vehicle dynamics

Physical evidence, witness statements, vehicle capabilities, and audio analysis were employed to reconstruct the dynamics of the subject vehicle. In doing so, several environmental and mechanical constraints were carefully considered that influenced how the vehicle moved and came to rest.

- The subject vehicle is estimated to have traveled a total distance of approximately 13 to 14 feet from its initial motion to rest. Subsequently, after coming to rest, the vehicle reversed an additional 2 to 3 feet during the removal of Mr. Barber.
- The driveway surface is composed of dirt and loose gravel, rather than a paved or asphalt surface. On such loose surfaces, the coefficient of friction is lower compared to firm, paved surfaces. Published data indicate that gravel surfaces may have friction coefficients in the range of approximately 0.40 to 0.50 under dry conditions, which is considerably lower than typical dry asphalt values of 0.7 to 0.9.
- The vehicle did not begin moving when the engine could be heard revving. There was a period during which the engine was engaged and revving but the vehicle remained stationary. During that time, tire-surface interaction may have included tire spin, wheel slip, or deformation of the loose surface before traction could be achieved.
- The vehicle was either stationary or progressing only at a very slow speed after the sixth shot fired by Deputy Alfred. This inference is drawn because Deputy Alfred ceased firing after the sixth shot, indicating that he did not perceive an immediate or escalating threat at that moment. The decision to stop shooting supports the conclusion that the vehicle no longer presented a significant or immediate danger from which he believed defensive action was required.

Although the exact time of travel cannot be determined by audio analysis alone, the total distance traveled offers sufficient information into the operating behavior of the vehicle. In this case, the vehicle covered approximately 13 to 14 feet while starting, accelerating, reaching a top speed, decelerating, and coming to rest. Because this total distance is extremely short, it implies the vehicle could not have achieved a significant speed before coming to rest.

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

## CONCLUSIONS

Based on available evidence, scientific research literature, published test data, and this writer's training, education, and experience, this writer has reached the following conclusions to a reasonable degree of engineering probability:

- Given the dirt nature of the subject driveway, the coefficient of friction was lower than asphalt, approximately 0.4 to 0.5.
- Given the dirt nature of the subject driveway, the 2003 Chevrolet Trailblazer rear wheels spun for approximately 0.65s before gaining traction.
- Two distinct bullet casing clusters separated by approximately 6.9 ft can be seen on the scene which indicates that there was a gap in between the shooting.
- Deputy Alfred traveled a minimum distance of 15ft while shooting, which is inconsistent with the scenario in which the deputy was trapped or otherwise incapable to move to safety.
- The subject vehicle engine rev up without moving in reverse for approximately 2 seconds.
- 0.65 s between the subject vehicle starting to move to the first shot by Deputy Alfred.
- The first four shots were shot in rapid succession with a time in between of 0.3s.
- The fifth shot was delayed and it took about 0.42s from the fourth shot.
- The six shot was delayed even further to approximately 1.1s from the fifth shot.
- Deputy Alfred reacted to the sound of the engine sound rather than to the actual motion of the vehicle.
- After the first shot, the vehicle engine cannot be heard operating.
- The vehicle was either not in motion when Deputy Alfred started firing his shots or was moving at a slow speed of under 1 mile per hour.
- At the time of the first shot, the vehicle had moved backwards less than one foot.
- At the time of the second shot, the vehicle still had not traveled backwards more than one foot.
- At the time of the last shot, the vehicle had started decelerating and was moving at approximately under 1 mile per hour before coming to rest.
- Deputy Alfred shot six rounds in approximately 2.4 s.
- The subject vehicle traveled approximately 13 ft in reverse before coming to rest.
- When Mr. Barber's vehicle rolled backwards, it moved in a straight line. The resting position of the vehicle after the incident shows that the wheels are straight, meaning that Mr. Barber never changed the direction of the vehicle.
- The subject vehicle traveled an additional 2 to 3 ft when the San Bernardino County police were extracting Mr. Barber from the vehicle.
- The subject vehicle accelerated at idle acceleration of approximately 0.07 G.

Barber v. County of San Bernardino
Accident Reconstruction Report

YAES No. AR-20251516
October 31, 2025

- The vehicle achieved a maximum traveling speed of approximately 3.4 mph. The significance of the vehicle's maximum speed of 3.4 miles per hour becomes apparent when compared to normal human locomotion speeds. Based on standard biomechanical data, the average human walking speed ranges from 3.0 to 3.5 miles per hour, meaning the vehicle's maximum speed was equivalent to or slightly faster than a person walking at normal pace.
- Given the slow speed of the subject vehicle and the distance between Deputy Alfred and the vehicle, Deputy Alfred had enough time to find cover or move out of the way instead of shooting.

The opinions and conclusions expressed in this report are based upon the information and materials provided to the writer as of the date of this report. If additional information becomes available, then the author reserves the right to review this information, which may or may not change the opinions and conclusions expressed in this report. The author reserves the right to offer opinions and testimony in rebuttal to any other expert who may testify in this case on issues addressed in this report.

Respectfully submitted,

_____

Robert Morales, M.S.M.E.
Sr. Managing Accident Reconstructionist



CURRICULUM VITAE
**Robert Morales, MSME**

## SPECIALIZATION

- Electronic Data Recorder
- Heavy Truck EDR
- Computer Simulation and Animation
- Vehicle Dynamics and Loss of Control
- Rollover Analysis
- Mechanical Failure Analysis

- Accident Reconstruction
- Traffic Signal Analysis
- Visibility Studies
- Re-enactments
- Forensic Data Analysis
- Forensic Video Analysis

## EDUCATION

- ➢ Master of Science as a Mechanical Engineer
  California State University, Los Angeles (2016)
- ➢ Bachelor of Science in Mechanical Engineering
  California State University, Los Angeles (2015)
- ➢ Bachelor of Science, Manufacturing Engineering
  California State University, Los Angeles (2015)
- ➢ Bachelor of Science, Software and Computer Engineering
  Technological University of El Salvador (2004)

## PUBLICATIONS

- Morales, R., Gamboa, J., Nguyen, B., Siddiqui, O. et al., "Accuracy and Validation of Geotab GPS Fleet Tracking Devices," SAE Technical Paper 2021-01-0908, 2021.
- Morales, R., Farias, E. et al., "Accuracy and Validation of 360-Degree Camera Use in Photogrammetry" SAE Technical Paper 2022-01-0829.
- Morales, R., Gamboa, J. et al., "Accuracy and Validation of Geotab GPS Fleet Tracking Devices for Medium Duty Trucks" SAE Technical Paper 2022-01-0140

## CERTIFICATIONS

- ➢ SAE – Accident Reconstruction Certificate Program, 2020
- ➢ CDR – Technician (Crash Data Group), 2017
- ➢ LEVA – Certified Forensic Video Technician

## ADDITIONAL TRAINING

- ➢ SATAI Conference and Crash Tests: Multi-year
- ➢ ARC Accident Reconstruction Conference: Multi-year
- ➢ Advanced Applications of Heavy Vehicle EDR Data, May, 2022
- ➢ Interactive Driver Response Research Software Forum, Mar, 2022
- ➢ LEVA Level 3: Forensic Video Analysis & The Law, Oct, 2022

Robert Morales, MSME
Curriculum Vitae
January 2024
Page 2 of 5

- LEVA Level 2: Forensic Video Analysis & The Law, May, 2021
- LEVA Level 1: Forensic Video Analysis & The Law, February, 2021
- iNPUT ACE, Online Video Evidence Training Symposium, June 2020
- HVE SIMON 3D Collision Model Mar 2020
- SAE, Commercial Vehicle Braking Systems, October 2019
- HVE DyMESH 3D Collision Model Mar 2019
- Advanced HVE 2D and 3D Simulations Mar 2019
- SAE, Applied Vehicle Dynamics, December 2018
- Controller Area Network (CAN) for Vehicle Applications Nov 2018
- Creative Photo Academy Photography Boot Camp, July-August 2018
- Tesla EDR Training, June 2018
- Accessing and Interpreting Heavy Vehicle Event Data Recorders May 2018
- Vehicle Crash Reconstruction: Principles and Technology April 2018
- PCC Crash Workshop Feb 2018
- HVE Crush Analysis and Simulation Fundamentals Jan 2018
- Photogrammetry and Analysis of Digital Media December 2017
- Applying Automotive EDR Data to Traffic Crash Reconstruction December 2017
- Improving Scene Diagrams and Animations with FARO® Zone 3D June 2017
- Tire and Wheel Safety Issues, July 2017
- CDR Technician Certification Course, September 2015
- FARO 3D Scanning Training Course, September 2015

**PROFESSIONAL EXPERIENCE**

2022 to present        Young & Associates Engineering Services
                       *Senior Managing Accident Reconstructionist*
                       Reconstruction and investigation of accidents involving industrial
                       equipment, heavy trucks, agricultural equipment, cars, bicycles, scooters,
                       motorcycles, and pedestrians. Engineering services include video analysis,
                       vehicle dynamics, traffic signal analysis, rollover dynamics, mechanical
                       failure analysis, crash testing, reenactments, and visibility studies for
                       limited line sight or nighttime dark areas. Vehicle and site inspections
                       using laser measurement, GPS trackers, accelerometers, etc. Extensive
                       application of computerized simulations, graphics, and numerical methods
                       using energy-based equations and computer-based analysis.

2015 to 2022           MOMENTUM ENGINEERING CORP.
                       *Senior Forensic Engineer*
                       Accident reconstruction and investigation of automobiles, motorcycles,
                       heavy truck, bicycles and pedestrian accidents. State-of-the-art computer
                       simulation and animation production. Engineering services including
                       vehicle and site inspections, re-enactments, visibility studies, traffic signal
                       analysis, vehicle dynamics, rollover dynamics, crash testing, mechanical
                       failure analysis and design evaluation. Multiple vehicle and site
                       inspections involving laser measurement. Extensive use of computer-
                       based analysis, as well as momentum and energy-based equations.

Robert Morales, MSME
Curriculum Vitae
January 2024
Page 3 of 5

| | |
|---|---|
| 2011 to 2015 | **MMD Equipment Inc.** |
| | *Senior Lead Engineer* |
| | Develop design and manufacturing plans for mobile construction equipment and trailers. Assign tasks and schedule to assembly line and production managers. Direct outsourced product development and audit production planning and delivery schedules. Design power distribution and control panel's layouts. Oversee development of equipment technical literature and documentation. Hire, train, and mentor entry level engineers and technicians. Oversee the research and development of new products and procedures. Prepares documents and reports to support studies/ recommendations. |
| 2005 to 2011 | **Ford Collision Center** |
| | *Production Manager* |
| | Write vehicle repair estimates and supplements using Mitchell Repair Guide. Distribute repair orders by department and task assigns work to appropriate technician. Communicate due date goals to technicians daily, and coordinates information flow between the office and the production floor. Develop and communicate standard repair procedures, and quality within the detail, paint and body departments, and monitors performance. Develop and oversee the weekly and daily scheduling of work through the collision center. Directs the movement of vehicles through the collision center and assigns work to the technicians in the most productive manner. Hold regular meetings with employees to hear their input regarding issues of concern to them, including quality, productivity and costs. |
| 1995 to 2005 | **Toyota of El Salvador** |
| | *Operations Assistant Manager* |
| | Assists in the development and implementation of long and short-term marketing, promotions and retail sales plans with dealer management. Coordinate with dealership personnel and regional sales managers the vehicles distribution. Develop an efficient allocation and ordering of vehicles by mix to meet wholesale and retail objectives. Manage a small branch of auto parts and accessories within the dealership. |

## TECHNICAL BACKGROUND

**Accident Reconstruction:**
Reconstruction of automobile, heavy truck, bus, bicycle, motorcycle and pedestrian accidents. Scene investigation and drawings, skid/crush analysis, photography, vehicle inspection, damage analysis, vehicle dynamics, rollover analysis, tread detachment, loss of control and human factors associated with accident reconstruction.

**Computer-based accident reconstruction using PC-Crash and EDCRASH.**

**Computer-based photographic analysis:**

Robert Morales, MSME
Curriculum Vitae
January 2024
Page 4 of 5

Including close range photogrammetry, scanning/analysis in Photoshop and use of Photomodeler to analyze skids and crush patterns. Computer simulation and animation, including production of presentation-quality video animations. Crash testing and vehicle dynamics testing, data analysis and reduction.

**Automotive:**
Brakes, steering, engines, cooling systems, clutches, transmissions, drive train, suspension, frame, body structure repair.

**Computer and Classical Analysis:**
Finite element modeling, vibration, acoustics, and stress analysis

**Design Evaluation:**
Mechanical systems and components performance evaluation.

## ADDITIONAL TRAINING DETAIL

- LEVA Level 2: Digital Multimedia Evidence Processing, May, 2021

    - Advanced theory and processing of Digital Media Evidence including but not limited to capturing, preserving and analysis of video. Introduction to best practices for acquisition and processing of forensic digital evidence and comprehension of video evidence in the legal setting.

- LEVA Level 1: Forensic Video Analysis & The Law, February, 2021

    - Basic understanding of forensic video technology including but not limited to capturing, playback and analysis of video. Methodology of forensic video analysis and comprehension of video evidence in the legal setting.

- iNPUT ACE, Online Video Evidence Training Symposium, June 2020

    - Interactive training experience to enhance the ability to properly interrogate video evidence. Calculating accurate timing from video. Incorporating video evidence into workflow from the field investigation through the analysis.

- HVE DyMESH 3D Collision Model, March 2019

    - A series of workshops designed for HVE users to learn how to use the latest features and capabilities of HVE:  EDSMAC/EDCRASH/SIMON.  User's Group meetings, the HVE White Paper Session and interactive networking social hours were also all designed to learn the theories and techniques of this simulation modeling software.

- SAE, Applied Vehicle Dynamics, December 2018

Robert Morales, MSME
Curriculum Vitae
January 2024
Page 5 of 5

- o Three-day class (theory + track time) on fundamental principles associated with longitudinal and lateral vehicle dynamics. Learn tire-road friction limits and to compose the friction circle for a given vehicle system. Illustrate the physics of turning and calculate lateral weight transfer. Estimate brake system balance and brake proportioning. Measure and graph a vehicle's understeer gradient. Calculate the most efficient path for a vehicle to negotiate a given maneuver.

➢ SAE, Applying Automotive EDR Data to Traffic Crash Reconstruction, November 2018

- o SAE class providing the skills necessary to analyze EDR data that has already been imaged, apply it to crash reconstruction, and reconcile it with calculations using other data sources. Enable the participant to analyze any current and future EDR data set without regard to manufacturer.

➢ Creative Photo Academy Photography Boot Camp, July-August 2018

- o Learn the functions/controls of the camera and honing the photographic thought process. Shutter speed, f-stop, aperture, zoom; composition and image design; creative exposure, light metering, and proper exposure; light, ISO, shutter speed, color; electronic flash, depth of field; filters.

➢ Tesla EDR Training, June 2018

- o Training on imaging/downloading crash data from Airbag Control Module of Tesla vehicle.

➢ Accessing and Interpreting Heavy Vehicle Event Data Recorders, May 2018

- o Identify potential sources of HVEDR data available on commercial vehicles. Utilize various methodologies for accessing and imaging data from HVEDRs while preserving the data in its original electronic format with the control module. Compile documentation of the vehicle and the imaged HVEDR data to properly establish foundational facts that tie the data to the vehicle and to ensure the reliability of the incident specific data. Properly interpret data from HVEDR's and understand the limitations of this data. Analyze HVEDR data in the context of collision reconstruction.

➢ SAE Vehicle Crash Reconstruction Principles and Technology, April 2018

- o Describe basic evidence documentation techniques. Recognize the different types of evidence produced by the different collision types. Describe the basic mechanics of collision. Summarize the principles of planar impact mechanics and crush analysis. Describe forms of analysis applicable to each collision type. Summarize the empirical data available in the literature for each collision type.

➢ SAE, Photogrammetry and Analysis of Digital Media, December 2017

Robert Morales, MSME
Curriculum Vitae
January 2024
Page 6 of 5

- o  Theory and techniques for getting the most out of digital media, including correctly processing raw video and photographs, correcting for lens distortion, and using photogrammetric techniques to convert the information in digital media to usable scaled three-dimensional data. Hands-on training using actual case studies and a variety of software titles such as 3D Studio Max, PTLens, Photoshop, and PFTrack.

## PROFESSIONAL AFFILIATIONS

- SAE International (formerly Society of Automotive Engineers)
- California Association of Accident Reconstruction Specialists (CAARS)
- Southwest Association of Technical Accident Investigators (SATAI)
- Law Enforcement & Emergency Services Video Association International (LEVA)

List of cases in which Robert Morales, MSME has provided DEPO AND TRIAL testimony during the past four years

**DEPO LIST**

| Case Name | Court Location | Case Number | Attorney | Law Firm | Date |
|---|---|---|---|---|---|
| Godoy v. Watson | Los Angeles, CA | BC556204 | Kyle K. Madison | Madison Law Group | 1/18/2017 |
| Cuevas v. RAI Trucking | Bakersfield, CA | BCV-I8-100615 | Chantal A. Trujillo | Rodriguez & Associates | 11/1/2019 |
| Guardado v. Ming Chim | Bakersfield, CA | BC642441 | Paula M. Shaw | McDowell, Shaw & Garcia | 1/22/2020 |
| Pitts v. Empire Transportation | Riverside, CA | RIC1706150 | Hillary A. Booth | Booth, LLP | 1/28/2021 |
| Carrasco v. Sunwest Electric Inc. | Los Angeles, CA | 19STCV25004 | Arthur-Jon Mark Kotanjian | Sailer Law Firm, APC | 3/29/2021 |
| Beltran v. Idaho Milk Transport Inc. | Los Angeles, CA | 20STCV02633 | Daniel DeSantis | Wilshire Law Firm | 4/29/2021 |
| Rodarte v. Swift | San Bernadino, CA | CIVDS1821710 | Rob Ryder | Wolfe & Wyman, LLP | 12/13/2021 |
| Wiggins v. Penske Truck Leasing, Corp. | San Bernadino, CA | 5;19-CV-02260-DNC-KK | Lourdes De Armas | Dolan Law Firm, PC | 3/29/2022 |
| Hart v. San Joaquin County Sheriff's Office | Stockton, CA | STK-CV-UNPI-2020-3813 | Thomas J. Johnston | Johnston, Hutchinson & Lira, LLP | 7/19/2022 |
| Samano v. City of Riverside | Riverside, CA | RIC1818668 | Richard S. Hall | Office of the City Attorney-Riverside | 8/4/2022 |
| Johnson v. Tobin | San Bernadino, CA | CIVDS2011794 | Darlene McIver | Stratman, Schwartz & Williams-Abre | 8/26/2022 |
| Bough v. J Square General Contractors | Bakersfield, CA | BCV-20-101708-BCB | Chantal A. Trujillo | Rodriguez & Associates | 8/30/2022 |
| Stovall v. Waste Management | Los Angeles, CA | 19AVCV00144 | Joshua Bordin-Wosk | Bordin Semmer, LLP | 9/28/2022 |
| Flores v. United States of America | Santa Ana, CA | 2:21-cv-3608-FWS-MAAx - | Nina Sargsyan | Downtown LA Law Group | 12/20/22 & 1/23/23 |
| Silva v. LACMTA; City of Long Beach | Los Angeles, CA | 18STCV08756 | Kenzo Capilitan | Law Offices of Tim D. Wright | 3/1/2023 |
| Camacho v. Berger Transportation & Storage | Los Angeles, CA | 19STCV29787 | John Montevideo | DiMarco, Araujo & Montevideo | 3/24/2023 |
| Alvarez v. Darrell's Air Conditioning | Tulare, CA | VCU287420 | Jonathan Paul Garcia | Yagoubzadeh Law Firm LLP | 4/5/2023 |
| Murillo v. Mobile Truck Works, Inc. | Los Angeles, CA | 21STCV17789 | Sanaz Imani | Mesriani Law Group | 4/10/2023 |
| Hernandez v. Tran | Los Angeles, CA | 20STCV43059 | Colin M. Jones | Wilshire Law Firm | 12/15/2023 |
| Lopez v. Fedex | Sacramento, CA | 34-2022-00315405 | Chantal A. Trujillo | Rodriguez & Associates | 12/27/2023 |
| Medrano v. Shippers Transport Express, Inc. | Los Angeles, CA | 21STCV09224 | John C. Carpenter | Carpenter & Zuckerman | 2/6/2024 |
| Lopez v. Reeves | Los Angeles, CA | 21STCV46007 | Dean Ogrin | McGee Lerer & Associates | 2/27/2024 |
| Payton v. LACMTA | Los Angeles, CA | 20STCV24719 | Martin J Kanarek | BD&J, PC | 3/20/2024 |
| Miller v. Gorman | Nevada County, CA | CU20-084697 | Dorsett Michael Phillips | Phillips Law Offices | 4/5/2024 |
| Dupuis v. City of Los Angeles | Los Angeles, CA | 20STCV05291 | Steve Messner | McGee Lerer & Associates | 7/12/2024 |
| Ball v. Walmart Transportation | Orange County, CA | 30-2022-01296930-CLI-PA-CJC | Christine Boisclair | Pettit Kohn Ingrassia & Lutz, PC | 7/15/2024 |
| Cabrera v. LACMTA | Los Angeles, CA | 21STCV13630 | Mark J. Giannamore | Vaziri Law Group, APC | 7/30/2024 |
| Jameson v. Universal Waste Systems, Inc. | Los Angeles, CA | 19STCV22923 | Taylor B. Dordick | Dordick Law Corporation | 9/18/2024 |
| Estate of Sarkees Sarkeesian v. Glendale Dodge, LLC | Los Angeles, CA | 22STCV19263 | Sylvia Sultanyan | Foster, Sultanyan & Euredjian, LLP | 10/2/2024 |
| Svallingson/Ramos v. City of San Francisco | San Francisco, CA | CGC-22-601509 | Catalina Munoz | The Matiasic Firm, P.C. | 1/31/2025 |
| Farrell v. Garcia | Los Angeles, CA | 23LBCV02480 | Evan Ghaffari | Morgan & Morgan | 2/7/2025 |
| Martinez v. Tucker | Tulare, CA | VCU293922 | Christopher Ardalan | Ardalan & Associates, PLC | 3/31/2025 |
| Stevenson v. Heartland Express | San Bernardino, CA | CIVSB2224816 | Brad Byszewski | Vaziri Law Group, APC | 6/3/2025 |
| Garcia v. Dhanoa | Ventura, CA | 56-2022-00569669-CU-PO-VTA | Katherine M. Shrager | Banafshe Law Firm, PC | 6/4/2025 |

**TRIAL LIST**

| Case Name | Court Location | Case Number | Attorney | Law Firm | Date |
|---|---|---|---|---|---|
| Cuevas v. RAI Trucking | Bakersfield, CA | BCV-I8-100615 | Chantal A. Trujillo | Rodriguez & Associates | 12/3/2019 |
| Pitts v. Empire Transportation | Riverside, CA | RIC1706150 | Hillary Booth | Booth, LLP | 5/19/2021 |
| Yuwiler v. Degrut; Privado | Los Angeles, CA | 21STCV09521 | Gelareh Sara Golriz | Rains Lucia Stern | 3/23/2023 |
| Roknipour v. Abrams | Santa Ana | 30-2020-01144211 | Martin E. Jerisat | Law Offices of Martin Jerisat | 4/20/2023 |
| Alvarez v. Darrell's Air Conditioning | Tulare, CA | VCU287420 | Jonathan Paul Garcia | Yagoubzadeh Law Firm LLP | 04/25,26/27/2023 |
| Turner v. Luna | Los Angeles, CA | 19STCV46140 | Ike E. Orjiakor | Barrington Legal | 5/9/2023 |
| Hernandez v. Carrasco | Victorville, CA | CIVSB2200384 | Amir Ahmadi | Law Office of Tim D. Wright | 4/15/2024 |
| Kim, et al. v. Dunn | Los Angeles, CA | 22TCV12426 | Rose Petrosyan | Stratman & Williams-Abrego | 6/27/2024 |
| People v. Barber | San Bernardino, CA | FVI21001312 | James A. Bryant | The Cochran Firm | 12/4,12/11/2024 |
| Farrell v. Garcia | Los Angeles, CA | 23LBCV02480 | Evan Ghaffari | Morgan & Morgan | 2/11-13/2025 |
| Svallingson/Ramos v. City of San Francisco | San Francisco, CA | CGC-22-601509 | Catalin Munoz | The Matiasic Firm, P.C. | 4/22/2025 |
| Hernandez v. Tran | Los Angeles, CA | 20STCV43059 | Ryan S. Cowan | Whilshire Law Firm | 6/25/2025 |

# YA Engineering Services Accident Reconstruction

# RATE SCHEDULE

The following fee schedule is for professional services based on hourly rates plus reimbursable expenses.

| Senior Managing Accident Reconstructionist | Standard Rate | Testimony Rate |
|---|---|---|
| Robert Morales | $405 / hour | $490 / hour |
| **Supporting Specialists & Technicians** | | |
| As Needed | $140-240 / hour | NA |

**POLICY OF CASE ACCEPTANCE**

$230 file opening fee is charged to all cases: covering miscellaneous administrative charges.

$3,000 non-refundable retainer is required to commence work on all Plaintiff and Criminal cases.

2-hour minimum for testimony.

Case acceptance contingent upon written acceptance from YA Engineering Services, LLC to the client.

Designation is not permitted without prior agreement with YA Engineering Services, LLC.

**Rates may be increased annually.**

YA Engineering Services, LLC: Federal Tax ID# 83-2051691

Services in CT, MI, NY and NC provided through YA Engineering, PLLC
Services in CA provided through YA Engineering Services, Inc.



# YA Engineering Services Accident Reconstruction
# OTHER RELATED EXPENSES

| TRAVEL | RATE |
|---|---|
| HOTEL/AIRFARE/PARKING/RENTAL VEHICLE | AT COST |
| PER DIEM | $100 |
| MILEAGE (EMPLOYEE-OWNED VEHICLE) | IRS APPROVED RATE |
| COMPANY OWNED TRUCK | $1/PER MILE |

**LEGAL EVIDENCE**

| | |
|---|---|
| STORAGE OF BIKE/CDR/HELMETS/CLOTHING | $30 PER MONTH |
| STORAGE OF TIRES/WHEELS/SUSPENSION/WHEELCHAIR | $50 PER MONTH |
| INDOOR MOTORCYCLE STORAGE | $125 PER MONTH |
| INDOOR VEHICLE STORAGE | $500 PER MONTH |

**GRAPHICS**

| | |
|---|---|
| HD/4K VIDEO RECORDING | $75 PER DAY |
| PRORES VIDEO RECORDING | $300 PER DAY |
| USB DRIVE: 32GB/64GB | $20 / $40 |
| DIGITAL PHOTOGRAPHS | $1 EACH ORIGINAL |
| PROOF SHEET OF DIGITAL PICTURES | $1 PER PAGE |
| LARGE FORMAT PRINTS | $10 PER SQUARE |
| CUSTOM/ENLARGEMENTS | AT COST |
| AERIAL PHOTOS | $60 |

**TESTING**

| | |
|---|---|
| TEST MATERIALS AND SUPPLIES | AT COST AND/OR AS QUOTED |
| EQUIPMENT RENTAL (EXTERNAL OR IN-HOUSE) | AT COST AND/OR AS QUOTED |

**MISCELLANEOUS**

| | |
|---|---|
| CARFAX, EPICVIN, DOCUSEARCH, TITLE SEARCHES, ETC. | AT COST |
| EVENT DATA RECORDER | $300 PER VEHICLE |
| IPHONE/IPAD LIDAR SCAN | $100 PER VEHICLE |
| 3-D LASER SCANNER | $800 PER DAY |
| DRONE SURVEY OF SITE | $350 PER INSPECTION |
| HEAVY TRUCK DOWNLOAD | $500 PER VEHICLE |

www.YAEServices.com

Services in CT, MI, NY and NC provided through YA Engineering, PLLC
Services in CA provided through YA Engineering Services, Inc.

P a g e | 2

# EXHIBIT D

# EXHIBIT D

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                            Vol 1                                            Page 1

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF SAN BERNARDINO

 3   DEPARTMENT S-15                      HON. DAVID COHN, JUDGE

 4

     PEOPLE OF THE STATE OF CALIFORNIA, )
 5                                       )
                         Plaintiff,      )
 6                                       )
                vs.                      )  No. FVI-21001312
 7                                       )
     STEFFON TODD BARBER,                )
 8                                       )
                         Defendant.      )
 9   _____)

10             REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

11                     SAN BERNARDINO, CALIFORNIA

12                       DECEMBER 2, 2024

13

     APPEARANCES:
14
     For the People:      JASON ANDERSON
15                        District Attorney
                          By:  KATHLEEN FULTZ
16                        Deputy District Attorney

17
     For the Defendant:   JAMES BRYANT
18                        Attorney at Law

19                        RYAN DUCKETT
                          Attorney at Law
20

21                                      CERTIFIED
                                        TRANSCRIPT
22

23

24

25

26
     Reported By:         ALICIA S. VASQUEZ, C.S.R.
27                        Official Court Reporter, CSR No. 12225

28   Volume 1 of 7
     Pages 1 through 133, incl.
```

 1  proffered by you will be admissible in court.  Now, I'm going
 2  to ask Mr. Bryant not to do the full blown explanation.  It's
 3  going to be a shortened version.
 4        THE WITNESS:  Okay.
 5        THE COURT:  Okay?
 6        THE WITNESS:  Yes.
 7        THE COURT:  All right.
 8        MR. BRYANT:  Thank you, Your Honor.
 9
10                    ROBERTO MORALES,
11  called as a witness on behalf of the Defense, having been first
12  duly sworn, was examined and testified as follows:
13
14                    DIRECT EXAMINATION
15  BY MR. BRYANT:
16        Q.   Mr. Morales, could you please state briefly your
17  educational background?
18        A.   I am a mechanical engineer.
19        Q.   And where did you go to school, if any?
20        A.   California State University Los Angeles.
21        Q.   And was that a bachelor's that you received?
22        A.   Bachelor's, dual major, mechanical engineering and
23  manufacturing engineering.
24        Q.   And did you receive any other advanced degrees
25  following your bachelor's?
26        A.   Yes.  Master's in mechanical engineering.
27        Q.   Okay.  Are you a part of any societies in the
28  engineering field?

```
 1        A.   Yes, there are a few, like the --

 2        THE COURT:  Let's skip that.  We don't need the

 3   societies.  I think let's --

 4        MR. BRYANT:  Understood, Your Honor.

 5        THE COURT:  You want to do that with the jury, I

 6   understand.

 7        MR. BRYANT:  You push me, and I will move.  All right.

 8   BY MR. BRYANT:

 9        Q.   So do you have outside of -- what are you here to

10   testify about?

11        A.   About vehicle mechanics, like -- and also like the

12   analysis of the reconstruction based on the evidence analyzed.

13        Q.   Okay.  And had you had any training as it relates

14   to doing accident or incident reconstructions?

15        A.   Yes.

16        Q.   And what's your training?

17        A.   I do have a training as video analyst and audio

18   analyst.  I have a training in accident reconstruction as well.

19        Q.   Is there any further trainings that would be

20   important for you to inform the Court this brief period?

21        A.   Like what I do, like continuous education, like

22   every year I go to different courses to help me keep track of

23   new methods and, you know, to scientific methodology to use in

24   my career.

25        Q.   Who do you work for?

26        A.   Young & Associates Engineering Services.

27        Q.   How long have you been employed by them?

28        A.   Approximately like ten years.
```

1    Q.   And with your employment there what has been your
2  primary job?  What do you do there?
3    A.   Accident reconstruction.
4    Q.   And when you say accident reconstruction, is that
5  limited?  Can you maybe explain or expand on that, explain to
6  the Court the scope of your accident reconstruction?
7    A.   It is -- we use, for instance, forensic analysis,
8  digital and physical evidence, to reconstruct accidents related
9  to passengers and also a commercial vehicles and a -- also
10  industrial accidents and the separate idea of, you know,
11  accident reconstruction disciplines.
12    Q.   And when you say industrial accidents, what do you
13  mean by industrial accidents?
14    A.   Accidents that happen, for example, with a, usually
15  show of equipment, a forklift, you know, like conveyor belts,
16  trip and falls.
17    Q.   So your accident reconstruction work isn't limited
18  to just solely vehicles; would that be accurate?
19    A.   No.
20    Q.   And you also state that, you know, you give
21  analysis and opinions on motor vehicles.  Maybe explain to the
22  Court what is your experience, knowledge and training in terms
23  of how you are able to give an analysis on that?
24    A.   Pretty much to prove using research and methods,
25  you know, to determine, to show the mechanical capacity of
26  vehicles, how they move, you know, how -- how -- what move do
27  we expect, you know, to speeds the vehicle could reach,
28  specific times, using like -- like a common factors for

```
 1  acceleration.
 2       Q.   And have you ever been an expert witness before?
 3       A.   Yes, many times.
 4       Q.   How many times would you estimate you've been an
 5  expert witness in a case?
 6       A.   Pretty much like 15, 20 cases a month.
 7       THE COURT:  Let's find out about any qualifications
 8  relating to the placement of the officer and the firearm, all
 9  that stuff.
10       MR. BRYANT:  Sure.  Sure.
11  BY MR. BRYANT:
12       Q.   So as far as your reconstruction of an accident
13  scene, or in this particular instance a crime scene, can you
14  give the Court your background, training and education how
15  you're able to be qualified to testify as it relates to placing
16  different individuals at certain parts in certain time frames,
17  you know, in any particular accident situation?
18       A.   In this one in particular or --
19       Q.   Sure, why don't you --
20       A.   Pretty much I receive evidence of like
21  measurements.  That's actually a common practice, you know.  I
22  receive the traffic collision reports, where they take place
23  and the measurements taken at scene, you know, so I could
24  analyze the physical evidence.  That's in combination of
25  digital evidence, like photos, audio, to establish a, like a
26  time, distance in particular, for particular reasons.
27            This one in this case in particular it was a
28  combination of all of them.
```

1    Q.   What about movement behaviors, so how do you

2  determine, make an opinion on where you believe people either

3  began and where you believe people ended at the time that the

4  incident had finalized, how are you able to provide that

5  opinion based upon your training, knowledge and experience?

6    A.   The analysis of the audio.

7    Q.   When you also -- did you also -- you talked about

8  the measurements.  Did you use the measurements as well?

9    A.   Yes.  The measurements provided by the police.

10    Q.   Just because this is a criminal crime scene, would

11  this particular crime scene be any different than you

12  reconstructing any other accident scene?

13    A.   No.

14    Q.   Why is that?

15    A.   Because they are reference of, you know, like

16  serial reference point that is provided by the surveyor, the

17  survey, the place, every single piece of evidence at the scene.

18    THE COURT:  Okay.  I've got enough from you right now.

19  Did you want to voir dire the witness just on qualifications,

20  or do you want to hear the opinions?

21    MS. FULTZ:  Well, I am not really sure I understand what

22  the qualification was for the analysis of the movement of

23  people.

24    THE COURT:  Why don't you inquire then.

25    MS. FULTZ:  Sure.

26

27    ///////

28    ///////

```
 1                        CROSS-EXAMINATION
 2   BY MS. FULTZ:
 3        Q.   Good afternoon.
 4        A.   Good afternoon.
 5        Q.   You said that you were able to reconstruct the
 6   placement of the involved parties based on the audio recording
 7   and measurements provided by law enforcement?
 8        A.   Yes.
 9        Q.   Did you also review the reports and interviews to
10   determine where that audio might place someone?
11        A.   Yes.  I compared the different statements provided,
12   and I compared those to physical evidence in order to get the
13   conclusion.
14        Q.   Did you rely on those statements in forming that
15   conclusion?
16        A.   I compared them to the physical evidence, the
17   combination of evidence.
18        Q.   Is that a yes, you relied on it, or you were able
19   to tell -- let's take the fired cartridge cases, for example.
20   Were you able to tell anything about the location of those
21   fired cartridge cases just by looking at the photographs and
22   measurements and hearing the audio?
23        A.   Yes.
24        Q.   And you didn't rely at all on the statements to
25   assist in forming an opinion about the placement of those?
26        A.   Yes.  I read the statements, but however, you have
27   to rely on the measurements of the police officers.
28        Q.   Okay.  And then I apologize if I just missed it.
```

1    Did you have some training outside of your accident

2    reconstruction and industrial accident investigations that

3    related to the placement of the parties during the incident?

4         A.   As far as the placement of the parties was based on

5    a statistical probability based on research based on

6    calculations.

7         Q.   What research are you relying on?

8         A.   First of all, the capacity of the vehicle to

9    accelerate in reverse.

10        Q.   Okay.  Focusing on Deputy Alfred and providing an

11   opinion as to where he's located at any given time during the

12   incident, what training and experience do you have or education

13   related to determining where an individual is standing?  You

14   would agree there's no collision here.  There wasn't an actual

15   impact, correct?

16        A.   Yes.

17        Q.   And so what are you relying on or what training and

18   experience do you have in making the calculation of where those

19   people are located?

20        A.   My capacity to analyze the audio provided, the

21   physical evidence measured by the police, and that tells me

22   that the FCC had to be really in a close range from -- from

23   they were fired.

24        THE COURT:  What experience, if any, do you have with

25   respect to firearms and the ejection of fired cartridge

26   casings?

27        THE WITNESS:  I did a research and based on the -- this

28   particular make and model of the handgun so -- and I had a

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                          Vol 4                          Page 442

1   video that demonstrate how those FCCs will be deployed after
2   being fired, and that tells me that the individuals who fired
3   those shots were in the range of at least 3 to 4 feet away.
4   BY MS. FULTZ:
5        Q.   What research did you conduct?
6        A.   I provided a video.
7        Q.   So your -- the foundation of your knowledge as to
8   the ejection of cartridge cases from this Glock 21, .45 caliber
9   firearm, comes entirely from the video.  Was that a YouTube
10  video?
11       A.   Yes.
12       THE COURT:  All right.  Mr. Bryant, anything else?
13       MR. BRYANT:  Just briefly.
14
15                    REDIRECT EXAMINATION
16  BY MR. BRYANT:
17       Q.   Mr. Morales, during your -- the course of your, you
18  know, jobs that you are given, are there times where you're
19  going to have a situation where you're going to have to
20  research a specific issue, like spillage, where you have to --
21  maybe you've never dealt with a specific type of spillage
22  before.  Would you have to do some research to determine what
23  happens for this particular liquid, if a certain thing drops in
24  and it splashes at a certain distance?  Are those similar
25  things that permits you, if you do some research, to understand
26  how you can determine where those FCCs or those shell casings
27  would have landed in relation to where the officer was firing?
28       A.   Yes.  If we could go, you know, like far with the

1  investigation, we can, you know, determine specifically an

2  approximation, you know, based on the statistical, you know,

3  research, like how far those casings could land from the

4  individual that's firing.

5          But in this case, was a common sense that it was in

6  a close range, so there is no -- there is no explanation for

7  the casing to be in, like in certain instances that will land

8  far from others.

9      THE COURT:  All right.  I think I've heard enough here.

10          Here are my thoughts, that this witness is well

11  qualified based on his accident reconstruction experience to

12  talk about the movement of the SUV, where it was, how fast it

13  was moving, how long it took, all those issues.

14          He has no qualifications to talk or foundation to

15  talk about the placement of Officer Alfred.  He has no

16  experience with respect to the FCCs being ejected from the

17  Glock, other than watching a video that's available on YouTube.

18  So I will exclude all of that.

19          If you think his testimony is relevant about, you

20  know, how fast the vehicle was moving, what the direction of

21  travel was.  Perhaps those things aren't disputed, but I think

22  he's well qualified to talk about that.

23      MR. BRYANT:  Okay, Your Honor.  Understood.

24          And the Court says that they're not -- they don't

25  believe he's qualified to testify as to placement.  Would he at

26  least be able to testify, maybe not necessarily to where the

27  FCCs are, but based upon the evidence that he's reenacting this

28  actual scene, would he be able to testify as to the movement