1  Eugene P. Ramirez (State Bar No. 134865)
     *eugene.ramirez@manningkass.com*
2  Kayleigh Andersen (State Bar No. 306442)
     *kayleigh.andersen@manningkass.com*
3  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
4  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
5  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
6
7  Attorneys for Defendants, COUNTY OF
   SAN BERNARDINO and DEPUTY
   CHRISTOPHER ALFRED
8
                    **UNITED STATES DISTRICT COURT**
9
        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
10
11  STEFFON BARBER, an individual,          Case No. 5:22-cv-00625-KK-DTBx
12              Plaintiff,                   *[District Judge, Kenly Kiya Kato,*
                                             *Magistrate Judge, David T. Bristow]*
13          v.
14  COUNTY OF SAN BERNARDINO, a             **[MOTION IN LIMINE NO. 3]**
15  municipal entity, and DOES 1 through
    10, inclusive,                          **NOTICE OF MOTION AND**
16                                          **MOTION *IN LIMINE* BY**
                Defendant.                   **DEFENDANTS TO EXCLUDE**
17                                          **PLAINTIFF'S EXPERT DR. AMY**
                                            **MAGNUSSON[DAUBERT**
18                                          **MOTION]; MEMORANDUM OF**
                                            **POINTS AND AUTHORITIES;**
19                                          **DECLARATION OF KAYLEIGH A.**
                                            **ANDERSEN**
20
                                            Judge:  Hon. Kenly Kiva Kato
21                                          Date:   1/8/2026
                                            Time:   10:30 a.m.
22                                          Crtrm.: 3, 3rd Floor
23                                          Trial Date: 1/26/26
24  ///
25  ///
26  ///
27  ///
28  ///

**TO THE HONORABLE COURT AND TO ALL PARTIES AND COUNSEL:**

By and through their counsel of record in this action, defendants COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED (collectively herein after as "Defendants") will move this Court for an order to exclude the following opinions and testimony of plaintiff's expert, Dr. Amy Magnusson ("Dr. Magnusson"), at trial regarding:

1.     Any testimony that is cumulative/duplicative with plaintiff's medical expert Dr. Bennet Omalu;

2.     Any testimony or opinions by the expert that are based on speculation and/or lack foundation;

3.     Any testimony or opinions beyond the expert's scope of expertise; and

4.     Any testimony or opinions by the expert regarding treatment recommendations that are irrelevant or not possible given Plaintiff's incarceration.

This motion is made on the grounds that the above opinions lack evidentiary support pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and constitute nothing more than speculation.  Dr. Magnusson cannot state these opinions to a reasonable degree of medical probability.  As such, her opinions are inadmissible under Fed. R. Evid. 702.

This motion is based on all  pleadings, records and files in this action, and upon such further oral and documentary evidence as may be presented at the hearing on this motion.  This motion is made following conference of counsel which took place via telephone on December 4, 2025.

///

///

///

///

///

///

DATED:  December 11, 2025          Respectfully submitted,

                                   **MANNING & KASS**
                                   **ELLROD, RAMIREZ, TRESTER LLP**


                                   By:  _____/s/ Kayleigh Andersen_____
                                        Eugene R. Ramirez
                                        Kayleigh A. Andersen
                                        Attorneys for Defendant, COUNTY OF
                                        SAN BERNARDINO

**MK MANNING | KASS**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

By this motion *in limine*, defendants seek to exclude certain opinions and testimony of plaintiff's expert, Dr. Amy Magnusson , at the time of trial, that:

1.    Any testimony that is cumulative/duplicative with plaintiff's medical expert Dr. Bennet Omalu;

2.    Any testimony or opinions by the expert that are based on speculation and/or lack foundation;

3.    Any testimony or opinions beyond the expert's scope of expertise; and

4.    Any testimony or opinions by the expert regarding treatment recommendations that are irrelevant or not possible given Plaintiff's incarceration.

All of Dr. Magnusson's opinions relate to the above categories [See Andersen Decl., Ex. A], and therefore all testimony by Dr. Magnusson should be excluded. The opinions offered by Dr. Magnusson are unreliable; they are lacking in evidentiary support and stated as speculation under the *Daubert* standard of admissibility; and are irrelevant and impossible due to Plaintiff's incarceration.

### II.    THE *DAUBERT* THRESHOLD FOR EXPERT OPINION EVIDENCE.

The trial court serves a gatekeeping function regarding the admissibility of expert evidence.  Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid, Rule 702 also provides that a witness may be qualified as an expert if "the testimony is based on sufficient facts or data."  "Where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question…, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  If the testimonial evidence fails in this regard, the expert opinion is inadmissible.  *Id.*

4

MANNING | KASS

MK

In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence." *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F.Supp.2d 1021,1026 (C.D. Cal. 2013); (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  The offering party must show by a preponderance of the evidence that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion.  *Daubert*, 509 U.S. at 592-93.

## III.    DR. MAGNUSSON'S TESTIMONY IS CUMULATIVE AND DUPLICATIVE OF DR. BENNET OMALU'S TESTIMONY.

The Court has discretion to exclude evidence if the probative value of the evidence is "substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This discretion extends to duplicative or otherwise cumulative expert testimony. *See, United States v. Alisal Water Corp.*, 431 F.3d 643, 659-60 (9th Cir. 2005) (exclusion of defendants' expert's testimony cumulative to opinions that challenged valuation of court appointed accountant after defendants already provided its own valuation through another expert witness); *Davis v. Mason Cnty.*, 927 F.2d 1473, 1484 (9th Cir. 1991) (no abuse of discretion when district court limited parties to two expert witnesses in the area of police practices when those experts were to testify regarding the "same topic"); *United States v. Elksnis*, 528 F.2d 236, 239 (9th Cir. 1975) (exclusion of relevant, but cumulative, evidence is within discretion of the trial court). *See, e.g., Allen v. Hylands Inc.*, 2015 U.S. Dist. LEXIS 186799, at *3-4 (C.D. Cal. Aug. 20, 2015) (excluding cumulative expert testimony where the experts opined on many of the same topics and relied on the same or very similar evidence for their opinions); *Brooks v. Munoz*, 2014 U.S. Dist. LEXIS 22992, at *2-4 (S.D. Cal. Feb. 24, 2014) (excluding cumulative testimony that significantly overlapped with that of another expert); *Mankins v. United States*, 2013 U.S. Dist. LEXIS

131339, at *6-8 (C.D. Cal. Sept. 9, 2013) (limiting the plaintiff to two medical experts on the issues of causation and prognosis because testimony from each of the plaintiff's experts, five in total, was "needlessly cumulative" under Rule 403); *Engman v. City of Ontario*, 2011 U.S. Dist. LEXIS 66128, at *21 (C.D. Cal. June 20, 2011 (determining that expert testimony was cumulative where the opinions of the experts overlapped substantially); *see also Moniz v. City of Delano*, 2015 U.S. Dist. LEXIS 2136, at *20 (E.D. Cal. Jan. 8, 2015) (limiting the presentation of experts to testimony that does not duplicate the testimony of other experts).

Here, there is a significant danger that Plaintiff's expert Dr. Magnusson will offer needlessly cumulative and prejudicial testimony to Dr. Omalu's anticipated testimony regarding the extent of Plaintiff's physical and neurological injuries, as well as treatment recommendations for such injuries. Defendants request that the Court exercise its discretion and limit or exclude such evidence.

Both Doctors Omalu and Magnusson are expected to testify regarding Plaintiff's prognosis and recommended medical treatment. This exactly the sort of overlapping and duplicative testimony that the Ninth Circuit and California district courts have excluded as needlessly cumulative under Rule 403. *See Alisal Water Corp.*, 431 F.3d at 659-60; *Davis*, 927 F.2d at 1484; *Allen*, 2015 U.S. Dist. LEXIS 186799, at *3-4; *Brooks*, 2014 U.S. Dist. LEXIS 22992, at *2-4; *Mankins*, 2013 U.S. Dist. LEXIS 131339, at *6-8. Whatever the probative value of the defense theories (while disputed by Plaintiffs), it is clear that the probative value of hearing the same theory multiple  times is *de minimis*. Meanwhile, considerations of waste of time and the cumulative presentation of evidence weigh in favor of exclusion under Rule 403. It will also be misleading and unduly prejudicial for the Defendants to argue that they have multiple medical experts who all disagree with Defendants' sole medical expert regarding the Plaintiff's injuries, recommended treatment, and prognosis, and therefore, Defendants' position is more persuasive and must be correct.

Accordingly, this Court should limit expert testimony concerning Plaintiff's recommended medical treatment and prognosis so that these are addressed by only one expert.

## IV.    THE *DAUBERT* THRESHOLD FOR EXPERT OPINION EVIDENCE.

Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702 also provides that a witness may be qualified as an expert if "the testimony is based on sufficient facts or data." "Where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question…, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). If the testimonial evidence fails in this regard, the expert opinion is inadmissible. *Id.*

In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence. *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F.Supp.2d 1021,1026 (C.D. Cal. 2013); (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The offering party must prove admissibility, by a preponderance of the evidence, that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion. *Id.* at 592-93; *Lust v. Merrell Dow Pharm., Inc.*, 89 F. 3d 594, 592-3. (9th Cir. 1996).

## V.    DR. MAGNUSSON LACKS THE REQUISITE EXPERTISE AND EVIDENTIARY FOUNDATION TO SUPPORT HER OPINIONS.

Expert opinions are properly excluded if the *Daubert* standard is not met. *See Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *12 (E.D. Mo. 2007). Moreover, an expert is only permitted to testify "within the reasonable confines of his subject area."

7

1    *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (quoting

2    *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969–70 (10th Cir. 2001)).

3    "[M]erely possessing a medical degree is not sufficient to permit a physician to testify

4    concerning any medical-related issue. [Citations]." *Ralston, supra,* 275 F.3d at 970.

5        While Dr. Magnusson is board certified in physical medicine and rehabilitation,

6    with subspecialties in spinal cord and brain injury, she did not personally examine

7    Plaintiff before reaching any diagnoses. (See Andersen Decl., Ex. A and B at 11:25 –

8    12:16). At best, Dr. Magnusson reviewed the reports of other medical doctors to opine

9    as to Plaintiff's injuries and need for future treatment. (See Andersen Decl., Ex. A).

10   Dr. Magnusson is not a psychologist or neurologist and cannot render opinions on any

11   psychological or neurological diagnoses. (See Andersen Decl., Ex. A and B at 12:19-

12   21). Dr. Magnusson, even if qualified to make any diagnoses, has failed to establish

13   that any diagnostic opinions are based on adequate factual and scientific support, as

14   required for admissibility. See, *Daubert* at 592-93; (See Andersen Decl., Ex. A).

15   Further, Dr. Magnusson provides no reference to any peer-reviewed articles she might

16   have relied upon in reaching her opinions and her self-reported experience fails to

17   demonstrate that she has participated in any research or studies regarding the very

18   injuries and treatment she references and recommends in her report. (See Andersen

19   Decl., Ex. A). Importantly, Dr. Magnusson did not even read Plaintiff's deposition

20   testimony in order to gain some understanding of Plaintiff's current complaints, as

21   well as his ability to understand questions and provide responses as it relates to her

22   recommended treatment for any alleged TBI. (See Andersen Decl., Ex. B at 20:20 –

23   21:7). Thus, Dr. Magnusson's opinions that reference any diagnoses or the *extent* of

24   Plaintiff's physical injuries and his alleged traumatic brain injury, fail to meet the

25   evidentiary requirements as provided in *Daubert* and she should be precluded from

26   offering such an opinion, at trial. While Dr. Magnusson may be able to provide

27   recommendations for treatment, she must be precluded from diagnosing or

28   speculating about the nature of Plaintiff's injuries because she has not established that

she has specialized knowledge that might assist the jury in this case or that, assuming she has proper qualification, that her opinion is based on sufficient factual and scientific support.

Lastly, Dr. Magnusson offered opinions about a shoulder injury with unknown etiology. (See Andersen Decl., Ex. A and B at 17:6-25). Dr. Magnusson admitted she did not know what caused the shoulder injury to any degree of medical certainty, and therefore Dr. Magnusson must be excluded from offering opinions regarding the cause of the shoulder injury, the extent of the injury, and any treatment recommendations for an injury that has not been proven to be associated with the incident in this case.

Pursuant to *Daubert*, Dr. Magnusson's opinions regarding are not admissible.

## VI.    DR. MAGNUSSON'S RECOMMENDATIONS FOR TREATMENT ARE IRRELEVANT BECAUSE THEY MAY NOT BE POSSIBLE IN A PRISON SETTING.

In addition to Dr. Magnusson lacking the expertise to testify as to various matters addressed in her Rule 26 Report and at the time of trial, Dr. Magnusson bases her treatment opinions on pure speculation. At the time she wrote her report and sat for deposition, Dr. Magnusson did not know that Plaintiff had been sentenced to 14 years in prison for his actions during the incident. (See Andersen Decl., Ex. B at 14:2-9). Dr. Magnusson admitted she had never provided recommendations for interdisciplinary rehab for an incarcerated person before this case. (See Andersen Decl., Ex. B at 14:10-12). The fact that Plaintiff will be incarcerated in a state prison for 14 years surely has an effect on the availability of Dr. Magnusson's recommendations for treatment and rehabilitation, including but not limited to aquatic therapy, power wheelchair, and alternative medicine (acupuncture or deep tissue massages). Dr. Magnusson admittedly did not know which, if any, of her treatment recommendations would be available to Plaintiff in the state prison where he is currently incarcerated. (See Andersen Decl., Ex. B at

15:20-24, 23:25 – 25:6, 27:9-13, 29:2-9, 31:17-20). To allow Dr. Magnusson to testify about her recommendations for treatment for Plaintiff over the next 14 years when Plaintiff is incarcerated and admittedly may not have access to any of these treatment options would be irrelevant, confuse the jury, and be an undue consumption of time. To permit Dr. Magnusson to testify regarding treatment options that may be unavailable to Plaintiff over the next 14 years would also be prejudicial to Defendants because any argument, testimony, or reference to Plaintiff's inability to obtain the recommended treatment due to his incarceration could cause a jury to believe that Defendants have in some way prevented Plaintiff from obtaining treatment. However, it is undisputed, Plaintiff's incarceration is his own fault and a result of a criminal conviction for his actions in this case.

Further, Plaintiff did not retain any type of life care planner or request that Dr. Magnusson total the costs for her treatment recommendations. To the extent Dr. Magnusson intends to offer testimony about the cost of these treatment recommendations, that should be excluded as it is not in the report or in her deposition testimony. Additionally, due to Plaintiff's incarceration, Plaintiff does not have any out-of-pocket expenses for his treatment and will not until his release.

Lastly, even Dr. Magnusson does not know the effect of Plaintiff's potential inability to receive her treatment recommendations over the next 14 years on Plaintiff's overall prognosis. This is clearly not to any degree of medical certainty how her treatment recommendations 14 years after the incident when Plaintiff is done serving his sentence, would be relevant or applicable to Plaintiff. (See Andersen Decl., Ex. B at 32:2-11).

## VII. CONCLUSION

For the reasons stated above, Defendants respectfully request this Honorable Court to grant their Motion *in Limine* to Exclude Cumulative Expert Testimony and the speculative and irrelevant testimony of plaintiff's expert Dr. Magnusson.

1  DATED:  December 11, 2025        Respectfully submitted,

2

3                                                    **MANNING & KASS**
                                                     **ELLROD, RAMIREZ, TRESTER LLP**

4

5

6                                              By:  _____/s/ Kayleigh Andersen_____

7                                                    Eugene R. Ramirez
                                                     Kayleigh A. Andersen

8                                                    Attorneys for Defendant, COUNTY OF
                                                     SAN BERNARDINO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' MOTION IN LIMINE NO. 3**

## <u>DECLARATION OF KAYLEIGH ANDERSEN</u>

I, Kayleigh Andersen, declare as follows:

1.  I am an attorney at law duly authorized to practice before all the courts of the State of California and in all of the United States District Courts within the Central District of California. I am a partner in the law firm of Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record herein for Defendants COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED (collectively "Defendants"). If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration, except as to those matters that are stated on information and belief herein.

2.  Attached hereto as **Exhibit A**, is a true and correct copy of Plaintiff's expert Dr. Amy Magnusson's Rule 26 expert report in this matter, which was served with the Plaintiff's expert disclosures on or about October 31, 2025.

3.  Attached hereto as **Exhibit B**, is a true and correct copy of excerpts from the deposition transcript of Plaintiff's expert Dr. Amy Magnusson, which was taken on December 5, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 11, 2025 at Los Angeles, California.

*/s/ Kayleigh Andersen*
Kayleigh Andersen

**DEFENDANTS' MOTION IN LIMINE NO. 3**

# EXHIBIT A

# EXHIBIT A

**AMY MAGNUSSON, M.D.**
**DIPLOMATE, AMERICAN BOARD OF**
**PHYSICAL MEDICINE AND REHABILITATION**
**SUBSPECIALTY BOARD CERTIFICATION, SPINAL CORD MEDICINE**
**SUBSPECIALTY BOARD CERTIFICATION, BRAIN INJURY MEDICINE**
**8765 Aero Drive, Suite #310**
**San Diego, CA 92123**
**p- 858-648-5322**
**f- 858-648-5324**

TO:                          LAW OFFICES OF DALE K. GALIPO
                             21800 Burbank Blvd., Suite 310
                             Woodland Hills, CA 91367
                             p- 818-347-3333
                             f- 818-347-4188
                             Renee V. Masongsong, Esq.
                             rvalentine@galipolaw.com

PATIENT:             Steffon Barber
DATE OF BIRTH:       2/12/86
DATE OF INJURY:      4/27/21
DATE OF REPORT:      10/31/25

**PHYSICAL MEDICINE AND REHABILITATION**
**BRAIN INJURY MEDICINE**
**MEDICAL-LEGAL EVALUATION**

**IDENTIFICATION**
Mr. Steffon Barber is a 39 year old male who sustained a gunshot injury to the head resulting in a traumatic brain injury on 4/27/21. I was contacted on 7/18/25 by the Plaintiff's Attorney, Ms. Renee Masongsong, Esq., with request for my involvement to review Mr. Barber's medical records and provide opinions regarding the injuries he sustained, his current condition, and anticipated future medical care needs he has secondary to his injuries.

**RECORDS/REPORTS REVIEWED**
SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

ARROWHEAD REGIONAL MEDICAL CENTER

HANGER CLINIC

SAN BERNARDINO COUNTY SBCSD JAIL MEDICAL RECORDS

SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT HEALTH SERVICES
REQUEST

SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT WITNESS INTERVIEW

SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT HOSPITAL RESPONSE

SECOND AMENDED COMPLAINT
     1. VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983) (Based on Unreasonable
     Use of Excessive Force)

     2. VIOLATIONS OF CIVIL RIGHTS (42 U.S.C. § 1983) (Based on
     Unconstitutional Policy, Practice, or Custom)

     3. BATTERY (Cal. Government Code §§ 815.2(a), 820(a); Cal. Civil Code § 43)

     4. NEGLIGENCE (Cal. Government Code §§ 815.2(a), 820(a))

     5. VIOLATION OF THE BANE ACT (CAL. CIV. 51.1)

     6. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

     DEMAND FOR JURY TRIAL

PHOTOGRAPHS


**CURRENT MEDICAL STATUS/CHRONIC SEQUELAE SECONDARY TO
6/17/21 INCIDENT**
**Neurology/Traumatic Brain Injury**
-left spastic hemiparesis
     -neuropathic pain

     -painful neurogenic spasms


**Orthopedic/Musculoskeletal**
-chronic left shoulder pain
     -risk for shoulder subluxation secondary to shoulder girdle weakness with left
     hemiparesis

-inability to obtain MRI due to concern for residual intracranial bullet fragments

-risk for musculoskeletal over-use/chronic repetitive strain injuries secondary to left hemiparesis, chronic pain, alterations in normal biomechanics

-risk for acute musculoskeletal trauma
 -fall risk

**Psychiatry/Psychology**
-risk for grief secondary to losses, including physical abilities

-problems related to life management functions, limitation of activities

**Pain Management**
-chronic pain
 -skeletal/orthopedic/myofascial

 -neuropathic

**Endocrine**
-risk for metabolic syndrome due to more sedentary lifestyle postinjury
 -potential for hypertension, dyslipidemia, diabetes, high BMI

**Physical Medicine and Rehabilitation/Functional Status**
-functional mobility impairments

-functional self-care/instrumental activities of daily living impairments

-anticipated progressive functional decline over and beyond the normal aging process

**CARE RECOMMENDATIONS AND MEDICAL SUBSTANTIATION**
Mr. Barber sustained a traumatic brain injury on 4/27/21, which has resulted in permanent impairments, negatively impacting his physical functioning, as well as resulting in chronic pain issues.  The ability for Mr. Barber to best optimize and maintain his overall health, medical stability, functional status, and quality of life, will be dependent on his future comprehensive and specialized medical and rehabilitation care. The overall goals are to stabilize his general medical status, prevent further injuries or illness, optimize his functional outcomes, manage his pain, improve his quality of life,

and support his physical and emotional well-being over his life, despite the permanent effects of his traumatic brain injury. As he ages with these sequelae, it is anticipated he will have progression of these functional deficits, and an overall decline in his abilities and quality of life. Ensuring he has specialized and comprehensive medical care, therapies, medications, durable medical equipment, and home health care assistance is imperative in achieving the best outcomes, as well as prevention of complications and comorbidities.

In analyzing the future care, addressing needs directly related to the 4/27/21 injuries, to a reasonable degree of medical probability, Mr. Barber will require care from Physical Medicine and Rehabilitation/ Neurorehabilitation and Musculoskeletal Rehabilitation. Other care needs will include interdisciplinary neurorehabilitation and musculoskeletal therapy referrals to include functional mobility and self-care, instrumental activities of daily living, upper extremity/shoulder rehab, and chronic pain management. Additional care needs include medications, diagnostic evaluations, durable medical equipment, safety aids, adaptive technology and assistive devices, homemaker/homehealth aide caregiver services, community resources, education, and peer support organizations.

## MEDICAL CARE

### Physiatry/Neurorehabilitation and Musculoskeletal Rehabilitation
-leading the interdisciplinary rehabilitation team, for optimizing health, well-being, functional restoration and maintenance, following traumatic brain injury with residual neurologic and musculoskeletal sequelae/impairments, prevention of further disability, injury, and illness

-Physical Therapy and Occupational Therapy referrals will be necessary for addressing mobility, self-care/instrumental activities of daily living, chronic pain, general long-term care of an individual who has sustained a traumatic injury resulting in residual impairments

-rehab medicine-related issues, including musculoskeletal dysfunction, chronic pain, spasticity, and general long-term care of an individual who has sustained a traumatic brain injury
    -neurorehabilitation addressing mobility, self-care/instrumental activities of daily living issues related to TBI and residual left spastic hemiparesis

    -musculoskeletal rehabilitation with care provided to monitor functional status, acute and chronic musculoskeletal dysfunction relating to left spastic hemiparesis

-evaluation and treatment of secondary chronic and acute injury, which can involve the spine and postural muscles, due to altered gait mechanics and

biomechanical strain while performing activities of daily living

-musculoskeletal injuries relating to falls

-chronic pain management is a priority, to optimize overall physical functioning and mental well-being, prevention of complications, with monitoring and management of chronic and acute pain with multiple etiologies, including joint/orthopedic, myofascial, and neuropathic

      -utilizing a multimodal approach to optimize pain control, including therapy modalities, interventional procedures, and medication management

      -pharmacologic pain management to include nonsteroidal antiinflammatory therapy, psychotropic medication, anticonvulsant medication, topical patches, compound cream, avoidance or at least minimizing use of opioid therapy

      -participation in an interdisciplinary pain rehabilitation program will be an important component of his life-long pain management program

      -Mr. Barber could benefit from complementary medicine modalities, including acupuncture treatments and manual therapy/myofascial deep tissue release

      -it is imperative to understand that Mr. Barber's pain issues are anticipated to continue over his lifetime, and exploring various combinations of therapeutic approaches will be dynamic, utilizing medications, modalities, and interventions

      -it is hopeful that conservative approaches of medications, therapy modalities, gym and aquatic therapy, participation in an interdisciplinary pain rehabilitation program, alternative approaches, and interventional/injection therapy will be effective for management of these issues

-two times per year

## INTERDISCIPLINARY THERAPIES/NEUROREHABILITATION/ MUSCULOSKELETAL REHABILITATION

      -From a musculoskeletal standpoint, Mr. Barber requires periodic therapy assessments over his lifetime.  Consultations and treatments will be necessary for surveillance and maintenance of optimal functional status related to his injuries, for prevention of further disability and injury, updating life-long therapy

interventions during the aging process with chronic impairments.  The therapy team will address musculoskeletal health, postural/spine stabilization, upper and lower extremity joint protection and preservation, balance, chronic pain management, updated independent therapeutic exercise/gym program, strengthening, conditioning, optimize gait/functional mobility, fall prevention, and safety, assessment of necessary durable medical equipment and adaptive devices for mobility and self-care

-Physical Therapy
- -periodic monitoring and assessment of functional mobility limitations, musculoskeletal health, postural/spine stabilization, injury prevention, chronic pain, strengthening, conditioning, optimizing gait/functional mobility, fall prevention, and safety

- -preservation of upper and lower extremity joints and musculoskeletal health, avoidance of chronic repetitive strain/over-use injuries

- -address fatigue and decreased tolerance and endurance for physical activity, provide energy conservation strategies

- -update independent therapeutic home and gym exercise program

- -consultation and 10 sessions every two years land therapy

- -consultation and 10 sessions every two years aquatic therapy

-Occupational Therapy
- -addressing self-care skills, strategies for safely participating in instrumental activities of daily living, ergonomic optimization, addressing chronic repetitive strain, adaptive device assessment, energy conservation

- -addressing left upper extremity spasticity and weakness, joint stabilization, orthotic use, contracture prevention

- -evaluation and five therapy sessions, every two years

-Interdisciplinary Outpatient Pain Rehabilitation Program
- -management of life-long acute and chronic pain of various etiologies

- -utilizing a Physical Therapy approach to emphasize mobility, stretching, conditioning, improved flexibility, movement, ergonomic/durable medical equipment assessment

-utilizing a Psychologic approach to emphasize cognitive/behavioral management of pain, including diagnostic understanding, muscle tension biofeedback, diaphragmatic breathing, relaxation strategies, mindfulness-based stress reduction, recognition of limits and honoring them, empowering the patient to feel more in control of his pain

-two times per week, two hour sessions, duration eight weeks, now and repeat three times

-alternative medicine
    -acupuncture- 12 sessions per year

    -myofascial deep tissue manual therapy- 12 sessions per year

## DIAGNOSTICS
-musculoskeletal
    -shoulder xrays, three views
    -five

    -shoulder CT scan
    -two

    -cervical spine xrays, three views
    -two

    -cervical spine CT scan
    -one

    -lumbar spine xrays, three views
    -three

    -lumbar spine CT scan
    -two

## MEDICATIONS
-Mr. Barber's medication regimen will address management of chronic pain and spasticity.

### pain management
-Lidoderm 5% patch, one topically x12 hrs/day, #120/year

-Flector patch, one topically q12hrs, #120/year

-Celebrex 200mg daily, #120/year

-Voltaren gel, #1 tube/month

**spasticity management**
    -Tizanidine 4mg TID


**DURABLE MEDICAL EQUIPMENT**
    -specialized adaptive devices are necessary for individuals with chronic functional
    impairments, to optimize functional mobility, self-care, and instrumental activities
    of daily living, to assure care needs and activities are performed safely and
    effectively, with the highest level of independence, prevention of further
    musculoskeletal injury/medical complications, promote pain reduction,
    particularly due to aging with disabilities

    -mobility/adaptive equipment
        -custom manual wheelchair with hemi-drive, power assist rims, and
        cushion

        -power wheelchair and cushion for community mobility

    -activities of daily living
        -grab bars

        -shower chair/hand held shower nozzle

    -pain management
        -aquatic therapy/aqua jogger/flotation devices

        -OrthoCore- shoulder unit

        -H-wave

        -hot and cold packs

        -adjustable bed with pressure-reducing memory foam mattress to optimize
        positioning, transfers, pain management

**ASSISTANCE WITH INSTRUMENTAL ACTIVITIES OF DAILY
LIVING/HOUSEHOLD MANAGEMENT/TRANSPORTATION, PROVIDED BY
A HOMEMAKER/HOMEHEALTH AIDE**

-Mr. Barber's permanent functional impairments, physical limitations, and chronic pain
result in overall functional decline in his independence for managing his affairs/day-to-
day life, mobility and IADL's, resulting in the medical necessity for assistance from a
homemaker/homehealth aide, to optimize health management, safety, prevention of
further acute and chronic injury, chronic pain management, and quality of life

-from a physical standpoint, activities now can require an unreasonable amount of time
and energy to accomplish, expose him to exacerbation of pain, potential acute injury,
chronic repetitive strain injuries, and emotional frustration and stress

-while he does not currently require hands-on assistance for accomplishing self-care
activities, over the later years of his life, Mr. Barber's functional status will predictably
decline, more precipitously than had it not been for the injury he sustained, and he will
require progressively more assistance

-receiving assistance with activities he is limited in safely performing will best assure
avoidance of additional injury, as well as assurance that his daily needs are met safely
and effectively, and well-being/quality of life is optimized as best as possible

-Once Mr. Barber returns to community living, he will have the medical necessity for
homemaker/homehealth aide care for 10 hours per week, and continuing over the next ten
years, then,
-increasing need to 20 hours per week, continuing over the next ten years, then,
-increasing need to 30 hours per week, continuing over the next ten years, then,
-increasing need to 40 hours per week, continuing over the remainder of his lifetime

**HOME ENVIRONMENT SAFETY/ACCESSIBILTY/ARCHITECTURAL
BARRIERS**

-once Mr. Barber returns to community living, evaluation will be necessary for
assessment of the home environment for modifications needed to optimize accessibility,
safety, comfort issues, and quality of life

**TRANSPORTATION**

-a modified van with a ramp will be necessary to transport his power wheelchair for
community accessibility

**EDUCATIONAL RESOURCES/PEER SUPPORT/ORGANIZATIONS**
-education on approaches to maximize function, health, and quality of life, while living
with chronic impairments, community resources, and staying current with rehabilitation
technology and interventions, caregiver/family support

-local brain injury foundation

-chronic pain support group


Thank you very much for the opportunity to evaluate Mr. Barber.  As additional
assessments and information become available, I will provide updates with appropriate
modifications of care needs as indicated.  Please do not hesitate to contact me for any
further questions or input.

___/s/ Amy Magnusson_____
Amy Magnusson, MD

cc:

LAW OFFICES OF DALE K. GALIPO
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
p- 818-347-3333
f- 818-347-4188
Renee V. Masongsong, Esq.
rvalentine@galipolaw.com

# EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

STEFFON BARBER, an individual,)
                              )
          Plaintiff,          )
                              )
    vs.                       )   Case No.
                              )   5:22-cv-00625-KK-SHK
COUNTY OF SAN BERNARDINO, a   )
municipal entity, and DOES 1  )
through 10, inclusive,        )
                              )
          Defendants.         )
_____)


VIDEOTAPED DEPOSITION OF AMY MAGNUSSON, M.D.

REPORTED REMOTELY

FRIDAY, DECEMBER 5, 2025

11:35 A.M. - 12:31 P.M.


REPORTED BY MELISSA PLOOY, CSR #13068

```
 1              THE VIDEOTAPED DEPOSITION OF AMY MAGNUSSON,

 2   M.D. WAS TAKEN VIA ZOOM VIDEOCONFERENCE BEFORE MELISSA

 3   PLOOY, A CERTIFIED SHORTHAND REPORTER IN AND FOR THE

 4   STATE OF CALIFORNIA, ON FRIDAY, DECEMBER 5, 2025,

 5   COMMENCING AT THE HOUR OF 11:35 A.M.

 6

 7                    APPEARANCES OF COUNSEL

 8

 9   FOR THE PLAINTIFF:

10        LAW OFFICES OF DALE K. GALIPO
          BY:  RENEE MASONGSONG, ESQ.
11        21800 Burbank Boulevard, Suite 310
          Woodland Hills, California 91367
12        (818) 347-3333
          rvalentine@galipolaw.com
13
          IVIE MCNEILL WYATT PURCELL & DIGGS
14        BY:  RODNEY DIGGS, ESQ.
          444 South Flower Street, Suite 3200
15        Los Angeles, California 90071
          (213) 489-0028
16        rdiggs@imwlaw.com

17

18   FOR THE DEFENDANTS:

19        MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
          BY:  KAYLEIGH ANDERSEN, ESQ.
20        801 South Figueroa Street, 15th Floor
          Los Angeles, California 90017
21        (213) 624-6900
          kayleigh.andersen@manningkass.com
22

23

24   ALSO PRESENT:  SHREVE VANZANTEN, VIDEOGRAPHER

25
```

```
 1   medical directorship at Learning Services, which is a
 2   post acute brain injury residential facility.
 3        Q.   And you do medical-legal work as well; is that
 4   correct?
 5        A.   Yes.                                                    11:44
 6        Q.   What percentage of your current work would you
 7   say is medical-legal work?
 8        A.   Approximately 40 percent.
 9        Q.   So I know you gave me your estimate of over 200
10   times you've been deposed.  Have all of those been as an   11:44
11   expert?
12        A.   Yes.
13        Q.   How many of those times where you've been
14   deposed as an expert were you testifying on behalf of
15   the plaintiff in a civil case?                             11:44
16        A.   It's approximately 85 percent, I believe.
17        Q.   Would the other 15 percent, I assume, be for
18   defense in a civil case?
19        A.   Yes.
20        Q.   And have you worked on other cases that involve 11:44
21   allegations of excessive force by law enforcement?
22        A.   I have.
23        Q.   Approximately how many time before this case?
24        A.   Maybe in the neighborhood of ten.
25        Q.   Did you conduct an in-person evaluation of      11:45
```

THE SULLIVAN GROUP OF COURT REPORTERS

```
 1   Mr. Barber?
 2        A.   I did not.
 3        Q.   Did you request to conduct an in-person
 4   evaluation of Mr. Barber?
 5        A.   Attempts were made to do so.  I completed      11:45
 6   paperwork that was required by the prison and the timing
 7   didn't work such that I was able to actually travel
 8   there or do a remote evaluation.
 9        Q.   In your medical-legal work, do you typically
10   conduct in-person evaluations of your clients for the    11:45
11   plaintiff?
12        A.   Yes.
13        Q.   And why is that important?
14        A.   To be able to correlate what my findings
15   between a history and physical exam are to those that    11:45
16   are documented throughout the medical records.
17        Q.   Are you an orthopedic specialist?
18        A.   No.
19        Q.   Do you have a license or certification in
20   psychology?                                              11:46
21        A.   I do not.
22        Q.   And I understand on your CV you identify spinal
23   cord -- where is it?  I just saw it.  Subspecialty board
24   certification, spinal cord medicine and brain injury
25   medicine.  Can you tell me what each of those mean?      11:46
```

THE SULLIVAN GROUP OF COURT REPORTERS

```
1        A.    That's correct.
2        Q.    Okay.  And a lot of your recommendations
3    involve community resources and home health as well as a
4    caregiver and family support, but you understand that
5    Mr. Barber is currently serving a 14-year prison          11:48
6    sentence; is that correct?
7        A.    I was not certain the length of the sentence,
8    but as of June 2025, it was my understanding he was
9    still serving.
10       Q.    Okay.  Have you provided recommendations for   11:48
11   interdisciplinary rehab for incarcerated persons before?
12       A.    I don't believe so.
13       Q.    Are you aware of any restrictions or
14   limitations on resources and, I guess, the things that
15   would be available to Mr. Barber while in a state         11:48
16   prison?
17       A.    Well, it's my understanding from the records
18   that he was continuing to receive outpatient care at
19   Arrowhead Regional Medical Center from physical therapy
20   and occupational therapy, neurosurgery follow-up,         11:49
21   orthopedic surgery, physiatry and neurology, I believe.
22       Q.    Were you able to review any records from the
23   state prison where he's currently incarcerated?
24       A.    Yes.  I believe so.  I think the last notation
25   or documentation is from June of 2025.  I believe that's  11:49
```

1   what you're referring to.

2      Q.   In reviewing the records from the state prison

3   where he's currently incarcerated or at least as of June

4   of 2025, do you know whether he was receiving any type

5   of outpatient care?                          11:49

6      A.   I don't believe so.  I think that that had

7   concluded I believe sometime in 2023, I believe,

8   approximately.

9      Q.   And the date of the incident was 2020 -- April

10   of 2021, so four and a half, approximately, years ago,   11:50

11   correct?

12      A.   Yes.

13      Q.   Have you spoken to any of Mr. Barber's treating

14   physicians, whether from Arrowhead or any other

15   outpatient clinic that he received treatment?       11:50

16      A.   I have not.

17      Q.   Have you spoken to anyone at the prison where

18   he's currently incarcerated on how to -- I think

19   Mr. Diggs is joining us.

20        Have you spoken to anyone at the state prison   11:50

21   regarding your recommendations in this case and how it

22   would -- whether they would be able to accommodate any

23   of these recommendations?

24      A.   I have not.

25      Q.   Did you prepare any type of cost analysis for   11:50

 1    endocrine abnormalities, including metabolic syndrome,

 2    and addressing his functional impairments, which include

 3    mobility, self-care, instrumental activities of daily

 4    living and monitoring for functional decline over his

 5    lifetime.                                                    11:53

 6        Q.    And you mentioned the shoulder pain.  Do you

 7    know if that was in any way connected to the incident at

 8    issue in this case?

 9        A.    It is -- so I'm not aware of any shoulder pain

10    he had before his injury, but that -- I'm not aware if     11:53

11    he did or did not have shoulder pain prior to this

12    injury.  Back in the acute care hospital at Arrowhead,

13    that was when he initially began complaining of the

14    shoulder pain and then continued to do so during his

15    incarceration being referred for X-ray, CT scan, seeing    11:53

16    orthopedic surgery and having the corticosteroid

17    injection and addressing that with PT and OT.  So I

18    believe that it potentially could be correlated to the

19    injury.  He's got left hemiparesis, and with muscular

20    weakness, there can be laxity or instability in the        11:54

21    joint and so that can be a painful -- or an etiology

22    where you would experience shoulder pain from.  So I

23    can't say with absolute certainty, but I think that

24    there's -- you know, the clinical correlation makes

25    sense to me.                                                11:54

THE SULLIVAN GROUP OF COURT REPORTERS

17

1   So he had some confusion, and I think back initially

2   before his cranioplasty, he had spontaneous movements of

3   all four extremities.  Following the cranioplasty with

4   the titanium plate, it looked as though that's when the

5   left upper extremity weakness and the bilateral lower     11:57

6   extremity weakness was consistently documented from

7   there.

8       Q.   Have you noticed any changes in the

9   presentation of Mr. Barber's TBI since 2021 and 2022?

10      A.   So when he had follow-up with neurosurgery and  11:58

11  neurology at Arrowhead, it looked as though they were

12  giving him a Glasgow Coma Scale of 15, saying that he

13  was alert and oriented times four.  He had regained

14  strength in his right lower extremities.  So he had full

15  five over five strength.  The left hemiparesis also       11:58

16  improved to I think probably three over five strength in

17  the left foot and ankle, so with a foot drop, but

18  otherwise four to five strength in the left upper and

19  lower extremity.

20      Q.   Did you review Mr. Barber's deposition          11:58

21  testimony as well?

22      A.   I did not.

23      Q.   Okay.  Do you understand that he was -- he gave

24  a deposition in this case?

25      A.   I did see that, yes.                             11:59

```
 1        Q.   Did you request to review his deposition
 2   transcript?
 3        A.   I did not.
 4        Q.   Why not?
 5        A.   Didn't -- didn't think of asking and I believe    11:59
 6   that when I was made aware of it is when I was sent the
 7   Dropbox and noted it in there.
 8        Q.   And then in this section under medical care,
 9   sorry, the first section and towards the bottom of Page
10   5, you put two times per year.  Do you see that?            11:59
11        A.   I do.
12        Q.   What's the time limit on that?  Is that for the
13   rest of his life or is there some time constraint on
14   that?
15        A.   It would be over the course of his lifetime.      11:59
16        Q.   And do you recommend he receive these therapies
17   while incarcerated as well?
18        A.   Yes.
19        Q.   You're just not sure if that's an option
20   through the state prison; is that correct?                  12:00
21        A.   Well, he was referred to physical medicine and
22   rehab while incarcerated to receive Botox to the -- or
23   to address the left lower extremity spasticity and foot
24   drop.  He was seen once I believe and was prescribed
25   dantrolene prior to proceeding with any kind of Botox       12:00
```

THE SULLIVAN GROUP OF COURT REPORTERS

1  injury, we need to sequentially or episodically provide

2  reevaluations from the interdisciplinary team.  For

3  Mr. Barber, it would be primarily physical therapy and

4  occupational therapy to provide a functional assessment,

5  identify any short- or long-term goals that are new          12:02

6  since the prior evaluation and focused therapies and

7  interventions to optimize his function and his safety,

8  pain management.

9      Q.   And you note under the physical therapy section

10 that you just were talking about the aquatic therapy as    12:02

11 well as land therapy.  What's your recommendation for

12 how often he would need those two types of therapy?

13     A.   So for each of them, it would be a consultation

14 and ten sessions every two years.  So probably

15 alternating land therapy, aquatic therapy, land therapy    12:03

16 over his life.  The aquatic therapy is often prescribed

17 for individuals with neurologic and functional

18 limitations because you're eliminating the gravitational

19 forces that make land therapy in some respects more

20 challenging than the water therapy would be.              12:03

21     Q.   In the four and a half years since this

22 incident, do you know if Mr. Barber has received any

23 type of aquatic therapy?

24     A.   I don't recall seeing any, no.

25     Q.   And do you know if that would be available      12:03

```
 1  through a state prison?

 2       A.    I think it would be dependent on the rehab

 3  facility and whether or not they offer that.  So many

 4  rehab hospitals have both of those therapeutic

 5  modalities available.  I don't know about Arrowhead,          12:04

 6  whether their physical therapy department has that

 7  available or not.

 8       Q.    Do you know the last time he was seen at

 9  Arrowhead?

10       A.    Off the top of my head, no.  I believe it was   12:04

11  in 2024.  I'm not recalling anything specifically in

12  2025, but he had follow-up with those medical

13  specialties that I mentioned before, ortho,

14  neurosurgery, neurology, rehab and then the PT and the

15  OT.                                                          12:04

16       Q.    Do you know based on your review of the

17  records, including from the state prison, if since he's

18  gone to the state prison he's gone back to Arrowhead at

19  any time?

20       A.    As an inpatient?                                 12:05

21       Q.    Or outpatient.

22       A.    Could you rephrase that question?

23       Q.    Of course.  I'm trying to -- it's kind of a

24  confusing topic, but do you know if since he's gone to

25  state prison he's ever gone back to Arrowhead?              12:05
```

THE SULLIVAN GROUP OF COURT REPORTERS

24

1      A.    I believe all of that care was through

2   Arrowhead.

3      Q.    Including since he's been incarcerated in a

4   state prison as opposed to county jail?

5      A.    Oh, that I don't know.  I don't know when he        12:05

6   transitioned facilities or how that works.

7      Q.    Okay.

8      A.    I don't know.

9      Q.    Okay.  If Mr. Barber is not able to get the

10   therapies that you recommend in this -- in your report,     12:05

11   including the aquatic therapy, do you know how that

12   would affect his prognosis, if at all?

13      A.    Uh-huh.  I think it would negatively impact his

14   prognosis.  Individuals with neurologic injuries that

15   have residual sequelae need ongoing care over the rest      12:06

16   of their lives to prevent further injury or illness,

17   complications that are associated with their neurologic

18   injuries, hence the reason for the physical medicine and

19   rehab and the recommendations I provided in my report.

20   So I think that there would be a -- not just a              12:06

21   functional recline -- decline, but a functional -- or a

22   decline in his quality of life, the decline in his

23   comfort management of pain and spasticity.  So I do

24   think it would be detrimental.

25      Q.    So if he's potentially incarcerated for the        12:07

```
 1   chronic pain management, but also therapy modalities,

 2   exercise and then these other modalities such as

 3   acupuncture and myofascial release to -- to enhance

 4   exercise tolerance, joint and muscle mobility and

 5   flexibility and general enhancement of an individual's          12:09

 6   mobility to enhance functional mobility just in general

 7   terms as far as gait and maintaining independence with

 8   that.

 9       Q.   Okay.  And do you know if either of these

10   options for alternative medicine or these                       12:09

11   recommendations for alternative medicine, do you know if

12   those would be available in a prison setting?

13       A.   I don't know that.

14       Q.   And then you have 12 sessions per year.  Is

15   that also for the rest of his life?                             12:09

16       A.   Yes.

17       Q.   And then under diagnostics, you have several

18   scans, imaging studies that you recommend and I'm

19   assuming those numbers says 5, 2.  Do you mean five

20   total or five each year?  What's the -- what's the time        12:10

21   period on that?

22       A.   Those are over his lifetime.

23       Q.   Okay.  And then would your recommendations or

24   plan for him for future care change based on what is --

25   what is shown in these scans and imaging studies?             12:10
```

```
 1    that he is anticipated to have.
 2         Q.    And, again, do you know whether each of these
 3    medications would be available in a prison setting?
 4         A.    I don't know.  From personal experience, I
 5    mean, none of these are opioid or habit-forming          12:12
 6    medications.  So I would imagine that's one of the
 7    criteria of a setting such as that, but I just -- I
 8    don't know specifically what is and isn't available
 9    there.
10         Q.    And how long would he need to take each of     12:13
11    these medications?
12         A.    These are anticipated over his lifetime.
13         Q.    Would he need to take under pain management all
14    four of those at the same time?
15         A.    No.  That's why, for example, the patches, the  12:13
16    Lidoderm and the Flector, that's only 120 per year
17    versus 365 or on a daily basis.
18         Q.    Under -- move to durable medical equipment also
19    on Page 8 there.  What information did you use to rely
20    on to form your recommendations and opinions in this    12:13
21    section?
22         A.    Just as a physiatrist, looking at ways in which
23    we need to compensate for permanent residual
24    impairments, functional mobility issues, self-care
25    issues, chronic pain and what types of devices,          12:14
```

1    extremity joints because it gives you a little

2    propulsion with your manual push.

3        Q.    And in the four and a half years or so since

4    this incident, do you know if he's ever complained of

5    pain from having to use a manual wheelchair?                    12:16

6        A.    I don't know if that's where some of the left

7    shoulder pain comes from or not, if it's an overuse soft

8    tissue component to that shoulder pain.

9        Q.    There's no documented medical record about

10   what's causing that?  Is that still your understanding    12:16

11   of the shoulder pain?

12       A.    It is.  I believe that the appropriate imaging,

13   the MRI, cannot be done because of retained bullet

14   fragments from the injury and so I think the MRI would

15   be most revealing or informative of what the underlying   12:16

16   pathology is.

17       Q.    And then the specific bed that's recommended,

18   the adjustable bed, maybe it's a silly question, but do

19   you know whether that's available at the prison?

20       A.    I don't know one way or the other.              12:17

21       Q.    Okay.  But you would recommend -- again, if he

22   serves the full sentence of 14 years, that you would

23   recommend these -- these -- this durable medical

24   equipment for after his release as well; is that

25   correct?                                                  12:17

```
 1        A.    Oh, yes.
 2        Q.    And, again, if he's not able to retain this
 3    stuff over the next 14 years of his sentence, what
 4    effect does that have on his prognosis?
 5        A.    I just -- I think all of his care is medically     12:17
 6    necessary now moving forward.  It's hard to have a
 7    crystal ball and say if he doesn't have the care in 14
 8    years what his -- what the specific outcomes will be,
 9    but I think it negatively contributes to, you know, what
10    his function, quality of life and medical stability will     12:17
11    be over time.
12        Q.    Next section starting on Page 9, the assistance
13    with instrumental activities of daily living, household
14    management, again, because he's incarcerated for the
15    next 14 years, are these recommendations mostly for          12:18
16    after his release?
17        A.    I would say -- I mean, certainly, as I
18    mentioned in the first couple paragraphs, a lot of this
19    is -- and also reflected, interestingly, in that June of
20    2025 medical evaluation where it's identified at this        12:18
21    time he's essentially independent with his self-care,
22    his bathing, dressing, grooming, hygiene, toileting,
23    that it would be the instrumental activities of daily
24    living, the shopping, cooking, cleaning, laundry,
25    running errands.  So during his incarceration, I think       12:19
```