Eugene P. Ramirez, Esq. (State Bar No. 134865)
  *eugene.ramirez@manningkass.com*
Kayleigh A. Andersen (State Bar No. 306442)
  *Kayleigh.Andersen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, COUNTY OF
SAN BERNARDINO and
CHRISTOPHER ALFRED

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEFFON BARBER, an individual, | Case No. 5:22-cv-00625-KK-DTB |
| Plaintiff, | *[Assigned to the Honorable District Judge Kenly Kiya Kato, Magistrate Judge, David T. Bristow]* |
| v. | |
| COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE OF, ARGUMENT REGARDING, OR REFERENCES TO PLAINTIFF STEFFON BARBER'S CRIMINAL RECORD AND PRIOR BAD ACTS; DECLARATION OF KAYLEIGH A. ANDERSEN** |
| Defendants. | |
| | Judge:  Hon. Kenly Kiya Kato |
| | Date:   January 8, 2026 |
| | Time:   10:30 a.m. |

Defendants COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED ("Defendants") hereby submit the following Opposition to Plaintiff's Motion *in Limine* No. 1 to Exclude Evidence of, Argument Regarding, or References to Plaintiff Steffon Barber's Criminal Record and Prior Bad Acts.

///

///

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    EVIDENCE REGARDING PLAINTIFF'S CRIMINAL RECORD AND PRIOR BAD ACTS ARE RELEVANT TO PLAINTIFF'S INTENT, MOTIVE, AND/OR STATE OF MIND.**

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401.

Under Federal Rule of Evidence 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]he intent behind the rule is not to 'flatly prohibit the introduction of such evidence,' but to limit the purpose for which it may be introduced." *Boyd v. City & County of San Francisco,* 576 F.3d 938, 947 (9th Cir. 2009) [quoting *Huddleston v. United States*, 485 U.S. 681, 687 (1988)].

"Under 404(b)(2), the evidence of other crimes and bad acts may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." See *Heath v. Cast,* 813 F.2d 254, 259 (9th Cir. 1987) [admission of evidence of an arrest and misdemeanor convictions to show bias against police, even when plaintiffs offered to stipulate that they were biased, was not an abuse of discretion]. Courts may therefore permit the introduction of such information — even that which is unknown to an officer at the time of the incident — to show Plaintiff's intent, motive, and plan during the incident. "In a case . . . where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible." *Boyd*, 576 F.3d at 944.

For example, in an excessive force case against police officers and their law enforcement agency, the Ninth Circuit affirmed the admission of prior bad acts of the decedent — including a pre-incident high-speed chase, prior arrests for drugs and related erratic behavior, and other non-incident conduct involving high-risk acts

(some of which were unknown to the involved officer) — on the grounds that such prior bad acts tended to show the decedent's suicidal propensity, which in turn tended to show the decedent's intent or motive to commit suicide by cop during the incident use of force — which was in turn consistent with the defense theory of the case. See *Boyd*, 576 F.3d at 944-47.

Here, Plaintiff seeks to exclude evidence that impacted the Defendant Deputy's decision to use force during this incident. Specifically, this evidence has a tendency to make a fact of consequence more or less probable.

In this case, upon the arrival of Defendant Deputy Alfred at the incident location, he identified and attempted to speak with Plaintiff, and gave Plaintiff repeated commands to show his hands and step away from Plaintiff's vehicle. Plaintiff refused to comply and instead entered and reversed his vehicle in Deputy Alfred's direction in an attempt to seriously injure or kill Deputy Alfred.

Notably, Plaintiff's criminal record includes three other instances of obstructing or resisting a peace officer, with the most recent being a felony conviction for violation of California Penal Code § 69 in May 2018, just three years prior to the Subject Incident in April 2021. At the time of the Subject Incident, Plaintiff was also on probation due to a December 2017 conviction for felony child cruelty. Plaintiff believed at the time of this incident that he was on felony probation for assault on *a different deputy*. (Andersen Decl., Ex. A at 24:7 – 26:5, 27:3-14). And, Plaintiff has been arrested by the San Bernardino County Sheriff's Department numerous times. (Andersen Decl., Ex. A at 26:6-14). Therefore, Plaintiff was on probation at the time of this incident and required to comply with law enforcement commands and submit to search. (Andersen Decl., Ex. A at 27:21 – 28:4). Further, Plaintiff's conviction resulting from the Subject Incident is highly relevant as Plaintiff was found guilty of assault with a deadly weapon by a criminal jury. And, the 14 year sentence that Plaintiff received was in part due to his violation of probation. (Andersen Decl., Ex. A at 28:20 – 29:9).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1

Thus, Plaintiff's criminal record, including, but not limited to, the criminal conviction resulting from the Subject Incident and any past convictions, charges, arrests, jail time, and/or previous interactions with law enforcement, is relevant to show Plaintiff's intent, motive, and plan during the incident, including an impetus to ignore the commands of law enforcement and resist arrest. Even if such intent, motive, or plan facts were unknown to the involved deputy, such evidence has a tendency in reason to make it more likely that Plaintiff would display repeated non-compliance and resist the Defendant Deputy in his lawful duties. See *Heath*, 813 F.2d at 259-262, n.5 (holding that evidence of plaintiff's prior arrest and brother's misdemeanor convictions were admissible to show bias against the police in bringing the action); *United States v. Johnson,* 542 F.2d 230, 234 (5th Cir. 1976) (in a case where defendant's flight from and resistance to police officers was an issue, the appellate court affirmed the admission of evidence of the suspect's prior convictions and pending arrest warrant, so as to show the suspect's motive for such evasion and resistance); *cf. Graham v. Connor*, 490 U.S. 386 (1989).

II.    **EVIDENCE REGARDING PLAINTIFF'S CRIMINAL RECORD AND PRIOR BAD ACTS ARE RELEVANT TO PLAINTIFF'S CLAIM FOR DAMAGES.**

The evidence sought to be excluded is also directly relevant to issues which Plaintiff has placed in issue — namely, the amount of damages to which he is entitled. Whether a party has a criminal record, including, but not limited to, any past convictions, charges, arrests, jail time, and/or previous interactions with law enforcement, is relevant in calculating lost earnings and loss of earnings capacity.

In *Estate of Casillas*, the Court found that Casillas's criminal and incarceration history, his prior drug usage, and the toxicology screen at autopsy were not excludable in that they were relevant to the damages elements of plaintiffs' claims. *Estate of Casillas*, 2019 U.S. Dist. LEXIS 23710, *8-11 (E.D. Cal. Feb. 13, 2019) (citing *N.W. v. City of Long Beach*, 2016 U.S. Dist. LEXIS 194469, *13-14

4

MANNING | KASS

(C.D. Cal. June 7, 2016) (evidence of the presence of marijuana in decedent's system and drug-use history deemed "relevant to the determination of noneconomic damages as recognized in California; as it goes to his life expectancy, health, habits, activities, lifestyle, and occupation"; decedent's criminal record deemed relevant to future earnings; and decedent's history of incarceration deemed relevant to the amount of time "plaintiffs and decedent have spent…apart"); *Knudsen v. Welsh*, 872 F.2d 428 (9th Cir. 1989) (holding that prior bad acts were "properly introduced for the purpose of proving damages"); *Castro v. Cnty. of L.A.,* 2015 U.S. Dist. LEXIS 103945, *11 (C.D. Cal. Aug. 3, 2015) (denying motion *in limine* to exclude decedent's drug use history because of its relevance to the issue of damages for plaintiffs' § 1983 and wrongful death claims); *P.C. v. City of L.A.*, 2011 U.S. Dist. LEXIS 165075, *7-8 (C.D. Cal. Aug. 22, 2011) (denying plaintiff's motion *in limine* to exclude decedent's criminal record partly due to the issue of damages, and stating that while the nature of decedent's convictions would raise FRE 403 concerns, inquiry into the "length of time decedent spent in prison . . . are probative of damages and of the credibility of damages witnesses who may testify to having spent considerable time with decedent").

Similar to the plaintiffs in *Estate of Casillas*, Plaintiff seeks economic and noneconomic damages. Thus, Plaintiff's criminal record, including, but not limited to, the criminal conviction resulting from the Subject Incident and any past convictions, charges, arrests, jail time, and/or previous interactions with law enforcement, is relevant and admissible to the issue of damages in this case.

## III.    THE PROBATIVE VALUE OF THE EVIDENCE PLAINTIFF SEEKS TO EXCLUDE IS NOT OUTWEIGHED BY A DANGER OF PREJUDICE.

FRE 403 articulates the judicial power to exclude relevant evidence because of prejudicial dangers or considerations. Relevant evidence may be excluded under FRE 403 only if its probative value is substantially outweighed by one or more of the articulated dangers or consideration. This requires that the probative value of the evidence be

compared to the articulated reasons for exclusion and permits exclusion only if one or more of those reasons "substantially outweigh" the probative value. FRE 403 favors admissibility, while concomitantly providing the means of keeping distracting evidence out of the trial.

*United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000).

Plaintiffs improperly assert that the evidence they seek to exclude lacks probative value and is unduly prejudicial, but, as demonstrated above, such evidence is clearly relevant and has probative value.

Evidence of Plaintiff's criminal record, including, but not limited to, the criminal felony conviction resulting from the Subject Incident and any past felony convictions is always admissible under the Federal Rules of Evidence, Rule 609. The evidence of these convictions, charges, arrests, jail time, and/or previous interactions with law enforcement is also relevant to explain his intent, motive, and state of mind during the incident and to determine the amount of his damages. It is also evidence of Plaintiff's bias against the Department due to his numerous interactions with the San Bernardino County Sheriff's Department and resulting charges and convictions. Such probative value is not outweighed by a danger of prejudice because the Court can give the jury a limiting instruction regarding the proper use of such evidence.

Moreover, Plaintiff's criminal record, including, but not limited to, the criminal conviction resulting from the Subject Incident and any past convictions, charges, arrests, jail time, and/or previous interactions with law enforcement, is not unduly prejudicial because the probative value of such evidence deals directly with the Subject Incident and shows Plaintiff's motive and intent on the date of the incident, including an impetus to ignore the commands of law enforcement and resist arrest.

The prior convictions and Plaintiff's conviction for the Subject Incident is also relevant to Plaintiff's claimed damages. Plaintiff is currently serving a 14-year prison sentence. Any anticipated testimony about his injuries, recommended

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1

medical treatment, employment history and potential future employment, will certainly be affected by the prior felony convictions and the felony conviction stemming from the Subject Incident.

Lastly, the evidence of Plaintiff's felony conviction for assault with a deadly weapon is directly relevant to the elements of Plaintiff's claims. A criminal jury has already heard evidence and testimony and determined that Plaintiff used a deadly weapon (his vehicle) to assault Deputy Alfred (the victim in the criminal case). Plaintiff has to prove that there he was not an imminent threat of death or serious bodily injury to anyone under *Graham v. Connor* to support his claims that the force was excessive. A jury has already decided he used a deadly weapon to assault Deputy Alfred, knocking out the elements of Plaintiff's claims. The evidence of the criminal convictions is therefore directly relevant.

Plaintiff fails to demonstrate that his reasons for exclusion substantially outweigh the probative value of the evidence. Therefore, Plaintiff's motion should be denied.

## IV.    DEFENDANTS ARE NOT SEEKING TO INCLUDE ANY OF THIS EVIDENCE AS CHARACTER EVIDENCE.

Defendants are not seeking to introduce any of this evidence as character evidence. Thus, exclusion pursuant to Federal Rules of Evidence 404 is improper. Although it is true that, in general, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it is also true that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See* Fed. R. Evid. 404(b).

Here, Plaintiff's criminal record, including, but not limited to, the criminal conviction resulting from the Subject Incident and any past convictions, charges, arrests, jail time, and/or previous interactions with law enforcement, is relevant to

7

show Plaintiff's intent, motive, and plan during the incident, even if such intent, motive, or plan facts were unknown to the involved deputy, because such evidence has a tendency in reason to make it more likely that Plaintiff posed an immediate threat to the safety of Defendant Deputy Alfred. See *Boyd*, 576 F.3d at 944 ("In a case such as this, where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible").

Thus, the subject evidence cannot be excluded on the grounds that it is impermissible character evidence under Federal Rules of Evidence 404.

## V.   THE EVIDENCE PLAINTIFF SEEKS TO EXCLUDE IS ADMISSIBLE UNDER FEDERAL RULES OF EVIDENCE 803(8) AND 803(22).

Plaintiff seeks to exclude any reports containing information pertaining to Plaintiff's criminal history under Federal Rules of Evidence 801 and 802. However, under Federal Rules of Evidence 803(8), "a record or statement of a public office" — such as police records — is an exception to the hearsay rule and thereby admissible if it "sets out . . . factual findings from a legally authorized investigation". *See* Fed. R. Evid. 803(8)(A)(iii). These records were created by law enforcement officers in the regular course of their official duties and document matters observed and factual findings resulting from an investigation or other official duty, and are thereby admissible.

These records also include references to and documentation of final judgments of conviction, including a 2018 conviction, for which Plaintiff was sentenced to imprisonment for more than a year. Under Federal Rules of Evidence 803(22), evidence of Plaintiff's prior convictions is admissible if "(A) the judgment was entered after a trial or guilty plea . . . (B) the conviction was for a crime punishable . . . by imprisonment for more than a year; (C) the evidence is admitted to prove any fact essential to the judgment". *See* Fed. R. Evid. 803(22).

Plaintiff's "hearsay within hearsay" objection does not warrant exclusion of

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1

the records in their entirety. Federal Rules of Evidence 805 permits admission where each layer of hearsay falls within an exception. Here, the records themselves are admissible under Federal Rules of Evidence 803(8) and (22). Any embedded statements by third parties can be admitted if they independently satisfy an applicable exception or may be disregarded without undermining the admissibility of the records themselves. To the extent the Court identifies particular embedded statements that do not fall within a hearsay exception, it may "restrict the evidence to its proper scope" and redact those statements, ensuring that only those portions of the records satisfying a hearsay exception under Federal Rules of Evidence 803 are introduced. *See* Fed. R. Evid. 105.

Because the evidence Plaintiff seeks to exclude qualifies as an exception to the hearsay rule under Federal Rules of Evidence 803(8) and (22), and because any hearsay-within-hearsay concerns can be resolved through limited redactions, Plaintiff's motion *in limine* should be denied.

## VI.    CONCLUSION

Based on the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Motion *in Limine* No. 1 to Exclude Evidence of, Argument Regarding, or References to Plaintiff Steffon Barber's Criminal Record and Prior Bad Acts.

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1**

1    DATED:  December 18, 2025          **MANNING & KASS**
2                                       **ELLROD, RAMIREZ, TRESTER LLP**

3

4                                       By:  _____/s/ Kayleigh A. Andersen_____
5                                            Eugene P. Ramirez, Esq.
6                                            Kayleigh A. Andersen, Esq.
                                             Attorneys for Defendants, COUNTY OF
7                                            SAN BERNARDINO and
8                                            CHRISTOPHER ALFRED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1**

## <u>DECLARATION OF KAYLEIGH ANDERSEN</u>

I, Kayleigh Andersen, declare as follows:

1.  I am an attorney at law duly authorized to practice before all the courts of the State of California and in all of the United States District Courts within the Central District of California. I am a partner in the law firm of Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record herein for Defendants COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED (collectively "Defendants"). If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration, except as to those matters that are stated on information and belief herein.

2.  Attached hereto as **Exhibit A**, is a true and correct copy of relevant portions of the deposition transcript of Plaintiff Steffon Barber, which was taken on September 9, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 18, 2025 at Los Angeles, California.

*/s/ Kayleigh Andersen*
Kayleigh Andersen

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1**

# EXHIBIT A

# EXHIBIT A

October 29, 2025

Eugene Ramirez, Esq.
Kayleigh Andersen, Esq.
Manning | Kass
801 S. Figueroa Street, 15th Floor
Los Angeles, CA 90017

<u>**Federal Rules of Civil Procedure 26 (a) (2) (B) Report**</u>
**BARBER, Plaintiff,**
**v.**
**COUNTY OF SAN BERNARDINO, et al, Defendants**
**USDC Case No.  5:22-cv-00625-JWH (SHKx)**

Mr. Ramirez and Ms. Andersen:

Thank you for retaining me to review, examine, and render opinions on this matter.  I have
studied and analyzed interviews, policies, procedures, video and audio recordings, reports,
photographs, memoranda, and associated materials (listed in the Materials Reviewed Section of
the Federal Rules of Civil Procedure 26(a) (2) (B) report) that have been provided thus far in this
case.

I understand that this matter is still evolving.  If you provide additional documents, data, or
materials to review, I may need to author a supplemental report to underscore current or express
other opinions.  Additionally, it's essential to note that I do not make credibility determinations
when forming my opinions or conclusions.  My fee for reviewing case material is $300.00 per
hour.

Phillip L. Sanchez

## EXPERT REPORT OF PHILLIP L. SANCHEZ

My name is Phillip L. Sanchez, and I authored this report at the request of defense counsel
Eugene Ramirez, Esq., and Kayleigh Andersen, Esq., Manning | Kass.

I was a peace officer in California for 38 years, serving with the Santa Monica and Pasadena
Police Departments.  My career encompassed numerous assignments, including those as a police
officer, field training officer, investigator, task force liaison officer, Sergeant, lieutenant, captain,
deputy chief, interim police chief, and chief of police.

I attended the Rio Hondo Police Academy in 1980.  I graduated 3rd overall in my class and was
ranked 1st in physical fitness and practical application, including arrest and control tactics.  The
Santa Monica Police Department hired me in April 1980.  I served the community for 30 years,
rising to the rank of deputy chief (the first in the department's history).  I also served as interim
police chief for the same agency in 2005.

The City of Santa Monica is approximately 9.2 square miles and has a population of roughly
85,000.  It is a popular international destination that requires unique police resources to serve a
diverse population.  The City hosts numerous large-scale events each year, requiring additional
police services, strategic planning, and, at times, mutual aid with other law enforcement
agencies.
During my tenure, the Santa Monica Police Department maintained a multi-million-dollar budget
and was a full-service municipality.  The agency employed approximately 215 sworn peace
officers and 200 professional staff and operated a Type 1 jail facility (with a capacity of 80 pre-
arraignment inmates).  The department provided its employees with a range of police services,
youth programs, and professional development opportunities.

As a police officer, I was familiar with the departmental rules, regulations, policies, customs, and
practices governing the Santa Monica jail, use of force, and general orders.  I arrested, processed,
or had direct contact with hundreds of inmates in a custody environment.  As a peace officer, I
conducted field investigations, custody and witness interviews, collected and processed evidence
and property, and participated in numerous major incident scenes.  I served as a patrol officer
and field training officer.  I was selected for the Crime Impact Team, serving as a vice and
narcotics undercover operator, and investigator before my promotion to police sergeant in 1988.
As a police detective, I investigated numerous criminal matters and presented the cases to the
appropriate prosecutor for consideration of filing.  I conducted criminal investigations, managed
informants, and conducted undercover, covert, and high-risk operations.  I was familiar with
investigative strategies and custody protocols (including the use of detoxification and safety cells
and restraining devices).

I served as a certified firearm (pistol, sub-machine gun, police rifle), defensive tactics, and arrest
and control instructor.  I possessed knowledge and experience in field operations, patrol
protocols, mass casualty response, unusual occurrences, canine handling, and small patrol tactics.

As a California peace officer, I qualified as an expert in State Court numerous times, involving
undercover operations, narcotics sales, possession for sales, distribution, control, and identifying
subjects under the influence of opioids, methamphetamine, phencyclidine, the use of force,

SWAT, and patrol tactics. I served on several professional panels providing expert opinions on topics including police-community relations, use of force, officer-involved shootings, administrative and internal affairs investigations, audits and inspections, evidence tracking, and jail operations. I also managed the department's Emergency Operations Center (EOD) as necessary.

As a police sergeant in the Office of Operations, I served as the acting watch commander, patrol supervisor, and tactical unit supervisor. I supervised field investigations, approved arrests, and investigated use-of-force incidents and misconduct allegations involving both sworn and non-sworn employees. I led, managed, or participated in warrant service and civil unrest incidents and served as the Officer in Charge (OIC) for the Democratic National Convention hosted in Santa Monica.

I served in the Technical Services Division as an Adjutant. My duties included supervising the Records and Communication Sections and the jail, and monitoring the department's budget. As jail manager, I completed Title 15 and jail operations training for a Type 1 facility. I was responsible for ensuring compliance with the current jail policy, ordering supplies, and maintaining inmate safety. I authorized medical treatment for inmates, prisoner transportation to local hospitals and the Los Angeles County Central Jail, legal representation, family visitation, and release from custody, among other duties.

I developed and implemented the Santa Monica Police Department's Metro Crime Unit and the Special Weapons & Tactics Team (SWAT). The team initially consisted of nine operators and later expanded to over 30 tactical specialists. The Metro/SWAT team was responsible for warrant service, high-risk tactical entries, mitigating barricaded suspect situations, and hostage rescue. The Metro/SWAT team conducted more than 70 incidents annually, including high-risk area searches with the canine unit. I supervised the department's canine unit, defensive tactics unit, and firearms cadre. I also developed and implemented the Santa Monica Police Department's Patrol Rifle Team, frequently assisting the SWAT Team with high-risk incidents.

As a police lieutenant, I served as a watch commander, supervising subordinate personnel. I managed field investigations and approved reports and other official documents. I conducted audits and investigated use-of-force incidents and allegations of misconduct involving both sworn and non-sworn employees.

I supervised over 50 sworn and professional staff members as the Executive Officer of the Criminal Investigation Division. I led complex criminal investigations, approved reports, and conducted high-profile investigations. I managed undercover operations involving large amounts of narcotics and U.S. Currency. I liaised with the Federal Bureau of Investigation's Joint Terrorist Task Force (JTTF) to address homeland security and terrorism-related issues. I worked closely with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force (LA-IMPACT) to mitigate major narcotics trafficking and served as a board member.

I investigated misconduct allegations, disciplined employees (as the circumstances warranted), and recommended divisional commendations. I reported the division's work efforts and crime statistics to my superiors, the Federal Bureau of Investigation (FBI), and the California Attorney

General's Office.  I managed the Uniform Crime Reporting (UCR) and criminal case
management system.

I was the jail administrator responsible for all custody operations (Type 1).  I conducted
administrative audits, internal affairs investigations, and evaluated employees' performance.  I
participated in the Title 15 training and directly supervised jail staff, ensuring the department
complied with the Board of State Community Corrections (BSCC) and Standards and Training
for Corrections (STC) regulations.  I implemented a contemporary use-of-force policy and a
critical incident evaluation process.  I served as an original member of the department's Liability
Assessment Team, responsible for investigating officer-involved shootings, in-custody deaths,
and other high-risk incidents.

I led the department's Internal Affairs Section, overseeing and conducting administrative
investigations, addressing allegations of criminal misconduct, and handling related incidents.  I
implemented an early warning tracking system to monitor officers' and non-sworn employees'
performance.  I managed or assisted with investigating officer-involved shootings, categorical
use of force, and other sensitive matters, reporting my findings directly to the Santa Monica
police chief.

As a police captain, I supervised police lieutenants, sergeants, officers, and professional staff
assigned to the Operations Division.  My duties included managing the department's largest
budget, reviewing allegations of misconduct, and providing policy and disciplinary
recommendations to the police chief.  I also developed deployment strategies, planned for large-
scale events in the City, managed civil unrest incidents, and monitored the Field Officer's
Training Program and other units assigned to patrol.  I participated in the department's Mutual
Aid Program and response, collaborating with local, state, and federal officials.

I served as the Jail Administrator for the Santa Monica Police Department, where I developed
policy recommendations for the police chief and ensured compliance with Titles 15 and 24. I
frequently met with representatives from the Board of State Community Corrections and
Standards and Training for Corrections concerning training plans, the physical plant (jail),
regulatory compliance, and routine audits.  I reviewed employee performance, completed
administrative reports, and initiated Internal Affairs investigations.  I served as the Incident
Commander when critical events occurred in the jail, including in-custody deaths and the use of
force.

As the Santa Monica Police Department's deputy chief, I assumed command of the organization
in the police chief's absence.  I was responsible for the department's daily operations, and my
subordinates included four (4) police captains, three (3) civilian managers, and twelve (12)
lieutenants.  I also supervised the department's Internal Affairs, Jail Operations, special events,
and professional standards sections.

I led the department's Internal Affairs and Audit/Inspections Sections and served as the liaison to
local, state, and federal law enforcement agencies.  I frequently met with jail supervisors to
discuss employee performance, budget, staffing, scheduling, the physical plant, suicide
prevention for inmates, and prisoners requiring special accommodations.  I participated in or

initiated jail audits with the Board of State Community Corrections and the Los Angeles County
Civil Grand Jury.  I collaborated with professional representatives from local hospitals and
nonprofit organizations regarding inmates' medical and mental health services.  I served as the
Incident Commander in several high-risk incidents, including the Santa Monica Pier Hostage
incident and the Third Street Promenade Mass Casualty Incident.

As deputy chief, I managed several large projects, including the department's transition into the
new Public Safety Facility (police headquarters).  The move to the Public Safety Facility
involved coordinating logistics, purchasing supplies, the police radio cut-over (transferring
communications and telephone lines from the old police building to the Public Safety Facility),
identifying workspaces for all four divisions, and ensuring the custody area met BSCC
requirements.  I managed the police technology projects, including the department's
communications upgrade (patrol cars, mobile radios, and the base station).  I led the department's
effort to purchase lethal devices (conductive electronic weapons) and implemented the
associated training and governing policies.

I frequently reviewed the use-of-force policies, practices, and protocols for the entire department,
including the jail section.  I managed the department's budget and approved significant
acquisitions.

I served as the interim police chief of Santa Monica, responsible for all aspects of the
department.  I developed and approved policies, disciplined employees, approved budget
acquisitions, and worked closely with the city's leadership team (City Manager, City Attorney,
and department executives).  I met with the Los Angeles County Police Chiefs and the South
Bay Police Chiefs Association.  I resigned from the Santa Monica Police Department after 30
years of professional service to become chief of the Pasadena (CA) Police Department in July
2010.

The City of Pasadena covers approximately 26 square miles and has a population of around
152,000.  The City is a popular international destination with iconic historic sites like the Norton
Simon and USC Pacific Asian Museums, the Rose Bowl Stadium, the Pasadena Tournament of
Roses House, and the Jet Propulsion Laboratory (JPL).  Several prestigious educational
institutions are located in this area, including Caltech, Fuller Theological Seminary, and
Pasadena City College (PCC).  Over 900 nonprofit organizations operate in the City, providing a
range of nongovernmental services, including housing, social support, mental health outreach,
and crisis intervention.

Pasadena hosts several major events annually, including the Rose Parade and Rose Bowl Game,
NCAA athletic events, International Soccer matches, UCLA and Pac-12 football games, and
iconic entertainers.  The events draw more than a million people to the City yearly, which
requires additional police resources and strategic security planning.

As the Pasadena Police Chief, my direct subordinates included the Deputy Police Chief, four
police commanders, the Air Support Captain, five civilian commanders, the Internal Affairs and
Professional Standards Unit, and the Audit and Inspection Unit.  I was responsible for more than
383 full-time employees (250 peace officers) and maintained an annual budget of approximately

$ 80 million.  I was responsible for all aspects of the department, such as public safety, crime reduction, and building community trust.  The police department operated a Type 1 jail facility (capacity for 100 inmates, pre-arraignment).  I frequently inspected the jail and evidence room to ensure compliance with state regulations.

As the chief executive, I approved hiring jail staff and sworn peace officers.  I managed technology enhancements, training, and the purchase of specialized equipment (SCBA, Cameras, PPE, AEDs).  I initiated jail inspections and audits with the BSCC and the Los Angeles County Civil Grand Jury.  I frequently met with BSCC and STC representatives regarding the department's training plans for custody staff and sworn personnel assigned to the jail.

I served as the Incident Commander for all major events hosted in the City, including the Rose Bowl Stadium, the Tournament of Roses Parade, International Sporting Events, and entertainment events.  I provided police resources, identified local and homeland security risks, and worked collaboratively with state and federal law enforcement agencies.  I selected Pasadena peace officers to serve as task force officers with the Federal Joint Terrorism Task Force (JTTF), the High-Intensity Drug Trafficking Areas (HIDTA), and the United States Marshal Service (USMS).

I also worked closely with the United States Secret Service (USSS), the United States Military (including Marines, Navy – Special Operations, Army – Special Operations, Coast Guard, and Air Force), as well as other Homeland Security and Defense agencies.  I maintained a high-level security clearance and frequently attended secret briefings by the FBI, DEA, USSS, and other federal agencies.  I identified, implemented, and coordinated security measures with the United States Secret Service during visits from the President of the United States (POTUS), international leaders, or other high-ranking officials.

As the Pasadena Police Chief, I served two terms as President of the Foothill Air Support Team (FAST).  I was responsible for the department's Air Support Program, which maintained a fleet of seven helicopters (the third-largest in Los Angeles County) and provided aerial resources to municipalities in the San Gabriel Valley.  I approved significant acquisitions through the Federal Government's 1033 Program, which enables the department to secure surplus equipment and reduce its budget impact.  I also served as the President of the San Gabriel Police Chiefs Association and was an active member of the Los Angeles County Police Chiefs Association. As police chief, I received notifications of all critical incidents in the City, including those at the jail.  The reports involved in-custody deaths, categorical use of force by jail staff or peace officers, significant injuries sustained by department personnel, officer-involved shootings, and related incidents.

I developed, approved, and implemented BWC policies in collaboration with community groups and stakeholders.  I reviewed and approved plans allowing medical and mental health professionals to assess inmates in custody.  I also met with the City Manager and City Attorney to discuss high-risk incidents, civil litigation, community concerns, the budget, and other related matters.  I served as the project manager for the Pasadena Police Department, helping to select, purchase, and implement the Body-Worn Camera program (one of the first in Los Angeles

County) and upgrade the In-Car Video system.  I implemented an electronic tracking program to preserve the integrity of evidence.

I designed and implemented the department's rifle program, authorizing officers to care for and use (if necessary) the urban police rifle at the Rose Bowl Stadium during significant events, thereby reducing the homeland security threat.  I frequently met with the department's firearms cadre to design and implement progressive use-of-force and range training, which included contemporary tactics (such as the three-gun system), decision-making, cover and concealment, and de-escalation.  I served as the Chief of Police for the Pasadena Police Department for nearly eight years, retiring in April 2018.

During my career, I collaborated closely with the City of Pasadena Public Health Department, the Los Angeles County Department of Public Health, Councils of Governments (COGs), Subregions in Los Angeles County, and nonprofit and governmental organizations to address concerns about mental illness among the unhoused population.  I also work with the Department of Housing and Livability to identify transitional, temporary, and permanent housing for homeless families, emancipated adults, and at-risk people.

I supervised and managed Homeless Outreach Teams for the Santa Monica and Pasadena Police Departments, collaborating with mental health professionals to expand access to social services, housing, case management, and shelter for the unhoused.  I actively recruited experienced mental health clinicians and social workers, integrating them into the outreach police teams and increasing the department's immediate intervention capacity.

I coordinated with other city departments (housing, public works, fire, and community resources) in Pasadena and Santa Monica to address the impact of homelessness on the community.  I implemented Mental Health Awareness and Response Training for the Santa Monica and Pasadena Police Departments.

As a professional law enforcement officer, I instructed hundreds of law enforcement officers (local, state, federal, and international) and personnel assigned to military special operations units.  I lectured on various topics, including the use of force, special weapons & tactics, patrol tactics, weaponless defense & de-escalation techniques, incident command and control, crowd dynamics & civil unrest, discipline and accountability, mass casualty response, leadership, civil liability, personnel investigations, community policing, community partnerships, audits, managing jail facilities, officer survival, managing significant scale events, homeland security, fusion center leadership, information sharing, and related topics.

I authored several articles on the impact of stress during critical incidents, police training, firearms training, cognitive decision-making, security, and wellness for peace officers, published in police periodicals and professional journals.  I led the research efforts and approved and implemented various firearms, impact devices, less-lethal weapon systems, and ammunition for several police organizations, including the Pasadena and Santa Monica police departments.

As a police instructor, I refined the officer survival mindset, encompassing de-escalation tactics, communication skills, firearms and less-lethal devices, ground-fighting techniques, defensive tactics, and arrest and control tactics for peace officers and military personnel.

Throughout my years in leadership and operational roles, I prioritized interagency collaboration and professional development.  I worked to ensure the seamless integration of new technologies and strategies into day-to-day policing, always with a focus on public safety and personnel well-being.  By fostering relationships with local, state, and federal partners, I consistently improved departmental readiness for significant incidents and community challenges.

My dedication to public service extended beyond field operations and administration.  I regularly engaged in policy development, community outreach, and the expansion of training curricula to address evolving trends in law enforcement.  As a mentor, I encouraged innovation, ethical leadership, and adaptability among rising officers.  I also contributed my expertise in advisory capacities, assisting agencies in navigating complex operational, legal, and moral issues as they arose.

I studied and taught decision-making for first responders under extreme stress and, in conjunction with the fire service, implemented the Tactical Emergency Medical Support (TEM) protocols to mitigate the impact of active shooter threats at the Pasadena and Santa Monica Police Departments.

I earned a master's from the United States Naval Postgraduate School, Center for Homeland Defense and Security (with honors, class speaker), and an undergraduate Degree from the University of Redlands (with honors).  I also earned several prestigious professional certificates, including the Harvard University, John F. Kennedy School of Government, Senior Management Institute for Police, the Federal Bureau of Investigation, National Academy, Federal Bureau of Investigations, Southwest Command College, Leadership Los Angeles, and the California Peace Officer Standard and Training (POST), Command College (honors, class speaker).

I received certificates for California Peace Officer Standards and Training in Executive, Management, Supervisory, Advanced, Intermediate, and Basic levels.  I earned instructor credentials in firearms, arrest, control tactics, military operations in urban terrain, defensive tactics, and impact weapons.

As a police practice consultant, I have assisted law enforcement agencies in developing best practices for use-of-force, investigative protocols, evidence collection and preservation, audits, and the effective use of technology.  I have served individual peace officers, law enforcement agencies, and municipalities in Los Angeles, Orange, Fresno, Monterey, San Diego, Santa Barbara, San Bernardino, Riverside, and Imperial counties.  My education, training, and experience are detailed in my resume (CV).  My deposition and trial appearances in the past four (4) years are attached to the report.

In the matter of the estate of BARBER, Plaintiff v.  THE COUNTY OF SAN BERNARDINO, et al, Defendants, United States District Court Case number: 5:22-cv-00625-JWH (SHKx), I reviewed the following material: recordings, reports, videos, and documents to form the basis of my conclusions and opinions.

- Complaint.

- Item 01, Crime report and summary, by Detective Hernandez.
- Item 02, Crime report, by Detective Hernandez.
- Item 03, Crime briefing, by Detective Hernandez.
- Item 04, SBSCD Crime scene report, by Detective Navarro.
- Item 05, Supplemental report 002, Deputy Collins.
- Item 06, Supplemental report 012, by Deputy Morales.
- Item 07, Supplemental report 005, by Deputy Coley.
- Item 08, Supplemental report 010, by Deputy Russell.
- Item 09, Supplemental report 009, by Deputy Domon.
- Item 10, Supplemental report 002, by Officer Collins.
- Item 11, Supplemental report 003, by Deputy Hood.
- Item 12, Supplemental report 004, by Deputy Sandeles.
- Item 13, Supplemental report, by Deputy Hernandez.
- Item 14, Supplemental report 001, Property release, by Deputy Hernandez.
- Item 15, Supplemental report 006, Property report, by Deputy Hernandez.
- Item 16, Notification report, by Detective Domon.
- Item 17, Notification report, by Detective Hernandez.
- Item 18, Notification report, by Detective Bustamante.
- Item 19, Notification report, by Detective Ripley.
- Item 20, Notification report, by Detective Navarro.
- Item 21, SBSCD Crime report, Hospital response, by Detective Bustamante.
- Item 22, SBSCD Crime report, Interview with Monique Granados, by Detective Bustamante.
- Item 23, SBSCD Crime Report, Interview with Joseph Cocchi, by Detective Ripley.
- Item 24, SBSCD Crime Report, Interview with Mara Gallo, by Detective Hernandez.
- Item 25, SBSCD Crime Report, Interview with Angelica Lopez, by Detective Navarro.
- Item 26, SBSCD Crime Report, Interview with Deputy Coley, by Detective Ripley.
- Item 27, SBSCD Crime Report, Interview with Deputy Mora, by Detective Hernandez.
- Item 28, SBSCD Crime Report, Interview with Deputy Torres, by Detective Hernandez.
- Item 29, SBSCD Crime Report, Interview with Sergeant Long, by Detective Ripley.
- Item 30, SBSCD Crime Report, Interview with Firefighter Murphy, by Detective Domon.
- Item 31, SBSCD Crime Report, Interview with Firefighter R. Gilford, by Detective Domon.
- Item 32, SBSCD Crime Report, Interview with Fire Captain Tellez, by Detective Domon.
- Item 33, SBSCD Crime Report: Neighborhood Contacts/Interviews, by Detective Domon.
- Item 34, SBSCD Crime report, Vehicle processing, by Detective Bustamante.
- Item 35, SBSCD, Audio analysis of Deputy Alfred's belt recorder, by Detective Hernandez.
- Item 200, Audio Marisela Garcia, by Detective Domon.
- Item 201, Audio Interview with R. Gilford, by Detective Domon.
- Item 202, Audio, Interview with R. Murphy, by Detective Domon.
- Item 203, Audio Interview with D. Tellez, by Detective Domon.
- Item 204, Audio, Interview with M. Gallo, by Detective Hernandez.
- Item 205, Audio Interview with M. Granados, by Detective Hernandez.
- Item 206, Audio Interview with Savero, by Detective Hernandez.
- Item 207, Audio call to Jones, Barber's family, by Detective Hernandez.
- Item 208, Audio Interview with Deputy Alfred, by Detective Hernandez.
- Item 209, Audio Interview with Deputy Mora, by Detective Hernandez.
- Item 210, Audio Vehicle notification to M. Granados, by Detective Hernandez.
- Item 211, Audio Interview with Deputy Torres, by Detective Ripley.
- Item 212, Audio Interview Angelica Lopez, by Detective Navarro.

- Item 213, Audio Interview with Christopher Alfred, by Detective Navarro.
- Item 214, Audio Interview with B. Coley, by Detective Ripley.
- Item 215, Audio Interview with J. Cocchi, by Detective Ripley.
- Item 216, Audio Interview with J. Mora, by Detective Ripley.
- Item 217, Audio of 911.
- Item 218, Audio of dispatch (calling unit regarding the incident).
- Item 219, Audio Coley.
- Item 220, Audio Deputy Alfred (shots fired).
- Item 221, Audio regarding incident 29.45.042721.
- Item 222, Audio Deputy Mora.
- Item 223, Audio Deputy Morales.
- Item 224, Audio Deputy Torres.
- Item 225, Audio L. Torres, by Detective Ripley.
- Item 226, Audio M. Granados, by Detective Ripley.
- Item 1000, Crime Scene Procedure Manual (Updated 012920).
- Item 2000, Barber Criminal trial transcript.
- Item 1301, Barber Medical Records (SBCSD Jail).
- Item 1302, Barber Medical Records (SBCSD Jail).
- Item 1303, Barber Medical Records (SBSCD Jail).
- Item 2003, Barber Superior Court of California, County of San Bernardino, Sentencing Order.
- Deputy Christopher Alfred, Deposition Transcript.
- Steffon Barber, Deposition Transcript.

## INCIDENT SUMMARY:

On April 27, 2021, at about 11:12 p.m., the San Bernardino County Sheriff's Department (SBCSD) Communication Center received a 911 call regarding an "unknown problem" at 12013 White Avenue, Adelanto. The informant, Maria Gallo, advised the SBCSD emergency operator that she and her husband, Joseph Cocchi, were landlords and residents at the property (Gallo's parents own the property). Gallo stated that Monique Granados and Steffon Barber rent a dwelling at 12013 White Avenue from her and have lived there for the past year. The apartment complex has a shared (common) driveway.

Gallo continued to provide the operator with information. Gallo said that at about 10:45 p.m., she arrived home at 12013 White Avenue (in separate cars with her husband, Cocchi). Cocchi backed his vehicle onto the long driveway (leading to his residence) and saw Barber at the south end of the drive, standing near his Chevrolet Trailblazer. The Blazer's doors and rear hatch were open. Barber was wearing a white T-shirt and jeans.[1]

Cocchi parked his white Mercedes behind his residence and noticed Barber walking toward him. When Barber reached the area where Cocchi had parked, he used the palm of his hand to strike the front passenger window several times. Cocchi partially rolled down the driver's window and spoke to Barber. After a brief conversation, Barber walked around the front of Cocchi's car and slapped the hood of the Mercedes several times. Barber then demanded to be let into Cocchi's

---

[1] Item 001, Crime report and summary, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 34; Barber's deposition, September 9, 2025, p. 38, 50.

car; however, Cocchi refused.  Cocchi exited his vehicle, locked the doors, and walked toward the driveway.[2]

Gallo began backing her car onto the driveway leading to her residence as BARBER stood in the drive pretending to guide her toward the backyard.  When Gallo stopped her vehicle, Barber attempted to open the front passenger door; however, it was locked.  Independent of Barber's actions, Cocchi walked to Gallo's car, opened the rear driver's door, and entered.

Barber attempted to reach inside Gallo's car; however, the windows were rolled up and the doors were locked.  Gallo drove north on the driveway (Cocchi was in the car), and Barber slapped her vehicle multiple times.  When Gallo reached the end of the drive, she turned west on White Avenue, parked, and called 911.  Gallo and Cocchi said they were fearful that Barber would harm them and that he appeared to be under the influence of alcohol or a controlled substance because of his behavior.  Gallo and Cocchi also believed Barber might have been armed because he reached into his pockets.[3]

San Bernardino County Sheriff's Deputy Alfred was assigned the call.  He responded to 12013 White Avenue and parked his marked patrol unit nearby.  Deputy Alfred exited his patrol unit and contacted the informants (Gallo and Cocchi).

Following his preliminary interview with Gallo and Cocchi while they were parked on White Avenue, Deputy Alfred activated his department-issued belt recorder and walked onto the driveway.  He (Alfred) contacted Barber and issued several verbal commands to display his hands and not to reach into his SUV; however, Barber refused to comply.

At his sworn deposition, Barber testified he heard a verbal command to show his hands and not to reach into his SUV, which was idling.  Barber's verbal responses were primarily inaudible; however, he was heard saying, "Back the funk up." Deputy Alfred used his sheriff's radio to advise the communication center that Barber was uncooperative and refused to comply with his commands.[4]

Barber entered the Trailblazer and put the vehicle in reverse.  Barber drove quickly in reverse (the sound of tire traction was captured on the belt recorder, and during the post-shooting investigation, tire impressions at the scene indicated a loss of traction).  Deputy Alfred fired six shots (southerly direction) in rapid succession.  The Trailblazer stopped after the gunshots.  Deputy Alfred requested additional patrol deputies and medical aid.  When Sergeant Long arrived at the scene, he secured a public safety statement from Deputy Alfred.[5]

---

[2] Item 001, Crime report and summary, by Detective Hernandez.

[3] Item 001, Crime report and summary, by Detective Hernandez, Item 217, Audio of 911 call.

[4] Item 001, Crime report and summary, by Detective Hernandez; SBSCD Audio analysis of Deputy Alfred digital belt recording; Barber's deposition, September 9, 2025, p. 43 – 44, 47.

[5] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; SBSCD Audio analysis of Deputy Alfred digital belt recording; Deputy Alfred's deposition, August 26, 205, p. 7.

## OPINIONS AND CONCLUSIONS:

My Opinions and conclusions are based on my 38-year law enforcement career, which has included roles as a police officer, detective, supervisor, executive, and police chief. I conducted, reviewed, or managed hundreds of force cases (including officer-involved shootings), high-risk incidents, and field and administrative investigations. I taught weaponless defense, arrest & control techniques, less lethal devices, de-escalation techniques, firearms, and tactical operations to municipal and county peace officers, military personnel, and international police officials.

I designed, implemented, and trained the Santa Monica Police Department Special Weapons (SWAT) and Patrol Rifle Teams. I supervised the Santa Monica Police Department's Crisis Negotiation Unit and frequently interacted with them during critical incidents, including area searches, barricaded suspects, and hostage rescue events.

I served as a special weapons team leader and tactical operator during hundreds of critical incidents. I also served as a tactical and incident commander at high-risk incidents, including civil unrest and mass protest events, as well as a venue for the Democratic National Convention hosted in Santa Monica. I frequently interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies to implement security measures and emergency protocols during visits by the President of the United States (POTUS) or other high-ranking officials to Santa Monica.

As the Pasadena police chief, I was the Incident Commander for the Tournament of Roses Parade, the Rose Bowl Game, and numerous athletic, entertainment, and international events. These events required police intervention and resources to mitigate civil unrest and protests, as well as manage large groups. My responsibilities included security, event planning, crowd management and control, group dynamics, and preparation for civil unrest.

I interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies, implementing security measures and emergency protocols during visits by the President of the United States (POTUS) or other high-ranking officials in Pasadena.

As the police chief, I reviewed and evaluated officer-involved shootings, use-of-force incidents, vehicle pursuits, police helicopters as a tactical platform, and other high-risk incidents involving sworn and non-sworn personnel. I chaired the Pasadena Police Department's Use of Force Review, which determined the level of culpability (if any) in matters alleging misconduct, misuse of force, or misuse of tactics or equipment.

Throughout my 38-year law enforcement career, I have received hundreds of hours of POST-certified training, both as a student and instructor. I maintained several POST certificates, including Executive, Management, Supervisory, Advanced, Intermediate, and Basic certificates.

I graduated from the POST Command College (a two-year master's program for future studies). The program required a thesis; graduates received a certificate from the California Department of Justice. I graduated with top honors. I also graduated from the Federal Bureau of Investigation

(FBI), the National Academy, the John F. Kennedy School of Government, and the United States Naval Postgraduate School.

I was promoted through the ranks (officer, detective, Sergeant, lieutenant, captain, deputy chief, interim chief of police, and police chief) at two different agencies, serving in various assignments and capacities. I commanded the Internal Affairs and Professional Standards Division, reviewing or investigating the use of force, officer-involved shootings, and allegations of misconduct. As the interim and police chief, I classified administrative investigations and, when appropriate, took disciplinary actions, such as termination, demotion, or remedial training, against involved peace officers or professional staff.

**Opinion 1:**
Based on the circumstances, I believe that Deputy Alfred had reasonable suspicion to contact and detain Barber to determine if he had committed a crime, exonerate him, or provide other resources. His actions were objectively reasonable and consistent with statewide policing practices, department policy[6], and POST Learning Domain 15 (Laws of Arrest). A peace officer with equivalent training, experience, and knowledge would act similarly.

Deputy Alfred was assigned to assist Gallo and Cocchi, who had called the SBCSD requesting help after experiencing an unprovoked and unwanted contact with Barber (Barber was staying on and off with his children's mother, Granados, at 12013 White Avenue). Barber's aggressive actions (slapping Gallo and Cocchi's vehicle, attempting to open their locked car, and demanding that they provide transportation to an unknown apartment complex) may have violated California Penal Code section 594 (Vandalism). At the very least, Barber's actions were bizarre and threatening, scaring Gallo and Cocchi. At his sworn deposition, Barber testified that he injected methamphetamine before he confronted Gallo and Cocchi. Based on the totality of the circumstances and Barber's behavior, the couple was fearful and believed he (Barber) was possibly armed and under the influence.[7]

Based on the case material, Gallo had good reason to be concerned with Barber's unwanted behavior on April 27, 2021. Granados recently told Gallo that Barber assaulted her on April 16, 2021, and was arrested (just 11 days before threatening Gallo and Cocchi in their driveway at 12013White Avenue). Granados shared that Barber has been acting "odd" since his release.[8]

When Gallo called the SBCSD and requested assistance, she expressed concern not only for her safety but also for her husband's. The SBCSD 911 operator had no reason to doubt Gallo's veracity about her overview of the event on April 27, 2021. The operator assigned the call to Deputy Alfred, who responded. Once at the scene, Deputy Alfred interviewed Gallo and Cocchi near the intersection of White Avenue and Adelanto Road.[9]

---

[6] Deputy Alfred's deposition, August 26, 2025, p. 10.
[7] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Item 023, Interview of Joseph Cocchi; Item 024, Interview of Maria Gallo; Deputy Alfred's deposition, August 26, 2025, p. 31; Barber's deposition, September 9, 2025, p. 31 – 32, 36.
[8] Item 001, Crime report and summary, by Detective Hernandez; Item 023, Interview of Joseph Cocchi; Item 024, Interview of Maria Gallo.
[9] Deputy Alfred's deposition, Auguste 26, 2025, p. 32.

Upon his arrival, Deputy Alfred contacted Gallo and Cocchi in accordance with established statewide policing practices. He (Alfred) conducted a preliminary investigation to gather as much information as possible about Barber's behavior and actions. When Deputy Alfred concluded his interview, he walked onto the property at 12013 White Avenue, intending to contact Barber.

Barber unnecessarily escalated the event and enhanced Deputy Alfred's suspicion when he (Barber) failed to comply with any verbal commands. At his sworn deposition, Barber testified that he heard the "police" (Deputy Alfred) give him verbal orders not to enter his SUV; however, he (Barber) could not see where the orders were coming from, so he "jumped" in his car.[10]

Barber's actions violated California Penal Code Section 148(a)(1), a misdemeanor crime. In my experience, a reasonable person would follow the deputy's commands and then explain their perception of the events.[11]

**Opinion 2:**
Based on the circumstances, I believe that Deputy Alfred attempted to de-escalate his contact with BARBER by remaining professional and issuing clear and concise orders (effective communication). His actions were objectively reasonable and consistent with statewide policing practices, department policy, and POST Learning Domain 20 (Use of Force and De-escalation). A peace officer with equivalent training, experience, and knowledge would act similarly.

Deputy Alfred walked onto the long driveway at 12013 White Avenue and contacted Barber (approximately 70' south). Deputy Alfred issued several verbal commands demanding that Barber display his hands and walk backward to him (Alfred). Barber ignored the commands and yelled, "Back the fuck up" (Barber's statement was captured on Alfred's belt recorder). BARBER started to enter his vehicle, a 2003 black Chevrolet Trailblazer (CA License Plate 5AMC384), which was parked facing south. Deputy Alfred continued to issue verbal orders regarding Barber's actions; however, all the commands were ignored.[12]

Deputy Alfred attempted to de-escalate the event by issuing orders (to Barber) in a clear, concise, and professional manner. Initially, Deputy Alfred kept his duty pistol holstered, indicating that he was not anticipating a lethal encounter or attempting to intimidate Barber. In his sworn deposition, Deputy Alfred testified that he was standing about 10 feet behind Barber's SUV, his pistol holstered, and only holding a flashlight in his left hand.[13]

I did not see any evidence suggesting that Deputy Alfred used racial words or treated Barber poorly; however, he (Alfred) used explicit language to underscore some of his commands. Peace

---

[10] Barber's deposition, September 9, 2025, p. 35.
[11] I was a California peace officer for 38-years and investigated several calls involving unknown trouble or disputes.
[12] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Item 035, SBSCD Audio analysis of Deputy Alfred digital belt recording; Deputy Alfred's deposition, August 26, 2025, p. 39.
[13] Deputy Alfred's deposition, August 26, 2025, p. 36 – 37.

officers are trained to de-escalate situations; however, the subject of the contact (in this case, Barber) is expected to comply and cooperate.

In this case, Barber yelled (Back the fuck up) at Deputy Alfred.  Despite the profanity directed at him, Deputy Alfred restated his verbal orders and unholstered his pistol.  At his sworn deposition, Deputy Alfred testified that he did not initially point his pistol at Barber while Barber was standing near his SUV.13 The verbal orders were intended to give Barber directions, and when the scene was static, he could explain the events of his contact with Gallo and Cocchi.

**Opinion 3:**
Based on the circumstances, I believe that Deputy Alfred had probable cause to use force to arrest Barber for violating California Penal Code section 245(a), a felony crime.  His actions were objectively reasonable and consistent with statewide policing practices, department policy, POST Learning Domain 20 (Use of Force and De-escalation), and California Penal Code section 835a.  A peace officer with equivalent training, experience, and knowledge would act similarly.

Deputy Alfred intended to contact Barber following his preliminary interview with Gallo and Cocchi.  He walked south on the long driveway at 12013 White Avenue, which leads to several dwellings.  Deputy Alfred saw Barber near a black Chevrolet Trailblazer and ordered him to display his hands and not to enter the SUV.  Barber ignored the commands and entered the vehicle.  Barber sat in the driver's seat, and Deputy Alfred stood about 10 feet behind the SUV.14

Deputy Alfred continued issuing verbal commands; however, Barber ignored them.  Deputy Alfred was about 12 feet north of the Trailblazer when Barber started the engine.  Deputy Alfred reported seeing "back-up lights" and saw the SUV accelerate in reverse. Based on the rapidly evolving event and the circumstances, Deputy Alfred believed Barber intended to assault him with the SUV.15

Deputy Alfred feared imminent death or serious injury and fired about six rounds from his service pistol. He was positioned on the driveway, closer to the driver's side of Barbar's vehicle, when he shot through the open rear hatch of the SUV as it moved toward him in reverse. One of the rounds struck Barber, and the SUV became wedged against the west portion of the apartment wall, preventing it from moving further in reverse. In his sworn deposition, Deputy Alfred testified that all six shots were fired within about 2 to 4 seconds.

In my opinion, the force used by Deputy Alfred was objectively reasonable and the only viable tactic at the time of the attempted felony assault.  Based on the case material I reviewed, there was no cover or concealment available that could shield Deputy Alfred from death or serious injury (Alfred was standing in the driveway when Barber's vehicle drove toward him in reverse).

Additionally, there was no viable escape route that Deputy Alfred could have used.  In his sworn deposition, Deputy Alfred testified that "there was no proper avenue to retreat to."  Deputy

---

13 Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 35.
14 Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 35.
15 Item 001, Crime report and summary, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 43.

Alfred also testified that one of the deputies arriving at the scene (after the shooting) placed Barber's vehicle in park (from reverse). The gear position (reverse) was consistent with Deputy Alfred's observations (Barber was driving his SUV in reverse toward Alfred at the time of the shooting).[16]

In the post-shooting review, the driveway was described as long and narrow. The driveway was constructed of gravel and dirt.[17] The east side of the drive was bordered by wrought iron and chain-link fencing, which varied in height (from five to six feet). A stucco wall of the apartment complex was on the west side of the driveway.[18]

The barriers on the east and west sides of the drive prevented Deputy Alfred from moving laterally to avoid Barber's vehicle. In his sworn deposition, Deputy Alfred testified that the chain-link fence was about 3 – 4 feet from his left shoulder (east) and the stucco wall of the apartment complex was about the same distance from his right shoulder (west). He also testified that after the officer-involved shooting, he again looked for cover or concealment options; however, they were not available.[19]

Even if Deputy Alfred could leap onto the fence along the driveway, he would not have been tall enough to clear Barber's SUV (according to Chevy specs, a 2003 Trailblazer is 191.8 inches long, 64.7 inches wide, and 72.5 inches tall).

Likewise, it would have been unsafe and futile to try to outrun Barber's SUV (by running north or south on the driveway). Deputy Alfered initially walked about 70 feet north along the driveway to contact Barber. When Barber ignored Deputy Alfred's commands, entered the Trailblazer, started the engine, and quickly accelerated in reverse, he endangered Deputy Alfred by creating a real, deadly threat. Considering the physical barriers (fencing) and the distance to the end of the driveway (either north or south), Deputy Alfred reasonably concluded he could not outrun Barber's vehicle.

The use of less lethal devices (hand or leg strikes, chemical spray, impact weapons, or Taser-CED) would be ineffective against this particular deadly threat. Barber's SUV protected him (significantly reducing the practical application of a less lethal device) while driving in reverse toward Deputy Alfred.

The personal less lethal tools carried by Deputy Alfred at the time of the attempted felony assault require him (Alfred) to be dangerously close to Barber. Additionally, the recommended application of the available less-lethal devices made their use impractical and would have further endangered Deputy Alfred if he had attempted to deploy them.

---

[16] Deputy Alfred's deposition, August 26, 2025, p. 17, 48, 53 – 54.
[17] Deputy Alfred's deposition, August 26, 2025, p. 18.
[18] Deputy Alfred's deposition, August 26, 2025, p. 17, 20.
[19] Deputy Alfred's deposition, August 26, 2025, p. 19 – 21, 45.

In my view, Barber possessed the Ability, Opportunity, and Apparent Intent to kill or seriously injure Deputy Alfred:

- Ability:  Despite verbal orders from Deputy Alfred, Barber entered his SUV (a Chevy Trailblazer), started the engine, and accelerated toward Deputy Alfred.  If Barber had complied with the verbal orders to display his hands and not enter the SUV, the use of force would have been eliminated.  Barber's actions unnecessarily escalated the event, which led to the use of deadly force by Deputy Alfred.

- Opportunity:  Based on the evidence in this case, Barber heard the verbal orders issued by Deputy Alfred.  In response to the verbal orders, Barber is heard yelling, "Back the fuck up" (as captured on Alfred's belt recorder).  If Barber had complied with the orders, the need for force would have been eliminated.

- Apparent Intent:  Despite orders from Deputy Alfred, Barber entered the SUV, started the engine, and placed the transmission in reverse.  Barber then accelerated quickly in reverse (causing the tires to lose traction) toward Deputy Alfred.  Barber's actions (entering the SUV, starting the engine, placing the transmission in reverse, and driving backward) all require deliberate thought and execution.  Barber could reasonably conclude that the weight, size, and speed of his SUV would cause death or serious bodily injury if he hit Deputy Alfred.  Barber's actions created a legitimate, deadly threat, placing Deputy Alfred in jeopardy.

Barber survived his gunshot injury and was arrested following his medical treatment and recovery.  Eventually, Barber's criminal case was heard by Superior Court Judge David Cohn.  Barber was convicted (245 (a)(1), a felony) and sentenced to state prison.[20]

**Opinion 4:**
In this case, the San Bernardino County Sheriff's Department's policies are consistent with the Statewide standards, procedures, and guidelines for law enforcement agencies.  Based on my evaluation of the material, the sheriff's department does not propagate, promote, maintain, or enforce policies that allowed for or caused the Plaintiff's injuries.

Furthermore, based on the material I reviewed, the sheriff's department is adequately trained, supervised, and managed the involved deputies.  Given the circumstances, the deputies' conduct was proper and thorough, and they followed their department's policies, guidelines, and procedures.

**Opinion 5:**
Based on the documents and materials in this case, I did not see any evidence suggesting that the defendant's actions, conduct, or training fell below the standard of care in the law or policies related to reasonable suspicion or probable cause for contact, detention, or arrest, or the use of force.  The defendants' conduct appeared objectively reasonable and compliant with the law

---

[20] Item 20023, Superior Court of California, County of San Bernardino, Portal Minute Order; Barber's deposition, September 9, 2025, p. 8, 15 – 16, 28 – 29.

enforcement training, policies, and procedures.

I, Phillip L. Sanchez, affirm that the expert opinions above are well-considered and solidly based on recognized police standards.

PHILLIP L. SANCHEZ                    10 - 29 - 2025
                                          DATE