EXHIBIT

A

On-Scene Consulting

October 29, 2025

Ms. Renee Masongsong, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

## Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**STEFFON BARBER, an individual, Plaintiff,**
**vs.**
**COUNTY OF SAN BERNARDINO, a Municipal entity, and CHRISTOPHER**
**ALFRED, Defendants.**
**Case No. 5:25-cv-00625-KK-DTB**

Dear Ms. Masongsong,

Thank-you for retaining me to analyze and render opinions regarding the April 27, 2021, Deputy-Involved Shooting of Mr. Steffon Barber by San Bernardino County Sheriff's Department, Deputy Sheriff Christopher Alfred, No. G9800. Pursuant to the requirements of Rule 26, I have studied reports, videos, photographs, San Bernardino County Sheriff's Department documents, Transcription of Digitally Recorded Deposition, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Second Amended Complaint for Damages, Case No. 5:22-cv-00625-KK-SHK.

2. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, (COSB 000947-956).

3. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Officer E. Hernandez, E, G4629, (COSB 000957-966).

4, San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Crime Scene Report by Detective G. Navarro, (COSB 000967-975).

5. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Detective A. Collins, #H7540, (211-215).

6. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Detective J. Giles, #C9502, (241-244).

7. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Detective J. Giles, #C9502, (219-223).

8. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, (15-28),(29-32), (34-54), (55-56), (58-61), (62-151), (153-167), (180-181), (187-195), (207-208), (216-218), (224-231), (233-236), (238-239), (246), (454-465), (466-472), (473-478),(480), (505-518), (976-979), (COSB 000976-1023), (COSB 001032-1034), (COSB 001043-1055), (COSB 001057-1064).

9. State of California Department of California Highway Patrol, Vehicle Report, (197-198).

10. Sheriff's Department, County of San Bernardino, California, 03600, Case No. 242210897, (209-210).

11. Sheriff's Department, County of San Bernardino, California 03600, Evidence/Property, (453).

On-Scene Consulting

12. Audio Analysis, San Bernardino County Sheriff's Department,
<u>DR#242100897/H#2021-053</u>.

13. <u>Audio-Recordings</u>:
- Neighbor Marisela Garcia, (<u>5:14</u>).
- R. Gilford, (<u>11:20</u>).
- R. Murphy, (<u>21:44</u>).
- D. Tellez, (<u>12:19</u>).
- Maria Gallo, (<u>30:13</u>).
- Monique Granados, (<u>1:26:36</u>).
- _ Severo, (<u>1:43</u>).
- _Jones, (<u>2:35</u>).
- Deputy Christopher Alfred, (<u>1:25:21</u>).
- Deputy Joseph Mora, (<u>1:06:50</u>).
- Monique Granados, (<u>4:03</u>).
- Deputy Torres, (<u>44:35</u>).
- Neighbor Angelica_(<u>16:04</u>).
- Blake Coley, (<u>43:05</u>).
- J. Cocchi, (<u>1:30:53</u>).

14. 911 Audio-Recording, (<u>4:19</u>).

15. Dispatch Audio-Recording, (<u>24:10</u>).

16. Audio-Recording, Deputy Alfred, "Shots Fired," (<u>13:17</u>).

17. Audio-Recording, Re: Incident, (<u>29:45</u>).

18. Audio-Recording, Officer Mora, (<u>12:26</u>).

19. Audio-Recording, Officer Morales, (<u>29:45</u>).

20. Audio-Recording, Officer Torres, (<u>6:18</u>).

21. Air-Med Transport Records, Account No. 0321012884A, (<u>PLTF ID 000896-908</u>).

22. Detailed History for Police, Incident No. AD211170085, (<u>199-206</u>).

On-Scene Consulting

23. San Bernardino County Sheriff's Department Manual, (COSB 000001-946).

24. Deputy Alfred Belt Recording, (13:17).

25. San Bernardino County Sheriff's Department, DR No. 242100897, Crime Report & Miscellaneous Documents, (PLTF ID 001-288).

26. Audio-Recording, Morales, LFE, 04/27/21, (29:45).

27. Photographs of Deputy C. Alfred, (PLTF ID 000289-328).

28.. Photographs, Barber, (PLTF ID 000329-434).

29. Photographs of Scene, (PLTF ID 000435-659).

30. San Bernardino County Sheriff's Department Lethal Force Encounter, H#2021053/DR No. 242100897.

31. Deposition Transcript and Exhibits of Christopher Alfred taken on August 26, 2025.

32. Deposition Transcript of Steffon Barber, taken on September 9, 2025.

33. Protective Order.

**California POST Basic Learning Domains as Follows:**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #22: "Vehicle Pullovers."
7. #21: "Patrol Techniques."
8. #23: "Crimes in Progress."
9. #33: "Arrest and Control."
10. #35: "Firearms/Chemical Agents."
11. #37: "People with Disabilities."

On-Scene Consulting

**Summary**

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for Deputy Sheriff Christopher Alfred to shoot at Mr. Barber for fleeing or attempting to flee. Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.

Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (2) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (3) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (4) the officer gives some warning that deadly force may be used, where feasible. (*POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a; San Bernardino County Sheriff's Department Manual 3.608, The Use of Lethal Force*).

These four factors were not met in this case. Mr. Barber did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident; Mr. Barber did not have a firearm, and Mr. Barber posed no immediate threat of death or serious bodily injury necessitating deadly force.

Deputy Sheriff Christopher Alfred violated basic police officer training and standards with respect to the use of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a vehicle. A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. Mr. Barber did not pose an immediate threat of death or serious bodily injury to Sheriff's Deputy Christopher Alfred or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way.

**Opinions:**

<u>Note</u>: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. I hold the opinions below a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education,

On-Scene Consulting

training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my comprehensive review of materials listed on Pages 2-4 of this report.  My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions.  My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

### **Opinion Number 1**

It is my opinion based on my review of the facts, testimony, totality of the circumstances and videos in this matter, a reasonable law enforcement officer acting consistent with standard police practices would have moved to a position of cover and formulated a tactical plan.  Based on my review of the facts in this matter, Deputy Sheriff Christopher Alfred, No. G9800, had the requisite time and opportunity to move to a position of cover and wait for additional San Bernardino County Sheriff's Department Deputy Sheriffs to arrive.  In the event Mr. Steffon Barber left the scene in his vehicle, Deputy Sheriff Christopher Alfred could simply take a report from the Person Reporting, (PR).  If the investigation revealed that Mr. Steffon Barber committed a crime that necessitated a detention, Deputy Sheriff Christopher Alfred could request assistance of San Bernardino County Sheriff's Department Police Helicopter (40 King) to assist with containment and formulated an effective and safe tactical plan.

In the event Mr. Steffon Barber did not flee in his vehicle or fled on foot, Deputy Sheriff Christopher Alfred could have established a perimeter if there was Reasonable Suspicion to detain Mr. Steffon Barber or Probable Cause to arrest Mr. Steffon Barber.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-8):

**First Unit at the Scene:** The first unit to arrive at the scene should take on the role of the primary unit.  That officer should take the leadership responsibility to gather as much information as is reasonably possible regarding the current status of the crime scene.  It is the primary officer who must take charge and initiate the appropriate steps toward controlling the situation.

The first officer to arrive should:

- Take a position to best observe and control the scene.

On-Scene Consulting

- Advise dispatch and responding units of the arrival and location.
- Identification and location of reporting person.
- Interview of reporting person to determine if a crime occurred.
- Number of suspects and suspect(s) description.
- The type of weapon(s) involved.
- The number of persons injured by the suspect.
- Actions (propensity toward violence).
- Suspects current and prior mental health issues.
- Suspects current and prior medical issues.
- Other emergency vehicles responding to the scene.
- ***Communicate and coordinate with the other officers to establish perimeters to contain the suspect and prevent escape.***
- ***Request additional resources if necessary and available, (e.g., supervisor, additional units, canine unit, police helicopter).***

The Aviation Unit is one of the most technologically advanced and efficient law enforcement tools. The aircraft and their equipment are a "force multiplier" for law enforcement. One helicopter in the air can cover as much territory (more quickly) as 12 officers in patrol cars on the ground. The primary function continues to be that of support for ground units.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-10):

## **Establishment of a Perimeter:**

It is the responsibility of the primary officer to initiate the coordination of the security and containment of the crime scene. This can be done by establishing a boundary or perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.

Establishing a perimeter:
- Contains and isolates the crime scene.
- Prevents the suspect(s) from escaping the area.
- It prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(s).

On-Scene Consulting

There are two types of perimeters at a crime scene: **inner perimeter** and **outer perimeter**:

**Inner Perimeter**:
- Immediate area around the incident (e.g., private residence, commercial establishment, vehicle, etc.)
- Varying size depending on the purpose of the perimeter.

**Outer Perimeter:**
- Area surrounding the inner perimeter.
- May aid in apprehension if the suspect manages to breech the inner perimeter.

In addition, I base my opinion on my twenty-eight years of law enforcement experience as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of perimeters throughout all geographical patrol divisions to assist with containment, perimeter tactics and K9 searches. In addition, most of the K9 searches involved the assistance of an Air Unit(s).

In addition, it is my opinion based on my review of the facts, totality of the circumstances, testimony and videos in this matter, Deputy Sheriff Christopher Alfred's actions of remaining in the driveway without any cover or concealment was a poor tactical decision and unnecessarily escalated the situation. Deputy Sheriff Christopher Alfred failed to use Time and Distance.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided. Effective communication may enable a Police Officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- It can result in a reduction of injuries.
- Renders more effective public service and improves community relations.

On-Scene Consulting

- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

De-Escalation is a concept that involves an officer's use of time, distance and relative positioning in combination with Professional Communication Skills to attempt to stabilize a situation and reduce the immediacy of threat posed by an individual.

The tactical plan should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Conducted Energy Weapon, (CEW), Taser with an effective range of 7-15 feet and maximum range of 21-25 feet, Ballistic Shield, K9, Pepper Ball Round, 40MM Foam Baton Round and or Direct Impact CS Round,  ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 10-15 feet., or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round.  The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blended and filled with #9 shot.  The design utilizes four stabilizing tails and smokeless powder as the propellant.  The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet which could have effectively been deployed from a position of cover.

In addition, I base my opinion on POST Learning Domain 21, "Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**Cover**:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received (firearm, shotgun, rifle).

**Examples of Cover:**
- Cement block or brick walls.

On-Scene Consulting

- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, I base my opinion on <u>California Police Officer Standards and Training
(POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific
Crimes in Progress, 3-5</u>:

## **<u>Establish a Contact Officer and Cover Officers:</u>**

### **<u>Contact Officer:</u>**
The roles and responsibilities of each officer involved in a high-risk vehicle pullover
must be clear.  The **<u>Contact Officer:</u>**
- Conducts the business of the pullover,
- Directs the driver and occupants(<u>s</u>) of the target vehicle,
- Takes necessary actions related to the investigation.

### **<u>Cover Officers:</u>**
<u>It is general responsibility of any cover officers to assist the primary officer at the scene
of a high-risk vehicle pullover to</u>:
- Protect the primary officer who is conducting the business of the pullover,
- Take and maintain proper positions of cover and concealment,
- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

### **<u>Communications Between Officers:</u>**
In order to ensure officer safety and help ensure an appropriate outcome, the primary
officers and cover officers must effectively communicate with one another.  Appropriate
communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.


In addition, I base my opinion on my twenty-eight years of law enforcement experience
where I responded to thousands of calls for service and have effectively utilized defusing
techniques, de-escalation techniques, verbal strategies, and active listening skills to

reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 2**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Steffon Barber that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"  Based upon my review of the facts in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred, No. G9800, did not give a verbal warning to Mr. Steffon Barber that deadly force would be used and did not give Mr. Steffon Barber a reasonable opportunity to comply prior to firing his Glock, Model 21, .45 caliber, semi-automatic pistol unnecessarily shooting Mr. Steffon Barber.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department

On-Scene Consulting

Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

## **Opinion Number 3**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices would not have used lethal force in this situation.  This was not an immediate defense of life situation, and, as explained further below, under the facts of this case, San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred, No. G9800, could not shoot Mr. Steffon Barber for fleeing.

In addition, it is my opinion that "Shooting at or from Moving Vehicles," which are shots fired at or from a moving vehicle, are rarely effective.  Deputy Sheriffs should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.  A Deputy Sheriff should only discharge a firearm at a motor vehicle or its occupants when the Deputy Sheriff reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.  Deputy Sheriffs should not shoot at any part of the vehicle in an attempt to disable the vehicle.  "Shooting at or From Moving Vehicles" has shown to be a poor tactic in most scenarios.  If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle.

It is my opinion that Deputy Sheriff Christopher Alfred, No. G9800, should not have used lethal force in this matter. This was not an immediate defense of life situation, including for the following reasons:

- Deputy Sheriff Christopher Alfred did not have any information that Mr. Barber was part of a gang. (*Deposition Transcript of Christopher Alfred, Page 32*).
- Deputy Sheriff Christopher Alfred did not have any information that Mr. Barber had any criminal convictions or had injured anyone prior to shooting him. (*Deposition Transcript of Christopher Alfred, Page 30*).
- Steffon Barber was committing no crime when Deputy Sheriff Christopher Alfred first approached him.
- Deputy Sheriff Christopher Alfred never saw a gun on Mr. Barber, nor did any citizen. Deputy Sheriff Christopher Alfred had no corroborated information that Mr. Barber had a gun, and in Deputy Sheriff Christopher Alfred's experience, a reporting party might report that a person has a gun in order to expedite law enforcement response. (*Deposition Transcript of Christopher Alfred*).

On-Scene Consulting

- Deputy Sheriff Christopher Alfred knew that Mr. Barber was in his own driveway. *(Deposition Transcript of Christopher Alfred, Page 32)*.
- Prior to firing his shots, Deputy Sheriff Christopher Alfred formed the impression that Mr. Barber's vehicle was on and that Mr. Barber wanted to leave, and he saw the reverse lights come on. (*Deposition Transcript of Christopher Alfred, Pages 40, 74*).
- Deputy Sheriff Christopher Alfred knew that the only way to leave the driveway was to reverse out. (*Deposition Transcript of Christopher Alfred, Pages 49-50*).
- Deputy Sheriff Christopher Alfred was not struck by any gravel or dirt from the tires prior to the shooting. (*Deposition Transcript of Christpher Alfred, Page 68*).
- The driveway width was approximately 15 feet and 7 inches, *(San Bernardino County Sheriff's Department Crime Report, Scene Description, PLTFID000274)*, and at the time of the shooting, Deputy Sheriff Christopher Alfred had approximately two to four feet between the left side of his body and the chain link fence to his left. (*Deposition Transcript of Christopher Alfred, Pages 19-20; photographs of the scene*).
- When Mr. Barber's vehicle moved backwards, it moved backwards approximately 16.9 feet, moving slowly in a straight line. *(Photographs and diagrams of the scene; investigative reports; belt recording; Deposition Transcript of Christopher Alfred, Pages 61-62)*.
- Deputy Sheriff Christopher Alfred was not struck by Mr. Barber's vehicle. (*Deposition Transcript of Christopher Alfred, Page 48*).
- Deputy Sheriff Christopher Alfred never had to dive out of the way of Mr. Barber's vehicle. (*Deposition Transcript of Christopher Alfred, Page 48*).
- Deputy Sheriff Christopher Alfred was the starting point guard of his high school basketball team. (*Deposition Transcript of Christopher Alfred, Page 22*).

From the standpoint of police practices, including basic police training, POST standards, and the County of San Bernardino's own policies, Deputy Sheriff Christopher Alfred's use of deadly force was improper, inappropriate, contrary to basic police training and POST standards, excessive, and unreasonable, including (but not limited to) for the following reasons:

- No Immediate Defense of Life Situation. Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury. A fear of future harm is not enough. There was no immediate defense of life situation when Deputy Sheriff Christopher Alfred fired his shots. No person was about to be

On-Scene Consulting

run over by Mr. Steffon Barber's vehicle at the time of the shots.

- <u>Subjective fear is insufficient</u>.  Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger."  In this case, the record does not support any objectively reasonable explanation that Mr. Steffon Barber posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired.  Mr. Barber was unarmed, and no person was about to be struck by Mr. Barber's vehicle.

- <u>Violation of basic police training.</u>  Deputy Sheriff Christopher Alfred violated police training and standards surrounding shooting at vehicles and their driver when he shot Mr. Steffon Barber while Mr. Barber occupied the driver seat of a vehicle.  There was no person about to be struck by Mr. Barber's vehicle when Deputy Alfred fired his shots.  Therefore, there was no reason for Sheriff's Deputy Christopher Alfred to shoot.

- <u>No crime involving the infliction of serious injury or death.</u>  Deputy Sheriff Christopher Alfred was not responding to a crime involving the infliction of death or serious bodily injury.  Deputy Sheriff Christopher Alfred had no information that Mr. Barber was armed and no information that anyone had been injured.

- <u>Cannot shoot for fleeing</u>.  As explained herein, Deputy Sheriff Christopher Alfred could not justify shooting Mr. Steffon Barber under a Fleeing Felon theory, including because Mr. Barber was unarmed, and Deputy Alfred had no information that Mr. Barber had killed or injured anyone prior to the shooting.

- <u>Unarmed</u>.  Based on my review of the facts in this matter, at no time did Deputy Sheriff Christopher Alfred or any citizen observe Mr. Steffon Barber in possession of a firearm or any other weapon at the time of the shooting.

- <u>No verbal threats</u>.  Mr. Barber never verbally threatened to harm Deputy Sheriff Christopher Alfred.

- <u>Reasonable alternative measures available</u>.  Officers are trained that they can only use deadly force in a "last resort" situation.  Deputy Sheriff Christopher Alfred had other reasonable measures available, including moving out of the way, waiting for backup, giving further commands, and setting up a perimeter for later apprehension.

- <u>No reverence for human life</u>.  Police officers are trained that they must show a reverence for human life.  Deputy Sheriff Christopher Alfred showed no reverence for human life when he fired at Mr. Steffon Barber.

- <u>Police officers are responsible for justifying every shot</u>.  Police officers are trained that they must justify every shot they fire.  Deputy Sheriff Christopher Alfred is responsible for every shot that he fired in this case, and all six of his shots were unjustified.

On-Scene Consulting

In addition, it is my opinion that even if the incident occurred as described by Deputy Sheriff Christopher Alfred, the use of deadly force would still not be appropriate in this incident as the movement would not have created an Immediate Defense of Life (<u>IDOL</u>) situation.

Lastly, I base my opinion on my twenty- eight- year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## <u>Opinion Number 4</u>

It is my opinion that San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred's use of lethal force <u>violated</u> police training and caused serious bodily injury to Mr. Steffon Barber, <u>including but not limited to for the following reasons</u>:

In addition, it is my opinion based on the facts and testimony in this matter, Department Deputy Sheriff Christopher Alfred <u>violated</u> basic police training with respect to shooting at vehicles and their drivers.

<u>San Bernardino County Sheriff's Department Manual, Policy 3.608, The Use of Lethal Force,</u>(<u>COSB 000673-675</u>),  states as follows:

> Firearms should not be discharged from or at a moving vehicle except in exigent circumstances. In these situations, a safety member must have articulable reason(<u>s</u>) for this use of lethal force, which include, but are not limited to the following: [1] A person in the vehicle is threatening the safety member or another person with lethal force by means other than the vehicle; or [2] The vehicle is operated in a manner which is likely to result in great bodily injury or death to a safety member or another person, and other reasonable means of defense have been exhausted, or are not available or practical. This may include, if time and circumstances allow moving out of the path of the vehicle.

<u>Deputy Sheriffs are expected to follow their own department policies.</u>

Deputy Sheriff Christopher Alfred's understanding of the policy in effect at the time of the incident was that deputies should get out of the path of a moving vehicle, rather than shooting at it, if feasible. (<u>*Deposition Transcript of Christopher Alfred, Pages 11, 13,*</u>

On-Scene Consulting

<u>48</u>). Deputy Sheriff Christopher Alfred had been trained, at the time of the incident, not to tactically position himself in a bad spot, with respect to moving vehicles. (*Deposition Transcript of Christopher Alfred, page 11*).

In addition to the San Bernardino County Sheriff's Department Manual, basic police officer training teaches that shooting at a moving vehicle has shown to be a poor tactic in most scenarios.  If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle.  Additionally, an assaultive motor vehicle does not presumptively justify the use of deadly force.

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for  Deputy Sheriff Christopher Alfred to shoot at Mr. Barber for fleeing or attempting to flee.  Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.
Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (<u>1</u>) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (<u>2</u>) the officer has probable cause to believe that that the person will cause death or serious bodily injury to another person unless immediately apprehended, (<u>3</u>) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (<u>4</u>) the officer gives some warning that deadly force may be used, where feasible. (*POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a; San Bernardino County Sheriff's Department Manual 3.608, The Use of Lethal Force*).

**These four factors were not met in this case**.  Mr. Barber did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident; Mr. Barber did not have a firearm, and Mr. Barber posed no immediate threat of death or serious bodily injury necessitating deadly force.

Deputy Alfred <u>violated</u> basic police officer training and standards with respect to the use of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a vehicle.  A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation.  Mr. Barber did not pose an immediate threat of death or serious bodily injury to Deputy Sheriff Christopher Alfred or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way.

On-Scene Consulting

Lastly I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


**Opinion Number 5**

It is my opinion that under the facts of this case, that San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred could not shoot Mr. Steffon Barber under a Fleeing Felon theory as described above, especially because Mr. Steffon Barber never inflicted death or serious bodily injury on anyone prior to the shooting.

In addition, it is my opinion based on the facts and testimony in this matter, Department Deputy Sheriff Christopher Alfred <u>violated</u> <u>San Bernardino County Sheriff's Department Manual, Policy 3.608, The Use of Lethal Force,</u>(COSB 000673-674): A safety member shall not fire at a person who is called upon to halt on mere suspicion and who simply runs away to avoid arrest.

**<u>Considerations Regarding the Use of Deadly Force</u>**

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy, and the use of force must meet an "*Objectively Reasonable"* standard.  The following quotes from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner,"(Learning Domain #20; "<u>Introduction to the Use of Force</u>," Pages 1-4).

On-Scene Consulting

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.  This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer "police powers" on themselves*.  These powers come to the criminal justice system from the people they serve.  (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

On-Scene Consulting

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

Per California Penal Code Section 835a(e)(2): "A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed."

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


## Opinion Number 6

It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a departure of from POST Standards Use of Force and Use of Deadly Force Training. In addition, I base my opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013 Cal LEXIS 6652. In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly us of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force. This includes but is not limited to the following:

Deputy Sheriff Christopher Alfred failed to identify himself as a police officer prior to shooting. (Deposition Transcript of Christopher Alfred, Page 38). Deputy Sheriff Christopher Alfred failed to request a back-up before attempting to make contact with Mr. Barber. (Deposition Transcript of Christopher Alfred, Page 33), and a reasonable officer under these facts would have waited for additional San Bernardino County Sheriff's Department Sheriff's Deputies to assist with containment and tactical deployment to take Mr. Barber into custody. (POST LD 23, Chapter 2: Basic Tactical Considerations Approach, Pages 2-8). Deputy Sheriff Christopher Alfred exercised poor tactics when he: placed himself in a position behind the vehicle, did not step out of the way after Mr. Barber entered the vehicle, did not step out of the way when he saw the reverse lights come on the vehicle, and did not step out of the path of the vehicle to make

On-Scene Consulting

sure he would not be in the path of the vehicle. (*Deposition Transcript of Christopher Alfred, Pages 40-41*).


## Opinion Number 7

It is my opinion based on my review of the facts and videos in this matter that Deputy Sheriff Christopher Alfred, No. G9800, failed to initially determine that Mr. Steffon Barber was mentally ill and or experiencing a mental crisis.  Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Steffon Barber who might be suffering from a mental illness and or experiencing a mental crisis.  Deputy Sheriff Christopher Alfred had information from the reporting party regarding Mr. Barber's behaviors that would indicate that he may have been mentally ill or experiencing a mental health crisis.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided.  It is my opinion that Deputy Sheriff Christopher Alfred, No. G9800, failed to create Time and Distance to de-escalate the situation. Effective communication may enable a Police Officer to gain cooperation and voluntary compliance in stressful situations.

In addition, law enforcement officers should be taught the below listed De-escalation Techniques:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (voices).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

On-Scene Consulting

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

It is my expert opinion that a similarly trained San Bernardino County Sheriff's Department Deputy Sheriff would not have considered Mr. Steffon Barber to be a lethal threat in this set of facts.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


**Opinion Number 8**

It is my opinion based on my review of the facts, videos and totality of the circumstances, the San Bernardino County Sheriff's Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used by Deputy Sheriff Christopher Alfred in this matter was inappropriate, unreasonable, and excessive. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a failure by the San Bernardino County Sheriff's Department to properly train Deputy Sheriff Christopher Alfred on following subject matters: Verbal Strategies, Defusing and De-Escalation Techniques, Use of Cover and Contact Officers, Situational Awareness and the use of Less Lethal/Lethal/Deadly Force to include Shooting Into Moving Vehicles. In addition, the San Bernardino County Sheriff's Department ratified the conduct of Deputy Sheriff Christopher Alfred by determining that his conduct was within policy and for failing to properly train them prior to this incident. These types of decisions tend to have a ripple effect in the Department because other Officers believe that they can engage in similar conduct without consequences.

On-Scene Consulting

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

On-Scene Consulting

I was promoted to the rank of Detective and attended Basis Detective School. Upon
completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field
Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to
my assignment, I attended mandated Basic Supervisor School. In conjunction with
Supervisor School, I was selected to attend the West Point Leadership Academy
Supervisor Training. The training focused on team building, leadership, and decision
making. While assigned to Hollenbeck Division, I conducted roll call training on a daily
basis on numerous subject matters to include Use of Force Options (Non-Lethal and
Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle
Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal
Bulletins, Training Directives, and other Standardized Roll Call Training. I directly
supervised a Watch of Officers and provided supervisory oversight during calls for
service, tactical situations, perimeter tactics, containment and control issues and use of
force incidents. I conducted audits, personnel investigations, Standard Based
Assessments (Ratings), Use of Force Investigations, Administrative Projects, and
prepared commendations for officer's field performance. While assigned to Hollenbeck
Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special
Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to
the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically
targeted career criminals in the Division. I provided ongoing mandated Department
Training as well tactical, firearms, less than lethal and search warrant tactics training to
the Officers and Detectives. As a Unit, we prepared and served numerous search
warrants. I provided search warrant tactical briefing and de-briefing of each warrant at
the conclusion of the of the service. I completed audits, administrative projects, Use of
Force Investigations, personnel complaints, and other administrative duties as deemed
necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I
investigated personnel complaints that were too large in scope for a geographical
Division. At the conclusion of my loan, I was selected to Management Services
Division, Special Projects, Office of the Chief of Police. I completed numerous in-depth
staff projects for review by the Chief of Police. In addition, I was assigned with
conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from
California State University, Long Beach.

On-Scene Consulting

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised
ten undercover officers and four uniformed officers. I provided all facets of training to
the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates,
Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics
Training, Undercover Operations training, Surveillance training, and any other training
deemed necessary by my Area Commanding Officer. I conducted audits, personnel
investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart
Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central
and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant
II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the
entire Department covering all Patrol Divisions and Specialized Units. I provided all
facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant
services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force
Options, Department Directives, Training Bulletins, and other training dictated by the
Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-
service training, Watch Commander School, Field Training Officer (FTO) School, and
Basic Detective School.  While at K9, I investigated and completed K9 contacts,
personnel complaints, and Use of Force Investigations. In addition, I directed and was
directly involved in Use of Force incidents. I received the LAPD Medal of Valor and
LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I
directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT
training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun,
Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In
addition, I facilitated and conducted training in the following training Cadres: Breacher
(Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention,
Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support
Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions
and High-Risk Search Warrant Services to include all facets (preparation, briefing,
deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation
Team. I provided on-going crisis negotiation training, mental health training,

On-Scene Consulting

de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008.  I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats.  Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  Responded to hostilities.  Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies.  Conducted all facets of security training for the company and employees.  Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention

On-Scene Consulting

Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal

On-Scene Consulting

Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe