**RODNEY S. DIGGS, Esq. (SBN 274459)**
Email: RDiggs@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 489-0028
Facsimile: (213) 489-0552

**LAW OFFICES OF DALE K. GALIPO**
**Dale K. Galipo, Esq. (SBN 144074)**
dalekgalipo@yahoo.com
**Renee V. Masongsong, Esq. (SBN 281819)**
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

Attorneys for Plaintiff **STEFFON BARBER**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEFFON BARBER, | Case No. 5:22-cv-00625-KK-DTB |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 4 TO EXCLUDE PLAINTIFF'S EXPERT DR. BENNET OMALU** |
| vs. | |
| COUNTY OF SAN BERNARDINO, and DEPUTY CHRISTOPHER ALFRED, | |
| Defendants. | |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.      SUMMARY

Defendants' *motion in limine* to exclude Plaintiff's expert Dr. Bennet Omalu is meritless and represents an improper attempt to prevent the jury from hearing critical testimony regarding the devastating and permanent injuries Mr. Barber sustained in the incident relating to the cause of action before this court. Defendants seek to exclude all testimony from Plaintiff's expert Dr. Bennet Omalu. This request is based on an overbroad interpretation of Dr. Omalu's expected testimony and conflates both the scope and foundation of his opinions.

Dr. Bennet Omalu is one of the most exceptionally qualified forensic pathologists and neuropathologists in the United States, possessing credentials, expertise, and experience that unquestionably satisfy the Daubert requirements for expert testimony under Federal Rule of Evidence 702. His opinions in this case are based on comprehensive review of extensive medical records, in-person clinical examination of Mr. Barber, and application of well-established, peer-reviewed medical methodologies. Most importantly, Dr. Omalu's differential diagnosis methodology, a well-recognized method in his field, is grounded in sufficient facts and data, has been subjected to extensive peer review and publication, and has gained universal acceptance in the medical and forensic pathology communities.

## II.     LEGAL STANDARD

The Federal rules of Evidence states, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that; (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of

reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702.

Under the *Daubert* standard, the trial court serves as gatekeeper to ensure that expert testimony is both relevant and reliable. In assessing reliability, the court considers whether the expert's theory or technique can be and has been tested; whether it has been subjected to peer review and publication; the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and the degree of general acceptance within the pertinent scientific community. Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311 (9th Cir. 1995)

Additionally, the ultimate decision regarding the admissibility of expert witness testimony is determined by the court and is not restricted to the Daubert factors. "***Daubert***'s general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge. A trial court *may* consider one or more of the more specific factors that ***Daubert*** mentioned when doing so will help determine that testimony's reliability. But, … the test of reliability is 'flexible,' and ***Daubert***'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The court has discretion to include or exclude expert testimony based on its own findings of reliability.

Under Federal Rule Evidence 703 an expert may rely on hearsay. Section 703 provides, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose

them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703

### III.  ANALYSIS

#### A. DR. OMALU IS EXCEPTIONALLY QUALIFIED TO TESTIFY.

Dr. Omalu holds four separate board certifications from the American Board of Pathology: Anatomic Pathology; Clinical Pathology; Forensic Pathology; and Neuropathology. He also holds a fifth board certification in Medical Management as a Certified Physician Executive from the American College of Physician Executives. Additionally, Dr. Omalu completed residency training in Anatomic and Clinical Pathology at the College of Physicians and Surgeons of Columbia University, Harlem Hospital Center; fellowship training in Forensic Pathology at the Allegheny County Coroner's Office, University of Pittsburgh; and fellowship training in Neuropathology at the University of Pittsburgh Medical Center. Further, Dr. Omalu holds a Master of Public Health (MPH) in Epidemiology from the Graduate School of Public Health at the University of Pittsburgh and a Master of Business Administration from the Tepper School of Business at Carnegie Mellon University. His epidemiology training is directly relevant to his opinions in this case regarding the long-term outcomes of traumatic brain injury. He earned his Bachelor of Medicine and Bachelor of Surgery (M.B., B.S.) from the University of Nigeria (June 1990) and holds unrestricted medical licenses in California, as well as previously in Pennsylvania, Indiana, and Hawaii.

Dr. Omalu has been involved in several death and injury investigations during his 25-year career as a Forensic Pathologist and Neuropathologist. He has personally conducted over 13,000 autopsies and death investigations and has examined over 15,000 brain tissue specimens. Critically, he routinely evaluates living victims of all types of injuries and trauma, including victims of assault, traumatic falls, industrial and accidental injuries, medical complications, and sports-related injuries,

performing trauma pattern analysis to determine causes and mechanisms of injury. He currently serves as Clinical Professor of Medical Pathology and Laboratory Medicine at the University of California, Davis and President and Medical Director of Bennet Omalu Pathology, Inc. His previous positions include Chief Medical Examiner for San Joaquin County, California; Co-Director of the Brain Injury Research Institute at West Virginia University/NorthShore University Health System; Member of the NFL Players Association Concussion and Traumatic Brain Injury Committee; and member of the Traumatic Brain Injury Advisory Board of the State of California.

Clearly, Dr. Omalu meets the Daubert threshold and Federal Rules of Evidence 702 standard to qualify as an expert.

### B. DR. OMALU'S OPINIONS ARE BASED ON RELIABLE METHODOLOGY AND ADEQUATE FOUNDATION

Dr. Omalu explicitly stated that he applied "a valid differential diagnosis method including but not limited to causation criteria analysis, Central Limit Theorem analysis and Clinico-Pathologic Correlation analysis" to form his opinions in this case. As he explained, "The differential diagnosis method is a very well established and generally accepted methodology in the medical sciences and is common knowledge for the determination of disease outcomes." This methodology has gained universal acceptance in medicine and is routinely employed by physicians across all specialties to diagnose diseases, determine causation, and predict outcomes. The differential diagnosis methodology involves: (1) reviewing the patient's comprehensive medical history, social history, educational history, and occupational history; (2) documenting the pattern of trauma and injuries sustained; (3) performing physical examination and systems review; (4) analyzing diagnostic imaging, laboratory results, and clinical findings; (5) applying established medical principles regarding injury mechanisms and outcomes; (6) ruling out alternative

causes; and (7) determining causation and prognosis based on the totality of evidence and published medical literature. Dr. Omalu applied the Bradford Hill Criteria, a recognized framework for determining causation in epidemiology, to analyze the contributory and causal risk factors for TBI and traumatic encephalopathy. This rigorous, evidence-based approach demonstrates reliability under Daubert. Courts have repeatedly recognized differential diagnosis as a reliable methodology for determining medical causation, and the reliability of Dr. Omalu's methodology is demonstrated by its widespread use throughout medicine—every physician employs differential diagnosis when evaluating patients, as it is the fundamental analytical framework of medical practice.

### C. DR. OMALU'S OPINIONS ARE NOT SPECULATIVE AND ARE BASED ON SUFFICIENT EVIDENCE

Here, Dr. Omalu formed an opinion regarding body positioning at the time of the shooting. His opinion is based on the objective anatomic location of the entrance wound in the top of the head as documented in medical records and observed during his examination. A bullet wound in this location, according to forensic pathology principles, indicates the gun was positioned above Mr. Barber's head when fired, consistent with him sitting in a vehicle. Dr. Omalu's opinions are not speculative because they represent the reliable application of established medical principles and published epidemiological research to the documented facts of Mr. Barber's case.

Moreover, his opinion regarding the nature and extent of brain injury is based on the CT imaging showing bullet trajectory through brain tissue, the surgical operative notes documenting "herniating liquified brain tissue" and "necrotic brain tissue," and established medical knowledge that high-velocity projectiles (greater than 1,200 feet per second) transfer large amounts of kinetic energy causing both focal and diffuse traumatic brain injury. His prognosis opinions regarding increased dementia risk are grounded in published peer-reviewed epidemiological studies from

leading medical journals showing that severe TBI is associated with a hazard ratio of 11.4 for young-onset dementia, with the strongest association in patients who, like Mr. Barber, sustained severe TBI at a younger age. While forming his opinion, Dr. Omalu cited over 114 peer-reviewed scientific references supporting his analysis and stated his opinions to a reasonable degree of medical and scientific certainty.

Additionally, each opinion flows logically from the documented evidence through application of the differential diagnosis methodology—the universally accepted medical framework for determining causation and prognosis. There is no analytical gap between the data Dr. Omalu reviewed and his conclusions; rather, his testimony represents exactly the type of reliable expert analysis contemplated by Daubert and Rule 702.

### D. THE COURT SHOULD DENY DEFENDANTS' REQUEST TO EXCLUDE DR. OMALU'S TESTIMONY IN ITS ENTIRETY

While Defendants may argue that Dr. Omalu lacks specific credentials as a "bullet trajectory analyst" or "shooting incident reconstructionist," this objection misunderstands and misstates the nature of his testimony. Dr. Omalu does not opine as a ballistics engineer or firearm expert, rather, he opines as a forensic pathologist regarding the anatomical location and trajectory of the wound through the body. Determining body positioning and wound trajectory based on entrance and exit wounds, tissue damage patterns, and anatomical pathology is core forensic pathology expertise.

As Dr. Omalu explained, "The patterns of injuries generated by gunshots, firearms and ballistics weapons, and the mechanisms of generation, causation, and sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge." Forensic pathologists routinely determine wound trajectories, body positioning, and mechanisms of injury based on anatomical analysis—this is fundamental to forensic pathology practice. Dr. Omalu's over

13,000 autopsies and 15,000 injury investigations provide extensive practical experience analyzing gunshot wounds and determining trajectories based on anatomical evidence.

Moreover, Dr. Omalu does not claim that trajectory analysis is a specialized skill requiring separate certification, rather, he identifies it as applying "common knowledge" and "generally accepted principles" of forensic pathology to the anatomical evidence. His humility regarding the level of specialization required does not undermine his qualifications; rather, it demonstrates his accurate understanding that anatomical trajectory analysis is a routine component of forensic pathology practice.

### E. DR. OMALU'S OPINIONS WILL ASSIST THE TRIER OF FACT AND ARE WITHIN HIS AREA OF EXPERTISE

Dr. Omalu's testimony will assist the jury in understanding highly technical medical and scientific matters that are plainly beyond the common knowledge of lay jurors. The jury cannot independently interpret the CT imaging showing "gunshot wound to the right parietal vertex with comminuted fracture and bullet/bone fragments tracking centrally into the brain, bilateral parietal subarachnoid hemorrhage, and subdural hemorrhage along the falx and right tentorium." Lay jurors do not possess the specialized anatomical knowledge to understand what these findings mean in terms of the severity of brain injury, the mechanism by which high-velocity projectiles cause structural brain damage, or the distinction between focal and diffuse traumatic brain injury. Dr. Omalu's testimony will explain the pathophysiology of penetrating gunshot wounds to the brain, including how a bullet traveling at over 1,200 feet per second transfers kinetic energy into the enclosed cranial space causing a severe brain effects, why the human brain as a "post-mitotic organ" cannot regenerate following significant injury, and why Mr. Barber's documented brain damage is permanent and irreversible. Similarly, lay jurors cannot

understand from medical records alone why the anatomic location of the entrance wound in the top of the head indicates Mr. Barber's body positioning at the time of the shooting—this requires forensic pathology expertise in wound trajectory analysis and understanding the relationship between bullet entry angles and body positioning. These are precisely the types of specialized medical questions for which expert testimony is not only appropriate but essential to ensure the jury can properly evaluate the nature and extent of Mr. Barber's injuries.

Furthermore, Dr. Omalu's testimony will assist the jury in understanding the long-term medical consequences and prognosis of severe traumatic brain injury—matters that require specialized knowledge of epidemiology, neuropathology, and the mechanisms of neurodegenerative disease. Lay jurors cannot independently assess the medical significance of epidemiological studies for developing dementia and Alzheimer's disease following moderate and severe TBI, or understand that severe TBI at age 35 is associated with young-onset dementia. Dr. Omalu will explain why Mr. Barber's specific injury pattern—severe TBI with documented structural brain damage requiring surgical debridement of necrotic brain tissue, resulting in permanent hemiplegia and wheelchair dependence—places him at substantially elevated risk for progressive neurodegenerative disease as he ages. Without Dr. Omalu's testimony, the jury would have no framework for understanding how a single traumatic event causing permanent brain injury in 2021 will manifest as progressive neurological deterioration decades later, why Mr. Barber faces approximately 24.3 years of life lost compared to the general population, or the medical distinction between the acute injuries documented at Arrowhead Regional Medical Center and the chronic traumatic encephalopathy that will worsen over time. Dr. Omalu's specialized knowledge in neuropathology, forensic pathology, and epidemiology provides the essential medical context that

allows the jury to fully comprehend the devastating lifelong impact of Mr. Barber's injuries.

## IV. CONCLUSION

For the reasons stated above, Defendants have failed to meet their burden of demonstrating that Dr. Omalu's expert testimony should be excluded. Excluding Dr. Omalu's testimony would prejudice Plaintiff by depriving the jury of critical information necessary to fairly assess the devastating and lifelong impact of Defendants' actions. Dr. Omalu's testimony satisfies Federal Rule of Evidence 702's requirement that expert testimony assist the trier of fact in understanding the evidence and determining facts in issue.

Accordingly, the Court should deny Defendants' Motion in Limine No. 4 to Exclude Plaintiff's Expert Dr. Omalu.

Dated: December 18, 2025            **IVIE McNEILL WYATT PURCELL & DIGGS**

              By: /s/ Rodney S. Diggs
                Rodney S. Diggs, Esq.
                Brandon Tanter, Esq.
                Attorneys for Plaintiff,

              **LAW OFFICES OF DALE K. GALIPO**

              By: /s/ Renee V. Masongsong
                Dale K. Galipo, Esq.
                Renee V. Masongsong, Esq.
                Attorneys for Plaintiff,
                STEFFON BARBER