1  Eugene P. Ramirez, Esq. (State Bar No. 134865)
     *eugene.ramirez@manningkass.com*
2  Kayleigh A. Andersen (State Bar No. 306442)
     *Kayleigh.Andersen@manningkass.com*
3  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
4  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
5  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
6
7  Attorneys for Defendants, COUNTY OF
   SAN BERNARDINO and
   CHRISTOPHER ALFRED
8

9  ## UNITED STATES DISTRICT COURT

10  ## CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  STEFFON BARBER, an individual, | Case No. 5:22-cv-00625-KK-DTB |
| 13  Plaintiff, | *[Assigned to the Honorable District Judge Kenly Kiya Kato, Magistrate Judge, David T. Bristow]* |
| 14  v. | |
| 15  COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED, | **EXHIBIT A AND EXHIBIT B TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 3 TO EXCLUDE DRUG EVIDENCE** |
| 16  Defendants. | |
| 17  | |
| 18  | Judge:  Hon. Kenly Kiya Kato |
| 19  | Date:   January 8, 2026<br>Time:   10:30 a.m. |

20

21  DATED:  December 18, 2025      **MANNING & KASS**
                                   **ELLROD, RAMIREZ, TRESTER LLP**
22

23

24                               By: _____/s/ Kayleigh A. Andersen_____
                                      Eugene P. Ramirez, Esq.
25                                    Kayleigh A. Andersen, Esq.
                                      Attorneys for Defendants, COUNTY OF
26                                    SAN BERNARDINO and
                                      CHRISTOPHER ALFRED
27

28

---

**EXHIBIT A AND EXHIBIT B TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 3 TO EXCLUDE DRUG EVIDENCE**

# EXHIBIT A

# EXHIBIT A

October 29, 2025

Eugene Ramirez, Esq.
Kayleigh Andersen, Esq.
Manning | Kass
801 S. Figueroa Street, 15th Floor
Los Angeles, CA 90017

<u>**Federal Rules of Civil Procedure 26 (a) (2) (B) Report**</u>
**BARBER, Plaintiff,**
**v.**
**COUNTY OF SAN BERNARDINO, et al, Defendants**
**USDC Case No.  5:22-cv-00625-JWH (SHKx)**

Mr. Ramirez and Ms. Andersen:

Thank you for retaining me to review, examine, and render opinions on this matter.  I have studied and analyzed interviews, policies, procedures, video and audio recordings, reports, photographs, memoranda, and associated materials (listed in the Materials Reviewed Section of the Federal Rules of Civil Procedure 26(a) (2) (B) report) that have been provided thus far in this case.

I understand that this matter is still evolving.  If you provide additional documents, data, or materials to review, I may need to author a supplemental report to underscore current or express other opinions.  Additionally, it's essential to note that I do not make credibility determinations when forming my opinions or conclusions.  My fee for reviewing case material is $300.00 per hour.

Phillip L. Sanchez

## EXPERT REPORT OF PHILLIP L. SANCHEZ

My name is Phillip L. Sanchez, and I authored this report at the request of defense counsel Eugene Ramirez, Esq., and Kayleigh Andersen, Esq., Manning | Kass.

I was a peace officer in California for 38 years, serving with the Santa Monica and Pasadena Police Departments.  My career encompassed numerous assignments, including those as a police officer, field training officer, investigator, task force liaison officer, Sergeant, lieutenant, captain, deputy chief, interim police chief, and chief of police.

I attended the Rio Hondo Police Academy in 1980.  I graduated 3rd overall in my class and was ranked 1st in physical fitness and practical application, including arrest and control tactics.  The Santa Monica Police Department hired me in April 1980.  I served the community for 30 years, rising to the rank of deputy chief (the first in the department's history).  I also served as interim police chief for the same agency in 2005.

The City of Santa Monica is approximately 9.2 square miles and has a population of roughly 85,000.  It is a popular international destination that requires unique police resources to serve a diverse population.  The City hosts numerous large-scale events each year, requiring additional police services, strategic planning, and, at times, mutual aid with other law enforcement agencies.
During my tenure, the Santa Monica Police Department maintained a multi-million-dollar budget and was a full-service municipality.  The agency employed approximately 215 sworn peace officers and 200 professional staff and operated a Type 1 jail facility (with a capacity of 80 pre-arraignment inmates).  The department provided its employees with a range of police services, youth programs, and professional development opportunities.

As a police officer, I was familiar with the departmental rules, regulations, policies, customs, and practices governing the Santa Monica jail, use of force, and general orders.  I arrested, processed, or had direct contact with hundreds of inmates in a custody environment.  As a peace officer, I conducted field investigations, custody and witness interviews, collected and processed evidence and property, and participated in numerous major incident scenes.  I served as a patrol officer and field training officer.  I was selected for the Crime Impact Team, serving as a vice and narcotics undercover operator, and investigator before my promotion to police sergeant in 1988.  As a police detective, I investigated numerous criminal matters and presented the cases to the appropriate prosecutor for consideration of filing.  I conducted criminal investigations, managed informants, and conducted undercover, covert, and high-risk operations.  I was familiar with investigative strategies and custody protocols (including the use of detoxification and safety cells and restraining devices).

I served as a certified firearm (pistol, sub-machine gun, police rifle), defensive tactics, and arrest and control instructor.  I possessed knowledge and experience in field operations, patrol protocols, mass casualty response, unusual occurrences, canine handling, and small patrol tactics.

As a California peace officer, I qualified as an expert in State Court numerous times, involving undercover operations, narcotics sales, possession for sales, distribution, control, and identifying subjects under the influence of opioids, methamphetamine, phencyclidine, the use of force,

SWAT, and patrol tactics. I served on several professional panels providing expert opinions on topics including police-community relations, use of force, officer-involved shootings, administrative and internal affairs investigations, audits and inspections, evidence tracking, and jail operations. I also managed the department's Emergency Operations Center (EOD) as necessary.

As a police sergeant in the Office of Operations, I served as the acting watch commander, patrol supervisor, and tactical unit supervisor. I supervised field investigations, approved arrests, and investigated use-of-force incidents and misconduct allegations involving both sworn and non-sworn employees. I led, managed, or participated in warrant service and civil unrest incidents and served as the Officer in Charge (OIC) for the Democratic National Convention hosted in Santa Monica.

I served in the Technical Services Division as an Adjutant. My duties included supervising the Records and Communication Sections and the jail, and monitoring the department's budget. As jail manager, I completed Title 15 and jail operations training for a Type 1 facility. I was responsible for ensuring compliance with the current jail policy, ordering supplies, and maintaining inmate safety. I authorized medical treatment for inmates, prisoner transportation to local hospitals and the Los Angeles County Central Jail, legal representation, family visitation, and release from custody, among other duties.

I developed and implemented the Santa Monica Police Department's Metro Crime Unit and the Special Weapons & Tactics Team (SWAT). The team initially consisted of nine operators and later expanded to over 30 tactical specialists. The Metro/SWAT team was responsible for warrant service, high-risk tactical entries, mitigating barricaded suspect situations, and hostage rescue. The Metro/SWAT team conducted more than 70 incidents annually, including high-risk area searches with the canine unit. I supervised the department's canine unit, defensive tactics unit, and firearms cadre. I also developed and implemented the Santa Monica Police Department's Patrol Rifle Team, frequently assisting the SWAT Team with high-risk incidents.

As a police lieutenant, I served as a watch commander, supervising subordinate personnel. I managed field investigations and approved reports and other official documents. I conducted audits and investigated use-of-force incidents and allegations of misconduct involving both sworn and non-sworn employees.

I supervised over 50 sworn and professional staff members as the Executive Officer of the Criminal Investigation Division. I led complex criminal investigations, approved reports, and conducted high-profile investigations. I managed undercover operations involving large amounts of narcotics and U.S. Currency. I liaised with the Federal Bureau of Investigation's Joint Terrorist Task Force (JTTF) to address homeland security and terrorism-related issues. I worked closely with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force (LA-IMPACT) to mitigate major narcotics trafficking and served as a board member.

I investigated misconduct allegations, disciplined employees (as the circumstances warranted), and recommended divisional commendations. I reported the division's work efforts and crime statistics to my superiors, the Federal Bureau of Investigation (FBI), and the California Attorney

General's Office.  I managed the Uniform Crime Reporting (UCR) and criminal case management system.

I was the jail administrator responsible for all custody operations (Type 1).  I conducted administrative audits, internal affairs investigations, and evaluated employees' performance.  I participated in the Title 15 training and directly supervised jail staff, ensuring the department complied with the Board of State Community Corrections (BSCC) and Standards and Training for Corrections (STC) regulations.  I implemented a contemporary use-of-force policy and a critical incident evaluation process.  I served as an original member of the department's Liability Assessment Team, responsible for investigating officer-involved shootings, in-custody deaths, and other high-risk incidents.

I led the department's Internal Affairs Section, overseeing and conducting administrative investigations, addressing allegations of criminal misconduct, and handling related incidents.  I implemented an early warning tracking system to monitor officers' and non-sworn employees' performance.  I managed or assisted with investigating officer-involved shootings, categorical use of force, and other sensitive matters, reporting my findings directly to the Santa Monica police chief.

As a police captain, I supervised police lieutenants, sergeants, officers, and professional staff assigned to the Operations Division.  My duties included managing the department's largest budget, reviewing allegations of misconduct, and providing policy and disciplinary recommendations to the police chief.  I also developed deployment strategies, planned for large-scale events in the City, managed civil unrest incidents, and monitored the Field Officer's Training Program and other units assigned to patrol.  I participated in the department's Mutual Aid Program and response, collaborating with local, state, and federal officials.

I served as the Jail Administrator for the Santa Monica Police Department, where I developed policy recommendations for the police chief and ensured compliance with Titles 15 and 24. I frequently met with representatives from the Board of State Community Corrections and Standards and Training for Corrections concerning training plans, the physical plant (jail), regulatory compliance, and routine audits.  I reviewed employee performance, completed administrative reports, and initiated Internal Affairs investigations.  I served as the Incident Commander when critical events occurred in the jail, including in-custody deaths and the use of force.

As the Santa Monica Police Department's deputy chief, I assumed command of the organization in the police chief's absence.  I was responsible for the department's daily operations, and my subordinates included four (4) police captains, three (3) civilian managers, and twelve (12) lieutenants.  I also supervised the department's Internal Affairs, Jail Operations, special events, and professional standards sections.

I led the department's Internal Affairs and Audit/Inspections Sections and served as the liaison to local, state, and federal law enforcement agencies.  I frequently met with jail supervisors to discuss employee performance, budget, staffing, scheduling, the physical plant, suicide prevention for inmates, and prisoners requiring special accommodations.  I participated in or

initiated jail audits with the Board of State Community Corrections and the Los Angeles County Civil Grand Jury. I collaborated with professional representatives from local hospitals and nonprofit organizations regarding inmates' medical and mental health services. I served as the Incident Commander in several high-risk incidents, including the Santa Monica Pier Hostage incident and the Third Street Promenade Mass Casualty Incident.

As deputy chief, I managed several large projects, including the department's transition into the new Public Safety Facility (police headquarters). The move to the Public Safety Facility involved coordinating logistics, purchasing supplies, the police radio cut-over (transferring communications and telephone lines from the old police building to the Public Safety Facility), identifying workspaces for all four divisions, and ensuring the custody area met BSCC requirements. I managed the police technology projects, including the department's communications upgrade (patrol cars, mobile radios, and the base station). I led the department's effort to purchase lethal devices (conductive electronic weapons) and implemented the associated training and governing policies.

I frequently reviewed the use-of-force policies, practices, and protocols for the entire department, including the jail section. I managed the department's budget and approved significant acquisitions.

I served as the interim police chief of Santa Monica, responsible for all aspects of the department. I developed and approved policies, disciplined employees, approved budget acquisitions, and worked closely with the city's leadership team (City Manager, City Attorney, and department executives). I met with the Los Angeles County Police Chiefs and the South Bay Police Chiefs Association. I resigned from the Santa Monica Police Department after 30 years of professional service to become chief of the Pasadena (CA) Police Department in July 2010.

The City of Pasadena covers approximately 26 square miles and has a population of around 152,000. The City is a popular international destination with iconic historic sites like the Norton Simon and USC Pacific Asian Museums, the Rose Bowl Stadium, the Pasadena Tournament of Roses House, and the Jet Propulsion Laboratory (JPL). Several prestigious educational institutions are located in this area, including Caltech, Fuller Theological Seminary, and Pasadena City College (PCC). Over 900 nonprofit organizations operate in the City, providing a range of nongovernmental services, including housing, social support, mental health outreach, and crisis intervention.

Pasadena hosts several major events annually, including the Rose Parade and Rose Bowl Game, NCAA athletic events, International Soccer matches, UCLA and Pac-12 football games, and iconic entertainers. The events draw more than a million people to the City yearly, which requires additional police resources and strategic security planning.

As the Pasadena Police Chief, my direct subordinates included the Deputy Police Chief, four police commanders, the Air Support Captain, five civilian commanders, the Internal Affairs and Professional Standards Unit, and the Audit and Inspection Unit. I was responsible for more than 383 full-time employees (250 peace officers) and maintained an annual budget of approximately

$ 80 million.  I was responsible for all aspects of the department, such as public safety, crime reduction, and building community trust.  The police department operated a Type 1 jail facility (capacity for 100 inmates, pre-arraignment).  I frequently inspected the jail and evidence room to ensure compliance with state regulations.

As the chief executive, I approved hiring jail staff and sworn peace officers.  I managed technology enhancements, training, and the purchase of specialized equipment (SCBA, Cameras, PPE, AEDs).  I initiated jail inspections and audits with the BSCC and the Los Angeles County Civil Grand Jury.  I frequently met with BSCC and STC representatives regarding the department's training plans for custody staff and sworn personnel assigned to the jail.

I served as the Incident Commander for all major events hosted in the City, including the Rose Bowl Stadium, the Tournament of Roses Parade, International Sporting Events, and entertainment events.  I provided police resources, identified local and homeland security risks, and worked collaboratively with state and federal law enforcement agencies.  I selected Pasadena peace officers to serve as task force officers with the Federal Joint Terrorism Task Force (JTTF), the High-Intensity Drug Trafficking Areas (HIDTA), and the United States Marshal Service (USMS).

I also worked closely with the United States Secret Service (USSS), the United States Military (including Marines, Navy – Special Operations, Army – Special Operations, Coast Guard, and Air Force), as well as other Homeland Security and Defense agencies.  I maintained a high-level security clearance and frequently attended secret briefings by the FBI, DEA, USSS, and other federal agencies.  I identified, implemented, and coordinated security measures with the United States Secret Service during visits from the President of the United States (POTUS), international leaders, or other high-ranking officials.

As the Pasadena Police Chief, I served two terms as President of the Foothill Air Support Team (FAST).  I was responsible for the department's Air Support Program, which maintained a fleet of seven helicopters (the third-largest in Los Angeles County) and provided aerial resources to municipalities in the San Gabriel Valley.  I approved significant acquisitions through the Federal Government's 1033 Program, which enables the department to secure surplus equipment and reduce its budget impact.  I also served as the President of the San Gabriel Police Chiefs Association and was an active member of the Los Angeles County Police Chiefs Association. As police chief, I received notifications of all critical incidents in the City, including those at the jail.  The reports involved in-custody deaths, categorical use of force by jail staff or peace officers, significant injuries sustained by department personnel, officer-involved shootings, and related incidents.

I developed, approved, and implemented BWC policies in collaboration with community groups and stakeholders.  I reviewed and approved plans allowing medical and mental health professionals to assess inmates in custody.  I also met with the City Manager and City Attorney to discuss high-risk incidents, civil litigation, community concerns, the budget, and other related matters.  I served as the project manager for the Pasadena Police Department, helping to select, purchase, and implement the Body-Worn Camera program (one of the first in Los Angeles

County) and upgrade the In-Car Video system. I implemented an electronic tracking program to preserve the integrity of evidence.

I designed and implemented the department's rifle program, authorizing officers to care for and use (if necessary) the urban police rifle at the Rose Bowl Stadium during significant events, thereby reducing the homeland security threat. I frequently met with the department's firearms cadre to design and implement progressive use-of-force and range training, which included contemporary tactics (such as the three-gun system), decision-making, cover and concealment, and de-escalation. I served as the Chief of Police for the Pasadena Police Department for nearly eight years, retiring in April 2018.

During my career, I collaborated closely with the City of Pasadena Public Health Department, the Los Angeles County Department of Public Health, Councils of Governments (COGs), Subregions in Los Angeles County, and nonprofit and governmental organizations to address concerns about mental illness among the unhoused population. I also work with the Department of Housing and Livability to identify transitional, temporary, and permanent housing for homeless families, emancipated adults, and at-risk people.

I supervised and managed Homeless Outreach Teams for the Santa Monica and Pasadena Police Departments, collaborating with mental health professionals to expand access to social services, housing, case management, and shelter for the unhoused. I actively recruited experienced mental health clinicians and social workers, integrating them into the outreach police teams and increasing the department's immediate intervention capacity.

I coordinated with other city departments (housing, public works, fire, and community resources) in Pasadena and Santa Monica to address the impact of homelessness on the community. I implemented Mental Health Awareness and Response Training for the Santa Monica and Pasadena Police Departments.

As a professional law enforcement officer, I instructed hundreds of law enforcement officers (local, state, federal, and international) and personnel assigned to military special operations units. I lectured on various topics, including the use of force, special weapons & tactics, patrol tactics, weaponless defense & de-escalation techniques, incident command and control, crowd dynamics & civil unrest, discipline and accountability, mass casualty response, leadership, civil liability, personnel investigations, community policing, community partnerships, audits, managing jail facilities, officer survival, managing significant scale events, homeland security, fusion center leadership, information sharing, and related topics.

I authored several articles on the impact of stress during critical incidents, police training, firearms training, cognitive decision-making, security, and wellness for peace officers, published in police periodicals and professional journals. I led the research efforts and approved and implemented various firearms, impact devices, less-lethal weapon systems, and ammunition for several police organizations, including the Pasadena and Santa Monica police departments.

As a police instructor, I refined the officer survival mindset, encompassing de-escalation tactics, communication skills, firearms and less-lethal devices, ground-fighting techniques, defensive tactics, and arrest and control tactics for peace officers and military personnel.

Throughout my years in leadership and operational roles, I prioritized interagency collaboration and professional development. I worked to ensure the seamless integration of new technologies and strategies into day-to-day policing, always with a focus on public safety and personnel well-being. By fostering relationships with local, state, and federal partners, I consistently improved departmental readiness for significant incidents and community challenges.

My dedication to public service extended beyond field operations and administration. I regularly engaged in policy development, community outreach, and the expansion of training curricula to address evolving trends in law enforcement. As a mentor, I encouraged innovation, ethical leadership, and adaptability among rising officers. I also contributed my expertise in advisory capacities, assisting agencies in navigating complex operational, legal, and moral issues as they arose.

I studied and taught decision-making for first responders under extreme stress and, in conjunction with the fire service, implemented the Tactical Emergency Medical Support (TEM) protocols to mitigate the impact of active shooter threats at the Pasadena and Santa Monica Police Departments.

I earned a master's from the United States Naval Postgraduate School, Center for Homeland Defense and Security (with honors, class speaker), and an undergraduate Degree from the University of Redlands (with honors). I also earned several prestigious professional certificates, including the Harvard University, John F. Kennedy School of Government, Senior Management Institute for Police, the Federal Bureau of Investigation, National Academy, Federal Bureau of Investigations, Southwest Command College, Leadership Los Angeles, and the California Peace Officer Standard and Training (POST), Command College (honors, class speaker).

I received certificates for California Peace Officer Standards and Training in Executive, Management, Supervisory, Advanced, Intermediate, and Basic levels. I earned instructor credentials in firearms, arrest, control tactics, military operations in urban terrain, defensive tactics, and impact weapons.

As a police practice consultant, I have assisted law enforcement agencies in developing best practices for use-of-force, investigative protocols, evidence collection and preservation, audits, and the effective use of technology. I have served individual peace officers, law enforcement agencies, and municipalities in Los Angeles, Orange, Fresno, Monterey, San Diego, Santa Barbara, San Bernardino, Riverside, and Imperial counties. My education, training, and experience are detailed in my resume (CV). My deposition and trial appearances in the past four (4) years are attached to the report.

In the matter of the estate of BARBER, Plaintiff v. THE COUNTY OF SAN BERNARDINO, et al, Defendants, United States District Court Case number: 5:22-cv-00625-JWH (SHKx), I reviewed the following material: recordings, reports, videos, and documents to form the basis of my conclusions and opinions.

- Complaint.

8

- Item 01, Crime report and summary, by Detective Hernandez.
- Item 02, Crime report, by Detective Hernandez.
- Item 03, Crime briefing, by Detective Hernandez.
- Item 04, SBSCD Crime scene report, by Detective Navarro.
- Item 05, Supplemental report 002, Deputy Collins.
- Item 06, Supplemental report 012, by Deputy Morales.
- Item 07, Supplemental report 005, by Deputy Coley.
- Item 08, Supplemental report 010, by Deputy Russell.
- Item 09, Supplemental report 009, by Deputy Domon.
- Item 10, Supplemental report 002, by Officer Collins.
- Item 11, Supplemental report 003, by Deputy Hood.
- Item 12, Supplemental report 004, by Deputy Sandeles.
- Item 13, Supplemental report, by Deputy Hernandez.
- Item 14, Supplemental report 001, Property release, by Deputy Hernandez.
- Item 15, Supplemental report 006, Property report, by Deputy Hernandez.
- Item 16, Notification report, by Detective Domon.
- Item 17, Notification report, by Detective Hernandez.
- Item 18, Notification report, by Detective Bustamante.
- Item 19, Notification report, by Detective Ripley.
- Item 20, Notification report, by Detective Navarro.
- Item 21, SBSCD Crime report, Hospital response, by Detective Bustamante.
- Item 22, SBSCD Crime report, Interview with Monique Granados, by Detective Bustamante.
- Item 23, SBSCD Crime Report, Interview with Joseph Cocchi, by Detective Ripley.
- Item 24, SBSCD Crime Report, Interview with Mara Gallo, by Detective Hernandez.
- Item 25, SBSCD Crime Report, Interview with Angelica Lopez, by Detective Navarro.
- Item 26, SBSCD Crime Report, Interview with Deputy Coley, by Detective Ripley.
- Item 27, SBSCD Crime Report, Interview with Deputy Mora, by Detective Hernandez.
- Item 28, SBSCD Crime Report, Interview with Deputy Torres, by Detective Hernandez.
- Item 29, SBSCD Crime Report, Interview with Sergeant Long, by Detective Ripley.
- Item 30, SBSCD Crime Report, Interview with Firefighter Murphy, by Detective Domon.
- Item 31, SBSCD Crime Report, Interview with Firefighter R. Gilford, by Detective Domon.
- Item 32, SBSCD Crime Report, Interview with Fire Captain Tellez, by Detective Domon.
- Item 33, SBSCD Crime Report: Neighborhood Contacts/Interviews, by Detective Domon.
- Item 34, SBSCD Crime report, Vehicle processing, by Detective Bustamante.
- Item 35, SBSCD, Audio analysis of Deputy Alfred's belt recorder, by Detective Hernandez.
- Item 200, Audio Marisela Garcia, by Detective Domon.
- Item 201, Audio Interview with R. Gilford, by Detective Domon.
- Item 202, Audio, Interview with R. Murphy, by Detective Domon.
- Item 203, Audio Interview with D. Tellez, by Detective Domon.
- Item 204, Audio, Interview with M. Gallo, by Detective Hernandez.
- Item 205, Audio Interview with M. Granados, by Detective Hernandez.
- Item 206, Audio Interview with Savero, by Detective Hernandez.
- Item 207, Audio call to Jones, Barber's family, by Detective Hernandez.
- Item 208, Audio Interview with Deputy Alfred, by Detective Hernandez.
- Item 209, Audio Interview with Deputy Mora, by Detective Hernandez.
- Item 210, Audio Vehicle notification to M. Granados, by Detective Hernandez.
- Item 211, Audio Interview with Deputy Torres, by Detective Ripley.
- Item 212, Audio Interview Angelica Lopez, by Detective Navarro.

- Item 213, Audio Interview with Christopher Alfred, by Detective Navarro.
- Item 214, Audio Interview with B. Coley, by Detective Ripley.
- Item 215, Audio Interview with J. Cocchi, by Detective Ripley.
- Item 216, Audio Interview with J. Mora, by Detective Ripley.
- Item 217, Audio of 911.
- Item 218, Audio of dispatch (calling unit regarding the incident).
- Item 219, Audio Coley.
- Item 220, Audio Deputy Alfred (shots fired).
- Item 221, Audio regarding incident 29.45.042721.
- Item 222, Audio Deputy Mora.
- Item 223, Audio Deputy Morales.
- Item 224, Audio Deputy Torres.
- Item 225, Audio L. Torres, by Detective Ripley.
- Item 226, Audio M. Granados, by Detective Ripley.
- Item 1000, Crime Scene Procedure Manual (Updated 012920).
- Item 2000, Barber Criminal trial transcript.
- Item 1301, Barber Medical Records (SBCSD Jail).
- Item 1302, Barber Medical Records (SBCSD Jail).
- Item 1303, Barber Medical Records (SBSCD Jail).
- Item 2003, Barber Superior Court of California, County of San Bernardino, Sentencing Order.
- Deputy Christopher Alfred, Deposition Transcript.
- Steffon Barber, Deposition Transcript.

## INCIDENT SUMMARY:

On April 27, 2021, at about 11:12 p.m., the San Bernardino County Sheriff's Department (SBCSD) Communication Center received a 911 call regarding an "unknown problem" at 12013 White Avenue, Adelanto. The informant, Maria Gallo, advised the SBCSD emergency operator that she and her husband, Joseph Cocchi, were landlords and residents at the property (Gallo's parents own the property). Gallo stated that Monique Granados and Steffon Barber rent a dwelling at 12013 White Avenue from her and have lived there for the past year. The apartment complex has a shared (common) driveway.

Gallo continued to provide the operator with information. Gallo said that at about 10:45 p.m., she arrived home at 12013 White Avenue (in separate cars with her husband, Cocchi). Cocchi backed his vehicle onto the long driveway (leading to his residence) and saw Barber at the south end of the drive, standing near his Chevrolet Trailblazer. The Blazer's doors and rear hatch were open. Barber was wearing a white T-shirt and jeans.[1]

Cocchi parked his white Mercedes behind his residence and noticed Barber walking toward him. When Barber reached the area where Cocchi had parked, he used the palm of his hand to strike the front passenger window several times. Cocchi partially rolled down the driver's window and spoke to Barber. After a brief conversation, Barber walked around the front of Cocchi's car and slapped the hood of the Mercedes several times. Barber then demanded to be let into Cocchi's

---

[1] Item 001, Crime report and summary, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 34; Barber's deposition, September 9, 2025, p. 38, 50.

car; however, Cocchi refused. Cocchi exited his vehicle, locked the doors, and walked toward the driveway.[2]

Gallo began backing her car onto the driveway leading to her residence as BARBER stood in the drive pretending to guide her toward the backyard. When Gallo stopped her vehicle, Barber attempted to open the front passenger door; however, it was locked. Independent of Barber's actions, Cocchi walked to Gallo's car, opened the rear driver's door, and entered.

Barber attempted to reach inside Gallo's car; however, the windows were rolled up and the doors were locked. Gallo drove north on the driveway (Cocchi was in the car), and Barber slapped her vehicle multiple times. When Gallo reached the end of the drive, she turned west on White Avenue, parked, and called 911. Gallo and Cocchi said they were fearful that Barber would harm them and that he appeared to be under the influence of alcohol or a controlled substance because of his behavior. Gallo and Cocchi also believed Barber might have been armed because he reached into his pockets.[3]

San Bernardino County Sheriff's Deputy Alfred was assigned the call. He responded to 12013 White Avenue and parked his marked patrol unit nearby. Deputy Alfred exited his patrol unit and contacted the informants (Gallo and Cocchi).

Following his preliminary interview with Gallo and Cocchi while they were parked on White Avenue, Deputy Alfred activated his department-issued belt recorder and walked onto the driveway. He (Alfred) contacted Barber and issued several verbal commands to display his hands and not to reach into his SUV; however, Barber refused to comply.

At his sworn deposition, Barber testified he heard a verbal command to show his hands and not to reach into his SUV, which was idling. Barber's verbal responses were primarily inaudible; however, he was heard saying, "Back the funk up." Deputy Alfred used his sheriff's radio to advise the communication center that Barber was uncooperative and refused to comply with his commands.[4]

Barber entered the Trailblazer and put the vehicle in reverse. Barber drove quickly in reverse (the sound of tire traction was captured on the belt recorder, and during the post-shooting investigation, tire impressions at the scene indicated a loss of traction). Deputy Alfred fired six shots (southerly direction) in rapid succession. The Trailblazer stopped after the gunshots. Deputy Alfred requested additional patrol deputies and medical aid. When Sergeant Long arrived at the scene, he secured a public safety statement from Deputy Alfred.[5]

---

[2] Item 001, Crime report and summary, by Detective Hernandez.

[3] Item 001, Crime report and summary, by Detective Hernandez, Item 217, Audio of 911 call.

[4] Item 001, Crime report and summary, by Detective Hernandez; SBSCD Audio analysis of Deputy Alfred digital belt recording; Barber's deposition, September 9, 2025, p. 43 – 44, 47.

[5] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; SBSCD Audio analysis of Deputy Alfred digital belt recording; Deputy Alfred's deposition, August 26, 205, p. 7.

## OPINIONS AND CONCLUSIONS:

My Opinions and conclusions are based on my 38-year law enforcement career, which has included roles as a police officer, detective, supervisor, executive, and police chief. I conducted, reviewed, or managed hundreds of force cases (including officer-involved shootings), high-risk incidents, and field and administrative investigations. I taught weaponless defense, arrest & control techniques, less lethal devices, de-escalation techniques, firearms, and tactical operations to municipal and county peace officers, military personnel, and international police officials.

I designed, implemented, and trained the Santa Monica Police Department Special Weapons (SWAT) and Patrol Rifle Teams. I supervised the Santa Monica Police Department's Crisis Negotiation Unit and frequently interacted with them during critical incidents, including area searches, barricaded suspects, and hostage rescue events.

I served as a special weapons team leader and tactical operator during hundreds of critical incidents. I also served as a tactical and incident commander at high-risk incidents, including civil unrest and mass protest events, as well as a venue for the Democratic National Convention hosted in Santa Monica. I frequently interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies to implement security measures and emergency protocols during visits by the President of the United States (POTUS) or other high-ranking officials to Santa Monica.

As the Pasadena police chief, I was the Incident Commander for the Tournament of Roses Parade, the Rose Bowl Game, and numerous athletic, entertainment, and international events. These events required police intervention and resources to mitigate civil unrest and protests, as well as manage large groups. My responsibilities included security, event planning, crowd management and control, group dynamics, and preparation for civil unrest.

I interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies, implementing security measures and emergency protocols during visits by the President of the United States (POTUS) or other high-ranking officials in Pasadena.

As the police chief, I reviewed and evaluated officer-involved shootings, use-of-force incidents, vehicle pursuits, police helicopters as a tactical platform, and other high-risk incidents involving sworn and non-sworn personnel. I chaired the Pasadena Police Department's Use of Force Review, which determined the level of culpability (if any) in matters alleging misconduct, misuse of force, or misuse of tactics or equipment.

Throughout my 38-year law enforcement career, I have received hundreds of hours of POST-certified training, both as a student and instructor. I maintained several POST certificates, including Executive, Management, Supervisory, Advanced, Intermediate, and Basic certificates.

I graduated from the POST Command College (a two-year master's program for future studies). The program required a thesis; graduates received a certificate from the California Department of Justice. I graduated with top honors. I also graduated from the Federal Bureau of Investigation

(FBI), the National Academy, the John F. Kennedy School of Government, and the United States Naval Postgraduate School.

I was promoted through the ranks (officer, detective, Sergeant, lieutenant, captain, deputy chief, interim chief of police, and police chief) at two different agencies, serving in various assignments and capacities. I commanded the Internal Affairs and Professional Standards Division, reviewing or investigating the use of force, officer-involved shootings, and allegations of misconduct. As the interim and police chief, I classified administrative investigations and, when appropriate, took disciplinary actions, such as termination, demotion, or remedial training, against involved peace officers or professional staff.

**Opinion 1:**

Based on the circumstances, I believe that Deputy Alfred had reasonable suspicion to contact and detain Barber to determine if he had committed a crime, exonerate him, or provide other resources. His actions were objectively reasonable and consistent with statewide policing practices, department policy[6], and POST Learning Domain 15 (Laws of Arrest). A peace officer with equivalent training, experience, and knowledge would act similarly.

Deputy Alfred was assigned to assist Gallo and Cocchi, who had called the SBCSD requesting help after experiencing an unprovoked and unwanted contact with Barber (Barber was staying on and off with his children's mother, Granados, at 12013 White Avenue). Barber's aggressive actions (slapping Gallo and Cocchi's vehicle, attempting to open their locked car, and demanding that they provide transportation to an unknown apartment complex) may have violated California Penal Code section 594 (Vandalism). At the very least, Barber's actions were bizarre and threatening, scaring Gallo and Cocchi. At his sworn deposition, Barber testified that he injected methamphetamine before he confronted Gallo and Cocchi. Based on the totality of the circumstances and Barber's behavior, the couple was fearful and believed he (Barber) was possibly armed and under the influence.[7]

Based on the case material, Gallo had good reason to be concerned with Barber's unwanted behavior on April 27, 2021. Granados recently told Gallo that Barber assaulted her on April 16, 2021, and was arrested (just 11 days before threatening Gallo and Cocchi in their driveway at 12013White Avenue). Granados shared that Barber has been acting "odd" since his release.[8]

When Gallo called the SBCSD and requested assistance, she expressed concern not only for her safety but also for her husband's. The SBCSD 911 operator had no reason to doubt Gallo's veracity about her overview of the event on April 27, 2021. The operator assigned the call to Deputy Alfred, who responded. Once at the scene, Deputy Alfred interviewed Gallo and Cocchi near the intersection of White Avenue and Adelanto Road.[9]

---

[6] Deputy Alfred's deposition, August 26, 2025, p. 10.
[7] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Item 023, Interview of Joseph Cocchi; Item 024, Interview of Maria Gallo; Deputy Alfred's deposition, August 26, 2025, p. 31; Barber's deposition, September 9, 2025, p. 31 – 32, 36.
[8] Item 001, Crime report and summary, by Detective Hernandez; Item 023, Interview of Joseph Cocchi; Item 024, Interview of Maria Gallo.
[9] Deputy Alfred's deposition, Auguste 26, 2025, p. 32.

Upon his arrival, Deputy Alfred contacted Gallo and Cocchi in accordance with established statewide policing practices. He (Alfred) conducted a preliminary investigation to gather as much information as possible about Barber's behavior and actions. When Deputy Alfred concluded his interview, he walked onto the property at 12013 White Avenue, intending to contact Barber.

Barber unnecessarily escalated the event and enhanced Deputy Alfred's suspicion when he (Barber) failed to comply with any verbal commands. At his sworn deposition, Barber testified that he heard the "police" (Deputy Alfred) give him verbal orders not to enter his SUV; however, he (Barber) could not see where the orders were coming from, so he "jumped" in his car.[10]

Barber's actions violated California Penal Code Section 148(a)(1), a misdemeanor crime. In my experience, a reasonable person would follow the deputy's commands and then explain their perception of the events.[11]

**Opinion 2:**
Based on the circumstances, I believe that Deputy Alfred attempted to de-escalate his contact with BARBER by remaining professional and issuing clear and concise orders (effective communication). His actions were objectively reasonable and consistent with statewide policing practices, department policy, and POST Learning Domain 20 (Use of Force and De-escalation). A peace officer with equivalent training, experience, and knowledge would act similarly.

Deputy Alfred walked onto the long driveway at 12013 White Avenue and contacted Barber (approximately 70' south). Deputy Alfred issued several verbal commands demanding that Barber display his hands and walk backward to him (Alfred). Barber ignored the commands and yelled, "Back the fuck up" (Barber's statement was captured on Alfred's belt recorder). BARBER started to enter his vehicle, a 2003 black Chevrolet Trailblazer (CA License Plate 5AMC384), which was parked facing south. Deputy Alfred continued to issue verbal orders regarding Barber's actions; however, all the commands were ignored.[12]

Deputy Alfred attempted to de-escalate the event by issuing orders (to Barber) in a clear, concise, and professional manner. Initially, Deputy Alfred kept his duty pistol holstered, indicating that he was not anticipating a lethal encounter or attempting to intimidate Barber. In his sworn deposition, Deputy Alfred testified that he was standing about 10 feet behind Barber's SUV, his pistol holstered, and only holding a flashlight in his left hand.[13]

I did not see any evidence suggesting that Deputy Alfred used racial words or treated Barber poorly; however, he (Alfred) used explicit language to underscore some of his commands. Peace

---

[10] Barber's deposition, September 9, 2025, p. 35.
[11] I was a California peace officer for 38-years and investigated several calls involving unknown trouble or disputes.
[12] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Item 035, SBSCD Audio analysis of Deputy Alfred digital belt recording; Deputy Alfred's deposition, August 26, 2025, p. 39.
[13] Deputy Alfred's deposition, August 26, 2025, p. 36 – 37.

officers are trained to de-escalate situations; however, the subject of the contact (in this case, Barber) is expected to comply and cooperate.

In this case, Barber yelled (Back the fuck up) at Deputy Alfred.  Despite the profanity directed at him, Deputy Alfred restated his verbal orders and unholstered his pistol.  At his sworn deposition, Deputy Alfred testified that he did not initially point his pistol at Barber while Barber was standing near his SUV.[13] The verbal orders were intended to give Barber directions, and when the scene was static, he could explain the events of his contact with Gallo and Cocchi.

**Opinion 3:**
Based on the circumstances, I believe that Deputy Alfred had probable cause to use force to arrest Barber for violating California Penal Code section 245(a), a felony crime.  His actions were objectively reasonable and consistent with statewide policing practices, department policy, POST Learning Domain 20 (Use of Force and De-escalation), and California Penal Code section 835a.  A peace officer with equivalent training, experience, and knowledge would act similarly.

Deputy Alfred intended to contact Barber following his preliminary interview with Gallo and Cocchi.  He walked south on the long driveway at 12013 White Avenue, which leads to several dwellings.  Deputy Alfred saw Barber near a black Chevrolet Trailblazer and ordered him to display his hands and not to enter the SUV.  Barber ignored the commands and entered the vehicle.  Barber sat in the driver's seat, and Deputy Alfred stood about 10 feet behind the SUV.[14]

Deputy Alfred continued issuing verbal commands; however, Barber ignored them.  Deputy Alfred was about 12 feet north of the Trailblazer when Barber started the engine.  Deputy Alfred reported seeing "back-up lights" and saw the SUV accelerate in reverse. Based on the rapidly evolving event and the circumstances, Deputy Alfred believed Barber intended to assault him with the SUV.[15]

Deputy Alfred feared imminent death or serious injury and fired about six rounds from his service pistol. He was positioned on the driveway, closer to the driver's side of Barbar's vehicle, when he shot through the open rear hatch of the SUV as it moved toward him in reverse. One of the rounds struck Barber, and the SUV became wedged against the west portion of the apartment wall, preventing it from moving further in reverse. In his sworn deposition, Deputy Alfred testified that all six shots were fired within about 2 to 4 seconds.

In my opinion, the force used by Deputy Alfred was objectively reasonable and the only viable tactic at the time of the attempted felony assault.  Based on the case material I reviewed, there was no cover or concealment available that could shield Deputy Alfred from death or serious injury (Alfred was standing in the driveway when Barber's vehicle drove toward him in reverse).

Additionally, there was no viable escape route that Deputy Alfred could have used.  In his sworn deposition, Deputy Alfred testified that "there was no proper avenue to retreat to."  Deputy

---

[14] Item 001, Crime report and summary, by Detective Hernandez; Item 002, Crime report, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 35.
[15] Item 001, Crime report and summary, by Detective Hernandez; Deputy Alfred's deposition, August 26, 2025, p. 43.

Alfred also testified that one of the deputies arriving at the scene (after the shooting) placed Barber's vehicle in park (from reverse). The gear position (reverse) was consistent with Deputy Alfred's observations (Barber was driving his SUV in reverse toward Alfred at the time of the shooting).[16]

In the post-shooting review, the driveway was described as long and narrow. The driveway was constructed of gravel and dirt.[17] The east side of the drive was bordered by wrought iron and chain-link fencing, which varied in height (from five to six feet). A stucco wall of the apartment complex was on the west side of the driveway.[18]

The barriers on the east and west sides of the drive prevented Deputy Alfred from moving laterally to avoid Barber's vehicle. In his sworn deposition, Deputy Alfred testified that the chain-link fence was about 3 – 4 feet from his left shoulder (east) and the stucco wall of the apartment complex was about the same distance from his right shoulder (west). He also testified that after the officer-involved shooting, he again looked for cover or concealment options; however, they were not available.[19]

Even if Deputy Alfred could leap onto the fence along the driveway, he would not have been tall enough to clear Barber's SUV (according to Chevy specs, a 2003 Trailblazer is 191.8 inches long, 64.7 inches wide, and 72.5 inches tall).

Likewise, it would have been unsafe and futile to try to outrun Barber's SUV (by running north or south on the driveway). Deputy Alfered initially walked about 70 feet north along the driveway to contact Barber. When Barber ignored Deputy Alfred's commands, entered the Trailblazer, started the engine, and quickly accelerated in reverse, he endangered Deputy Alfred by creating a real, deadly threat. Considering the physical barriers (fencing) and the distance to the end of the driveway (either north or south), Deputy Alfred reasonably concluded he could not outrun Barber's vehicle.

The use of less lethal devices (hand or leg strikes, chemical spray, impact weapons, or Taser-CED) would be ineffective against this particular deadly threat. Barber's SUV protected him (significantly reducing the practical application of a less lethal device) while driving in reverse toward Deputy Alfred.

The personal less lethal tools carried by Deputy Alfred at the time of the attempted felony assault require him (Alfred) to be dangerously close to Barber. Additionally, the recommended application of the available less-lethal devices made their use impractical and would have further endangered Deputy Alfred if he had attempted to deploy them.

---

[16] Deputy Alfred's deposition, August 26, 2025, p. 17, 48, 53 – 54.
[17] Deputy Alfred's deposition, August 26, 2025, p. 18.
[18] Deputy Alfred's deposition, August 26, 2025, p. 17, 20.
[19] Deputy Alfred's deposition, August 26, 2025, p. 19 – 21, 45.

In my view, Barber possessed the Ability, Opportunity, and Apparent Intent to kill or seriously injure Deputy Alfred:

- Ability:  Despite verbal orders from Deputy Alfred, Barber entered his SUV (a Chevy Trailblazer), started the engine, and accelerated toward Deputy Alfred.  If Barber had complied with the verbal orders to display his hands and not enter the SUV, the use of force would have been eliminated.  Barber's actions unnecessarily escalated the event, which led to the use of deadly force by Deputy Alfred.

- Opportunity:  Based on the evidence in this case, Barber heard the verbal orders issued by Deputy Alfred.  In response to the verbal orders, Barber is heard yelling, "Back the fuck up" (as captured on Alfred's belt recorder).  If Barber had complied with the orders, the need for force would have been eliminated.

- Apparent Intent:  Despite orders from Deputy Alfred, Barber entered the SUV, started the engine, and placed the transmission in reverse.  Barber then accelerated quickly in reverse (causing the tires to lose traction) toward Deputy Alfred.  Barber's actions (entering the SUV, starting the engine, placing the transmission in reverse, and driving backward) all require deliberate thought and execution.  Barber could reasonably conclude that the weight, size, and speed of his SUV would cause death or serious bodily injury if he hit Deputy Alfred.  Barber's actions created a legitimate, deadly threat, placing Deputy Alfred in jeopardy.

Barber survived his gunshot injury and was arrested following his medical treatment and recovery.  Eventually, Barber's criminal case was heard by Superior Court Judge David Cohn.  Barber was convicted (245 (a)(1), a felony) and sentenced to state prison.[20]

**Opinion 4:**
In this case, the San Bernardino County Sheriff's Department's policies are consistent with the Statewide standards, procedures, and guidelines for law enforcement agencies.  Based on my evaluation of the material, the sheriff's department does not propagate, promote, maintain, or enforce policies that allowed for or caused the Plaintiff's injuries.

Furthermore, based on the material I reviewed, the sheriff's department is adequately trained, supervised, and managed the involved deputies.  Given the circumstances, the deputies' conduct was proper and thorough, and they followed their department's policies, guidelines, and procedures.

**Opinion 5:**
Based on the documents and materials in this case, I did not see any evidence suggesting that the defendant's actions, conduct, or training fell below the standard of care in the law or policies related to reasonable suspicion or probable cause for contact, detention, or arrest, or the use of force.  The defendants' conduct appeared objectively reasonable and compliant with the law

---

[20] Item 20023, Superior Court of California, County of San Bernardino, Portal Minute Order; Barber's deposition, September 9, 2025, p. 8, 15 – 16, 28 – 29.

enforcement training, policies, and procedures.

I, Phillip L. Sanchez, affirm that the expert opinions above are well-considered and solidly based on recognized police standards.

PHILLIP L. SANCHEZ

10-29-2025
DATE

# EXHIBIT B

# EXHIBIT B

## On-Scene Consulting

October 29, 2025

Ms. Renee Masongsong, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**STEFFON BARBER, an individual, Plaintiff,**
**vs.**
**COUNTY OF SAN BERNARDINO, a Municipal entity, and CHRISTOPHER ALFRED, Defendants.**
**Case No. 5:25-cv-00625-KK-DTB**

Dear Ms. Masongsong,

Thank-you for retaining me to analyze and render opinions regarding the April 27, 2021, Deputy-Involved Shooting of Mr. Steffon Barber by San Bernardino County Sheriff's Department, Deputy Sheriff Christopher Alfred, No. G9800.  Pursuant to the requirements of Rule 26, I have studied reports, videos, photographs, San Bernardino County Sheriff's Department documents, Transcription of Digitally Recorded Deposition, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.  Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.  It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Second Amended Complaint for Damages, <u>Case No. 5:22-cv-00625-KK-SHK</u>.

2. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, (<u>COSB 000947-956</u>).

3. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Officer E. Hernandez, E, G4629, (<u>COSB 000957-966</u>).

4, San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Crime Scene Report by Detective G. Navarro, (<u>COSB 000967-975</u>).

5. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Detective A. Collins, #H7540, (<u>211-215</u>).

6. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Detective J. Giles, #C9502, (<u>241-244</u>).

7. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, Report by Detective J. Giles, #C9502, (<u>219-223</u>).

8. San Bernardino County Sheriff's Department, Crime Report, DR No. 242100897/H2021-053, (<u>15-28</u>),(<u>29-32</u>), (<u>34-54</u>), (<u>55-56</u>), (<u>58-61</u>), (<u>62-151</u>), (<u>153-167</u>), (<u>180-181</u>), (<u>187-195</u>), (<u>207-208</u>), (<u>216-218</u>), (<u>224-231</u>), (<u>233-236</u>), (<u>238-239</u>), (<u>246</u>), (<u>454-465</u>), (<u>466-472</u>), (<u>473-478</u>),(<u>480</u>), (<u>505-518</u>), (<u>976-979</u>), (<u>COSB 000976-1023</u>), (<u>COSB 001032-1034</u>), (<u>COSB 001043-1055</u>), (<u>COSB 001057-1064</u>).

9. State of California Department of California Highway Patrol, Vehicle Report, (<u>197-198</u>).

10. Sheriff's Department, County of San Bernardino, California, 03600, <u>Case No. 242210897</u>, (<u>209-210</u>).

11. Sheriff's Department, County of San Bernardino, California 03600, Evidence/Property, (<u>453</u>).

On-Scene Consulting

12. Audio Analysis, San Bernardino County Sheriff's Department,
<u>DR#242100897/H#2021-053</u>.

13. <u>Audio-Recordings</u>:
- Neighbor Marisela Garcia, (<u>5:14</u>).
- R. Gilford, (<u>11:20</u>).
- R. Murphy, (<u>21:44</u>).
- D. Tellez, (<u>12:19</u>).
- Maria Gallo, (<u>30:13</u>).
- Monique Granados, (<u>1:26:36</u>).
- _ Severo, (<u>1:43</u>).
- _Jones, (<u>2:35</u>).
- Deputy Christopher Alfred, (<u>1:25:21</u>).
- Deputy Joseph Mora, (<u>1:06:50</u>).
- Monique Granados, (<u>4:03</u>).
- Deputy Torres, (<u>44:35</u>).
- Neighbor Angelica_(<u>16:04</u>).
- Blake Coley, (<u>43:05</u>).
- J. Cocchi, (<u>1:30:53</u>).

14. 911 Audio-Recording, (<u>4:19</u>).

15. Dispatch Audio-Recording, (<u>24:10</u>).

16. Audio-Recording, Deputy Alfred, "Shots Fired," (<u>13:17</u>).

17. Audio-Recording, Re: Incident, (<u>29:45</u>).

18. Audio-Recording, Officer Mora, (<u>12:26</u>).

19. Audio-Recording, Officer Morales, (<u>29:45</u>).

20. Audio-Recording, Officer Torres, (<u>6:18</u>).

21. Air-Med Transport Records, Account No. 0321012884A, (<u>PLTF ID 000896-908</u>).

22. Detailed History for Police, Incident No. AD211170085, (<u>199-206</u>).

On-Scene Consulting

23. San Bernardino County Sheriff's Department Manual, (<u>COSB 000001-946</u>).

24. Deputy Alfred Belt Recording, (<u>13:17</u>).

25. San Bernardino County Sheriff's Department, DR No. 242100897, Crime Report & Miscellaneous Documents, (<u>PLTF ID 001-288</u>).

26. Audio-Recording, Morales, LFE, 04/27/21, (<u>29:45</u>).

27. Photographs of Deputy C. Alfred, (<u>PLTF ID 000289-328</u>).

28.. Photographs, Barber, (<u>PLTF ID 000329-434</u>).

29. Photographs of Scene, (<u>PLTF ID 000435-659</u>).

30. San Bernardino County Sheriff's Department Lethal Force Encounter, <u>H#2021053/DR No. 242100897</u>.

31. Deposition Transcript and Exhibits of Christopher Alfred taken on August 26, 2025.

32. Deposition Transcript of Steffon Barber, taken on September 9, 2025.

33. Protective Order.

**<u>California POST Basic Learning Domains as Follows:</u>**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #22: "Vehicle Pullovers."
7. #21: "Patrol Techniques."
8. #23: "Crimes in Progress."
9. #33: "Arrest and Control."
10. #35: "Firearms/Chemical Agents."
11. #37: "People with Disabilities."

On-Scene Consulting

## Summary

Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for Deputy Sheriff Christopher Alfred to shoot at Mr. Barber for fleeing or attempting to flee.  Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.

Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the infliction of serious bodily harm or death, (2) the officer has probable cause to believe that that person will cause death or serious bodily injury to another person unless immediately apprehended, (3) the officer has probable cause to believe that the use of deadly force is reasonably necessary, and (4) the officer gives some warning that deadly force may be used, where feasible.  (*POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a; San Bernardino County Sheriff's Department Manual 3.608, The Use of Lethal Force*).

These four factors were not met in this case.  Mr. Barber did not inflict or threaten to inflict death or serious bodily injury against anyone at any point relative to this incident; Mr. Barber did not have a firearm, and Mr. Barber posed no immediate threat of death or serious bodily injury necessitating deadly force.

Deputy Sheriff Christopher Alfred violated basic police officer training and standards with respect to the use of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a vehicle.  A reasonable officer acting consistent with standard police practices would not have used lethal force in this situation.  Mr. Barber did not pose an immediate threat of death or serious bodily injury to Sheriff's Deputy Christopher Alfred or to any other person at the time of the shots. At the time of the shooting, it was not the case that any person was about to be run over by the vehicle with no opportunity to get out of the way.

## Opinions:

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  I hold the opinions below a reasonable degree of professional certainty.  The basis and reasons for my opinions are premised upon my education,

On-Scene Consulting

training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my comprehensive review of materials listed on <u>Pages 2-4</u> of this report. My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

## <u>Opinion Number 1</u>

It is my opinion based on my review of the facts, testimony, totality of the circumstances and videos in this matter, a reasonable law enforcement officer acting consistent with standard police practices <u>would have</u> moved to a position of cover and formulated a tactical plan. Based on my review of the facts in this matter, Deputy Sheriff Christopher Alfred, <u>No. G9800,</u> had the requisite time and opportunity to move to a position of cover and wait for additional San Bernardino County Sheriff's Department Deputy Sheriffs to arrive. In the event Mr. Steffon Barber left the scene in his vehicle, Deputy Sheriff Christopher Alfred could simply take a report from the Person Reporting, (<u>PR</u>). If the investigation revealed that Mr. Steffon Barber committed a crime that necessitated a detention, Deputy Sheriff Christopher Alfred could request assistance of San Bernardino County Sheriff's Department Police Helicopter (<u>40 King</u>) to assist with containment and formulated an effective and safe tactical plan.

In the event Mr. Steffon Barber did not flee in his vehicle or fled on foot, Deputy Sheriff Christopher Alfred could have established a perimeter if there was Reasonable Suspicion to detain Mr. Steffon Barber or Probable Cause to arrest Mr. Steffon Barber.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-8)</u>:

**<u>First Unit at the Scene:</u>** The first unit to arrive at the scene should take on the role of the primary unit. That officer should take the leadership responsibility to gather as much information as is reasonably possible regarding the current status of the crime scene. It is the primary officer who must take charge and initiate the appropriate steps toward controlling the situation.

<u>The first officer to arrive should</u>:

- Take a position to best observe and control the scene.

On-Scene Consulting

- Advise dispatch and responding units of the arrival and location.
- Identification and location of reporting person.
- Interview of reporting person to determine if a crime occurred.
- Number of suspects and suspect(s) description.
- The type of weapon(s) involved.
- The number of persons injured by the suspect.
- Actions (propensity toward violence).
- Suspects current and prior mental health issues.
- Suspects current and prior medical issues.
- Other emergency vehicles responding to the scene.
- ***Communicate and coordinate with the other officers to establish perimeters to contain the suspect and prevent escape.***
- ***Request additional resources if necessary and available, (e.g., supervisor, additional units, canine unit, police helicopter).***

The Aviation Unit is one of the most technologically advanced and efficient law enforcement tools. The aircraft and their equipment are a "force multiplier" for law enforcement. One helicopter in the air can cover as much territory (more quickly) as 12 officers in patrol cars on the ground. The primary function continues to be that of support for ground units.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-10):

**Establishment of a Perimeter:**

It is the responsibility of the primary officer to initiate the coordination of the security and containment of the crime scene. This can be done by establishing a boundary or perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.

Establishing a perimeter:
- Contains and isolates the crime scene.
- Prevents the suspect(s) from escaping the area.
- It prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(s).

On-Scene Consulting

There are two types of perimeters at a crime scene: **inner perimeter** and **outer perimeter**:

**Inner Perimeter**:
- Immediate area around the incident (e.g., private residence, commercial establishment, vehicle, etc.)
- Varying size depending on the purpose of the perimeter.

**Outer Perimeter:**
- Area surrounding the inner perimeter.
- May aid in apprehension if the suspect manages to breech the inner perimeter.

In addition, I base my opinion on my twenty-eight years of law enforcement experience as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of perimeters throughout all geographical patrol divisions to assist with containment, perimeter tactics and K9 searches. In addition, most of the K9 searches involved the assistance of an Air Unit(s).

In addition, it is my opinion based on my review of the facts, totality of the circumstances, testimony and videos in this matter, Deputy Sheriff Christopher Alfred's actions of remaining in the driveway without any cover or concealment was a poor tactical decision and unnecessarily escalated the situation. Deputy Sheriff Christopher Alfred failed to use Time and Distance.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided. Effective communication may enable a Police Officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- It can result in a reduction of injuries.
- Renders more effective public service and improves community relations.

## On-Scene Consulting

- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

De-Escalation is a concept that involves an officer's use of time, distance and relative positioning in combination with Professional Communication Skills to attempt to stabilize a situation and reduce the immediacy of threat posed by an individual.

The tactical plan should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Conducted Energy Weapon, (CEW), Taser with an effective range of 7-15 feet and maximum range of 21-25 feet, Ballistic Shield, K9, Pepper Ball Round, 40MM Foam Baton Round and or Direct Impact CS Round, ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 10-15 feet., or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round. The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blended and filled with #9 shot. The design utilizes four stabilizing tails and smokeless powder as the propellant. The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet which could have effectively been deployed from a position of cover.

In addition, I base my opinion on POST Learning Domain 21, "Officers must approach every contact with officer safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**Cover**:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received (firearm, shotgun, rifle).

**Examples of Cover:**
- Cement block or brick walls.

On-Scene Consulting

- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, I base my opinion on <u>California Police Officer Standards and Training
(POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific
Crimes in Progress, 3-5:</u>

**<u>Establish a Contact Officer and Cover Officers:</u>**

**<u>Contact Officer:</u>**
The roles and responsibilities of each officer involved in a high-risk vehicle pullover
must be clear.  The **<u>Contact Officer:</u>**
- Conducts the business of the pullover,
- Directs the driver and occupants(<u>s</u>) of the target vehicle,
- Takes necessary actions related to the investigation.

**<u>Cover Officers:</u>**
<u>It is general responsibility of any cover officers to assist the primary officer at the scene
of a high-risk vehicle pullover to</u>:
- Protect the primary officer who is conducting the business of the pullover,
- Take and maintain proper positions of cover and concealment,
- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

**<u>Communications Between Officers:</u>**
In order to ensure officer safety and help ensure an appropriate outcome, the primary
officers and cover officers must effectively communicate with one another.  Appropriate
communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.


In addition, I base my opinion on my twenty-eight years of law enforcement experience
where I responded to thousands of calls for service and have effectively utilized defusing
techniques, de-escalation techniques, verbal strategies, and active listening skills to

On-Scene Consulting

reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 2**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Steffon Barber that he was going to fire his service weapon.  The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible*…"  Based upon my review of the facts in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred, No. G9800, did not give a verbal warning to Mr. Steffon Barber that deadly force would be used and did not give Mr. Steffon Barber a reasonable opportunity to comply prior to firing his Glock, Model 21, .45 caliber, semi-automatic pistol unnecessarily shooting Mr. Steffon Barber.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department

On-Scene Consulting

Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

### **Opinion Number 3**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices <u>would not</u> have used lethal force in this situation. This was not an immediate defense of life situation, and, as explained further below, under the facts of this case, San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred, <u>No. G9800,</u> could not shoot Mr. Steffon Barber for fleeing.

In addition, it is my opinion that "Shooting at or from Moving Vehicles," which are shots fired at or from a moving vehicle, are rarely effective. Deputy Sheriffs should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. A Deputy Sheriff should only discharge a firearm at a motor vehicle or its occupants when the Deputy Sheriff reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others. Deputy Sheriffs should not shoot at any part of the vehicle in an attempt to disable the vehicle. "Shooting at or From Moving Vehicles" has shown to be a poor tactic in most scenarios. If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle.

It is my opinion that Deputy Sheriff Christopher Alfred, <u>No. G9800,</u> <u>should not</u> have used lethal force in this matter. This was not an immediate defense of life situation, including for the following reasons:
- Deputy Sheriff Christopher Alfred did not have any information that Mr. Barber was part of a gang. (*Deposition Transcript of Christopher Alfred, Page 32*).
- Deputy Sheriff Christopher Alfred did not have any information that Mr. Barber had any criminal convictions or had injured anyone prior to shooting him. (*Deposition Transcript of Christopher Alfred, Page 30*).
- Steffon Barber was committing no crime when Deputy Sheriff Christopher Alfred first approached him.
- Deputy Sheriff Christopher Alfred never saw a gun on Mr. Barber, nor did any citizen. Deputy Sheriff Christopher Alfred had no corroborated information that Mr. Barber had a gun, and in Deputy Sheriff Christopher Alfred's experience, a reporting party might report that a person has a gun in order to expedite law enforcement response. (*Deposition Transcript of Christopher Alfred*).

On-Scene Consulting

- Deputy Sheriff Christopher Alfred knew that Mr. Barber was in his own driveway. *(Deposition Transcript of Christopher Alfred, Page 32)*.
- Prior to firing his shots, Deputy Sheriff Christopher Alfred formed the impression that Mr. Barber's vehicle was on and that Mr. Barber wanted to leave, and he saw the reverse lights come on. (*Deposition Transcript of Christopher Alfred, Pages 40, 74)*.
- Deputy Sheriff Christopher Alfred knew that the only way to leave the driveway was to reverse out. (*Deposition Transcript of Christopher Alfred, Pages 49-50)*.
- Deputy Sheriff Christopher Alfred was not struck by any gravel or dirt from the tires prior to the shooting. (*Deposition Transcript of Christpher Alfred, Page 68)*.
- The driveway width was approximately 15 feet and 7 inches, *(San Bernardino County Sheriff's Department Crime Report, Scene Description, PLTFID000274)*, and at the time of the shooting, Deputy Sheriff Christopher Alfred had approximately two to four feet between the left side of his body and the chain link fence to his left. (*Deposition Transcript of Christopher Alfred, Pages 19-20; photographs of the scene*).
- When Mr. Barber's vehicle moved backwards, it moved backwards approximately 16.9 feet, moving slowly in a straight line. *(Photographs and diagrams of the scene; investigative reports; belt recording; Deposition Transcript of Christopher Alfred, Pages 61-62)*.
- Deputy Sheriff Christopher Alfred was not struck by Mr. Barber's vehicle. (*Deposition Transcript of Christopher Alfred, Page 48)*.
- Deputy Sheriff Christopher Alfred never had to dive out of the way of Mr. Barber's vehicle. (*Deposition Transcript of Christopher Alfred, Page 48)*.
- Deputy Sheriff Christopher Alfred was the starting point guard of his high school basketball team. (*Deposition Transcript of Christopher Alfred, Page 22)*.

From the standpoint of police practices, including basic police training, POST standards, and the County of San Bernardino's own policies, Deputy Sheriff Christopher Alfred's use of deadly force was improper, inappropriate, contrary to basic police training and POST standards, excessive, and unreasonable, including (but not limited to) for the following reasons:

- No Immediate Defense of Life Situation.  Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury.  A fear of future harm is not enough.  There was no immediate defense of life situation when Deputy Sheriff Christopher Alfred fired his shots.  No person was about to be

On-Scene Consulting

run over by Mr. Steffon Barber's vehicle at the time of the shots.

- <u>Subjective fear is insufficient</u>.  Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger."  In this case, the record does not support any objectively reasonable explanation that Mr. Steffon Barber posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired. Mr. Barber was unarmed, and no person was about to be struck by Mr. Barber's vehicle.

- <u>Violation of basic police training.</u>  Deputy Sheriff Christopher Alfred violated police training and standards surrounding shooting at vehicles and their driver when he shot Mr. Steffon Barber while Mr. Barber occupied the driver seat of a vehicle. There was no person about to be struck by Mr. Barber's vehicle when Deputy Alfred fired his shots. Therefore, there was no reason for Sheriff's Deputy Christopher Alfred to shoot.

- <u>No crime involving the infliction of serious injury or death.</u>  Deputy Sheriff Christopher Alfred was not responding to a crime involving the infliction of death or serious bodily injury.  Deputy Sheriff Christopher Alfred had no information that Mr. Barber was armed and no information that anyone had been injured.

- <u>Cannot shoot for fleeing</u>. As explained herein, Deputy Sheriff Christopher Alfred could not justify shooting Mr. Steffon Barber under a Fleeing Felon theory, including because Mr. Barber was unarmed, and Deputy Alfred had no information that Mr. Barber had killed or injured anyone prior to the shooting.

- <u>Unarmed</u>.  Based on my review of the facts in this matter, at no time did Deputy Sheriff Christopher Alfred or any citizen observe Mr. Steffon Barber in possession of a firearm or any other weapon at the time of the shooting.

- <u>No verbal threats</u>.  Mr. Barber never verbally threatened to harm Deputy Sheriff Christopher Alfred.

- <u>Reasonable alternative measures available</u>.  Officers are trained that they can only use deadly force in a "last resort" situation.  Deputy Sheriff Christopher Alfred had other reasonable measures available, including moving out of the way, waiting for backup, giving further commands, and setting up a perimeter for later apprehension.

- <u>No reverence for human life</u>.  Police officers are trained that they must show a reverence for human life.  Deputy Sheriff Christopher Alfred showed no reverence for human life when he fired at Mr. Steffon Barber.

- <u>Police officers are responsible for justifying every shot</u>.  Police officers are trained that they must justify every shot they fire.  Deputy Sheriff Christopher Alfred is responsible for every shot that he fired in this case, and all six of his shots were unjustified.

On-Scene Consulting

In addition, it is my opinion that even if the incident occurred as described by Deputy
Sheriff Christopher Alfred, the use of deadly force would still not be appropriate in this
incident as the movement would not have created an Immediate Defense of Life (IDOL)
situation.

Lastly, I base my opinion on my twenty- eight- year law enforcement career where, as a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 4

It is my opinion that San Bernardino County Sheriff's Department Deputy Sheriff
Christopher Alfred's use of lethal force violated police training and caused serious bodily
injury to Mr. Steffon Barber, including but not limited to for the following reasons:

In addition, it is my opinion based on the facts and testimony in this matter, Department
Deputy Sheriff Christopher Alfred violated basic police training with respect to shooting
at vehicles and their drivers.

San Bernardino County Sheriff's Department Manual, Policy 3.608, The Use of Lethal
Force,(COSB 000673-675),  states as follows:

> Firearms should not be discharged from or at a moving vehicle except in
> exigent circumstances. In these situations, a safety member must have
> articulable reason(s) for this use of lethal force, which include, but are not
> limited to the following: [1] A person in the vehicle is threatening the safety
> member or another person with lethal force by means other than the vehicle;
> or [2] The vehicle is operated in a manner which is likely to result in great
> bodily injury or death to a safety member or another person, and other
> reasonable means of defense have been exhausted, or are not available or
> practical. This may include, if time and circumstances allow moving out of
> the path of the vehicle.

Deputy Sheriffs are expected to follow their own department policies.

Deputy Sheriff Christopher Alfred's understanding of the policy in effect at the time of
the incident was that deputies should get out of the path of a moving vehicle, rather than
shooting at it, if feasible. (*Deposition Transcript of Christopher Alfred, Pages 11, 13,*

_48_). Deputy Sheriff Christopher Alfred had been trained, at the time of the incident, not
to tactically position himself in a bad spot, with respect to moving vehicles. (_Deposition
Transcript of Christopher Alfred, page 11_).

In addition to the San Bernardino County Sheriff's Department Manual, basic police
officer training teaches that shooting at a moving vehicle has shown to be a poor tactic in
most scenarios.  If a driver is wounded or killed when operating a motor vehicle, it
prevents their ability to effectively operate a motor vehicle.  Additionally, an assaultive
motor vehicle does not presumptively justify the use of deadly force.

Under the facts of this case and pursuant to police standards and training, it would have
been inappropriate for  Deputy Sheriff Christopher Alfred to shoot at Mr. Barber for
fleeing or attempting to flee.  Police officers are trained that a police officer cannot justify
shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave
the area.
Police officers are trained that they can only shoot a fleeing felon where all of the
following factors are present: (_1_) the person threatens the officer with a weapon or the
officer has information that the person has committed a felony involving the infliction of
serious bodily harm or death, (_2_) the officer has probable cause to believe that that the
person will cause death or serious bodily injury to another person unless immediately
apprehended, (_3_) the officer has probable cause to believe that the use of deadly force is
reasonably necessary, and (_4_) the officer gives some warning that deadly force may be
used, where feasible. (_POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal.
Penal Code 835a; San Bernardino County Sheriff's Department Manual 3.608, The Use
of Lethal Force_).

**These four factors were not met in this case**.  Mr. Barber did not inflict or threaten to
inflict death or serious bodily injury against anyone at any point relative to this incident;
Mr. Barber did not have a firearm, and Mr. Barber posed no immediate threat of death or
serious bodily injury necessitating deadly force.

Deputy Alfred _violated_ basic police officer training and standards with respect to the use
of deadly force when he shot Mr. Barber while Mr. Barber occupied the driver seat of a
vehicle.  A reasonable officer acting consistent with standard police practices would not
have used lethal force in this situation.  Mr. Barber did not pose an immediate threat of
death or serious bodily injury to Deputy Sheriff Christopher Alfred or to any other person
at the time of the shots. At the time of the shooting, it was not the case that any person
was about to be run over by the vehicle with no opportunity to get out of the way.

On-Scene Consulting

Lastly I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 5

It is my opinion that under the facts of this case, that San Bernardino County Sheriff's Department Deputy Sheriff Christopher Alfred could not shoot Mr. Steffon Barber under a Fleeing Felon theory as described above, especially because Mr. Steffon Barber never inflicted death or serious bodily injury on anyone prior to the shooting.

In addition, it is my opinion based on the facts and testimony in this matter, Department Deputy Sheriff Christopher Alfred violated San Bernardino County Sheriff's Department Manual, Policy 3.608, The Use of Lethal Force,(COSB 000673-674): A safety member shall not fire at a person who is called upon to halt on mere suspicion and who simply runs away to avoid arrest.

## Considerations Regarding the Use of Deadly Force

The use of deadly force is the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.  Reverence for life is the foundation on which deadly force rests.  Deadly force is always the last resort used in the direst of circumstances.  The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy, and the use of force must meet an *"Objectively Reasonable"* standard.  The following quotes from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner,"(Learning Domain #20; "Introduction to the Use of Force," Pages 1-4).

On-Scene Consulting

Further, POST teaches in the basic curriculum regarding the legislative and community
expectations regarding their powers of arrest and use of force by POST certified police
officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so not come from the rule of an authoritarian dictator.  Rather it
comes from the will and consent of the people who *put their trust in law enforcement to
use that power with the utmost care and restraint.  This is why it is important to
emphasize that peace officers do with the utmost care and restraint, *not confer "police
powers" on themselves*.  These powers come to the criminal justice system from the
people they serve.  (Learning Domain #2: "Criminal Justice System," page s 1-4,
Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the
"Consequences of Unreasonable Force."

"**Unreasonable force** occurs when the type, degree and duration of force employed was
not necessary or appropriate." Also, POST specifies that there are a number of key
factors that can affect which force option is approved and appropriate under the concept
of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be
only justified on the basis of an "objectively reasonable" standard.  In other words, per
the POST requirements, officers are not justified in any use of force based upon
"subjective" fear.  The requirements are taught in detail throughout the POST Basic
Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear
or mechanism that is necessary for officer safety based on actual perceived
circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind
with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5,
Emphasis added).  Officers are also taught that POST requires that any use of deadly
force must be based on an "objective" rather than "subjective" "reasonable necessity" of
action to "imminent danger." (Learning Domain #20, Chapter 3).

On-Scene Consulting

A great deal of emphasis is placed on tried and proved tactics at the POST Basic
Academy with the strong message in almost every germane training domain that
incompetent tactics will invariably lead to unnecessary injury and/or death.

Per California Penal Code Section 835a(e)(2): "A threat of death or serious bodily injury
is "imminent" when, based on the totality of the circumstances, a reasonable officer in the
same situation would believe that a person has the present ability, opportunity, and apparent
intent to immediately cause death or serious bodily injury to the peace officer or another
person.  An imminent harm is not merely a fear of future harm, no matter how great the
fear and no matter how great the likelihood of the harm, but is one that, from appearances,
must be instantly confronted and addressed."

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.


**Opinion Number 6**

It is my opinion that there was a gross lack of situational awareness and fundamental
tactical errors in this incident.  It is also my opinion that there was a departure of from
POST Standards Use of Force and Use of Deadly Force Training. In addition, I base my
opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013
Cal LEXIS 6652.  In Hayes, the California Supreme Court found that, under California
negligence law, an officer's pre-shooting conduct leading up to a deadly us of force may
affect whether a use of force is ultimately reasonable and therefore may be considered in
the analysis of any use of deadly force.  This includes but is not limited to the following:

Deputy Sheriff Christopher Alfred failed to identify himself as a police officer prior to
shooting. (*Deposition Transcript of Christopher Alfred, Page 38*). Deputy Sheriff
Christopher Alfred failed to request a back-up before attempting to make contact with
Mr. Barber. (*Deposition Transcript of Christopher Alfred, Page 33*), and a reasonable
officer under these facts would have waited for additional San Bernardino County
Sheriff's Department Sheriff's Deputies to assist with containment and tactical
deployment to take Mr. Barber into custody. (*POST LD 23, Chapter 2: Basic Tactical
Considerations Approach, Pages 2-8*). Deputy Sheriff Christopher Alfred exercised poor
tactics when he: placed himself in a position behind the vehicle, did not step out of the
way after Mr. Barber entered the vehicle, did not step out of the way when he saw the
reverse lights come on the vehicle, and did not step out of the path of the vehicle to make

On-Scene Consulting

sure he would not be in the path of the vehicle. (*Deposition Transcript of Christopher Alfred, Pages 40-41*).

## Opinion Number 7

It is my opinion based on my review of the facts and videos in this matter that Deputy Sheriff Christopher Alfred, No. G9800, failed to initially determine that Mr. Steffon Barber was mentally ill and or experiencing a mental crisis.  Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Steffon Barber who might be suffering from a mental illness and or experiencing a mental crisis.  Deputy Sheriff Christopher Alfred had information from the reporting party regarding Mr. Barber's behaviors that would indicate that he may have been mentally ill or experiencing a mental health crisis.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided.  It is my opinion that Deputy Sheriff Christopher Alfred, No. G9800, failed to create Time and Distance to de-escalate the situation. Effective communication may enable a Police Officer to gain cooperation and voluntary compliance in stressful situations.

In addition, law enforcement officers should be taught the below listed De-escalation Techniques:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (voices).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

On-Scene Consulting

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety.  Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

It is my expert opinion that a similarly trained San Bernardino County Sheriff's Department Deputy Sheriff would not have considered Mr. Steffon Barber to be a lethal threat in this set of facts.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.


**Opinion Number 8**

It is my opinion based on my review of the facts, videos and totality of the circumstances, the San Bernardino County Sheriff's Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used by Deputy Sheriff Christopher Alfred in this matter was inappropriate, unreasonable, and excessive.  It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident.  It is also my opinion that there was a failure by the San Bernardino County Sheriff's Department to properly train Deputy Sheriff Christopher Alfred on following subject matters: Verbal Strategies, Defusing and De-Escalation Techniques, Use of Cover and Contact Officers, Situational Awareness and the use of Less Lethal/Lethal/Deadly Force to include Shooting Into Moving Vehicles.  In addition, the San Bernardino County Sheriff's Department ratified the conduct of Deputy Sheriff Christopher Alfred by determining that his conduct was within policy and for failing to properly train them prior to this incident. These types of decisions tend to have a ripple effect in the Department because other Officers believe that they can engage in similar conduct without consequences.

On-Scene Consulting

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

On-Scene Consulting

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

On-Scene Consulting

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised
ten undercover officers and four uniformed officers. I provided all facets of training to
the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates,
Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics
Training, Undercover Operations training, Surveillance training, and any other training
deemed necessary by my Area Commanding Officer. I conducted audits, personnel
investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart
Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central
and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant
II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the
entire Department covering all Patrol Divisions and Specialized Units. I provided all
facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant
services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force
Options, Department Directives, Training Bulletins, and other training dictated by the
Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-
service training, Watch Commander School, Field Training Officer (FTO) School, and
Basic Detective School. While at K9, I investigated and completed K9 contacts,
personnel complaints, and Use of Force Investigations. In addition, I directed and was
directly involved in Use of Force incidents. I received the LAPD Medal of Valor and
LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I
directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT
training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun,
Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In
addition, I facilitated and conducted training in the following training Cadres: Breacher
(Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention,
Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support
Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions
and High-Risk Search Warrant Services to include all facets (preparation, briefing,
deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation
Team. I provided on-going crisis negotiation training, mental health training,

On-Scene Consulting

de-briefs, 40-hour POST Certified CNT School, and suicide prevention training.  I
worked in conjunctional with the mental health community to provide and facilitate
training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science
Services Section (BSS), and the Didi Hirsch Suicide Prevention Training.  In addition, I
assisted the West Point Military Academy with the development of their crisis
negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to
Mumbai India with Counterterrorism following the terrorist attack in November 2008.  I
taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical
Police Officers.  Upon my return, I assisted with the development of multiple
venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service
to pursue an opportunity in the private sector. I held supervisory positions for the last 14
years of my career.  During my tenure with the LAPD, I received over 100
Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at
Caruso Affiliated in Los Angeles, CA.  My responsibilities included: Identified and
conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments,
projected developments/investments, and residences.  Utilized strategic-level analysis
from the intelligence community, law enforcement and the private sector.  Ensured a
coordinated ability to identify and monitor potential or actual incidents among critical
infrastructure domains and all personal and professional interests of Caruso Affiliated.
Mitigated expected threats.  Utilized preplanned, coordinated actions in response to
infrastructure warnings or incidents.  Responded to hostilities.  Identified and eliminated
the cause, or source, of an infrastructure event by the utilization of emergency response
measures to include on-site security personnel, local law enforcement, medical and fire
rescue and relevant investigative agencies.  Conducted all facets of security training for
the company and employees.  Formulated Business Continuity and CEO Succession Plans
for the company and all affiliated business interests.  Conducted ongoing audits and
internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's
Department where I conducted all facets of patrol service to include calls for service, self-
initiated field activity, arrests, citations, and court testimony. In addition, during my tenure
with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention

On-Scene Consulting

Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies. Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal

## On-Scene Consulting

Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe