UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | **EDCV 22-00625-KK-DTBx** | | Date: | December 22, 2025 |
| Title: | ***Steffon Barber v. County of San Bernardino et al.*** | | | |

Present: The Honorable    KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Dominique Carr | Not Reported |
| Deputy Clerk | Court Reporter |

| | |
|---|---|
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings:    (In Chambers) Order DENYING Defendants' Motion for Summary Judgment [Dkt. 97]**

## I.
## INTRODUCTION

On June 17, 2025, plaintiff Steffon Barber ("Plaintiff") filed the operative Second Amended Complaint ("SAC") against defendants County of San Bernardino ("County") and Christopher Alfred ("Deputy Alfred") (together, "Defendants"). ECF Docket No. ("Dkt.") 72, SAC. Plaintiff brings claims, pursuant to 42 U.S.C. § 1983 ("Section 1983") and state law, stemming from an incident on April 27, 2021, when Deputy Alfred shot at Plaintiff and his vehicle. Id. On October 9, 2025, Defendants filed the instant Motion for Summary Judgment ("Motion") as to all claims. Dkt. 97, Motion ("Mot.").

The Court finds this matter appropriate for resolution without oral argument. See Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. For the reasons set forth below, Defendants' Motion is **DENIED**.

///

///

///

///

# II.
# BACKGROUND

## A.    FEDERAL CIVIL PROCEEDINGS

Plaintiff commenced this action on April 12, 2022, and filed the operative SAC against Defendants on June 17, 2025.  Dkt. 1; SAC.  Plaintiff raises the following causes of action as a result of the April 27, 2021 incident:

> **First Cause of Action:** Excessive Force, pursuant to Section 1983, against Deputy Alfred;
>
> **Second Cause of Action:** Unconstitutional Policy, Practice, or Custom, pursuant to Section 1983, against defendant County;
>
> **Third Cause of Action:** Battery, pursuant to section 43 of the California Civil Code and sections 815.2(a) and 820(a) of the California Government Code, against Defendants;
>
> **Fourth Cause of Action:** Negligence, pursuant to sections 815.2(a) and 820(a) of the California Government Code, against Defendants;
>
> **Fifth Cause of Action:** Violation of the Bane Act, pursuant to section 52.1 of the California Civil Code, against Defendants; and
>
> **Sixth Cause of Action:** Intentional Infliction of Emotional Distress, against Defendants.

SAC ¶¶ 24-116.

On October 9, 2025, Defendants filed the instant Motion, arguing they are entitled to judgment as a matter of law on all causes of action.  Mot. at 9-10.  In support of the Motion, Defendants filed a statement of undisputed material facts, partial deposition transcripts of Plaintiff and Deputy Alfred, and several exhibits relevant to Plaintiff's state criminal prosecution.[1]  See Dkt. 97-1, Deposition of Christopher Alfred ("Defs.' Alfred Dep."); Dkts. 97-2 to -3; Dkt. 97-4, Deposition of Steffon Barber ("Defs.' Barber Dep."); Dkts. 97-5 to -7; Dkt. 97-8, Jury Instructions Transcript ("Jury Instrs. Tr."); Dkt. 97-9; Dkt. 98.  Defendants also submitted audio of the 911 call, Deputy Alfred's belt recording, and radio dispatch communications.  See Dkt. 100, ¶ 1, Ex. B ("911 Audio"); id. ¶ 2, Ex. C ("Alfred Audio"); id. ¶ 3, Ex. E ("Dispatch Audio").

On October 23, 2025, Plaintiff filed an Opposition to the Motion.  Dkt. 101, Opposition ("Opp.").  In support of the Opposition, Plaintiff filed a responsive statement of undisputed material facts and declarations by expert witnesses Robert Morales ("Morales") and Scott DeFoe.

---

[1] Defendants request judicial notice of the several state court documents submitted in support of the Motion.  See Dkt. 99.  A court may take judicial notice of "matters of public record."  Flaxman v. Ferguson, 151 F.4th 1178, 1184 n.1 (9th Cir. 2025) (citing Fed. R. Evid. 201).  Accordingly, the Request for Judicial Notice is **GRANTED**.

Dkt. 101-1; Dkt. 101-2, Declaration of Morales ("Morales Decl."); Dkt. 101-3. Plaintiff also filed a declaration from counsel Renee V. Masongsong, attaching two verdicts from other excessive force cases involving defendant County and partial deposition transcripts of Plaintiff and Deputy Alfred. Dkt. 101-5, Deposition of Christopher Alfred ("Pl.'s Alfred Dep."); Dkt. 101-6, Deposition of Steffon Barber ("Pl.'s Barber Dep."); Dkts. 101-7 to -8.

On October 30, 2025, Defendants filed a Reply and a response to Plaintiff's responsive statement of undisputed material facts. Dkt. 102, Reply; Dkt. 102-1 ("SUMF").

This matter, thus, stands submitted.

## B.    THE APRIL 27, 2021 INCIDENT

Unless noted otherwise, the following facts are undisputed.

On April 27, 2021, Plaintiff and his neighbors had a dispute regarding the use of their shared driveway on White Avenue. See Pl.'s Barber Dep. at 5:4-19. According to Plaintiff, an issue arose when his neighbors would not move their car out the driveway so he could drive to the store. See id. The driveway, made of dirt and gravel, stretched from White Avenue to Plaintiff's neighbors' house and then to Plaintiff's house. See SUMF ¶ 19; Defs.' Alfred Dep. at 56:4-7, 60, 62. The driveway's width varies from fifteen feet and seven inches to thirteen feet and eight inches, and is bordered to the east by a chain-link fence. SUMF ¶¶ 24, 76. To the west, a picket fence starts roughly sixty feet into the driveway, leaving an opening to the neighbors' backyard. See Defs.' Alfred Dep. at 56:7, 60.

At 11:12 p.m. that night, Plaintiff's neighbors called 911. SUMF ¶¶ 1-2. The neighbors advised dispatch Plaintiff had repeatedly asked them for a ride "somewhere" and tried opening their car doors while they attempted to park in the driveway. 911 Audio at 0:28-:39. They further advised Plaintiff was "going crazy" and would not let them go in their house. SUMF ¶ 2. Plaintiff eventually walked away to his car, a black Chevrolet Trailblazer ("Trailblazer"), where the neighbors claimed "he was taking things out of the vehicle." Id. ¶ 5; 911 Audio at 1:58-2:20. The neighbors also told dispatch they did not know if Plaintiff had a weapon, but believed Plaintiff was either high or intoxicated. SUMF ¶ 6; 911 Audio at 2:10-:15.

At 11:16 p.m., Deputy Alfred of the San Bernardino County Sheriff's Department responded to the dispatcher's call for service. Dkt. 97-2 at 1. Dispatch relayed to Deputy Alfred that Plaintiff tried "to open [his neighbor's] vehicle door" and was now "taking things out of his vehicle trunk." Dispatch Audio at 00:57-1:13. Dispatch also relayed codes "HBD" and "HS."[2] Id. at 2:08-:11.

---

[2] It appears the code "HBD" stands for "had been drinking," Kirby v. City of E. Wenatchee, No. CV-12-190-JLQ, 2013 WL 1497343, at *1 (E.D. Wash. Apr. 10, 2013), and "HS" is for "narcotics activity," Geiger v. Mossbrooks, No. SACV 19-2299-CAS-AGRx, 2021 WL 4822556, at *6 n.3 (C.D. Cal. Sep. 20, 2021), report and recommendation adopted, No. SACV 19-02299-CAS-AGRx, 2021 WL 4819706 (C.D. Cal. Oct. 15, 2021), aff'd, No. 21-56230, 2022 WL 10385677 (9th Cir. Oct. 18, 2022).

At 11:19 p.m., Deputy Alfred arrived at the scene alone, armed with a service gun, taser, baton, and OC spray. SUMF ¶¶ 12, 77. He first met Plaintiff's neighbors "[n]ear the intersection of White Avenue and Adelanto Road." Defs.' Alfred Dep. at 22:18-21. Upon arrival, the neighbors told Deputy Alfred Plaintiff threatened them and had slammed his hands on their car. SUMF ¶ 13. The neighbors also told Deputy Alfred Plaintiff might be armed but that they never saw a weapon. Alfred Audio at 01:38-:50. Deputy Alfred later testified this information was not "corroborated" and was something said "often to generate a fast law enforcement response." Pl.'s Alfred Dep. at 24:14-25. No one told Deputy Alfred Plaintiff had injured anyone, and at this point, Deputy Alfred did not call for backup. SUMF ¶¶ 70, 109.

At 11:21 p.m., Deputy Alfred walked to the driveway to speak with Plaintiff. See Dkt. 97-2 at 2; Alfred Audio at 1:12. The area had minimal lighting, and Deputy Alfred claims he used his flashlight to navigate "[t]he general area." Defs.' Alfred Dep. at 7:13-19, 28:11-13. Plaintiff testified he did not see a flashlight. Pl.'s Barber Dep. at 7:6-12.

Deputy Alfred first saw Plaintiff "[b]y [the] driver's side door" of his Trailblazer, which was "idling" with its trunk open and parked facing the end of the driveway. Defs.' Alfred Dep. at 10:19-21, 24:12-14, 41:19-21, 47:8-10. Deputy Alfred positioned himself "in line with the driver's side" of the Trailblazer, id. at 26:7-9, and exchanged the following words with Plaintiff:

> Deputy Alfred: Hey bud, come out here. Come over here. Let me see your hands.
> Plaintiff: Let me see your hands.
> Deputy Alfred: Let me see your hands.
> Plaintiff: Your fucking hands.
> Deputy Alfred: Let me see your hands.
> Plaintiff: Do like this and -- back the fuck up.

Alfred Belt Recording at 2:48-3:02. Deputy Alfred gave these commands without verbally identifying himself as a deputy, SUMF ¶ 110, and Plaintiff testified he thought one of his neighbors was talking to him, Pl.'s Barber Dep. at 5:16-19, 6:2-21. Deputy Alfred can be heard walking during this period. Alfred Audio at 2:54-3:02.

Plaintiff walked closer to his driver's side door, and Deputy Alfred reported to dispatch that Plaintiff "was not complying verbally." Id. at 3:04-:08. He then commanded Plaintiff not to "go to that fucking car" and to "get [his] ass over here." Id. at 3:09-:11. Plaintiff ignored these commands and instead reached in his Trailblazer for his cell phone. Pl.'s Barber Dep. at 8:19-9:8; SUMF ¶ 36. At some point, although unspecified, Deputy Alfred claims he "observed movements consistent with someone [] armed with a firearm." Defs.' Alfred Dep. at 6:10-:11. After reaching for his phone, Plaintiff entered his Trailblazer, closed the door, and changed his gear to reverse. See SUMF ¶ 39; Pl.'s Barber Dep. at 10:01-:10. When Deputy Alfred noticed the Trailblazer's reverse lights come on, he told dispatch, "[Plaintiff] is getting in the car." Alfred Audio at 3:12-:15. As Deputy Alfred communicated this over radio, Plaintiff either revved the Trailblazer's engine or spun its tires. Id. at 3:14.

Immediately after the revving or spinning ended, Deputy Alfred fired his service weapon at Plaintiff six times in under three seconds. Id. at 3:15-:18. According to Plaintiff, "the Trailblazer was either not in motion when Deputy Alfred started firing his shots or was moving at a slow speed of under one mile per hour." Morales Decl. ¶ 11. Plaintiff's Trailblazer came to a stop after the

sixth shot.  Id.  Deputy Alfred did not issue a verbal warning before shooting and can still be heard walking throughout this period.  Alfred Audio at 3:12-:18.

    The locations of Plaintiff's Trailblazer and Deputy Alfred during the shooting are disputed. Plaintiff claims the Trailblazer reversed sixteen feet during Deputy Alfred's gunfire and "came to rest" six feet from the chain-link fence.  Morales Decl. ¶ 9.  Further, Plaintiff testified Deputy Alfred was moving toward the Trailblazer while he was shooting.  Id. ¶ 12.  In contrast, Deputy Alfred claims he was "generally stationary" during gunfire and maintained eight to ten feet between himself and the Trailblazer.  Defs.' Alfred Dep. at 8:12-22, 31:1-3, 47:2-7.  He also testified he was two to three feet from the chain-link fence and two to three feet before the opening to the backyard.[3]  Id. at 12:1-10, 47:20-25.

    Defendants also provide the following photographs of the scene:





Id. at 59, 66.

---

    [3] Deputy Alfred also claims moving out the Trailblazer's path was not "practical," and that he decided not to approach the driver's side of the Trailblazer before the shooting because of a possible "exchange in gunfire."  Defs.' Alfred Dep. at 49:1-9, 49:15-25.

After Deputy Alfred fired his last shot, he went to the opening to the neighbors' backyard for "concealment" and commanded Plaintiff to show his hands.  Id. at 35:6-9, 52:8-19; Alfred Audio at 3:25-4:41.  Plaintiff did not respond at first, and Deputy Alfred remained in his position so he could "maintain[] a visual" on Plaintiff until "medical resources . . . arrived."  Defs.' Alfred Dep. at 35:9-12.

Backup officers arrived roughly one minute and thirty seconds later.  See Dkt. 97-2 at 2; Alfred Audio at 4:42.  The officers eventually approached Plaintiff and discovered his foot was depressing the Trailblazer's brake pedal.  Defs.' Alfred Dep. at 37:24-25.  When the officers removed Plaintiff from the Trailblazer, it proceeded to reverse until an officer placed it in park.  Id. at 38:1-3.  Plaintiff was subsequently arrested and booked for assaulting a peace officer with a deadly weapon, in violation of section 245(c) of the California Penal Code.  SUMF ¶ 55.

One of Deputy Alfred's gunshots struck Plaintiff in the head, and he now uses a wheelchair.  Defs.' Barber Dep. at 10:18-22, 11:3.  Deputy Alfred testified he purposely aimed for "the driver's side[] headrest."  Defs.' Alfred Dep. at 9:10.

## C.    STATE CRIMINAL PROCEEDINGS

On April 28, 2021, Plaintiff was charged in San Bernardino County Superior Court with one count of attempted murder ("Count One") and one count of assaulting a peace officer with a deadly weapon in violation of section 245(c) of the California Penal Code ("Count Two").  See SUMF ¶ 56; Reply at 6 n.1.  On October 28, 2022, Plaintiff pled not guilty to both counts.  See Court Access Portal, Superior Ct. of Cal., Cnty. of San Bernardino, https://cap.sb-court.org/search (search for case no. "FVI21001312" and navigate to "Charges/Dispo.") (last visited Dec. 21, 2025).

On November 25, 2024, Plaintiff proceeded to a jury trial.  See id. (search for case no. "FVI21001312" and navigate to "Hearings").  At the end of the trial, the jury was instructed on both counts, including the lesser crime for Count Two: assault with a deadly weapon other than a firearm, in violation of California Penal Code section 245(a)(1) ("Section 245(a)(1)").  Jury Instrs. Tr. at 2-3.  Specifically, the court instructed the jury that to find Plaintiff guilty under Section 245(a)(1), the People of California must prove:

1.  The defendant did an act with a deadly weapon other than a firearm, that by its nature would directly and probably result in the application of force to a person;
2.  The defendant did that act willfully;
3.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; AND
4.  When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person.

Id.

On December 16, 2024, the jury rendered a split verdict, finding Plaintiff not guilty on Count One but guilty on Count Two of the lesser included crime of assault with a deadly weapon other than a firearm, in violation of Section 245(a)(1).  Dkt. 97-5 at 1.  Plaintiff was later sentenced to thirteen years in prison.  Dkt. 97-6 at 2.

## III.
## EVIDENTIARY OBJECTIONS[4]

### A.    APPLICABLE LAW

At the summary judgment stage, the parties may only rely on "evidence that would be admissible at trial."  Hill v. Walmart Inc., 32 F.4th 811, 822 (9th Cir. 2022); see also Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must . . . set out facts that would be admissible in evidence.").  The focus is "on the admissibility of [the evidence's] contents," not its "form."  Sandoval v. Cnty. of San Diego, 985 F.3d 657, 666 (9th Cir. 2021) (quoting Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)).  "Under the general rule of evidence, all relevant evidence is admissible unless . . . the Federal Rules of Evidence provide otherwise."  Weil v. Citizens Telecom Servs. Co., 922 F.3d 993, 998 (9th Cir. 2019).

Under Federal Rule of Evidence 702, an expert must be "sufficiently qualified . . . by knowledge, skill, experience, training, or education," to testify.  Elosu v. Middlefork Ranch Inc., 26 F.4th 1017, 1023 (9th Cir. 2022) (quoting City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1043 (9th Cir. 2014)).  Testimony by an expert must be "based on sufficient facts or data."  Fed. R. Evid. 702(b).  In addition, expert testimony must be reliable, meaning it must have a sound "basis in the knowledge and experience of the relevant discipline."  Engilis v. Monsanto Co., 151 F.4th 1040, 1047 (9th Cir. 2025) (citation modified).

### B.    ANALYSIS

Here, Defendants argue the Court should exclude the declaration of Plaintiff's expert Robert Morales because he is unqualified and his testimony is unreliable.[5]  See Reply at 9-13.  The Court partly agrees and addresses both arguments in turn.

In his declaration, Morales notes he is a "mechanical engineer" with a master's degree in "mechanical engineering" and "controlled systems."  Morales Decl. ¶ 2.  Morales further states he has a certificate for "accident reconstruction" and "video analys[is]," has received annual continuous education at "accident reconstruction conferences," has "been employed as an accident reconstructionist for approximately fourteen years," and, as part of his experience, "listen[s] to audio

---

[4] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself."  Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Thus, the Court declines to address such objections.

[5] Defendants also object to the testimony of Plaintiff's expert, Scott DeFoe.  Reply at 12-13.  However, since the Court is not relying on expert Scott DeFoe's testimony in reaching its conclusions, the Court declines to address these objections.  See Hall v. Live Nation Worldwide, Inc., 146 F. Supp. 3d 1187, 1193 n.26 (C.D. Cal. 2015) ("Because the court does not rely on this evidence, it need not rule on [the] objections.").

to determine the movement of objects and people." <u>Id.</u>  His practice involves combining "physical evidence, photographs, audio, and/or video, . . . with research, engineering, computations, simulations, and calculations." <u>Id.</u> ¶ 4.

Defendants first argue Morales is not qualified to opine on "ballistics evidence."  Reply at 12.  The Court agrees.  Nothing in Morales's declaration suggests he is qualified to speak on ballistics.  <u>See</u> Morales Decl. ¶¶ 2-4.  Ballistics evidence fits "outside the jurors' knowledge," <u>United States v. Scheffer</u>, 523 U.S. 303, 313 (1998), and thus an expert must attest to its reliability, <u>cf.</u> <u>United States v. Johnson</u>, 875 F.3d 1265, 1280 (9th Cir. 2017) (recognizing that ballistics jury instructions are "meant to ensure that juries are not misled about the reliability of ballistics evidence").  <u>See also</u> <u>Krause v. Cnty. of Mohave</u>, 459 F. Supp. 3d 1258, 1265-66 (D. Ariz. 2020) ("Ballistics testimony requires specialized expertise.").  Accordingly, Defendants' objection is **SUSTAINED** as to Morales's conclusions set forth in paragraphs 16, 17, and 18, to the extent they set forth opinions other than the objective evidence of where the shell casings were located.  <u>See</u> Morales Decl. ¶¶ 16-18.

Defendants also broadly contend Morales's declaration is unreliable because it "is based on opinions that fail to consider the testimony of both Deputy Alfred and Plaintiff."  Reply at 12.  Defendants do not identify the specific opinions that are unreliable – but even if they did, the Court does not find that to be a basis for exclusion.  <u>See</u> <u>Hyer v. City & Cnty. of Honolulu</u>, 118 F.4th 1044, 1056 (9th Cir. 2024) ("Rule 702's 'sufficient facts or data' element requires foundation, not corroboration.'" (quoting <u>Elosu</u>, 26 F.4th at 1025)).  Based on Morales's knowledge, skill, experience, training, or education, Defendants concede "Morales is a mechanical engineer and accident reconstructionist with training in photogrammetry."  Reply at 12.  Accordingly, to the extent Defendants seek to exclude the remainder of Morales's declaration, the objection is **OVERRULED**.

# IV.
# LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit." <u>Nat'l Ass'n of Optometrists & Opticians v. Harris</u>, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of production by "producing evidence[] or showing the absence of evidence."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).  "[T]he ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial."  <u>Id.</u>  A moving party without the ultimate burden of persuasion at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." <u>Id.</u>  "[T]o carry its ultimate burden of persuasion on the motion, the moving party must" establish "there is no genuine issue of material fact."  <u>Id.</u>

If the moving party meets its initial burden of production, the burden then shifts to the non-moving party to "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (citation modified) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party "cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982).

In deciding a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587.  Summary judgment is, therefore, not proper "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts."  Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 (9th Cir. 1980).  Further, a court does not make credibility determinations with respect to the evidence offered.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

# V.
# DISCUSSION

## A.    DEPUTY ALFRED IS NOT ENTITLED TO SUMMARY JUDGMENT ON CAUSE OF ACTION ONE FOR EXCESSIVE FORCE IN VIOLATION OF SECTION 1983

### 1.    Plaintiff's Excessive Force Claim Is Not Heck-Barred

#### a.    Applicable Law

Section 1983 prohibits "the deprivation of any rights, privileges, or immunities" under color of state law.  42 U.S.C. § 1983.  The Fourth Amendment, applicable to the States through the Fourteenth Amendment, protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  "Because apprehending a suspect through the use of deadly force is considered a Fourth Amendment seizure of the person," one who survives deadly force may sue under Section 1983.  Monzon v. City of Murrieta, 978 F.3d 1150, 1156 (9th Cir. 2020).  In deciding whether an officer's use of deadly force was reasonable, the "immediacy" of a "significant threat of death or serious physical injury to the officer or others" is the most important factor.  Hyer, 118 F.4th at 1061-62.

There is, however, "an 'implicit exception' for [Section 1983] actions that lie 'within the core of habeas corpus.'"  Nance v. Ward, 597 U.S. 159, 167 (2022) (quoting Wilkinson v. Dotson, 544 U.S. 74, 78-79 (2005)); accord Preisner v. Rodriguez, 411 U.S. 475, 490 (1973) (concluding that Congress's "determin[ation] that habeas corpus is the appropriate remedy for state prisoners attacking the validity of . . . their confinement . . . must override the general terms of § 1983").  One category of such actions is where the Section 1983 litigant seeks relief that would "necessarily imply the invalidity of his conviction."  Nance, 597 U.S. at 167 (citation modified) (quoting Heck v. Humphrey, 512 U.S. 477, 487 (1994)).  Importantly, that implication "must be 'necessary.'"  Id. at 168 (citation modified) (quoting Wilkinson, 544 U.S. at 81); accord Nelson v. Campell, 541 U.S. 637, 647 (2004) ("[W]e were careful in Heck to stress the importance of the term 'necessarily.'").  Thus, a

court should be "careful" not to extinguish "suits that could otherwise have gone forward had the plaintiff not been convicted." Nelson, 541 U.S. at 647.

"Heck is an affirmative defense," Hebrard v. Nofziger, 90 F.4th 1000, 1006 (9th Cir. 2024), that requires a defendant to meet two prongs. The defendant must first show the factual bases of the conviction and the Section 1983 claim are the same. See Mayfield v. City of Mesa, 131 F.4th 1100, 1108-09 (9th Cir. 2025) (reversing partly because the defendant did not evidence the "factual basis" for a conviction); see also Martell v. Cole, 115 F.4th 1233, 1237 (9th Cir. 2024) ("[A] court cannot conclude generally that the plaintiff's conviction was 'based on the entire incident as a whole.'" (quoting Lemos v. Cnty. of Sonoma, 40 F.4th 1002, 1007 (9th Cir. 2022) (en banc))). The Court should be able to probe "the record to see which acts formed the basis for the [jury verdict]." Mayfield, 131 F.4th at 1108 (quoting Lemos, 40 F.4th at 1006). Second, if the factual bases are the same, the defendant must show "the plaintiff's success on [their Section 1983] claim would necessarily "negat[e] an element of the offense' of which [the plaintiff] was convicted." Id. at 1108 (quoting Lemos, 40 F.4th at 1007). "[W]hen the plaintiff's conviction could be based on activity or evidence untainted by purportedly unlawful police conduct, . . . the Heck bar does not apply." Id. (quoting Smith v. City of Hemet, 394 F.3d 689, 696-97 (9th Cir. 2005) (en banc), disapproved of on other grounds by Lemos, 40 F.4th 1002). The "principal" question is whether the plaintiff is using Section 1983 to "collateral[ly] attack" their conviction. King v. R. Villegas, 156 F.4th 979, 987 (9th Cir. 2025).

> **b.    Analysis**

Here, Defendants argue Plaintiff's Section 1983 claim is Heck-barred. As discussed below, the Court finds otherwise.

As an initial matter, Defendants forfeited their Heck affirmative defense by not asserting it in their answers, see Dkts. 75, 78 at 22-26. See Hebrard, 90 F.4th at 1006 ("[The defendant's] failure to plead Heck as an affirmative defense clearly constituted [] a forfeiture."). "An affirmative defense, once forfeited, is 'exclu[ded]' from the case.'" Wood v. Milyard, 566 U.S. 463, 470 (2012). Thus, rejecting Defendants' Heck defense on this ground alone is sufficient.[6] However, even had the defense been properly preserved, Plaintiff can prevail on his Section 1983 claim without invalidating his Section 245(a)(1) conviction.

> **i.    Defendants Have Not Sufficiently Demonstrated the Factual Basis of Plaintiff's Conviction**

Defendants' Heck argument fails at the outset because they have not sufficiently "identified [anything] in the record that shows the specific factual basis" for Plaintiff's conviction. Reese v. Cnty. of Sacramento, 888 F.3d 1030, 1046 (9th Cir. 2018); see also Mayfield, 131 F.4th at 1109

---

[6] While a court could exercise its discretion to permit a forfeited Heck affirmative defense if it would not result in prejudice to Plaintiff, see Hebrard, 90 F.4th at 1007 n.5, the Court declines to do so here because Plaintiff was not put on notice of this defense, and it appears discovery regarding this defense was limited, at best. Among other things, the Court notes it has not been provided with key pleadings for the underlying state criminal case, including the charging document and verdict form. Defendants' initial misunderstanding of which crime Plaintiff was convicted for further illustrates the last-minute nature of their defense. See Mot. at 9, 13, 16-17; Reply at 6 n.1.

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk DC

(concluding the defendants did not establish which of the plaintiff's specific acts "underl[y] her plea and conviction"). Indeed, the current record is sparce. See supra n.6. Though the jury was instructed Plaintiff must have acted with his Trailblazer in a way that "would directly and probably result in the application of force to a person," Jury Instrs. Tr. at 2-3, it is unclear what specific act this was. Among other possibilities, Plaintiff (1) entered an idling car knowing someone was behind him, (2) illuminated his brake lights by putting the Trailblazer in reverse, (3) revved his engine or spun his tires, and (4) then reversed his Trailblazer. SUMF ¶¶ 39, 42, 44. It is also undisputed that Plaintiff remained in the Trailblazer after the shooting, which was still in reverse. Id. ¶ 54. Given assault's focus on "indirect preparation," People v. Chance, 44 Cal. 4th 1164, 1172 (2008), the jury arguably could have convicted Plaintiff based on any of these acts. Plaintiff's Section 1983 claim, however, solely rests on the force Deputy Alfred used while Plaintiff reversed his Trailblazer. See Morales Decl. ¶ 11. Thus, without information "show[ing] the specific factual basis" for Plaintiff's conviction, "this Court cannot determine that [Plaintiff's] claim of excessive force in this case would call into question the validity of his [assault] conviction." Reese, 888 F.3d at 1046; see also Mayfield, 131 F.4th at 1109 (reversing the district court for granting Heck defense where the record contained no "recitation of the factual basis" for the involved crime).

## ii. Plaintiff's Section 1983 Claim Would Not Negate an Element of His Conviction

Moreover, even assuming the factual bases were the same, Defendants' Heck defense also fails because Plaintiff's Section 1983 claim does not negate an element of his conviction. Cf. Lemos, 40 F.4th at 1006 (opining that a conviction under section 148(a)(1) of the California Penal Code, which requires an officer to be "engaged in the performance of his or her duties," would necessarily be negated by an excessive force claim). Regarding this prong, Defendants argue Plaintiff's Section 1983 claim requires him to "contradict the jury's findings that [he] acted 'with a deadly weapon' . . . 'likely to produce great bodily injury.'" Mot. at 16; see also Reply at 6. This is not necessarily so.

Section 245(a)(1) prohibits (1) "assault[ing] . . . the person of another" (2) "with a deadly weapon . . . other than a firearm." In re B.M., 6 Cal. 5th 528, 532-33 (2018) (citation modified) (quoting Cal. Penal Code § 245(a)(1)). The "deadly weapon" inquiry focuses on "what harm could have resulted from the way the object was actually used." In re B.M., 6 Cal. 5th at 535 (emphasis added); cf. People v. Williams, 26 Cal. 4th 779, 787 (2001) ("[A]ssault criminalizes . . . what might have happened – and not what actually happened."). Though this element is obviously met in cases where harm from using an object is certain, it may also be met where there is just "more than a mere possibility" of injury. In re B.M., 6 Cal. 5th at 534. The same goes for the "assault" component. One completes the actus reus for assault when they have the "present ability[] to commit a violent injury on the person of another." Chance, 44 Cal. 4th at 1167. Though this element is of course met when an injury is "immediate," it may also be met when an injury would occur with "delay" or not as the "next step in the sequence of events." Id. at 1172. Indeed, assault does not even require a "direct attempt at violence" – just the "indirect preparation towards it" is sufficient. Id. California's assault statute, thus, covers a broad swath of conduct. See, e.g., People v. Marsh, 37 Cal. App. 5th 474, 488 (2019) (affirming assault conviction where the defendant severed the brake lines of a parked car).

Conversely, the Fourth Amendment's "immediate" and "significant threat of death or serious physical injury" standard, Hyer, 118 F.4th at 1061, covers a much narrower range of

conduct.[7]  See, e.g., Vos v. City of Newport Beach, 892 F.3d 1024, 1032 (9th Cir. 2018) (ruling the immediate threat factor was a question for a jury where the plaintiff "charged" at the officers with scissors); S.B. v. Cnty. of San Diego, 864 F.3d 1010, 1014 (9th Cir. 2017) (finding a triable issue of fact where the plaintiff wielded a knife "approximately six to eight feet away from [the officers]"). Such a threat cannot be "hypothetical."  Blanford v. Sacramento Cnty., 406 F.3d 1110, 1115 (9th Cir. 2005).  This is especially so when an officer shoots at a suspect driving a car.  See generally Acosta v. City & Cnty. of San Francisco, 83 F.3d 1143 (9th Cir. 1996), as amended (June 18, 1996). In Acosta, the Ninth Circuit concluded that despite the possibility that a car moved in the officer's direction before the officer fired shots, a "jury could have reasonably concluded that a reasonable officer . . . would have recognized that he could avoid being injured . . . by simply stepping to the side."  Id. at 1146.  In doing so, the Ninth Circuit acknowledged that while a car certainly "can inflict deadly force," there are circumstances where it would not "constitute the type of threat that justifies an officer[] shooting the driver."  Id. at 1146 n.9.  As such, a person who survives such deadly force could certainly bring a Section 1983 claim under the theory that the officer "used too much force to respond to the assault," despite their conviction.  Havens v. Johnson, 783 F.3d 776, 782 (10th Cir. 2015) (collecting First, Fifth, Seventh, Ninth, and Eleventh Circuit cases); accord Hooper v. Cnty. of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011) (ruling Heck did not bar claim where the plaintiff argued "he suffered unnecessary injuries because the response to his [conduct] was not objectively reasonable" (citation modified) (quoting VanGilder v. Baker, 435 F.3d 689, 692 (7th Cir. 2006))).

Thus, even considering Defendants' forfeited Heck defense, Plaintiff's Section 1983 claim is not barred just because he was convicted under Section 245(a)(1).  See Havens, 783 F.3d at 782 ("An excessive-force claim against an officer is not necessarily inconsistent with a conviction for assaulting the officer."); Ramos-Ramirez v. Berwick Borough, 819 F. App'x 103, 106 (3d Cir. 2020) ("[W]e conclude that simple assault with a deadly weapon . . . is not necessarily inconsistent with an excessive force claim.").  Put simply, though Plaintiff's conduct rose to the level of assault, it may not have not risen to "the type of threat that justifie[d] an officer[]" to use deadly force while Plaintiff was in his vehicle, Acosta, 83 F.3d at 1146 n.9.  For this reason, the Court cannot conclude Plaintiff's Section 1983 claim requires invalidating his conviction.[8]

*    *    *

In short, Plaintiff is not using Section 1983 to "collateral[ly] attack" his conviction.  King, 156 F.4th at 987.  His first Cause of Action is thus not precluded under Heck.

---

[7] For example, one could be guilty of assault even if the "intended victim [took] effective steps to avoid injury."  Chance, 44 Cal. 4th at 1174.  A similar situation, however, would be insufficient to justify deadly force.  See Villanueva v. California, 986 F.3d 1158, 1170 (9th Cir. 2021) ("We have consistently found use of deadly force to stop a slow-moving vehicle unreasonable when the officers could have easily stepped out of the vehicle's path to avoid danger.").

[8] To the extent Defendants also argue Plaintiff would have to negate the mens rea element of assault to succeed on his Section 1983 claim, see Reply at 6, that argument is meritless.  An excessive force inquiry focuses on the arrestee's conduct rather than their subjective intent, see Barnes v. Felix, 605 U.S. 73, 80 (2025) (instructing courts to consider the "stopped person's conduct" for purposes of whether they posed a threat).  Thus, Plaintiff's subjective mens rea has no bearing on his Section 1983 claim.

2.      **Genuine Disputes of Material Fact Exist as to Whether Deputy Alfred's Force
Was Reasonable**

a.      **Applicable Law**

The Fourth Amendment demands officers use only such force that is "objectively reasonable in light of the facts and circumstances confronting them." Graham v. Connor, 490 U.S. 386, 397 (1989) (citation modified). In assessing reasonableness, courts consider (1) "the severity of the intrusion on the individual's Fourth Amendment rights," (2) "the government's interest in the use of force," and (3) "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." Scott v. Smith, 109 F.4th 1215, 1223 (9th Cir. 2024) (citation modified); see also Barnes v. Felix, 605 U.S. 73, 79 (2025) (taking "due account of both the individual interests and the governmental interests at stake"). However, "[t]here is no easy-to-apply legal test or on/off switch in this context." Barnes, 605 U.S. at 80 (citation modified) (quoting Scott v. Harris, 550 U.S. 372, 382-83 (2007)). Hence, this analysis "nearly always requires a jury to sift through disputed factual contentions," and summary judgment is "granted sparingly." Scott, 109 F.4th at 1222-23 (citation modified); accord Rosenbaum v. City of San Jose, 107 F.4th 919, 924 (9th Cir. 2024) ("Where factual disputes exist as to the objective reasonableness of an officer's conduct, the case cannot be resolved at summary judgment on qualified immunity grounds.").

b.      **Analysis**

For the reasons below, genuine disputes of material fact exist as to whether Deputy Alfred violated the Fourth Amendment.

i.      **Severity of the Intrusion**

With respect to the severity of the intrusion, courts "consider 'the type and amount of force inflicted' against him." Sanderlin v. Dwyer, 116 F.4th 905, 914 (9th Cir. 2024) (quoting Young v. Cnty. of Los Angeles, 655 F.3d 1156, 1161 (9th Cir. 2011)). "The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force." Sabbe v. Washington Cnty. Bd. of Comm'rs, 84 F.4th 807, 821 (9th Cir. 2023).

Here, Deputy Alfred used deadly force by shooting Plaintiff in the head. Deadly force "implicates the highest level of Fourth Amendment interests." Napouk v. Las Vegas Metro. Police Dep't, 123 F.4th 906, 915 (9th Cir. 2024) (citation modified); accord Calonge v. City of San Jose, 104 F.4th 39, 45 (9th Cir. 2024) ("'The intrusiveness of a seizure by means of deadly force is unmatched' because of a person's 'fundamental interest in his own life.'" (quoting Tennessee v. Garner, 471 U.S. 1, 9 (1985))).

Accordingly, Deputy Alfred must show "the governmental interests at stake were sufficient to justify" his use of deadly force. Napouk, 123 F.4th at 915.

///

///

///

ii.     **The Governmental Interests**

To quantify the governmental interests in using force, courts look to the "severity of the crime prompting the stop," "the stopped person's conduct," and "actions the officer took during the stop." Barnes, 605 U.S. at 80 (citation modified).

a.     <u>Severity of the Crime</u>

There are "'two slightly different ways' of assessing the seriousness of the offense in question." Singh v. City of Phoenix, 124 F.4th 746, 752 (9th Cir. 2024) (quoting <u>S.R. Nehad v. Browder</u>, 929 F.3d 1125, 1136 (9th Cir. 2019)). The first focuses on the suspect's reported behavior, while the second focuses on the suspect's conduct at the time the officer arrives at the scene. See id. The salient question is whether the circumstances of the case "warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious." Hyer, 118 F.4th at 1061 (citation modified) (quoting <u>Smith</u>, 394 F.3d at 702).

Here, under either approach, a jury "could conclude that the circumstances of this case weigh against the use of deadly force." Id. First, it is undisputed Deputy Alfred responded to a call that Plaintiff was possibly under the influence of drugs or alcohol and was preventing his neighbors from entering their residence. See Dispatch Audio at 0:18-:22, 2:08-:11. These suspected crimes are not serious, as they amount to nothing more than misdemeanors, see Calonge, 104 F.4th at 47 (citation modified) (holding a misdemeanor "is not a serious crime that could justify a high degree of force").

Second, it is also undisputed Plaintiff's suspected behavior, as reported by his neighbors, had ended by the time Deputy Alfred arrived at the scene, see Alfred Audio at 1:10-2:40. See Singh, 124 F.4th at 752 ("A jury could discount the severity of the suspect's purported crimes when the suspect is 'indisputably not engaged in felonious conduct when the officer arrives.'" (citation modified)). Indeed, even by the end of the neighbors' 911 call, Plaintiff had stopped interacting with his neighbors and had gone to his Trailblazer further down the driveway by his residence, see SUMF ¶ 5, which is where he was found when Deputy Alfred arrived, SUMF ¶ 18. See Hyer, 118 F.4th at 1061 (concluding the crime was not severe where, "by the time the officers had arrived at the scene, [the plaintiff] had barricaded and isolated himself in his own residence"). Also, while his neighbors told Deputy Alfred that Plaintiff might be armed, see Alfred Audio at 01:38-:41, Deputy Alfred testified he did not credit this information because it was not "corroborated." Pl.'s Alfred Dep. at 24:14-25.

Thus, under either approach, the severity of the crime here was minimal, and "a trier of fact could conclude that the circumstances of this case weigh against the use of deadly force."[9] Hyer, 118 F.4th at 1061.

---

[9] Defendants argue the severity of the crime warranted deadly force because the situation "rapidly changed" from the actions reported by Plaintiff's neighbors to Plaintiff's assault against Deputy Alfred. Reply at 15-16. However, there are genuine disputes of material fact as to whether the situation was, in fact, rapidly changing. As noted above, Deputy Alfred responded to a call reporting a dispute between neighbors that arose, at most, to a misdemeanor and, when he arrived at the scene, Plaintiff was not engaged in any criminal conduct.

### b.  Plaintiff's Conduct

With respect to the plaintiff's conduct, courts focus on "whether the suspect pose[d] an immediate threat to the safety of the officers or others" and "whether the suspect was actively resisting arrest or attempting to escape."  Scott, 109 F.4th at 1224 (citation modified).

Starting with the "most important" factor, Hyer, 118 F.4th at 1060, a jury could find Plaintiff did not pose an immediate threat.  This factor turns on the "danger a suspect poses at the time force is applied."  Andrews v. City of Henderson, 35 F.4th 710, 717 (9th Cir. 2022).  Danger is minimal where a suspect is driving a car slowly and the officer has the "commonsense" chance to "simply tak[e] a step back."  Orn v. City of Tacoma, 949 F.3d 1167, 1175 (9th Cir. 2020).

Here, by the time Deputy Alfred fired the first shot, it is undisputed Plaintiff was in his Trailblazer and had shifted the transmission to reverse.  SUMF ¶ 111.  It is also clear, based on Deputy Alfred's audio recording, that Plaintiff depressed the gas pedal one second before the first shot, causing the Trailblazer to rev its engine or spin its tires until gaining traction on the gravel driveway.  See Alfred Audio at 03:14-:15; Morales Decl. ¶¶ 10-11.  At this point, Deputy Alfred was standing behind the Trailblazer "in line" with the driver's side.[10]  Defs.' Alfred Dep. at 26:7-9.  Immediately after the revving or tire spinning faded, five shots were fired in rapid succession with a sixth shot fired a second later.  Alfred Audio at 03:14-:18; Morales Decl. ¶ 11.  The record supports that Plaintiff's Trailblazer (1) was either still or moving less than one mile per hour by the first shot and (2) had decelerated to less than one mile per hour by the final shot.  See Morales Decl. ¶ 11; see also Defs.' Alfred Dep. at 31:14-32:6.  Plaintiff's evidence further shows the Trailblazer traveled sixteen feet at a maximum speed of 3.4 miles per hour and ultimately rested six feet west of the chain-link fence.  Morales Decl. ¶¶ 9, 12.  Moreover, the record supports that Deputy Alfred was positioned three feet from the chain-link fence and at least two feet from the backyard opening.  Defs.' Alfred Dep. at 12:1-3, 47:11-25.

Considering these circumstances, a jury could conclude Plaintiff did not pose an immediate threat.  Specifically, by the first shot, Plaintiff's Trailblazer had either stopped or was reversing at less than one mile per hour, and Deputy Alfred – who stood behind the driver's side of the Trailblazer – could have easily "stepped to the side" to avoid being injured.  See Acosta, 83 F.3d at 1146 (ruling an officer could have avoided any injury where "the car moved slowly" and "he was standing closer to the side than the dead-center of the car").  Defendant Alfred could have simply stepped away when the Trailblazer reversed at just 3.4 miles per hour.  See Orn, 949 F.3d at 1175 (concluding the driver posed no immediate threat where he drove "at just five miles per hour" and the officer could have "simply tak[en] a step back").  Though Deputy Alfred testified he did not have the space to move out Plaintiff's way, a jury could conclude that was not true given his position relative to the six

---

[10] Deputy Alfred's testimony concerning his distance behind Plaintiff's car is, at best, confusing and contradictory.  He first claims he was "10 to 15 feet" behind Plaintiff's car.  Defs.' Alfred Dep. at 7:5-7.  Later during his deposition, he claimed he was "[e]ight to 10 feet" behind Plaintiff's car.  Id. at 47:4-6.  Similarly, when asked about his distance from the backyard opening, he claimed the opening was "south" of him, which contradicts his post-incident interview statement that the opening was "2 to 3 feet north" of him.  Id. at 47:11-25.  Even accepting that the opening was south of him, Defendants' own photograph of the scene defies that such a position would be "[e]ight to [ten] feet" from the car.  Id. at 60.

feet between Plaintiff's Trailblazer and the chain-link fence, <u>see</u> Morales Decl. ¶ 9; Defs.' Alfred
Dep. at 12:1-3. Considering the Trailblazer's slow speed, a jury could also find Deputy Alfred had
sufficient time to move to the backyard opening he stood two feet away from (and retreated to right
after the sixth shot). <u>See</u> Defs.' Alfred Dep. at 47:11-25, 52:8-15. Accordingly, this factor weighs
against the use of deadly force.[11]

     A jury could also conclude Plaintiff did not pose an immediate threat to Deputy Alfred
before he got in the Trailblazer. Though Deputy Alfred testified seeing Plaintiff move "consistent
with someone who's armed with a firearm," he never testified that Plaintiff made furtive gestures
suggesting he was prepared to use a gun, nor that Plaintiff threatened to use violence against him.
<u>See</u> <u>Hyer</u>, 118 F.4th at 1062 (requiring the defendants to make "a greater showing [to justify deadly
force]—for instance, that the suspect used a threatening gesture"). Further, as Deputy Alfred noted
himself, the neighbors' mention that Plaintiff might have been armed was unsupported, <u>see</u> Pl.'s
Alfred Dep. at 24:14-25, and it is undisputed no one ever saw Plaintiff with a weapon of any kind,
SUMF ¶ 72. Notably, even if it was substantiated, the "mere possession of a gun [does] not justify
the use of deadly force." <u>Calonge</u>, 104 F.4th at 46.

     As to the second factor, a jury could also find that Plaintiff "did not engage in 'sufficient
active resistance' to warrant the use of deadly force," <u>Hyer</u>, 118 F.4th at 1062. Defendants argue
Plaintiff "refus[ed] to comply with Deputy Alfred's commands multiple times." Mot. at 21. Yet it is
undisputed Deputy Alfred never verbally identified himself as an officer, it was dark, and Plaintiff
testified he believed his neighbors were speaking to him. SUMF ¶¶ 82, 110. Under these facts, a
jury could find Plaintiff did not resist or attempt to flee from Deputy Alfred. <u>See</u> <u>Andrews</u>, 35 F.4th
at 717 ("[B]ecause [the plaintiff] did not know the detectives' identities before they tackled him,
there is no dispute that he was not resisting arrest or attempting to flee."); <u>Est. of Lopez ex rel.</u>
<u>Lopez v. Gelhaus</u>, 871 F.3d 998, 1020 (9th Cir. 2017) ("Gelhaus never identified himself as a police
officer, so Andy could not have consciously disobeyed a law enforcement order."). However, even
accepting Deputy Alfred's position, "seconds of non-compliance (absent some other [immediate]
threat) do[] not justify deadly force." <u>Calonge</u>, 104 F.4th at 46 (citing <u>Gelhaus</u>, 871 F.3d at 1007,
1010-11).

---

    [11] Defendants cite three cases in support of finding Plaintiff posed an immediate threat.
Mot. at 19-20. None are analogous. <u>Monzon</u> and <u>Wilkinson</u> were "tense, uncertain, and rapidly
evolving" situations, <u>Wilkinson v. Torres</u>, 610 F.3d 546, 550 (9th Cir. 2010), that started as
aggressive high-speed chases and ended with suspects accelerating their vehicles in close proximity
to officers. <u>See</u> <u>id.</u> at 551 ("The situation had quickly turned from one involving a crashed vehicle to
one in which the driver of a moving vehicle, ignoring police commands, attempted to accelerate
within close quarters of two officers on foot."); <u>Monzon</u>, 978 F.3d at 1163 ("[T]he officers in this
case attempted a traffic stop, witnessed the dangerous and illegal driving of Monzon from the
freeway to the dead-end street, and only fired when Monzon turned the van in their direction,
accelerated toward them, and threatened their safety."); <u>id.</u> ("[T]he van was traveling toward some of
the officers at up to 17 mph—25 feet every second."). Lastly, in <u>Gaxiola v. City of Richmond Police</u>
<u>Dep't</u>, a nonbinding memorandum disposition, the car had <u>actually</u> "struck" an officer, "knock[ing]
him backwards" and prompting him to "reasonably believe[] that if [he] did not use deadly force at
that time, the car would strike [him] again, likely running him over." 131 F. App'x 508, 509 (9th Cir.
2005).

### c.  Deputy Alfred's Conduct

Because the excessive force inquiry "requires assessing the totality of the circumstances," courts must also look to the officer's conduct, "such as giving warnings or otherwise trying to control the encounter."  Barnes, 605 U.S. at 76, 80; see also Seidner v. de Vries, 39 F.4th 591, 599 (9th Cir. 2022) (considering whether the officer had "less intrusive alternatives" or gave "proper warnings before force was used" (citation modified)).  Though "officers must act 'without the benefit of 20/20 hindsight,' and must often make 'split-second judgments,'" this does not mean officers may "unnecessarily creat[e] [their] own sense of urgency."  S.R. Nehad, 929 F.3d at 1135 (quoting Torres v. City of Madera, 648 F.3d 1119, 1127 (9th Cir. 2011)).

Here, a jury could find Deputy Alfred's "poor judgment or lack of preparedness caused him . . . to act unreasonably, 'with undue haste.'"  Id. at 1135 (citation modified) (quoting Torres, 648 F.3d at 1126).  Upon arriving at the scene by himself, Deputy Alfred spoke with Plaintiff's neighbors and then stepped away to speak with Plaintiff.  SUMF ¶¶ 12-16.  Once Deputy Alfred saw Plaintiff standing by his Trailblazer, he gave Plaintiff commands in a dark driveway without identifying himself as a peace officer.  Id. ¶ 110.  He also did not call for backup, id. ¶ 109, and directed profanity at Plaintiff, in violation of the San Bernardino County Sheriff's Department Manual, see Defs.' Alfred Dep. at 27:13-19.  See Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1059 (9th Cir. 2003) ("[W]e may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable.").  Additionally, upon seeing the Trailblazer slowly reverse, Deputy Alfred chose to stand behind the Trailblazer and fire multiple shots, SUMF ¶¶ 66, 87, instead of simply moving out the way by stepping closer to the chain-link fence or in the adjacent backyard that, according to Deputy Alfred, was a mere two feet away, see Defs.' Alfred Dep. at 47:11-25.  Under these circumstances, a jury certainly "could conclude that any sense of urgency was of [Deputy Alfred's] own making."  S.R. Nehad, 929 F.3d at 1135.

### iii.     Balancing the Interests

Ultimately, in balancing the gravity of the intrusion and the government's need for that intrusion, a jury could find Deputy Alfred's use of deadly force was unreasonable.  See Scott, 109 F.4th at 1225 ("Force 'is permissible only when a strong government interest compels the degree of force used.'" (citation modified)).  In particular, viewing the evidence most favorably to Plaintiff, a jury could find Deputy Alfred acted unreasonably when he fired six shots – without warning and after failing to identify himself as an officer in a dark driveway – at Plaintiff's slowly moving vehicle that he could have avoided by simply stepping away.

### 3.    Deputy Alfred Is Not Entitled to Qualified Immunity

### a.    Applicable Law

Qualified immunity "shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  City of Tahlequah v. Bond, 595 U.S. 9, 12 (2021) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  "[A]ll but the plainly incompetent or those who knowingly violate the law" are protected.  Id. (citation modified) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)).

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam)). Unless the violated right is "obvious," the plaintiff "must identify a case that put [the officer] on notice that his specific conduct was unlawful," id., and the court must make an "effort to explain how that case law prohibit[s] [the officer's] actions," City of Escondido v. Emmons, 586 U.S. 38, 43 (2019). There may be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Hope v. Pelzer, 536 U.S. 730, 740 (2002); accord Cortesluna, 595 U.S. at 5 ("Although 'this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting White v. Pauly, 580 U.S. 73, 79 (2017)); cf. Scott, 109 F.4th at 1227 ("[A] decision with identical facts is not required to clearly establish that it is unreasonable to use deadly force when the force is totally unnecessary to protect officers, the public, or the suspect himself." (citing Hope, 536 U.S. at 740)).

**b. Analysis**

Here, Deputy Alfred is not entitled to qualified immunity because his use of deadly force, viewed most favorably to Plaintiff, violated clearly established law. On the date of the incident in April 2021, it had been well established for at least a quarter century that using deadly force is unreasonable where the officer, "standing closer to the side than the dead-center of [a] car," shoots at the "slow-moving car" instead of "simply stepping to the side." Acosta, 83 F.3d at 1146-47; accord Villanueva, 986 F.3d at 1172 ("In light of Acosta, all reasonable officers would know it is impermissible to shoot at a slow-moving car when he could 'simply step[] to the side' to avoid danger." (quoting Acosta, 83 F.3d at 1146)).

Among other cases, Plaintiff cites Acosta and Orn as establishing his violated right. See Opp. at 15-16. In Acosta, an officer chased two suspected robbers around 6:45 p.m. at night until they hopped in a getaway car. 83 F.3d at 1144. The officer then "positioned himself facing the driver so that he was standing closer to the side than the dead-center of the car." Id. Shortly after, the car "mov[ed] or roll[ed] very slowly from a standstill," and the officer fired two shots. Id. at 1144, 1147. The Ninth Circuit opined that the jury could have concluded the officer acted unreasonably given the car's speed and the officer's ability to "simply step[] to the side." Id. at 1146.

In Orn, officers blocked a suspect's vehicular path after pursuing him into an apartment complex parking lot and repeatedly commanding him to stop his car. 949 F.3d at 1172. The suspect "briefly stopp[ed]" in front of the officer's SUV, but then "attempted to navigate through a narrow opening between the passenger side of [the officer's] SUV and a nearby parked car." Id. at 1173. He drove "very slowly" at just "five miles per hour." Id. After "clipp[ing]" the officer's rear quarter panel, the officer – who claimed to be "in the path of [the suspect's] vehicle" – fired multiple shots out of fear "he would be run over . . . or pinned between his vehicle and [the suspect's]." Id. According to the officer, the suspect "stepped on the gas and propelled the vehicle toward him under 'hard acceleration.'" Id. The Ninth Circuit ruled that, even under the officer's version of the facts, a jury could find the officer "lacked an objectively reasonable basis to fear for his own safety" because he could "have avoided any risk of being struck by simply taking a step back." Id. at 1175.

Hence, at the time of the incident, Acosta or Orn put Deputy Alfred "on notice that his specific conduct was unlawful," Cortesluna, 595 U.S. at 6. As in Acosta and Orn, Plaintiff's car

moved from standstill to a very slow speed with an officer potentially in its vehicular path.  Morales
Decl. ¶ 11.  Also as in <u>Acosta</u> and <u>Orn</u>, a jury could find the officer could have simply stepped out
that path given his surroundings and his location relative to the slow-moving vehicle.  <u>See</u> Section
V.A.2.  Accordingly, assuming the facts in the light most favorable to Plaintiff, Deputy Alfred
violated a clearly established right, and his motion for summary judgment as to Cause of Action One
is **DENIED**.

## B.    DEFENDANT COUNTY IS NOT ENTITLED TO SUMMARY JUDGMENT ON CAUSE OF ACTION TWO UNDER <u>MONELL</u>

### 1.    Applicable Law

A government entity may be liable under Section 1983 "if the governmental body itself
'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such
deprivation."  <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (quoting <u>Monell v. Dep't of Soc. Servs.</u>,
436 U.S. 658, 692 (1978)).  Such an entity may not be sued under Section 1983 "for an injury
inflicted solely by its employees or agents."  <u>Monell</u>, 436 U.S. at 694.  Rather, a municipality is liable
under Section 1983 only "when execution of [the local] government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,
inflicts the injury."  <u>Id.</u>

To prove a <u>Monell</u> claim, a plaintiff must first show an underlying constitutional violation by
a municipal employee.  <u>See id.</u>  Second, a plaintiff must show: (1) the alleged constitutional violation
was committed "pursuant to a formal governmental policy or a longstanding practice or custom
which constitutes the standard operating procedure of the local government entity," (2) the
constitutional violation was committed by a government official with "final policy-making
authority," or (3) a government official with "final policy-making authority" ratified a subordinate's
unconstitutional conduct and the basis for it.  <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346 (9th Cir.
1992) (citation modified).  Alternatively, a plaintiff may establish municipal liability under Section
1983 by showing a municipality failed to train its employees and such failure to train amounts to
"deliberate indifference" to the constitutional rights of the persons with whom the employees come
into contact.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

The plaintiff must also show the municipality's "<u>deliberate</u> conduct . . . was the 'moving
force' behind the [constitutional] injury."  <u>Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown</u>, 520 U.S.
397, 404 (1997).  "Ordinarily, 'a pattern of similar constitutional violations,' rather than proof of a
single incident, is 'necessary to demonstrate deliberate indifference.'"  <u>Perez v. City of Fresno</u>, 98
F.4th 919, 931 (9th Cir. 2024).  However, "single-incident liability may exist in the rare case where
'the unconstitutional consequences of failing to train' are 'patently obvious.'"  <u>Id.</u> (quoting <u>Connick</u>,
563 U.S. at 63-64)); <u>accord</u> <u>Kirkpatrick v. Cnty. of Washoe</u>, 843 F.3d 784, 794 (9th Cir. 2016)
("[T]he Supreme Court has opined that a single incident of excessive force, coupled with evidence
that a city had neglected to train its armed officers on the constitutional limitations on using force
against fleeing felons, might establish that the city manifested deliberate indifference in training law
enforcement." (citing <u>Harris</u>, 489 U.S. at 390 n.10)).

///

///

### 2. Analysis

Here, Plaintiff asserts a <u>Monell</u> claim under a failure-to-train theory.[12]  Specifically, he argues and presents evidence that defendant County failed to train Deputy Alfred on issuing verbal warnings before using deadly force.[13]  The Court finds a triable issue of fact as to whether defendant County is liable under <u>Monell</u> under this theory.

When questioned on whether he was "trained to give a verbal warning before using deadly force, when feasible," Deputy Alfred flatly responded, "No."  Defs.' Alfred Dep. at 54:7-9.  In addition, nothing in the record suggests he was trained on this issue, and the Sheriff's Department Manual is likewise silent on this issue, <u>see generally</u> Dkt. 97-9.  Moreover, Defendants did not address this argument in their Reply.  <u>See</u> Reply at 17.  Issuing a warning before using deadly force is an obvious constitutional limitation.  <u>See</u> <u>Sabbe</u>, 84 F.4th at 825 ("The 'seemingly obvious principle' that, when practicable, police should give warnings before they use deadly force 'is not novel.'" (citation modified)); <u>Napouk</u>, 123 F.4th at 921 ("In general, we have recognized that an officer must give a warning before using deadly force 'whenever practicable.'" (quoting <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 794 (9th Cir. 2014))).  Thus, a jury could find defendant County acted deliberately indifferent by failing to train Deputy Alfred to issue verbal warnings before using deadly force, whenever practicable.  <u>See</u> <u>Soderberg v. City of Los Angeles</u>, No. CV 18-3861-FMO-JPRx, 2020 WL 6540511, at *22 (C.D. Cal. Sep. 30, 2020) (finding a "triable issue of fact as to whether the City's failure to train the officer defendants regarding the issuance of warnings prior to the use of lethal force constitutes deliberate indifference to [the plaintiff's] constitutional rights").

Similarly, there is a question of fact as to whether defendant County's failure to train had a "direct causal link" to the deprivation of Plaintiff's Fourth Amendment rights.  <u>Kirkpatrick</u>, 843 F.3d at 796.  Such a link exists if the "'deficiency in [the county's] training program' []' was 'closely related to the ultimate injury.'"  <u>Black Lives Matter L.A. v. City of Los Angeles</u>, 113 F.4th 1249, 1264 (9th Cir. 2024) (quoting <u>Harris</u>, 489 U.S. at 391).  Here, a reasonable factfinder could conclude defendant County's failure to train its officers to give warnings before shooting was the "moving

---

[12] Plaintiff's other theories of <u>Monell</u> liability fail.  First, he gathers four deadly force cases from 2013 to 2018 that resulted in a verdict or a settlement against defendant County.  Opp. at 18.  Four incidents occurring over five years does not establish the required "duration, frequency[,] and consistency" necessary for "the conduct [to] become a traditional method of carrying out policy."  <u>Gordon v. Cnty. of Orange</u>, 6 F.4th 961, 974 (9th Cir. 2021) (citation modified) (quoting <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996), <u>modified on other grounds by</u> <u>Navarro v. Block</u>, 250 F.3d 729 (9th Cir. 2001)); <u>cf.</u> <u>Jones v. City of N. Las Vegas</u>, 150 F.4th 1030, 1039 (9th Cir. 2025) (holding that "three prior suits involving dog-shootings, each with different facts than those presented here, during a five-year period" did not show a custom).  Second, Plaintiff challenges defendant County's post-hoc policy change and delay in interviewing Deputy Alfred.  Opp. at 19.  These isolated incidents are insufficient to establish a custom; but even assuming they were, Plaintiff has not shown how these customs were the moving force behind his constitutional injury.

[13] Plaintiff's other failure-to-train theories fail.  He argues defendant County failed to train Deputy Alfred on when to use deadly force and whether to use "other reasonable options," as evidenced by his deposition testimony.  Opp. at 19.  Though Deputy Alfred's initial answers might have suggested he was not trained on these matters, his later answers indicate he was.  <u>See</u> Defs.' Alfred Dep. at 54:2-55:13.

force" behind Deputy Alfred shooting Plaintiff, i.e., that Plaintiff would have complied to avoid being shot.

Accordingly, Defendants' motion for summary judgment as to Cause of Action Two is **DENIED**.

## C.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CAUSE OF ACTION THREE FOR BATTERY

### 1.    Applicable Law

"Under California law, when an alleged battery was committed by a police officer, the plaintiff must prove 'unreasonable force' in addition to the typical elements of the tort." Uzun v. City of Santa Monica, 54 F.4th 595, 596 (9th Cir. 2022) (citing Yount v. City of Sacramento, 43 Cal. 4th 885, 902 (2008)).

### 2.    Analysis

Here, Defendants' argument for summary judgment hinges on the reasonableness of Deputy Alfred's force. See Mot. at 23-24. As explained above, a jury could find Deputy Alfred's use of deadly force unreasonable. See Section V.A.2.

Accordingly, Defendants' motion for summary judgment as to Cause of Action Three is **DENIED**.

## D.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CAUSE OF ACTION FOUR FOR NEGLIGENCE

### 1.    Applicable Law

To prevail on a negligence claim, the plaintiff must "prove the officers had a duty to use due care, they breached that duty, and the breach was the proximate cause of his injury." Uzun, 54 F.4th at 596-97 (citing Hayes v. Cnty. of San Diego, 57 Cal. 4th 622, 629 (2013)). California officers "have a duty to act reasonably when using deadly force." Vos, 892 F.3d at 1037 (quoting Hayes, 57 Cal. 4th at 629). "[P]reshooting conduct is included in the totality of circumstances surrounding an officer's use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to preshooting conduct." Villalobos v. City of Santa Maria, 85 Cal. App. 5th 383, 389 (2022) (quoting Hayes, 57 Cal. 4th at 632); cf. Alves v. Cnty. of Riverside, 135 F.4th 1161, 1171 (9th Cir. 2025) ("[P]reshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." (citation modified) (quoting Hayes, 57 Cal. 4th at 630)).

### 2.    Analysis

Here, Plaintiff's negligence claim is based on Deputy Alfred's pre-shooting conduct. See Opp. at 23-24. As explained above a jury could find Deputy Alfred created his own sense of urgency leading up to the shooting. See Section V.A.2. Thus, for the same reason, a jury could also conclude Deputy Alfred's pre-shooting conduct amounted to negligence. See Murillo v. City of Los Angeles, 707 F. Supp. 3d 947, 967 (C.D. Cal. 2023) ("A jury could reasonably conclude, under the

broader negligence standard, that [the officer's] negligence led to the escalation of the situation and the need for the officers to use deadly force at all."); Rodriguez v. Cnty. of Los Angeles, 654 F. Supp. 3d 1029, 1051 (C.D. Cal. 2023) ("[I]f there remain triable issues over whether defendants intentionally violated plaintiff's Fourth Amendment rights, plaintiffs' [pre-shooting] negligence claims must survive summary judgment, as well.").

Accordingly, Defendants' motion for summary judgment as to Cause of Action Four is **DENIED**.

## E.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CAUSE OF ACTION FIVE FOR VIOLATING THE BANE ACT

### 1.    Applicable Law

The Bane Act prohibits interference with constitutional rights "by threat, intimidation, or coercion." Cal. Civ. Code § 52.1. "[A] defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion." O'Toole v. Superior Ct., 140 Cal. App. 4th 488, 502 (2006). To prove a Bane Act violation, the plaintiff must show an officer had the "specific intent to violate the arrestee's right to freedom from unreasonable seizure." Reese, 888 F.3d at 1043 (quoting Cornell v. City & Cnty. of San Francisco, 17 Cal. App. 5th 766, 800 (2017), as modified (Nov. 17, 2017)). Specific intent turns on (1) the right at issue being "clearly delineated and plainly applicable under the circumstances of the case," and (2) the officer "commit[ting] the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right." Sandoval v. Cnty. of Sonoma, 912 F.3d 509, 520 (9th Cir. 2018) (quoting Cornell, 17 Cal. App. 5th at 801-02).

### 2.    Analysis

Here, Defendants argue Plaintiff's Bane Act claim fails for two reasons.

First, Defendants argue summary judgment is warranted because "there is no evidence of [an] underlying constitutional violation." Mot. at 25. As discussed in Section V.A.2, however, a jury could reasonably conclude that Deputy Alfred's use of deadly force violated the Fourth Amendment.

Second, Defendants argue summary judgment is warranted because "there is absolutely no evidence to suggest that [] Deputy Alfred acted with any specific intent to interfere with Plaintiff's rights." Mot. at 25. Once again, as discussed above in Section V.A.2, a jury could reasonably conclude Deputy Alfred violated clearly established law. See Rodriguez, 654 F. Supp. 3d at 1054 ("[T]he 'clearly delineated and plainly applicable' requirement under the Bane Act is nowhere as exacting as the clearly established law requirement." (quoting Sandoval, 912 F.3d at 520)); cf. Untalan v. Stanley, No. 22-55077, 2023 WL 2158371, at *3 (9th Cir. Feb. 22, 2023) (remanding Bane Act claim "to consider prong two of the specific intent inquiry" where "the unlawfulness of the [conduct] was clearly established"). Further, construing the facts in the light most favorable to Plaintiff, a jury could also find Deputy Alfred purposely deprived Plaintiff of his right to unreasonable seizures, among other things, by aiming at "the driver's side headrest" at a slow-moving vehicle despite the opportunity to move out of the way, Defs.' Alfred Dep. at 9:10. Cf. McLeod v. City of Redding, No. 2:22-CV-00585 WBS JDP, 2024 WL 3011227, at *8 (E.D. Cal. June

12, 2024) (concluding a jury could find reckless disregard where officers "attempted to smash the window and . . . puncture the tire of a vehicle that had not hit either of them and was either stationary or moving very slowly, without trying to . . . move out of the vehicle's path"); see also Orr v. Brame, 727 F. App'x 265, 269 (9th Cir. 2018) (affirming denial of judgment as a matter of law on Bane Act claim because "[e]xcessive force . . . is by its very nature egregious"); cf. Chinaryan v. City of Los Angeles, 113 F.4th 888, 907 (9th Cir. 2024) ("In most cases, including this one, the existence of specific intent for a Bane Act claim is a question that is 'properly reserved for the trier of fact.'" (quoting Hughes v. Rodriguez, 31 F.4th 1211, 1224 (9th Cir. 2022))), cert. denied sub nom. Cueto v. Chinaryan, 145 S. Ct. 1927 (2025).

Accordingly, Defendants' motion for summary judgment as to Cause of Action Five is **DENIED**.

## F. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CAUSE OF ACTION SIX FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### 1. Applicable Law

To prove intentional infliction of emotional distress, the plaintiff must prove "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Doe v. Gangland Prods., Inc., 730 F.3d 946, 960 (9th Cir. 2013) (quoting Davidson v. City of Westminster, 32 Cal. 3d 197, 209 (1982)). Conduct is "outrageous" if it is "so 'extreme as to exceed all bounds of that usually tolerated in a civilized community.'" Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009) (citation modified).

### 2. Analysis

Here, Defendants argue Plaintiff cannot prove Deputy Alfred's conduct was extreme or that Deputy Alfred intended to cause emotional distress. See Mot. at 26. However, a jury could conclude Deputy Alfred's decision to shoot Plaintiff while he slowly reversed his Trailblazer, specifically aiming at his headrest, was intentional and extreme, see Hughes, 46 Cal. 4th at 1043 (holding "'physical violence' . . . may qualify as being severe in the extreme"). See Gold v. Cal. Highway Patrol, 763 F. Supp. 3d 914, 934 (N.D. Cal. 2025) ("[A] reasonable jury could conclude . . . that this use of deadly force constituted 'extreme and outrageous' conduct."). Defendants also attack Plaintiff's decision to not seek medical treatment while incarcerated. See Mot. at 26. While that lack of evidence may be relevant to damages, the Court does not find it persuasive on the merits since a plaintiff need not "demonstrate 'objective symptoms' to recover for intentional infliction of emotional distress" under California law. Hailey v. Cal. Physicians' Serv., 158 Cal. App. 4th 452, 477 (2007), as modified on denial of reh'g (Jan. 22, 2008); cf. Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1000 n.20 (1993) ("[T]o recover compensatory damages in an action for intentional infliction of emotional distress, a plaintiff need only prove the fact that a defendant intentionally inflicted such distress by a preponderance of the evidence.").

Accordingly, Defendants' motion for summary judgment as to Cause of Action Six is **DENIED**.

**VI.**
**<u>CONCLUSION</u>**

For the reasons set forth above, Defendants' motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**.