Eugene P. Ramirez (State Bar No. 134865)
  *eugene.ramirez@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
  *kayleigh.andersen@manningkass.com*
Angela Brunson (State Bar No. 189223)
  *Angela.Brunson@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendant, COUNTY OF
SAN BERNARDINO and DEPUTY
CHRISTOPHER ALFRED

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEFFON BARBER, an individual,<br><br>              Plaintiff,<br><br>      v.<br><br>COUNTY OF SAN BERNARDINO, a municipal entity, DEPUTY CHRISTOPHER ALFRED, an individual, and DOES 1 through 10, inclusive,<br><br>              Defendants. | Case No. 5:22-cv-00625-KK-DTBx<br><br>*[District Judge, Kenly Kiya Kato, Magistrate Judge, David T. Bristow]*<br><br>**DEFENDANT COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OBJECTION TO THE PLAINTIFF'S PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT AND EXHIBIT**<br><br>Judge:  Hon. Kenly Kiya Kato<br>Crtrm.:  3; 3rd Floor |

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

Defendants County of San Bernardino ("the County") and Deputy Christopher Alfred (collectively, "Defendants") hereby **OBJECT** to the proposed judgment submitted by Plaintiff in this matter (Dkt. No. 204-1) on the following basis:

1

**DEFENDANT COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OBJECTION TO THE PLAINTIFF'S PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT AND EXHIBIT**

MANNING | KASS

1.      The jury awarded Plaintiff the amount of $7,250,00.00 for past pain and suffering and emotional distress; $18,250,000.00 for further pain and suffering and emotional distress; and $1,850,000.00 for future economic loss ("Damages Award"). [Dkt. 200 at p. 10.] The jury also found that Plaintiff was 36% responsible for his injury, damage, loss or harm. [*Id.* at p. 8.]

Question 12 asked the jury to answer the question as to damages only if it answered "Yes" to ***any*** of Questions 2, 5, 6, 7, 8, or 11. [Dkt. 200 at p. 10 (emphasis added).]  Question 2 asked, "Was the use of excessive force a cause of injury, damage, loss or harm to Plaintiff Steffon Barber?" to which the jury answered "Yes". [*Id.* at p. 2.]  The jury did not answer this question as it was related to the County's failure to train for which jury found the County not liable. [*Id.* at p. 4.] Question 6 asked "Did Defendant Christopher Alfred intentionally interfere with, or attempt to interfere with, Plaintiff Steffon Barber's civil rights by threats, intimidation, coercion in violation of the Bane Act?" to which the jury answered Yes".  [*Id.* at p. 5.] Question 7 asked "Did Defendant Christopher Alfred commit a battery in using deadly force on Plaintiff Steffon Barber" to which the jury answered Yes".  [*Id.* at p. 6.] Question 8 asked "Was Defendant Christopher Alfred negligent in his use of deadly force on Plaintiff Steffon Barber?" to which the jury answered "Yes".  [*Id.* at p. 7.]

However, the Damages Award is "cumulative" and does not have separate awards for each of the causes of action for which the jury found for the Plaintiff: excessive use of force, violation of the Bane Act, battery, and negligence. *C.f. Yeti by Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1110 (9th Cir. 2001) (verdict form required the jury to assign a separate damages figure for each cause of action); *Evans v. Multnomah Cnty*., 492 F. App'x 756, 760 (9th Cir. 2012) (the verdict form had blank lines for damages on each of the causes of action for excessive force, assault, and battery); Fed. R. App. P. 32.1.

MANNING | KASS

2

MANNING | KASS

2.      Accordingly, because it is undisputable that the jury found Plaintiff 36% responsible for his injury, damage, loss or harm (Dkt. 200 at p. 8), the award for non-economic damages is subject to apportionment based on the jury's determination of Plaintiff's percentage of fault as to the non-economic damages. Cal. Civ. Code § 1431.2.  *B.B. v. County of Los Angeles,* 10 Cal. 5th 1 (2020), holding that subdivision (a) for Cal. Civ. Code section 1431.2 does not authorize reduction in the liability of intentional tortfeasors for noneconomic damages based on the negligence of the plaintiff, does not apply here.  In *B.B. v. County of Los Angeles,* 10 Cal. 5th 1 (2020), the jury awarded the entire amount of non-economic damages to the plaintiff even while finding that the deputy-defendant was only 20% responsible for the decedent's death on the cause of action of battery on the premise that an intentional tortfeasor cannot claim a reduction oof liability based on the negligence of others. *Id.* at 29.  However, in *B.B. v. County of Los Angeles,* the jury did not find the defendants separately liable under a negligence cause of action, as it did here, for which then the jury also explicitly separately found that the plaintiff, as it did here, was 36% responsible.  In addition, in *B.B. v. County of Los Angeles,* the Supreme Court did not address the scenario of when a jury awards cumulative damages for several causes of action, including both intentional torts and negligence, as it did here, without specifying a dollar amount for each cause of action. *Id., generally; compare with Phelps v. Superior Ct.,* 136 Cal. App. 3d 802, 813 (Ct. App. 1982) (the special verdicts did not separate damages on the negligence as opposed to conversion of battery so that the apportionment ratio may be applied to the negligence verdict.)

Furthermore, the Defendants are the category of defendants for which the California statute was designed specifically to protect. Cal. Civ. Code § 1431.1 ("reforms in the liability laws in tort actions are necessary and proper to avoid catastrophic economic consequences for state and local governmental bodies").

**DEFENDANT COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OBJECTION TO THE PLAINTIFF'S PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT AND EXHIBIT**

3.      With respect to the economic damages, the entire award should be stricken because the award of future economic loss is not supported by substantial evidence and is purely speculative, guesswork and conjecture. *Villacorta v. Cemex Cement, Inc.*, 221 Cal. App. 4th 1425, 1433 (2013) (substantial evidence in the record to support lost wages, i.e. three years of lost salary at an annual rate of $65,699); *Walden v. United States*, 31 F. Supp. 2d 1230, 1235 (S.D. Cal. 1998) ("any claim by plaintiff for lost wages, medical expenses, and impaired future earning capacity must be supported by concrete evidence").

The jury was duly instructed that the determination of damages must not be speculative: "The plaintiff has the burden of proving damages by a preponderance of the evidence. ... Your award must be based upon evidence and not upon speculation, guesswork, or conjecture." [Declaration of Kayleigh A. Andersen, ¶ 2, Ex. 1, pp. 882:5-6; 883:1-2.]  However, there is no evidence to support the award of future economic loss, as there was no evidence of lost wages or earning capacity, of future medical costs or specific medical treatment sufficient for the jury to find the Plaintiff met his burden by a preponderance of the evidence.

Specifically, the Plaintiff did not testify as to his lost wages or employment during trial.  Plaintiff only testified as to participating in "general labor" prior to April 27, 2021:

> Direct Examination:
>
> Q:  What other physical activities did you do prior to April 27, 2021.
> A:  Um, just general labor, I guess. I don't know.
> …
> Cross-Examination:
> Q:  You mentioned something about general labor. I just want to clarify. What do you mean by "general labor"?
> A:  Referring to what?
> Q: I think you were asked activities you engaged in prior to this incident and you said general labor. What did you

DEFENDANT COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OBJECTION TO THE PLAINTIFF'S PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT AND EXHIBIT

> mean by that?
> A: General labor? I don't -- clean the yard is general labor.
> I don't know. Taking the trash out is general labor.

[Declaration of Kayleigh A. Andersen, ¶ 2, Ex. 1, pp. 466:12-14; 492:1-8]. Then, when Plaintiff was asked about employment prior to the incident, and the Court sustained the objection of Plaintiff's counsel, and Plaintiff did not provide testimony of employment:

> Cross-Examination:
> Q: And how long had it been since you were employed prior to this incident?
> Mr. Diggs: Objection, Your Honor. 403. Outside the scope.
> The Court: Sustained.

[Declaration of Kayleigh A. Andersen, ¶ 2, Ex. 1, pp. 492:9-10.]

Finally, there was no evidence presented of future medical costs or specific future medical treatment. [*Id.* at pp. 401-500 (Plaintiff's testimony, generally); 505-560 (Dr. Bennet Omalu, M.D.'s testimony, generally).]

Depending on the judgment entered by the Court, Defendants reserve the right to seek amendment of that judgment pursuant to Federal Rules of Civil Procedure 59, in accordance with the parties' stipulation and Court's briefing schedule. Dkts. 203, 205.

**DEFENDANT COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OBJECTION TO THE PLAINTIFF'S PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT AND EXHIBIT**

1    DATED:  February 23, 2026          Respectfully submitted,

2

3                                       **MANNING & KASS**
                                        **ELLROD, RAMIREZ, TRESTER LLP**

4

5

6                                       By:        /s/ Kayleigh Andersen

7                                              Eugene P. Ramirez
                                               Kayleigh Andersen
8                                              Angela Brunson
                                               Attorneys for Defendant, COUNTY OF
9                                              SAN BERNARDINO and DEPUTY
                                               CHRISTOPHER ALFRED
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        6

# DECLARATION OF KAYLEIGH ANDERSEN

I, Kayleigh Andersen, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am  A partner Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendant, COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.  I make this declaration in support of Defendant County of San Bernardino and Deputy Christopher Alfred's Objection to the Plaintiff's Proposed Judgment.

2.      Attached as **Exhibit 1** is a true and correct copy of the relevant pages from the transcript of the trial, pages omitted for brevity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 23rd day of February, 2026, at Los Angeles, California.


/s/ Kayleigh Andersen
Kayleigh Andersen

MANNING | KASS

1

# EXHIBIT 1

# EXHIBIT 1

1            UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3        HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

4

5   STEFFON BARBER,                      )
                                         )
6                    Plaintiff,          )
                                         )
7      v.                                )         Case No.
                                         )   CV 22-625 KK (DTBx)
8   COUNTY OF SAN BERNARDINO, et al.,    )
                                         )         Volume 3
9                    Defendants.         )   (Pages 392 - 597)
    _____)


11          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                   JURY TRIAL:  DAY THREE
12            TUESDAY, FEBRUARY 3, 2026
                       8:35 AM
13               RIVERSIDE, CALIFORNIA


23      MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24                 3470 12TH STREET
              RIVERSIDE, CALIFORNIA  92501
25                 (951) 328-4414


            UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MR. DIGGS: |
| 3 | Q.   Good morning, Mr. Barber. |
| 4 | THE COURT:  Mr. Barber, if you could please spell |
| 10:34AM   5 | your name for the record. |
| 6 | THE WITNESS:  Steffon, S-t-e-f-f-o-n. |
| 7 | THE COURT:  Last name. |
| 8 | THE WITNESS:  Barber, B-a-r-b-e-r. |
| 9 | THE COURT:  Thank you. |
| 10:34AM   10 | You may proceed. |
| 11 | MR. DIGGS:  Thank you, Your Honor. |
| 12 | BY MR. DIGGS: |
| 13 | Q.   Good morning, Mr. Barber. |
| 14 | A.   Good morning, sir. |
| 10:34AM   15 | Q.   Mr. Barber, how old are you currently? |
| 16 | A.   39. |
| 17 | Q.   Okay.  And in April of 2021, what city and state |
| 18 | were you living in? |
| 19 | A.   I was residing in Adelanto, California. |
| 10:34AM   20 | Q.   All right.  Now, briefly, Mr. Barber, on the night |
| 21 | of April 27th, 2021, you have a memory of that? |
| 22 | A.   A little.  A little. |
| 23 | Q.   Okay.  Were you at your home located on |
| 24 | White Avenue? |
| 10:34AM   25 | A.   Yes. |

1    Q.    Okay.  And that night, did you hear anyone talking

2    to you as you were trying to get in your vehicle, which we

3    talked about yesterday?

4    A.    Yes.

10:35AM  5    Q.    Okay.  And did you know who was speaking to you?

6    A.    No.

7    Q.    Could you see who was speaking to you?

8    A.    Not at all.

9    Q.    Did you have any indication that the individual that

10:35AM  10    was speaking to you was a police officer?

11    A.    No.

12    Q.    Did you see any police lights that evening?

13    A.    No.

14    Q.    Okay.  Did anyone announce to you, Mr. Barber, that

10:35AM  15    they were a police officer?

16    A.    Not at all.

17    Q.    Who did you think you were talking to that evening?

18    A.    I don't remember.

19    Q.    All right.  Now, at some point, you got in your

10:35AM  20    vehicle?

21    A.    Yes.

22    Q.    Okay.  What is the last thing that you remember?

23    A.    Getting in my vehicle.

24    Q.    What is your next memory thereafter?

10:35AM  25    A.    Waking up in the hospital.

**UNITED STATES DISTRICT COURT**

1       Q.    Okay.  All right.  What did you discover,

2    Mr. Barber, when you woke up in the hospital?

3       A.    Um, I couldn't move.

4       Q.    Could you move your legs?

10:36AM  5       A.    No.

6       Q.    Could you move your arms?

7       A.    No.

8       Q.    All right.  And how long were you in the hospital?

9       A.    Approximately five months.

10:36AM 10       Q.    Okay.  And have you learned that you were shot in

11    the head?

12       A.    Yeah, through the nurses.

13       Q.    Okay.  And during the time that you were in the

14    hospital, Mr. Barber, did you have any surgeries?

10:36AM 15       A.    Yeah.  They informed me that I had brain surgery.

16       Q.    Okay.  Um, and do you still have a scar on your head

17    from the brain surgery?

18       A.    Yes.

19       Q.    Can you show the ladies and gentlemen of the jury

10:36AM 20    the scar?

21       A.    (Indicating.)

22       Q.    Okay.  Now, Mr. Barber, I would like to show some

23    documents to you.

24             MR. DIGGS:  And, Your Honor, myself and counsel have

10:36AM 25    talked and we agreed on the documents already -- the exhibits

         1    that I will be moving into evidence will be Exhibit 8-1, 8-2,

         2    8-3, 8-5, 8-6, and 8-9.

         3            THE COURT:  All right.  So 8-1, 2, 3, 5, 6, and 9.

         4            MR. DIGGS:  Yes, Your Honor.

10:37AM  5            THE COURT:  Very well.  Then those will be admitted,

         6    and you may publish.

         7                (Exhibit Nos. 8-01, 8-02, 8-03, 8-05, 8-06,

         8                 and 8-09 for identification and received

         9                 into evidence.)

10:37AM 10            MR. DIGGS:  Thank you, Your Honor.

        11    BY MR. DIGGS:

        12        Q.   I'll just briefly, Mr. Barber, just show you -- is

        13    that you in the picture that we're seeing right now?

        14        A.   Yes, sir.

10:37AM 15        Q.   Okay.  And do you know how long you were like this

        16    in the hospital during the five months?

        17        A.   I don't know.

        18        Q.   Okay.  And this one, again, is that you in the

        19    hospital?

10:37AM 20        A.   That is me.

        21        Q.   Okay.

        22            THE COURT:  And when you're putting them up, if you

        23    could refer to them.

        24            MR. DIGGS:  Oh.  Yes.  Exhibit 8-2.

10:37AM 25            The next exhibit published is Exhibit 8-3.

1           THE COURT:  Thank you.

2           MR. DIGGS:  Uh-huh.

3    BY MR. DIGGS:

4       Q.    And did the nurses tell you what was going on when

10:38AM  5    you finally woke up in the hospital, what -- while you're in

6    the bed like this?

7       A.    Well, I wasn't awake then, that I remember.  I --

8    when I -- when I woke up, I was -- I didn't have all the tubes

9    and stuff.  I just had -- they came, they were doing -- I had

10:38AM  10   staples all the way on my head.

11      Q.    Understood.

12            And I'm going to show these just briefly,

13   Mr. Barber.

14            8-5.  That is your head where the bullet entered; is

10:38AM  15   that correct?

16      A.    Yes, sir.

17      Q.    Okay.  And Exhibit 8-6, showing the same thing, your

18   head, Mr. Barber?

19      A.    Yes, sir.

10:38AM  20   Q.    Okay.  And you briefly just mentioned now your head

21   was shaven.  I'm going to show Exhibit 8-9.

22            Is that your head prior to the hair shaving off?

23      A.    Yes.

24      Q.    Okay.  All right.  Thank you, Mr. Barber.

10:39AM  25            Now, Mr. Barber, how did you feel when you learned

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | you had been shot in the head? |
| 2 | A.    I was devastated.  I couldn't -- I didn't |
| 3 | understand -- I didn't understand it. |
| 4 | Q.    All right.  And how did you feel when it -- when you |
| 10:39AM  5 | learned that it was a police officer that shot you in the head? |
| 6 | A.    It -- oh, I -- I don't -- I can't describe it. |
| 7 | Q.    Okay.  Let me ask you this, Mr. Barber.  Do -- the |
| 8 | shooting happened in 2021 and we're in 2026.  Do you still |
| 9 | think about the shooting? |
| 10:40AM  10 | A.    Every day. |
| 11 | Q.    Okay.  Do you ever have any nightmares about what |
| 12 | happened that evening? |
| 13 | A.    I don't really have a good memory of what happened |
| 14 | that -- that evening. |
| 10:40AM  15 | Q.    All right.  Now, Mr. Barber, we see that you are in |
| 16 | a wheelchair.  Is that correct? |
| 17 | A.    Yes, sir. |
| 18 | Q.    All right.  And is that how you generally get |
| 19 | around? |
| 10:40AM  20 | A.    Yes. |
| 21 | Q.    Okay.  Now, before April 27th, 2021, were you able |
| 22 | to walk? |
| 23 | A.    Yes. |
| 24 | Q.    Were you able to run? |
| 10:40AM  25 | A.    Yes. |

```
        1        Q.    Are you able to run now?

        2        A.    Not at all.

        3        Q.    Okay.  Before this incident happened, Mr. Barber,

        4   did you participate in any sports?

10:40AM 5        A.    I wasn't good at any sports, but I did, like, a

        6   little basketball or something --

        7        Q.    Okay.  And --

        8        A.    -- at that time.

        9        Q.    I'm sorry.  I didn't mean to cut you off.

10:40AM 10             And are you able to play basketball now?

       11        A.    Not at all.

       12        Q.    Okay.  What other physical activities did you do

       13   prior to April 27th, 2021?

       14        A.    Um, just general labor, I guess.  I don't know.

10:41AM 15        Q.    Okay.  And, Mr. Barber, are there any issues with

       16   your left arm?

       17        A.    Yeah.  I have mobility issues.

       18        Q.    Okay.  Are you able to stand up at all?

       19        A.    Not for long periods of time.

10:41AM 20        Q.    Okay.  And you generally need help to stand up?

       21        A.    Assistance, yes.

       22        Q.    Okay.  And prior to April 27th, 2021 -- sorry -- did

       23   you have any issues walking or standing?

       24        A.    No.

10:41AM 25        Q.    Okay.  Now, just want to talk about some of the
```

**UNITED STATES DISTRICT COURT**

1    daily activities, Mr. Barber, starting from after the shooting.

2         Are you able to tie your shoes?

3    A.   I can get around to it eventually.  It takes a -- it

4    takes a great amount of energy and time to -- to do the

10:42AM    5    little -- little things like that because it's more -- I don't

6    know the word -- like, intricate or something.  I don't know.

7    I don't know.  But it's more -- it's more difficult trying to

8    tie my shoes.

9    Q.   Understood.

10:42AM    10         And are you able to button your shirt?

11    A.   I can -- I can manage eventually if it's not, you

12    know -- I -- I couldn't get this top one, but I managed the

13    rest of them.

14    Q.   Understood.

10:42AM    15         Are you able to shower yourself?

16    A.   Yeah.

17    Q.   Okay.  And we talked about your shirt.  But are you

18    able to get dressed by yourself?

19    A.   Yes.

10:42AM    20    Q.   Okay.  Now, Mr. Barber, as a result of the shooting,

21    do you experience any pain?

22    A.   Yes.  Yes.

23    Q.   Can you describe the type of pain that you

24    experience for the ladies and gentlemen of the jury?

10:43AM    25    A.   Um, it's -- it's like a constant stinging, like a

**UNITED STATES DISTRICT COURT**

```
 1    pricking.  It don't -- it doesn't never go away.  It --

 2    sometimes it's easier to deal with, you know, but, um -- it's

 3    always there, you know.  It never -- it never -- it's a

 4    never -- it's never a moment where it -- where I'm without

 5    pain, you know.

 6         Q.   And, Mr. Barber, when did you first start

 7    experiencing this pain?

 8         A.   Um, before the -- right before they discharged me

 9    from the hospital.

10         Q.   All right.  And you mentioned, does -- does the pain

11    ever stop?

12         A.   No.

13         Q.   Let me ask you this, Mr. Barber, to put into

14    perspective.  How many days in the past week have you

15    experienced pain?

16         A.   Every day.

17         Q.   How many days in the past month have you experienced

18    pain?

19         A.   Every day.

20         Q.   How many days in the past year have you experienced

21    pain?

22         A.   The same answer.  If it -- if it's not -- if it's

23    not one area, it's another area.

24         Q.   All right.

25         A.   So it's -- it's -- it's constant.  I'm constantly in
```

Timestamps in left margin: 10:43AM (line 5), 10:43AM (line 10), 10:44AM (line 15), 10:44AM (line 20), 10:44AM (line 25)

**UNITED STATES DISTRICT COURT**

1    pain in some area or multiple areas in my -- in my life -- in

2    my body, every day.

3        Q.    As you sit here now in court, are you experiencing

4    pain?

5        A.    Right now.

6        Q.    Do you experience headaches -- I'm not talking about

7    regular headaches that, you know, you may receive, but do you

8    experience a different type of headache at all as a result of

9    being shot in the head?

10        A.    Yes.

11        Q.    And can you just -- are you able to describe that?

12        A.    Words can't -- can't describe that.

13        Q.    All right.  Do you have muscle spasms as a result of

14    being shot?

15        A.    Yes.

16        Q.    And how frequent and in which part of the body do

17    you have muscle spasms?

18        A.    I have leg spasms, um, then my -- my -- my left hand

19    goes numb from time to time; the toes, I could -- I -- I could

20    feel them, but I can't move them, you know.  I don't --

21        Q.    Are the muscle spasms that you have, are those

22    painful?

23        A.    Yeah, sometimes.

24        Q.    All right.  Before April 27th, 2021, that you were

25    shot in the head, Mr. Barber, did you have this constant pain

1    every day that you just described to the ladies and gentlemen

2    of the jury?

3         A.    No.

4         Q.    Okay.  Before -- this day before you were shot, did

10:46AM    5    you have the type of headaches that you just described to the

6    ladies and gentlemen of the jury?

7         A.    No, sir.

8         Q.    Okay.  Before you were shot, Mr. Barber, did you

9    experience the type of spasms throughout your body that you

10:46AM   10    just explained?

11         A.    No.

12         Q.    All right.  As a result of the shooting, Mr. Barber,

13    has your memory changed at all?

14         A.    A little bit, yeah.

10:46AM   15         Q.    Do you have any challenges in remembering certain

16    things like --

17         A.    It's hard -- it's harder.

18         Q.    Harder.

19         A.    To retain information.

10:46AM   20         Q.    Did you have the same type of memory issues in terms

21    of retaining information prior to the shooting?

22         A.    I never had the best, but, I mean, it wasn't as it

23    is today.

24         Q.    Understood.

10:46AM   25              Now, just briefly, Mr. Barber, can you tell the

ladies and gentlemen of the jury, like, how do you feel -- it's

been almost, you know, five years, but how do you feel now that

you're in a wheelchair and you weren't in a wheelchair prior to

the shooting?

A.    Um, how do -- how do I feel?

Q.    Yeah.  How do you feel about being in a wheelchair?

A.    Uh, I don't have -- I don't have -- let me see.

Well, you know, life has its obstacles; right?  I was

struggling before this, now this is a whole new struggle I have

to -- that I'm trying to -- I'm trying to deal with it.  And,

um, I have my good days and bad days.

Q.    We talked about some of the physical activities that

you were doing prior, and I know you said that you weren't that

good in basketball.  But how does it make you feel now that

you're in a wheelchair and the activities that you used to do,

such as running or even walking or playing basketball, that you

can't do that anymore?  How do you feel about that?

A.    I feel cheated.

Q.    Mr. Barber, I'm almost done.

Almost five years later since this happened, has --

has the -- the level of pain, um -- has it gotten any better

since when you woke up in the hospital?

A.    I mean, I had my -- my good days and bad days, but

the pain is always there.

Q.    You mentioned the mobility in your left arm.  Has --

```
 1   has it gotten any stronger at all?
 2         A.    No.
 3               MR. DIGGS:  All right.  No further questions.
 4               Thank you, Mr. Barber.
 5               THE COURT:  Thank you.
 6               Mr. Ramirez, cross-examination?
 7               MR. RAMIREZ:  Miss Andersen will be handling it,
 8   Your Honor.
 9               THE COURT:  Very well.
10               Ms. Andersen.
11               MS. ANDERSEN:  Yes, Your Honor.  Thank you.
12                         CROSS-EXAMINATION
13   BY MS. ANDERSEN:
14         Q.    Good morning, Mr. Barber.
15         A.    Good morning, ma'am.
16         Q.    You were asked by counsel about memory issues.  Do
17   you recall giving a deposition in this case?
18         A.    Yes.
19         Q.    Back in September of last year.  Does that sound
20   accurate?
21         A.    Yeah, 20 -- yes, 2025.
22         Q.    You told counsel that you don't recall anything
23   after getting into the vehicle before waking up in the
24   hospital; right?
25         A.    Yes.
```

1    Q.    But you do recall the events that happened before

2    you got into the vehicle.  Is that fair?

3    A.    Fair.

4    Q.    You recall your neighbors as Maria Gallo and

10:50AM    5    Joseph Cocchi?

6    A.    Yeah.  They were -- the husband and wife landlords

7    in the front house.

8    Q.    Okay.  The front house that's located on

9    White Avenue?

10:50AM    10    A.    Yes, ma'am.

11    MS. ANDERSEN:  Okay.  I discussed with counsel,

12    Your Honor, Exhibit 3-68.  I believe it's -- we've stipulated

13    to it.

14    MR. DIGGS:  Yes.  No objection, Your Honor.

10:50AM    15    THE COURT:  Very well.  3-68 will be admitted, and

16    you may publish.

17    (Exhibit No. 3-68 for identification

18    and received into evidence.)

19    MS. ANDERSEN:  Thank you, Your Honor.

10:51AM    20    BY MS. ANDERSEN:

21    Q.    Do you see the photograph on the screen in front of

22    you?

23    A.    Yes.

24    Q.    And do you see Maria and Joseph Cocchi's house in

10:51AM    25    that photo?

**UNITED STATES DISTRICT COURT**

```
 1        A.    Yes.

 2        Q.    Okay.  Is it that photo -- I'm sorry.  Is it the

 3   house on the right side of the photograph?

 4        A.    Yes.

 5        Q.    Okay.

 6              MS. ANDERSEN:  And then next exhibit, Your Honor,

 7   will be 7-25, again by agreement with counsel.

 8              MR. DIGGS:  No objection, Your Honor.

 9              THE COURT:  7-25 will be admitted.  You may publish.

10              (Exhibit No. 7-25 for identification

11               and received into evidence.)

12              MS. ANDERSEN:  Thank you.

13   BY MS. ANDERSEN:

14        Q.    All right.  Do you see the photograph in front of

15   you?

16        A.    Yes.

17        Q.    Does that photograph depict your residence that you

18   were living in at the time of the incident?

19        A.    Yes.

20        Q.    Okay.  And it's the building essentially right

21   behind that house we just looked at in 3-68; correct?

22        A.    Yes, ma'am.

23        Q.    Okay.  And that's because Maria and Joseph were the

24   landlords for the property where you were living; is that

25   correct?
```

The time markers "10:51AM" appear at lines 5, 10, 15, 20, and 25.

```
 1          A.    Correct.
 2          Q.    How long had you lived at that residence prior to
 3    April 27th of 2021?
 4          A.    Roughly a year, I believe.  I'm not too sure.
 5          Q.    And was that consistently you lived there for an
 6    entire year with the same landlords?
 7                MR. DIGGS:  Objection, Your Honor.  Relevance.
 8                THE COURT:  Sustained.
 9    BY MS. ANDERSEN:
10          Q.    Had you interacted with Maria and Joseph prior to
11    April 27th of 2021?
12          A.    No.
13          Q.    So this whole incident started because you were
14    leaving at that exact moment you heard this voice in the
15    driveway to go to the corner store; is that correct?
16          A.    Yes.
17          Q.    Okay.  Where was this corner store?
18          A.    It was off of Bartlett, Bartlett and Pearmain.
19          Q.    And how -- how long would it take you to get there
20    from your house?
21          A.    Couple minutes.
22          Q.    Okay.  And this incident took place about a little
23    after 11:00 PM on a Tuesday, April 27th of 2021.  Does that
24    sound accurate?
25          A.    I had thought that was earlier, but I'm not sure.
```

10:52AM
10:52AM
10:52AM
10:52AM
10:53AM

1    Because I think the store closes at either 10:00 or 11:30.

2    10:30, 11:30, I'm not sure.  I don't remember.

3        Q.    Okay.  Had Ms. Gallo or Mr. Cocchi ever given you a

4    ride to the corner store before this date?

5        A.    No.  I never needed a ride.

6        Q.    Do you recall asking them for a ride on the date of

7    this incident to go to the corner store?

8        A.    Yes.

9        Q.    When you were asking them that question, were they

10   inside their vehicle or were they outside their vehicle?

11       A.    I don't remember.

12       Q.    Do you remember if one or both of them was inside or

13   outside the vehicle one way or another?

14       A.    One -- it was Cocchi at first.  I talked to him.  I

15   never talked to, um -- that I was -- I was blocked in the

16   driveway.  So he didn't want to move his car for -- for

17   whatever reason, so I asked him could he just give me a ride to

18   the store since he didn't want to move his car because I was

19   blocked in.  He never parked where he parked any other time,

20   you know.  So I don't know what was going on or -- but I was

21   just trying to leave to go to the store.

22       Q.    Where were you when you had this interaction with

23   Joseph?

24       A.    In the driveway.

25       Q.    Were you standing next to your vehicle?

**UNITED STATES DISTRICT COURT**

       1        A.    Um, my vehicle was -- was parked where it always was

       2    parked at, in the -- in the driveway.

       3        Q.    I guess we'll look at this photo as an example.

       4    Would it have been closer, more forward towards those trash

10:54AM  5    cans that's depicted, at least the blue one?

       6        A.    Yeah.  Closer to the air compressor.

       7        Q.    I'm sorry, the what?

       8        A.    Air compressor closer to the -- to the fence.

       9        Q.    Okay.

10:54AM 10        A.    Like right -- like right near the second -- second

      11    door.

      12        Q.    So where was Joseph when you were having this

      13    contact with him?

      14        A.    In the driveway.

10:54AM 15        Q.    Was he inside a vehicle or was he outside the

      16    vehicle?

      17        A.    He was in his vehicle in back of my vehicle.

      18        Q.    Okay.  And did you ask him to move?

      19        A.    I don't recall.

10:55AM 20        Q.    Do you recall pulling on his door handles?

      21        A.    His door handles?  No, I don't recall.

      22        Q.    Okay.  But you did -- you do recall asking them to

      23    give you a ride to the corner store?

      24        A.    Yeah, he refused.  He said that he was waiting on

10:55AM 25    his wife or something.

1      Q.    Do you know where your landlords typically park that

2  vehicle that you claim was blocking the driveway?

3      A.    In -- in the -- in the -- in their area where they

4  normally -- you know, we share the driveway up to a certain

10:55AM  5  point before the break.  And then they park their cars in their

6  little -- their little break right there.  I don't know how to

7  explain it.

8      Q.    Okay.  But off of the driveway.  They don't park in

9  the driveway?

10:55AM  10     A.    No, they don't ever park in the driveway.

11     Q.    Do you recall anything that they said to you about

12  your vehicle being in their way?

13         MR. DIGGS:  Objection.  Hearsay.

14         THE COURT:  Sustained.  I'm not sure what the

10:55AM  15  relevance of this line of questioning is either.

16         MS. ANDERSEN:  Okay.  Your Honor, I'll move on.

17         THE COURT:  Thank you.

18  BY MS. ANDERSEN:

19     Q.    Do you recall seeing your neighbors leave in the

10:56AM  20  vehicle after you had this interaction with Joseph?

21     A.    Yeah, they finally did leave.  So then that's when I

22  was able to -- to -- to leave myself, because I was blocked in.

23  I couldn't leave while they were doing whatever they were doing

24  or not wanting to move for whatever reason.

10:56AM  25     Q.    Okay.  Did -- did you say anything to them before

**UNITED STATES DISTRICT COURT**

1    they left?

2        A.    No.

3        Q.    But you saw them drive away and completely exit the

4    driveway; is that correct?

5        A.    Yeah.  It took them -- it took them a while.  She

6    came home and then they backed the cars up or whatever.  Then

7    the driveway was finally clear, and that's when I was getting

8    ready to leave, and that's when I heard somebody talking to me.

9        Q.    How much time would you estimate passed between your

10   neighbors driving away -- or at least exiting the driveway to

11   when the deputy arrived, this voice arrived?

12       A.    I don't -- I don't recall.  It wasn't that long.  It

13   was like -- it seemed like right -- like right after -- it had

14   to be a few minutes, but it seemed like it was right away.

15       Q.    Do you recall previously testifying it was about

16   5 minutes?

17       A.    I think.  Vaguely -- you know, I don't know exactly

18   the number but it was -- it could have been more or less.

19       Q.    Okay.  In that time frame, after your neighbors

20   exited before you heard this voice in the driveway, you did not

21   go to the corner store?

22       A.    No, I never made it.

23       Q.    Okay.  And that's because the police showed up and

24   instructed you not to get in the car; is that correct?

25       A.    I didn't even know the police came.  I didn't know

**UNITED STATES DISTRICT COURT**

they were even called.

Q.    Do you recall testifying to that in your deposition, that the police came up and instructed you not to get in the car.  That's why you didn't leave?

A.    I don't recall that.

Q.    Okay.

MS. ANDERSEN:  I'd like to go to his deposition transcript, page 35, lines 10 through 19.

THE COURT:  Is this to refresh recollection?

MS. ANDERSEN:  This is to impeach, Your Honor.

THE COURT:  Well, he said he didn't recall.  So the proper thing to do would be to see whether or not anything would refresh.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.    Would it refresh your recollection to look at your prior testimony in this case?

A.    I don't -- I don't have a problem with it.

Q.    Okay.  There is a stack over there.  One has your name on it.  Are you able to find it, Barber, Steffon?

MR. GALIPO:  We have an extra copy, also, if necessary.

THE COURT:  We have a copy.

MR. DIGGS:  Counsel, can you give page and line numbers?

|        |    |                                                                  |
|--------|----|------------------------------------------------------------------|
|        | 1  | MS. ANDERSEN:  Yes.  35, lines 10 through 19.                     |
|        | 2  | BY MS. ANDERSEN:                                                  |
|        | 3  | Q.    Mr. Barber, let me know when you get to the page.          |
|        | 4  | Okay?                                                             |
| 10:58AM| 5  | A.    What page is it again?                                      |
|        | 6  | Q.    It's page 35 of that transcript.                           |
|        | 7  | A.    Which number am I looking at?                              |
|        | 8  | Q.    Yes.  It would be lines 10 -- starting at line 10,         |
|        | 9  | down to 19.                                                      |
| 10:59AM| 10 | A.    Hmm.                                                        |
|        | 11 | Q.    Have you had an opportunity to look at those lines?        |
|        | 12 | Mr. Barber, does that refresh your recollection at               |
|        | 13 | all to giving me that testimony at your deposition?             |
|        | 14 | A.    Yeah.  I mean, it doesn't really refresh my memory,        |
| 11:00AM| 15 | but, I mean, I -- obviously I said it, you know.                 |
|        | 16 | Q.    And although you told counsel when he was asking you       |
|        | 17 | questions that you didn't know who the voice was, in deposition  |
|        | 18 | you testified it was Joseph Cocchi, your neighbor.              |
|        | 19 | MR. DIGGS:  Objection, Your Honor.  Misstates the                |
| 11:00AM| 20 | testimony in the deposition.                                     |
|        | 21 | THE COURT:  Sustained.                                           |
|        | 22 | BY MS. ANDERSEN:                                                 |
|        | 23 | Q.    Did you know who the voice you were speaking with          |
|        | 24 | that night was?                                                 |
| 11:00AM| 25 | A.    No.                                                         |

**UNITED STATES DISTRICT COURT**

        Q.    Did you believe it was your neighbor?

        A.    It possibly could have been.  I don't know.

        Q.    Well, can I have you look at those same lines again,
page 35, lines 10 through 19, please, and see if it refreshes
11:01AM  your recollection about whether you thought it was your
neighbor at that time?

              (Pause in the proceedings.)

              THE WITNESS:  Yeah.  I'm reading it, but I never --
I never made contact with the police officer.  I never knew it
11:01AM  was a police officer.

BY MS. ANDERSEN:

        Q.    Yeah, my question was actually about the neighbor,
whether at the time of this incident you believed you were
speaking with your neighbor.

11:02AM        A.    Yeah, because that's the person I had -- I had the
verbal little altercation with, with Cocchi.

        Q.    Do you mean before --

        A.    Before --

        Q.    -- you got in your vehicle?

11:02AM        A.    Before I jumped into the car, yes.

        Q.    So did you believe that it was Joseph Cocchi that
you were speaking with before you got to your vehicle?

        A.    That was talking to me?  Yes.

        Q.    Why do you think your neighbor would instruct you to
11:02AM  show you -- show him your hands?

1          MR. DIGGS:  Objection.  Calls for speculation.

2    Conjecture.

3          THE COURT:  Sustained.

4    BY MS. ANDERSEN:

11:02AM  5     Q.    So after you had your interaction -- your initial

6    interaction, I guess we'll say, with Joseph in the driveway and

7    they've exited, the next thing you know there's a deputy in

8    your drive -- driveway asking you something to the effect of,

9    "hey, bud, come over here."  Is that correct?

11:03AM 10     A.    I didn't know the deputy --

11          MR. DIGGS:  I'm sorry.  Objection.  Assumes facts

12   not in evidence as phrased.

13          THE COURT:  Sustained.

14   BY MS. ANDERSEN:

11:03AM 15     Q.    Did you hear "hey, bud, come over here"?

16     A.    I did.

17     Q.    Okay.  And then you received commands, "let me see

18   your hands."

19          Did you hear those?

11:03AM 20     A.    Yes, ma'am.

21     Q.    Okay.  And in response to that, the command to see

22   your hands, you told this voice to show you his hands; is that

23   correct?

24     A.    Right.

11:03AM 25     Q.    Okay.  If you couldn't see this individual, why were

1    you asking to see his hands?

2        A.    To see where -- where the person was at.

3        Q.    Did you ever yell "who are you" or "why are you

4    asking me these things" at any time before you got in the

11:03AM 5    vehicle?

6        A.    I think something along the lines of -- or -- "who

7    are you" or "what are you doing back here," something --

8    something along those lines.

9        Q.    When did you say that?

11:04AM 10       A.    Sometime during the discourse.

11       Q.    Have you listened --

12       A.    Or the oral exchange.

13       Q.    I apologize.  I cut you off.

14             We have played the audio, which is Exhibit 10 in

11:04AM 15   this case, multiple times in your presence.

16             Have you listened to it?

17       A.    Vaguely -- yeah, a little bit.

18       Q.    Did you ever hear yourself on the audio asking "who

19   are you"?

11:04AM 20       A.    Who are -- I don't -- I don't recall saying "who are

21   you."  I thought it said "what are you doing back here" or --

22   along those lines.  I don't know.  I try not to listen to it,

23   to be honest with you.

24       Q.    Did you also tell this voice to "back the fuck up"?

11:04AM 25       A.    Yeah, I do recall that.

**UNITED STATES DISTRICT COURT**

1    Q.    Okay.  And, again, why are you asking this person to

2    back the fuck up if you can't see them?

3    A.    Because I was -- my intentions were to leave the

4    driveway.

11:04AM    5    Q.    Did you know where they were?

6    A.    No.

7    Q.    So did you know whether or not they were even in the

8    driveway?

9    A.    I don't know.  All I know I was trying to leave --

11:04AM    10    leave to go to the store, that's it.

11    Q.    Then why the phrase "back the fuck up" if you're

12    just trying to back up your vehicle?

13    A.    Because I'm going to be backing out the vehicle,

14    backing my car out -- I don't know.  I can't -- I can't give

11:05AM    15    you an answer to that.

16    Q.    Do you know what color uniform deputies with the

17    San Bernardino County Sheriff's Department wear?

18    A.    I've had -- I've had a lot of run-ins with them,

19    yeah.

11:05AM    20    Q.    Okay.  What -- what does their uniform look like,

21    like color?

22    A.    Like color?  It's -- it's tan and -- tan and green.

23    Q.    And that would be tan shirt, green pants?

24    A.    Yeah.

11:05AM    25    Q.    Okay.  This voice also told you not to get into your

1    vehicle; correct?

2        A.    Correct.

3        Q.    And then you did it anyway?

4        A.    No.  First he told me don't put my hands in the

5    vehicle, and I wasn't sure if he was talking to me or not.  So

6    I stuck my hands in the vehicle and nobody said anything.  So I

7    assumed that he wasn't talking to me.

8        Q.    And you pulled out a cell phone at that time;

9    correct?

10       A.    No.  I jumped in the car at that time.

11       Q.    The first time, when you reached into the vehicle,

12   was it to grab your cell phone?

13       A.    I believe so, yes.

14       Q.    Okay.  And so you heard "don't get in your car," you

15   reached in, grabbed a cell phone, then you step back out of the

16   vehicle?

17       A.    I'm not sure.  I think -- I'm not sure if it was all

18   one motion or not or -- or --

19       Q.    Did you hear "don't get in the vehicle" or "don't

20   get in the car" more than one time?

21       A.    I don't -- I don't understand where we're going with

22   this.

23       Q.    Did you hear it more than once?  That's all I'm

24   asking.  "Don't get in your vehicle, don't get in your car"?

25       A.    I remember hearing it.  I don't remember the number

```
 1   of times.
 2       Q.    And then you did eventually get into your vehicle;
 3   correct?
 4       A.    Yes.
 5       Q.    And closed the door?
 6       A.    Yes, ma'am.
 7       Q.    And left the trunk wide open?
 8       A.    Yes, ma'am.
 9       Q.    Okay.  And that was to go to the corner store?
10       A.    Yeah.
11       Q.    With the trunk open?
12       A.    Or to back out the driveway.
13       Q.    Do you typically back out the driveway with your
14   trunk wide open?
15       A.    No, but it was dark out that night.
16       Q.    Why didn't you close it, then?
17       A.    Why didn't I?  I didn't get around to it.  I never
18   made it out the driveway.
19       Q.    Why didn't you close it before you got into the
20   vehicle?
21       A.    Because the back hatch up, it illuminates the whole
22   driveway.  It's a dark -- it's a dark, little, long strip and
23   an old car.
24       Q.    So are you saying that you typically reverse your
25   vehicle out of the driveway with the trunk wide open?
```

Timestamps in left margin: 11:06AM (line 5), 11:06AM (line 10), 11:06AM (line 15), 11:06AM (line 20), 11:07AM (line 25)

**UNITED STATES DISTRICT COURT**

1        A.    No, not normally, because I normally don't leave at

2    night.  But in that incident, in that circumstance, I was -- I

3    was going to back out the truck -- leave it open so it could

4    illuminate the whole backyard -- I mean, the whole -- the whole

11:07AM   5    driveway because it's dark.

6        Q.    Okay.  And you said the corner store closes around

7    10:00 or 11:00.  Is that your understanding?

8        A.    Yeah.  I'm not sure.  If -- if that one was closed,

9    I probably would have went to the actual gas station or

11:07AM  10    something, I don't know.

11        Q.    But you recall testifying about going to the corner

12    store specifically?

13        A.    Yeah.  That was my intention.

14        Q.    But it could have been closed if this incident took

11:07AM  15    place after 11:00.  Is that fair?

16        A.    True.

17            MR. DIGGS:  Objection.  Argumentative.  403.

18            THE COURT:  Sustained.

19    BY MS. ANDERSEN:

11:07AM  20        Q.    Did those voice -- the voice you heard telling you

21    "don't get in the vehicle, don't reach in the vehicle, show me

22    your hands," do those sound like law enforcement commands?

23        A.    I don't know what law -- I don't -- I don't know --

24    I haven't had that conversation with law enforcement.

11:08AM  25        Q.    Ever?

**UNITED STATES DISTRICT COURT**

|  | 1 | THE COURT:  Move on. |
|--|---|---------------------|

```
 1              THE COURT:  Move on.

 2              MS. ANDERSEN:  If he opens the door, is that not --

 3              THE COURT:  Move on.

 4              MS. ANDERSEN:  Okay.

 5    BY MS. ANDERSEN:

 6         Q.    So you didn't tell this voice, hey, I'm just going

 7    to leave, I need to make it to the corner store?

 8         A.    No.

 9         Q.    Okay.  And you got in the car, it was already

10    idling, it was already on?

11         A.    Yes, ma'am.

12         Q.    Was it in park when you got into the vehicle?

13         A.    Yes.

14         Q.    Okay.  And then you shifted it into reverse?

15         A.    Upon me attempting to leave, yes.

16         Q.    So you do recall that part of getting into the

17    vehicle and shifting it into reverse?

18         A.    All I remember really is getting in the vehicle.  I

19    must have had -- I must have shifted it into reverse because

20    that was my intention was to leave.  I don't know where we're

21    going with that.  I mean, I'm trying to be honest and answer

22    the question, but I don't know -- you're not -- you're not

23    taking my answers.  I don't know how to explain it.

24         Q.    Well, I'm just asking you questions.  I'm -- did

25    you -- you do have a recollection of the car moving backwards,
```

Timestamps in left margin: 11:08AM (line 5), 11:08AM (line 10), 11:08AM (line 15), 11:09AM (line 20), 11:09AM (line 25)

                though; is that correct?

                    A.    No.  I remember getting in the car and -- and next

                thing I remember waking up in the hospital.  I don't remember

                putting it in reverse, I don't remember -- I don't remember

11:09AM         those things.

                    Q.    Can I have you take a look, then, at page 48 of that

                same deposition transcript?

                    A.    48?  Yes, ma'am.

                    Q.    And lines 20 to 22?

11:09AM             A.    48:20?

                    Q.    Yes.  Page 48, lines 20 to 22.

                    A.    20 to 22.

                          (Pause in the proceedings.)

                BY MS. ANDERSEN:

11:10AM             Q.    Were you able to take a look at those lines?

                    A.    Yes, ma'am.

                    Q.    Do you have a recollection of the car moving

                backwards?

                    A.    It doesn't change my answer.

11:10AM             MS. ANDERSEN:  Your Honor, that's impeachment.  I'd

                like to use this as impeachment.

                          THE COURT:  You can go ahead and read the question

                at line 20 and the answer.

                          MS. ANDERSEN:  Thank you, Your Honor.

11:10AM                   "QUESTION:  But do you have a recollection

```
 1          of the car moving backwards?  Is that correct?
 2               "ANSWER:  Yes."
 3   BY MS. ANDERSEN:
 4          Q.    And then you do recall feeling a gunshot; is that
 5   correct?
 6          A.    Yes.
 7          Q.    Okay.  And that was while you were in the vehicle;
 8   correct?
 9          A.    Yes.
10          Q.    Do you recall whether the vehicle was still moving
11   backwards when you felt that gunshot?
12          A.    No.  I don't know.
13          Q.    So it's not completely accurate that you don't
14   recall anything after closing the door on the vehicle and
15   waking up in the hospital; is that correct?
16          A.    I guess.  I -- I guess I try to forget certain
17   stuff.
18          Q.    You don't recall hearing any gunshots before you
19   felt the gunshot; is that true?
20          A.    True.
21          Q.    Do you recall hearing any gunshots after you felt
22   the gunshot?
23          A.    I didn't hear any -- no.
24          Q.    Okay.
25          A.    Not to my knowledge.  I don't -- I don't know.
```

**UNITED STATES DISTRICT COURT**

1    Q.    You mentioned something about general labor.  I just

2    want to clarify.  What do you mean by "general labor"?

3    A.    Referring to what?

4    Q.    I think you were asked activities you engaged in

11:11AM 5    prior to this incident and you said general labor.  What did

6    you mean by that?

7    A.    General labor?  I don't -- clean the yard is general

8    labor.  I don't know.  Taking the trash out is general labor.

9    Q.    And how long had it been since you were employed

11:12AM 10   prior to this incident?

11           MR. DIGGS:  Objection, Your Honor.  403.  Outside

12   the scope.

13           THE COURT:  Sustained.

14   BY MS. ANDERSEN:

11:12AM 15   Q.    You were prescribed a number of medications by the

16   hospital after this incident; is that correct?

17   A.    Yes.

18   Q.    Okay.  And you refused to take medications after you

19   left the hospital that were prescribed by Arrowhead; is that

11:12AM 20   correct?

21   A.    Yes.

22   Q.    And you were prescribed physical therapy to continue

23   after you were discharged from the hospital; correct?

24   A.    Correct.

11:12AM 25   Q.    You also chose to stop attending physical therapy

```
 1   sometime after your discharge from the hospital; is that
 2   correct?
 3       A.    Yes.
 4       Q.    Was cost ever an issue for you not to attend those
 5   physical therapy appointments?
 6             MR. DIGGS:  Objection, Your Honor.  403.
 7             THE COURT:  Sustained.
 8   BY MS. ANDERSEN:
 9       Q.    Did you -- I apologize.  I'm going to ask you to
10   repeat your response to this.  Did you say that you can get
11   dressed on your own or you cannot get dressed on your own, when
12   asked by counsel?
13       A.    I can.  It just takes a while.
14       Q.    Back in November of 2021, were you still at
15   Arrowhead, the hospital?
16       A.    Back in when?
17       Q.    November of 2021.
18       A.    I believe I left in September.  I'm not -- I'm not
19   too sure.
20       Q.    Okay.  Sometime after your discharge from the
21   hospital, did you practice walking without the wheelchair?
22       A.    Walking without the wheelchair?  That was part of
23   the physical therapy was walking, um, on the bars.  It had bars
24   there.
25       Q.    And as early as February of 2022, do you recall
```

11:12AM  5
11:12AM  10
11:13AM  15
11:13AM  20
11:13AM  25

1    telling medical professionals that you wanted to start using a

2    walker instead of the wheelchair?

3        A.    Did I tell them that?

4        Q.    Yeah.  Do you recall telling them that?

11:13AM  5        A.    I told them I would like to, yeah.  That was -- that

6    was the goal.  I never reached the goal.

7        Q.    And you were advised to also continue with physical

8    therapy appointments as of 2022; correct?

9        A.    Yes.  But I had trial, and it was conflicting with

11:14AM 10    my trial.

11        Q.    But sometime in the year 2022 you did stop attending

12    physical therapy; is that correct?

13            MR. DIGGS:  Objection.  Asked and answered.

14    Cumulative.

11:14AM 15            THE COURT:  Overruled.

16            THE WITNESS:  Can you ask me the question again?

17    BY MS. ANDERSEN:

18        Q.    Of course.

19            Sometime in 2022, you stopped attending physical

11:14AM 20    therapy; correct?

21        A.    Yes, ma'am.

22        Q.    Yes?

23        A.    Yes.

24        Q.    Do you recall telling a medical provider in December

11:14AM 25    of 2022 that you did not want any more medical follow-up and

```
 1    all future appointments canceled?
 2        A.    Regarding to what?
 3        Q.    Your health.  December of 2022.
 4        A.    Yeah because they were giving -- they were trying to
 5    give me psych meds.  I didn't want to take no psych meds.
 6        Q.    What about a medical appointment you had?
 7        A.    I didn't have any medical appointments.
 8        Q.    After 2022?
 9        A.    I -- I wasn't -- I wasn't on medical.
10            MR. DIGGS:  Objection.  Objection under the line of
11    questioning.  403.
12            THE COURT:  I'm going to overrule it, but I would
13    suggest that we move on.
14            You may answer the question.
15            THE WITNESS:  What is the question?
16    BY MS. ANDERSEN:
17        Q.    I'll go back to the original question.  I think
18    there's been some confusion.
19            In December of 2022, do you recall telling a medical
20    provider you did not need any more medical follow-up and you
21    wanted all future appointments canceled?
22        A.    That was the only way for them not to schedule it
23    again because they said, well -- they said medical precedes
24    Court.  And I was trying to -- I was tired -- tired of
25    waiving my -- my -- missing court for physical therapy just
```

Timestamps (left margin): 11:15AM (line 5), 11:15AM (line 10), 11:15AM (line 15), 11:15AM (line 20), 11:16AM (line 25)

| | |
|---|---|
| 1 | because it wasn't physical therapy. |
| 2 | THE COURT:  Move on. |
| 3 | BY MS. ANDERSEN: |
| 4 | Q.    And in that same appointment, you were advised to |
| 5 | continue physical therapy; correct? |
| 6 | A.    Yeah, they told me -- they told me to -- that they |
| 7 | were offering me physical therapy. |
| 8 | Q.    And you did not take them up on that offer to |
| 9 | continue physical therapy; correct? |
| 10 | A.    Because being chained in a room, it is not physical |
| 11 | therapy. |
| 12 | Q.    Back when you were still in physical therapy at |
| 13 | Arrowhead, isn't it true that even back then, you were able to |
| 14 | walk with a walker and transfer independently to the bed? |
| 15 | A.    Walk with a walker?  I've never had a walker.  I |
| 16 | have a walker in prison.  I never -- I never -- |
| 17 | Q.    Would you say that the weakness in your legs is |
| 18 | worse today than it was when you were at Arrowhead? |
| 19 | A.    No.  It's the opposite. |
| 20 | Q.    So it's gotten -- the weakness has gotten better or |
| 21 | some relief to the weakness? |
| 22 | A.    It's just become manageable. |
| 23 | Q.    When was the last time you attended physical |
| 24 | therapy? |
| 25 | MR. DIGGS:  Objection, Your Honor.  403 again, this |

Timestamps in left margin: 11:16AM (line 5), 11:16AM (line 10), 11:16AM (line 15), 11:17AM (line 20), 11:17AM (line 25)

**UNITED STATES DISTRICT COURT**

1    line of questioning.

2              THE COURT:  Overruled.

3              THE WITNESS:  When's the last time?  I don't

4    remember the date.

11:17AM  5    BY MS. ANDERSEN:

6         Q.    You mentioned a stinging sensation when asked by

7    your counsel if you were experiencing pain.

8              Do you recall that?

9         A.    Yes, ma'am.

11:17AM 10         Q.    Have you ever advised any medical professional that

11    you have this stinging sensation?

12         A.    They said it was because of the nerve damage.

13         Q.    Do you recall the last time you saw a medical

14    professional for this stinging sensation?

11:17AM 15         A.    No.

16         Q.    You also mentioned headaches.  When was the last

17    time you saw a medical provider for these headaches?

18         A.    They prescribed some psych meds.  And I -- I refused

19    to take them.  I didn't want -- I didn't want to take them.  So

11:18AM 20    I stopped seeing that person.

21         Q.    Have you seen any other medical providers for the

22    headaches?

23         A.    No.  They -- they -- they said everything was, um --

24    everything -- everything that I'm going through can be -- be --

11:18AM 25    what's the word?  It could be, um -- psych meds will take care

1    of it; the pain, the -- the spasms.  Psych meds will do the

2    trick for everything.

3        Q.    And you refused to take those; is that correct?

4        A.    Yeah, I didn't want to take -- I didn't like the way

11:18AM  5    it made me feel.

6        Q.    Did you ask for any alternative prescriptions for

7    pain medications?

8        A.    No.  Tylenol, ibuprofen.

9        Q.    Is it also correct that you did not any -- attend

11:18AM  10   any type of therapy or counseling for mental or emotional

11   injuries you attribute to this incident?

12       A.    Any counseling?

13       Q.    Correct.

14       A.    At -- you're talking about at Arrowhead?

11:19AM  15   Q.    Anywhere.  Any -- anytime after Arrowhead.

16       A.    I've had a substance abuse program.  I don't know if

17   that helps.  I don't -- I don't know.

18            MS. ANDERSEN:  Nothing further at this time,

19   Your Honor.  Thank you.

11:19AM  20           THE COURT:  Thank you.

21            Mr. Diggs, redirect?

22            MR. GALIPO:  May we have one -- can I confer with

23   Mr. Diggs for just one moment, Your Honor?

24            THE COURT:  Yes.

11:19AM  25               (Off-the-record discussion between counsel.)

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | MR. GALIPO:  Thank you, Your Honor. |
| 2 | MR. DIGGS:  Thank you, Your Honor. |
| 3 | Your Honor, briefly, for the rule of completeness, |
| 4 | um, could I read from Mr. Barber's deposition, page 48, |
| 11:20AM  5 | line 17, through 49, line 5?  And then -- |
| 6 | THE COURT:  Give me one moment. |
| 7 | 48, what line? |
| 8 | MR. DIGGS:  17. |
| 9 | THE COURT:  Through 49 -- |
| 11:20AM  10 | MR. DIGGS:  Line 5. |
| 11 | THE COURT:  Yes. |
| 12 | MR. DIGGS:  Thank you. |
| 13 | "QUESTION:  And you do not recall whether |
| 14 | you put it in reverse or not; is that correct? |
| 11:20AM  15 | "ANSWER:  That's correct. |
| 16 | "QUESTION:  But you do have a recollection |
| 17 | of the car moving backwards; is that correct? |
| 18 | "ANSWER:  Yes. |
| 19 | "QUESTION:  Was that a yes, I'm sorry? |
| 11:20AM  20 | "ANSWER:  Yes. |
| 21 | "QUESTION:  Okay.  Do you recall pressing |
| 22 | down on the gas pedal at any time you got into the |
| 23 | driver's seat? |
| 24 | "I don't recall." |
| 11:21AM  25 | Thank you, Your Honor. |

**UNITED STATES DISTRICT COURT**

```
 1                    No further questions.

 2              THE COURT:  No further questions?

 3              MS. ANDERSEN:  No further questions, Your Honor.

 4              THE COURT:  Very well.  Then we're going to go ahead

 5    and take a brief break at this time.

 6              Mr. Galipo, do you have your next witness available?

 7    I guess I'm wondering if we should just simply take an early

 8    lunch break.

 9              MR. GALIPO:  I think that makes sense, Your Honor.

10    And then I'll be ready to go right after our break.

11              THE COURT:  Very well.

12              Then, ladies and gentlemen, we are going to take an

13    early lunch break at this time.

14              I will see you back here at 12:30.  In the meantime,

15    please remember the admonitions.  Keep an open mind, do not

16    speak to anybody about the case, do not let anyone speak to you

17    about the case, and do not conduct any independent research or

18    investigation.

19              Thank you.  Have a nice lunch.

20              THE COURTROOM DEPUTY:  All rise.

21                 (Out of the presence of the jury:)

22              THE COURT:  You may be seated.

23              We are still on the record outside the presence of

24    the jury.

25              Mr. Galipo, I believe that your last witness will be
```

**UNITED STATES DISTRICT COURT**

```
 1  whole truth, and nothing but the truth, so help you God?
 2              THE WITNESS:  I do.
 3              THE COURTROOM DEPUTY:  Thank you.  Please have a
 4  seat and state and spell your first and last name for the
 5  record.
 6              THE WITNESS:  My name is Bennet Omalu, B-e-n-n-e-t,
 7  Omalu, O-m-a-l-u.
 8              THE COURT:  Thank you.
 9              Mr. Galipo, you may proceed.
10              MR. GALIPO:  Thank you very much, Your Honor.
11                      BENNET OMALU, M.D.,
12  called as a witness by the plaintiff, was sworn and testified
13  as follows:
14                      DIRECT EXAMINATION
15  BY MR. GALIPO:
16      Q.   Good afternoon, Dr. Omalu.
17      A.   Good afternoon, sir.
18      Q.   Are you what's sometimes referred to as a forensic
19  pathologist?
20      A.   Yes, sir.
21      Q.   Do you have particular areas of expertise with
22  respect to the human brain?
23      A.   Yes, sir.
24      Q.   And injuries to the human brain?
25      A.   Yes, sir.
```

12:40PM (line 5)
12:41PM (line 10)
12:41PM (line 15)
12:41PM (line 20)
12:41PM (line 25)

```
 1   whole truth, and nothing but the truth, so help you God?
 2              THE WITNESS:  I do.
 3              THE COURTROOM DEPUTY:  Thank you.  Please have a
 4   seat and state and spell your first and last name for the
 5   record.
 6              THE WITNESS:  My name is Bennet Omalu, B-e-n-n-e-t,
 7   Omalu, O-m-a-l-u.
 8              THE COURT:  Thank you.
 9              Mr. Galipo, you may proceed.
10              MR. GALIPO:  Thank you very much, Your Honor.
11                         BENNET OMALU, M.D.,
12   called as a witness by the plaintiff, was sworn and testified
13   as follows:
14                        DIRECT EXAMINATION
15   BY MR. GALIPO:
16        Q.   Good afternoon, Dr. Omalu.
17        A.   Good afternoon, sir.
18        Q.   Are you what's sometimes referred to as a forensic
19   pathologist?
20        A.   Yes, sir.
21        Q.   Do you have particular areas of expertise with
22   respect to the human brain?
23        A.   Yes, sir.
24        Q.   And injuries to the human brain?
25        A.   Yes, sir.
```

Timestamps in left margin:
12:40PM (line 5)
12:41PM (line 10)
12:41PM (line 15)
12:41PM (line 20)
12:41PM (line 25)

```
 1        Q.    Can you tell the ladies and gentlemen of the jury,

 2   before we get into some of your opinions in this case, about

 3   your educational background, please?

 4        A.    Well, I went to medical school in Nigeria in

 5   West Africa, the seven-year medical school curriculum fashioned

 6   after the British; six years of medical school training; one

 7   month every year of clinical internship whereby you work as a

 8   physician but under supervision.  So I worked in the

 9   departments of gynecology and obstetrics, surgery, internal

10   medicine, and pediatrics.  I performed surgeries, delivered

11   about 400 babies.  Then I began work as an emergency room

12   physician for three years in a university hospital.  I sat for

13   my United States medical license and examination, which I

14   passed while I was in Nigeria.  I applied to the World Health

15   Organization for a scholarship, which I got, that enabled me to

16   come to the University of Washington, Seattle, Washington, to

17   come to the school of public health to do a one-year clinical

18   research program, which I completed, then proceeded to

19   Columbia University in New York City at Harlem Hospital Center

20   to do a five-year residency training program in anatomic and

21   clinical pathology.  Because of exceptional scholarship, the

22   five years were reduced to four years for me.  I completed

23   residency training in anatomic and clinical pathology four

24   years, then I proceeded to the University of Pittsburgh,

25   Pittsburgh, Pennsylvania, to do a one-year fellowship training
```

Timestamps: 12:41PM (line 5), 12:42PM (line 10), 12:42PM (line 15), 12:43PM (line 20), 12:43PM (line 25)

1    in forensic pathology.

2         Q.    Let me stop you for one moment.

3              You used the term "forensic pathology," "clinical

4    pathology."  Can you explain to the jury what those

12:43PM  5    different -- and another pathology, which I'm forgetting right

6    now, I apologize.  Can you explain to the jury what those

7    two -- three different areas -- forensic pathology, clinical

8    pathology, and what was the third one?

9         A.    Forensic pathology.

12:43PM  10        Q.    Forensic, clinical.  And what am I missing?

11        A.    Anatomic.

12        Q.    Anatomic.  Thank you.

13        A.    Yes, sir.

14        Q.    Can you explain to the jury what those specialties

12:44PM  15   are?

16        A.    An anatomic pathologist is a specialized physician

17   who studies disease and makes disease diagnosis by structure of

18   disease.  An example, assuming you're a woman, you feel a lump

19   in your breast and you go and see your surgeon.  Your surgeon

12:44PM  20   takes a biopsy and sends it to an anatomic pathologist who

21   would analyze the tissue to determine if you have cancer or not

22   and, if you have cancer, what type of cancer and what type of

23   treatment you need.

24              A clinical pathologist is a specialized physician

12:44PM  25   who studies disease and makes disease diagnosis by the study of

1    chemicals in the body.  A good example, too, if you go and see

2    your doctor and you do your annual physical and then send

3    you -- they send you to the lab to have your blood drawn, your

4    blood is sent to a clinical pathologist who will determine the

12:45PM    5    levels of glucose, sodium, hormones in your body, and come back

6    with a diagnosis to your physician.

7            A forensic pathologist, again, is a specialized

8    physician who studies disease, who studies trauma, and who

9    studies death.  A forensic pathologist comes after the fact,

12:45PM    10    after something has happened, an event has occurred.  A

11    forensic pathologist applies scientific methods to make

12    determinations of causation, mechanism of sustenance, and

13    treatment.

14           So a forensic pathologist attend to living patients

12:45PM    15    who suffered all types of trauma and also to dead patients who

16    died from all types of disease.

17           So the forensic pathologist, tell me what you were

18    doing -- the forensic pathologist can tell you what happened to

19    you.  Um, that is a forensic pathologist.

12:46PM    20    Q.    Okay.  Thank you for that.

21           And, for example, do forensic pathologists such as

22    yourself commonly do autopsies to determine the cause of death

23    and manner of death?

24    A.    Yes.  So one of the things we do is performing

12:46PM    25    autopsies to determine how and why people die and to provide

answers to any questions society or any interested party may

have in terms of what killed the person, could it have been

prevented, and what lesson does society have to learn from this

death.

12:46PM  Q.    Okay.  Thank you.

Now, you were up to the time that you, I think, got

to Pittsburgh --

A.    Yes.

Q.    -- Pennsylvania.  Tell us about your education and

12:47PM  professional experience in Pittsburgh.

A.    So after forensic pathology, I went back to the

University of Pittsburgh, Pittsburgh, Pennsylvania, to do a

two-year fellowship training in neuropathology.

Q.    What is neuropathology?

12:47PM  A.    Again, neuropathology is a specialized part of

medicine -- or a neuropathologist is a specialized physician

who studies diseases of the nervous system -- the brain, the

spinal cord, the muscles, and the nerves -- who studies all

types of trauma to the nervous system, and who studies dementia

12:47PM  in -- in living and dead people and makes diagnosis of disease.

A neuropathologist determines types of brain trauma

and determines expected outcomes of brain trauma.

Q.    And after your fellowship in neuropathology, where

did your education take you next?

12:48PM  A.    So after neuropathology, I went back to the

University of Pittsburgh, the school of public health, to do a

three-year master's in public health program in epidemiology,

e-p-i-d-e-m-i-o-l-o-g-y.

Q.    You're helping our court reporter?

A.    Yes.

Q.    Okay.  She's a pretty good speller, I think.

But explain to the jury what that is.

A.    So -- so epidemiology is a specialty of medicine

that studies the distribution, the spread, and the causation of

diseases and trauma in populations and in groups of

populations.

So the epidemiologist establishes generally accepted

principles of every disease upon which we apply to each and

every individual patient.

For example, it was an epidemiologist who discovered

that, when you play football, that you suffer brain damage.  It

was an epidemiologist that discovered that, when you have sex,

you could contract HIV.  So these are what epidemiologists do.

Q.    You at some point in your time in Pittsburgh took

particular interest in brain injuries; is that true?

A.    Yes, sir.

Q.    Including brain injuries of NFL football players?

A.    Yes, sir.

Q.    And the movie *Concussion* covered your work as a

doctor in brain injuries to football players?

1    A.    Yes, sir.

2    Q.    Now, after you did your master -- you got your

3  master's in public health in Pittsburgh, where did your

4  education take you next?

12:50PM  5    A.    So I went back to the Carnegie Mellon University to

6  do a three-year program in business management with a focus on

7  medical management.  I went to the Tepper, T-e-p-p-e-r, Tepper

8  School of Business.  I completed that in three years.  Then I

9  sat for board certification examination in medical management.

12:50PM  10    Q.    Okay.  What is board certification for doctors?

11    A.    Well, board certification, the analogy -- when you

12  are done with the training in a specialty of medicine, you sit

13  for an examination, which, if you pass, you become certified as

14  an authority in the specialty.  There is nothing higher.

12:51PM  15        So when I'm actually some -- a degree that is

16  similar to -- it's like having a Ph.D. in physics.  So when you

17  have a board certification in neuropathology, that is the max

18  you could get.  You are sufficiently knowledgeable and your

19  opinions could be regarded as authoritative.

12:51PM  20    Q.    Would it be fair to say, Dr. Omalu, that some

21  medical doctors are not board certified and others are?

22    A.    Yes, sir.

23    Q.    You could still be a doctor, and a competent doctor,

24  without being board certified?

12:51PM  25    A.    Yes.

1    Q.    How many areas of medicine do you have board

2    certifications in?

3    A.    I don't like saying it, but I have board

4    certification in five specialties.

12:51PM    5    Q.    Okay.  Can you tell the jury what are the five

6    different areas of medicine that you are board certified?

7    A.    I'm board certified in anatomic pathology, in

8    clinical pathology, forensic pathology, neuropathology, and

9    medical management.  Then I hold a master's in public health in

12:52PM    10    epidemiology and a master's in business administration.

11    Q.    Okay.  And you have testified in courts before as an

12    expert in -- in forensic pathology and neuropathology, for

13    example?

14    A.    Yes.  I have testified hundreds of times in every

12:52PM    15    jurisdiction -- federal, state, county, municipal courts -- all

16    over the country.

17    Q.    Okay.  Well, thank you for being here today.

18    And I want to ask you some questions about this

19    case.

12:52PM    20    You, at some point, were retained by my office to

21    review this particular case.  Is that fair?

22    A.    Yes, sir.

23    Q.    And you and I -- I have -- my office has retained

24    you to review other cases in the past.  Is that also correct?

12:53PM    25    A.    Yes.

1          Q.    I'm going to show you what I think is already in

2     evidence, Exhibit 8, page 6.

3                THE COURT:  Yes.

4                MR. GALIPO:  Is it okay if I publish?  I believe

12:53PM  5     it's in, Your Honor.

6                THE COURT:  It is.  You may publish.

7     BY MR. GALIPO:

8          Q.    All right.  Is this one of the photographs you were

9     able to view in this particular case?

12:53PM  10         A.    Yes, sir.

11         Q.    And do you have an understanding as to what caused

12     this wound?

13         A.    Yes, sir.

14         Q.    What's your understanding?

12:53PM  15         A.    He suffered severe traumatic brain injury caused by

16     a ballistic, a gunshot, a bullet that came from a handgun.

17         Q.    And we see damage on the outside of the head in this

18     picture; correct?

19         A.    Yes, sir.

12:54PM  20         Q.    Does this picture necessarily show the damage to the

21     inside of the brain?

22         A.    Partly it does, partly -- you could see brain tissue

23     bulging out of the wound.  So when you see that, we call it

24     herniation, upward herniation.  So for a bullet that travels at

12:54PM  25     about 1200 to 1400 feet per second, that's a large amount of

1    energy.

2            So when it gets into the skull cavity, the skull

3    cavity is a rigid cavity that does not necessarily communicate

4    with the outside.  So with such a massive amount of energy,

12:55PM  5    when the bullet gets inside the cranial cavity, it causes an

6    explosive effect.  And, in fact, when you see simulations for

7    about 200 milliseconds, the brain expands multiple times.  So

8    because of the explosive expansion, brain tissue herniates

9    upward, forceful herniation through the gaping defect in the

12:55PM  10    skull.  So such a pattern of trauma is consistent with severe

11    traumatic brain injury.

12        Q.    Okay.  I'm going to take this down now and talk to

13    you a little bit about the extent of the injury that Mr. Barber

14    suffered.

12:55PM  15            In addition to looking at photographs and

16    understanding the mechanism of injury, did you have an

17    opportunity to review medical records, particularly from

18    Arrowhead Regional Hospital where Mr. Barber was for some

19    period of time?

12:56PM  20        A.    Yes.

21        Q.    Can you explain to the jury, given your expertise as

22    a neuropathologist, how the bullet entering Mr. Barber's head

23    and brain caused him damages and whether those damages are

24    permanent or not?

12:56PM  25        A.    So over the centuries, very intelligent people that

came before us have studied this and established what we call

generally accepted principles of medicine, almost like

scientific truths.

So when you have a tiny object like a bullet

12:56PM    traveling at a very high speed, what is lethal about it is the

kinetic energy, not the mass of the bullet.

So when the bullet encounters the skin of the scalp,

it entered -- in this instance, it entered from the back and

top of the head.  It never came from the front or the side.  It

12:57PM    came from the back, was traveling in a rightward and downward

trajectory.

Because of the energy, upon coming in contact with

the skull, about 100 milliseconds the skull will put a

resistance, but the energy of the bullet overcomes the

12:57PM    resistance of the skull and the amount of energy splintered the

skull.

And when that happens, you have what we call

comminuted, comminuted, meaning broken up into multiple tiny

pieces.  Comminuted fractures of the skull.  Then the bullet

12:58PM    continued, entered the cranial cavity, downloaded that entire

energy.  Unfortunately, a bullet that settles in your body is

more dangerous than a bullet that continues through your body.

Because when the bullet continues, it takes energy with it.

But when it gets in contact with the body and settles inside

12:58PM    your body, all that entire energy is downloaded on your body.

1          So it entered -- entered the brain.  Unfortunately,

2     the human brain is 60 to 80 percent water.  So it has almost no

3     resistance.  So that amount of energy caused the diffused

4     explosive and the brain pretty much splinters apart the fibers.

12:59PM  5          So although the bullet entered in the local part of

6     the head, the damage is diffused because it was a bullet with

7     high amounts of energy.

8          So the area surrounding the point of entry will be

9     the most damaged.  It will actually be pulpified.  And then,

12:59PM  10    diffusely, other parts of the brain are affected.

11         Because it was such an extensive injury, the

12    surgeons couldn't go in to take out the pieces of bullet.  So

13    all they did was to wash out as much as they could -- the less

14    you handle the brain, the better.  And they removed the

12:59PM  15    broken-up pieces of skull and put in titanium, which is

16    permanent.

17         So because, again, the human brain is a body -- only

18    organ in the body that does not have any reasonable capacity to

19    heal itself or to regenerate itself, any injury to the brain,

01:00PM  20    especially severe injury, is permanent.

21     Q.    Let me ask you this.  Thank you for all of that.  I

22    just want to follow up on a few points before I forget.

23         Based on your review of the medical records, I'm

24    assuming that you looked at some of the diagnostic scans that

01:00PM  25    were done, CT scans of the brain, et cetera?

**UNITED STATES DISTRICT COURT**

```
 1        A.    Yes, sir.

 2        Q.    Are you saying that there were multiple bullet

 3    fragments in his brain?

 4        A.    Yes, sir, bullet fragments, multiple pieces of tiny

 5    speckles of bone that are still inside his brain even until

 6    today.

 7        Q.    Okay.  That was my next question.

 8              Are you saying that Mr. Barber has bullet fragments

 9    and bone fragments in his brain scattered throughout his brain

10    from this incident, even till today?

11        A.    Yes, sir.

12        Q.    And then you mentioned that they had to put a -- a

13    plate in.  Is that a titanium plate?

14        A.    Yes, sir.

15        Q.    What's the name of that surgical procedure to do

16    that?

17        A.    Well, pardon the jargon.  It's called cranioplasty,

18    c-r-a-n-i-o-p-l-a-s-t-y.  Cranioplasty is Latin.  It simply

19    means fixing the -- the skull.

20        Q.    Can you -- can you just generally explain that

21    surgical procedure to the jury?

22        A.    So the surgical procedure was described in the

23    medical records.  So what the surgeons did at his bedside,

24    they'll get normal saline, which is about the -- has the same

25    tonicity, about -- it's about the same as plasma in terms of
```

01:00PM (line 5)
01:00PM (line 10)
01:01PM (line 15)
01:01PM (line 20)
01:01PM (line 25)

1   the density of the water.  So then they use normal saline,

2   s-a-l-i-n-e.  They irrigate very slowly to wash out the dead

3   brain tissue.

4           So while they wash it out slowly, once the -- the

01:02PM   5   surgeon believes he's reasonably washed out the dead brain

6   tissue, they suture the dura mater.  And then they do their

7   best to take out the pieces, the fragments of bone.

8           The less you touch the brain, the better.  Remember,

9   it's 60 to 80 percent water.  And it has no ability to

01:02PM   10   regenerate itself.  A good analogy, if you take out half of

11   your liver, six months later, if you go back, your liver has

12   regrown.  The brain does not have that capacity.

13          So whatever is damaged, what you do is you mitigate

14   secondary damage.  So they did that, and then they covered the

01:02PM   15   cranium with this titanium so that there wouldn't be any

16   additional trauma to his skull accidentally.

17       Q.    So, in your opinion, Dr. Omalu, were brain cells

18   damaged for Mr. Barber because of this -- this bullet into his

19   brain?

01:03PM   20       A.    Yes, sir.  The entire brain was damaged, not just

21   the brain cells, the tiny blood vessels of the brain.  There

22   are different types of brain cells.  They were all damaged.

23   Um, so it's all permanent.

24          Unfortunately, when you -- the brain cells sustain

01:03PM   25   severe damage, the genomics resets itself and, over time, the

damage becomes progressive.

Q.    And what do you mean by progressive?  Does that mean worse?

A.    Yes.  It's -- his symptoms will become worse.  He'll begin to lose his previously obtained functionality.  He'll become -- start becoming less intelligent, start becoming more emotional.

In fact, as an epidemiologist, I know that for somebody like Mr. Barber, in about 20 to 30 years after he suffered his trauma -- he was 35 when he suffered this trauma.  So at about 55, 65, he will develop full-blown dementia.  And the mien and median we use is 20 to 30 years where he will require almost 24/7 assistance.

This is the statistics.  This is one of the truths of science, ob- -- observed over the centuries.  So it's called traumatic encephalopathy.  So such severe traumatic brain injury is permanent, is irreversible, and it's progressive.

Q.    Okay.  Thank you.

And then I think you spoke about the -- the herniation of the brain matter.  That's part of what we see sticking out of the skull in that photo I showed you earlier?

A.    Yes, sir.

Q.    Was the -- was there a skull fracture?  And if so, how would you describe it?

A.    Yeah.  The skull fracture was the comminuted

1    fractures.  So a comminuted fracture is the most extensive and

2    the most severe type of fracture anybody could have.

3         So -- and that was why the surgeons couldn't fix it.

4    They had to remove it, replace it with an artificial skull.

01:05PM    5    Q.    Did you note during the course of Mr. Barber's

6    treatment at Arrowhead that he was -- participated in physical

7    therapy and occupational therapy?

8    A.    Yes, sir.

9    Q.    Did they have to put staples in his head at some

01:06PM    10   point?

11   A.    I believe so, yes, sir.

12   Q.    And were those removed at some point, the staples?

13   A.    Yes, sir.

14   Q.    Um, is there a period of time where the person is

01:06PM    15   going to get about as good as they're going to get in an injury

16   like this?

17   A.    Yeah.  So the human brain has, um, great reserve of

18   what we call great plasticity, in plastic, plasticity.

19        So -- and it depends on individuals.  About -- based

01:06PM    20   on epidemiology, about six months to one year, it will be as

21   bad as you could be.  Then after six months to one year, you

22   may show some compensatory recovery.  What does that mean?  It

23   doesn't mean you're recovering.  It simply means that the brain

24   cells that were not as damaged as the others will begin to

01:07PM    25   hyperfunction.  They'll form new neural connections to

compensate for the damage.

But because the brain is not like other organs --
we'll call it a post-mitotic, post-mitotic, meaning the brain
cells cannot divide to form new ones.  The brain cell does not
01:07PM  have the capacity to divide and form a new brain cell like
other cells in the body do.

So after a certain limit, that compensation, which
is its maximum extent -- because there is a limit to what one
brain cell can do.  It could vary, and that is why they become
01:08PM  very -- they decompensate very quickly after 20 to 30 years.

So as time goes on -- it varies in individuals --
they will start losing their functionality in every domain.

However, they will never regain their functionality
before they were shot.  What does that mean?  Assuming somebody
01:08PM  has the brain of a physicist and he suffers such brain damage,
he could now begin to function at the level of -- I don't
know -- maybe a housekeeper that cannot solve very complex
mathematical problems.

So when you look at it, you may think, oh, he's
01:08PM  doing okay.  But when you encounter him on a personal level,
you ask him, okay, what is the basic law of speed of light?
Remember, he's a Ph.D. of physics.  He would have remembered
that.  So they may function well, don't be fooled.  They are
not functioning at their premorbid state, but they still have
01:09PM  symptoms -- cognitive impairment, mood disorders, they could

1    cry, behavioral disorders, and then somatic.  They may not be

2    able to use all parts of their body.  They may be having

3    headaches.  They may be having aches and pain.

4           And they may also have distorted, distorted

01:09PM    5    thinking, meaning what a regular, normal, average person may

6    think is good for him, because of his brain damage, he may not

7    think it's good for him.  So we call them cognitive distortions

8    caused by his injury.

9           Q.    Okay.  Now, you've touched on some of the things.

01:10PM    10    There's been some reference to headaches.

11           A.    Yes, sir.

12           Q.    Is it common for someone who's been shot in the

13    brain, if they survive, to have severe headaches?

14           A.    Yes.  They have severe headaches and we have the

01:10PM    15    medical explanations for the headaches they have.  Yes.

16           Q.    How about -- there's been talk about constant pain,

17    24/7 pain, some days better than others.  Is that, in your

18    opinion, related to the injuries from being shot in the brain?

19           A.    Yes, sir.  That's called neuro -- neuropathic pain,

01:10PM    20    yes, sir.

21           Q.    Can you explain that to the jury, please?

22           A.    So the human brain is one of the most effective and

23    efficient mechanisms you can ever encounter.  So it functions

24    in a very delicate and very well-balanced system.  And it

01:11PM    25    maintains itself.

1    So when you suffer brain trauma, that balance is

2    disturbed.  There are brain cells in your brain that keep other

3    brain cells in check.  It's highly coordinated.  That is why,

4    assuming you're eating, you're hungry, you're eating, at some

01:11PM  5    point you're full.  There are brain cells that tell you you are

6    full, stop eating.  And they tell the brain cell that are

7    making you eat, stop.

8    So when it comes to pain, there are brain cells that

9    want to constantly make you feel pain.  And there are brain

01:11PM  10    cells that shut them down.  Okay, enough.  So when your brain

11    is damaged like Mr. Barber's brain is damaged, you lose that

12    mechanism.  It also happens in people with spinal cord

13    injuries.  They have severe pain in the extremities.

14    So these cells now start firing constantly, nonstop.

01:12PM  15    So they will now be having this constant pain.  And because the

16    brain damage is permanent, there is no drug that can eradicate

17    that pain now.  So what you do, you try to mitigate, minimize

18    the pain, and you give them anti-depressants to stop them from

19    becoming too depressed from the constant pain.

01:12PM  20    Q.    How about there's been reference in the medical

21    records -- and I think the jury's heard some testimony about

22    muscle -- or spasms.  Is that related to the brain injury?  And

23    if so, how?

24    A.    Yeah.  Same mechanism.  Same mechanism.  Again, this

01:12PM  25    happens in spinal cord patients.

1        So there are cells that are there -- there are

2   reasons -- I don't want to go into the -- the detailed science.

3   There are reasons why there should be cells that are constantly

4   firing.

01:13PM   5        So the cells that tell them to stop will shut them

6   down.  There are -- sometimes you need your muscles to go into

7   spasm, like when you're having fever.  So there are times.  So

8   when it's not needed, the brain cell shut them down.  Okay,

9   stop.

01:13PM  10        Now, when that balance is disturbed, some of the

11   cells will not escape, they don't have any check, and they keep

12   on constantly firing.  And then that's when you have the muscle

13   spasms.  We'll call -- sometimes we'll call them

14   fasciculations, fasciculations.  And it could be very, very

01:13PM  15   severe pain.  Very, very severe.

16        It's like -- well, I don't know if you ever had a

17   muscle spasm, like you're playing soccer, and you have this

18   crampy spasm.  That is the type of pain they have.

19        Q.   How about -- how could -- in your opinion,

01:13PM  20   Dr. Omalu, is the brain injury -- the permanent brain injury

21   suffered by Mr. Barber, is that affecting his ambulation and

22   ability to walk or run and, if so, how?

23        A.   So if you notice, based on the medical records,

24   Mr. Barber's left side is weaker than the right.  The question

01:14PM  25   you ask yourself, you know, before I went to medical school,

why?  The damage was on the right.  Why on the left?  There's a
reason for that.

At the lower level of your brain, the fibers on the
right cross over to the left.

01:14PM

So if you have extensive damage on the right, the
left side will be affected.

What that tells us, because he's what we call
hemi -- hemiplegic, h-e-m-i-p-l-e-g-i-a- -- g-i-c, meaning he's
lost significant power on the left side of his body.  But

01:15PM

remember, the bullet entered on the surface on the top.  So
what explains that?

Remember what I told you.  It was not the focalized
trauma.  It was explosive.  And the right side was more damaged
than the left because the bullet was traveling in a rightward

01:15PM

direction.  So the energy was going rightward.

The power on the right side isn't what it used to be
before he was shot, but it's better than on the left.

So the left localization of the hemiplegia is
consistent with the patterns of trauma.  That is what we expect

01:15PM

to see based on what we know about science and the behavior of
the human body.

Q.   Could you describe to the jury, given your medical
background and your background in neuropathology, what type of
pain and suffering is associated with Mr. Barber's injuries

01:16PM

that you've been describing?

         1          A.    So when you talk about pain, pain is a primitive

         2   reflex.  What does that mean?  Pain is a protective reflex.

         3   It's like thirst and hunger.

         4          Pain is there to protect you, to alert you to things

01:16PM  5   harmful to you, to remove you from such circumstances.  Because

         6   unchecked, pain will kill you.  If you put your hand in fire

         7   and you don't remove it, you will get burned.

         8          So it's meant to be protective, meaning the upper

         9   parts of your brain do not have any control over whether you

01:16PM  10  experience pain or not.  Just like the upper parts of your

         11  brain, even when you're unconscious and in coma, you will

         12  experience hunger and thirst.  Even if you're in coma, if you

         13  don't -- if you're not given water, you will die.  So pain is

         14  like that.

01:17PM  15         There are three types of pain.  There is the mental

         16  pain, there is the physical or somatic pain, s-o-m-a-t-i-c, and

         17  then there is the biochemical pain.

         18         The first thing we consider in somebody who has

         19  suffered trauma is:  Is the trauma a serious bodily injury,

01:17PM  20  meaning is it severe trauma?  Was there extensive damage and

         21  disruption of tissue?  And the first thing I had said earlier

         22  was, yes, this is severe traumatic brain injury.

         23         So when you have severe traumatic brain injury, you

         24  suffer high-scale pain and suffering or severe pain and

01:18PM  25  suffering, meaning this is the type of pain that will disrupt

your activities of daily living.  This is not the type of pain you can ignore.

So he's going to have mental or psychological pain because the brain responds to noxious -- it's called noxious stimuli, anything that causes you pain, eventually affects your mood and your brain.  And you have mental anxiety.  Your blood pressure goes up, your -- you breathe faster, your heart pumps faster.  Certain chemicals are released in your body to cause stress.  That is the mental pain.

And then you have the physical pain, the aches and pain, the headache, the spasms.  The hunger inside you causes physical pain because your stomach will produce more acid.  If you're crampy in your stomach, your intestines will move faster.  You feel sometimes you have diarrhea just from pain. Sometimes you have chest pain in your heart from pain.  That is all the somatic pain.

And then the biochemical pain is the pain you experience when abnormal chemicals are being released by your body in response to the trauma and to the pain you have suffered.

Biochemical -- one way I explain it to medical students is, if you've ever suffered from the flu and you're sitting down in the comfort of your living room but you feel terrible, you feel lethargic, you feel aches and pain. Meanwhile, you've not done anything.  You are sitting down.

1  Yet you're feeling aches and pain and you feel terrible because

2  of the chemicals your body is releasing in response to the

3  infection.  So that is the classic biochemical pain.

4          And given the trauma Mr. Barber had suffered, he

01:20PM  5  will continue to experience the severe pain, high-scale pain,

6  the permanent injury for the rest of his life.

7      Q.    So are you saying, Dr. Omalu, that not only is --

8  has he experienced the pain from the day of this incident -- I

9  think it'll be five years this April -- but he's going to

01:20PM  10  continue to experience the pain the rest of his life?

11      A.    Yes, sir.

12      Q.    And is there anything that anyone can do at this

13  point to repair the brain damage that he has from this shot so

14  he doesn't experience that pain?

01:20PM  15      A.    No, sir.

16          In this stage of science, in this day and age -- and

17  it's not going to change anytime soon -- science does not have

18  the capacity and the wherewithal to reverse brain injuries.

19          So what you do for any type of brain injury is

01:21PM  20  prevention.  After you've suffered the brain injury, all we can

21  do is mitigation, stop you from suffering additional injury,

22  and then control and manage the consequences, pretty much to

23  help to enhance the quality of your life.  But can we cure it

24  and stop it?  No.

01:21PM  25      Q.    And given his issues with walking or ambulating, in

**UNITED STATES DISTRICT COURT**

your opinion, Dr. Omalu, if he tries to walk, is he at risk for

falling down?

A.    Yes.  The left side of his body is weak.  So he is

permanent.  I don't think that could ever be reversed.

However, there is technology that exists today, if provided to

him, could teach him ways to improve on his walking, could help

him to significantly maybe get back some of the walking.  They

teach him ways to compensate, but he will never recover.

And, unfortunately, these therapies are very

specialized centers, they cost money.

Q.    The last thing you mentioned, I think you were

saying he was -- Mr. Barber was 35 years old when this happened

and based on your background and experience in medicine and

epidemiology, that once he gets to 55 or so, he could further

deteriorate worse than he is now?

A.    He will continue to deteriorate, but at about 20 to

30 years after the trauma, there will be severe noncompensatory

decompensation.

Q.    And I think you've mentioned a few of these,

Dr. Omalu, but you can -- can you just repeat a couple of the

things that he'll -- if he lives that long, he'll have to deal

with?

A.    So generally we break them down into four

categories.  This is very basic neuroscience.

So anybody who suffers severe traumatic brain

1  injury, no matter how you suffered it, over time you will

2  develop what we call traumatic encephalopathy.  It's a

3  neurodegenerative disease.  In fact, the commonest cause of

4  dementia is trauma.

01:23PM  5        So he will develop cognitive impairment.  He will

6  begin to lose his intellectual functioning, his intelligence.

7  If he was born to be a pilot, he will -- he can never become a

8  pilot.

9        Then he will have mood impairment, mood disorders;

01:23PM  10  develop depression, anxiety.  He could be very easily tearful.

11  He's talking, he will cry.  He will just lose hope and develop,

12  you know, very poor responses to normal activities of life,

13  frustrations of life.

14        Then, um, number three, behavioral impairment.

01:24PM  15  Behavioral impairment of any type.  He may become more

16  impulsive.  He may lose his inhibitions.  He may use words he

17  shouldn't use.  He may become paranoid.  Any type of behavioral

18  impairment.  If he used to be a very clean, well-organized

19  person, he could become the most disorganized person you will

01:24PM  20  ever see.

21        Then the fourth one, it's somatic impairment,

22  meaning physical impairment, which is the inability to walk,

23  the headaches, the muscle spasms.

24        So these are the four general categories of

01:25PM  25  traumatic encephalopathy.  It is permanent.  There is nothing

any physician can do to reverse it.  All we can do is to provide the support for him.  It is not left for the physician to judge him.  All we can do is give him all he needs to do the best he can do.  That is where we are, unfortunately.

Q.    Thank you, Dr. Omalu.

The last question I have for now is so in categorizing the extent of his brain injury, how would you categorize it, if it -- if there was mild or moderate or severe or any other words you think appropriate?

A.    So based on the science, if you have comminuted fractures of your skull, you have a ballistic injury of your brain with subarachnoid hemorrhage, with subdural hemorrhage.

Q.    What are those terms?  Because you haven't used those before.

A.    So in his medical records, when he got to the hospital, he had bleeding inside his skull.  There are about four types of bleeding.  He had subdural, subarachnoid, parenchymal hemorrhage.  So he had three.

Whenever you have any bleeding inside your skull, the severe traumatic brain injury, why?  Blood stays inside blood vessels.  Blood is acidic because it has hemoglobin.

So once blood gets out of the blood vessels inside the cavity, it irritates the blood vessels and they're going to spasm.  And they cause more damage.

So given the constellation of trauma, the

combination of trauma he suffered, the skull fractures,

comminuted, the intracranial hemorrhages, the parenchymal

contusions and lacerations, the ballistic explosive injury, the

herniation of the brain, this is severe traumatic brain injury,

01:27PM    period.  And it was so severe that even the surgeons didn't

want to go in to fix anything.  They just irrigated, sped up --

let the way -- let his brain heal or recover as much as it

could.

MR. GALIPO:  Thank you, Dr. Omalu.

01:27PM    That's all I have at this point, Your Honor.

THE COURT:  Thank you.

Cross-examination.

THE WITNESS:  Your Honor, could I use the bathroom,

please?

01:27PM    THE COURT:  Sure.

All right.  We are going to go ahead and take a

brief 10-minute break.  Please remember the admonitions.  Keep

an open mind, do not discuss the case with anyone, do not let

anyone discuss the case with you, and do not conduct any

01:27PM    independent research or investigation.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  All right.  Dr. Omalu, why don't you

01:28PM    step down and we will reconvene in 10 minutes.

```
 1              MR. GALIPO:  Thank you, Your Honor.

 2                  (Break taken.)

 3                  (Out of the presence of the jury:)

 4              THE COURT:  Ms. Carr is bringing in the jury.

 5                  (In the presence of the jury:)

 6              THE COURT:  We are back on the record.  The jury is

 7    present.

 8              Dr. Omalu is back on the witness stand.

 9              And, Dr. Omalu, you are reminded you are still under

10    oath.

11              Cross-examination.

12              MS. BRUNSON:  Thank you, Your Honor.

13              May I proceed?

14              THE COURT:  Yes.

15                        CROSS-EXAMINATION

16    BY MS. BRUNSON:

17         Q.   Good afternoon, Dr. Bennet Omalu.  How are you?

18         A.   Wonderful.  How are you?

19         Q.   Good.  Thank you.

20              How many times have you testified as an expert

21    witness in a case where you were retained by the plaintiff's

22    side?

23         A.   Well, I don't keep count, but generally I would say

24    about 15 times in the past five, ten years.

25         Q.   And if you don't keep count, could you give us an
```

01:39PM (line 5)
01:40PM (line 10)
01:40PM (line 15)
01:41PM (line 20)
01:41PM (line 25)

```
 1    estimate of how often you're retained by the plaintiffs,

 2    perhaps like in a percentage, versus how often you are retained

 3    by the defense?

 4         A.    So, again, it varies by year, but generally most

 5    times plaintiffs, including district attorneys, I would say

 6    about 60 to 80 percent.  For the defense, it varies, about 20

 7    to 40 percent.

 8         Q.    And have you testified in cases where you have been

 9    retained by Mr. Galipo's office before in the past?

10         A.    Yes.  That was what I said earlier, about 15 times

11    in the past five, ten years, yes.

12         Q.    For Mr. Galipo's office?

13         A.    Yes, sir -- yes, ma'am, I'm sorry.

14         Q.    And when was the last time you cared -- as a doctor

15    you provided care for a patient that was alive?

16         A.    What do you mean by providing care?  You mean

17    treating?

18         Q.    Yes.

19         A.    Oh, I -- I -- yesterday I treat myself.  I treat my

20    family.  I treat my friends.  But I don't treat patients on a

21    formal basis.  I -- I choose not to do that.  I don't have -- I

22    don't have insurance coverage for that.

23         Q.    So most of your medical duties involve deceased

24    people; is that right?

25         A.    No.  No.  Like I said earlier, as a forensic
```

01:41PM (line 5)
01:42PM (line 10)
01:42PM (line 15)
01:42PM (line 20)
01:42PM (line 25)

pathologist, a neuropathologist, we also attend to live

patients.  But we also attend to deceased patients, yes, ma'am.

Q.    Did you write a report to prepare for your role in

this case?

01:43PM    A.    Did I file a report?

Q.    Did you write?

A.    Oh, yes, ma'am.

Q.    And did you review your report in order to get ready

to testify today?

01:43PM    A.    Yes.  I reviewed it, but I did not memorize every

line in my report.

Q.    Well, did you notice if there were any inaccuracies

that you wanted to change in your report?

A.    No, I did not notice any, no.

01:43PM    Q.    So if your report listed on page 3 that Mr. Barber

is deceased, would you want to change that to make some sort of

correction?

A.    Of course.  There's a typographical errors.  There

is no report I've written in my life that does not have one,

01:44PM    two, or three typographical errors.  I don't regard

typographical errors as errors that need to be changed because

it does not in any way affect, you know, the context of the

report.

Q.    Part of what you did as a -- your work in this case

01:44PM    is -- is you had an appointment and you met with Mr. Barber for

         1    about two hours.  Is that right?

         2         A.    Yes, ma'am.

         3         Q.    And that was in October -- let's see.  On the 29th

         4    of 2025; right?

01:44PM  5         A.    I believe so.  I don't remember the exact date now.

         6         Q.    Do you know if you conducted any tests of

         7    Mr. Barber's strengths or abilities during that meeting?

         8         A.    What do you mean by conducting tests?  Because there

         9    are different levels of tests.  Like -- I don't understand the

01:44PM 10    question.

        11         Q.    Okay.  Tell us what you did during that meeting.

        12         A.    Um, like I had stated during my deposition, um, I

        13    was observing him.  Um, and without him knowing, I was testing

        14    his power.  I moved something.  So my objective was to confirm

01:45PM 15    what is in the medical report.  My objective wasn't to elicit

        16    new information.

        17              So there was no test I did to elicit new

        18    information.  Every testing I did was simply to confirm what we

        19    already know.

01:45PM 20         Q.    And based on the tests that you -- I'm sorry -- the

        21    experiments --

        22         A.    Evaluation.

        23         Q.    Evaluation.

        24         A.    Yes, ma'am.

01:45PM 25         Q.    -- did what you observed seem to be in conformity

1  with the reports that you reviewed?

2      A.    Yes, ma'am.  I mean, generally.  In medicine, you

3  don't use absolutes.  Nothing can be hundred percent in

4  conformity.  But was it reasonably in conformity?  Yes, ma'am.

5      Q.    And either before or after meeting with Mr. Barber

6  in October, did you also review some of his medical records in

7  this case?

8      A.    Yes, ma'am.

9      Q.    Did any of those medical records that you reviewed

10  exist or document his conditions prior to being shot in April

11  of 2021?

12      A.    Well, I don't recall as I sit here.  It's been a

13  while.  But when we review medical records, part of medical

14  records states past medical history.  So they list any

15  pertinent -- pertinent, meaning important, medical history.

16          So as far as me reviewing the medical records, I

17  must have reviewed his past medical history.  If you ask me now

18  to be absolute, I cannot.  I -- I don't remember.

19      Q.    Are you familiar with Mr. Barber's previous medical

20  history prior to April of 2021?

21      A.    My role in this case was not to review his prior

22  medical history.  So for the purposes of my evaluating his

23  trauma, there was nothing I'm aware of in his prior medical

24  history that was significant in my evaluation of his trauma.

25      Q.    One of the reasons that you met with him in October

of 2025 was you wanted to try to determine the extent of his

injuries which were caused by being shot; is that correct?

A.    Yes, in relation to what has been documented in the

medical records.  I was not going to elicit new information,

no.

Q.    Did you review any records that discussed missed

physical therapy appointments on Mr. Barber's behalf?

A.    As I sit here now, I do not recall.  But I was aware

there were some programs, therapy programs, for him.  As I sit

here, I don't remember absolutes.

Q.    And as you reviewed his medical records, did you

note any dates that Mr. Barber refused to take certain

prescribed medications?

A.    I did not note such specific dates.  The types of

analysis we perform, specific unique dates and events in the

total picture are of no significant consequence.

For example, assuming a patient misses an

appointment on a day, does it in any way affect his long-term

outcomes?  No.  It's you got a total picture, not just single

events.  You take each patient globally, not break up a patient

into parts.

Q.    Would it be fair to say, though, that if a patient

such as Mr. Barber was prescribed medicine to help pain relief,

that would then, in turn, allow him to attend more physical

therapy sessions and perhaps get better because he's taking his

pain meds and feeling good enough to go to physical therapy?

A.    No.    No.    No.    Remember, this is a traumatic brain injury patient.    I remember one of the things I said was cognitive impairment, behavioral impairment.    So rather than judging the patient, the behavior he's manifesting more likely than not could be a manifestation of his disease.

And so the role -- we physicians or medical team, you don't judge a patient because of the behavior he's manifesting.    Rather, you watch him and you treat him to manage him.    If he says "I don't want to go," you find another modality to present it to him.    Because saying "I don't want to go" more likely than not is a manifestation of the trauma he suffered.    So he's not willfully being stubborn.

Even if he was being stubborn, it is a manifestation of TBI.    The way we approach these things, you need to be extra careful about placing judgments on the patient.    No, you don't do that.    You take the patient as the patient is and you work with the patient.

Q.    How did you form the opinion that Mr. Barber is showing symptoms of neurocognitive issues?

A.    Okay.    When I'm asked such a question, how did I do something -- so, remember, I'm a licensed physician.    So as a physician, we have a method called differential diagnosis.    That's a method every physician uses.    So in differential diagnosis, the first thing you do is, what does the science

say?  And they are called the general, general causation principles.

And like I said in my deposition, there is a theory of science called the central limit theorem.  Central limit theorem, CLT.  And the central limit theorem is the foundation of science, is the foundation of everything, every scientist does.

And what the central limit theorem says, when you see a human being, as long as that human being is a member of the homo sapiens species, when they suffer that type of trauma, that human being must -- this is not will -- will manifest symptoms and signs that are within plus or minus 2 standard deviation of a known expectation.

This is the same principle that underlies when a patient sees you in the clinic and tells you, I'm having a headache that is almost pulsating.  That is a vascular headache.  There is nothing too alarming I've seen yet.

So once you've seen that, you know what trauma did this patient suffer.  This patient suffers severe traumatic brain injury.  This was all the things that were established before I went to see him.  And then what are the symptoms?  I went through his medical records, then I went to see him myself.

And the specific questions you ask your patient -- for example, he may not know it, I will ask him a question and,

less than 3 or 4 minutes later, I repeat the same question.  He will forget that he had given me that answer.  If you come to him like this is the first time I'm bringing it up, once you see that, that is an obvious sign of cognitive impairment.

01:54PM      And another thing -- so I'm talking to him, suddenly he becomes tearful.  He starts crying.  He looks beaten down.  Once you see that tearfulness, continuous tearfulness, that's a manifestation of mood disorder.

01:54PM      So I will be reasonably confident to make such diagnosis because we already know what his general causation principals are.  He suffers severe traumatic brain injury.  And, oh, I'm so sorry it's taking me long.  Everything I'm describing here is the scientific method called differential diagnosis.

01:54PM  Q.    You stated that physicians rely on the patient's medical, social, education, and occupation history as narrated, meaning as told to you, by the patient, the family members, the friends, and colleagues.  Is that an accurate statement?

A.    Yes, ma'am.

01:55PM  Q.    So in this case, did -- did you speak with any of Mr. Barber's family members?

A.    No.  No.  No.  If you let me expand -- maybe I just say no.  No.

Q.    That's fine.  Thank you.

01:55PM      Did you speak to any of Mr. Barber's friends?

**UNITED STATES DISTRICT COURT**

1      A.    No.

2      Q.    Did you speak with any of his colleagues?

3      A.    No.

4      Q.    His other doctors?

01:55PM    5      A.    Not verbally, but I read the notes and medical

6   records made by other doctors.

7      Q.    Did you speak with any of the nurses who had treated

8   him?

9      A.    No, ma'am.

01:55PM   10      Q.    Did you speak with any of his physical therapists?

11      A.    No, ma'am.

12      Q.    His occupational therapists?

13      A.    No, ma'am.

14      Q.    How exactly did you determine with case-specific

01:56PM   15   facts or symptoms that Mr. Barber will experience pain and

16   suffering for the rest of his life?

17      A.    That is what we call common knowledge.  Common

18   knowledge is like if you put your hand in fire, it will burn

19   you.  That's common knowledge.

01:56PM   20         A human being who suffers severe traumatic brain

21   injury, it is common knowledge that he will suffer pain and

22   suffering for the rest of his life.  There's no question.  It's

23   not my opinion.  It's a fact of science.  And that is why they

24   are called common knowledge.  It is something that is commonly

01:57PM   25   known.

1           And the patient himself has told you five, six years

2    after his trauma, he's still having headaches, still having

3    pain and suffering.  So you listen to the patient.  If a

4    patient tells you, I'm feeling pain, you don't tell him, oh,

01:57PM    5    shut up, you're lying, you're not feeling pain.  You don't do

6    that.

7           Q.    How do you account for adaptations or pain

8    management interventions that could reduce suffering over time?

9           A.    So, remember, the question is, is a patient

01:57PM    10    experiencing pain?  The question is not is the patient

11    experiencing reduced pain?  That's a totally different type of

12    analysis, which doesn't apply here.

13           So because the underlying trauma is permanent,

14    progressive, and irreversible, you cannot eradicate the

01:57PM    15    symptoms and signs of the trauma if you cannot cure the trauma.

16           If it was trauma to the liver, after a couple of

17    years, it will go away.  But trauma to the brain or spinal cord

18    is permanent.  Pain is a symptom of the underlying trauma.  So

19    as long as the trauma is permanent, the symptoms of the trauma

01:58PM    20    will be permanent.  And since pain is a symptom of the trauma,

21    the pain will be permanent.

22           Q.    Aren't there situations where patients have suffered

23    pain -- trauma to their spinal cord or brain and due to the

24    nature of their paralysis, they don't actually experience the

01:58PM    25    pain associated from that trauma?

**UNITED STATES DISTRICT COURT**

1     A.    It is not medically possible that a patient with

2   spinal cord injury will stop feeling pain.  In fact, one of the

3   people with the highest levels of pain medications are spinal

4   cord injury patients.  And if you notice in my report, I spent

01:59PM  5   almost half a page explaining that principle.  Some of the

6   scientific principles are paradoxical.  But -- even sometimes

7   me, myself, I don't understand them, but I respect them because

8   people smarter than me came before me.

9     Q.    So did Mr. Barber indicate to you, when you met with

01:59PM  10  him, that he was experiencing pain?

11    A.    Well, when I met with him, I already knew he was

12  experiencing pain.  So I confirmed that -- headaches, muscle

13  spasm, emotional pain, um, regrets.  I mean, one, which I

14  almost started crying myself, he's always wanted to be an

01:59PM  15  underwater welder.  That has been his dream.  And he was

16  planning to learn how to swim.  And he looked at me, it can't

17  be done.  I became tearful.  I'm a human being, too.  I became

18  tearful, too.  I'm sorry.  That is emotional pain.

19          So the two hours I was with him, I confirmed that

02:00PM  20  this was a man who is simply confirming the science.  He will

21  be in pain for the rest of his life, unfortunately.  I wish I

22  could help him.  I really do.

23    Q.    Throughout your career, have you experienced

24  patients who do something called malingering?

02:00PM  25    A.    We need to be very, very -- extremely careful about

that.  I've not -- I have encountered patients who suffer from

what is call Munchausen Syndrome, M-a-n-c-h-u-s-e-n *[sic]*.

Malingering is not a terminology a physician would use, no.

Huh-uh.  Especially for TBI patient, you need to be extremely

02:01PM   careful.

TBI patients suffer behavioral impairment.  So even

if you think the patient is suffering from malingering, it is

not intentional.  It is a manifestation of the severe traumatic

brain injury he has suffered.  And that was why I said you must

02:01PM   listen to the patient.  In patient care management -- I'm both

certified in medical management -- the beginning of the

management is the patient.  The center of patient care

management is the patient, is treatment by the patient.

Q.    When you reviewed the medical records, I can't

02:01PM   remember, did you say you do recall or do not recall seeing

instances where Mr. Barber refused to take certain muscle

relaxants or chronic pain medication?

A.    I did not see any.  All I saw was a severe traumatic

brain injury patient manifesting the signs and symptoms of his

02:02PM   trauma.  Nothing else, nothing more.

Q.    If you had seen records that said Mr. Barber refused

to take medications in 2003 and 2004 that were intended for

muscle relaxing, chronic pain, or nerve pain, would that mean

to you -- could it mean to you that he was no longer feeling

02:02PM   pain and requiring the assistance from those medicines?

**UNITED STATES DISTRICT COURT**

1          MR. GALIPO:  I'm going to object just with respect

2     to the dates.  I don't know if that -- I think she said 2003

3     and 2004.

4          THE COURT:  She did.

02:02PM  5          MS. BRUNSON:  Sorry.  2023, I'm sorry.  2023 and

6     2024.

7          MR. GALIPO:  Okay.

8          THE WITNESS:  I lost you.  I'm sorry.  Could you

9     repeat it, please.

02:03PM 10    BY MS. BRUNSON:

11        Q.    If you had -- if you seen or reviewed medical

12    records that suggested Mr. Barber refused medications for pain

13    in 2023 and in 2024, could you interpret that as he was no

14    longer experiencing pain at that time?

02:03PM 15        A.    No.  Not at all.  Absolutely not.

16              Um, there is -- there are thousands of reasons why a

17    patient would say he does not want something.  When a patient

18    says that, it is the duty of the medical care team to find out

19    why and what other modality of treatment you offer the patient.

02:03PM 20    In medical care management and in the assessment of patients,

21    thou shall not judge or be condescending with the patient.  You

22    don't do that, that because a patient refuses to do this, this

23    is why.

24              If I were to do that, I'll lose my license.

02:04PM 25        Q.    Well, what if you saw a record where in April of

1  2023 Mr. Barber told his physician that he was doing well

2  without meds.  Would that mean something to you as far as

3  Mr. Barber's pain and suffering, at least with regard to that

4  time, that month?

02:04PM  5       A.    So in my interaction with him, he said -- because

6  he's not getting the care he wants, people don't pay attention

7  to him.  He's being -- he's being given pain medications that

8  are causing him so much side effects.  And that's a medical --

9  somebody with board certification in medical care management in

02:05PM  10  social medicine, it's very well-known to us that many times

11  medical care teams don't listen to patients.

12            So when he says this -- I don't like this

13  medication, can you change it for me, it's causing him side

14  effects -- and you refused to change it for me.  The only power

02:05PM  15  he has is to say, I cannot take it.

16            So to jump the loop to say he -- he's refusing

17  specific medication because he's no longer feeling pain is not

18  fair to the patient.

19       Q.    Well, what if in the same record, April 3rd of 2023,

02:05PM  20  Mr. Barber told his doctor, I'm doing well without meds and

21  doing -- and the doctor noted that Mr. Barber was doing well

22  with his ADLs, that means activities of daily living; right?

23       A.    (No audible response.)

24       Q.    And then the record notes that the provider told

02:06PM  25  Mr. Barber to notify staff if he wants to start muscle

1    relaxants again.

2              THE COURT:  Mr. Galipo?

3              MR. GALIPO:  I think we're getting into hearsay at

4    this point, Your Honor.

02:06PM  5    THE COURT:  I would agree.  You're just reading.

6              MS. BRUNSON:  May I ask --

7              THE COURT:  You can ask a question.  You can't read

8    from a document that's not admitted into evidence.

9    BY MS. BRUNSON:

02:06PM  10   Q.    So, Dr. Omalu, if there was a record in your review

11   about Mr. Barber doing well with his ADLs, being off his

12   medication, being told if you would like to restart your

13   medication, please let the doctor know, to which Mr. Barber

14   smiled and agreed, if a record had said that, does that still

02:06PM  15   tell you nothing of value with regard to Mr. Barber's pain and

16   suffering or does it mean something to you?

17             MR. GALIPO:  I'm going to object to the question as

18   compound, calls for hearsay, and assumes facts not in evidence.

19             THE COURT:  Sustained.

02:07PM  20   BY MS. BRUNSON:

21   Q.    Your opinion is that Mr. Barber will remain in a

22   wheelchair for the rest of his life; is that correct?

23   A.    Yes, ma'am.

24   Q.    How do you address reports of patients with

02:07PM  25   penetrating brain injuries who have actually improved their

1    functional outcome over the years?

2        A.    You asked me this question during my deposition, and

3    I addressed it.

4            First, you don't compare one patient to the other

02:07PM    5    patient.  You don't do that.

6            Two, the general standard and the law of medicine --

7    maybe I know the law -- the law, actually, but the standard in

8    medicine, you take each patient as the patient is.  Does that

9    make sense?

02:08PM   10            Mr. Barber's trauma is permanent.  And like I said

11    in the deposition, we should not judge the patient.  What we

12    need to do, pay for him to go to the best centers in America,

13    they cost millions of dollars.  Let's give it to him.  Provide

14    him what he needs.  Let him be the one who fights the battle

02:08PM   15    inside the ring.

16        Q.    Sir --

17        A.    Give him -- I haven't finished.

18        Q.    Sorry.

19        A.    Give him the support he needs, let him fight the

02:08PM   20    battle, and let it -- let us see where it will lead us to.

21            Going back to the scientific concept of the central

22    limit theorem, plus or minus 2 standard deviation of patients,

23    on both sides.  So as I'm sitting here, what I know, could he

24    get out of a wheelchair or not?  No.  All I know is if we give

02:09PM   25    him -- pay for him, give him the resources he needs to get the

best therapies, he will give us the best of himself.

But because he's suffering hemiplegia, it's like a patient with a stroke, there is nothing we can do to reverse that.  All we can do is to support him to see how much he can continue to sustain himself.

Activities of daily living for a trauma patient is relative.  The activities of daily living for a trauma patient like him, not activities of daily living for a person like you who has not suffered, who's not been shot in the head.

So when a doctor says he's doing well for his activities of daily living, the doctor's referring he's doing well based on his state as an individual with a permanent, irreversible, and progressive severe traumatic brain injury.

We need to be very careful about who writes freely on someone's business.  It is not fair to the patient and it is not fair to society.

Q.    You testified that the brain is the only organ that cannot heal itself.  Is that correct?

A.    Yes, the only organ that cannot heal itself.  Another organ is the ovary.  The ovary, if you notice, you can't create new eggs.

Q.    Right.

A.    You use your eggs, that's it.  The brain is like that, too.

Q.    Now, is it possible, though, for the brain to

1    restructure itself?

2        A.    That was what I said.  I wouldn't use the word

3    "restructure" because there is no structure in it.  It's

4    compensate.

02:10PM    5        So the brain cells that are surviving will overfire.

6    But remember that that applies to people who have suffered like

7    a stroke, who suffered very focal trauma.  A gunshot wound to

8    the head is a diffused injury.  It's more diffused.  It's not

9    like somebody who's just had a stroke.

02:11PM    10        So can the brain compensate?  Yes.  It could.  But

11    does it reverse the trauma?  No.

12        Compensation is more effective with people who have

13    been born with an inadequacy in childhood while the brain is

14    still developing.  That is why if you see like people who are

02:11PM    15    blind, they become super musicians because, while their brain

16    was developing, their brain made necessary adjustments very

17    early in childhood.  But for an adult in his 30s, he's lost

18    that capacity.  So there's a limitation to how much he can

19    compensate.  That is why six years after his trauma, he is

02:11PM    20    still on a wheelchair.

21        Q.    So you testified that Mr. Barber's injuries are

22    permanent and progressive, and what was the other word?  There

23    was one more.

24        A.    Irreversible.

02:12PM    25        Q.    Irreversible, yes.

Now, one day, could Mr. Walker -- sorry -- could Mr. Barber use a walker and ambulate with a walker, even though you just testified his injuries are permanent and progressive and irreversible?

02:12PM    A.    So the same answer I'll give.  Remember the central limit theorem?  You can't absolutely predict where a patient will be.  But what you use is six years after his trauma, does he still need a wheelchair?  Yes.

Okay.  Now, if you spend -- as a hypothetical, if
02:12PM    you give him a hundred million dollars for the rest of his life to have the best care -- one of the best care is in Colorado -- and he goes there, the best people give him what he needs, say, five, ten years from now, he may be able to use one gadget or two.  But the key point is give him the wherewithal, let him
02:13PM    use the ingenuity of his spirit to fight that battle.  Can we do that?  Can you promise me, let's do that and let's see how well he does?

Q.    So are you saying he could or could not walk with a walker?

02:13PM    A.    We don't know.  All we know is what he needs now to help him to see if he could walk or not walk.  Because if he continues the way he is, there's a risk he will fall and he will suffer more trauma.

So all we know now is if society can provide him
02:13PM    with the wherewithal he needs for the best care, we increase

**UNITED STATES DISTRICT COURT**

his chances, the probability, because these are probabilistic

statements.  We increase the probability that some day, some

day the sun will rise and he could be walking around with a

walker to the best of his ability.  But without the society

02:14PM   supporting him, the probability diminishes significantly.

Q.   So you're saying if -- if society paid for him to go

to a center, he could become ambulatory with a walker.  Is that

what you're saying?

A.   There is a higher probability.  I'm not saying yes.

02:14PM   What I'm saying in science, especially for medicine that is not

an absolute science, you can't make absolute statements so you

use relatives.

So if you give him what he needs, the probability of

him maybe some day ambulating with a walker increases.  But if

02:14PM   you don't give it to him, the probability remains and may even

start tending negative because he will now start having

consequences.  He could fall and impact his head on the

concrete floor and become bedridden.

So, again, probability, which is better as a human

02:15PM   being, respecting his dignity as a human being, do you leave

him to go down, to fall, become bedridden or do you give him

what he needs to see if he could go up.  As a human being, I'll

choose the second.  Let's give him what he needs and see how

well he does.  It's the only -- it's the best better option

02:15PM   than anything else.

| | |
|---|---|
| 1 | MS. BRUNSON:  Your Honor, I'm asking permission to |
| 2 | impeach using page 58, lines 2 through 16, of Mr. Omalu's -- |
| 3 | Dr. Omalu's transcript. |
| 4 | THE COURT:  Give me one moment. |
| 02:16PM 5 | MR. GALIPO:  May I confer with counsel for a moment? |
| 6 | THE COURT:  Yes. |
| 7 | (Off-the-record discussion between counsel.) |
| 8 | THE COURT:  Lines 2 through 16? |
| 9 | MR. GALIPO:  One moment, please. |
| 02:16PM 10 | MS. BRUNSON:  Yes, Your Honor. |
| 11 | THE COURT:  I don't believe this is inconsistent |
| 12 | with what he's been testifying to. |
| 13 | MS. BRUNSON:  Your Honor, on page 6 -- on line 16, |
| 14 | there is a different response. |
| 02:16PM 15 | MR. GALIPO:  Your Honor, I would submit, number one, |
| 16 | it's not inconsistent or proper impeachment; and, number two, |
| 17 | you'd have to read the whole question and answer going back to |
| 18 | page 57, line 16, as opposed to just a portion. |
| 19 | THE COURT:  I would agree.  He's answering a |
| 02:17PM 20 | question.  If you'd like to read the entire question and |
| 21 | answer, you can.  But you can't just selectively choose part of |
| 22 | an answer. |
| 23 | MS. BRUNSON:  Your Honor, I did ask him that exact |
| 24 | question -- |
| 02:17PM 25 | THE COURT:  Counsel, that's my ruling. |

**UNITED STATES DISTRICT COURT**

1          MS. BRUNSON:  Okay.

2     BY MS. BRUNSON:

3          Q.    So when you spent two hours with Mr. Barber in

4     October of 2025, did you record this interaction -- or meeting

02:17PM  5     in any way?

6          A.    No, ma'am, I did not.

7          Q.    Do you normally record your interactions with

8     clients like that?

9          A.    It depends on different cases.  Whether the attorney

02:18PM  10    instructs me to each case.  I'm not the one who decides.  The

11    Court or the -- some -- some other power above me decides that.

12    It's above my pay grade.

13         Q.    Do you have plans to assess Mr. Barber again in a

14    number of months or years to see if he's progressing or

02:18PM  15    declining?

16         A.    I don't have the power to do that.  I'm just a

17    physician with an office in Sacramento, if I'm called upon, I

18    will.  But as I sit here, I don't know.

19         Q.    Would it -- would your opinion have more data to

02:18PM  20    support it if you had seen Mr. Barber more than once over a

21    period of time in order to note is the injury progressing or

22    getting worse or is it getting better?

23         A.    No, no.  The standard -- whatever I do goes in line

24    with the standards of practice; otherwise, I'll lose my

02:19PM  25    license.

1          So the standard of practice says in a case like

2     this, when you have medical records, where the trauma is very

3     well-established, you'd simply go -- in fact, they recommend

4     one hour.  But I usually do two to three hours to simply

5     evaluate the patient and confirm what is written down.

6          And so that as I'm sitting here testifying, it is

7     not hearsay.  I can testify with authority and audacity because

8     I spent time with the patient.

9          Q.   In your opinion, is there any chance that Mr. Barber

10    could ever walk again?

11         A.   Like I have said earlier, I cannot answer that.  All

12    I can say is his trauma is irreversible, permanent, and

13    progressive.  If we give him what he needs to get the -- not

14    necessarily go to Colorado, there are excellent centers in

15    Sacramento -- it will increase his chance of spending less time

16    on a wheelchair.  But is he going to get to a point where he

17    will never need a wheelchair is less likely because of the type

18    of damage he has suffered.

19         But you cannot deny a patient care because you

20    believe he's not going to walk again, no.  We don't do that.

21    You treat the patient, give the patient what is available, the

22    best care possible, and see how the patient responds.

23         MS. BRUNSON:  Your Honor, I would ask the Court --

24    draw the Court's attention to page 60, lines 2 through 6.

25         MR. GALIPO:  Again, Your Honor --

**UNITED STATES DISTRICT COURT**

1          Did you say page 60?

2          MS. BRUNSON:  Yes.  Lines 2 through 6.

3          MR. GALIPO:  It looks like, again, it's part of an

4     answer.  I don't think it's really impeachment on what he said

02:21PM  5     today, but if it's read, the whole question and answer should

6     be read.

7          THE COURT:  I would agree.

8          Ms. Brunson, that answer starts on page 59, line 21,

9     and doesn't end until page 60, line 14.

02:21PM 10          You cannot just pick part of the answer.

11          MS. BRUNSON:  I understand.

12          Then I would ask to read page 59, lines 20, which is

13     the question, through page 60, line 15.

14          THE COURT:  I do not find that it's impeachment, but

02:22PM 15     if you'd like to read the answer, go ahead.

16          MS. BRUNSON:  "QUESTION:  So what about

17          eventually walking?

18          "ANSWER:  I don't think, given the severe

19          nature of the trauma he had suffered, gunshot wound

02:22PM 20          severely damages a specific pattern of the brain.

21          The velocity, even if the brain was to, you know,

22          restructure itself, it is less likely he could walk

23          independently.  However, having said that, science

24          recognizes, yes, if you pay millions of dollars and

02:23PM 25          keep him in the best centers for decades for five,

UNITED STATES DISTRICT COURT

1    ten years, he could get out.  He could ambulate.  So

2    we cannot really recommend that unless society pays

3    millions of dollars for him to go to such a center

4    and then we watch and see.  Our ultimate goal is to

02:23PM  5    rehabilitate him as much as we can.  Why not?  So if

6    we spend $20 million so that some day he is now

7    walking independent of himself, let's do that.  Why

8    not?"

9        Thank you.

02:23PM  10       Nothing further.

11       THE COURT:  Mr. Galipo, redirect?

12       MR. GALIPO:  Yes.  Very briefly.

13                **REDIRECT EXAMINATION**

14   BY MR. GALIPO:

02:23PM  15   Q.    Dr. Omalu, in your review of the photographs of the

16   gunshot wound to the head, the -- and all the hospital records,

17   including all the diagnostic studies and brain surgery and

18   notes there, did you feel that you were able to generally form

19   your opinions in this case even without seeing Mr. Barber in

02:24PM  20   person?

21   A.    Yes.  Yes.  Um, many of the cases I do, I don't see

22   the patient.  Medical records are -- as long as it's written by

23   a certified physician -- reasonable types of evidence.

24   Q.    And did you think you needed to speak to family,

02:24PM  25   friends, doctors, or nurses after looking at all of the

| | |
|---|---|
| 1 | hundreds of pages of medical records in understanding the |
| 2 | traumatic brain injury and shot he had to his brain to give a |
| 3 | medical opinion? |
| 4 | A.    No, no, sir, because this is not the type of case |
| 5 | where I need to speak to family because the mechanism of |
| 6 | sustenance of the trauma is very well-documented. |
| 7 | Q.    And did you feel comfortable, based on the |
| 8 | information you had available to you in this case, giving the |
| 9 | opinions you have given to this jury? |
| 10 | A.    I lost you.  Could you repeat it. |
| 11 | Q.    Did you feel comfortable that you had sufficient |
| 12 | information in this case to give the opinions you have given to |
| 13 | this jury? |
| 14 | A.    Yes, sir.  Yes, sir. |
| 15 | Q.    And lastly, counsel has harped on this idea of, if |
| 16 | he had the best care in the world and understanding that's very |
| 17 | expensive, if he could possibly walk again with a walker or |
| 18 | something like that -- do you remember those questions? |
| 19 | MS. BRUNSON:  Objection.  That misstates the |
| 20 | evidence. |
| 21 | THE COURT:  Overruled. |
| 22 | BY MR. GALIPO: |
| 23 | Q.    Do you remember those questions generally? |
| 24 | A.    Yes, sir. |
| 25 | Q.    Okay.  Are you saying that it's unlikely he'll ever |

02:24PM (line 5)
02:25PM (line 10)
02:25PM (line 15)
02:25PM (line 20)
02:25PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   be able to walk again with a walker, but if he gets the

 2   possible -- best possible medical care, it increases the

 3   probability of that ever happening?

 4        A.    It increases the probability of him ambulating to an

 5   extent, but would he regain the power on the left side of his

 6   body?  No.

 7        Q.    And for that reason, you think he would remain a

 8   fall risk?

 9        A.    Yes, sir.

10             MR. GALIPO:  Thank you.  That's all I have.

11             THE COURT:  Any recross?

12             MS. BRUNSON:  No.  Thank you, Your Honor.

13             THE COURT:  All right.  Very well.

14             May we excuse Dr. Omalu at this time?

15             MR. GALIPO:  Yes.  Thank you, Your Honor.

16             THE COURT:  Dr. Omalu, thank you.  You are excused.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  Mr. Galipo, does the plaintiff have any

19   further witnesses at this time?

20             MR. GALIPO:  No, Your Honor.  Subject to any

21   discussion regarding exhibits, plaintiff rests.

22             THE COURT:  Thank you.

23             Mr. Ramirez?

24             MR. RAMIREZ:  We have a motion to make at the

25   Court's convenience, but at this point, we'd like to call our
```

1                  **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES   )
                            )
4   STATE OF CALIFORNIA     )

5

6            I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17            DATED THIS 4TH DAY OF FEBRUARY, 2026.

18

19

20                     /S/ MYRA L. PONCE
    _____
21       MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

                  **UNITED STATES DISTRICT COURT**

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on this 23rd day of February, 2026, I electronically filed

3 the foregoing **DEFENDANT COUNTY OF SAN BERNARDINO AND**

4 **DEPUTY CHRISTOPHER ALFRED'S OBJECTION TO THE PLAINTIFF'S**

5 **PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH A. ANDERSEN**

6 **AND EXHIBITS** with the Clerk of the Court using the CM/ECF system which will

7 send notification of such filing to the following:

8 Rodney S. Diggs, Esq.                Dale K. Galipo, Esq.
  IVIE McNEILL WYATT PURCELL &         The Law Offices of Dale K. Galipo
9 DIGGS                                21800 Burbank Blvd., Suite 310
  444 S. Flower St., 32nd Floor        Woodland Hills, CA 91367
10 Los Angeles, CA 90071               Tel: (818) 347-3333
  Tel: (213) 489-0028                  Email: dalekgalipo@yahoo.com
11 Fax: (213) 489-0552                 rvalentine@galipolaw.com;
  Email: RDiggs@imwlaw.com             amonguia@galipolaw.com;
12 afeather@imwlaw.com                 sanderson@galipolaw.com
  AWilliams@imwlaw.com
13 LMetoyer@imwlaw.com                 *Attorney for Plaintiff, Steffon Barber*
  BTanter@imwlaw.com
14 james.bryant@thecalawgroup.com

15 *Attorneys for Plaintiff, Steffon Barber*

16

17

18                                      /s/ Katherine Hwang
                                        _____
19                                      Katherine J. Hwang
                                        Attorneys for Defendant, COUNTY OF
20                                      SAN BERNARDINO and DEPUTY
                                        CHRISTOPHER ALFRED

21

22

23

24

25

26

27

28

DEFENDANT COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S
OBJECTION TO THE PLAINTIFF'S PROPOSED JUDGMENT; DECLARATION OF KAYLEIGH
ANDERSEN IN SUPPORT AND EXHIBIT