# Exhibit 2

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                        Vol 1                                        Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15                          HON. DAVID COHN, JUDGE


PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )   No. FVI-21001312
                                   )
STEFFON TODD BARBER,               )
                                   )
                    Defendant.     )
_____)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 2, 2024


APPEARANCES:

For the People:        JASON ANDERSON
                       District Attorney
                       By:  KATHLEEN FULTZ
                       Deputy District Attorney


For the Defendant:     JAMES BRYANT
                       Attorney at Law

                       RYAN DUCKETT
                       Attorney at Law


**CERTIFIED TRANSCRIPT**


Reported By:           ALICIA S. VASQUEZ, C.S.R.
                       Official Court Reporter, CSR No. 12225

Volume 1 of 7
Pages 1 through 133, incl.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 1                              Page 2

SESSIONS

DATE                                                      PAGE

December 2, 2024
     Morning Session                                        5
     Afternoon Session                                     73

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                            Vol 1                            Page 3

CHRONOLOGICAL INDEX OF WITNESSES


PEOPLE'S WITNESSES                                                  PAGE

ALFRED, Christopher

    Direct Examination by Ms. Fultz   ............   35
    Cross-Examination by Mr. Bryant   ............   85

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                     Vol 1                                      Page 4

INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD | |
|-----|-------------|-----|-----|---|
| 1   | Audio recording | 81 | | |
| 1A  | Transcript | 81 | | |
| 3   | Photograph | 41 | | |
| 4   | Photograph | 42 | | |
| 5   | Photograph | 43 | | |
| 6   | Photograph | 43 | | |
| 7   | Photograph | 44 | | |
| 8   | Photograph | 44 | | |
| 9   | Photograph | 37 | | |
| 10  | Photograph | 46 | | |
| 11  | Photograph | 45 | | |
| 12  | Photograph | 45 | | |
| 15  | Photograph | 60 | | |
| 17  | Photograph | 58 | | |
| 18  | Photograph | 59 | | |
| 19  | Photograph | 47 | | |
| 20  | Photograph | 60 | | |
| 30  | Photograph | 98 | | |
| 31  | Photograph | 99 | | |
| 32  | Diagram | 103 | | |
| 33  | Photograph | 110 | | |
| 34  | Photograph | 113 | | |
| 35  | Photograph | 114 | | |
| 36  | Photograph | 115 | | |
| 37  | Photograph | 118 | | |
| 38  | Photograph | 119 | | |
| 39  | Photograph | 120 | | |
| 40  | Photograph | 120 | | |

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 1                              Page 5

SAN BERNARDINO, CALIFORNIA, MONDAY, DECEMBER 2, 2024

MORNING SESSION

DEPARTMENT S-15          HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,

JAMES BRYANT, Attorney at Law and

RYAN DUCKETT, Attorney at Law;

KATHLEEN FULTZ, Deputy District Attorney,

representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT:  We're on the record outside the presence of the jury.  Counsel are present on the defense side.  We have Mr. Bryant and Mr. Duckett.  Is Mr. Diggs going to be here?

MR. BRYANT:  No, as I think I explained to the Court originally Mr. Diggs is going to be gone this entire week.

THE COURT:  Okay.

MR. BRYANT:  He'll be back next week.

THE COURT:  The defendant is present in custody.

Yes, Ms. Fultz.

MS. FULTZ:  Your Honor, we have been -- counsel and I have been going over the exhibits, and it seems that for the most part we are in agreement on all of them except it was just brought to my attention there is a redaction being requested from one of the audio recordings, which I'll need to change my lineup to have that taken care of.  I was hoping maybe we could litigate the issue and see if it's even necessary to make the redaction.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

all the other evidence in the case?

Did other evidence prove or disprove any fact about which the witness testified?

Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember.  Also, two people may witness the same event, yet see or hear it differently.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.  Or if you think the witness lied about some things, but told the truth about others, you may simply accept the part you think is true and ignore the rest.

You may be permitted to separate during recesses and at the end of the day.  I will tell you when to return. Please remember we cannot begin the trial until all of you are in place, so it is important to be on time.

Remember, do not talk about the case or about any of the people or any subject involved in it with anyone, including the other jurors.  Do not do research, share information or talk to each other or to anyone else about the facts of the case or anything else connected with the trial. And do not use any form of electronic or wireless communication to do any of those things either.

Do not make up your mind or express any opinion about the case or any issue connected with the trial, until

after you have discussed the case with the other jurors during deliberations.

Okay.  That's it for my initial instructions.  One other thing, one of you had an issue about frequent bathroom breaks.  If we do not take a break soon enough and somebody has an emergency, stick your hand up in the air.  I'll see it, and we can call for a recess at that time.

Okay.  All right.  We'll now hear the opening statements of the lawyers.

Ms. Fultz, do you wish to make an opening statement?

MS. FULTZ:  Yes, thank you.

THE COURT:  Please feel free to use the well or wherever you'd like to go.

MS. FULTZ:  You're going to hear about a night, April 27th, 2021, when a sheriffs deputy nearly lost his life in the line of duty.  You will hear from Maria Gallo and Joseph Cocchi, who were neighbors to the defendant, Mr. Barber.  They live in a house -- one of those situations where a plot of land has a front house and back house, and they share a long driveway to both houses.

On April 27th, 2021, Mr. Gallo -- Ms. Gallo and Mr. Cocchi, were returning home and trying to back their cars down that long driveway.  And the defendant, Mr. Barber, was in the driveway further, which what will be south towards his residence in the back.

As Mr. Cocchi backs his vehicle in first, the defendant would come and start hitting his car demanding to be

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

taken somewhere, asking for items that Mr. Cocchi did not have. Basically alarming Mr. Cocchi, who became uncomfortable, who was fearful.  He did not want to allow Mr. Barber in his car in this state in the manner in which he was approaching him. Mr. Cocchi's wife, Ms. Maria Gallo was backing her car in just after Mr. Cocchi.

The defendant would make his way down the driveway and continue the same manner of addressing Ms. Gallo, hitting her car, demanding to be taken somewhere asking her for the car.  Mr. Cocchi makes his way out of his car and joins his wife and says, "Take off."  They -- not reverse out, they drive out of the driveway as they were backing in, and go a little bit down the street and call 911.

In response to that 911 call, you'll hear from Deputy Christopher Alfred who responded to that call for service.  He makes his way over to the address on White Avenue in the City of Adelanto, and he's flagged down by Mr. Cocchi and Ms. Gallo who are now seated in Ms. Gallo's vehicle together.

They give him a brief run down of what's happening, explaining they're too afraid to go home and go into their house.  And Deputy Alfred understands the situation and says, let me go talk to him.  Let me see if I can figure out what's going on.

Deputy Alfred would approach the driveway making his way up to the -- on the screen, that white house.  You will see there's the front house.  That's Mr. Cocchi and Ms. Gallo's home.  Just further down the driveway is where you can see a

black vehicle.  It's a little hard to see with the bright lights, but there's a black vehicle there.  That's Mr. Barber's vehicle that he was standing near.  And in a very brief exchange you'll hear what took place.

(Audio played; not reported.)

MS. FULTZ:  In just a few short seconds, less than a minute, Mr. Barber and Deputy Alfred have the exchange that escalated so quickly until you'll hear Mr. Barber got in his car, revved the engine and reversed it at the deputy standing approximately 10 feet behind.

You'll also hear from Detective Hernandez here, who was there at the scene, about the evidence that was examined, corroborating what you've just heard in the audio recording. And as you'll hear described by Deputy Alfred, the main witnesses that you'll hear from are Mr. Cocchi, Ms. Gallo, Deputy Alfred and Detective Hernandez.  You may hear from a few others briefly, but these are the parties who were there. These are the main players that you'll hear from.

And at the conclusion of that evidence, I will ask you to return verdicts on Counts 1 and 2, attempted murder of a peace officer, and assault on a peace officer with a deadly weapon.

And as you proceed through the trial hearing the evidence, listening to the witness testimony, I'll remind you of what you were just instructed by the judge.  The juror -- a juror has certain duties.  A juror is to consider the elements of the crime, which the judge just told you he'll read later in the trial.  The instructions of the law, any documents or

photos, recordings, anything that's moved into evidence is proper for a juror to consider, the witness testimony and your evaluation alone of their credibility.

There are things that jurors, it's improper for you to consider.  Sympathy, speculation, penalties and punishments, passions, public opinion, prejudice or sentiment, those are things that they're human nature, but they don't belong in deliberations as a juror.  I will ask you to focus on the evidence as it's presented before the conclusion of the trial when we give our closing statements in the People of the State of California versus Steffon Barber.  Thank you.

THE COURT:  Thank you, Ms. Fultz.

Mr. Bryant, do you wish to make an opening statement at this time?

MR. BRYANT:  I do, Your Honor.  May I have just a few seconds to get set up over here?

THE COURT:  Of course.

MR. BRYANT:  Thank you.  May I grab this, Your Honor? Thank you.

THE COURT:  Of course.  It's on wheels, if you want to push it.

MR. BRYANT:  It's all right.

Good morning, ladies and gentlemen of the jury.  My name is James Bryant.  And I am with my colleague.  Mr. Duckett and I have the honor to represent Mr. Steffon Barber.  I also want to thank my colleague for being here today.  And we are all here for one very, very important reason, for you all to make a determination as to whether or not Mr. Barber attempted

to murder Deputy Alfred.  And whether Mr. Barber attempted to assault Deputy Alfred with a deadly weapon.

And what I will say is this, at the end of this case, the evidence will be clear that Mr. Barber is not guilty. And what this is right now is what we call an opening statement.  In an opening statement as the judge instructed and as my colleague instructed, it's just sort of a road map.  It's not evidence.  What I am going to be presenting to you all is what you should expect to see during this trial.  What you should expect to hear from a variety of different witnesses and the evidence that will come in.

And the one thing I ask of you all, when you took that oath and you're here doing your civic duty, pay attention to the evidence.  And as it was said, put passion to the side, put prejudice to the side, put bias to the side and just focus on what we have in front of us.

Now, this incident occurred on May 27th, 2021.  And I think that you just heard a video or an audio.  You heard an audio, and you hear Deputy Alfred speaking to somebody.  And you can kind of hear somebody speaking a little bit back to him.  And eventually you hear some car tires and you hear gunfire.  That's what you hear.  There's not going to be any body cam.

So how are you going to understand what actually occurred that night?  How are you going to understand that? And there's one critical thing that I need you all to do me -- to do for me.  Look at the physical evidence that's going to be presented throughout this trial, and it will surprise you.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

So you hear that there's a call that comes in from a Ms. Gallo.  Ms. Gallo calls 911.  She explains that my neighbor is acting a little funny, banging on my door, asking for things, asking for a ride.  Sounds strange, right?

You're also going to hear from Mr. Cocchi. Mr. Cocchi is also going to say, I don't really know this guy. I don't know him that well.  We kind of got into it this evening.  I don't know.  He's asking me to take him somewhere. I'm not sure why he was banging on the car, what was going on. Fine.  That happens as they interpreted it.

And you're going to hear a little bit more that it wasn't just them who was there.  You're going to hear from a Monique Grenados (phonetic), Mr. Barber's wife, who was also there.  And you're going to hear what was happening that evening.  Approximately 11:00 o'clock at night on May 27th, Mr. Barber and Ms. Grenados are getting ready to pick up their children.  They're going to pick up their children.

And Mr. Barber owns a black Trailblazer.  And that black Trailblazer is going to be sitting at the very back of their home.  So there's going -- you're going to see, and I'll show you this at some point.  The way it works is this, there is a house that sits on the street, and then there's a long driveway.  It's going to be well over a hundred feet, and you'll see it.  The long driveway, then there's a house in the back.  And that house in the back is where Mr. Barber and his wife lived.  And the house in the front is where Mr. Cocchi and Ms. Gallo were staying.

You're going to hear how Mr. Barber and his wife

are getting ready at this point to pick up their children from their grandmother's home.  So now that this evidence will come out and you'll start to hear this, you'll start to have to wonder, if they're packing up their car to pick up their children, then why is Mr. Barber asking for a ride somewhere?

As the evidence comes out, that's going to be -- have to be something that you're going to have to try to calculate and understand.  Does it make sense?  What you're also going to learn, is that this is in Adelanto, California.  This area that they're in is very dark.  You're, at some point, going to hear testimony from Officer Alfred, who's going to tell you this visibility was poor looking down the driveway.

If you can please turn on -- a little dark in here. I apologize folks, but this is the area that they live in.  And it is very dark.  You will see that this light here, is going to be really lights from where they're taking photographs, and they have officer's lights.  Those are going to be lights that are actually there.  That's from wherever they're trying to take these photos.  And this is the area you're going to see. At some point, show the officer's vehicle is here on the street.  Then you're going to see the driveway.

All the way back here is where Mr. Barber's vehicle was.  And it's actually further back, and we'll get into that. But this is a driveway.  Without this light here, this is what one is looking at as they're walking down this driveway.  That is what the evidence is going to show, a very long and a very dark driveway.

As Officer Alfred comes to the scene, he starts

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 1                              Page 26

speaking to Mr. Cocchi and Ms. Gallo.  And they're on the street in their car.  They're not down this driveway.  And they explain to Officer Alfred what they believe occurred or what was happening, the issues that they were having with their neighbor.  All right.  They got somebody to come out pretty quickly.

Officer Alfred says, okay.  Let me take a look. Let me talk to this individual.  And you heard the audio.  What the end is going to show, something very important.  And I want you to pay attention to this.  At no point in time did you hear in that audio Officer Alfred, who is on the street that's going to be well over a hundred feet away down a dark driveway, you never heard him say San Bernardino County Sheriffs.  You never heard him announce who he was at any point in time.

Now, we know that something happened between Mr. Barber and his neighbors.  There was some argument that had occurred.  So now there's an individual who has not announced themselves, who is dressed wearing this, a beanie and a dark face mask, walking down a very dark, very long driveway.  At no point, again did you hear or will you hear Officer Al -- Deputy Alfred ever say who he is.

So then you hear an exchange between Mr. Barber and Deputy Alfred.  Deputy Alfred is saying, "Let me see your hands."  Mr. Barber saying, "Let me see your hands."  He hasn't said, I don't listen to cops.  I don't care about cops.  He hasn't made any mention that this is an actual law enforcement officer.  He says, "Let me alone."  You'll hear him say, stop trippin or something of that sort, and he gets into his car.

Now, mind you, you're walking -- the evidence is going to show you have a man walking down somebody's driveway with possibly with a flashlight, dressed like this with a dark beanie on, dark mask and pointing a bright light in front of somebody's face.  Has not announced who they are.

Mr. Barber is looking to leave.  He's waiting for his wife, so he gets in his car.  And then you're going to hear as what you heard, some tires squeal.  You'll hear the engine rev up.  You're going to hear some tires moving.  And shortly thereafter, you're going to hear the tires stop, and then you're going to hear gunfire.

There's going to be six shots fired.  And these shots are important.  It's going to be important to know where these shots were fired.  It's going to be important to know where that vehicle was in relation to where it began, where that vehicle ended.  Officer Alfred is going to testify that he was approximately -- prior to shooting, he was approximately 8 to 10 feet away from the vehicle.  And he had no opportunity to go left or right.

What you're going to see here, Officer Alfred is going to say that he was unable to go into this area over here, which is a yard.  He's going to testify that he walked passed this, and he's going to testify that he began to fire his shots after he dropped his flashlight.  And that was approximately 8 to 10 feet away from that vehicle.

And he's going to say I had to do it because the vehicle was moving so fast in my direction that I had no choice but to fire shots because I was in fear of my life.  That's why

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                          Vol 1                              Page 28

I had to fire shots.

But that's not what the evidence is going to show. The evidence is going to show first, where were the shell casings.  You're going to learn in this image the shell casing two, three, four and five, those are -- where the first four shots were fired in that approximate area.  You're going to hear this from an expert witness that's going to come in, Robert Morales.  And he's going to testify based upon the audio, there's going to be four shots initially fired at .25 intervals.

He's going to testify that in this area that is going to be approximately 52 feet away from that initial vehicle where it was at.  52 feet.  You're then going to see two other shell casings, six and seven.  What Mr. Morales is going to testify is that approximately .42 seconds after the first four shots, another shot fires, and then after that fifth shot fires, at approximately one second after that a sixth shot fires.

This is going to be very important to understand where the physical evidence is.  Because the physical evidence is going to prove where Deputy Alfred fired his shots before that at the time that that car was making that noise.  And this is going to directly contradict what Deputy Alfred is going to testify to.

You're also going to see here there can be a flashlight way up here, way up here.  And that flashlight is still going to be approximately 15, 20 feet away from where the car actually was when it began to move.  So why is that

important?  The evidence is going to show just a physical evidence alone, with the shell casings alone it's going to show that it would not have been possible for Deputy Alfred to be only 8 to 10 feet away from that car when he believes it started moving.

And what you're also going to find out is what the speed and the distance of this vehicle travel.  You're going to hear testimony from Monique Grenados, Mr. Barber's wife.  She hears the shots.  She's literally right in the laundry room, right where the actual car is.  She can see it.  You're also going to hear about Ms. Grenados is going to have some vision issues.  She has glaucoma at the time.  She couldn't see in her left eye but could see in her right eye.  She created tunnel vision.  She can understand light distances.  She can understand movement.  She can see approximately 3 or 4 feet in front of her fairly well.  As she starts to go back, she sees things moving.  That's not an issue.

And you're going to hear testimony that Ms. Grenados was interviewed shortly after this incident.  And Ms. Grenados is going to say, I heard several shots, then say the car slowly moved in reverse and stopped.  She's also going to testify about this vehicle, about the Trailblazer.

She's going to testify that Mr. Barber, because it is an older late model Trailblazer, he has to warm his car up. He has to put his foot on the brake.  He puts his accelerator to get the engine going.  That's always what they have to do with this older model.

So when she at first hears this kind of the engine

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

idling, she hears the vehicle rev up.  She does notice it was a little more weird than it would normally sound.  She's going to say that, but what she is going to say is, I might not have the best vision but I can see when headlights move.  And I can tell you what speed something is going.  I know something is moving fast or something is moving slow.  And I know when something is actually moving.  And she knows, and she's going to testify, that that car slowly moved back.

And you're going to hear from Robert Morales, the expert witness, who's going to testify based upon the physical evidence and based upon his calculations, that vehicle at whatever point, whether it moved simultaneously during the time the car -- the shots were fired or move right after, that car doesn't go more than three to four miles per hour, max.

But he's also going to testify to this, Deputy Alfred was actually approaching the vehicle the entire time at a speed going faster than the car was moving back.  Deputy Alfred is going to testify that he never had an opportunity to simply go to the right where this massive open space is into the neighbor's yard.  He never had an opportunity to do that because he was so far up, that he could only shoot.  Couldn't move left because there's a chain-link fence there.  Couldn't move right because they had this wooden fence.  He says it's only 8 to 10 feet away.  And ultimately he had to fire those shots because he feared for his life.

Well, the evidence is going to show, ladies and gentlemen, Mr. Barber, one didn't have a clue who this man was.  And if anything, he likely thought it was his neighbor who he

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

had just gotten into it with.  Two, there's going to be no doubt that Mr. Barber revved up that engine.  But you'll even hear Deputy Alfred say yeah, it was trying to gain tractions or something was going on with the tires.  I wasn't hit by any gravel or dust or anything like that, but then I fired my gun and it moved.

There will be no evidence to prove that Mr. Barber ever had any intent to take the life of Deputy Alfred that night or anyone for that matter.  And it is going to be critical for you all to pay attention to this physical evidence because as you will see, two, three, four, five, those are the initial shell casings.  Deputy Alfred will explain what kind of gun he had.  And you'll know that if he claims that he was shooting 8 to 10 feet from where the car started moving back, there's no way these shell casings could have moved all the way 52 feet from that car initial starting point.

You'll also see that again, at some point, the police cruiser wasn't on.  The lights weren't on.  It was way off in the distance.  So again there was no way for Mr. Barber to know that there was any -- that there was any officers there.  Mr. Barber may have gotten into a fight or an argument or some dispute with his neighbor.  It happens all the time.

They'll testify they actually don't have any issues with the guy.  They didn't know him that well.  But what's going to be important is to understand what this case is and what it's not.  You were read some jury instructions, and I just -- to put things into perspective, you're going to see this.  It is not to scale, but it's part of a report.  You will

see where all of the bullet shell casing land.  You'll see where the car stops.

Now, what's going to be interesting you're going to hear testimony that where the car stops isn't actually where the car stopped.  What I mean by this is, after officers arrive, and they take Mr. Barber out of the vehicle, the car actually rolls back another 2 to 3 feet where it finally rests.  And what's also going to be important is that Deputy Alfred describes this vehicle coming at him at this pace, this speed, where he had no choice.  But the car is just going to stop.  It wasn't obstructed by anything.  And it's only going to move between 10 to 12 feet as it rolled back slowly.  And this is ultimately what you are all going to have to make a decision on.

You will hear about a jury instruction on circumstantial evidence.  Throughout this case, before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved every fact essential to that conclusion beyond a reasonable doubt.

Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence, is that the defendant is guilty.  If you can draw two or more reasonable conclusions from circumstantial evidence, and one of those reasonable conclusions points to innocence, and another to guilt, you must accept one that points to innocence.  However, even considering

circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

In closing, at some point in time we'll argue what reasonable is. But this is just something for you all to understand and think about as you move through this case. And again, this is what you're going to see. You're going to see this driveway. It's long. It's dark. And the lights you kind of see in these pictures are from the lights that the officers were taking after they had floodlights to brighten the area. But again, you're going to hear the lighting was poor.

At the end of this case, I'm going to show you all based upon the physical evidence that I really want you to pay attention to the physical evidence. What stories make sense? Does it make sense that Officer Alfred or Deputy Alfred was approximately 8 to 10 feet away? He had nowhere to move, and he fired this gun at a fast moving vehicle but doesn't go through this chain-link fence because it's moving so fast.

Or does it make more sense that you had some guy who had a dispute with his neighbor, had an argument, saw his neighbor who he believed may be some of his friends coming down, you know, the driveway with a flashlight blazing in their eyes telling them to do something. And he's saying I don't have to do anything you say, revs up the engine, gets the tires moving, and shots are fired.

At the end of this case, I believe that you all will make the decision and the evidence will prove that Mr. Barber is not guilty of attempted murder. Mr. Barber is not guilty of assault with a deadly weapon. This is not a case

about a man who was running around pointing a gun at a law enforcement officer.  This is not a case where Mr. Barber was actively middle of the day recognized there was an officer there and fighting with him.  And you may hear some evidence that Mr. Barber may have gotten into a past conviction of fighting with a cop.  That may come in, and he owns that.

But the evidence will show that is not what happened today, and the evidence will show in that instance is nothing compared to this instance.  With that, ladies and gentlemen of the jury, I look forward to presenting this case. Thank you all so much.

THE COURT:  Thank you, Mr. Bryant.

Ms. Fultz, your first witness, please.

MS. FULTZ:  Thank you.  Christopher Alfred, please.

THE JUDICIAL ASSISTANT:  You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE JUDICIAL ASSISTANT:  Thank you please be seated.

THE BAILIFF:  Far chair is the mic is active.  Once you're seated, please state and spell your name for the record.

THE WITNESS:  Christopher Alfred, C-h-r-i-s-t-o-p-h-e-r, A-l-f-r-e-d.

THE COURT:  Good morning, Deputy Alfred.

THE WITNESS:  Good morning, sir.

THE COURT:  Ms. Fultz.

MS. FULTZ:  Thank you.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                         Vol 1                              Page 133

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--O0O--

THE PEOPLE OF THE STATE        )
OF CALIFORNIA,                 )
                               )
                    Plaintiff,)
                               )
              -vs-             )    No. FVI-21001312
                               ) REPORTER'S CERTIFICATE
STEFFON TODD BARBER,           )
                               )
                    Defendant.)
_____)


STATE OF CALIFORNIA           )
                              )  ss
COUNTY OF SAN BERNARDINO      )


     I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do

hereby certify:

     That I am a Certified Shorthand Reporter of the State of

California, duly licensed to practice; that I did report in

stenotype oral proceedings had upon hearing of the

aforementioned cause at the time and place herein before set

forth; that the foregoing pages numbered 5 to 132, inclusive,

constitute to the best of my knowledge and belief a full, true,

and correct transcription from my said shorthand notes so taken

for the date of December 2, 2024.

     Dated at San Bernardino, California, this 3rd day of May,

2025.


_____
Official Court Reporter
C.S.R. No. 12225

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 6                              Page 571

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15                          HON. DAVID COHN, JUDGE


PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
                   Plaintiff,      )
                                   )
        vs.                        )  No. FVA-025457
                                   )
STEFFON TODD BARBER,               )
                                   )
                   Defendant.      )
_____)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 11, 2024


APPEARANCES:

For the People:      JASON ANDERSON
                     District Attorney
                     By:  KATHLEEN FULTZ
                     Deputy District Attorney


For the Defendant:   JAMES BRYANT
                     Attorney at Law

                     RYAN DUCKETT
                     Attorney at Law

                     RODNEY DIGGS
                     Attorney at Law


Reported By:         ALICIA S. VASQUEZ, C.S.R.
                     Official Court Reporter, CSR No. 12225

Volume 6 of 7
Pages 571 through 723, incl.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

SESSIONS


DATE                                                  PAGE

December 11, 2024
     Morning Session                                   575
     Afternoon Session                                 647

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                          Vol 6                          Page 573

CHRONOLOGICAL INDEX OF WITNESSES

DEFENDANT'S WITNESSES                                          PAGE

MORALES, Robert

     Cross-Examination by Ms. Fultz    ............ 585
     Redirect Examination by Mr. Bryant............ 592
     Recross-Examination by Ms. Fultz ............. 609
     Further Redirect Examination by Mr. Bryant.... 616


PEOPLE'S WITNESSES                                            PAGE

HERNANDEZ, Edward

     Direct Examination by Ms. Fultz   ............ 620
     Cross-Examination by Mr. Bryant   ............ 627
     Redirect Examination by Ms. Fultz............. 635
     Recross-Examination by Mr. Bryant............. 637
     Further Redirect Examination by Ms. Fultz..... 640

                              INDEX OF EXHIBITS


NO. ____DESCRIPTION            ID           EVD    __ _____

32        (Unidentified)                    618
80        (Unidentified)                    618
81        (Unidentified)                    618

SAN BERNARDINO, CALIFORNIA, WEDNESDAY, DECEMBER 11, 2024

MORNING SESSION

DEPARTMENT S-15        HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,

JAMES BRYANT, Attorney at Law,

RYAN DUCKETT, Attorney at Law and

RODNEY DIGGS, Attorney at Law;

KATHLEEN FULTZ, Deputy District Attorney,

representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--oOo--

THE COURT:  Good morning.  We're on the record, outside the presence of the jury.  Both counsel are present. Mr. Barber is present.  Detective Hernandez is present.

Okay.  We need to talk about jury instructions.  I have read People versus Golde, G-o-l-d-e, cited by the People, 163 Cal.App.4th 101 2008, indicating that the lesser included offenses of simple assault would not be appropriate when the automobile is involved.

Now, an argument can be made I think that the Golde case is limited to its particularly egregious facts.  The Court writes at page 133, quote, It is ludicrous to suggest on this record that defendant committed only simple assault when he drove a motor vehicle toward the 4 foot 11 inch, 83 pound victim and repositioned the vehicle in her direction when she tried to move out of its way, end of quote.  We don't have those facts here.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

MS. FULTZ:  Correct.

THE COURT:  Okay.  Anything else?

MS. FULTZ:  On page 19 we had a similar typo.

THE COURT:  I changed this to 875(a), I don't think that's in your version.

MS. FULTZ:  Yes.

THE COURT:  I call it 875(a).

MS. FULTZ:  Yes, I do have that.

THE COURT:  Okay.  And --

MS. FULTZ:  The last line of Instruction 875(a) has the same typo, can an object.

THE COURT:  Thank you.  Then 875(b)?

MS. FULTZ:  It's not in that.

THE COURT:  I'm sorry?

MS. FULTZ:  That's all I have.

THE COURT:  Okay.  And, Mr. Bryant, do you agree with all of those?

MR. BRYANT:  There's just one more, Your Honor.  It's on page 4, under 104, the last paragraph, where it starts with, the court reporter is making, the second line should be after the court reporter's record be read, it's just a double to, to to.

MS. FULTZ:  Is the Court rereading the 100 series?

THE COURT:  No, I'm not going to.  But with your permission I'll delete the double to.

MS. FULTZ:  Yes.

THE COURT:  Okay.  Give me a moment to make these edits.

(Brief pause.)

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

THE COURT:  Okay.  Could you switch the thing over to my computer please and let's bring the jury in.

(The following proceedings were held in the presence of the jury.)

THE COURT:  Everyone is present.  We're back on the record.

As I told you at the beginning of the case, the law requires that I read the instructions to you.  You'll also have them in written form to refer to, so if you do miss something, don't panic about that.  The lawyers are going to talk about the instructions in their closing arguments as well.  I put them on the overhead.  If it helps you to follow along as I read, feel free to do so.  If it doesn't help you, I understand that.

Some people, you know, read at different speeds silently than someone can speak.  So don't feel obligated to read them on the overhead.  But it's there for your assistance if that helps you.  Okay.

Members of the jury, I will now instruct you on the law that applies to this case.  I will give you a copy of the instructions to use in the jury room.  You must decide what the facts are.  It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial.

You must not let bias, sympathy, prejudice or public opinion influence your assessment of the evidence or your decision.  Many people have assumptions and biases about or stereotypes of other people and may be unaware of them.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

You must not be biased in favor of or against any party, witness, attorney, defendant or alleged victim, because of his or her disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age or socioeconomic status.  You must follow the law as I explain it to you, even if you disagree with it.

If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.  Pay careful attention to all of these instructions and consider them together.  If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.

Some words or phrases used during this trial have legal meanings that are different from their meanings in every day use.  These words and phrases will be specifically defined in these instructions.

Please be sure to listen carefully and follow the definitions that I give you.  Words and phrases not specifically defined in these instructions, are to be applied using their ordinary, every day meanings.

Some of these instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

Do not use the internet or a dictionary or social media in any way in connection with this case, either on your

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

own or as a group.  Do not investigate the facts or the law, or do any research regarding this case, either on your own or as a group.  Do not conduct any tests or experiments or visit the scene of any event involved in the case.  If you happen to pass by the scene, do not stop or investigate.

You have been given notebooks and may have taken notes during the trial.  You may use your notes during deliberations.  Your notes are for your own individual use to help you remember what happened during the trial.  Please keep in mind that your notes may be inaccurate or incomplete.

If there is a disagreement about the testimony at trial, you may ask that the court reporter's record be read to you.  It is the record that must guide your deliberations, not your notes.  You must accept the court reporter's record as accurate.

Do not ask the court reporter questions during the read back and do not discuss the case in the presence of the court reporter.

Please do not remove your notes from the jury room.  At the end of the trial, your notes will be collected and destroyed.

The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true.  You must not be biased against the defendant just because he has been arrested, charged with a crime or brought to trial.

A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

you the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence and anything else I told you to consider as evidence.

Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence.  The attorneys' questions are significant only if they help you to understand the witnesses' answers.  Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law.  If I sustain an objection, you must ignore the question.  If the witness was

not permitted to answer, do not guess what the answer might have been or why I ruled as I did.  If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose.

During the trial, you were told that the People and the Defense agreed or stipulated to certain facts.  This means that they both accept those facts as true.  Because there's no dispute about those facts, you must also accept them as true.

You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.

The court reporter has made a record of everything that was said during the trial.  If you decide that it is necessary, you may ask that the court reporter's record be read to you.  You must accept the court reporter's record as accurate.

Facts may be proved by direct or circumstantial evidence or by a combination of both.  Direct evidence can prove a fact by itself.  For example, if a witness testifies he saw it raining before he came into the courthouse, that testimony is direct evidence that it was raining.

Circumstantial evidence may also be called indirect evidence.  Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question.  For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

evidence because it may support a conclusion that it was raining outside.

Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of the charge, including intent and mental state and acts necessary to a conviction.  Neither is necessarily more reliable than the other.  Neither is entitled to any greater weight than the other.  You must decide whether a fact in issue has been proved based on all the evidence.

Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  Also, before you may rely on circumstantial evidence to conclude that the defendant is guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.

If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must only accept reasonable conclusions and reject any that are unreasonable.

You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

In evaluating a witness's testimony you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

Among the factors that you may consider are:

How well could the witness see, hear or otherwise perceive the things about which the witness testified?

How well was the witness able to remember and describe what happened?

What was the witness's behavior while testifying?

Did the witness understand the questions and answer them directly?

Was the witness's testimony influenced by a factor, such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how the case is decided?

What was the witness's attitude about the case or about testifying?

Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

How reasonable is the testimony when you consider all the other evidence in the case?

Did other evidence prove or disprove any fact about which the witness testified?

Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember.  Also, two people may witness the same event, yet see or hear it differently.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.  Or, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

The crimes at issue in this case involve -- or excuse me -- require proof of the union or joint operation of act and wrongful intent or mental state.

The following crimes require a specific intent:

Attempted murder as charged in Count 1.

For you to find the person guilty of this crime, that person must not only intentionally commit the prohibited act but must do so with a specific intent.

The specific intent required for the crime of attempted murder is intent to kill.

For the additional allegation, that the attempted murder was of a peace officer, the mental state required for that allegation is that the defendant knew or should have known Deputy Alfred was a peace officer.

The following crimes require general criminal intent:

Assault on a peace officer with a deadly weapon or a force likely to cause great bodily injury, as charged in

Count 2, and assault with a deadly weapon and assault with force likely to cause great bodily injury, both lesser crimes of the crime charged in Count 2.

For you to find a person guilty of any of these crimes, that person must not only commit the prohibited act but must do so with wrongful intent.  A person acts with wrongful intent, when he intentionally does a prohibited act.  However, it is not required that he intend to break the law.  The act required is explained in the instruction for each crime.

Additionally, the crime charged in Count 2, assault on a peace officer with a deadly weapon, or force likely to cause great bodily injury, the mental state required is that the defendant knew or should have known Deputy Alfred was a peace officer.

The distinction between the crime charged in Count 2 and the lesser crimes of assault with a deadly weapon or assault with force likely to cause great bodily injury, is that the lesser crimes do not require that the defendant knew or should have known Deputy Alfred was a peace officer. Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant.

The testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence.

If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe.

Do not simply count the number of witnesses who

agree or disagree on a point and accept the testimony of the greater number of witnesses.  On the other hand, do not disregard the testimony of any witness without any reason or because of prejudice or a desire to favor one side or the other.  What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point.

During the trial certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other.

You have heard evidence of statements that a witness made before the trial.  If you decide that the witness made those statements, you may use those statements in two ways:

1.  To evaluate whether the witness's testimony in court is believable;

AND

2.  As evidence that the information in those earlier statements is true.

Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide.

In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or

information on which the expert relied in reaching that opinion.

You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence.

An expert witness may be asked a hypothetical question.  A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts.  It is up to you to decide whether an assumed fact has been proved.

If you conclude that the assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

If the expert witnesses disagreed with one another, you should weigh each opinion against the others.  You should examine the reasons given for each opinion and the facts or other matters on which each witness relied.  You may also compare the experts' qualifications.

Witnesses who were not testifying as experts gave their opinions during trial.  You may, but are not required to, accept those opinions as true or correct.  You may give the opinions whatever weight you think is appropriate.  Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.

You must decide whether information on which the

witness relied was true and accurate.  You may disregard all, or any part of any opinion you find unbelievable, unreasonable or unsupported by the evidence.

A defendant has an absolute Constitutional right not to testify.  He or she may rely on the state of the evidence and argue that the People have proved -- failed to prove the charges beyond a reasonable doubt.  Do not consider for any reason at all the fact that the defendant did not testify.  Do not discuss that fact during your deliberations or let it influence your decision in any way.

The People are not required to prove that the defendant had a motive to commit any of the crimes charged or the lesser crimes.  In reaching your verdict you may, however, consider whether the defendant had a motive.  Having a motive may be a factor tending to show that the defendant is guilty.  Not having a motive may be a factor tending to show that the defendant is not guilty.

The People presented evidence that the defendant committed the offenses of resisting a peace officer and assault of a peace officer that were not charged in this case.  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses.

Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this

evidence entirely.

If you decide that the defendant committed the uncharged offenses, you may but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted with the intent to kill in this case, or the defendant had a motive to commit the offenses alleged in this case, or the defendant knew or should have known that Deputy Alfred was a peace officer or the defendant's actions were not the result of mistake or accident.

In evaluating this evidence consider the similarity or lack of similarity between the uncharged offenses and the charged offenses.  Do not consider this evidence for any other purpose.

Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of Count 1 and Count 2 or the lesser crimes.  The People must still prove each charge beyond a reasonable doubt.

The defendant is charged in Count 1 with attempted murder.

To prove that the defendant is guilty of attempted murder, the People must prove that:

1.  The defendant took at least one direct but ineffective step toward killing another person;

AND

2.  The defendant intended to kill that person.

A direct step is more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.  A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action.  A direct step indicates a definite and unambiguous intent to kill.  It is a direct movement toward the commission of the crime after preparations are made.  It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

A person who attempts to commit murder is guilty of attempted murder even if after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control.

On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder.

If you find the defendant guilty of attempted murder under Count 1, you must then decide whether the People have proved the additional allegation that he attempted to murder a peace officer.

To prove this allegation, the People must prove that:

1.  Deputy Christopher Alfred was a person employed as a peace officer by the San Bernardino County Sheriffs

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

Department, lawfully performing his duties as a peace officer;

AND

2.   When the defendant attempted the murder, the defendant knew or reasonably should have known that Deputy Christopher Alfred was a peace officer who was performing his duties.

The duties of a peace officer include parole, responding to calls for service, and investigating crimes.

A police officer is not lawfully performing his or her duties if he or she is unlawfully detaining someone.

Instruction 2670 explains when a detention is unlawful.

The defendant is charged in Count 2 with assault with a deadly weapon other than a firearm or force likely to produce great bodily injury on a peace officer, in violation of Penal Code Section 245.

To prove that the defendant is guilty of this crime, the People must prove that:

1.   The defendant did an act with a deadly weapon other than a firearm, that by its nature would directly and probably result in the application of force to a person, or with force likely to produce great bodily injury;

2.   The defendant did that act willfully;

3.   When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone;

4.   When the defendant acted, he had the present

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

ability to apply force likely to produce bodily injury, or with a deadly weapon other than a firearm to a person;

5.   When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer;

AND

6.   When the defendant acted, he knew or reasonably should have known that the person assaulted was a peace officer who was performing his duties.

Someone commits an act willfully when he or she does it wilfully or on purpose.  It is not required that he or she intend to break the law, hurt someone else or gain any advantage.

The terms application of force and apply force mean to touch in a harmful or offensive manner.  The slightest touching can be enough, if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough.  The touching does not have to cause pain or injury of any kind.  The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone.  The People are not required to prove that the defendant actually intended to use force against someone when he acted.  No one needs to actually have been injured by defendant's act, but if someone was injured you may consider that fact, along with all the other evidence in deciding whether the defendant committed an assault.

Great bodily injury means significant or

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

substantial physical injury.  It is an injury that is greater than minor or moderate harm.

A deadly weapon is any object, instrument or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.  In deciding whether an object is a deadly weapon, consider all the surrounding circumstances.

The duties of a peace officer include patrol, responding to calls for service and investigating crimes.

A person employed as a police officer by the San Bernardino County Sheriffs Department is a peace officer.

The People have the burden of proving beyond a reasonable doubt that Christopher Alfred was lawfully performing his duties as a peace officer for the crimes of attempted murder of a peace officer and assault on a peace officer with a deadly weapon or force likely to cause great bodily injury.  If the People have not met this burden, you must find the defendant not guilty of these crimes and allegations.

A peace officer is not lawfully performing his or her duties if he or she is unlawfully detaining someone.

A peace officer may legally detain someone if:

1.  Specific facts known or apparent to the officer lead him or her to suspect that the person to be detained has been, is or about to be involved in activity relating to crime;

AND

2.  A reasonable officer who knew the same facts would have the same suspicion.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

Any other detention is unlawful.

In deciding whether the detention was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he detained the person.

Totality of the circumstances means all facts known to the peace officer at the time, including the conduct of the defendant and Christopher Alfred leading up to the use of deadly force.

If a person knows or reasonably should know that a peace officer is arresting or detaining him, the person must not use force or any weapon to resist an officer's use of reasonable force.

A lesser crime to the crime charged in Count 2, is assault with a deadly weapon other than a firearm.  Do not consider this crime unless you find the defendant not guilty of the crime charged in Count 2, assault on a peace officer with a deadly weapon other than a firearm or force likely to cause great bodily injury.

To prove that the defendant is guilty of this crime, the People must prove that:

1.  The defendant did an act with a deadly weapon other than a firearm, that by its nature would directly and probably result in the application of force to a person;

2.  The defendant did that act willfully;

3.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

application of force to someone;

AND

4.  When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person.

Someone commits an act willfully when he does it willingly or on purpose.  It is not required that he intend to break the law, hurt someone else or gain any advantage.

The terms application of force and apply force mean to touch in a harmful or offensive manner.  The slightest touching can be enough, if it is done in a rude or angry way.

Making contact with another person, including through his or her clothing is enough.  The touching does not have to cause pain or injury of any kind.  The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone.  The People are not required to prove that the defendant actually intended to use force against someone when he acted.  No one needs to actually have been injured by defendant's act.  But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault.

A deadly weapon is any object, instrument or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.  The deadly weapon in this case is alleged to be the vehicle.

Great bodily injury means significant or

substantial injury.  It is an injury that is greater than minor or moderate harm.

In deciding whether an object is a deadly weapon, consider all the surrounding circumstances.

A lesser crime to the crime charged in Count 2 is assault with force likely to cause great bodily injury.

Do not consider this crime unless you find the defendant not guilty of the crime charged in Count 2, assault on a peace officer with a deadly weapon other than a firearm, and not guilty of the lesser crime of assault with a deadly weapon.

To prove that the defendant is guilty of this crime, the People must prove that:

1.  The defendant did an act that by its nature would directly and probably result in the application of force to a person;

2.  The force was likely to produce great bodily injury -- I apologize.  These numbers are wrong.

The second 2, which is actually 3.  The defendant did that act willfully;

3, as listed but it's actually 4.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

AND

What's listed as 4 is actually 5.  When the defendant acted, he had the present ability to apply force

likely to cause great bodily injury.

We'll get those numbers corrected before the instructions go to you in the jury room.

Someone commits an act willfully when he does it willingly or on purpose.  It is not required that he intend to break the law, hurt someone else or gain any advantage.

The term application of force and apply force mean to touch in a harmful or offensive manner.  The slightest touching can be enough, if it is done in a rude or angry way.

Making contact with another person, including through his or her clothing is enough.  The touching does not have to cause pain or injury of any kind.  The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone.  The People are not required to prove that the defendant actually intended to use force against someone when he acted.  No one needs to actually have been injured by defendant's act, but if someone was injured, you may consider that fact, along with all the other evidence in deciding whether the defendant committed an assault.

Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

Each of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each one.

If you find the defendant not guilty of assault on

a peace officer with a deadly weapon or force likely to cause great bodily injury, you may then consider the lesser crime of assault with a deadly weapon.

If you find the defendant not guilty of assault with a deadly weapon, you may then consider the lesser crime of assault by means of force likely to cause great bodily injury.

Do not return a verdict for a lesser crime, if you find the defendant guilty of the greater crime.

Okay.  That's it for the instructions that I am going to read.  The last one I'll read is 3550, after the closing arguments of the lawyers.  So if you would shut down my computer.  Thank you.

All right.  Ms. Fultz, would you like to make a closing argument?

MS. FULTZ:  Yes.  Thank you.

THE COURT:  Feel free to use the well.

MS. FULTZ:  Good afternoon.

(Audio played; not reported.)

MS. FULTZ:  In a 30-second encounter on April 27th, 2021, what could have been a peaceful exchange between a Adelanto patrol deputy and a resident turned into a near deadly, for a patrol deputy, incident in a long narrow driveway surrounded by multiple forms of fencing, all of which were estimated to be approximately 6 foot high.

When Steffon Barber, the defendant, instead of complying with, hey, bud, come out here, instead of engaging in a conversation, instead of asking for help for whatever maybe was going on, decided against angrily and against a lawful

command not to, entered his vehicle, threw it in reverse and hit the gas, and nearly ran down Deputy Alfred as he stood behind that vehicle.

We spent a lot of time talking about Deputy Alfred's movements and where he was, and a lot of the things related to the actions and movements of Deputy Alfred.  But what requires your attention and deliberation are the actions of the defendant, Steffon Barber.

And you heard some instructions about lawful performance, and we will get into a little bit about what was required of Deputy Alfred, but when you are given the case and you are asked to go in the deliberation room and you are given verdict forms to sign, it will be related to the actions of the defendant, Steffon Barber.  Let's talk about what's charged.

Count 1 is attempt murder.  You heard the instruction.  The defendant took at least one direct but ineffective step towards killing another person.  And the defendant intended to kill that person.  Now, in order for you to convict Mr. Barber of Count 1, I have to prove to you these two elements, and these are, of course, abbreviations.  Please follow the instructions as they're provided by the Court.

So let's talk about what evidence supports each of these elements.  Let's look at Element No. 1.  The defendant took at least one direct but ineffective step towards killing another person.

Well, you heard the testimony of Deputy Christopher Alfred.  You heard him describe the events.  You heard him describe that he was working the patrol shift.  He answered a

call for service.  He arrived at the location on White Avenue in the town of Adelanto.  He made contact with the reporting parties.  He took a statement from them to figure out what's going on.  Why am I here?  He agreed to go and talk to the person that they were having the problem with.  And then that leads to the encounter that we just listened to in the recording.

So you have this eyewitness account, what he recollects from about three and a half years ago, and you also have his belt recording that we just listened to a portion of it.  You have the entire recording of this call for service, from the time his vehicle arrives until the end of the gunshots.  And you will have that recording with you in the deliberation room, if you choose to listen to it again.

(Audio played; not reported.)

MS. FULTZ:  You also have photographs of the physical evidence.  You had testimony from Detective Hernandez, who walked the scene, who saw these items of evidence that were photographed for you and the meaning and significance of them.

Well, at Placard 14, it's very difficult to see in this even smaller photograph version form in the PowerPoint, but you'll have the photo printed for your review in the deliberation room.  And you heard the testimony that that gouge mark with the slightly darker dirt, that's where there was moisture, that's showing the displacement of the dirt from the rear tire.

This was a rear wheel drive vehicle.  The rear tire losing traction as it was spinning because of the depression of

that gas pedal hitting the gas, and causing the tire to lose traction before it actually began to move.

You also have the photos of the tire tracks which showed the vehicle moved.  The vehicle moved 14 feet in the direction of Deputy Alfred in that encounter that you hear in the recording.

The physical evidence shows that the defendant took a direct step.  What is that direct step?  He got into a 5,000 pound piece of metal and accelerated it at another human being. That is the direct step.

Now, the other element is the intent to kill.  And this is almost always going to be a circumstantial evidence. People don't narrate their lives the way Will Ferrell does in movies.  So we have to look at the surrounding circumstances.

You have the physical evidence, the, again, there's the photograph at Placard 14, showing not just the gouge mark from the rear tire when it lost traction and began -- then began to accelerate, but next to the gouge mark is the tire impression left by the front tire.

And why is that important that they're next to each other?  It shows that there was a turning movement.  If the vehicle just moved in a direct straight path, those tracks would have been exactly on top of each other.

You also heard from Maria Gallo, who testified that in the instance that led to her calling 911, she described the defendant's demeanor as angry, and he made me fear that we were about to be assaulted.  That was how she described his demeanor.  This was the mind set just prior to Deputy Alfred

arriving at the location.

You also heard from Joseph Cocchi, who described the defendant's demeanor as aggressive and violent.  He was talking about him banging on the car doors, trying to open all the car doors on both Mr. Cocchi and Ms. Gallo's vehicles.

You heard the 911 call.  So this wasn't just an instance where a neighbor was maybe like an elevated mood.  This was, I was in fear such that I made an excuse to jump in my wife's car.  We turned around the corner of the driveway, out of the view of the defendant, and we called 911.  We were too scared to go into our home.  That is the circumstantial evidence of the state of mind that was described to you, that the defendant was in just prior to Deputy Alfred's arrival.

You also have Deputy Alfred's reaction to that direct step.  And he testified to you that when he saw that vehicle coming at him, he discharged his firearm.  You hear in the recording he discharged his firearm six times.  We know that he had, it's a 13-load magazine, with one in the chamber, 14 rounds available.  I asked him, why did you stop at six?  He said the vehicle stopped moving.  His reaction was to a threat that was coming at him.

And, of course, you have the recording of Mr. Barber himself, his first reaction to Deputy Alfred when he arrived on scene.

(Audio played; not reported.)

MS. FULTZ:  That is not a friendly reaction.  And no one is required to have a friendly reaction to law enforcement.  But it was an aggressive reaction.  It was using foul language.

It was using raised voice.  His demeanor as described by Ms. Gallo, as described by Mr. Cocchi, what we hear in the recording, and then coupled with the actions taken with that vehicle, all demonstrate an intent to kill.

In his state of mind you also have the -- you heard the revving of the engine.  You can consider the action when it was described by the witnesses and the experts, that in order to make the engine make that revving sound that you hear, you have to hit the gas.  Even Mr. Morales conceded that eventually.  That you have to depress that gas pedal to make the engine rev.

And this makes me think of like a road rage situation.  When someone is angry and depresses that gas pedal you get that loud engine revving sound.

And consider the weapon that was used.  The weapon used in this incident when he drove at Deputy Alfred was a 5,000 pound motor vehicle.  That is, if it doesn't kill, it's going to cause some damage.

Now, you also heard testimony from several other deputies.  And you were instructed you can only use those in a very limited way.  Here, you can use the evidence that you heard from Deputies VanBrimmer, Deputy Layos and Deputy Ortega in considering intent.

So what did we hear from Deputy VanBrimmer?  In 2018, that he had an encounter with the defendant and while wearing the same uniform, that Deputy Alfred wore on April 27th in 2021, that they had an encounter where he failed to follow commands and fought with law enforcement.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

In 2018, again, you heard from Deputy Layos, Deputy Layos described an incident where he and his partner had to contact the defendant while in that same uniform. And that Deputy Layos ended up getting tased as the defendant was taking the taser from his partner.

You also heard from Deputy Ortega that in 2021, earlier than this incident, that there was an encounter again with the defendant, uniformed officers in the same Class A Sheriffs Department issued uniforms, that the defendant angrily reacted to the deputies' contact. He testified that his partner Deputy Johnson was punched by the defendant. And that he headbutted Deputy Ortega.

Well, in considering the intent of the defendant, in his actions toward Deputy Alfred, you have a sheriffs deputy showing up in that same uniform and a consistent reaction, although escalated certainly here. The defendant took a step to kill Deputy Alfred when he accelerated his vehicle toward him, and the defendant intended to kill Deputy Alfred when he accelerated his vehicle toward him.

The defendant is guilty of attempt murder.

There's also an allegation that is separate from the attempt charge. And that is, did the defendant intend to kill a sheriffs deputy? The elements here are that Deputy Alfred was a peace officer, lawfully performing his duties as a peace officer. You just heard the instruction on what lawful performance is. We'll talk about that a little bit.

And when the defendant attempted the murder, the defendant knew or reasonably should have known that Deputy

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

Alfred was a peace officer who was performing his duties.

So what do we know about Deputy Alfred in his capacity as a sheriffs deputy for the San Bernardino County Sheriffs Department?  He was a peace officer working patrol. He was a sheriffs deputy working patrol in the City of Adelanto.  His duties were answering calls for service.  We hear him in his recording updating dispatch on his activities. You can hear him telling them his location.  You can hear him updating them on the events that are taking place in that driveway.  You hear him contact reporting parties.  And he's taking a witness statement.

He's getting a very brief description of the encounter.  He is told by Mr. Cocchi that Mr. Cocchi thinks he may have a gun.  And you hear him, he doesn't just take that at face value.  He's asking further questions.  What makes you think that?  Why do you think that?  Did you see him with one? Did he say he had one?  You can hear that in his recording. These are all activities performed by a peace officer, a sheriffs deputy.

And again, we hear him attempt to contact Mr. Barber.  "Hey, bud, come out here.  Show me your hands." Why is it important?  Show me your hands.  Well, Mr. Cocchi just described why he thought the defendant had a firearm. These are normal things that a peace officer would do.  These are all corroborating and circumstantial evidence of a fact that Deputy Alfred is a peace officer.

This gets a bit wordy, bear with me.  A peace officer -- and this comes from Instruction 2670, the one on

lawful performance that you'll have with you in the deliberation room.  A peace officer may detain if specific facts are known or apparent to the officer to lead him to suspect that the person to be detained has been or is about to be involved in activity relating to crime.

What did Deputy Alfred tell you when he made contact with Ms. Gallo and Mr. Cocchi?  So although he took a brief statement from them about what was going on, he told you that his starting point, what he thought he might be looking at, was possibly a vandalism, because they described him banging on the car.  So from there, he attempts to go and make contact with the defendant.  A reasonable officer who knew the same facts would have the same suspicion.

Now, Deputy Alfred explained he can't just make contact with Ms. Gallo and Mr. Cocchi and decide this is a vandalism.  He's got to conduct further investigation.  And that's what he told you he was attempting to do during this encounter when he went to speak with Mr. Barber.

Here, Deputy Alfred responded to the call for service, where the reporting parties told him that their neighbor banged on their cars.  They tried -- he tried to forcefully enter their vehicles, was pulling on the door handles and demanded to be taken somewhere.  They told Deputy Alfred they were too afraid to enter their home.  Deputy Alfred, he had a duty to investigate, and he was in lawful performance to detain the suspect pending the investigation.

When he -- I asked him, was Mr. Barber free to leave when he made contact?  And he said no, he was conducting

an investigation.

Based on the circumstances described by Ms. Gallo and Mr. Cocchi, Deputy Alfred's -- I just lost the word -- Deputy Alfred's actions were reasonable, and any reasonable officer would have taken the same steps.

When the -- when the defendant attempted the murder -- this is the next element of the peace officer allegation.  When the defendant attempted the murder, the defendant knew or reasonably should have known that Deputy Alfred was a peace officer performing his duties.

Well, what do we know about whether or not Mr. Barber knew Deputy Alfred when he was contacted was law enforcement?  You heard some evidence that it was darker out. That there wasn't great lighting.  You heard that Deputy Alfred didn't approach announcing Sheriffs Department, something like that.  But he did tell you about a visual announcement.  And that was he's wearing his uniform.  You saw the Class A, the tan shirt, all the badging, all the patches, all of the indicia of a police uniform, and his beanie had big gold lettering that said sheriff right across the front, when he was wearing that beanie.

We also know that in his contact with Ms. Gallo and Mr. Cocchi, that Mr. Cocchi, while he was explaining why he thought maybe the defendant had a gun, he said, well, he was acting really weird last night and asking if we had seen law enforcement.  This is someone who's already on the lookout or policing the area.

We also know that the defendant had the interaction

that was described by Ms. Gallo and Mr. Cocchi.  Mr. Cocchi said that he kind of like led him to believe that maybe he would give him a ride, but he was trying to get out of there. Well, after behaving that way with his neighbors and his neighbors disappear, it's reasonable to assume they have left to call law enforcement to the area.

Deputy Alfred used cop lingo.  He didn't -- he asked, "Show me your hands.  Hey, bud, come out here.  Show me your hands."  Civilians don't talk to each other that way.  You aren't going to have Christmas dinner, hi, grandma, show me your hands.  That's not how normal civilian, non-law enforcement people talk to each other.  That's cop lingo. That's something that, based on what we heard from Deputy Ortega, something he would have heard before about his hands, he would recognize that.

And it was dark, but there was lighting enough. You heard Deputy Alfred describe that he can see, even from the street he saw a guy in a white shirt.  So it stands to reason that if you can see in one direction you're able to see in the opposite direction.  But it's simply unreasonable to think that the only thing Mr. Barber could not see that night was the uniform worn by Deputy Alfred.

We know that minutes earlier he saw Ms. Gallo and he saw Mr. Cocchi because they described the interaction that they had.  We know he was able to see his vehicle when he got into it and accelerated it at Deputy Alfred.  There were plenty of things that we can draw reasonable inferences that he saw, and so it is simply unreasonable to think that Deputy Alfred's

uniform was the only thing he could not see.

We know Deputy Alfred wore the same uniform that other law enforcement wore in the same -- the same Class A tan and green sheriffs uniform.  And I don't recall, I think at least two of the deputies who came in and testified had their Class As, but I showed them a photograph of Deputy Alfred to confirm, is this the same thing that you were wearing, and they described it was the same.  You can use the testimony of those three deputies, VanBrimmer, Layos and Ortega, for this specific purpose as well, for knowledge, lack of mistake, the fact that they are in the same uniform is evidence of the fact that the defendant recognized Deputy Alfred to be law enforcement.

Deputy Alfred was a peace officer lawfully performing his duties as a peace officer when he answered this call for service on April 27th in '21.  And the defendant knew or reasonably should have known that Deputy Alfred was a peace officer performing his duties.  The defendant attempted to murder a peace officer.

Now, Count 2 is assault on a peace officer with a deadly weapon other than a firearm or with force likely to cause great bodily injury.  Now, you heard that there are lessers of assault with a deadly weapon and assault with force likely to cause great bodily injury.  The main difference being that, there's no requirement the defendant knew Deputy Alfred was a peace officer in those.  So I'm not going to repeat and recycle through all of the evidence because it's the same for the other elements.

But let's talk about what's required.  And this

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

instruction is a mouthful, so we'll take it one step at a time.

The first element is that the defendant did an act with a deadly weapon or with force likely to cause great bodily injury that, by its nature, would directly and probably result in the application of force to a person.

What do we have here?  The defendant does an act that would cause an injury or would be using a deadly weapon against a person.  The second element is that the defendant did that act willfully, on purpose.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone.

Telling you, it's a mouthful.

When the defendant acted, he had the present ability to apply force likely to produce great bodily injury, or with a deadly weapon to a person.  And when the defendant acted, the person assaulted was lawfully performing his duties as a peace officer.  This is that element that I told you is not in the lesser offenses.  So we'll just focus on this count here.

And finally, when the defendant acted, he knew or reasonably should have known that the person assaulted was a peace officer performing his duties.

So one bite at a time.  The first element being, the act -- the defendant did an act with a deadly weapon or with force likely that, by its nature, would directly and probably result in the application of force to a person.

The act here is the same act in the first count

that was the direct step.  The same action taken is the act.  And what is that?  That was the defendant, against a lawful command, angrily entering his vehicle, throwing the car in reverse, and accelerating that vehicle at Deputy Alfred.  The Chevy Trailblazer that you've seen several photos of, is the deadly weapon that is alleged here.

And you heard in that instruction that the touching can be done indirectly.  This isn't, you know, it has to be a physical fist to face.  It can be indirectly causing an object to touch the other person.  And when you have assault with a deadly weapon, of course, that's what you're going to have here.  So the act alleged is that he attempted to run Deputy Alfred down with that motor vehicle.

The same evidence shows that if the defendant accelerated his vehicle at Deputy Alfred, that act by its nature would directly and probably result in the application of force to a person.  And you have the definition of application of force in that instruction.  That's the touching.  I think I'm getting ahead of myself.

The second element is that the defendant did the act willfully.  And this is probably the simplest element to get through, that it was done on purpose.  It's not an accident.  The defendant didn't have to intend to break the law or hurt anyone, anything like that.  And the People are not required to prove that the defendant actually intended to use force against someone when he acted.  He had to intend the act, that acceleration of that vehicle, with wrongful intent.

And you'll have the entirety of the instruction,

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

just trying to break it down a little bit here with the evidence.

The next element is when the defendant acted, he was aware of facts that would lead a reasonable person to realize the act, by its nature, would directly and probably result in the application of force to a person.  Well, does a reasonable person know, if you accelerate a vehicle at someone, it will result in the application of force?  Does that make sense?  The defendant took an affirmative step to enter the vehicle and press that gas hard enough to cause the engine to rev.  Hard enough to cause the wheels, the rear wheels to lose traction.  And to move that vehicle 14 feet in Deputy Alfred's direction according to Maria Gallo.

The defendant is the one who drives that car.  And so he knows what it does.  He knows the -- he knows that vehicle.  He drives it.

The defendant knew where Deputy Alfred was when he entered that car and accelerated at him, because you hear in the recording, Deputy Alfred yells at him just before he enters that vehicle.  He used foul language, telling him not to enter that vehicle.  So by his voice alone he would know where Deputy Alfred was when he accelerated.

Reasonable people know that driving a vehicle at a person will result in the application of force, a hit, an impact.  And that is defined in the instruction as a harmful or offensive touching.

The next element, when the defendant acted, he had the present ability to apply force, to apply force likely to

produce great bodily injury or with a deadly weapon to a person. The vehicle was on. You heard testimony that when Deputy Alfred approached the defendant in the driveway, that the vehicle was sitting there. That it was on. The defendant had no impediment to moving that vehicle. It wasn't like up on blocks, and he had to move it off the blocks or run in and get the keys. There was nothing creating an intervening impediment to him conducting the act that we are talking about.

And we know it accelerated in reverse for 14 feet. And I'll only address really the 14 feet because that was what was the active acceleration. That was the distance that all of the witnesses agree, that was the distance that the vehicle was accelerated when Deputy Alfred was describing behind that vehicle.

Again, he didn't have to go get the keys, anything like that. He had present ability to act. Could he do it then, in that moment? And ability does not equal actual touching. You heard the instruction on that element, and the People are not required to prove the defendant actually touched someone. Only that he did the act that we are talking about.

When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer. And again, we talked about this with the special allegations that attached to Count 1. It's the same evidence from that allegation for Count 1, so I don't want to belabor the point.

But the same evidence applies here. Deputy Alfred works for the San Bernardino County Sheriffs Department. He was uniformed. He was on patrol. He was answering a call for

service.  And he was conducting a criminal investigation at the time when the defendant tried to run him down in that driveway.

And when the defendant acted, he knew or reasonably should have known that Deputy Alfred was a peace officer performing his duties.  The same evidence applies.  I don't want to beat a dead horse and repeat myself over and over.  But for all of the same reasons that we discussed in the special allegation to Count 1, the defendant knew that Deputy Alfred was a peace officer or reasonably should have known.

We spent an awful lot of time, distances and speeds and all sorts of variables and calculations, we really got in the weeds.  Sorry about that.  What is important here?  In deciding the elements of the crime that we have just talked about, what is the evidence that supports the charges as they are alleged against Mr. Barber?  Where was Deputy Alfred when the defendant drove the vehicle at him?

Well, you heard the contradiction of the path of orange cones, which, frankly, I just wanted to be able to argue to you that the fight or flight factor that Detective Hernandez talked a little bit about, and explaining why Deputy Alfred's recollection might be a little bit off, but as it turns out, that path was his exit path.  And the evidence seems to be corroborated, what Deputy Alfred testified was that he rounded that corner from the west entering, walking up toward the middle of that driveway and moving his way so that he can create a visual of the defendant, where he was at.

Especially as the defendant is giving him negative response, acting aggressively, he's going to want to keep that

sight line.  And he said that the east was his vantage point where he was able to observe Mr. Barber.

And again, why was it important that he be able to observe him?  Well, two people just told Deputy Alfred he might have a gun, and that's an important fact, right?

The tire tracks, was a little bit difficult getting there with Mr. Morales, but the tire tracks show the path of travel.  And the path of travel goes directly, it's a narrow driveway, so it's not going to be a huge -- you're not going to see a huge deviation in path, because you would have crashed into one fence or the other if he had overturned in either direction.  But that path shows that he turned his wheel in the direction where Deputy Alfred described he was standing.

And what did he recollect as the point where he saw the vehicle and perceived the vehicle as coming at him and he determined he had to shoot?  He remembered where he dropped his flashlight.  And where he dropped his flashlight was at Placard 9.  And you'll have that in the photographs in the deliberation room.

Now, the fired cartridge cases are not as helpful. We heard testimony, they're probably the least reliable point of reference in which to decide where anything happened here, because you have at least six people and a moving gurney traipsing through the path where they were.  You heard that they bounce and move when they're fired.  They're going to continue to do so when they're moved.  So they're not as helpful in determining where the action took place.

At the end of the day all of the witnesses agreed,

perhaps until this morning, Mr. Morales got into some different possibilities, but as of Monday, all of the witnesses agreed the defendant hit the gas, causing that vehicle to accelerate, and that the reaction, meaning it happened after, was that Deputy Alfred discharged his firearm.  And we know he fired those six shots.

The defendant attempted to murder Deputy Alfred while he was performing his duties as a peace officer when he accelerated that vehicle in his direction, as corroborated by the physical evidence seen on that driveway.  And the defendant committed an assault with a deadly weapon against Deputy Alfred while he was performing his duties as a peace officer.  The only reasonable interpretation of the evidence is guilt.

Just want to remind you, I know you saw this once and you were instructed on these things as well, just to remind you, in deliberations your focus is the elements of the crime, the instructions that the judge is giving you, the documentary evidence, photos, the recordings, the evidence that's submitted to you for your consideration, the witness testimony, the people who are there and describe to you what happened that night on April 27th, and your evaluation alone of the witnesses' credibility.

The instructions of the law tell you, you cannot consider things like sympathy, speculation, penalties and punishments, passion, public opinion, prejudice or sentiment. They are all natural human things that we want to consider in our life, but for the purposes of juror deliberation right inside that circle, just the evidence and the law.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

And with that, I submit to you the case.

THE COURT:  Thank you, Ms. Fultz.

It's 3 o'clock, so let's take our afternoon recess before we hear from Mr. Bryant.  We'll come back at 20 minutes after.

Don't talk about the case.  Don't form any conclusions yet.

(The following proceedings were held outside the presence of the jury.)

THE COURT:  We're on the record outside the presence of the jury.

A couple of things.  The verdict forms, 1-A is fine.  1-B, you need to remove the word or.  It would just say as charged in Count 1, period.

MS. FULTZ:  Did the Court get my e-mail this afternoon at lunch?

THE COURT:  I thought that's what these were.

MS. FULTZ:  I don't see an or.

THE COURT:  Okay.  All right.  That's been corrected then.

MS. FULTZ:  Yes.

THE COURT:  Okay.  And then the other verdicts, I think they need a period at the end.  Do they all have periods?

MS. FULTZ:  That's correct.  It is wrong.

THE COURT:  All right.  We didn't do this expressly when we were on the record.  Both sides agree with the jury instructions in their entirety; is that correct?

MS. FULTZ:  Yes.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

MR. BRYANT:  Yes.

THE COURT:  Okay.  Thank you.  See you in 15 minutes.

(A recess was taken.)

(The following proceedings were held in the presence of the jury.)

THE COURT:  We're back on the record.  Everyone is present.

Mr. Bryant?

MR. BRYANT:  Thank you, Your Honor.  Again, just may I approach the well?

THE COURT:  Of course.

MR. BRYANT:  Thank you.

Good afternoon, ladies and gentlemen of the jury. Once again, my name is James Bryant, and I represent Mr. Steffon Barber, along with my colleagues, Ryan Duckett and Rodney Diggs.

I want to first thank my colleague, Ms. Fultz, for her consummate professionalism.  I'd like to thank the court staff.  Take time to thank the judge for being here.  Most importantly, I want to thank you all.  I got to meet every last one of you just right before Thanksgiving.  You all were thinking about a holiday, about spending time with your families, enjoying your weekend.  Yet, every single last one of you showed up the day before a holiday to do your civic duty to do the one thing that separates America from just about every other nation in this world.  And that is what makes this process special and is what makes this process unique, because a jury of Mr. Barber's peers are going to ultimately make a

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                        Vol 6                          Page 692

decision as to whether or not he committed the crimes alleged by the State of California.

Now, I'll submit to you, by the time my closing is done, the evidence will absolutely show that the State did not prove beyond a reasonable doubt that Mr. Barber attempted to murder Deputy Alfred.  Nor did he try to assault with a deadly weapon -- or let me reword that.  Nor did he ever attempt to assault Deputy Alfred with a deadly weapon.

And why?  Why is that?  You're the jury.  The judge decided the law before we stepped into this room.  And today, and throughout the next period, whenever you make a decision all 12 of you are going to decide the facts.  All 12 of you are going to have to decide the facts.  You will either say acquitted, not guilty or you will say guilty.  And then there's that in between, when you all can't make up a decision and you hang that jury.

But again, you all have been here for almost two weeks.  Once I go through the evidence I explain to you the standards.  I believe you all will see that the State, once again, did not meet their burden of proving beyond a reasonable doubt that Mr. Barber committed these alleged crimes.

Ladies and gentlemen, what is it all about?  He never used a deadly weapon.  He never had a deadly weapon.  Keep that in mind.  We know that guns are inherently deadly weapons.  Meaning a gun is designed to kill someone.  But a vehicle, the natural design of a vehicle is to transport someone from one point to another.  And there are instances in which a vehicle, which this pointer, which this pen, can be

transformed into a deadly weapon.  Just about anything can be transformed into a deadly weapon, including a vehicle.

But what the evidence showed throughout this trial, is that a vehicle that never went faster than three miles per hour, and we'll talk about this, the same pace as you all walked into this room and you walked into this jury box, that is three miles per hour.  Some of you walk faster.  Some of you walk a little slower.  But on average, that is the fastest point in which that vehicle was going.  That is not, folks, the transformation of a transport vehicle into a deadly weapon.

Now, what you didn't hear during the People's closing is the standard, the beyond a reasonable doubt standard.  And some very important parts are in that.  A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.

So what does that mean?  I'm going to explain this to you all in the simplest of forms, because it sounds kind of tricky, right?  Beyond a reasonable doubt, what is reasonable doubt?  We're going to get to that.  Here, proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  That the evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

Meaning, it's possible that as we sit here right now, in this time and place and in this point in the universe, a meteor could hit this building and we can all die.  I mean, sure, that's a, quote unquote, possibility, but is it even

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 6                              Page 694

realistic?  Absolutely not.  And if somebody told you we're going to die today by a meteor strike, you'd say that just isn't reasonable.  Very funny.

But this is important.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.  He is entitled to that.  If the People -- as I go through this very simple set of examples, if the People don't prove that every single reasonable possibility has been determined and they're still at the end of the day two, you must, not you may, you must find Mr. Barber not guilty.

Give you an example.  You come home from a long vacation with your significant other.  And get home, you guys walk to your room.  It's dark.  Turn on the lights in the hallway.  You open that door and you flip the light switch.  But nothing comes on.  No light comes on.  The lamp in that room does not come on.  Your partner goes, light bulb must have went out.  And that's a reasonable possibility, right?  The light bulb may have went out.

But is that the only reasonable possibility?  It could be that the light bulb is out.  It could be that the lamp isn't plugged in.  Somebody may have inadvertently unplugged the lamp before you left or the circuit breaker in that room may have tripped.  Here's the problem, folks, there are three reasonable possibilities, and although it is highly likely that this light bulb is out, because it just went out, it expired, right here is a definition of reasonable doubt.  You have not determined which single issue is causing that light to remain

unlit.

So you do an investigation.  You do a thorough investigation.  You first go, the lamp, it's kind of dark.  You're bumping around the room.  You pull the plug, and it's plugged in.  You're like, bingo, plugged in, so it's obviously and highly likely and extremely possible that the light bulb really just is burned out.  However, you grab that light bulb, untwist it and you shake it.  We're using, not these candescent, but the old school ones that I like, with the little filament.  The one you used to make, when we were in elementary school, for science projects.  You shake it and there's no jungle.  You're like, oh, I could have swore it was because this light bulb had burned out.  But there's no jungle, so you know the filament is intact.

Twist back the cap.  Go to the garage.  Finally, you walk into that garage, you open the circuit breaker, and it's right in the middle between left and right, it's right there.  And you're like circuit breaker.  You flip the switch.  You yell to your significant other, is the light on?  Light's on, honey.  You have done every single investigation possible, and there was only one clear certain determinant, and that was the circuit breaker had tripped.

But remember, when you first walked into that room the logical and reasonable conclusion and highly likely, highly probable conclusion was that the light bulb burned out.

Folks, when you're making important decisions, you have to be absolutely sure.  There is no room for doubt.

Reasonable doubt.  So what is some of the

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

unreasonable doubts?  Gremlins chewed on the cord.  We know Gremlins don't exist, but someone can say Gremlins chewed on the cord; that's unreasonable.  A ghost turned it off.  Depends if you believe in ghosts.  Some people do.  Some people see them.  Did the ghost turn it off?  Probably not likely.  And for those who understand what an EMP is, an electromagnetic pulse, somebody puts a mini bomb and destroyed the circuitry in your room.  No.  Those are completely unreasonable.  That is what we consider an unreasonable possibility.  An unreasonable possibility.

These are all reasonable.  And in order for the People to prove beyond a reasonable doubt the only one that can be left is the circuit breaker tripped.

Now, I'd like to show the burden of proof, as sort of this stepping stone.  We see all of these various colors going up in blue.  Then at the top is red.  Strong brief in guilt.  The strong belief that that light bulb burned out as opposed to everything else is not enough.  The strong belief that Mr. Barber moved that vehicle in before Deputy Alfred fired that shot is not enough.  You must eliminate every single reasonable possibility, because that's how serious it is when the State is looking to potentially remove a right.  That's why it requires all 12 people, not nine in a civil trial.  Preponderance of the evidence, which is more likely than not.  It must be so strong that there is absolutely no uncertainty.

And I'm going to give you one more example, because I like to give examples because not everybody understands every single example.  You all have gone to a concert.  Walk into a

concert.  You grab the tickets, and you're going to the concert with your significant other.  You put it either in your jacket pocket or your purse, the tickets are in your jacket pocket or purse.  As you get closer to the stadium, this venue, you start to get a little worried, did I leave my tickets at home?  And so you grab your jacket and you look inside just to make sure those tickets are there.  Or you look in your purse, let me make sure to double check.

The act, just the very act of having to check that, ladies and gentlemen, is another example of reasonable doubt.  Unless you are 100 percent certain that those tickets are in your pocket and you don't have to check, you're walking there, significant other, do you have the tickets?  I have the tickets.  I've got them.  We're good.  I don't need to check.  You are 100 percent certain.  That is proving beyond a reasonable doubt.

And I will submit to you that at the end of this closing, it will be clear that there are so many possibilities as to what happened that night, it is impossible to prove this case beyond a reasonable doubt.  And again, you didn't even hear the State talk about this because it's a bad fact.  It's a bad standard for the State in this case.  Maybe not every case, but in this case.  It's like you didn't really hear about great bodily injury or deadly force.  Deadly weapon.  Deadly weapon. No definition.

And again, like I said, not a single doubt can be left in your mind that Mr. Barber committed each of the alleged crimes.  Every reasonable possibility must be investigated

thoroughly.  Remember that.  Because that's an important thing we talked about, as you heard today.  Every investigation must be investigated thoroughly.  Or if it's not, you must, not you may, you must find Mr. Barber not guilty of attempted murder and not guilty of assault with a deadly weapon on an officer.

Now, we all, again, we all remember, many of us know 12 Angry Men, right?  Very old movie.  Great movie.  And it was about jurors, 12 jurors who all got together and they were fighting over the facts back there.  Some of you have been in this situation.  Some of you actually have been in a deliberation.  But there was one hold out.  And that hold out said the prosecution did not prove beyond a reasonable doubt, and I will not move.

I ask you all, if you believe that the prosecution did not prove their case, will you just capitulate because everybody is telling you to and they want to go home, and each one of you said absolutely not.  And I believe you.  I didn't see a single one of you, not that I could see you very much, but I didn't see a single one of you falling asleep during this trial.  That's actually something to be said.

I've done a lot of trials.  Sometimes jurors just kind of get bored, but you're one of the most attentive juries I have literally ever seen.

Attempted murder, to prove that the defendant is guilty of attempted murder the defendant took at least one direct but ineffective step towards killing another person and the defendant intended to kill.  What does that mean?  Took a step and that the defendant intended to kill.

What's not attempted murder is if I have a water gun and I go up to you and I say, I'm going to kill you, and I shoot the water gun at you.  It's not attempted murder.  If I have a real firearm and I shoot at you, whether I hit you or not, it can zoom past your face, it can graze your arm, it could hit your body, and you survive.  That is an attempted murder, because you consciously, with specific intent, intended to kill that person.  It wasn't because you move the gun and waved it around and you actually fired it.  It's because you intended, you had the intent to want to kill that person.

And how is intent proven typically?  Through circumstantial evidence.  Unless Mr. Barber would have been yelling, I'm going to kill you.  I'm going to kill you.  I'm going to move this car back and I'm going to kill you, cop. Unless you hear that, you don't have a clue what's going on through this man's head.

And I can submit to the jury that the People didn't prove what was in this man's head at that time either when that car moved.

So what's the definition of a deadly weapon?  These are very important to understand.  A deadly weapon can be a vehicle.  I'll tell you, a deadly weapon can be a vehicle, if a vehicle is going 15 miles per hour, and you're standing right there, meaning 22 feet per second, and that -- and that vehicle hits you, it is a great possibility you are going to be harmed significantly or you might even die.  If it's going 25 miles per hour, it's a great possibility that you're going to be -- you're going to suffer from great bodily injury, or you're

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

going to die.

So I'll read it to you.  A deadly weapon is any object, instrument or weapon that is used in such a way that it's capable of causing and likely to cause death or great bodily injury.  A vehicle that has not transformed into a deadly weapon, meaning a vehicle going at a very slow rate of speed.  We will talk about this.  There has been no evidence that a car moving anywhere between one to three miles per hour could cause even a bruise.  No matter how big that car is.  Even if it does cause a bruise, the definition of great bodily injury will say that it is not a deadly weapon, because it doesn't constitute great bodily injury.

Again, you're going to hear about -- you're going to read, circumstantial evidence, and again, we talk about this, both direct and circumstantial evidence are acceptable types of evidence to convict someone.  And you can use this evidence to determine somebody's mental state.  What were they thinking?

However, you're going to see in evidence code -- I shouldn't say -- circumstantial evidence, Jury Instruction No. 224.  Before you may rely on circumstantial evidence to conclude that the defendant is guilty, you must be convinced that the only -- remember, I talked about that, think about the pocket, think about the light bulbs -- that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.

If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable

conclusions points to innocence and the other to guilt, you must accept the one that points to innocence.  And why is this important?  Because if you have two scenarios, one where Mr. Barber has that car moving, before he fires, before the officer fires that shot, and another scenario where Mr. Barber has his foot on that brake, after he revs up that engine and it goes idle, then a shot is fired, and he's either startled or he's actually shot and he involuntarily pulls his foot off that brake temporarily and it moves back.

Those are two distinct possibilities, and you must find that Mr. Barber is not guilty, because you must take the conclusion at two or three, but must at a minimum take the conclusion that the one of innocence is the one you must rely on and you must say not guilty.

Again, we talked about assault with a deadly weapon.  This is with the officer, but I'm just going through the four important elements that you're going to continue to see.

The defendant did an act with a deadly weapon other than a firearm, probably result in application of force to a person, or with force likely to produce great bodily injury. Defendant did act willfully.  He was aware of the facts.  And when the defendant acted, he had the present ability to apply force likely to produce great bodily injury or with a deadly weapon other than firearm.

Now, the instruction may -- I think it looks like that now.  I did this a little earlier.  If it's not, bear with me.  Whatever the judge instructs you on the law, that is the

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

way it's supposed to read, but here is the critical point.  As I said before, what's this case about?  It's about the fact there's no deadly weapon.  And if there's no deadly weapon, there can't be an instrument to cause great bodily injury.

The definition of great bodily injury.  And again, folks, I'm going over these things first.  The definitions is to get you to understand what these instructions are talking about, because when I dive into the evidence, I am hoping that it all makes sense.

Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than a minor or moderate harm.  As we talked about, the average human speed is three miles per hour.  The vehicle, in this particular case, only reached a heightened speed at three miles per hour and only for a few tenths of a second.

So what are some of examples of great bodily injury?  Second degree burns.  Fractures.  Brain injuries.  Gunshot wounds.  Stabs.  Paralysis.  Those are some examples of great bodily injury.  Not a bruise.  Not a bump.  I don't know how many of you have ever been walking and you run into another person much larger than you walking sort of the same speed.  It hurt, if your shoulders collide.  Especially if you've been in New York, that seems to happen a lot when you're out there.  But it's not going to cause significant injury to you.

And I don't know how many of you have been walking a crosswalk or walking in a parking lot, where a car accidentally backed up on you, kind of bumped you and you kind of jumped, it hit you a little bit when it was going in

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                    Vol 6                                    Page 703

reverse.  You didn't suffer great bodily injury.  Yeah, maybe it would have hurt you a little bit if you got hit right on your knee.  But again, you're not suffering great bodily injury.

One of the things that you're not going to see in this case is that you're not going to see the car moving faster than a person walking.  There were no medical experts or human forces experts to prove that a vehicle moving at a rate of three miles per hour could cause significant injury to anyone.  There's been no evidence of that at all.  The People have just said, the car was trying to run him down.  Well, we're getting into that.  There's no evidence that this car tried to run Deputy Alfred down.

Just again, use common sense.  If a car is moving as fast as you can walk, it's likely not going to hurt you that much, even if it did hit you.

And then you heard about the application of force.  That's just simple.  That means either you graze somebody.  Let's say I'm going 30 miles per hour at you.  You jump out of the way.  That's an application of force.  I could have seriously hurt you, but you didn't get touched.  Or I'm going 30 miles per hour, and I hit your arm.  I don't hit your entire body, but I hit your arm.  Or if you're wearing a dress and it's flowing I hit your dress, but I don't hit the rest of your body.  That is what application of force means.  That's what they mean by that.

Instruction No. 105 is important, and sometimes I will use this, and I think it's appropriate in this case.  If

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

you decide that a witness did not tell the truth about something important, you may choose not to believe anything that witness said.

What the evidence showed that Mr. Barber did not do?  Mr. Barber's vehicle did not exceed a maximum of three miles per hour.  Mr. Barber did not press the accelerator any time after his tires stopped spinning in place.  Mr. Barber did not press the accelerator in an attempt to harm Deputy Alfred after the deputy started firing his weapon.  Mr. Barber did not slam on his brakes prior to the vehicle coming to rest. Mr. Barber did not make any verbal threats to kill Deputy Alfred.  Mr. Barber did not threaten to kill his neighbors. Mr. Barber did not even get into a physical altercation with Mr. Cocchi when they were talking, and they were outside.  And Mr. Barber did not affirmatively acknowledge that he knew Deputy Alfred was a law enforcement officer.

So before we get into more of this, on April 27th, 2021, law enforcement is called out.  Deputy Anderson -- or Deputy Alfred shows up to the scene.  Let me tell you what happened.  Deputy Alfred talked to the reporting witnesses and he began to walk southbound down the middle of that driveway in the gravel.  And as he got to what we'll know as Marker 6 and 7, and as he's trying to talk to Mr. Barber, we know he does not announce who he is.  He doesn't say law enforcement.  He doesn't say San Bernardino County Sheriffs.  He just says, hey, buddy.

Now, mind you, it's dark.  He says it was poorly lit.  He's warring a ski mask.  He's wearing a beanie.  He's

wearing dark pants.  And at this point probably a dark shirt. This isn't a shirt with reflectors on it.  It's not a white shirt.  Mr. Barber has no idea who is walking down his driveway.  And he says, "Hey, buddy, Mr. Barber."  And then he goes, "Let me see your hands."

Now, let me see your hands is actually not as abnormal as one would think.  There are places in our society where you might have somebody go up to you and somebody is walking up, it's sort of a hostile neighborhood, before people start engaging into an argument or a fight, one of the guys may go, hey, brother, let me see your hands.  Meaning, what's up? Like do you have a weapon on you?  And the guy might respond, I ain't got no weapon, I'm good.  That actually happens quite a bit more often than people think.

MS. FULTZ:  Objection.  Facts not in evidence.

THE COURT:  Sustained.

MR. BRYANT:  So as he's walking down and he's trying to communicate with Mr. Barber, Mr. Barber again is not saying at any point, I know you're law enforcement, get out of here, cop, or anything like that.  He says, "Let me see your hands." Mr. Barber responds, "Let me see your hands."  And at some point he says, "Don't go to your fucking car.  Don't get in your fucking car."

And in response Mr. Barber, who does not have a clue who it is, and is being told to do something from somebody who we will be able to prove was almost 50 feet away, he gets in that car, and as he gets in the car, he turns on that engine and he revs up that engine and the tires start spinning.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

Now, the car is not moving in place, but what we do know and what I can tell you is that we know that car is in a stationary position, and it is not going backwards.  And the revving doesn't last longer than approximately three quarters of a second.  And at that moment the engine is silent.  It's not revving up.  And then eventually at about two-thirds of a second in you hear gunfire, and then you hear five more shots.

Now, I'll submit to you that this occurred around all those areas where you see the shell casings, between 40 and 50 feet from this vehicle.  How do we know this?  How do we know this?  We know this because one of the very first things that Deputy Alfred testified to when he was on that stand was that he fired his gun when the car started moving.  We know he fired his gun when the car started moving because we heard the audio, and the car started moving when he was between Markers No. 6 and No. 7.

Even Detective Hernandez said, yup, that's what he said at first.  Why is that important?  It's very important, distance is important.  Speed is important.  It's important to show intent.  It's important to show whether or not this vehicle was transformed into a deadly weapon.  It's important to understand, did officer -- or did Deputy Alfred actually comply with the policies and procedures of the San Bernardino County Sheriffs Department?  And if he didn't, what are the ramifications?

And here's what we know next.  The car rolled no greater than 14 feet and stopped.  There wasn't some massive slamming of the brakes.  The car just stopped.  You didn't even

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

hear an old car have squeaky brakes.  And four or five minutes later Deputy Alfred, Deputy Mora and Deputy Torres are all at the front of the vehicle after the shooting, and they pull Mr. Barber out of that car, whose foot was on that brake.  And, folks, we know Mr. Barber was shot.  That was clear.  And despite being shot Mr. Barber kept his foot on that brake until he was removed, and the paramedics came.

What you also heard or what you didn't hear is if a man is intent on killing someone and they are being fired at, you go for the gusto.  If you're going to try to kill somebody, you go for it.  He's firing at you, you punch it harder.  Punch the accelerator and you go, because it's over, no matter what.  That's not what you heard.  You heard a very soft slow.  Then you didn't hear anything.  Braking.  And a man who sat in a vehicle clearly wounded with his foot on that brake, even though that car was in reverse.  They pull him out and without acceleration that car moves back.  Put the car in park.

But there was one other part that I skipped, and that was the flashlight.  We're going to play that, and I want you to listen intently.  At no point between the time Deputy Alfred had given the command to not get into that car and he heard that engine rev up and those tires move, to the time he started shooting, what you never heard was a thud or a drop. You never heard it one time.  You heard moving.  You heard him going forward.  But you never hear him allegedly drop this flashlight.

However, what you did hear as Deputy Alfred testified he never dropped anything other than his flashlight.

You hear at 50 seconds after the incident, while he's speaking to someone on his radio, you finally hear what purports to be a loud thud. Like a boom, boom. Loud enough to represent what a one-pound object would sound like falling on dirt ground.

That flashlight was never at the point in which Deputy Alfred fired. In his very first words, I was between 6 and 7, which was over 40 feet away, that is where he first fired that weapon.

Deputy Alfred and his inconsistent statements. Now, he said he approached the residence on the east side dirt path in the southbound direction, meaning heading down that path. But what we know is that as I started to show this evidence, and during cross-examination of Detective Hernandez, who also heavily relied on this, this was the physical evidence that he was corroborating every single one of his opinions on, was that the fact that you have these orange cones going south.

The reality, the truth is that Deputy Alfred never once walked southbound towards Mr. Barber's home that evening in that dirt. And you want to know why we know? Because Deputy Hernandez agreed that there were no footprints or shoe prints to suggest he was walking in that direction. Just wasn't true. He walked up the middle of that driveway or closer to the west side because it was more cover there.

The deputy fired his gun 8 to 12 feet away from the vehicle at the vehicle's initial starting point. Remember, when he first gave his statement about a month later? He said, I was about 8 to 10 feet away, and I couldn't go anywhere and that car was moving so fast. I didn't have a chance to escape,

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

that's why I had to fire my gun.  And then he moved it back 12 feet.  Then when he realized his story was kind of not sounding so good, he moved it back to 15 feet all of a sudden.  He said he had read something or saw something, and now he's 15 feet away.

And then he came in here and he gave you, almost four years later, his description of what happened.  Now, he's 18 feet away.  And even if you take his story, which I will submit is not true, that he fired where his flashlight was found, that's 30 feet away.  He keeps going back further and further and further.  It went from, my life was in danger, there is a car moving at the speed of 15 miles per hour, and I have nowhere to go, to now we find out that car was moving at the fastest three miles per hour.  Again, we know he initially testified he was between Marker 6 and 7.

And again, when Deputy Hernandez was asked this, is that what he testified to?  He said, yeah.  And then I asked, did he change his testimony in the middle of trial?  Yeah.  And then I asked him -- did I ask Deputy Alfred did you read something?  You all went to break and changed your entire testimony.  And he said, I kind of heard you say something like that.

I don't know if you picked up on why I had asked that, that odd question, what did you read?  It's because I was so surprised that he was finally starting to say what happened to some extent.  But when he realized he was telling the truth, it didn't match his original story.  And we'll get to that.  What's the motive for that?

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

Your Honor, I'm just looking at the time.  That's all.  I just want to make sure where we are.

He states the vehicle is moving at him at a rate of approximately ten to 15 miles per hour.  We know that is impossible.  Even if he was 12 feet away, as Deputy Hernandez testified, that's 22 feet per second.  We know that that car moved anywhere between 2.7 and 4.5 seconds.  He would have been clobbered.  And that vehicle would have been somewhere down that driveway almost on the street.

Why would he say that?

I had asked the deputy, did you ever move or jump?  He said, well, I stayed stationary when I was shooting the whole time.  Well, why is that important?  Because if a car is moving at you and you're only 8 to 12 feet away, we know that car ended up 14 feet, how did you not jump out of the way?  Either, one, it was going so slow you were able to walk back; or two, you were over 40 feet away when you started firing that gun.

Now, we'll talk about the bullet casings and the near perfect placing of those bullet casings based upon the sounds you see.  You see four bullet casings all in one little area.  After four bursts, you hear another one, it's about almost a second later, and another one that's a full second later, and they're all somewhat in order.  But why are they all 40 to 50 feet back towards that very large yard that Deputy Alfred said he couldn't make it to?

And again, we talked about this, he testified he dropped his flashlight prior to finding that gun, and again,

you'll hear it, you don't hear anything when he fires that gun. So the reality is, it is not even certain whether or not he was holding his flashlight at the time, or he was using his flashlight on his service weapon by this point.  It is not even clear whether he was holding that flashlight at this point in time.  He's just asking you to take his word for it.

If you listen to the audio belt when you have an opportunity, and I'll play it for you today, he says he's stationary this entire time.  The prosecution said, hey, you know, you were moving when you're dropping your flashlight at first -- your first shot, but all, all six shots, you hear movement, for all six shots.  You hear, for all six shots, and then when he's done with his sixth shot he stopped moving. That means he's advancing forward, and that is consistent with the bullet patterns, with the shell casing patterns.  Why do you have four bunched up in one little area and then another in front and another in front?  Because Deputy Alfred was actually moving forward and didn't stop moving and advancing toward this vehicle until that vehicle stopped.

And again, Deputy Alfred said he fired his service weapon when the flashlight was dropped.  But we heard from Deputy Hernandez that now Marker No. 10 is all of a sudden the exit.  Remember, that was an important thing.  Marker No. 10 was so important that showed he was right there, the path going south that showed he was right there.  Now, all you have is the flashlight.

And the flashlight as he agreed with me, had absolutely no footprints around it.  There were no footprints

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

around that flashlight to suggest when he dropped it he was in a firing position, whether 2 feet under or some sort of straddle position.

And this is a pattern, folks. This is the pattern. Marker No. 2 is 52 feet away, from the initial start of that vehicle. You have four bullet casings, 2, 3, 4, 5, all bunched up in one area. Then you have 7 and 8. Marker No. 6, 7, Ms. Fultz had asked Deputy Alfred, where were you when that car first started moving? He said between Marker 6 and 7.

Why is this all important? Because if we know that he never walked to the left, that east side of this screen, up this dirt, then naturally he had to walk into the gravel. And we know you can't see any footprints because it's not the type of surface to provide that. And naturally it will be more likely than not that as he walked up this path that is why, up the middle of this gravel, that is why the bullet pattern, the bullet casing patterns are where they are, because he fired his weapon around this area between 2 and 7.

And again, this is a 12-foot yard. You see where the flashlight is. Deputy Alfred said that he couldn't make it across to run into this yard, because the vehicle was moving so fast. But we know that this position right here is at least 30 feet away. A car moving three miles per hour, I could slowly walk and look at the car and walk into that yard and not think a thing. Not think one thing. You can easily walk that. A light jog definitely gets you into that yard.

But this is a vantage point of where these bullets and bullet casings have landed. And they're consistent with

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                  Vol 6                                  Page 713

the sounds you hear.

And again, there is no footprints identified by Deputy Alfred. And I'm going to play this for you, and I want you just to listen to this, folks. I want you to pay attention to the sound and listen. You're first going to hear the initial encounter when he starts firing. Just pay really close attention, try to see if you hear anything falling on the ground, because this is a fairly sensitive microphone. And you can hear all sorts of noises. You can even hear his footsteps. So you will certainly be able to hear Deputy Alfred drop a flashlight.

(Audio played; not reported.)

MR. BRYANT: Now, you didn't hear anything drop. Listen to this, approximately 50 seconds later.

(Audio played; not reported.)

MR. BRYANT: That wasn't him bumping into something. That was clearly an object that hits twice. Boom, boom. This is clearly Deputy Alfred dropping his flashlight at this point in time. He doesn't drop anything at any other point in time. And there is absolutely no explanation for what that noise could be, other than at that point as he moved up from 6 to 7, because we know he stops. After he fires the first six shots, you hear him continuing to move up.

He dropped his flashlight. And that is why it was sitting approximately 10 feet beyond 6 and 7. And there are no footprints around this flashlight to suggest he fired his weapon over there. None. You will not find any evidence of that.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

Expert witness testimony.  Why do we have experts here?  The prosecution said we don't want to get into the weeds.  That's their way of saying, I don't want you to pay attention to some very important evidence.  It's not the weeds.  The speed is important.  The distance we are -- Deputy Alfred in relation to Mr. Barber is critically important if you're talking about turning a vehicle into a deadly weapon.  Or if you're talking about saying that, I'm trying to assault someone with a vehicle, that's going to cause great bodily injury.

You'll hear -- you'll see this instruction that says, if you conclude an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.  We have two experts, Detective Hernandez and Mr. Morales.  What do we know about this?

Mr. Morales says this, the vehicle moved at a top speed of 3.39 miles per hour.  Between the second period where the vehicle is idle, between the period where the vehicle was idle for .65 seconds, of two-thirds of a second, and that second shot fired, and the second shot fired, it was reasonable that -- and it should be the first shot -- the vehicle did not move until the first shot as a result of him involuntarily moving his foot off the brake due to gunfire or being shot.  He said that's a reasonable possibility.  That wasn't ruled out.

The vehicle could have moved approximately one-tenth -- at one-tenth of a second prior to that first shot being fired.  He said, look, I can't tell you that the car didn't move before, or I would be lying.  That's a reasonable possibility.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

There was also the reasonable possibility that the vehicle could have moved before or after the first shot was fired.  Well, why is that important?  Given the fraction of time between the vehicle -- time the vehicle stops trying to gain traction where Deputy Alfred fired his first shot, you heard Mr. Morales say it would have been physiologically impossible to see the car move before firing his weapon because it was not enough time.

At night it takes approximately 2.5 seconds to register movement.  During the day it's 1.5.  Even if you are a trained professional, in the light, in the dark, given that it was only .65 seconds before that first shot, there is no way possible that Deputy Alfred could have seen that vehicle move, and it is not based on his perception, folks.  That is not what's important.  What's important is the act of Mr. Barber in what he did.

I will submit to you that just these three possibilities create reasonable doubt.  They absolutely and unequivocally create reasonable doubt, because the State never proved that two of these three did not happen.  The State did not prove that any of these didn't happen.  The State has the burden to prove that the only thing that happened was that Mr. Barber drove his vehicle at Deputy Alfred who was approximately 10 to 12 feet away at a speed of ten to 15 miles per hour, that was either going to kill him or cause him great bodily harm.  That was their burden to prove.

And as we sit here today, and I asked Deputy Hernandez -- or Detective Hernandez, you don't have any video

to show me what he was doing in his car?  He says no.  So you would agree with me, although you're saying, I'm 100 percent certain he moved that vehicle, you would agree with me that you don't know whether or not he had his foot on the brake and was just causing his tires to move and scare the officer or the person behind him.

But just moving your tires, in a tire position that is stationary, that does not constitute assault with a deadly weapon with a vehicle.  It is not a gun.  A vehicle is not an inherently dangerous object meant to kill.  A vehicle can sit in place and you can burn rubber all you want.  But until that vehicle starts taking off and chasing after somebody at enough speed and velocity to cause great bodily injury, that vehicle is just a vehicle.  It is not turned into a deadly weapon.  It is not turned into a weapon with the means of causing great bodily injury, and that is the truth.

We've heard this entire video over and over again. I'm going to skip it, but I'm going to go to a couple of pieces here.  We know this engine revs up.  Door closes at two seconds.  The engine revs up.  Engine revving up.  The tires are spinning at the engine revving up.  At a third of a second the tires start spinning.  The tires spin for about three quarters of a second.  Then the engine goes idle.  And engine is idle for .65 seconds.

What does that mean when the engine goes idle?  You don't hear the engine going in reverse.  You don't hear that. It's completely silent.  So one of two things is happening right before .65 seconds occurs.  Mr. Barber's foot was taken

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

off the accelerator, because we know it had to come off the accelerator in order for it to be quiet, and puts his foot on the brake, or he takes his foot off the accelerator and it starts to roll back.  Those are one of two possibilities.

But I can tell you this, the People have not proven that Mr. Barber did not have his foot on that brake during this .65 seconds before that first shot.  That is still a reasonable possibility as it stands before you all today.  And that folks is me checking my pocket.  That is uncertainty.  That is doubt.  And they have not cleared that part of the investigation.

And we'll talk about the investigation.  Again, as you heard, it takes 1.5 seconds for your brain to detect motion during the light.  Deputy Alfred just did not see that car moving.  He heard.  He heard from 50 feet away.  And he saw some brake lights from 50 feet away.  And he jumped, and he got jumpy and he pulled out that weapon and he started firing.  Boom, boom, boom, boom.  And stopped when that car slowly put on its brakes.

At no point as he advances towards that vehicle was Mr. Barber ever going at some crazy rate of ten to 15 miles per hour.  Again, he only went three seconds -- or three miles per hour for a short period of time.  Then we hear the bullets, the intervals going.  We're going.  Sixth shot.

And again, this is the time.  This is the time that occurred.  This is the speed.  For the most part the vehicle was going anywhere between one to two miles per hour for most of that time.

And even Detective Hernandez, for whatever reason

the first time he officially checked that speed, even he said it was going between 2.7 and 3.1 miles per hour max.  That's their expert.  They agreed that that car was not going fast.

Again, the tire impressions.  You don't see brakes squirming all over the place, as if it broke hard.  Detective Hernandez agreed with me that never occurred.  He agreed with me there was no slamming of the brakes.  He agreed with me no disruption to suggest Steffon Barber did anything but lightly press that gas pedal as that man was shot.  And he never took his foot off that brake, even after Deputy Alfred is still behind that car.  He hasn't started back up again and punch. He keeps his foot on that brake for dear life.

And we know, again, 16 feet, the car reverses on its own when in gear.  I asked Deputy Alfred, how does a car move without putting acceleration?  Simple common sense.  If anyone has parallel parked on a flat surface, you never press the accelerator most of the time.  99 percent of the time you do it on your own.  You hold the brake.  You move it reverse, it goes in reverse.  You put it forward, it moves forward.  You never have to put any acceleration.  That is how vehicles work.

When they are in gear, they move, and they only stop unless there's brakes and there's something preventing it from moving forward.

So why did that vehicle move?  One reasonable possibility that that vehicle moved is when Deputy Alfred shot those shots prematurely, instead of getting out of the way and going over to that yard, if he thought that car was moving, it's because Mr. Barber involuntarily removed his foot off that

brake temporarily, and that car started rolling back.  When he realized that car is still going back, he stops it.  And that is a reasonable possibility.

It may not be the only possibility.  He very well just never could have had his foot on the brake.  That's a possibility.  But the standard is that the People, they are required to prove every single possibility be eliminated, every reasonable possibility be eliminated, or you must find Mr. Barber not guilty.

These are all the things we know about the vehicle that I've kind of gone over.  As we are starting to look at the time here, got about ten minutes before the court --

THE COURT:  We will be stopping in eight minutes.

MR. BRYANT:  Eight minutes.  So I'm going to move.

Again, it's dark.  It's the desert, Adelanto.  Barely any lights.  This is what Deputy Alfred was wearing.  Poor lighting.  Dark beanie.  Dark shirt.  Dark pants.  Dark shoes.  No reflective clothing.  He does not ever once, and he tells you that that is not even protocol, he's trained, command presence, you're trained to announce who you are, especially in the dark.

If you go up to a door and you knock on it, you want to say San Bernardino County Sheriffs Department.  If you're walking into an area that is not well-lit and you're wearing dark clothes and you're wearing a beanie and you might look like, at least to Steffon Barber, somebody who's menacing you might want to say, Sheriffs Department.  Because Steffon Barber doesn't know who's coming to his house.  He just had

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

some little run in where he was like take me somewhere with his neighbors, and they didn't take him and they drove off.

Yeah, he might have been a little scary banging on the window and saying let me in, but when Mr. Cocchi was outside, they didn't fight.  He was just talking.  I don't really know why he was asking him for this, but he was.  But he didn't threaten him.  He didn't threaten to kill him.  Didn't bang on the window.

What this means is this, you never heard Mr. Barber affirmatively say, I know you're law enforcement.  I hate cops or whatever the case may be.  And the People have not proven for a fact that Mr. Barber knew this was a law enforcement officer.

They brought all these examples of people who Mr. Barber had seen wearing uniforms.  Two were in the facility.  He was in a facility.  It's true.  It's a fact.  And he definitely recognized who's in that facility with him.  And the other time's in the daytime.  And it wasn't really clear what happened in that last instance, but the other two instances Mr. Barber is only resisting arrest.  He's not doing anything.  He's not trying to attack these officers.  They come to him.  Then they start -- I said, well, did you engage the physical activity?  They're like, yeah.  Not him.  He wasn't the aggressor.

And we don't know, because they didn't bring in the Officer Douglas to say why Steffon punched him.  He punched him.  That's not good.  But most certainly, nobody came in here saying, man, this guy tried to killed me, pulled a weapon on

me, did all these things.  No.  Just a little defiant.

But that's not what happened in this situation. This is the dark.  He doesn't know who's coming to his house. He can't see them.  How can he recognize this uniform simply because they say, hey, buddy, come here.  Let me see your hands.

Crime scene contamination.  That was the only way to say, why these bullets were where they were.  Crime scene contamination.  Well, they didn't produce a single witness to come in here, and mind you, there was lots of witnesses, lots of officers, lots of emergency responders, nobody came in here to say, hey, yeah, I accidentally kicked that stuff.  Yeah, I moved it.  You want to know why?  Because they could not get anybody to do that because it didn't happen.

MS. FULTZ:  Objection.  Facts not in evidence.

THE COURT:  Sustained.

MR. BRYANT:  You talk about the gurney that's going up, causing all kinds of problems.  There was no -- the gurney.  If the gurney is going to be impeded by anything, it's going to be a large flashlight sitting in the middle of the road.  When I asked, wouldn't it likely be the gurney that got moved or wouldn't it be the flashlight that got moved?  No way, it couldn't have happened.  Why?  Because the path, the physical evidence, the path is going south.  Then you have Marker No. 10.  And so, therefore, that's the only logical thing, they wouldn't touch that.

It would be more likely that they moved a flashlight in the way where a man is needing emergency services

than little bullet casings.

What do we know?  We know bullet casings are over here.  Bullet casings we talked about it, they were completely untouched.  Not damaged.  They're just sitting on top of this gravel.  Not a single scratch.  Not a single dent.  Deputy Hernandez said if they were stepped on, they'd be bent.

But this, this flashlight most certainly could have got moved, after it was dropped 50 seconds after.  And it would have more likely gotten moved, because this is closer to that car and probably somewhere in that way, because the first responders had to kick it out of the way.  If I step on that, I'm going to trip and slip and fall.  If I step on bullet casings, nothing is going to happen.  They're going to get crushed.

And again, firearm has a flashlight on it.  That's the light he had by the time he started pointing that firearm at Mr. Barber.  That's when he pulled out his firearm.  That's the light he had.  And this is the path he took, between 6 and 7.

Again --

THE COURT:  Let's go ahead and stop for the day.  We'll have to resume tomorrow.  So if everybody can be here at 8:45.

Don't talk about the case tonight.  Don't form any opinions or conclusions.  I'll see everyone at 8:45, and we'll finish up.

(Whereupon, the foregoing proceedings were continued to December 12, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--O0O--

THE PEOPLE OF THE STATE          )
OF CALIFORNIA,                   )
                                 )
                    Plaintiff,)
                                 )
              -vs-               )    No. FVI-21001312
                                 ) REPORTER'S CERTIFICATE
STEFFON TODD BARBER,             )
                                 )
                    Defendant.)
_____)


STATE OF CALIFORNIA          )
                             )  ss
COUNTY OF SAN BERNARDINO      )


     I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do

hereby certify:

     That I am a Certified Shorthand Reporter of the State of

California, duly licensed to practice; that I did report in

stenotype oral proceedings had upon hearing of the

aforementioned cause at the time and place herein before set

forth; that the foregoing pages numbered 575 to 722, inclusive,

constitute to the best of my knowledge and belief a full, true,

and correct transcription from my said shorthand notes so taken

for the date of December 11, 2024.

     Dated at San Bernardino, California, this 13th day of May,

2025.




_____
Official Court Reporter
C.S.R. No. 12225

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15                    HON. DAVID COHN, JUDGE


PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )  No. FVA-025457
                                   )
STEFFON TODD BARBER,               )
                                   )
                    Defendant.     )
_____)

          REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

                  SAN BERNARDINO, CALIFORNIA

                      DECEMBER 12, 2024


APPEARANCES:

For the People:        JASON ANDERSON
                       District Attorney
                       By:  KATHLEEN FULTZ
                       Deputy District Attorney


For the Defendant:     JAMES BRYANT
                       Attorney at Law

                       RYAN DUCKETT
                       Attorney at Law

                       RODNEY DIGGS
                       Attorney at Law








Reported By:           ALICIA S. VASQUEZ, C.S.R.
                       Official Court Reporter, CSR No. 12225

Volume 7 of 7
Pages 724 through 772, incl.

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 7                              Page 725

SESSIONS

DATE                                                                    PAGE

December 12, 2024
    Morning Session                                                      728
    Afternoon Session                                                    771

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

CHRONOLOGICAL INDEX OF WITNESSES


PEOPLE'S WITNESSES                                              PAGE

NONE

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                    Vol 7                                    Page 727

                              INDEX OF EXHIBITS


NO. ___DESCRIPTION              ID              EVD      __ _____

NONE

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                        Vol 7                        Page 728

SAN BERNARDINO, CALIFORNIA, THURSDAY, DECEMBER 12, 2024

MORNING SESSION

DEPARTMENT S-15        HONORABLE DAVID COHN, JUDGE

APPEARANCES:

          The Defendant with his counsel,

          JAMES BRYANT, Attorney at Law,

          RYAN DUCKETT, Attorney at Law and

          RODNEY DIGGS, Attorney at Law;

          KATHLEEN FULTZ, Deputy District Attorney,

          representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT:  Good morning, everyone.  Okay.  Everyone is present.  We're back on the record.

          Mr. Bryant will be finishing his closing argument this morning.  And then Ms. Fultz will have an opportunity for rebuttal.  And then you will go into the jury room to decide this case.

          Mr. Bryant?

MR. BRYANT:  Thank you, Your Honor.

          Good morning, everyone.  Thank you for your patience.  We are very soon concluding this case.  And there are a few matters that I want to continue to tie up, to finalize our position regarding the fact that Mr. Barber is not guilty.

          So when we first left or when we last left, they were talking about crime scene contamination, and really the point I want to make about that is, folks, it doesn't make any

sense whatsoever.  This idea that bullet casings that were perfectly aligned based upon the actual audio were somehow moved in a perfect position over 40 feet away because first responders and other officers or deputies had come on to the scene.  It doesn't make sense.

Someone would have had to meticulously pick each one of those casings up and place them perfectly in order for them to work in the same sequence as we saw and as we heard on that audio tape.  So, again, if it doesn't make sense, then is it realistic?  Does it add up to the physical evidence?

And one of the things that I said in the very beginning of my opening, I said that, please pay attention to the physical evidence that you're going to see in this case.  And I know when you first heard this case, and you were listening to the jury instructions, I apologize, when you were doing your -- just you hadn't heard anything about the case, you're sitting here during jury selection, and you're probably wondering, is this case about some raving man running around with a gun shooting at cops?  I can tell you this case is likely nothing that you had on your mind.

But that's the beauty of our legal system.  You all have an opportunity to make that decision.  And whatever decision that's going to be is going to be based upon your perceptions and your beliefs, as long as you follow the law.

So we talked about Deputy Alfred's motive.  Why would he do this?  Why would he come up with these stories when he first gave an interview?  He said he was 8 to 10 feet away from the vehicle.  He said he was really, really close.  He

said he couldn't move to this very large yard.  He said that the car was moving at a speed that didn't permit him to avoid being harmed.  So the -- so he had to use deadly force because there was an imminent threat of death or great bodily injury.  That is what his statement was to Detective Hernandez 30 days after the incident occurred.

Why?  Why would an officer say that?  Because in an officer-involved shooting there is an investigation.  And that's critical.  That shows a very different motive.  It's not as if Deputy Alfred was just out there.  A guy tries to hit him with a car.  He shoots, and that's it.  As he testified, when they're under investigation, if they do or use deadly force outside of policy and procedure what could happen?  Reprimand up to termination.  That is a very real consequence.  And that happens.

When officers fail to follow policy and procedure, just like anyone else, just like anyone else, there are consequences for doing that, because you are trained professionals to know how to act and in given situations.  And I'll tell you, from the very first time Deputy Alfred stepped on to that gravel driveway he failed policy.  We talked about command presence.  You announce Sheriffs Department.  You have to let somebody know, especially in a dark area.  He admitted they customarily did that, but he didn't do it here.  Cop lingo isn't, hey, buddy.  Cop lingo is, law enforcement, LAPD, San Bernardino County Sheriffs.

You assert who you are, so that, one, the person who is over a hundred feet away recognizes, all right, I'm

dealing with law enforcement here.  This isn't some guy looking like he's wearing some kind of Army fatigues or commandos coming down my driveway looking crazy.  Because again, this is a pretty tough neighborhood.  This isn't Beverly Hills here, folks.

So you have to look at what he did.  And here we'll talk about that.

And I asked Detective Hernandez, we talked about use of force and you were probably wondering, why are we talking about this?  What does this have to do with anything?  When can you use deadly force?  They're trained that as a means of last resort, is the last thing you can do, and you must have an imminent threat of death or great bodily injury.  If somebody is 60 feet away, at a car going five miles per hour, there is no imminent threat of great bodily injury, especially if you can get out of the way.

So I went through all of these scenarios with him.  And I said at a hundred feet if somebody's going five miles per hour, would it be reasonable to use deadly force?  No.  At 60 feet if somebody was going five miles per hour, would it be reasonable to use deadly force?  No.  At 40 feet if someone was going five miles per hour, would it be reasonable to use deadly force?  No.  At 30 feet, would it be reasonable to use deadly force at a car moving at you at five miles per hour?  The answer was, I would have got out of the way.  I would have moved into the yard.

And why is that important?  Because if we actually look at the facts of this case, what really happened, and if

that investigation actually came out, I can guarantee you there's going to be a different outcome than somebody who says, I was 8 to 10 feet away.  I had nowhere to go.  I had to use my firearm, and that car was moving 15 to 20 miles per hour at me.

There was a consequence.  There is a motive to tell a story that isn't accurate, because you're trying to save your own tail.  And unfortunately, it happens sometimes.  And unfortunately, what it does is it disrupts the entire process.  And we're going to talk about why that disrupts the process, because we are going to talk about an individual who's in this room who is Detective Hernandez, who I respect.

Detective Hernandez, as he sat on this stand talks about how thorough he is when he does his investigations and how he tries to do the right thing.  And I believe him.  I do. I believe he's intelligent.  He's able to calculate things on the fly that most people cannot.  He has a vast amount of knowledge.

However, as great of a detective as he is 95, 96, 97, 98 percent of the time, if he's not great at a hundred percent of the time, because of what we're going to talk about now, confirmation bias, then this investigation, this entire investigation blows up.  And that is what happened in this courtroom.

You saw a rarity, folks.  It is not often that you have such a distinguished detective that was so biased through his confirmation of trying to support his fellow member, that he couldn't even see the truth right in front of him.

Again, look at those shell casings, folks.  Are you

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

telling me that when Deputy Alfred originally said that he was all the way up near the car when he first avoided getting hit, and somehow the scene got contaminated, somebody had the wherewithal to pick up bullet number -- Casing No. 7, 8, 2, 3, 4, 5, and place it in that order?  No.  Didn't make sense.

But see, the problem was nobody thought that actually someone is going to take a real good look at this evidence and really try to find out what happened.  No one thought people were going to actually take the time to review this because it's a cop involved.  And you heard a jury instruction that says, you can't have sympathy just because somebody is an officer, just because Mr. Barber was shot.  You have to look at the facts and the evidence.

Look, we all come from communities where, you know, our law enforcement, 99.9 percent of the time does the right thing.  No reason not to respect them.  But you can't say, because I like Deputy Alfred I feel like it's more likely that he's just telling the truth.  And it can't be more likely.  It has to be 100 percent.

MS. FULTZ:  Objection.

THE COURT:  Sustained.

MR. BRYANT:  But you have to -- you have to look at the physical evidence.  And again, that flashlight, it's still wide open.  That 12 foot yard right there.  The shell casings that we saw before, they're behind this house.  They are behind this house.  They're behind this yard.  6 and 7 where he said he was located is literally right there at this yard.

So if a car is moving back five miles per hour,

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                  Vol 7                                      Page 734

which we know it was only three, two to three max, he could have just shuffled over there.  He could have walked over there.  He could have lightly jogged over there.  But there is no reason, other than the fact that he heard -- and hear something is not enough -- and saw some reverse lights, that he fired his weapon.  And it was a bad shooting.  And because it was not within policy he had to come up with a story.  And that's why he keeps moving back.

Investigation is over 8 to 10 feet, now 10 to 12, 12 to 15, 18, 30, 45, between 6 and 7.  Why?  You're probably wondering why, because there was a motive to do so.  Confirmation bias.

Not too often do I hear some very dynamic, very well thought out, very eye opening at times answers from jurors that are so profound that you sit there and you say to yourself, man, I live in a great community.  One of the jurors brought up confirmation bias.  She said that she couldn't be a good juror because, no matter what, she's going to have the tendency to search for, interpret, favor and recall information in a way that confirms or supports one's prior beliefs or values.  People display this bias when they select information that supports their views, ignoring contrary information, or when they interpret ambiguous evidence as supporting their existing attitudes.

Why is --

MS. FULTZ:  Objection.  Facts not in evidence.

THE COURT:  Just a moment.  Sustained.

MR. BRYANT:  Why is confirmation bias so important?

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                          Vol 7                                          Page 735

Let's talk about Deputy Hernandez.

When Deputy Hernandez originally got on that stand -- or detective, I apologize. I should say detective. He said the following. He relied on the evidence of Deputy Alfred's statements. He relied on the shoe impressions marked by orange cones on the east side of the driveway, heading south. He relied on the shoe impressions discovered around Marker No. 10.

Remember, that whole discussion when I asked him, you say he was at Marker No. 10, then he backed up to Marker No. 9, and he shot, what are you talking about? He was like, yeah. I was like Deputy Alfred never even said that. He said the physical evidence supports that because of the footprints from the east heading south. And I said, that doesn't -- that doesn't make sense. You're saying that you are interpreting this that didn't even come out of testimony from Deputy Alfred. And he goes, yes, he went from 10 and then moved 6 feet back to 9. Drops his flashlight. Then he fires. And that's because the physical evidence supported that.

And now, and based upon that, his conclusion was Mr. Barber intended to kill Deputy Alfred. Based upon that. And what did we learn? The shoe impressions are all headed in a northerly direction, folks. They were all headed in a northerly direction. And you saw the shock on his face when he realized he made such a massive -- this isn't a somewhat, hey, shell casing here, this is a massive error in such a serious investigation where you are going to charge somebody at the end of the day with attempted murder. To say I rely on this.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 7                              Page 736

See 10.  He said 10.  He said, I was right here. And then he jumps back.  But remember, just a couple of days ago, when I asked him again, why do you know the flashlight was here?  He says because of No. 10.  Then after I showed him that Deputy Alfred was actually in the front of the car, he says, those -- those -- No. 10 is where he was leaving.  I said, didn't you just say that's why the -- why the flashlight was there?  He was like, did I say that?

I hope you remember that exchange.  Confirmation bias.  He's trying to make the evidence fit for his story and not the evidence fit for the reality.

When you are a detective on a case, when you're the lead detective, you have to make sure you get it right.  And the reason why you have to make sure you get it right, because if you get it wrong, there is jeopardy of that individual who's being charged with something, being charged with something they shouldn't be charged with.  Or at least evidence that's being presented in the improper way.

So what do we know?  The shoe impressions, these were all the ones leading east.  And I made sure to show these outlines.  This is the shoe, heads this way.  This is the shoe, headed this way. Absolutely.  Absolutely.  These are all headed south.  Absolutely, they're all heading south.  Because he didn't want to look at the fact that they were headed north. Because he didn't want to see the truth.  Because as good of a detective as he is his bias, his internal bias couldn't even allow him to see something so glaringly obvious.

And that glaringly obvious fact destroys, it

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 7                              Page 737

destroys his opinion.  Because he says that the physical evidence -- I said, remember I said, you're walking down this path.  You have these bullet casings over here.  If -- would you agree with me that this would be consistent if he walked up the path, and these bullet casings?  He said, no.  I said, why?  He goes because of the physical evidence.  I said, because of Deputy Alfred's statements?  Not just because of that, because of these pathway marks.  And because of that flashlight.

And those pathway marks, as I sat there I said, are you sure?  He said, I'm sure.

My client is being charged with attempted murder on a peace officer.  My job is to make sure I look at everything.  My job is to make sure I look at every bit of evidence to ensure that the jury is given the right information.  That is my job and my duty.  And that said he was leaving.  So if that is the fundamental basis and the foundation of his opinion, that Mr. Barber was shot where Deputy Alfred says, at a speed that Deputy Alfred said he was going, and that Mr. Barber intended to kill him, then this entire investigation is turned upside down because it is based upon a false premise.

Follow those shoe prints.  And those shoe prints lead out.

And I asked him, I said, do you have -- I gave him an opportunity.  Do you know why this seems to be having, you know, an entry from east to west if we know he came from west to east?  He says, I don't have a clue.  I don't know why they did that.  Well, if he had really paid attention to the evidence, he would have known why.

And what does this mean?  If he made a mistake on such a major issue like that, what other biases did he have?  What other things did he see?  He relied primarily on Deputy Alfred's testimony, folks.  And we know Deputy Alfred is not telling the truth.  He changed his testimony 50 times on that stand.  So if the main thing that you're relying on is Deputy Alfred, and you cannot rely on this alleged physical evidence, then you have to call into question what on earth happened that night, other than what you heard.  And other than what you see.

Again, I asked him, here's the path.  Wouldn't it be consistent if he walked up this path and fired his weapon?  And we know you can't find footprints here.  And he goes, I can't give you that answer, you're making me have a hypothetical that doesn't exist.  And as a matter of fact, I was asking him to actually tell me what happened, because we know that that physical evidence of a man walking on the east side heading south is nonexistent.

I asked him, is there any evidence of Mr. -- or Deputy Alfred's shoes walking on the east and south?  He said no.  So if we know he never walked south, he had to have walked in this gravel.  And why did he do that?  Because he feared that a man may have had a firearm or a weapon.  So therefore, you heard his training, you're supposed to go for cover.  So the proper thing to do is stand in the line of sight.  If we know Mr. Barber is here on the vehicle and the vehicle is right here, the vehicle is kind of tall, that is a way for you, if you are walking on the west, westerly side heading south, at least you can avoid your angle where he can't -- he has to jump

around that vehicle in order to start firing.

It is safer -- it is safer for him to be on the west side, which is why he was there.  Which is why all of those bullet casings are there.

And, yeah, it's possible that some of those bullet casings may have hit up against the house and landed right there.  But that doesn't mean that he didn't walk up the middle.  Of course.  Fine.  Sure.  But they're all starting at No. 250 (sic), 2 feet away, we'll talk about that.  Speed and distance matter, folks.

Again, there was a discussion about the weeds.  No.  Why does speed and distance matter?  Because if you're trying to prove that a -- that an object that is inherently not used to kill is a deadly weapon, you have to show at what threshold does a vehicle go or transform from a vehicle that is just meant to transport people into a weapon.

Just like a baseball.  Professional baseball player picks up a baseball.  Tosses it at me at 10 percent of speed.  Says I want to kill you.  Tosses the baseball at me and it hits me.  It didn't hurt.  I mean, I might have a bruise.  But that's it.  Is he going to be charged with a deadly weapon?  No.  He's going to be charged with assault.  Simple assault.

But if he takes that baseball and he throws that baseball at my head at a hundred miles per hour, you better believe that baseball has now turned into a deadly weapon.  And that is why speed and distance are critical in this case.

MS. FULTZ:  Objection.  Facts not in evidence.

THE COURT:  Overruled.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

MR. BRYANT:  So, folks, what do we know?  We know that Mr. Morales came up with an entire speed graph.  And we know that the maximum speed was 3. --

THE COURT:  Excuse me.  Excuse me.  I apologize.  I'm going to sustain that objection.

MR. BRYANT:  Thank you, Your Honor.

The maximum speed is 3.39 miles per hour.  The maximum speed.  And what would the speed before that?  At the first shot it was zero.  Second shot was .43 miles per hour.  Third shot it was less than one mile per hour.  At the fourth shot it's 1.36 miles per hour.  At the fifth shot it's two miles per hour.  And at the sixth shot as the vehicle starts to decelerate it is 3.17 miles per hour.

And the distances.  If you were to take the shell casings at 2, 3, 4 and 5, if Deputy Anderson -- or Deputy Alfred was there around that period of time, it's 53 feet away.  Between 7 and 8, that's -- you'll see 7 and 8, that's the two other shots, it's about 45 feet away.  And that midpoint distance between Marker 6 and 9, that's 40 feet away.  And the flashlight, that's 30 feet away.

Alfred's initial interview, if you look to the right, 8 to 10 feet away.  There is an X there, and the reason why there is an X there is because if he didn't move, and he just sat there and allowed a two to three mile per hour car to make contact with him, he would have been hit, because we know that car traveled 14 feet.

Distance and speed are critical.  And the reason why that is, is because at what point does a vehicle become a

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                                  Vol 7                                  Page 741

deadly weapon?  And at what speed does a vehicle become an instrument that can cause great bodily injury?  And look, all vehicles weigh several tons.  I mean, we're talking about a Trailblazer.  We're not talking about a Humvee here.  We're not talking about a tank.  We're not talking about an 18-wheeler. It's a mid size SUV.  Cars weigh between, anywhere between two to 5,000 pounds, 6,000, 7,000 pounds.  It's a car.

But three miles per hour, having had no experts come in to tell you that that is enough to cause severe injury, serious injury?  Even if you use common sense, folks, if that's walking speed it's not doing anything to you.  You might get a bruise.  It's important to see, again, visualize, if Deputy Alfred is at 6 and 7, where he said he saw that vehicle first move, he is approximately 45 feet away from that initial start of that vehicle.  He could have easily walked over there.

And more importantly, a car moving three miles per hour, at a vantage point of 45 feet away, would cause absolutely no injury at all.  Even if he sat there and waited for that vehicle to come, just sat there and said, okay, drive three miles per hour, keep going.  Bumps him a little bit, he could have just walked up and yanked him out of that car at that speed.

And again, see that flashlight.  The reason I always continue to show this image, is because this flashlight is literally right across from that opening where he could have easily walked over there.  And if you had to have anyone who paid attention to this evidence and not just taken Deputy Alfred for his word, there would have been potentially a very

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

serious discussion at this OIS investigation.

I want to start going back to where we started. What's the definition of a deadly weapon?  Deadly weapon is an object, instrument or weapon that is used in such a way that is capable of causing and likely to cause death or great bodily injury.

The reason why I just went through this exercise of speed, velocity and distance for a vehicle is because a vehicle is not like a firearm.  It is not inherently used to kill or harm.  It can.  But the People have the burden to prove beyond a reasonable doubt, every single element beyond a reasonable doubt, that that speed would cause great bodily injury or death.

Now, we know for a fact that a car moving at three miles per hour, which is walking speed, is not going to kill anybody.  Common sense will tell you that.

MS. FULTZ:  Objection.  Facts not in evidence.

THE COURT:  Sustained.

MR. BRYANT:  Use common sense.  Use common sense.

We also know that there's been no evidence presented to show that three mile per hour car is going to do any great bodily injury anyhow.

What is great bodily injury?  It's a substantial physical injury, an injury that is greater than a minor or moderate harm.  And I've shown you examples.  Here are some examples.  There will be others.  But again, you have to ask yourself, would a three mile per hour vehicle, if it made contact with Deputy Alfred, would it have caused any of these

great bodily injuries?

MS. FULTZ:  Objection.  Speculation.

THE COURT:  Sustained.

MR. BRYANT:  Circumstantial evidence.  I read this instruction before, but it's important.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.

So if we're talking about all this circumstantial evidence, and there's one possibility that still exists that says, well, you know, although it is highly, highly, highly likely that I think Mr. Barber did X, but it's still reasonably possible Mr. Barber did Y, it doesn't matter how much you wait, you must, you must find Mr. Barber not guilty.  And that is how you weigh circumstantial evidence.

Mr. Barber is being charged, once again, with attempted murder.  It means that he took at least one direct but ineffective step, and the defendant intended to kill.  And as I said before, you have to look at circumstantial evidence to decide this.  Look at all the possible outcomes, reasonable possibilities that did not show intent.

Here's a reasonable possibility.  The vehicle moved involuntarily after Mr. Barber was shot or startled by gunfire.  Meaning that if he had his foot on the brake, he could have taken it off involuntarily and momentarily, and then put his foot back on that brake, which is why it stopped.  There is nothing that's been proven to eliminate that possibility.

Nothing the State has done has eliminated that possibility.  It still exists today.

It is like the light bulb.  It is like that room. There are still a bunch of different possibilities out there that still we don't know what happened.  And there has been nothing to eliminate that.  After the tires gain traction, there's no sound of acceleration in the .65 seconds prior to the first shot.  We know that.  Everyone admitted to that. There's no sound.  You don't hear the engine.  This is an old car.  You're going to at least hear the engine doing something if it's accelerating.

So the alternative is that car, as we know, as we learned, it moves in reverse when it's in gear.  We talked about the parallel parking example.  But when this car is in gear and your foot is off that brake, this thing moves back. It moves, and it will continue to move until something stops it.  So if we know that, we know there's a couple of outcomes. Either A, Mr. Barber pressed on the accelerator.  Spun those wheels.  Didn't gain traction.  He took his foot off the accelerator.  And the car could have rolled back without him pressing the brake.  Or conversely, could have had his foot on the brake.  Heard the first shot.  Got shot.  Took his foot off that brake.  It goes back.

Here's the point.  When I asked, can you tell me for certain that that didn't happen?  Nobody could.  Nobody could tell you for certain.  But everyone said it's possible, he could have had his foot on the brake, and he could have been pressing the accelerator.  It would have done that burning

rubber motion where you're just spinning those wheels, but the car is not moving. Everyone said, yeah, it's possible.

The brakes were softly pressed. You didn't hear any squealing of the brakes. You didn't hear any slamming of the brakes. It was softly pressed. Is this intent to kill? No. You have to -- if somebody's softly pressing the brakes, they're not slamming on it, you can reasonably conclude that he did not intend to kill anybody.

And again, if you believe maybe he did. Maybe he didn't. You have to go with maybe he didn't.

What we also know is Mr. Barber never accelerates that vehicle during the shooting. So as I told you before if somebody is hell bent on killing someone, you will hear people pressing that accelerator. He's going for it. Because at this point, why not? You're trying to kill this man, whether you believe he's a cop or just whoever. If for some reason you just go into a rage and you're trying to kill someone, would you softly press the brakes? I don't care if someone is shooting or not. No. They're going to press that accelerator. We know that didn't happen.

Here's another very important point. If a man, if he had the intent to kill, why is his foot on that brake, even after he's shot? For four minutes it takes them to come around, to move that car, and during that time, you know that Deputy Alfred is still out there before these other officers arrive. You know he's still talking to him. We know that he drops his flashlight somewhere behind this vehicle. But you want to know what Mr. Barber never does? He never takes the

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

second opportunity to slam that thing on again and take off, because we know it was in the reverse gear.  But he never did that.

So that is also circumstantial evidence saying that, well, you know what, I mean, if he's trying to kill this guy, why didn't he do it when he had an opportunity after the cop started firing?  And that, folks, that is when you apply circumstantial evidence, and you say, if I have to weigh the two, I always have to go with not guilty.  Because they did not eliminate that.

Again, the vehicle traveling at two to three miles per hour, again somebody who is way down there by the way. Even if you take his word, his initial word that he was between Marker 6 and 7, he is 45 feet away, folks.  If you're trying to kill somebody, you're not going three miles per hour.  He is far.  He is -- we know he is not 8 to 10 feet.  We know that. So if we know that, is somebody really trying to kill you, if they are going three miles per hour and you're 40 feet away? The logical conclusion is no.  No.

And we know that in order to attempt to kill somebody, you have to have something that can kill somebody.  A vehicle going at two to three miles per hour is not a deadly weapon, folks.  Use your common sense.

We keep talking about this .65 period.  And I just want to play this for you, and I want you just to listen. Where the tires stop screeching you hear a silence.  You hear a pure silence.

(Audio played; not reported.)

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                            Vol 7                            Page 747

MR. BRYANT:  You will have an opportunity to listen to this.  You can go back in that jury room.  You'll have these audios.  You can listen to it intently.  There is a silence.  And that is this period right here.  And you don't hear that accelerator going, but you hear those shots.

And we know that a man who is 45 feet away, I don't care if you are the most trained eagle eye, with night vision goggles, it is physiologically impossible for any person at night to see a vehicle moving in .65 seconds.  He never saw that vehicle moving.  He was 45 feet away.  He shot prematurely.  And then he gave a statement that wasn't accurate to his own people.  Then he gave statements that weren't accurate to everybody in this room.

Assault with a deadly weapon.  You're going to hear about this and it has -- there's two different charges for this.  You're going to have one that is with a peace officer and one that is without a peace officer, meaning if you didn't know it was a peace officer is it still assault with a deadly weapon?  It's Instruction No. 8 -- 860 and 875.  They're both the same, except one is an officer and one is not.

But again, we're going to go through these elements, and one of the important things is the defendant didn't act with a deadly weapon other than a firearm that will probably result in the application of force to a person or force likely to produce great bodily injury.

This is important.  When the defendant acted, he presented the ability to apply force to produce great bodily injury.  Folks, the first thing is, was his movement even

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

voluntary?  And we keep going over this.  And the reason why I harp on this, you're probably saying, Mr. Bryant, you've said this five million times.  I'm tired of it.  I get it.  But the reason why I'm saying this is because you'll be surprised not everybody does get it.  And I have to repeat it over and over again, so people really kind of understand what I'm saying.

There is a very reasonable possibility that Mr. Barber was first shot or startled when he had his foot on the brake, that momentary period between .6 -- .01 and .65, when that first shot happened, and he just took his foot off the brake involuntarily.  It wasn't his fault.  He didn't intend do it.  But he was shot.  And that car moved back.  And no one has presented evidence from the state to say that didn't happen.  They must eliminate that possibility or that is, folks, reasonable doubt.

Again, gone through all of these things.  A vehicle going two to three miles per hour is not going to cause great bodily injury.  Definitely not going to kill anybody.  And if he never had the intent, you can look at all these facts, and here's a critical point.  Maybe you think it's possible, maybe it was possible this could have happened.  It's possible is not enough.  It's like when I said, when you had that ticket in your pocket, when your significant other asks you, you got the tickets, I don't need to check, I got them.  We're good.  We're fine.  I am 100 percent certain.

So for 860 and 875, both of these, assault with a deadly weapon, regardless whether it's an officer or not, must find Mr. Barber not guilty, because there is absolutely

reasonable doubt all over this place.

Concluding, I'm getting close to the very end.

Expert witness testimony.  I read this to you before.  If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

Now, Mr. Morales he told you, those -- that was heading north.  I couldn't rely on those footsteps.  But unfortunately, and I say unfortunately, because I want our law enforcement officers and our detectives to do their best, because everybody's life is important.  There are so much at stake.  You gotta get it right.  You cannot be wrong.  You cannot be wrong on a unforced error, right?  This is something that an error that shouldn't have happened.

Again, talked about how he initially testified, but then after all these revelations had occurred, here's what Deputy Hernandez later admits.  He admits that Deputy Alfred actually did testify that he saw the car moving when he was standing between Marker 6 and 7, 45 feet away.  He admitted that he incorrectly assumed that the shoe impressions were headed in the southbound direction.  He admitted that that flashlight was 30 feet away from the initial starting point of the vehicle.  He admitted that he never officially calculated the speed of that vehicle moving before it initially came to rest.

And I'll stop right there, really quickly.  That is a critical component, trying to determine, is this speed likely to cause the harm for a potential charge later?  A thorough

investigator, a thorough detective calculates all of this stuff. He makes sure. He said it. He said it. Here's what I was a little concerned about. He said, yeah, I did the calculations, but I didn't officially put it in the report.

That is the one time I paused and said, what do you mean? I didn't go into it during the trial but in my head I said, so you knew, you knew this car was going two to three miles per hour, and you didn't say anything? I was a little upset. Maybe we would have a different outcome. I just want people to do right.

MS. FULTZ: Objection.

THE COURT: Sustained.

MS. FULTZ: If you know a fact, if you know a fact, put that in the official report. Let the powers that be make a decision as to what they want to do with this case. Don't withhold a critical component of this case.

He never questioned whether Deputy Alfred's initial statements given during his interview were accurate. Because you see, if he did determine that this speed was three miles per hour, and Deputy Alfred told him in his witness interview that he was going at a very high rate of speed, you have to start questioning, what do you mean?

And then I asked him, so would any of the stuff change your opinion if you would have actually calculated this? Would it change your opinion if you knew he wasn't actually walking on this side? And Deputy Hernandez said, nope, I'm 100 percent certain that Mr. Barber intended to kill him and drove that car at him.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

And then I asked him a bunch of questions.  How do you know?  You don't have any video saying that he didn't have his foot on the brake?  No.  You don't have this?  You don't have that?  He kept saying, nope, nope, don't know, don't know.

So his 100 percent certainty was conclusory.  For those who don't know what conclusory means, it means he was giving a statement of opinion based upon no facts.  It was a hollow statement which had no value whatsoever.

And I will say this, Detective Hernandez to some extent I think started to redeem himself.  And he admitted this, he did not conduct a thorough investigation.  It is not easy for anyone as reputable as Detective Hernandez, to sit on the stand and admit to you all that he did not conduct a thorough investigation, confirmation bias does that to you.  And if he did not conduct a thorough investigation, you have to believe that there is reasonable doubt riddled all over this case.

What are we doing here?  Not conducting a thorough investigation, believing only one side when it completely contradicts the evidence means that you could not, it's not cannot, it's you could not, it is impossible to eliminate every reasonable possibility.  It's impossible.  And by virtue of that statement alone, Mr. Barber cannot be found guilty of any of the alleged crimes, because there is reasonable doubt.

Because during the period between April and possibly September of 2021, Detective Hernandez did not do a thorough investigation.  And sometimes gets the best of us, when we want to believe someone so bad, because they're all

part of the same department.  And I asked him, do you have bias because, you know, you work for the sheriffs department, you guys are all part of the same group?  No, I don't have any bias.  Maybe, you know, outwardly saying no, I'm trying to be objective.  But we see how it was virtually impossible for him to do so, and it led to him having to admit that his investigation was botched.

MS. FULTZ:  Your Honor, can we approach?

THE COURT:  You may.

Give us a moment, ladies and gentlemen.

(Bench conference held, not reported.)

MR. BRYANT:  Folks, rapping up.  And I'm just going to go through a list, just a few things that cause reasonable doubt.  Because all of these reasonable possibilities still exist and what -- let me go back to the light.

We go into the room, and we're trying to make a determination as to why this light is not cutting on.  And your significant other is just dead set that they think that it is just so highly probable that the light burnt out, and you're like, it probably is, but you haven't looked at all of the different possibilities and conducted a thorough investigation.

And what we found at the end of that investigation, it wasn't the light bulb that was burned out.  It was -- it was the circuit breaker.

And why is that important?  Because you got to get it right.  I don't want to get it wrong.  I think one of the jurors said it best, rather let a guilty man go free than convict an innocent person.  And that's why you have to be 100

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

percent certain.  And it's not --

MS. FULTZ:  Objection.

MR. BRYANT:  -- an easy decision.

MS. FULTZ:  Objection.  Misstates.

THE COURT:  Sustained.

MR. BRYANT:  It's not --

THE COURT:  Ladies and gentlemen, the instruction is in 220, the definition of reasonable doubt.  It is not 100 percent certainty.

MR. BRYANT:  Thank you, Your Honor.

THE COURT:  I'll also direct your attention to Instruction 200, if the lawyer's comments on the law conflict with my instructions, you must follow my instructions.

MR. BRYANT:  As I said, the judge directs you on the law.

Reasonable doubt.  It is reasonably possible that Mr. Barber released his foot from that brake causing the vehicle to roll back only after being shot by Deputy Alfred. It is reasonably possible Mr. Barber never pressed the accelerator at any point during the period which that vehicle was idle.  It is reasonably possible Mr. Barber released his foot from the brake causing the vehicle to roll back only after being startled by gunfire.

It's reasonably possible Mr. Barber released his foot from the brake causing the vehicle to roll back only after being shot by Deputy Alfred.  It's reasonably possible Mr. Barber released his foot from the brake causing the vehicle to roll back only after the first four shots were fired.  It's

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

PEOPLE vs STEFFON TODD BARBER
FVI-21001312                              Vol 7                        Page 754

reasonably possible the vehicle's tires started spinning, and Mr. Barber did not have his foot on the brake and the vehicle began to move back slowly before the shooting.  That's entirely possible, too.

It's reasonably possible that the vehicle traveling between two to three miles per hour would not cause great bodily injury or death if it made contact with an individual. It is reasonably possible Mr. Barber recognized that Deputy Alfred was a peace officer.  That's reasonably possible.  But it's also reasonably possible that Mr. Barber did not know Deputy Alfred was a peace officer.  Because again, these answers have not been met.

And unless you eliminate all of these possibilities, and you only rely solely on what the State believes that they've proven, then you must find that Mr. Barber is not guilty of any of these crimes.  Because, quite frankly, the State has not gone beyond all of these reasonable possibilities.

The final step isn't justifying what the problems are or the possibilities are.  It's eliminating all of them until you get to the point, that you have, with clear certainty, the State has proven their case.

With that, you all, I will just say, this is Mr. Barber.  May not have seen him too much in this trial as he sat there.  This is my client, and I am proud to represent him.

Thank you.

THE COURT:  Thank you, Mr. Bryant.

MR. BRYANT:  Thank you, Your Honor.

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--O0O--

THE PEOPLE OF THE STATE        )
OF CALIFORNIA,                 )
                              )
                Plaintiff,)
                              )
          -vs-                )    No. FVI-21001312
                              ) REPORTER'S CERTIFICATE
STEFFON TODD BARBER,           )
                              )
                Defendant.)
_____)


STATE OF CALIFORNIA           )
                              )  ss
COUNTY OF SAN BERNARDINO      )


     I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do

hereby certify:

     That I am a Certified Shorthand Reporter of the State of

California, duly licensed to practice; that I did report in

stenotype oral proceedings had upon hearing of the

aforementioned cause at the time and place herein before set

forth; that the foregoing pages numbered 728 to 771, inclusive,

constitute to the best of my knowledge and belief a full, true,

and correct transcription from my said shorthand notes so taken

for the date of December 12, 2024.

     Dated at San Bernardino, California, this 15th day of May,

2025.




                              _____
                              Official Court Reporter
                              C.S.R. No. 12225

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).
05-15-2025 9:24AM