# EXHIBIT "1"

# EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| JAMES MICHAEL WELLS, | Case No. 3:13-cr-00008-SLG |
| Defendant. | |

## ORDER RE: MOTIONS *IN LIMINE* TO EXCLUDE DEFENSE EXPERT WITNESSES

Before the Court are six motions *in limine* filed by the government seeking exclusion of proposed defense expert witnesses.[1]  The motions relate to Dr. Park Dietz, Jim Hoerricks, Dr. Daniel Reisberg, Chris Coleman, Steven Beck, and Gregg McCrary. Defendant James Michael Wells filed an opposition to each motion.[2]  The government did not seek to file a reply to any of the oppositions.

### I.    Legal standards

Before a witness may testify as an expert, a district court must make three express findings.  First, the court must find that the proposed witness is qualified to offer expert testimony.  Second, the court must find that the witness has applied reliable principles. Third, the court must find that the witness's testimony may help the jury understand evidence or determine a fact at issue in the case.  So long as an expert meets these

---

[1] Docket 975, 976, 977, 978, 979, and 980.

[2] Docket 990 (opposing Docket 979); Docket 991 (opposing Docket 975); Docket 992 (opposing Docket 976); Docket 993 (opposing Docket 977); Docket 994 (opposing Docket 978); and Docket 1002 (opposing Docket 980).

threshold considerations, the expert may testify; it is up to the jury to determine the weight to give that testimony.[3]  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[4]  The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.[5]

Federal Rule of Evidence 702 provides that a person "qualified as an expert by knowledge, skill, experience, training or education" may provide expert testimony if he or she has "scientific, technical, or other specialized knowledge."[6]  That knowledge must "help the trier of fact to understand the evidence or determine a fact in issue"[7]—this requirement "goes primarily to relevance."[8]

Expert testimony must be reliable.  That means it must be "based on sufficient facts or data," be "the product of reliable principles and methods," and the principles and methods must have been reliably applied to the facts of the case.[9]  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the

---

[3] *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* Apr. 27, 2010.

[4] *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc* (*Daubert I*), 509 U.S. 579, 596 (1993)).

[5] *Daubert I*, 509 U.S. at 592 n. 10; *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

[6] Fed. R. Evid. 702(a).

[7] Fed. R. Evid. 702(a).

[8] *Primiano*, 598 F.3d at 564 (citing *Daubert I*, 509 U.S. at 591.

[9] Fed. R. Evid. 702(b), (c), (d).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 2 of 36

opinion proffered."[10]   The reliability requirement analyzes "whether the reasoning or methodology underlying the testimony is scientifically valid."[11]   The Supreme Court has identified four factors that bear on this analysis: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community.[12]   This same framework applies to both scientific and non-scientific opinion testimony.[13]   However, this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case"; it "was meant to be helpful, not definitive[.]"[14]   Depending on the type of expertise and particular subject of the testimony, these factors may or may not assist in assessing reliability.[15]   A district court may choose not to examine factors that are not "reasonable measures of reliability in a particular case."[16]   "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case."[17]

---

[10] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[11] *Daubert I*, 509 U.S. at 592–93.

[12] *Id.* at 593–94.

[13] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002) ("*Daubert* and *Kumho Tire* did indeed require that the judge apply his gatekeeping role under Daubert to all forms of expert testimony, not just scientific testimony.").

[14] *Primiano*, 598 F.3d at 564 (citing *Kumho Tire Co.*, 526 U.S. at 151).

[15] *Id.* at 565 (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

[16] *Murray v. Southern Route Maritime SA*, 870 F.3d 915, 922–23 (9th Cir. 2017).

[17] *Primiano*, 598 F.3d at 564 (citing *Kumho Tire Co.*, 526 U.S. at 150, 152); *see also United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996) ("Social science in general, and psychological

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 3 of 36

Expert testimony must also be relevant and "fit" an issue in the case. Relevancy "simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'"[18] The testimony does not have to be persuasive in order to be relevant.[19] However, the "fit" requirement is not merely a reiteration of the general relevancy requirement under Federal Rule of Evidence 402:[20] "[T]he standard for fit is higher than bare relevance."[21] Scientific expert testimony introduces special dangers to the fact-finding process because it "can be both powerful and quite misleading because of the difficulty in evaluating it."[22] Therefore, courts must ensure that proffered expert testimony speaks clearly and directly to an issue in dispute in the case and that it will not mislead the jury.[23]

Even though "district courts are not required to consider all (or even any) of [the *Daubert I*] factors . . . [they] do not have 'discretion to abandon the gatekeeping function' altogether."[24] In exercising the gatekeeping function, district courts must assess the

evidence in particular, have posed both analytical and practical difficulties for courts attempting to apply Rule 702 and *Daubert*.").

[18] *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (alterations in *Barabin*).

[19] *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) ("*Daubert* does not require a court to admit or to exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance.").

[20] *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert II*), 43 F.3d 1311, 1321 n. 17 (9th Cir. 1995).

[21] *In re Paoli R.R. Yard PCB Lit.,* 35 F.3d 717, 745 (3d Cir. 1994).

[22] *Daubert I*, 509 U.S. at 595 (internal quotation marks and citation omitted).

[23] *Daubert II*, 43 F.3d at 1321.

[24] *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (quoting *Kumho Tire*, 526 U.S. at 158–59).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 4 of 36
Case 3:13-cr-00008-SLG   Document 1070   Filed 07/17/19   Page 4 of 36

validity or methodology of proposed expert testimony and must explicitly find it to be both relevant and reliable before admitting the testimony.[25]

## II.     Analysis

The Court has reviewed and considered the legal arguments, expert qualifications, and expert reports filed by the parties as to each of the six government motions.  The Court has also applied Rule 403's balancing test to each proposed expert.[26]  The Court sets out its findings as to the experts' qualifications, reliability, and relevance, and its Rule 403 analyses below.

### A.  Dr. Park Dietz (Docket 975; opposition at Docket 991)

The defense seeks to elicit the expert testimony of Dr. Park Dietz, a forensic psychiatrist and criminologist, regarding workplace violence.[27]  The defense intends to call Dr. Dietz to rebut and critique government expert Robert Morton.  Dr. Dietz's report outlines his points of disagreement with government experts Robert Morton and Dr. Reid Meloy.[28]  Dr. Dietz's critiques include Mr. Morton's focus on a single theory of the case, Mr. Morton's conclusions regarding the sequence of gunshots and the possibility of verbal interaction between the perpetrator and the victims,[29] and Mr. Morton's conclusion that

---

[25] *Id.* at 1189–90.

[26] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

[27] Docket 991 at 10.

[28] Docket 975-1.  Because the government is not calling Dr. Meloy as a witness, the portion of Dr. Dietz's report critiquing Dr. Meloy's conclusions is not relevant.

[29] By separate order that will be forthcoming, the Court will be entering an order that excludes Mr. Morton's testimony as to the possibility of verbal interaction.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 5 of 36

the homicides were a targeted "personal cause" crime.[30]  The government objects to Dr. Dietz's testimony on the grounds that he is not qualified, that his methods are unreliable, and that his testimony is irrelevant.

### i.    Qualifications

The government maintains that Dr. Dietz is not qualified to testify as to workplace violence and that he is not qualified to rebut the opinion of expert Robert Morton.[31]  The Court finds that Dr. Dietz is qualified to testify as an expert as to workplace violence and to rebut the opinion of Mr. Morton due to his extensive psychiatric background and experience teaching and presenting on the topic of workplace violence.[32]  As the government itself noted, "Dr. Dietz appears to have experience/expertise in workplace violence[.]" [33]

### ii.    Reliability

Dr. Dietz based his conclusions on sufficient facts, having reviewed the crime scene and autopsy photographs, a diagram of the T-1 building, Mr. Morton's analysis, testimony, and supplemental report, and other information from the first trial of this case.[34]  Dr. Dietz applied reliable principles and methods to reach his conclusions.

---

[30] Docket 975-1.

[31] Docket 975 at 4.

[32] Docket 975-1 at 63, 68, 76–92.

[33] Docket 975 at 8.

[34] Docket 975-1 at 93–94.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 6 of 36

### iii.    Relevance

The government asserts that because it will not be using the term "workplace violence" at trial and will not be calling its workplace violence profiler (Dr. Meloy) from the first trial, Dr. Dietz's testimony about workplace violence is not relevant.[35]   During the first trial in this case, the undisputed "intended role of [Dr. Meloy's] testimony . . . invited the jury to find a 'fit' between Dr. Meloy's criminal profile and the lay witnesses' testimony concerning Wells' own character traits."[36]   The Ninth Circuit held that "[t]he probative value of Dr. Meloy's testimony is found only in its ability to answer the impermissible question of whether, based on his character profile, Wells acted in accordance therewith on the morning of [the homicides]," and the admission of Dr. Meloy's testimony was reversable error.[37]

Although the government maintains that it will not use the term "workplace violence" at trial, it has made clear through its motions and argument on remand that it intends to focus its motive evidence on the workplace culture, Mr. Wells' role in the workplace, Mr. Wells' relationship with his various co-workers, and his co-workers' opinions of Mr. Wells in relation to his place of work.[38]   The government appears to be advancing a similar motive theory to that presented in the first trial:  Mr. Wells' motive to kill two of his co-workers was directly tied to his diminishing professional status and

---

[35] Docket 975 at 2.

[36] *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018).

[37] *Id.* at 923–24.

[38] See Docket 957 (government's opposition to Motion in Limine to exclude other act evidence); Docket 958 (government's opposition to Motion in Limine to exclude character evidence); Docket 973 (government's supplemental briefing regarding other act evidence).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 7 of 36
Case 3:13-cr-00008-SLG   Document 1070   Filed 07/17/19   Page 7 of 36

strained relationships at his place of work.  The Court is unaware of any alternative theory from the government that would seek to connect the homicides to anything other than Mr. Wells' workplace status and relationships.

The jury will be asked to determine whether the motive for the killings was related to the workplace, because under the government's theory this makes it more likely that Mr. Wells committed the homicides.  The absence of government expert profiling testimony directly tying Mr. Wells' characteristics to those of someone likely to commit workplace violence will not eliminate all references to the fact that the homicides occurred in the workplace and that the two victims were Mr. Wells' co-workers.  As stated by the Ninth Circuit, "background information regarding Wells' relationships with his co-workers, his working environment and his work history . . . is relevant in a workplace homicide prosecution."[39]

Additionally, the government seeks to have Mr. Morton testify as an expert to explain why the homicides are "personal cause homicides."[40]  Mr. Morton's reasoning for concluding that the homicides were personal cause homicides rests in part on the fact that the homicides occurred in the victims' workplace and his opinion of the perpetrator's knowledge of that workplace.[41]  The Court perceives little semantic difference between "workplace violence" and "personal cause homicide" in the factual context of this case.  So long as foundational evidence is introduced to support the claim that the homicides were related to the workplace, the Court finds that Dr. Dietz's generalized testimony as

---

[39] *Wells*, 879 F.3d at 926.

[40] Docket 1008.

[41] Docket 1004-1 at 8.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 8 of 36

to homicides in the workplace is relevant to and fits the issues in this case. Although the government is concerned that Dr. Dietz's testimony may open the door to a government rebuttal expert,[42] that is a risk for the defense to choose to take. However, because Dr. Meloy will not be testifying, Dr. Dietz shall not testify about or make reference to his critiques of Dr. Meloy's prior report and testimony.

The Court has weighed the probative value of Dr. Dietz's proposed testimony and finds that it is not substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or the presentation of cumulative evidence.

In summary, the motion regarding Dr. Dietz at Docket 975 is DENIED with the following limitations: Dr. Dietz may testify about workplace violence and his critiques of Mr. Morton's methodology and conclusions. If Mr. Morton's testimony at trial does not address all of what will be permitted by the Court's order on the Morton motion in limine, the Court may narrow Dr. Dietz's testimony correspondingly.[43] Regardless of Mr. Morton's testimony, Dr. Dietz shall not refer to Dr. Meloy or his critiques of Dr. Meloy's prior report or testimony.

### B. Jim Hoerricks (Docket 976; opposition at Docket 992)

The defense seeks to elicit the expert testimony of Jim Hoerricks, a forensic image and video analyst who uses photogrammetry[44] to analyze digital evidence. The defense

---

[42] Docket 975 at 2.

[43] See the Court's forthcoming Order Re: Motions *in Limine* to Exclude Government Expert Witnesses for limitations on Mr. Morton's testimony.

[44] In an unpublished opinion, the Ninth Circuit has described photogrammetry as "the art, science and technology of obtaining reliable information about objects and their environment from a process of recording, measuring and interpreting photographic images." *Hutchinson v.*

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 9 of 36

proposes to have Mr. Hoerricks testify in three areas:  (1) his conclusions based on his review of the surveillance video from the Coast Guard station, which shows a vehicle of interest entering and leaving the base close to the time of the homicides (the T-1 video); (2) his opinion as to whether government expert witnesses who analyzed the T-1 video adhered to recognized best practices guidelines; and (3) whether the investigative techniques used by those government witnesses were tainted by confirmation bias.[45]

### i.   Qualifications

The government does not contest Mr. Hoerricks' qualifications "in the fields of computer forensics, video/photographic analysis, surveillance set up[,] etc."[46]  The Court agrees that Mr. Hoerricks' knowledge, skill, experience, and training qualify him to provide expert testimony with respect to his methodology, analysis, and conclusions based on the T-1 video.[47]  His testimony may include explaining the distinction between forensic image analysis and other fields, such as traffic accident reconstruction.

However, the government asserts that Mr. Hoerricks is not qualified to render an expert opinion as to vehicle identifications because his *curriculum vitae* does not demonstrate any background in vehicle identification.[48]  In the Court's view, expertise in

---

*Hamlet*, 243 Fed. Appx. 238, 239 (9th Cir. 2007).  Here, the Court uses the term "photogrammetry" to include video or still image conversion, restoration, clarification, enhancement, authentication, measurement, and comparison.

[45] Docket 992 at 5–6.  The defense's response in opposition combines Mr. Hoerricks' critique of the methodology used by government witnesses and the risk of confirmation bias into one category.  However, they are two distinct areas of proposed testimony and the Court treats them as such.

[46] Docket 976 at 4.

[47] Docket 992-1 (*curriculum vitae* of Jim Hoerricks).

[48] Docket 976 at 4–5 ("He simply has no education, training, knowledge or experience working

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 10 of 36

vehicle identification is not required to forensically analyze an image of a vehicle and compare it to the dimensions and features of a specific known vehicle.  Otherwise, a forensic imaging expert would also need to be an expert in the subject of the images he reviewed be it facial recognition, animals, weapons, vehicles, or aircraft.[49]  It *does* take a photogrammetry expert to utilize the methods and computer programs to properly enhance and measure an image to make the comparison.  Because Mr. Hoerricks qualifies as a photogrammetry expert, he may testify as to his methodology and conclusions from comparing the images from the T-1 video to the characteristics of Hondas.[50]

Mr. Hoerricks is also qualified by training and experience to testify as to the accepted methodology and best practices used by other image analysts and to opine as to whether those analysts used sound methods in reaching their conclusions.[51]  Mr. Hoerricks' *curriculum vitae* demonstrates that he has received extensive training on the collection of digital evidence and has formulated the standardized procedures for

---

with cars—particularly Sport Utility Vehicles.").

[49] If the government's theory was correct, all of its own witnesses testifying about whether the video shows the Wells' Honda would also have to be vehicle identification experts, which they do not appear to be.

[50] Docket 992-3 (Hoerricks' report dated May 6, 2019, explaining his analysis of the video and comparison to the vehicle in question).

[51] Docket 992-1 (*curriculum vitae* of Jim Hoerricks).  Docket 972-3 (Hoerricks' report dated April 1, 2019, describing his review of "previously engaged analysts'" methodology and conclusions, the validation—or lack thereof—of certain methods, and what he views as incorrect use of terminology).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 11 of 36

collecting video evidence for the Los Angeles Police Department.[52]  Review of his report demonstrates his familiarity with published best practices in forensic photogrammetry.[53]

The government maintains that Mr. Hoerricks' opinions as to the qualifications of government experts cannot usurp the Court's role in determining who qualifies to give expert testimony.[54]  A district court may not delegate its gatekeeping role.[55]  Accordingly, the defense may not elicit testimony from Mr. Hoerricks as to whether other witnesses have the qualifications *to testify* as experts.   However, once this Court fulfills its gatekeeping duties by making the necessary findings to allow other witnesses to testify as experts, Mr. Hoerricks may testify as to his opinion of the acceptability, accuracy, and reliability of the methods and techniques used by other experts and the adequacy of their qualifications.[56]  This testimony goes to the *weight* the jury should accord the testimony of other experts.

Mr. Hoerricks is not qualified to testify as to whether government witnesses' opinions were tainted by confirmation bias.  His *curriculum vitae* shows no formal education or experience in assessing confirmation bias, no detailing of relevant

---

[52] Docket 992-1 at 3, 13 (*curriculum vitae* of Jim Hoerricks).

[53] Docket 976-1 at 4.

[54] Docket 976 at 3–4.

[55] *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019) ("We have thus held that a district court abuses its discretion when it either abdicates its role as gatekeeper by failing to assess the scientific validity or methodology of an expert's proposed testimony, or delegates that role to the jury by admitting the expert testimony without first finding it to be relevant and reliable." (internal quotations and alterations omitted).

[56] "Expert testimony relating to the accuracy or reliability of the methodology used by an expert witness may assist the trier of fact without encroaching on the fact finder's role to make credibility determinations."  Docket 354 at 8 (Magistrate Judge's 2014 order regarding the admissibility of the expert testimony of Dr. Daniel Reisberg).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 12 of 36

knowledge or skills related to assessing confirmation bias, and only one ten-hour training related to confirmation bias.[57]   The Court will be allowing the testimony of a defense expert psychologist on the concept of confirmation bias[58]; as compared to that expert, Mr. Hoerricks does not have the same knowledge, skill, experience, training, or education in the field of confirmation bias.  Thus, while Mr. Hoerricks has extensive qualifications in the field of forensic video analysis, he does not have sufficient qualifications in the field of psychology or confirmation bias to testify as to whether other experts' opinions have been affected by confirmation bias.  Pursuant to Evidence Rule 702, he is not qualified to give expert testimony regarding confirmation bias.

### ii.    Reliability

The government asserts that Mr. Hoerricks' opinions as to the methodology and qualifications of government experts are unreliable.[59]   The government breaks this assertion down into three parts:  First, that Mr. Hoerricks "failed to reference the methods and principles" on which he relied; second, that he "fails to identify any rational foundation for his assertions"; and third, that he does not conduct his own testing using the methods

---

[57] Docket 992-1 (*curriculum vitae* of Jim Hoerricks).  The ten-hour training occurred in May of 2017 through CONCEPT Professional Training.  Docket 992-1 at 6.  CONCEPT describes itself as providing "premium online professional training in areas relevant to forensic mental health." www.concept-ce.com (last accessed July 9, 2019).  The company explains that the course Mr. Hoerricks completed, "Minimizing Bias in Forensic Decision Making," focuses on "application to mental health evaluation" and is intended for "forensic evaluators, including psychologists, psychiatrists, social workers, counselors, and other mental help professionals . . . ." www.concept-ce.com/product/self-paced-minimizing-bias-in-forensic-decision-making-fmha (last accessed July 9, 2019).

[58] See § C, *infra*, regarding Dr. Daniel Reisberg.

[59] Docket 976 at 5–7.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 13 of 36

to which he subscribes or analyze the video himself.[60]  As of the date that the government filed its motion to exclude Mr. Hoerricks' testimony, Mr. Hoerricks had only submitted one report.  However, four days after the government filed its motion, Mr. Hoerricks provided a second report, dated May 6, 2019, which indicates that he did complete his own forensic analysis of the T-1 video.[61]   The government's motion, filed on May 2, 2019, understandably does not address this second report, but the second report details the methods and technologies Mr. Hoerricks used to reach his conclusions and the foundation for his opinions.[62]  These are the same methods, technologies, and technical terminology that he contrasts with the methods, technologies, and terminology used by other experts in this case that are discussed in the April 1, 2019 report.[63]  In both of his reports, Mr. Hoerricks adequately referenced best practices standards and used a reliable foundation to reach his conclusions.

### iii.    Relevance

The government contends that Mr. Hoerricks' testimony "is irrelevant because it will not assist the trier of fact in deciding a fact or consequence at issue."[64]   The government appears to be relying heavily on the T-1 video to support its theory that Mr. Wells is guilty of the homicides:  The government has had the video reviewed, analyzed,

---

[60] Docket 976 at 6–7.

[61] Docket 992-3 (Hoerricks' May 6, 2019 report).

[62] *E.g.*, Amped Five, Video Commander, pixel dimensions, the Scientific Working Group Digital Evidence (SWGDE) Vehicle Make/Model Comparison Form, and the SWGDE Best Practices for Photographic Comparison for All Disciplines.

[63] *E.g.*, Steven Becker's use of Video Commander.

[64] Docket 976 at 3, 7–10.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 14 of 36

or enhanced by at least eight people and will undoubtedly be calling some of them as witnesses at trial[65]; has recreated the T-1 video using the Wells' Honda[66]; and has retained a Honda engineer to compare the vehicle in the T-1 video to Honda vehicles.[67] The jury will be asked to determine whether the vehicle seen in the T-1 video is the Wells' Honda. This question is entwined with the government's theory that Mr. Wells drove his wife's vehicle to the rigger shop (the T-2 building) on the morning of the homicides and is entwined with Mr. Wells' defense that it was not his wife's vehicle seen in the T-1 video. Further, the government has provided notice of its intent to introduce its own experts to testify about identification of the vehicle seen in the T-1 video,[68] which makes Mr. Wells' rebuttal expert on the same topic relevant. Mr. Hoerricks' proposed testimony as to the T-1 video thus fits the issues in this case.

The government's motion also asserts that Mr. Hoerricks' testimony "will result in confusion to the jury, and undue delay" but does not further explain this argument other than to posit that Mr. Hoerricks' analysis is "confusing" and that it would "obstruct the orderly adjudication of justice in this case."[69] Although the analysis is highly technical, its

---

[65] Chris Iber, George Skaluba, Gerald Richards, Richard Vorder Bruegge, Angelo Toglia, Neil Schmidt, Steven Becker, and Lalit Mestha.

[66] *See* Docket 1012, Attachment B (attachment under seal) (Motion to Exclude the April 19, 2012 Government Driving Experiment Video). The government made two recreations of this video, but it is unclear whether it intends to introduce both or just one of them at trial. Docket 1012 at 2 n. 1.

[67] *See* Docket 1022 (government's opposition to a defense motion to preclude the testimony of Neil Schmidt, a technical specialist at Honda).

[68] *See, e.g.*, Docket 1022 (government's opposition to a defense motion to preclude the testimony of Neil Schmidt, a technical specialist at Honda).

[69] Docket 976 at 3, 9.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 15 of 36

exclusion is not warranted based on the risk of confusion or undue delay.  The Court finds that the probative value of Mr. Hoerrick's proposed testimony is not substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or the presentation of cumulative evidence.

In summary, the motion regarding Mr. Hoerricks at Docket 976 is GRANTED IN PART and DENIED IN PART as follows:  Mr. Hoerricks may testify about the distinction between forensic image analysis and other fields, such as traffic accident reconstruction; his methodology and conclusions based on his review of the T-1 video; and his opinion as to whether government expert witnesses who analyzed the T-1 video adhered to recognized best practices guidelines and their professional qualifications (or lack thereof) that the jury should consider in weighing their testimony.  Mr. Hoerricks shall not comment on the veracity of other witnesses.  He shall not comment on whether other expert witnesses are *qualified to testify* as experts.  He shall not testify as to whether the investigative techniques used by other witnesses were tainted by confirmation bias.

### C.  Dr. Daniel Reisberg (Docket 977; opposition at Docket 993)

The defense seeks to elicit the expert testimony of Dr. Daniel Reisberg, a psychologist who chairs the psychology department at Reed College.  The defense proposes to have Dr. Reisberg testify in four areas:  (1) the concept of confirmation bias,[70] (2) the role of confirmation bias in forensic analysis and the concomitant increased risk in error when confirmation bias is present, (3) ways to avoid or minimize confirmation bias

---

[70] "Confirmation bias is 'the well-documented tendency, once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment.'" *Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1004, 1018 n. 11 (N. D. Ill. 2014), quoting Richard Posner, *How Judges Think*, 111 (2008).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 16 of 36

during investigations, and (4) how confirmation bias can affect someone's perception of visual images (such as the T-1 video and the government's proposed reenactment video).[71]   Dr. Reisberg's report explains the concept of confirmation bias, reviews the potential for confirmation bias in Mr. Wells' case (specifically whether two government witnesses who viewed the T-1 video "were compromised to some extent by confirmation bias"), outlines studies researching confirmation bias in forensic settings, and explains the risk of "top-down" effects in the courtroom.[72]

The government challenged Dr. Reisberg's testimony prior to the first trial in this case.[73]   Magistrate Judge John Roberts held a hearing on the motion and limited the scope of Dr. Reisberg's testimony "to challenging a government's expert's methodology" but reserved ruling on the final scope of the testimony for the trial judge.[74]   Dr. Reisberg did not testify in the first trial and no further rulings were made regarding the scope of his testimony.[75]   The government now challenges two areas of Dr. Reisberg's proposed testimony: The effects confirmation bias may have had on the government's witnesses who reviewed the T-1 video and the reenactment video and the effects confirmation bias may have on the judge or on the jury as they view the T-1 video and reenactment video.

---

[71] Docket 993 at 1–2.

[72] Docket 977-3.  Dr. Reisberg's report explains the "top down effect" as an analogue to confirmation bias that occurs when a person is tasked with perceiving an image (here, viewing a video).   It is the idea "that our vision is heavily influenced by our knowing what we are 'supposed to' see, and, once we have perceived a pattern in one fashion, it is extremely difficult to 'un-see' that pattern and to go back to being an objective viewer."  Docket 977-3 at 11.

[73] Docket 312.

[74] Docket 354 at 12.

[75] Docket 993 at 3.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 17 of 36

### i.    Qualifications

The government does not dispute that Dr. Reisberg is qualified to testify as an expert on confirmation bias.  The Court agrees with the parties that Dr. Reisberg is qualified to give expert testimony on the topic of confirmation bias.

### ii.    Reliability

The government asserts that Dr. Reisberg's proposed testimony regarding government witnesses Angelo Toglia and Neil Schmidt is unreliable because he "failed to apply the specific facts of Toglia and Schmidt's analysis to his proposed methodology."[76] The defense maintains that Dr. Reisberg reviewed the reports prepared by these government experts along with transcripts of their previous trial testimony.[77]  Dr. Reisberg's report from 2014 expressly evaluates the methods used by Mr. Toglia and Mr. Schmidt as they reviewed the T-1 video.[78]  Dr. Reisberg compares these methods to research scenarios where confirmation bias was demonstrated and thus applies reliable principles to the facts of this case.

At trial, sufficient evidence must be introduced to support the inference that these two government witnesses each used methods that could trigger confirmation bias.  If such evidence is introduced, Dr. Reisberg may testify about how confirmation bias and top-down effects can have an adverse effect on the reliability of a witness attempting to

---

[76] Docket 977 at 3.

[77] Docket 993 at 9.

[78] Docket 993-2 at 5–7, 9

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 18 of 36
Case 3:13-cr-00008-SLG   Document 1070   Filed 07/17/19   Page 18 of 36

identify a vehicle seen in a video. [79]   He shall not testify about his opinion as to the witnesses' credibility or the accuracy of their identification of the vehicle seen in the T-1 video.

### iii.    Relevance

The government contends that "Dr. Reisberg's opinions are not sufficiently related to the facts of this case and lack any tendency to make the existence of a fact of consequence, to wit, whether or not the video shows the defendant's vehicle, more or less probable than it would without the evidence."[80] As explained *supra* at Section (B)(iii), the government's theory of the case relies on the jury finding that the T-1 video shows Mr. Wells driving the Honda to and from the T-2 building close to the time of the homicides.  The government has retained experts, both in and out of law enforcement, to review, enhance, and/or recreate the T-1 video in order to try to persuade the jury that it shows Mr. Wells' vehicle.   The government intends to call at least some of those witnesses at trial; their testimony will likely focus on explaining how and why they have concluded that the vehicle in the T-1 video is Mr. Wells' Honda.  Dr. Reisberg's testimony challenging the reasoning of those witnesses due to confirmation bias fits with the issues in this case.  As stated by the Magistrate Judge prior to the first trial, "it would address

---

[79] It is unclear whether the defense is also seeking to have Dr. Reisberg testify regarding the effects of confirmation bias on Lalit Mestha and Steven Becker, the government's new experts for the retrial.  If so, and if Dr. Reisberg has prepared a report in that regard, it presumably has already been discovered to the government.

[80] Docket 977 at 7.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 19 of 36

factors that have an adverse effect on the reliability of the government witness's identification of a vehicle closely associated with the defendant and his alibi defense."[81]

Dr. Reisberg's report also addresses the potential effect confirmation bias would have on the Court as it reviews the videos to make evidentiary rulings.[82]  The Court agrees with Magistrate Judge Roberts that "Dr. Reisberg should not be permitted to tell the jury that the court has impeded it's [sic] ability to decide the case."[83]  It is not relevant to any fact at issue whether the jury believes that the Court's viewing of the T-1 video was affected by confirmation bias—the jury may not even know that the Court has viewed it.

Dr. Reisberg's report also addresses the effect confirmation bias and the top-down effect—the potential for jurors to see in the T-1 video only what the government tells them they are "supposed" to see—may have on jurors as they view the videos: "Jurors will not be able to set aside the ideas gained from the enhanced video, and, if these ideas are misleading, this will undermine the juror's ability to see what is actually in the raw video."[84] The defense has filed a motion seeking exclusion of the government's reenactment of the T-1 video.[85]  The Court reserves ruling as to the scope of Dr. Reisberg's trial testimony regarding the jurors' perception of that reenactment video until after the motion at Docket 1012 is decided.

---

[81] Docket 354 at 9.

[82] Docket 977-2 at 15.

[83] Docket 354 at 2.

[84] Docket 977-2 at 15.

[85] Docket 1012 (set for evidentiary hearing July 30, 2019).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 20 of 36

The Court has weighed the probative value of Dr. Reisberg's proposed testimony and finds that it is not substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or the presentation of cumulative evidence.

In summary, the motion regarding Dr. Reisberg at Docket 977 is DENIED with the following limitations:  At trial, sufficient evidence must be introduced to support the inference that government witnesses used methods that could trigger confirmation bias. If such evidence is introduced, Dr. Reisberg may testify about how confirmation bias and top-down effects can have an adverse effect on the reliability of a witness attempting to identify a vehicle seen in a video.  Dr. Reisberg shall not testify about his opinion as to the witnesses' credibility or the accuracy of their identification of the vehicle seen in the T-1 video.  Dr. Reisberg shall not comment on the possible effect confirmation bias could have on a judge reviewing the videos.  The Court reserves ruling as to the scope of Dr. Reisberg's trial testimony regarding the jurors' perception of the reenactment video until after the motion at Docket 1012 is decided.

### D.  Chris Coleman (Docket 978; opposition at Docket 994)

The defense seeks to elicit the expert testimony of Chris Coleman, a forensic scientist and employee at Forensic Analytical Sciences.[86]  In the first trial of this case, the defense called Jaco Swanepoel, who was then an employee of Forensic Analytical Sciences, as an expert.[87]  Mr. Swanepoel produced a report and testified about the nail found in Mr. Wells' tire and the "characteristics of the bullets recovered from the crime,

---

[86] Docket 978-2 at 1.

[87] Docket 978 at 2.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 21 of 36

the types of firearms potentially available that may create such characteristics, and general availability of such firearms."[88]   Mr. Swanepoel no longer works for Forensic Analytical Sciences, so for the second trial the defense seeks to have Mr. Coleman testify "regarding the work and findings of Mr. Swanepoel."[89]

The Court agrees with the parties that Mr. Coleman is qualified to give expert testimony in the field of forensic analysis.[90]  The Court finds that Mr. Coleman's proposed testimony regarding ballistics analysis is relevant as to whether Mr. Wells had access to a firearm that could have been used to perpetrate the homicides.   Mr. Coleman's proposed testimony regarding analysis of the nail found in Mr. Wells' truck tire is relevant as to the credibility of Mr. Wells' alibi.

The government challenges the admissibility of Mr. Coleman on the bases that Mr. Coleman cannot testify "as a substitute expert witness for the defense" because Mr. Swanepoel is not unavailable to testify and because it is improper to substitute Mr. Coleman for Mr. Swanepoel.[91]   The question of unavailability is not applicable here because the defense is not trying to admit *Mr. Swanepoel's* testimony on the basis that he is now unavailable.[92]   Instead, the defense is seeking to admit the testimony of Mr. Coleman, which is based at least in part on the testing done by Mr. Swanepoel.

---

[88] Docket 994 at 4–5.

[89] Docket 994 at 3.

[90] The government agrees that Mr. Coleman is a qualified forensic analyst.  Docket 978 at 6, 7.

[91] Docket 978 at 2, 3.  The parties both raise Confrontation Clause arguments and cite to Confrontation Clause caselaw.  As the government has no right to confrontation, these cases are not applicable and instead this decision is based on the Federal Rules of Evidence.

[92] Federal Rule of Evidence 804 permits hearsay testimony that was given by a witness at a prior trial if that witness is now unavailable.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 22 of 36

Federal Rule of Evidence 703 allows an expert to base his opinion on facts, data, or opinions presented to him outside of court and other than by his own direct perception so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."[93]   However, while an expert may rely on information or conclusions provided by other experts in forming an opinion, an expert "may not simply 'parrot the opinion' of another expert"[94] or act as another expert's "spokesperson."[95]   Put simply, "Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay."[96]

It is unclear from the filings in the record whether Mr. Coleman has reviewed Mr. Swanepoel's testimony and other materials in order to reach his own conclusions (which happen to match Mr. Swanepoel's conclusions) or whether he is simply acting as a conduit to convey Mr. Swanepoel's original testimony.[97]   Mr. Coleman indicates he will be relying on "the identical material provided to Swanepoel" and on "Swanepoel's testing,

---

[93] *See Matter of James Wilson Assoc.*, 965 F.2d 160, 172 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him . . . .").

[94] *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, No. C06-1750JLR, 2014 WL 1494023, at *7 n. 2 (W.D. Wash. Apr. 16, 2014).

[95] *Matter of James Wilson Assoc.*, 965 F.2d at 172–73 ("The architect could use what the engineer told him to offer an opinion within the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him—of becoming in short the engineer's spokesman.").

[96] *United States v. Tomasian,* 784 F.2d 782, 786 (7th Cir. 1986).

[97] *See* Docket 994 at 3 ("Mr. Coleman has replaced Mr. Swanepoel at FAS and will testify regarding the work and findings of Mr. Swanepoel.  He will also testify generally about issues related to the manufacture and circulation of firearms within the United States. ***  No new report exists because not a single new opinion will be offered save for the ones already stated by the prior expert.").

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 23 of 36

analysis and prior testimony" and will not offer any opinion that was not offered by Mr. Swanepoel in the prior trial.[98]

The defense states that as to the ballistics testimony, "Coleman will testify that he was informed by the report . . . to establish some of the factual and testing background that the report contained *in forming his opinion.*"[99]  However, the defense also states that Mr. Coleman "will further indicate that he is unable to formulate any new opinions about a nail originally examined by Swanepoel . . . ."[100]  Because Mr. Coleman has not produced a report detailing his own methodology and opinions, he has not met the *Daubert* standard to provide expert testimony.

In summary, the motion regarding Mr. Coleman at Docket 978 is GRANTED without prejudice for the defense to submit to the government a report authored by Mr. Coleman that contains all of his methodology and opinions **within 14 days** of the date of this order and to file with the Court a motion to reconsider **within seven days thereafter**.[101]

**E. Steven Beck (Docket 979; opposition at Docket 990)**

---

[98] Docket 994 at 3.

[99] Docket 994 at 4 (emphasis added).

[100] Docket 994 at 5.

[101] Mr. Coleman's report may not add any new opinions beyond those about which Mr. Swanepoel reported or testified.  At trial, Mr. Coleman may testify as to information in the reports upon which he relied in formulating his opinions, including Mr. Swanepoel's report, but such testimony is only admissible to explain the basis of Mr. Coleman's own opinions and not as substantive evidence.  The Court will give a limiting instruction at the time of the testimony if requested by the government.  *See United States v. Cazares*, 788 F.3d 956, 978 (9th Cir. 2015) ("We have recognized that to the extent that inadmissible evidence is reasonably relied upon by an expert, a limiting instruction typically is needed to limit the use of that evidence.").

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 24 of 36

The defense seeks to elicit the testimony of Steven Beck, a forensic audio analysis expert.[102]  In the first trial of this case, lay witness Don Rudat testified that he was walking near the building where the homicides occurred (the T-2 building) while wearing earbud headphones and listening to music.[103]  At 7:12 a.m., he heard a sound he likened to metal falling on concrete, which he thought came from the T-2 building.[104]  The defense proposes to have Mr. Beck testify in two areas:  First, adopting Mr. Rudat's observation and description of the sound as accurate, that it is likely that the sound did not come from the T-2 building but instead from a nearby water treatment facility where construction was underway.[105]  Second, that the sound Mr. Rudat described is inconsistent with the sound of multiple gunshots being fired inside the T-2 building.[106]

### i.    Qualifications

The government asserts that Mr. Beck is not qualified as an expert "in how humans react to noises such as described here."[107]  But Mr. Beck is not proposing to testify about how humans react to noises—he is proposing to testify as to the acoustic qualities of a .44 caliber gun fired multiple times inside a concrete building, how the gunshots would sound to an earwitness outside of the building, and "whether an earwitness could distinguish between the sound of a gunshot, the sounds of a metal trashcan, and sound

---

[102] Docket 990 at 2.

[103] Docket 990 at 3–4.

[104] Docket 990 at 3–4; Docket 979-2 at 3.

[105] Docket 990 at 16.

[106] Docket 990 at 8.

[107] Docket 979 at 2, 4.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 25 of 36

of a large metal tank."[108]   Mr. Beck is qualified by knowledge, skill, training, and experience in the fields of sound perception and source localization.  He has presented papers related to audio analysis of gunshot and related to the physics of earwitness accounts.[109]  He was the principal investigator and chief consulting contractor for the FBI's Forensic Audio and Video Analysis Unit on acoustic gunshot analysis for five years.[110] The fact that many of his previous studies involved reviewing existing recordings of gunfire does not mean he is unqualified as a forensic audio analyst.  Mr. Beck is extrapolating from his previous studies of recordings of gunfire and live gunfire to opine as to what acoustic properties the live gunfire in this case could have produced.  Thus, he is properly "proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation . . . ."[111]

### ii.    Reliability

The government next contends that Mr. Beck's analysis is flawed because he relies on an acoustical study of outdoor gunshots from 22 years ago, did not do any acoustical testing inside of the T-2 building, and did not consider the terrain in the area.[112] Despite these limitations, the Court finds that Mr. Beck's proposed testimony is still based on sufficient data—including the type of weapon, the relevant distances, the temperature, the witness's use of earbud headphones to listen to music, and consideration and

---

[108] Docket 979-2 at 17, 20.

[109] *E.g.*, "Physics and Psychoacoustics Related to Earwitness Accounts" and "Forensic Gunshot Acoustics."  Docket 979-1 (*curriculum vitae* of Steven Beck).

[110] Docket 979-1 at 3 (*curriculum vitae* of Steven Beck).

[111] *Daubert II*, 43 F.3d at 1317.

[112] Docket 979 at 2.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 26 of 36

calculation of sound traveling through concrete walls—even if it is not based on all possible data.[113]  Mr. Beck used tested principles and applied them to the facts in this case, he relied on peer-reviewed literature in reaching his conclusions, and the methodology underlying his conclusions is valid.  Even if the literature is old, it can still be valid.  The government's concerns regarding reliability are areas for cross-examination and do not require exclusion.

### iii.    Relevance

Mr. Beck's proposed testimony fits the issues in this case:  The jury will be asked to determine at what time the homicides occurred.  If the sound Mr. Rudat heard was one or more gunshots, this places the homicides at approximately 7:12 a.m.  This timing conforms to the government's theory—and the video purportedly showing—that Mr. Wells drove his wife's Honda to the T-2 building at 7:09 a.m. on the morning of the homicides and drove away at 7:14 a.m.[114]  However, if the sound Mr. Rudat heard was not one or more gunshots, this opens up the possibility that the homicides occurred at a different time and supports Mr. Wells' defense that he was not at the T-2 building when the homicides occurred.

---

[113] Docket 979-2 (report of Steven Beck).  The defense has explained why no testing was done inside of the T-2 building.  First, Mr. Beck "would not advocate test firing a .44 revolver inside an enclosed building like the [T-2 building] for safety concerns."  Docket 990 at 13.  Second, "the Coast Guard altered the wall configuration and fully cleaned out the building contents of the [T-2] building after the murders so the scene could not be accurately replicated for testing . . . ."  Docket 990 at 14.

[114] *See* Docket 1021-2 (sealed) and Docket 1021-3 (sealed) (timestamped video stills of vehicle).

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 27 of 36

The government maintains that Mr. Beck "is being offered solely to discredit a percipient witness's testimony."[115]  But even if this accurately described the purpose of Mr. Beck's testimony, it does not require excluding him as a witness.  Parties routinely call witnesses to challenge percipient eyewitnesses' testimony (for example, challenges to suspect line-ups or photo throwdowns and challenges to the ability of the witness to perceive what they are testifying about either due to physical limitations such as eyesight or inhibitions to their senses due to drug or alcohol use).[116]  Here the defense is challenging an earwitness's identification of a particular noise.  Notably, the defense is not utilizing Mr. Beck to discredit or disprove the character or veracity of Mr. Rudat.  Instead, the defense is adopting Mr. Rudat's explanation of what sound he heard and providing an alternate explanation for the source of the sound.[117]  The Court finds that Mr. Rudat's testimony is relevant.

The Court has weighed the probative value of Mr. Beck's proposed testimony and finds that it is not substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or the presentation of cumulative evidence.

In summary, the motion regarding Mr. Beck at Docket 979 is DENIED with the following limitations:  Mr. Beck shall not opine on Mr. Rudat's honesty or trustworthiness as a witness.  However, Mr. Beck may explain why, in his opinion, Mr. Rudat's belief that

---

[115] Docket 979 at 2.

[116] *See* K. Menninger, II, *Proof of Reliability of Eyewitness and Earwitness Testimony*, 92 Am. Jur. Proof of Facts 3d 379 (2006 ed. with 2019 update).

[117] Docket 990 at 2.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 28 of 36

the sound came from the T-2 building is unreliable insofar as human senses are fallible. In addition, prior to Mr. Beck testifying about the possible alternate source of the sound, sufficient evidence will need to be admitted that on the date and time Mr. Rudat heard the sound, construction work consistent with that sound was then being done at the water treatment facility.

## F.  Gregg McCrary (Docket 980; opposition at Docket 1002)

The defense seeks to elicit the testimony of Gregg McCrary, a crime scene and police best-practices expert.  The defense proposes to have Mr. McCrary testify in three areas: (1) explaining proper and necessary law enforcement protocols and procedures in a murder investigation; (2) identifying mistakes and "common subtle traps and hazards" that affect a murder investigation; and (3) discussing "cognitive biases, probability errors and organization traps to assist [the jury] in evaluating the large volume of evidence presented about the massive investigation that took place in this case."[118]

### i.      Qualifications

The government acknowledges that Mr. McCrary qualifies as an expert in the fields of crime scene analysis and police practices.[119]  The Court agrees with the parties and finds that Mr. McCrary is qualified as an expert in these areas.  However, the government asserts that Mr. McCrary "is not qualified to render expert opinions in the psychological and social science fields," specifically in "the complex social and/or psychological science surrounding cognitive biases" such as "tunnel vision," "confirmation bias," "anchor traps,"

---

[118] Docket 1002 at 12.

[119] Docket 980 at 4.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 29 of 36

and "groupthink."[120]  The government contends that the defense "erroneously characterize[s] the distinct expert fields of psychology, social sciences and any other cognitive biases as everyday perceptions in conducting law enforcement."[121]

Mr. McCrary is not a psychologist and his psychology-based experience at the FBI focused on researching violent criminal behavior, not the behavior or psychology of law enforcement investigators.[122]  However, he has a master's degree in psychological services, teaches a graduate level forensic psychology course at Marymount University that includes coursework about defining cognitive biases,[123] and has presented to multiple professional associations about criminal investigation failures.[124]  Mr. McCrary also has extensive experience and training in the area of police practices and investigation failures.[125]  Because knowledge of psychological impediments to successful investigations (*e.g.*, tunnel vision, anchor traps, and confirmation bias) is intertwined with the specialized knowledge of best practices and investigation failures, the Court finds that Mr. McCrary is qualified to testify as an expert on the topics of investigation best practices, investigation failures, and the psychological effects that can lead to investigation failures.[126]

---

[120] Docket 980 at 2–5.

[121] Docket 980 at 4.

[122] *See State v. Essa*, 955 N.E.2d 429, 448 (Ct. App. Ohio 2011) ("According to McCrary, the behavioral-science unit was developed in order to understand how people commit crimes, what motivates them to commit crimes, and how they get away with committing crimes.").

[123] Docket 1002 at 8.

[124] Docket 980-3 (*curriculum vitae* of Gregg McCrary).

[125] Docket 980-3 (*curriculum vitae* of Gregg McCrary).

[126] The district court for the Northern District of Illinois recently found that Mr. McCrary did not

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 30 of 36

### ii.    Reliability

The government asserts that Mr. McCrary's generalized opinion regarding professional standards for investigation is not reliable because he has not "considered any facts surrounding the methodology undertaken by the law enforcement officer in investigating this case, or the government's expert witnesses during the respective analyses of certain evidentiary materials."[127]  However, it appears that the defense is not offering Mr. McCrary to opine on the actual investigation done in this case but instead to give generalized information to the jury so that the jury has context for (the anticipated) defense argument that the investigation was flawed.  Mr. McCrary relied on published statistics and articles in his report about common causes of investigation failure.  His opinions are based on principles that he maintains are reliable and that the government may freely challenge through cross-examination.

### iii.    Relevance

The government asserts that Mr. McCrary's proposed testimony "is irrelevant as it will not assist the trier of fact in deciding a fact or consequence at issue" because he is

---

have the psychological qualifications to testify about false confessions in a wrongful conviction case.  In its pretrial ruling regarding the scope of Mr. McCrary's testimony, the district court concluded that Mr. McCrary's "'field' is police practices, not the complex social science of false confessions and coercive investigations." *Harris v. City of Chicago*, 2017 WL 3193585 at *4, Case No. 15-C-4391 (N.D. Ill. July 27, 2017).  On a motion for a new trial, the district court upheld its prior ruling, reasoning that Mr. McCrary "is not a social scientist and has not contributed to the study of coercive interrogations and false confessions.  Instead, [Mr.] McCrary's police practices expertise includes crime scene analysis, criminal behavior, and violent crime." *Harris v. City of Chicago*, 2018 WL 2183992, Case No. 14-C-4391 (N.D. Ill. May 11, 2018) (Memorandum Opinion and Order regarding plaintiff's motion for a new trial).  In contrast to the lack of qualifications to testify about false confessions, here Mr. McCrary proposes to testify about psychological effects—tunnel vision, anchor traps, and confirmation bias—that are a subcategory of a field he is well qualified in: investigative failures.

[127] Docket 980 at 7.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 31 of 36

proposing to give only generalized testimony as to how a criminal investigation may focus on the wrong suspect or lead to a wrongful conviction and does not offer any opinion as to the specific practices employed in the investigation of this case.[128]

As the government explains, Mr. McCrary's report reads like an article and makes no mention of Mr. Wells' case specifically.[129]  In a wrongful-conviction civil case in which Mr. McCrary testified, the Seventh Circuit noted that "[e]xpert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether [law enforcement's] deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights."[130]   Although the Seventh Circuit was considering a constitutional tort claim, the same principle applies to a jury in a criminal trial:  A jury cannot be expected to have prior, personal knowledge of proper law enforcement practices or techniques.

The advisory note to Evidence Rule 702 "recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."[131]  "[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."[132]  When an expert

---

[128] Docket 980 at 8–9.

[129] Docket 980 at 2.

[130] *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).

[131] Fed. R. Evid. 702, 1975 Notes of Advisory Committee on Proposed Rules.

[132] Fed. R. Evid. 702, Committee Notes on Rules-2000 Amendment.  The Court notes that when defending the admissibility of Dr. Meloy's testimony during the first trial and during the appeal in

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 32 of 36

gives only generalized testimony, Rule 702 still requires that "the testimony address a subject matter on which the factfinder can be assisted by an expert" and "'fit' the facts of the case."[133]   Here, Mr. McCrary's testimony may help the jury determine a baseline for evaluating whether the homicide investigation met professional standards or was otherwise impaired, in support of the defense theory that law enforcement incorrectly focused on Mr. Wells as a suspect.   Because the defense theory centers around the adequacy of the investigation, generalized discussion of investigative best practices is relevant even without specific reference to the investigation done in Mr. Wells' case.

The Court has weighed the probative value of Mr. McCrary's proposed testimony and finds that it is not substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or the presentation of cumulative evidence.

In summary, the motion regarding Mr. McCrary at Docket 980 is DENIED with the following limitation:  Mr. McCrary shall not make any reference to the investigation in Mr. Wells' case or apply general principles to the Wells investigation.

## III.    Conclusion

In light of the foregoing, IT IS ORDERED that:

- **The motion regarding Dr. Dietz at Docket 975 is DENIED with the following limitations:**  Dr. Dietz may testify about workplace violence and his critiques of

---

this case, "[t]he Government also relied, then and now, on the advisory committee's note to the 2000 amendments to Rule 702, providing that it might 'be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.'" *United States v. Wells*, 879 F.3d 900, 915 (9th Cir. 2018).

[133] Fed. R. Evid. 702, Committee Notes on Rules-2000 Amendment.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 33 of 36
Case 3:13-cr-00008-SLG   Document 1070   Filed 07/17/19   Page 33 of 36

Mr. Morton's methodology and conclusions.  If Mr. Morton's testimony at trial does not address all that is permitted by the Court's ruling on the Morton motion *in limine*, the Court may narrow Dr. Dietz's testimony correspondingly.  Regardless of Mr. Morton's testimony, Dr. Dietz shall not refer to Dr. Meloy or his critiques of Dr. Meloy's prior report or testimony.

- **The motion regarding Mr. Hoerricks at Docket 976 is GRANTED IN PART and DENIED IN PART as follows:**  Mr. Hoerricks may testify about the distinction between forensic image analysis and other fields, such as traffic accident reconstruction; his methodology and conclusions based on his review of the T-1 video; and his opinion as to whether government expert witnesses who analyzed the T-1 video adhered to recognized best practices guidelines and their professional qualifications (or lack thereof) which the jury should consider in weighing their testimony.   Mr. Hoerricks shall not comment on the veracity of other witnesses.  He shall not comment on whether other expert witnesses are *qualified to testify* as experts.  He shall not testify as to whether the investigative techniques used by other witnesses were tainted by confirmation bias.

- **The motion regarding Dr. Reisberg at Docket 977 is DENIED with the following limitations:**  At trial, sufficient evidence must be introduced to support the inference that government witnesses used methods that could trigger confirmation bias.  If such evidence is introduced, Dr. Reisberg may testify about how confirmation bias and top-down effects can have an adverse effect on the reliability of a witness attempting to identify a vehicle seen in a video.  Dr. Reisberg shall not testify about his opinion as to the witnesses' credibility or the accuracy of

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 34 of 36

their identification of the vehicle seen in the T-1 video.  Dr. Reisberg shall not comment on the possible effect confirmation bias could have on a judge reviewing the videos.  The Court reserves ruling as to the scope of Dr. Reisberg's trial testimony regarding the jurors' perception of the reenactment video until after the motion at Docket 1012 is decided.

- **The motion regarding Mr. Coleman at Docket 978 is GRANTED** without prejudice for the defense to submit to the government a report authored by Mr. Coleman that contains his methodology and opinions **within 14 days** of the date of this order and to file with the Court a motion to reconsider **within seven days thereafter**.[134]

- **The motion regarding Mr. Beck at Docket 979 is DENIED with the following limitations:**  Mr. Beck shall not opine on Mr. Rudat's honesty or trustworthiness as a witness.  However, Mr. Beck may explain why, in his opinion, Mr. Rudat's belief that the sound came from the T-2 building is unreliable insofar as human senses are fallible.  Prior to Mr. Beck testifying about the possible alternate source of the sound, sufficient evidence will need to be admitted that on the date and time Mr. Rudat heard the sound, construction work consistent with that sound was then being done at the water treatment facility.

- **The motion regarding Mr. McCrary at Docket 980 is DENIED with the following limitations:**  Mr. McCrary shall not make any reference to the investigation in Mr. Wells' case or apply general principles to the Wells

---

[134] Mr. Coleman's report may not add any new opinions beyond those previously articulated by Mr. Swanepoel.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 35 of 36

investigation.

Both parties should seek to elicit testimony from their experts that can reasonably be found within the four corners of the testifying expert's report.  If an expert begins testifying to matters that cannot be fairly derived from the report, the Court will entertain objections based on unfair extrapolation.

Both parties must comply with this order, and any application to modify the terms of this order shall be made outside the presence of the jury.[135]

DATED this 17th day of July, 2019, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[135] Although the Court has made Evidence Rule 403 findings in this order, the Court does not intend these findings to preclude objections to specific questions or testimony at trial based on Evidence Rule 403 or on any other basis.

Case No. 3:13-cr-00008-SLG, *United States v. Wells*
Order Re: Motions *in Limine* to Exclude Defense Expert Witnesses
Page 36 of 36