Eugene P. Ramirez (State Bar No. 134865)
  *eugene.ramirez@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
  *kayleigh.andersen@manningkass.com*
Angela Brunson (State Bar No. 189223)
  *Angela.Brunson@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEFFON BARBER, an individual, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF SAN BERNARDINO, a municipal entity, DEPUTY CHRISTOPHER ALFRED, an individual, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 5:22-cv-00625-KK-DTBx <br><br> *[District Judge, Kenly Kiya Kato, Magistrate Judge, David T. Bristow]* <br><br> **DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS** <br><br> *Filed concurrently with:* <br> *1. Memorandum of Points and Authorities In Opposition to Plaintiff's Motion for Attorney's Fees;* <br> *2. Declaration of Kayleigh Andersen and Exhibits; and* <br> *3. Request for Judicial Notice* <br><br> Judge:  Hon. Kenly Kiya Kato <br> Date:   May 7, 2026 <br> Time:   9:30 a.m. <br> Crtrm.: 3; 3rd Floor |

1

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS FEES; AND EXHIBITS**

# DECLARATION OF GERALD KNAPTON

I, Gerald Knapton, declare as follows:

1.      I am a senior partner at of the law firm Ropers, Majeski APC.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.  I make this declaration in support of Defendants County of San Bernardino and Deputy Christopher Alfred's Opposition to the Plaintiff Steffon Barber's ("Plaintiff's" or "Barber's") Motion for Attorney's Fees.

2.      My background, qualifications as an expert on attorneys' fees issues, and relevant experience are fully set forth in **Exhibit 1**. In brief, I received my undergraduate education at Brown University and the University of California, Berkeley. I obtained my JD from the School of Law at the University of California, Los Angeles. Today, I am a senior partner of the law firm Ropers, Majeski APC, which has offices in Los Angeles (where I am based), Costa Mesa, Seattle, San Francisco, Menlo Park, San Jose, Las Vegas, New York City, Boston, and Paris. I am licensed and admitted to practice law before all courts of the State of California (since 1977), before all federal District Courts sitting in California, and before the United States Courts of Appeals for the 9th and 3rd Circuits.

3.      For over 30 years, in connection with hundreds of litigation matters, I have opined as an expert on the reasonableness and necessity of attorneys' fees. My work as an attorneys' fees expert frequently involves reviewing legal invoices and supporting work product. I have personally reviewed thousands of invoices for legal work, including numerous matters based in Los Angeles and Orange County, totaling far in excess of $6 billion in fees. I have opined as an attorneys' fees expert in all variety of matters, including civil rights involving claims of excessive use of force in federal and California state actions.  I have qualified and testified as an

1

DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS

attorneys' fees expert in many lawsuits, including, as here, civil rights violations including claims of excessive use of force, under federal and California state law.

4.    I have also acted as an attorneys' fees expert for many other kinds of litigation, in both individual business disputes and class-action overtime cases, commercial disputes, consumer products cases, wage and labor matters, individual and class actions involving statutory interpretation, pharmaceutical cases, patent-infringement suits, intellectual-property matters, environmental-contamination and compliance matters, notice-compliance matters (for "clean water act" and "catalyst" cases), accounting cases, retail-credit compliance litigation, truth-in-lending lawsuits, discrimination lawsuits, Brown Act matters, FEHA matters, FSLA lawsuits, and a wide variety of individual actions.

5.    My client base is similarly diverse and expansive. I have been retained as an attorneys' fees expert by law firms, judges (in bankruptcy matters), corporations, partnerships, insurance companies, cities, counties, State of California, trustees, plaintiffs, defendants, and individuals at both the trial and appellate level. About half the time, I am retained to offer my opinion in support of a fee request; in the other half, I am engaged to offer my opinion in opposition to a fee request. Thus I have seen the time and fees from both sides of fee motions. Our time is billed by the hour with no contingency or bonus depending on the outcome. My time is billed at $1,325 per hour. I do not accept projects if I cannot offer my honest opinion on the matter.

6.    In some cases, I only review hourly rates for "reasonableness" in light of the work performed and comparable market rates. In other cases, I also review invoices and work product submitted as part of a settlement or a motion for attorneys' fees. I have performed each type of analysis in dozens of cases for various clients, and I have reviewed hundreds of motions for attorneys' fees and their supporting invoices, many based on "attorneys' fee provisions," codes,

2

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

statutes, or common law doctrines. Because of this work, I have deep experience and knowledge regarding the rack rates and discounted rates charged for personal injury litigation work in state and federal Los Angeles and Orange County courts. I have similarly deep experience and knowledge regarding the reasonable amount of time needed to accomplish litigation and trial-related tasks as well as related appeals.

7.    I write and lecture frequently on the issue of determining reasonable legal fees in fee-shifting matters. My articles have been featured in the American Bar Association Magazine, National Law Journal, California Lawyer, Los Angeles Daily Journal, Law360, and numerous other publications.

8.    I have qualified and testified in person as an attorneys' fees expert on more than 70 occasions before juries and judges (including two in the Central District), and have offered my declarations dozens of times to Central District federal and California courts evaluating a request for fees under many kinds of fee-shifting mechanisms.

9.    I was retained by Defendants to prepare my expert opinion on the reasonableness and necessity of the legal fees for Plaintiff's counsels' work in this matter.

**INTRODUCTION AND SUMMARY OF CONCLUSION**

10.    My understanding of the facts is that Plaintiff's action arose out of an incident with Deputy Alfred on April 27, 2021 in Adelanto, CA.  Deputy Alfred started to walk south onto the driveway of the residence so he could speak with Mr. Barber. The narrow driveway was approximately 96 feet long. The east side of the driveway was enclosed with wrought iron and chain link fencing, which varied in height from five to six feet. There were no openings along the fence line. The west side of the driveway was enclosed by a chain link fence, a residence wall, and a wooden fence, approximately five feet high, with one gate opening. As Deputy

3

Alfred walked toward Barber, he gave verbal commands for Barber to show his hands and walk toward him. Barber was uncooperative and would not comply with Deputy Alfred's commands. Deputy Alfred ordered Barber not to go to his vehicle, a 2003 black Chevrolet Trailblazer, and told Barber to walk towards him. Barber refused to comply and reached inside the vehicle. At that time, Deputy Alfred drew his duty weapon and held it at a low ready position. Barber then got into the driver's seat of the vehicle. Deputy Alfred was standing approximately eight to ten feet north of Barber's vehicle. Deputy Alfred was located behind Barber's vehicle. Barber revved the engine, put the vehicle in reverse, and accelerated rapidly towards Deputy Alfred. Due to the narrowness of the driveway and the surrounding fencing, Deputy Alfred did not believe he had any avenue of escape. As the vehicle accelerated toward him, Deputy Alfred feared for his life. Deputy Alfred raised his duty weapon from a low ready position and fired six rounds at Barber's vehicle. Barber was struck by gunfire and the vehicle came to a stop. After the lethal force encounter, Deputy Alfred requested medical aid respond to the location. Barber was transported to the hospital. Barber sustained a gunshot wound to the top of his head. Barber underwent surgery for his injuries.

11. As a result of this incident, the San Bernardino County Sheriff's Department, Victor Valley Sheriff Station, submitted a case to the San Bernardino County District Attorney's Office to review for potential criminal charges against Barber. Criminal charges were filed against Barber in San Bernardino County Superior Court case number FVI21001312. There were two counts alleged in the felony criminal complaint. Count 1 of the criminal complaint alleged a violation of Penal Code Section 664/187(a) Attempted Murder of a Peace Officer. Count 2 of the criminal complaint alleged a violation of Penal Code Section 245(c) Assault Upon a Peace Officer. (San Bernardino County District Attorney's Office Public Information Release Memorandum October 31, 2022, attached as **Exhibit 2** and on-

4

line San Bernardino Superior Court case information for case FVI21001312).

12. Barber was convicted following jury trial on 12/16/24 of Penal Code § 245(a)(1)-F, Assault with Deadly Weapon Not Firearm or Force: Great Bodily Injury Likely and then sentenced to 13 years in state prison on 6/20/2025. (On-line San Bernardino Superior Court case information for case FVI21001312).

13. On April 12, 2022, Barber filed his civil rights action against the County of San Bernardino and Deputy Alfred. The parties mutually requested a stay in the suit pending the resolution of Barber's criminal case. By order of the court, the suit was stayed from July 27, 2022 to December 19, 2024.

14. Trial in the civil matter commenced on Friday, January 30, 2026 and lasted seven days. Plaintiff called his first witness on the second day, Monday, February 2, 2026 and rested after five witnesses on the third day, on Tuesday, February 3, 2026. Defendants rested after five witnesses on the fifth day, on Thursday, February 5, 2026. The jury was charged on the fifth day, on Thursday, February 5, 2026.

15. Barber was very badly injured in the incident and the jury found in his favor on five questions: excessive use of force, violation of the Bane Act, battery, negligence and intentional infliction of emotional distress. The jury found in favor of the County of San Bernardino on Barber's *Monell* claim. On the negligence count, the jury put responsibility at 64% Alfred and 36% Barber. The damages found were $7,250,000 for past pain & suffering; $18,250,000 for future pain & suffering; and $1,850,000 for future economic loss. The total judgment entered in favor for Barber was $27,350,000.

16. This matter now comes before the Court for determination of reasonable fees for the litigation.

17. I understand that fees will be sought from Defendants under 42 U.S.C. § 1988, which authorizes fees only "in any action or proceeding to enforce a

5

MANNING | KASS

provision of section[] … 1983." 42 U.S.C. § 1988 and California Civil Code § 52.1(a) in the amount of $3,679,030 and a 2.0 multiplier to the statutory attorneys' fees pursuant to California Civil Code § 52.1 and § 52(a) for a total amount of $7,358,060.

18.     Plaintiffs propose an award of attorneys' fees for 3,512.60 hours of time for 6 attorneys for work from 7/23/2021 to 3/25/26.  Dale K. Galipo and Renee V. Masongsong, attorneys from the Law Firm of Dale K. Galipo, produced timekeeping records by line item.[1]  Darci Gilbert, a legal assistant from the Law Firm of Dale K. Galipo also produced a timekeeping record by line item.[2]  Rodney S. Diggs, Ryan Duckett, and Brandon R. Tanter, attorneys from the law firm of Ivie McNeill Wyatt Purcell & Diggs ("Ivie") produced timekeeping records by both line item and phases of litigation.[3]  The paralegal, Alice D. Williams, and the legal secretary/assistants, Le Chaune Metoyer and Alexandria Feather from Ivie also produced timekeeping records by both line item and phase of litigation.[4]  James Bryant from The Cochran Firm California did not file a declaration or any timekeeping records.

19.     Based on my review of the records in this matter, it is my opinion that the reasonable and necessary fees lodestar for the work by counsel for Plaintiff is $1,683,201 for 2,310.55 hours of time.

The Standard to Apply:

20.     To determine a "reasonable attorney's fee," courts employ the "lodestar" method.  *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

---

[1] Dkts. 211-2, 211-14.

[2] Dkt. 211-19.

[3] Dkt. 213-1.

[4] *Id.*

6

"The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Id.*

21. "The burden is on plaintiffs to prove up their fees. "The party seeking fees bears the burden of documenting the hours expended in the litigation and must submit evidence supporting those hours and the rates claimed." *Welch v. Metro. Life Ins. Co*., 480 F.3d 942, 945-46 (9th Cir. 2007).

22. The Ninth Circuit has adopted a multi-part test for evaluating a request for reasonable legal fees, costs and expenses from one's opponents:

> In a case presenting a similar situation, *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), the Fifth Circuit found it necessary to vacate the award of attorney's fees and remand for reconsideration in light of the following guidelines: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. These guidelines are consistent with those recommended by the Code of Professional Responsibility of the American Bar Association, Disciplinary Rule 2-106.
>
> We adopt these guidelines as appropriate factors to be considered in the balancing process required in a determination of reasonable attorney's fees. The failure to consider such factors constitutes an abuse of discretion.

*Kerr v. Screen Extras Guild, Inc*., 526 F.2d 67, 69-70 (9th Cir. 1975)

23. It is my understanding and assumption that most of the twelve "*Kerr*

7

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

Factors" remain in use in this Circuit:

> Whether these factors require an increase of the lodestar amount is for the district court to decide in the first instance on remand. We agree, however, that the court's failure explicitly to consider the Kerr "reasonableness" factors, as well as the delay and risk factors, was an abuse of discretion.

*Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016).

24. Enhancements are allowed for four reasons by California law:

> Under *Serrano III*, the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. [*Serrano v. Priest*, 20 Cal. 3d 25, 42, 569 P.2d 1303 (1977)]. The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.

*Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).

Summary of opinion:

25. Some of time is for the handling of the criminal matter and for Monell claims. One person (James Bryant) submits no detail about his claimed 591.6 hours of work. After deducting those hours the balance of time is 2,310.55 hours and a lodestar for that time is $1,683,201

Staffing:

26. Plaintiff's criminal case was handled by the Mr. Diggs, Ms. Williams, Ms. Metoyer, and Mr. Duckett.

8

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

27. Plaintiff's civil case was handled by Mr. Galipo, Ms. Masongsong, Ms. Gilbert, as well as Mr. Diggs, Ms. Williams, Ms. Metoyer, and Mr. Tanter. However, during trial, Mr. Galipo handled opening and closing statements examination and cross-examination of all witnesses except for the direct examination of Plaintiff.

28. Here, listed by firm, is a table of the team's hours and **requested** fees, including the fees requested for work on Barber's criminal defense and civil rights suit.

| Firm | Timekeeper | Hours | Rate | Total |
|---|---|---|---|---|
| Law Firm of Dale K. Galipo | Galipo | 405.9 | $1.500 | $608.850 |
| | Masongsong | 250.1 | $900 | $225.090 |
| | Gilbert | 43.7 | $250 | $10.925 |
| | | | | |
| Ivie McNeill Wyatt Purcell & Diggs | Diggs | 1.249 | $1.250 | $1.561.250 |
| | Duckett | 214.85[5] | $900 | $193.320 |
| | Tanter | 297 | $650 | $193.050 |
| | Williams | 260.1 | $450 | $117.045 |
| | Metoyer | 119.5 | $150 | $17.925 |
| | Feather | 80.5 | $150 | $12.075 |
| | | | | |
| The Cochran Firm California | Bryant | 591.6[6] | $1,250 | $739,500 |

**HOURLY RATES**

*The background of the Plaintiff's lawyers:*

29. According to the California Bar on-line records I read, the lawyers for the Plaintiff are all admitted to practice law as shown below. Non-attorney staff show a bar number and admission date of "N/A".

//
//
//
//

---

[5] Actual total is 218.85 hours for his time.

[6] No details supplied.

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

30.    The timekeepers admission dates:

| Firm | Timekeeper[7] | Role | SBN | Admitted |
|---|---|---|---|---|
| Law Firm of Dale K. Galipo | Dale K. Galipo | Partner | 144074 | 12/11/1989 |
| | Renee V. Masongsong | Associate | 281819 | 1/4/2012 |
| | Darci Gilbert | Paralegal | N/A | N/A |
| Ivie McNeill Wyatt Purcell & Diggs | Rodney S. Diggs | Partner | 274459 | 12/6/2010 |
| | Ryan Duckett | Associate | 288750 | 1/22/2013 |
| | Brandon R. Tanter | Associate | 351037 | 11/21/2023 |
| | Alice D. Williams | Paralegal | N/A | N/A |
| | Le Chaune Metoyer | Legal secretary | N/A | N/A |
| | Alexandria Feather | Legal secretary | N/A | N/A |

## THE RULES FOR RATES AND FEES

31.    I understand that the settled and established guidance of the Ninth Circuit (and thus for this Court and me) on what rates to apply in fee-shifting situations is this: "The established standard is the 'rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.'" *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986)." *Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir. 1997).

***This is a contingency fee retention:***

32.    I am informed that these lawyers are not charging for their time on an hourly basis for this matter. The lawyers took this matter on a contingency fee basis and they will be compensated by the amount of fees that are awarded by the Court for the reasonable time as well as by some percentage of the total recovery.

33.    I review legal bills almost every day and, because of this, I have an understanding of what rates are paid for the Los Angeles area for legal work over the period at issue from 2014 to the present time. While I have personally reviewed far more than $6 billion in fees and have come to know what rates are being paid

---

[7] As set forth above, James Bryant from The Cochran Firm California did not file a declaration in support of Plaintiff's Motion for Attorney's Fees. *See, generally*, Docket.

10

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

for legal work, it is also helpful to have another objective source of information for rates. I have come to distrust most rate surveys if other, more reliable and relevant information is available. And one is.

**Real Rate Report**

34.    Starting in 2010 the TyMetrix/LegalVIEW actual "anonymized" billing data has been assembled and published each year by the Wolters Kluwer ELM Solutions company.  The data is gathered for the most part from the TyMetrix360° electronic invoicing system. I subscribe to those Reports.

35.    In years past I have used the TyMetrix system for my own invoicing, and I also worked directly with the TyMetrix program managers on a very large project. During that project I came to understand exactly how the program worked and the steps that they took to verify the accuracy of their data. I am now familiar with the way the TyMetrix electronic billing system works, based on a set of rules that must be followed.  The program requires that a set of rules with budgets, staffing and rates be agreed to by the law firm before the system will allow an invoice to be processed. If there are discounts (which is quite common) those discounts are factored in to the budget and rate data shown. Once the invoices are submitted the program processes the invoice for compliance with the agreed-upon rules and recommends a payment to be made by the client.  The payment data on hourly rates is what is captured by the Real Rate Report.

36.    We must seek to find hourly rates for "similar work" and that is litigation work.  This is one of the categories for which hourly rate data for work through the end of 2025 is shown in the "2025 Real Rate Report" ("2025 Report"). The relevant excerpts of the 2025 Report is attached as **Exhibit 3**. It is said to be a more than  $200 billion-dollar database (Exhibit 3 at pp. 4-5).

37.    The data in the 2025 Report is less than six months old now assuming that the fee hearing for this motion is in May 2026.

11

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

38. The Ninth Circuit has approved the use of the Real Rate Report as a helpful source for rates in *LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608 (9th Cir. 2026).

***Many Central District Courts Accept the Real Rate Report:***

39. Many Los Angeles trial courts have agreed with me that this Report is a useful tool: "The Court also turns to the 2016 Real Rate Report: Lawyer Rates, Trends, and Analysis ("the Real Rate Report") as a useful guidepost to assess the reasonableness of these hourly rates in the Central District. *See Eksouzian v. Albanese*, No. CV 13-728 PSG (AJWx), 2015 WL 12765585, at *4-5 (C.D. Cal. Oct. 23, 2015). The Real Rate Report identifies attorney rates by location, experience, firm size, areas of expertise, and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than 80 companies. *See Hicks v. Toys 'R' Us-Del., Inc.,* No. CV 13-1302 DSF JCG, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014). Courts have found that the Real Rate Report is "a much better reflection of true market rates than self-reported rates in all practice areas." *Id*. at *1; *see also Tallman v. CPS Sec. (USA), Inc*., 23 F. Supp. 3d 1249, 1258 (D. Nev. 2014) (considering the Real Rate Report); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 894 F. Supp. 2d 415, 433 (S.D.N.Y. 2012) (same). *Grant & Eisenhofer, P.A. v. Brown*, No. CV175968PSGAFMX, 2018 WL 4945303, at *2 (C.D. Cal. May 14, 2018).

40. While not every court has accepted it, many experienced judges in the Central District have found the Real Rate Report to be useful. For example:

**Hon. Kenly Kiya Kato:** "Courts also consider data from the Real Rate Report, a Wolters Kluwer publication identifying attorney rates by location, experience, firm size, areas of expertise, and industry based on invoices submitted by law firms." (citations omitted).

12

*Shapiro v. Pemmasani*, 2024 U.S. Dist. LEXIS 236146, *12 (July 23, 2024).

**Hon. Stephen V. Wilson**: "Plaintiff bases his request for a reasonable hourly rate on the 2024 Wolters Kluwer Real Rate Report ("the Report"). MAF at 10. The Report "is a widely accepted measure of attorney's fees for the location they are based in" and "relies on similarly charged rates for Los Angeles." Id. The Report divides reasonable hourly rates for litigation and non-litigation partners and associates in the Los Angeles area into a "first quartile," [*7]  "median," and "third quartile." Whalen Decl. at ¶ 18-19. The Report does the same for paralegals. Id. at ¶ 20. The Court will use the Report's median hourly rates to determine the reasonable rate for Plaintiff's attorney services.

*Aung v. Watts*, 2025 U.S. Dist. LEXIS 216465, *6-7 (August 7, 2025).

**Hon. Michael W. Fitzgerald**: "As such, the Court concludes that the following three sources are particularly persuasive; (1) a recent Central District case considering the reasonable rate for Mr. Margarian in a highly similar action (which neither party saw fit to identify for the Court in their briefs); (2) Plaintiff's declaration explaining his experience and non-contingent rate charged to paying clients; and (3) the 2022 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices ("Real Rate Report"), published by Wolters Kluwer".

*Matevosyan v. Mercedes-Benz USA, LLC*, 2023 U.S. Dist. LEXIS 213774, *11  (July 10, 2023)

**Hon. George H. Wu** has accepted the Real Rate Report in at least 3 matters: *Nisbet v. Am. Nat'l Red Cross*, #2-16-cv-7342-GW (ASx) Docket 136 at 14, n.12 (June 7, 2018)).  *Harrison v. Archdiocese of Los Angeles* 2:13-cv-8257 GW (SSx), Docket #115 at 9-10 (May 7, 2015).  *In Housing Works v County of Los Angeles*, 2:15-cv-08982 GW-RAO, Judge Wu made these comments on July 12, 2018 in his written tentative:

13

The Court finds that the Real Rate Report provides objective empirical data that serves as a better benchmark of reasonableness than scouring a litany of cases from within and outside the judicial district." [Also citing the *Downey Surgical Clinic matter Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*, 2016 WL 5938722, at *11 (C.D. Cal. May 16, 2016) ("Courts have found that the Real Rate Report is a much better reflection of true market rates than self-reported rates in all practice areas.") Alexa CURTIN, Plaintiff, v. COUNTY OF ORANGE; Nicholas Lee Caropino, individually and as Deputy  Sheriff for the County of Orange; and Does 1 through 50, Defendants., 2017 WL 3834631 (C.D. Cal.) No. 8-cv-00591- SVW- PLA (filed 8/27/2017)."]

**Hon. Dale S. Fisher**: "The Real Rate Report is more persuasive and gives a better reflection of true market rates than the National Law Journal survey because the National Law Journal Survey only lists the rates charged by the 350 largest national law firms according to the firm's advertised rates. The Real Rate Report, however, is based on actual legal billing, matter information, and paid and processed invoices. *Don v. Unum Group*, 13-4502 DSF (VBK), 2016 WL 6804920 at *7-*8 (C.D. Cal. July 5, 2016); *Rivas v. ESA Mgmt. LLC*, No. 14-5767 DSF (AS), 2016 WL 7647670 at *2 (C.D. Cal. Apr. 28, 2016); *Cappuccio v. Pepperdine Univ.*, No. 13-3125 DSF (AJW), 2014 WL 12573366 at *3–*4 (C.D. Cal. Sept. 17, 2014); *Hicks v. Toys 'R' Us-Delaware, Inc.*, Nos. 13-1302-DSF (JCG), 13-01159 DSF (JCG), 2014 WL 4670896 at *1" (C.D. Cal. Sept. 2, 2014).

**Hon. Philip S. Gutierrez**:  "The Court turns to the Real Rate Report as a "useful guidepost" in assessing the reasonableness of hourly rates in the Central District. It is persuasive and a better reflection of true market rates than self-reported rates in all practice areas.  Real Rate Report identifies attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas. *Zielke v. Rosenstiel*, 19-702 PSG (EM), 2019 WL 1718681 at *2

14

(C.D. Cal. Mar. 25, 2019); *Salazar v. Midwest Servicing Group, Inc.*, 17-0137 PSG (KS), 2018 WL 4802139 at *6–*7 (C.D. Cal. Oct. 2, 2018); *Grant & Eisenhofer, P.A. v. Brown*, No. 17-5968 PSG (AFM), 2018 WL 4945303 at *2 (C.D. Cal. May 14, 2018); *Sang Yong v. Torrance Unified School Dist.*, 17-5914 PSG (PLA), 2018 WL 6185986 at *7 (C.D. Cal. Feb. 23, 2018); *Tom v. Com Dev USA, LLC*, 16-1363 PSG (GJS), 2017 WL 10378629 at *7–*8 (C.D. Cal. Dec. 4, 2017); *Retta v. Millennium Products, Inc.*, Nos.15-1801 PSG (AJW), 16-3780 PSG AJW, 2017 WL 5479637 at *12" (C.D. Cal. Aug. 22, 2017).

**Hon. S. James Otero**: "The Court found the requested rates were reasonable using the Real Rate Report, declarations from counsel, and the Court's own knowledge of reasonable rates in the district. *Mkay Inc. v. City of Huntington Park*, 17-01467 SJO (AFM), 2019 WL 1751823 at *3" (C.D. Cal. Mar. 7, 2019)

41.    The 2025 Real Rate Report is the most recent iteration of the Real Rate Report it covers legal work through the end of 2025.  The explanation of how the rate data is derived is contained in pages is summarized on page 256 of Exhibit 3:

- "Data in DynamicInsights is taken from invoice line-item entries contained in invoices received and approved by participating companies through Wolters Kluwer."

- "To capture practice area details, the matter ID within each invoice was associated with matter profiles containing areas of work in the systems of each company.  The areas of work were then systematically categorized into legal practice areas."

- "To capture location and jurisdiction details, law firms and timekeepers were systematically mapped to the existing profiles within ELM Solutions systems, as well as with public available data sources for further validation and normalization."

42.    The Report does not break out rates for paralegal time by city so we use the national rates for that category based on 3,515 examples (the "n" number). National rates paid by role (partner, associate, and paralegal) are shown on Exhibit 3's page 10 of the 2025 Report, an accurate composite of which is shown here for ease of refence:

15

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

## Section I: High-Level Data Cuts

**All**
By Role

**2025 Real Rates by Partner, Associate, and Paralegal**

**Trend Analysis - Mean**

| Role | n | First Quartile | Median | Third Quartile | 2025 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|
| Partner | 9,072 | $420 | $675 | $1,099 | $820 | $817 | $774 |
| Associate | 7,357 | $336 | $530 | $842 | $627 | $611 | $571 |
| Paralegal | 3,515 | $150 | $226 | $350 | $271 | $264 | $253 |

43. The Median rate of $226 for paralegal time was for work up to the end of 2025.

44. The rates paid for litigation work by attorneys in Los Angeles are shown on Exhibit 3's page 29 of the 2025 Report, an accurate composite of which is shown here for ease of refence:

## Section I: High-Level Data Cuts

**Cities**
By Matter Type

**2025 Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2025 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|---|---|
| Los Angeles CA | Litigation | Partner | 289 | $519 | $875 | $1,334 | $984 | $945 | $866 |
| | | Associate | 229 | $461 | $700 | $1,041 | $763 | $736 | $687 |
| | Non-Litigation | Partner | 335 | $515 | $950 | $1,377 | $1,002 | $1,005 | $949 |
| | | Associate | 312 | $504 | $740 | $959 | $759 | $744 | $681 |

45. Based on 518 examples for litigation (the "n" number), the Third Quartile litigation rate of $1,334 for partner time and $875 for the Median partner

16

time was for work up to the end of year2025.

46.     The Third Quartile litigation rate of $1,041 for associate time, $700 for the Median associate time, and $461 First Quartile associate time was for work up to the end of year 2025.

47.     Median rates are considered a robust measure of the central tendency of rates that is less affected by outliers and is the best choice for most timekeepers. Given his specialized experience and the level of publicity for the case, the $1,330 Third Quartile Rate is appropriate for only Mr. Galipo; the $875 Median Rate is appropriate for Mr. Diggs; the $700 Median Rate is appropriate for Ms. Masonsong; and the First Quartile $461 rate is appropriate for Mr. Tanter.  The $226 Median Rate is appropriate for Ms. Gilbert and Ms. Williams.

48.     I reviewed the Plaintiff's Motion for Attorney's Fees, and the Declarations of Dale K. Galipo, Renee Masongsong, and Rodney Diggs and the attached records generated by the billing software by each lawyer's respective firms to assist me in preparing this declaration.  Based on those records, it is my understanding that the some of  Plaintiff's attorneys did not allocate their prevailing time and non-prevailing time (*Monell* motion, criminal law work) but they have exercised billing judgment in several other ways. Attorney hours that were duplicative, unnecessary, or administrative in nature were either not entered by attorneys during the initial timekeeping process or were reduced during the review of the billing records done for this Motion.[8]

49.     Here is a table that shows the total time (including work on the criminal case) by each attorney and paralegal **for whom detail is provided** with fees shown at reasonable rates.

[8] Dkt. 211:10-14.

17

| Timekeeper | Hours | Work dates range | Real Rate Report Rates | Fees (Rounded) |
|---|---|---|---|---|
| Galipo | 405.9 | 6-14-25 to 3-24-2026 | $1,334 (Q3) | $541,471 |
| Masongsong | 250.1 | 7-1-2025 to 3-25-2026 | $700 (Median) | $175,070 |
| Gilbert | 43.7 | 6-4-2025 to 3-25-2026 | $226 (Median) | $9,877 |
| Diggs | 1,249.0 | 9-16-2021 to 3-18-2026 | $875 (Median) | $1,092,875 |
| Duckett[9] | 218.85 | 7-16-2024 to 6-20-2025 | $700 (Median) | $153,195 |
| Tanter | 297.0 | 11-3-2025 to 3-10-2026 | $461 (Q1) | $136,917 |
| Williams | 260.1 | 7-23-2021 to 3-10-2026 | $226 (Median) | $58,783 |
| Metoyer | 119.5 | 9-16-2021 to 3-25-2026 | $00.00* | $00.00 |
| Feather | 80.5 | 2-13-2025 to 3-25-2026 | $00.00* | $00.00 |
| Totals before adjustments | 2,924.65 | | | $2,168,188 |

*Time for clerical or secretarial work is now **not** usually billed in Los Angeles as this kind of work is usually included as "overhead" and is considered a component in the professional's hourly rates.

50.    The Median number is the mid-point of the data. The Third Quartile is another mid-point between the overall Median and the highest number in the dataset. The Median is less affected by outliers and is usually the best choice. See Exhibit 3 at page 6.

## PLAINTIFF'S CRIMINAL CASE

51.    Some the time was only for the defense of the state's criminal case against Mr. Barber and some of the time is block billed with time for both the criminal matter and the federal civil matter. Since it is the burden of the fee-seeking counsel to apportion the time I have identified those entries that are entirely or partly for the criminal matter and recommend that those not be paid.

[9] The hours for Mr. Duckett have a discrepancy as both 23.9 hours and 19.4 hours are listed for Phase 1 Criminal Case Development During Stay. 23.9 is correct.

18

MK MANNING | KASS

52. Mr. Duckett worked exclusively on the criminal case. This is a summary of Mr. Duckett's hours for work on Plaintiff's criminal defense case.

**RXD PHASE TOTALS**

| Phase | Description | Hours | Amount |
|-------|-------------|-------|--------|
| Phase 1 | Criminal Case Development During Stay | 19.40 | $17,460 |
| Phase 2 | Criminal Trial Preparation | 103.10 | $93,150 |
| Phase 3 | Criminal Trial | 61.00 | 54,900 |
| Phase 4 | Post-Sentencing & Transition | 30.90 | $27,810 |
| **RXD TOTAL** | | **214.80** | **$193,320** |

53. That shown amount is slightly off as the correct total is 218.85 hours. Mr. Duckett's fees at the adjusted rate of $700 total $153,195.

54. For the duration of the stay of the civil case from 7/27/2022 to 12/19/2024, Plaintiff also submitted the following for work by attorneys and paralegal.

| Attorney/Paralegal | Hours | Fees at reg. rates | Fees at RRR rates |
|--------------------|-------|--------------------|--------------------|
| Diggs | 270.55 | $338,188 | $236,731 |
| Williams | 45.10 | $20,295 | $10,960 |
| Totals | 315.65 | $358,483 | $247,691 |

55. Mr. Barber was convicted in the criminal matter and I understand that he is now is prison. Because Plaintiff did not prevail on the criminal case, all fees attributed to the criminal case should not be awarded, including all of Mr. Duckett's fees, and any of the fees submitted for Mr. Diggs, Mr. Tanter, and Ms. Williams for work on the criminal matter. Those total $400,886.00 at the adjusted Real Rate Report levels.

56. Unfortunately, fees submitted by both Mr. Diggs and Mr. Duckett include several line items which include improper combination of tasks related to both Plaintiff's criminal and civil cases. Not only is this improper as the Plaintiff

19

DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS

did not prevail on his criminal case (*Bell v. Vista Unified Sch. Dist.*, 82 Cal. App. 4th 672, (2000)) but is improper block billing that makes it more difficult for the court to determine how much time was spent on particular activities (*Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007).  Exemplars from Exhibit A to the Declaration of Mr. Diggs is as follows:

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 10/01/2021 | Call with Shyrah Butcher re Steffon's transfer from ARMC to West Valley Detention Center; update on criminal charges; advise on civil litigation timeline | 1.50 | $1,250 | $1,875 |
| 10/05/2021 | Research *Heck v. Humphrey* doctrine and its application to pending PC § 245(c) charge; analyze implications for planned § 1983 excessive force claims; research vehicle-as-weapon cases | 6.00 | $1,250 | $7,500 |
| 10/14/2021 | Review criminal charging documents; analyze preliminary hearing materials; develop civil theory distinguishing criminal conviction from civil excessive force claim | 4.00 | $1,250 | $5,000 |

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 10/20/2021 | Research Monell liability theories; review SBCSD Department Manual §§ on use of force; research ratification doctrine and failure-to-train liability | 6.00 | $1,250 | $7,500 |
| 11/05/2021 | Call with Shyrah Butcher re criminal case status; discuss Government Tort Claim and civil claims; address family concerns re Steffon's condition | 1.50 | $1,250 | $1,875 |

57.    Ms. Williams also has mixed time for the criminal case:

| Date | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| 12/18/2024 | Prepare and file Status Report re criminal case resolution [Dkt. 41]; calendar all new case deadlines | 1.50 | $450 | $675 |

58.    To compensate for that block billed time for work on the criminal aspect I recommend a further reduction of those 19 hours by Mr. Diggs at $875 per hour fees of $16,625.00 and for the 1.5 hours by Ms. Williams at $226 is fees of $339.00 for a total adjustment of $16,964.00.

//

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

## GALIPO TEAM TIME CONCERNS

59. Many of Mr. Galipo's description are too vague to receive full credit. His  descriptions typically read "Review Case Materials" "Review Criminal File" "Trial Preparation*" He adds an asterisk with an explanation of all the things that are included in trial preparation - but this is not an acceptable explanation as he has the burden to explain what he has done. Because of these minimal descriptions I suggest a ten percent (10%) reduction to his 405.9 hours of time. That would mean a reduction of 40.6 hours at $1,334 per hour for an adjustment of $54,160.40 in fee attributable to his work.

60. Ms. Masongsong records travel time of 3.5 to 4.0 hours for each day of trial for a total of 18.5 hours. This time at her rate of $700 is $12,950. That is not usually billed to a client and it is not usually awarded in a fee-shifting matter.

## RECAPITULATION

61. Here is a table with a recapitulation of the adjustments:

| Issue | Amount | Explanation |
|---|---|---|
| Fees Requested | $3,679,030 | Motion at page 21 |
| Less Bryant hours/fees | -$739,500 | Solely criminal case |
| Adjusted balance once Bryant time and fees deducted | $2,939,530 | At requested rates; no detail provided |
| Balance 2,924.65 hours (-$771,342 rates adjustment) | $2,168,188 | All time adjusted rates see §49, above |
| Less Duckett 218.85 | -$153,195 | Solely criminal case – at adjusted rates |
| Less Diggs  -270.55 | -$236,731 | Stay at adjusted rates |
| Less Williams -45.1 | -$10,960 | Stay at adjusted rates |
| Less portion of Diggs | -$16,625 | Block billed entries |

21

| Issue | Amount | Explanation |
|---|---|---|
| -19.0 | | combining criminal and civil work; at adjusted rates |
| Less portion of Williams 1.5 | -$339. | Block billed entries combining criminal and civil work; at adjusted rates |
| Subtotal  2,369.65 hours | $1,750,311. | Request less Bryant, Duckett and portion of Diggs hours; at adjusted rates |
| Galipo time too vague 40.6 hours | -$54,160 | At adjusted rates |
| Masongsong travel 18.5 hours | -$12,950 | At adjusted rates |
| Balance 2,310.55 hours | $1,683,201 | Possible Lodestar |

## LODESTAR ENHANCEMENT

62.    The lodestar is a presumptively reasonable award.  Both State and federal law allows the lodestar to be enhanced in some circumstances. Since many of the Diggs team included time for the criminal work both before and after the "stay" and did not allocate their time for the non-prevailing work this militates against an enhancement under federal practice. However the rule for California law is different as it allows an enhancement for the risk of contingency. The lodestar enhancement that I see most often applied for the contingency risk is 1.2 to 1.4 time the lodestar.

22

## CONCLUSION

63.    In my opinion the total reasonable and necessary lodestar is $1,683,201 in fees for legal work for 2,310.55 hours of time from 7/23/2021 to 3/25/2026.

64.    In my opinion the requested lodestar enhancement of 2.0 is not an appropriate enhancement for the contingency risk for this matter .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 8th day of April, 2026, at Los Angeles, California.

_Gerald J. Knapton_

_____

Gerald Knapton

23

**DECLARATION OF GERALD KNAPTON IN SUPPORT OF DEFENDANTS COUNTY OF SAN BERNARDINO AND DEPUTY CHRISTOPHER ALFRED'S OPPOSITION TO THE PLAINTIFF'S MOTION FOR ATTORNEY'S FEES; AND EXHIBITS**

# EXHIBIT 1

# EXHIBIT 1

*Curriculum Vitae*
**GERALD G. KNAPTON, ESQ.**







pg. 1

**Firm Name:**

**Ropers, Majeski, P.C.** (f/k/a Ropers, Majeski, Kohn & Bentley, apc)
801 South Figueroa Street, Suite 2100
Los Angeles, California 90017
(also Menlo Park, San Jose, Minneapolis, NYC, Seattle, Las Vegas, & Paris
Main tel. (213) 312-2000 or direct line: (213) 312-2016 **or mobile (213) 808-2019**
Main fax  (213) 312-2001 – web site [www.ropers.com](http://www.ropers.com)
**E-mail:** [gerald.knapton@ropers.com](mailto:gerald.knapton@ropers.com)

**Status**:     Senior Partner
(Prior experience as general counsel and as partner and associate at L.A. law firms)

**Ratings**: AV Preeminent by Martindale-Hubbell and Preeminent "AV" in Judicial Edition Martindale-Hubbell/Reed Elsevier/Lexis-Nexis rating through 2026.

**Admissions to Practice Law**:

| | | | |
|---|---|---|---|
| California   (SBN 077038) | : 1977 | Hong Kong (registered foreign lawyer) | : 2007 |
| Central District of California | : 1978 | Ninth Circuit Court of Appeals | : 1978 |
| Southern District of California | : 1979 | Northern District of California | : 1979 |
| Eastern District of California | : 1981 | Third Circuit Court of Appeals | : 1998 |

**Member**:

California State Bar Committee on Mandatory Fee Arbitration
(2001- 2006; Vice-Chair 2004 – 2005; Chair 2005-2006).

American Intellectual Property Law Association (AIPLA)

(2004 - 2005; 2009 - 2012; 2017 – 2023)

Los Angeles County Bar Association member

(2003 to 2012)

Los Angeles County Bar Association Professional Responsibility & Ethics Committee

(2005 – 2008).

Pasadena Humane Society & SPCA – Board of Directors

(2008 – 2017)

Council on Litigation Management

(member 2009 – 2012).

American Bar Association

(member 1978 – 1983; 2009 to 2011).

**Education**:

Brown University (Providence, Rhode Island) and
University of California, Berkeley, B.A., 1973 (With Highest Honors & Phi Beta Kappa).
University of California, Los Angeles, School of Law, J.D., 1976
Pepperdine University School of Law – Straus Institute for Dispute Resolution, 2003

pg. 2

**Litigation/Trial Experience**:

More than 48 cases to court, jury and arbitration panel(s).
More than 8 Court of Appeals and Supreme Court matters.

**Testifying expert**:

Qualified and testified in person as an expert on fees more than 70 times to a jury, court or arbitrator(s) as an expert on the reasonableness and necessity of legal fees and costs.

**Fee Dispute Matters**:

Reviewed far over $6 billion dollars in charges in more than a thousand matters regarding nationwide legal fees, experts' fees and costs and work product reviewed. Litigation management and fee matters concerning attorney's fees and related costs ranging from $20,000 to in excess of $800,000,000.00 in charges. Lawyer to lawyer approach backed by computer technology. Lectures and seminars, written and oral opinions, declarations and expert testimony on reasonableness of fees in hundreds of matters throughout the United States, Canada and other common law jurisdictions. Analysis of _Cumis_, fee-shifting, lodestar, agreement-based, common-fund, panel and retained counsel's fees. "CAFA" projections. _Buss_ and _Brandt_ and other allocations. Cost-control training, including budgets, alternative fee programs, guidelines and retainer agreements. California State Bar Sub-Committee member on drafting the 2005 State Bar Sample Fee Agreements. Outside auditor of legal fees for the several governmental entities. Retained by insurance companies, law firms, governmental entities, corporations and private individuals as fee expert, _in support of and opposing_ requests for fees. Designated "binding" neutral by existing clients, an adverse prominent city and large insurer. Retained as mediator in fee disputes. Acknowledged as fee expert in _LA Int'l Corp. v. Prestige Brands Holdings, Inc._, 168 F.4th 608 (9th Cir. 2026).

**Author**:
"Why not follow the best road?" August 21, 2020 _Los Angeles & San Francisco Daily Journal_; "How to Count to Thirty" December 9, 2019 _Los Angeles Daily Journal_"; "Candor to the Tribunal is now Mandatory in California" November 8, 2019 _Los Angeles Daily Journal_; "MFAA versus CAA: Jurisdictional traps for the unwary in arbitration" June 17, 2019 Los Angeles Daily Journal; "Unconscionable' legal fees under California's new rules" May 31, 2019 _Los Angles Daily Journal_. "Budgets, Performance Metrics and You" (ADTA Program Handout -76th Meeting, Nashville April 2017). "What Every Lawyer Should Know About the Latest Interpretation of California's Cost-Shifting Settlement Statute" (MCLE article, January 5, 2017) _California Lawyer_; "How to Prove an Attorney's Reasonable Hourly Fee" Expert Advice/Practical Tips _California Lawyer_ November 2015; "Can You Prove Your Hourly Rate to the Court?" _Daily Journal_ October 19, 2015; 2 Routes to Hourly Rates for Lawyers" April 15, 2015 _Law 360_; "Recovering Fees In Family Law Practice" 2015 - Volume 37 No. 1 _Family Law Newsletter_, California State Bar; "Wrangling with whether and when actual trial begins" _Los Angeles Daily Journal_, February 4, 2015; "Recovering Fees from Clients" _California Lawyer_, July 2014; "Catalyst theory still a viable route to attorney fees" _Los Angeles Daily Journal_, June 19, 2013. "One-way fee shifting proves risky" _Los Angeles Daily Journal_, March 21, 2013. "Welcome to the cafeteria of _Jankey v. Lee_" [federal preemption law] _Los Angeles Daily Journal_, December 27, 2012.

"For the Love of a Family Pet," The Recorder, October 19 & 22, 2012.  "State high court to review fee award in disability access suit," *Los Angeles Daily Journal*, October 17, 2012.  "Warning: Some Cost Shifting May Occur" *California Lawyer* (MCLE article September 2012). "Legislative History Says No Fee-Shifting in Meal and Rest Break Litigation," *Los Angeles Daily Journal*, May 16, 2012. "Labor Code Fee Shifting Provisions," *Los Angeles Daily Journal,* February 17, 2012. "Fee Shifting Statutes and Self Representation" *The Recorder* November 2011.  "Recoverable Attorney Fees for Public Entities" Public CEO (July 22, 2011).  "The fine art of actually collecting legal fees" *National Law Journal,* June 15, 2009. "Arbitration & Mediation", *The Recorder* April 15, 2009. "Attorney's Guide to Arbitrating and Litigating a Fee Dispute," September 2008 program materials at California State Bar Annual Meeting in Monterey, CA.  "Controlling the Costs of E-Discovery," *Los Angeles Daily Journal*, August 6, 2008.  October 2006 California State Bar Meeting materials and speaker at MCLE program on California State Bar retainer agreements.  September, 2005 California Sate Bar meeting materials for and speaker at 2 MCLE programs: "New State Bar Sample Written Fee Agreements" and "Overview of the Mandatory Fee Arbitration Process."  "Billing Guidelines Offer Base Against Which to Measure Results." *San Francisco and Los Angeles Daily Journal* November 24, 2004. October 2004 California State Bar meeting materials for, and speaker at, 2 MCLE programs: "Getting It Right From the Beginning" and "Do's and Don'ts For Collecting Attorneys Fees".  "Vroom, Vroom. Three Categories For Fee Shifting Means Finding The Right Gear", *The Recorder* & *Cal Law* (Practice Center, August 18, 2004). "Ethics of Attorneys Fees", *California Lawyer* (MCLE article July, 2004).  "Attorney Liens Must Comply With 'Fletcher' Requirements", *San Francisco and Los Angeles Daily Journal*, June 29, 2004. "'Catch-All' Arbitration Clauses Don't Give Parties Firm Footing", *San Francisco and  Los Angeles Daily Journal*, June 4, 2004. "Attorney-Client Fee Conflicts"  San Francisco and Los Angeles Daily Journals (January 26, 2004).  "Attorneys Fees Applications" MCLE, *California Lawyer* (January, 2004 revision). "Paper Cutter" (Electronic Invoicing) Daily Journal *Extra* (December 29, 2003). "Appealing Arbitration Awards", *Los Angeles Daily Journal* (October 6, 2003). "Fees in Flux" MCLE Program materials for, and speaker at, 2003 California State Bar Meeting.  "Shaping Arbitration", *Los Angeles Daily Journal Verdicts & Settlements* (March 8, 2002).  "The *Catalyst Theory* May Still Live", *Expert Advice, California Lawyer* (November, 2001).  "Policy Language Is Winning Against Recoupment But A New Battle Looms" *Mealey's Attorney Fees*, Vol. 3, #11 (June, 2001). "Why Don't Clients Pay? What You Need to Know to Avoid Collections Headaches" *Law Practice Management Magazine* (American Bar Association) Vol. 27, # 3 (April,  2001)." The Choice Of The Yardstick Is The Most Crucial Decision", *Mealey's Attorney Fees*, Vol. 3, #2 (September, 2000). "A Lawyers Bill May Be Reduced or Forfeited by Ethical Violations", *Expert Advice, California Lawyer* (February, 2000). "How Do You Prove the "Lodestar" for In-house Counsel Fees?", *Mealey's Attorney Fees*, Vol. 2, #1 (August, 1999)." Attorneys Fees Applications", MCLE*, California Lawyer* (May, 1999). "Paying the Other Side's Legal Fees: Attorneys' Fees Calculations Under Fee-Shifting Statutes.", *The Directory of Municipal Practitioners*, § II, G. (League of California Cities, 1997).

**Speaking engagements**:

USC/Gould School of Law, Second Annual Advanced Arbitration Institute - July 28, 2017.
Association of Southern California Defense Counsel MCLE program on recovering fees by motion and the ethics of legal billing on November 3, 2016.
Law firm pricing program to large law firm on June 17, 2015.
Plaintiffs Securities Law Firm: In-house MCLE program "Optimal Timekeeping Procedures; Avoiding Objectionable Case-Related Expenses." August 9, 2012

Smart Business Los Angeles – July 2012 edition. "How to ensure your money is well spent with the right law firm during litigation."
ACI's 6th Annual Forum "Reducing Legal Costs" October 20-21, 2011
Provisors, LLP "Effective Motions for Attorney's Fees" July 8, 2011
Mercury Insurance Group on Mediation for CLM February 2011
Sonoma Risk Insurance MCLE on Contract Litigation Insurance 2010
How to Review Legal Bills, CLM program in Columbia, SC June 2010
Strafford's Ethical Pitfalls in Client Billing & Fee Collection, July 29, 2009.
State Bar Annual Meeting, September, 2008 (Monterey) on arbitrating or litigating fee disputes.
Bermuda offshore carriers program May, 2008.
State Bar Annual Meeting, 2006 (Monterey) on retainer agreements.
CELA Annual Conference speaker on retainer agreement, September 15, 2006
Bridgeport MCLE program on Insurance Bad Faith August 25, 2006
Class Action/UCL MCLE Program section on Attorney's Fees, April, 2006
Quisenberry Insurance Bad Faith Litigation Seminar, January, 2006
State Bar Annual Meeting, 2005 (San Diego) on retainer agreements and arbitration.
Quisenberry Seminar in January, 2005 on fees and ethics.
State Bar Annual Meeting, 2004 (Monterey) on fees and ethics.
State Bar Annual Meeting, 2003 (Anaheim) on fees and ethics.

**Employment History of Gerald G. Knapton, Esq. (CA SBN 077038):**

| | |
|---|---|
| 2002 to present. | Ropers, Majeski, P.C. – Sr. Partner (formerly known as Ropers, Majeski, Kohn & Bentley apc) |
| 1992 to 2002 | Cooper Kardaras & Kelleher LLP (formerly known as Cooper, Brown, Kardaras & Scharf) - Partner (& Manager of Lauditors, Inc.) |
| 1992 to 1992 | First National Group, Inc. - General Counsel |
| 1989 to 1991 | Northland Financial Company - Vice President |
| 1983 to 1989 | First National Group, Inc. - General Counsel |
| 1982 to 1983 | Schroeder, Forde & Knapton - Business/Bank Litigation Partner |
| 1978 to 1982 | Hahn Cazier & Leff - Business Litigation Associate |
| 1977 to 1978 | Kirtland & Packard - Tort Defense Litigation Associate |
| 1973 to 1977 | California Attorney General and Law Offices of Kenneth L. Knapp; law clerk while attending, and after, law school. |

**Business Experience prior to law school:**
Rogers Corporation (Manufacturing Company)
Branch Motor Express (Trucking Company)
Adley Express (Trucking Company).

Others to be provided upon request.

List of testimony follows

pg. 5

EXPERT WITNESS TESTIMONY BY **GERALD KNAPTON**, ESQ.

REGENERON PHARMACEUTICALS, INC. v. NOVARTIS PHARMA AG

United States District Court, Southern District of New York Case No. 7:20-cv-05502-PMH-AEK

Retained by Latham & Watkins

GIBSON, DUNN & CRUTCHER LLP v. JOEL WIENER, THE PINNACLE GROUP

JAMS (NEW YORK) - JAMS Ref. No. 5425002817

Retained by Gibson, Dunn & Crutcher

SEMPRA v. ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED

United States District Court, Central District of California case no. 2:23-cv-10544-JLS-SSC

Retained by Defendant AEGIS

BENJAMIN CHUI ET AL v. PARKER MILLIKEN, CLARK, O'HARA & SAMUELIAN

Los Angeles Superior Court matter no. 20STCV34158

Retained by Trustee/Plaintiffs

RIVAS-STOLLER EQUITIES, LLC v. GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP

In the Tribunals of ADR Services, Inc. Case No. 22-4530-GSR

Testified to the Court, Hon. Gerald Rosenberg (Ret.)

EDYLWISE ROMERO v. GEICO CASUALTY COMPANY

San Francisco Superior Court Case No. CGC-19-576933

Retained by GEICO

GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP v. STELLA BOLOCHNIKOV

JAMS Los Angeles Reference no. 1220070739; retained by Plaintiff

Testified to Arbitrator, Hon. Candace Cooper, (Ret.)

WILLMARK COMMUNITIES, INC. v. CALIFORNIA CAPITAL INSURANCE COMPANY

 San Diego Superior Court Case No. 37-2018-002029839-CU

Retained by California Capital Insurance Company

STEVEN J. HORN v. PRASHANT & MITA VAGHASIA

AAA Commercial Arbitration Tribunal Case No. 01-20-0015-9809

Retained by Plaintiff

Testified to the Arbitrator, Henry J. Silberberg

PARKER-HANNIFIN CORPORATION v. STANDARD MOTOR PRODUCTS, INC.

United States District Court, N. Dist. Ohio - Case No. 1:19-cv-00617

Retained by Standard Motor Products, Inc.

LYLE AND ALISON TURNER v. FEDERAL INSURANCE COMPANY

USDC California Central District Case. No. 2:20-cv-00851-MWF-AGR

Retained by Federal Insurance Company

GIBSON, DUNN & CRUTCHER LLP v. WORKSPOT, INC.

JAMS Reference no. 1425031221 - Hon Terry Friedman (Ret)

Retained by Gibson, Dunn & Crutcher

COSTCO WHOLESALE CORPORATION v. ARROWOOD INDEMNITY

USDC Western District of Washington at Seattle Case No. 2:17-cv-01212-RSL

Retained on behalf of Costco Wholesale Corporation

GIBSON, DUNN & CRUTCHER, LLP V. SARAH JOHNSON

JAMS New York City reference no. 1425026989

Retained by Gibson, Dunn & Crutcher

pg. 7

Testified to arbitrator, Hon. Theodore H. Katz (Ret.)

PETER GATHRIGHT vs. CHEESECAKE FACTORY

American Arbitration Association case no. 01-17-003-9979

Retained on behalf of Cheesecake Factory

STEVEN J. HORN v. MARY & ANTHONY KLING

AAA Case no. 01-15-0002-3199

Retained on behalf of Steven J. Horn

Testified in arbitration, Hon. Jack M. Newman (Ret.)

GLASER WEIL v. DOV CHARNEY

JAMS reference no. 122051123

Retained by Glaser Weil

Testified in arbitration, Hon. Jonathan H. Cannon (Ret.)

FRAYLEY v. DK ART PUBLISHING, INC.

American Arbitration Association case no. 01-16-0001-3741

Retained on behalf of DK Art Publishing

Testified in arbitration, Richard R. Mainland, arbitrator

WILLIAM H. COSBY, JR. v. QUINN EMANUEL URQUART & SULLIVAN , LLP

ACMAS case no. M-192-16-AC

Retained on behalf of Mr. Cosby

Testified to arbitration panel: F.G. Blundo, E. Selten & D. M. Tabatabaee

JACOBS ENGINEERING GROUP v. PARAMOUNT PETROLEUM CORP.

LASC Case No. TC027982

Retained by Paramount Petroleum Corporation

Testified to the Court, Hon. Michael Vicencia, Judge

LINCOLN STUDIOS, LLC v. AEW CAPITAL MANAGEMENT

LASC Case Nos. BC 551551 & BC 550227

Retained by AEW Capital Management

Testified to the Court, Hon. Suzanne G. Bruguera

GOLDEN STATE FOODS CORP. v. COLUMBIA/OKURA

JAMS Case NO. 01-14-0001-1604

Retained by Golden State Foods

Testified to panel:  Hon. Michael Berg (Ret.), Michael F. Minchella, Esq. and Paul R. Fine, Esq.

STAT HOLDINGS LLC v. WOUNDCO HOLDINGS, INC.

JAMS reference number 1450003127

Retained by WoundCo Holdings, Inc.

Testified to the Court, Hon. Maria Marinari Sypek (Ret.)

MAHAFFEY & ASSOCIATES, PLC and ANGUS PETROLEUM CORPORATION

JAMS Arbitration No. 12200488068

Retained by Angus Petroleum Corporation

AXA VERSICHERUNG, AG v. GORDIAN RUNOFF LIMITED

Winter Reporting Service Reinsurance Arbitration Center (NYC)

Testified to panel, Peter A. Gentile, Umpire; Arbitrators Jonathan Rosen & Diane M. Nergaard

RYSHER ENTERTAINMENT, LLC, 2929 ENTERTAINMENT, L.P., QUALIA CAPITAL, LLC. v. COX MEDIA GROUP, LLC (a/k/a COX MEDIA GROUP, INC.)

Los Angeles Superior Court Case No. BC 517198

Retained by Rysher Entertainment, 2029 Entertainment and Qualia Capital, LLC.

FIRE INSURANCE EXCHANGE v. AUSTIN, MAZZOCCO

pg. 9

San Diego Superior Court Case No. 37-2011-00099975-CU-IC-CTL

Retained by Archer Norris

Testified to the jury, Hon. Jeffrey B. Barton presiding

UBS AG v. IGOR M. OLENICOFF

Orange County Superior Court Case No. 30-2012-000589134-CU-MC-CJC

Retained by UBS AG

F&B, LLC v. SHARED MEMORY GRAPHICS

AAA (Orange County) Matter #72 194 Y 000978 12 (and others)

Retained by Alvarado Smith

Testified to the Court, Hon. Alice D. Sullivan (Ret.)

BERNS BROTHERS INC. v. ALPERT BARR & GRANT

Retained by Goshgarian & Marshall

LACBA DRS Binding Arbitration

Testified to three-person panel of Arbitrators

ALAN D. LIKER v. DAWN ARNALL, ET AL

Los Angeles Superior Court Case No. BC419835

Retained by Reed Smith & McKool Smith Hennigan

Testified to a jury, Hon. Yvette M. Palazuelos, judge presiding

WENDEL, ROSEN, BLACK & DEAN LLP v. DANIEL HELIX ET AL

JAMS – Walnut Creek Reference no. 1120009947

Retained by Wendel, Rosen, Black & Dean

Testified to the Court, Hon. V. Gene McDonald (Ret.)

RICHARD A. MAIZE v. GLASER WEIL FINK ET AL.

JAMS – LA Ref. no. 1100060599

Retained by Glaser Weil et al

Testified to the Court, Hon. Ann L. Kough (Ret.)

RICHARD WASSON V. GRIBOW LAW OFFICES

Riverside Superior Court Case INC056272

Retained by Richard Wasson

Testified to the Court (Hon. John G. Evans) in Phase One and to the Jury in Phase Two.

BRIAN BILLET V. CERYX ASSET RECOVERY, LLC ET AL

LASC Case No. BC 418446

Retained by Ceryx Asset Recovery

Testified to court, Hon. Joe W. Hilberman (Ret.)

GEORGIANA B. HIXSON v. RICHARD STONE

ADR Case NO. 06-4651-RWT

Retained by Richard Stone

Testified to the arbitrator, Hon. Robert W. Thomas

SELVIN & WEINER v. BENCH INTERNATIONAL SEARCH, INC.

Superior Court, State of California, County of Los Angeles Case No. SC084316

Retained by Bench International

Testified to a jury, Hon. Cesar Sarmiento, judge presiding

PAUL FLYNN v. HOLLAND & HART LLP

State Bar of Nevada Fee Dispute Arbitration No. 09-267

Retained by petitioner Paul Flynn

Testified to panel: Todd A. Bader, Bruce Breslow & Clark V. Vellis, arbitrators

pg. 11

YARPEZESHKAN v. SULLIVAN, HILL, LEWIN, REZ & ENGEL

Superior Court, State of California, County of San Diego Case No. GIC 850949

Retained by White, Oliver & Amundsen

Testified to a jury, Hon. Ronald S. Prager, judge presiding

SPILLANE WEINGARTEN LLP v. PARADIGM INDUSTRIES, INC.

JAMS Ref. #1220041382

Retained by Spillane Weingarten.

Testified to court, Hon. Ann Kough (Ret.)

VALVOULIS & WEINER v. CASTLE & ASSOCIATES

Superior Court, State of California, County of Los Angeles Case No. BC 370385

Retained by Castle & Associates, apc

Testified to the court, Hon. Michael L. Stern, judge presiding

PROSKAUER ROSE LLP v. BLIX STREET RECORDS

United States District Court, Central District of California Case No. CV06-4040 GW

Retained by Blix Street Records

Testified to a jury, Hon. George H. Wu, judge presiding

CENTURY INSURANCE GROUP RE O'HARA-BARNES LLP

LACBA case M-203-06-SBM

Retained by O'Hara-Barnes

Testified to arbitrator, Bruce E. Schwartz, Esq.

WELCH FOODS, INC. v. LIBERTY MUTUAL INSURANCE COMPANY

Worcester (Mass.) Superior Court, C.A. No. WOCV 2000-01249

Retainer by Morrison Mahoney LLP

pg. 12

Testified to jury, Hon. Peter W. Agnes, Jr., judge, presiding

CHRISTENSEN GLASER FINK JACOBS WEIL & SHAPIRO, LLP v. COVE MANAGMENT PARTNERS, LLC.

Contractual  Arbitration - JAMS Arbitration number 1220038152

Retained by Christensen Glaser, et al.

Testified in arbitration, Charles G. Bakaly, Jr., Esq., arbitrator

AT&T WIRELESS SERVICES RE TELECOM SECURITIES LITIGATION

Delaware Superior Court, New Castle County Case # 03C-12-232 WCC

Retained by DLA Piper (NYC)

Testified to jury, Hon. Wm. C. Carpenter, judge, presiding

TAHERI LAW GROUP APC v. ALEXANDER SOROKURS, M.D.

Alternative Dispute Resolution case no. 78M365 [and see B206693]

Retained by Dr. Alexander Sorokurs

Testified to court, Honorable Michael Berg, Ret., judge

LISA MONIQUE WEBB v. ST. FRANCIS MEDICAL CENTER

LASC Case No. BC 339161

Retained by St. Francis Medical Center

Testified to court, Honorable G. Keith Wisot, Ret., judge

HOWREY, LLP v. ALAN CASDEN

American Arbitration Association case no. AAA-16194Y0041805

Retained on behalf of Alan Casden

Testified to arbitrator, Richard Mainland, Esq.

SALES v. MISSION DYE HOUSE, LLC

Los Angeles County Superior Court Case No. BC 336517

Retained by Sassoon Sales

Testified to the jury, Hon. Mel Red Recana, judge, presiding

WESTCHESTER FIRE INSURANCE COMPANY v. AMERICAN FIRE CASUALTY

Orange County Superior Court Case No. 00CC13050

Retained jointly by several firms including Daniels, Fine, Israel & Schonbuch LLP

Testified to the court, Hon. Ronald Bauer, judge


ISKCON of California, Inc. v Penn America Insurance Company

USDC California Central District Case No. 03-CV-04506

Retained by Goshgarian & Marshall

Testified to the court, Honorable John Kennedy, judge

GRIFFIN DEWATERING CORPORATION v. NORTHERN INSURANCE COMPANY OF NEW YORK

Orange County Superior Court Case No. 00CC04293 [and see G036896]

Retained by Willams Law Group (L.A.) & Meckler, Bulger & Tilson (Chicago)

Testified to jury, Hon. W. Michael Hayes, judge, presiding

NICKEL v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION

United States District Court  (N. Dist. California) No. C-94-2716 CAL

Retained by The Mills Law Firm

Testified to the court, Honorable Eugene Lynch (Ret.).

ZURICH INSURANCE COMPANY v. SO. CALIFORNIA REGIONAL RAIL AUTHORITY

LASC BC 219 631 (transferred from Ventura County)

Retained by Bergman, Wedner & Dacey on behalf of SCRRA/Metrolink

Testified to the court, Honorable Campbell Lucas, by reference, presiding.

HAWTHORNE SAVINGS FSB v. CONTINENTAL INSURANCE COMPANY, ET AL

American Arbitration Association case 7219400061301

Retained by Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone on behalf of Continental/CNA

Testified at arbitration before   Kenneth C. Gibbs, Arbitrator.


TRW, INC. adv CONFIDENTIAL NAME.

USDC (Central District) Case No. CV XX-XXXX RSWL

Retained by Munger, Tolles & Olson on behalf of TRW

Testified at arbitration before Justice John Trotter  (Ret.)

ANDY HEYWARD v. QUINN EMANUEL URQUART OLIVER & HEDGES

L.A. County Bar Dispute Resolution Services No. M-315-01-SLM

Retained by Andy Heyward

Testified to Arbitration Panel of Dorothy Wolpert, William Steffin and Louis B. Davis


CHARLES E. ALPERT v. DEBORAH GEORGE

LASC case no. LC 044370 (related action SC 052694)

Retained by Charles A. Alpert

Testified at arbitration before Commr. Jill S. Robbins (Ret.)


1600 SAND HILL ASSOCIATES V. NATIONAL FARMERS UNION P&C INSURANCE

Santa Clara County Superior Court

Retained by Thayer Harvey Hodder & Gregerson

Testified to court, Judge Kevin McKenney

CREDENTIAL SERVICES INTERNATIONAL, INC. V. CHUBB CUSTOM INS. CO.

Retained by Pillsbury-Winthrop LLP

Private JAMS Arbitration before Honorable Eugene F. Lynch (Ret.)

FIREMAN'S FUND INSURANCE COMPANY V. J.G. COMMUNICATIONS, INC.

LASC Case No. BC 175 222

Retained by Fireman's Fund Insurance Company

Testified to the court, Judge Ronald Sohegian

DURAN vs. BELRIDGE GARDENS

USDC (E. District of California)

Case No. CV-F-94-5965 REC-SMS

Retained by Belridge Farms/Rice Fowler Booth & Banning

Testified at arbitration before Justice David N. Eagleson (Ret.)

THE CITY OF LOS ANGELES RE LEGAL BILLINGS

Confidential matter in re DOES.

Testified to court, Judge Dion Morrow (Ret.)

CONFIDENTIAL MATTER KNOWN AS "BRONCO"

Construction defect matter venued in Orange County

Testified to court,  Hon. Thomas Johnston (Ret.)

AMERICAN-WEST VS. COMMERCIAL UNION

USDC Cal. Central Case No. CV 98-4554 RSWL

Retained by Derby Cook Quinby & Tweedt

Testified to court, Judge Ronald Lew

MORIARITY V. RONEY (AND CONSOLIDATED ACTION)

LASC Case No. LC 040176 (and 97C00048)

Retained by the law offices of John Moriarity

Testified in court, Hon. Richard B. Wolfe, judge presiding

NME HOSPITALS INC. v. ZAMBRETTI

Retained by McKenna & Cuneo

Private Arbitration before arbitrator Richard Chernick

THE CITY OF LOS ANGELES  In Re Nate Holden's Legal Bills

No case number—private, confidential mediations before Judge (Ret.) Weil and Judge (Ret.) Hogan

Retained by the City of Los Angeles

FIRE INSURANCE EXCHANGE re BALL, PYFROM & YORKE

Ventura County Case No. VCBA 1832

Testified to Arbitrators David L Praver, Richard Spencer & Ben A. Schuck III

Retained by Fire Insurance Exchange.

MALIS v. ADAMS

Private arbitration

Retained by George Burns

Testified before Judge (Ret.) George M. Dell

SELTZER CAPLAN WILKINS & MCMAHON VS. SHAPPELL INDUSTRIES, INC.

Retained by National Union [A.I.G.]/Acker, Kowalick & Whipple

Testified to court Hon.  F.V. Lopardo.

LOCKSHIN VS. LAPIN

San Francisco Superior Court  Case No. 977 616

Retained by Mr. Lapin/Goldstein, Gellman, Melbostad, Gibson & Harris LLP

Testified in court to a jury.

pg. 17

HAVLICEK v BERJIS

Los Angeles Superior Court Case BC 123 655

Retained by Crusader/Truck Insurance

Testified at arbitration before Judge (Ret.) Choate

ACO LITIGATION DISPUTE CASES

San Mateo Superior Court Case No. 3143

Retained by Long & Levit/ CNA

Testified in court to jury.

FEDERATION OF HILLSIDE AND CANYON ASSOCIATIONS vs. CITY OF LOS ANGELES.

LASC case No. C 526616

Retained by the City of Los Angeles

Testified by declaration and to court.

Note:

This list does not include matters where a restrictive agreement or court order does not allow disclosure.

It also does not include my many declarations filed in private arbitration matters.

Documents reviewed by Knapton for *Castanaras v. City of Chula Vista*

1. Fee motion – opening brief: case 37-2021-000017713
2. Register of actions
3. Appellate Courts Case Information for D082048
4. Appellate Courts Case Information for S283674
5. CA State Bar for #176284 (Briggs)
6. CA State Bar for 328921 (Ferraro
7. Register of actions and May 23, 2025 Fee award in 37-2022-00028102
8. Fee award in opinion D084242 (re 37-2023-0044600)
9. Complaint filed April 19, 2021 in case 37-2021-00017713
10. Request for Inspection of Premises Set No. Two (December 10, 2021)
11. Motion to compel inspection (February 8, 2022
12. Deposition transcript of Captain Miriam Foxx November 7, 2022.
13. Deposition of Don Redmond January 23, 2023
14. Plaintiff's opening brief supporting petition for writ March 8, 2023
15. Plaintiff's Reply brief March 23, 2023
16. Plaintiff's objection to evidence March 23, 2023
17. Plaintiff's ex pate application to take further deposition or continue trial March 23, 2023
18. Petitioner extraordinary writ for May 3, 2023
19. The Court of Appeal, Fourth Appellate District May 9, 2023 request for Real Party in Interest to file an informal response
20. City's informal response dated May 18, 2023.
21. Application to file Amici Curiae brief (May 19, 2023)
22. City's answer to Amici brief (June 21, 2023)
23. Notice of entry of judgment or order (6/23/2023)
24. Application of Peace Officers Research Assn to file Amici brief (August 14, 2023)
25. Real party's Return to writ petition (August 21, 2023)
26. Petitioner's Reply Brief dated September 18, 2023
27. City's notice of new authority dated October 27, 2023 (Gilroy: No declaratory relief under CPRA)
28. Mr. Brigg's November 3, 2023 letter request for new oral argument date.
29. Court of Appeal's order for oral argument on December 14, 2023
30. December 27, 2023 opinion in D082048 (29 pages)
31. City's Petition for Review S283674 (February 2, 2024)
32. Petitioner asked for more time to file an answer to the petition on February 14, 2024
33. Amici brief in support of petition (February 22, 2024)
34. Letter dated February 22, 2024 in support of review
35. Letter dated March 4, 2024 in support of review by IMLA
36. Petitioner's request for more time (due to parent's health issue) March 6, 2024
37. Sherriff's letter dated March 11, 2024 in support of Grant of Review
38. Petitioner's Answer to petition for review (March 24, 2024)
39. Second offer to compromise - CCP section 998 dated April 19, 2024
40. Court order following hearing on Remand (May 24, 2024)
41. Notice of entry of judgment or order (June 10, 2025)

pg. 19

# EXHIBIT 2

# EXHIBIT 2



# PUBLIC INFORMATION RELEASE MEMORANDUM

**DATE:** October 31, 2022

**SUBJECT:** Officer Involved Shooting (Non-Fatal)

**Officer:** Deputy Christopher Alfred
San Bernardino County Sheriff's Department

**Involved Subject:** Steffon Todd Barber (Injured)
Date of Birth 02/12/86
Adelanto, CA

**Date of Incident:** April 27, 2021

**Incident location:** ***** White Avenue
Adelanto, CA

**DA STAR #:** 2021-52064

**Investigating Agency:** San Bernardino County Sheriff's Department

**Case Agent:** Detective Edward Hernandez

**Report Number#:** DR# 242100897 / H# 2021-053

---

## TABLE OF CONTENTS

PREAMBLE ........................................................................................................3

RELATED CASE ................................................................................................3

FACTUAL SUMMARY .......................................................................................3

*Public Information Release, OIS STAR No. 2021-52064*
*October 31, 2022*

SCENE DESCRIPTION..................................................................................................................5

STATEMENTS BY POLICE OFFICERS...........................................................................................5
    Deputy Christopher Alfred...................................................................................................5
    Deputy Blake Coley..............................................................................................................8
    Deputy Larry Torres ............................................................................................................8
    Deputy Joseph Mora ...........................................................................................................9

STATEMENTS BY CIVILIAN WITNESSES ....................................................................................9
    Witness #3............................................................................................................................9
    Witness #1..........................................................................................................................11
    Witness #2..........................................................................................................................12
    Witness #4..........................................................................................................................14
    Witness #5..........................................................................................................................14

INCIDENT AUDIO.....................................................................................................................15
    Belt Recording ...................................................................................................................15

INVOLVED VEHICLE .................................................................................................................16

INVOLVED SUBJECT..................................................................................................................16
    Injuries................................................................................................................................16
    Toxicology...........................................................................................................................16
    Criminal History .................................................................................................................16

DE-ESCALATION ......................................................................................................................17

APPLICABLE LEGAL PRINCIPLES...............................................................................................18

ANALYSIS.................................................................................................................................24

CONCLUSION ..........................................................................................................................26

## PREAMBLE

This was a non-fatal officer involved shooting by a deputy from the San Bernardino County Sheriff's Department. The shooting was investigated by the San Bernardino County Sheriff's Department. This factual summary is based on a thorough review of all the investigative reports, photographs, and audio recordings submitted by the San Bernardino County Sheriff's Department, DR# 242100897 / H# 2021-053.

## RELATED CASE

As a result of this incident, the San Bernardino County Sheriff's Department, Victor Valley Sheriff Station, submitted a case to the San Bernardino County District Attorney's Office to review for potential criminal charges against Steffon Todd Barber. Criminal charges were filed against Barber in San Bernardino County Superior Court case number FVI21001312. There were two counts alleged in the felony criminal complaint. Count 1 of the criminal complaint alleged a violation of Penal Code Section 664/187(a) Attempted Murder of a Peace Officer. Count 2 of the criminal complaint alleged a violation of Penal Code Section 245(c) Assault Upon a Peace Officer.

## FACTUAL SUMMARY

On the evening of April 27, 2021, Witness #1 and his wife, Witness #2 returned home in separate vehicles to their home located at ***** White Avenue in the City of Adelanto. When Witness #1 tried to back his vehicle into the driveway, his tenant, Steffon Barber, stood in the driveway and blocked Witness #1 from parking in the rear of the property. Barber and his wife, Witness #3, lived in the rear residence located at ***** White Avenue. Witness #1 partially rolled down his window to speak to Barber. Barber asked Witness #1 several times if he had zip ties. When Witness #1 said he might have some inside his house, but it would take several minutes to check, Barber struck Witness #1's vehicle with his hands. Barber told Witness #1 he could not wait and asked Witness #1 to give him a ride to some nearby apartments. Barber became angry when Witness #1 said he was unable to give him a ride. Barber hit Witness #1's car again and told Witness #1 to let him into the vehicle. When Witness #1 would not unlock the vehicle doors, Barber walked back toward Barber's front yard.

When Witness #2 attempted to back her vehicle into the driveway, Barber walked up and attempted to open the locked front passenger door of Witness #2's vehicle. Witness #2 continued to reverse into the backyard which allowed Witness #1 to open the rear driver's side door and get into Witness #2's backseat. Barber then tried to reach into the driver's window of Witness #2's vehicle, but Barber did not realize the window was rolled up. Barber repeatedly told Witness #2 to let him inside the vehicle because he needed to go somewhere. Barber slapped Witness #2's vehicle multiple times and attempted to open the passenger side doors. Witness #2 continued down the

driveway until Barber stopped following them. Witness #2 then drove her vehicle west on to White Avenue and parked several houses away to call 9-1-1. Witness #1 and Witness #2 believed Barber's body language and behavior were threatening.

At approximately 11:19 in the evening, Deputy Christopher Alfred from the San Bernardino County Sheriff's Department arrived at the location. Deputy Alfred was in uniform and driving a marked patrol vehicle. Deputy Alfred briefly spoke with Witness #1 about what had occurred. Witness #1 told Deputy Alfred about Barber's strange behavior and said that he and his wife were frightened of Barber. Witness #1 also warned Deputy Alfred that although he never saw a gun, Witness #1 believed Barber was armed.

Deputy Alfred started to walk south onto the driveway of the residence so he could speak with Barber. The narrow driveway was approximately 96 feet long. The east side of the driveway was enclosed with wrought iron and chain link fencing, which varied in height from five to six feet. There were no openings along the fence line. The west side of the driveway was enclosed by a chain link fence, a residence wall, and a wooden fence, approximately five feet high, with one gate opening.

As Deputy Alfred walked toward Barber, he gave verbal commands for Barber to show his hands and walk toward him. Barber was uncooperative and would not comply with Deputy Alfred's commands. Deputy Alfred ordered Barber not to go to his vehicle, a 2003 black Chevrolet Trailblazer, and told Barber to walk towards him. Barber refused to comply and reached inside the vehicle. At that time, Deputy Alfred drew his duty weapon and held it at a low ready position. Barber then got into the driver's seat of the vehicle. Deputy Alfred was standing approximately eight to ten feet north of Barber's vehicle. Deputy Alfred was located behind Barber's vehicle. Barber revved the engine, put the vehicle in reverse, and accelerated rapidly towards Deputy Alfred.

Due to the narrowness of the driveway and the surrounding fencing, Deputy Alfred did not believe he had any avenue of escape. As the vehicle accelerated toward him, Deputy Alfred feared for his life. Deputy Alfred raised his duty weapon from a low ready position and fired six rounds at Barber's vehicle. Barber was struck by gunfire and the vehicle came to a stop. After the lethal force encounter, Deputy Alfred requested medical aid respond to the location.

Barber was transported to the hospital. Barber underwent surgery. Barber sustained a gunshot wound to the top of his head.

The 2003 Chevrolet Trailblazer which was driven by Barber at the time of the lethal force encounter was towed to the San Bernardino County Weights and Measures vehicle scale. It was determined that the weight of the Trailblazer, minus the solo occupant, was 4,980 pounds. With the added weight of Barber, the Trailblazer weighed approximately 5,040 pounds.

## SCENE DESCRIPTION

***** and ***** White Avenue share a driveway on the east side of the property which is approximately ninety-six feet in length.  The driveway was approximately fifteen feet and 7 inches in width and narrowed to approximately twelve feet and seven inches from north to south.  Given the width, only one vehicle would be able to travel on the driveway at a time.  The property was enclosed by a combination of wrought iron and chain-link fencing.  The only opening was a narrow driveway on the northeast side of the property.

On the east side of the property, from north to south, was a wrought iron fence which was approximately thirty-one feet and three inches in length and five feet tall.  The wrought iron fence connected to a chain-link fence which was approximately sixty-four feet and six inches in length and six feet and four inches tall.  The chain-link fence connected to a white vinyl fence on the south property line from east to west.

The west side of the driveway was enclosed by a chain-link fence, the residential wall of ***** White Avenue, and a wooden fence, which traveled north to south.  The chain-link fence was approximately twenty-nine feet and seven inches in length and three feet and five inches tall.  The chain-link fence connected to the northeast corner of ***** White Avenue.  There was an opening from the southeast corner of ***** White Avenue, which measured approximately fifteen feet and five inches in length from north south.  This opening provided vehicle and pedestrian access into the rear of ***** White Avenue.  On the south side of the opening, was a wooden fence, approximately twenty-one feet and two inches in length and six feet tall, from north to south.  The wood fence continued east to west and measured approximately forty-nine feet and nine inches in length and six feet tall.  This portion of the wood fence separated ***** and ***** White Avenue. The wood fence continued south to north and was approximately thirty-eight feet and eight inches in length and six feet tall.  The fence ended at the southeast corner of ***** White Avenue.

## STATEMENTS BY POLICE OFFICERS

On May 10, 2021, at approximately 11:00 in the morning, **Deputy Christopher Alfred** was interviewed by Detective Edward Hernandez and Detective Gerania Navarro.[1]

On April 27, 2021, Deputy Christopher Alfred, from the San Bernardino County Sheriff's Department, was assigned to patrol at the Victor Valley Station.  Deputy Alfred was wearing a long-sleeved San Bernardino County Sheriff's Department "Class A" uniform and driving a marked patrol vehicle.  On that date, Deputy Alfred was in the parking lot at the police station when he heard a call come out of a disturbed subject.  Deputy Alfred was the closest deputy to the location and decided to respond.  As he made his

---

[1] Deputy Alfred reviewed his belt recording prior to being interviewed by Detective Hernandez and Detective Navarro.

way to the location, dispatch advised Deputy Alfred that the reporting party called about a tenant or neighbor whose vehicle was blocking the reporting party's driveway and there was a verbal altercation going on. Dispatch told Deputy Alfred that the reporting party would be waiting outside in their vehicle.

When Deputy Alfred arrived at the location, the reporting party flashed their high beams at Deputy Alfred. Deputy Alfred drove toward them and verified they were the people who called law enforcement. Deputy Alfred was familiar with the address and the area. Deputy Alfred had been to the location approximately two hours earlier.[2] Before Deputy Alfred spoke to the reporting party, he looked down the driveway and saw a subject, later identified as Steffon Barber, standing near a Chevy Trailblazer. Deputy Alfred exited his patrol vehicle and walked across the street to speak with the reporting party, Witness #1.

Witness #1 told Deputy Alfred he had a disagreement with his tenant, later identified as Barber, and Witness #1 was trying to get into his residence, but the driveway was blocked. Witness #1 stated he was in fear for his safety and he believed Barber had a gun. Deputy Alfred asked Witness #1 to explain why he thought Barber was armed. Witness #1 said he had not seen a gun and was unable to point to anything specific. Witness #1 believed Barber's behavior was strange and described an incident that occurred the day before where Barber hit Witness #1's vehicle with his hand which forced Witness #1 and his wife to lock themselves inside the vehicle. Witness #1 also said Barber asked when law enforcement had last been in the area. Witness #1 appeared frightened as he spoke with Deputy Alfred.

Deputy Alfred made his way down the driveway to speak with Barber. The lighting in the area was poor. Deputy Alfred had his flashlight in his left hand so he could illuminate himself. Deputy Alfred asked Barber to come over and speak to him. Barber immediately started yelling profanities at Deputy Alfred. The driver side door of Barber's vehicle was open. Barber was standing in the pocket area of the driver's seat and the driver's side door. Deputy Alfred also noticed the trunk hitch to the SUV was open, the taillights were illuminated, and the vehicle was idling.

Deputy Alfred continued to talk to Barber but Barber would not respond. Barber also refused to walk towards Deputy Alfred. Deputy Alfred was unable to see Barber's hands. Given the information provided by Witness #1, Deputy Alfred started asking to see Barber's hands. Deputy Alfred told Barber, "You know what sir, let me see your hands and step away from the vehicle." Barber responded something to the effect of "fuck you." Barber ignored Deputy Alfred's command and quickly reached into the driver's seat of the vehicle. Deputy Alfred was unable to see inside the vehicle and was concerned Barber was reaching for a weapon.

Deputy Alfred was still unable to see Barber's hands and relayed that information to the dispatcher. Deputy Alfred advised that Barber was not complying verbally. Deputy

---

[2] The earlier call was in reference to people arguing. When Deputy Alfred went to the location, he did not hear anything nor see any signs of a fight, so he closed the call out.

Alfred drew his firearm and held it in a low ready position. Deputy Alfred estimated he was eight to ten feet away from Barber's vehicle at that time. Deputy Alfred used his flashlight to try and keep a visual on what Barber was doing. Deputy Alfred told Barber to step away from the vehicle and show his hands. Barber responded, "Fuck you. Show me your hands."

Barber turned towards the vehicle, got into the driver's seat, and shut the door. The white reverse lights on the vehicle illuminated and Deputy Alfred heard the tires attempt to gain traction on the hard-packed dirt. The engine revved and Barber's vehicle drove at Deputy Alfred in reverse at a high rate of speed. Deputy Alfred tried to put that information out over the radio while at the same raising his firearm up. Deputy Alfred dropped the flashlight he was holding and took a shooter stance. Deputy Alfred believed he was about to be run over and feared for his life. Deputy Alfred fired towards the back of the driver's seat as the vehicle moved towards him. Deputy Alfred estimated he fired five to six rounds from his duty weapon.[3] Based on where he was positioned, Deputy Alfred did not believe he had an avenue of escape and would not have been able to outrun the vehicle.

After the lethal force encounter, Barber's vehicle came to a rest. Deputy Alfred slowly repositioned himself to the right of the vehicle and advised dispatch shots had been fired. Deputy Alfred requested medical personnel respond to the scene. Deputy Alfred gave Barber additional commands to show his hands. Deputy Alfred was looking for any signs of life, but he did not get any response from Barber.

Deputy Alfred heard a woman, later identified as Witness #3, south of his location. Witness #3 screamed and appeared distraught. Deputy Alfred was unsure whether Witness #3 was injured or had been shot so he asked her if she was hurt. Witness #3 did not indicate she was hurt so Deputy Alfred continued to give verbal commands to Barber. When Deputy Alfred's partners arrived, Deputy Alfred gave them a quick assessment of what just occurred and advised them of what issues they had to address. Deputy Alfred wanted to get Barber medical care.

The deputies forced their way through a picket fence in order to reach the front portion of Barber's vehicle. Barber was unresponsive. Barber's hands were tucked underneath his stomach and he was leaning towards the right of the vehicle on the center console. Deputy Alfred maintained his firearm in a low ready position since he was unable to see Barber's hands and did not know whether Barber was armed. Deputy Joseph Mora and Deputy Larry Torres advised Deputy Alfred they were going to go around and remove Barber from the driver's seat since the passenger door was stuck. The vehicle started to move and one of the deputies put the vehicle in park. Deputy Mora and Deputy Torres removed Barber, placed him onto the ground, and started to render medical aid. Deputy Alfred then removed himself from the scene.

---

[3] Deputy Alfred fired a total of six rounds from his duty weapon.

On April 28, 2021, at approximately 6:40 in the morning, **Deputy Blake Coley** was interviewed by Detective Robert Ripley.[4]

On April 27, 2021, Deputy Blake Coley, from the San Bernardino County Sheriff's Department was assigned to patrol at the Victor Valley Station. Deputy Coley was wearing a San Bernardino County Sheriff's Department "Class A" uniform. Deputy Coley's Field Training Officer, Deputy Larry Torres, was driving their marked patrol vehicle. On that date, at around 9:00 in the evening, Deputy Coley and Deputy Torres responded to ***** White Avenue in the City of Adelanto. There was a call for service regarding two females arguing. Deputy Coley and Deputy Torres arrived at the location a few minutes later and met up with Deputy Alfred. Deputy Coley and Deputy Torres were unable to locate any signs of two females arguing and cleared the scene while Deputy Alfred completed the disposition of the call.

At approximately 11:20 that evening, Deputy Coley and Deputy Torres were parked in the area of Palmdale Avenue and U.S. Highway 395. Dispatch broadcasted a call of an unwanted subject at 120005 White Avenue. Deputy Coley recalled they had responded there earlier in their shift. The reporting party indicated a neighbor, later identified as Barber, would not let him park in the driveway of their residence and forcibly tried to enter his vehicle. Deputy Coley and Deputy Torres continued to monitor the radio for additional information.

Several minutes later, Deputy Alfred arrived at the location and broadcasted Barber was non-compliant. Deputy Coley and Deputy Torres responded to the scene to assist Deputy Alfred. Approximately twenty seconds later, Deputy Alfred broadcasted "shots fired." Deputy Torres notified dispatch they were enroute and activated his red and blue overhead emergency lights and siren. Deputy Alfred broadcasted Barber continued not to comply with commands and requested medical aid to the scene.

On April 28, 2021, at approximately 9:17 in the morning, **Deputy Larry Torres** was interviewed by Detective Edward Hernandez.[5]

On April 27, 2021, Deputy Larry Torres, from the San Bernardino County Sheriff's Department, was assigned to patrol at the Victor Valley Station. Deputy Torres was wearing a San Bernardino County Sheriff's Department "Class A" uniform. Deputy Torres and his trainee, Deputy Blake Coley, were driving in a marked patrol vehicle. On that date, at around 9:00 in the evening, Deputy Torres and Deputy Coley responded to ***** White Avenue in the City of Adelanto. There was a call for service regarding two females arguing. Deputy Torres and Deputy Coley arrived at the location a few minutes later and met up with Deputy Alfred. Deputy Torres and Deputy Coley could not locate

---

[4] Deputy Coley's interview was reviewed in its entirety. The summary, however, will only cover through the point he decided to respond to the scene, after the lethal force encounter already occurred.
[5] Deputy Torres' interview was reviewed in its entirety. The summary, however, will only cover through the point he decided to respond to the scene, after the lethal force encounter already occurred.

any signs of two females arguing. Deputy Torres and Deputy Coley cleared from the call and Deputy Alfred completed the disposition.

At approximately 11:12 that evening, Deputy Torres and Deputy Coley were parked in the area of Palmdale Avenue and U.S. Highway 395. Dispatch broadcasted an unwanted subject at 12005 White Avenue. The reporting party indicated a neighbor, later identified as Barber, would not let him park in the driveway and forcibly tried to enter his vehicle. Deputy Torres and Deputy Coley monitored the radio transmissions concerning the call.

Several minutes later, Deputy Alfred arrived at the location and advised Barber was non-compliant. Deputy Torres and Deputy Coley responded to the location to assist Deputy Alfred. Approximately two minutes later, Deputy Alfred broadcasted "shots fired." Deputy Torres activated the red and blue overhead emergency lights and siren and continued to respond to the residence. Deputy Alfred broadcasted Barber continued not to comply with commands.

On April 28, 2021, at approximately 7:40 in the morning, **Deputy Joseph Mora** was interviewed by Detective Robert Ripley and Detective Edward Hernandez.[6]

On April 27, 2021, Deputy Joseph Mora, from the San Bernardino County Sheriff's Department, was assigned to patrol at the Victor Valley Station. Deputy Mora was wearing a San Bernardino County Sheriff's Department "Class A" uniform. Deputy Mora and his trainee, Deputy Kevin Russell, were driving in a marked patrol vehicle.

On that date, at approximately 11:12 in the evening, dispatch broadcasted a call of an unwanted subject at 12005 White Avenue. The reporting party indicated a neighbor, later identified as Barber, would not let her into her residence and forcibly tried to enter her vehicle. Deputy Mora and Deputy Russell were not dispatched to the call but monitored the radio transmissions. Several minutes later, Deputy Alfred arrived at the location and broadcasted Barber was non-compliant. Approximately two minutes later, Deputy Alfred broadcasted "shots fired." Deputy Mora activated the red and blue overhead emergency lights and siren and responded to the scene.

## STATEMENTS BY CIVILIAN WITNESSES

On April 28, 2021, at approximately 4:25 in the morning, **Witness #3** was interviewed by Detective Robert Ripley and Detective Edward Hernandez.

Witness #3 suffers from severe Glaucoma and was completely blind in her left eye. She only has five percent vision in her right eye and described her sight as "tunnel vision."

---

[6] Deputy Mora's interview was reviewed in its entirety. The summary, however, will only cover through the point he decided to respond to the scene, after the lethal force encounter already occurred.

*Public Information Release, OIS STAR No. 2021-52064*
*October 31, 2022*

Witness #3 was married to Steffon Barber for approximately one year and eight months. The couple were living together with their two young children at a residence located at ***** White Avenue in the City of Adelanto. Witness #3 and Barber were renting from the owner of the property, Witness #2, who lived in the northern residence on the property. Witness #3 and Barber owned one vehicle, a black 2003 Chevrolet Trailblazer.

On April 27, 2021, at approximately 11:00 in the evening, Witness #3 and Barber were at their residence. They were preparing to leave to go pick up their children from Witness #3' mother's house. Witness #3 was inside the laundry room. The laundry room had an exterior door, which faced east, and was open. According to Witness #3, police vehicles have "squeaky" brakes when breaking was applied. Witness #3 said she heard vehicle brakes squeak from the street and knew "cops" were in front of her residence. Witness #3 did not know how many patrol vehicles were in front of her residence.

Approximately two to three minutes later, Barber went outside and started their Trailblazer engine. The vehicle was parked in front of Witness #3' front door and faced south in the driveway. According to Witness #3, the Trailblazer needed to be revved when started so the engine would remain on. Witness #3 heard the Trailblazer start and the engine revved. Witness #3 was able to see the lighting from the vehicle's headlamps from the laundry room. Witness #3 said the Trailblazer's engine revved loud for approximately a few seconds at a time, during a one-minute period, which seemed unusual for Barber to do.

Witness #3 was standing inside the laundry room, approximately one foot away from the door frame, when she heard four to five gunshots. Witness #3 said she noticed their Trailblazer moved in reverse slowly. Witness #3 did not hear any conversation or any yelling prior to the gunshots. After the gunshots, Witness #3 heard someone yell, "Slow down." Witness #3 exited the laundry-room and noticed the Trailblazer moved backwards, approximately ten to twelve feet.

Witness #3 noticed a bright light shined on her face. She heard a male yell at her to place her hands down. Witness #3 was unable to see a uniform but knew it was a sheriff's deputy based on the commands to place her hands down. The deputy told Witness #3 to stay back from the vehicle. Witness #3 did not hear the Trailblazer's engine running. She also did not hear any glass break. Witness #3 heard a male say, "Get a pulse. Get a pulse. He was shot in the head." She also heard a male say, "What's your name, what's your name?"

Witness #3 did not know why the deputies were at her residence. Witness #3 had not called the police and she did not believe anyone else had called the police.

On April 28, 2021, at around 10:21 in the morning, **Witness #1** was interviewed by Detective Robert Ripley.

Witness #1 managed properties for his father-in-law. The property was on the south side of White Avenue and contained two separately addressed residences. Witness #1's house was located closest to White Avenue and there was a second rental property located to the south. The two residences have a shared driveway that ran north to south from White Avenue. The driveway ended into the front yard of the rear residence with a chain link gate that could be closed to prevent access. Witness #1's backyard was accessible from the driveway and that was where he and his wife parked their vehicles. There was no fence to prevent access to his backyard from his driveway. For the last year, the rear residence, located at ***** White Avenue, was occupied by Witness #3 and Barber.

On April 27, 2021, at around 11:15 in the evening, Witness #1 and his wife were returning to their residence. Witness #1 saw Barber at the south end of the driveway near Barber's Chevrolet Blazer. The vehicle's doors and rear hatch were opened. After Witness #1 parked his vehicle behind his residence, Barber walked toward him. Witness #1 was still seated in the driver's seat of his vehicle. Barber used his palm and smacked the front passenger window of Witness #1's vehicle several times. Witness #1 partially rolled down the window and spoke to Barber. Barber asked Witness #1 several times whether he had zip ties. Witness #1 said he may have zip ties inside the house, but he would need to check. Barber walked around to the front of Witness #1's vehicle and slapped the hood or fender several times. Barber told Witness #1 he could not wait.

Barber then approached Witness #1's driver door. Barber slapped the window and told Witness #1 to give him a ride to the nearby apartments. Witness #1 told Barber he was unable to give him a ride because Witness #1 could not leave his wife home alone. Barber became angry, hit Witness #1's vehicle, and told Witness #1 to let him in because he needed a ride. When Witness #1 refused to unlock the doors, Barber walked back toward his front yard.

Witness #1 saw his wife's vehicle driving in reverse down the driveway toward their backyard. Witness #1 exited his vehicle, locked the doors, and walked toward the driveway. Witness #1 stood in the driveway and pretended to guide Witness #2 toward the backyard. Barber was pacing up and down the driveway. Barber then walked over to Witness #2's vehicle and tried to open the front passenger door, but the door was locked. Witness #2 continued to reverse into the backyard which allowed Witness #1 to quickly open the driver side rear door and get into the backseat.

Barber attempted to reach inside Witness #2's driver door window, but he did not realize the window was rolled up. Barber repeatedly told Witness #2 to let him in because he needed to go somewhere. As Witness #2 and Witness #1 drove north down the driveway, Barber slapped the vehicle multiple times and told them to let him in as he tried to open the passenger side doors. Witness #2 continued down the driveway until

Barber stopped following them.  Witness #2 drove west onto White Avenue and parked several houses away so they could call 9-1-1.

Witness #1 believed Barber had done something illegal and needed to get out of the area quickly.  Witness #1 considered Barber's behavior and body language to be "threatening."  Witness #1 believed Barber would "carjack" them if Barber got inside the vehicle.  Witness #1 believed Barber lied about needing zip ties and was trying to get Witness #1 to get out of the vehicle.

Witness #2 called and spoke to a Sheriff's Department dispatcher.  Witness #2 requested a deputy respond to the location.  Witness #1 and Witness #2 switched seats in the vehicle and waited for a deputy to arrive.  Approximately four minutes later, Deputy Alfred arrived in a marked patrol vehicle.  Witness #1 spoke briefly with Deputy Alfred about the incident.  Witness #1 warned Deputy Alfred to be careful because he believed Barber was armed.  Deputy Alfred walked south down the driveway and out of Witness #1's view.  Witness #1 rolled his window up and heard Deputy Alfred speak to someone.  Witness #1 was unable to hear what was said.  Several seconds later, Witness #1 heard approximately five to six gunshots in rapid succession.  Witness #1 believed Barber shot the deputy, so he quickly drove down the street toward the driveway where Witness #1 had lost sight of Deputy Alfred.  Several minutes later, additional deputies and emergency medical services personnel arrived.

On April 28, 2021, at approximately 10:19 in the morning, **Witness #2** was interviewed by Detective Edward Hernandez.

Witness #2 and her husband, Witness #1, resided at ***** White Avenue in the City of Adelanto.  Witness #2 managed the property for her parents who owned the property.  There was also a rental home located at ***** White Avenue.  Witness #2 rented the rear home to Witness #3 and Barber.  Witness #3 and Barber had been living at the location for approximately one year.  Witness #2 said she had been having problems with Witness #3 and Barber over the last two months.

On April 27, 2021, at approximately 10:45 in the evening, Witness #2 and Witness #1 returned home from work in separate vehicles.  They planned to arrive home at roughly the same time because Witness #2 was afraid of Barber.  Witness #1 backed his vehicle south into the dirt driveway near its end.  Witness #2 saw Barber approach and knock on the passenger side of Witness #1's vehicle.  Witness #2 backed her vehicle into the driveway.  Barber approached the passenger side of Witness #2's vehicle which caused her to stop.  Barber knocked on the window and said, "Give me your car, take me to the apartments."  Witness #2 told Barber she could not take him, and Barber asked, "Are you sure?"  Barber attempted to open the passenger side doors, but they were locked.

Barber walked around the rear of Witness #2's vehicle and tried to open the driver's side doors which were also locked.  This prevented Witness #2 from reversing her

vehicle. Witness #2 was scared. Witness #2 did not know Barber well enough for him to demand she give him a ride anywhere. Barber walked south away from Witness #2's vehicle. Barber climbed the chain link fence and seemed to be under the influence of drugs or alcoholic beverages. Witness #1 approached the passenger side of Witness #2's vehicle so she unlocked the doors and allowed him inside. Witness #1 sat in the front passenger seat.

Barber returned and stood in front of Witness #2's vehicle. Barber would not let Witness #2 drive north. Barber approached Witness #2's vehicle again and tried to open the passenger side doors, but they were locked. Witness #2 drove north, approximately forty feet, to the end of the driveway and stopped. Witness #2 and Witness #1 quickly exited the vehicle, switched positions, and locked the doors. Witness #1 drove west on White Avenue, made a U-turn, and parked on the south side of the street. Witness #2 called Sheriff's Dispatch and explained Barber would not let her and Witness #1 enter their driveway. Witness #2 said she and Witness #1 were afraid for their safety.

Approximately five minutes after Witness #2 spoke with Sheriff's Dispatch, a patrol vehicle arrived. The Sheriff's Department patrol vehicle stopped east of their location, on the north side of the street, and faced west. Deputy Alfred exited his patrol vehicle and walked toward Witness #2 and Witness #1. Deputy Alfred was in uniform and Witness #2 immediately recognized him as a Sheriff's deputy. Witness #2 and Witness #1 spoke with Deputy Alfred for approximately five minutes and explained Barber's behavior.

Deputy Alfred walked south on the driveway of Witness #2's residence. Deputy Alfred used a flashlight to illuminate the driveway. Witness #2 lost sight of Deputy Alfred behind the east wall of the residence. Witness #2 did not hear anything after she lost sight of Deputy Alfred. The windows to Witness #2's vehicle were up and the radio was off. Approximately two minutes later, Witness #2 heard approximately four gunshots in rapid succession. Witness #2 believed the gunshots came from the driveway Deputy Alfred was walking on. Witness #2 and Witness #1 were scared. Witness #2 was unsure whether Barber shot Deputy Alfred or Deputy Alfred shot Barber.

Witness #1 started their vehicle and drove north toward their neighbor's driveway. Witness #1 and Witness #2 exited their vehicle and stood with the neighbor near the front porch. Approximately five minutes later, additional Sheriff's Department patrol vehicles arrived at the location. Four or five deputies walked down Witness #2's driveway. A few minutes later, a white ambulance arrived on the street. Witness #2 saw paramedics from the ambulance roll a gurney down her driveway. Approximately ten minutes later, the paramedics rolled the gurney back to the ambulance. Witness #2 noticed Barber was laying on the gurney. The paramedics placed Barber into the ambulance and drove away.

On April 28, 2021, at approximately 2:30 in the afternoon, **Witness #4** was interviewed by Detective Gerania Navarro.

Witness #4 lived at a residence located on White Avenue in the City of Adelanto. Witness #4 lived directly across the street from Witness #2 and Witness #1. On April 25, 2021, at approximately 9:40 in the evening, Witness #4 called Witness #2 and told her that Barber was going crazy or was high on drugs because Barber tried to fight her boyfriend. Witness #4 said Barber reversed his black Trailblazer out of his driveway at a high rate of speed and almost struck Witness #4's chain link fence.

On April 27, 2021, at approximately 11:00 in the evening, Witness #2 called Witness #4 and said Barber did not let her get out of her car to go inside her home. Witness #2 was afraid of Barber's aggressive behavior and wanted to spend the night at Witness #4's mother's house. Witness #4 said she saw Barber bang on Witness #2's car with his hands and yell for Witness #2 to get out of her vehicle. Witness #4 was on the phone with Witness #2 and told her not to get out of the car. Witness #4 was afraid for Witness #2's safety.

Witness #4 had the keys ready for Witness #2 and was waiting in the front yard of her home when she saw law enforcement arrive. Deputy Alfred parked his patrol vehicle in front of her house and turned on the overhead red and blue emergency lights. When Deputy Alfred got out of his patrol vehicle, Witness #4 saw he was wearing a tan and green Sheriff's Department uniform. Witness #4 heard Deputy Alfred tell Barber to show his hands two or more times. Barber did not comply and yelled, "No." Witness #4 demonstrated how Barber's hands were moving around when Deputy Alfred was giving commands. Witness #4 motioned with her hands rummaging around her waistband and pants pockets.

Witness #4 yelled for her parents to get inside the house. Witness #4 felt something bad was going to happen because Barber was not listening to Deputy Alfred's commands. As Witness #4 followed her parents inside the house, she heard three to four gunshots. Witness #4 thought Barber and Deputy Alfred were shooting at each other. Witness #4 did not see anything else because she went to the back of the house so she would not get hit with any bullets.

On April 27, 2021, at approximately 11:50 in the evening, Deputy Andrew Collins was holding the east perimeter at the intersection of White Avenue and Adelanto Road. During this time, Deputy Collins spoke with **Witness #5**.

Witness #5 said he was in the parking lot of the apartments just east of the incident location. Witness #5 was working on his truck's transmission. Several hours before the lethal force encounter, Witness #5 heard a male and female at the incident location arguing. Later, when Witness #5 was getting ready to leave to take his girlfriend home, Witness #5 heard the male and female arguing again. A deputy, later identified as Deputy Alfred, arrived at the scene and ordered the male, later identified as Steffon

Barber, to show his hands.   Witness #5 said Barber did not want to comply and cursed at Deputy Alfred.

Deputy Alfred told Barber not to go back into the vehicle.  Witness #5 said Barber immediately went into the driver's seat of the vehicle and put it into reverse.  According to Witness #5, "he put it into reverse and just like stomps on it.  So, he's burning rubber in the dirt and that's when I heard shots fired."  Witness #5 indicated he left the location following the gunshots.

## INCIDENT AUDIO

**BELT RECORDING.**    All belt recordings submitted were reviewed in their entirety. The belt recording summary will only cover the period of time from the beginning of each recording through the occurrence of the lethal force encounter.

## Deputy Christopher Alfred

Deputy Alfred had his belt recorder activated and recording during the incident under review.  The recording was approximately 13 minutes and 18 seconds in length.

Deputy Alfred could be heard speaking with Witness #1.  Witness #1 tells Deputy Alfred he called about his neighbor, Barber.  Witness #1 tells Deputy Alfred that Barber was threatening Witness #1 and his wife and that Barber was slamming his hands on their car.  Deputy Alfred asks where Barber lives.  Witness #1 indicates where Barber lives and tells Deputy Alfred that Barber is in and out of jail.  Witness #1 could be heard telling Deputy Alfred that he was afraid Barber "might have a gun or something." Deputy Alfred asks Witness #1 why he thought Barber had a gun.  Witness #1 tells Deputy Alfred he did not see a gun but that he just had a feeling.  Witness #1 explains Barber was acting "really, really, really, really strange" the day before.  Witness #1 says Barber kept asking if Witness #1 had seen any police cars come this way.  Deputy Alfred asks Witness #1 if Barber said he was armed.  Witness #1 responds, "No, no, but I mean, he reached for his pocket a second ago when he was hammering the car, because we wouldn't give him a ride."  Deputy Alfred tells Witness #1 he is going to go talk to Barber.  Witness #1 tells Deputy Alfred, "We're real scared."

Deputy Alfred could be heard telling Barber, "Hey bud, come out here."  Barber says, "I'm right here."  Deputy Alfred tells Barber, "Come over here, let me see your hands." Barber says, "Your hands."  Deputy Alfred, again, tells Barber, "Let me see your hands." Barber responds, "Your fucking hands."  Deputy Alfred says, "Let me see your hands." Barber responds, "Man, do like this, back the fuck up."  At this point, Deputy Alfred could be heard telling dispatch, "I have one not complying verbally."  Barber could be heard saying, "Your tension man."   Deputy Alfred tells Barber, "Don't go to that fucking

car, get your ass over here." Deputy Alfred says, "24-Paul-11, he's getting in the car, he trying to back up!" A vehicle could be heard accelerating loudly and a loss of tire traction was heard from the dirt driveway. Six gunshots are then heard in rapid succession. Deputy Alfred says, "24-Paul-11, shots fired, shots fired!" Witness #3 says, "No, no, what the fuck?" Deputy Alfred yells, "Show me your fucking hands now!" Witness #3 says, "Stop shooting! What's the problem!" Deputy Alfred is then heard saying, "24-Paul-11, 24-Paul, 24-Paul-11, shots fired, he tried to reverse the vehicle behind me. Can you start meds?" Sirens are heard in the background.

## INVOLVED VEHICLE

2003 Chevrolet Trailblazer which was driven by Barber at the time of the lethal force encounter was towed to the San Bernardino County Weights and Measures vehicle scale. It was determined that the weight of the Trailblazer, minus the solo occupant, was 4,980 pounds. With the added weight of Barber, the Trailblazer weighed approximately 5,040 pounds.

## INVOLVED SUBJECT

**INJURIES.** Steffon Barber was transported to a hospital for treatment for a gunshot wound to the head. Doctor indicated Barber sustained an open skull fracture to the posterior top portion of his head.

**TOXICOLOGY RESULTS.** Blood sample was collected from Barber.

Toxicology results for the blood sample were listed as follows:
- Amphetamines – Detected
  - Methamphetamine, LC/MS/MS – 187 ng/mL
  - Amphetamine, LC/MS/MS – 37 ng/mL
- Benzodiazepines – Detected
  - Midazolam, LC/MS/MS – 29 ng/mL

**CRIMINAL HISTORY.** 2005, 487(c) of the Penal Code, Grand Theft from Person. Los Angeles County case number VA088187-01, a felony.

2006, 69 of the Penal Code, Obstruct/Resist Executive Officer. 148(a)(1) of the Penal Code, Obstruct/ETC Public Officer/ETC. Kern County case number BM695272A, a misdemeanor.

2006, 23152(a) of the Vehicle Code, Driving Under the Influence Alcohol/Drugs. 12500(a) of the Vehicle Code, Driving without License. Kern County case number BM697314A, a misdemeanor.

2006, 422 of the Penal Code, Threaten Crime with Intent to Terrorize. 69 of the Penal Code, Obstruct/Resist Executive Officer. Kern County case number BM698442A, a misdemeanor.

2009, 243(a) of the Penal Code, Battery On Person. Kern County case number BM745716A, a misdemeanor.

2010, 666 of the Penal Code, Petty Theft with Prior Jail. Kern County case number BF129487A, a felony.

2012, 11377(a) of the Health and Safety Code, Possession of Controlled Substance. Kern County case number BF144385A, a misdemeanor.

2017, 415(a) of the Penal Code, Fight/Noise/Offensive Words. San Bernardino County case number MVI17008225, a misdemeanor.

2017, 273a(a) of the Penal Code, Child Cruelty: Possible Injury/Death. San Bernardino County case number FVI17003346, a felony.

2018, 69 of the Penal Code, Obstruct/Resist Executive Officer. San Bernardino County case number FVI18000982, a felony.

2018, 69 of the Penal Code, Obstruct/Resist Executive Officer. San Bernardino County case number FVI18000983, a felony.

2021, 245(c) of the Penal Code, Assault with Deadly Weapon Not a Firearm: Peace Officer/Firefighter: Great Bodily Injury. San Bernardino County case FVI21001037, a felony.

## DE-ESCALATION

Although Deputy Alfred was on scene for approximately three minutes and sixteen seconds before the lethal force encounter occurred, Deputy Alfred did not have a real opportunity to de-escalate the situation. Deputy Alfred first spoke to Witness #1 about what occurred with Barber. Afterwards, Deputy Alfred, who was in uniform, attempted to speak with Barber. Barber was uncooperative from the very first moment Deputy Alfred contacted him. Deputy Alfred told Barber multiple times to show his hands, but Barber refused to comply. When Deputy Alfred told Barber not to go to his car, Barber, again, refused to comply. There was no indication from Barber that he intended to comply with any of Deputy Alfred's commands. Instead, the situation escalated quickly.

Barber got into his Chevrolet Trailblazer, put the vehicle in reverse, revved the engine, and drove at a high rate of speed. Approximately twenty-eight seconds passed between Deputy Alfred first contacting Barber and when Deputy Alfred was forced to draw his weapon and fire at Barber's vehicle. Deputy Alfred had no time to consider the use of less lethal force options.

## APPLICABLE LEGAL PRINCIPLES

A peace officer may use objectively reasonable force to effect an arrest if he believes that the person to be arrested has committed a public offense. (Calif. Penal C. §835a(b).)[7] Should an arresting officer encounter resistance, actual or threatened, he need not retreat from his effort and maintains his right to self-defense. (Penal C. §835a(d).) An officer may use objectively reasonable force to effect an arrest, prevent escape or overcome resistance. (Penal C. §835a(d).)

An arrestee has a duty to refrain from using force or any weapon to resist arrest, if he knows or should know that he is being arrested. (Penal C. §834a.) This duty remains even if the arrest is determined to have been unlawful. (*People v. Coffey* (1967) 67 Cal.2d 204, 221.) In the interest of orderly resolution of disputes between citizens and the government, a *detainee* also has a duty to refrain from using force to resist detention or search. (*Evans v. City of Bakersfield* (1994) 22 Cal.App.4th 321, 332-333.) An arrestee or detainee may be kept in an officer's presence by physical restraint, threat of force, or assertion of the officer's authority. (*In re Gregory S.* (1980) 112 Cal. App. 3d 764, 778, *citing, In re Tony C.* (1978) 21 Cal.3d 888, 895.) The force used by the officer to effectuate the arrest or detention can be justified if it satisfies the Constitutional test in *Graham v. Connor* (1989) 490 U.S. 386, 395. (*People v. Perry* (2019) 36 Cal. App. 5th 444, 469-470.)

An officer-involved shooting may be justified as a matter of self-defense, which is codified in Penal Code at §§196 and 197. Both of these code sections are pertinent to the analysis of the conduct involved in this review and are discussed below.

**PENAL CODE SECTION 196**. Police officers may use deadly force in the course of their duties, under circumstances not available to members of the general public. Penal Code §196 states that homicide by a public officer is justifiable when it results from a use of force that "is in compliance with Section 835a." Section 835a specifies a **police officer is justified in using deadly force** when he reasonably believes based upon the totality of the circumstances, that it is necessary:

> (1)    to defend against an imminent threat of death or serious bodily injury to the officer or another, or

---

[7] All references to code sections here pertain to the California Penal Code.

(2)    to apprehend a fleeing felon who threatened or caused death or
serious bodily injury, if the officer also reasonably believes that the
fleeing felon would cause further death or serious bodily injury
unless immediately apprehended,

(Penal C. §835a(c)(1).) Discharge of a firearm is "deadly force." (Penal C. §835a(e)(1).)
The " '[t]otality of the circumstances' means all facts known to the peace officer at the
time, including the conduct of the officer and the subject leading up to the use of deadly
force." (Penal C. §835a(e)(3).) A peace officer need not retreat or desist from efforts to
arrest a resistant arrestee. (Penal C. §834a(d).) A peace officer is neither deemed the
aggressor in this instance, nor does he lose the right of self-defense by the use of
objectively reasonable force to effect the arrest, prevent escape or overcome
resistance. (*Id.*)

While the appearance of these principals was new to section 835a in 2020,[8] the courts
have been defining the constitutional parameters of use of deadly force for many years.
In 1985, the United States Supreme Court held that when a police officer has probable
cause to believe that the suspect he is attempting to apprehend "has committed a crime
involving the infliction or threatened infliction of serious physical harm" to the officer or
others, using deadly force to prevent escape is not constitutionally unreasonable.
(*Tennessee v. Garner* (1985) 471 U.S. 1, 11-12.) California courts have held that when
a police officer's actions are reasonable under the Fourth Amendment of our national
Constitution, that the requirements of Penal Code § 196 are also satisfied.  (*Martinez v.
County of Los Angeles* (1996) 47 Cal.App.4th 334, 349; *Brown v. Grinder* (E.D. Cal.,
Jan. 22, 2019) 2019 WL 280296, at *25.) There is also a vast body of caselaw that has
demonstrated *how* to undertake the analysis of what is a reasonable use of force under
the totality of the circumstances. (See *Reasonableness* discussion, *infra.*) As such, our
pre-2020 state caselaw, developed upon the former iteration of section 196, is still
instructive.

There are two new factors in section 835a that did not appear in the section previously,
nor did they develop in caselaw pertaining to use of deadly force. First, a peace officer
must make reasonable efforts to identify themselves as a peace officer and warn that
deadly force may be used, prior to using deadly force to affect arrest. (Penal C.
§835a(c)(1).) This requirement will not apply if an officer has objectively reasonable
grounds to believe that the person to be arrested is aware of those facts. (Penal C.
§835a(c)(1).)  Second, deadly force cannot be used against a person who only poses a
danger to themselves. (Penal C. §835a(c)(2).)

While the codified standards for use of deadly force in the course of arrest are set forth
at subsections (b) through (d) of Section 835a, the legislature also included findings and
declarations at subsection (a). These findings and declarations lend guidance to our

---

[8] Assem. Bill No. 392 (2019-2020 Reg. Sess.) approved by the Governor, August 19, 2019. [Hereinafter
"AB-392"]

analysis, but are distinct from the binding standards that succeed them within the section. In sum, the findings are as follows:

(1) that the use of force should be exercised judiciously and with respect for human rights and dignity; that every person has a right to be free from excessive uses of force;

(2) that use of force should be used only when necessary to defend human life and peace officers shall use de-escalation techniques if it is reasonable, safe and feasible to do so;

(3) that use of force incidents should be evaluated thoroughly with consideration of gravity and consequence, lawfulness and consistency with agency policies;[9]

(4) that the evaluation of use of force is based upon a totality of the circumstances, from the perspective of a reasonable officer in the same situation; and

(5) that those with disabilities may be affected in their ability to understand and comply with peace officer commands, and suffer a greater instance of fatal encounters with law enforcement, therefore.

(Penal C. §835a(a).)

**PENAL CODE SECTION 197.** California law permits *all persons* to use deadly force to protect themselves from the imminent threat of death or great bodily injury. Penal Code §197 provides that the use of deadly force by any person is justifiable when used in self-defense or in defense of others.

---

[9] Penal C. §835a (a)(3) conflates a demand for thorough evaluation of a use of force incident with a dictate that it be done "in order to ensure that officers use force consistent with law and agency policies." On its face, the section is clumsily worded. Nothing included in AB-392 plainly requires that a use of force also be in compliance with agency policies. A provision in the companion bill to AB-392—Senate Bill No. 230 [(2019-2020 Reg. Sess.) approved by the Governor, September 12, 2019] (Hereinafter "SB-230"), does explicitly state that "[a law enforcement agency's use of force policies and training] may be considered as a factor in the totality of circumstances in determining whether the officer acted reasonably, but shall not be considered as imposing a legal duty on the officer to act in accordance with such policies and training." (Sen. Bill No. 230 (2019-2020 Reg. Sess.) §1.) It is noteworthy, however, that this portion of SB-230 is uncodified, unlike the aforementioned portion of Penal C. §835a (a)(3).

The pertinent criminal jury instruction to this section is CALCRIM 505 ("Justifiable Homicide: Self-Defense or Defense of Another"). The instruction, rooted in caselaw, states that a person acts in lawful self-defense or defense of another if:

> (1)    he reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;

> (2)    he reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and

> (3)    he used no more force than was reasonably necessary to defend against that danger.

(CALCRIM 505.) The showing required under section 197 is principally equivalent to the showing required under section 835a(c)(1), as stated *supra*.

**IMMINENCE.** "Imminence is a critical component" of self-defense. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.) A person may resort to the use of deadly force in self-defense, or in defense of another, where there is a reasonable need to protect oneself or someone else from an apparent, *imminent* threat of death or great bodily injury. "An imminent peril is one that, from appearances, must be instantly dealt with." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) The primary inquiry is whether action was instantly required to avoid death or great bodily injury. (*Humphrey, supra*, 13 Cal.4th at 1088.) What a person knows and his actual awareness of the risks posed against him are relevant to determine if a reasonable person would believe in the need to defend. (*Id.* at 1083.) In this regard, there is no duty to wait until an injury has been inflicted to be sure that deadly force is indeed appropriate. (*Scott v. Henrich, supra*, 39 F. 3d at 915.)

Imminence more recently defined in the context of use of force to effect an arrest, is similar:

> A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

(Penal C. §835a(e)(2).)

**REASONABLENESS.** Self-defense requires both subjective honesty and objective reasonableness. (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1186.) The United States Supreme Court has held that an officer's right to use force in the course of an arrest, stop or seizure, deadly or otherwise, must be analyzed under the Fourth Amendment's "reasonableness" standard. (*Graham v. Connor, supra,* 490 U.S. at 395.)

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight....The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

(*Id.* at 396-397, citations omitted.)

The "reasonableness" test requires an analysis of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (*Id.* at 397, citations omitted.) What constitutes "reasonable" self-defense or defense of others is controlled by the circumstances. A person's right of self-defense is the same whether the danger is real or merely apparent. (*People v. Jackson* (1965) 233 Cal.App.2d 639.) If the person's beliefs were reasonable, the danger does not need to have actually existed. (CALCRIM 505.) Yet, a person may use no more force than is reasonably necessary to defend against the danger they face. (CALCRIM 505.)

When deciding whether a person's beliefs were reasonable, a jury is instructed to consider the circumstances as they were known to and appeared to the person and considers what a reasonable person in a similar situation with similar knowledge would have believed. (CALCRIM 505.) It was previously held that in the context of an officer-involved incident, this standard does not morph into a "reasonable police officer" standard. (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1147.)[10] To be clear, the officer's conduct should be evaluated as "the conduct of a reasonable person functioning as a police officer in a stressful situation." (*Id.*)

The *Graham* court plainly stated that digestion of the "totality of the circumstances" is fact-driven and considered on a case-by-case basis. (*Graham v. Connor, supra,* 490 U.S. at 396.) As such, "reasonableness" cannot be precisely defined nor can the test be mechanically applied. (*Id.*) Still, *Graham* does grant the following factors to be considered in the "reasonableness" calculus: the severity of the crime committed, whether the threat posed is immediate, whether the person seized is actively resisting arrest or attempting to flee to evade arrest. (*Id.*)

---

[10] The legislative findings included in Penal C. section 835a(a)(4) suggest to the contrary that "the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation". As such, if the officer using force was acting in an effort to *effect arrest*, as is governed by section 835a, then it appears the more generous standard included there would apply.

Whether the suspect posed an immediate threat to the safety of the officer or others has been touted as the "most important" *Graham* factor. (*Mattos v. Agarano* (9th Cir. 2011) 661 F.3d 433, 441-442.) The threatened use of a gun or knife, for example, is the sort of immediate threat contemplated by the United States Supreme Court, that justifies an officer's use of deadly force. (*Reynolds v. County of San Diego* (9th Cir. 1994) 858 F.Supp. 1064, 1071-72 "an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.") Again, the specified factors of *Graham* were not meant to be exclusive; other factors are taken into consideration when "necessary to account for the totality of the circumstances in a given case." (*Mattos v. Agarano, supra,* 661 F.3d at 441-442.)

The use of force policies and training of an involved officer's agency *may* also be considered as a factor to determine whether the officer acted reasonably. (Sen. Bill No. 230 (2019-2020 Reg. Sess) §1. See fn. 3, *infra.*)

When undertaking this analysis, courts do not engage in *Monday Morning Quarterbacking,* and nor shall we. Our state appellate court explains,

> under *Graham* we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

(*Martinez v. County of Los Angeles, supra,* 47 Cal.App.4th at 343, citing *Smith v. Freland* (6th Cir. 1992) 954 F.2d 343, 347.) Specifically, when a police officer reasonably believes a suspect may be armed or arming himself, it does not change the analysis even if subsequent investigation reveals the suspect was unarmed. (*Baldridge v. City of Santa Rosa* (9th Cir. 1999) 1999 U.S. Dist. LEXIS 1414 *1, 27-28.) The Supreme Court's definition of reasonableness is, therefore, "comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." (*Martinez v. County of Los Angeles, supra,* 47 Cal.App.4th at 343-344, citing *Roy v. Inhabitants of City of Lewiston* (1st Cir. 1994) 42 F.3d 691, 695.) In close-cases therefore, the Supreme Court will surround the police with a fairly wide "zone of protection" when the aggrieved conduct pertains to on-the-spot choices made in dangerous situations. (*Id.* at 343-344.) One court explained that the deference given to police officers (versus a private citizen) as follows:

> unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'

(*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1109, citing *Graham v. Connor,* [*supra*] 490 U.S. 386, 396.)

**NON-LETHAL FORCE.**    This does not suggest that anything *less than* deadly force requires no justification. "[A]ll force—lethal and non-lethal—must be justified by the need for the specific level of force employed." (*Bryan v. MacPherson* (9th Cir. 2010) 630 F.3d 805, 825, citing *Graham* [*v. Connor* (1989)] 490 U.S. [386], 395.) The *Graham* balancing test, as described *supra*, is used to evaluate the reasonableness of lethal and non-lethal force, alike. (*Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1282-83.)

Use of a taser or a shotgun-fired bean bag has been categorized as intermediate non-lethal force. (*Bryan v. MacPherson, supra,* 630 F.3d at 825[taser]; *Deorle v. Rutherford, supra,* 272 F.3d at 1279-80 [bean bag].) This designation exists despite the fact that such force is *capable* of being used in a manner causing death. (*Id.*) To be deemed "lethal force" the instrumentality must be force that "creates a substantial risk of death or serious bodily injury." (*Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 693.); use of a taser or shotgun-fired bean bag both fall short of this definition. (*Bryan v. MacPherson, supra,* 630 F.3d at 825; *Deorle v. Rutherford, supra,* 272 F.3d at 1279-80.) Similarly, the use of a trained police dog does not qualify as "deadly force" as it too has fallen short of the lethal force definition set forth in *Smith.* (*Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 165-169.)

Beyond the traditional *Graham* factors, and particularly in the use of non-lethal force, the failure of officers to give a warning and the subject's mental infirmity can also be considered when assessing the totality of the circumstances. (*Bryan v. MacPherson, supra,* 630 F.3d at 831; *Deorle v. Rutherford, supra,* 270 F.3d at 1283-84.) Failure to pass-muster under *Graham* can deem the use of non-lethal force as "excessive" and therefore violate the Fourth Amendment. (*Id.*) On the other hand, active resistance could justify multiple applications of non-lethal force to gain compliance and would not be deemed "excessive" nor violate the Fourth Amendment. (*Sanders v. City of Fresno* (9th Cir. 2008) 551 F.Supp.2d 1149, 1182 [not excessive to use physical force and tase an unarmed but actively resisting subject with 14 taser cycles where such was needed to gain physical control of him].)

## ANALYSIS

In this case, Deputy Alfred had an honest and objectively reasonable belief Barber posed an imminent risk of serious bodily injury or death. Deputy Alfred was wearing a San Bernardino County Sheriff's Department "Class A" uniform and driving a marked patrol vehicle on the date of the incident under review. When Deputy Alfred first arrived at the location, he spoke with Witness #1. Deputy Alfred said Witness #1 appeared frightened as he explained what happened with Barber. Witness #1 advised Deputy Alfred that Barber was threatening Witness #1 and his wife and Barber was slamming

his hands on their car. Witness #1 told Deputy Alfred that he thought Barber had a gun. Witness #1 explained to Deputy Alfred that although he never saw Barber with a gun, Barber reached for his pocket when he was slamming his hands on their vehicle. Witness #1 told Deputy Alfred that he and his wife were scared.

Deputy Alfred walked towards Barber and attempted to speak with him. Deputy Alfred told Barber to show his hands, but Barber refused to comply. Barber yelled at Deputy Alfred and said, "Man, do like this, back the fuck up." Deputy Alfred ordered Barber not to go to his car, but again Barber refused to comply with commands. Deputy Alfred saw Barber reaching inside his Trailblazer. Deputy Alfred was standing to the east of the driveway towards the chain-link fence so he could maintain his view of Barber. Deputy Alfred was approximately eight feet north of Barber's vehicle. Given what Witness #1 had described about his interaction with Barber, Deputy Alfred became concerned that Barber may be reaching for a weapon. After Barber refused to comply with Deputy Alfred's verbal commands, Barber got into the driver's seat of the Trailblazer. Barber put the vehicle into reverse and revved the engine. Barber then drove towards Deputy Alfred at a high rate of speed.

It was objectively reasonable for Deputy Alfred to believe Barber intended to run him over. Barber's Trailblazer weighed approximately 5,040 pounds and was traveling toward Deputy Alfred at a high rate of speed. Deputy Alfred only had seconds to react and there was no viable avenue of escape. The driveway where the lethal force encounter occurred was very narrow and mostly surrounded by fencing on both sides. There were no openings on the east side of the fence line where Deputy Alfred was standing, and Deputy Alfred had already moved beyond the opening on the west side which was now approximately two to three feet north of Deputy Alfred's position. Deputy Alfred was approximately eight to ten feet behind Barber's vehicle. In order to reach the opening on the west side, Deputy Alfred would have had to run across the driveway directly behind Barber's vehicle toward a picket fence. Deputy Alfred, however, did not believe the picket fence would sustain the impact from a vehicle and thus did not want to risk being struck by Barber's vehicle. Deputy Alfred also reasonably believed he would be unable to outrun Barber's vehicle if he attempted to escape by running north out of the driveway.

From the time Deputy Alfred first spoke to Barber to the time Deputy Alfred fired his weapon was approximately twenty-eight seconds. Approximately six seconds passed from the time Deputy Alfred told Barber not to get into his vehicle to when Deputy Alfred fired his weapon. From the time Deputy Alfred heard the engine on Barber's vehicle revving to when Deputy Alfred fired his weapon was approximately one to two seconds. This was a rapidly evolving incident that required quick decision making on the part of Deputy Alfred. If Deputy Alfred did not fire his weapon at Barber's vehicle, Deputy Alfred reasonably believed he would most assuredly be seriously injured or killed. Given those circumstances, the decision by Deputy Alfred to use deadly force was justified.

## <u>CONCLUSION</u>

Based on the facts presented in the reports and the applicable law, Deputy Alfred's use of lethal force was a proper exercise of Deputy Alfred's right of self-defense and therefore his actions were legally justified.

**Submitted By:**
**San Bernardino County District Attorney's Office**
**303 West Third Street**
**San Bernardino, CA 92415**



# EXHIBIT 3

# EXHIBIT 3

ELM Solutions

# 2025 Real Rate Report® powered by LegalVIEW® DynamicInsights

The industry's leading analysis of law firm rates, trends, and practices


Wolters Kluwer



## Report Editor

**Jennifer McIver**
Director, Legal Operations and Industry Insights
Wolters Kluwer ELM Solutions

## Lead Data Analysts

**Anand Kumar Pathinettam Padian**
Software and Data Engineer
Wolters Kluwer ELM Solutions

**Farhan Shaikh**
Data Scientist
Wolters Kluwer ELM Solutions

## ELM Solutions Creative

**David Andrews**
Senior Graphic Designer
Wolters Kluwer ELM Solutions

## Contributing Analysts and Authors

**Haemi Jung**
Strategic Business Intelligence Manager
Wolters Kluwer ELM Solutions

**Manish Sharma**
Director, Business Analysis
Wolters Kluwer ELM Solutions

**Karen Sekley-Dandrea**
Director, Marketing
Wolters Kluwer ELM Solutions

**Mat Greener**
Project & Program Management Director
Wolters Kluwer ELM Solutions

## Executive Sponsor

**Brian Jorgenson**
Vice President, Product Management
Wolters Kluwer ELM Solutions

©2004 - 2025 Wolters Kluwer ELM Solutions. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. To request permission, please contact:

Wolters Kluwer ELM Solutions
2929 Allen Pkwy Ste 3300
Houston, TX 77019 United States
ATTN: Marketing
ELMSolutionsSales@wolterskluwer.com

**LEGAL CAVEAT**

Wolters Kluwer ELM Solutions has worked to ensure the accuracy of the information in this report powered by LegalVIEW DynamicInsights; however, we cannot guarantee accuracy in all cases. Neither this report nor LegalVIEW DynamicInsights constitute legal, accounting, or professional advice and should not be used as such. This material should not be construed as a substitute for professional advice based on specific facts or circumstances. ELM Solutions is not responsible for any claims or losses arising from reliance on the information or recommendations included in this solution. View terms of use.

# Table of Contents – 2025 Real Rate Report

**A Letter to Our Readers • 4**

**Real Rate Report Overview • 5**

**Section I: High-Level Data Cuts • 9**

- Partners, Associates, and Paralegals
- Partners, Associates, and Paralegals by Practice Area and Matter Type
- Partners and Associates by City
- Partners and Associates by City and Matter Type
- Partners by City and Years of Experience
- Associates by City and Years of Experience
- Partners and Associates by Firm Size and Matter Type

**Section II: Industry Analysis • 71**

- Partners, Associates, and Paralegals by Industry Group
- Partners and Associates by Industry Group and Matter Type
- Basic Materials and Utilities
- Consumer Goods
- Consumer Services
- Financials (Excluding Insurance)
- Health Care
- Industrials
- Insurance
- Technology and Telecommunications

**Section III: Practice Area Analysis • 98**

- Bankruptcy and Collections
- Commercial
- Corporate: Mergers, Acquisitions, and Divestitures
- Corporate: Other
- Corporate: Regulatory and Compliance
- Employment and Labor
- Environmental
- Finance and Securities
- General Liability (Litigation Only)
- Insurance Defense (Litigation Only)
- Intellectual Property: Other
- Intellectual Property: Patents
- Intellectual Property: Trademarks
- Real Estate

**Section IV: In-Depth Analysis for Select US Cities • 201**

- Boston, MA
- Chicago, IL
- Los Angeles, CA
- New York, NY
- Philadelphia, PA
- San Francisco, CA
- Washington, DC

**Section V: International Analysis • 226**

**Section VI: Matter Staffing Analysis • 255**

**Appendix: Data Methodology • 259**

**NOTE:**
You may experience an issue that can sometimes occur in PDF viewer. Thin lines (like table borders) may appear to "disappear" or look broken when zoomed out in a PDF viewer. This is usually a display/rendering issue rather than a problem with the actual content of the PDF.

**Solution:**
- Open the PDF in Acrobat and go to Edit > Preferences > Page Display.
- Uncheck Enhance thin lines (if it's checked).
- Restart Acrobat and reopen the PDF.

# A Letter to Our Readers

**Welcome to the latest edition of the Real Rate Report®, the legal industry's most trusted benchmark for legal billing rates.**

Since 2010, the Real Rate Report has helped legal departments and law firms make smarter decisions about pricing, resourcing, and vendor management. That hasn't changed. What has changed is how we deliver those insights.

This year, the Real Rate Report is powered by LegalVIEW® DynamicInsights—our new digital-first platform that brings the same trusted LegalVIEW data to life in a more interactive, flexible, and timely way. Leveraging  Wolters Kluwer's LegalVIEW database, with over $200B in anonymized, approved, invoice data, LegalVIEW DynamicInsights offers dynamic filters, quarterly updates, and calendar-year alignment to help users tailor benchmarks to their unique needs, on demand.

The Real Rate Report remains a vital snapshot of the market, and we know many of you rely on it as a reference tool. But DynamicInsights goes further. It enables deeper exploration of rate trends by role, experience, geography, practice area, industry, and more. Whether you're negotiating rates, evaluating law firm performance, or planning budgets, DynamicInsights gives you the agility and precision today's legal environment demands.

As always, we welcome your feedback and thank our data contributors for making this work possible. We're proud to be your partner in legal analytics and look forward to continuing to deliver insights that drive better business outcomes.

Sincerely,

**Brian Jorgenson**
Vice President, Product Management
Wolters Kluwer ELM Solutions

# Real Rate Report Overview

The Real Rate Report is powered by LegalVIEW DynamicInsights, a web-based solution that delivers dynamic, invoice-backed insights through approved legal billing rates. It enables legal professionals to analyze rate trends by role, experience, industry, geography, practice area, and more using the world's largest repository of legal spend data.

DynamicInsights leverages the same trusted LegalVIEW database that has powered the Real Rate Report for years, now encompassing over $200B+ in anonymized, approved legal invoice data. As with previous Real Rate Reports, our data is sourced from corporations' and law firms' e-billing and time management solutions. We have included lawyer and paralegal rate data filtered by specific practice and sub-practice areas, metropolitan areas, and types of matters. This level of granularity gives legal departments and law firms the precision they need to identify areas of opportunity.

## What's different with DynamicInsights?

Same source, same methodology: DynamicInsights uses the same rigorous data validation and methodology as the Real Rate Report.

- **Enhanced flexibility:** With dynamic filters, DynamicInsights enables users to tailor benchmarks to their unique needs and on demand.

- **Full year data:** DynamicInsights now aligns to a calendar year view—January through December—replacing the previous July-to-June format used in the Real Rate Report, reducing confusion and improving consistency across reporting periods.

- **More up to date:** Unlike the annual and static Real Rate Report, DynamicInsights is refreshed quarterly, offering more timely insights.

- **Digital-first access:** Delivered via a secure online interface, users can interact with the data, bookmark views, and share insights in real time.

DynamicInsights provides the same level of credibility and analytical power long trusted in the Real Rate Report with more agility and transparency for today's legal environment.

### 2025 Real Rate Report use considerations

- Examines law firm rates over time
- Identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal)
- Itemizes variables that drive rates up or down

All the analyses included in DynamicInsights and this report are derived from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information, along with the ranges of those rates and their changes over time, highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals.

Legal departments might ask whether they are paying the right amount for different types of legal services, while law firm principals might ask whether they are charging the right amount for legal services and whether to modify their pricing approach.

### Examples of data to consider when reviewing rates:

- **Industry** – Compare spend and rate trends across various industries
- **Practice area** – Analyze cost variations in different legal practice areas
- **Detailed practice area** – Drill down into niche legal specialties for precise benchmarking
- **Am Law** – Benchmark against top-ranked law firms for competitive rate analysis
- **City** – Understand rate trends in specific metropolitan areas
- **Country** – Gain a global perspective on legal costs and spend management
- **Role** – Assess legal spend distribution across different law firm roles

# Real Rate Report Overview

**Understanding key statistical terms**

To help interpret the legal rate data presented in DynamicInsights and this report, it's important to understand the statistical measures used. Below are definitions of the core metrics:

- **Mean (average):** The sum of all rate values divided by the total number of values added. It provides a general sense of the central tendency of the rates but can be influenced by extreme values (outliers).
- **Median:** The middle value when all rates are arranged in ascending order. If there is an even number of rates being analyzed, the median is the average of the two middle rates. It is a robust measure of central tendency of rates that is less affected by outliers.
- **First quartile (Q1):** The value below which 25% of the rates fall. It marks the lower boundary of the middle 50% of the rates and helps identify the lower range of typical values.
- **Third quartile (Q3):** The value below which 75% of the rates fall. It marks the upper boundary of the middle 50% of the rates and helps identify the upper range of typical values.
- **n:** The number of unique timekeepers contributing to the data.

These metrics are used to provide a more nuanced view of legal rates, helping users identify trends, outliers, and benchmarks across various dimensions.

# Section I: High-Level Data Cuts

**All**
By Role

**2025 Real Rates by Partner, Associate, and Paralegal**                                    **Trend Analysis - Mean**

| Role | n | First Quartile | Median | Third Quartile | 2025 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|
| Partner | 9,072 | $420 | $675 | $1,099 | $820 | $817 | $774 |
| Associate | 7,357 | $336 | $530 | $842 | $627 | $611 | $571 |
| Paralegal | 3,515 | $150 | $226 | $350 | $271 | $264 | $253 |

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2025 Real Rates for Associate and Partner**

**Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2025 | 2024 | 2023 |
|------|-------------|------|---|----------------|--------|----------------|------|------|------|
| **Los Angeles CA** | **Litigation** | Partner | 289 | $519 | $875 | $1,334 | $984 | $945 | $866 |
| | | Associate | 229 | $461 | $700 | $1,041 | $763 | $736 | $687 |
| | **Non-Litigation** | Partner | 335 | $515 | $950 | $1,377 | $1,002 | $1,005 | $949 |
| | | Associate | 312 | $504 | $740 | $959 | $759 | $744 | $681 |
| **Memphis TN** | **Litigation** | Partner | 13 | $313 | $352 | $420 | $353 | $358 | $334 |
| **Miami FL** | **Litigation** | Partner | 59 | $300 | $485 | $658 | $502 | $537 | $491 |
| | | Associate | 34 | $225 | $376 | $475 | $361 | $366 | $359 |
| | **Non-Litigation** | Partner | 140 | $195 | $550 | $800 | $569 | $590 | $623 |
| | | Associate | 101 | $175 | $263 | $481 | $356 | $404 | $411 |
| **Milwaukee WI** | **Litigation** | Partner | 13 | $275 | $432 | $625 | $497 | $469 | $493 |
| | **Non-Litigation** | Partner | 21 | $400 | $510 | $650 | $540 | $600 | $520 |

# Appendix: Data Methodology

## Invoice information

Data in DynamicInsights is taken from invoice line-item entries contained in invoices received and approved by participating companies through Wolters Kluwer. Invoice data were received in the Legal Electronic Data Exchange Standard (LEDES) format (LEDES.org). The following information was extracted from those invoices and their line items:

- Law firm (which exists as a random number in the ELM Solutions reference database)
- Timekeeper ID (which exists as a random number in the ELM Solutions reference database)
- Matter ID (which exists as a random number in the ELM Solutions reference database)
- Timekeeper's position (role) within the law firm (partner, associate, paralegal, etc.)
- Uniform Task-Based Management System (UTBMS) code set, task codes, and activity codes
- Date of service
- Hours billed
- Hourly rate billed
- Fees billed

## Non-invoice information

To capture practice area details, the matter ID within each invoice was associated with matter profiles containing areas of work in the systems of each company. The areas of work were then systematically categorized into legal practice areas. Normalization of practice areas was done based on company mappings to system-level practice areas available in the ELM Solutions system and by naming convention.

The majority of analyses included in DynamicInsights have been mapped to one of 12 practice areas, further divided into sub-areas and litigation/non-litigation.

To capture location and jurisdiction details, law firms and timekeepers were systematically mapped to the existing profiles within ELM Solutions systems, as well as with publicly available data sources for further validation and normalization. Where city location information is provided, it includes any address within that city's defined Core-Based Statistical Area (CBSA) as defined by the Office of Management and Budget (OMB). The CBSAs are urban centers with populations of 10,000 or more and include all adjacent counties that are economically integrated with that urban center.

Where the analyses focus on partners, associates, of counsel, and paralegals, the underlying data occasionally included some sub-roles, such as "senior partner" or "junior associate." In such instances, those timekeeper sub-roles were placed within the broader partner, associate, and paralegal segments. The years-of-experience for timekeepers is populated from data submitted by vendors within ELM Solutions systems and supplemented by available data from Martindale-Hubbell.

Demographics regarding law firm size, location, and lawyer years of experience were augmented by incorporating publicly available information.

# Appendix: Data Methodology

**General Liability**

Asbestos/Mesothelioma
Auto and Transportation
Consumer Related Claims
Crime, Dishonesty and Fraud
Employment
General/Other

Personal Injury/Wrongful Death
Premises
Product and Product Liability
Property Damage
Toxic Tort
Workplace Safety

**Government Relations**

General/Other

**Insurance Defense**

Advertising Injury
Asbestos/Mesothelioma
Auto and Transportation
Errors and Omissions
General/Other
Insurer Work Comp
Marine

Personal Injury/Wrongful Death
Pollution
Premises
Product and Product Liability
Professional Liability
Property Damage

**Insurance Policies and Coverage**

Claims and Coverage Analysis
General/Other
Policy Coverage Dispute

**Intellectual Property**

Copyrights
General/Other
Licensing

Opinions
Patents
Trademarks

**Marketing and Advertising**

General/Other

**Real Estate**

Construction/Development
Easement and Right of Way
General/Other
Land Use/Zoning/Restrictive Covenants
Landlord/Tenant Issues

Leasing
Liens
Property/Land Acquisition or Disposition
Titles

**Requests for Information**

Subpoena



# About Wolters Kluwer ELM Solutions

ELM Solutions is the market-leading global provider of enterprise legal spend and matter management and legal analytics solutions. It provides a comprehensive suite of tools that address the growing needs of corporate legal operations and insurance claims departments to increase operational efficiency and reduce costs, including the LegalVIEW legal spend database featuring more than $200B+ in invoices. Corporate legal and insurance claims departments trust its innovative technology and end-to-end customer experience to drive world-class business outcomes. In 2025, Wolters Kluwer ELM Solutions earned Globee Awards for Achievement (Gold): Legal Technology Solutions – LegalVIEW DynamicInsights and Merit Awards for Business (Silver): Business Technology – LegalVIEW DynamicInsights.