LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA  91367
Telephone:   (818) 347-3333
Facsimile:    (818) 347-4118

# UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEFFON BARBER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED,<br><br>Defendants. | Case No. 5:22-cv-00625-KK-DTBx<br><br>*[District Judge, Kenly Kiya Kato, Magistrate Judge, David T. Bristow]*<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO FRCP 59**<br><br>*[Filed concurrently with Declaration of Renee V. Masongsong and exhibits thereto]*<br><br>Date: June 7, 2026<br>Time: 9:30 a.m. |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   LEGAL STANDARD...........................................................................................3

III.  THE JURY'S VERDICT WAS SUPPORTED BY THE CLEAR WEIGHT OF THE EVIDENCE ...........................................................................................4

    A.   The evidence at trial supports Plaintiff's excessive force claim. ............. 4

    B.   Deputy Alfred is not entitled to qualified immunity. ............................... 7

    C.   The jury's verdict on Plaintiff's state law claims must also stand. ........... 8

IV.   THE COURT'S EVIDENTIARY RULINGS WERE NOT ERRONEOUS OR PREJUDICIAL ..........................................................................................11

    A.   The Court did not err in excluding evidence of Plaintiff's criminal history. ...................................................................................................... 11

        1.   *Barber's criminal history was irrelevant and inadmissible, and this Court did not prejudicially err in concluding otherwise.* .....................11

        2.   *The Court did not prejudicially err in barring Defendants from cross-examining Plaintiff about his criminal history, and Plaintiff did not open the door.* .................................................................................................14

    B.   Dr. Vilke's testimony was not limited.................................................... 15

    C.   The Court did not prejudicially err in permitting testimony of future economic damages................................................................................... 15

    D.   The Court did not prejudicially err in denying Defendants' MIL No. 2 to exclude Robert Morales' testimony....................................................... 16

V.    THE JURY'S DAMAGES AWARD WAS NOT EXCESSIVE ...................18

VI.   CONCLUSION .................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Acosta v. City & Cnty. of S.F.*,
 83 F.3d 1143 (9th Cir. 1996)...............................................................9, 13

*Bell v. Williams*,
 108 F.4th 809 (9th Cir. 2024)..................................................20, 21, 22

*Bryan v. McPherson*,
 630 F.3d 805 (9th Cir. 2010).....................................................................4

*Cf. United States v. Bagley*,
 772 F.2d 482 (9th Cir. 1985).....................................................................14

*Cornell v. City and County of San Francisco*,
 17 Cal. App. 5th 766 (2017).....................................................................10

*Crawford v. Tribeca Lending Corp.*,
 815 F.3d 121 (2d Cir. 2016).......................................................................3

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
 95 F.3d 1422 (9th Cir. 1996)....................................................................21

*Espinosa v. City & Cnty. of San Francisco*,
 598 F.3d 528 (9th Cir. 2010).....................................................................4

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
 762 F.3d 892 (9th Cir. 2014).....................................................................7

*Gasperini v. Center for Humanities, Inc.*,
 518 U.S. 415 (1996) ..................................................................................21

*Glenn v. Washington County*,
 673 F.3d 864 (9th Cir. 2011).....................................................................14

*Graham v. Connor*,
 490 U.S. 386 (1989) ....................................................................................4

*Harper v. City of Los Angeles*,
 533 F.3d 1010 (9th Cir. 2008)...............................................................4, 20

*Havens v. F/T Polar Mist*,
 996 F.2d 215 (9th Cir. 1993).....................................................................18

*Havens v. Johnson*,
 783 F.3d 776 (10th Cir. 2015)...................................................................12

*Hayes v. Cnty. of San Diego*,
 57 Cal. 4th 622 (2013)..............................................................................10

*Hyer v. City & County of Honolulu*,
 118 F.4th 1044 (9th Cir. 2024)..................................................................12

*Landes Const. Co., Inc. v. Royal Bank of Canada*,
 833 F.2d 1365 (9th Cir. 1987).....................................................................3

*Morse v. County of Merced*,
 2018 WL 34690632 (E.D. Cal. July 16, 2018) ........................................21

*Orn v. City of Tacoma*,
 949 F.3d 1167 (9th Cir. 2020).....................................................................8

*People v. Chance*,
 44 Cal. 4th 1164 (2008)............................................................................13

*People v. Marsh*,
  37 Cal. App. 5th 474 (2019)...................................................................................12
*Reese v. Cnty. of Sacramento*,
  888 F.3d 1030 (9th Cir. 2018)...............................................................................10
*Rubalcava v. City of Los Angeles*,
  64 F.3d 1323 (9th Cir. 1995)..............................................................................3, 12
*Snake River Valley Elec. Ass'n v. PacifiCorp*,
  357 F.3d 1042 (9th Cir. 2004)...............................................................................16
*Tortu v. Las Vegas Metro. Police Dept.*,
  556 F.3d 1075 (9th Cir. 2009)..................................................................................8
*United States v. Rangel*,
  466 F.3d 158 (1st Cir. 2006) .................................................................................16
*United States v. Redlightning*,
  624 F.3d 1090 (9th Cir. 2010)...............................................................................15
*United States v. Reese*,
  2 F.3d 870 (9th Cir. 1993).....................................................................................11
*United States v. Tamman*,
  782 F.3d 543 (9th Cir. 2015).................................................................................15
*Villanueva v. California*,
  986 F.3d 1158 (9th Cir. 2021)..................................................................................8
*Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007) ...................................3
*Whittaker Corp. v. Execuair Corp.*,
  953 F.2d 510 (9th Cir. 1992).................................................................................16
**Statutes**
California Penal Code § 835(a) ....................................................................................8
**Other Authorities**
Judicial Council of California Civil Jury Instructions No. 441................................9
Judicial Council of California Civil Jury Instructions, No. 1305B .......................9
**Rules**
Federal Rule of Evidence 103............................................................................15, 16
Federal Rules of Civil Procedure, Rule 61 ...............................................................3

## I.    **<u>INTRODUCTION</u>**

This Court should deny Defendants' motion for a new trial in full. First, overwhelming evidence presented at trial supports the jury's finding in Plaintiff's favor on his §1983 claim and on his state law claims, as follows: Prior to seeing Barber enter the Trailblazer, Alfred knew Barber wanted to leave the driveway, as that was the nature of the call for service, and knew the only way out of the driveway was to reverse. Alfred never announced himself as a police officer, and Barber did not know it was law enforcement speaking to him. Contrary to Alfred's police training instructing deputies not to stand behind a vehicle they think might move, Alfred chose to position himself behind the Trailblazer and stood there even when he heard the engine and saw the reverse lights come on. At the time of the shooting, there was a wide opening a few feet to Alfred's right, where he could have easily repositioned himself within one second. Rather than tactically repositioning to the opening as trained, Alfred made a radio dispatch and fired six shots, aiming for the back of the headrest and striking Barber in the back of the head.

At the time of the first shot, Alfred was at least 25 to 30 feet from the back of the Trailblazer, and the Trailblazer was either not moving or had at most moved back only one foot, at about one mile per hour. By the time of the third shot, the Trailblazer had still only moved back slowly about 1.4 feet. The Trailblazer's speed never exceeded average human walking pace. Alfred did not give Barber a verbal warning that he was prepared to use deadly force, even though he had time to make a radio dispatch before shooting. Based on this overwhelming evidence, the jury even found a Bane Act violation, which required Plaintiff to prove that Alfred acted with a reckless disregard for Barber's

constitutional right to be free from excessive force, a higher standard than that required for Plaintiff's excessive force claim.

Second, this Court's evidentiary rulings were not erroneous or prejudicial. This Court properly excluded Barber's Penal Code §245(a)(1) conviction and other criminal history under Federal Rules of Evidence ("FRE"), Rules 402, 403, and 404. This Court also did not err in admitting the testimony of Plaintiff's expert Robert Morales, whose qualifications this Court established in ruling on Defendants' summary judgment motion and motion in limine. Nor did this Court err in excluding defense expert Dr. Vilke's untimely opinion regarding Barber's progress and alleged failure to mitigate—Plaintiff's counsel actually reached an agreement with defense counsel to allow Vilke to give opinions that were not specifically enumerated as opinions in his Rule 26 report, rendering this Court's ruling moot. Contrary to Defendants' Motion, Plaintiff did not seek damages for lost earnings, and it was defense counsel who elicited testimony from Plaintiff's expert Dr. Omalu regarding Barber's future medical expenses. These rulings were not erroneous, were certainly not prejudicial, and had no impact on the outcome or the jury's award, particularly in light of the overwhelming evidence supporting the verdict.

Third, the jury's damages award of $27,350,000 was not grossly excessive or the product of passion and prejudice. At trial, Omalu gave detailed testimony regarding Barber's progressive brain damage and the full-blown dementia he will develop within 20 to 30 years after the shooting, when he will require almost 24/7 assistance. Recent verdicts and settlements in comparable cases, including multi-million dollar awards for pre-death pain and suffering where the decedent survived for only a short period of time, also support the jury's damages award here, where Barber endured approximately five years of pain and suffering prior

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL

to trial and will continue to endure pain and suffering for the rest of his life, approximately 33 years.

For the reasons set forth herein, this Court should deny Defendants' Rule 59 Motion for a New Trial and should not reduce the damages award.

## II. LEGAL STANDARD

A verdict should only be set aside where, after giving full respect to the jury's findings, the judge "is left with the definite and firm conviction that a mistake has been committed by the jury." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987). Courts "should not be quick to revisit a jury's credibility determinations, and must proceed with caution and great restraint when asked to do so." *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 128 (2d Cir. 2016). A court may not grant a new trial simply because it would have arrived at a different verdict. *Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007).

"Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61. "[T]he court must disregard all errors and defects that do not affect any party's substantial rights." *Id.* "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Rubalcava v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (internal citations omitted). Prejudice is found only if the error "more probably than not…tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008).

### III.    THE JURY'S VERDICT WAS SUPPORTED BY THE CLEAR WEIGHT OF THE EVIDENCE

#### A.    The evidence at trial supports Plaintiff's excessive force claim.

The clear weight of the evidence at trial shows that Alfred's use of deadly force was objectively excessive and unreasonable. "Fourth Amendment claims of excessive [] force are analyzed under an objective reasonableness standard." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010); *Graham v. Connor*, 490 U.S. 386, 397 (1989). In considering whether Alfred used excessive force, the most important factor is whether Barber posed an immediate threat of death or serious bodily injury to Alfred or others at the time of the shooting. *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010). The clear weight of the evidence supports the jury's finding that he did not[1].

First, in violation of basic police training on situational awareness, cover, concealment, and tactical positioning, Alfred chose to position himself behind the Trailblazer despite clear indications that the Trailblazer was going to leave. TT-II: 319:21-322:23, 325:9-326:22. Based on the call for service, Alfred knew that Barber wanted to leave the driveway in his vehicle and that the only way to leave the driveway was to reverse out. TT-II: 311:19-312:25, 352:7-15. Prior to Barber entering the Trailblazer, Alfred saw that the Trailblazer's lights were on and its engine was running, giving the impression that it was going to leave. TT-II: 205:24-206:11, 208:2-6, 220:9-17, 323:4-13, 324:10-24. When Barber closed the Trailblazer's door, Alfred thought Barber was going to back up. TT-II: 220:9-17.

Second, Alfred had time to move out of the Trailblazer's potential path rather than shooting. Approximately two seconds passed between the Trailblazer door closing and the engine revving, and approximately three seconds passed

---

[1] Plaintiff incorporates by reference the trial evidence discussed in Plaintiff's opposition to Defendants' Rule 50(b) Motion. (Dkt. 218 at 4:6-7:3).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL

between the door closing and the first shot. TT-III: 416:5-418:15. The Trailblazer was on a low-friction surface, meaning it would have taken longer for the Trailblazer to gain traction and move backwards. TT-III: 416:22-417:7. At the time of the first shot, the Trailblazer was either not moving or had moved back only about one foot and was moving slowly, less than one mile per hour. TT-III: 411:11-19, 419:11-19. At the time of the third shot, the Trailblazer had moved about 1.4 feet total. TT-III: 9-19. The maximum speed the Trailblazer reached during all six shots was 3.4 miles per hour, which is average human walking speed. TT-III: 421:14-422:1, 425:14-20, 651:13-25. Alfred was at least 25 to 30 feet from the Trailblazer when it started backing up. TT-II: 222:19-21; TT-III: 413:11-24; TT-IV: 620:4-24. The Trailblazer moved backward only about 10 to 13 feet, and the reasonable inference is the Trailblazer had moved a much lesser distance before the shots ended, meaning the Trailblazer never came close to Alfred's position. TT-II: 197:11-23, 223:12-14; TT-III: 409:7-12, 411:20-412:12, 587:21-588:8; TT-IV: 650:5-15.

Third, Alfred had cover available where he could have easily repositioned himself within one second rather than shooting. At the time of the shooting, there was a wide opening adjacent to the fence on the west side of the driveway, approximately three to four feet to Alfred's right. TT-II: 209:10-13, 212:19-25, 220:2-5. The opening was approximately eight to fifteen feet wide. TT-II: 211:4-9, TT-IV: 617:2-25, 622:22-25. Alfred saw that opening before the shooting. TT-II: 209:10-13, 210:8-16. According to Plaintiff's expert Morales, Alfred could have moved three to four feet to his right within one second (TT-III: 426:2-7), and according to Alfred, it would only have taken him a couple seconds to move into the opening. TT-II: 221:14-22, 250:3-13. The jury also heard testimony by Plaintiff's expert Scott DeFoe that officers are trained not to stand behind a

vehicle they think might move, and that a reasonable deputy in Alfred's position would have just moved the three to four feet into the opening rather than just standing there and shooting. TT-II: 320:22-322:23, 324:22-325:2, 326:4-327:10. Alfred also testified that his understanding of the training and department policy was that deputies shall not shoot at a moving vehicle and shall step out of the way rather than shooting, when feasible. TT-II: 212:2-18, 223:3-5, 230:17-231:1.

Defendants' argument that the Trailblazer "could have" knocked down the fence misunderstands the standard with respect to the use of deadly force. An officer cannot justify a shooting by simply saying that he thought he was about to be run over—the fear must be objective, and a fear of future harm is insufficient to justify a use of deadly force. TT-II: 329:10-21, 337:21-338:14.

Further, despite Defendants' contentions, the reasonable inference is that the jury found Barber's testimony credible, and this Court should not revisit the jury's credibility determinations. Consistent with Barber's testimony that he did not know that it was law enforcement speaking to him and did not know Alfred was behind the Trailblazer (TT-III: 461:1-16, 479:23-480:1, 481:23-482:2, 482:21-23), Alfred conceded that he never identified himself as a police officer (TT-II: 202:18-24, 208:13-15).

In assessing whether the verdict was against the clear weight of the evidence, this Court may consider that the jury likely found issues with Alfred's credibility[2]. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 892, 842 (9th Cir. 2014). This Court has already found, and should reiterate, in its discretion and based on its great familiarity with the evidence at trial, including witness demeanor, that Alfred's testimony about his ability to move out of the way was not credible. After Alfred testified, the Court noted outside the jury's

---

[2] Plaintiff incorporates by reference the more detailed recitation of Alfred's conflicting testimony in Plaintiff's opposition to Defendants' Rule 50(b) Motion. (Dkt. 218 at 7:4-8:7).

presence that he gave "quite a bit of testimony" that was inconsistent, and could support an adverse instruction. TT-II: 389:12-21. This Court also noted in denying Defendants' Rule 50(a) motion that Alfred's credibility "has been an issue in this case," and was "certainly questionable." TT-IV: 743:19-744:21. "Among other things, there were notable material discrepancies, which simply cannot be reconciled. In answering questions, he was also evasive and defensive at times." TT-IV: 743:22-744:5. The material discrepancies noted by the Court, "including under oath," included but were not limited to, "whether he was north or south of the opening on the west side of the driveway, and perhaps most astonishingly, his original denial that there was even an opening at all on the west side of the driveway." *Id*. Further, Alfred initially testified under oath that he was never trained to give verbal warnings before using deadly force when feasible, or that deadly force should not be used in the absence of an immediate threat of death or serious bodily injury. TT-IV: 744:11-16. As the Court noted, he later disclaimed that testimony. TT-IV: 744:17-20.

### B. Deputy Alfred is not entitled to qualified immunity.

Defendants seek a new trial on their qualified immunity defense, contending that Barber failed to show that his right was clearly established. Mot. at 6. However, the "clearly established" prong must be raised post-trial in a Rule 50(b) motion; it "cannot be appropriately considered on a motion for a new trial." *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d 1075, 1085 (9th Cir. 2009). Based on the foregoing evidence presented at trial, the clear weight of the evidence shows that Alfred's shooting violated Barber's constitutional right to be free from excessive force. Even if Defendants' instant motion were the appropriate vehicle for this argument, at the time of the shooting, it was clearly

established that deadly force would be excessive under this factual scenario[3]. *See Villanueva v. California*, 986 F.3d 1158, 1172-73 (9th Cir. 2021) ("In light of *Acosta*, all reasonable officers would know it is impermissible to shoot at a slow-moving car when he could 'simply step[] to the side' to avoid danger."); *Orn v. City of Tacoma*, 949 F.3d 1167, 1179 (9th Cir. 2020) (denying qualified immunity where "Orn's vehicle was moving at just five miles per hour [and the shooting officer] could therefore have avoided any risk of being struck by simply taking a step back, a common-sense conclusion"); *Acosta v. City & Cnty. of S.F.*, 83 F.3d 1143, 1146-47 (9th Cir. 1996).

## C. **The jury's verdict on Plaintiff's state law claims must also stand.**

The clear weight of the evidence also supports the jury's verdicts in Plaintiff's favor on his claims for battery, negligence, violation of the Bane Act, and intentional infliction of emotional distress.

Under California law standards, "[a] threat of death or serious bodily injury is "imminent" when … a reasonable officer … would believe [the] person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury." Judicial Council of California Civil Jury Instructions ("CACI"), No. 1305B (Battery by Peace Officer, Deadly Force); CACI 441 (Negligent Use of Deadly Force by Peace Officer); Cal. Penal Code § 835(a); TT-II: 330:20-331:334:7. "An imminent harm is not merely a fear of future harm  no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed." *Id*. The clear weight of the evidence shows that Barber posed no imminent threat of death or serious bodily injury at the time of the shots, where Alfred knew Barber wanted to leave the driveway, at the time of the first shot, the Trailblazer had

---

[3] Plaintiff incorporates by reference his qualified immunity discussion in his opposition to Defendants' Rule 50(b) Motion. (Dkt. 218 at 9:3-14:20).

moved back at most one foot at a speed of less than one mile per hour, Alfred was at least 25 to 30 feet from the back of the Trailblazer, and it would have taken him one second to move three to four feet to his right into the wide fence opening. Under CACI 1305B, a "peace officer [has] a duty to use tactical repositioning" (TT-V: 817:12-14), and under both CACI 1305B and CACI 441, the jury was required to consider Alfred's tactical conduct leading up to the shooting and whether Alfred had other available techniques as an alternative to using deadly force (TT-V: 819:4-15). *See also Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 639 (2013). Pursuant to Alfred's own training and policy, Alfred never should have positioned himself behind the Trailblazer and should have tactically repositioned himself into the fence opening rather than shooting.

Not only does the clear weight of the evidence support the jury's finding of excessive force, battery, and negligence, but it also supports the jury's verdict in Plaintiff's favor on the Bane Act claim. The fact that the jury found a Bane Act violation, which carries a higher standard of proving the officer acted with a "reckless disregard," further confirms that the evidence supports the jury's findings on Plaintiff's claims for excessive force, battery, and negligence. Contrary to Defendants' arguments, Plaintiff need not show that Alfred intended to violate his constitutional rights. *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 799-800 (2017). "[I]t is not necessary for the defendants to have been 'thinking in constitutional or legal terms at the time of the incident[], because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.'" *Reese v. Cnty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) (quoting *United States v. Reese*, 2 F.3d 870 (9th Cir. 1993); TT-V: 814:14-815:2 (instructing the jury on the appropriate standard). The evidence, including that Alfred fired six shots at

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL

Barber without giving him a verbal warning or announcing himself as a police officer, when he could have tactically repositioned to the opening to his right within one second, demonstrates a reckless disregard for Barber's constitutional right to be free from excessive force.

Similarly, the clear weight of the evidence at trial showing that "Alfred acted with reckless disregard of the probability that [] Barber would suffer emotional distress" supports the jury's verdict in Plaintiff's favor on his claim for Intentional Infliction of Emotional Distress, and there is no specific "intent" requirement separate from the "reckless disregard." TT-V: 820:10-19 (giving CACI 1600). There is also no requirement that Plaintiff seek treatment for his emotional distress to prevail on this claim. The evidence at trial supports the jury's finding that Alfred's conduct—including standing behind a vehicle that was clearly about to reverse and shooting six times instead of moving a few feet to the right—was "outrageous" and demonstrates a "reckless disregard." *Id.* Barber testified at trial that he was "devastated" when he learned he had been shot in the head and that he now uses a wheelchair as a result of the shooting, supporting the jury's finding that Barber suffered severe emotional distress as a result of the shooting. TT-III: 464:14-465:20, 466:15-24.

## IV.    THE COURT'S EVIDENTIARY RULINGS WERE NOT ERRONEOUS OR PREJUDICIAL

### A. The Court did not err in excluding evidence of Plaintiff's criminal history.

#### 1. *Barber's criminal history was irrelevant and inadmissible, and this Court did not prejudicially err in concluding otherwise.*

This Court properly excluded evidence of Barber's criminal history pursuant to FRE 401, 402, 403, and 404. There was no error or abuse of discretion, and certainly no prejudicial error. *See Rubalcava v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (a new trial should not be granted if the error was harmless). Admission of Barber's criminal history would not have overcome the overwhelming evidence at trial that Alfred simply could have stepped out of the way rather than shooting.

First, Barber's conviction under Penal Code §245(a)(1) was properly excluded as irrelevant to the question whether Barber posed an immediate threat of death or serious bodily injury at the time of the shots. As this Court explained, § 245(a)(1) "covers a broad swath of conduct," and "an excessive-force claim against an officer is not necessarily inconsistent with a conviction for assaulting the officer"; therefore, the criminal conviction had little or no probative value in the civil case. Dkt. 132 at 10-12 (citing *People v. Marsh*, 37 Cal. App. 5th 474, 488 (2019) and *Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015)); Dkt. 158 at 10; *see* Dkt. 208-2 at 45:13-22. The standard under § 245(a)(1) diverges from the Fourth Amendment's requirement of an "'immediate' and 'significant threat of death or serious physical injury'" to justify deadly force. Dkt. 132 at 11-12 & n.7 (quoting *Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1061 (9th Cir. 2024) and *People v. Chance*, 44 Cal. 4th 1164, 1167, 1172 (2008)). Here, the jury

11
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL

heard evidence that an assaultive motor vehicle does not independently justify the use of lethal force (TT-II: 208:16-22, 212:2-18, 223:3-5, 230:17-231:1, 316:11-317:8, 341:4-20) and that officers are trained to step out of the way rather than shooting (TT-II: 212:2-18, 223:3-5, 230:17-231:1). Using deadly force against someone in a slow-moving vehicle is unreasonable when the officer can "simply step[]" aside, as here, highlighting differences in the criminal and civil standards. Dkt. 132 at 12 (quoting *Acosta*, 83 F.3d at 1146 & n.9).[4] Further, in the criminal trial, the prosecution instructed the jury that they were not to consider whether it was reasonable for Alfred to shoot Barber, as that was not an issue for them to decide. Masongsong Decl., Ex. 5 at 763-64.

Evidence of Plaintiff's conviction was also properly excluded under FRE 403 as misleading and confusing. Admission would have risked the jury assuming the criminal case already adjudicated the propriety of Alfred's deadly force, and substituting the criminal jury's decision for its own. *Cf. United States v. Bagley*, 772 F.2d 482, 488 (9th Cir. 1985) ("To allow evidence of a prior conviction of the very crime for which a defendant is on trial may be devastating in its potential impact on a jury."). The jury had to decide the case based on the evidence presented in the civil case, and it would have been unfair to permit the jury to

---

[4] Defendants argue the conviction shows "Plaintiff was intentionally reversing" at Alfred. Mot. at 10. But Plaintiff's subjective intentions were irrelevant to the reasonableness of Alfred's force. Dkt. 132 at 12 n.8 (citing *Barnes v. Felix*, 605 U.S. 73, 80 (2025)); *see Jackson v. County of San Bernardino*, 194 F.Supp.3d 1004, 1009 (C.D. Cal. 2016). *Boyd v. City & County of San Francisco*, 576 F.3d 938 (9th Cir. 2009), does not establish otherwise. *Boyd* concerned a "suicide-by-cop" defense and major discrepancies in testimony regarding material details, both absent here. *See V.R. v. County of San Bernardino*, 2022 WL 2285655, at *5 (C.D. Cal. Apr. 12, 2022) (distinguishing *Boyd* and excluding criminal history). *Boyd* is also an outlier decision contravening the rule against hindsight evidence, from which the Ninth Circuit subsequently "retreated." *Ruvalcaba v. City of Los Angeles*, 2014 WL 4426303, at *1-2 (C.D. Cal. Sept. 8, 2014). Regarding Rule 403, *Boyd* simply held the district court had not abused its discretion in admitting criminal history evidence, but did not hold such admission was required or conduct any substantive Rule 403 analysis. 576 F.3d at 947-48.

12

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL

speculate on what the jury in the criminal case found, where there was different evidence presented and a different standard of proof. Further, admission of the criminal jury's findings would have included Barber's acquittals on the charges of attempted murder and assault with a deadly weapon against a peace officer (which certainly, the defense would have argued to exclude), leaving the jury confused as to what impact, if any, the conviction and acquittals had on the civil case.

Nor did this Court err in excluding Barber's other criminal history, which was highly prejudicial under FRE 403. This Court correctly held that because Alfred was unaware of Barber's criminal history when he fired his shots, this information was irrelevant to whether Alfred's use of deadly force was reasonable. *See* Dkt. 158 at p. 9 (quoting *Glenn v. Washington County*, 673 F.3d 864, 871, 873 n.8 (9th Cir. 2011)); *see also* Dkt. 184 at 29-30, 33-34, 36-37. Defendants' arguments, including regarding purported anti-police bias—immaterial to any jury issue—show that Defendants improperly sought to introduce Barber's criminal history to generate negative character inferences against Barber and appeal to the jury's prejudices. This Court also appropriately excluded this evidence under FRE 404(b)(1), which prohibits the use of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Dkt. 158 at p. 9-10.

Nor was it error to exclude evidence of Barber's criminal history with respect to damages. The Court had reserved ruling on this limited issue, but Defendants only argued it was relevant to "lost earnings," Dkt. 119 at 4-5, which Plaintiff did not seek at trial, and Defendants never revisited this. *See* Fed. R. Evid. 103(b); *United States v. Redlightning*, 624 F.3d 1090, 1113 (9th Cir. 2010);

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL

*United States v. Tamman*, 782 F.3d 543, 552 n.2 (9th Cir. 2015). Although Defendants argue Barber's history "was relevant for impeachment," they identify no relevant impeachment point, and did not raise this at trial. Def. Mot. at p. 10.

### 2. The Court did not prejudicially err in barring Defendants from cross-examining Plaintiff about his criminal history, and Plaintiff did not open the door.

Defendants' contention that Plaintiff opened the door through two passing references to prison, responding to questions logically calling for those references, is unpersuasive, and the transcript does not show that Defendants sufficiently raised this issue at trial. TT-III: 496:4-504:22. First, it is defense counsel who intentionally asked Barber questions designed to elicit testimony Defendants could later argue "opened the door," and questions they knew would violate this Court's order on Plaintiff's motion in limine. TT-III: 495:17-496:16. Second, this Court properly ruled that the door had not been opened. *Id*. Third, having sat silent when the alleged door-opening occurred, Defendants cannot belatedly claim "the Court erred in failing to permit" conviction-related follow-up questions, Mot. at 11, when Defendants never requested this. *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1052-53 (9th Cir. 2004) (party waived challenge to *in limine* ruling where the door was allegedly opened at trial but party failed to proffer the excluded evidence at that time) (citing *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992)). Nor does it appear Defendants ever addressed the conviction issue during trial or made an offer of proof. *See* Fed. R. Evid. 103(a)(2); *United States v. Rangel*, 466 F.3d 158, 162 (1st Cir. 2006) (litigants cannot "retrench after an adverse jury verdict and ask … to view the trial judge's evidentiary rulings through a new and different lens").

## B. Dr. Vilke's testimony was not limited.

Defendants ignore the trial record and attempt to manufacture an error that never occurred. At trial, Vilke gave all the opinions that Defendants wanted him to give. *See* TT-V: 772:12-25. Vilke provided the opinion that Barber's extremity weakness "appears to be less functional than when he was in the hospital." TT-V: 788:14-18. Vilke also gave the opinion that Barber's "regression [in] progress is likely due to his lack of following physical therapy recommendations from the hospital as well as refusing physical therapy . . . treatments thereafter." TT-V: 788:22-789:20. Vilke even gave a detailed explanation of what he meant by a "regression in progress," even though this was not a specifically enumerated opinion in his Rule 26 report. TT-V: 789:2-20.

Defendants themselves acknowledge they "strategically came to an agreement" with Plaintiff's counsel regarding Vilke's testimony. Dkt. 210 at 12. That agreement permitted Vilke to "essentially say what's in that last paragraph [of page 14 of his report]," in addition to his two numbered opinions in his report. TT-V: 778:2-4. There is no reason to reexamine the Court's tentative ruling— which the parties' agreement and Vilke's actual testimony rendered moot—that his report improperly tried to "slide in" the regression issue at the end of his unrelated first opinion. TT-V: 775:5-12. Because the regression testimony came in and went to the jury unrestricted, Defendants cannot establish error, let alone prejudicial error.

## C. The Court did not prejudicially err in permitting testimony of future economic damages.

Defendants' argument that the Court prejudicially erred in permitting testimony of future economic damages fails. Plaintiff's counsel did not present such testimony; rather, it is Defendants who questioned Dr. Omalu regarding

Barber's future medical expenses, and Defendants did not move to strike Omalu's responses. TT-III: 551:25-553:25. In response to defense counsel's questioning, Omalu testified that if, hypothetically, you gave Barber $100 million to have the best care for the rest of his life, then he could potentially make some progress in five to ten years. TT-III: 552:9-17. The jury awarded Barber a small fraction of that estimate—only $1.85 million in future economic damages to cover his medical expenses for the rest of his life[5].

Contrary to Defendants' suggestion, there is no reasonable dispute that Barber's injuries were caused by the shooting. TT-III: 465:15-25, 472:2; 492:1-8 (testifying extensively about his ongoing physical limitations following the shooting, including that he was not in a wheelchair prior to the shooting). Omalu corroborated the severity and long-term nature of Barber's injuries, including to the brain, providing the jury with a basis to conclude those limitations are permanent. TT-III: 516:21-517:6, 518:17-519:13). Defendants' reliance on Barber's current incarceration is misplaced, particularly in light of evidence that Barber will be permanently injured and in pain for the rest of his life, beyond the period of his incarceration. *See Havens v. F/T Polar Mist*, 996 F.2d 215 (9th Cir. 1993) (rejecting the employer's argument that the employee's economic damage award should be reduced because his employment had been interrupted in the past by significant periods of incarceration).

### D. **The Court did not prejudicially err in denying Defendants' MIL No. 2 to exclude Robert Morales' testimony.**

This Court did not err in admitting Morales' testimony, which this Court even limited. Rather, this Court meticulously vetted his testimony and

---

[5] Although Defendants argue that Plaintiff failed to provide evidence of past employment and lost future wages, Plaintiff did not seek damages for or present testimony regarding lost earnings. *See* TT-V: 822:4-25 (reading the damages instruction).

qualifications in ruling on Defendants' motion for summary judgment, and later, Defendants' motion in limine No. 2, and found appropriate foundation for his opinions. Dkt. 132 at pp. 7-8; Dkt. 158 at pp. 5-6. As established during Plaintiff's counsel's examination, Morales visited the scene of the incident, took measurements, studied the tire impressions through the photographs, and analyzed the audio. TT-III:405:1-18. As this Court correctly found:

> Morales adequately explains how he derived his conclusions on the movement of Plaintiff's vehicle during the shooting from his review and analysis of the relevant materials using, among other methods, photogrammetry and vehicle dynamics reconstruction. . . To the extent that Defendants argue Mr. Morales's testimony is not sufficiently corroborated or credible, such concerns go to the weight of the testimony and ,therefore, are properly addressed by cross examination.

Dkt. 158 at p. 6. Indeed, Defendants did have a full and fair opportunity to cross examine Morales. When asked about his training in audio analysis, Morales explained that it was included as part of his LEVA forensic video analysis certification. TT-III: 445-46. And what Morales did with the audio was straightforward: he identified discrete sounds on Alfred's belt recording, such as a door closing, an engine revving, tires spinning, and six gunshots, and noted the timestamps at which each occurred. TT-III: 414-420. He then used those timestamps to inform his reconstruction of events. Defendants compare him to FBI acoustic forensics specialists who perform gunshot source localization and voice analysis, but Morales never offered such opinions.

Further, Defendants' claim that Morales needed ballistics expertise to substantiate his opinions in this case is unfounded. Ballistics is a field of mechanics concerned with launching, flight behavior, and impact effects of projectiles. Morales offered no such opinions. He testified about vehicle distance, vehicle speed, timing of events, and the spatial relationship between physical

evidence and the vehicle at various points during the incident. TT-III: 409–427. That the incident involved a firearm does not transform reconstruction opinions into ballistics opinions.

Defendants' biomechanics argument fares no better. The only testimony they challenge on this basis is Morales' reference to 3.5 miles per hour as the average walking speed of a healthy adult. TT-III: 425:14-20. This is a very basic universally recognized fact requiring no specialized biomechanics training. Defendants' invocation of California's no-duty-to-retreat statute is a red herring. Morales never testified that Alfred had a legal duty to retreat; he testified about the feasibility of moving to a protected position based on his reconstruction of events. TT-III: 418–19, 425–26. His testimony was directly relevant to the *Graham* totality-of-circumstances inquiry. Evidence that an officer had ample time and space to reach safety is relevant to the severity of the perceived threat and the feasibility of an alternative course of action.

Although there was no evidentiary error, there was certainly no prejudice. Rather than retaining their own accident reconstructionist, Defendants called Sergeant Edward Hernandez to testify with respect to his traffic collision investigation. Hernandez's opinions were largely consistent with and corroborated Morales' opinions, including Hernandez's testimony that the Trailblazer traveled approximately 12 feet in reverse before Barber was removed from the vehicle (TT-IV: 642:18-643:7, 650:5-19), and the maximum speed the Trailblazer reached was 2.7 to 3.1 miles per hour (TT-III: 651:13-25).

## V.     THE JURY'S DAMAGES AWARD WAS NOT EXCESSIVE

"The jury's verdict must be upheld unless the amount is 'grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'" *Bell v. Williams*, 108 F.4th 809, 830–31 (9th Cir. 2024) (quoting

*Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008)). Courts must "afford 'substantial deference to a jury's finding of the appropriate amount of damages.'" *Harper*, 533 F.3d at 1028 (citing *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996)).

As described in detail above and in Plaintiff's opposition to Defendants' Rule 50(b) motion filed concurrently herewith, Plaintiff presented evidence to support a substantial award, and the jury's award should be upheld under this deferential standard consistent with the Seventh Amendment right to jury trial. *See Bell*, 108 F.4th at 831 (explaining that "deferential" review of determination to uphold jury verdict "give[s] the trial court 'the benefit of every doubt'" (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 4436 (1996)); *see also Morse v. County of Merced*, 2018 WL 34690632, at *2-3 (E.D. Cal. July 16, 2018) (collecting cases denying post-trial motions challenging damages awards). As the Ninth Circuit has explained, "[T]he evidence presented at trial should be given foremost priority in assessing the reasonableness of a damages award. If the evidence is sufficient to support even a high award, there is no need to compare cases." *Bell*, 108 F.4th at 832. Because all the foregoing evidence, taken together, "is sufficient to support [the jury's] award, there is no need to compare" this to other cases, *Bell*, 108 F.4th at 832, and the Court should deny Defendants' request for a remittitur or new trial on this basis.

Even if the Court elects to consider damages awards in other cases, it "must exercise caution" when doing so where the categories of damages are subjective, *Bell*, 108 F.4th at 832, as here. The Ninth Circuit has warned that comparing cases improperly risks "restrain[ing] the effects of social change on damages awards," which may legitimately based on factors including "changing attitudes

toward certain types of official misconduct." *Id.* The utility of any comparison, of course, also depends on actual, material similarities between the compared cases.

The jury's award of $7,250,000 in damages for past pain and suffering and emotional distress, as well as $18,250,000 in damages for future pain and suffering and emotional distress, is not excessive. The non-economic damages award is supported by substantial evidence at trial—not passion or prejudice—including Omalu's testimony that: to this day, Barber has bullet fragments scattered throughout his brain from this incident; Barber has permanent brain damage as a result of the shooting, and his symptoms will become progressively worse until he develops full-blown dementia; Barber will eventually require almost 24/7 assistance; Barber will be in constant, severe, high-scale pain for the rest of his life as a result of the shooting; the shooting will affect Barber's ability to ambulate and put him at risk of falling for the rest of his life; there is nothing anyone can do at this point to repair the brain damage that he has from this shot so he doesn't experience that pain. TT-III: 517:2-519:13, 522:9-523:19, 524:19-525:11, 525:22-529:8. Barber's testimony also supports the non-economic damages award, including testimony that: he is in constant pain as a result of the shooting, including headaches, a stinging feeling, and muscle spasms; he requires a wheelchair to ambulate; and he has memory challenges. TT-III: 466:12-470:19. Moreover, the jury's damages award is far less than the $10 million in past pain and suffering and the $33 million in future pain and suffering that Plaintiff's counsel suggested in closing argument. TT-V: 851:12-23.

Further, the non-economic damages award in this case is not excessive when compared to survival damages awarded in similar cases where the person shot or asphyxiated endured pain and suffering for only a short period of time before dying as a result of the police misconduct. Considering that Barber will

endure pain and suffering for the rest of his life (approximately another 33 years[6]), the jury's award in this case is actually significantly less than awards for survival damages in comparable cases. For example:

In the 2023 police asphyxiation case *Zelaya v. City of Los Angeles*, 20-cv-08382-ODW, the jury awarded $6 million for pre-death pain and suffering where the decedent survived for approximately five days after the incident. Ex. 8 to Masongsong Decl. In the 2023 police shooting case *Murillo v. City of Los Angeles*, 2:21-cv-08738-FMO, the jury awarded $6.5 million for the decedent's pre-death pain and suffering, where the decedent survived for only approximately 40 minutes after the shooting. Ex. 9 to Masongsong Decl. In *Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1101 (9th Cir. 2021), the jury awarded $6 million for the decedent's pre-death pain and suffering, where the decedent survived for a very short period of time. Ex. 10 to Masongsong Decl. In the 2023 case *Najera v. Ponder*, ED-CV-18-762-DMG, the jury awarded $10 million in survival damages where the decedent died on the same day of the shooting. Ex. 11 to Masongsong Decl. In the 2018 case *Archibald v. County of San Bernardino*, CV-16-01128-AB, the jury awarded $7 million in survival damages where the decedent only survived for a very short period of time after the shooting. Ex. 12 to Masongsong Decl. Given Barber's age and life expectancy, the non-economic damages award does not even equate to $1 million per year, far less than the foregoing examples.

Defendants selectively cite lower-value cases while ignoring the wide range of outcomes in catastrophic injury cases. The existence of smaller awards does not render this one excessive. Five of the six cases Defendants assert are "comparable" were decided more than a decade ago. These figures do not reflect

---

[6] Contrary to Defendants' Motion, Dr. Omalu indicated that Barber would live for approximately another 30 years. Defendants did not present evidence of or challenge Barber's life expectancy.

current California jury values, which have risen substantially over time. Furthermore, Defendants' own "ceiling" case — *Lam v. City of San Jose* — resulted in an $11,300,000 verdict in December 2015 for a 36-year-old male with paraplegia, nerve damage, and aggravated emotional distress. Adjusted for inflation from 2015 to 2026, the *Lam* verdict alone supports an award well above $15 million. Barber's injuries are arguably more severe — he suffered a gunshot to the head producing traumatic brain injury in addition to permanent bilateral limb weakness and constant pain, whereas Lam involved only a back wound causing paraplegia. Defendants' comparable cases thus do not establish that this verdict shocks the conscience; at most, they confirm that *Lam* — their own exhibit —supports the jury's award in this case.

Finally, as indicated above, the jury's award of $1,850,000 in economic damages is also not excessive. For each of the foregoing reasons, a remittitur is not warranted.

## V.    CONCLUSION

For the reasons stated above, Plaintiff respectfully requests the Court deny Defendant's Motion for a New Trial and deny Defendants' alternative request to issue a remittitur.

Dated: April 8, 2026,                    LAW OFFICES OF DALE K. GALIPO

                                                   */s/ Renee V. Masongsong*
                                                   Dale K. Galipo
                                                   Renee V. Masongsong
                                                   Attorneys for Plaintiff

### L.R. 11-6.2. Certificate of Compliance

The undersigned, counsel of record for Plaintiff Steffon Barber, certifies that this brief contains 6,980 words (excluding the caption page, signature blocks, and certificate of compliance), which complies with the word limit of L.R. 11-6.2.

Dated: April 8, 2026                    Law Offices of Dale K. Galipo

                        By:     */s/ Renee V. Masongsong*
                                Dale K. Galipo
                                Renee V. Masongsong
                                Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL