# EXHIBIT 1

145

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

### HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

STEFFON BARBER,                          )
                                         )
                     Plaintiff,          )
                                         )
     v.                                  )          Case No.
                                         )   CV 22-625 KK (DTBx)
COUNTY OF SAN BERNARDINO, et al.,        )
                                         )          Volume 2
                     Defendants.         )   (Pages 145 - 391)
_____  )

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
JURY TRIAL:  DAY TWO
MONDAY, FEBRUARY 2, 2026
8:53 AM
RIVERSIDE, CALIFORNIA

_____

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
(951) 328-4414

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Several.  I don't know specific number.  Several meetings.

BY MR. GALIPO:

Q.    Can you give us an estimate?

A.    Maybe ten.

Q.    Going back to April 27th, 2021, you had been on patrol for about three years at that point?

A.    Uh, correct, yes.

Q.    You had a Taser with you at the time?

A.    Correct.

Q.    Pepper spray?

A.    Correct.

Q.    Police baton?

A.    Yes.

Q.    You had used your pepper spray in the field before about five or ten times; is that fair?

A.    Yes.

Q.    You had used your Taser in the field about 20 times?

A.    Correct, yes.

Q.    And you had used your police baton as an impact weapon in the field about ten times?

A.    Correct, yes.

Q.    In high school, you played basketball?

**UNITED STATES DISTRICT COURT**

A. Yes.

Q. You were the point guard on the varsity basketball team?

A. Yes.

Q. And even after high school, you kept in shape?

A. To the best of my ability, yes.

Q. You ran sprints and sometimes ran up to 2 miles?

A. Correct, yes.

Q. You played recreational basketball?

A. Yes.

Q. At the time of this incident, you were 31 years old?

A. Yes.

Q. How tall are you?

A. Five foot ten.

Q. How much did you weigh, approximately, at the time of this incident?

A. About 165 pounds.

Q. You heard counsel mentioning in his opening statement about your equipment has some weight to it.  Did you hear that?

A. Yes.

Q. That's the normal equipment you wear as a deputy?

A. Yes.

Q. You've been involved in foot pursuits before, haven't you?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    And in foot pursuits, you are sometimes chasing someone; correct?

A.    Yes.

Q.    How many foot pursuits would you say you've been involved in, approximately?

A.    Maybe 15.

Q.    And when you're running after someone in a foot pursuit, I'm assuming you have the same equipment on?

A.    Correct, yes.

Q.    You're not suggesting, are you, that your equipment prohibits you from running after someone in a foot pursuit?

A.    They can provide some challenges, but it doesn't prevent you, no.

Q.    Okay.  I want to talk to you a little bit about the information you had regarding this call.

You actually had been to the residence about an hour and a half or two earlier on that day; correct?

A.    Yes.

Q.    And when you went to the residence earlier, you were with a partner?

A.    Correct.

Q.    Was there any disturbance you noted at the residence at that time?

A.    No.

**UNITED STATES DISTRICT COURT**

Those are admitted.  And you may publish.

(Exhibit Nos. 3-10 and 3-26

received into evidence.)

BY MR. GALIPO:

Q.    Showing you Exhibit 3-10, do you recognize the front of the Chevy Trailblazer?

A.    Yes.

Q.    Is this the approximate position it was in after Mr. Barber was taken out of the car?

A.    Yes.

Q.    And you're saying the vehicle moved back some distance before coming to a stop; correct?

A.    Correct.

Q.    Would you agree, Deputy Alfred, this was not the position of the vehicle before it started moving backwards?

A.    That is correct, yes.

Q.    It was further forward?

A.    Slightly.

Q.    Slightly?

A.    Slightly forward, yes.

Q.    How many feet?  8 or 10 feet forward?  What would be your estimate?

A.    Approximately 10 feet.

Q.    Okay.  Now, can you see -- in this image, can you see your patrol vehicle on the street?

**UNITED STATES DISTRICT COURT**

A.    From this image, no.

Q.    Showing you Exhibit 3-26.

Can you see in this image certain markers down on the ground in yellow?

A.    Yes.

Q.    You generally understand that those were identifying pieces of evidence?

A.    Yes.

Q.    Including casings ejected from your .45 caliber gun?

A.    Correct, yes.

Q.    In this photo, can you see your patrol vehicle?

A.    No.

Q.    You parked your patrol vehicle down the street, slightly offset from the driveway; is that fair?

A.    Correct.

Q.    I want to show you some photographs.

MR. GALIPO:  Again, by agreement, Your Honor.

MR. RAMIREZ:  No objection, Your Honor.

THE COURT:  And, Counsel, what photographs are we identifying?

MR. GALIPO:  I'm going to give you the numbers now.

So Exhibit 5-1, 5-2, 5-3, and 5-4, all photos of Deputy Alfred.

THE COURT:  Thank you.  Those will be identified and admitted.

**UNITED STATES DISTRICT COURT**

Q.    And 5-4, again the face covering is down here; correct?

A.    Correct.

Q.    So at some point, you wanted to talk to -- to the person in the driveway by the Trailblazer; is that true?

A.    Correct.

Q.    You had spoken briefly to the reporting party out on the street.  They were in a vehicle?

A.    Correct, yes.

Q.    You did not request backup; is that fair? Initially.

A.    Yes.

Q.    Based on the information you had, you did not think it was necessary to request backup.  Is that -- is that your contention?

A.    That is correct, yes.

Q.    And you even stated that sometimes it's been your experience that reporting parties tend to exaggerate the facts of a call to try to get a quicker police response.  You've seen that in your career?

A.    Yes.

Q.    And at some point, I think the reporting party referenced that they thought he -- someone possibly had a weapon but they never saw one and there was no mention of one. You remember hearing that?

**UNITED STATES DISTRICT COURT**

201

A.    Yes.

Q.    But you also thought that you weren't so sure that was the case because there was no verification of that?

A.    Correct.

Q.    Did you have any information that anybody had been injured?

A.    No.

Q.    Did you see any property damage to any of the vehicles?

A.    Initially, no.

Q.    You weren't even sure a crime had been committed; is that fair?

A.    I was investigating a crime.

Q.    And the reason you were investigating it, because you weren't sure one had been committed?

A.    That's throughout the course of the investigation, yes.

Q.    And as you were walking up this driveway, at some point, you see someone standing on the driver's side of the SUV; correct?

A.    Correct.

Q.    And is it true that the people that you spoke to, the reporting parties in the car, never specifically identified the person that they wanted you to talk to?

A.    They pointed in the direction of the subject and the

**UNITED STATES DISTRICT COURT**

information was provided through sheriff's dispatch of a clothing description.

Q.    Right.  But when they pointed in the direction, you couldn't even see that individual by the SUV when you were standing there talking to them; fair?

A.    I observed the subject prior to speaking with them.

Q.    Do you recall testifying previously under oath in this case that they did not ID the person?

A.    Correct, yes.

Q.    Okay.  So you're coming up a driveway.  You see someone standing out on the driver's side of the vehicle?

A.    Correct.

Q.    And it's a long driveway, would you agree, about 70 feet?

A.    A little further, but yes, a long driveway.

Q.    And it's dark outside; correct?

A.    Correct.

Q.    And you would agree you never ID'd yourself as a police officer.  You never said "Sheriff's Department" or "Police" or any words to that effect.  Would you agree with that?

A.    That is correct.

Q.    Would you also agree at some point you used some profanity?

A.    Correct, yes.

**UNITED STATES DISTRICT COURT**

Q.    And is the policy of the department to refrain from using profanity in general?

A.    Generally -- generally, yes, in certain circumstances.

Q.    Because part of the training you had is to de-escalate situations instead of escalating them; is that fair?

A.    Correct.

Q.    And so I'm going to show you Exhibit 6-1, which I think is an image of your firearm?

MR. RAMIREZ:  No objection, Your Honor.

THE COURT:  All right.  That will be admitted and you may publish.

(Exhibit No. 6-01 for identification and received into evidence.)

BY MR. GALIPO:

Q.    Do you see this on the screen?

A.    Yes.

Q.    Does that appear to be your firearm?

A.    Yes.

Q.    It's a .45 caliber?

A.    Correct, yes.

Q.    That would be a semiautomatic weapon?

A.    Yes.

Q.    And you have to press the trigger for each shot; is

**UNITED STATES DISTRICT COURT**

that correct?

A.    Yes.

Q.    In this case, did you intentionally press the trigger six times?

A.    Yes.

Q.    And were you at least trained as a police officer that you have to justify each of your shots?

A.    Yes.

Q.    And when you were firing, you were firing in the direction of the headrest; correct?

A.    Correct.

Q.    And at least you know now, or probably knew at some point at the scene, that Mr. Barber had been struck in the head; correct?

A.    Correct.

Q.    Would it be fair to say that you knew, as a police officer at the time, that striking someone in the head with a bullet could cause death or permanent serious injury?

A.    Correct, yes.

Q.    Now, when you're initially walking up the driveway -- and I'll show you Exhibit 3-3, a photo of the driveway by agreement.

MR. RAMIREZ:  No objection, Your Honor.

THE COURT:  3-3 will be admitted, and you may publish.

(Exhibit No. 3-03 for identification

and received into evidence.)

BY MR. GALIPO:

Q.    You, at some point, could see the Chevy Trailblazer -- or at least a dark SUV?

A.    Yes.

Q.    But you would agree it was not in the position we see here.  It was further up, as you say, approximately 10 feet further south?

A.    Correct, yes.

Q.    And are you aware that prior to these photos being taken, there was extra illumination put up by the investigating agency?

MR. RAMIREZ:  May call for speculation.

THE COURT:  Do you want to ask a foundational question?

MR. GALIPO:  Sure.

BY MR. GALIPO:

Q.    Do you see in the left-hand side of this picture two spotlights or lights?

A.    Yes.

Q.    Were those there at the time?

A.    Yes.

Q.    Okay.  In any event, when you saw the vehicle, the lights of the vehicle were on; correct?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    You heard the engine on.  You heard it idling; correct?

A.    Yes.

Q.    And your impression before Mr. Barber ever got in the car is the car was getting ready to leave?

A.    No.  That was not my impression.

Q.    Did you believe the car was on?

A.    Yes.

Q.    Could you hear it on?

A.    Yes.

Q.    You said you gave a statement in this case about two weeks later; is that correct?

A.    Correct, yes.

Q.    And I think there should be some exhibit books to your side there.  And one of them should say, "Plaintiff's exhibits."

Do you have that book in front of you?  Can you turn to Exhibit 2-B, as in boy, please?

(Exhibit No. 2-B for identification.)

THE WITNESS:  Sir, do you have a direct page number?

BY MR. GALIPO:

Q.    Sure.

First of all, does that appear to be a transcription of the statement that you gave?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    Can you turn to page 11, please?

Are you at that page?

A.    Yes.

Q.    And do you see line numbers on the left-hand side?

A.    Yes.

Q.    If you could look at lines 13 and 14, do you see where you say that the -- it was illuminated and it led you to believe the car was on, maybe he just got there or maybe he's getting ready to leave?

MR. RAMIREZ:  I'll object, Your Honor.  There's actually two 11s.  Is it the smaller 11 or the one that says --

MR. GALIPO:  Oh.

MR. RAMIREZ:  That's, I think, the problem.

MR. GALIPO:  I apologize.  Let me make sure we're on the same page, literally.

BY MR. GALIPO:

Q.    Yes.  So it's -- here in the exhibit book it's 18 of 19, but it's page 11 from your actual statement.

Do you see page 11 from your statement, which is also page 18 of 89 of Exhibit 2-B?

A.    Correct, yes.

Q.    Okay.  Now, if you look to lines 13 and 14 of your statement on that page, let me know when you're able to find those.

**UNITED STATES DISTRICT COURT**

A.    I found them.

Q.    Would you agree in your initial statement you said the lights of the vehicle were illuminated, which led you to believe the car was on, maybe he just got there or he's getting ready to leave?  Do you see that?

A.    Yes.

Q.    Okay.  And one of the things you had to decide is whether you were going to tell them you were law enforcement or not; correct?

A.    One of the things was to decide if there was a crime that occurred, and that's only done through speaking with Mr. Barber.

Q.    Would you agree you did not identify yourself verbally as law enforcement?

A.    Correct, yes.

Q.    Would you agree that that's something you're trained to do, especially at night in the dark, to identify yourself as law enforcement?

MR. RAMIREZ:  Objection.  Lacks foundation.  May call for speculation depending on the circumstances.

THE COURT:  Overruled.

THE WITNESS:  That is correct, yes.

BY MR. GALIPO:

Q.    So as you got -- you started giving commands shortly after entering the driveway, even from where we see the bottom

UNITED STATES DISTRICT COURT

of this photograph; is that true?

A.    Correct, yes.

Q.    And at some point, as you're walking up the driveway, you notice that on the left-hand side, there's a chain-link fence; correct?

A.    Yes.

Q.    And on the right-hand side, you notice there's a wooden picket fence; correct?

A.    Correct, yes.

Q.    And at some point, you notice there's an opening on the west side adjacent to the wooden picket fence; is that true?

A.    Correct.

Q.    And I want to show you a few photographs of that.

First, Exhibit 3, page 4, by agreement?

MR. RAMIREZ:  No objection.

THE COURT:  All right.  3-4 is admitted.

MR. GALIPO:  A photo of the driveway.

THE COURT:  Yes.  And you may publish.

(Exhibit No. 3-04 for identification and received into evidence.)

BY MR. GALIPO:

Q.    Do you see that photo on your screen?

A.    Yes.

Q.    And we could see the chain-link fence on the left;

**UNITED STATES DISTRICT COURT**

correct?

A.     Correct.

Q.     And just to -- directionally, the front of the Trailblazer's facing south?

A.     Correct, yes.

Q.     The fence on the left would be to the east?

A.     Yes.

Q.     And the wooden picket fence on the right would be to the west?

A.     Yes.

Q.     And as you're approaching, at some point, you notice this opening on the right-hand side; is that fair?

A.     Yes.

Q.     And clearly, you saw that before the shooting; correct?

A.     Correct.

Q.     I'd like to show you Exhibit 3, page 29.

MR. RAMIREZ:  No objection.

THE COURT:  3-29?

MR. GALIPO:  Yes, Your Honor.

THE COURT:  All right.  It will be admitted, and you may publish.

(Exhibit No. 3-29 for identification and received into evidence.)

///

**UNITED STATES DISTRICT COURT**

211

BY MR. GALIPO:

Q.    Are you able to see that on your screen, Deputy?

A.    Yes.

Q.    That also shows the opening; correct?

A.    Correct.

Q.    And what would you estimate the width of that opening to be?

A.    Approximately 10 feet, 8 to 10 feet.

Q.    8 to 10 feet.  Okay.

And also like to show you Exhibit 3, page 15.

MR. RAMIREZ:  No objection.

THE COURT:  3-15 is admitted.  You may publish.

(Exhibit No. 3-15 for identification

and received into evidence.)

BY MR. GALIPO:

Q.    Again, we could see the opening here; correct?

A.    Correct.

Q.    We could also see the back of the Chevy Trailblazer in the position it ended up in?

A.    Correct.

Q.    Were you trained on the concept of cover and concealment?

A.    Yes.

Q.    Were you trained on the importance of tactical positioning?

A.      Yes.

Q.      Now, I take it you were familiar with the policy regarding shooting at moving vehicles?

A.      Correct.

Q.      And you were aware -- and I think we talked about this in your deposition -- that at the time, the policy says you shall not shoot at a moving vehicle and you shall step out of the way instead of shooting.

Do you recall that discussion?

A.      Yes, when feasible.

Q.      Right.

And that was your understanding of the policy at the time; correct?

A.      Correct.

Q.      That's because stepping out of the way rather than shooting, because good idea to take other reasonable measures if you could rather than shooting someone?

A.      If possible, yes.

Q.      And so your recollection is that this opening that we see on the west side or right side of this photograph was 3 to 4 feet from you; correct?

A.      Correct, yes.

Q.      And it would have been 3 to 4 feet on your right side.  Is that also correct?

A.      Correct.

213

Q.    And looking at Exhibit 1-A, by agreement.

MR. RAMIREZ:  No objection.

MR. GALIPO:  A diagram, Your Honor.

THE COURT:  Yes.  Are we admitting this?

MR. GALIPO:  Yes, Your Honor.

THE COURT:  All right.  Very well.  It will be admitted.

(Exhibit No. 1-A for identification and received into evidence.)

BY MR. GALIPO:

Q.    Are you able to see the diagram on the screen?

A.    Yes.

Q.    And generally you understand where I'm pointing with my pen is where the vehicle came to rest?

A.    Correct, yes.

Q.    And the opening here (indicating) that we've been talking about is where my pen is pointed; is that right?

A.    Correct.

Q.    Where were you positioned at the time Mr. Barber got in the car relative to this opening?

A.    Near Placard Number 9.

Q.    Okay.  So let me just put up Exhibit 3, page 15, again.

Do you recall in your deposition, when I asked you where you were in relation to this opening, telling me that the

**UNITED STATES DISTRICT COURT**

opening was ahead of you?

A.      Correct, yes.

Q.      And you told me one of the reasons you were thinking of not running to the opening is because you did not want to run or move in the direction of the vehicle backing up.

Do you recall that?

A.      Correct, yes.

Q.      So obviously, if the opening was ahead of you, that would put you more like where Number 5 is here, wouldn't it?

A.      Uh, that is incorrect.

Q.      So when you say it was ahead of you, you told me in your deposition it was further south of you.

Do you recall that?

A.      Yeah.  I think there was some confusion in terms of the direction previously when we spoke.

Q.      Confusion on whose part?

A.      Pertaining to the question of the opening.

Q.      You're saying you were confused?

A.      Yes.

Q.      So when you said -- you said that you didn't want to go towards the opening because you would be going more in the direction of the Trailblazer, you were -- you were confused in your directions at that point?

A.      No, in terms of the opening -- or the west.  Are we referring to walking in a west direction to the opening?

Q.    You do recall having your deposition taken; correct?

A.    Correct, yes.

MR. GALIPO:  And does the Court have a copy of the depo?

THE COURT:  I do.

MR. GALIPO:  May I hand a copy to your clerk to provide to the witness?

THE COURT:  I believe that there is one on your left, if it --

MR. GALIPO:  Oh, great.

THE COURT:  If you look to your left, it says, "Christopher Alfred."

BY MR. GALIPO:

Q.    Can you turn to page 42, please?

MR. GALIPO:  And I'd offer to read from page 42, lines 3 through 5.

MR. RAMIREZ:  I'd object as improper.

THE COURT:  Do you have a question for this witness? And what lines are we looking at?

MR. GALIPO:  Page 42 of the transcript, lines 3 through 5.

THE COURT:  Give me one moment.

(Pause in the proceedings.)

THE COURT:  And you're attempting to read it for impeachment purposes?

MR. GALIPO:  Correct.

THE COURT:  You may proceed.

MR. GALIPO:  "QUESTION:  And where was this opening in regards to where you were standing?

"ANSWER:  Just ahead of me, a couple of feet ahead of me."

BY MR. GALIPO:

Q.    Do you recall that question and answer from your deposition?

A.    Correct, yes.

Q.    And then can you turn to page 93 of the same deposition.

MR. GALIPO:  I'd like to read lines 3 through 7, also for impeachment.

THE COURT:  All right.  Give me one moment, Counsel.

(Pause in the proceedings.)

MR. RAMIREZ:  93, what lines?

MR. GALIPO:  Page -- page 93, lines 3 through 7.

THE COURT:  You may proceed.

MR. GALIPO:  "QUESTION:  And then to get to that opening in the fence to the west of you, immediately before you fired your shots," you would have to have -- you -- no, "would you have had to move closer to the vehicle to the south of you?

"ANSWER.  Yes."

**UNITED STATES DISTRICT COURT**

BY MR. GALIPO:

Q.    Do you see that question and answer?

A.    Yes.

Q.    So weren't you saying in your deposition -- and I think that was in response to your attorney's question -- that you would have to had to move further south closer to the vehicle to get to that opening?

A.    No.  My interpretation referenced the opening was upon my approach.  So there was some misinterpretation on my behalf.

Q.    Would you at least still agree that this opening was 3 to 4 feet from you?

A.    Yes.

Q.    And when you saw this vehicle on with the lights on and, as you indicated in your statement, you thought maybe it was getting ready to leave, did you ever move towards that opening?

A.    No.

Q.    Did you choose a position other than behind the car?

A.    Yes, to the left of the vehicle, which would be aligned with the driver's side.

Q.    So you were not directly behind the car initially. Is that what you're saying?

A.    No.

Q.    You are saying that or not saying that?

**UNITED STATES DISTRICT COURT**

A.    No.  I was aligned with the driver's side of the vehicle.

Q.    Okay.  Let me put it this way:  Do you think if the vehicle backed up in your initial position, you would have been at any risk for being hit?

A.    Yes.

Q.    And you chose that position?

A.    Yes.

Q.    And initially, you were about 30 feet from the vehicle; isn't that true?

A.    At what point?

Q.    Well, you said you were -- the flashlight was to your left; correct?

A.    Correct, yes.

Q.    And the flashlight --

Showing you Exhibit 1-1, by agreement.

MR. RAMIREZ:  No objection.

THE COURT:  So admitted.  And you may publish.

(Exhibit No. 1-01 for identification

and received into evidence.)

THE COURT:  And, Counsel, 1-1 is different than 1-A, just so we have a clear record.

MR. GALIPO:  Yes, it is.

THE COURT:  Thank you.

MR. GALIPO:  Thank you, Your Honor.

BY MR. GALIPO:

Q.   So we can see Exhibit 9 -- or Item Number 9 in this diagram; correct?

A.   Correct, yes.

Q.   And let me -- and you're saying that was your flashlight, as you understand it?

A.   Correct, yes.

Q.   And the distance between your flashlight and the back of this vehicle is about 15 feet, isn't it?

A.   I didn't conduct a -- any measurements of the scene, so I'm not 100 percent sure on that accurate distance.

Q.   Do you have an estimate of the distance between your flashlight, where it ended up, and the back of that vehicle?

A.   From the flashlight to the rear bumper, close estimate, I would say, anywhere from 10 to 15 feet.

Q.   Okay.  But as we discussed earlier, this is not where the vehicle started.

A.   Correct, yes.

Q.   You said earlier the vehicle moved back, in your estimation, about 10 feet.

A.   From its initial point, yes.

Q.   So if you were standing near this flashlight, you wouldn't have been 10 or 15 feet from the vehicle initially. You would have been just adding 10, 20 to 25 feet from the back?

A.      Correct, yes.

Q.      And you're still 3 to 4 feet from this opening that we've been talking about, which we see again in Exhibit 3, page 29; correct?

A.      Correct.

Q.      So after the door closed, then, in your mind, you knew, okay, he's definitely going to reverse; correct?

A.      Not necessarily.

Q.      Well, didn't you, both in your statement and deposition testimony, say, "Once he got in the car, I believed he was going to back up"?

A.      Yes, once the vehicle was in motion and the lights were illuminated, yes.

Q.      Well, you recall testifying that once he got in the car and closed the door, you believed he was going to back up?

A.      Correct, yes.

Q.      Right.

And so when he closed the door, how long do you think it would have taken you to move 3 or 4 feet?

A.      I'm not sure.  I don't have an estimate for that.

Q.      Well, uh, basketball players are trained to move laterally, aren't they?

A.      Correct, yes.

Q.      I mean, even to play defense, you've got to be able to shuffle your feet and move quickly left and right laterally;

true?

A.    Correct.

Q.    And then the point guard of the basketball team often is one of the most agile and quickest people on the team?

A.    Not necessarily.

Q.    So do you think it would have taken you 1 second, a half a second?  How long do you think it would have taken you to move laterally 3 or 4 feet?

A.    I don't want to speculate, sir.  That's tough with 30 pounds of equipment.  You know, when you consider the analogy of playing basketball, you don't have that kind of equipment on you.  So to have that same type of movement with 30 additional pounds, that can be challenging.

Q.    The same equipment you have when you do foot pursuits?

A.    Correct, yes.

Q.    Could you give me an estimate with that equipment? You were 31 years old, in good shape.  How long do you think it would have taken you to move 3 or 4 feet?

MR. RAMIREZ:  May call for speculation.

THE COURT:  Overruled.

THE WITNESS:  Couple seconds.

BY MR. GALIPO:

Q.    And would you agree that, not only did you not move in there while Mr. Barber was outside the car, when he got in

UNITED STATES DISTRICT COURT

222

and closed the door, you still didn't move there.  Would you agree?

A.    Correct, yes.

Q.    And there was some time between the door closing and the reverse lights coming on; true?

A.    No.

Q.    There was no time between the door closing and the reverse lights coming on?

A.    That was very close to a simultaneous action.

Q.    Isn't it true that about 2-and-a-half seconds passed from the door closing to the car actually backing up?

A.    No.  I'm not aware of that.

Q.    So after the door closed and before you saw -- or -- you're saying it was the same time that the door closed and the reverse lights came on?

A.    It was very close.

Q.    When you saw the reverse lights, did you then move out of the way?

A.    No.  The vehicle was in motion.

Q.    25 feet away from you; correct?

A.    Approximate, yes.

Q.    Now, you're standing there, you're saying the vehicle starts backing up; correct?

A.    Correct.

Q.    Would you agree, Deputy Alfred, instead of moving

UNITED STATES DISTRICT COURT

out of the way, as you are trained, you made a radio dispatch?

A.    Correct, yes.

Q.    Were you aware of the training to move out of the way, get out of the path instead of shooting?

A.    Yes.

Q.    Are you saying that as you're making this dispatch, the car's starting to back up?

A.    Correct, yes.

Q.    So, instead of moving out of the way, as you're trained to do, you're making a dispatch?

A.    Correct, yes.

Q.    So you said the car backed up a total of about 10 feet?

A.    An approximate, yes.

Q.    And you fired six shots?

A.    Correct, yes.

Q.    And you're aiming at the headrest?

A.    Yes.

Q.    Did you give any verbal warning you were going to shoot?

A.    No.  It was not feasible.

Q.    You had time to give a dispatch but no time to give a verbal warning; is that what you're saying?

MR. RAMIREZ:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  Your question, sir?

BY MR. GALIPO:

Q.    Yes.

You're saying you had time to give a dispatch over your police radio but no time to give a person a verbal warning that you were about to use deadly force?

A.    That is correct, at that time the decision of deadly force was not confirmed.  It only became confirmed once the vehicle was in motion.

Q.    So did you make the dispatch after Mr. Barber got in the car?

A.    Yes.

Q.    So there was a period of time, then, between him getting in the car and the vehicle being in motion; right?

A.    As I previously stated, it was very brief.

Q.    Well, you just told us that when you were making the dispatch, the vehicle was not in motion yet.  Did I understand you correctly?

A.    That is correct, yes.

Q.    So, obviously, there would have been a period of time for you to make the dispatch between him getting in the car and the vehicle moving backwards; is that fair?

A.    Yes.  That's correct.

Q.    And during that period of time, between him getting in the car and the vehicle going in motion while you were

UNITED STATES DISTRICT COURT

making this dispatch, you did not use that time to get out of the way.  Is that also a correct statement?

A.    That is correct, yes.

Q.    And then, when you saw the reverse lights come on, you still did not get out of the way.  Is that also correct?

A.    That is correct.

Q.    I mean, that's a pretty good sign that someone's going to back up, right, when you see the reverse lights?

A.    Yes.

Q.    Have you ever had the -- the -- have you ever had the experience of being at a parking lot of a grocery store or something and you're walking along the parking aisle and you see a car's reverse lights come on and you're thinking, they might not even know I'm behind them, so you quickly move out of the path?

MR. RAMIREZ:  Objection as to relevance.

THE COURT:  Sustained.

BY MR. GALIPO:

Q.    So if the vehicle moved back a total of 10 feet and you fired six shots, how far do you think it moved back at the time of your first shot?

A.    That's tough to determine.  The vehicle was in motion.  So the distances change over time.

Q.    Well, it's a total of 10 feet according to your estimate; correct?

UNITED STATES DISTRICT COURT

Deputy Alfred is still on the stand.

And, Deputy, you are reminded you are still under oath.

Mr. Galipo.

MR. GALIPO:  Okay.  Thank you.

BY MR. GALIPO:

Q.   You indicated earlier that you did review your deposition in preparation for the trial?

A.   Correct, yes.

Q.   Were you aware after your deposition was taken that you had the right to make changes to any answers if you thought you needed to?

A.   Clarification.

Q.   Did you change any answers in your depositions or clarify any after you received the transcript?

A.   Yes.

Q.   To who?

A.   My representation.

Q.   Did you ever write anything where you would cross out answers and say that answer was mistaken; it should have been something else?

A.   No.  Not that I'm aware of, no.

Q.   So when you told me today that some of your answers under oath in the deposition, there was some confusion or misunderstanding, when did you realize this confusion or

**UNITED STATES DISTRICT COURT**

misunderstanding for the first time?

A.    Throughout the course of the prep.

Q.    In the last week or so?

A.    Yes.  There were clarifications made within the last week, yes.

Q.    Do you know if any of those clarifications made it to my office?

A.    I'm unaware, no.

Q.    So do you recall providing prior testimony under oath that you didn't know the person in the driveway was the subject of the call?

A.    Correct, yes.

Q.    And you would agree, you never told the person they were under arrest; correct?

A.    That is correct, they were not advised they were under arrest.

Q.    This policy regarding shooting at moving vehicles, I think you've told us, but you were aware of that policy before this shooting; correct?

A.    Correct, yes.

Q.    And you were aware that the language said, "You shall not shoot at the driver of a moving vehicle."  Correct?

A.    Correct.

Q.    And you were also aware that the policy and the training was to step out of the path instead of shooting?

A.    If feasible, yes.

Q.    And would you agree that you never, at any time before you fired your last shot, attempted to step out of the path?  Would you agree with that?

A.    No, I would not agree.  That was a consideration, but it was not practical on my end.

Q.    Okay.  So let me break that down when you say it was a consideration.

First of all, showing you Exhibit 3, page 5.

MR. GALIPO:  I think it's already in evidence, Your Honor.  If not, we have an agreement as to that exhibit.

THE COURT:  All right.

MR. RAMIREZ:  There is no objection but --

THE COURT:  I do not believe 3-5 was previously admitted, but it will be admitted at this time.

MR. GALIPO:  Okay.  Thank you, Your Honor.

(Exhibit No. 3-05 for identification

and received into evidence.)

MR. GALIPO:  And I'm assuming when it's admitted, it's okay to publish, Your Honor?

THE COURT:  Of course.

MR. GALIPO:  Okay.  I'm trying to zoom out, not very successfully, here.

BY MR. GALIPO:

Q.    Okay.  You can see the back of the vehicle in this

image; correct?

A.    Correct, yes.

Q.    And we could see your flashlight in this image.  Is that also correct?

A.    Yes.

Q.    Now, you had -- you're right-handed; is that true?

A.    Correct.

Q.    So you would have had at some point your flashlight in your left hand?

A.    Yes.

Q.    And you believe you dropped your flashlight from your left hand at some point before you started firing?

A.    Correct.  I did drop it.

Q.    Do you know whether your flashlight was ever picked up by anyone at the scene after the shooting?

A.    I do not know.

Q.    In any event, we could see in the area to the right of your flashlight this opening we've been talking about; is that true?

A.    Correct.

Q.    And you have told us previously that you were standing approximately 3 to 4 feet from the opening?

A.    Correct.

Q.    And would it be correct that the opening would be to your right?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    And you're saying you were aware there was an opening there before the shooting?

A.    Correct.

Q.    Are you also saying that you considered, before the shooting, moving into the opening?

A.    It was an area that I looked at as I approached Mr. Barber, yes.

Q.    So you looked at it.  Are you also saying that you considered, as one of your options tactically, to move to the right?

A.    Yes, if it was feasible, yes.

Q.    Okay.  When did you first consider that?  Did you ever consider that before Mr. Barber got in the vehicle?

A.    I observed the opening as I walked down the driveway.

Q.    Okay.  Did you consider moving to that area before Mr. Barber got in the vehicle?

A.    Yes.

Q.    Did you consider moving to that area after Mr. Barber got in the vehicle?

A.    No.

Q.    Did you consider moving in that area after you saw the reverse lights come on?

A.    No.

**UNITED STATES DISTRICT COURT**

Q.   Did you consider moving into that area after you saw the vehicle starting to come backwards?

A.   No, I did not.

Q.   Even though your training and policy says to move out of the path, you're saying you did not consider moving out of the path?

A.   That is correct, yes.

MR. GALIPO:  Exhibit 3, page 16, by agreement, Your Honor.

THE COURT:  Any objection, Mr. Ramirez?

MR. RAMIREZ:  No objection.

THE COURT:  It will be admitted.  And you may publish.

(Exhibit No. 3-16 for identification and received into evidence.)

MR. GALIPO:  Thank you, Your Honor.

BY MR. GALIPO:

Q.   Can you see this image on your screen?

A.   Yes.

Q.   And this is from inside the open area looking out towards the driveway; is that correct?

A.   That is correct, yes, east.

Q.   And do you see a marker Number 9, a yellow marker Number 9 in -- towards the middle of the driveway?

A.   Correct.

UNITED STATES DISTRICT COURT

Q.    And is that your flashlight, if you know?

A.    Yes.

Q.    I'm not doing too well at zooming here, but that's the 9 and that's your flashlight?

A.    Yes.

Q.    And you're saying you dropped that with your left hand before you started shooting?

A.    Yes.

Q.    And you would have obviously been standing in the area between your flashlight and this opening about 3 to 4 feet from the opening as you described?

A.    Just south of the flashlight.

Q.    You were aware when you were firing your shots at the headrest area that you could potentially kill the driver?

A.    No, I was not aware of that.

Q.    Were you aware from your training that shooting someone in the upper body or head could cause death or serious bodily injury?

A.    Yes, it can.

Q.    And you were trying to strike the driver; is that fair?

A.    That is incorrect.  I was trying to stop the threat.

Q.    Well, you weren't shooting out the tire, were you?

A.    That is correct.  I was not shooting at the tire.

Q.    You were aiming center mass, were you not?

UNITED STATES DISTRICT COURT

A.    The upper torso, yes.

Q.    Wasn't your intent, Deputy, to strike the driver with a bullet?  That's why you were aiming at the headrest?

A.    My intent was to stop the threat and as a result, Mr. Barber was struck by gunfire.

Q.    I just want to make sure I'm understanding.

Were you trying to strike his body or were you shooting at some other part of the car?

A.    His body.

Q.    And you fired six shots?

A.    Correct, yes.

Q.    Do you know which one of your six shots struck him in the head; whether it was the first shot, the last shot, or some shot in between?

A.    No, I'm not aware.

Q.    You have testified that even if you were able to move out of the path of the vehicle, you still would have shot.

Do you recall that testimony?

A.    Correct, yes.

Q.    So the training and policy is, move out of the path rather than shooting; you're saying you didn't try to move out of the path, but had you moved out of the path, you still would have shot anyways?

A.    No.  That is incorrect.  If I had a safe avenue to escape, then there would be no reason for the gunfire itself.

Q.    Well, when you say "a safe avenue of escape," the training is to move out of the path; correct?

A.    Yes, when feasible.

Q.    Okay.  When you started shooting, your first shot, this -- the back of this vehicle was over 20 feet from you, wasn't it?

A.    Approximately.

Q.    And it was going probably less than 3 miles an hour; true?

A.    No, that isn't true.

Q.    You don't even know whether it moved 3 feet or not at the time of your first shot?

A.    That is correct.

Q.    Did any dirt or gravel that was spit up strike you?

A.    No.  I was uninjured.  But it was airborne.

Q.    Did you have to dive out of the way of the vehicle?

A.    No.

Q.    Did you have to make a sudden movement to avoid being struck by the vehicle?

A.    No.  The vehicle came to rest.

Q.    Did you at any time see a firearm in Mr. Barber's -- either one of his hands?

A.    I did not, no.

Q.    Could you tell what race he was before he got in the car?

UNITED STATES DISTRICT COURT

A.    He appeared to be African-American.

Q.    Would it be correct, Deputy Alfred, that you didn't know whether Mr. Barber knew you were behind the car when he started going backwards?

A.    That is incorrect.

Q.    Do you recall providing testimony under oath that you didn't know if Mr. Barber knew you were behind the vehicle?

A.    No, I do not recall, no.

Q.    Do you think it might refresh your recollection potentially if I showed you some prior testimony in that regard?

A.    Sure, yes.

MR. GALIPO:  This is something slightly different than the deposition.  If I could hand it to your clerk to hand to the witness, please?

THE COURT:  Yes.  And, Mr. Galipo, I don't believe I have a copy of that.  Do you have a copy for me?

MR. GALIPO:  Yes.

THE COURT:  Thank you.

MR. GALIPO:  I'll wait for Ms. Masongsong.  We're going to get another copy right now.

THE COURT:  Thank you.

MR. GALIPO:  I'll hand this to your clerk, if that's --

THE COURT:  Of course.

MR. GALIPO:  I'll hand this to your clerk for Your Honor.

THE COURT:  Thank you.

You may proceed, Mr. Galipo.

MR. GALIPO:  Okay.  Thank you.

BY MR. GALIPO:

Q.   Were you provided a copy of that testimony?

A.   Yes, sir.

Q.   Okay.  Towards the end, there's page numbers on the upper right.  If you could find page 146.

Maybe we can go to -- start at 145, if -- let me know if you have that page.

A.   145.

Q.   Okay.  Are you on that page?

A.   Yes.

Q.   Um, on page 145, there's a question that starts on the bottom, line 25.  And then it goes to the top of page 146, page 5.  Could you just read that to yourself for a moment and tell me if that refreshes your recollection about your prior testimony under oath on this issue.

A.   You said lines 25 to which line?

Q.   Yeah.  Page 145, line 25, to page 146, line 5.  If you can please read that to yourself and let us know when you've had a chance to do that.

A.   Uh-huh.

UNITED STATES DISTRICT COURT

(Pause in the proceedings.)

MR. RAMIREZ:  I would ask that he read to line 17 on page 146, Your Honor.

THE COURT:  Well, you can certainly address that when you have your opportunity to question the witness.

MR. RAMIREZ:  Thank you.

BY MR. GALIPO:

Q.    Have you had a chance to read those lines?

A.    Correct, yes.

Q.    Does that refresh your recollection about some prior testimony on this issue?

A.    Yes.

Q.    Would you agree you indicated in prior testimony that you didn't know Mr. Barber knew you were behind the vehicle?

A.    Correct, yes.

Q.    And that would include during the time frame when the vehicle started backing up; correct?  According to this prior testimony.

A.    I'm unaware of that.

Q.    Okay.  Let's look at the top of page 146, line 2.

Do you recall being asked --

MR. GALIPO:  May I read it, Your Honor, just lines 2 through 5?

THE COURT:  Yes.

MR. GALIPO:  "QUESTION:  So you would agree with me that you have no idea if Mr. Barber even knew you were behind that vehicle when he started getting his tires moving; correct?

"ANSWER:  That is correct."

BY MR. GALIPO:

Q.    Do you see that question and answer?

A.    Correct, yes.

Q.    Do you recall what the dispatch was that you made after Mr. Barber got in the car but before you fired?

A.    I advised the dispatcher that I had a subject who was verbally uncooperative.

Q.    That was before he got in the car, wasn't it?

A.    Correct, yes.

Q.    Okay.  What I'm wondering is -- you said earlier you made a dispatch after he got in the car but before you fired.

Do you recall that?

A.    Correct, yes.

Q.    What was that dispatch?

A.    That he's -- Mr. Barber was entering his vehicle and reversing it in my direction.

Q.    And that's before you fired?

A.    Correct.

Q.    And you didn't think that would be a good time to move out of the path as you were trained?

UNITED STATES DISTRICT COURT

Q.    And at least you know now that at the time the scene was processed, that's where the casings were?

A.    Correct, yes.

Q.    So you would agree that the casings were further away from the back of the truck than your flashlight?

A.    No, not necessarily.  Those casings, from my understanding, were not in their original position.  That's a generalized area of where they were.

Q.    Do officers, if you know, have some training when there's a shooting or some incident to try to preserve the evidence if they can?

A.    That is correct, yes.

Q.    And do you understand the casings as part of the scene, part of the evidence?

A.    Yes.

Q.    Did you see anybody moving the casings at any time before you left the scene?

A.    Not that I'm aware of.

Q.    Did you see anybody moving the flashlight at any time before you left the scene?

A.    Not that I'm aware of, no.

Q.    So why are you saying that those casings are not in their original position?

A.    Due to the additional resources that were advised to respond to the scene, we have other partners and medical

UNITED STATES DISTRICT COURT

A.    No.   That would put me close to Placard 9. Placard 9 is a representation of where I was positioned.

Q.    And you think your casings may have been kicked around by some other people?  Is that what you're saying?

A.    It's a possibility.

Q.    Immediately after the shots were fired, you again make a broadcast; correct?

A.    Correct, yes.

Q.    I think you broadcast "shots fired" at some point?

A.    Yes.

Q.    You said something like "the vehicle reversed behind me," but you agree that was a mistake in language?

A.    Correct, yes.

Q.    And after the shooting, where did you -- did you reposition yourself after the shooting?

A.    After the fact, yes.

Q.    Where did you position yourself after the shooting?

A.    Within the opening area.

Q.    Looking at 3 -- Exhibit 3, page 15.

So this opening area that we've been talking about for about an hour, you positioned yourself there after the shooting?

A.    Correct.

Q.    And how long were you positioned in the open area before backup arrived?

**UNITED STATES DISTRICT COURT**

unintentionally struck her?

A.    Correct, yes.

Q.    And, again, you're saying in the 2 to 3 seconds it took you to fire your shots, you chose to use that time to fire rather than moving out of the path.  Is that a fair statement?

A.    Yes, that would have put me in the pathway of the vehicle, crossing the pathway of the vehicle.

Q.    Well, you already told us that the opening was only 3 or 4 feet to your right; correct?

A.    Correct, yes.

Q.    And you told us you could have got there within 1 or 2 seconds; correct?

A.    Correct, yes.

Q.    And at some point when other officers came to assist, a portion of the fence was knocked out?

A.    After the fact, yes.

Q.    And Mr. Barber, at some point, was removed from the vehicle?

A.    From my understanding, yes.

Q.    And when he was removed, as you understand it, the vehicle rolled backwards some distance because the car was still in reverse with his foot on the brake?

A.    I was unaware if his foot was on the brake, but the vehicle rolled back, yes.

Q.    And you estimated after your last shot, the vehicle

moved back less than 5 feet.

Do you recall that estimate in your deposition?

A.    It was a short distance, yes.

Q.    So I want to talk to you about that.

You're estimating that the vehicle moved back a total of 10 feet, approximately?

A.    Correct.

Q.    And you're saying it moved back less than 5 feet after your last shot?

A.    It appeared so, yes.

Q.    So just putting your estimates together, you would have fired your six shots during the approximate first 5 feet that it moved?

A.    My shots were fired while the vehicle was in motion.

Q.    Would you at least agree with me that the vehicle moved some distance after your last shot?

A.    A short distance, yes.

Q.    You did a walk-through of the scene at some point after the incident; correct?

A.    Correct, yes.

Q.    When did you do the walk-through in relation to the incident?

A.    Approximately a month after, maybe a month and a half.

Q.    And you were with an attorney at that time?

UNITED STATES DISTRICT COURT

A.      Correct, yes.

MR. GALIPO:  May I have a moment to look at my notes, Your Honor?

THE COURT:  Yes.

(Pause in the proceedings.)

BY MR. GALIPO:

Q.      Do you recall in your original statement the detective asking you several times why you didn't move to the opening on the west side?

A.      That is correct, yes.

Q.      You also indicated in your original statement that you didn't know it was Mr. Barber at the time.

Do you recall saying that?

A.      Correct, yes.

Q.      That's because you -- you didn't even know who the person was at the time you were shooting at him; is that true?

A.      That is correct, yes.

Q.      Your testimony that if you had moved into this area out of the path of the vehicle, you would have fired anyways. That's your testimony; is that correct?

A.      I'm sorry.  Can you -- can you --

Q.      Did I understand you correctly to say that if you had moved that 3 or 4 feet to the west in this opening to get out of the path of the vehicle, you would have fired your shots anyways?

A.    No.   That would defeat the purpose of the deadly force option.

Q.    Okay.   That's what I want to follow up on.   I'm going to show you again page -- Exhibit 3, page 5.

MR. RAMIREZ:  I think it's already admitted.

THE COURT:  It is.

MR. GALIPO:  I think it's in.

THE COURT:  Yes.

BY MR. GALIPO:

Q.    Okay.   I just want to be clear on this last point.

The whole purpose of the policy in training is to step out of the way so you don't have to shoot; correct?

A.    Yes, if it's feasible.

Q.    So where I'm confused but you could probably help me out -- are you saying that if you had moved into this open area out of the path of the vehicle, you would have fired anyways?

A.    No, that's not what I'm saying.

Q.    Do you still have your prior testimony under oath up there, that copy that was provided?

A.    Correct, yes.

Q.    Can you see if you can find page 156, towards the back?

A.    156.

Q.    Are you on that page?

A.    Yes, sir.

Q.    Can you read lines 11 through 23 to yourself for a moment?

(Pause in the proceedings.)

BY MR. GALIPO:

Q.    Let me know when you've had a chance to read through line 23.

A.    I'm ready.

Q.    Okay.  You recall being asked about whether, if you were in the -- I guess in line with the picket fence in that gap --

A.    Yes.

Q.    -- whether you would have fired anyways and you said yes?

A.    In line with the picket fence?  Yes, because that still places me in the pathway of the vehicle.

Q.    And then the follow-up question:  "Even though there was a possibility you could have just moved into the yard over here?"

You say:  "That is correct, I would have fired my service weapon."

Do you see that?

A.    Yes.

Q.    So what I want to know is if you had crossed into this open area beyond the picket fence, beyond it, are you saying you still would have fired then or not?

UNITED STATES DISTRICT COURT

A.    No.  No.  So for clarification, if I was out of the pathway of the vehicle, well within this yard, there would be no purpose for that course of fire.  I do apologize for that.

Q.    That's okay.

And the reason is, is because what we've been talking about, if you can get out of the path of the vehicle, there's no need to shoot; correct?

A.    Correct, yes.

Q.    And that's why the training is to get out of the path, if feasible, rather than shooting?

A.    Correct, if feasible.

Q.    Thank you.

MR. GALIPO:  That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Ramirez.

MR. RAMIREZ:  Thank you, Your Honor.

May I proceed, Your Honor?

THE COURT:  Yes.

MR. RAMIREZ:  Thank you.

**CROSS-EXAMINATION**

BY MR. RAMIREZ:

Q.    Good morning, Deputy.

A.    Good morning, sir.

Q.    If you'll look in the defense exhibit binder there, Number 20.

**UNITED STATES DISTRICT COURT**

A.    I have.

Q.    And I'm just going to mention some of them.  You don't have to list all of them.  For example, have you listened to radio dispatch tapes?

A.    I have.

Q.    Have you listened to the belt recording?

A.    Yes, from Deputy Alfred.

Q.    Have you looked at various photos of the scene?

A.    Yes, sir.

Q.    Have you reviewed Deputy Alfred's original statement?

A.    I have.

Q.    Have you reviewed Deputy Alfred's prior testimony under oath?

A.    His deposition, yes, sir.

Q.    With respect to the nature of the call, was that an important factor in your analysis of this case?

A.    It was.

Q.    Can you explain to the ladies and gentlemen of the jury why the nature of the call was important?

A.    Depending on the type of call, if it's an emergency call like a crime in progress, say like a domestic violence or robbery in progress, that's an elevated call.  It's basically a Code 3.  You see an officer driving with lights and sirens to a call, it's an emergency call.

**UNITED STATES DISTRICT COURT**

This was more of a landlord/tenant-type civil dispute.  There was apparently a disagreement at the premises where they, both parties, reside.  So in that respect it was -- all calls are serious and should be taken as such is the reason why the police are responding but not to the nature where it was elevated where you reasonably believed someone was armed with a firearm.  In this particular case, there was no weapons that were mentioned initially, and primarily the call, as it states on the CAD -- and the CAD is a computer-aided dispatch is what the officer will either get on their computer in their car and/or here on the radio -- was that it was the neighbor is not letting them enter their residence is what the call for service initially came out as.

Q.    Did you understand they had a shared driveway?

A.    Yes.

Q.    There was some issue about whether one person could get in and out of the driveway?

A.    Correct.  And there was a disagreement over that.

Q.    Okay.  In the severity of calls that a police officer could respond to, where does this one rank?

A.    On the lower level.  Once again it's a call for service.  You always have to be mindful in a situational awareness, but on the lower level in a metropolitan city such as Adelanto or L.A. where I work, this would be a lower or less important call for service.

Q.      -- in the books.  But can you see Deputy Alfred's patrol car in this picture?

A.      No.

MR. GALIPO:  And is Exhibit 3, page 10, in yet, Your Honor?

THE COURT:  It is.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.      Putting that up again, can you see Deputy Alfred's patrol car on the street?

A.      I cannot.

Q.      All right.  So I want to take you to the time frame where Deputy Alfred, according to his testimony, is walking up the driveway towards the back of the Chevy Trailblazer, and he sees someone on the driver's side of the car.  Are you with me so far?

A.      I am.

Q.      And further assume that Deputy Alfred is not even a hundred percent sure that's the subject of the call, but he thinks it may be.  Are you with me so far?

A.      I am.

Q.      And are you aware that the reporting party told Deputy Alfred that they haven't seen any gun, but they thought maybe he could have one, but they weren't sure, or words to that effect?

UNITED STATES DISTRICT COURT

A.    Correct.

Q.    Now, does the fact that there was no weapon seen, no act of violence, and no injury reported play into the totality of the circumstances?

A.    Yes.

Q.    What is the totality of the circumstances based on training?

A.    It's everything that the officer knows, either prior to arrival, what he or she may hear or see upon arrival, or what they may learn from either witnesses or victim of a crime.

Q.    So do you have an opinion as to whether or not Deputy Alfred should have announced himself as a police officer or said "Sheriff's Department" under the circumstances of this case?

A.    Yes.

Q.    What is your opinion?

A.    Well, it's after 11:00 PM at night.  I know the photos here -- there's no body-worn camera, but the photos show that the area is illuminated, but I don't know what a subject can see inside of a vehicle.  So I'm going to identify who I am and I'm going to use my outdoor voice when I do that so everyone knows that it's, you know, Officer Smith from the San Bernardino County Sheriff's Department so they -- you could project that.  And you talk with some command presence so they know if there's any question as to who is there, that, in fact,

**UNITED STATES DISTRICT COURT**

the police are at the scene.

Q.     And given the time of night this happened, the fact that it's been reported that the driveway area was not well lit, at least by the parties, and there just had been a verbal dispute between the neighbors, why would it be important to make sure Mr. Barber knew it was a police officer?

A.     For one, the lighting.  For two, to let them know that you're here to investigate a crime.

Q.     I want to show you --

MR. GALIPO:  I think Exhibit 3, page 4, is in evidence, Your Honor.

THE COURT:  Give me one moment.

Yes, it is.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.     You've seen photos or similar photos before, Mr. DeFoe?

A.     Yes, sir.

Q.     In terms of requesting backup before approaching, do you have any thoughts on that issue?

A.     Yes.

Q.     Can you share those with the jury?

A.     For one, there's no rush.  As it relates to this case the facts are that, you know, he did have a conversation with the people reporting for about five minutes, which would

afford him the opportunity.  There's only one way out, so if you're concerned about the person in the car, the only way they can leave is by backing out, and if they leave, I don't even know if I have a crime at this point that's going to allow me to detain someone, have reasonable suspicion to detain an individual.

So if I do reasonably believe I'm going to detain and stop that person, it's always better to have more than one officer or deputy at the scene.  So I'm simply going to request, you know, a deputy, when available, to respond to my scene.  Once again, not a rush, not a crime in progress.  It's just better for command presence.  It's a force multiplier to have more than one deputy.  You're more likely to listen to me if I have a partner officer more so than you would if I'm by myself.

Q.    When there's a second deputy, is there something called a contact officer-cover officer configuration?

A.    There should be, yes.

Q.    What is that generally?

A.    Well, typically, if -- if me and this gentleman are working together here and he's got a better use of the English language, he's got better temperament than I am, I'm going to let him be the contact officer.  It means that he's going to initiate the dialogue.  He'll be the one that will do all the talking.  I'm going to do -- I'm the cover officer.

So in the event that it escalates where I need to use less lethal force -- I have pepper spray, I have a Taser, I have a baton.  But I'm going to allow him to initiate dialogues.  A, that there's no conflicting commands or warnings, like what happens a lot of times, let him initiate the dialogue.  I'm just going to sit there and cover, which means I'm going to watch and observe, look at situational awareness, all -- any external type of issues that may be a problem or may be a concern for us, and allow him to do the talking as to what the objective would be.

Q.   Now, you understand, Mr. DeFoe, that there was a period of time before Mr. Barber got in the car that there was some conversation back and forth?

A.   Yes.

Q.   And some profanity used?

A.   Yes.

Q.   Showing you Exhibit 3, page 15 --

MR. GALIPO:  Which I think is also in, Your Honor?

THE COURT:  Yes.

BY MR. GALIPO:

Q.   Is there something that officers are taught about situational awareness so that they can quickly become familiar with their surroundings in an incident?

A.   Yes.  You're looking for any area I could use as cover or concealment.  Cover is something that, you know,

typically would stop any type of lethal threat, such as a bullet.  That's how it's defined in our training, which is Peace Officers Standards and Training in California.

Concealment, it's not going to afford you any cover, but it's going to allow that person not to see you.  That could be behind a bush, could be behind a wall, something where they can't see you, but you can still monitor their behavior.

Q.    And looking at Exhibit 3-15 -- and now I'm going to show you --

MR. GALIPO:  Is Exhibit 3, page 29, in yet?

THE COURT:  I do not -- yes.  Ms. Carr is telling me yes.

MR. GALIPO:  Okay.  Thank you for that.

BY MR. GALIPO:

Q.    Are you able to see that on your screen, Mr. DeFoe?

A.    Yes.

Q.    So one of the tactical decisions an officer has to make -- we've already talked about whether they should call for backup and whether they should announce themself as a police officer; correct?

A.    Correct.

Q.    Is another tactical decision where to tactically position themselves for their safety and the safety of others?

A.    Yes.

Q.    And given this scene and given what you have

**UNITED STATES DISTRICT COURT**

observed through looking at the case materials and the photographs, do you have an opinion as to whether Deputy Alfred should have positioned himself behind the car?

A.    Never.

Q.    Um, explain to the jury why you say that.

A.    For one, if you get pulled over by law enforcement -- hopefully you don't, but if you do, you'll see that typically they're never going to stand right behind your car, right, in case you back up.  They're never going to put themselves in that poor tactical position.  They'll be on the side of your car, they'll look for available cover.

For instance, I mentioned this room.  If I need to clear this room, I don't need to enter the room to do that. I'm going to stay at that door at cover and do whatever I need to do from there if I can; call people out, whatever that may be.

Here, there's an opening of a fence you see in the photos.  The first place I'm going to look at is go to that opening of the fence because anything I need to do I can do from there.  If I'm right-hand dominant and I need to transition to a pistol -- means a handgun -- I can -- we're taught in the course of fire training for all law enforcement in Southern California would be to transition from right-hand dominant to left hand.  So if I needed to take my pistol out on that fence, I could cover that potential threat with my handgun

**UNITED STATES DISTRICT COURT**

out if I needed to be.

But it also puts me in a safety position where I can issue whatever commands I can from -- or want to from behind that fence area.  I'm not going to stand behind the vehicle, especially when I look and say, there's only one way out.  If that vehicle is to leave, it's going to reverse and it's going to come towards me.  And I don't want to put myself in that poor tactical position.

MR. GALIPO:  Exhibit 3, page 6, I'm not sure that one is in yet.

THE COURT:  I believe it is.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.    So looking at this image, Mr. DeFoe, do you see an area where it would have been tactically appropriate for Deputy Alfred to position himself?

A.    Um, right where that fence post as you can see, inside of that to be able to view, from there would be the best place.  I mean, I wouldn't walk down that mouth of that driveway myself initially.  If I could do something from beyond the driveway, it would be fine.  If I'm already in that area, the safest thing to do would be to move to that opening we can see in the photo.

Q.    Now, in this case, when you reviewed materials, did you see information that as Deputy Alfred was walking up the

driveway, he noted that the car was on and the brake lights of the vehicle were on?

A.    Yes.

Q.    And also that he had the impression that the car was either just getting there or getting ready to leave?

A.    Yes.

Q.    Does the fact that the vehicle is on and the lights are on before Mr. Barber gets in play into your opinion that you wouldn't want to stand behind the car?

A.    Yeah, that's called a clue that you wouldn't want to stand there, that there's a likelihood that that vehicle is going to be leaving and the only path of that vehicle leaving would be to reverse from its position out into the street.

Q.    So at some point, based on your review, does Mr. Barber get in the car?

A.    He does.

Q.    And are you aware that at least on the audio from the belt recording, there's an indication in some of the materials as to the door slamming?

A.    Yes.

Q.    And was there some passage of time, based on your review, from the door slamming to hearing the engine rev and the tires spinning and then the -- and then the car starting to move?

A.    Yes.

Q.    So assuming that Deputy Alfred did not get out of the way -- strike that.

Assuming that he positioned himself behind the vehicle -- and let's assume the distance is 20 to 30 feet for purposes of my hypothetical -- and he's standing there, essentially in the middle of the driveway with this opening 3 to 4 feet to his right.

Do you have that hypothetical in mind?

A.    Yes.

Q.    And assume that he then observes Mr. Barber get in the vehicle and slam the door.  Are you with me so far?

A.    I am.

Q.    What would you expect a reasonably trained officer to do if the officer was not in the position you recommended but standing in the middle of the driveway when the door closes?

A.    Immediately move to that position.

Q.    And why would a reasonably trained officer immediately move to the position?

A.    Because the -- he got into the vehicle and the door shut, which would be an indicator that he's going to leave.

Q.    And assuming that that opening, at least as described by Deputy Alfred, is 3 to 4 feet to his right, do you have any thoughts on how difficult it would be to move that 3 to 4 feet?

UNITED STATES DISTRICT COURT

A.     No.   Just walk 3 to 4 feet, just as you did when you walked up the driveway.

Q.     There's been some suggestion that there was concern for the road surface or falling down.  Does that, from a police practice expert's viewpoint, play into whether you should get to a -- a better position?

A.     No.  My understanding he didn't fall down on the way walking towards the vehicle.

Q.     And why would it be important tactically for an officer, once the door closed, to -- to move that 3 or 4 feet to the right?

A.     It would be for anyone.  I mean, if we're in the grocery store and you see someone backing up with their light on and they don't see you, we just simply move out of the way. We move to where it's safe.  It doesn't take specialized training.  It's just situational awareness.  You don't want to get hit by the vehicle that's going to potentially be leaving and you're standing behind it, so you simply just walk out of the way of the vehicle, and you have an opening 3 to 4 feet from you, so it's not -- not difficult.

Q.     Now, at some point after he got in the car and the door closed, it's your understanding that the reverse lights came on?

A.     Yes.

Q.     Would that be further information to a reasonably

trained officer that the vehicle might be backing up or getting ready to back up?

A.    Yes.

Q.    Again, at that point, at 20 or 30 feet, what would a reasonable officer do?

A.    Just move 3 to 4 feet to the right behind the opening of the fence.

Q.    What if the officer says I was afraid to move the 3 to 4 feet because I didn't feel I had time and I was afraid maybe I'll fall down on the gravel?

A.    Well, if you're afraid of the vehicle backing up, if that's the fear, clearly the best option is to move away from the vehicle.  You have an opening 3 to 4 feet away.  And it's only going to take you less than a second to move over to that location where you're out of the vehicle's path of travel if, in fact, it starts to leave.

Q.    And given that, would the distance the vehicle was away and the speed of the vehicle be factors to consider?

A.    Yes.  I mean, I wouldn't be looking at the speed of the vehicle because once he got in and shut the door, I would have already moved over to the opening.  I would have been at the opening prior to him getting in the car.

But if he did get in the car and shut the door, I definitely at that juncture would have moved to the opening at that point.  Plenty of time, plenty of opportunity.  And then

when you see the brake lights come on, now that he's going to be reversing the vehicle, that's another opportunity, that you clearly just walk 3 to 4 feet out of the way.

Especially because it's dark, you don't know if that person can see you, you haven't identified yourself as a law enforcement officer.  He may not even know that he's being detained or been in trouble for anything as to the reason why he couldn't leave at that point.

So all of those factors, I would just move out of the way, simply move out of the way.

Q.    Did you review materials that indicated that at the time Mr. Barber got in his vehicle he was not under arrest?

A.    Correct.

Q.    And have you reviewed materials in which Deputy Alfred testified that he didn't even know if Mr. Barber knew he was behind the car when the car was backing up?

A.    Correct.

Q.    Are you familiar with policies in general about shooting at moving vehicles, generally speaking?

A.    Yes.  Generally speaking, most policies throughout the United States, including this policy of the San Bernardino County Sheriff's Department, states you should not shoot at a moving vehicle unless you can't avert the vehicle.  You simply get out of the way is what the policy states.  And I can read it verbatim into the record if you'd like me to.

Q.    Well, does the policy talk about -- just one moment so I can get it in front of me.

First of all, was it important in your review in this case regarding whether the shooting was appropriate or not that Deputy Alfred never saw a firearm on Mr. Barber's person, in Mr. Barber's hand, or in the car?

A.    Yes.

Q.    Why is that important?

A.    Because there's no weapon, nothing that resembled a weapon.  In this case, to the hatch of the vehicle was up in the back, so you can see in.  I mean, it's good for an officer. You can now see in what that person's doing.  Other than it being dark tinted windows at night, that actually the back hatch of the vehicle is up, which provides you, as an officer, to be able to better view the back of the car and what's inside of the vehicle.

Q.    So is part of the analysis whether the officer is about to get run over by the vehicle?

A.    Yes.

Q.    And is it -- is it -- is another part whether the officer is able to move out of the way?

A.    Correct.

Q.    Based on your review of the materials in this case, was Deputy Alfred about to be run over by this truck?

A.    No.  There was no imminent threat of great bodily

injury or death at any time, especially preceding the firing of the six rounds from his Glock model 21, .45 caliber pistol.

Q.    Well, let me ask you about the concept of subjective fear.

Are you familiar with this concept in training?

A.    Yes.

Q.    And fear of future harm.

Are you also familiar with that concept?

A.    Yes.

Q.    Isn't it enough for an officer to justify a shooting to say, I thought I was going to get run over or I thought I was going to be killed?

A.    No.

Q.    Why not?

A.    The fear is to be objectively reasonable based on the totality of the circumstances, can't be future harm.  It is at the time in which the force used, was the subject in imminent or immediate threat of great bodily injury or death. If not, it does not rise to the level where the use of lethal force would be reasonable based on the totality of the circumstances.

Q.    And does the training on the use of lethal force encompass the concept of reverence for human life?

A.    Yes.

Q.    Can you explain that to the jury, please?

330

A.    Well, that's the ultimate.  You know that you have a very -- obviously, a great responsibility in law enforcement that you should only use lethal force, and with that understanding that the utmost is the reverence for human life, that the result of you using force, especially lethal force, could result in great bodily injury or death to someone and it should only be when there's an imminent threat of great bodily injury or life to the officer or someone else.

Q.    And I don't think the jury's heard too much about this, but are there POST learning domains covering different topics of training?

A.    Yes.   There are 43 POST learning domains.   And POST is the governing body in Sacramento that basically certifies all of us that were law enforcement officers or are law enforcement officers in the state of California.   Of the 43 learning domains, there are several that apply to this case. Learning Domain Number 20 deals with use of force and the use of reasonable force and force options based on the subject's level of resistance.

Q.    I want to ask you a little bit about Learning Domain 20.   And you've talked about this a little bit.   And the jury has heard a little bit about this.

But in order for there to be lethal force used, is the training that there has to be an immediate or imminent threat of death or serious bodily injury?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    And does it talk about the opportunity, ability, and apparent intent to immediately cause death or serious bodily injury?

A.    By the subject, yes.

Q.    Can you explain that to the jury as it relates to the training on deadly force?

A.    Does the -- the question is does the suspect at the time have the ability, based on what he or she is doing; do they have the opportunity, based on either positioning or what the situation is at that point to be able to justify the use of lethal force.

Q.    And the apparent intent?

A.    Correct.  And in this case, there was no threats ever made by Mr. Barber to Deputy Alfred about I'm going to kill you or there's something to that effect.  There were no verbal threats made prior to the shooting.

Q.    How about seeing a firearm in a person's hand?  Is that in and of itself, based on the training, enough to use deadly force?

A.    In your hand, no.

Q.    And is there training with respect to whether there are other reasonable options?

A.    Yes.

Q.    Can you explain how that plays into the analysis?

**UNITED STATES DISTRICT COURT**

A.    Like, for instance, in the San Bernardino County Sheriff's Department policy, as relates to shooting into moving vehicles, it says if time and circumstances allow, move out of the path of the vehicle.  It says it right there in their policy.

So the policy is, is that if time and circumstances, you have the time to go ahead and move out of the path of the vehicle.  So that's a -- other reasonable measure that you could do in lieu of using lethal force.

In this particular case, there's no opportunity to use less than lethal force or any force.  You simply move out of the vehicle.  You're not going to put -- spray pepper spray into the car from that position; obviously, you can't tase the person; you can't hit them with a baton.  And especially in this particular case, you don't even really know if there's a crime.  There hasn't been an arrest.  You're still figuring that out.

So the fact that even if someone drives away, you can't shoot them for driving away.  He's not a fleeing felon.  So you can't use lethal force to stop the car simply if he decides to drive out of there and drive away.  There's no justification for that.

Q.    And, obviously, if someone drives away and they want to make contact with them, there's other tactics that officers can use?

A.      Yes.  The sheriff's department of San Bernardino
have a real robust air support division, which is the police
helicopter.  So if he fled and you justified that there was
reasonable suspicion to detain or probable cause to arrest, you
would just request additional deputies, you request the police
helicopter, and you would follow him like you would any other
vehicle that fled the scene of a crime, if there was a crime.

Q.      How about a verbal warning before using deadly
force?  What's the training on that?

A.      It's a verbal warning and a reasonable opportunity
to comply.  Like "get on the ground" is a command.  "Get on the
ground or I'm going to tase you" is a warning.  So I'm letting
you know that if you don't do A, B is going to happen.  So
there's an ultimatum to that.

As relates to use of lethal force, which is
virtually in every department's policy, is when feasible, you
should use a verbal warning.  "Let me see your hands or I will
shoot.  Don't move or I will shoot."  That is a warning.  And
then a reasonable opportunity to comply with what you're asking
that person to do at the time.

Q.      When reviewing Deputy Alfred's deposition, did you
note when he was asked whether he had any training about giving
a verbal warning before using deadly force, he said no?

A.      I did.

Q.      Did you note when he was asked if he had training

UNITED STATES DISTRICT COURT

that you need the opportunity, ability, and apparent intent, he said he didn't have that training?

A.     Correct.

Q.     And when he was asked whether he was supposed to look at other reasonable measures, did you see that he said he didn't have that training?

A.     Correct.

Q.     Assuming he did not have that training from the County of San Bernardino, in your opinion, would that be insufficient or inadequate training?

A.     Yes.

Q.     So what if, like we have in this case, the deputy says, well, um, I didn't want to go to my right 3 or 4 feet because by doing so, I'm kind of crossing the potential path of this car and -- of this SUV, and I didn't know if I could get there in time -- if I can move that 3 to 4 feet.  And, you know, the ground level was a little uneven.  I thought maybe I could fall.

In your opinion, are any of those good reasons not to follow the policy to move out of the way?

A.     No.

Q.     Can you explain to the jury why not?

A.     Well, it's basic common sense.  If you reasonably believe the threat is the vehicle that's backing up towards you, you want to get out of the way of the vehicle.  If I had

UNITED STATES DISTRICT COURT

to crawl on the ground, I would do so rather than stay in that position behind the car.  You just want to get out of the way of the vehicle.  The vehicle is the issue.

And what's great about this particular case is there's an opening just 3 feet away and how long it would take for us of -- any of us without running or anything else, regardless of age or fitness level, to walk 3 feet.  It's going to take you a second.  And if you see a vehicle coming down there and you want to expedite that, it's even going to be faster.

So there's an opportunity for you just to move to that position that you should have been in from the beginning. And then you should have moved to when the door shut and you still should have moved to when the lights went on that they were backing up.  Now you definitely need to move and -- when you hear that car go in gear.

So there's opportunities along the way that you're afforded to just move to the opening and get out of the path of the vehicle, especially because it's dark, you don't know if they can see you -- or if he can see you, whoever's in the vehicle.  And you haven't identified yourself.  And the person may not even realize that they're being detained for anything, so they can leave and come and go as they wish.

Q.    So you spoke earlier about the reverence for human life as part of the training on deadly force.

A.    Yes.

Q.    So in -- if an officer in Deputy Alfred's position is standing somewhere, let's say, in the middle of this driveway with the opening 3 to 4 feet to his right and he has a decision to make:  Either I attempt to move out of the way, step 3 or 4 feet to my right to get out of the path, the potential path, or I'm going to shoot at the driver, and the deputy decides he doesn't even try to get out of the way, he makes a dispatch, then gets in a shooting stance with both hands on the gun, using his sights, as he indicated, firing six shots towards the headrest, how does that play into the reverence for human life, deciding to shoot six times rather than moving 3 or 4 feet to the right?

A.    Well, once again, if I'm going to get on the radio, and I'm going to say 2A55, whatever my call sign is at the time, I have someone that's resisting or they're backing up in their vehicle, that's another opportunity I could have moved, before I took my radio out or keyed my radio to request a backup.  I shouldn't do that from the middle of the -- the driveway.  I should do that from the opening where it's safe. I need to get myself to a safe --

And then lining up, taking out your pistol or having your pistol out and getting in either a Weaver, shooting stance, which is basically -- not to overly bore you, it's your basically nondominant leg in front of your rear leg like this

(indicating).  If I'm right-hand dominant, I'm going to take my pistol out and I'm going to line up my front-rear sight aperture, which are basically your sighting system on a pistol. And it's your lining up this is what you're going to see on a front-rear sight aperture.

For me to aim at the headrest, in this case hit the person in the head, means that I took the time to line up the front-rear sights -- once again, additional time to do that -- and now to fire off six rounds in succession.  All of that time preceding, all the way back could have been used to simply move out of the path of the vehicle.

Q.    And is it your understanding from the first shot to the last shot was approximately 2.4 seconds?

A.    Yes.

Q.    Now, there's also been a suggestion, Mr. DeFoe, that -- it's a little unclear, but --

MR. GALIPO:  Is Exhibit 3-16 -- Exhibit 3, page 16, in yet?

THE COURT:  Yes.

BY MR. GALIPO:

Q.    -- that if Deputy Alfred had got inside this open area, that maybe the car could have come through the fence somehow and, therefore, maybe it was still okay to shoot. What -- what's your opinion of that?

A.    Once again, it's -- you're talking about future harm

at the time.  You need to be concentrated at the time in which the force is used; was there an imminent threat of great bodily injury or death at that time.  What someone may do or what you may speculate they do doesn't have any bearing on it.  That's future harm.  It has to be dealing with what's happening at that time in which the force is used.

Q.    Based on officer training, is the fact that a vehicle is starting to back up in your direction, no matter how slow the car is going, no matter how far you are back, does that automatically justify shooting at the driver?

A.    No.

Q.    Why not?

A.    There's no imminent threat of great bodily injury or death.

Q.    Do you have an understanding as to where Deputy Alfred tactically repositioned after the shooting?

A.    To the opening of the fence.

Q.    The same one we've been discussing?

A.    Yes.

MR. GALIPO:  May I have a moment to look at my notes, Your Honor?

THE COURT:  Yes.

BY MR. GALIPO:

Q.    In terms of fear, anger, do officers have training with respect to controlling their fear?

UNITED STATES DISTRICT COURT

imminent threat or an immediate threat of great bodily injury or death that would justify my use of lethal force to stop that potential lethal behavior.

Q.    So just following up on that, if someone doesn't obey commands, is that justification to use lethal force?

A.    No.

Q.    If someone's assaultive, is that justification to use lethal force?

A.    No.  Typically no.

Q.    If there's an assaultive motor vehicle, does that in and of itself justify using lethal force based on the training?

A.    Assaultive, no.

Q.    And if an officer, based on the training, overreacts, for whatever reason overreacts in using deadly force, is the training that that is inappropriate and excessive to do?

A.    Yes.  It's -- overreaction is excessive force.

Q.    And are officers trained that they're responsible to justify every shot?

A.    Yes.

MR. GALIPO:  Thank you.  That's all I have at this time, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Ramirez, approximately how long for your cross-examination?

Deputy Alfred like, hey, I don't know who you are, I'm just trying to leave.  Right?

A.    Um, I don't recall hearing that specifically on the body-worn camera -- or the belt recording.

Q.    Have you reviewed any evidence in this case that Mr. Barber was simply trying to leave in the vehicle?

A.    That he was trying to leave in the vehicle?

Q.    Yeah.  Leave as opposed to use it as a weapon.

A.    Yes, ma'am, he was -- based on the speed of the vehicle, I think that would be reasonable to think that he was traveling at 3.4 miles an hour down that driveway would be someone that was driving reasonably to leave their residence.  Uh, he backed up, got in the car and slammed the door, put the car in reverse.  Those are all reasons to believe that he was clearly driving down the driveway.

Q.    He left the trunk open, didn't he?

A.    He did.

Q.    And you've not reviewed any materials in this case the vehicle stopped during any of Deputy Alfred's shots; is that correct?

A.    Um, it did stop, and then it rolled backwards after they removed Mr. Barber from the vehicle, is my understanding.

Q.    Okay.  Do you know whether the vehicle was still in motion during all of Mr. -- or, I'm sorry, Deputy Alfred's six shots?

A.    Still in motion?  I don't know at which point and how far the vehicle went, as I testified to.  It traveled from 30 feet to about 16 feet, so a difference of 14 feet, during the shooting.  And at that point, it rolled an additional 3 feet, to my understanding, after he was removed from the vehicle.

Q.    Are law enforcement officers trained to allow individuals they are attempting to contact as part of a call for service to get into a vehicle and leave the scene in the direction of the reporting party?

A.    Well, there's only one way to leave that scene, and then Deputy Alfred testified to that, so backing out of the driveway, there's only one way out.  And if there wasn't reasonable suspicion to detain, connecting Mr. Barber to any type of criminal activity, he'd be free to leave.

Q.    And he matched, again, the physical description by the reporting party and was at the residence for the call for service; correct?

A.    He was, but still, there wasn't a -- you have to establish that a crime occurred.  The fact if I call the police on you, the police just can't detain you unless I've established that you've committed a crime.

Q.    And that's exactly what Deputy Alfred was doing in attempting to make contact with Mr. Barber; correct?

A.    You know, once again, I don't know what he testified

admits he never saw a firearm or anything that looked like a firearm?

A.    Correct.

Q.    And then the second exception has several parts. One is that the vehicle is operated in a manner which is likely to result in great bodily injury or death to a safety member or another person.  That's the first part; right?

A.    It is.

Q.    Do you think that part, based on the speed and distance you're talking about, occurred in this case?

A.    No.

Q.    Then it goes on to say, "and other reasonable means of defense have been exhausted."

Do you see that?

A.    Correct.

Q.    Do you feel other reasonable means of defense had been exhausted here?

A.    In this case, no.

Q.    Then it goes on to say, "or are not available or practical."

Do you see that wording?

A.    Correct.

Q.    Finally, "This may include, if time and circumstances allow, moving out of the path of the vehicle."

Do you see that?

pounds.  So probably 10 to 12 pounds.

A lot of the gear now is much more lightweight than when I started with LAPD.  They've refined a lot of the vests and things.  Bulletproof vest, as well, probably 2-and-a-half pounds, the inner vest that you wear underneath your shirt.

Q.    Did you -- when you were an officer, were you involved in foot pursuits from time to time?

A.    A lot.

Q.    Were there times where you had to move out of the path of a potential vehicle?

A.    Yes, sir.

Q.    Were you unable to do so because of the weight of your equipment?

A.    No, sir.

Q.    You were asked a question about whether you could hear Mr. Alfred *[sic]* at some point saying something to the effect "back up" or "back the F up" or something like that.  Do you recall that question?

A.    Yes.

Q.    And as you understand it, that was said before he got in the car?

A.    Yes.

Q.    Do you still have an affiliation with LAPD?

A.    Oh, I carry a concealed weapon.  And I'm just -- again, I have to get approved by the police department and the

immediately before Mr. Barber went in the car.  And you indicated previously, I think, that there was -- he never yelled out or indicated he was law enforcement and there was no verbal warning.

A.    Correct.

Q.    Based on your review, were there any commands given after Mr. Barber got in the car?

A.    Not that I heard.

Q.    You were asked about split-second decisions.  Does that mean just because an officer makes a decision to shoot in a short period of time, that the shooting's okay?

A.    No.

Q.    You were asked about Penal Code Section 835A.  Is some of that language in the POST learning domain?

A.    Yes.

Q.    And does some of that talk about what we talked about, about the opportunity, ability, and apparent intent to immediately cause death?

A.    It does.

Q.    And -- and taking other reasonable measures or alternatives?

A.    It does.

Q.    And you said something else when counsel asked you about if someone perceives an imminent threat of death or serious bodily injury, and you noted the training says it has

MR. GALIPO:  Yes.

THE COURT:  -- Deputy Alfred.

MR. GALIPO:  Thank you so much.

THE COURT:  Thank you.

Deputy Alfred, if you want to step back onto the witness stand.  And you are reminded you are still under oath.

CHRISTOPHER ALFRED, called as a witness by the plaintiff, previously sworn, testified further as follows:

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q.    Good afternoon again, Deputy Alfred.

A.    Good afternoon, sir.

Q.    I want to ask you a question about the lights on your vehicle.  Am I understanding your testimony that your -- are you saying your overhead lights were on?

A.    The alley lights.

Q.    Where are they?

A.    They're affixed to the top of the police vehicle.

Q.    Can you open up -- it might be already open there -- the plaintiff's exhibit book back to Exhibit 2-B, which is a copy of your statement.

A.    Do you have a page number, sir?

Q.    Sure.  So it's page -- the statements page is 46 and it says 53 of 89 on the bottom right.  I'm sorry for the

**UNITED STATES DISTRICT COURT**

confusion.

Are you there now, page 46 of the statement, page 53 of 89 of the exhibit?

A.    One second.  I'm on page 46 of 89.

THE COURT:  It's 53 of 89, which is page 46 of your statement.

BY MR. GALIPO:

Q.    Do you have that page in front of you?

A.    Yes.

Q.    Do you see towards the bottom, starting on line 22, Deputy Navarro is asking you whether your lights were on or anything?

A.    Yes.

Q.    And you said that your headlights were on.

Do you see that?

A.    Correct, yes.

Q.    And then, going to the top of the next page, do you see that you're asked whether your overhead lights were on?

A.    Correct, yes.

Q.    And you say, "No, not the overheads, no."

Do you see that?

A.    Correct, yes.

Q.    And can you turn to page 48 of that same statement? It's going to be page 55 of 89, two pages forward.

And do you know if Detective Navarro worked for the

**UNITED STATES DISTRICT COURT**

sheriff's department?

A.    Yes.

Q.    And he was the one -- or one of the detectives taking your statement?

A.    Correct, yes.

Q.    And on line 6 and 7, you see he says, "Right.  And you couldn't go right 'cause you wouldn't make it past and then there was no opening right there; correct?"

And you say, "Correct, yes."

Do you see that?

A.    Yes.

Q.    But, actually, there was an opening 3 or 4 feet to your right, which we've been talking about most of the day, wasn't there?

A.    Correct, yes.

Q.    So do you know why you agreed with the detective that there was no opening to your right when you gave your interview?

A.    Uh, no, there mostly likely was a misinterpretation of this question or what they were asking at that time.

Q.    Okay.  So the policy language of shooting at moving vehicles, we've now gone over that -- at least you heard us going over it with Mr. DeFoe?

A.    Correct.

Q.    And just so we're clear, you're saying you were

UNITED STATES DISTRICT COURT

familiar with that policy language prior to this incident?

A.    Correct, yes.

Q.    So you were aware that there not only had to be an imminent threat of death or serious bodily injury, but there had to be no other options?

A.    Correct, yes.

Q.    And an inability to move out of the way?

A.    Yes.

Q.    And speaking of moving out of the way, you did move to the right after the shooting; correct?

A.    Correct, yes.

Q.    You didn't trip or fall or anything when you moved that 3 to 4 feet to the right after the shooting, did you?

A.    No.

Q.    You didn't trip at all when you were walking up the driveway, did you?

A.    No, I did not.

Q.    You're not suggesting, are you, that the weight on your -- from your gear prevented you from moving the 3 or 4 feet to the right, are you?

A.    No.

Q.    In terms of your training --

And you do recall having your deposition taken; correct?

A.    Correct, yes.

**UNITED STATES DISTRICT COURT**

A.    That is correct.  And as I previously stated, it goes back to the clarification on that training.

Q.    You thought it was a -- a difficult question to understand?

MR. RAMIREZ:  Argumentative.

THE COURT:  Sustained.

BY MR. GALIPO:

Q.    And do you recall saying that you were not trained that when using deadly force, there has to be an ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?

A.    Yes.

Q.    And if I understood your testimony earlier, you did not -- you did not see the flashlight picked up.  This is something that you heard about?

A.    That is correct.

Q.    Can you turn to page 92 -- is your deposition still up there?  So not your statement but your deposition.  Can you please turn to page 92?

MR. GALIPO:  I would offer to read, Your Honor, from page 92, for impeachment, lines 13 through 20.

THE COURT:  Give me one moment.

MR. RAMIREZ:  I'm going to object as improper.

THE COURT:  In light of his answers, it is proper impeachment.  You may proceed.

373

MR. GALIPO:  "QUESTION:" -- and this was by Ms. Andersen.  "The flashlight that was depicted in Exhibit 2, do you know whether that was moved after you dropped it?

"ANSWER:  Yes.  Once the available resources were present and medical services, there was personnel from AMR who picked up the flashlight and asked who it belonged to and he was instructed to leave it where it was at.

"QUESTION:  But you saw him pick it up?

"ANSWER:  Yes."

BY MR. GALIPO:

Q.    Do you recall that question and answer in your deposition?

A.    Correct, yes.

Q.    Did you understand that you were under oath at the time of your deposition?

A.    Yes.

Q.    Would you at least agree that when your attorney at your deposition asked you if you saw your flashlight picked up, you said yes?

A.    Yes.  That's correct.

Q.    And would you agree when I just asked you the same question in front of this jury whether you saw anyone pick up the flashlight, you said no?

UNITED STATES DISTRICT COURT

Q.    And I think you've already said that you're estimating the time from the first shot to the last shot to be about 2 to 3 seconds?

A.    Correct, yes.

Q.    And when you made the dispatch, after Mr. Barber got in the car, that would have been right before you started shooting?

A.    Yes.

Q.    Were you in the same spot, essentially, when you made the dispatch as you were when you fired the six shots?

A.    Yes, the general area, yeah.

Q.    And you would have had the weapon in two hands?

A.    At what point?

Q.    When you were in your shooting platform you described?

A.    Correct, yes.

Q.    And you would have raised the weapon up and used your sights?

A.    Yes.

Q.    And your sights were aimed towards the headrest of the vehicle?

A.    Correct.

Q.    Were you trained that in moving out of the path of the vehicle, if you happen to find yourself in the pathway, you could never move laterally if you're crossing the path of the

Q.    And you were with an attorney during the walk-through?

A.    Correct, yes.

Q.    And was that same attorney present for your statement?

A.    Correct.

Q.    Would you agree that if you had moved out of the path of the vehicle and the vehicle continued backing out of the driveway, it would have been inappropriate to shoot at -- at the driver?

A.    Well, therefore, it would have been unnecessary but the vehicle was not reversed in a manner such as --

Q.    I'm sorry.  I didn't understand your last response.

A.    The vehicle was not reversed or operated in a regular manner of someone who's reversing the vehicle out of the driveway.  The vehicle was operated at a high rate of speed.

THE COURT:  I believe that's nonresponsive.  I'm going to order that it be stricken.

Mr. Galipo, if you want to ask that question again.

MR. GALIPO:  Sure.

BY MR. GALIPO:

Q.    What I'm asking you, you indicated that if you had moved that 3 or 4 feet to get out of the path of the vehicle, based on your training, you're saying it would be inappropriate

UNITED STATES DISTRICT COURT

to shoot at the vehicle.  Do I have that part correct?

A.    Correct.  It would be unnecessary.

Q.    Right.  So what -- so what I'm asking you is if you had got out of the path of the vehicle and the vehicle kept continuing down the driveway backing up past your position -- do you understand my hypothetical?

A.    Correct, yes.

Q.    -- you would agree it would be inappropriate to shoot at the vehicle just for backing out of the driveway if you were out of the path?

A.    Yes.  If it passed me, yes.

Q.    Your lapel mic, did you have to activate your lapel mic with one of your hands in order to make the dispatch?

A.    Correct, yes.

Q.    So are you saying -- you had your gun in your right hand and your flashlight in your left hand at some point; right?

A.    Correct.

Q.    And that would be before Mr. Barber got in the vehicle?

A.    Correct, yes.

Q.    So what hand did you use to activate your lapel mic after he got in the vehicle?

A.    My left hand.

Q.    Was the flashlight still in it?

A.    Yes.

Q.    Do you recall indicating in prior testimony under oath in this case that from your point of view, the lighting was very poor, dim?

A.    Correct, yes.

Q.    And that you were unable to make out details because of the lighting being so dim?

A.    Correct, yes.

MR. GALIPO:  May we approach on one point, Your Honor?

THE COURT:  Yes.

(At sidebar:)

THE COURT:  Go ahead, Mr. Galipo.

MR. GALIPO:  Yes.  Based on the state of the record, um, Deputy Alfred has a prior -- had a prior shooting before this shooting where he fired 30 shots.  I don't want to go there unless the Court thinks it's appropriate based on the record, the rulings on motions in limine, and the testimony he gave to Mr. Ramirez, and that's why I -- I wanted to ask you --

THE COURT:  Prior to this incident?

MR. GALIPO:  Prior.

MR. RAMIREZ:  But I didn't ask anything about it because I didn't think it was relevant.

THE COURT:  Would you be using it to argue that he wasn't properly trained?

A.    Correct, yes.

Q.    Is there also classroom instruction that goes with that type of training?

A.    Correct.

Q.    Does that training include giving warnings when feasible?

A.    Yes.

Q.    In this case, why didn't you give a warning that you were about to use deadly force to Mr. Barber?

A.    It was not feasible.

Q.    Why not?

A.    Due to time constraints.

Q.    What were the time constraints?

A.    From my point of contact with Mr. Barber to the course of fire was roughly 10 to 12 seconds.

Q.    And also part of your training is you have to be aware of your backdrop; correct?

A.    Correct.

Q.    Counsel was asking you about an attorney who was present when you gave a statement to investigators.  Was that your union attorney?

A.    Correct, yes.

Q.    It wasn't anybody as part of my team, though, was it?

A.    Not that I'm aware of, no.

MR. RAMIREZ:  That's fine.  Thank you.

THE COURT:  All right.  Mr. Galipo, I do believe that there's an issue that you wanted to take up regarding prior incidents?

MR. GALIPO:  Yes, Your Honor.

I think rather than wasting time with it now, I'm -- I'm going to think about it and see if I'm going to withdraw the request.  If I withdraw it, then there's no need for us to spend a lot of time on it, and I'm leaning towards withdrawing it.  But I will let the Court and counsel know first thing in the morning whether I'm going to go there or not.

THE COURT:  All right.  Very well.

And I will have to say, there have been quite -- there's been quite a bit of testimony from Deputy Alfred that is inconsistent.  He has his deposition testimony, he has his prior statement two weeks after the incident, and now we have his current testimony in court.

Whether it rises to the level of perjury, I'm not yet sure, but I would certainly entertain an adverse instruction, Mr. Galipo, if you and your team wanted to brief that issue.

MR. GALIPO:  We will, Your Honor.  Thank you.

THE COURT:  All right.

Anything further at this time, Mr. Ramirez?

MR. RAMIREZ:  No, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  Then we will adjourn for the day.  And I will see counsel back in court at 8:00 AM because the jury's coming in at 8:30.

MR. GALIPO:  Thank you, Your Honor.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  All rise.  This court is adjourned.

(Proceedings adjourned at 4:24 PM.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


             I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


                          DATED THIS 2ND DAY OF FEBRUARY, 2026.



                          /S/ MYRA L. PONCE
                      _____
                          MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                           FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**