# EXHIBIT 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

STEFFON BARBER,                          )
                                         )
                    Plaintiff,           )
                                         )
      v.                                 )          Case No.
                                         )     CV 22-625 KK (DTBx)
COUNTY OF SAN BERNARDINO, et al.,        )
                                         )          Volume 3
                    Defendants.          )     (Pages 392 - 597)
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
JURY TRIAL:  DAY THREE
TUESDAY, FEBRUARY 3, 2026
8:35 AM
RIVERSIDE, CALIFORNIA

_____

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
(951) 328-4414

UNITED STATES DISTRICT COURT

THE WITNESS:  Sure.  R-o-b-e-r-t M-o-r-a-l-e-s.

THE COURT:  Thank you.

Mr. Galipo, you may proceed.

MR. GALIPO:  Thank you, Your Honor.

ROBERT MORALES,

called as a witness by the plaintiff, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.    Good morning, Mr. Morales.

A.    Good morning.

Q.    Are you an accident reconstructionist?

A.    Yes, sir.

Q.    And were you retained to do an analysis of this particular case some time ago?

A.    Correct.

Q.    Would that be before I became involved in the case?

A.    Yes, sir.

Q.    And as part of your analysis, did you go to the scene and take measurements?

A.    Correct.

Q.    Did you review the investigation reports related to this incident?

A.    Yes.

Q.    Did you review and study all the photographs you had

UNITED STATES DISTRICT COURT

Q.     Okay.  That's fine.

And so you already told us you viewed numerous investigation reports; correct?

A.     Yes.

Q.     Did some of those reports itemize the different items of evidence and have measurements associated with them?

A.     Correct.

Q.     And numerous photographs of the scene, you already told us you looked at that?

A.     Yes.

Q.     And you explained that you listened to the audio; correct?

A.     Yes.

Q.     And additional discovery documents?

A.     Correct.

Q.     And did you do any research related to this particular vehicle, a 2003 Chevy Trailblazer?

A.     Yes.

Q.     Can you tell the jury what type of research you did relative to the vehicle?

A.     Well, the -- the research conducted for, um, this and any other case will include to get published and -- specifications so we can -- so I can understand the capabilities of the vehicle.  I do -- do -- I also do research about, like, history reports and that sort of thing.  And so

UNITED STATES DISTRICT COURT

should also be on your screen in front of you.

A.    Yes.

Q.    Can you see that?

A.    I do.

Q.    Okay.  Do you recognize that as a photograph or similar photograph that you have reviewed in your work on this case?

A.    Yes.

Q.    And does that appear to be the scene where this occurred?

A.    Correct.

Q.    Okay.  So I want to ask you a few questions about this.

First of all, can you see in this photograph the 2003 Chevy Trailblazer?

A.    Yes.

Q.    And can you see in this photograph the opening adjacent to the picket fence on the right side or west side?

A.    Yes.

Q.    Okay.  Now, where we see -- and the jury's looking at the photo, as well.  Where we see the Chevy Trailblazer here, is this where it was when the shooting started?

A.    No.

Q.    And how far south -- the front of the vehicle is facing south; is that correct?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    So how far south or forward of this position was that Chevy Trailblazer when the shooting started?

A.    16 feet.

Q.    16 feet further away?

A.    Correct.

Q.    I want to show you -- and while we're on that topic, how do you know it was 16 feet further away?

A.    The vehicle moved a total distance of 13 feet during the incident, and when Mr. Barber was extracted from the vehicle, he released his foot from -- from the brakes.  And that actually made the vehicle move another 3 feet.

Q.    Okay.  Let me stop you right there.

Was there evidence in the photographs or the reports of tire impression marks?

A.    Yes.

Q.    Did that assist you also in determining where the vehicle started and how far it went backwards?

A.    Correct.

Q.    Were some of the tire impression marks that you reviewed marked by some green markers?

A.    Yes.

Q.    I want to show you -- I think these are in, but I'm not sure.

MR. GALIPO:  I have Exhibit 3, page 18, and

UNITED STATES DISTRICT COURT

started?

A.   Correct.

Q.   And so did you calculate in your workup on this case how far the vehicle moved back as of the time of the first shot?

A.   Yes.

Q.   And what was your determination?

A.   13 feet.

Q.   No, as of the time of the first shot is my question, not total.

When the first shot occurred, how far did it move back?

A.   Oh.  The vehicle was pretty much not -- I would estimate -- I estimated that it was like close to 1 foot.

Q.   Okay.  So -- and we're going to get to the basis of your analysis.  But you're saying that the vehicle either hadn't moved back or moved up to 1 foot back at the time of the first shot?

A.   Correct.

Q.   And we'll get to that in a moment.

So going back, then, to Exhibit 3, page 15.  If I'm understanding you correctly, you're saying that the vehicle moved back a total, by the time all the shots had stopped and the vehicle stopped, about 13 feet?

A.   Yes.

**UNITED STATES DISTRICT COURT**

412

Q.    And then it moved back another 3 feet, as you understand it, once Mr. Barber was extracted from the vehicle?

A.    Correct.

Q.    So did you have an understanding that while Mr. Barber was in the car, his foot was on the brake?

A.    Yes.

Q.    And the car was still in reverse?

A.    Yes.

Q.    So if we would move the car up from where we see it in this photo about 3 feet, is that where it would have been after it came to an initial stop after the shooting?

A.    Correct.

Q.    So in looking at the various items of evidence in this case -- and I'll show you --

MR. GALIPO:  Is Exhibit 3, page 16, in?

THE COURT:  Yes.

BY MR. GALIPO:

Q.    Okay.  Are you aware that one of the items of evidence that was documented was a flashlight?

A.    Yes.

Q.    And do you recall if that was Exhibit Number 9 or Marker Number 9 associated with it?

A.    Yes.

Q.    I'm going to try to zoom in here.  This is looking from the opening out into the driveway.  And I'm going to try

UNITED STATES DISTRICT COURT

to make it a little closer to the Exhibit 9.  And I think I probably have to press something.

MR. GALIPO:  Ms. Masongsong, you could probably help me here.  Is there an auto focus or something on this?

Okay.  Thank you.

BY MR. GALIPO:

Q.   Okay.  Can you see the -- can you see -- we've zoomed in a little bit.  Can you see on the screen that flashlight at Marker 9?

A.   Yes.

Q.   Now, how far, approximately, is that flashlight from the back of the truck -- or the back of the SUV in its final resting position that we saw in the previous photograph?

A.   It is at least 14 feet.

Q.   Okay.  So going back to the photo -- and I'm showing you Exhibit 3, page 15.

Going back to the photo we saw, the flashlight would be at least 14 feet from the back of the vehicle?

A.   Yes.

Q.   So if we move the vehicle in its original position, 16 feet forward as you've testified, how far would the flashlight be from the back of the vehicle in its initial position?

A.   30 feet.

Q.   Okay.  You just basically added the 14 plus the 16?

UNITED STATES DISTRICT COURT

A.      Yes.

Q.      And then if the vehicle moved back a foot, approximately, at the time of the first shot, how far would the flashlight have been from the back of the vehicle at the time of the first shot?

A.      29.

Q.      29 feet?

A.      Yes.

Q.      Okay.  So -- I'm going to show you again Exhibit 3, page 16.  I'm going to try to zoom out here.

        Okay.  So now I want to talk to you a little bit about the -- your audio analysis as it relates to the timing and the speed of the vehicle.

        You -- you did do an audio analysis?

A.      Yes.

Q.      And I believe that's mentioned on page 11 of your report you prepared in this case?

A.      Yes.

Q.      And did you have a time reference to when you can hear the door of the Trailblazer being closed?

A.      Correct.

Q.      What's that time reference?

A.      It's at 3:12.60.

Q.      Okay.  Now, this obviously came from Deputy Alfred's belt recording?

A.    Correct.

Q.    And that would be a time reference relative to his belt recording; is that right?

A.    Yes.

Q.    And is 3:12, if I'm understanding you correctly, 3 minutes and 12 seconds?

A.    Yes.

Q.    And the .60, is that 60 one-hundredths --

A.    Correct.

Q.    -- of a second?

A.    Yes.

Q.    Okay.  And you can hear that on the audio?

A.    Yes, sir.

Q.    Now, at the time that the door of the Trailblazer closed at 3:12.60, was the vehicle moving at that time?

A.    No.

Q.    And at that time, are you saying that the flashlight, just using that as a marker, would have been approximately 30 feet from the back of the vehicle?

MS. BRUNSON:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    Now, you also reference on your timeline the time frame for where you can hear the engine revving or sound of the

**UNITED STATES DISTRICT COURT**

engine; is that right?

A.    Yes.

Q.    What time do you have for that?

A.    3:14:35.

Q.    Okay.  So about how long after the door closed on your audio analysis do you hear the engine sound?

A.    Approximately 2 seconds.

Q.    Slightly under 2 seconds?

A.    Yeah.  Yes.

Q.    Prior to the engine revving -- prior to the engine sound, do you have an opinion as to whether the car moved backwards at all?

A.    No.

Q.    No, you don't have an opinion or no, it didn't move backwards?

A.    I don't mean -- the vehicle was not moving at all.

Q.    Okay.  Now, you then have a reference on your audio analysis timeline to the rear tires can be heard spinning.

A.    Yes.

Q.    Is that something you heard on the audio analysis?

A.    Correct.

Q.    Now, the -- what was the surface there that the car was on?  Was it dirt?

A.    It was a combination of dirt and gravel.

Q.    And if you hear the tires spinning from your

viewpoint as an accident reconstructionist on this surface, what does that mean?

A.     It's a low-friction surface.

Q.     Okay.  What does that mean?  Can you explain that to the jury, please?

A.     That means -- that means it -- the tires would take longer to gain traction with the -- with the road.

Q.     And in this case, when you hear the tires initially spinning, in your opinion, was the vehicle immediately coming back yet?

A.     No.

Q.     Why not?

A.     Because if you -- if you -- if the tires are spinning, that means the vehicle is in the same position.

Q.     Okay.  And you then have a reference to when you can no longer hear the tires spinning.

A.     Correct.

Q.     And what time reference is that?

A.     3:15.73.

Q.     And how long has it been -- and so far, the first shot has not happened yet; correct?

A.     Correct.

Q.     And how long has it been, approximately, since the door of the vehicle closed up to the time you could no longer hear the tires spinning?  Is it about 3 seconds?

A.    Correct.

Q.    And then you have the first shot at what time?

A.    Yes.  Um, 3 seconds after we hear the door -- the door closing.

Q.    What time frame, please, on your table do you have the first shot?

A.    3 -- 3:16.27.

Q.    Okay.  And when, again, did you say the door of the vehicle closed?

A.    3:12.6.

Q.    And how much time is there, then, between the time the door closed and the time of the first shot?

A.    It's a little over 3 seconds.

Q.    Okay.  About 3-and-a-half seconds?

A.    Correct.

Q.    Okay.  Was one of the things that you were trying to determine in your analysis of this case whether or not Deputy Alfred had the time to move out of the way?  Is that one of the things you were considering?

A.    Yes.

Q.    And in considering that, was the timing to you important?

A.    Yes.

Q.    Was the distance that the Chevy Trailblazer was from him important to you?

**UNITED STATES DISTRICT COURT**

A.      Yes.

Q.      Was the speed of the Trailblazer important to you?

A.      Correct.

Q.      And was it important to you the configuration of the -- seeing as to whether he had a place to go?

A.      Yes.

Q.      Did you consider in your analysis what the walking speed of a normal human being is; in other words, if we're walking, how many feet per second we go?

A.      Correct.

Q.      So we'll get back to that.  But I just want to stick on the -- the speed.

How did you determine or what is your opinion as to the speed of the vehicle at the time of the first shot?

A.      At the time of the first shot, a -- the vehicle was not moving at all -- or it was moving really slow.

Q.      And when you say "really slow," what would be your estimate?

A.      Less than 1 mile per hour.

Q.      Okay.  Now, you continue on, because there are six shots all together; right?

A.      Correct.

Q.      And I take it that the second shot happened about when?

A.      There's a window of shooting within -- the second

shot was a -- heard .3 seconds after.

Q.    Okay.  I'm looking at your table because you identify them on page 11 of your report, each shot.

So your second -- are you saying that the first group of shots, there was about three-tenths of a second between each shot?

A.    Yes.

Q.    Okay.  Can you look at your table on page 11 of your report, please?

A.    Yes.

Q.    What time do you put for the -- the first shot you put what time, again?

A.    3:16:27.

Q.    .27.

How about the second shot?

A.    3:16.54.

Q.    The third shot?

A.    3:16.84.

Q.    The fourth shot?

A.    3:17.13.

Q.    The fifth shot?

A.    3:17.55.

Q.    And the final shot?

A.    3:18.64.

Q.    How long was there between the fifth shot and the

last shot?

A.    1.1 seconds.

Q.    Was that the longest gap between?

A.    Yes.

Q.    And was the second longest gap between the fourth and fifth shots?

A.    .4 seconds.

Q.    Okay.  So you had a little bit over a second between the fifth shot and the sixth shot?

A.    Yes.

Q.    Okay.  And how much time -- if we go from the first shot to the last shot, how much time is there?

A.    Total of 2.5 seconds.

Q.    Okay.  Now, did you estimate, based on your analysis, the maximum speed of the Chevy Trailblazer during the course of it moving back this approximate 13 feet?

A.    Yes.

Q.    What was the maximum speed?

A.    3.4 miles per hour.

Q.    Okay.  And at the time of the last shot, did you have an estimate as to the speed of the Chevy Trailblazer?

A.    Yes.

Q.    What was your estimate on that?

A.    3.4 miles per hour.

Q.    Maximum speed or the time of the last shot?

A.    That's equivalent to the maximum speed, yes.

Q.    And then did the car, after the last shot, in your opinion, continue to roll back some distance before it came to a stop?

A.    Correct.

Q.    So if we look at the photograph that we did before of the car in its resting position, you're saying the car would have been further forward or south of that at the time of the last shot?

A.    Please repeat that question.

Q.    Sure.

You've already told us, I think, that you're estimating that the car moved back another 3 feet when Mr. Barber was taken out of the car because the foot came off the brake.

A.    Yes.

Q.    So you then said, based on that, 16 minus 3 is 13 feet; the car moved back 13 feet?

A.    Yes.

Q.    What I'm wondering, if you know, whether the car moved back at all in that 13 feet window after the last shot.

A.    Yes, it moved.

Q.    Okay.  So can -- do you have an opinion as to where the car was in this 13-foot window at the time of the last shot or it's hard to say?

A.    I made some calculations for that.

Q.    What was your calculation?

A.    Um, so the vehicle -- let me see if I can organize my thoughts.

Your question was about the distance.  Can you please restate the --

Q.    Sure.

A.    -- the question?

Q.    Do you know -- like, for example, at the time of the second shot, how far had the vehicle moved?

A.    At the start of the second?

Q.    At the time of the second shot.  You said the first shot, it moved not at all or a very short distance.  How about the second shot?

A.    I got an interval of .4 feet between the first and the second shot.

Q.    How far had it moved total as of the time of the third shot?

A.    Total would be 1.4 feet.

Q.    How about the time of the fourth shot, how far had it moved?

A.    Like 2. -- 2.2.

Q.    2.2.  Feet at the time of the fourth shot?

A.    Yes.

Q.    How about the time of the fifth shot, how far had it

**UNITED STATES DISTRICT COURT**

moved?

A.   3.6.

Q.   And then you told us there was a second gap between -- a little over a second gap between the fifth shot and the sixth shot?

A.   Yes.

Q.   So you're saying at the time of the fifth shot, it had moved about 3.6 feet?

A.   Yes.

Q.   How far had it moved back at the time of the last shot?

A.   Approximately 6., um -- 6.2.

Q.   Feet?

A.   Yes.

Q.   And then after the last shot, it would have moved back the remaining distance up to the 13 feet?

A.   Correct.  In 3.5 seconds.

Q.   So if a car is in reverse and the driver does not have their foot on the accelerator or the brake, what would the car normally do?

A.   It would roll back.

Q.   Um, now I want to ask you about -- one moment, please.

When you looked at the photos of the resting position of the Trailblazer, did you look to see whether the

UNITED STATES DISTRICT COURT

front wheels were turned or straight?

A.   Yes.

Q.   And how were the front wheels in its resting position?

A.   There is some minor -- you can see there's some minor -- minor angle -- angular deviation, but that's -- pretty much look almost straight.

Q.   Okay.  Now, given your timeline from the door closing to the time of the first shot being about 3-and-a-half seconds, did you try to determine whether or not, time-wise, Deputy Alfred would have enough time to get out of the path of the vehicle before the first shot?

A.   Yes, I believe so.

Q.   And what is -- out of curiosity, realizing some of us walk faster than others, but, generally speaking, what is the walking speed of a normally healthy person in terms of feet per -- per second?

A.   3.5 miles per hour.

Q.   How many feet per second?

A.   That's 5.2 feet per second.

Q.   Now, I want you -- to ask you this.  Assuming hypothetically that Deputy Alfred was 3 to 4 feet from the opening that we see in this Exhibit 3, page 16 -- can you assume that for a moment?  He's 3.4 feet from the threshold. Are you able to assume that?

**UNITED STATES DISTRICT COURT**

A.    Yes.  Yes.

Q.    How long, in your opinion, would it take him, even if he was walking, to travel that 3 to 4 feet?

A.    One second.

Q.    And if he was moving quicker than a walk, it would take less?

A.    Correct.

Q.    Given the distance Deputy Alfred was from the vehicle, even assuming he was in the area of that flashlight, given the amount of distance the vehicle was moving back and its speed at various times that you indicated, do you have an opinion as to whether Deputy Alfred had enough time to step out of the way?

A.    Yes.

Q.    What is your opinion?

A.    I think there is -- there is a short distance, um, to be covered in -- like, really -- in plenty of time.

Q.    And so if a person -- I think you said a person could walk that distance in about 1 second?

A.    Correct.

Q.    And the shooting from the beginning to the end was how long, again?  First shot to last shot?

A.    2.5 seconds.

Q.    And how much time, again, was it from the time the -- the door closed to the time of the first shot?

**UNITED STATES DISTRICT COURT**

A.    3 seconds.

Q.    Look again, if you can, at page 11 of your time.

A.    Can you please --

Q.    Sure.  How much time passed from the closing of the door -- let's give you two questions.

How much time passed from the closing of the door to the vehicle starting to move backwards?

A.    Well, I think, based on the reference that I have over here on the table, since -- I believe the vehicle was moving very slow or not moving at all, my reference is the first shot.

Q.    Okay.  And how long was the closing of the door to the first shot?

A.    It's approximately 3 -- more than 3-and-a-half seconds.

Q.    And, again, if Deputy Alfred was standing near the flashlight, what would be his distance from the back of the car at the time of the first three or four shots?

A.    Like 30 feet; 30, 29 feet.

Q.    And take the last shot.  You said the vehicle moved back about 6-and-a-half feet by the time of the last shot. Assuming Deputy Alfred was near the flashlight, what would be the distance of the back of the vehicle from him at the time of the last shot?

A.    24 feet.

UNITED STATES DISTRICT COURT

Q.    Now, without going into any detailed analysis, you also --

MR. GALIPO:  Is Exhibit 3, page 26, in?

THE COURT:  Yes.

BY MR. GALIPO:

Q.    You also looked at, in addition to the flashlight, other evidence markers, as well; correct?

A.    Yes.

Q.    So if, hypothetically, Deputy Alfred was further north of the flashlight at the time of the shooting, then the distances you have given us would be greater?

A.    Correct.

MR. GALIPO:  May I have a moment to look at my notes, Your Honor?

THE COURT:  Yes.

(Pause in the proceedings.)

MR. GALIPO:  Thank you.  That's all I have at this time.

THE COURT:  Thank you.

Cross-examination.

**CROSS-EXAMINATION**

BY MS. BRUNSON:

Q.    Hi, Mr. Morales.  How are you?

A.    I'm good.  How are you?

Q.    I'm Angela Brunson.  We met at your deposition.

**UNITED STATES DISTRICT COURT**

432

happened, you know, including the vehicle -- vehicle dynamics. And you start analyzing the photos, audio, and start using photogrammy -- photogrammetry, going to the scene, laser scan the area so you can get perfect measurements, using those measurements to do a retroreflective -- reflective process so you can position every piece of evidence in that -- in a site diagram so you can understand the relationship between one object and another.

Q.   Okay.  So you -- you visited the scene, that was part of your process?

A.   Yes.

Q.   And the shooting happened April 27th, 2021, around 11:00 or 11:15 at night; is that right?

A.   Yes.

Q.   When you visited the scene, it was October 2025 at 11:00 AM, daytime; right?

A.   Yes.

Q.   Now, did you ever go back and visit the scene anytime in the evening hours to see what it looked like in the dark?

A.   It's -- there's no change.

Q.   My question simply was, sir, did you ever go back to the scene in the evening hours to observe the lighting conditions?

A.   Oh, no.

**UNITED STATES DISTRICT COURT**

Q.    So it -- so if they were flat tires, they could be spinning?

MR. GALIPO:  I apologize, Your Honor.  I don't think there's any evidence the tires were flat in this case.

THE COURT:  Sustained.

BY MS. BRUNSON:

Q.    Well, you did just say that regardless of the inflation of a tire, you -- your opinion would stay the same; is that right?

A.    Yes.

Q.    So I'm asking you, would your opinion stay the same if the tires were underinflated?

A.    If the tire is flat -- let me -- let me explain what's going on if the tire is flat.  I think everybody has the same experience.

If your tire is flat, there might be additional, um, uh -- the tire could spin, but since the tire is debeaded because the tire is flat, you know, they're still -- the vehicle wouldn't -- wouldn't move at all because it's the rim actually, like, spinning and the tire stays there.  Why?  Because there's no air in the tire.

Q.    And, again, you have no idea how much air was in any of the tires on that vehicle; correct?

A.    We will be talking about hypotheticals because we can see on the photos that the tires were not flat.

UNITED STATES DISTRICT COURT

444

Q.    Did you ever actually look at the tires with your own eyes?  Or did you just look at the photos?

A.    I looked at the photos.

Q.    Were there any photos of just each tire?

A.    I believe so.

Q.    In full?

A.    I believe -- there is -- there is plenty of those photos that would give us an idea of the -- the -- if the tires were inflated or not because, if you see a tire is deflated, there's a short distance between the rim and the -- and the ground.

Q.    Now, because the amount of inflation does, in fact, affect its ability to gain traction, do you think it would have been important to reference the amount of inflation in those tires in your report?

A.    No.  I don't think -- I don't think it would make any -- any difference to my opinion.

Q.    Well, what about the compound of the tire?  Did you note whether or not these tires were particularly sticky or firm?  Are they all-weather?  Are they meant for rain?  Are they meant for off road?

MR. GALIPO:  Your Honor, I'm going to object under 403 at this point.

THE COURT:  Sustained.

May I see counsel at sidebar, please.

UNITED STATES DISTRICT COURT

(At sidebar:)

THE COURT:  Ms. Brunson, I believe you estimated approximately an hour and a half for this witness.  We are not doing an hour and a half like this.

You need to move on from things that are not relevant to this case, from things for which there is no evidence in this case, and I would watch your tone with this witness.  Do you understand?

MS. BRUNSON:  Yes.

THE COURT:  Thank you.

(In the presence of the jury:)

THE COURT:  You may proceed.

BY MS. BRUNSON:

Q.    Did you conduct any reenactments with a 2003 Chevy Trailblazer where you put it into reverse on the driveway at that location?

A.    No.

Q.    Describe for us your training in the field of audio analysis.

A.    Pardon me?

Q.    Describe for us any training or education you have received specific to the field of audio analysis.

A.    That's included on the, um, LEVA 1 and LEVA 2, the forensic video analysis.

Q.    What kind of analysis?

UNITED STATES DISTRICT COURT

A.    Forensic video analysis.

Q.    That's -- the audio analysis --

A.    Yes.

Q.    -- is part of that?

A.    Yes.

Q.    And when did you take those trainings?

A.    In February 2021 and 20' -- and May 2021.

Q.    How many times have you testified as an expert in the field of audio analysis?

A.    I testified my -- my, um -- my services include, um, video analysis as an accident reconstructionist.  It's included.

Q.    Did I hear you correctly, you said your services include video analysis?

A.    Video analysis.  And video analysis, it's -- audio is encapsulated on the video analysis, as well.

Q.    Because there was no video in this case, was there?

A.    That's correct.

Q.    Are you certified in the field of audio analysis?

A.    I'm certified on the -- in the field of video analysis.

Q.    And when did you receive that certification?

A.    February 2021 and May 2021.

Q.    And you conducted a detailed forensic analysis to extract critical information from Deputy Alfred's recorder; is

Q.    Okay.  And that night, did you hear anyone talking to you as you were trying to get in your vehicle, which we talked about yesterday?

A.    Yes.

Q.    Okay.  And did you know who was speaking to you?

A.    No.

Q.    Could you see who was speaking to you?

A.    Not at all.

Q.    Did you have any indication that the individual that was speaking to you was a police officer?

A.    No.

Q.    Did you see any police lights that evening?

A.    No.

Q.    Okay.  Did anyone announce to you, Mr. Barber, that they were a police officer?

A.    Not at all.

Q.    Who did you think you were talking to that evening?

A.    I don't remember.

Q.    All right.  Now, at some point, you got in your vehicle?

A.    Yes.

Q.    Okay.  What is the last thing that you remember?

A.    Getting in my vehicle.

Q.    What is your next memory thereafter?

A.    Waking up in the hospital.

**UNITED STATES DISTRICT COURT**

464

THE COURT:  Thank you.

MR. DIGGS:  Uh-huh.

BY MR. DIGGS:

Q.   And did the nurses tell you what was going on when you finally woke up in the hospital, what -- while you're in the bed like this?

A.   Well, I wasn't awake then, that I remember.  I -- when I -- when I woke up, I was -- I didn't have all the tubes and stuff.  I just had -- they came, they were doing -- I had staples all the way on my head.

Q.   Understood.

And I'm going to show these just briefly, Mr. Barber.

8-5.  That is your head where the bullet entered; is that correct?

A.   Yes, sir.

Q.   Okay.  And Exhibit 8-6, showing the same thing, your head, Mr. Barber?

A.   Yes, sir.

Q.   Okay.  And you briefly just mentioned now your head was shaven.  I'm going to show Exhibit 8-9.

Is that your head prior to the hair shaving off?

A.   Yes.

Q.   Okay.  All right.  Thank you, Mr. Barber.

Now, Mr. Barber, how did you feel when you learned

UNITED STATES DISTRICT COURT

you had been shot in the head?

A.    I was devastated.  I couldn't -- I didn't understand -- I didn't understand it.

Q.    All right.  And how did you feel when it -- when you learned that it was a police officer that shot you in the head?

A.    It -- oh, I -- I don't -- I can't describe it.

Q.    Okay.  Let me ask you this, Mr. Barber.  Do -- the shooting happened in 2021 and we're in 2026.  Do you still think about the shooting?

A.    Every day.

Q.    Okay.  Do you ever have any nightmares about what happened that evening?

A.    I don't really have a good memory of what happened that -- that evening.

Q.    All right.  Now, Mr. Barber, we see that you are in a wheelchair.  Is that correct?

A.    Yes, sir.

Q.    All right.  And is that how you generally get around?

A.    Yes.

Q.    Okay.  Now, before April 27th, 2021, were you able to walk?

A.    Yes.

Q.    Were you able to run?

A.    Yes.

**UNITED STATES DISTRICT COURT**

Q.    Are you able to run now?

A.    Not at all.

Q.    Okay.  Before this incident happened, Mr. Barber, did you participate in any sports?

A.    I wasn't good at any sports, but I did, like, a little basketball or something --

Q.    Okay.  And --

A.    -- at that time.

Q.    I'm sorry.  I didn't mean to cut you off.

And are you able to play basketball now?

A.    Not at all.

Q.    Okay.  What other physical activities did you do prior to April 27th, 2021?

A.    Um, just general labor, I guess.  I don't know.

Q.    Okay.  And, Mr. Barber, are there any issues with your left arm?

A.    Yeah.  I have mobility issues.

Q.    Okay.  Are you able to stand up at all?

A.    Not for long periods of time.

Q.    Okay.  And you generally need help to stand up?

A.    Assistance, yes.

Q.    Okay.  And prior to April 27th, 2021 -- sorry -- did you have any issues walking or standing?

A.    No.

Q.    Okay.  Now, just want to talk about some of the

daily activities, Mr. Barber, starting from after the shooting.

Are you able to tie your shoes?

A.    I can get around to it eventually.  It takes a -- it takes a great amount of energy and time to -- to do the little -- little things like that because it's more -- I don't know the word -- like, intricate or something.  I don't know.  I don't know.  But it's more -- it's more difficult trying to tie my shoes.

Q.    Understood.

And are you able to button your shirt?

A.    I can -- I can manage eventually if it's not, you know -- I -- I couldn't get this top one, but I managed the rest of them.

Q.    Understood.

Are you able to shower yourself?

A.    Yeah.

Q.    Okay.  And we talked about your shirt.  But are you able to get dressed by yourself?

A.    Yes.

Q.    Okay.  Now, Mr. Barber, as a result of the shooting, do you experience any pain?

A.    Yes.  Yes.

Q.    Can you describe the type of pain that you experience for the ladies and gentlemen of the jury?

A.    Um, it's -- it's like a constant stinging, like a

**UNITED STATES DISTRICT COURT**

pricking.  It don't -- it doesn't never go away.  It -- sometimes it's easier to deal with, you know, but, um -- it's always there, you know.  It never -- it never -- it's a never -- it's never a moment where it -- where I'm without pain, you know.

Q.    And, Mr. Barber, when did you first start experiencing this pain?

A.    Um, before the -- right before they discharged me from the hospital.

Q.    All right.  And you mentioned, does -- does the pain ever stop?

A.    No.

Q.    Let me ask you this, Mr. Barber, to put into perspective.  How many days in the past week have you experienced pain?

A.    Every day.

Q.    How many days in the past month have you experienced pain?

A.    Every day.

Q.    How many days in the past year have you experienced pain?

A.    The same answer.  If it -- if it's not -- if it's not one area, it's another area.

Q.    All right.

A.    So it's -- it's -- it's constant.  I'm constantly in

pain in some area or multiple areas in my -- in my life -- in my body, every day.

Q.    As you sit here now in court, are you experiencing pain?

A.    Right now.

Q.    Do you experience headaches -- I'm not talking about regular headaches that, you know, you may receive, but do you experience a different type of headache at all as a result of being shot in the head?

A.    Yes.

Q.    And can you just -- are you able to describe that?

A.    Words can't -- can't describe that.

Q.    All right.  Do you have muscle spasms as a result of being shot?

A.    Yes.

Q.    And how frequent and in which part of the body do you have muscle spasms?

A.    I have leg spasms, um, then my -- my -- my left hand goes numb from time to time; the toes, I could -- I -- I could feel them, but I can't move them, you know.  I don't --

Q.    Are the muscle spasms that you have, are those painful?

A.    Yeah, sometimes.

Q.    All right.  Before April 27th, 2021, that you were shot in the head, Mr. Barber, did you have this constant pain

**UNITED STATES DISTRICT COURT**

every day that you just described to the ladies and gentlemen of the jury?

A.   No.

Q.   Okay.  Before -- this day before you were shot, did you have the type of headaches that you just described to the ladies and gentlemen of the jury?

A.   No, sir.

Q.   Okay.  Before you were shot, Mr. Barber, did you experience the type of spasms throughout your body that you just explained?

A.   No.

Q.   All right.  As a result of the shooting, Mr. Barber, has your memory changed at all?

A.   A little bit, yeah.

Q.   Do you have any challenges in remembering certain things like --

A.   It's hard -- it's harder.

Q.   Harder.

A.   To retain information.

Q.   Did you have the same type of memory issues in terms of retaining information prior to the shooting?

A.   I never had the best, but, I mean, it wasn't as it is today.

Q.   Understood.

Now, just briefly, Mr. Barber, can you tell the

UNITED STATES DISTRICT COURT

they left?

A.    No.

Q.    But you saw them drive away and completely exit the driveway; is that correct?

A.    Yeah.  It took them -- it took them a while.  She came home and then they backed the cars up or whatever.  Then the driveway was finally clear, and that's when I was getting ready to leave, and that's when I heard somebody talking to me.

Q.    How much time would you estimate passed between your neighbors driving away -- or at least exiting the driveway to when the deputy arrived, this voice arrived?

A.    I don't -- I don't recall.  It wasn't that long.  It was like -- it seemed like right -- like right after -- it had to be a few minutes, but it seemed like it was right away.

Q.    Do you recall previously testifying it was about 5 minutes?

A.    I think.  Vaguely -- you know, I don't know exactly the number but it was -- it could have been more or less.

Q.    Okay.  In that time frame, after your neighbors exited before you heard this voice in the driveway, you did not go to the corner store?

A.    No, I never made it.

Q.    Okay.  And that's because the police showed up and instructed you not to get in the car; is that correct?

A.    I didn't even know the police came.  I didn't know

**UNITED STATES DISTRICT COURT**

they were even called.

Q.    Do you recall testifying to that in your deposition, that the police came up and instructed you not to get in the car.  That's why you didn't leave?

A.    I don't recall that.

Q.    Okay.

MS. ANDERSEN:  I'd like to go to his deposition transcript, page 35, lines 10 through 19.

THE COURT:  Is this to refresh recollection?

MS. ANDERSEN:  This is to impeach, Your Honor.

THE COURT:  Well, he said he didn't recall.  So the proper thing to do would be to see whether or not anything would refresh.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.    Would it refresh your recollection to look at your prior testimony in this case?

A.    I don't -- I don't have a problem with it.

Q.    Okay.  There is a stack over there.  One has your name on it.  Are you able to find it, Barber, Steffon?

MR. GALIPO:  We have an extra copy, also, if necessary.

THE COURT:  We have a copy.

MR. DIGGS:  Counsel, can you give page and line numbers?

MS. ANDERSEN:  Yes.  35, lines 10 through 19.

BY MS. ANDERSEN:

Q.    Mr. Barber, let me know when you get to the page.
Okay?

A.    What page is it again?

Q.    It's page 35 of that transcript.

A.    Which number am I looking at?

Q.    Yes.  It would be lines 10 -- starting at line 10,
down to 19.

A.    Hmm.

Q.    Have you had an opportunity to look at those lines?

Mr. Barber, does that refresh your recollection at
all to giving me that testimony at your deposition?

A.    Yeah.  I mean, it doesn't really refresh my memory,
but, I mean, I -- obviously I said it, you know.

Q.    And although you told counsel when he was asking you
questions that you didn't know who the voice was, in deposition
you testified it was Joseph Cocchi, your neighbor.

MR. DIGGS:  Objection, Your Honor.  Misstates the
testimony in the deposition.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you know who the voice you were speaking with
that night was?

A.    No.

**UNITED STATES DISTRICT COURT**

Q.    Did you believe it was your neighbor?

A.    It possibly could have been.  I don't know.

Q.    Well, can I have you look at those same lines again, page 35, lines 10 through 19, please, and see if it refreshes your recollection about whether you thought it was your neighbor at that time?

(Pause in the proceedings.)

THE WITNESS:  Yeah.  I'm reading it, but I never -- I never made contact with the police officer.  I never knew it was a police officer.

BY MS. ANDERSEN:

Q.    Yeah, my question was actually about the neighbor, whether at the time of this incident you believed you were speaking with your neighbor.

A.    Yeah, because that's the person I had -- I had the verbal little altercation with, with Cocchi.

Q.    Do you mean before --

A.    Before --

Q.    -- you got in your vehicle?

A.    Before I jumped into the car, yes.

Q.    So did you believe that it was Joseph Cocchi that you were speaking with before you got to your vehicle?

A.    That was talking to me?  Yes.

Q.    Why do you think your neighbor would instruct you to show you -- show him your hands?

**UNITED STATES DISTRICT COURT**

of times.

Q.    And then you did eventually get into your vehicle; correct?

A.    Yes.

Q.    And closed the door?

A.    Yes, ma'am.

Q.    And left the trunk wide open?

A.    Yes, ma'am.

Q.    Okay.  And that was to go to the corner store?

A.    Yeah.

Q.    With the trunk open?

A.    Or to back out the driveway.

Q.    Do you typically back out the driveway with your trunk wide open?

A.    No, but it was dark out that night.

Q.    Why didn't you close it, then?

A.    Why didn't I?  I didn't get around to it.  I never made it out the driveway.

Q.    Why didn't you close it before you got into the vehicle?

A.    Because the back hatch up, it illuminates the whole driveway.  It's a dark -- it's a dark, little, long strip and an old car.

Q.    So are you saying that you typically reverse your vehicle out of the driveway with the trunk wide open?

THE COURT:  Move on.

MS. ANDERSEN:  If he opens the door, is that not --

THE COURT:  Move on.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.    So you didn't tell this voice, hey, I'm just going to leave, I need to make it to the corner store?

A.    No.

Q.    Okay.  And you got in the car, it was already idling, it was already on?

A.    Yes, ma'am.

Q.    Was it in park when you got into the vehicle?

A.    Yes.

Q.    Okay.  And then you shifted it into reverse?

A.    Upon me attempting to leave, yes.

Q.    So you do recall that part of getting into the vehicle and shifting it into reverse?

A.    All I remember really is getting in the vehicle.  I must have had -- I must have shifted it into reverse because that was my intention was to leave.  I don't know where we're going with that.  I mean, I'm trying to be honest and answer the question, but I don't know -- you're not -- you're not taking my answers.  I don't know how to explain it.

Q.    Well, I'm just asking you questions.  I'm -- did you -- you do have a recollection of the car moving backwards,

UNITED STATES DISTRICT COURT

Q.    You mentioned something about general labor.  I just want to clarify.  What do you mean by "general labor"?

A.    Referring to what?

Q.    I think you were asked activities you engaged in prior to this incident and you said general labor.  What did you mean by that?

A.    General labor?  I don't -- clean the yard is general labor.  I don't know.  Taking the trash out is general labor.

Q.    And how long had it been since you were employed prior to this incident?

MR. DIGGS:  Objection, Your Honor.  403.  Outside the scope.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    You were prescribed a number of medications by the hospital after this incident; is that correct?

A.    Yes.

Q.    Okay.  And you refused to take medications after you left the hospital that were prescribed by Arrowhead; is that correct?

A.    Yes.

Q.    And you were prescribed physical therapy to continue after you were discharged from the hospital; correct?

A.    Correct.

Q.    You also chose to stop attending physical therapy

all future appointments canceled?

    A.    Regarding to what?

    Q.    Your health.  December of 2022.

    A.    Yeah because they were giving -- they were trying to give me psych meds.  I didn't want to take no psych meds.

    Q.    What about a medical appointment you had?

    A.    I didn't have any medical appointments.

    Q.    After 2022?

    A.    I -- I wasn't -- I wasn't on medical.

    MR. DIGGS:  Objection.  Objection under the line of questioning.  403.

    THE COURT:  I'm going to overrule it, but I would suggest that we move on.

    You may answer the question.

    THE WITNESS:  What is the question?

BY MS. ANDERSEN:

    Q.    I'll go back to the original question.  I think there's been some confusion.

    In December of 2022, do you recall telling a medical provider you did not need any more medical follow-up and you wanted all future appointments canceled?

    A.    That was the only way for them not to schedule it again because they said, well -- they said medical precedes Court.  And I was trying to -- I was tired -- tired of waiving my -- my -- missing court for physical therapy just

because it wasn't physical therapy.

THE COURT:  Move on.

BY MS. ANDERSEN:

Q.    And in that same appointment, you were advised to continue physical therapy; correct?

A.    Yeah, they told me -- they told me to -- that they were offering me physical therapy.

Q.    And you did not take them up on that offer to continue physical therapy; correct?

A.    Because being chained in a room, it is not physical therapy.

Q.    Back when you were still in physical therapy at Arrowhead, isn't it true that even back then, you were able to walk with a walker and transfer independently to the bed?

A.    Walk with a walker?  I've never had a walker.  I have a walker in prison.  I never -- I never --

Q.    Would you say that the weakness in your legs is worse today than it was when you were at Arrowhead?

A.    No.  It's the opposite.

Q.    So it's gotten -- the weakness has gotten better or some relief to the weakness?

A.    It's just become manageable.

Q.    When was the last time you attended physical therapy?

MR. DIGGS:  Objection, Your Honor.  403 again, this

UNITED STATES DISTRICT COURT

of it; the pain, the -- the spasms.  Psych meds will do the trick for everything.

Q.    And you refused to take those; is that correct?

A.    Yeah, I didn't want to take -- I didn't like the way it made me feel.

Q.    Did you ask for any alternative prescriptions for pain medications?

A.    No.  Tylenol, ibuprofen.

Q.    Is it also correct that you did not any -- attend any type of therapy or counseling for mental or emotional injuries you attribute to this incident?

A.    Any counseling?

Q.    Correct.

A.    At -- you're talking about at Arrowhead?

Q.    Anywhere.  Any -- anytime after Arrowhead.

A.    I've had a substance abuse program.  I don't know if that helps.  I don't -- I don't know.

MS. ANDERSEN:  Nothing further at this time, Your Honor.  Thank you.

THE COURT:  Thank you.

Mr. Diggs, redirect?

MR. GALIPO:  May we have one -- can I confer with Mr. Diggs for just one moment, Your Honor?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

UNITED STATES DISTRICT COURT

MR. GALIPO:  Thank you, Your Honor.

MR. DIGGS:  Thank you, Your Honor.

Your Honor, briefly, for the rule of completeness, um, could I read from Mr. Barber's deposition, page 48, line 17, through 49, line 5?  And then --

THE COURT:  Give me one moment.

48, what line?

MR. DIGGS:  17.

THE COURT:  Through 49 --

MR. DIGGS:  Line 5.

THE COURT:  Yes.

MR. DIGGS:  Thank you.

"QUESTION:  And you do not recall whether you put it in reverse or not; is that correct?

"ANSWER:  That's correct.

"QUESTION:  But you do have a recollection of the car moving backwards; is that correct?

"ANSWER:  Yes.

"QUESTION:  Was that a yes, I'm sorry?

"ANSWER:  Yes.

"QUESTION:  Okay.  Do you recall pressing down on the gas pedal at any time you got into the driver's seat?

"I don't recall."

Thank you, Your Honor.

UNITED STATES DISTRICT COURT

No further questions.

THE COURT:  No further questions?

MS. ANDERSEN:  No further questions, Your Honor.

THE COURT:  Very well.  Then we're going to go ahead and take a brief break at this time.

Mr. Galipo, do you have your next witness available? I guess I'm wondering if we should just simply take an early lunch break.

MR. GALIPO:  I think that makes sense, Your Honor. And then I'll be ready to go right after our break.

THE COURT:  Very well.

Then, ladies and gentlemen, we are going to take an early lunch break at this time.

I will see you back here at 12:30.  In the meantime, please remember the admonitions.  Keep an open mind, do not speak to anybody about the case, do not let anyone speak to you about the case, and do not conduct any independent research or investigation.

Thank you.  Have a nice lunch.

THE COURTROOM DEPUTY:  All rise.

        (Out of the presence of the jury:)

THE COURT:  You may be seated.

We are still on the record outside the presence of the jury.

Mr. Galipo, I believe that your last witness will be

Dr. Omalu; is that correct?

MR. GALIPO:  Yes.

THE COURT:  And, again, if you could remind me approximately -- I think you said an hour with him?

MR. GALIPO:  Yes.

THE COURT:  And then who's doing the cross-examination?

MR. RAMIREZ:  Ms. Brunson, Your Honor.

THE COURT:  And I know that yesterday you estimated an hour and a half?

MS. BRUNSON:  Yes.

THE COURT:  And I would certainly remind counsel to not go over matters that are not relevant to this case, as well as be mindful of your tone and respectfulness to the witness.

Are there any issues we need to take up at this time?

MR. GALIPO:  No.  Thank you, Your Honor.

MR. RAMIREZ:  I assume after Dr. Omalu, the plaintiffs are going to rest.  I'll make my comment, I have a motion to make, and we'll deal with that later.

We were only able to get one deputy for this afternoon.

THE COURT:  And who is that?

MR. RAMIREZ:  Deputy Mora, M-o-r-a, I believe.

THE COURT:  And how long do you anticipate Dr. --

UNITED STATES DISTRICT COURT

Deputy Mora's direct?

MR. RAMIREZ:  45 minutes top, probably.

THE COURT:  And cross-examination?

MR. GALIPO:  Depending on what he says, probably 30 at most I would anticipate.

MR. RAMIREZ:  So that would leave us tomorrow with Navarro, Hernandez, Sanchez, and then Vilke on Thursday as our final.

THE COURT:  And going through Navarro, Hernandez, and Sanchez, how long do you anticipate for direct?

MR. RAMIREZ:  Sanchez, I anticipate about an hour. For Hernandez, Sergeant Hernandez, about an hour and a half. And possibly half that time for Sergeant Navarro.

THE COURT:  And cross-examination?

MR. GALIPO:  Again, it may depend on what's covered, but I anticipate the cross will be less.  If they go one hour with Sanchez, I think at most it would be 45 minutes; if they go 45 minutes with Navarro, probably at most 30 minutes; and Hernandez -- did you estimate an hour and a half?

MR. RAMIREZ:  At the maximum.

MR. GALIPO:  Okay.  Again, at most, an hour but likely much less.

THE COURT:  All right.  So it sounds like those three witnesses would take us through the bulk of tomorrow.  We may end a bit early.

UNITED STATES DISTRICT COURT

And then we have your final witness, Dr. Vilke.

MR. RAMIREZ:  That is correct, which I think probably 45 minutes at maximum for his testimony.

THE COURT:  All right.  And he is going to be testifying virtually?

MR. RAMIREZ:  Yes, Your Honor.

THE COURT:  All right.  And I do expect for him to go right as soon as we start tomorrow morning.

MR. RAMIREZ:  Yes.  We will alert him to be ready to go on Thursday morning.

THE COURT:  I'm sorry.  Thursday morning.  Thank you.

All right.  Anything else before we break for lunch?

MR. GALIPO:  No.  But given that we're on track, timing, and we'll get the case to the jury early on Thursday, I think if we are done a little early today, it probably would be okay and the jurors probably will be fine with that.

THE COURT:  I have never had jurors complain when we let them go early.  So I think that's a safe assumption.

MR. GALIPO:  Right.  Okay.  Thank you, Your Honor.

THE COURT:  All right.  Thank you, everyone.  I will -- yes.

MR. DIGGS:  I'm sorry, Your Honor.  Just received this, a message from CDCR.  They are asking if we could provide a court seal or certified removal order for court proceedings.

I just want to bring it to the Court's attention.

THE COURT: What exactly are they requesting?

MR. DIGGS: A court seal certified removal order for court proceedings.

THE COURT: I don't know what a removal order is. Perhaps you could ask for clarification?

MR. GALIPO: We'll get clarification.

MR. DIGGS: Yeah.

THE COURT: All right. Thank you.

MR. GALIPO: Or maybe put them in touch with your court clerk.

THE COURT: I think if you could get clarification, that would be helpful for us.

MR. GALIPO: We will.

THE COURT: All right. Very well. I will see all of you back in an hour.

(Lunch recess taken.)

(In the presence of the jury:)

THE COURT: Mr. Galipo, would you like to call your next witness at this time?

MR. GALIPO: Yes. Thank you.

The plaintiff would like to call Dr. Bennet Omalu.

THE COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the

UNITED STATES DISTRICT COURT

whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat and state and spell your first and last name for the record.

THE WITNESS:  My name is Bennet Omalu, B-e-n-n-e-t, Omalu, O-m-a-l-u.

THE COURT:  Thank you.

Mr. Galipo, you may proceed.

MR. GALIPO:  Thank you very much, Your Honor.

BENNET OMALU, M.D.,

called as a witness by the plaintiff, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.   Good afternoon, Dr. Omalu.

A.   Good afternoon, sir.

Q.   Are you what's sometimes referred to as a forensic pathologist?

A.   Yes, sir.

Q.   Do you have particular areas of expertise with respect to the human brain?

A.   Yes, sir.

Q.   And injuries to the human brain?

A.   Yes, sir.

Q.    Can you tell the ladies and gentlemen of the jury, before we get into some of your opinions in this case, about your educational background, please?

A.    Well, I went to medical school in Nigeria in West Africa, the seven-year medical school curriculum fashioned after the British; six years of medical school training; one month every year of clinical internship whereby you work as a physician but under supervision.  So I worked in the departments of gynecology and obstetrics, surgery, internal medicine, and pediatrics.  I performed surgeries, delivered about 400 babies.  Then I began work as an emergency room physician for three years in a university hospital.  I sat for my United States medical license and examination, which I passed while I was in Nigeria.  I applied to the World Health Organization for a scholarship, which I got, that enabled me to come to the University of Washington, Seattle, Washington, to come to the school of public health to do a one-year clinical research program, which I completed, then proceeded to Columbia University in New York City at Harlem Hospital Center to do a five-year residency training program in anatomic and clinical pathology.  Because of exceptional scholarship, the five years were reduced to four years for me.  I completed residency training in anatomic and clinical pathology four years, then I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania, to do a one-year fellowship training

in forensic pathology.

Q.    Let me stop you for one moment.

You used the term "forensic pathology," "clinical pathology."  Can you explain to the jury what those different -- and another pathology, which I'm forgetting right now, I apologize.  Can you explain to the jury what those two -- three different areas -- forensic pathology, clinical pathology, and what was the third one?

A.    Forensic pathology.

Q.    Forensic, clinical.  And what am I missing?

A.    Anatomic.

Q.    Anatomic.  Thank you.

A.    Yes, sir.

Q.    Can you explain to the jury what those specialties are?

A.    An anatomic pathologist is a specialized physician who studies disease and makes disease diagnosis by structure of disease.  An example, assuming you're a woman, you feel a lump in your breast and you go and see your surgeon.  Your surgeon takes a biopsy and sends it to an anatomic pathologist who would analyze the tissue to determine if you have cancer or not and, if you have cancer, what type of cancer and what type of treatment you need.

A clinical pathologist is a specialized physician who studies disease and makes disease diagnosis by the study of

**UNITED STATES DISTRICT COURT**

chemicals in the body.  A good example, too, if you go and see your doctor and you do your annual physical and then send you -- they send you to the lab to have your blood drawn, your blood is sent to a clinical pathologist who will determine the levels of glucose, sodium, hormones in your body, and come back with a diagnosis to your physician.

A forensic pathologist, again, is a specialized physician who studies disease, who studies trauma, and who studies death.  A forensic pathologist comes after the fact, after something has happened, an event has occurred.  A forensic pathologist applies scientific methods to make determinations of causation, mechanism of sustenance, and treatment.

So a forensic pathologist attend to living patients who suffered all types of trauma and also to dead patients who died from all types of disease.

So the forensic pathologist, tell me what you were doing -- the forensic pathologist can tell you what happened to you.  Um, that is a forensic pathologist.

Q.    Okay.  Thank you for that.

And, for example, do forensic pathologists such as yourself commonly do autopsies to determine the cause of death and manner of death?

A.    Yes.  So one of the things we do is performing autopsies to determine how and why people die and to provide

**UNITED STATES DISTRICT COURT**

answers to any questions society or any interested party may have in terms of what killed the person, could it have been prevented, and what lesson does society have to learn from this death.

Q.    Okay.  Thank you.

Now, you were up to the time that you, I think, got to Pittsburgh --

A.    Yes.

Q.    -- Pennsylvania.  Tell us about your education and professional experience in Pittsburgh.

A.    So after forensic pathology, I went back to the University of Pittsburgh, Pittsburgh, Pennsylvania, to do a two-year fellowship training in neuropathology.

Q.    What is neuropathology?

A.    Again, neuropathology is a specialized part of medicine -- or a neuropathologist is a specialized physician who studies diseases of the nervous system -- the brain, the spinal cord, the muscles, and the nerves -- who studies all types of trauma to the nervous system, and who studies dementia in -- in living and dead people and makes diagnosis of disease.

A neuropathologist determines types of brain trauma and determines expected outcomes of brain trauma.

Q.    And after your fellowship in neuropathology, where did your education take you next?

A.    So after neuropathology, I went back to the

University of Pittsburgh, the school of public health, to do a three-year master's in public health program in epidemiology, e-p-i-d-e-m-i-o-l-o-g-y.

Q.    You're helping our court reporter?

A.    Yes.

Q.    Okay.  She's a pretty good speller, I think.

But explain to the jury what that is.

A.    So -- so epidemiology is a specialty of medicine that studies the distribution, the spread, and the causation of diseases and trauma in populations and in groups of populations.

So the epidemiologist establishes generally accepted principles of every disease upon which we apply to each and every individual patient.

For example, it was an epidemiologist who discovered that, when you play football, that you suffer brain damage.  It was an epidemiologist that discovered that, when you have sex, you could contract HIV.  So these are what epidemiologists do.

Q.    You at some point in your time in Pittsburgh took particular interest in brain injuries; is that true?

A.    Yes, sir.

Q.    Including brain injuries of NFL football players?

A.    Yes, sir.

Q.    And the movie *Concussion* covered your work as a doctor in brain injuries to football players?

UNITED STATES DISTRICT COURT

A.    Yes, sir.

Q.    Now, after you did your master -- you got your master's in public health in Pittsburgh, where did your education take you next?

A.    So I went back to the Carnegie Mellon University to do a three-year program in business management with a focus on medical management.  I went to the Tepper, T-e-p-p-e-r, Tepper School of Business.  I completed that in three years.  Then I sat for board certification examination in medical management.

Q.    Okay.  What is board certification for doctors?

A.    Well, board certification, the analogy -- when you are done with the training in a specialty of medicine, you sit for an examination, which, if you pass, you become certified as an authority in the specialty.  There is nothing higher.

So when I'm actually some -- a degree that is similar to -- it's like having a Ph.D. in physics.  So when you have a board certification in neuropathology, that is the max you could get.  You are sufficiently knowledgeable and your opinions could be regarded as authoritative.

Q.    Would it be fair to say, Dr. Omalu, that some medical doctors are not board certified and others are?

A.    Yes, sir.

Q.    You could still be a doctor, and a competent doctor, without being board certified?

A.    Yes.

Q.    How many areas of medicine do you have board certifications in?

A.    I don't like saying it, but I have board certification in five specialties.

Q.    Okay.  Can you tell the jury what are the five different areas of medicine that you are board certified?

A.    I'm board certified in anatomic pathology, in clinical pathology, forensic pathology, neuropathology, and medical management.  Then I hold a master's in public health in epidemiology and a master's in business administration.

Q.    Okay.  And you have testified in courts before as an expert in -- in forensic pathology and neuropathology, for example?

A.    Yes.  I have testified hundreds of times in every jurisdiction -- federal, state, county, municipal courts -- all over the country.

Q.    Okay.  Well, thank you for being here today.

And I want to ask you some questions about this case.

You, at some point, were retained by my office to review this particular case.  Is that fair?

A.    Yes, sir.

Q.    And you and I -- I have -- my office has retained you to review other cases in the past.  Is that also correct?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    I'm going to show you what I think is already in evidence, Exhibit 8, page 6.

THE COURT:  Yes.

MR. GALIPO:  Is it okay if I publish?  I believe it's in, Your Honor.

THE COURT:  It is.  You may publish.

BY MR. GALIPO:

Q.    All right.  Is this one of the photographs you were able to view in this particular case?

A.    Yes, sir.

Q.    And do you have an understanding as to what caused this wound?

A.    Yes, sir.

Q.    What's your understanding?

A.    He suffered severe traumatic brain injury caused by a ballistic, a gunshot, a bullet that came from a handgun.

Q.    And we see damage on the outside of the head in this picture; correct?

A.    Yes, sir.

Q.    Does this picture necessarily show the damage to the inside of the brain?

A.    Partly it does, partly -- you could see brain tissue bulging out of the wound.  So when you see that, we call it herniation, upward herniation.  So for a bullet that travels at about 1200 to 1400 feet per second, that's a large amount of

514

energy.

So when it gets into the skull cavity, the skull cavity is a rigid cavity that does not necessarily communicate with the outside.  So with such a massive amount of energy, when the bullet gets inside the cranial cavity, it causes an explosive effect.  And, in fact, when you see simulations for about 200 milliseconds, the brain expands multiple times.  So because of the explosive expansion, brain tissue herniates upward, forceful herniation through the gaping defect in the skull.  So such a pattern of trauma is consistent with severe traumatic brain injury.

Q.    Okay.  I'm going to take this down now and talk to you a little bit about the extent of the injury that Mr. Barber suffered.

In addition to looking at photographs and understanding the mechanism of injury, did you have an opportunity to review medical records, particularly from Arrowhead Regional Hospital where Mr. Barber was for some period of time?

A.    Yes.

Q.    Can you explain to the jury, given your expertise as a neuropathologist, how the bullet entering Mr. Barber's head and brain caused him damages and whether those damages are permanent or not?

A.    So over the centuries, very intelligent people that

**UNITED STATES DISTRICT COURT**

came before us have studied this and established what we call generally accepted principles of medicine, almost like scientific truths.

So when you have a tiny object like a bullet traveling at a very high speed, what is lethal about it is the kinetic energy, not the mass of the bullet.

So when the bullet encounters the skin of the scalp, it entered -- in this instance, it entered from the back and top of the head.  It never came from the front or the side.  It came from the back, was traveling in a rightward and downward trajectory.

Because of the energy, upon coming in contact with the skull, about 100 milliseconds the skull will put a resistance, but the energy of the bullet overcomes the resistance of the skull and the amount of energy splintered the skull.

And when that happens, you have what we call comminuted, comminuted, meaning broken up into multiple tiny pieces.  Comminuted fractures of the skull.  Then the bullet continued, entered the cranial cavity, downloaded that entire energy.  Unfortunately, a bullet that settles in your body is more dangerous than a bullet that continues through your body.  Because when the bullet continues, it takes energy with it.  But when it gets in contact with the body and settles inside your body, all that entire energy is downloaded on your body.

516

So it entered -- entered the brain.  Unfortunately, the human brain is 60 to 80 percent water.  So it has almost no resistance.  So that amount of energy caused the diffused explosive and the brain pretty much splinters apart the fibers.

So although the bullet entered in the local part of the head, the damage is diffused because it was a bullet with high amounts of energy.

So the area surrounding the point of entry will be the most damaged.  It will actually be pulpified.  And then, diffusely, other parts of the brain are affected.

Because it was such an extensive injury, the surgeons couldn't go in to take out the pieces of bullet.  So all they did was to wash out as much as they could -- the less you handle the brain, the better.  And they removed the broken-up pieces of skull and put in titanium, which is permanent.

So because, again, the human brain is a body -- only organ in the body that does not have any reasonable capacity to heal itself or to regenerate itself, any injury to the brain, especially severe injury, is permanent.

Q.    Let me ask you this.  Thank you for all of that.  I just want to follow up on a few points before I forget.

Based on your review of the medical records, I'm assuming that you looked at some of the diagnostic scans that were done, CT scans of the brain, et cetera?

UNITED STATES DISTRICT COURT

517

A.    Yes, sir.

Q.    Are you saying that there were multiple bullet fragments in his brain?

A.    Yes, sir, bullet fragments, multiple pieces of tiny speckles of bone that are still inside his brain even until today.

Q.    Okay.   That was my next question.

Are you saying that Mr. Barber has bullet fragments and bone fragments in his brain scattered throughout his brain from this incident, even till today?

A.    Yes, sir.

Q.    And then you mentioned that they had to put a -- a plate in.   Is that a titanium plate?

A.    Yes, sir.

Q.    What's the name of that surgical procedure to do that?

A.    Well, pardon the jargon.   It's called cranioplasty, c-r-a-n-i-o-p-l-a-s-t-y.   Cranioplasty is Latin.   It simply means fixing the -- the skull.

Q.    Can you -- can you just generally explain that surgical procedure to the jury?

A.    So the surgical procedure was described in the medical records.   So what the surgeons did at his bedside, they'll get normal saline, which is about the -- has the same tonicity, about -- it's about the same as plasma in terms of

UNITED STATES DISTRICT COURT

the density of the water.  So then they use normal saline, s-a-l-i-n-e.  They irrigate very slowly to wash out the dead brain tissue.

So while they wash it out slowly, once the -- the surgeon believes he's reasonably washed out the dead brain tissue, they suture the dura mater.  And then they do their best to take out the pieces, the fragments of bone.

The less you touch the brain, the better.  Remember, it's 60 to 80 percent water.  And it has no ability to regenerate itself.  A good analogy, if you take out half of your liver, six months later, if you go back, your liver has regrown.  The brain does not have that capacity.

So whatever is damaged, what you do is you mitigate secondary damage.  So they did that, and then they covered the cranium with this titanium so that there wouldn't be any additional trauma to his skull accidentally.

Q.    So, in your opinion, Dr. Omalu, were brain cells damaged for Mr. Barber because of this -- this bullet into his brain?

A.    Yes, sir.  The entire brain was damaged, not just the brain cells, the tiny blood vessels of the brain.  There are different types of brain cells.  They were all damaged.  Um, so it's all permanent.

Unfortunately, when you -- the brain cells sustain severe damage, the genomics resets itself and, over time, the

519

damage becomes progressive.

Q.    And what do you mean by progressive?  Does that mean worse?

A.    Yes.  It's -- his symptoms will become worse.  He'll begin to lose his previously obtained functionality.  He'll become -- start becoming less intelligent, start becoming more emotional.

In fact, as an epidemiologist, I know that for somebody like Mr. Barber, in about 20 to 30 years after he suffered his trauma -- he was 35 when he suffered this trauma.  So at about 55, 65, he will develop full-blown dementia.  And the mien and median we use is 20 to 30 years where he will require almost 24/7 assistance.

This is the statistics.  This is one of the truths of science, ob- -- observed over the centuries.  So it's called traumatic encephalopathy.  So such severe traumatic brain injury is permanent, is irreversible, and it's progressive.

Q.    Okay.  Thank you.

And then I think you spoke about the -- the herniation of the brain matter.  That's part of what we see sticking out of the skull in that photo I showed you earlier?

A.    Yes, sir.

Q.    Was the -- was there a skull fracture?  And if so, how would you describe it?

A.    Yeah.  The skull fracture was the comminuted

**UNITED STATES DISTRICT COURT**

fractures.  So a comminuted fracture is the most extensive and the most severe type of fracture anybody could have.

So -- and that was why the surgeons couldn't fix it. They had to remove it, replace it with an artificial skull.

Q.    Did you note during the course of Mr. Barber's treatment at Arrowhead that he was -- participated in physical therapy and occupational therapy?

A.    Yes, sir.

Q.    Did they have to put staples in his head at some point?

A.    I believe so, yes, sir.

Q.    And were those removed at some point, the staples?

A.    Yes, sir.

Q.    Um, is there a period of time where the person is going to get about as good as they're going to get in an injury like this?

A.    Yeah.  So the human brain has, um, great reserve of what we call great plasticity, in plastic, plasticity.

So -- and it depends on individuals.  About -- based on epidemiology, about six months to one year, it will be as bad as you could be.  Then after six months to one year, you may show some compensatory recovery.  What does that mean?  It doesn't mean you're recovering.  It simply means that the brain cells that were not as damaged as the others will begin to hyperfunction.  They'll form new neural connections to

UNITED STATES DISTRICT COURT

compensate for the damage.

But because the brain is not like other organs -- we'll call it a post-mitotic, post-mitotic, meaning the brain cells cannot divide to form new ones.  The brain cell does not have the capacity to divide and form a new brain cell like other cells in the body do.

So after a certain limit, that compensation, which is its maximum extent -- because there is a limit to what one brain cell can do.  It could vary, and that is why they become very -- they decompensate very quickly after 20 to 30 years.

So as time goes on -- it varies in individuals -- they will start losing their functionality in every domain.

However, they will never regain their functionality before they were shot.  What does that mean?  Assuming somebody has the brain of a physicist and he suffers such brain damage, he could now begin to function at the level of -- I don't know -- maybe a housekeeper that cannot solve very complex mathematical problems.

So when you look at it, you may think, oh, he's doing okay.  But when you encounter him on a personal level, you ask him, okay, what is the basic law of speed of light? Remember, he's a Ph.D. of physics.  He would have remembered that.  So they may function well, don't be fooled.  They are not functioning at their premorbid state, but they still have symptoms -- cognitive impairment, mood disorders, they could

522

cry, behavioral disorders, and then somatic.  They may not be able to use all parts of their body.  They may be having headaches.  They may be having aches and pain.

And they may also have distorted, distorted thinking, meaning what a regular, normal, average person may think is good for him, because of his brain damage, he may not think it's good for him.  So we call them cognitive distortions caused by his injury.

Q.    Okay.  Now, you've touched on some of the things.  There's been some reference to headaches.

A.    Yes, sir.

Q.    Is it common for someone who's been shot in the brain, if they survive, to have severe headaches?

A.    Yes.  They have severe headaches and we have the medical explanations for the headaches they have.  Yes.

Q.    How about -- there's been talk about constant pain, 24/7 pain, some days better than others.  Is that, in your opinion, related to the injuries from being shot in the brain?

A.    Yes, sir.  That's called neuro -- neuropathic pain, yes, sir.

Q.    Can you explain that to the jury, please?

A.    So the human brain is one of the most effective and efficient mechanisms you can ever encounter.  So it functions in a very delicate and very well-balanced system.  And it maintains itself.

UNITED STATES DISTRICT COURT

So when you suffer brain trauma, that balance is disturbed.  There are brain cells in your brain that keep other brain cells in check.  It's highly coordinated.  That is why, assuming you're eating, you're hungry, you're eating, at some point you're full.  There are brain cells that tell you you are full, stop eating.  And they tell the brain cell that are making you eat, stop.

So when it comes to pain, there are brain cells that want to constantly make you feel pain.  And there are brain cells that shut them down.  Okay, enough.  So when your brain is damaged like Mr. Barber's brain is damaged, you lose that mechanism.  It also happens in people with spinal cord injuries.  They have severe pain in the extremities.

So these cells now start firing constantly, nonstop.  So they will now be having this constant pain.  And because the brain damage is permanent, there is no drug that can eradicate that pain now.  So what you do, you try to mitigate, minimize the pain, and you give them anti-depressants to stop them from becoming too depressed from the constant pain.

Q.   How about there's been reference in the medical records -- and I think the jury's heard some testimony about muscle -- or spasms.  Is that related to the brain injury?  And if so, how?

A.   Yeah.  Same mechanism.  Same mechanism.  Again, this happens in spinal cord patients.

So there are cells that are there -- there are reasons -- I don't want to go into the -- the detailed science. There are reasons why there should be cells that are constantly firing.

So the cells that tell them to stop will shut them down. There are -- sometimes you need your muscles to go into spasm, like when you're having fever. So there are times. So when it's not needed, the brain cell shut them down. Okay, stop.

Now, when that balance is disturbed, some of the cells will not escape, they don't have any check, and they keep on constantly firing. And then that's when you have the muscle spasms. We'll call -- sometimes we'll call them fasciculations, fasciculations. And it could be very, very severe pain. Very, very severe.

It's like -- well, I don't know if you ever had a muscle spasm, like you're playing soccer, and you have this crampy spasm. That is the type of pain they have.

Q. How about -- how could -- in your opinion, Dr. Omalu, is the brain injury -- the permanent brain injury suffered by Mr. Barber, is that affecting his ambulation and ability to walk or run and, if so, how?

A. So if you notice, based on the medical records, Mr. Barber's left side is weaker than the right. The question you ask yourself, you know, before I went to medical school,

UNITED STATES DISTRICT COURT

why?  The damage was on the right.  Why on the left?  There's a reason for that.

At the lower level of your brain, the fibers on the right cross over to the left.

So if you have extensive damage on the right, the left side will be affected.

What that tells us, because he's what we call hemi -- hemiplegic, h-e-m-i-p-l-e-g-i-a- -- g-i-c, meaning he's lost significant power on the left side of his body.  But remember, the bullet entered on the surface on the top.  So what explains that?

Remember what I told you.  It was not the focalized trauma.  It was explosive.  And the right side was more damaged than the left because the bullet was traveling in a rightward direction.  So the energy was going rightward.

The power on the right side isn't what it used to be before he was shot, but it's better than on the left.

So the left localization of the hemiplegia is consistent with the patterns of trauma.  That is what we expect to see based on what we know about science and the behavior of the human body.

Q.    Could you describe to the jury, given your medical background and your background in neuropathology, what type of pain and suffering is associated with Mr. Barber's injuries that you've been describing?

**UNITED STATES DISTRICT COURT**

A.    So when you talk about pain, pain is a primitive reflex.  What does that mean?  Pain is a protective reflex. It's like thirst and hunger.

Pain is there to protect you, to alert you to things harmful to you, to remove you from such circumstances.  Because unchecked, pain will kill you.  If you put your hand in fire and you don't remove it, you will get burned.

So it's meant to be protective, meaning the upper parts of your brain do not have any control over whether you experience pain or not.  Just like the upper parts of your brain, even when you're unconscious and in coma, you will experience hunger and thirst.  Even if you're in coma, if you don't -- if you're not given water, you will die.  So pain is like that.

There are three types of pain.  There is the mental pain, there is the physical or somatic pain, s-o-m-a-t-i-c, and then there is the biochemical pain.

The first thing we consider in somebody who has suffered trauma is:  Is the trauma a serious bodily injury, meaning is it severe trauma?  Was there extensive damage and disruption of tissue?  And the first thing I had said earlier was, yes, this is severe traumatic brain injury.

So when you have severe traumatic brain injury, you suffer high-scale pain and suffering or severe pain and suffering, meaning this is the type of pain that will disrupt

your activities of daily living.  This is not the type of pain you can ignore.

So he's going to have mental or psychological pain because the brain responds to noxious -- it's called noxious stimuli, anything that causes you pain, eventually affects your mood and your brain.  And you have mental anxiety.  Your blood pressure goes up, your -- you breathe faster, your heart pumps faster.  Certain chemicals are released in your body to cause stress.  That is the mental pain.

And then you have the physical pain, the aches and pain, the headache, the spasms.  The hunger inside you causes physical pain because your stomach will produce more acid.  If you're crampy in your stomach, your intestines will move faster.  You feel sometimes you have diarrhea just from pain.  Sometimes you have chest pain in your heart from pain.  That is all the somatic pain.

And then the biochemical pain is the pain you experience when abnormal chemicals are being released by your body in response to the trauma and to the pain you have suffered.

Biochemical -- one way I explain it to medical students is, if you've ever suffered from the flu and you're sitting down in the comfort of your living room but you feel terrible, you feel lethargic, you feel aches and pain.  Meanwhile, you've not done anything.  You are sitting down.

Yet you're feeling aches and pain and you feel terrible because of the chemicals your body is releasing in response to the infection.  So that is the classic biochemical pain.

And given the trauma Mr. Barber had suffered, he will continue to experience the severe pain, high-scale pain, the permanent injury for the rest of his life.

Q.    So are you saying, Dr. Omalu, that not only is -- has he experienced the pain from the day of this incident -- I think it'll be five years this April -- but he's going to continue to experience the pain the rest of his life?

A.    Yes, sir.

Q.    And is there anything that anyone can do at this point to repair the brain damage that he has from this shot so he doesn't experience that pain?

A.    No, sir.

In this stage of science, in this day and age -- and it's not going to change anytime soon -- science does not have the capacity and the wherewithal to reverse brain injuries.

So what you do for any type of brain injury is prevention.  After you've suffered the brain injury, all we can do is mitigation, stop you from suffering additional injury, and then control and manage the consequences, pretty much to help to enhance the quality of your life.  But can we cure it and stop it?  No.

Q.    And given his issues with walking or ambulating, in

**UNITED STATES DISTRICT COURT**

your opinion, Dr. Omalu, if he tries to walk, is he at risk for falling down?

A.    Yes.  The left side of his body is weak.  So he is permanent.  I don't think that could ever be reversed. However, there is technology that exists today, if provided to him, could teach him ways to improve on his walking, could help him to significantly maybe get back some of the walking.  They teach him ways to compensate, but he will never recover.

And, unfortunately, these therapies are very specialized centers, they cost money.

Q.    The last thing you mentioned, I think you were saying he was -- Mr. Barber was 35 years old when this happened and based on your background and experience in medicine and epidemiology, that once he gets to 55 or so, he could further deteriorate worse than he is now?

A.    He will continue to deteriorate, but at about 20 to 30 years after the trauma, there will be severe noncompensatory decompensation.

Q.    And I think you've mentioned a few of these, Dr. Omalu, but you can -- can you just repeat a couple of the things that he'll -- if he lives that long, he'll have to deal with?

A.    So generally we break them down into four categories.  This is very basic neuroscience.

So anybody who suffers severe traumatic brain

UNITED STATES DISTRICT COURT

A.    It is not medically possible that a patient with spinal cord injury will stop feeling pain.  In fact, one of the people with the highest levels of pain medications are spinal cord injury patients.  And if you notice in my report, I spent almost half a page explaining that principle.  Some of the scientific principles are paradoxical.  But -- even sometimes me, myself, I don't understand them, but I respect them because people smarter than me came before me.

Q.    So did Mr. Barber indicate to you, when you met with him, that he was experiencing pain?

A.    Well, when I met with him, I already knew he was experiencing pain.  So I confirmed that -- headaches, muscle spasm, emotional pain, um, regrets.  I mean, one, which I almost started crying myself, he's always wanted to be an underwater welder.  That has been his dream.  And he was planning to learn how to swim.  And he looked at me, it can't be done.  I became tearful.  I'm a human being, too.  I became tearful, too.  I'm sorry.  That is emotional pain.

So the two hours I was with him, I confirmed that this was a man who is simply confirming the science.  He will be in pain for the rest of his life, unfortunately.  I wish I could help him.  I really do.

Q.    Throughout your career, have you experienced patients who do something called malingering?

A.    We need to be very, very -- extremely careful about

restructure itself?

A.    That was what I said.  I wouldn't use the word "restructure" because there is no structure in it.  It's compensate.

So the brain cells that are surviving will overfire.  But remember that that applies to people who have suffered like a stroke, who suffered very focal trauma.  A gunshot wound to the head is a diffused injury.  It's more diffused.  It's not like somebody who's just had a stroke.

So can the brain compensate?  Yes.  It could.  But does it reverse the trauma?  No.

Compensation is more effective with people who have been born with an inadequacy in childhood while the brain is still developing.  That is why if you see like people who are blind, they become super musicians because, while their brain was developing, their brain made necessary adjustments very early in childhood.  But for an adult in his 30s, he's lost that capacity.  So there's a limitation to how much he can compensate.  That is why six years after his trauma, he is still on a wheelchair.

Q.    So you testified that Mr. Barber's injuries are permanent and progressive, and what was the other word?  There was one more.

A.    Irreversible.

Q.    Irreversible, yes.

Now, one day, could Mr. Walker -- sorry -- could Mr. Barber use a walker and ambulate with a walker, even though you just testified his injuries are permanent and progressive and irreversible?

A.    So the same answer I'll give.  Remember the central limit theorem?  You can't absolutely predict where a patient will be.  But what you use is six years after his trauma, does he still need a wheelchair?  Yes.

Okay.  Now, if you spend -- as a hypothetical, if you give him a hundred million dollars for the rest of his life to have the best care -- one of the best care is in Colorado -- and he goes there, the best people give him what he needs, say, five, ten years from now, he may be able to use one gadget or two.  But the key point is give him the wherewithal, let him use the ingenuity of his spirit to fight that battle.  Can we do that?  Can you promise me, let's do that and let's see how well he does?

Q.    So are you saying he could or could not walk with a walker?

A.    We don't know.  All we know is what he needs now to help him to see if he could walk or not walk.  Because if he continues the way he is, there's a risk he will fall and he will suffer more trauma.

So all we know now is if society can provide him with the wherewithal he needs for the best care, we increase

**UNITED STATES DISTRICT COURT**

his chances, the probability, because these are probabilistic statements.  We increase the probability that some day, some day the sun will rise and he could be walking around with a walker to the best of his ability.  But without the society supporting him, the probability diminishes significantly.

Q.     So you're saying if -- if society paid for him to go to a center, he could become ambulatory with a walker.  Is that what you're saying?

A.     There is a higher probability.  I'm not saying yes. What I'm saying in science, especially for medicine that is not an absolute science, you can't make absolute statements so you use relatives.

So if you give him what he needs, the probability of him maybe some day ambulating with a walker increases.  But if you don't give it to him, the probability remains and may even start tending negative because he will now start having consequences.  He could fall and impact his head on the concrete floor and become bedridden.

So, again, probability, which is better as a human being, respecting his dignity as a human being, do you leave him to go down, to fall, become bedridden or do you give him what he needs to see if he could go up.  As a human being, I'll choose the second.  Let's give him what he needs and see how well he does.  It's the only -- it's the best better option than anything else.

UNITED STATES DISTRICT COURT

Q.    And did you request medical aid from dispatch?

A.    I did.

Q.    Did you request medical aid to be expedited from dispatch?

A.    I did.

Q.    After Mr. Barber was removed from the vehicle, was Mr. Barber able to talk?

A.    He was unresponsive initially.  Once he was on the ground, I was trying to obtain any kind of reaction from him. I was speaking to him.  I -- I used sternum rubs.  I used my hand to rub on the center of his chest, specifically his sternum, to elicit a reaction.  At that point, he began to moan and make noises.  I asked him what his name was.  He told me his name and his date of birth.

MS. ANDERSEN:  Nothing further at this time, Your Honor.

THE COURT:  Thank you.

Cross-examination.

MR. GALIPO:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. GALIPO:

Q.    Good afternoon, Deputy Mora.

A.    Good afternoon, sir.

Q.    You gave some type of a statement after this incident; is that right?

UNITED STATES DISTRICT COURT

574

A.    Roughly, all together, about 30 pounds.

Q.    Uh-huh.  Um, are you able to move around at all with that equipment?

A.    I mean, I can move, but, I mean, it definitely does hinder my agility and my ability to move quickly.

Q.    I see.

A.    I can move better without it, sir.

Q.    Okay.  Um, in any event, you were monitoring your police radio?

A.    Yes.

Q.    And was there any backup request that you heard prior to shots fired?

A.    As far as verbiage, backup request, no, but there was an uncooperative subject broadcast.

Q.    Okay.  Let me ask you this.  Can officers make a backup request of other officers?

A.    Yes.

Q.    And can they do that over the police radio?

A.    Yes.

Q.    And if you get a backup request from a fellow officer, would you normally respond to it?

A.    Yes.

Q.    And I think you said it took you about 5 minutes to get to the scene?

A.    Yes, sir.

**UNITED STATES DISTRICT COURT**

Q.   And I'm taking if you got a backup request earlier from Deputy Alfred, you would have responded?

A.   I -- it depends on the severity.  Again, I was assigned to the county areas.  So it wouldn't be my response initially.  The City of Adelanto contracts three deputies per shift.  Barring critical circumstances or exigent incidents, then, yes, county units and other sister stations will respond.  But, um, if a deputy requests backup and -- at the Victor Valley station, it's very different.  Um, you have the contract city of Adelanto and then you have the county areas.

So, typically, if a deputy does ask for a backup response, someone will go.  That time may vary based on where you're at.  If you're assigned to the county, backup could be 25, 30 minutes away; Adelanto, 5, 10, 15 minutes away.

Q.   But you got there in 5 minutes?

A.   Yes.

Q.   Did you hear anything over the police radio before you got there that someone had a gun or potentially had a gun?

A.   No.

Q.   Um, so you didn't hear anything about a gun and you didn't get a backup request before you came.  Is that fair?

A.   No.

Q.   Is that correct?

A.   I didn't get a backup request specifically from a county area.  I overhead a city patrol deputy advise "one

uncooperative."  And then in our language for our agency, it's different than, let's say, the LAPD who might say "officer needs help."  The way we operate, especially at that station because it's -- you know, deputies in Victorville or Hesperia Rancho may operate differently, but deputies at the Victor Valley station, the term "one uncooperative" is a verbal cue to all your partners that I -- I need somebody out here.  We do use that with discretion because of the fact that we are so scarce at that station where we're not going to directly ask a partner who's patrolling the unincorporated west side of the I-15 to come because we try to utilize de-escalation tactics.

But, yes, at the Victor Valley station, "one uncooperative" is an eyebrow raise.  It's something that your deputy working on that shift and the watch commander would take as, hey, he's dealing with something or she's dealing with something, let's probably start heading that way.

Q.    Okay.  So let me break down your response.

My first question was did you hear anything about someone maybe having a gun?

A.    No, sir.

Q.    Okay.  My second question is, did you start heading that way as soon as you heard the dispatch that someone was uncooperative?

A.    No.

Q.    And then my third follow-up is, you said, "We try to

**UNITED STATES DISTRICT COURT**

de-escalate situations."  Is that what you said?

A.    Yes, sir.

Q.    The goal is to de-escalate rather than escalate; correct?

A.    Yes, sir.

Q.    And the goal is for everyone's safety; right?

A.    Correct.

Q.    And use the minimum amount of force; correct?

A.    Correct.

Q.    Okay.  So you said you responded lights and sirens?

A.    Yes, sir.

Q.    And you do that in part to -- to get there quicker or let people know you're coming?

A.    Yes.  The Code 3 response.

Q.    And Code 3 is overhead lights, the flashers, and sirens?

A.    Yes, sir.

Q.    And when you arrived on scene, if you know, were you the next officer on scene other than Deputy Alfred or did other officers arrive before you?

A.    There was one officer who arrived prior to my arrival, and I arrived simultaneously with the second unit.

Q.    Okay.  So let's break it down.

What officer, if you know, arrived prior to your arrival?

UNITED STATES DISTRICT COURT

579

A.    Yes.

Q.    And were you -- when you were looking down the driveway, although it was dark, you could see the SUV because you could see the brake lights on?

A.    Yes.

Q.    I mean, most vehicles, if the foot is on the brake, it -- there's a certain light that comes on in the back; is that right?

A.    Yes.

Q.    And you could see the brake lights of the vehicle on when you started walking down this driveway?

A.    Yes.

Q.    But am I understanding you correctly, you could not see Deputy Alfred at the time?

A.    Correct.

Q.    And you didn't see anyone standing behind the car, did you, at that point?

A.    No, sir.

Q.    And I think you indicated that at some point it sounded to you like the car was on?

A.    Yes.

Q.    And because the car was on and the brake lights were on, I think you said you weren't going to walk or stand directly behind the car; correct?

A.    Not for an unreasonable amount of time, no.

**UNITED STATES DISTRICT COURT**

Q.    Right.  Because, obviously, based on your training, that would be not tactically a good idea.  Is that fair?

A.    Yes.

Q.    Okay.  So when you finally saw Deputy Alfred, I take it you eventually saw him in this opening on the right side or west side of the driveway?

A.    Yes, sir.

Q.    Okay.  And we have some photos that we've looked at. I think it --

MR. GALIPO:  Exhibit 3, page 6 is in, Your Honor?

THE COURT:  It is.

MR. GALIPO:  Ms. Masongsong, can you help me with the --

BY MR. GALIPO:

Q.    Hopefully you could see that on your screen, Deputy?

A.    Yes, sir.

Q.    Is this the opening that you were talking about? And in that opening, you saw Deputy Alfred?

A.    Yes.

Q.    And the -- was there any other deputies there other than Deputy Alfred when you saw him?

A.    Morales.

Q.    Morales.

So when you got to this opening, Deputy Alfred and Deputy Morales were there?

UNITED STATES DISTRICT COURT

A.    Correct.

Q.    And I think you told us you wanted to make sure Deputy Alfred was okay, and you determined he was okay, no injury; correct?

A.    From what I could see, yes.

Q.    Okay.  And where do you recall Deputy Alfred and Deputy -- Deputy Morales positioned in this opening we see in Exhibit 3, page 6?

A.    Um, I don't recall exactly where they were standing. Morales eventually proceeded that way.  But he wasn't near Alfred on my arrival.

Q.    Okay.  Would you at least agree that both the deputies were off the driveway into that opening?

A.    At some point, yes.  Definitely Alfred was there when I pressed forward.

Q.    Off the driveway in the opening?

A.    Yes.

Q.    And you went in that area with him for some period of time?

A.    I entered there, yes.

Q.    And you felt that was a better place to be than in the driveway, obviously, because the vehicle was still on and the brake lights were on?

A.    Yes, sir.

Q.    Did the brake lights indicate to you that there was

582

a chance that someone was applying the brakes in the vehicle?

A.      That was my assumption.  They weren't running lamps. There's a difference between running lamps and brake lamps. They are illuminated, darker.

Q.      Did you know at that point how many people were in the vehicle?

A.      I didn't.

Q.      Prior to you approaching the vehicle, as you described in your testimony, and looking into the vehicle, did you know how many people were in the car?

A.      I knew there was at least one person, Mr. Barber, in the front cab area.  I -- I didn't have enough time or even, you know, think to clearly look in the back portions, but I did know that it was occupied by a male subject in the front.

Q.      You knew at least one person was in the car.  You weren't sure if there were others?

A.      Yes.

Q.      Okay.  Now, how much time would you say passed between you getting to the scene and actually approaching the vehicle, as you described, somebody breaking out the -- were you the one who broke out the window?

A.      I broke out the window of the vehicle, yes.

Q.      Okay.  On the passenger's side?

A.      Yes, sir.

Q.      With your baton?

UNITED STATES DISTRICT COURT

fired them?

A.    I was under the impression shots were fired.

Q.    Well, did Deputy Alfred ever tell you in those 3 minutes you were there that he had fired the shots?

A.    Not that I recall, no.

Q.    Did he tell you that the person in the vehicle might be injured?

A.    No.  I didn't ask.

Q.    Did he tell you that anyone in the car had a gun?

A.    No.

Q.    Did he tell you he thought someone in the car might have a gun?

A.    No.

Q.    So when you approached the car finally, that would be after the -- someone kicked in the wooden planks?

A.    Yes.

Q.    And you approached the car.  Is that the first time you were able to see in?

A.    Yes.

Q.    And what -- can you describe what you observed regarding Mr. Barber's body position?

A.    I observed him slumped forward towards his steering wheel.

Q.    Okay.  Did he appear to be potentially injured to you at that point?

**UNITED STATES DISTRICT COURT**

Q.    Did -- did someone yell that out?

A.    I don't recall, but I -- I remember feeling the movement myself.

Q.    Okay.  Because you were in the process of taking him out of the car?

A.    Yes.

Q.    I take it at that point your feet were outside the car?

A.    Yes.

Q.    And you had him how, as you were starting to take Mr. Barber out of the car?  Can you explain where your hands were?

A.    Yes.  My hands were around his armpits and I'm attempting to pull him out the car and guiding his back -- or trying to shift and maneuver him towards my chest.

Q.    Okay.

A.    I'm very close to him.

Q.    Trying to get him at an angle where you can help him out?

A.    Yes.

Q.    And as you were doing that with both hands, you noticed the car is starting to idle back?

A.    Right.

Q.    And putting two and two together, you thought, okay, brake lights were on before, foot's off the brake because I'm

UNITED STATES DISTRICT COURT

pulling him out of the car, car is idling backwards?

A.   Yes.

Q.   And you said the car went back approximately 2 feet?

A.   About.

Q.   But you weren't measuring it; is that fair?

A.   That's fair.

Q.   Obviously, it could have been 3 or 4 feet possibly?

A.   Correct.

Q.   But you did your best you could after you realized it was going backwards to reach in and put it in park?

A.   Yes.

Q.   And where was the shifter on the car, if you recall?

A.   I don't recall.  I just recall it wasn't on park because I could push it -- I pushed it forward.

Q.   Oh, okay.

Was it at the center console, you had to reach over Mr. Barber to get the center console?  Is that where the gear selector was?

A.   Yes, I had to reach over Mr. Barber's person.

Q.   And you put the car in park and then it finally stopped?

A.   It stopped.

Q.   And you mentioned at least once, I think, during your testimony that you felt the driveway was poorly lit.  Is that fair?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    Now, did anyone, while you were there at the scene, talk about -- well, strike that.

Did you ever see anybody pick up Deputy Alfred's flashlight?

A.    No.

Q.    Did you hear any discussion about the flashlight being picked up or moved?

A.    Not that I remember.

Q.    Did you see anybody kicking the casings around?

A.    No.

Q.    I take it as a deputy, you have some experience with casings.  You know what those are; correct?

A.    Yes.  Casings.

Q.    And you have some experience going to a scene of an incident, trying your best to preserve the scene so as not to move evidence around, if you can avoid it.  Is that fair?

A.    Correct.

Q.    Do you know if eventually -- the paramedics got there eventually; correct?

A.    Yes, sir.

Q.    And is it your understanding that at some point Mr. Barber was airlifted by a helicopter to the hospital?

A.    Yes.

Q.    Do you have an estimate as to how long Deputy Alfred

UNITED STATES DISTRICT COURT

remained at the scene that you could see after you got there?

A.    No.

MR. GALIPO:  May I have one moment to look at my notes, Your Honor?

THE COURT:  Yes.

(Pause in the proceedings.)

BY MR. GALIPO:

Q.    During the entire time that you were on scene before you approached the vehicle, did you and the other officers remain in -- in this open area behind the wooden picket fence that we see?

A.    What -- I'm sorry.

Q.    Let me re-ask it.

You went up the driveway, you didn't see Deputy Alfred at first, but then you saw him in this open area we see in this image?

A.    Yes, sir.

Q.    I'm wondering whether you and the other officers on scene stayed in that area, on the west side of the picket fence, before you ended up approaching the vehicle, going through those open planks that were kicked out?

A.    Yes, sir.  That's correct.

MR. GALIPO:  Thank you, Deputy.

That's all I have, Your Honor.

THE COURT:  All right.  Ms. Andersen, any redirect?

**UNITED STATES DISTRICT COURT**

the apartment, the incident location.  So I had to have walked through the dirt and then further south into the gravel.

MS. ANDERSEN:  Nothing further, Your Honor.

THE COURT:  Mr. Galipo, anything further?

**RECROSS-EXAMINATION**

BY MR. GALIPO:

Q.    Just in terms of the brake lights on and the -- you could hear the engine was on also?

A.    Yes, sir.

Q.    And you're saying, if I'm understanding you correctly, you did not want to position yourself in any way behind the vehicle?

A.    Not for long.  I understood it was necessary to get to my partner.  I -- I didn't know where he was or what his status was.

Q.    So as soon as you could, you got off the driveway into that safer position in that opening?

A.    Yes, sir.

Q.    Which Deputy Alfred already was there when you got there?

A.    Yes, sir.

Q.    And I take it as a field training officer, you teach your trainees tactics; correct?

A.    Correct.

Q.    Including not standing behind a vehicle that might

**UNITED STATES DISTRICT COURT**

be starting to back up.  Is that fair?

A.    Yes.

MR. GALIPO:  Thank you.

THE COURT:  All right.  May we excuse this witness at this time?

MS. ANDERSEN:  Yes, Your Honor.

MR. GALIPO:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Deputy Mora, thank you.  You are excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And it's my understanding, Mr. Ramirez, that your next witnesses are not available until tomorrow.  Is that correct?

MR. RAMIREZ:  Yes, Your Honor.  Unfortunately. Tomorrow morning, though, we'll have three of them.

THE COURT:  All right.  Very well.

Then, ladies and gentlemen, we are going to break at this time.

I hope you all have a nice evening.

As always, please remember the admonitions.  Keep an open mind, do not discuss the case with anyone, do not let anyone discuss the case with you, and do not conduct any independent research or investigation.

Thank you.  Have a nice evening.

THE COURTROOM DEPUTY:  All rise.

UNITED STATES DISTRICT COURT

## CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


DATED THIS 4TH DAY OF FEBRUARY, 2026.


/S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**