# EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE KENLY KIYA KATO, U.S. DISTRICT JUDGE

STEFFON BARBER,                        )
                                       )
                Plaintiff,             )
                                       )
     v.                                )        Case No.
                                       )   CV 22-625 KK (DTBx)
COUNTY OF SAN BERNARDINO, et al.,      )
                                       )        Volume 4
                Defendants.            )   (Pages 598 - 762)
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
JURY TRIAL:  DAY FOUR
WEDNESDAY, FEBRUARY 4, 2026
8:42 AM
RIVERSIDE, CALIFORNIA

_____

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET
RIVERSIDE, CALIFORNIA  92501
(951) 328-4414

UNITED STATES DISTRICT COURT

**INDEX OF WITNESSES**

**DEFENDANTS' WITNESSES**                                              **PAGE**

GERANIA NAVARRO

  Direct Examination by Ms. Andersen                               604
  Cross-Examination by Mr. Galipo                                   615


EDWARD HERNANDEZ

  Direct Examination by Ms. Andersen                               626
  Cross-Examination by Mr. Galipo                                   646


PHILLIP LEE SANCHEZ

  Direct Examination by Mr. Ramirez                                655
  Cross-Examination by Mr. Galipo                                   706
  Redirect Examination by Mr. Ramirez                              734

**UNITED STATES DISTRICT COURT**

601

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 1-02 | Diagram | 612 | |
| 3-071 | Photograph | 692 | 692 |
| 3-089 | Photograph | 676 | 676 |
| 3-107 | Photograph | 638 | 638 |
| 3-146 | Photograph | 641 | 641 |
| 5-06 | Photograph | 681 | 681 |
| 5-10 | Photograph | 682 | 682 |
| 7-56 | Photograph | 637 | 637 |

**UNITED STATES DISTRICT COURT**

diagram?

A.    The measurements that I took and then the numbers of what we assigned the placards to each item, um, and then the location of them, um, where they were in reference to the house and the driveway and the -- and the police officer's vehicle.

Q.    As part of the -- the scene diagram that you created, did you also place in that diagram an approximate location for Deputy Alfred?

A.    Yes.

Q.    And how did you obtain that information to make that approximate location determination?

A.    The flashlight.

Q.    Okay.  And how did you note -- how did you associate the flashlight to Deputy Alfred?

A.    Um, I believe it was -- we -- we work as a homicide team.  We talk about it together.  We saw the flashlight. There was some footprints there, and then where the FCCs landed, um, so we believe that that's where he came to a stop when he actually had to stop holding the flashlight and then use his weapon in the scene.

Q.    Was the information about the flashlight obtained in any way from his interview with homicide investigators?

A.    Yes.

Q.    Were you part of that interview with Deputy Alfred?

A.    No.

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    What do those markers represent?

A.    Well, each marker in the -- it has a legend, but those 2, 3, 5, those were all FCCs, fired casings.

Q.    Cartridge casings from the weapon?

A.    Correct.

Q.    Okay.  Um, and we see an opening in this photograph on the west side; is that correct?

A.    Yes.

Q.    Did you measure the length of that opening?

A.    Yes.

Q.    And if you need to review your report -- but what's the length of the opening on the west side?

A.    I -- may I look at the report to refresh my memory?

THE COURT:  Yes.

THE WITNESS:  I'd have to do a little bit of math because the way I described the scene is I measured all the fence lines, but I don't think I put that in there.

BY MR. GALIPO:

Q.    Well, let me see if I can help you.

A.    If it was an opening -- well, the opening measured 15'5" from the north to south.

Q.    Okay.  15 feet 5 inches was the length of the opening; is that correct?

A.    Correct.

**UNITED STATES DISTRICT COURT**

Q.    I think you -- you can.

THE COURT:  Yes.

(Pause in the proceedings.)

THE WITNESS:  There was 16 feet 8 inches of length, sir.

BY MR. GALIPO:

Q.    Okay.  So would it be correct to say, at least your understanding, that where we see this vehicle here in this photograph, it would have been approximately 16 feet further south when it started?

A.    Yes.

Q.    Did -- is that a yes?

A.    Yes.

Q.    Okay.  Did you take any measurement of the distance between the flashlight and the back of this vehicle in its resting position?

A.    Yes.

Q.    What was that measurement?

A.    10 feet.  10 feet from the back of the vehicle to the -- to where the flashlight was.

Q.    Okay.  So then if we added the 16 feet 8 inches, the flashlight would have been a little over 26 feet from the back of the vehicle when it started.  Does that make sense?

A.    Yes.

Q.    Now, did anyone at any time tell you that the

UNITED STATES DISTRICT COURT

flashlight had been picked up or moved?

A.    No, but we do know that AMR came on scene and they trampled into the scene to do lifesaving measures and then they all came out.  So there could have been a lot of stuff that could have been disturbed due to that traffic.

Q.    I guess I'm asking a more specific question.

Did anyone tell you that the flashlight had been picked up by anyone?

A.    No.

Q.    Did anyone tell you the flashlight had been moved?

A.    No.

Q.    Did anyone tell you the casings had been kicked around?

A.    No, but we wouldn't -- we were not able to determine that due to the amount of traffic that went in there to -- there was four deputies, there was at least two ambulance drivers, the fire guys that carry all their equipment, and the gurney.  And it was right in the middle path of this rock where you see between 6 and 7.

Q.    Do officers, if you know, have training with respect to not disturbing the crime scene if they can avoid that?

A.    Well, the officers do, but fire department doesn't go through the San Bernardino County Sheriff's Academy.  So when they do lifesaving measures, they're not worried about anything going on except for getting to the victim and giving

them the proper medical lifesaving measures that they need to.

Q.   So your understanding is the fire department personnel has no training at all with respect to not disturbing the scene?

A.   I'm not saying that because I'm not a firefighter, but I'm just saying they don't attend my academy, so --

Q.   Okay.  Understood.

And you noted in your report that the -- the property was dimly lit.  Is that fair?

A.   Yes.

Q.   And in terms of your placement of Deputy Alfred at the time of the shooting, it sounds like you put him at the flashlight?

A.   Yes.

Q.   Do you know if he dropped or tossed his flashlight at some point before the shooting?

A.   That, I wouldn't know, sir, because I wasn't involved in the interview.

Q.   Right.

Do you know in the interview where he said he was in relation to the opening?

A.   We know that he was behind the vehicle.

Q.   No.  You see the 15-foot opening that you measured in this photograph?

A.   Yes.

UNITED STATES DISTRICT COURT

BY MS. ANDERSEN:

Q.    All right.  Directing your attention again to the screen.

Do you see in the center of the photograph there appears to be somewhat of a linear pattern in the gravel?

A.    Yes.

Q.    Were you able to make any determination as part of your investigation as to what created those lines?

A.    Yes.

Q.    What was that?

A.    That is the path left by the gurney that was wheeled in by AMR paramedics, along with fire, during their medical response to the incident.

Q.    And it appears from the photograph, the -- the lines go through 7 and 6.

Do you see that, Placards 7 and 6?

A.    Yes.

Q.    All right.  Based on the information that you've discussed today and as part of your investigation, were you able to determine how far the vehicle traveled in reverse, in total?

A.    The vehicle traveled approximately 14 feet in reverse.

Q.    And what is that based on?

A.    It's based on the length of the tire tread,

**UNITED STATES DISTRICT COURT**

information received during Deputy Mora's interview, which he explained that the vehicle possibly moved an additional 2 feet rearward when they extracted Mr. Barber from the driver's seat because it was still in gear and then he had to place the vehicle in park.

So I subtracted the 2 additional feet and estimated the 14 feet total travel.

Q.    As part of your investigation, were you able to determine how much time it took from the car being shifted in reverse and the -- the gas pedal being pressed to the time it came to rest and Mr. Barber was removed from the vehicle?

A.    I can only estimate.  I can't tell for sure.

Q.    What's your estimate?

A.    My estimate, based on -- I have distance and I have a time frame of approximately 3 seconds, to be fair in either direction, where six rounds were fired from the time that the engine revved.  So if I have distance of 14 feet, I can -- I can multiply it -- I'm sorry, divide that by my time, which gives me an approximate speed of 4.6.

Q.    As part of your investigation, were you able to tell where the vehicle was at each point in time during Deputy Alfred's six shots?

A.    It would have to be broken down by seconds or possibly fractions of a second to determine that based on the time that I believe the vehicle went into motion after the

said you believed the vehicle moved.

I take it you were doing some simple math, taking a 16-foot approximate total and subtracting 2 feet?

A.   Approximately, yes.

Q.   And you subtracted 2 feet because you took into account the fact that the vehicle moved some distance back when Mr. Barber was taken out?

A.   Correct.

Q.   Obviously, if the vehicle moved 3 or 4 feet back, then your 14-foot number would be 12 or 13 feet, for example?

A.   As an example, yes.

Q.   And you also indicated, when looking at that tire mark, that I think you said that was a period of time that the wheel was spinning before it gained traction to actually move?

A.   Correct.

Q.   So it's possible that the vehicle moved less than 14 feet before it came to a stop.  Would you at least agree with that possibility?

A.   Sure.

Q.   And also, we don't know how far the vehicle moved back after the last shot.  Would you also agree with that?

A.   No.

Q.   No, you wouldn't?

A.   No, not according to the statements that we received from Deputy Alfred.

UNITED STATES DISTRICT COURT

Q.    Okay.  Well, let's talk about that.

Are you saying the vehicle was stopped at the time of the last shot?

A.    Deputy Alfred said after his last shot, the vehicle came to a stop.

Q.    Right.  But how far did it travel after the last shot before it came to stop?

A.    I don't know.

Q.    Okay.  That's what I was getting at.

So we don't know how far it traveled backwards after the last shot.  Is that fair?

A.    That's fair.

Q.    So, um -- and we don't know how far it traveled at the time of the first shot.  Is that also fair?

A.    That would be fair.

Q.    In fact, your calculation regarding speed, I think you had previously estimated that the speed of the vehicle, top speed was between 2.7 miles per hour and 3.1.

Do you remember giving that estimate earlier?

A.    Are we talking about another court proceeding, sir?

Q.    Yes.

A.    I believe I did say that, yes.

Q.    Yeah.  In that court proceeding, you estimated the speed to be between 2.7 and 3.1 miles per hour.  Is that fair?

A.    Fair.

**UNITED STATES DISTRICT COURT**

Q.    Did anyone tell you, sir, that the flashlight had been picked up or moved at any time?

A.    No.

Q.    Did anyone tell you that the -- specifically tell you they saw the casings being moved or kicked around?

A.    No, I don't recall that.

Q.    To your knowledge, do the deputies do the best they can in preserving the scene?

A.    I believe so.

Q.    In the statement that you took from Deputy Alfred -- you -- you took his statement; is that right?

A.    Yes.

Q.    Didn't he indicate he was only a few feet from the opening on the west side when he fired?

A.    I don't believe he gave an estimate as to -- and when you say "opening," are you referring to the open wooden area near the residence?

Q.    Right.  That -- the opening, right, on the west side.  See if I can get a picture for you.

Showing you, again, Exhibit 3, page 15.

Right, that opening there on the right.  You don't recall him giving estimates as to how far he was from that opening?

A.    I don't recall an exact number that he gave me.  Um, he said he was slightly to the eastern portion of the driveway,

731

shooting towards the headrest where someone's head might be?

A.    Yes, through the open hatch of the SUV, Mr. Barber's SUV, which I understand is -- has three rows, and the middle row was actually down.

Q.    Are you aware that there's testimony by Deputy Alfred that when the car started to back up, he didn't even know if Mr. Barber knew he was behind the car?

A.    I recall that Deputy Alfred did make that statement -- yes, testified.

Q.    As a law enforcement officer, I -- and I realize you served -- wore many hats, probably literally.  When you were a younger officer on patrol, I assume you were in a lot of foot pursuits from time to time?

A.    I don't know if I'd characterize it a lot.  I have chased suspects, yes.

Q.    And officers are trained in foot pursuits; correct?

A.    Yes.

Q.    And do you have -- and do you recall in your deposition making a reference to there were four shots?  But there's actually six shots --

A.    Yeah.

Q.    -- you understand that?

A.    If I testified as four, I was in error.  There were a total of six fired -- six rounds fired by Deputy Alfred.

Q.    Okay.

**UNITED STATES DISTRICT COURT**

plaintiff viewing the evidence in the light most favorable to the plaintiff. I find that judgment as a matter of law is not warranted on any cause of action.

With respect to Mr. Barber's 1983 claim against defendant Alfred, the testimony and evidence are consistent with my finding on the motion for summary judgment, specifically, viewing the record in the light most favorable to Mr. Barber, a reasonable jury could find that he did not pose an imminent or immediate threat of serious bodily injury or death at the time defendant Alfred fired six shots.

Accordingly, a reasonable jury would have a legally sufficient evidentiary basis to conclude Defendant Alfred used excessive force. I also find he is not entitled to qualified immunity. And I would note that in defendant's motion, in attempting to distinguish cases, including *Orn, Acosta*, and *Estate of Aguirre*, they state that those involved officers whose credibility issues were a factor. And they go on to say that has not been a factor in this case.

Much to the contrary, Defendant Barber -- or Defendant Alfred's credibility has been an issue in this case. Among other things, there were notable material discrepancies, which simply cannot be reconciled. In answering questions, he was also evasive and defensive at times. But among the material discrepancies from his testimony in court when compared to his prior statements, including under oath, are

**UNITED STATES DISTRICT COURT**

whether he saw personnel pick up his flashlight, whether his alley lights were activated, whether he was north or south of the opening on the west side of the driveway, and perhaps most astonishingly, his original denial that there was even an opening at all on the west side of the driveway.

With respect to the *Monell* claim, the record could also support a reasonable jury's finding that defendant County failed to properly train Defendant Alfred on the use of deadly force and that that failure was a moving force behind Mr. Barber's constitutional injury.

Defendant Alfred provided sworn testimony under oath that he was not trained to give verbal warnings before using deadly force when feasible.  In that same prior testimony, he testified that he was not trained that deadly force should only be used if there's an immediate threat of death or serious bodily injury.

Based upon that testimony, Mr. DeFoe testified in his expert opinion that Defendant Alfred was insufficiently or inadequately trained.  While Defendant Alfred now disclaims such testimony, as I've already stated, his credibility is certainly questionable.

Accordingly, a reasonable jury would have a legally sufficient basis to find for Mr. Barber on his 1983 claims against both defendants.  And for those same reasons, they would have a legally sufficient evidentiary basis to find in

and done.

And, secondly, I -- in reading Dr. Vilke's report, I notice he does a lot of quoting from the medical records and so, just as a preview, if he's going to get up there and try to just read hearsay statements from the medical records, I'm going to be objecting, just to let the Court and counsel know.

THE COURT:  Of course.

And in those -- and I did get a chance to take a quick look at the report, as well.  And those two opinions are very discrete.  His analysis that follows those opinions gets into other areas, but his testimony is going to be limited to those two specific opinions.

MR. RAMIREZ:  The second opinion, very quick, I think he says the rotator cuff had nothing to do with this incident.

The first one, he talks about based upon his review of the medical records, that there is no indication -- or that his testimony's anticipated to be that Mr. Barber was afforded physical therapy sessions.  He did not take advantage of them, which contributes to his overall disability.  So he will be commenting on that.  That's in Opinion Number 1.

THE COURT:  Well, it's not in his Opinion Number 1, but, Mr. Galipo, what is that -- what is your position on that?

MR. GALIPO:  Well, first of all, with the rotator cuff, I don't recall us -- he's a rebuttal -- I don't recall us

UNITED STATES DISTRICT COURT

THE COURT: All right. I do not believe Dr. Omalu did. My only question in my head was whether or not Mr. Barber might have testified to something along those lines, but, again, without looking at the transcript.

MR. RAMIREZ: I'll take a look and if I see that it wasn't mentioned, then I won't need to get into the second opinion. But the first opinion on page 14 says his regression in progress is likely due to his lack of following physical therapy recommendations from the hospital, as well as his refusing physical therapy treatments elsewhere, without mentioning the jail facility.

THE COURT: But that's not what his opinion is regarding. His opinion -- and I don't have the report in front of me right now -- but is that the left arm and bilateral leg weakness are as a result of this incident. That is his opinion.

MR. RAMIREZ: "Injuries that occurred include left arm, bilateral leg weakness. However, in terms of mitigation, he could have gotten better but failed to attend his physical therapy." That is part of his opinion.

THE COURT: But it's not. His opinion, if you read the opinion -- and you have it in front of you.

MR. RAMIREZ: Yes.

THE COURT: So go ahead and read the opinion. The opinion is very narrow.

Thank you.

The way in which the opinion is phrased would give opposing counsel no indication that he was going to opine regarding the lack of progress.

MR. RAMIREZ:  Although it is mentioned in the last paragraph on page 14.

THE COURT:  It is.  But it's not the opinion.

MR. RAMIREZ:  I think it's part of his opinion.

THE COURT:  It's really not.  It's -- it's -- it's not even a reason in support of his opinion.  It's a totally different opinion.  I mean, that's why we have these expert disclosure rules so that --

MR. RAMIREZ:  That's why we disclosed this.

THE COURT:  But -- so that the opinion is disclosed to counsel so that they can properly prepare to rebut that opinion.

MR. RAMIREZ:  And I think it's -- they chose not to depose him.  They would have gone over this.  And it says in there his regression is because he failed to follow the physical therapy.

THE COURT:  But it's not their fault that perhaps this report was not properly reviewed at the time it was produced.  In other words, if you get this report, you would probably go back to your expert and say, well, do you have an opinion on his progress or lack thereof?  Can you include that

UNITED STATES DISTRICT COURT

opinion in your report?  Because we have to produce a report containing all of your opinions to opposing counsel under the federal rules.

MR. RAMIREZ:  The way I read it, I thought that was part of his opinion.

THE COURT:  This is trying to piggyback some information that is not directly relevant to the opinion.

MR. RAMIREZ:  Well, I'll -- I see where the Court's going.  I disagree.  I think it is part.  It's all part of that opinion.  And it --

THE COURT:  How does the opinion regarding his progress or lack thereof support the very simple opinion that the injuries that occurred from the gunshot wound to Mr. Steffon Barber on April 27, 2021, include left arm and bilateral leg weakness?  I mean, it kind of reads like a plaintiff's expert.

MR. RAMIREZ:  He says, "I've reviewed the medical records.  He's had no issues with his head wound.  However, there are some -- he's complaining of weakness to his bilateral lower extremity, weakness after a surgical repair in the hospital," and he goes on and talks about --

THE COURT:  I'm not disputing that.  We're talking about the opinion that was disclosed.  And this is a very narrow opinion that doesn't encompass whether or not he made progress.

**UNITED STATES DISTRICT COURT**

## CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES     )
                          )
STATE OF CALIFORNIA       )

I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 4TH DAY OF FEBRUARY, 2026.

/S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**