# EXHIBIT "A"

# EXHIBIT "A"

Q.    Did you talk to anyone at that time at the residence?

A.    No.

Q.    Knock on any doors or anything like that?

A.    No.

Q.    When you came back, about two hours later, it was about 11:15 at night?

A.    Approximately, yes.

Q.    Dark outside?

A.    Yes.

Q.    You were by yourself at that time?

A.    Correct.

Q.    And you parked your patrol vehicle somewhere on the street?

A.    Yes.

Q.    I want to show you two exhibits, I believe, by agreement, Exhibit 3-10 and 3-26.

(Exhibits Nos. 3-10 and 3-26 for identification.)

MR. RAMIREZ:  No objection, Your Honor.

THE COURT:  All right.  Are you seeking to admit them at this time?

MR. GALIPO:  Yes.  I'll repeat them for Your Honor and the court clerk.  Exhibit 3, page 10, and Exhibit 3, page 26.

THE COURT:  All right.  Thank you.

UNITED STATES DISTRICT COURT

correct?

A.    Correct.

Q.    And just to -- directionally, the front of the Trailblazer's facing south?

A.    Correct, yes.

Q.    The fence on the left would be to the east?

A.    Yes.

Q.    And the wooden picket fence on the right would be to the west?

A.    Yes.

Q.    And as you're approaching, at some point, you notice this opening on the right-hand side; is that fair?

A.    Yes.

Q.    And clearly, you saw that before the shooting; correct?

A.    Correct.

Q.    I'd like to show you Exhibit 3, page 29.

MR. RAMIREZ:  No objection.

THE COURT:  3-29?

MR. GALIPO:  Yes, Your Honor.

THE COURT:  All right.  It will be admitted, and you may publish.

            (Exhibit No. 3-29 for identification
             and received into evidence.)

///

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    Now, I take it you were familiar with the policy regarding shooting at moving vehicles?

A.    Correct.

Q.    And you were aware -- and I think we talked about this in your deposition -- that at the time, the policy says you shall not shoot at a moving vehicle and you shall step out of the way instead of shooting.

Do you recall that discussion?

A.    Yes, when feasible.

Q.    Right.

And that was your understanding of the policy at the time; correct?

A.    Correct.

Q.    That's because stepping out of the way rather than shooting, because good idea to take other reasonable measures if you could rather than shooting someone?

A.    If possible, yes.

Q.    And so your recollection is that this opening that we see on the west side or right side of this photograph was 3 to 4 feet from you; correct?

A.    Correct, yes.

Q.    And it would have been 3 to 4 feet on your right side.  Is that also correct?

A.    Correct.

A.    Correct, yes.

Q.    And you're still 3 to 4 feet from this opening that we've been talking about, which we see again in Exhibit 3, page 29; correct?

A.    Correct.

Q.    So after the door closed, then, in your mind, you knew, okay, he's definitely going to reverse; correct?

A.    Not necessarily.

Q.    Well, didn't you, both in your statement and deposition testimony, say, "Once he got in the car, I believed he was going to back up"?

A.    Yes, once the vehicle was in motion and the lights were illuminated, yes.

Q.    Well, you recall testifying that once he got in the car and closed the door, you believed he was going to back up?

A.    Correct, yes.

Q.    Right.

And so when he closed the door, how long do you think it would have taken you to move 3 or 4 feet?

A.    I'm not sure.  I don't have an estimate for that.

Q.    Well, uh, basketball players are trained to move laterally, aren't they?

A.    Correct, yes.

Q.    I mean, even to play defense, you've got to be able to shuffle your feet and move quickly left and right laterally;

UNITED STATES DISTRICT COURT

true?

A.    Correct.

Q.    And then the point guard of the basketball team often is one of the most agile and quickest people on the team?

A.    Not necessarily.

Q.    So do you think it would have taken you 1 second, a half a second?  How long do you think it would have taken you to move laterally 3 or 4 feet?

A.    I don't want to speculate, sir.  That's tough with 30 pounds of equipment.  You know, when you consider the analogy of playing basketball, you don't have that kind of equipment on you.  So to have that same type of movement with 30 additional pounds, that can be challenging.

Q.    The same equipment you have when you do foot pursuits?

A.    Correct, yes.

Q.    Could you give me an estimate with that equipment?  You were 31 years old, in good shape.  How long do you think it would have taken you to move 3 or 4 feet?

        MR. RAMIREZ:  May call for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  Couple seconds.

BY MR. GALIPO:

Q.    And would you agree that, not only did you not move in there while Mr. Barber was outside the car, when he got in

UNITED STATES DISTRICT COURT

and closed the door, you still didn't move there.  Would you agree?

A.    Correct, yes.

Q.    And there was some time between the door closing and the reverse lights coming on; true?

A.    No.

Q.    There was no time between the door closing and the reverse lights coming on?

A.    That was very close to a simultaneous action.

Q.    Isn't it true that about 2-and-a-half seconds passed from the door closing to the car actually backing up?

A.    No.  I'm not aware of that.

Q.    So after the door closed and before you saw -- or -- you're saying it was the same time that the door closed and the reverse lights came on?

A.    It was very close.

Q.    When you saw the reverse lights, did you then move out of the way?

A.    No.  The vehicle was in motion.

Q.    25 feet away from you; correct?

A.    Approximate, yes.

Q.    Now, you're standing there, you're saying the vehicle starts backing up; correct?

A.    Correct.

Q.    Would you agree, Deputy Alfred, instead of moving

**UNITED STATES DISTRICT COURT**

A.    Correct.

Q.    And how long did it take you to fire your six shots, from the first shot to the last shot?

A.    Approximately 2 to 3 seconds.

Q.    So you think this vehicle went about 10 feet in 2 to 3 seconds?

A.    I'm sorry?  Your -- the question one more time, sir?

Q.    You're saying the vehicle moved 10 feet in 2 to 3 seconds?

A.    It's possible.  That's the distance I perceived it to move, yeah.

Q.    Do you know if the vehicle moved more or less than 3 feet at the time of your first shot?

A.    Yes.

Q.    You know it did?

A.    Do I know if the vehicle moved more than 3 feet?

Q.    At the time of your first shot.

A.    No, I do not know.  Just the vehicle was in motion when the first course of fire took place.

Q.    Do you know at the time of your second shot, whether it had moved more than 3 feet?

A.    No.

Q.    Do you know at the time of your third shot, whether it had moved more than 3 feet?

A.    No.

**UNITED STATES DISTRICT COURT**

Q.    Do you know at the time of your fourth shot, whether it moved more than 3 feet?

A.    No.  The vehicle was in motion during the full course of fire.

Q.    At the time of your fifth shot, do you know if it moved more or less than 3 feet?

A.    No.  The vehicle was still in motion.

Q.    And at the time of your sixth shot, do you know if it moved more or less than 5 feet?

A.    At the conclusion of the sixth shot, the vehicle came to rest.

Q.    Well, you're not saying -- was the vehicle stopped when you fired your sixth shot?

A.    After.

Q.    How long after your sixth shot did it come to a stop?

A.    Half a second.  Very short time.  I didn't have a stopwatch during the incident to really measure the time frames of each incident.

Q.    So how far do you think it moved back after your last shot?

A.    Short distance.

Q.    Can you give us an estimate?

A.    I cannot.  No.

THE COURT:  Counsel, would now be a good time to

A.    No.    That would put me close to Placard 9. Placard 9 is a representation of where I was positioned.

Q.    And you think your casings may have been kicked around by some other people?  Is that what you're saying?

A.    It's a possibility.

Q.    Immediately after the shots were fired, you again make a broadcast; correct?

A.    Correct, yes.

Q.    I think you broadcast "shots fired" at some point?

A.    Yes.

Q.    You said something like "the vehicle reversed behind me," but you agree that was a mistake in language?

A.    Correct, yes.

Q.    And after the shooting, where did you -- did you reposition yourself after the shooting?

A.    After the fact, yes.

Q.    Where did you position yourself after the shooting?

A.    Within the opening area.

Q.    Looking at 3 -- Exhibit 3, page 15.

So this opening area that we've been talking about for about an hour, you positioned yourself there after the shooting?

A.    Correct.

Q.    And how long were you positioned in the open area before backup arrived?

unintentionally struck her?

A.    Correct, yes.

Q.    And, again, you're saying in the 2 to 3 seconds it took you to fire your shots, you chose to use that time to fire rather than moving out of the path.  Is that a fair statement?

A.    Yes, that would have put me in the pathway of the vehicle, crossing the pathway of the vehicle.

Q.    Well, you already told us that the opening was only 3 or 4 feet to your right; correct?

A.    Correct, yes.

Q.    And you told us you could have got there within 1 or 2 seconds; correct?

A.    Correct, yes.

Q.    And at some point when other officers came to assist, a portion of the fence was knocked out?

A.    After the fact, yes.

Q.    And Mr. Barber, at some point, was removed from the vehicle?

A.    From my understanding, yes.

Q.    And when he was removed, as you understand it, the vehicle rolled backwards some distance because the car was still in reverse with his foot on the brake?

A.    I was unaware if his foot was on the brake, but the vehicle rolled back, yes.

Q.    And you estimated after your last shot, the vehicle

Q.   Under what circumstances?

A.   If a vehicle is operated in a negligent or reckless manner that has the ability to produce great bodily injury and/or death.

Q.   And if feasible, you should try to move out of the way, if you can?

A.   Correct, if feasible.

Q.   But if you can't, your policy allows you to use deadly force to stop that threat; is that correct?

MR. GALIPO:  Objection.  Leading.

MR. RAMIREZ:  I'll rephrase it, Your Honor.

BY MR. RAMIREZ:

Q.   Is it your training, under your policy, that if you can't safely get out of the way, are you allowed to use deadly force?

A.   Correct, yes.

Q.   How long did this entire incident last from when you first started addressing Mr. Barber to your last shot?  Was it hours you were out there?

A.   Approximately 10 to 12 seconds.

Q.   From start to finish?

A.   Correct.

Q.   Why didn't you move into that opening?  A lot of questions about it but why not?

A.   Well, the opening doesn't provide any type of

structural security. You have to factor in we're talking about a vehicle versus a picket fence. And in the event that the vehicle continues in motion and strikes down the fence, now I'm still kind of exposed due to that confined space.

Q. From the moment you saw the vehicle start reversing until you fired your first shot, how much time did you have to assess the threat and determine what your response was going to be to that threat?

A. Seconds.

Q. Did you have time to consider, well, I played varsity basketball, I'm in great shape, I'll just hop over that fence?

A. No.

Q. Did you consider, well, I'm pretty fast under shuffle, I'll just try to get behind that vehicle as it backs up across that gravelly driveway? Did you consider that?

A. No.

Q. Why not?

A. There's other external hazards. Working in the desert, you have improper sidewalks, hazards in terms of gravel, uneven surfaces. So there's a potential hazard for trip and fall, and now, factoring that in, you're exposed in a driveway with a vehicle reversing down a driveway.

Q. Counsel asked you about you engaging in foot pursuits. And you said, yes, but there were challenges with

30 pounds of equipment.

What are those challenges that you were addressing?

A.    Weight.  It's challenging to maneuver in that fashion with additional 30 pounds.  The loss of equipment. There's other responsibilities.  It's not a matter of just pursuing someone on foot.  We have to be accountable for our direction and any other factors that are presented, as well as our safety, during that pursuit.

Q.    Was it stressful that night?

A.    Yes.

Q.    Did you want to shoot?

A.    Absolutely not.

Q.    Why did you shoot?

A.    Because I believed that I would be injured or killed if struck by that vehicle.

Q.    What is your training of when you are allowed to use deadly force?

A.    When there is a present ability, an imminent threat of great bodily injury and/or death.  And that pertains to my safety and the safety of others, in this case the reporting party.

Q.    Why didn't you yell, stop, driver, or I will shoot?

A.    It wasn't feasible.  Initially, I made an attempt for Mr. Barber to come and speak to me.  Therefore, any ability to develop a rapport was not practical due to the time

disregard anything regarding him being an FTO.

BY MR. RAMIREZ:

Q.    Before this incident, did you go anywhere else after Victor Valley station?

A.    No.

Q.    Did you stay there?

A.    Correct, yes.

Q.    On your deadly force training, on the range, where are you trained to shoot?

A.    Center mass, upper thoracic.

Q.    Why is that, if you know?

A.    Due to the overall size of the area, it minimizes missing a target during the course of fire.

Q.    Do you receive training on the number of rounds you should fire in any particular situation?

A.    Enough rounds necessary to -- to stop the threat.

Q.    Is there a particular number you're given or do you decide that number?

A.    The individual deputy decides that.

Q.    What does it mean to stop the threat?

A.    To gain compliance, so, for example, with -- a deadly force situation arises and you fired one shot and missed and you got someone to surrender or comply with your commands, then you have stopped that threat.

Q.    So on 4/27/21, what shift were you working?

A.    PM shift, 7:00 PM to 7:00 AM the following morning.

Q.    How long had you been on that particular shift?

A.    For about three months.

Q.    Were you assigned as a solo deputy or did you have a partner in your vehicle?

A.    Solo.

Q.    Counsel asked you about responding earlier that evening before the shooting to same address on White Avenue; is that correct?

A.    Correct, yes.

Q.    What was that regarding?

A.    Similar circumstances.  Neighbors engaged in an argument at that location.

Q.    When you arrived, what did you see?

A.    The -- the area was poorly lit.  There were no vehicles parked on the street or in the driveway, and I was unable to make contact with the reporting parties.

MR. RAMIREZ:  If I may have a moment, Your Honor, to show counsel some photos.  I just want to make sure there's no objections.

THE COURT:  Yes.

(Pause in the proceedings.)

MR. RAMIREZ:  All right.  At this time, Your Honor, there's no objection.  I'd like to show defense Exhibit 3-1, which is a photograph of a patrol vehicle.

**UNITED STATES DISTRICT COURT**

first time you saw the plaintiff standing in that driveway, if you did?

A.    Within that area.

Q.    What, if anything, was the plaintiff doing at that point?

A.    Mr. Barber was near the driver's side of his vehicle and appeared to rummage through some property on the -- of the floorboard.

Q.    When you first saw the vehicle, was the hatchback of the SUV in an up position or a closed position?

A.    Up position.

Q.    When you first saw Mr. Barber near his SUV, was the front door open or closed?

A.    Open.

Q.    So on the right side of this photo, 3-38, there's a chain-link fence which you have mentioned; correct?

A.    Correct, yes.

Q.    Then there's the stucco of that house; correct?

A.    Correct.

Q.    Then we see that opening that we've talked about and then the wooden fence; correct?

A.    Correct.

Q.    How tall was that wooden fence, if you recall?

A.    A little over eye level, approximately a little over 6 feet.

**UNITED STATES DISTRICT COURT**

Q.   On the left, we have the metal fence, then it looks like it transitions into a chain-link metal fence?

A.   Correct, yes.

Q.   How tall was that chain-link metal fence?

A.   Roughly around the same height.

MR. RAMIREZ:  At this time, Your Honor, I'd like to move into evidence Exhibit 3-42.  No objection.

THE COURT:  3-42 is admitted.

(Exhibit No. 3-42 for identification and received into evidence.)

MR. RAMIREZ:  May I show it?

THE COURT:  Yes.

MR. RAMIREZ:  Thank you.

BY MR. RAMIREZ:

Q.   Deputy Alfred, directing your attention to what has been admitted as 3-42.

Is this the same driveway we're talking about?

A.   Correct, during the daytime.

Q.   All right.  Before you get to that gravel, is that like hard-packed dirt?  Or what kind of a surface area is that?

A.   Yes, hard-packed dirt.

Q.   Then as you traverse that hard pack, what do you get next?

A.   Loose gravel.

Q.   Did that play any part into your tactical

decision-making that evening, that loose gravel?

A.    Yes.

Q.    How so?

A.    Due to trip and fall hazards -- the desert is a very rural area, so that's always a concern in terms of safety with your footing.

Q.    To the left of this photograph, 3-42, there's a tree.

Do you see that?

A.    Yes.

Q.    Using that as a marker, if we can, where were you when you first made any type of statement, warning, command, comment to the person next to the SUV?

A.    Within the loose gravel area.

Q.    At that point, was your gun out?

A.    No.

Q.    What do you recall saying?

A.    I asked the subject to show me their hands -- to show me his hands.

Q.    Did that person respond?

A.    They ignored my -- my request.

Q.    What did you do next?

A.    I repeated the -- the same command.

Q.    What did that person respond -- how did that person respond?

**UNITED STATES DISTRICT COURT**

280

A.    They ignored my -- my command.  They appeared agitated and said something to the effect of for me to show them my hands.

Q.    What happened next?

A.    I advised the subject not -- to not walk towards the vehicle -- or stay away from the vehicle, which they ignored, as well.

Q.    What happened next?

A.    That command was ignored, and the subject used the grab handle to enter the driver's side of the vehicle.

Q.    At any time did that person standing next to the SUV ever yell out, who are you?

A.    No.

Q.    Did they ever say, why are you bothering me?

A.    No.

Q.    Did they ever say anything to the effect of get off my property or I'll call the cops?

A.    No.

Q.    When you first arrived at the location -- well, strike that.

What else did the person standing near the car tell you?

A.    They used a -- an obscene language to tell me to step away or back up.

Q.    Can you tell us what the exact language was, please?

UNITED STATES DISTRICT COURT

MR. RAMIREZ:  Thank you.

(Exhibit No. 3-98 for identification

and received into evidence.)

BY MR. RAMIREZ:

Q.    Directing your attention to what is depicted as 3-98, Deputy Alfred.  Do you recognize what is shown here?

A.    Yes.

Q.    Okay.  What is this?

A.    The interior portion to the opening.

Q.    Did you think that any portion of this interior opening could have provided you protection from possibly being struck by the SUV driven by the plaintiff?

A.    No.

Q.    Why not?

A.    Just due to the fact the -- the overall structure of it.  This being the material of wood, it doesn't have any solid foundation to sustain any type of impact from a vehicle or a hard object.

Q.    Showing you the front part of the photograph where there's -- appears to be a portion of the fence kicked out. Deputies kicked those out; correct?

A.    Correct.

Q.    Did you think that this would be a good tactical positioning point for you if you were to get behind this wooden fence once you realized the car was backing up?

A.    No.

Q.    Why not?

A.    Because I'm still exposed to a substantial risk.

MR. RAMIREZ:  If we could go back to what I think has been previously admitted, Your Honor, as 3-93.

THE COURT:  Yes.

MR. RAMIREZ:  Will you please publish that?

BY MR. RAMIREZ:

Q.    All right.  Deputy Alfred, using Marker Number 9 where your flashlight is, what would it take for you -- with the vehicle spinning its wheels and beginning to back up, what would it take for you to get over to the other side inside that opening?

A.    I would have to quickly move across, from this photograph, from right to left across the gravel, towards that -- that opening.

Q.    Did you consider doing that?

A.    Prior -- on my -- my contact upon my arrival, it was something I did make a mental note of.  But during our interaction, I did not, no.

Q.    Why not?

A.    Because, like I previously stated, once the vehicle was in motion, I would have to run across the pathway of that moving vehicle, on top of the fact that now I have no line of sight of Mr. Barber and, you know, what he's doing at the

conclusion of this incident.

Q.    Did you have any indication of what Mr. Barber was going to do with that vehicle as far as is he going to turn it in towards that fence, away from the fence; come straight at you?  Did you know any of that?

A.    No.

Q.    Do you recall Mr. Barber ever yelling out through the open back hatch, hey, I'm not trying to hit you; I'm just trying to move?

A.    No.

Q.    Did you think that he knew you were behind this vehicle?

A.    Initially, no.  But, however, Mr. Barber and I, we did interact briefly with our contact.

Q.    Did you ever tell Mr. Barber, hey, I'm just going to walk away, I'm going to get away from your vehicle?  Did you ever say anything like that?

A.    I did not, no.

MR. RAMIREZ:  At this time, Your Honor, I'd like to move into evidence Exhibit 7-21, a photograph of the driveway and opening area.  No objections.

THE COURT:  7-21 will be admitted.

(Exhibit No. 7-21 for identification

and received into evidence.)

MR. RAMIREZ:  Thank you.

MR. RAMIREZ:  Thank you.

(Audio recording played, not reported.)

MR. RAMIREZ:  Can we stop there, please?

BY MR. RAMIREZ:

Q.    Do you recognize the voice in that audio recording we just played?

A.    Yes.  That's myself and the reporting party.

Q.    So this is when you have arrived at the scene of this incident; correct?

A.    Correct.

Q.    Did you receive some kind of a radio dispatch telling you to go to the scene?

A.    Correct, yes.

Q.    Do you recall what you were told by the dispatcher?

A.    There was an argument between two neighbors, or one neighbor pulled the door handle and struck the hood of the reporting party's vehicle.

Q.    Were you told anything else?

A.    I was provided with a brief description of the subject involved.

Q.    What were you told about that?

A.    The subject was a black adult male, wearing a white T-shirt.

Q.    So now you arrive and your cars are in an opposite direction and you're talking to him, you can say, hey, let me

A.    Medical care.  Preservation of life supersedes scene preservation.

Q.    Counsel talked about force being a last resort, deadly force sometimes being the last resort.  But sometimes is that your only resort?

A.    Yes.  In this case, yes.

MR. RAMIREZ:  May I have just a moment, Your Honor, to check some notes, please?

THE COURT:  Yes.

MR. RAMIREZ:  Thank you.

(Pause in the proceedings.)

BY MR. RAMIREZ:

Q.    Prior to Mr. Barber getting in his vehicle, did you think he looked in your direction?

A.    Yes.

Q.    Do you think that's why he knew you were behind his vehicle?

MR. GALIPO:  Objection.  Assumes facts not in evidence and leading.

THE COURT:  Sustained.

BY MR. RAMIREZ:

Q.    How long did it take you, approximately, to shoot those six rounds?

A.    2 to 3 seconds.

Q.    If it had been safe to do so, would you have

attempted to get out of the way of that truck as it backed up?

A.    Yes.

MR. RAMIREZ:  Thank you.

I have nothing further.

THE COURT:  Thank you, Mr. Ramirez.

Mr. Galipo?

MR. GALIPO:  With the Court's permission, we have a witness here we'd like to get on and off, so I'd like to put the witness on and then at the conclusion, I could resume my recross-examination of Deputy Alfred.

THE COURT:  Very well.

Deputy Alfred, you may step down at this time.

Mr. Galipo, would you like to call your next witness out of order?

MR. GALIPO:  Yes.  Thank you, Your Honor.  We'd like to call Scott DeFoe, please.

THE COURT:  Very well.

Mr. DeFoe, please step forward to the witness stand. Thank you.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a

UNITED STATES DISTRICT COURT

384

A.    Correct, yes.

Q.    Is there also classroom instruction that goes with that type of training?

A.    Correct.

Q.    Does that training include giving warnings when feasible?

A.    Yes.

Q.    In this case, why didn't you give a warning that you were about to use deadly force to Mr. Barber?

A.    It was not feasible.

Q.    Why not?

A.    Due to time constraints.

Q.    What were the time constraints?

A.    From my point of contact with Mr. Barber to the course of fire was roughly 10 to 12 seconds.

Q.    And also part of your training is you have to be aware of your backdrop; correct?

A.    Correct.

Q.    Counsel was asking you about an attorney who was present when you gave a statement to investigators.  Was that your union attorney?

A.    Correct, yes.

Q.    It wasn't anybody as part of my team, though, was it?

A.    Not that I'm aware of, no.

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    Was the speed of the Trailblazer important to you?

A.    Correct.

Q.    And was it important to you the configuration of the -- seeing as to whether he had a place to go?

A.    Yes.

Q.    Did you consider in your analysis what the walking speed of a normal human being is; in other words, if we're walking, how many feet per second we go?

A.    Correct.

Q.    So we'll get back to that.  But I just want to stick on the -- the speed.

How did you determine or what is your opinion as to the speed of the vehicle at the time of the first shot?

A.    At the time of the first shot, a -- the vehicle was not moving at all -- or it was moving really slow.

Q.    And when you say "really slow," what would be your estimate?

A.    Less than 1 mile per hour.

Q.    Okay.  Now, you continue on, because there are six shots all together; right?

A.    Correct.

Q.    And I take it that the second shot happened about when?

A.    There's a window of shooting within -- the second

**UNITED STATES DISTRICT COURT**

shot was a -- heard .3 seconds after.

Q.    Okay.  I'm looking at your table because you identify them on page 11 of your report, each shot.

So your second -- are you saying that the first group of shots, there was about three-tenths of a second between each shot?

A.    Yes.

Q.    Okay.  Can you look at your table on page 11 of your report, please?

A.    Yes.

Q.    What time do you put for the -- the first shot you put what time, again?

A.    3:16:27.

Q.    .27.

How about the second shot?

A.    3:16.54.

Q.    The third shot?

A.    3:16.84.

Q.    The fourth shot?

A.    3:17.13.

Q.    The fifth shot?

A.    3:17.55.

Q.    And the final shot?

A.    3:18.64.

Q.    How long was there between the fifth shot and the

last shot?

A.    1.1 seconds.

Q.    Was that the longest gap between?

A.    Yes.

Q.    And was the second longest gap between the fourth and fifth shots?

A.    .4 seconds.

Q.    Okay.  So you had a little bit over a second between the fifth shot and the sixth shot?

A.    Yes.

Q.    Okay.  And how much time -- if we go from the first shot to the last shot, how much time is there?

A.    Total of 2.5 seconds.

Q.    Okay.  Now, did you estimate, based on your analysis, the maximum speed of the Chevy Trailblazer during the course of it moving back this approximate 13 feet?

A.    Yes.

Q.    What was the maximum speed?

A.    3.4 miles per hour.

Q.    Okay.  And at the time of the last shot, did you have an estimate as to the speed of the Chevy Trailblazer?

A.    Yes.

Q.    What was your estimate on that?

A.    3.4 miles per hour.

Q.    Maximum speed or the time of the last shot?

UNITED STATES DISTRICT COURT

A.    That's equivalent to the maximum speed, yes.

Q.    And then did the car, after the last shot, in your opinion, continue to roll back some distance before it came to a stop?

A.    Correct.

Q.    So if we look at the photograph that we did before of the car in its resting position, you're saying the car would have been further forward or south of that at the time of the last shot?

A.    Please repeat that question.

Q.    Sure.

You've already told us, I think, that you're estimating that the car moved back another 3 feet when Mr. Barber was taken out of the car because the foot came off the brake.

A.    Yes.

Q.    So you then said, based on that, 16 minus 3 is 13 feet; the car moved back 13 feet?

A.    Yes.

Q.    What I'm wondering, if you know, whether the car moved back at all in that 13 feet window after the last shot.

A.    Yes, it moved.

Q.    Okay.  So can -- do you have an opinion as to where the car was in this 13-foot window at the time of the last shot or it's hard to say?

A.     I made some calculations for that.

Q.     What was your calculation?

A.     Um, so the vehicle -- let me see if I can organize my thoughts.

Your question was about the distance.  Can you please restate the --

Q.     Sure.

A.     -- the question?

Q.     Do you know -- like, for example, at the time of the second shot, how far had the vehicle moved?

A.     At the start of the second?

Q.     At the time of the second shot.  You said the first shot, it moved not at all or a very short distance.  How about the second shot?

A.     I got an interval of .4 feet between the first and the second shot.

Q.     How far had it moved total as of the time of the third shot?

A.     Total would be 1.4 feet.

Q.     How about the time of the fourth shot, how far had it moved?

A.     Like 2. -- 2.2.

Q.     2.2.  Feet at the time of the fourth shot?

A.     Yes.

Q.     How about the time of the fifth shot, how far had it

UNITED STATES DISTRICT COURT

moved?

A.    3.6.

Q.    And then you told us there was a second gap between -- a little over a second gap between the fifth shot and the sixth shot?

A.    Yes.

Q.    So you're saying at the time of the fifth shot, it had moved about 3.6 feet?

A.    Yes.

Q.    How far had it moved back at the time of the last shot?

A.    Approximately 6., um -- 6.2.

Q.    Feet?

A.    Yes.

Q.    And then after the last shot, it would have moved back the remaining distance up to the 13 feet?

A.    Correct.  In 3.5 seconds.

Q.    So if a car is in reverse and the driver does not have their foot on the accelerator or the brake, what would the car normally do?

A.    It would roll back.

Q.    Um, now I want to ask you about -- one moment, please.

When you looked at the photos of the resting position of the Trailblazer, did you look to see whether the

UNITED STATES DISTRICT COURT

**DIRECT EXAMINATION**

BY MR. DIGGS:

    Q.   Good morning, Mr. Barber.

    THE COURT:  Mr. Barber, if you could please spell your name for the record.

    THE WITNESS:  Steffon, S-t-e-f-f-o-n.

    THE COURT:  Last name.

    THE WITNESS:  Barber, B-a-r-b-e-r.

    THE COURT:  Thank you.

    You may proceed.

    MR. DIGGS:  Thank you, Your Honor.

BY MR. DIGGS:

    Q.   Good morning, Mr. Barber.

    A.   Good morning, sir.

    Q.   Mr. Barber, how old are you currently?

    A.   39.

    Q.   Okay.  And in April of 2021, what city and state were you living in?

    A.   I was residing in Adelanto, California.

    Q.   All right.  Now, briefly, Mr. Barber, on the night of April 27th, 2021, you have a memory of that?

    A.   A little.  A little.

    Q.   Okay.  Were you at your home located on White Avenue?

    A.   Yes.

**UNITED STATES DISTRICT COURT**

Q.   Okay.  And that night, did you hear anyone talking to you as you were trying to get in your vehicle, which we talked about yesterday?

A.   Yes.

Q.   Okay.  And did you know who was speaking to you?

A.   No.

Q.   Could you see who was speaking to you?

A.   Not at all.

Q.   Did you have any indication that the individual that was speaking to you was a police officer?

A.   No.

Q.   Did you see any police lights that evening?

A.   No.

Q.   Okay.  Did anyone announce to you, Mr. Barber, that they were a police officer?

A.   Not at all.

Q.   Who did you think you were talking to that evening?

A.   I don't remember.

Q.   All right.  Now, at some point, you got in your vehicle?

A.   Yes.

Q.   Okay.  What is the last thing that you remember?

A.   Getting in my vehicle.

Q.   What is your next memory thereafter?

A.   Waking up in the hospital.

**UNITED STATES DISTRICT COURT**

Q.    Okay.  All right.  What did you discover, Mr. Barber, when you woke up in the hospital?

A.    Um, I couldn't move.

Q.    Could you move your legs?

A.    No.

Q.    Could you move your arms?

A.    No.

Q.    All right.  And how long were you in the hospital?

A.    Approximately five months.

Q.    Okay.  And have you learned that you were shot in the head?

A.    Yeah, through the nurses.

Q.    Okay.  And during the time that you were in the hospital, Mr. Barber, did you have any surgeries?

A.    Yeah.  They informed me that I had brain surgery.

Q.    Okay.  Um, and do you still have a scar on your head from the brain surgery?

A.    Yes.

Q.    Can you show the ladies and gentlemen of the jury the scar?

A.    (Indicating.)

Q.    Okay.  Now, Mr. Barber, I would like to show some documents to you.

MR. DIGGS:  And, Your Honor, myself and counsel have talked and we agreed on the documents already -- the exhibits

UNITED STATES DISTRICT COURT

that I will be moving into evidence will be Exhibit 8-1, 8-2, 8-3, 8-5, 8-6, and 8-9.

THE COURT:  All right.  So 8-1, 2, 3, 5, 6, and 9.

MR. DIGGS:  Yes, Your Honor.

THE COURT:  Very well.  Then those will be admitted, and you may publish.

(Exhibit Nos. 8-01, 8-02, 8-03, 8-05, 8-06, and 8-09 for identification and received into evidence.)

MR. DIGGS:  Thank you, Your Honor.

BY MR. DIGGS:

Q.    I'll just briefly, Mr. Barber, just show you -- is that you in the picture that we're seeing right now?

A.    Yes, sir.

Q.    Okay.  And do you know how long you were like this in the hospital during the five months?

A.    I don't know.

Q.    Okay.  And this one, again, is that you in the hospital?

A.    That is me.

Q.    Okay.

THE COURT:  And when you're putting them up, if you could refer to them.

MR. DIGGS:  Oh.  Yes.  Exhibit 8-2.

The next exhibit published is Exhibit 8-3.

**UNITED STATES DISTRICT COURT**

THE COURT:  Thank you.

MR. DIGGS:  Uh-huh.

BY MR. DIGGS:

Q.    And did the nurses tell you what was going on when you finally woke up in the hospital, what -- while you're in the bed like this?

A.    Well, I wasn't awake then, that I remember.  I -- when I -- when I woke up, I was -- I didn't have all the tubes and stuff.  I just had -- they came, they were doing -- I had staples all the way on my head.

Q.    Understood.

And I'm going to show these just briefly, Mr. Barber.

8-5.  That is your head where the bullet entered; is that correct?

A.    Yes, sir.

Q.    Okay.  And Exhibit 8-6, showing the same thing, your head, Mr. Barber?

A.    Yes, sir.

Q.    Okay.  And you briefly just mentioned now your head was shaven.  I'm going to show Exhibit 8-9.

Is that your head prior to the hair shaving off?

A.    Yes.

Q.    Okay.  All right.  Thank you, Mr. Barber.

Now, Mr. Barber, how did you feel when you learned

you had been shot in the head?

A.    I was devastated.  I couldn't -- I didn't understand -- I didn't understand it.

Q.    All right.  And how did you feel when it -- when you learned that it was a police officer that shot you in the head?

A.    It -- oh, I -- I don't -- I can't describe it.

Q.    Okay.  Let me ask you this, Mr. Barber.  Do -- the shooting happened in 2021 and we're in 2026.  Do you still think about the shooting?

A.    Every day.

Q.    Okay.  Do you ever have any nightmares about what happened that evening?

A.    I don't really have a good memory of what happened that -- that evening.

Q.    All right.  Now, Mr. Barber, we see that you are in a wheelchair.  Is that correct?

A.    Yes, sir.

Q.    All right.  And is that how you generally get around?

A.    Yes.

Q.    Okay.  Now, before April 27th, 2021, were you able to walk?

A.    Yes.

Q.    Were you able to run?

A.    Yes.

Q.    Are you able to run now?

A.    Not at all.

Q.    Okay.  Before this incident happened, Mr. Barber, did you participate in any sports?

A.    I wasn't good at any sports, but I did, like, a little basketball or something --

Q.    Okay.  And --

A.    -- at that time.

Q.    I'm sorry.  I didn't mean to cut you off.

And are you able to play basketball now?

A.    Not at all.

Q.    Okay.  What other physical activities did you do prior to April 27th, 2021?

A.    Um, just general labor, I guess.  I don't know.

Q.    Okay.  And, Mr. Barber, are there any issues with your left arm?

A.    Yeah.  I have mobility issues.

Q.    Okay.  Are you able to stand up at all?

A.    Not for long periods of time.

Q.    Okay.  And you generally need help to stand up?

A.    Assistance, yes.

Q.    Okay.  And prior to April 27th, 2021 -- sorry -- did you have any issues walking or standing?

A.    No.

Q.    Okay.  Now, just want to talk about some of the

UNITED STATES DISTRICT COURT

daily activities, Mr. Barber, starting from after the shooting.

Are you able to tie your shoes?

A.    I can get around to it eventually.  It takes a -- it takes a great amount of energy and time to -- to do the little -- little things like that because it's more -- I don't know the word -- like, intricate or something.  I don't know. I don't know.  But it's more -- it's more difficult trying to tie my shoes.

Q.    Understood.

And are you able to button your shirt?

A.    I can -- I can manage eventually if it's not, you know -- I -- I couldn't get this top one, but I managed the rest of them.

Q.    Understood.

Are you able to shower yourself?

A.    Yeah.

Q.    Okay.  And we talked about your shirt.  But are you able to get dressed by yourself?

A.    Yes.

Q.    Okay.  Now, Mr. Barber, as a result of the shooting, do you experience any pain?

A.    Yes.  Yes.

Q.    Can you describe the type of pain that you experience for the ladies and gentlemen of the jury?

A.    Um, it's -- it's like a constant stinging, like a

pricking.  It don't -- it doesn't never go away.  It -- sometimes it's easier to deal with, you know, but, um -- it's always there, you know.  It never -- it never -- it's a never -- it's never a moment where it -- where I'm without pain, you know.

Q.    And, Mr. Barber, when did you first start experiencing this pain?

A.    Um, before the -- right before they discharged me from the hospital.

Q.    All right.  And you mentioned, does -- does the pain ever stop?

A.    No.

Q.    Let me ask you this, Mr. Barber, to put into perspective.  How many days in the past week have you experienced pain?

A.    Every day.

Q.    How many days in the past month have you experienced pain?

A.    Every day.

Q.    How many days in the past year have you experienced pain?

A.    The same answer.  If it -- if it's not -- if it's not one area, it's another area.

Q.    All right.

A.    So it's -- it's -- it's constant.  I'm constantly in

pain in some area or multiple areas in my -- in my life -- in my body, every day.

Q.    As you sit here now in court, are you experiencing pain?

A.    Right now.

Q.    Do you experience headaches -- I'm not talking about regular headaches that, you know, you may receive, but do you experience a different type of headache at all as a result of being shot in the head?

A.    Yes.

Q.    And can you just -- are you able to describe that?

A.    Words can't -- can't describe that.

Q.    All right.  Do you have muscle spasms as a result of being shot?

A.    Yes.

Q.    And how frequent and in which part of the body do you have muscle spasms?

A.    I have leg spasms, um, then my -- my -- my left hand goes numb from time to time; the toes, I could -- I -- I could feel them, but I can't move them, you know.  I don't --

Q.    Are the muscle spasms that you have, are those painful?

A.    Yeah, sometimes.

Q.    All right.  Before April 27th, 2021, that you were shot in the head, Mr. Barber, did you have this constant pain

UNITED STATES DISTRICT COURT

every day that you just described to the ladies and gentlemen of the jury?

A.    No.

Q.    Okay.  Before -- this day before you were shot, did you have the type of headaches that you just described to the ladies and gentlemen of the jury?

A.    No, sir.

Q.    Okay.  Before you were shot, Mr. Barber, did you experience the type of spasms throughout your body that you just explained?

A.    No.

Q.    All right.  As a result of the shooting, Mr. Barber, has your memory changed at all?

A.    A little bit, yeah.

Q.    Do you have any challenges in remembering certain things like --

A.    It's hard -- it's harder.

Q.    Harder.

A.    To retain information.

Q.    Did you have the same type of memory issues in terms of retaining information prior to the shooting?

A.    I never had the best, but, I mean, it wasn't as it is today.

Q.    Understood.

Now, just briefly, Mr. Barber, can you tell the

UNITED STATES DISTRICT COURT

ladies and gentlemen of the jury, like, how do you feel -- it's been almost, you know, five years, but how do you feel now that you're in a wheelchair and you weren't in a wheelchair prior to the shooting?

A.    Um, how do -- how do I feel?

Q.    Yeah.  How do you feel about being in a wheelchair?

A.    Uh, I don't have -- I don't have -- let me see. Well, you know, life has its obstacles; right?  I was struggling before this, now this is a whole new struggle I have to -- that I'm trying to -- I'm trying to deal with it.  And, um, I have my good days and bad days.

Q.    We talked about some of the physical activities that you were doing prior, and I know you said that you weren't that good in basketball.  But how does it make you feel now that you're in a wheelchair and the activities that you used to do, such as running or even walking or playing basketball, that you can't do that anymore?  How do you feel about that?

A.    I feel cheated.

Q.    Mr. Barber, I'm almost done.

Almost five years later since this happened, has -- has the -- the level of pain, um -- has it gotten any better since when you woke up in the hospital?

A.    I mean, I had my -- my good days and bad days, but the pain is always there.

Q.    You mentioned the mobility in your left arm.  Has --

**UNITED STATES DISTRICT COURT**

has it gotten any stronger at all?

A.    No.

MR. DIGGS:  All right.  No further questions.

Thank you, Mr. Barber.

THE COURT:  Thank you.

Mr. Ramirez, cross-examination?

MR. RAMIREZ:  Miss Andersen will be handling it, Your Honor.

THE COURT:  Very well.

Ms. Andersen.

MS. ANDERSEN:  Yes, Your Honor.  Thank you.

**CROSS-EXAMINATION**

BY MS. ANDERSEN:

Q.    Good morning, Mr. Barber.

A.    Good morning, ma'am.

Q.    You were asked by counsel about memory issues.  Do you recall giving a deposition in this case?

A.    Yes.

Q.    Back in September of last year.  Does that sound accurate?

A.    Yeah, 20 -- yes, 2025.

Q.    You told counsel that you don't recall anything after getting into the vehicle before waking up in the hospital; right?

A.    Yes.

Q.    But you do recall the events that happened before you got into the vehicle.  Is that fair?

A.    Fair.

Q.    You recall your neighbors as Maria Gallo and Joseph Cocchi?

A.    Yeah.  They were -- the husband and wife landlords in the front house.

Q.    Okay.  The front house that's located on White Avenue?

A.    Yes, ma'am.

MS. ANDERSEN:  Okay.  I discussed with counsel, Your Honor, Exhibit 3-68.  I believe it's -- we've stipulated to it.

MR. DIGGS:  Yes.  No objection, Your Honor.

THE COURT:  Very well.  3-68 will be admitted, and you may publish.

(Exhibit No. 3-68 for identification and received into evidence.)

MS. ANDERSEN:  Thank you, Your Honor.

BY MS. ANDERSEN:

Q.    Do you see the photograph on the screen in front of you?

A.    Yes.

Q.    And do you see Maria and Joseph Cocchi's house in that photo?

A.    Yes.

Q.    Okay.  Is it that photo -- I'm sorry.  Is it the house on the right side of the photograph?

A.    Yes.

Q.    Okay.

MS. ANDERSEN:  And then next exhibit, Your Honor, will be 7-25, again by agreement with counsel.

MR. DIGGS:  No objection, Your Honor.

THE COURT:  7-25 will be admitted.  You may publish.

(Exhibit No. 7-25 for identification

and received into evidence.)

MS. ANDERSEN:  Thank you.

BY MS. ANDERSEN:

Q.    All right.  Do you see the photograph in front of you?

A.    Yes.

Q.    Does that photograph depict your residence that you were living in at the time of the incident?

A.    Yes.

Q.    Okay.  And it's the building essentially right behind that house we just looked at in 3-68; correct?

A.    Yes, ma'am.

Q.    Okay.  And that's because Maria and Joseph were the landlords for the property where you were living; is that correct?

**UNITED STATES DISTRICT COURT**

A.    Correct.

Q.    How long had you lived at that residence prior to April 27th of 2021?

A.    Roughly a year, I believe.  I'm not too sure.

Q.    And was that consistently you lived there for an entire year with the same landlords?

MR. DIGGS:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Had you interacted with Maria and Joseph prior to April 27th of 2021?

A.    No.

Q.    So this whole incident started because you were leaving at that exact moment you heard this voice in the driveway to go to the corner store; is that correct?

A.    Yes.

Q.    Okay.  Where was this corner store?

A.    It was off of Bartlett, Bartlett and Pearmain.

Q.    And how -- how long would it take you to get there from your house?

A.    Couple minutes.

Q.    Okay.  And this incident took place about a little after 11:00 PM on a Tuesday, April 27th of 2021.  Does that sound accurate?

A.    I had thought that was earlier, but I'm not sure.

UNITED STATES DISTRICT COURT

Because I think the store closes at either 10:00 or 11:30. 10:30, 11:30, I'm not sure.  I don't remember.

Q.    Okay.  Had Ms. Gallo or Mr. Cocchi ever given you a ride to the corner store before this date?

A.    No.  I never needed a ride.

Q.    Do you recall asking them for a ride on the date of this incident to go to the corner store?

A.    Yes.

Q.    When you were asking them that question, were they inside their vehicle or were they outside their vehicle?

A.    I don't remember.

Q.    Do you remember if one or both of them was inside or outside the vehicle one way or another?

A.    One -- it was Cocchi at first.  I talked to him.  I never talked to, um -- that I was -- I was blocked in the driveway.  So he didn't want to move his car for -- for whatever reason, so I asked him could he just give me a ride to the store since he didn't want to move his car because I was blocked in.  He never parked where he parked any other time, you know.  So I don't know what was going on or -- but I was just trying to leave to go to the store.

Q.    Where were you when you had this interaction with Joseph?

A.    In the driveway.

Q.    Were you standing next to your vehicle?

**UNITED STATES DISTRICT COURT**

A.    Um, my vehicle was -- was parked where it always was parked at, in the -- in the driveway.

Q.    I guess we'll look at this photo as an example. Would it have been closer, more forward towards those trash cans that's depicted, at least the blue one?

A.    Yeah.  Closer to the air compressor.

Q.    I'm sorry, the what?

A.    Air compressor closer to the -- to the fence.

Q.    Okay.

A.    Like right -- like right near the second -- second door.

Q.    So where was Joseph when you were having this contact with him?

A.    In the driveway.

Q.    Was he inside a vehicle or was he outside the vehicle?

A.    He was in his vehicle in back of my vehicle.

Q.    Okay.  And did you ask him to move?

A.    I don't recall.

Q.    Do you recall pulling on his door handles?

A.    His door handles?  No, I don't recall.

Q.    Okay.  But you did -- you do recall asking them to give you a ride to the corner store?

A.    Yeah, he refused.  He said that he was waiting on his wife or something.

Q.   Do you know where your landlords typically park that vehicle that you claim was blocking the driveway?

A.   In -- in the -- in the -- in their area where they normally -- you know, we share the driveway up to a certain point before the break.  And then they park their cars in their little -- their little break right there.  I don't know how to explain it.

Q.   Okay.  But off of the driveway.  They don't park in the driveway?

A.   No, they don't ever park in the driveway.

Q.   Do you recall anything that they said to you about your vehicle being in their way?

MR. DIGGS:  Objection.  Hearsay.

THE COURT:  Sustained.  I'm not sure what the relevance of this line of questioning is either.

MS. ANDERSEN:  Okay.  Your Honor, I'll move on.

THE COURT:  Thank you.

BY MS. ANDERSEN:

Q.   Do you recall seeing your neighbors leave in the vehicle after you had this interaction with Joseph?

A.   Yeah, they finally did leave.  So then that's when I was able to -- to -- to leave myself, because I was blocked in. I couldn't leave while they were doing whatever they were doing or not wanting to move for whatever reason.

Q.   Okay.  Did -- did you say anything to them before

UNITED STATES DISTRICT COURT

they left?

A.    No.

Q.    But you saw them drive away and completely exit the driveway; is that correct?

A.    Yeah.  It took them -- it took them a while.  She came home and then they backed the cars up or whatever.  Then the driveway was finally clear, and that's when I was getting ready to leave, and that's when I heard somebody talking to me.

Q.    How much time would you estimate passed between your neighbors driving away -- or at least exiting the driveway to when the deputy arrived, this voice arrived?

A.    I don't -- I don't recall.  It wasn't that long.  It was like -- it seemed like right -- like right after -- it had to be a few minutes, but it seemed like it was right away.

Q.    Do you recall previously testifying it was about 5 minutes?

A.    I think.  Vaguely -- you know, I don't know exactly the number but it was -- it could have been more or less.

Q.    Okay.  In that time frame, after your neighbors exited before you heard this voice in the driveway, you did not go to the corner store?

A.    No, I never made it.

Q.    Okay.  And that's because the police showed up and instructed you not to get in the car; is that correct?

A.    I didn't even know the police came.  I didn't know

**UNITED STATES DISTRICT COURT**

they were even called.

Q.    Do you recall testifying to that in your deposition, that the police came up and instructed you not to get in the car.  That's why you didn't leave?

A.    I don't recall that.

Q.    Okay.

MS. ANDERSEN:  I'd like to go to his deposition transcript, page 35, lines 10 through 19.

THE COURT:  Is this to refresh recollection?

MS. ANDERSEN:  This is to impeach, Your Honor.

THE COURT:  Well, he said he didn't recall.  So the proper thing to do would be to see whether or not anything would refresh.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.    Would it refresh your recollection to look at your prior testimony in this case?

A.    I don't -- I don't have a problem with it.

Q.    Okay.  There is a stack over there.  One has your name on it.  Are you able to find it, Barber, Steffon?

MR. GALIPO:  We have an extra copy, also, if necessary.

THE COURT:  We have a copy.

MR. DIGGS:  Counsel, can you give page and line numbers?

MS. ANDERSEN:  Yes.  35, lines 10 through 19.

BY MS. ANDERSEN:

Q.    Mr. Barber, let me know when you get to the page.
Okay?

A.    What page is it again?

Q.    It's page 35 of that transcript.

A.    Which number am I looking at?

Q.    Yes.  It would be lines 10 -- starting at line 10,
down to 19.

A.    Hmm.

Q.    Have you had an opportunity to look at those lines?

Mr. Barber, does that refresh your recollection at
all to giving me that testimony at your deposition?

A.    Yeah.  I mean, it doesn't really refresh my memory,
but, I mean, I -- obviously I said it, you know.

Q.    And although you told counsel when he was asking you
questions that you didn't know who the voice was, in deposition
you testified it was Joseph Cocchi, your neighbor.

MR. DIGGS:  Objection, Your Honor.  Misstates the
testimony in the deposition.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you know who the voice you were speaking with
that night was?

A.    No.

Q.    Did you believe it was your neighbor?

A.    It possibly could have been.  I don't know.

Q.    Well, can I have you look at those same lines again, page 35, lines 10 through 19, please, and see if it refreshes your recollection about whether you thought it was your neighbor at that time?

(Pause in the proceedings.)

THE WITNESS:  Yeah.  I'm reading it, but I never -- I never made contact with the police officer.  I never knew it was a police officer.

BY MS. ANDERSEN:

Q.    Yeah, my question was actually about the neighbor, whether at the time of this incident you believed you were speaking with your neighbor.

A.    Yeah, because that's the person I had -- I had the verbal little altercation with, with Cocchi.

Q.    Do you mean before --

A.    Before --

Q.    -- you got in your vehicle?

A.    Before I jumped into the car, yes.

Q.    So did you believe that it was Joseph Cocchi that you were speaking with before you got to your vehicle?

A.    That was talking to me?  Yes.

Q.    Why do you think your neighbor would instruct you to show you -- show him your hands?

UNITED STATES DISTRICT COURT

MR. DIGGS:  Objection.  Calls for speculation.  Conjecture.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    So after you had your interaction -- your initial interaction, I guess we'll say, with Joseph in the driveway and they've exited, the next thing you know there's a deputy in your drive -- driveway asking you something to the effect of, "hey, bud, come over here."  Is that correct?

A.    I didn't know the deputy --

MR. DIGGS:  I'm sorry.  Objection.  Assumes facts not in evidence as phrased.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you hear "hey, bud, come over here"?

A.    I did.

Q.    Okay.  And then you received commands, "let me see your hands."

Did you hear those?

A.    Yes, ma'am.

Q.    Okay.  And in response to that, the command to see your hands, you told this voice to show you his hands; is that correct?

A.    Right.

Q.    Okay.  If you couldn't see this individual, why were

484

you asking to see his hands?

A.    To see where -- where the person was at.

Q.    Did you ever yell "who are you" or "why are you asking me these things" at any time before you got in the vehicle?

A.    I think something along the lines of -- or -- "who are you" or "what are you doing back here," something -- something along those lines.

Q.    When did you say that?

A.    Sometime during the discourse.

Q.    Have you listened --

A.    Or the oral exchange.

Q.    I apologize.  I cut you off.

We have played the audio, which is Exhibit 10 in this case, multiple times in your presence.

Have you listened to it?

A.    Vaguely -- yeah, a little bit.

Q.    Did you ever hear yourself on the audio asking "who are you"?

A.    Who are -- I don't -- I don't recall saying "who are you."  I thought it said "what are you doing back here" or -- along those lines.  I don't know.  I try not to listen to it, to be honest with you.

Q.    Did you also tell this voice to "back the fuck up"?

A.    Yeah, I do recall that.

**UNITED STATES DISTRICT COURT**

Q.    Okay.  And, again, why are you asking this person to back the fuck up if you can't see them?

A.    Because I was -- my intentions were to leave the driveway.

Q.    Did you know where they were?

A.    No.

Q.    So did you know whether or not they were even in the driveway?

A.    I don't know.  All I know I was trying to leave -- leave to go to the store, that's it.

Q.    Then why the phrase "back the fuck up" if you're just trying to back up your vehicle?

A.    Because I'm going to be backing out the vehicle, backing my car out -- I don't know.  I can't -- I can't give you an answer to that.

Q.    Do you know what color uniform deputies with the San Bernardino County Sheriff's Department wear?

A.    I've had -- I've had a lot of run-ins with them, yeah.

Q.    Okay.  What -- what does their uniform look like, like color?

A.    Like color?  It's -- it's tan and -- tan and green.

Q.    And that would be tan shirt, green pants?

A.    Yeah.

Q.    Okay.  This voice also told you not to get into your

**UNITED STATES DISTRICT COURT**

vehicle; correct?

A.    Correct.

Q.    And then you did it anyway?

A.    No.  First he told me don't put my hands in the vehicle, and I wasn't sure if he was talking to me or not.  So I stuck my hands in the vehicle and nobody said anything.  So I assumed that he wasn't talking to me.

Q.    And you pulled out a cell phone at that time; correct?

A.    No.  I jumped in the car at that time.

Q.    The first time, when you reached into the vehicle, was it to grab your cell phone?

A.    I believe so, yes.

Q.    Okay.  And so you heard "don't get in your car," you reached in, grabbed a cell phone, then you step back out of the vehicle?

A.    I'm not sure.  I think -- I'm not sure if it was all one motion or not or -- or --

Q.    Did you hear "don't get in the vehicle" or "don't get in the car" more than one time?

A.    I don't -- I don't understand where we're going with this.

Q.    Did you hear it more than once?  That's all I'm asking.  "Don't get in your vehicle, don't get in your car"?

A.    I remember hearing it.  I don't remember the number

of times.

Q.    And then you did eventually get into your vehicle; correct?

A.    Yes.

Q.    And closed the door?

A.    Yes, ma'am.

Q.    And left the trunk wide open?

A.    Yes, ma'am.

Q.    Okay.  And that was to go to the corner store?

A.    Yeah.

Q.    With the trunk open?

A.    Or to back out the driveway.

Q.    Do you typically back out the driveway with your trunk wide open?

A.    No, but it was dark out that night.

Q.    Why didn't you close it, then?

A.    Why didn't I?  I didn't get around to it.  I never made it out the driveway.

Q.    Why didn't you close it before you got into the vehicle?

A.    Because the back hatch up, it illuminates the whole driveway.  It's a dark -- it's a dark, little, long strip and an old car.

Q.    So are you saying that you typically reverse your vehicle out of the driveway with the trunk wide open?

UNITED STATES DISTRICT COURT

A.    No, not normally, because I normally don't leave at night.  But in that incident, in that circumstance, I was -- I was going to back out the truck -- leave it open so it could illuminate the whole backyard -- I mean, the whole -- the whole driveway because it's dark.

Q.    Okay.  And you said the corner store closes around 10:00 or 11:00.  Is that your understanding?

A.    Yeah.  I'm not sure.  If -- if that one was closed, I probably would have went to the actual gas station or something, I don't know.

Q.    But you recall testifying about going to the corner store specifically?

A.    Yeah.  That was my intention.

Q.    But it could have been closed if this incident took place after 11:00.  Is that fair?

A.    True.

MR. DIGGS:  Objection.  Argumentative.  403.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did those voice -- the voice you heard telling you "don't get in the vehicle, don't reach in the vehicle, show me your hands," do those sound like law enforcement commands?

A.    I don't know what law -- I don't -- I don't know -- I haven't had that conversation with law enforcement.

Q.    Ever?

**UNITED STATES DISTRICT COURT**

THE COURT:  Move on.

MS. ANDERSEN:  If he opens the door, is that not --

THE COURT:  Move on.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.    So you didn't tell this voice, hey, I'm just going to leave, I need to make it to the corner store?

A.    No.

Q.    Okay.  And you got in the car, it was already idling, it was already on?

A.    Yes, ma'am.

Q.    Was it in park when you got into the vehicle?

A.    Yes.

Q.    Okay.  And then you shifted it into reverse?

A.    Upon me attempting to leave, yes.

Q.    So you do recall that part of getting into the vehicle and shifting it into reverse?

A.    All I remember really is getting in the vehicle.  I must have had -- I must have shifted it into reverse because that was my intention was to leave.  I don't know where we're going with that.  I mean, I'm trying to be honest and answer the question, but I don't know -- you're not -- you're not taking my answers.  I don't know how to explain it.

Q.    Well, I'm just asking you questions.  I'm -- did you -- you do have a recollection of the car moving backwards,

though; is that correct?

A.    No.  I remember getting in the car and -- and next thing I remember waking up in the hospital.  I don't remember putting it in reverse, I don't remember -- I don't remember those things.

Q.    Can I have you take a look, then, at page 48 of that same deposition transcript?

A.    48?  Yes, ma'am.

Q.    And lines 20 to 22?

A.    48:20?

Q.    Yes.  Page 48, lines 20 to 22.

A.    20 to 22.

(Pause in the proceedings.)

BY MS. ANDERSEN:

Q.    Were you able to take a look at those lines?

A.    Yes, ma'am.

Q.    Do you have a recollection of the car moving backwards?

A.    It doesn't change my answer.

MS. ANDERSEN:  Your Honor, that's impeachment.  I'd like to use this as impeachment.

THE COURT:  You can go ahead and read the question at line 20 and the answer.

MS. ANDERSEN:  Thank you, Your Honor.

"QUESTION:  But do you have a recollection

of the car moving backwards?  Is that correct?

"ANSWER:  Yes."

BY MS. ANDERSEN:

Q.    And then you do recall feeling a gunshot; is that correct?

A.    Yes.

Q.    Okay.  And that was while you were in the vehicle; correct?

A.    Yes.

Q.    Do you recall whether the vehicle was still moving backwards when you felt that gunshot?

A.    No.  I don't know.

Q.    So it's not completely accurate that you don't recall anything after closing the door on the vehicle and waking up in the hospital; is that correct?

A.    I guess.  I -- I guess I try to forget certain stuff.

Q.    You don't recall hearing any gunshots before you felt the gunshot; is that true?

A.    True.

Q.    Do you recall hearing any gunshots after you felt the gunshot?

A.    I didn't hear any -- no.

Q.    Okay.

A.    Not to my knowledge.  I don't -- I don't know.

Q.    You mentioned something about general labor.  I just want to clarify.  What do you mean by "general labor"?

A.    Referring to what?

Q.    I think you were asked activities you engaged in prior to this incident and you said general labor.  What did you mean by that?

A.    General labor?  I don't -- clean the yard is general labor.  I don't know.  Taking the trash out is general labor.

Q.    And how long had it been since you were employed prior to this incident?

MR. DIGGS:  Objection, Your Honor.  403.  Outside the scope.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    You were prescribed a number of medications by the hospital after this incident; is that correct?

A.    Yes.

Q.    Okay.  And you refused to take medications after you left the hospital that were prescribed by Arrowhead; is that correct?

A.    Yes.

Q.    And you were prescribed physical therapy to continue after you were discharged from the hospital; correct?

A.    Correct.

Q.    You also chose to stop attending physical therapy

sometime after your discharge from the hospital; is that correct?

A.    Yes.

Q.    Was cost ever an issue for you not to attend those physical therapy appointments?

MR. DIGGS:  Objection, Your Honor.  403.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you -- I apologize.  I'm going to ask you to repeat your response to this.  Did you say that you can get dressed on your own or you cannot get dressed on your own, when asked by counsel?

A.    I can.  It just takes a while.

Q.    Back in November of 2021, were you still at Arrowhead, the hospital?

A.    Back in when?

Q.    November of 2021.

A.    I believe I left in September.  I'm not -- I'm not too sure.

Q.    Okay.  Sometime after your discharge from the hospital, did you practice walking without the wheelchair?

A.    Walking without the wheelchair?  That was part of the physical therapy was walking, um, on the bars.  It had bars there.

Q.    And as early as February of 2022, do you recall

UNITED STATES DISTRICT COURT

telling medical professionals that you wanted to start using a walker instead of the wheelchair?

A.    Did I tell them that?

Q.    Yeah.  Do you recall telling them that?

A.    I told them I would like to, yeah.  That was -- that was the goal.  I never reached the goal.

Q.    And you were advised to also continue with physical therapy appointments as of 2022; correct?

A.    Yes.  But I had trial, and it was conflicting with my trial.

Q.    But sometime in the year 2022 you did stop attending physical therapy; is that correct?

MR. DIGGS:  Objection.  Asked and answered. Cumulative.

THE COURT:  Overruled.

THE WITNESS:  Can you ask me the question again?

BY MS. ANDERSEN:

Q.    Of course.

Sometime in 2022, you stopped attending physical therapy; correct?

A.    Yes, ma'am.

Q.    Yes?

A.    Yes.

Q.    Do you recall telling a medical provider in December of 2022 that you did not want any more medical follow-up and

UNITED STATES DISTRICT COURT

all future appointments canceled?

A.    Regarding to what?

Q.    Your health.  December of 2022.

A.    Yeah because they were giving -- they were trying to give me psych meds.  I didn't want to take no psych meds.

Q.    What about a medical appointment you had?

A.    I didn't have any medical appointments.

Q.    After 2022?

A.    I -- I wasn't -- I wasn't on medical.

MR. DIGGS:  Objection.  Objection under the line of questioning.  403.

THE COURT:  I'm going to overrule it, but I would suggest that we move on.

You may answer the question.

THE WITNESS:  What is the question?

BY MS. ANDERSEN:

Q.    I'll go back to the original question.  I think there's been some confusion.

In December of 2022, do you recall telling a medical provider you did not need any more medical follow-up and you wanted all future appointments canceled?

A.    That was the only way for them not to schedule it again because they said, well -- they said medical precedes Court.  And I was trying to -- I was tired -- tired of waiving my -- my -- missing court for physical therapy just

because it wasn't physical therapy.

THE COURT:  Move on.

BY MS. ANDERSEN:

Q.    And in that same appointment, you were advised to continue physical therapy; correct?

A.    Yeah, they told me -- they told me to -- that they were offering me physical therapy.

Q.    And you did not take them up on that offer to continue physical therapy; correct?

A.    Because being chained in a room, it is not physical therapy.

Q.    Back when you were still in physical therapy at Arrowhead, isn't it true that even back then, you were able to walk with a walker and transfer independently to the bed?

A.    Walk with a walker?  I've never had a walker.  I have a walker in prison.  I never -- I never --

Q.    Would you say that the weakness in your legs is worse today than it was when you were at Arrowhead?

A.    No.  It's the opposite.

Q.    So it's gotten -- the weakness has gotten better or some relief to the weakness?

A.    It's just become manageable.

Q.    When was the last time you attended physical therapy?

MR. DIGGS:  Objection, Your Honor.  403 again, this

line of questioning.

THE COURT:  Overruled.

THE WITNESS:  When's the last time?  I don't remember the date.

BY MS. ANDERSEN:

Q.    You mentioned a stinging sensation when asked by your counsel if you were experiencing pain.

Do you recall that?

A.    Yes, ma'am.

Q.    Have you ever advised any medical professional that you have this stinging sensation?

A.    They said it was because of the nerve damage.

Q.    Do you recall the last time you saw a medical professional for this stinging sensation?

A.    No.

Q.    You also mentioned headaches.  When was the last time you saw a medical provider for these headaches?

A.    They prescribed some psych meds.  And I -- I refused to take them.  I didn't want -- I didn't want to take them.  So I stopped seeing that person.

Q.    Have you seen any other medical providers for the headaches?

A.    No.  They -- they -- they said everything was, um -- everything -- everything that I'm going through can be -- be -- what's the word?  It could be, um -- psych meds will take care

UNITED STATES DISTRICT COURT

of it; the pain, the -- the spasms.  Psych meds will do the trick for everything.

Q.    And you refused to take those; is that correct?

A.    Yeah, I didn't want to take -- I didn't like the way it made me feel.

Q.    Did you ask for any alternative prescriptions for pain medications?

A.    No.  Tylenol, ibuprofen.

Q.    Is it also correct that you did not any -- attend any type of therapy or counseling for mental or emotional injuries you attribute to this incident?

A.    Any counseling?

Q.    Correct.

A.    At -- you're talking about at Arrowhead?

Q.    Anywhere.  Any -- anytime after Arrowhead.

A.    I've had a substance abuse program.  I don't know if that helps.  I don't -- I don't know.

MS. ANDERSEN:  Nothing further at this time, Your Honor.  Thank you.

THE COURT:  Thank you.

Mr. Diggs, redirect?

MR. GALIPO:  May we have one -- can I confer with Mr. Diggs for just one moment, Your Honor?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

MR. GALIPO:  Thank you, Your Honor.

MR. DIGGS:  Thank you, Your Honor.

Your Honor, briefly, for the rule of completeness, um, could I read from Mr. Barber's deposition, page 48, line 17, through 49, line 5?  And then --

THE COURT:  Give me one moment.

48, what line?

MR. DIGGS:  17.

THE COURT:  Through 49 --

MR. DIGGS:  Line 5.

THE COURT:  Yes.

MR. DIGGS:  Thank you.

"QUESTION:  And you do not recall whether you put it in reverse or not; is that correct?

"ANSWER:  That's correct.

"QUESTION:  But you do have a recollection of the car moving backwards; is that correct?

"ANSWER:  Yes.

"QUESTION:  Was that a yes, I'm sorry?

"ANSWER:  Yes.

"QUESTION:  Okay.  Do you recall pressing down on the gas pedal at any time you got into the driver's seat?

"I don't recall."

Thank you, Your Honor.

**UNITED STATES DISTRICT COURT**

No further questions.

THE COURT:  No further questions?

MS. ANDERSEN:  No further questions, Your Honor.

THE COURT:  Very well.  Then we're going to go ahead and take a brief break at this time.

Mr. Galipo, do you have your next witness available? I guess I'm wondering if we should just simply take an early lunch break.

MR. GALIPO:  I think that makes sense, Your Honor. And then I'll be ready to go right after our break.

THE COURT:  Very well.

Then, ladies and gentlemen, we are going to take an early lunch break at this time.

I will see you back here at 12:30.  In the meantime, please remember the admonitions.  Keep an open mind, do not speak to anybody about the case, do not let anyone speak to you about the case, and do not conduct any independent research or investigation.

Thank you.  Have a nice lunch.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You may be seated.

We are still on the record outside the presence of the jury.

Mr. Galipo, I believe that your last witness will be

UNITED STATES DISTRICT COURT

644

engine -- of revving.  Again, a vehicle traveling 4.6 miles per hour -- per hour is traveling at about 7-and-a-half, 8 -- 7-and-a-half feet per second.

So I can -- I can do the math and estimate that, but that's just off the top of my head.

Q.   And that would be an estimation?

A.   Yes.

Q.   Would you ever use audio without video to determine where a car is at various points in time?

A.   Again, it would be an estimation.  Just as I explained here in court, it would be an -- I would be speculating and just estimating based on whatever evidence I have, whether it's -- right now it's just the time and the distance.

Q.   As part of your investigation, were you able to tell which one of Deputy Alfred's six shots struck Mr. Barber?

A.   No.

Q.   As -- I'm sorry.  During your investigation, the fired cartridge casings at Placards 2, 3, 4, 5, 7, and 8, were you able to identify in any way which one of those were fired first, second, third, all the way through six?

A.   No.

Q.   Why not?

A.   Because I wasn't present during the shooting.  Only if you were present during the shooting and observing where an

**UNITED STATES DISTRICT COURT**

wants you here --

THE COURTROOM DEPUTY:  You can do it during lunch, if you guys want.

MR. RAMIREZ:  Can we do that?

Yes.

THE COURTROOM DEPUTY:  Does that work for you guys also?

MR. GALIPO:  What is that?

THE COURTROOM DEPUTY:  Going over exhibits, do you want to go over exhibits during lunch?

MR. GALIPO:  I would rather not, but my colleagues would be happy to if that works for you.

THE COURTROOM DEPUTY:  Whichever works for everyone, we can speak about it later.

THE COURT:  All right.  Very well.

Anything from counsel?

MR. GALIPO:  No, thank you, Your Honor.

Oh, only that we don't want Dr. Vilke mentioning that these are records from the prison as opposed to just records in general.

MR. RAMIREZ:  He is aware of that.

THE COURT:  All right.  Thank you.

Then I do have the defense motion, Rule 50 motion. And I have reviewed that.  As the parties know, the question is whether or not any reasonable jury could find in favor of

**UNITED STATES DISTRICT COURT**

plaintiff viewing the evidence in the light most favorable to the plaintiff.  I find that judgment as a matter of law is not warranted on any cause of action.

With respect to Mr. Barber's 1983 claim against defendant Alfred, the testimony and evidence are consistent with my finding on the motion for summary judgment, specifically, viewing the record in the light most favorable to Mr. Barber, a reasonable jury could find that he did not pose an imminent or immediate threat of serious bodily injury or death at the time defendant Alfred fired six shots.

Accordingly, a reasonable jury would have a legally sufficient evidentiary basis to conclude Defendant Alfred used excessive force.  I also find he is not entitled to qualified immunity.  And I would note that in defendant's motion, in attempting to distinguish cases, including *Orn, Acosta*, and *Estate of Aguirre*, they state that those involved officers whose credibility issues were a factor.  And they go on to say that has not been a factor in this case.

Much to the contrary, Defendant Barber -- or Defendant Alfred's credibility has been an issue in this case. Among other things, there were notable material discrepancies, which simply cannot be reconciled.  In answering questions, he was also evasive and defensive at times.  But among the material discrepancies from his testimony in court when compared to his prior statements, including under oath, are

**UNITED STATES DISTRICT COURT**

whether he saw personnel pick up his flashlight, whether his alley lights were activated, whether he was north or south of the opening on the west side of the driveway, and perhaps most astonishingly, his original denial that there was even an opening at all on the west side of the driveway.

With respect to the *Monell* claim, the record could also support a reasonable jury's finding that defendant County failed to properly train Defendant Alfred on the use of deadly force and that that failure was a moving force behind Mr. Barber's constitutional injury.

Defendant Alfred provided sworn testimony under oath that he was not trained to give verbal warnings before using deadly force when feasible.  In that same prior testimony, he testified that he was not trained that deadly force should only be used if there's an immediate threat of death or serious bodily injury.

Based upon that testimony, Mr. DeFoe testified in his expert opinion that Defendant Alfred was insufficiently or inadequately trained.  While Defendant Alfred now disclaims such testimony, as I've already stated, his credibility is certainly questionable.

Accordingly, a reasonable jury would have a legally sufficient basis to find for Mr. Barber on his 1983 claims against both defendants.  And for those same reasons, they would have a legally sufficient evidentiary basis to find in

favor of Mr. Barber on his related state claims.

The motion is, therefore, denied.

Anything further before we break for lunch?

MR. GALIPO:  No, thank you, Your Honor.

MR. RAMIREZ:  Not at this time, Your Honor.

THE COURT:  All right.  Very well.

Then I'll see you back here at 1:30.

THE COURTROOM DEPUTY:  All rise.  This court is in recess.

(Lunch recess taken.)

(Out of the presence of the jury:)

THE COURTROOM DEPUTY:  Calling Item Number 1, ED CV 22-625, Steffon Barber versus County of San Bernardino, et al.  Counsel, please state your appearances, starting with the plaintiff.

MR. GALIPO:  Good afternoon, Your Honor, Dale Galipo with Renee Masongsong from my office on behalf of the plaintiff.

THE COURT:  Good afternoon.

MR. DIGGS:  Good afternoon, Your Honor. Rodney Diggs, along with Brandon Tanter and Alice Williams on behalf plaintiff.

THE COURT:  Good afternoon.

MR. BRYANT:  Good afternoon, Your Honor. James Bryant on behalf of plaintiff.