# EXHIBIT "A"

# EXHIBIT "A"

203

Q.   And is the policy of the department to refrain from using profanity in general?

A.   Generally -- generally, yes, in certain circumstances.

Q.   Because part of the training you had is to de-escalate situations instead of escalating them; is that fair?

A.   Correct.

Q.   And so I'm going to show you Exhibit 6-1, which I think is an image of your firearm?

MR. RAMIREZ:  No objection, Your Honor.

THE COURT:  All right.  That will be admitted and you may publish.

(Exhibit No. 6-01 for identification and received into evidence.)

BY MR. GALIPO:

Q.   Do you see this on the screen?

A.   Yes.

Q.   Does that appear to be your firearm?

A.   Yes.

Q.   It's a .45 caliber?

A.   Correct, yes.

Q.   That would be a semiautomatic weapon?

A.   Yes.

Q.   And you have to press the trigger for each shot; is

UNITED STATES DISTRICT COURT

A.    Correct, yes.

Q.    And you're still 3 to 4 feet from this opening that we've been talking about, which we see again in Exhibit 3, page 29; correct?

A.    Correct.

Q.    So after the door closed, then, in your mind, you knew, okay, he's definitely going to reverse; correct?

A.    Not necessarily.

Q.    Well, didn't you, both in your statement and deposition testimony, say, "Once he got in the car, I believed he was going to back up"?

A.    Yes, once the vehicle was in motion and the lights were illuminated, yes.

Q.    Well, you recall testifying that once he got in the car and closed the door, you believed he was going to back up?

A.    Correct, yes.

Q.    Right.

And so when he closed the door, how long do you think it would have taken you to move 3 or 4 feet?

A.    I'm not sure.  I don't have an estimate for that.

Q.    Well, uh, basketball players are trained to move laterally, aren't they?

A.    Correct, yes.

Q.    I mean, even to play defense, you've got to be able to shuffle your feet and move quickly left and right laterally;

**UNITED STATES DISTRICT COURT**

true?

A.    Correct.

Q.    And then the point guard of the basketball team often is one of the most agile and quickest people on the team?

A.    Not necessarily.

Q.    So do you think it would have taken you 1 second, a half a second?  How long do you think it would have taken you to move laterally 3 or 4 feet?

A.    I don't want to speculate, sir.  That's tough with 30 pounds of equipment.  You know, when you consider the analogy of playing basketball, you don't have that kind of equipment on you.  So to have that same type of movement with 30 additional pounds, that can be challenging.

Q.    The same equipment you have when you do foot pursuits?

A.    Correct, yes.

Q.    Could you give me an estimate with that equipment? You were 31 years old, in good shape.  How long do you think it would have taken you to move 3 or 4 feet?

MR. RAMIREZ:  May call for speculation.

THE COURT:  Overruled.

THE WITNESS:  Couple seconds.

BY MR. GALIPO:

Q.    And would you agree that, not only did you not move in there while Mr. Barber was outside the car, when he got in

UNITED STATES DISTRICT COURT

Q.    Do you know at the time of your fourth shot, whether it moved more than 3 feet?

A.    No.  The vehicle was in motion during the full course of fire.

Q.    At the time of your fifth shot, do you know if it moved more or less than 3 feet?

A.    No.  The vehicle was still in motion.

Q.    And at the time of your sixth shot, do you know if it moved more or less than 5 feet?

A.    At the conclusion of the sixth shot, the vehicle came to rest.

Q.    Well, you're not saying -- was the vehicle stopped when you fired your sixth shot?

A.    After.

Q.    How long after your sixth shot did it come to a stop?

A.    Half a second.  Very short time.  I didn't have a stopwatch during the incident to really measure the time frames of each incident.

Q.    So how far do you think it moved back after your last shot?

A.    Short distance.

Q.    Can you give us an estimate?

A.    I cannot.  No.

THE COURT:  Counsel, would now be a good time to

**UNITED STATES DISTRICT COURT**

A.    The upper torso, yes.

Q.    Wasn't your intent, Deputy, to strike the driver with a bullet?  That's why you were aiming at the headrest?

A.    My intent was to stop the threat and as a result, Mr. Barber was struck by gunfire.

Q.    I just want to make sure I'm understanding.

Were you trying to strike his body or were you shooting at some other part of the car?

A.    His body.

Q.    And you fired six shots?

A.    Correct, yes.

Q.    Do you know which one of your six shots struck him in the head; whether it was the first shot, the last shot, or some shot in between?

A.    No, I'm not aware.

Q.    You have testified that even if you were able to move out of the path of the vehicle, you still would have shot.

Do you recall that testimony?

A.    Correct, yes.

Q.    So the training and policy is, move out of the path rather than shooting; you're saying you didn't try to move out of the path, but had you moved out of the path, you still would have shot anyways?

A.    No.  That is incorrect.  If I had a safe avenue to escape, then there would be no reason for the gunfire itself.

**UNITED STATES DISTRICT COURT**

MR. RAMIREZ:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  No, I think it's important, based off of my training and experience, to advise the dispatchers, as well as my other resources, of what's unfolding.

BY MR. GALIPO:

Q.    I guess what I'm wondering, if your training and the policy is not to shoot at moving vehicles and step out of the path, why you didn't step out of the path.

A.    There was no safe area for me to escape to.

Q.    And we have a portion of Exhibit 3, page 16, up on the screen.

Do you see that?  Can you see it?

A.    This current photo?

Q.    Yes.

A.    Yes.  Uh-huh.

Q.    And I'm going to unzoom in a little bit, if I can.

You indicated earlier, I think, there was about a 10-foot opening there; true?

A.    Correct.  Correct, yes.

Q.    Showing you Exhibit 3, page 6, by agreement.

MR. RAMIREZ:  No objection.

THE COURT:  All right.  3-6 is admitted, and you may publish.

///

UNITED STATES DISTRICT COURT

unintentionally struck her?

A.    Correct, yes.

Q.    And, again, you're saying in the 2 to 3 seconds it took you to fire your shots, you chose to use that time to fire rather than moving out of the path.  Is that a fair statement?

A.    Yes, that would have put me in the pathway of the vehicle, crossing the pathway of the vehicle.

Q.    Well, you already told us that the opening was only 3 or 4 feet to your right; correct?

A.    Correct, yes.

Q.    And you told us you could have got there within 1 or 2 seconds; correct?

A.    Correct, yes.

Q.    And at some point when other officers came to assist, a portion of the fence was knocked out?

A.    After the fact, yes.

Q.    And Mr. Barber, at some point, was removed from the vehicle?

A.    From my understanding, yes.

Q.    And when he was removed, as you understand it, the vehicle rolled backwards some distance because the car was still in reverse with his foot on the brake?

A.    I was unaware if his foot was on the brake, but the vehicle rolled back, yes.

Q.    And you estimated after your last shot, the vehicle

Q.    Under what circumstances?

A.    If a vehicle is operated in a negligent or reckless manner that has the ability to produce great bodily injury and/or death.

Q.    And if feasible, you should try to move out of the way, if you can?

A.    Correct, if feasible.

Q.    But if you can't, your policy allows you to use deadly force to stop that threat; is that correct?

MR. GALIPO:  Objection.  Leading.

MR. RAMIREZ:  I'll rephrase it, Your Honor.

BY MR. RAMIREZ:

Q.    Is it your training, under your policy, that if you can't safely get out of the way, are you allowed to use deadly force?

A.    Correct, yes.

Q.    How long did this entire incident last from when you first started addressing Mr. Barber to your last shot?  Was it hours you were out there?

A.    Approximately 10 to 12 seconds.

Q.    From start to finish?

A.    Correct.

Q.    Why didn't you move into that opening?  A lot of questions about it but why not?

A.    Well, the opening doesn't provide any type of

structural security.  You have to factor in we're talking about a vehicle versus a picket fence.  And in the event that the vehicle continues in motion and strikes down the fence, now I'm still kind of exposed due to that confined space.

Q.    From the moment you saw the vehicle start reversing until you fired your first shot, how much time did you have to assess the threat and determine what your response was going to be to that threat?

A.    Seconds.

Q.    Did you have time to consider, well, I played varsity basketball, I'm in great shape, I'll just hop over that fence?

A.    No.

Q.    Did you consider, well, I'm pretty fast under shuffle, I'll just try to get behind that vehicle as it backs up across that gravelly driveway?  Did you consider that?

A.    No.

Q.    Why not?

A.    There's other external hazards.  Working in the desert, you have improper sidewalks, hazards in terms of gravel, uneven surfaces.  So there's a potential hazard for trip and fall, and now, factoring that in, you're exposed in a driveway with a vehicle reversing down a driveway.

Q.    Counsel asked you about you engaging in foot pursuits.  And you said, yes, but there were challenges with

30 pounds of equipment.

What are those challenges that you were addressing?

A.    Weight.  It's challenging to maneuver in that fashion with additional 30 pounds.  The loss of equipment.  There's other responsibilities.  It's not a matter of just pursuing someone on foot.  We have to be accountable for our direction and any other factors that are presented, as well as our safety, during that pursuit.

Q.    Was it stressful that night?

A.    Yes.

Q.    Did you want to shoot?

A.    Absolutely not.

Q.    Why did you shoot?

A.    Because I believed that I would be injured or killed if struck by that vehicle.

Q.    What is your training of when you are allowed to use deadly force?

A.    When there is a present ability, an imminent threat of great bodily injury and/or death.  And that pertains to my safety and the safety of others, in this case the reporting party.

Q.    Why didn't you yell, stop, driver, or I will shoot?

A.    It wasn't feasible.  Initially, I made an attempt for Mr. Barber to come and speak to me.  Therefore, any ability to develop a rapport was not practical due to the time

first time you saw the plaintiff standing in that driveway, if you did?

A.    Within that area.

Q.    What, if anything, was the plaintiff doing at that point?

A.    Mr. Barber was near the driver's side of his vehicle and appeared to rummage through some property on the -- of the floorboard.

Q.    When you first saw the vehicle, was the hatchback of the SUV in an up position or a closed position?

A.    Up position.

Q.    When you first saw Mr. Barber near his SUV, was the front door open or closed?

A.    Open.

Q.    So on the right side of this photo, 3-38, there's a chain-link fence which you have mentioned; correct?

A.    Correct, yes.

Q.    Then there's the stucco of that house; correct?

A.    Correct.

Q.    Then we see that opening that we've talked about and then the wooden fence; correct?

A.    Correct.

Q.    How tall was that wooden fence, if you recall?

A.    A little over eye level, approximately a little over 6 feet.

**UNITED STATES DISTRICT COURT**

278

Q.    On the left, we have the metal fence, then it looks like it transitions into a chain-link metal fence?

A.    Correct, yes.

Q.    How tall was that chain-link metal fence?

A.    Roughly around the same height.

MR. RAMIREZ:  At this time, Your Honor, I'd like to move into evidence Exhibit 3-42.  No objection.

THE COURT:  3-42 is admitted.

(Exhibit No. 3-42 for identification and received into evidence.)

MR. RAMIREZ:  May I show it?

THE COURT:  Yes.

MR. RAMIREZ:  Thank you.

BY MR. RAMIREZ:

Q.    Deputy Alfred, directing your attention to what has been admitted as 3-42.

Is this the same driveway we're talking about?

A.    Correct, during the daytime.

Q.    All right.  Before you get to that gravel, is that like hard-packed dirt?  Or what kind of a surface area is that?

A.    Yes, hard-packed dirt.

Q.    Then as you traverse that hard pack, what do you get next?

A.    Loose gravel.

Q.    Did that play any part into your tactical

UNITED STATES DISTRICT COURT

decision-making that evening, that loose gravel?

A.    Yes.

Q.    How so?

A.    Due to trip and fall hazards -- the desert is a very rural area, so that's always a concern in terms of safety with your footing.

Q.    To the left of this photograph, 3-42, there's a tree.

Do you see that?

A.    Yes.

Q.    Using that as a marker, if we can, where were you when you first made any type of statement, warning, command, comment to the person next to the SUV?

A.    Within the loose gravel area.

Q.    At that point, was your gun out?

A.    No.

Q.    What do you recall saying?

A.    I asked the subject to show me their hands -- to show me his hands.

Q.    Did that person respond?

A.    They ignored my -- my request.

Q.    What did you do next?

A.    I repeated the -- the same command.

Q.    What did that person respond -- how did that person respond?

MR. RAMIREZ:  Thank you.

(Exhibit No. 3-98 for identification

and received into evidence.)

BY MR. RAMIREZ:

Q.    Directing your attention to what is depicted as 3-98, Deputy Alfred.  Do you recognize what is shown here?

A.    Yes.

Q.    Okay.  What is this?

A.    The interior portion to the opening.

Q.    Did you think that any portion of this interior opening could have provided you protection from possibly being struck by the SUV driven by the plaintiff?

A.    No.

Q.    Why not?

A.    Just due to the fact the -- the overall structure of it.  This being the material of wood, it doesn't have any solid foundation to sustain any type of impact from a vehicle or a hard object.

Q.    Showing you the front part of the photograph where there's -- appears to be a portion of the fence kicked out. Deputies kicked those out; correct?

A.    Correct.

Q.    Did you think that this would be a good tactical positioning point for you if you were to get behind this wooden fence once you realized the car was backing up?

UNITED STATES DISTRICT COURT

A.      No.

Q.      Why not?

A.      Because I'm still exposed to a substantial risk.

MR. RAMIREZ:  If we could go back to what I think has been previously admitted, Your Honor, as 3-93.

THE COURT:  Yes.

MR. RAMIREZ:  Will you please publish that?

BY MR. RAMIREZ:

Q.      All right.  Deputy Alfred, using Marker Number 9 where your flashlight is, what would it take for you -- with the vehicle spinning its wheels and beginning to back up, what would it take for you to get over to the other side inside that opening?

A.      I would have to quickly move across, from this photograph, from right to left across the gravel, towards that -- that opening.

Q.      Did you consider doing that?

A.      Prior -- on my -- my contact upon my arrival, it was something I did make a mental note of.  But during our interaction, I did not, no.

Q.      Why not?

A.      Because, like I previously stated, once the vehicle was in motion, I would have to run across the pathway of that moving vehicle, on top of the fact that now I have no line of sight of Mr. Barber and, you know, what he's doing at the

UNITED STATES DISTRICT COURT

conclusion of this incident.

Q.    Did you have any indication of what Mr. Barber was going to do with that vehicle as far as is he going to turn it in towards that fence, away from the fence; come straight at you?  Did you know any of that?

A.    No.

Q.    Do you recall Mr. Barber ever yelling out through the open back hatch, hey, I'm not trying to hit you; I'm just trying to move?

A.    No.

Q.    Did you think that he knew you were behind this vehicle?

A.    Initially, no.  But, however, Mr. Barber and I, we did interact briefly with our contact.

Q.    Did you ever tell Mr. Barber, hey, I'm just going to walk away, I'm going to get away from your vehicle?  Did you ever say anything like that?

A.    I did not, no.

MR. RAMIREZ:  At this time, Your Honor, I'd like to move into evidence Exhibit 7-21, a photograph of the driveway and opening area.  No objections.

THE COURT:  7-21 will be admitted.

(Exhibit No. 7-21 for identification and received into evidence.)

MR. RAMIREZ:  Thank you.

UNITED STATES DISTRICT COURT

A.    Medical care.  Preservation of life supersedes scene preservation.

Q.    Counsel talked about force being a last resort, deadly force sometimes being the last resort.  But sometimes is that your only resort?

A.    Yes.  In this case, yes.

MR. RAMIREZ:  May I have just a moment, Your Honor, to check some notes, please?

THE COURT:  Yes.

MR. RAMIREZ:  Thank you.

(Pause in the proceedings.)

BY MR. RAMIREZ:

Q.    Prior to Mr. Barber getting in his vehicle, did you think he looked in your direction?

A.    Yes.

Q.    Do you think that's why he knew you were behind his vehicle?

MR. GALIPO:  Objection.  Assumes facts not in evidence and leading.

THE COURT:  Sustained.

BY MR. RAMIREZ:

Q.    How long did it take you, approximately, to shoot those six rounds?

A.    2 to 3 seconds.

Q.    If it had been safe to do so, would you have

UNITED STATES DISTRICT COURT

attempted to get out of the way of that truck as it backed up?

A.    Yes.

MR. RAMIREZ:  Thank you.

I have nothing further.

THE COURT:  Thank you, Mr. Ramirez.

Mr. Galipo?

MR. GALIPO:  With the Court's permission, we have a witness here we'd like to get on and off, so I'd like to put the witness on and then at the conclusion, I could resume my recross-examination of Deputy Alfred.

THE COURT:  Very well.

Deputy Alfred, you may step down at this time.

Mr. Galipo, would you like to call your next witness out of order?

MR. GALIPO:  Yes.  Thank you, Your Honor.  We'd like to call Scott DeFoe, please.

THE COURT:  Very well.

Mr. DeFoe, please step forward to the witness stand. Thank you.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a

312

This was more of a landlord/tenant-type civil dispute. There was apparently a disagreement at the premises where they, both parties, reside. So in that respect it was -- all calls are serious and should be taken as such is the reason why the police are responding but not to the nature where it was elevated where you reasonably believed someone was armed with a firearm. In this particular case, there was no weapons that were mentioned initially, and primarily the call, as it states on the CAD -- and the CAD is a computer-aided dispatch is what the officer will either get on their computer in their car and/or here on the radio -- was that it was the neighbor is not letting them enter their residence is what the call for service initially came out as.

Q. Did you understand they had a shared driveway?

A. Yes.

Q. There was some issue about whether one person could get in and out of the driveway?

A. Correct. And there was a disagreement over that.

Q. Okay. In the severity of calls that a police officer could respond to, where does this one rank?

A. On the lower level. Once again it's a call for service. You always have to be mindful in a situational awareness, but on the lower level in a metropolitan city such as Adelanto or L.A. where I work, this would be a lower or less important call for service.

Q.    And where did you obtain those measurements?

A.    Just by looking at the reports associated with this. Mr. Morales did a report and Mr. Landerville did a report, as well.

Q.    This Mr. Landerville, he's not a retained expert in this case, is he?

A.    I don't know.

Q.    And he's not a -- he's not a detective with the San Bernardino County Sheriff's Department; is that correct?

A.    A detective, no.

Q.    Did you ever speak with Mr. Landerville?

A.    I haven't spoke to anyone other than you at my depo in this case, Counsel.

Q.    But you considered the time and the distance as part of the totality of the circumstances; is that correct?

A.    Time and distance from --

Q.    The time it took for Mr. Barber to shut the door of the vehicle and put it in reverse and then the total distance that vehicle traveled.  Did you consider that as part of the totality of the circumstances?

A.    Considered all of the facts in the case, ma'am.

Q.    Are all law enforcement officers in the state of California required to have backup to investigate a call for service?

A.    Required, no, ma'am.

UNITED STATES DISTRICT COURT

Q.    Would you agree that it depends on the call for service?

A.    Yes, ma'am.

Q.    And if this was a lower level call for service as you described, why would Deputy Alfred have needed to wait for backup in order to investigate that call for service?

A.    Well, it depends, I mean, if I was told by a reporting party that they reasonably believed that someone may be armed, then that would elevate it or escalate it to the point where I would want to now slow things down and then request an additional unit.

Q.    Okay.  So it's not just because the vehicle is running that Deputy Alfred needed to call for backup; is that fair?

A.    Correct.  It's information he may have derived from the person reporting or people reporting in this case.

Q.    And do you recall what the original call for service was here?

A.    According to the CAD printout, ma'am, it states a -- "RP says neighbor is not letting them in their residence" is what's stated and then "additionally, neighbor was trying to open RP's car doors" is what it states in the CAD, verbatim.

Q.    Okay.  And then when Deputy Alfred actually arrived on scene, he received additional information from the reporting party; correct?

**UNITED STATES DISTRICT COURT**

A.    Still in motion?  I don't know at which point and how far the vehicle went, as I testified to.  It traveled from 30 feet to about 16 feet, so a difference of 14 feet, during the shooting.  And at that point, it rolled an additional 3 feet, to my understanding, after he was removed from the vehicle.

Q.    Are law enforcement officers trained to allow individuals they are attempting to contact as part of a call for service to get into a vehicle and leave the scene in the direction of the reporting party?

A.    Well, there's only one way to leave that scene, and then Deputy Alfred testified to that, so backing out of the driveway, there's only one way out.  And if there wasn't reasonable suspicion to detain, connecting Mr. Barber to any type of criminal activity, he'd be free to leave.

Q.    And he matched, again, the physical description by the reporting party and was at the residence for the call for service; correct?

A.    He was, but still, there wasn't a -- you have to establish that a crime occurred.  The fact if I call the police on you, the police just can't detain you unless I've established that you've committed a crime.

Q.    And that's exactly what Deputy Alfred was doing in attempting to make contact with Mr. Barber; correct?

A.    You know, once again, I don't know what he testified

to here today.

Q.   Okay.  But he was investigating a call for service at that residence?

A.   Yes, ma'am.

Q.   The basis for your opinion that Deputy Alfred was not trained properly by the San Bernardino County Sheriff's Department is solely based on your opinions of his actions during this incident; is that correct?

A.   And the comments I testified to earlier, what he testified to.

Q.   Okay.  When you reviewed the materials in this case, did you review any of the training manuals on the use of force from the San Bernardino County Sheriff's Department?

A.   I believe I did.  I believe I did receive -- I did review the -- obviously, the policies as I read into the record earlier.  Um, I reviewed -- there's miscellaneous training documents I received -- I received and reviewed the 946-page -- not all of it -- the ones that were applicable to this case, the department manual, yes.

Q.   And that's the policy manual for the sheriff's department; correct?

A.   Correct, ma'am.

Q.   But there's additional training materials usually received by law enforcement during their career; correct?

A.   There's both perishable and nonperishable training

**UNITED STATES DISTRICT COURT**

A.    No, ma'am.  I was in the hallway.

Q.    But it is fair to assume that Deputy Alfred did receive training on the specific policies for the San Bernardino County Sheriff's Department; is that fair?

A.    He would be accountable to the policies within the 946-page manual.  Did he receive them and was he trained on them and did they assess that training?  I don't know.

Q.    Do you have any evidence that he did not pass the academy on the first time?

A.    I do not have any evidence of that.

Q.    Okay.  Any -- anything in his training records that you reviewed that he attended any type of remedial training?

A.    No, ma'am.

Q.    Although the San Bernardino County Sheriff's Department policy in effect at this time said "you shall not shoot at or from moving vehicles," it did outline two exceptions to that; exigent circumstances.  Is that correct?

A.    It does.  There are two that is outlined in the actual policy.  It's Bates Number 677.

Q.    And you're not critical at all of the San Bernardino County Sheriff's Department use-of-force policy itself; is that correct?

A.    That's correct, ma'am.

Q.    And that policy does include the policy regarding -- or a subsection, I should call it, the shooting at or from

totality of the circumstances.

Q.    But it is based on what the officer knew and perceived at the time of the incident; correct?

A.    Correct.  But once again, if the officer's perception and what they knew at the time was reasonable based on the totality of the circumstances.

Q.    And you would agree that every deputy has the right to defend themselves from an imminent threat of death or serious bodily injury; correct?

A.    That's correct.

Q.    Would you agree that an officer need not stop shooting until the threat of imminent death or serious bodily injury has ceased?

A.    The threat has to be lethal threat at the time in which the officer uses lethal force, including assessing that lethal force during the deployment of the force, to ensure that you only use force that is reasonable based on the totality of the circumstances.

Q.    And would you agree that shooting incidents can happen in split seconds?

A.    Yes, ma'am.

Q.    And officers are forced to make split-second decisions?

A.    At times, ma'am, yes.

Q.    And you would agree that sometimes law enforcement

UNITED STATES DISTRICT COURT

officers are forced to leave a position of cover or put themselves in harm's way for the safety of the public?

A.     I agree with that.

Q.     Does an individual need to make a verbal threat of harm to a law enforcement officer for them to be an imminent threat?

A.     A verbal threat?  No, ma'am.

Q.     A vehicle, depending on the manner in which it is driven, could be considered a deadly weapon; correct?

A.     Could be.

Q.     And you mentioned reverence for human life, I believe.

A.     Yes.

Q.     That also includes the officer; is that correct?

A.     Yes, ma'am.

MS. ANDERSEN:  Can I have a minute, Your Honor, just to look at my notes?

THE COURT:  Yes.

(Pause in the proceedings.)

MS. ANDERSEN:  I don't have anything further for Mr. DeFoe.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Andersen.

Mr. Galipo.

MR. GALIPO:  Thank you.

started?

A.    Correct.

Q.    And so did you calculate in your workup on this case how far the vehicle moved back as of the time of the first shot?

A.    Yes.

Q.    And what was your determination?

A.    13 feet.

Q.    No, as of the time of the first shot is my question, not total.

When the first shot occurred, how far did it move back?

A.    Oh.  The vehicle was pretty much not -- I would estimate -- I estimated that it was like close to 1 foot.

Q.    Okay.  So -- and we're going to get to the basis of your analysis.  But you're saying that the vehicle either hadn't moved back or moved up to 1 foot back at the time of the first shot?

A.    Correct.

Q.    And we'll get to that in a moment.

So going back, then, to Exhibit 3, page 15.  If I'm understanding you correctly, you're saying that the vehicle moved back a total, by the time all the shots had stopped and the vehicle stopped, about 13 feet?

A.    Yes.

**UNITED STATES DISTRICT COURT**

A.    I made some calculations for that.

Q.    What was your calculation?

A.    Um, so the vehicle -- let me see if I can organize my thoughts.

Your question was about the distance.  Can you please restate the --

Q.    Sure.

A.    -- the question?

Q.    Do you know -- like, for example, at the time of the second shot, how far had the vehicle moved?

A.    At the start of the second?

Q.    At the time of the second shot.  You said the first shot, it moved not at all or a very short distance.  How about the second shot?

A.    I got an interval of .4 feet between the first and the second shot.

Q.    How far had it moved total as of the time of the third shot?

A.    Total would be 1.4 feet.

Q.    How about the time of the fourth shot, how far had it moved?

A.    Like 2. -- 2.2.

Q.    2.2.  Feet at the time of the fourth shot?

A.    Yes.

Q.    How about the time of the fifth shot, how far had it

moved?

A. 3.6.

Q. And then you told us there was a second gap between -- a little over a second gap between the fifth shot and the sixth shot?

A. Yes.

Q. So you're saying at the time of the fifth shot, it had moved about 3.6 feet?

A. Yes.

Q. How far had it moved back at the time of the last shot?

A. Approximately 6., um -- 6.2.

Q. Feet?

A. Yes.

Q. And then after the last shot, it would have moved back the remaining distance up to the 13 feet?

A. Correct. In 3.5 seconds.

Q. So if a car is in reverse and the driver does not have their foot on the accelerator or the brake, what would the car normally do?

A. It would roll back.

Q. Um, now I want to ask you about -- one moment, please.

When you looked at the photos of the resting position of the Trailblazer, did you look to see whether the

**UNITED STATES DISTRICT COURT**

front wheels were turned or straight?

A.    Yes.

Q.    And how were the front wheels in its resting position?

A.    There is some minor -- you can see there's some minor -- minor angle -- angular deviation, but that's -- pretty much look almost straight.

Q.    Okay.  Now, given your timeline from the door closing to the time of the first shot being about 3-and-a-half seconds, did you try to determine whether or not, time-wise, Deputy Alfred would have enough time to get out of the path of the vehicle before the first shot?

A.    Yes, I believe so.

Q.    And what is -- out of curiosity, realizing some of us walk faster than others, but, generally speaking, what is the walking speed of a normally healthy person in terms of feet per -- per second?

A.    3.5 miles per hour.

Q.    How many feet per second?

A.    That's 5.2 feet per second.

Q.    Now, I want you -- to ask you this.  Assuming hypothetically that Deputy Alfred was 3 to 4 feet from the opening that we see in this Exhibit 3, page 16 -- can you assume that for a moment?  He's 3.4 feet from the threshold. Are you able to assume that?

A.    Yes.  Yes.

Q.    How long, in your opinion, would it take him, even if he was walking, to travel that 3 to 4 feet?

A.    One second.

Q.    And if he was moving quicker than a walk, it would take less?

A.    Correct.

Q.    Given the distance Deputy Alfred was from the vehicle, even assuming he was in the area of that flashlight, given the amount of distance the vehicle was moving back and its speed at various times that you indicated, do you have an opinion as to whether Deputy Alfred had enough time to step out of the way?

A.    Yes.

Q.    What is your opinion?

A.    I think there is -- there is a short distance, um, to be covered in -- like, really -- in plenty of time.

Q.    And so if a person -- I think you said a person could walk that distance in about 1 second?

A.    Correct.

Q.    And the shooting from the beginning to the end was how long, again?  First shot to last shot?

A.    2.5 seconds.

Q.    And how much time, again, was it from the time the -- the door closed to the time of the first shot?

**UNITED STATES DISTRICT COURT**

A.    3 seconds.

Q.    Look again, if you can, at page 11 of your time.

A.    Can you please --

Q.    Sure.  How much time passed from the closing of the door -- let's give you two questions.

How much time passed from the closing of the door to the vehicle starting to move backwards?

A.    Well, I think, based on the reference that I have over here on the table, since -- I believe the vehicle was moving very slow or not moving at all, my reference is the first shot.

Q.    Okay.  And how long was the closing of the door to the first shot?

A.    It's approximately 3 -- more than 3-and-a-half seconds.

Q.    And, again, if Deputy Alfred was standing near the flashlight, what would be his distance from the back of the car at the time of the first three or four shots?

A.    Like 30 feet; 30, 29 feet.

Q.    And take the last shot.  You said the vehicle moved back about 6-and-a-half feet by the time of the last shot. Assuming Deputy Alfred was near the flashlight, what would be the distance of the back of the vehicle from him at the time of the last shot?

A.    24 feet.

UNITED STATES DISTRICT COURT

(At sidebar:)

THE COURT:  Ms. Brunson, I believe you estimated approximately an hour and a half for this witness.  We are not doing an hour and a half like this.

You need to move on from things that are not relevant to this case, from things for which there is no evidence in this case, and I would watch your tone with this witness.  Do you understand?

MS. BRUNSON:  Yes.

THE COURT:  Thank you.

(In the presence of the jury:)

THE COURT:  You may proceed.

BY MS. BRUNSON:

Q.    Did you conduct any reenactments with a 2003 Chevy Trailblazer where you put it into reverse on the driveway at that location?

A.    No.

Q.    Describe for us your training in the field of audio analysis.

A.    Pardon me?

Q.    Describe for us any training or education you have received specific to the field of audio analysis.

A.    That's included on the, um, LEVA 1 and LEVA 2, the forensic video analysis.

Q.    What kind of analysis?

A.    Forensic video analysis.

Q.    That's -- the audio analysis --

A.    Yes.

Q.    -- is part of that?

A.    Yes.

Q.    And when did you take those trainings?

A.    In February 2021 and 20' -- and May 2021.

Q.    How many times have you testified as an expert in the field of audio analysis?

A.    I testified my -- my, um -- my services include, um, video analysis as an accident reconstructionist.  It's included.

Q.    Did I hear you correctly, you said your services include video analysis?

A.    Video analysis.  And video analysis, it's -- audio is encapsulated on the video analysis, as well.

Q.    Because there was no video in this case, was there?

A.    That's correct.

Q.    Are you certified in the field of audio analysis?

A.    I'm certified on the -- in the field of video analysis.

Q.    And when did you receive that certification?

A.    February 2021 and May 2021.

Q.    And you conducted a detailed forensic analysis to extract critical information from Deputy Alfred's recorder; is

**DIRECT EXAMINATION**

BY MR. DIGGS:

Q.    Good morning, Mr. Barber.

THE COURT:  Mr. Barber, if you could please spell your name for the record.

THE WITNESS:  Steffon, S-t-e-f-f-o-n.

THE COURT:  Last name.

THE WITNESS:  Barber, B-a-r-b-e-r.

THE COURT:  Thank you.

You may proceed.

MR. DIGGS:  Thank you, Your Honor.

BY MR. DIGGS:

Q.    Good morning, Mr. Barber.

A.    Good morning, sir.

Q.    Mr. Barber, how old are you currently?

A.    39.

Q.    Okay.  And in April of 2021, what city and state were you living in?

A.    I was residing in Adelanto, California.

Q.    All right.  Now, briefly, Mr. Barber, on the night of April 27th, 2021, you have a memory of that?

A.    A little.  A little.

Q.    Okay.  Were you at your home located on White Avenue?

A.    Yes.

**UNITED STATES DISTRICT COURT**

Q.    Okay.  And that night, did you hear anyone talking to you as you were trying to get in your vehicle, which we talked about yesterday?

A.    Yes.

Q.    Okay.  And did you know who was speaking to you?

A.    No.

Q.    Could you see who was speaking to you?

A.    Not at all.

Q.    Did you have any indication that the individual that was speaking to you was a police officer?

A.    No.

Q.    Did you see any police lights that evening?

A.    No.

Q.    Okay.  Did anyone announce to you, Mr. Barber, that they were a police officer?

A.    Not at all.

Q.    Who did you think you were talking to that evening?

A.    I don't remember.

Q.    All right.  Now, at some point, you got in your vehicle?

A.    Yes.

Q.    Okay.  What is the last thing that you remember?

A.    Getting in my vehicle.

Q.    What is your next memory thereafter?

A.    Waking up in the hospital.

Q.   Okay.  All right.  What did you discover, Mr. Barber, when you woke up in the hospital?

A.   Um, I couldn't move.

Q.   Could you move your legs?

A.   No.

Q.   Could you move your arms?

A.   No.

Q.   All right.  And how long were you in the hospital?

A.   Approximately five months.

Q.   Okay.  And have you learned that you were shot in the head?

A.   Yeah, through the nurses.

Q.   Okay.  And during the time that you were in the hospital, Mr. Barber, did you have any surgeries?

A.   Yeah.  They informed me that I had brain surgery.

Q.   Okay.  Um, and do you still have a scar on your head from the brain surgery?

A.   Yes.

Q.   Can you show the ladies and gentlemen of the jury the scar?

A.   (Indicating.)

Q.   Okay.  Now, Mr. Barber, I would like to show some documents to you.

MR. DIGGS:  And, Your Honor, myself and counsel have talked and we agreed on the documents already -- the exhibits

**UNITED STATES DISTRICT COURT**

that I will be moving into evidence will be Exhibit 8-1, 8-2, 8-3, 8-5, 8-6, and 8-9.

THE COURT:  All right.  So 8-1, 2, 3, 5, 6, and 9.

MR. DIGGS:  Yes, Your Honor.

THE COURT:  Very well.  Then those will be admitted, and you may publish.

(Exhibit Nos. 8-01, 8-02, 8-03, 8-05, 8-06, and 8-09 for identification and received into evidence.)

MR. DIGGS:  Thank you, Your Honor.

BY MR. DIGGS:

Q.   I'll just briefly, Mr. Barber, just show you -- is that you in the picture that we're seeing right now?

A.   Yes, sir.

Q.   Okay.  And do you know how long you were like this in the hospital during the five months?

A.   I don't know.

Q.   Okay.  And this one, again, is that you in the hospital?

A.   That is me.

Q.   Okay.

THE COURT:  And when you're putting them up, if you could refer to them.

MR. DIGGS:  Oh.  Yes.  Exhibit 8-2.

The next exhibit published is Exhibit 8-3.

**UNITED STATES DISTRICT COURT**

THE COURT:  Thank you.

MR. DIGGS:  Uh-huh.

BY MR. DIGGS:

Q.    And did the nurses tell you what was going on when you finally woke up in the hospital, what -- while you're in the bed like this?

A.    Well, I wasn't awake then, that I remember.  I -- when I -- when I woke up, I was -- I didn't have all the tubes and stuff.  I just had -- they came, they were doing -- I had staples all the way on my head.

Q.    Understood.

And I'm going to show these just briefly, Mr. Barber.

8-5.  That is your head where the bullet entered; is that correct?

A.    Yes, sir.

Q.    Okay.  And Exhibit 8-6, showing the same thing, your head, Mr. Barber?

A.    Yes, sir.

Q.    Okay.  And you briefly just mentioned now your head was shaven.  I'm going to show Exhibit 8-9.

Is that your head prior to the hair shaving off?

A.    Yes.

Q.    Okay.  All right.  Thank you, Mr. Barber.

Now, Mr. Barber, how did you feel when you learned

you had been shot in the head?

A.    I was devastated.  I couldn't -- I didn't understand -- I didn't understand it.

Q.    All right.  And how did you feel when it -- when you learned that it was a police officer that shot you in the head?

A.    It -- oh, I -- I don't -- I can't describe it.

Q.    Okay.  Let me ask you this, Mr. Barber.  Do -- the shooting happened in 2021 and we're in 2026.  Do you still think about the shooting?

A.    Every day.

Q.    Okay.  Do you ever have any nightmares about what happened that evening?

A.    I don't really have a good memory of what happened that -- that evening.

Q.    All right.  Now, Mr. Barber, we see that you are in a wheelchair.  Is that correct?

A.    Yes, sir.

Q.    All right.  And is that how you generally get around?

A.    Yes.

Q.    Okay.  Now, before April 27th, 2021, were you able to walk?

A.    Yes.

Q.    Were you able to run?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    Are you able to run now?

A.    Not at all.

Q.    Okay.  Before this incident happened, Mr. Barber, did you participate in any sports?

A.    I wasn't good at any sports, but I did, like, a little basketball or something --

Q.    Okay.  And --

A.    -- at that time.

Q.    I'm sorry.  I didn't mean to cut you off.

And are you able to play basketball now?

A.    Not at all.

Q.    Okay.  What other physical activities did you do prior to April 27th, 2021?

A.    Um, just general labor, I guess.  I don't know.

Q.    Okay.  And, Mr. Barber, are there any issues with your left arm?

A.    Yeah.  I have mobility issues.

Q.    Okay.  Are you able to stand up at all?

A.    Not for long periods of time.

Q.    Okay.  And you generally need help to stand up?

A.    Assistance, yes.

Q.    Okay.  And prior to April 27th, 2021 -- sorry -- did you have any issues walking or standing?

A.    No.

Q.    Okay.  Now, just want to talk about some of the

UNITED STATES DISTRICT COURT

daily activities, Mr. Barber, starting from after the shooting.

Are you able to tie your shoes?

A.    I can get around to it eventually.  It takes a -- it takes a great amount of energy and time to -- to do the little -- little things like that because it's more -- I don't know the word -- like, intricate or something.  I don't know. I don't know.  But it's more -- it's more difficult trying to tie my shoes.

Q.    Understood.

And are you able to button your shirt?

A.    I can -- I can manage eventually if it's not, you know -- I -- I couldn't get this top one, but I managed the rest of them.

Q.    Understood.

Are you able to shower yourself?

A.    Yeah.

Q.    Okay.  And we talked about your shirt.  But are you able to get dressed by yourself?

A.    Yes.

Q.    Okay.  Now, Mr. Barber, as a result of the shooting, do you experience any pain?

A.    Yes.  Yes.

Q.    Can you describe the type of pain that you experience for the ladies and gentlemen of the jury?

A.    Um, it's -- it's like a constant stinging, like a

pricking.  It don't -- it doesn't never go away.  It -- sometimes it's easier to deal with, you know, but, um -- it's always there, you know.  It never -- it never -- it's a never -- it's never a moment where it -- where I'm without pain, you know.

Q.    And, Mr. Barber, when did you first start experiencing this pain?

A.    Um, before the -- right before they discharged me from the hospital.

Q.    All right.  And you mentioned, does -- does the pain ever stop?

A.    No.

Q.    Let me ask you this, Mr. Barber, to put into perspective.  How many days in the past week have you experienced pain?

A.    Every day.

Q.    How many days in the past month have you experienced pain?

A.    Every day.

Q.    How many days in the past year have you experienced pain?

A.    The same answer.  If it -- if it's not -- if it's not one area, it's another area.

Q.    All right.

A.    So it's -- it's -- it's constant.  I'm constantly in

pain in some area or multiple areas in my -- in my life -- in my body, every day.

Q.    As you sit here now in court, are you experiencing pain?

A.    Right now.

Q.    Do you experience headaches -- I'm not talking about regular headaches that, you know, you may receive, but do you experience a different type of headache at all as a result of being shot in the head?

A.    Yes.

Q.    And can you just -- are you able to describe that?

A.    Words can't -- can't describe that.

Q.    All right.  Do you have muscle spasms as a result of being shot?

A.    Yes.

Q.    And how frequent and in which part of the body do you have muscle spasms?

A.    I have leg spasms, um, then my -- my -- my left hand goes numb from time to time; the toes, I could -- I -- I could feel them, but I can't move them, you know.  I don't --

Q.    Are the muscle spasms that you have, are those painful?

A.    Yeah, sometimes.

Q.    All right.  Before April 27th, 2021, that you were shot in the head, Mr. Barber, did you have this constant pain

every day that you just described to the ladies and gentlemen of the jury?

A.    No.

Q.    Okay.  Before -- this day before you were shot, did you have the type of headaches that you just described to the ladies and gentlemen of the jury?

A.    No, sir.

Q.    Okay.  Before you were shot, Mr. Barber, did you experience the type of spasms throughout your body that you just explained?

A.    No.

Q.    All right.  As a result of the shooting, Mr. Barber, has your memory changed at all?

A.    A little bit, yeah.

Q.    Do you have any challenges in remembering certain things like --

A.    It's hard -- it's harder.

Q.    Harder.

A.    To retain information.

Q.    Did you have the same type of memory issues in terms of retaining information prior to the shooting?

A.    I never had the best, but, I mean, it wasn't as it is today.

Q.    Understood.

Now, just briefly, Mr. Barber, can you tell the

UNITED STATES DISTRICT COURT

ladies and gentlemen of the jury, like, how do you feel -- it's been almost, you know, five years, but how do you feel now that you're in a wheelchair and you weren't in a wheelchair prior to the shooting?

A.    Um, how do -- how do I feel?

Q.    Yeah.  How do you feel about being in a wheelchair?

A.    Uh, I don't have -- I don't have -- let me see. Well, you know, life has its obstacles; right?  I was struggling before this, now this is a whole new struggle I have to -- that I'm trying to -- I'm trying to deal with it.  And, um, I have my good days and bad days.

Q.    We talked about some of the physical activities that you were doing prior, and I know you said that you weren't that good in basketball.  But how does it make you feel now that you're in a wheelchair and the activities that you used to do, such as running or even walking or playing basketball, that you can't do that anymore?  How do you feel about that?

A.    I feel cheated.

Q.    Mr. Barber, I'm almost done.

Almost five years later since this happened, has -- has the -- the level of pain, um -- has it gotten any better since when you woke up in the hospital?

A.    I mean, I had my -- my good days and bad days, but the pain is always there.

Q.    You mentioned the mobility in your left arm.  Has --

**UNITED STATES DISTRICT COURT**

has it gotten any stronger at all?

A.    No.

MR. DIGGS:  All right.  No further questions.

Thank you, Mr. Barber.

THE COURT:  Thank you.

Mr. Ramirez, cross-examination?

MR. RAMIREZ:  Miss Andersen will be handling it, Your Honor.

THE COURT:  Very well.

Ms. Andersen.

MS. ANDERSEN:  Yes, Your Honor.  Thank you.

**CROSS-EXAMINATION**

BY MS. ANDERSEN:

Q.    Good morning, Mr. Barber.

A.    Good morning, ma'am.

Q.    You were asked by counsel about memory issues.  Do you recall giving a deposition in this case?

A.    Yes.

Q.    Back in September of last year.  Does that sound accurate?

A.    Yeah, 20 -- yes, 2025.

Q.    You told counsel that you don't recall anything after getting into the vehicle before waking up in the hospital; right?

A.    Yes.

**UNITED STATES DISTRICT COURT**

Q.    But you do recall the events that happened before you got into the vehicle.  Is that fair?

A.    Fair.

Q.    You recall your neighbors as Maria Gallo and Joseph Cocchi?

A.    Yeah.  They were -- the husband and wife landlords in the front house.

Q.    Okay.  The front house that's located on White Avenue?

A.    Yes, ma'am.

MS. ANDERSEN:  Okay.  I discussed with counsel, Your Honor, Exhibit 3-68.  I believe it's -- we've stipulated to it.

MR. DIGGS:  Yes.  No objection, Your Honor.

THE COURT:  Very well.  3-68 will be admitted, and you may publish.

(Exhibit No. 3-68 for identification

and received into evidence.)

MS. ANDERSEN:  Thank you, Your Honor.

BY MS. ANDERSEN:

Q.    Do you see the photograph on the screen in front of you?

A.    Yes.

Q.    And do you see Maria and Joseph Cocchi's house in that photo?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    Okay.  Is it that photo -- I'm sorry.  Is it the house on the right side of the photograph?

A.    Yes.

Q.    Okay.

MS. ANDERSEN:  And then next exhibit, Your Honor, will be 7-25, again by agreement with counsel.

MR. DIGGS:  No objection, Your Honor.

THE COURT:  7-25 will be admitted.  You may publish.

(Exhibit No. 7-25 for identification and received into evidence.)

MS. ANDERSEN:  Thank you.

BY MS. ANDERSEN:

Q.    All right.  Do you see the photograph in front of you?

A.    Yes.

Q.    Does that photograph depict your residence that you were living in at the time of the incident?

A.    Yes.

Q.    Okay.  And it's the building essentially right behind that house we just looked at in 3-68; correct?

A.    Yes, ma'am.

Q.    Okay.  And that's because Maria and Joseph were the landlords for the property where you were living; is that correct?

**UNITED STATES DISTRICT COURT**

A.    Correct.

Q.    How long had you lived at that residence prior to April 27th of 2021?

A.    Roughly a year, I believe.  I'm not too sure.

Q.    And was that consistently you lived there for an entire year with the same landlords?

MR. DIGGS:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Had you interacted with Maria and Joseph prior to April 27th of 2021?

A.    No.

Q.    So this whole incident started because you were leaving at that exact moment you heard this voice in the driveway to go to the corner store; is that correct?

A.    Yes.

Q.    Okay.  Where was this corner store?

A.    It was off of Bartlett, Bartlett and Pearmain.

Q.    And how -- how long would it take you to get there from your house?

A.    Couple minutes.

Q.    Okay.  And this incident took place about a little after 11:00 PM on a Tuesday, April 27th of 2021.  Does that sound accurate?

A.    I had thought that was earlier, but I'm not sure.

476

Because I think the store closes at either 10:00 or 11:30. 10:30, 11:30, I'm not sure.  I don't remember.

Q.    Okay.  Had Ms. Gallo or Mr. Cocchi ever given you a ride to the corner store before this date?

A.    No.  I never needed a ride.

Q.    Do you recall asking them for a ride on the date of this incident to go to the corner store?

A.    Yes.

Q.    When you were asking them that question, were they inside their vehicle or were they outside their vehicle?

A.    I don't remember.

Q.    Do you remember if one or both of them was inside or outside the vehicle one way or another?

A.    One -- it was Cocchi at first.  I talked to him.  I never talked to, um -- that I was -- I was blocked in the driveway.  So he didn't want to move his car for -- for whatever reason, so I asked him could he just give me a ride to the store since he didn't want to move his car because I was blocked in.  He never parked where he parked any other time, you know.  So I don't know what was going on or -- but I was just trying to leave to go to the store.

Q.    Where were you when you had this interaction with Joseph?

A.    In the driveway.

Q.    Were you standing next to your vehicle?

**UNITED STATES DISTRICT COURT**

A.    Um, my vehicle was -- was parked where it always was parked at, in the -- in the driveway.

Q.    I guess we'll look at this photo as an example. Would it have been closer, more forward towards those trash cans that's depicted, at least the blue one?

A.    Yeah.  Closer to the air compressor.

Q.    I'm sorry, the what?

A.    Air compressor closer to the -- to the fence.

Q.    Okay.

A.    Like right -- like right near the second -- second door.

Q.    So where was Joseph when you were having this contact with him?

A.    In the driveway.

Q.    Was he inside a vehicle or was he outside the vehicle?

A.    He was in his vehicle in back of my vehicle.

Q.    Okay.  And did you ask him to move?

A.    I don't recall.

Q.    Do you recall pulling on his door handles?

A.    His door handles?  No, I don't recall.

Q.    Okay.  But you did -- you do recall asking them to give you a ride to the corner store?

A.    Yeah, he refused.  He said that he was waiting on his wife or something.

**UNITED STATES DISTRICT COURT**

Q.    Do you know where your landlords typically park that vehicle that you claim was blocking the driveway?

A.    In -- in the -- in the -- in their area where they normally -- you know, we share the driveway up to a certain point before the break.  And then they park their cars in their little -- their little break right there.  I don't know how to explain it.

Q.    Okay.  But off of the driveway.  They don't park in the driveway?

A.    No, they don't ever park in the driveway.

Q.    Do you recall anything that they said to you about your vehicle being in their way?

MR. DIGGS:  Objection.  Hearsay.

THE COURT:  Sustained.  I'm not sure what the relevance of this line of questioning is either.

MS. ANDERSEN:  Okay.  Your Honor, I'll move on.

THE COURT:  Thank you.

BY MS. ANDERSEN:

Q.    Do you recall seeing your neighbors leave in the vehicle after you had this interaction with Joseph?

A.    Yeah, they finally did leave.  So then that's when I was able to -- to -- to leave myself, because I was blocked in. I couldn't leave while they were doing whatever they were doing or not wanting to move for whatever reason.

Q.    Okay.  Did -- did you say anything to them before

UNITED STATES DISTRICT COURT

they left?

A.   No.

Q.   But you saw them drive away and completely exit the driveway; is that correct?

A.   Yeah.  It took them -- it took them a while.  She came home and then they backed the cars up or whatever.  Then the driveway was finally clear, and that's when I was getting ready to leave, and that's when I heard somebody talking to me.

Q.   How much time would you estimate passed between your neighbors driving away -- or at least exiting the driveway to when the deputy arrived, this voice arrived?

A.   I don't -- I don't recall.  It wasn't that long.  It was like -- it seemed like right -- like right after -- it had to be a few minutes, but it seemed like it was right away.

Q.   Do you recall previously testifying it was about 5 minutes?

A.   I think.  Vaguely -- you know, I don't know exactly the number but it was -- it could have been more or less.

Q.   Okay.  In that time frame, after your neighbors exited before you heard this voice in the driveway, you did not go to the corner store?

A.   No, I never made it.

Q.   Okay.  And that's because the police showed up and instructed you not to get in the car; is that correct?

A.   I didn't even know the police came.  I didn't know

**UNITED STATES DISTRICT COURT**

they were even called.

Q.   Do you recall testifying to that in your deposition, that the police came up and instructed you not to get in the car.  That's why you didn't leave?

A.   I don't recall that.

Q.   Okay.

MS. ANDERSEN:  I'd like to go to his deposition transcript, page 35, lines 10 through 19.

THE COURT:  Is this to refresh recollection?

MS. ANDERSEN:  This is to impeach, Your Honor.

THE COURT:  Well, he said he didn't recall.  So the proper thing to do would be to see whether or not anything would refresh.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.   Would it refresh your recollection to look at your prior testimony in this case?

A.   I don't -- I don't have a problem with it.

Q.   Okay.  There is a stack over there.  One has your name on it.  Are you able to find it, Barber, Steffon?

MR. GALIPO:  We have an extra copy, also, if necessary.

THE COURT:  We have a copy.

MR. DIGGS:  Counsel, can you give page and line numbers?

481

MS. ANDERSEN:  Yes.  35, lines 10 through 19.

BY MS. ANDERSEN:

Q.    Mr. Barber, let me know when you get to the page. Okay?

A.    What page is it again?

Q.    It's page 35 of that transcript.

A.    Which number am I looking at?

Q.    Yes.  It would be lines 10 -- starting at line 10, down to 19.

A.    Hmm.

Q.    Have you had an opportunity to look at those lines?

Mr. Barber, does that refresh your recollection at all to giving me that testimony at your deposition?

A.    Yeah.  I mean, it doesn't really refresh my memory, but, I mean, I -- obviously I said it, you know.

Q.    And although you told counsel when he was asking you questions that you didn't know who the voice was, in deposition you testified it was Joseph Cocchi, your neighbor.

MR. DIGGS:  Objection, Your Honor.  Misstates the testimony in the deposition.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you know who the voice you were speaking with that night was?

A.    No.

UNITED STATES DISTRICT COURT

Q.    Did you believe it was your neighbor?

A.    It possibly could have been.  I don't know.

Q.    Well, can I have you look at those same lines again, page 35, lines 10 through 19, please, and see if it refreshes your recollection about whether you thought it was your neighbor at that time?

(Pause in the proceedings.)

THE WITNESS:  Yeah.  I'm reading it, but I never -- I never made contact with the police officer.  I never knew it was a police officer.

BY MS. ANDERSEN:

Q.    Yeah, my question was actually about the neighbor, whether at the time of this incident you believed you were speaking with your neighbor.

A.    Yeah, because that's the person I had -- I had the verbal little altercation with, with Cocchi.

Q.    Do you mean before --

A.    Before --

Q.    -- you got in your vehicle?

A.    Before I jumped into the car, yes.

Q.    So did you believe that it was Joseph Cocchi that you were speaking with before you got to your vehicle?

A.    That was talking to me?  Yes.

Q.    Why do you think your neighbor would instruct you to show you -- show him your hands?

UNITED STATES DISTRICT COURT

MR. DIGGS:  Objection.  Calls for speculation. Conjecture.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    So after you had your interaction -- your initial interaction, I guess we'll say, with Joseph in the driveway and they've exited, the next thing you know there's a deputy in your drive -- driveway asking you something to the effect of, "hey, bud, come over here."  Is that correct?

A.    I didn't know the deputy --

MR. DIGGS:  I'm sorry.  Objection.  Assumes facts not in evidence as phrased.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you hear "hey, bud, come over here"?

A.    I did.

Q.    Okay.  And then you received commands, "let me see your hands."

Did you hear those?

A.    Yes, ma'am.

Q.    Okay.  And in response to that, the command to see your hands, you told this voice to show you his hands; is that correct?

A.    Right.

Q.    Okay.  If you couldn't see this individual, why were

you asking to see his hands?

A.    To see where -- where the person was at.

Q.    Did you ever yell "who are you" or "why are you asking me these things" at any time before you got in the vehicle?

A.    I think something along the lines of -- or -- "who are you" or "what are you doing back here," something -- something along those lines.

Q.    When did you say that?

A.    Sometime during the discourse.

Q.    Have you listened --

A.    Or the oral exchange.

Q.    I apologize.  I cut you off.

We have played the audio, which is Exhibit 10 in this case, multiple times in your presence.

Have you listened to it?

A.    Vaguely -- yeah, a little bit.

Q.    Did you ever hear yourself on the audio asking "who are you"?

A.    Who are -- I don't -- I don't recall saying "who are you."  I thought it said "what are you doing back here" or -- along those lines.  I don't know.  I try not to listen to it, to be honest with you.

Q.    Did you also tell this voice to "back the fuck up"?

A.    Yeah, I do recall that.

**UNITED STATES DISTRICT COURT**

Q.    Okay.  And, again, why are you asking this person to back the fuck up if you can't see them?

A.    Because I was -- my intentions were to leave the driveway.

Q.    Did you know where they were?

A.    No.

Q.    So did you know whether or not they were even in the driveway?

A.    I don't know.  All I know I was trying to leave -- leave to go to the store, that's it.

Q.    Then why the phrase "back the fuck up" if you're just trying to back up your vehicle?

A.    Because I'm going to be backing out the vehicle, backing my car out -- I don't know.  I can't -- I can't give you an answer to that.

Q.    Do you know what color uniform deputies with the San Bernardino County Sheriff's Department wear?

A.    I've had -- I've had a lot of run-ins with them, yeah.

Q.    Okay.  What -- what does their uniform look like, like color?

A.    Like color?  It's -- it's tan and -- tan and green.

Q.    And that would be tan shirt, green pants?

A.    Yeah.

Q.    Okay.  This voice also told you not to get into your

**UNITED STATES DISTRICT COURT**

vehicle; correct?

A.    Correct.

Q.    And then you did it anyway?

A.    No.  First he told me don't put my hands in the vehicle, and I wasn't sure if he was talking to me or not.  So I stuck my hands in the vehicle and nobody said anything.  So I assumed that he wasn't talking to me.

Q.    And you pulled out a cell phone at that time; correct?

A.    No.  I jumped in the car at that time.

Q.    The first time, when you reached into the vehicle, was it to grab your cell phone?

A.    I believe so, yes.

Q.    Okay.  And so you heard "don't get in your car," you reached in, grabbed a cell phone, then you step back out of the vehicle?

A.    I'm not sure.  I think -- I'm not sure if it was all one motion or not or -- or --

Q.    Did you hear "don't get in the vehicle" or "don't get in the car" more than one time?

A.    I don't -- I don't understand where we're going with this.

Q.    Did you hear it more than once?  That's all I'm asking.  "Don't get in your vehicle, don't get in your car"?

A.    I remember hearing it.  I don't remember the number

**UNITED STATES DISTRICT COURT**

of times.

Q.    And then you did eventually get into your vehicle; correct?

A.    Yes.

Q.    And closed the door?

A.    Yes, ma'am.

Q.    And left the trunk wide open?

A.    Yes, ma'am.

Q.    Okay.  And that was to go to the corner store?

A.    Yeah.

Q.    With the trunk open?

A.    Or to back out the driveway.

Q.    Do you typically back out the driveway with your trunk wide open?

A.    No, but it was dark out that night.

Q.    Why didn't you close it, then?

A.    Why didn't I?  I didn't get around to it.  I never made it out the driveway.

Q.    Why didn't you close it before you got into the vehicle?

A.    Because the back hatch up, it illuminates the whole driveway.  It's a dark -- it's a dark, little, long strip and an old car.

Q.    So are you saying that you typically reverse your vehicle out of the driveway with the trunk wide open?

A.     No, not normally, because I normally don't leave at night.  But in that incident, in that circumstance, I was -- I was going to back out the truck -- leave it open so it could illuminate the whole backyard -- I mean, the whole -- the whole driveway because it's dark.

Q.     Okay.  And you said the corner store closes around 10:00 or 11:00.  Is that your understanding?

A.     Yeah.  I'm not sure.  If -- if that one was closed, I probably would have went to the actual gas station or something, I don't know.

Q.     But you recall testifying about going to the corner store specifically?

A.     Yeah.  That was my intention.

Q.     But it could have been closed if this incident took place after 11:00.  Is that fair?

A.     True.

MR. DIGGS:  Objection.  Argumentative.  403.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.     Did those voice -- the voice you heard telling you "don't get in the vehicle, don't reach in the vehicle, show me your hands," do those sound like law enforcement commands?

A.     I don't know what law -- I don't -- I don't know -- I haven't had that conversation with law enforcement.

Q.     Ever?

UNITED STATES DISTRICT COURT

THE COURT:  Move on.

MS. ANDERSEN:  If he opens the door, is that not --

THE COURT:  Move on.

MS. ANDERSEN:  Okay.

BY MS. ANDERSEN:

Q.    So you didn't tell this voice, hey, I'm just going to leave, I need to make it to the corner store?

A.    No.

Q.    Okay.  And you got in the car, it was already idling, it was already on?

A.    Yes, ma'am.

Q.    Was it in park when you got into the vehicle?

A.    Yes.

Q.    Okay.  And then you shifted it into reverse?

A.    Upon me attempting to leave, yes.

Q.    So you do recall that part of getting into the vehicle and shifting it into reverse?

A.    All I remember really is getting in the vehicle.  I must have had -- I must have shifted it into reverse because that was my intention was to leave.  I don't know where we're going with that.  I mean, I'm trying to be honest and answer the question, but I don't know -- you're not -- you're not taking my answers.  I don't know how to explain it.

Q.    Well, I'm just asking you questions.  I'm -- did you -- you do have a recollection of the car moving backwards,

though; is that correct?

A.    No.  I remember getting in the car and -- and next thing I remember waking up in the hospital.  I don't remember putting it in reverse, I don't remember -- I don't remember those things.

Q.    Can I have you take a look, then, at page 48 of that same deposition transcript?

A.    48?  Yes, ma'am.

Q.    And lines 20 to 22?

A.    48:20?

Q.    Yes.  Page 48, lines 20 to 22.

A.    20 to 22.

(Pause in the proceedings.)

BY MS. ANDERSEN:

Q.    Were you able to take a look at those lines?

A.    Yes, ma'am.

Q.    Do you have a recollection of the car moving backwards?

A.    It doesn't change my answer.

MS. ANDERSEN:  Your Honor, that's impeachment.  I'd like to use this as impeachment.

THE COURT:  You can go ahead and read the question at line 20 and the answer.

MS. ANDERSEN:  Thank you, Your Honor.

"QUESTION:  But do you have a recollection

**UNITED STATES DISTRICT COURT**

of the car moving backwards?  Is that correct?

"ANSWER:  Yes."

BY MS. ANDERSEN:

Q.    And then you do recall feeling a gunshot; is that correct?

A.    Yes.

Q.    Okay.  And that was while you were in the vehicle; correct?

A.    Yes.

Q.    Do you recall whether the vehicle was still moving backwards when you felt that gunshot?

A.    No.  I don't know.

Q.    So it's not completely accurate that you don't recall anything after closing the door on the vehicle and waking up in the hospital; is that correct?

A.    I guess.  I -- I guess I try to forget certain stuff.

Q.    You don't recall hearing any gunshots before you felt the gunshot; is that true?

A.    True.

Q.    Do you recall hearing any gunshots after you felt the gunshot?

A.    I didn't hear any -- no.

Q.    Okay.

A.    Not to my knowledge.  I don't -- I don't know.

492

Q.    You mentioned something about general labor.  I just want to clarify.  What do you mean by "general labor"?

A.    Referring to what?

Q.    I think you were asked activities you engaged in prior to this incident and you said general labor.  What did you mean by that?

A.    General labor?  I don't -- clean the yard is general labor.  I don't know.  Taking the trash out is general labor.

Q.    And how long had it been since you were employed prior to this incident?

MR. DIGGS:  Objection, Your Honor.  403.  Outside the scope.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    You were prescribed a number of medications by the hospital after this incident; is that correct?

A.    Yes.

Q.    Okay.  And you refused to take medications after you left the hospital that were prescribed by Arrowhead; is that correct?

A.    Yes.

Q.    And you were prescribed physical therapy to continue after you were discharged from the hospital; correct?

A.    Correct.

Q.    You also chose to stop attending physical therapy

sometime after your discharge from the hospital; is that correct?

A.    Yes.

Q.    Was cost ever an issue for you not to attend those physical therapy appointments?

MR. DIGGS:  Objection, Your Honor.  403.

THE COURT:  Sustained.

BY MS. ANDERSEN:

Q.    Did you -- I apologize.  I'm going to ask you to repeat your response to this.  Did you say that you can get dressed on your own or you cannot get dressed on your own, when asked by counsel?

A.    I can.  It just takes a while.

Q.    Back in November of 2021, were you still at Arrowhead, the hospital?

A.    Back in when?

Q.    November of 2021.

A.    I believe I left in September.  I'm not -- I'm not too sure.

Q.    Okay.  Sometime after your discharge from the hospital, did you practice walking without the wheelchair?

A.    Walking without the wheelchair?  That was part of the physical therapy was walking, um, on the bars.  It had bars there.

Q.    And as early as February of 2022, do you recall

**UNITED STATES DISTRICT COURT**

telling medical professionals that you wanted to start using a walker instead of the wheelchair?

A.    Did I tell them that?

Q.    Yeah.  Do you recall telling them that?

A.    I told them I would like to, yeah.  That was -- that was the goal.  I never reached the goal.

Q.    And you were advised to also continue with physical therapy appointments as of 2022; correct?

A.    Yes.  But I had trial, and it was conflicting with my trial.

Q.    But sometime in the year 2022 you did stop attending physical therapy; is that correct?

MR. DIGGS:  Objection.  Asked and answered.  Cumulative.

THE COURT:  Overruled.

THE WITNESS:  Can you ask me the question again?

BY MS. ANDERSEN:

Q.    Of course.

Sometime in 2022, you stopped attending physical therapy; correct?

A.    Yes, ma'am.

Q.    Yes?

A.    Yes.

Q.    Do you recall telling a medical provider in December of 2022 that you did not want any more medical follow-up and

all future appointments canceled?

A.    Regarding to what?

Q.    Your health.  December of 2022.

A.    Yeah because they were giving -- they were trying to give me psych meds.  I didn't want to take no psych meds.

Q.    What about a medical appointment you had?

A.    I didn't have any medical appointments.

Q.    After 2022?

A.    I -- I wasn't -- I wasn't on medical.

MR. DIGGS:  Objection.  Objection under the line of questioning.  403.

THE COURT:  I'm going to overrule it, but I would suggest that we move on.

You may answer the question.

THE WITNESS:  What is the question?

BY MS. ANDERSEN:

Q.    I'll go back to the original question.  I think there's been some confusion.

In December of 2022, do you recall telling a medical provider you did not need any more medical follow-up and you wanted all future appointments canceled?

A.    That was the only way for them not to schedule it again because they said, well -- they said medical precedes Court.  And I was trying to -- I was tired -- tired of waiving my -- my -- missing court for physical therapy just

because it wasn't physical therapy.

THE COURT: Move on.

BY MS. ANDERSEN:

Q. And in that same appointment, you were advised to continue physical therapy; correct?

A. Yeah, they told me -- they told me to -- that they were offering me physical therapy.

Q. And you did not take them up on that offer to continue physical therapy; correct?

A. Because being chained in a room, it is not physical therapy.

Q. Back when you were still in physical therapy at Arrowhead, isn't it true that even back then, you were able to walk with a walker and transfer independently to the bed?

A. Walk with a walker? I've never had a walker. I have a walker in prison. I never -- I never --

Q. Would you say that the weakness in your legs is worse today than it was when you were at Arrowhead?

A. No. It's the opposite.

Q. So it's gotten -- the weakness has gotten better or some relief to the weakness?

A. It's just become manageable.

Q. When was the last time you attended physical therapy?

MR. DIGGS: Objection, Your Honor. 403 again, this

line of questioning.

THE COURT:  Overruled.

THE WITNESS:  When's the last time?  I don't remember the date.

BY MS. ANDERSEN:

Q.    You mentioned a stinging sensation when asked by your counsel if you were experiencing pain.

Do you recall that?

A.    Yes, ma'am.

Q.    Have you ever advised any medical professional that you have this stinging sensation?

A.    They said it was because of the nerve damage.

Q.    Do you recall the last time you saw a medical professional for this stinging sensation?

A.    No.

Q.    You also mentioned headaches.  When was the last time you saw a medical provider for these headaches?

A.    They prescribed some psych meds.  And I -- I refused to take them.  I didn't want -- I didn't want to take them.  So I stopped seeing that person.

Q.    Have you seen any other medical providers for the headaches?

A.    No.  They -- they -- they said everything was, um -- everything -- everything that I'm going through can be -- be -- what's the word?  It could be, um -- psych meds will take care

of it; the pain, the -- the spasms.  Psych meds will do the trick for everything.

Q.    And you refused to take those; is that correct?

A.    Yeah, I didn't want to take -- I didn't like the way it made me feel.

Q.    Did you ask for any alternative prescriptions for pain medications?

A.    No.  Tylenol, ibuprofen.

Q.    Is it also correct that you did not any -- attend any type of therapy or counseling for mental or emotional injuries you attribute to this incident?

A.    Any counseling?

Q.    Correct.

A.    At -- you're talking about at Arrowhead?

Q.    Anywhere.  Any -- anytime after Arrowhead.

A.    I've had a substance abuse program.  I don't know if that helps.  I don't -- I don't know.

MS. ANDERSEN:  Nothing further at this time, Your Honor.  Thank you.

THE COURT:  Thank you.

Mr. Diggs, redirect?

MR. GALIPO:  May we have one -- can I confer with Mr. Diggs for just one moment, Your Honor?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

MR. GALIPO:  Thank you, Your Honor.

MR. DIGGS:  Thank you, Your Honor.

Your Honor, briefly, for the rule of completeness, um, could I read from Mr. Barber's deposition, page 48, line 17, through 49, line 5?  And then --

THE COURT:  Give me one moment.

48, what line?

MR. DIGGS:  17.

THE COURT:  Through 49 --

MR. DIGGS:  Line 5.

THE COURT:  Yes.

MR. DIGGS:  Thank you.

"QUESTION:  And you do not recall whether you put it in reverse or not; is that correct?

"ANSWER:  That's correct.

"QUESTION:  But you do have a recollection of the car moving backwards; is that correct?

"ANSWER:  Yes.

"QUESTION:  Was that a yes, I'm sorry?

"ANSWER:  Yes.

"QUESTION:  Okay.  Do you recall pressing down on the gas pedal at any time you got into the driver's seat?

"I don't recall."

Thank you, Your Honor.

UNITED STATES DISTRICT COURT

No further questions.

THE COURT:  No further questions?

MS. ANDERSEN:  No further questions, Your Honor.

THE COURT:  Very well.  Then we're going to go ahead and take a brief break at this time.

Mr. Galipo, do you have your next witness available? I guess I'm wondering if we should just simply take an early lunch break.

MR. GALIPO:  I think that makes sense, Your Honor. And then I'll be ready to go right after our break.

THE COURT:  Very well.

Then, ladies and gentlemen, we are going to take an early lunch break at this time.

I will see you back here at 12:30.  In the meantime, please remember the admonitions.  Keep an open mind, do not speak to anybody about the case, do not let anyone speak to you about the case, and do not conduct any independent research or investigation.

Thank you.  Have a nice lunch.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You may be seated.

We are still on the record outside the presence of the jury.

Mr. Galipo, I believe that your last witness will be

whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat and state and spell your first and last name for the record.

THE WITNESS:  My name is Bennet Omalu, B-e-n-n-e-t, Omalu, O-m-a-l-u.

THE COURT:  Thank you.

Mr. Galipo, you may proceed.

MR. GALIPO:  Thank you very much, Your Honor.

BENNET OMALU, M.D.,

called as a witness by the plaintiff, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.   Good afternoon, Dr. Omalu.

A.   Good afternoon, sir.

Q.   Are you what's sometimes referred to as a forensic pathologist?

A.   Yes, sir.

Q.   Do you have particular areas of expertise with respect to the human brain?

A.   Yes, sir.

Q.   And injuries to the human brain?

A.   Yes, sir.

Q.    Can you tell the ladies and gentlemen of the jury, before we get into some of your opinions in this case, about your educational background, please?

A.    Well, I went to medical school in Nigeria in West Africa, the seven-year medical school curriculum fashioned after the British; six years of medical school training; one month every year of clinical internship whereby you work as a physician but under supervision.  So I worked in the departments of gynecology and obstetrics, surgery, internal medicine, and pediatrics.  I performed surgeries, delivered about 400 babies.  Then I began work as an emergency room physician for three years in a university hospital.  I sat for my United States medical license and examination, which I passed while I was in Nigeria.  I applied to the World Health Organization for a scholarship, which I got, that enabled me to come to the University of Washington, Seattle, Washington, to come to the school of public health to do a one-year clinical research program, which I completed, then proceeded to Columbia University in New York City at Harlem Hospital Center to do a five-year residency training program in anatomic and clinical pathology.  Because of exceptional scholarship, the five years were reduced to four years for me.  I completed residency training in anatomic and clinical pathology four years, then I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania, to do a one-year fellowship training

**UNITED STATES DISTRICT COURT**

in forensic pathology.

Q.    Let me stop you for one moment.

You used the term "forensic pathology," "clinical pathology."  Can you explain to the jury what those different -- and another pathology, which I'm forgetting right now, I apologize.  Can you explain to the jury what those two -- three different areas -- forensic pathology, clinical pathology, and what was the third one?

A.    Forensic pathology.

Q.    Forensic, clinical.  And what am I missing?

A.    Anatomic.

Q.    Anatomic.  Thank you.

A.    Yes, sir.

Q.    Can you explain to the jury what those specialties are?

A.    An anatomic pathologist is a specialized physician who studies disease and makes disease diagnosis by structure of disease.  An example, assuming you're a woman, you feel a lump in your breast and you go and see your surgeon.  Your surgeon takes a biopsy and sends it to an anatomic pathologist who would analyze the tissue to determine if you have cancer or not and, if you have cancer, what type of cancer and what type of treatment you need.

A clinical pathologist is a specialized physician who studies disease and makes disease diagnosis by the study of

**UNITED STATES DISTRICT COURT**

chemicals in the body.  A good example, too, if you go and see your doctor and you do your annual physical and then send you -- they send you to the lab to have your blood drawn, your blood is sent to a clinical pathologist who will determine the levels of glucose, sodium, hormones in your body, and come back with a diagnosis to your physician.

A forensic pathologist, again, is a specialized physician who studies disease, who studies trauma, and who studies death.  A forensic pathologist comes after the fact, after something has happened, an event has occurred.  A forensic pathologist applies scientific methods to make determinations of causation, mechanism of sustenance, and treatment.

So a forensic pathologist attend to living patients who suffered all types of trauma and also to dead patients who died from all types of disease.

So the forensic pathologist, tell me what you were doing -- the forensic pathologist can tell you what happened to you.  Um, that is a forensic pathologist.

Q.    Okay.  Thank you for that.

And, for example, do forensic pathologists such as yourself commonly do autopsies to determine the cause of death and manner of death?

A.    Yes.  So one of the things we do is performing autopsies to determine how and why people die and to provide

answers to any questions society or any interested party may have in terms of what killed the person, could it have been prevented, and what lesson does society have to learn from this death.

Q.    Okay.  Thank you.

Now, you were up to the time that you, I think, got to Pittsburgh --

A.    Yes.

Q.    -- Pennsylvania.  Tell us about your education and professional experience in Pittsburgh.

A.    So after forensic pathology, I went back to the University of Pittsburgh, Pittsburgh, Pennsylvania, to do a two-year fellowship training in neuropathology.

Q.    What is neuropathology?

A.    Again, neuropathology is a specialized part of medicine -- or a neuropathologist is a specialized physician who studies diseases of the nervous system -- the brain, the spinal cord, the muscles, and the nerves -- who studies all types of trauma to the nervous system, and who studies dementia in -- in living and dead people and makes diagnosis of disease.

A neuropathologist determines types of brain trauma and determines expected outcomes of brain trauma.

Q.    And after your fellowship in neuropathology, where did your education take you next?

A.    So after neuropathology, I went back to the

University of Pittsburgh, the school of public health, to do a three-year master's in public health program in epidemiology, e-p-i-d-e-m-i-o-l-o-g-y.

Q. You're helping our court reporter?

A. Yes.

Q. Okay. She's a pretty good speller, I think.

But explain to the jury what that is.

A. So -- so epidemiology is a specialty of medicine that studies the distribution, the spread, and the causation of diseases and trauma in populations and in groups of populations.

So the epidemiologist establishes generally accepted principles of every disease upon which we apply to each and every individual patient.

For example, it was an epidemiologist who discovered that, when you play football, that you suffer brain damage. It was an epidemiologist that discovered that, when you have sex, you could contract HIV. So these are what epidemiologists do.

Q. You at some point in your time in Pittsburgh took particular interest in brain injuries; is that true?

A. Yes, sir.

Q. Including brain injuries of NFL football players?

A. Yes, sir.

Q. And the movie *Concussion* covered your work as a doctor in brain injuries to football players?

UNITED STATES DISTRICT COURT

A.    Yes, sir.

Q.    Now, after you did your master -- you got your master's in public health in Pittsburgh, where did your education take you next?

A.    So I went back to the Carnegie Mellon University to do a three-year program in business management with a focus on medical management.  I went to the Tepper, T-e-p-p-e-r, Tepper School of Business.  I completed that in three years.  Then I sat for board certification examination in medical management.

Q.    Okay.  What is board certification for doctors?

A.    Well, board certification, the analogy -- when you are done with the training in a specialty of medicine, you sit for an examination, which, if you pass, you become certified as an authority in the specialty.  There is nothing higher.

So when I'm actually some -- a degree that is similar to -- it's like having a Ph.D. in physics.  So when you have a board certification in neuropathology, that is the max you could get.  You are sufficiently knowledgeable and your opinions could be regarded as authoritative.

Q.    Would it be fair to say, Dr. Omalu, that some medical doctors are not board certified and others are?

A.    Yes, sir.

Q.    You could still be a doctor, and a competent doctor, without being board certified?

A.    Yes.

Q.    How many areas of medicine do you have board certifications in?

A.    I don't like saying it, but I have board certification in five specialties.

Q.    Okay.  Can you tell the jury what are the five different areas of medicine that you are board certified?

A.    I'm board certified in anatomic pathology, in clinical pathology, forensic pathology, neuropathology, and medical management.  Then I hold a master's in public health in epidemiology and a master's in business administration.

Q.    Okay.  And you have testified in courts before as an expert in -- in forensic pathology and neuropathology, for example?

A.    Yes.  I have testified hundreds of times in every jurisdiction -- federal, state, county, municipal courts -- all over the country.

Q.    Okay.  Well, thank you for being here today.

And I want to ask you some questions about this case.

You, at some point, were retained by my office to review this particular case.  Is that fair?

A.    Yes, sir.

Q.    And you and I -- I have -- my office has retained you to review other cases in the past.  Is that also correct?

A.    Yes.

Q.    I'm going to show you what I think is already in evidence, Exhibit 8, page 6.

THE COURT:  Yes.

MR. GALIPO:  Is it okay if I publish?  I believe it's in, Your Honor.

THE COURT:  It is.  You may publish.

BY MR. GALIPO:

Q.    All right.  Is this one of the photographs you were able to view in this particular case?

A.    Yes, sir.

Q.    And do you have an understanding as to what caused this wound?

A.    Yes, sir.

Q.    What's your understanding?

A.    He suffered severe traumatic brain injury caused by a ballistic, a gunshot, a bullet that came from a handgun.

Q.    And we see damage on the outside of the head in this picture; correct?

A.    Yes, sir.

Q.    Does this picture necessarily show the damage to the inside of the brain?

A.    Partly it does, partly -- you could see brain tissue bulging out of the wound.  So when you see that, we call it herniation, upward herniation.  So for a bullet that travels at about 1200 to 1400 feet per second, that's a large amount of

energy.

So when it gets into the skull cavity, the skull cavity is a rigid cavity that does not necessarily communicate with the outside.  So with such a massive amount of energy, when the bullet gets inside the cranial cavity, it causes an explosive effect.  And, in fact, when you see simulations for about 200 milliseconds, the brain expands multiple times.  So because of the explosive expansion, brain tissue herniates upward, forceful herniation through the gaping defect in the skull.  So such a pattern of trauma is consistent with severe traumatic brain injury.

Q.   Okay.  I'm going to take this down now and talk to you a little bit about the extent of the injury that Mr. Barber suffered.

In addition to looking at photographs and understanding the mechanism of injury, did you have an opportunity to review medical records, particularly from Arrowhead Regional Hospital where Mr. Barber was for some period of time?

A.   Yes.

Q.   Can you explain to the jury, given your expertise as a neuropathologist, how the bullet entering Mr. Barber's head and brain caused him damages and whether those damages are permanent or not?

A.   So over the centuries, very intelligent people that

came before us have studied this and established what we call generally accepted principles of medicine, almost like scientific truths.

So when you have a tiny object like a bullet traveling at a very high speed, what is lethal about it is the kinetic energy, not the mass of the bullet.

So when the bullet encounters the skin of the scalp, it entered -- in this instance, it entered from the back and top of the head.  It never came from the front or the side.  It came from the back, was traveling in a rightward and downward trajectory.

Because of the energy, upon coming in contact with the skull, about 100 milliseconds the skull will put a resistance, but the energy of the bullet overcomes the resistance of the skull and the amount of energy splintered the skull.

And when that happens, you have what we call comminuted, comminuted, meaning broken up into multiple tiny pieces.  Comminuted fractures of the skull.  Then the bullet continued, entered the cranial cavity, downloaded that entire energy.  Unfortunately, a bullet that settles in your body is more dangerous than a bullet that continues through your body. Because when the bullet continues, it takes energy with it. But when it gets in contact with the body and settles inside your body, all that entire energy is downloaded on your body.

So it entered -- entered the brain.  Unfortunately, the human brain is 60 to 80 percent water.  So it has almost no resistance.  So that amount of energy caused the diffused explosive and the brain pretty much splinters apart the fibers.

So although the bullet entered in the local part of the head, the damage is diffused because it was a bullet with high amounts of energy.

So the area surrounding the point of entry will be the most damaged.  It will actually be pulpified.  And then, diffusely, other parts of the brain are affected.

Because it was such an extensive injury, the surgeons couldn't go in to take out the pieces of bullet.  So all they did was to wash out as much as they could -- the less you handle the brain, the better.  And they removed the broken-up pieces of skull and put in titanium, which is permanent.

So because, again, the human brain is a body -- only organ in the body that does not have any reasonable capacity to heal itself or to regenerate itself, any injury to the brain, especially severe injury, is permanent.

Q.    Let me ask you this.  Thank you for all of that.  I just want to follow up on a few points before I forget.

Based on your review of the medical records, I'm assuming that you looked at some of the diagnostic scans that were done, CT scans of the brain, et cetera?

A.    Yes, sir.

Q.    Are you saying that there were multiple bullet fragments in his brain?

A.    Yes, sir, bullet fragments, multiple pieces of tiny speckles of bone that are still inside his brain even until today.

Q.    Okay.  That was my next question.

Are you saying that Mr. Barber has bullet fragments and bone fragments in his brain scattered throughout his brain from this incident, even till today?

A.    Yes, sir.

Q.    And then you mentioned that they had to put a -- a plate in.  Is that a titanium plate?

A.    Yes, sir.

Q.    What's the name of that surgical procedure to do that?

A.    Well, pardon the jargon.  It's called cranioplasty, c-r-a-n-i-o-p-l-a-s-t-y.  Cranioplasty is Latin.  It simply means fixing the -- the skull.

Q.    Can you -- can you just generally explain that surgical procedure to the jury?

A.    So the surgical procedure was described in the medical records.  So what the surgeons did at his bedside, they'll get normal saline, which is about the -- has the same tonicity, about -- it's about the same as plasma in terms of

518

the density of the water.  So then they use normal saline, s-a-l-i-n-e.  They irrigate very slowly to wash out the dead brain tissue.

So while they wash it out slowly, once the -- the surgeon believes he's reasonably washed out the dead brain tissue, they suture the dura mater.  And then they do their best to take out the pieces, the fragments of bone.

The less you touch the brain, the better.  Remember, it's 60 to 80 percent water.  And it has no ability to regenerate itself.  A good analogy, if you take out half of your liver, six months later, if you go back, your liver has regrown.  The brain does not have that capacity.

So whatever is damaged, what you do is you mitigate secondary damage.  So they did that, and then they covered the cranium with this titanium so that there wouldn't be any additional trauma to his skull accidentally.

Q.   So, in your opinion, Dr. Omalu, were brain cells damaged for Mr. Barber because of this -- this bullet into his brain?

A.   Yes, sir.  The entire brain was damaged, not just the brain cells, the tiny blood vessels of the brain.  There are different types of brain cells.  They were all damaged. Um, so it's all permanent.

Unfortunately, when you -- the brain cells sustain severe damage, the genomics resets itself and, over time, the

**UNITED STATES DISTRICT COURT**

damage becomes progressive.

Q.    And what do you mean by progressive?  Does that mean worse?

A.    Yes.  It's -- his symptoms will become worse.  He'll begin to lose his previously obtained functionality.  He'll become -- start becoming less intelligent, start becoming more emotional.

In fact, as an epidemiologist, I know that for somebody like Mr. Barber, in about 20 to 30 years after he suffered his trauma -- he was 35 when he suffered this trauma.  So at about 55, 65, he will develop full-blown dementia.  And the mien and median we use is 20 to 30 years where he will require almost 24/7 assistance.

This is the statistics.  This is one of the truths of science, ob- -- observed over the centuries.  So it's called traumatic encephalopathy.  So such severe traumatic brain injury is permanent, is irreversible, and it's progressive.

Q.    Okay.  Thank you.

And then I think you spoke about the -- the herniation of the brain matter.  That's part of what we see sticking out of the skull in that photo I showed you earlier?

A.    Yes, sir.

Q.    Was the -- was there a skull fracture?  And if so, how would you describe it?

A.    Yeah.  The skull fracture was the comminuted

fractures.  So a comminuted fracture is the most extensive and the most severe type of fracture anybody could have.

So -- and that was why the surgeons couldn't fix it. They had to remove it, replace it with an artificial skull.

Q.    Did you note during the course of Mr. Barber's treatment at Arrowhead that he was -- participated in physical therapy and occupational therapy?

A.    Yes, sir.

Q.    Did they have to put staples in his head at some point?

A.    I believe so, yes, sir.

Q.    And were those removed at some point, the staples?

A.    Yes, sir.

Q.    Um, is there a period of time where the person is going to get about as good as they're going to get in an injury like this?

A.    Yeah.  So the human brain has, um, great reserve of what we call great plasticity, in plastic, plasticity.

So -- and it depends on individuals.  About -- based on epidemiology, about six months to one year, it will be as bad as you could be.  Then after six months to one year, you may show some compensatory recovery.  What does that mean?  It doesn't mean you're recovering.  It simply means that the brain cells that were not as damaged as the others will begin to hyperfunction.  They'll form new neural connections to

UNITED STATES DISTRICT COURT

compensate for the damage.

But because the brain is not like other organs -- we'll call it a post-mitotic, post-mitotic, meaning the brain cells cannot divide to form new ones.  The brain cell does not have the capacity to divide and form a new brain cell like other cells in the body do.

So after a certain limit, that compensation, which is its maximum extent -- because there is a limit to what one brain cell can do.  It could vary, and that is why they become very -- they decompensate very quickly after 20 to 30 years.

So as time goes on -- it varies in individuals -- they will start losing their functionality in every domain.

However, they will never regain their functionality before they were shot.  What does that mean?  Assuming somebody has the brain of a physicist and he suffers such brain damage, he could now begin to function at the level of -- I don't know -- maybe a housekeeper that cannot solve very complex mathematical problems.

So when you look at it, you may think, oh, he's doing okay.  But when you encounter him on a personal level, you ask him, okay, what is the basic law of speed of light? Remember, he's a Ph.D. of physics.  He would have remembered that.  So they may function well, don't be fooled.  They are not functioning at their premorbid state, but they still have symptoms -- cognitive impairment, mood disorders, they could

**UNITED STATES DISTRICT COURT**

cry, behavioral disorders, and then somatic.  They may not be able to use all parts of their body.  They may be having headaches.  They may be having aches and pain.

And they may also have distorted, distorted thinking, meaning what a regular, normal, average person may think is good for him, because of his brain damage, he may not think it's good for him.  So we call them cognitive distortions caused by his injury.

Q.    Okay.  Now, you've touched on some of the things.  There's been some reference to headaches.

A.    Yes, sir.

Q.    Is it common for someone who's been shot in the brain, if they survive, to have severe headaches?

A.    Yes.  They have severe headaches and we have the medical explanations for the headaches they have.  Yes.

Q.    How about -- there's been talk about constant pain, 24/7 pain, some days better than others.  Is that, in your opinion, related to the injuries from being shot in the brain?

A.    Yes, sir.  That's called neuro -- neuropathic pain, yes, sir.

Q.    Can you explain that to the jury, please?

A.    So the human brain is one of the most effective and efficient mechanisms you can ever encounter.  So it functions in a very delicate and very well-balanced system.  And it maintains itself.

UNITED STATES DISTRICT COURT

So when you suffer brain trauma, that balance is disturbed.  There are brain cells in your brain that keep other brain cells in check.  It's highly coordinated.  That is why, assuming you're eating, you're hungry, you're eating, at some point you're full.  There are brain cells that tell you you are full, stop eating.  And they tell the brain cell that are making you eat, stop.

So when it comes to pain, there are brain cells that want to constantly make you feel pain.  And there are brain cells that shut them down.  Okay, enough.  So when your brain is damaged like Mr. Barber's brain is damaged, you lose that mechanism.  It also happens in people with spinal cord injuries.  They have severe pain in the extremities.

So these cells now start firing constantly, nonstop.  So they will now be having this constant pain.  And because the brain damage is permanent, there is no drug that can eradicate that pain now.  So what you do, you try to mitigate, minimize the pain, and you give them anti-depressants to stop them from becoming too depressed from the constant pain.

Q.    How about there's been reference in the medical records -- and I think the jury's heard some testimony about muscle -- or spasms.  Is that related to the brain injury?  And if so, how?

A.    Yeah.  Same mechanism.  Same mechanism.  Again, this happens in spinal cord patients.

So there are cells that are there -- there are reasons -- I don't want to go into the -- the detailed science. There are reasons why there should be cells that are constantly firing.

So the cells that tell them to stop will shut them down.  There are -- sometimes you need your muscles to go into spasm, like when you're having fever.  So there are times.  So when it's not needed, the brain cell shut them down.  Okay, stop.

Now, when that balance is disturbed, some of the cells will not escape, they don't have any check, and they keep on constantly firing.  And then that's when you have the muscle spasms.  We'll call -- sometimes we'll call them fasciculations, fasciculations.  And it could be very, very severe pain.  Very, very severe.

It's like -- well, I don't know if you ever had a muscle spasm, like you're playing soccer, and you have this crampy spasm.  That is the type of pain they have.

Q.    How about -- how could -- in your opinion, Dr. Omalu, is the brain injury -- the permanent brain injury suffered by Mr. Barber, is that affecting his ambulation and ability to walk or run and, if so, how?

A.    So if you notice, based on the medical records, Mr. Barber's left side is weaker than the right.  The question you ask yourself, you know, before I went to medical school,

UNITED STATES DISTRICT COURT

why?  The damage was on the right.  Why on the left?  There's a reason for that.

At the lower level of your brain, the fibers on the right cross over to the left.

So if you have extensive damage on the right, the left side will be affected.

What that tells us, because he's what we call hemi -- hemiplegic, h-e-m-i-p-l-e-g-i-a- -- g-i-c, meaning he's lost significant power on the left side of his body.  But remember, the bullet entered on the surface on the top.  So what explains that?

Remember what I told you.  It was not the focalized trauma.  It was explosive.  And the right side was more damaged than the left because the bullet was traveling in a rightward direction.  So the energy was going rightward.

The power on the right side isn't what it used to be before he was shot, but it's better than on the left.

So the left localization of the hemiplegia is consistent with the patterns of trauma.  That is what we expect to see based on what we know about science and the behavior of the human body.

Q.    Could you describe to the jury, given your medical background and your background in neuropathology, what type of pain and suffering is associated with Mr. Barber's injuries that you've been describing?

UNITED STATES DISTRICT COURT

A.    So when you talk about pain, pain is a primitive reflex.  What does that mean?  Pain is a protective reflex. It's like thirst and hunger.

Pain is there to protect you, to alert you to things harmful to you, to remove you from such circumstances.  Because unchecked, pain will kill you.  If you put your hand in fire and you don't remove it, you will get burned.

So it's meant to be protective, meaning the upper parts of your brain do not have any control over whether you experience pain or not.  Just like the upper parts of your brain, even when you're unconscious and in coma, you will experience hunger and thirst.  Even if you're in coma, if you don't -- if you're not given water, you will die.  So pain is like that.

There are three types of pain.  There is the mental pain, there is the physical or somatic pain, s-o-m-a-t-i-c, and then there is the biochemical pain.

The first thing we consider in somebody who has suffered trauma is:  Is the trauma a serious bodily injury, meaning is it severe trauma?  Was there extensive damage and disruption of tissue?  And the first thing I had said earlier was, yes, this is severe traumatic brain injury.

So when you have severe traumatic brain injury, you suffer high-scale pain and suffering or severe pain and suffering, meaning this is the type of pain that will disrupt

**UNITED STATES DISTRICT COURT**

your activities of daily living.  This is not the type of pain you can ignore.

So he's going to have mental or psychological pain because the brain responds to noxious -- it's called noxious stimuli, anything that causes you pain, eventually affects your mood and your brain.  And you have mental anxiety.  Your blood pressure goes up, your -- you breathe faster, your heart pumps faster.  Certain chemicals are released in your body to cause stress.  That is the mental pain.

And then you have the physical pain, the aches and pain, the headache, the spasms.  The hunger inside you causes physical pain because your stomach will produce more acid.  If you're crampy in your stomach, your intestines will move faster.  You feel sometimes you have diarrhea just from pain.  Sometimes you have chest pain in your heart from pain.  That is all the somatic pain.

And then the biochemical pain is the pain you experience when abnormal chemicals are being released by your body in response to the trauma and to the pain you have suffered.

Biochemical -- one way I explain it to medical students is, if you've ever suffered from the flu and you're sitting down in the comfort of your living room but you feel terrible, you feel lethargic, you feel aches and pain.  Meanwhile, you've not done anything.  You are sitting down.

**UNITED STATES DISTRICT COURT**

Yet you're feeling aches and pain and you feel terrible because of the chemicals your body is releasing in response to the infection.  So that is the classic biochemical pain.

And given the trauma Mr. Barber had suffered, he will continue to experience the severe pain, high-scale pain, the permanent injury for the rest of his life.

Q.    So are you saying, Dr. Omalu, that not only is -- has he experienced the pain from the day of this incident -- I think it'll be five years this April -- but he's going to continue to experience the pain the rest of his life?

A.    Yes, sir.

Q.    And is there anything that anyone can do at this point to repair the brain damage that he has from this shot so he doesn't experience that pain?

A.    No, sir.

In this stage of science, in this day and age -- and it's not going to change anytime soon -- science does not have the capacity and the wherewithal to reverse brain injuries.

So what you do for any type of brain injury is prevention.  After you've suffered the brain injury, all we can do is mitigation, stop you from suffering additional injury, and then control and manage the consequences, pretty much to help to enhance the quality of your life.  But can we cure it and stop it?  No.

Q.    And given his issues with walking or ambulating, in

your opinion, Dr. Omalu, if he tries to walk, is he at risk for falling down?

A.    Yes.  The left side of his body is weak.  So he is permanent.  I don't think that could ever be reversed.  However, there is technology that exists today, if provided to him, could teach him ways to improve on his walking, could help him to significantly maybe get back some of the walking.  They teach him ways to compensate, but he will never recover.

And, unfortunately, these therapies are very specialized centers, they cost money.

Q.    The last thing you mentioned, I think you were saying he was -- Mr. Barber was 35 years old when this happened and based on your background and experience in medicine and epidemiology, that once he gets to 55 or so, he could further deteriorate worse than he is now?

A.    He will continue to deteriorate, but at about 20 to 30 years after the trauma, there will be severe noncompensatory decompensation.

Q.    And I think you've mentioned a few of these, Dr. Omalu, but you can -- can you just repeat a couple of the things that he'll -- if he lives that long, he'll have to deal with?

A.    So generally we break them down into four categories.  This is very basic neuroscience.

So anybody who suffers severe traumatic brain

**UNITED STATES DISTRICT COURT**

injury, no matter how you suffered it, over time you will develop what we call traumatic encephalopathy. It's a neurodegenerative disease. In fact, the commonest cause of dementia is trauma.

So he will develop cognitive impairment. He will begin to lose his intellectual functioning, his intelligence. If he was born to be a pilot, he will -- he can never become a pilot.

Then he will have mood impairment, mood disorders; develop depression, anxiety. He could be very easily tearful. He's talking, he will cry. He will just lose hope and develop, you know, very poor responses to normal activities of life, frustrations of life.

Then, um, number three, behavioral impairment. Behavioral impairment of any type. He may become more impulsive. He may lose his inhibitions. He may use words he shouldn't use. He may become paranoid. Any type of behavioral impairment. If he used to be a very clean, well-organized person, he could become the most disorganized person you will ever see.

Then the fourth one, it's somatic impairment, meaning physical impairment, which is the inability to walk, the headaches, the muscle spasms.

So these are the four general categories of traumatic encephalopathy. It is permanent. There is nothing

531

any physician can do to reverse it.  All we can do is to provide the support for him.  It is not left for the physician to judge him.  All we can do is give him all he needs to do the best he can do.  That is where we are, unfortunately.

Q.    Thank you, Dr. Omalu.

The last question I have for now is so in categorizing the extent of his brain injury, how would you categorize it, if it -- if there was mild or moderate or severe or any other words you think appropriate?

A.    So based on the science, if you have comminuted fractures of your skull, you have a ballistic injury of your brain with subarachnoid hemorrhage, with subdural hemorrhage.

Q.    What are those terms?  Because you haven't used those before.

A.    So in his medical records, when he got to the hospital, he had bleeding inside his skull.  There are about four types of bleeding.  He had subdural, subarachnoid, parenchymal hemorrhage.  So he had three.

Whenever you have any bleeding inside your skull, the severe traumatic brain injury, why?  Blood stays inside blood vessels.  Blood is acidic because it has hemoglobin.

So once blood gets out of the blood vessels inside the cavity, it irritates the blood vessels and they're going to spasm.  And they cause more damage.

So given the constellation of trauma, the

UNITED STATES DISTRICT COURT

combination of trauma he suffered, the skull fractures, comminuted, the intracranial hemorrhages, the parenchymal contusions and lacerations, the ballistic explosive injury, the herniation of the brain, this is severe traumatic brain injury, period.  And it was so severe that even the surgeons didn't want to go in to fix anything.  They just irrigated, sped up -- let the way -- let his brain heal or recover as much as it could.

MR. GALIPO:  Thank you, Dr. Omalu.

That's all I have at this point, Your Honor.

THE COURT:  Thank you.

Cross-examination.

THE WITNESS:  Your Honor, could I use the bathroom, please?

THE COURT:  Sure.

All right.  We are going to go ahead and take a brief 10-minute break.  Please remember the admonitions.  Keep an open mind, do not discuss the case with anyone, do not let anyone discuss the case with you, and do not conduct any independent research or investigation.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  All right.  Dr. Omalu, why don't you step down and we will reconvene in 10 minutes.

533

MR. GALIPO:  Thank you, Your Honor.

(Break taken.)

(Out of the presence of the jury:)

THE COURT:  Ms. Carr is bringing in the jury.

(In the presence of the jury:)

THE COURT:  We are back on the record.  The jury is present.

Dr. Omalu is back on the witness stand.

And, Dr. Omalu, you are reminded you are still under oath.

Cross-examination.

MS. BRUNSON:  Thank you, Your Honor.

May I proceed?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MS. BRUNSON:

    Q.    Good afternoon, Dr. Bennet Omalu.  How are you?

    A.    Wonderful.  How are you?

    Q.    Good.  Thank you.

How many times have you testified as an expert witness in a case where you were retained by the plaintiff's side?

    A.    Well, I don't keep count, but generally I would say about 15 times in the past five, ten years.

    Q.    And if you don't keep count, could you give us an

UNITED STATES DISTRICT COURT

534

estimate of how often you're retained by the plaintiffs, perhaps like in a percentage, versus how often you are retained by the defense?

A.   So, again, it varies by year, but generally most times plaintiffs, including district attorneys, I would say about 60 to 80 percent.  For the defense, it varies, about 20 to 40 percent.

Q.   And have you testified in cases where you have been retained by Mr. Galipo's office before in the past?

A.   Yes.  That was what I said earlier, about 15 times in the past five, ten years, yes.

Q.   For Mr. Galipo's office?

A.   Yes, sir -- yes, ma'am, I'm sorry.

Q.   And when was the last time you cared -- as a doctor you provided care for a patient that was alive?

A.   What do you mean by providing care?  You mean treating?

Q.   Yes.

A.   Oh, I -- I -- yesterday I treat myself.  I treat my family.  I treat my friends.  But I don't treat patients on a formal basis.  I -- I choose not to do that.  I don't have -- I don't have insurance coverage for that.

Q.   So most of your medical duties involve deceased people; is that right?

A.   No.  No.  Like I said earlier, as a forensic

**UNITED STATES DISTRICT COURT**

pathologist, a neuropathologist, we also attend to live patients.  But we also attend to deceased patients, yes, ma'am.

Q.    Did you write a report to prepare for your role in this case?

A.    Did I file a report?

Q.    Did you write?

A.    Oh, yes, ma'am.

Q.    And did you review your report in order to get ready to testify today?

A.    Yes.  I reviewed it, but I did not memorize every line in my report.

Q.    Well, did you notice if there were any inaccuracies that you wanted to change in your report?

A.    No, I did not notice any, no.

Q.    So if your report listed on page 3 that Mr. Barber is deceased, would you want to change that to make some sort of correction?

A.    Of course.  There's a typographical errors.  There is no report I've written in my life that does not have one, two, or three typographical errors.  I don't regard typographical errors as errors that need to be changed because it does not in any way affect, you know, the context of the report.

Q.    Part of what you did as a -- your work in this case is -- is you had an appointment and you met with Mr. Barber for

UNITED STATES DISTRICT COURT

536

about two hours.  Is that right?

A.    Yes, ma'am.

Q.    And that was in October -- let's see.  On the 29th of 2025; right?

A.    I believe so.  I don't remember the exact date now.

Q.    Do you know if you conducted any tests of Mr. Barber's strengths or abilities during that meeting?

A.    What do you mean by conducting tests?  Because there are different levels of tests.  Like -- I don't understand the question.

Q.    Okay.  Tell us what you did during that meeting.

A.    Um, like I had stated during my deposition, um, I was observing him.  Um, and without him knowing, I was testing his power.  I moved something.  So my objective was to confirm what is in the medical report.  My objective wasn't to elicit new information.

So there was no test I did to elicit new information.  Every testing I did was simply to confirm what we already know.

Q.    And based on the tests that you -- I'm sorry -- the experiments --

A.    Evaluation.

Q.    Evaluation.

A.    Yes, ma'am.

Q.    -- did what you observed seem to be in conformity

**UNITED STATES DISTRICT COURT**

with the reports that you reviewed?

A.    Yes, ma'am.  I mean, generally.  In medicine, you don't use absolutes.  Nothing can be hundred percent in conformity.  But was it reasonably in conformity?  Yes, ma'am.

Q.    And either before or after meeting with Mr. Barber in October, did you also review some of his medical records in this case?

A.    Yes, ma'am.

Q.    Did any of those medical records that you reviewed exist or document his conditions prior to being shot in April of 2021?

A.    Well, I don't recall as I sit here.  It's been a while.  But when we review medical records, part of medical records states past medical history.  So they list any pertinent -- pertinent, meaning important, medical history.

So as far as me reviewing the medical records, I must have reviewed his past medical history.  If you ask me now to be absolute, I cannot.  I -- I don't remember.

Q.    Are you familiar with Mr. Barber's previous medical history prior to April of 2021?

A.    My role in this case was not to review his prior medical history.  So for the purposes of my evaluating his trauma, there was nothing I'm aware of in his prior medical history that was significant in my evaluation of his trauma.

Q.    One of the reasons that you met with him in October

**UNITED STATES DISTRICT COURT**

of 2025 was you wanted to try to determine the extent of his injuries which were caused by being shot; is that correct?

A.    Yes, in relation to what has been documented in the medical records.  I was not going to elicit new information, no.

Q.    Did you review any records that discussed missed physical therapy appointments on Mr. Barber's behalf?

A.    As I sit here now, I do not recall.  But I was aware there were some programs, therapy programs, for him.  As I sit here, I don't remember absolutes.

Q.    And as you reviewed his medical records, did you note any dates that Mr. Barber refused to take certain prescribed medications?

A.    I did not note such specific dates.  The types of analysis we perform, specific unique dates and events in the total picture are of no significant consequence.

For example, assuming a patient misses an appointment on a day, does it in any way affect his long-term outcomes?  No.  It's you got a total picture, not just single events.  You take each patient globally, not break up a patient into parts.

Q.    Would it be fair to say, though, that if a patient such as Mr. Barber was prescribed medicine to help pain relief, that would then, in turn, allow him to attend more physical therapy sessions and perhaps get better because he's taking his

539

pain meds and feeling good enough to go to physical therapy?

A.    No.  No.  No.  Remember, this is a traumatic brain injury patient.  I remember one of the things I said was cognitive impairment, behavioral impairment.  So rather than judging the patient, the behavior he's manifesting more likely than not could be a manifestation of his disease.

And so the role -- we physicians or medical team, you don't judge a patient because of the behavior he's manifesting.  Rather, you watch him and you treat him to manage him.  If he says "I don't want to go," you find another modality to present it to him.  Because saying "I don't want to go" more likely than not is a manifestation of the trauma he suffered.  So he's not willfully being stubborn.

Even if he was being stubborn, it is a manifestation of TBI.  The way we approach these things, you need to be extra careful about placing judgments on the patient.  No, you don't do that.  You take the patient as the patient is and you work with the patient.

Q.    How did you form the opinion that Mr. Barber is showing symptoms of neurocognitive issues?

A.    Okay.  When I'm asked such a question, how did I do something -- so, remember, I'm a licensed physician.  So as a physician, we have a method called differential diagnosis.  That's a method every physician uses.  So in differential diagnosis, the first thing you do is, what does the science

**UNITED STATES DISTRICT COURT**

say?  And they are called the general, general causation principles.

And like I said in my deposition, there is a theory of science called the central limit theorem.  Central limit theorem, CLT.  And the central limit theorem is the foundation of science, is the foundation of everything, every scientist does.

And what the central limit theorem says, when you see a human being, as long as that human being is a member of the homo sapiens species, when they suffer that type of trauma, that human being must -- this is not will -- will manifest symptoms and signs that are within plus or minus 2 standard deviation of a known expectation.

This is the same principle that underlies when a patient sees you in the clinic and tells you, I'm having a headache that is almost pulsating.  That is a vascular headache.  There is nothing too alarming I've seen yet.

So once you've seen that, you know what trauma did this patient suffer.  This patient suffers severe traumatic brain injury.  This was all the things that were established before I went to see him.  And then what are the symptoms?  I went through his medical records, then I went to see him myself.

And the specific questions you ask your patient -- for example, he may not know it, I will ask him a question and,

less than 3 or 4 minutes later, I repeat the same question.  He will forget that he had given me that answer.  If you come to him like this is the first time I'm bringing it up, once you see that, that is an obvious sign of cognitive impairment.

And another thing -- so I'm talking to him, suddenly he becomes tearful.  He starts crying.  He looks beaten down.  Once you see that tearfulness, continuous tearfulness, that's a manifestation of mood disorder.

So I will be reasonably confident to make such diagnosis because we already know what his general causation principals are.  He suffers severe traumatic brain injury.  And, oh, I'm so sorry it's taking me long.  Everything I'm describing here is the scientific method called differential diagnosis.

Q.   You stated that physicians rely on the patient's medical, social, education, and occupation history as narrated, meaning as told to you, by the patient, the family members, the friends, and colleagues.  Is that an accurate statement?

A.    Yes, ma'am.

Q.    So in this case, did -- did you speak with any of Mr. Barber's family members?

A.    No.  No.  No.  If you let me expand -- maybe I just say no.  No.

Q.    That's fine.  Thank you.

Did you speak to any of Mr. Barber's friends?

A.    No.

Q.    Did you speak with any of his colleagues?

A.    No.

Q.    His other doctors?

A.    Not verbally, but I read the notes and medical records made by other doctors.

Q.    Did you speak with any of the nurses who had treated him?

A.    No, ma'am.

Q.    Did you speak with any of his physical therapists?

A.    No, ma'am.

Q.    His occupational therapists?

A.    No, ma'am.

Q.    How exactly did you determine with case-specific facts or symptoms that Mr. Barber will experience pain and suffering for the rest of his life?

A.    That is what we call common knowledge.  Common knowledge is like if you put your hand in fire, it will burn you.  That's common knowledge.

A human being who suffers severe traumatic brain injury, it is common knowledge that he will suffer pain and suffering for the rest of his life.  There's no question.  It's not my opinion.  It's a fact of science.  And that is why they are called common knowledge.  It is something that is commonly known.

543

And the patient himself has told you five, six years after his trauma, he's still having headaches, still having pain and suffering.  So you listen to the patient.  If a patient tells you, I'm feeling pain, you don't tell him, oh, shut up, you're lying, you're not feeling pain.  You don't do that.

Q.   How do you account for adaptations or pain management interventions that could reduce suffering over time?

A.   So, remember, the question is, is a patient experiencing pain?  The question is not is the patient experiencing reduced pain?  That's a totally different type of analysis, which doesn't apply here.

So because the underlying trauma is permanent, progressive, and irreversible, you cannot eradicate the symptoms and signs of the trauma if you cannot cure the trauma.

If it was trauma to the liver, after a couple of years, it will go away.  But trauma to the brain or spinal cord is permanent.  Pain is a symptom of the underlying trauma.  So as long as the trauma is permanent, the symptoms of the trauma will be permanent.  And since pain is a symptom of the trauma, the pain will be permanent.

Q.   Aren't there situations where patients have suffered pain -- trauma to their spinal cord or brain and due to the nature of their paralysis, they don't actually experience the pain associated from that trauma?

UNITED STATES DISTRICT COURT

544

A.    It is not medically possible that a patient with spinal cord injury will stop feeling pain.  In fact, one of the people with the highest levels of pain medications are spinal cord injury patients.  And if you notice in my report, I spent almost half a page explaining that principle.  Some of the scientific principles are paradoxical.  But -- even sometimes me, myself, I don't understand them, but I respect them because people smarter than me came before me.

Q.    So did Mr. Barber indicate to you, when you met with him, that he was experiencing pain?

A.    Well, when I met with him, I already knew he was experiencing pain.  So I confirmed that -- headaches, muscle spasm, emotional pain, um, regrets.  I mean, one, which I almost started crying myself, he's always wanted to be an underwater welder.  That has been his dream.  And he was planning to learn how to swim.  And he looked at me, it can't be done.  I became tearful.  I'm a human being, too.  I became tearful, too.  I'm sorry.  That is emotional pain.

So the two hours I was with him, I confirmed that this was a man who is simply confirming the science.  He will be in pain for the rest of his life, unfortunately.  I wish I could help him.  I really do.

Q.    Throughout your career, have you experienced patients who do something called malingering?

A.    We need to be very, very -- extremely careful about

UNITED STATES DISTRICT COURT

545

that.  I've not -- I have encountered patients who suffer from what is call Munchausen Syndrome, M-a-n-c-h-u-s-e-n *[sic]*. Malingering is not a terminology a physician would use, no. Huh-uh.  Especially for TBI patient, you need to be extremely careful.

TBI patients suffer behavioral impairment.  So even if you think the patient is suffering from malingering, it is not intentional.  It is a manifestation of the severe traumatic brain injury he has suffered.  And that was why I said you must listen to the patient.  In patient care management -- I'm both certified in medical management -- the beginning of the management is the patient.  The center of patient care management is the patient, is treatment by the patient.

Q.    When you reviewed the medical records, I can't remember, did you say you do recall or do not recall seeing instances where Mr. Barber refused to take certain muscle relaxants or chronic pain medication?

A.    I did not see any.  All I saw was a severe traumatic brain injury patient manifesting the signs and symptoms of his trauma.  Nothing else, nothing more.

Q.    If you had seen records that said Mr. Barber refused to take medications in 2003 and 2004 that were intended for muscle relaxing, chronic pain, or nerve pain, would that mean to you -- could it mean to you that he was no longer feeling pain and requiring the assistance from those medicines?

UNITED STATES DISTRICT COURT

MR. GALIPO:  I'm going to object just with respect to the dates.  I don't know if that -- I think she said 2003 and 2004.

THE COURT:  She did.

MS. BRUNSON:  Sorry.  2023, I'm sorry.  2023 and 2024.

MR. GALIPO:  Okay.

THE WITNESS:  I lost you.  I'm sorry.  Could you repeat it, please.

BY MS. BRUNSON:

Q.    If you had -- if you seen or reviewed medical records that suggested Mr. Barber refused medications for pain in 2023 and in 2024, could you interpret that as he was no longer experiencing pain at that time?

A.    No.  Not at all.  Absolutely not.

Um, there is -- there are thousands of reasons why a patient would say he does not want something.  When a patient says that, it is the duty of the medical care team to find out why and what other modality of treatment you offer the patient. In medical care management and in the assessment of patients, thou shall not judge or be condescending with the patient.  You don't do that, that because a patient refuses to do this, this is why.

If I were to do that, I'll lose my license.

Q.    Well, what if you saw a record where in April of

UNITED STATES DISTRICT COURT

547

2023 Mr. Barber told his physician that he was doing well without meds. Would that mean something to you as far as Mr. Barber's pain and suffering, at least with regard to that time, that month?

A.   So in my interaction with him, he said -- because he's not getting the care he wants, people don't pay attention to him. He's being -- he's being given pain medications that are causing him so much side effects. And that's a medical -- somebody with board certification in medical care management in social medicine, it's very well-known to us that many times medical care teams don't listen to patients.

So when he says this -- I don't like this medication, can you change it for me, it's causing him side effects -- and you refused to change it for me. The only power he has is to say, I cannot take it.

So to jump the loop to say he -- he's refusing specific medication because he's no longer feeling pain is not fair to the patient.

Q.   Well, what if in the same record, April 3rd of 2023, Mr. Barber told his doctor, I'm doing well without meds and doing -- and the doctor noted that Mr. Barber was doing well with his ADLs, that means activities of daily living; right?

A.   (No audible response.)

Q.   And then the record notes that the provider told Mr. Barber to notify staff if he wants to start muscle

UNITED STATES DISTRICT COURT

548

relaxants again.

THE COURT:  Mr. Galipo?

MR. GALIPO:  I think we're getting into hearsay at this point, Your Honor.

THE COURT:  I would agree.  You're just reading.

MS. BRUNSON:  May I ask --

THE COURT:  You can ask a question.  You can't read from a document that's not admitted into evidence.

BY MS. BRUNSON:

Q.   So, Dr. Omalu, if there was a record in your review about Mr. Barber doing well with his ADLs, being off his medication, being told if you would like to restart your medication, please let the doctor know, to which Mr. Barber smiled and agreed, if a record had said that, does that still tell you nothing of value with regard to Mr. Barber's pain and suffering or does it mean something to you?

MR. GALIPO:  I'm going to object to the question as compound, calls for hearsay, and assumes facts not in evidence.

THE COURT:  Sustained.

BY MS. BRUNSON:

Q.   Your opinion is that Mr. Barber will remain in a wheelchair for the rest of his life; is that correct?

A.   Yes, ma'am.

Q.   How do you address reports of patients with penetrating brain injuries who have actually improved their

UNITED STATES DISTRICT COURT

functional outcome over the years?

A.    You asked me this question during my deposition, and I addressed it.

First, you don't compare one patient to the other patient.  You don't do that.

Two, the general standard and the law of medicine -- maybe I know the law -- the law, actually, but the standard in medicine, you take each patient as the patient is.  Does that make sense?

Mr. Barber's trauma is permanent.  And like I said in the deposition, we should not judge the patient.  What we need to do, pay for him to go to the best centers in America, they cost millions of dollars.  Let's give it to him.  Provide him what he needs.  Let him be the one who fights the battle inside the ring.

Q.    Sir --

A.    Give him -- I haven't finished.

Q.    Sorry.

A.    Give him the support he needs, let him fight the battle, and let it -- let us see where it will lead us to.

Going back to the scientific concept of the central limit theorem, plus or minus 2 standard deviation of patients, on both sides.  So as I'm sitting here, what I know, could he get out of a wheelchair or not?  No.  All I know is if we give him -- pay for him, give him the resources he needs to get the

**UNITED STATES DISTRICT COURT**

best therapies, he will give us the best of himself.

But because he's suffering hemiplegia, it's like a patient with a stroke, there is nothing we can do to reverse that.  All we can do is to support him to see how much he can continue to sustain himself.

Activities of daily living for a trauma patient is relative.  The activities of daily living for a trauma patient like him, not activities of daily living for a person like you who has not suffered, who's not been shot in the head.

So when a doctor says he's doing well for his activities of daily living, the doctor's referring he's doing well based on his state as an individual with a permanent, irreversible, and progressive severe traumatic brain injury.

We need to be very careful about who writes freely on someone's business.  It is not fair to the patient and it is not fair to society.

Q.    You testified that the brain is the only organ that cannot heal itself.  Is that correct?

A.    Yes, the only organ that cannot heal itself. Another organ is the ovary.  The ovary, if you notice, you can't create new eggs.

Q.    Right.

A.    You use your eggs, that's it.  The brain is like that, too.

Q.    Now, is it possible, though, for the brain to

**UNITED STATES DISTRICT COURT**

551

restucture itself?

    A.    That was what I said.  I wouldn't use the word "restructure" because there is no structure in it.  It's compensate.

        So the brain cells that are surviving will overfire.  But remember that that applies to people who have suffered like a stroke, who suffered very focal trauma.  A gunshot wound to the head is a diffused injury.  It's more diffused.  It's not like somebody who's just had a stroke.

        So can the brain compensate?  Yes.  It could.  But does it reverse the trauma?  No.

        Compensation is more effective with people who have been born with an inadequacy in childhood while the brain is still developing.  That is why if you see like people who are blind, they become super musicians because, while their brain was developing, their brain made necessary adjustments very early in childhood.  But for an adult in his 30s, he's lost that capacity.  So there's a limitation to how much he can compensate.  That is why six years after his trauma, he is still on a wheelchair.

    Q.    So you testified that Mr. Barber's injuries are permanent and progressive, and what was the other word?  There was one more.

    A.    Irreversible.

    Q.    Irreversible, yes.

**UNITED STATES DISTRICT COURT**

552

Now, one day, could Mr. Walker -- sorry -- could Mr. Barber use a walker and ambulate with a walker, even though you just testified his injuries are permanent and progressive and irreversible?

02:12PM    A.    So the same answer I'll give.  Remember the central limit theorem?  You can't absolutely predict where a patient will be.  But what you use is six years after his trauma, does he still need a wheelchair?  Yes.

Okay.  Now, if you spend -- as a hypothetical, if 02:12PM you give him a hundred million dollars for the rest of his life to have the best care -- one of the best care is in Colorado -- and he goes there, the best people give him what he needs, say, five, ten years from now, he may be able to use one gadget or two.  But the key point is give him the wherewithal, let him 02:13PM use the ingenuity of his spirit to fight that battle.  Can we do that?  Can you promise me, let's do that and let's see how well he does?

Q.    So are you saying he could or could not walk with a walker?

02:13PM    A.    We don't know.  All we know is what he needs now to help him to see if he could walk or not walk.  Because if he continues the way he is, there's a risk he will fall and he will suffer more trauma.

So all we know now is if society can provide him 02:13PM with the wherewithal he needs for the best care, we increase

UNITED STATES DISTRICT COURT

his chances, the probability, because these are probabilistic statements. We increase the probability that some day, some day the sun will rise and he could be walking around with a walker to the best of his ability. But without the society supporting him, the probability diminishes significantly.

Q. So you're saying if -- if society paid for him to go to a center, he could become ambulatory with a walker. Is that what you're saying?

A. There is a higher probability. I'm not saying yes. What I'm saying in science, especially for medicine that is not an absolute science, you can't make absolute statements so you use relatives.

So if you give him what he needs, the probability of him maybe some day ambulating with a walker increases. But if you don't give it to him, the probability remains and may even start tending negative because he will now start having consequences. He could fall and impact his head on the concrete floor and become bedridden.

So, again, probability, which is better as a human being, respecting his dignity as a human being, do you leave him to go down, to fall, become bedridden or do you give him what he needs to see if he could go up. As a human being, I'll choose the second. Let's give him what he needs and see how well he does. It's the only -- it's the best better option than anything else.

554

MS. BRUNSON:  Your Honor, I'm asking permission to impeach using page 58, lines 2 through 16, of Mr. Omalu's -- Dr. Omalu's transcript.

THE COURT:  Give me one moment.

MR. GALIPO:  May I confer with counsel for a moment?

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

THE COURT:  Lines 2 through 16?

MR. GALIPO:  One moment, please.

MS. BRUNSON:  Yes, Your Honor.

THE COURT:  I don't believe this is inconsistent with what he's been testifying to.

MS. BRUNSON:  Your Honor, on page 6 -- on line 16, there is a different response.

MR. GALIPO:  Your Honor, I would submit, number one, it's not inconsistent or proper impeachment; and, number two, you'd have to read the whole question and answer going back to page 57, line 16, as opposed to just a portion.

THE COURT:  I would agree.  He's answering a question.  If you'd like to read the entire question and answer, you can.  But you can't just selectively choose part of an answer.

MS. BRUNSON:  Your Honor, I did ask him that exact question --

THE COURT:  Counsel, that's my ruling.

UNITED STATES DISTRICT COURT

MS. BRUNSON:  Okay.

BY MS. BRUNSON:

Q.    So when you spent two hours with Mr. Barber in October of 2025, did you record this interaction -- or meeting in any way?

A.    No, ma'am, I did not.

Q.    Do you normally record your interactions with clients like that?

A.    It depends on different cases.  Whether the attorney instructs me to each case.  I'm not the one who decides.  The Court or the -- some -- some other power above me decides that.  It's above my pay grade.

Q.    Do you have plans to assess Mr. Barber again in a number of months or years to see if he's progressing or declining?

A.    I don't have the power to do that.  I'm just a physician with an office in Sacramento, if I'm called upon, I will.  But as I sit here, I don't know.

Q.    Would it -- would your opinion have more data to support it if you had seen Mr. Barber more than once over a period of time in order to note is the injury progressing or getting worse or is it getting better?

A.    No, no.  The standard -- whatever I do goes in line with the standards of practice; otherwise, I'll lose my license.

UNITED STATES DISTRICT COURT

So the standard of practice says in a case like this, when you have medical records, where the trauma is very well-established, you'd simply go -- in fact, they recommend one hour. But I usually do two to three hours to simply evaluate the patient and confirm what is written down.

And so that as I'm sitting here testifying, it is not hearsay. I can testify with authority and audacity because I spent time with the patient.

Q. In your opinion, is there any chance that Mr. Barber could ever walk again?

A. Like I have said earlier, I cannot answer that. All I can say is his trauma is irreversible, permanent, and progressive. If we give him what he needs to get the -- not necessarily go to Colorado, there are excellent centers in Sacramento -- it will increase his chance of spending less time on a wheelchair. But is he going to get to a point where he will never need a wheelchair is less likely because of the type of damage he has suffered.

But you cannot deny a patient care because you believe he's not going to walk again, no. We don't do that. You treat the patient, give the patient what is available, the best care possible, and see how the patient responds.

MS. BRUNSON: Your Honor, I would ask the Court -- draw the Court's attention to page 60, lines 2 through 6.

MR. GALIPO: Again, Your Honor --

**UNITED STATES DISTRICT COURT**

Did you say page 60?

MS. BRUNSON:  Yes.  Lines 2 through 6.

MR. GALIPO:  It looks like, again, it's part of an answer.  I don't think it's really impeachment on what he said today, but if it's read, the whole question and answer should be read.

THE COURT:  I would agree.

Ms. Brunson, that answer starts on page 59, line 21, and doesn't end until page 60, line 14.

You cannot just pick part of the answer.

MS. BRUNSON:  I understand.

Then I would ask to read page 59, lines 20, which is the question, through page 60, line 15.

THE COURT:  I do not find that it's impeachment, but if you'd like to read the answer, go ahead.

MS. BRUNSON:  "QUESTION:  So what about eventually walking?

"ANSWER:  I don't think, given the severe nature of the trauma he had suffered, gunshot wound severely damages a specific pattern of the brain. The velocity, even if the brain was to, you know, restructure itself, it is less likely he could walk independently.  However, having said that, science recognizes, yes, if you pay millions of dollars and keep him in the best centers for decades for five,

ten years, he could get out.  He could ambulate.  So we cannot really recommend that unless society pays millions of dollars for him to go to such a center and then we watch and see.  Our ultimate goal is to rehabilitate him as much as we can.  Why not?  So if we spend $20 million so that some day he is now walking independent of himself, let's do that.  Why not?"

Thank you.

Nothing further.

THE COURT:  Mr. Galipo, redirect?

MR. GALIPO:  Yes.  Very briefly.

### REDIRECT EXAMINATION

BY MR. GALIPO:

Q.    Dr. Omalu, in your review of the photographs of the gunshot wound to the head, the -- and all the hospital records, including all the diagnostic studies and brain surgery and notes there, did you feel that you were able to generally form your opinions in this case even without seeing Mr. Barber in person?

A.    Yes.  Yes.  Um, many of the cases I do, I don't see the patient.  Medical records are -- as long as it's written by a certified physician -- reasonable types of evidence.

Q.    And did you think you needed to speak to family, friends, doctors, or nurses after looking at all of the

559

hundreds of pages of medical records in understanding the traumatic brain injury and shot he had to his brain to give a medical opinion?

A.    No, no, sir, because this is not the type of case where I need to speak to family because the mechanism of sustenance of the trauma is very well-documented.

Q.    And did you feel comfortable, based on the information you had available to you in this case, giving the opinions you have given to this jury?

A.    I lost you.  Could you repeat it.

Q.    Did you feel comfortable that you had sufficient information in this case to give the opinions you have given to this jury?

A.    Yes, sir.  Yes, sir.

Q.    And lastly, counsel has harped on this idea of, if he had the best care in the world and understanding that's very expensive, if he could possibly walk again with a walker or something like that -- do you remember those questions?

MS. BRUNSON:  Objection.  That misstates the evidence.

THE COURT:  Overruled.

BY MR. GALIPO:

Q.    Do you remember those questions generally?

A.    Yes, sir.

Q.    Okay.  Are you saying that it's unlikely he'll ever

UNITED STATES DISTRICT COURT

be able to walk again with a walker, but if he gets the possible -- best possible medical care, it increases the probability of that ever happening?

A.    It increases the probability of him ambulating to an extent, but would he regain the power on the left side of his body?  No.

Q.    And for that reason, you think he would remain a fall risk?

A.    Yes, sir.

MR. GALIPO:  Thank you.  That's all I have.

THE COURT:  Any recross?

MS. BRUNSON:  No.  Thank you, Your Honor.

THE COURT:  All right.  Very well.

May we excuse Dr. Omalu at this time?

MR. GALIPO:  Yes.  Thank you, Your Honor.

THE COURT:  Dr. Omalu, thank you.  You are excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Mr. Galipo, does the plaintiff have any further witnesses at this time?

MR. GALIPO:  No, Your Honor.  Subject to any discussion regarding exhibits, plaintiff rests.

THE COURT:  Thank you.

Mr. Ramirez?

MR. RAMIREZ:  We have a motion to make at the Court's convenience, but at this point, we'd like to call our

April 27th, 2021, include left arm and bilateral leg weakness. And the second opinion, it's unclear that Mr. Barber's left rotator cuff injury is related to the gunshot wound.

So I am concerned that they're going to try to broaden his opinions and lengthen his examination.

So I'm hoping his direct will be much less because of his limited opinions, and then my cross will be much less. At most, I'll be 30 minutes. I may try to do it in 15 or 20 minutes.

THE COURT: All right. Go ahead and provide a copy of that report. But if, in fact, Mr. Galipo's reading of the opinions is correct, then I would expect Dr. -- or is it doctor or mister?

MR. RAMIREZ: Doctor.

THE COURT: -- Dr. Vilke's testimony to be quite brief.

MR. RAMIREZ: I'm going to try to keep it to a half-hour, but yes, I will do my best to keep it short.

THE COURT: And it would be within the bounds of the report and those two opinions just stated on the record.

MR. RAMIREZ: Yes. Also based on his review of the medical records, which is part of his opinion.

THE COURT: All right. Very well.

Then approximately how long do each of you anticipate for your closing arguments?

**UNITED STATES DISTRICT COURT**

774

the Court is not allowing them to call Dr. Vilke.  It's only saying that he would be limited to his opinions in his report. And I'll submit on that.

THE COURT:  Mr. Ramirez.

MR. RAMIREZ:  I was going to say the deposition is listed in his materials reviewed of the plaintiff, and also I can ask him hypothetically, assuming plaintiff were to have testified in this case that he didn't attend his physical therapy, would that assist in a degradation of his ability to recover from these various injuries?

The way I understand it now is I could only ask him did he suffer an injury which would include left arm and bilateral leg weakness and nothing further.

THE COURT:  Well -- and the problem that I have is that the opinion very clearly states, "The injuries that occurred from the gunshot wound to Mr. Steffon Barber on April 27, 2021, include left arm and bilateral leg weakness." That is it in its entirety.  It says nothing about failure to mitigate, it says nothing about what his prognosis would be, and that is my concern.

And so the information that follows on page 14 of his report, in particular his opinion that -- at the very end -- Mr. Barber's regression and progress is likely due to his lack of following physical therapy recommendations from the hospital, as well as refusing physical therapy treatments while

UNITED STATES DISTRICT COURT

in jail, that has nothing to do with that opinion.  It doesn't support that opinion.  It doesn't provide analysis for -- that is a separate opinion in its entirety.  And that is the concern.

And had your expert prepared a report with the opinions that he intended to present at trial, I would have no problem with this.  But the problem is you are putting information -- and I'm not saying there was any intentionality to it -- but the way that this report reads is almost like trying to slide in some opinion that has nothing to do with what was the identified opinion in the report.  And that is my problem with that.

MR. RAMIREZ:  I understand that.  Let me ask this. If he had put out a separate heading, his failure to attend physical therapy has led to a regression of his recovery, that is what a Court -- this Court would accept and would anticipate.

THE COURT:  Correct.

MR. RAMIREZ:  All right.  So as it stands now, I will not be able to get into that testimony.

THE COURT:  Correct.

MR. RAMIREZ:  Well, with that ruling, I'm going to ask for time to be able to call Dr. Vilke before the jurors come in whenever is convenient to the Court to let him know that I will not be calling him.

THE COURT:  All right.  Thank you.

And, Mr. Galipo, any rebuttal on behalf of the plaintiff?

MR. GALIPO:  No rebuttal, Your Honor.

THE COURT:  All right.  Very well.

MR. GALIPO:  We do want to reserve our right to discuss a Rule 50(a) motion, but we could do that later.

THE COURT:  All right.  Thank you.

MR. GALIPO:  Thank you.

THE COURT:  (Reading:)

"Members of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

"It is your duty to find the facts from all the evidence in the case.  To those facts, you will apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

"Please do not read into these instructions or anything that I may say or do or have said or done that I have

an opinion regarding the evidence or what your verdict should be.

"To help you follow the evidence, I gave you a brief summary of the positions of the parties.

"Plaintiff Steffon Barber asserts that during an incident that occurred on April 27, 2021, defendant County of San Bernardino Sheriff's Department Deputy Christopher Alfred used deadly force against plaintiff that was excessive, unreasonable, unnecessary, and negligent, in violation of federal and California law, and that such force caused plaintiff's injuries and damages.  Plaintiff further contends that the County of San Bernardino failed to provide adequate training to its deputies on issuing verbal warnings before using deadly force, was deliberately indifferent to the known or obvious consequences of its failure to train its deputies adequately, and thereby caused the deprivation of plaintiff's rights by defendant Christopher Alfred.

"Plaintiff has the burden of proving each of these claims by a preponderance of the evidence.

"Defendants deny those claims and contend defendant Christopher Alfred acted reasonably under the totality of the circumstances during the incident involving plaintiff Steffon Barber.

"When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it

798

means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

"You should base your decision on all of the evidence, regardless of which party presented it.

"You should decide the case as to each party separately.  Unless otherwise stated, the instructions apply to all parties.

"The evidence you are to consider in deciding what the facts are consists of:

"1.  The sworn testimony of any witness;

"2.  The exhibits that are admitted into evidence;

"3.  Any facts to which the lawyers have agreed; and,

"4.  Any facts that I have instructed you to accept as proved.

"In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

"1.  Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they may say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

"2.   Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

"3.   Testimony that is excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.  In addition, some evidence may have been received only for a limited purpose.  When I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

"4.   Anything you may see or hear when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

"Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that" person -- "what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

"By way of example, if you wake up in the morning

and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

"You have heard testimony from witnesses in this case who testified to their opinions and the reasons for those opinions.  This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of these witnesses.

"Such opinion testimony should be judged like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's specialized knowledge, skill, experience, training or education, the reasons given for the opinions, and all the other evidence in the case.

"Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form and you will be able to view them in the jury room.  A computer, projector, printer, and accessory equipment will be available to you in the jury room.

"A court technician will show you how to operate the computer and other equipment, how to locate and view the

exhibits on the computer, and how to print the exhibits.  You will also be provided with a paper list of all exhibits received in evidence.  You may request a paper copy of any exhibit received in evidence by sending a note through the clerk or bailiff.  If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the clerk or bailiff, signed by your foreperson or by one or more members of the jury.  Do not refer to or discuss any exhibit you were attempting to view.

"If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the clerk or the bailiff present for the sole purpose of assuring that the only matter that is discussed is the technical problem.  When the court technician or non-juror is in the jury room, the jury shall not deliberate.  No juror may say anything to the court technician or a non-juror other than to describe the technical problem or to seek information about operation of the equipment.  Do not discuss any exhibit or any aspect of the case.

"The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case.  You may not use the computer for any other purpose.  At my direction, technicians have taken steps to ensure that the computer does not permit access to the

Internet or to any outside website, database, directory, game, or other material.  Do not attempt to alter the computer to obtain access to such materials.  If you discover that the computer provides or allows access to such materials, you must inform the Court immediately and refrain from viewing such materials.  Do not remove the computer or any electronic data from the jury room and do not copy any such data.

"The parties have agreed to certain facts that were read to you and have been placed into evidence as Exhibit 101. You must, therefore, treat these facts as having been proved.

"There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overruled the objection, the question could be answered or the exhibit received.  If I sustained the objection, the question could not be answered and the exhibit could not be received.  Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

"Sometimes I may have ordered that evidence be stricken from the record and that you disregard or ignore that evidence.  That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

"In deciding the facts in this case, you may have to

decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

"In considering the testimony of any witness, you may take into account:

"1.  The opportunity and ability of the witness to see or hear or know the things testified to;

"2.  The witness's" manner;

"3" -- I'm sorry.  "The witness's memory;

"3.  The witness's manner while testifying;

"4.  The witness's interest in the outcome of the case, if any;

"5.  The witness's bias or prejudice, if any;

"6.  Whether other evidence contradicted the witness's testimony;

"7.  The reasonableness of the witness's testimony in light of all the evidence; and,

"8.  Any other factors that bear on believability.

"Sometimes a witness may have said something that was not consistent with something else he or she said.  Sometimes different witnesses will have different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences but do not decide that testimony is untrue just

because it differs from other testimony.

"However, if you decide that a witness deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

"The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testified. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

"If there is any news media account or commentary about the case or anything to do with it, you must ignore it. You must not read, watch, or listen to any news media account or commentary about the case or anything to do with it.  The case must be decided by you solely and exclusively on the evidence that was received in the case and on my instructions as to the law that applies.  If any juror is or was exposed to any outside information, please notify me immediately.

"At the beginning of this trial, I instructed you that you could take notes to help you remember the evidence. If you took notes, please keep them to yourself until you go to the jury room to decide the case.  When you leave the jury room for any reason, your notes should be left in the jury room.  No one will read your notes.  They will be destroyed at the

conclusion of the case.

"Whether or not you took notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

"From time to time during the trial, it may have become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom or by calling a recess. Please understand that while you were waiting, we were working. The purpose of these conferences was not to keep relevant information from you but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

"Of course, we have done what we could to keep the number and length of these conferences to a minimum. I may not have always granted an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

"Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves except for discussing the case with your fellow jurors during your

deliberations.

"Do not communicate with anyone in any way and do not let anyone communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means via e-mail, via a text messaging, or any Internet chat room, blog, website, or application, including, but not limited to, Facebook, YouTube, the platform X, formerly known as Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media.  This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

"Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it, although I have no information that there will be news reports about this case.

"Do not do any research, such as by consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.  Do not visit or view any place discussed in this case and do not use Internet

programs or other devices to search for or view any place

discussed during the trial.  Also, do not do any research about

this case, the law, or the people involved -- including the

parties, the witnesses, or the lawyers -- until you have been

excused as jurors.  If you happen to read or hear anything

touching on the case in the media, turn away and report it to

me as soon as possible.

"These rules protect each party's right to have this

case decided only on evidence that has been presented here in

court.  Witnesses here in court take an oath to tell the truth,

and the accuracy of their testimony is tested through the trial

process.  If you do any research or investigation outside the

courtroom or gain any information through improper

communications, then your verdict may be influenced by

inaccurate, incomplete, or misleading information that has not

been tested by the trial process.  Each of the parties is

entitled to a fair trial by an impartial jury, and if you

decide the case based on information not presented in court,

you will have denied the parties a fair trial.  Remember, you

have taken an oath to follow the rules, and it is very

important that you follow these rules.

"A juror who violates these restrictions jeopardizes

the fairness of these proceedings and a mistrial could result

that would require the entire trial process to start over.  If

any juror is exposed to any outside information, please notify

**UNITED STATES DISTRICT COURT**

the Court immediately.

"Plaintiff Steffon Barber brings claims for violations of constitutional rights under the federal statute, 42 United States Code, Section 1983, which provides that any person or persons who, under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

"In order to prevail on his Section 1983 claim against defendant Christopher Alfred, plaintiff Steffon Barber must prove each of the following elements by a preponderance of the evidence:

"1.  Defendant Christopher Alfred acted under color of state law;

"2.  The acts or failure to act by defendant Christopher Alfred deprived plaintiff Steffon Barber of particular rights under the United States Constitution as explained in later instructions; and

"3.  Defendant Christopher Alfred's conduct was an actual cause of the claimed injury.

"A person acts under color of state law when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that defendant Christopher Alfred acted under color of state law.

**UNITED STATES DISTRICT COURT**

"Defendant Christopher Alfred's conduct is an actual cause of plaintiff Steffon Barber's injury only if the injury would not have occurred but for that conduct and the conduct has a sufficient connection to the result.

"If you find plaintiff Steffon Barber has proved each of these elements and if you find that plaintiff Steffon Barber has proved all the elements he is required to prove under the instructions I review with you, your verdict should be for plaintiff Steffon Barber on his Section 1983 claim.  If, on the other hand, you find that plaintiff Steffon Barber has failed to prove any one or more of these elements, your verdict should be for defendant Christopher Alfred on the Section 1983 claim against defendant Christopher Alfred.

"In order to prevail on his Section 1983 claim against defendant County of San Bernardino alleging liability based on a policy of a failure to train its police officers, plaintiff Steffon Barber must prove each of the following elements by a preponderance of the evidence:

"1.  The acts or failure to act of defendant Christopher Alfred deprived plaintiff Steffon Barber of his particular rights under the United States Constitution as explained in later instructions.

"2.  Defendant Christopher Alfred acted under color of state law;

"3.  The training policies of defendant County of San Bernardino were not adequate to train its police officers to handle the usual and recurring situations with which they must deal;

"4.  Defendant County of San Bernardino was deliberately indifferent to the known or obvious consequences of its failure to train its police officers adequately; and

"5.  The failure of defendant County of San Bernardino to provide adequate training caused the deprivation of plaintiff Steffon Barber's rights by defendant Christopher Alfred; that is, defendant County of San Bernardino's failure to train played a substantial part in bringing about or actually causing the injury or damage to plaintiff Steffon Barber.

"A person acts under color of state law when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that defendant Christopher Alfred acted under color of state law.

"A policy is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.  A policy of inaction or omission may be based on a failure to implement procedural safeguards to prevent constitutional violations.  To

establish that there is a policy based on a failure to preserve constitutional rights, plaintiff Steffon Barber must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to plaintiff Steffon Barber's constitutional rights and that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy.

"Deliberate indifference is a conscious choice to disregard the known or obvious consequences of one's acts or omissions.  Plaintiff Steffon Barber may prove deliberate indifference in this case by showing that the facts available to defendant County of San Bernardino put it on actual or constructive notice that its failure to train adequately was substantially certain to result in the violation of the constitutional rights of persons such as plaintiff Steffon Barber due to police officers' conduct.

"If you find plaintiff Steffon Barber has proved each of these elements and if you find that plaintiff Steffon Barber has proved all the elements he is required to prove under the instructions I review with you, your verdict should be for plaintiff Steffon Barber on his section 1983 claim.  If, on the other hand, you find that plaintiff Steffon Barber has failed to prove any one or more of these elements, your verdict should be for defendant County of San Bernardino on the Section 1983 claim against defendant

UNITED STATES DISTRICT COURT

County of San Bernardino.

"Plaintiff Steffon Barber claims that defendant Christopher Alfred unreasonably seized and used excessive force against him.  In general, a seizure of a person is unreasonable under the Fourth Amendment if a police officer uses excessive force in making a lawful arrest, in defending himself or others, and/or in attempting to stop a fleeing or escaping suspect.  Therefore, to establish an unreasonable seizure in this case, plaintiff Steffon Barber must prove by a preponderance of the evidence that defendant Christopher Alfred used excessive force during the incident at issue in this case.

"Under the Fourth Amendment, a police officer may use only such force as is 'objectively reasonable' under all of the circumstances.  You must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.  Although the facts known to the officer are relevant to your inquiry, an officer's subjective intent or motive is not relevant to your inquiry.

"In determining whether defendant Christopher Alfred used excessive force in this case, consider all the circumstances known to defendant Christopher Alfred on the scene, including:

"1.  The nature of the crime or other circumstances known to defendant Christopher Alfred at the time force was

UNITED STATES DISTRICT COURT

applied;

"2.   Whether plaintiff Steffon Barber posed an immediate threat to the safety of defendant Christopher Alfred or to others;

"3.   Whether plaintiff Steffon Barber was actively resisting arrest or attempting to evade arrest by flight;

"4.   The amount of time defendant Christopher Alfred had to determine the type and amount of force that reasonably appeared necessary and any changing circumstances during that period;

"5.   The relationship between the need for the use of force and the amount of force used;

"6.   The extent of plaintiff Steffon Barber's injury;

"7.   Any effort made by defendant Christopher Alfred to temper or to limit the use of force;

"8.   The severity of the security problem at issue;

"9.   The availability of alternative methods either to take plaintiff Steffon Barber into custody or to subdue him;

"10.   The number of lives at risk -- motorists, pedestrians, police officers -- and the parties' relative culpability, that is, which party created the dangerous situation and which party is more innocent;

"11.   Whether it was practical for defendant Christopher Alfred to give warning of the imminent use of force

**UNITED STATES DISTRICT COURT**

and whether such warning was given;

"12. Whether a reasonable officer would have or should have accurately perceived a mistake" of fact -- mistaken fact; and

"13. Whether there was probable cause for a reasonable officer to believe that the subject had committed a crime involving the infliction or threatened infliction of serious physical harm.

"Probable cause exists when, under all of the circumstances known to defendant Christopher Alfred at the time, an objectively reasonable police officer would conclude there is a fair probability that plaintiff Steffon Barber had committed or was committing a crime.

"Plaintiff Steffon Barber claims that defendant Christopher Alfred intentionally interfered with or attempted to interfere with plaintiff's civil rights by threats, intimidation, or coercion.

"To establish this claim, plaintiff Steffon Barber must prove all of the following:

"1. That defendant Christopher Alfred acted violently against plaintiff Steffon Barber to prevent him from exercising his right to be free from the use of excessive force;

"2. That defendant Christopher Alfred intended to deprive plaintiff Steffon Barber of or acted with reckless

disregard for his enjoyment of the interest protected by the right to be free from the use of excessive force;

"3.   That plaintiff Steffon Barber was harmed; and

"4.   That the conduct of defendant Christopher Alfred was a substantial factor in causing plaintiff Steffon Barber's harm.

"Under California law, a peace officer may use deadly force only when necessary in defense of human life. Plaintiff Steffon Barber claims that defendant Christopher Alfred unnecessarily used deadly force" against -- "on him.  To establish this claim, plaintiff Steffon Barber must prove all of the following:

"1.   That defendant Christopher Alfred intentionally touched plaintiff Steffon Barber or caused plaintiff Steffon Barber to be touched;

"2.   That defendant Christopher Alfred used deadly force on plaintiff Steffon Barber;

"3.   That defendant Christopher Alfred's use of deadly force was not necessary to defend human life;

"4.   That plaintiff Steffon Barber was harmed; and

"5.   That defendant Christopher Alfred's use of deadly force was a substantial factor in causing plaintiff Steffon Barber's harm.

"Defendant Christopher Alfred's use of deadly force was necessary to defend human life only if a reasonable officer

UNITED STATES DISTRICT COURT

in the same situation would have believed, based on the totality of the circumstances known to or perceived by defendant Christopher Alfred at the time, that deadly force was necessary to defend against an imminent threat of death or serious bodily harm to defendant Christopher Alfred or another person.

"Deadly force means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

"A threat of death or serious bodily injury is 'imminent' when based on the totality of the circumstances a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

"Totality of the circumstances means all the facts known to the peace officer at the time, including the conduct of defendant Christopher Alfred and plaintiff Steffon Barber leading up to the use of deadly force.  In determining whether defendant Christopher Alfred's use of deadly force was necessary in defense of human life, you must consider defendant

Alfred's tactical conduct and decisions before using deadly force on plaintiff Steffon Barber and whether defendant Christopher Alfred used other available resources and techniques as alternatives to deadly force if it was reasonably safe and feasible to do so.

"A peace officer who makes or attempts to make an arrest does not have to retreat or stop because the person being arrested is resisting or threatening to resist.  Tactical repositioning or other de-escalation tactics are not retreat.  A peace officer does not lose the right to self-defense by use of objectively reasonable force to effect the arrest or to prevent escape or to overcome resistance.  A peace officer does, however, have a duty to use reasonable tactical repositioning or other de-escalation tactics.

"Under California law, a peace officer may use deadly force only when necessary in defense of human life. Plaintiff Steffon Barber claims that defendant Christopher Alfred was negligent in" his -- "in using deadly force to arrest, detain, prevent escape, or overcome the resistance of plaintiff Steffon Barber.  To establish this claim, plaintiff Steffon Barber must prove all of the following:

"1.  That defendant Christopher Alfred was a peace officer;

"2.  That defendant Christopher Alfred used deadly

**UNITED STATES DISTRICT COURT**

force on plaintiff Steffon Barber;

"3.   That defendant Christopher Alfred's use of deadly force was not necessary to defend human life;

"4.   That plaintiff Steffon Barber was harmed; and

"5.   That defendant Christopher Alfred's use of deadly force was a substantial factor in causing plaintiff Steffon Barber's harm.

"Defendant Christopher Alfred's use of deadly force was necessary to defend human life only if a reasonable officer in the same situation would have believed, based on the totality of the circumstances known to or perceived by defendant Christopher Alfred at the time, that deadly force was necessary to defend against an imminent threat of death or serious bodily injury to defendant Christopher Alfred or another person.

"Deadly force is force that creates a substantial risk of causing death or serious bodily injury.  It is not limited to the discharge of a firearm.

"A threat of death or serious bodily injury is imminent if, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or to another person.  An imminent harm is not merely a fear of future harm, no matter how great the fear

819

and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

"Totality of the circumstances means all facts known to or perceived by the peace officer at the time, including the conduct of defendant Christopher Alfred and plaintiff Steffon Barber leading up to the use of deadly force.  In determining whether defendant Christopher Alfred's use of deadly force was necessary in defense of human life, you must consider defendant Christopher Alfred's tactical conduct and decisions before using deadly force on plaintiff Steffon Barber and whether defendant Christopher Alfred used other available resources and techniques as alternatives to deadly force if it was reasonably safe and feasible to an objectively reasonable officer.

"A peace officer who makes or attempts to make an arrest does not have to retreat or stop because the person being arrested is resisting or threatening to resist.  Tactical repositioning or other de-escalation tactics are not retreat. A peace officer does not lose the right to self-defense by using objectively reasonable force to arrest, detain, prevent escape, or overcome resistance.

"Defendants claim that plaintiff Steffon Barber's own negligence contributed to his harm.  To succeed on this claim, defendants must prove both of the following.

**UNITED STATES DISTRICT COURT**

820

"1.   That plaintiff Steffon Barber was negligent; and

"2.   That plaintiff Steffon Barber's negligence was a substantial factor in causing his harm.

"If defendants prove the above, plaintiff Steffon Barber's damages on his negligence claim only are reduced by your determination of the percentage of plaintiff Steffon Barber's responsibility.  I will calculate the actual reduction.

"Plaintiff Steffon Barber claims that defendant Christopher Alfred caused him to suffer severe emotional distress.  To establish this claim, plaintiff Steffon Barber must prove all of the following:

"1.   That defendant Christopher Alfred's conduct was outrageous;

"2.   That defendant Christopher Alfred acted with reckless disregard of the probability that plaintiff Steffon Barber would suffer emotional distress knowing that plaintiff Steffon Barber was present when the conduct occurred;

"3.   That plaintiff Steffon Barber suffered severe emotional distress; and

"4.   That defendant Christopher Alfred's conduct was a substantial factor in causing plaintiff Steffon Barber's severe emotional distress.

"In order to establish liability for plaintiff's

UNITED STATES DISTRICT COURT

California state law claims, as explained in the foregoing instructions, plaintiff Steffon Barber must prove by a preponderance of the evidence that the conduct of defendant Christopher Alfred was a substantial factor in causing plaintiff Steffon Barber's harm.

"A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.

"Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.

"An employer is responsible for harm caused by the wrongful conduct of its employees while acting within the scope of their employment.

"In this case, the parties have stipulated that:

"1.  Defendant Christopher Alfred was an employee of defendant County of San Bernardino; and

"2.  During the incident at issue in this case, defendant Christopher Alfred was acting within the scope of his employment.

"Defendant County of San Bernardino may only be held vicariously liable on plaintiff's California state law claims. Defendant County of San Bernardino may not be held vicariously liable on plaintiff's federal law causes of action.

"It is the duty of the Court to instruct you about

the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

"If you find for the plaintiff on any claim, you must determine the plaintiff's damages.  The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant.

"You should consider the following:

"1.  The nature and extent of the injuries;

"2.  The disability, disfigurement, and loss of enjoyment of life experienced and that with reasonable probability will be experienced in the future;

"3.  The mental, physical, and emotional pain and suffering experienced and that with reasonable probability will be experienced in the future;

"4.  The reasonable value of necessary medical and psychological care, treatment, and services received to the present time; and

"5.  The reasonable value of necessary medical and psychological care, treatment, and services that with reasonable probability will be required in the future.

"It is for you to determine what damages, if any, have been proved.

823

"Your award must be based upon evidence and not upon speculation, guesswork, or conjecture.

"The plaintiff has a duty to use reasonable efforts to mitigate damages.  To mitigate means to avoid or reduce damages.

"The defendants have the burden of proving by a preponderance of the evidence:

"1.  That the plaintiff failed to use reasonable efforts to mitigate damages; and

"2.  The amount by which defendants would have been mitigated.

"Before you begin your deliberations, elect one member of the jury as your presiding juror.  The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

"You shall diligently strive to reach agreement with all of the other jurors if you can do so.  Your verdict must be unanimous.

"Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

"It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.  Do not

824

be unwilling to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict."

I will have some additional instructions for you following closing argument.

Mr. Galipo, would you like to make your closing argument at this time?

MR. GALIPO:  Yes.  Thank you very much, Your Honor.

Well, good morning to all of you.  First and foremost, I want to thank you all very much on behalf of everyone, including, obviously, Mr. Barber, our group here on our side, and everyone, really, for being jurors, paying such close attention, being here every day.  We really respect you and we really appreciate you.

And as you probably realize, this is an important case.  It involves an officer-involved shooting.  It involves issues as to when an officer should be permitted to shoot another human being.  So thank you.

I want to say at the outset that I'm going to review some of the evidence with you in a moment.  I'm going to review some of the jury instructions with you.  I don't intend to go over everything you've heard and some of what I say may be what you already know.  I apologize for that.  But maybe it will

893

and a reckless disregard for someone's rights.

So I'll conclude by saying this. Thank you all very much, again. This is a very important case, and I believe that you good people are going to do the right thing, based on the law and the evidence, and answer yes on the questions, getting to damages, and awarding fair damages to Mr. Barber so that there's full accountability and compensation in this case.

We want to support our police, but we have to do better than this.

Thank you.

THE COURT: Thank you, Mr. Galipo.

Ladies and gentlemen, in just a moment, you will begin your deliberations. I just have a couple of additional instructions for you.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case, except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone -- including the Court -- how the jury stands, whether in terms of

UNITED STATES DISTRICT COURT

894

vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

I will give you a verdict form with questions you must answer. I have already instructed you on the law that you are to use in answering these questions. You must follow my instructions and the forms carefully. You must consider each question separately. Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict forms in the order they appear. After you answer a question, the forms tell you what to do next.

All of you must deliberate on and answer each question. All of you must agree on an answer before you can move on to the next question.

When you have finished filling out the form, the presiding juror must write the date and sign the form and then notify the bailiff that you are ready to present your verdict in the courtroom.

I see we have our bailiff. If you could please step forward.

And, Ms. Carr, if you could please swear our bailiff in.

THE COURTROOM DEPUTY: Please raise your right hand and please state your name.

THE COURT SECURITY OFFICER: Michael Bova.

THE COURTROOM DEPUTY: Do you solemnly swear to keep