**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Blvd., Ste. 310
Woodland Hills, CA 91367
Tel:   (818) 347-3333
Fax:   (818) 347-4118

RODNEY S. DIGGS, Esq. (SBN 274459)
Email: RDiggs@imwlaw.com
**IVIE MCNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, California 90071
Tel:   (213) 489-0028
Fax:   (213) 489-0552

Attorneys for Plaintiff, STEFFON BARBER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEFFON BARBER, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED,<br><br>        Defendants | Case No. 5:22-cv-00625-KK-DTBx<br><br>*[District Judge, Kenly Kiya Kato, Magistrate Judge, David T. Bristow]*<br><br>**DECLARATION OF JAMES A. BRYANT IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES** |

## DECLARATION OF RODNEY S. DIGGS

I, James A. Bryant, declare:

1.      I am an attorney at law fully licensed and admitted to practice before all courts of the State of California.  I am a Partner with The Cochran Firm California, co-counsel for Plaintiff Steffon Barber ("Plaintiff"). The matters contained in this declaration are known to me personally, and if called upon to testify as to such matters under oath in a court of law, I could and would do so competently.

1

**MY REQUESTED HOURLY RATE IS REASONABLE**

2. I have maintained contemporaneous time records reflecting the work activity and time spent on this case. I have exercised billing judgment, I have reduced or written off unproductive time or other time that would not ordinarily be charged to a fee-paying client, and I have ensured that my billing records related to the criminal matter are only those that were used for research and preparation for the civil matter. A copy of the time records for this case is attached hereto as **Exhibit A**.

3. All of the work done in this case was performed to advance the claims ultimately presented to the jury, to defend Mr. Barber's criminal case in a manner that preserved the viability of this civil action, or to otherwise advance Mr. Barber's interest in obtaining justice for the constitutional violations committed against him.

4. I graduated with a B.A. from University of California Berkeley in 2004. I attended and graduated from University of Michigan School of Law in 2007.

5. I have specialized in and devoted the majority of my practice to civil rights, catastrophic injury, wrongful death, employment litigation, business litigation, intellectual property and related fields, which I believe go hand in hand. Over the course of my career, spanning nearly 20 years of exemplary legal practice, I have handled over 1,000 cases and have secured more than $125 million in verdicts, arbitration awards and settlements for my clients. My practice encompasses civil rights, catastrophic injury, wrongful death, employment law, sports and entertainment, intellectual property, commercial litigation, state and federal criminal matters ranging from murder to federal espionage, as well as a variety of international matters involving US citizens.

6. In 2007, after graduation, I joined Orrick, Herrington & Sutcliffe, LLP as an associate in San Francisco. While at Orrick my assigned practice areas included the Real Estate Transaction and Securities Litigation groups. In 2009, I left

2

Orrick and founded the Law Office of James A. Bryant, which practices included complex litigation and transactional work in the areas corporate law, entertainment law, employment and labor, intellectual property and real estate law. In 2012, I joined the Cochran Firm as of-counsel. In 2014, I became an equity partner at the Cochran Firm – California. In addition, I am the lead partner for all defense litigation matters.

7. In my practice I handle numerous high-profile cases all across the country ranging from egregious civil rights violations to cases of significant interest involving celebrities and other public figures. In my first notable eight figure award, in February of 2014, as co-counsel representing plaintiff real estate development company in a first of its kind dispute against a major insurance company for breach of contract for a sub-contractor default insurance claim, we successfully obtained an arbitration award in the amount of $11,973,780.00 in favor of plaintiff. Over the years, I have served as first chair in over fifteen civil trials in federal and state court.

8. Among my landmark results:

- In 2019, my second eight figure award occurred when I was co-counsel in the case *Sinuon Samantha Pream, et al. v. City of Long Beach*, et al., Case No. CV 17-04295 TJH (FFMx).  We obtained a $9.1 million dollar verdict which was the largest verdict against The City of Long Beach in a shooting wrongful death case and the second largest in the United States District Court Central District in a civil rights shooting wrongful death case. This verdict was also top 10 civil rights verdict in California for 2019.
- In the excessive force matter of *Clayton et al v. City of Oxford, Mississippi* et al  Case No. 3:21-cv-00174-GHD-JMV, United States District Court, Northern District Mississippi: On May 26, 2022, as lead counsel, I received a $2.2 million judgment, the largest against a police involved murder in Mississippi history.

- In the excessive force matter of *Devin Nolley v. City of East Point et al* Case 1:19-cv-05189-CAP, United States District Court, Northern District of Georgia: On March 23, 2023, as lead counsel, with trial quickly approaching, I received an undisclosed seven figure settlement involving an unlawful police shooting that resulted in my client becoming a quadriplegic.

- In the wrongful detention matter of *Steven Jessie Harris v. Clay County, Mississippi et al*, Case No. 1:18-cv-00167-MPM-RP, United States District Court, Northern District of Georgia: On March 7, 2023, as lead counsel, just shortly empaneling a jury, Defendants entered into a confidential settlement resulting the largest settlement or judgment involving the wrongful detention of a person in state of Mississippi.

- In 2023, as co-counsel, I obtained a $24,584,449.00 jury verdict in an employment civil rights case against a school district — believed to be the largest employment retaliation verdict ever secured against a school district

- In 2019, I obtained a Top 10 verdict in the United States and a Top 10 verdict in California. In 2020, I obtained a Top 50 verdict in California. In 2021, I obtained a Top 10 settlement in the United States and two Top 10 settlements in California.

9.     I have also shaped federal and state law through published appellate decisions. I was lead counsel and was published in United States Fifth Circuit the case *Steven Jessie Harris v. Clay County, Mississippi et al* Case No. 21-60456 (MSND No. 1:18-cv-00167-MPM-RP). Following a unanimous *En Banc* panel review, the Fifth Circuit issued a landmark civil rights opinion, in a case of first impression, where it was determined that detaining in a county a jail, a person deemed legally incompetent for seven years following a competency hearing was a blatantly obvious constitutional violation. This precedent setting case will have a

long-lasting impact on legal jurisprudence. I was also lead counsel and was published in the case *Kiara Belen v. Ryan Seacrest Productions et al* Case No. B304642 (Superior Court No. 19STCV26534)). I represented Plaintiff in this matter. This matter established that production companies cannot be shielded behind free speech when filming individuals without permission and broadcasting their nude bodies to millions of viewers. Most recently, I was co-counsel in *Bassett Unified School District v. Los Angeles County Superior Court; Michael Ross* (RPI), Case No. B323528, in which the Court of Appeal issued a significant ruling strengthening employee protections.

10.    My peer-recognized honors and awards reflect a sustained record of excellence at the highest levels of the profession, including:

- Southern California Super Lawyer and California Super Lawyer Rising Star (2015–2023)
- In 2022, I was named one of the Top 50 most powerful black lawyers in the country by the National Bar Association

11.    I have been awarded attorneys' fees by courts on multiple occasions. On March 28, 2017, the California Court of Appeal affirmed that Judge Mackey was reasonable in awarding me $500.00 per hour in *Ruiz v. U.S. Security Association*, B275201. In January 2022, my hourly billing rate was approved by Los Angeles Superior Court at $700.00 per hour in the matter of *Bassett Unified School District v. Los Angeles County Superior Court; Michael Ross*. My skills, experience, accolades, and trial results have increased substantially since each of those awards, and my requested rate of $1,200.00 per hour reflects the current prevailing market rate for attorneys of my skill, experience, and reputation in the Central District.

12.    The successful result in this matter was achieved by Plaintiffs' attorneys through diligent and tireless effort, including preparing this case for the criminal and civil trial a.  The work performed by myself and each attorney in

furtherance of this action was reasonable and necessary.  All of the time was contemporaneously kept and was billed for legitimate, necessary activities such as: (1) meetings with client; (2) drafting pleadings; (3) preparing for, taking and defending numerous depositions and conducting written discovery; (4) drafting and opposing motions; (5) attending court proceedings and mediations; (6) reviewing extensive documentation and evidence; (7) locating and speaking with witnesses; (8) preparing pre-trial pleadings; (9) preparing for trial; and (10) trial.

13.     This case presented an unusual and demanding challenge. From 2021 through the February 9, 2026 verdict, my firm worked on this matter with a risk of no recovery. Bringing it to a successful resolution required the skill and specific knowledge I have acquired from representing hundreds of plaintiffs in civil rights matters, combined with the unique challenge of simultaneously managing a companion criminal defense matter — in which Mr. Barber faced charges including assault with a deadly weapon on a peace officer under Penal Code § 245(c) — that served as a prerequisite to this civil case proceeding at all.

14.     A further complexity of this matter is that Mr. Barber, as a result of having been shot in the head by Deputy Alfred, was in a coma for an extended period following the April 27, 2021 shooting and remained cognitively impaired during the early years of this litigation. Mr. Barber's sister, Shyrah Butcher, served as his Guardian Ad Litem during this period. As a result, a significant portion of client communications during the early stages of this case — and throughout the period of Mr. Barber's incapacitation — were conducted with Ms. Butcher as his representative. The time reflected in my billing records that references communications with Ms. Butcher was work performed on behalf of Mr. Barber as Plaintiff, through his GAL. The billing matter was accordingly denominated "Butcher, Shyrah — GAL Steffon Barber" but reflects legal services rendered on Plaintiff Steffon Barber's behalf in this matter.

15. As Mr. Diggs explained in his declaration, this case was vigorously defended every step of the way. Defendants maintained throughout that the shooting was justified and did not make any meaningful settlement offer, as reflected in the parties' joint status report regarding settlement filed December 11, 2025. Despite the difficult evidence — including the defense's central contention that Mr. Barber attempted to reverse his vehicle toward Deputy Alfred — my office, together with co-counsel Ivie McNeil Wyatt Purcell and Diggs and the Law Offices of Dale K. Galipo achieved a jury verdict on February 9, 2026, awarding total damages of $27,350,000. It is anticipated that Defendants will file post-trial motions and a likely appeal, such that this case continues to demand attorney time and resources.

16. The successful result in this matter was achieved through diligent and tireless effort over five years of litigation, including prosecution of the companion criminal case, complex civil discovery, motion practice, retention and coordination of four expert witnesses, and nearly two weeks of trial preparation and trial. All work performed by myself and each attorney and staff member of my firm was reasonable and necessary. All time was contemporaneously recorded and reflects legitimate, necessary activities, including: (1) client communications, in-custody visits, coordination with CDCR, and extensive communications with Mr. Barber's Guardian Ad Litem Shyrah Butcher; (2) criminal court appearances, criminal trial attendance, and nightly preparation during the criminal trial; (3) drafting and reviewing pleadings; (4) preparing for, taking, and attending depositions and conducting written discovery; (5) drafting and opposing motions, including the Opposition to Defendants' Motion for Summary Judgment; (6) attending court hearings and mediation; (7) reviewing extensive documentary evidence, investigative reports, forensic materials, and criminal trial transcripts; (8) retaining, coordinating with, and preparing expert witnesses; (9) preparing pretrial documents including jury instructions, motions in limine, and the memorandum of contentions

of fact and law; (10) preparing for and attending all seven days of civil trial, including nightly preparation reviewing prior testimony and preparing examinations for the following day's witnesses; and (11) post-trial matters.

17.     More specifically I was intimately involved in both the criminal and civil matters. Serving as lead counsel for the criminal trial, and initially served as co-lead counsel for the civil trial until associating the renowned civil rights attorney Dale Galipo to serve as co-lead counsel.

18.     The extensive number of hours my firm worked on this case precluded me and my attorneys from devoting that time to the prosecution of other matters handled by this office.

19.     The criminal proceedings arising out of the April 27, 2021 shooting were not collateral to the civil case. They were indispensable to it. They were necessary both to preserve Plaintiff's ability to bring his civil rights claims at all and to develop the factual record ultimately used to prove those claims.

20.     A criminal conviction in this case for attempted murder would have had significant ramifications to the status of the civil action, which is why the success at the criminal trial was so critical.

21.     That issue was identified and addressed from the beginning of the representation. My time records reflect that on September 16, 2021, counsel reviewed incident reports, probable cause materials, arrest records, and the investigative file, analyzed the Penal Code sections at issue and civil Heck exposure, and developed a dual-track criminal/civil litigation strategy. On October 5, 2021, counsel specifically researched Heck v. Humphrey and its application to the pending section 245(c) charge, analyzed the implications for the anticipated section 1983 excessive-force claims, and researched vehicle-as-weapon cases. On October 14, 2021, counsel reviewed the criminal charging documents and preliminary hearing materials and developed a civil theory distinguishing any criminal conviction from

the anticipated excessive-force claim. Those are contemporaneous entries, not after-the-fact labels. They show that the criminal and civil matters were strategically intertwined from inception.

22.    The criminal work was also compensable because it developed the same factual record later used in the civil case. While section 1988 does not automatically authorize fees for all work performed in collateral proceedings, such work is compensable where it is "useful and of a type ordinarily necessary" to advance or preserve the civil rights litigation. *Webb v. Bd. of Educ.*, 471 U.S. 234, 243 (1985). That standard is satisfied where the criminal and civil matters arise from a "common core of facts." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Where, as here, the work done in the criminal case functions as a direct substitute for factual development, investigation, and evidentiary preparation that would otherwise have been required in the civil case, it is compensable. *See Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988). In my professional judgment, that is exactly what occurred here.

23.    The overlap in witnesses and issues was direct and substantial. The criminal case and the civil case both involved the same central use-of-force witnesses and reconstruction issues, including Deputy Christopher Alfred, Detective Edward Hernandez, and expert Robert Morales. The same questions were being litigated: where Alfred was positioned; what path he took; how far Plaintiff's vehicle moved; how fast it moved; whether Alfred had an avenue of retreat; whether Plaintiff knew Alfred was law enforcement; and whether the physical evidence was consistent with Alfred's account.

24.    The criminal transcript itself shows that I was litigating issues that the trial court recognized as civil excessive-force issues. Outside the presence of the jury, Judge Cohn stated: "This is a criminal prosecution for attempted murder. It's not a civil lawsuit against the department or Officer Alfred for using excessive

force. So I don't understand the relevance of this entire line of questioning about when it is proper to use deadly force." The Court then added: "There's been a lot of time spent throughout this trial on Deputy Alfred's use of force and whether it was proper. And I don't see how that's relevant at all. Assume for the sake of argument that he reacted improperly, doesn't matter." Criminal Trial Transcript - 3 RT 301–302. A true and correct copy of the trial complete Criminal Trial Transcript is attached hereto as **Exhibit B**.

25.    Those comments are highly significant. They show that the criminal court itself recognized that the line of questioning I was pursuing concerned the propriety of Alfred's use of force and the objective reasonableness of his conduct—issues at the center of the later civil rights trial. In other words, the very lines of inquiry the criminal court viewed as outside the core focus of an attempted-murder prosecution were the precise constitutional issues later tried in federal court.

26.    The criminal record further shows that the case was being litigated through a civil-rights lens even before the judge's intervention. In opening statement, I told the jury that there would be no body camera, that the physical evidence would matter, that the driveway was very dark, that Deputy Alfred never announced "San Bernardino County Sheriffs," and that the case would turn on whether the physical evidence and scene evidence were consistent with Alfred's account. 1 RT 23:24–34:6. That was not rhetoric untethered from the facts. It was the roadmap for the same factual and physical-evidence theory later used in the civil case.

27.    Alfred's testimony in the criminal trial developed issues central to the civil case. On direct, Alfred testified that the area was "relatively dim" and that he would classify it as "poor lighting." 1 RT 40:20–21. That matters directly to Plaintiff's civil theory because one of the central disputes was whether Plaintiff reasonably perceived Alfred as law enforcement before the shooting.

28.     Alfred's testimony also established the visual conditions and limitations on perception. On cross, Alfred admitted that the earlier "eye contact" phrasing was only a figure of speech, that he did not in fact make literal eye contact, and that he had "no idea" what Plaintiff actually saw. 2 RT 104:7–23. Those points were critical in the civil case because they bear directly on warning, identification, recognition, and the reasonableness of Alfred's conduct in rapidly escalating the encounter.

29.     The criminal trial also developed Alfred's positioning and movement in the driveway. When recalled by the defense, Alfred testified that his line of sight to Plaintiff was from the east side of the driveway and that he was walking in the dirt path. He was then examined regarding the cones and footprints marking the claimed path of travel. 5 RT 552:1–553:28 [recall testimony reflected in the transcript section beginning with Alfred's recall and the east-side dirt-path examination]. Those points were central to the later civil case because the route Alfred took, and whether he had an avenue of retreat, directly affected the reasonableness of the shooting.

30.     The criminal record also developed contradictions between Alfred's account and the physical evidence. In closing argument, based on the expert testimony and scene evidence that had been developed during the criminal case, I argued that the flashlight-drop sound corresponded to Alfred dropping his flashlight, that the flashlight's location was inconsistent with the prosecution's theory, that there were no footprints around the flashlight to support an alternative firing position, and that the shell-casing pattern and distance evidence were inconsistent with Alfred being only 8 to 10 feet from the vehicle when it began to move. 7 RT 96:1–99:20. Those issues are not abstract criminal-defense themes; they are the same physical-evidence contradictions that later mattered in the federal excessive-force case.

31.    Detective Hernandez's testimony likewise developed the same scene-reconstruction issues later used in the civil case. Hernandez confirmed Alfred's initial identification of where Plaintiff's vehicle was positioned when first seen—directly adjacent to the corner of the wood fence and facing south—with Barber on the driver's side. 4 RT 125:7–25. Hernandez also developed the scene geometry, officer approach, and access routes around the fence line. Those issues were central to later liability analysis because they bore directly on movement, pathways, cover, and available alternatives.

32.    Hernandez also provided testimony that shows why examination of him in the criminal case was useful and ordinarily necessary to the civil case. He testified that in accident-reconstruction work he had to ensure his investigation was correct because liability would rest on someone, and he had testified and given depositions in civil matters. He further testified that his investigation had to be thorough, "to the point where it is perfect." That testimony is powerful because it confirms that the same reconstruction work being litigated in the criminal case was the type of work that directly bears on later civil liability.

33.    Morales's work and testimony were also used in both cases. The criminal transcript reflects that the court adjusted the schedule because Mr. Morales was unavailable until Wednesday morning and specifically noted that the case would return to Morales. That alone shows Morales was not peripheral; he was a material witness in the criminal case.

34.    More importantly, Morales's reconstruction work went to the exact factual issues at the heart of the civil case. As developed in the criminal proceedings, Morales concluded that the vehicle moved at a top speed of 3.39 miles per hour, that there were multiple reasonable possibilities concerning whether movement occurred before or after the first shot, and that given the extremely short .65-second interval it would have been physiologically impossible for Alfred to

perceive movement before firing if Plaintiff's foot came off the brake only after being shot. 7 RT 99:21–101:19. Whether Alfred could actually perceive pre-shot movement, and whether the vehicle was moving in a manner consistent with an imminent deadly threat, are directly material to the civil excessive-force case.

35.    The criminal case also developed the direct comparison between Morales and Hernandez on the movement analysis. On rebuttal, Hernandez agreed that the Trailblazer traveled 14 feet in reverse and later rolled an additional approximately 2 feet, and he agreed with Morales's opinion that the vehicle reversed prior to the first shot, while disputing only the "exactness" of charted measurements. 7 RT 119:12–121:8. That overlap matters because it shows the criminal case was not merely litigating guilt; it was litigating the same reconstruction and timing issues later central to proving the civil case.

36.    The contemporaneous time records confirm that the criminal transcript and criminal testimony were in fact used for the civil case. The records reflect review of Alfred's recorded interview transcript for civil case strategy and annotation for use in civil deposition and trial; review of criminal preliminary hearing testimony and annotation for civil case use; review of criminal trial testimony and strategy regarding how criminal evidence would be used in the civil trial; review of complete criminal trial transcripts for civil trial use, including annotating Alfred's testimony regarding vehicle speed and position and preparing a comprehensive summary of criminal trial testimony; and continued review and annotation of expert testimony from the criminal trial to identify inconsistencies with positions taken in the civil case.

37.    The records also reflect that criminal testimony was affirmatively used in preparing the civil trial. Those entries include Alfred deposition preparation by reviewing his complete criminal trial testimony and recorded interview and annotating all inconsistencies regarding position, speed, and whether the car was

13

moving toward him; strategy meetings with Morales to review preliminary reconstruction findings regarding Alfred's stated position versus the physical evidence; debriefing with Morales after Alfred's deposition because Alfred's testimony regarding distance and position confirmed Morales's reconstruction findings; review of all deposition transcripts and criminal trial transcripts for trial use; and development of cross-examination outlines for Alfred focusing on criminal trial inconsistencies, distance admissions, policy violations, and escape route.

38.    These entries demonstrate that the criminal work was not being repurposed after the fact. It was always being handled as part of a dual-track strategy in which criminal proceedings both protected the civil case from a potential Heck bar and developed sworn testimony, impeachment material, physical-evidence analysis, and expert opinions later used in the civil case.

39.    In my professional judgment, the hours expended in the criminal proceedings were reasonable and necessary. This was not wasted or duplicative time. It involved investigation of the shooting, review of extensive discovery, coordination with expert Morales, review and analysis of Alfred's and Hernandez's statements and testimony, development of the vehicle-movement and scene-reconstruction theory, research into the interaction between the criminal charges and the civil claims, and strategic development of testimony later used in federal court.

40.    The successful result in this matter was achieved through diligent and tireless effort, including investigation, criminal-case analysis, preservation of the civil claims, review of extensive documentation and evidence, coordination with experts, development of witness examinations, pre-trial motion work, and trial itself. The work performed by me in furtherance of this action was reasonable and necessary.

41.    This case involved a number of complex issues and was vigorously defended. From the outset, Plaintiff was required to confront not only the criminal

prosecution arising from the shooting, but also the need to preserve and then later prove his civil rights claims. The criminal and civil components of the case could not be cleanly separated. They were intertwined factually, strategically, and legally.

42.    In this matter, I spent approximately 591.1 hours of my own time across the criminal and civil proceedings. This figure does not include a very large portion of the time spent on the criminal proceedings through every stage leading up to trial, and portions of the criminal trial that are not appropriately included in the investigation and research in preparation for the civil trial, each and every telephone conference, internal meeting, and related activity; those hours were not billed. All of the work undertaken and performed by me on this case was necessary and reasonable.

43.    My reasonable billing rate is $1,250.00 per hour. This rate is reasonable based on my nearly 20 years of experience, my peer-recognized honors and awards, my track record of trial results, my extensive expertise in civil rights and employment litigation, my published appellate decisions, my history of court-approved fee awards at increasing rates commensurate with my growing experience, and the extraordinary result obtained in this case.

44.    I am respectfully requesting this hourly fee on the basis of all of the foregoing. A true and correct copy of my firm's detailed billing records itemizing the date, hours, and description of the nature of the work performed to date is attached hereto as **Exhibit A**.

| Attorney | Rate | Hours | Total Amount |
|---|---|---|---|
| James A. Bryant, Esq. | $1250.00/Hour | 591.1 | $738,875.00 |

45.    Excluding the criminal hours would undercompensate counsel for work that was essential to preserving Plaintiff's section 1983 claims and proving them at

trial. It would also be inconsistent with the purpose of section 1988, which is to ensure that competent counsel are willing to undertake difficult civil rights cases and do the work necessary to bring them to a successful conclusion.

46.   To date, I have received no compensation for the time I expended in this matter.

47.   I have spent additional time preparing this declaration and supporting materials for the fee reply.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 25th day of March, 2026, at Los Angeles, California.


/s/ James A. Bryant
_____

JAMES A. BRYANT, Declarant