# EXHIBIT 13

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

EMILY GARCIA; and C.G., by and through her guardian ad litem, Rosalia Becerra, individually and as successors-in-interest,

Plaintiffs,

v.

CITY OF TUSTIN; ESTELLA SILVA; and DOES 1 through 10, inclusive,

Defendants.

*Consolidated with:*
WENDY LORENA GALICIA RAMIREZ; and KEVIN JOSUE GALICIA RAMIREZ,

Plaintiffs,

v.

CITY OF TUSTIN; ESTELLA SILVA; and DOES 1 through 10, inclusive,

Defendants.

Case No. 8:22-cv-00131-SPG-KES

**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL AND GRANTING, IN SUBSTANTIAL PART, PLAINTIFFS' MOTIONS FOR ATTORNEY'S FEES**
**[ECF NOS. 174, 177, 180]**

Before the Court are three motions: (1) the Motion for Judgment as a Matter of Law and New Trial, (ECF No. 174 ("Rule 50(b) Motion")), filed by Defendants City of Tustin (the "City") and Officer Estella Silva ("Officer Silva" or, together with the City, "Defendants"); (2) the Garcia Plaintiffs' Motion for Attorneys' Fees, (ECF No. 177 ("Garcia Fees Motion")), filed by Plaintiffs Emily Garcia and C.G. (the "Garcia Plaintiffs"); and (3) the Galicia Plaintiffs' Motion for Attorney Fees, (ECF No. 180 ("Galicia Fees Motion")), filed by Plaintiffs Wendy and Kevin Galicia (the "Galicia Plaintiffs" or, together with the Garcia Plaintiffs, "Plaintiffs"). The Court has read and considered the Motions and concluded that they are suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES the Rule 50(b) Motion and GRANTS, in substantial part, the Fees Motions.

## I. BACKGROUND

### A. Factual Background

This case arises from the August 9, 2021, fatal shooting of Luis Garcia ("Garcia") by Officer Silva of the Tustin Police Department. Garcia's two daughters (the Garcia Plaintiffs) and his wife and son from another relationship (the Galicia Plaintiffs) separately sued Defendants, alleging constitutional and state law violations. The Court previously summarized the undisputed factual background of this case as follows:

> In brief, on August 9, 2021, the Tustin Police Department received a 911 call reporting that a homeless man had been seen "living in the bushes" in front of the Saddleback Mobile Lodge. (JAF 1; ECF No. 38-2 ("JAE") at 6 ("Critical Incident Release ("CIR") Recording")). The caller reported that she had seen the man the day before carrying a knife but indicated that she had not personally seen him that day. (CIR Recording at 1:33-54).
>
> Officer Silva responded to the call along with Officers Yuhas and Frias. (JAF 2). The subsequent encounter between Garcia and the officers was recorded by Officer Yuhas's body-worn camera. *See* (JAE at 188 ("Yuhas Footage")). In the video, Officer Silva approaches the hedge where Garcia was located, observes Garcia asleep on the ground, and tells Garcia to wake up and come

> out with his hands up. (Yuhas Footage at 0:19-0:26). Officer Silva recognizes Garcia, stating, "I know you, come on." (*Id.* at 0:28-0:29). In her deposition, Officer Silva stated that she had previously interacted with Garcia on three occasions: (1) in 2020, after Garcia had been reported brandishing a knife; (2) in 2020, when she detained Garcia in connection with an alleged robbery and assault with a deadly weapon; and (3) in 2021, when she arrested Garcia on a felony warrant for assault with a deadly weapon and for possession of methamphetamine. (JAF 5-7; JAE at 60-63).
>
> After Officer Silva tells Garcia that she recognizes him, Officer Silva and Garcia communicate for nearly a minute, with Garcia asking why he is being targeted and stating that he is just collecting recyclables, and Officer Silva repeatedly instructing Garcia to come out from the hedge with his hands up. (Yuhas Footage at 0:29-1:16). At one point, Officer Silva says, "Dude, I'm going in," and moves towards the opening in the hedge but stops after Officer Yuhas tells her to wait. (*Id.* at 1:17-1:21). Shortly afterwards, Garcia begins to come out of the opening in the hedge but quickly retreats when Officers Silva and Yuhas reach out towards him. (*Id.* at 1:28-1:30). Officer Silva then moves towards the hedge opening but retreats upon seeing Garcia carrying a large wooden pole. (*Id.* at 1:33-1:36). Officer Silva then draws her firearm and points it towards the opening of the hedge, yelling, "Get your hands up." (*Id.* at 1:36-1:38). At the same time, Officer Yuhas draws his Taser and points it towards the hedge opening. (*Id.*). Garcia then emerges from the hedge holding a long wooden pole, which appears to extend from approximately his knee to above his head. (*Id.* at 1:38-39). As Garcia emerges, Officer Yuhas fires his Taser, striking Garcia. (*Id.* at 1:39). Shortly thereafter, with Garcia still holding the wooden pole and positioned approximately 2-3 feet away from Officer Silva, Officer Silva fires her firearm twice in quick succession. (*Id.* at 1:41-42). Garcia runs a few feet southbound, drops the pole, and collapses into a shrub next [to] the sidewalk after being pushed by Officer Frias. (*Id.* at 1:41-43). The officers then converge on Garcia and cuff him. (*Id.* at 1:43-2:18). The officers contacted paramedics, who arrived seven minutes later, but Garcia tragically died. (*Id.* at 1:43-8:44).

(ECF No. 98 ("Second MSJ Order") at 2-4).

### B. Procedural History

The Garcia Plaintiffs initiated this suit on January 25, 2022, alleging federal constitutional claims for use of excessive force, denial of medical care, loss of familial

relations, and municipal liability, as well as state law claims for negligence, battery, and violations of California's Tom Bane Civil Rights Act ("Bane Act"). (ECF No. 1). The Galicia Plaintiffs filed a separate complaint on August 31, 2022, asserting similar claims against Defendants. *See Galicia Ramirez v. City of Tustin*, No. 8:22-cv-01619-SPG-KES (C.D. Cal. Aug. 31, 2022), ECF No. 1. On December 16, 2022, the Court granted the parties' stipulation to consolidate the two cases. (ECF No. 27).

Following discovery, Defendants moved for summary judgment, which the Court ultimately granted on March 18, 2024. (ECF No. 77 ("First MSJ Order")). In that Order, the Court concluded that, while there was a triable issue of fact as to whether Officer Silva's use of force was excessive, Officer Silva was entitled to invoke qualified immunity because Plaintiffs failed to show that Officer Silva's conduct violated a clearly established constitutional right. (*Id.* at 11-36). Second, the Court granted summary judgment in favor of Defendants on the denial of medical care claims because the uncontroverted evidence showed that the officers promptly summoned medical assistance and attempted to provide preliminary medical care themselves. (*Id.* at 37-38). Third, the Court dismissed the *Monell* claims against the City because Plaintiffs failed to establish a pattern of similar constitutional violations by untrained employees. (*Id.* at 39). Fourth, the Court granted summary judgment on the loss of familial relations claims because there was no evidence that Officer Silva acted with intent to harm Garcia unrelated to legitimate law enforcement objectives. (*Id.* at 40). Because no federal claims remained, the Court declined to exercise supplemental jurisdiction and dismissed the remaining state law claims. (*Id.* at 40-42).

Plaintiffs appealed to the Ninth Circuit as to the excessive force and familial association claims, and, on August 8, 2025, the Ninth Circuit issued an order reversing, in part, and affirming, in part, the First MSJ Order. (ECF No. 89 ("Ninth Circuit Order")). The Ninth Circuit found that the Court erred in granting summary judgment on the excessive force claim because the application of qualified immunity would depend on how the jury resolved contested issues of material fact. (*Id.* at 3). As to the familial association claim, the Ninth Circuit affirmed summary judgment, concluding that "nothing in the

record support[ed] the claim that Officer Silva acted with any purpose besides her subjective belief that she was defending herself and other officers." (*Id.* at 5). The Ninth Circuit remanded "for a trial to resolve the material disputed facts." (*Id.* at 6). Because the Ninth Circuit reversed the excessive force claim, it also reversed the Court's decision to decline supplemental jurisdiction over the state law claims. (*Id.*).

Following remand, the Court issued its Second MSJ Order, addressing the outstanding state law claims. On the negligence claim, the Court granted summary judgment to Defendants insofar as Plaintiffs' claim was based on theories of negligent training and negligent medical care. (Second MSJ Order at 6-7). The Court otherwise denied summary judgment, concluding that there was a triable issue of fact as to whether Defendants were negligent in their use of deadly force, whether Officer Silva committed battery, and whether Officer Silva violated the Bane Act. (*Id.* at 8-11). Following the Second MSJ Order, the Court set the case for trial on Plaintiffs' claims for excessive force, battery, violation of the Bane Act, and negligence.

**C. The Trial**

From April 14, 2026, to April 21, 2026, the Court held a six-day trial on Plaintiffs' remaining claims. At trial, Plaintiffs presented testimony from the following witnesses: (1) Officer Silva; (2) Fire Captain Paramedic Jeffrey Baca; (3) Tustin Police Officer Joshua Yuhas; (4) Tustin Police Officer Hector Frias; (5) Tustin Police Officer Taylor Babb; (6) Plaintiff Emily Garcia; (7) Plaintiff C.G.; (8) Plaintiff Wendy Galicia; (9) Plaintiff Kevin Galicia; and (10) former Los Angeles Police Department officer and police practices expert Scott DeFoe. Defendants presented testimony from a single witness: former Huntington Beach Chief of Police and police practices expert Robert Handy.

At the close of Plaintiffs' case, Defendants made an oral Rule 50(a) motion for judgment as a matter of law, arguing that Plaintiffs' evidence was insufficient to show that Officer Silva used unreasonable force or committed battery. Defendants also argued that there was insufficient evidence that Officer Silva acted with intent or reckless disregard, as necessary to establish a violation of the Bane Act. Finally, Defendants argued that there

was insufficient evidence to establish the negligence claim, since Plaintiffs' expert admitted that Officer Silva never violated any established standard from Peace Officer Standards and Training ("POST") or any other recognized organization. (Day 5 Transcript at 119).[1] The Court denied the motion on the record, concluding that there was sufficient evidence to permit each claim to go to the jury. (*Id.* at 121).

Following deliberations, the jury reached a verdict for Plaintiffs on all four claims, concluding that Officer Silva used excessive force, acted with the requisite intent to violate the Bane Act, committed a battery, and was negligent in the use of deadly force. (ECF No. 159). On the excessive force claim, the jury answered a special interrogatory and found that Defendants failed to prove that "any reasonable officer with the same knowledge, circumstances, and facts as Officer Silva would have believed that Luis Garcia posed an immediate threat of serious bodily injury or death." (*Id.* at 3). On the negligence claim, the jury assigned no comparative fault to Garcia, concluding that Defendants failed to show that he acted negligently. (*Id.* at 6). The jury awarded a total of $17,000,000 in damages to Plaintiffs, including $10,000,000 for Garcia's pre-death pain and suffering and loss of life, $2,000,000 in wrongful death damages for each of Garcia's children, and $1,000,000 in wrongful death damages for Garcia's wife. (*Id.* at 8).

### D. The Instant Motions

Defendants filed the Rule 50(b) Motion on June 3, 2026, seeking judgment as a matter of law or, in the alternative, a new trial. (Rule 50(b) Mot.). Plaintiffs filed a consolidated opposition on July 1, 2026, accompanied by various exhibits, including copies of special verdict forms in nine other police shooting cases from district courts in this State. (ECF No. 192 ("Rule 50(b) Opp.")); *see* (ECF Nos. 192-13–192-21). Defendants replied in support of the Motion on July 14, 2026. (ECF No. 193 ("Rule 50(b) Reply")).

The Garcia and Galicia Plaintiffs filed their Fees Motions on June 3, 2026. (Garcia Fees Mot.; Galicia Fees Mot.). The Fees Motions are accompanied by supporting

[1] Defendants lodged copies of the Court Reporter's transcripts directly with the Court. When referring to the transcripts, the Court references the copies as lodged by Defendants.

declarations from the attorneys and paralegals who worked on this case, as well as supporting exhibits documenting the hours spent litigating the case. *See* (ECF No. 177-1 ("Galipo Decl."); ECF No. 172-27 ("Masongsong Decl."); ECF No. 177-47 ("Carrillo Decl."); ECF No. 177-48 ("Flores Decl."); ECF No. 177-49 ("Monguia Decl."); ECF No. 177-53 ("Laurel Decl."); ECF No. 177-58 ("Gilbert Decl."); ECF No. 180-1 ("Arias Decl.")). Defendants filed their oppositions to the Fees Motions on July 1, 2026, (ECF No. 188 ("Galicia Fees Opp."); ECF No. 189 ("Garcia Fees Opp.")), and Plaintiffs replied in support of their Motions on July 15, 2026, (ECF No. 194 ("Garcia Fees Reply"); ECF No. 195 ("Galicia Fees Reply")).

## II. JUDGMENT AS A MATTER OF LAW

### A. Legal Standard

Under Federal Rule of Civil Procedure 50(a), once a party has been fully heard on an issue during a jury trial, the opposing party may move for judgment on the grounds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). Because a Rule 50(b) motion is merely a renewed Rule 50(a) motion, "[a] party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

In reviewing a motion for judgment as a matter of law, courts "should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A reviewing court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* Judgment as a matter of law should be granted if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). Conversely, "[a] jury's verdict must be upheld if it is

Case 8:22-cv-00131-SPG-KES Document 198 Filed 07/29/26 Page 8 of 41 Page ID #:3956

supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

**B. Discussion**

In the Rule 50(b) Motion, Defendants assert that they are entitled to judgment as a matter of law based on qualified immunity. In the alternative, they argue that the jury's verdict on each of the claims was unsupported by the evidence. The Court will discuss each of these arguments in turn.

1. Qualified Immunity

First, Defendants argue that Officer Silva is entitled to qualified immunity based on the facts established at trial. Defendants point to the following facts: (1) Officer Silva recognized Garcia; (2) Officer Silva had previously detained Garcia for a robbery, in which she had been informed that the victim had been knocked unconscious; (3) Officer Silva had also previously arrested Garcia on a warrant for felony assault with a deadly weapon, as well as possession of methamphetamine; (4) Officer Silva suspected that Garcia was under the influence of methamphetamine, and the toxicology report later confirmed that; (5) Officer Yuhas yelled "he's got a stick" before deploying his Taser; (6) Garcia raised the stick above his head after being tased; (7) Garcia said "dale, dale" in Spanish as he exited the bush, which Officer Silva understood to be the utterance made just before striking a piñata; and (8) Officer Silva fired two shots in rapid succession, striking Garcia in the center of his chest and on his left side as he turned towards Officer Frias. Defendants point to the testimony of the three other officers and Chief Handy, the fact that the California Attorney General did not prosecute Officer Silva, the fact that this Court granted summary judgment on qualified immunity, and the fact that the Ninth Circuit's reversal of the First MSJ Order drew a dissent as proof that a reasonable officer would not have viewed Officer Silva's conduct as violative of clearly established law. (Mot. at 7-12).

Plaintiffs respond that Defendants failed to preserve their qualified immunity argument under Rule 50(b) because they did not mention it during their Rule 50(a) motion.

Plaintiffs also argue that the Ninth Circuit's order reversing the Court's First MSJ Order, coupled with the jury's response to the special interrogatory, foreclose a finding of qualified immunity. Plaintiffs contend that the constitutional violation here was obvious based on the fact that Garcia did not match the description of the individual whom officers had been called to investigate, Garcia was sleeping at the time officers arrived, no crime was in progress, Garcia never swung the stick, Garcia had been tased, and Garcia was turning away from Officer Silva at the time of the shots. In the alternative, Plaintiffs argue that the law was clearly established that shooting under these circumstances would violate Garcia's constitutional right to be free from excessive force. (Rule 50(b) Opp. at 8-12).

"[T]he doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted). In assessing whether an officer is entitled to qualified immunity, a court must determine "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). The purpose of this doctrine is to give "government officials breathing room to make reasonable but mistaken judgements about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity "is an *immunity from suit* rather than a mere defense to liability" and is ordinarily waived "if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). However, in certain circumstances, officials may be "forced to go to trial because their right to immunity turns on the resolution of disputed facts." *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994). In such cases, "qualified immunity is then transformed from a doctrine providing immunity from suit to one providing a defense at trial." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017).

As discussed above, in the First MSJ Order, the Court concluded that, although there was a material dispute of fact as to whether Officer Silva's conduct deprived Garcia of a constitutional right, Officer Silva was entitled to qualified immunity because any such right

was not clearly established at the time of the alleged misconduct. (First MSJ Order at 12-36). On appeal, the Ninth Circuit reversed, concluding: "Whether our precedent 'clearly established' that using lethal force under these circumstances was unlawful depends upon how the jury resolves the disputed issues of material fact." (Ninth Circuit Order at 3). The Ninth Circuit explained:

> If a jury concludes that Garcia did not pose an immediate threat of death or serious bodily harm, Ninth Circuit precedent has clearly established that using lethal force would be unlawful. Alternatively, a reasonable jury could find that any reasonable officer would have believed Garcia posed an immediate threat, so Officer Silva's use of lethal force was lawful and no constitutional violation occurred.

(*Id.* at 4). Based on the Ninth Circuit Order, the verdict form included a special interrogatory, asking the jury whether Defendants had shown that "any reasonable officer with the same knowledge, circumstances, and facts as Officer Silva would have believed that Luis Garcia posed an immediate threat of serious bodily injury or death." (ECF No. 159 at 3). The jury ultimately answered this question in the negative and found that Officer Silva violated Garcia's Fourth Amendment rights by using deadly force. (*Id.* at 2-3).

The jury's resolution of the disputed factual questions forecloses qualified immunity under the Ninth Circuit Order.[2] The first step of the qualified immunity analysis is ordinarily a "question of fact for the jury." *Morales*, 873 F.3d at 823 (internal quotation

---

[2] The Court will assume without deciding that Defendants preserved this argument. While a defendant must ordinarily "make a motion for judgment as a matter of law under Rule 50(a)" to preserve a qualified immunity defense, *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1088 (9th Cir. 2017), the issue may nevertheless be preserved "where the factual arguments made in support of that [50(a)] motion were the same as those underlying the asserted claim to qualified immunity made in the defendant's Rule 50(b) motion," *Est. of Aguirre v. Cnty. of Riverside* ("*Est. of Aguirre II*"), 131 F.4th 702, 706 (9th Cir. 2025) (internal quotation marks and citation omitted). In their Rule 50(a) motion, Defendants argued that Plaintiffs "failed to meet their burden of showing" that Officer Silva "used unreasonable force" when she shot Garcia. (Day 5 Transcript at 119). These factual arguments significantly overlap with the qualified immunity defense raised in the Motion.

marks and citation omitted). Here, the jury clearly found that Officer Silva violated Garcia's constitutional right to be free from the unreasonable use of deadly force. As the Ninth Circuit has explained, while an inquiry into whether the officer "*could have* acted with a legitimate objective . . . might be appropriate when a defendant asserts qualified immunity in a motion for summary judgment or a pre-verdict JMOL motion, the jury's view of the facts must govern our analysis once litigation has ended with a jury's verdict." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 456-57 (9th Cir. 2013). As discussed below, Section II.B.2., the jury was presented with substantial evidence from which it could reasonably have reached this conclusion. Accordingly, the Court finds this element to be met.

The second step of the qualified immunity analysis poses a "question of law for the judge, not the jury." *Morales*, 873 F.3d at 823. However, this question "may depend upon the jury's resolution of disputed facts and the inferences it draws therefrom." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (citation omitted). The Ninth Circuit explicitly directed the Court to apply this approach here, instructing that whether Officer Silva violated a clearly established right would depend on whether the jury finds that Garcia posed "an immediate threat of death or serious bodily harm." (Ninth Circuit Order at 4). At trial, the jury found that a reasonable officer would not have believed that Garcia posed an immediate threat of death or serious bodily harm. (ECF No. 159 at 3). This determination of the facts was not unreasonable. While Officer Silva had previously interacted with Garcia in connection with violent offenses, Garcia had never been violent towards Officer Silva in any of these interactions. While the officers had been called based on a report of a man wielding a knife, the description of the knife bearer bore no resemblance to Garcia, and Garcia was asleep at the time the officers made contact. While Officer Silva testified that Garcia jabbed the stick at her, this was not captured on camera, and none of the other officers corroborated this account. While Garcia was carrying a large wooden stick at the time of the shooting, based on the video and the other evidence presented at trial, the jury could have reasonably found that Garcia never swung the stick,

that he was incapacitated by the Taser, or that he was turning to flee rather than attempting to strike Officer Silva. Aside from the officers, there were no other bystanders. Garcia was more than 10 feet away from Officer Frias at the time of the shooting, and Officer Frias did not pull out his own firearm. Because the jury found as a matter of fact that Garcia did not pose an immediate threat of death or serious bodily harm, and because this factual determination was based on substantial evidence, the Court must accept this as true in assessing the clearly established prong. *See Est. of Aguirre II*, 131 F.4th at 707 ("Assessing qualified immunity after a jury verdict turns on the second, 'clearly established' prong, which requires deference to the jury's view of the facts.").

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (internal quotation marks, citation, and alterations omitted). Here, based on the jury's factual findings, Officer Silva should have been aware that shooting Garcia was unlawful because "existing precedent . . . placed the statutory or constitutional question confronted by [Officer Silva] beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks and citation omitted). Under Ninth Circuit case law, "[d]eadly force is not justified '[w]here the suspect poses no immediate threat to the officer and no threat to others.'" *Est. of Aguirre v. Cnty. of Riverside* ("*Est. of Aguirre I*"), 29 F.4th 624, 629 (9th Cir. 2022) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). This means that "[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).

The right to be free from deadly force under the circumstances of this case is clearly established. For example, in *Aguirre*, police were called after an individual was seen destroying property with a bat-like object. *Est. of Aguirre I*, 29 F.4th at 626. The responding officer approached Aguirre and gestured for him to drop the stick, but Aguirre did not drop it, and by some accounts verbally refused to do so. The officer attempted to

use pepper spray, but it blew back into his own face and did not affect Aguirre. The officer then pointed his gun at Aguirre and again ordered him to drop the stick, but Aguirre did not comply. Eyewitnesses disputed whether Aguirre approached the officer with the stick raised or whether he stood still holding the stick pointed down. After Aguirre failed to comply with orders to drop the stick, the officer shot Aguirre six times from approximately 10-15 feet away, with four bullets striking Aguirre in the chest and two in the back. The district court denied summary judgment, and the Ninth Circuit affirmed on appeal, finding that there was a material dispute as to whether Aguirre posed a threat, and that it was clearly established "that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile." *Id.* at 629-30. At the ensuing trial, the jury found in favor of Aguirre, and the district court denied the officer's Rule 50 motions. *Est. of Aguirre II*, 131 F.4th at 706. On appeal, the Ninth Circuit again affirmed the denial of qualified immunity, concluding that the jury could have reasonably concluded that Aguirre "wielded the bat in a non-threatening manner" and that "[t]hese facts do not warrant deadly force under our precedent." *Id.* at 709.

Here, as in *Aguirre*,[3] Garcia held a stick that could conceivably have been used as a weapon against Officer Silva. As in *Aguirre*, the officer issued no warning before firing, and the bullets struck the decedent in different parts of his body, suggesting that the decedent was in the act of turning away from the officer. Under the jury's factual findings, Garcia did not pose a threat of death or serious bodily harm to Officer Silva or any other individuals. Because Garcia did not pose a threat to the officers, it was clearly established

---

[3] While *Aguirre* was decided in 2022, it found that this right was clearly established as of April 2016 when the underlying incident occurred. *Est. of Aguirre I*, 29 F.4th at 629. In the First MSJ Order, the Court distinguished *Aguirre* because "nothing in the record suggested the decedent was threatening or advancing toward bystanders when he was killed, and, based on the decedent's facts, the decedent presented no threat at all to the officer—or anyone else—in that moment." (First MSJ Order at 31 (internal quotation marks and citation omitted)). Given the intervening Ninth Circuit Order and the jury's factual finding that Garcia similarly did not pose a threat of death or imminent bodily harm, the Court now concludes that *Aguirre* is on point.

that merely holding a stick did not justify Officer Silva's use of deadly force under these circumstances. *See George v. Morris*, 736 F.3d 829, 838–39 (9th Cir. 2013) (holding that, if a jury concluded a decedent carrying a pistol posed no threat when officers fatally shot him without warning, the officers were not entitled to qualified immunity); *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1234-35 (9th Cir. 2013) (finding material dispute as to whether officers used excessive force in fatally shooting individual carrying large knife and standing six to eight feet away because decedent was holding the knife in a non-threatening manner and the officers fired without warning); *see also Est. of Aguirre II*, 131 F.4th at 709 ("[I]t was specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006))).

The cases cited by the Ninth Circuit in its order remanding this case support the same conclusion. In *Longoria v. Pinal County*, police engaged in a 70-minute car chase that culminated with police disabling Longoria's car with a PIT maneuver. 873 F.3d 699, 702-03 (9th Cir. 2017). Throughout the car chase, Longoria exhibited erratic behavior, including holding his wallet in one hand behind his back like a gun and telling officers that he had nothing to live for. *Id.* at 702. After the car crash, officers surrounded Longoria and drew their guns, and Longoria again stood with one hand behind his back. *Id.* at 703. Officers fired beanbag and Taser rounds at Longoria, and Longoria flinched, moved erratically, and turned halfway to his right towards Officer Rankin. *Id.* Believing that he saw a black or silver weapon in Longoria's hands and that Longoria was moving into a shooter's stance, Officer Rankin fired two rounds from his assault rifle, killing Longoria. *Id.* The district court granted summary judgment to Officer Rankin on grounds of qualified immunity, but the Ninth Circuit reversed, concluding that whether Officer Rankin violated a clearly established right depended on whether "Rankin reasonably perceived that Longoria posed a threat of serious physical harm to Rankin or other officers." *Id.* at 710.

The Ninth Circuit remanded for a jury to determine whether Officer Rankin's use of deadly force was lawful. *Id.* at 711.

The factual similarities between *Longoria* and the present case are such that Officer Silva should have known she could not lawfully shoot Garcia. Both Longoria and Garcia were acting erratically, and officers deployed less lethal force against both to deal with the threat. Unlike the other officers on the scene, neither Rankin nor Silva waited to see if the less lethal force was effective before shooting. In both cases, Longoria and Garcia may have been reflexively reacting to being tased at the time they were shot. While either officer would have been vindicated in their use of deadly force had a jury agreed with their version of events, the opposite finding—that neither decedent posed a threat of death or serious bodily injury—compels the conclusion that the officers "violated [a] clearly established right" when they used deadly force. *Id.* at 711; *see also Glenn v. Washington Cnty.*, 673 F.3d 864, 879–80 (9th Cir. 2011) (reversing finding that officers were entitled to qualified immunity where they shot a decedent armed with a knife for moving after he was hit with bean bag rounds because a jury could conclude decedent was not a threat).

Similarly, in *Estate of Lopez by & through Lopez v. Gelhaus*, Officer Gelhaus noticed Lopez walking down a city sidewalk in the middle of the day with a BB gun stylized as an AK-47 held by his side. 871 F.3d 998, 1001-02 (9th Cir. 2017). According to Officer Gelhaus, Lopez was behaving normally aside from carrying what appeared to him to be an assault rifle. *Id.* at 1002. Despite that, Officer Gelhaus drew his service weapon, approached Lopez from behind, and yelled at him to drop the gun. *Id.* at 1002-03. Lopez stopped and turned to face Officer Gelhaus, who recounted seeing Lopez's BB gun raised upwards as he turned. *Id.* Officer Gelhaus then fired eight rounds at Lopez, killing him. *Id.* at 1003-04. On appeal, the Ninth Circuit affirmed a district court determination that qualified immunity was improper because a reasonable jury could conclude that Lopez never posed a threat to Officer Gelhaus. *Id.* at 1019-21. The Ninth Circuit found that it was clearly established that "the use of deadly force is unreasonable where the victim does not directly threaten the officer with the gun." *Id.* at 1020. The

Ninth Circuit found that Officer Gelhaus' entitlement to qualified immunity would "ultimately depend[] on disputed factual issues," including whether Lopez intentionally disobeyed orders to drop the gun, whether he turned aggressively, and whether the gun was pointed at the ground. *Id.* at 1021.

Here, as in *Lopez*, there were disputed factual questions as to whether the object carried by the decedent could reasonably be perceived as a weapon and whether the potential weapon was being carried or raised in a threatening manner. As the Ninth Circuit recognized, a jury could reasonably find that the decedent did not pose an imminent threat of bodily harm, and the resolution of this factual question would determine whether the officer's conduct violated clearly established law. Because the jury did not credit Officer Silva's version of events, and instead found that a reasonable officer would not have perceived Garcia to pose an imminent threat of death or serious bodily harm, Officer Silva's use of lethal force was a violation of clearly established law.

2. Excessive Force

Defendants next argue that no reasonable jury could have found that Officer Silva used excessive force. Defendants assert that, aside from the testimony of Plaintiffs' expert Scott DeFoe—which Defendants suggest should be disregarded due to DeFoe's bias—there was no evidence to suggest that Officer Silva's belief of an imminent threat was objectively unreasonable. Defendants further contend that the body-worn camera footage is the best evidence, and that it shows that Officer Silva acted reasonably. (Rule 50(b) Mot. at 13).

The Court disagrees. The jury was presented with multiple body-worn and dashcam videos of the incident, still images, testimony from the officers on the scene, expert testimony from dueling police practices experts, and a visual demonstrative of the stick held by Garcia. This evidence was more than sufficient to permit a reasonable jury to conclude that Officer Silva used excessive force under the totality of the circumstances. As Defendants contend, the best evidence here was the body-worn camera footage. Both this Court and the Ninth Circuit have already viewed these videos and concluded that a

reasonable jury could find that Officer Silva used excessive force. *See* (First MSJ Order at 22 ("[T]he evidence presented, taken in the light most favorable to Plaintiffs on Defendants' Motion, precludes finding at the summary judgment stage [in] Defendants' favor on whether Officer Silva's use of deadly force violated Garcia's Fourth Amendment rights."); Ninth Circuit Order at 3 ("[V]iewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Silva's use of deadly force violated the Fourth Amendment.")). Drawing all reasonable inferences in Plaintiffs' favor, the video and the testimony demonstrated that Officer Silva positioned herself close to Garcia in an area that made retreat difficult; escalated the conflict by raising her voice and attempting to forcibly remove Garcia from the bush over another officer's objections; failed to give a warning before firing her weapon; failed to command Garcia to drop the stick; failed to wait to see whether the Taser took effect; and fired multiple shots at Garcia's chest, even as he was turning away from her. In addition to the video, the jury was presented with expert testimony from Scott DeFoe, who described the shooting as "one of the worst" that he has seen out of more than 450 cases. While Defendants contend that the Court should disregard DeFoe's testimony as unfairly biased, the jury was presented with this same evidence of bias and nevertheless agreed with DeFoe's view of the evidence. Accordingly, the Court finds that the record contains substantial evidence to support the jury's verdict on this claim.

3. Bane Act

Defendants next argue that the jury's finding of a Bane Act violation was unreasonable because there was no evidence Officer Silva had the requisite intent to violate Garcia's constitutional rights. Defendants cite to *Wilkinson v. Torres*, 610 F.3d 546. 554 (9th Cir. 2010), for the proposition that a decision resulting from "a snap judgment because of an escalating situation" is not sufficient to show the officer acted with purpose. Because the situation developed so quickly here, Defendants argue that Officer Silva could not have had the requisite state of mind. Defendants also renew their objection to the Court adding

"reckless disregard" in the jury instruction for the Bane Act violation. (Rule 50(b) Mot. at 14-15).

As an initial matter, to the extent Defendants intend to raise a legal challenge to the jury instructions, this argument is not a proper basis for a Rule 50(b) motion both because it was not raised in Defendants' 50(a) motion and because it does not relate to whether the jury had a "legally sufficient evidentiary basis to find" for Plaintiffs on this issue. Fed. R. Civ. P. 50(a)(1). Regardless, as the Court explained in its Second MSJ Order, a Bane Act claim may be proven through evidence of recklessness. It therefore was appropriate to include this language in the jury instruction. *See Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) ("[I]t is not necessary for the defendants to have been thinking in constitutional *or legal terms* at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." (internal quotation marks and citation omitted)); *S.R. Nehad v. Browder*, 929 F.3d 1125, 1142 n.15 (9th Cir. 2019) ("Although Bane Act claims do require the specific intent to deprive a person of constitutional rights, such intent can be proven by evidence of recklessness."). It was Defendants that requested that a definition of "reckless disregard" be added to the jury instruction, and Defendants did not object to the definition proposed by the Court. (Day 5 Transcript at 20, 127).

On the sufficiency of the evidence, the Court concludes that a reasonable jury could find that Officer Silva acted with at least reckless disregard for Garcia's constitutional right to be free from excessive force. Viewing the video and the other evidence presented at trial, the jury could have reasonably concluded that Garcia was attempting to cooperate with the officers just before the shooting by emerging from the hedge with his belongings; that Garcia did not swing the stick at Officer Silva; and/or that Officer Silva's testimony about Garcia jabbing the stick off camera was not credible. The first two issues were susceptible to multiple interpretations in the video, and the last issue was a pure credibility determination given that it was not captured on the video. Based on any of these predicate findings, the jury could have reasonably concluded that Officer Silva acted in reckless

disregard for Garcia's constitutional right to be free from excessive force by shooting Garcia shortly after he had been Tased by another officer; by issuing no warning or command to drop the stick before firing her weapon; by making no effort to reposition herself away from Garcia; and by firing multiple shots at Garcia, even as he was turning away from her. *See Gonzalez v. City of Alameda*, No. 21-cv-09733-DMR, 2023 WL 6232239, at *21 (N.D. Cal. Sept. 22, 2023) ("If a reasonable jury concludes that [the decedent] did not pose an immediate threat and was not actively resisting the officers, it could infer that the officers acted with reckless disregard sufficient for [the plaintiff] to prevail on his Bane Act claim."); *S.T. by & through Niblett v. City of Ceres*, 327 F. Supp. 3d 1261, 1283 (E.D. Cal. 2018) ("[A] reasonable jury could conclude that officer Defendants acted unreasonably *and* with reckless disregard for [the decedent's] rights under the Fourth Amendment when they shot him twice in the back while he was fleeing."). Defendants' citation to *Wilkinson* is unpersuasive given that it was a 14th Amendment loss of familial relations case, applying a "purpose to harm" test, rather than the reckless disregard required under the Bane Act. *See Wilkinson*, 610 F.3d at 554. Accordingly, the Court finds that the jury's verdict on this claim was supported by substantial evidence.

4. Battery

Defendants next challenge the sufficiency of the evidence on the battery claim, arguing that "it is inconceivable that three other officers actually on scene with Officer Silva, Chief Robert Handy, the California DOJ and Attorney General, as well as this Court and a Ninth Circuit judge could all view the same evidence" and reach one conclusion, while the jury reached another. (Rule 50(b) Mot. at 16). Defendants also argue that Plaintiffs misstated the law by repeatedly referencing a portion of the jury instruction stating that the use of deadly force must be "necessary to defend human life." (*Id.* at 15).

As the Court stated in the Second MSJ Order, the standard for civil battery by a police officer is essentially identical to the standard for finding excessive force under § 1983. *See Hernandez v. City of Pomona*, 46 Cal. 4th 501, 514 (2009) ("California's civil jury instructions specifically direct the jury, in determining whether police officers used

Case 8:22-cv-00131-SPG-KES Document 198 Filed 07/29/26 Page 20 of 41 Page ID #:3968

unreasonable force for purposes of tort liability, to consider the same factors that the high court has identified [for a section 1983 action]."); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) ("[A] prima facie battery is not established unless and until plaintiff proves unreasonable force was used."). Given the substantial overlap in these claims, the Court concludes that there was sufficient evidence to sustain the battery claim for the same reasons stated as to the § 1983 claim. The fact that the other officers and Defendants' retained expert found Officer Silva's conduct to be reasonable does not mean that a jury could not conclude otherwise—if so, there would be no reason to have a trial. The fact that the California Attorney General did not prosecute Officer Silva criminally has no bearing on whether there was substantial evidence to support a jury verdict on a civil battery claim.

As to Defendants' argument about Plaintiffs' Counsel's statements during closing, again, these statements would not be a proper basis for a Rule 50(b) motion because they would not entitle Defendants to judgment as a matter of law. Regardless, Defendants have not identified any incorrect statement of the law in Plaintiffs' closing argument. California's model jury instruction on civil battery by a police officer includes an element that the defendant's "use of deadly force was not necessary to defend human life." The term "necessary" is defined in the instruction to include an assessment of various enumerated factors. *See* CACI 1305B. This is the instruction given by the Court and referenced by Plaintiffs' Counsel. It was not error, let alone prejudicial error, for Plaintiffs' Counsel to reference this language.

5. Negligence

Finally, Defendants argue that the jury's findings on the negligence claim are unsupported because there was no evidence in the record that Officer Silva acted in violation of any established tactics or protocol. Defendants also argue that the jury could not reasonably have assigned no comparative fault to Garcia. Defendants point to the "undisputed fact" that Garcia had ingested methamphetamine, failed to comply with lawful orders of a police officer, and held a five foot pole just two to three feet from a retreating uniformed police officer. (Rule 50(b) Mot. at 16-18).

Defendants point to no cases holding that a plaintiff must establish a violation of some specific police protocol to make out a claim of negligent use of deadly force. Under California law, "peace officers have a duty to act reasonably when using deadly force." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). This determination is made "in light of the totality of circumstances." *Id.* at 631. Requiring a plaintiff to show a violation of a specific police protocol would be inconsistent with this flexible, fact-specific test.[4] Instead, California courts "generally analyze [negligent use of deadly force claims] under the same rubric as § 1983 claims based on the Fourth Amendment." *Quinto-Collins v. City of Antioch*, 718 F. Supp. 3d 1033, 1058 (N.D. Cal. 2024) (citation omitted); *see also Banks v. Mortimer*, 620 F. Supp. 3d 902, 935 (N.D. Cal. 2022); *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1048 (C.D. Cal. 2021); *McKay v. City of Hayward*, 949 F. Supp. 2d 971, 988 (N.D. Cal. 2013). Thus, for the same reasons discussed with respect to the § 1983 claim, a reasonable jury could have found that Officer Silva's use of deadly force was not necessary to defend against an imminent threat of death or serious bodily injury.

As to comparative fault, it was not contrary to the evidence introduced at trial for the jury to assign no comparative fault to Garcia. While Defendants point to Garcia's use of methamphetamine as evidence of his negligence, this evidence was not presented to the jury. (Day 4 Transcript at 10 (declining to admit toxicology report)). Even if it had been, however, a reasonable jury viewing all the evidence could have determined that any negligence by Garcia was not a substantial factor in causing his death, or that Garcia was not comparatively at fault. The jury could have viewed Garcia's actions as an attempt to comply with Officer Silva's orders, by grabbing his belongings and emerging from the bush as ordered. While Garcia was slow to comply, the jury could reasonably have found that this was because he had just been awoken from a nap and needed time to collect his belongings. Ultimately, the jury could have reasonably found that Officer Silva alone caused Garcia's death by verbally escalating the encounter, attempting to grab Garcia out

---

[4] Regardless, DeFoe did testify that Officer Silva violated various police training and tactics, even if he did not point to any specific provision in POST.

of the bush, placing herself in a position where she could not retreat, using her firearm without waiting for the Taser to take effect, and resorting to deadly force even as Garcia was turning away from her. Defendants' Rule 50(b) Motion for judgment as a matter of law is DENIED.

## III. MOTION FOR A NEW TRIAL

### A. Legal Standard

Federal Rule of Civil Procedure 59 authorizes courts to grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court generally "must uphold a jury verdict if it is supported by substantial evidence." *Guy v. City of San Diego*, 608 F.3d 582, 585 (9th Cir. 2010). However, a court may grant a new trial, even when substantial evidence supports the verdict, if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent . . . a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted). As such, a court "can weigh the evidence, make credibility determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 841 (9th Cir. 2014). However, a court "may not grant a new trial simply because it would have arrived at a different verdict." *Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007) (citation omitted).

### B. Discussion

1. <u>Jury Selection Process</u>

Defendants first argue that the jury selection process was prejudicially flawed because the Court permitted the Garcia and Galicia Plaintiffs to separately exercise peremptory challenges, resulting in Plaintiffs having more challenges than Defendants. (Rule 50(b) Mot. at 19). Defendants also suggest that the jury was unrepresentative because it did not include any jurors from Orange County. (*Id.* at 20).

Under Federal Rule of Civil Procedure 47(b), "[t]he court must allow the number of peremptory challenges provided by 28 U.S.C. § 1870." Fed. R. Civ. P. 47(b). Section

1870, in turn, provides that, "[i]n civil cases, each party shall be entitled to three peremptory challenges." 28 U.S.C. § 1870. However, "[s]everal defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly." *Id.* "The deliberate use of the word 'may' is intended to confer a judicial discretion in the trial court." *John Long Trucking, Inc. v. Greear*, 421 F.2d 125, 128 (10th Cir. 1970); *see also Meza-Perez v. Sbarro LLC*, No. 23-15702, 2024 WL 4532903, at *5 (9th Cir. Oct. 21, 2024) (reviewing allocation of peremptory challenges for abuse of discretion). Here, exercising its discretion, the Court determined that it was appropriate to permit the Garcia and Galicia Plaintiffs to separately exercise peremptory challenges given that they were separately represented and had filed separate complaints. While the Garcia and Galicia Plaintiffs were similarly situated in some respects, their interests were materially adverse in others, as reflected by the jury's allocation of damages. This allocation of peremptory challenges was within the Court's discretion.

Even assuming otherwise, however, Defendants fail to show that the Court's allocation of peremptory strikes resulted in a "miscarriage of justice" or otherwise caused any prejudice. As the Ninth Circuit has explained, the right to peremptory challenges exists by virtue of statute, "not by virtue of the Constitution." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 967 (9th Cir. 2013). Therefore, erroneous denial of a challenge is subject to review for "harmless error, requiring [courts] to disregard error not affecting 'substantial rights.'" *Id.* This requires showing that the decision "affect[ed] the substance of the case" rather than merely "the procedural right to three peremptory challenges." *Id.*

Defendants have not met this standard. While the Court assigned three peremptory challenges to each party, no party used more than two challenges, and Defendants accepted the jury without exercising their final peremptory challenge. *See Goldstein v. Kelleher*, 728 F.2d 32, 38 (1st Cir. 1984) ("We think that before a reversal is granted, the complaining party should be able to point to some convincing indication in the record that if a further

peremptory challenge had been allowed, he meant to challenge one or more jurors.”). Defendants argue that exercising their final challenge would have resulted in Juror #18, “a much more plaintiff-oriented juror,” being seated. (Rule 50(b) Reply at 11). However, Defendants offer no basis to believe that Juror #18 would have been more supportive of Plaintiffs’ case. Indeed, the record reflects that none of the three jurors who would have been seated if the parties had exercised their additional challenges were subjected to any significant voir dire questioning by the parties.[5] *See* (Day 1 Transcript). Given that Defendants made no attempt to develop challenges against Jurors 18, 19, or 20, there is no basis in the record to find that the denial of additional peremptory challenges in any way affected the substance of the case. *United States v. Patterson*, 215 F.3d 776, 782 (7th Cir. 2000) (“Doubtless it will often be impossible to show that a change in the number of peremptory challenges affected the outcome of a trial—but inability to trace adverse effects to a mistake does not justify reversing a [judgment]; it shows instead that there is no warrant for disturbing the judgment.”), *abrogated on other grounds by Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The Court further notes that Defendants did not specifically object to the allocation of peremptory challenges or the constitution of the jury. *See Roberson v. Briddle*, 241 F. App’x 395, 396 (9th Cir. 2007) (“By not objecting to the constitution of the jury prior to trial, [the moving party] waived his argument” regarding the denial of a peremptory challenge). As to the argument that no member of the jury was from Orange County, Defendants again did not raise this argument at trial, and they point to no case law or legal principle that would require a new trial under these circumstances. Accordingly, the Court DENIES this portion of the Rule 50(b) Motion.

---

[5] The only exchange with any of the three jurors was a question to Juror #18 about the official Spanish translation. Juror #18 indicated that he/she could “speak a little Spanish” but was not fluent and “would be able to stick with what the translation in the record shows.” (Day 1 Transcript at 118-19).

2. Bifurcation

Defendants next argue that the Court's denial of Defendants' motion to bifurcate liability and damages caused undue prejudice to the Defense. Defendants point to Plaintiffs' introduction of an 11-minute video of Garcia after the shooting, in which he continuously moaned in pain. (Rule 50(b) Mot. at 21).

Under Federal Rule of Civil Procedure 42(b), courts may order separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Courts have "broad discretion" in determining whether to bifurcate a trial. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). "Rule 42(b) merely *allows*, but does not require, a trial court to bifurcate cases 'in furtherance of convenience or to avoid prejudice.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (quoting Fed. R. Civ. P. 42(b)).

In denying Defendants' motion to bifurcate, the Court determined that bifurcation would result in unnecessary duplication of effort. Because the liability and damages witnesses substantially overlapped, bifurcation would have potentially required multiple rounds of testimony from the same witnesses, including the officers and the treating paramedic. Bifurcation would have also necessitated multiple rounds of deliberations in the event the Plaintiffs prevailed, and it could have risked prejudicing Plaintiffs if the jury sought to avoid returning for a second phase. While Defendants are correct that failing to bifurcate resulted in the admission of additional emotional testimony, the case was inherently emotional, as is any wrongful death case. To address issues of prejudice, the Court instructed the jury multiple times that it "must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy," and that it "must decide the case solely on the evidence." (ECF No. 155 at 2, 39). Ultimately, the Court exercised its discretion in concluding that any prejudice was outweighed by concerns of convenience and judicial economy. Defendants have not shown that this determination was unreasonable or resulted in a miscarriage of justice. Accordingly, the Court DENIES this portion of the Rule 50(b) Motion.

3. Vicarious Liability Instruction

Finally, Defendants argue that the Court erred in giving a jury instruction on the City's vicarious liability. Defendants assert that this instruction led the jury to award Plaintiffs an excessive amount in damages that bore little relationship to the evidence or the individual Plaintiffs' harm. Defendants argue that this problem was compounded by comments from the Galicia Plaintiffs' Counsel during closing argument about what "message" the jury's verdict would send. Defendants also point to a question posed by the jury during deliberations about who would receive pain and suffering damages as evidence that the jury was improperly motivated to compensate the family. (Rule 50(b) Mot. at 22-25).

The challenged jury instruction reads: "If you find that Officer Silva's conduct violated any of the claims under Claim Two (Violation of the Bane Civil Rights Act); Claim Three (Battery); and/or Claim Four (Negligence), then the City of Tustin is responsible for any harm caused by Officer Silva's wrongful conduct. This instruction applies only to those claims." (ECF No. 155 at 30). This instruction was taken from California's model jury instructions. *See* CACI 3703.

There is no dispute here that the City was vicariously liable under California law for any of the state law claims against Officer Silva. Thus, giving this instruction was an accurate statement of California law. The instruction provided context for why the City was named as a Defendant in the Court's Statement of the Case and the jury instruction on Claims and Defenses. The instruction clarified the scope of liability for the jury and avoided speculation that Officer Silva would be personally liable for the damages. As Plaintiffs demonstrate, courts routinely give this instruction under similar circumstances. *See* (ECF Nos. 146-2 – 146-12 (collecting similar police misconduct cases in which CACI 3703 was given)). Defendants do not identify any cases finding error in giving such an instruction. Accordingly, Defendants have failed to show that this instruction justifies a new trial.

As to the comments by the Galicia Plaintiffs' Counsel, the Court sustained objections to these statements, and Defendants did not request a curative instruction. *See United States v. Piascik*, 559 F.2d 545, 550 (9th Cir. 1977) ("In the light of no request for a cautionary instruction we cannot expect a court, under ordinary circumstances, to interrupt the argument of counsel and act on its own motion. Moreover, the giving of a cautionary instruction frequently unduly emphasizes the objectionable argument."). The Court also repeatedly instructed the jury that Counsel's arguments are not evidence, and that the jury must not be influenced by opinions, prejudices, or sympathy. (ECF No. 155 at 6, 18, 39). On this record, the Galicia Plaintiffs' Counsel's statements—rhetorical questions asking what message would be sent by a Defense verdict—are no more than harmless error.

Finally, to the extent Defendants argue that the damages award itself necessitates a new trial,[6] the Court disagrees. Courts must afford "substantial deference to a jury's finding of the appropriate amount of damages," and a jury award must be upheld "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). The evidence here supported the jury's award of damages for pain and suffering and loss of life, as the video presented unrebutted evidence that Garcia suffered for approximately 10-15 minutes before succumbing to his injuries. The evidence also supported the awards of damages to each of the Plaintiffs, as each Plaintiff testified to their emotional connection to Garcia and to the impact that his death had on them. It was not unreasonable for the jury to award equal amounts to each of Garcia's children and a lower amount to his wife. As Plaintiffs demonstrate, while the $17 million award may be on the high end of such awards, it was not out of line with awards in

[6] Defendants do not explicitly argue that they are entitled to a new trial because the jury verdict was excessive. Instead, they argue that they are entitled to a new trial because of the improper jury instruction, and they suggest that the instruction led to an excessive verdict.

similar cases in this State, including cases involving homeless individuals and estranged family members. *See* (ECF Nos. 192-13 – 192-21). While Defendants point to a single case awarding a far smaller verdict, they fail to demonstrate that the award in this case was "grossly excessive or monstrous." Accordingly, the Rule 50(b) Motion is DENIED.

**IV. FEES MOTIONS**

Finally, the Court turns to the Fees Motions filed by the Garcia and Galicia Plaintiffs. In their Motion, the Garcia Plaintiffs seek an award of $3,054,130 in fees based on hourly rates of $250 for litigation assistants and $900 – $1,500 for attorneys, more than 1,300 hours spent on the case, and a two times multiplier under the Bane Act. (Garcia Fees Mot. at 30-31; Garcia Fees Reply at 20-21). The Galicia Plaintiffs seek an award of $1,060,350, based on an hourly rate of $1,000 for attorneys and $250 for litigation assistants, more than 650 hours spent on the case, and a two times multiplier. (Galicia Fees Mot. at 20). While Defendants do not dispute Plaintiffs' entitlement to a statutory fees award, they argue that the requested hourly rates are excessive, that the number of hours billed is unreasonable, and that no multiplier is warranted. (Garcia Fees Opp.; Galicia Fees Opp.).

Under 28 U.S.C. § 1988, a prevailing plaintiff in a § 1983 action is entitled to recover "a reasonable attorney's fee as part of the costs." 28 U.S.C. § 1988(b). Because this provision is intended to "ensure effective access to the judicial process for persons with civil rights grievances," a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted). To determine the amount of a reasonable fee, courts proceed in two steps. First, "a court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016). Second, the court "may then adjust the lodestar upward or downward based on a variety of factors, including the degree of success obtained by the plaintiffs." *Bravo v. City of Santa Maria*, 810 F.3d 659, 666 (9th Cir. 2016).

For state law claims, federal courts apply state law "in determining not only the right to [attorney's] fees, but also [] the method of calculating the fees." *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995). Under the Bane Act, a prevailing plaintiff is entitled to recover "reasonable attorney's fees." Cal. Civ. Code § 52.1(i). As with federal law, California courts determine a reasonable attorney's fees award by applying the lodestar method. *Reck v. FCA US LLC*, 64 Cal. App. 5th 682, 691 (2021). Courts may then adjust the lodestar figure based on consideration of case-specific factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).

**A. Effect of Contingency Fee on Statutory Fee Award**

As an initial matter, Defendants object that Plaintiffs' Counsel will receive a windfall if it is awarded the requested statutory fee award in addition to any contingency fee award agreement with Plaintiffs. While Plaintiffs have not provided the terms of any contingency fee arrangement, Defendants argue that Attorney Galipo's office typically requires a retainer agreement entitling him to 40% of any jury award. With the requested statutory fees, Defendants estimate that Plaintiffs' Counsel's total recovery will exceed 70% of Plaintiffs' damages. (Garcia Fees Opp. at 2). In their Reply, Plaintiffs cite to out-of-circuit case law and argue that they are entitled to recover both a statutory fee and any contingency fee, and that "the total amount that the attorney stands to recover must not influence" the determination of the statutory fees award. (Garcia Fees Reply at 7).

"[S]tatutory awards of fees can coexist with private fee arrangements." *Venegas v. Mitchell*, 495 U.S. 82, 88 (1990). While the "presence of a pre-existing fee agreement may aid in determining reasonableness" of a statutory fee request, "a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees." *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989). Thus, where a fee agreement provides "less than a reasonable fee calculated [by the lodestar method], the defendant should nevertheless be

required to pay the higher amount." *Id.* If, on the other hand, "[t]he contingency fee is greater than the statutory fee, [the] plaintiff shall pay the difference to his counsel." *Hamner v. Rios*, 769 F.2d 1404, 1409 (9th Cir. 1985). "[P]laintiff's attorneys are not entitled to *both* the statutory award and the full amount of the contingent fee." *Venegas v. Skaggs*, 867 F.2d 527, 534 n.7 (9th Cir. 1989), *aff'd sub nom. by Venegas v. Mitchell*, 495 U.S. 82 (1990).

Applied here, this means that Plaintiffs are entitled to recover their full statutory fee as prevailing plaintiffs under § 1988, notwithstanding any contingency fee agreement. To the extent the reasonable fee award exceeds any contingency fee award, Defendants are obligated to pay the statutory award in its entirety. To the extent the reasonable fee calculated by the Court is less than the amount Plaintiffs agreed to pay as a contingency fee, Plaintiffs are obligated to pay the difference to Plaintiffs' Counsel. However, to prevent a windfall, Plaintiff's Counsel may not take both the statutory fee award and the entirety of the contingency fee.

**B. Reasonable Hourly Rate**

The Garcia Plaintiffs request the following hourly rates: (1) $1,500 for Galipo, an attorney with 36 years of experience; (2) $900 for Masongsong, an attorney with 15 years of experience; (3) $1,000 for Carrillo and Flores, attorneys with 18 and 20 years of experience, respectively; and (4) $250 for three litigation assistants with 10, 20, and 24 years of experience. (Garcia Fees Mot. at 30). In their Reply, the Garcia Plaintiffs indicate that an additional attorney, John Fattahi, worked on these post-trial motions and seeks an hourly rate of $1115. (ECF No. 194-3 ("Fattahi Decl.")). As to Galipo, the Garcia Plaintiffs argue that the high hourly rate is reasonable because Galipo is a particularly accomplished civil rights litigator, having prevailed in dozens of civil rights jury trials and received multiple local, state, and national honors. *See* (Galipo Decl. ¶¶ 5-18). The Garcia Plaintiffs point to several federal cases since 2020 in which Galipo has been awarded hourly rates ranging from $1,100 to $1,400. (*Id.* ¶¶ 19-26); *see* (ECF Nos. 172-4 – 172-12). Similarly, Masongsong identifies several cases since 2020 in which she has been

awarded rates between $550 and $800. (Masongsong Decl. ¶¶ 14-18). The Masongsong and Galipo declarations are accompanied by declarations from Carol A. Sobel, an attorney who provides market rate assessments by comparison to lawyers of comparable skill and experience in Los Angeles. (ECF No. 177-13, 177-33). In addition to citing a litany of purportedly comparable attorney's fee awards, Sobel points to the 2025 Real Rate Report, which provides hourly rates by quartile for various practice and geographic areas. *See* (ECF No. 177-26). Carrillo and Flores provide their own supporting declarations but have not pointed to any previous cases approving similar rates. (Carrillo Decl.; Flores Decl.).

For their part, the Galicia Plaintiffs seek an hourly rate of $1,000 for Arias and $250 for a legal assistant. (Galicia Fees Mot. at 20). Arias provides a declaration, in which he identifies various civil rights cases that he has worked on dating back to 2014, though he states that only three of his cases have gone to jury trial. (Arias Decl. ¶ 17). Arias does not identify any previous cases in which a court awarded him fees.

Defendants oppose, seeking reductions to $1,300 for Galipo, $650 for Masongsong, $650 for Carrillo, $500 for Flores, $650 for Arias, $220 for the Garcia litigation assistants, and $200 for the Galicia litigation assistant. Defendants argue that this case was relatively straightforward, and they object to the requested increase above previously approved rates. As to Carrillo and Flores, Defendants argue that their participation in the case was substantially less than either Masongsong or Galipo, and that they should be compensated in accordance with their diminished role. (Garcia Fees Opp. at 2-5; Galicia Fees Opp. at 3).

The reasonable hourly rate is the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). The burden is on the fee applicant to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the

plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). Courts are also entitled to rely "on their own knowledge of customary rates and their experience concerning reasonable and proper fees." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).

Beginning with Galipo, the Court concludes that an hourly rate of $1,400 is appropriate. From the Court's own observations, Galipo exhibited exceptional skill in litigating and trying this case. The Court agrees with other courts that have recognized Galipo as among the most skilled and experienced attorneys in the field of civil rights litigation. *See, e.g.*, *Valenzuela v. City of Anaheim*, No. SACV 17-00278-CJC (DFMx), 2023 WL 2249178, at *3 (C.D. Cal. Feb. 23, 2023) (recognizing Galipo's "strong reputation within the legal community"). As Galipo points out, other courts have awarded rates of $1,100 in 2020 and 2021, $1,200 in 2023, $1,300 in 2023 and 2025, and $1,400 in 2024. (Galipo Decl. ¶¶ 19-26). However, while there has been a clear upward trajectory in hourly rates, the Court is not convinced that a $1,500 rate is appropriate here. As Plaintiffs' own outside consultant attests, hourly rates for legal services increased by an annual average of 3.1% before the pandemic and have increased at a slightly higher rate of 5% since. (ECF No. 177-13 at 11). A rate of $1,400 is more in line with this rate of increase since 2021. This rate is also in line with the Real Rate Report for Los Angeles, which provides that the hourly rate for 75th percentile litigation partners is $1,334. (ECF No. 177-26 at 22). The Court is unpersuaded by Sobel's citation to various corporate litigation partner rates, as these rates have little bearing on the market rate for civil rights work.

As to Masongsong, the Court will approve an hourly rate of $800. Adjudicating similar motions from Masongsong, courts in this district have previously approved rates of $550 in 2020, $600 in 2021, $700 in 2023, and $800 in 2024. (Masongsong Decl. ¶¶ 14-17). Applying the same inflation rates discussed above, the requested $900 rate would significantly outpace ordinary inflation in the legal market. In addition, under the Real

Rate Report, the median prevailing rate for litigation associates in Los Angeles is $700. (ECF No. 177-26 at 22). While the Court agrees that an increase above this rate is appropriate given Masongsong's experience and skill displayed in this case, the requested $900 rate is excessive.

For Fattahi, the Court will approve an hourly rate of $1000. As detailed in his declaration, Fattahi has approximately 18 years of experience as a federal civil rights litigator and is the founder of his own solo practice that exclusively handles civil rights litigation. (Fattahi Decl. ¶ 6). Fattahi has extensive experience in this area, including being named as a finalist for Consumer Attorney of the Year in California, and he was brought onto this case to assist with post-trial motions and appellate strategy. (*Id.* ¶¶ 4-8). Fattahi points to previous cases in which he was awarded rates of $850 in 2022, $920 in 2023, and $975 in 2024. (*Id.* ¶ 5). Because Fattahi has not previously been involved in this litigation, the Court has not had the opportunity to observe Fattahi's skill throughout this case. However, the $1000 hourly rate approved here is in line with previous awards to Fattahi and is well within the Real Rate Report hourly rates for litigation partners in Los Angeles. *See* (ECF No. 177-26 at 22 (listing median rates of $875 and third quartile rates of $1334)).

Turning to Carrillo, the Court will approve an hourly rate of $750. While Carrillo has more years of experience than Masongsong, he details less relevant civil rights litigation experience in his declaration. Carrillo also served as third chair in this case and, from the Court's observations, did not significantly contribute to the trial.[7] Unlike Galipo and Masongsong, Carrillo has not identified any prior fees awards that he has received. Instead, he identifies various cases from 2012 to 2022 approving rates between $500 and $760 for attorneys with fewer years of experience. (Carrillo Decl. ¶ 24). The rate approved

---

[7] Before the trial, Plaintiffs advised the Court that, due to Carillo experiencing a recent, personal loss, there was a possibility that Carillo would not be sitting at the counsel's table during trial or participating in the trial. Although Carillo did ultimately sit at the counsel's table during the trial, he did not assist with any questioning of witnesses or argument and his participation appeared to be limited for much of the trial, except when aiding with a demonstration.

by the Court is well within the prevailing market rate for litigation partners in Los Angeles. *See* (ECF No. 177-26 at 22 (showing first quartile rates of $519 and median rates of $875)).

The Court will approve an hourly rate of $600 for Flores. Again, while Flores has more years of experience than either Masongsong or Carrillo, his declaration identifies less relevant civil rights experience. *See* (Flores Decl. ¶¶ 6-7 (describing 15 years of experience in land use and personal injury law)). He served as fourth chair in the case and, from the Court's observations, did not significantly contribute to the trial. Flores' declaration does not identify any prior fee awards, either to him or to another attorney of similar experience and skill. Looking again to the Real Rate Report, an award of $600 is between the first quartile and median rate for litigation associates in Los Angeles. (ECF No. 177-26 at 22 (showing first quartile rates of $461 and median rates of $700)).

For Arias, the Court finds that an hourly rate of $700 is appropriate. As mentioned above, while Arias has identified at least 12 years of experience working on civil rights cases, he has relatively little experience on similar trials. During trial, Arias took a backseat to Galipo, leading direct examination only for his own clients. The briefing and presentation of evidence on summary judgment exhibited a similar disparity. Moreover, as detailed in the trial transcript, Arias' conduct at trial demonstrated a less than exceptional level of skill and experience. *See, e.g.*, (Day 4 Transcript at 90-92 (admonishing Arias and threatening sanctions for discussing excluded evidence to jury, in violation of Court orders); Day 6 Transcript at 50 (sustaining objection to closing argument that jury should consider the message sent by their verdict)). Arias has not identified any previous fee awards to provide a benchmark for the Court's award. However, this rate is well within the range of rates for similar work in this District. *See* (ECF No. 177-26 at 22 (showing first quartile rate of $519 and median rate of $875 for litigation partners in Los Angeles)).

Finally, as to the litigation assistants, the Court finds the requested $250 hourly rate to be reasonable. Plaintiffs' litigation assistants have 8, 10, 20, and 24 years of legal experience respectively. *See* (Arias Decl. ¶ 29; Monguia Decl. ¶ 4; Laurel Decl. ¶ 2; Gilbert Decl. ¶ 2). Courts in this District approved rates of $220 for some of these

individuals in 2024, and, from the Court's knowledge and experience, rates of $250 are within the range of rates typically approved for similar paralegal work.

In sum, the Court finds the following rates reasonable: (1) $1,400 for Galipo; (2) $800 for Masongsong; (3) $1000 for Fattahi; (4) $750 for Carrillo; (5) $600 for Flores; (6) $700 for Arias; and (7) $250 for the litigation assistants.

**C. Reasonable Number of Hours**

In their Motions, Plaintiffs' Counsel seek to recover fees for the following number of hours: (1) 579.2 hours by Galipo, (ECF No. 194-1); (2) 503.6 hours by Masongsong, (ECF No. 194-2); (3) 17.5 hours by Fattahi, (ECF No. 194-3); (4) 99.15 hours by Carrillo, (ECF No. 177-47); (5) 63.45 hours by Flores, (ECF No. 177-48); (6) 91.65 hours by legal assistants for the Garcia Plaintiffs, (ECF Nos. 177-50, 177-54, 177-58); (7) 477.90 hours by Arias, (ECF No. 180-2); and (8) 209.1 hours by Arias' legal assistant, (*id.*).

"[A]n attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*, including those relating solely to the fee." *Ketchum*, 24 Cal. 4th at 1133. Hours are reasonable if they "would have been undertaken by a reasonably prudent lawyer to advance or protect his client's interest." *Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003) (citation omitted). In contingency fee cases, because the "payoff is too uncertain," courts should generally "defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

Defendants first argue that the Court should reduce the time spent on the summary judgment motion by 13.2 hours because Defense Counsel took the lead in preparing the joint motion and billed significantly less time than Plaintiffs' Counsel. (Garcia Fees Opp. at 5). The Court disagrees. Given the complexity of this case, spending 70.5 hours on a motion for summary judgment was not excessive. While Defense Counsel may have drafted the initial joint motion for summary judgment, it is not inherently unreasonable for Plaintiffs' Counsel to spend approximately 20% more time than Defense Counsel on their

portion of the motion. This is particularly true given that Plaintiffs bore the burden to identify clearly established case law to rebut the qualified immunity argument.

Second, Defendants seek a reduction of 26.4 hours for depositions that were attended by multiple attorneys. Defendants point to five depositions that were attended by three attorneys and three that were attended by two. (Garcia Fees Opp. at 6). The Garcia Plaintiffs respond that the second attorney at each deposition played a significant role in consulting with the lead attorney, preparing and displaying the deposition exhibits, and identifying specific issues for questioning. (Garcia Fees Reply at 17). The Court agrees with Plaintiffs that it was not unreasonable to have multiple attorneys at these depositions. As other courts have recognized, "division of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings." *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010) (citation omitted). However, Plaintiffs have offered no justification for having three attorneys at several of the depositions, and courts have frequently drawn the line at two attorneys. *See, e.g.*, *Grace Church of N. Cnty. v. City of San Diego*, No. 07cv0419 H(RBB), 2008 WL 11508664, at *15 (S.D. Cal. Sept. 9, 2008) ("The court finds it unreasonable for more than two attorneys to attend a deposition."). In the absence of specific justification for having three attorneys attend these depositions, the Court will reduce the Garcia Plaintiffs' hours by 10.2 hours, representing the amount of time spent by the third attorney in the five listed depositions.

Third, Defendants argue that Galipo engaged in impermissible block billing by billing 152.1 hours for "trial preparation." Defendants point to two previous cases in this District that have imposed 10% reductions to Galipo's fees based on identical block billing. (Garcia Fees Opp. at 6). Plaintiffs respond that these records do not amount to block billing because Galipo has included a footnote indicating the types of tasks that he performed. (Garcia Fees Reply at 17-18). "Block billing is the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metro. Life Ins. Co.*, 480 F.3d

942, 945 n.2 (9th Cir. 2007) (internal quotation marks and citation omitted). Courts have the discretion to apply an across-the-board reduction for block-billed hours "because block billing makes it more difficult to determine how much time was spent on particular activities." *Id.* at 948. Two previous courts in this district have reduced Galipo's hours for "trial preparation" by 10% under identical circumstances, including the same footnote. As one court put it, "[w]ithout a breakdown of how much time Galipo spent on these tasks, the Court is unable to say that it was reasonable to spend 390.5 hours on trial preparation." *Frias v. City of Los Angeles*, No. CV 16-4626 PSG (SKx), 2020 WL 4001620, at *5 (C.D. Cal. Apr. 23, 2020). Because Galipo has previously been warned about this specific practice, and because the block billing inhibits the Court's ability to assess the reasonableness of these hours, the Court will apply the same 10% reduction of 15.2 hours.

Fourth, Defendants seek a reduction of 22.2 hours for time billed by Galipo for legal research. Defendants argue that, given Galipo's high billing rate and exceptional experience, legal research tasks should be delegated to less senior attorneys. (Garcia Fees Opp. at 7). The Court disagrees. As Plaintiffs argue, Galipo was responsible for conducting oral argument in this Court and at the Ninth Circuit. There is nothing unreasonable about Galipo billing for a relatively short period of time spent researching, reviewing cases, and updating himself on changes in the law.

Fifth, Defendants seek a reduction of 30.5 hours spent by Flores at trial. Defendants argue that Flores did no more than sit at the counsel table, and that the Garcia Plaintiffs' interests were already more than adequately represented by the other three attorneys at trial. (Garcia Fees Opp. at 7). Flores' billing records for trial already reflect a significant reduction, as he bills only 30.5 hours for a 6-day trial, while the other attorneys billed well over 40 hours. As Plaintiffs explain, Flores played a role at trial by taking notes, assisting with trial strategy, and conducting legal research regarding the admission of demonstrative evidence. Moreover, the Court has already factored in Flores' limited participation at trial into its reduction of his requested hourly rate. Given these factors, the Court finds the requested 30.5 hours to be reasonable.

Finally, as to the Galicia Plaintiffs, Defendants seek a reduction of 7.0 hours from Arias' billing for "hours billed for visiting the courthouse and filing papers." Defendants also seek to reduce Arias' legal assistant's hours by 33.6 for clerical tasks of making phone calls, gathering forms, and filing documents in court. (Galicia Fees Opp. at 3-4). As the Ninth Circuit has held, "[w]hen clerical tasks are billed at hourly rates, the court should reduce the hours requested to account for the billing errors." *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009). The Galicia Plaintiffs have not responded to this portion of the Opposition and have offered no argument why billing for clerical tasks should be included. Accordingly, the Court will reduce the billing by the amounts requested by Defendants.

Based on the above, the Court approves the following number of hours: (1) 564.0 hours by Galipo; (2) 503.6 hours by Masongsong; (3) 17.5 hours by Fattahi; (4) 91.45 hours by Carrillo; (5) 60.95 hours by Flores; (6) 91.65 hours by legal assistants for the Garcia Plaintiffs; (7) 470.90 hours by Arias; and (8) 175.5 hours by Arias' legal assistant.

**D. Multiplier**

Finally, Plaintiffs request that the Court apply a 2.0 times multiplier to their fee award because of the contingent risk associated with litigating this case. (Garcia Fees Mot. at 26-30; Galicia Fees Mot. at 12-14). Defendants oppose any multiplier, arguing that this is not the "rare and exceptional" case that would warrant deviation from the lodestar under federal law. Under state law, Defendants argue that the purpose of the multiplier is already satisfied because Counsel are being paid at or above market rate. (Garcia Fees Opp. at 8; Galicia Fees Opp. at 4).

Under California law, courts may adjust the lodestar figure based on consideration of case-specific factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." *Ketchum*, 24 Cal. 4th at 1132. Courts should also consider "the fact that an award against the state would ultimately fall upon the taxpayers." *Serrano v. Priest*, 20 Cal. 3d

25, 49 (1977). "The purpose of a fee enhancement, or so-called multiplier, for contingent risk is to bring the financial incentives for attorneys enforcing important constitutional rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis." *Ketchum*, 24 Cal. 4th at 1132. While "contingency-fee multipliers" are unavailable under federal fee-shifting statutes, California law "permits such enhancements under state fee-shifting statutes." *Mangold*, 67 F.3d at 1478. "[W]hen a plaintiff succeeds on both federal and state claims that support a fee award, the state-law multiplier is available." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1112 (9th Cir. 2014).

As Plaintiffs argue, the contingent nature of the fee award in this case weighs strongly in favor of applying an upward adjustment to the lodestar. Plaintiffs litigated this case for nearly five years and invested approximately $1.5 million in legal services without any guarantee of compensation. *See Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 809 (9th Cir. 2018) (affirming 2.0 multiplier based, in part, on the "substantial financial risk that appellees' counsel assumed in investing $3.4 million of attorney time in a contingency case"). Defendants' argument that the lodestar already provides adequate compensation fails to account for this contingent risk. The risk of non-compensation was particularly acute in this case, as evidenced by the fact that this Court initially granted summary judgment to Defendants on qualified immunity. Moreover, as the Court has discussed, Garcia Plaintiffs' Counsel exhibited exceptional skill in litigating this case, including on appeal and at trial. However, the other factors weigh less strongly in favor of a multiplier: the questions in this case were somewhat difficult but not necessarily novel, and the nature of the litigation may have had some preclusive effect on other employment but would not significantly interfere with other cases. In addition, because the City is a government entity, "the attorney fees award would not be paid out of a common fund or be borne by a private wrongdoer, but would ultimately fall upon the shoulders of California taxpayers." *Nw. Energetic Servs., LLC v. Cal. Franchise Tax Bd.*, 159 Cal. App. 4th 841, 881 (2008).

Weighing all of these factors, the Court concludes that a 1.6 times multiplier would adequately compensate for the contingent risk of bringing this case.

As to the Galicia Plaintiffs, however, the Court will apply only a 1.2 times multiplier. Like the Garcia Plaintiffs, the Galicia Plaintiffs' Counsel bore significant risk in bringing this case on contingency without any guarantee of compensation. However, the Garcia Plaintiffs' Counsel's investment in this case was far less significant than that of the Garcia Plaintiffs' Counsel. The Galicia Plaintiffs took a backseat on summary judgment, on appeal, and during trial. Moreover, as discussed above, the Galicia Plaintiffs' counsel provided less meaningful arguments on summary judgment and displayed less skill throughout trial. While some upward adjustment is warranted to account for the contingent risk, the Court believes this adjustment should be significantly reduced in light of the other factors.

Based on the above, the Court awards the following amounts in fees: (1) to the Garcia Plaintiffs, \$2,140,880; and (2) to the Galicia Plaintiffs, \$448,206.[8]

## V. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Defendants' Rule 50(b) Motion is DENIED;
2. The Garcia Plaintiffs' Fees Motion is GRANTED, and the Garcia Plaintiffs are awarded \$2,140,880 in attorney's fees and costs; and
3. The Galicia Plaintiffs' Fees Motion is GRANTED, and the Galicia Plaintiffs are awarded \$448,206 in attorney's fees and costs.

---

[8] These figures are calculated as follows:

1) Garcia Plaintiffs – 1.6 x ((564 x 1,400) + (503.6 x 800) + (17.5 x 1,000) + (91.45 x 750) + (60.95 x 600) + (91.65 x 250))
2) Galicia Plaintiffs – 1.2 x ((470.90 x 700) + (175.5 x 250))

Within fourteen (14) days of the issuance of this Motion, Plaintiffs shall lodge a proposed judgment with the Court, consistent with this Order and the findings of the jury.

**IT IS SO ORDERED.**

DATED: July 29, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE