**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Blvd., Ste. 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

RODNEY S. DIGGS, Esq. (SBN 274459)
Email: RDiggs@imwlaw.com
**IVIE MCNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, Suite 3200
Los Angeles, California 90071
Tel: (213) 489-0028
Fax: (213) 489-0552

Attorneys for Plaintiff, STEFFON BARBER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEFFON BARBER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO and DEPUTY CHRISTOPHER ALFRED,<br><br>Defendants | Case No. 5:22-cv-00625-KK-DTBx<br><br>*[District Judge, Kenly Kiya Kato, Magistrate Judge, David T. Bristow]*<br><br>**DECLARATION OF JAMES A. BRYANT IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES** |

**DECLARATION OF RODNEY S. DIGGS**

I, James A. Bryant, declare:

1. I am an attorney at law fully licensed and admitted to practice before all courts of the State of California. I am a Partner with The Cochran Firm California, co-counsel for Plaintiff Steffon Barber (“Plaintiff”). The matters contained in this declaration are known to me personally, and if called upon to testify as to such matters under oath in a court of law, I could and would do so competently.

**MY REQUESTED HOURLY RATE IS REASONABLE**

2. I have maintained contemporaneous time records reflecting the work activity and time spent on this case. I have exercised billing judgment, I have reduced or written off unproductive time or other time that would not ordinarily be charged to a fee-paying client, and I have ensured that my billing records related to the criminal matter are only those that were used for research and preparation for the civil matter. A copy of the time records for this case is attached hereto as **Exhibit A**.

3. All of the work done in this case was performed to advance the claims ultimately presented to the jury, to defend Mr. Barber's criminal case in a manner that preserved the viability of this civil action, or to otherwise advance Mr. Barber's interest in obtaining justice for the constitutional violations committed against him.

4. I graduated with a B.A. from University of California Berkeley in 2004. I attended and graduated from University of Michigan School of Law in 2007.

5. I have specialized in and devoted the majority of my practice to civil rights, catastrophic injury, wrongful death, employment litigation, business litigation, intellectual property and related fields, which I believe go hand in hand. Over the course of my career, spanning nearly 20 years of exemplary legal practice, I have handled well over 200 cases and have secured more than $125 million in verdicts, arbitration awards and settlements for my clients. My practice encompasses civil rights, catastrophic injury, wrongful death, employment law, sports and entertainment, intellectual property, commercial litigation, state and federal criminal matters ranging from murder to federal espionage, as well as a variety of international matters involving US citizens.

6. In 2007, after graduation, I joined Orrick, Herrington & Sutcliffe, LLP as an associate in San Francisco. While at Orrick my assigned practice areas included the Real Estate Transaction and Securities Litigation groups. In 2009, I left

Orrick and founded the Law Office of James A. Bryant, which practices included complex litigation and transactional work in the areas corporate law, entertainment law, employment and labor, intellectual property and real estate law. In 2012, I joined the Cochran Firm as of-counsel. In 2014, I became an equity partner at the Cochran Firm – California. In addition, I am the lead partner for all defense litigation matters.

7. In my practice I handle numerous high-profile cases all across the country ranging from egregious civil rights violations to cases of significant interest involving celebrities and other public figures. In my first notable eight figure award, in February of 2014, as co-counsel representing plaintiff real estate development company in a first of its kind dispute against a major insurance company for breach of contract for a sub-contractor default insurance claim, we successfully obtained an arbitration award in the amount of $11,973,780.00 in favor of plaintiff. Over the years, I have served as first chair in over fifteen civil trials in federal and state court.

8. Among my landmark results:

- In 2019, my second eight figure award occurred when I was co-counsel in the case *Sinuon Samantha Pream, et al. v. City of Long Beach*, et al., Case No. CV 17-04295 TJH (FFMx). We obtained a $9.1 million dollar verdict which was the largest verdict against The City of Long Beach in a shooting wrongful death case and the second largest in the United States District Court Central District in a civil rights shooting wrongful death case. This verdict was also top 10 civil rights verdict in California for 2019.
- In the excessive force matter of *Clayton et al v. City of Oxford, Mississippi* et al Case No. 3:21-cv-00174-GHD-JMV, United States District Court, Northern District Mississippi: On May 26, 2022, as lead counsel, I received a $2.2 million judgment, the largest against a police involved murder in Mississippi history.

- In the excessive force matter of *Devin Nolley v. City of East Point et al* Case 1:19-cv-05189-CAP, United States District Court, Northern District of Georgia: On March 23, 2023, as lead counsel, with trial quickly approaching, I received an undisclosed seven figure settlement involving an unlawful police shooting that resulted in my client becoming a quadriplegic.
- In the wrongful detention matter of *Steven Jessie Harris v. Clay County, Mississippi et al*, Case No. 1:18-cv-00167-MPM-RP, United States District Court, Northern District of Georgia: On March 7, 2023, as lead counsel, just shortly empaneling a jury, Defendants entered into a confidential settlement resulting the largest settlement or judgment involving the wrongful detention of a person in state of Mississippi.
- In 2023, as co-counsel, I obtained a $24,584,449.00 jury verdict in an employment civil rights case against a school district — believed to be the largest employment retaliation verdict ever secured against a school district
- In 2019, I obtained a Top 10 verdict in the United States and a Top 10 verdict in California. In 2020, I obtained a Top 50 verdict in California. In 2021, I obtained a Top 10 settlement in the United States and two Top 10 settlements in California.

9. I have also shaped federal and state law through published appellate decisions. I was lead counsel and was published in United States Fifth Circuit the case *Steven Jessie Harris v. Clay County, Mississippi et al* Case No. 21-60456 (MSND No. 1:18-cv-00167-MPM-RP). Following a unanimous *En Banc* panel review, the Fifth Circuit issued a landmark civil rights opinion, in a case of first impression, where it was determined that detaining in a county a jail, a person deemed legally incompetent for seven years following a competency hearing was a blatantly obvious constitutional violation. This precedent setting case will have a

long-lasting impact on legal jurisprudence. I was also lead counsel and was published in the case *Kiara Belen v. Ryan Seacrest Productions et al* Case No. B304642 (Superior Court No. 19STCV26534)). I represented Plaintiff in this matter. This matter established that production companies cannot be shielded behind free speech when filming individuals without permission and broadcasting their nude bodies to millions of viewers. Most recently, I was co-counsel in *Bassett Unified School District v. Los Angeles County Superior Court; Michael Ross* (RPI), Case No. B323528, in which the Court of Appeal issued a significant ruling strengthening employee protections.

10. My peer-recognized honors and awards reflect a sustained record of excellence at the highest levels of the profession, including:

- Southern California Super Lawyer and California Super Lawyer Rising Star (2015–2023)
- In 2022, I was named one of the Top 50 most powerful black lawyers in the country by the National Bar Association

11. I have been awarded attorneys' fees by courts on multiple occasions. On March 28, 2017, the California Court of Appeal affirmed that Judge Mackey was reasonable in awarding me $500.00 per hour in *Ruiz v. U.S. Security Associatio*n, B275201. In January 2022, my hourly billing rate was approved by Los Angeles Superior Court at $700.00 per hour in the matter of *Bassett Unified School District v. Los Angeles County Superior Court; Michael Ross*. My skills, experience, accolades, and trial results have increased substantially since each of those awards, and my requested rate of $1,200.00 per hour reflects the current prevailing market rate for attorneys of my skill, experience, and reputation in the Central District.

12. The successful result in this matter was achieved by Plaintiffs' attorneys through diligent and tireless effort, including preparing this case for the criminal and civil trial a.  The work performed by myself and each attorney in

furtherance of this action was reasonable and necessary. All of the time was contemporaneously kept and was billed for legitimate, necessary activities such as: (1) meetings with client; (2) drafting pleadings; (3) preparing for, taking and defending numerous depositions and conducting written discovery; (4) drafting and opposing motions; (5) attending court proceedings and mediations; (6) reviewing extensive documentation and evidence; (7) locating and speaking with witnesses; (8) preparing pre-trial pleadings; (9) preparing for trial; and (10) trial.

13. This case presented an unusual and demanding challenge. From 2021 through the February 9, 2026 verdict, my firm worked on this matter with a risk of no recovery. Bringing it to a successful resolution required the skill and specific knowledge I have acquired from representing hundreds of plaintiffs in civil rights matters, combined with the unique challenge of simultaneously managing a companion criminal defense matter — in which Mr. Barber faced charges including assault with a deadly weapon on a peace officer under Penal Code § 245(c) — that served as a prerequisite to this civil case proceeding at all.

14. A further complexity of this matter is that Mr. Barber, as a result of having been shot in the head by Deputy Alfred, was in a coma for an extended period following the April 27, 2021 shooting and remained cognitively impaired during the early years of this litigation. Mr. Barber's sister, Shyrah Butcher, served as his Guardian Ad Litem during this period. As a result, a significant portion of client communications during the early stages of this case — and throughout the period of Mr. Barber's incapacitation — were conducted with Ms. Butcher as his representative. The time reflected in my billing records that references communications with Ms. Butcher was work performed on behalf of Mr. Barber as Plaintiff, through his GAL. The billing matter was accordingly denominated "Butcher, Shyrah — GAL Steffon Barber" but reflects legal services rendered on Plaintiff Steffon Barber's behalf in this matter.

15. As Mr. Diggs explained in his declaration, this case was vigorously defended every step of the way. Defendants maintained throughout that the shooting was justified and did not make any meaningful settlement offer, as reflected in the parties' joint status report regarding settlement filed December 11, 2025. Despite the difficult evidence — including the defense's central contention that Mr. Barber attempted to reverse his vehicle toward Deputy Alfred — my office, together with co-counsel Ivie McNeil Wyatt Purcell and Diggs and the Law Offices of Dale K. Galipo achieved a jury verdict on February 9, 2026, awarding total damages of $27,350,000. It is anticipated that Defendants will file post-trial motions and a likely appeal, such that this case continues to demand attorney time and resources.

16. The successful result in this matter was achieved through diligent and tireless effort over five years of litigation, including prosecution of the companion criminal case, complex civil discovery, motion practice, retention and coordination of four expert witnesses, and nearly two weeks of trial preparation and trial. All work performed by myself and each attorney and staff member of my firm was reasonable and necessary. All time was contemporaneously recorded and reflects legitimate, necessary activities, including: (1) client communications, in-custody visits, coordination with CDCR, and extensive communications with Mr. Barber's Guardian Ad Litem Shyrah Butcher; (2) criminal court appearances, criminal trial attendance, and nightly preparation during the criminal trial; (3) drafting and reviewing pleadings; (4) preparing for, taking, and attending depositions and conducting written discovery; (5) drafting and opposing motions, including the Opposition to Defendants' Motion for Summary Judgment; (6) attending court hearings and mediation; (7) reviewing extensive documentary evidence, investigative reports, forensic materials, and criminal trial transcripts; (8) retaining, coordinating with, and preparing expert witnesses; (9) preparing pretrial documents including jury instructions, motions in limine, and the memorandum of contentions

of fact and law; (10) preparing for and attending all seven days of civil trial, including nightly preparation reviewing prior testimony and preparing examinations for the following day's witnesses; and (11) post-trial matters.

17. More specifically I was intimately involved in both the criminal and civil matters. Serving as lead counsel for the criminal trial, and initially served as co-lead counsel for the civil trial until associating the renowned civil rights attorney Dale Galipo to serve as co-lead counsel.

18. The extensive number of hours my firm worked on this case precluded me and my attorneys from devoting that time to the prosecution of other matters handled by this office.

19. The criminal proceedings arising out of the April 27, 2021 shooting were not collateral to the civil case. They were indispensable to it. They were necessary both to preserve Plaintiff's ability to bring his civil rights claims at all and to develop the factual record ultimately used to prove those claims.

20. A criminal conviction in this case for attempted murder would have had significant ramifications to the status of the civil action, which is why the success at the criminal trial was so critical.

21. That issue was identified and addressed from the beginning of the representation. My time records reflect that on September 16, 2021, counsel reviewed incident reports, probable cause materials, arrest records, and the investigative file, analyzed the Penal Code sections at issue and civil Heck exposure, and developed a dual-track criminal/civil litigation strategy. On October 5, 2021, counsel specifically researched Heck v. Humphrey and its application to the pending section 245(c) charge, analyzed the implications for the anticipated section 1983 excessive-force claims, and researched vehicle-as-weapon cases. On October 14, 2021, counsel reviewed the criminal charging documents and preliminary hearing materials and developed a civil theory distinguishing any criminal conviction from

the anticipated excessive-force claim. Those are contemporaneous entries, not after-the-fact labels. They show that the criminal and civil matters were strategically intertwined from inception.

22. The criminal work was also compensable because it developed the same factual record later used in the civil case. While section 1988 does not automatically authorize fees for all work performed in collateral proceedings, such work is compensable where it is "useful and of a type ordinarily necessary" to advance or preserve the civil rights litigation. *Webb v. Bd. of Educ.*, 471 U.S. 234, 243 (1985). That standard is satisfied where the criminal and civil matters arise from a "common core of facts." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Where, as here, the work done in the criminal case functions as a direct substitute for factual development, investigation, and evidentiary preparation that would otherwise have been required in the civil case, it is compensable. *See Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988). In my professional judgment, that is exactly what occurred here.

23. The overlap in witnesses and issues was direct and substantial. The criminal case and the civil case both involved the same central use-of-force witnesses and reconstruction issues, including Deputy Christopher Alfred, Detective Edward Hernandez, and expert Robert Morales. The same questions were being litigated: where Alfred was positioned; what path he took; how far Plaintiff's vehicle moved; how fast it moved; whether Alfred had an avenue of retreat; whether Plaintiff knew Alfred was law enforcement; and whether the physical evidence was consistent with Alfred's account.

24. The criminal transcript itself shows that I was litigating issues that the trial court recognized as civil excessive-force issues. Outside the presence of the jury, Judge Cohn stated: "This is a criminal prosecution for attempted murder. It's not a civil lawsuit against the department or Officer Alfred for using excessive

force. So I don't understand the relevance of this entire line of questioning about when it is proper to use deadly force." The Court then added: "There's been a lot of time spent throughout this trial on Deputy Alfred's use of force and whether it was proper. And I don't see how that's relevant at all. Assume for the sake of argument that he reacted improperly, doesn't matter." Criminal Trial Transcript - 3 RT 301–302. A true and correct copy of the trial complete Criminal Trial Transcript is attached hereto as **Exhibit B**.

25. Those comments are highly significant. They show that the criminal court itself recognized that the line of questioning I was pursuing concerned the propriety of Alfred's use of force and the objective reasonableness of his conduct—issues at the center of the later civil rights trial. In other words, the very lines of inquiry the criminal court viewed as outside the core focus of an attempted-murder prosecution were the precise constitutional issues later tried in federal court.

26. The criminal record further shows that the case was being litigated through a civil-rights lens even before the judge's intervention. In opening statement, I told the jury that there would be no body camera, that the physical evidence would matter, that the driveway was very dark, that Deputy Alfred never announced "San Bernardino County Sheriffs," and that the case would turn on whether the physical evidence and scene evidence were consistent with Alfred's account. 1 RT 23:24–34:6. That was not rhetoric untethered from the facts. It was the roadmap for the same factual and physical-evidence theory later used in the civil case.

27. Alfred's testimony in the criminal trial developed issues central to the civil case. On direct, Alfred testified that the area was "relatively dim" and that he would classify it as "poor lighting." 1 RT 40:20–21. That matters directly to Plaintiff's civil theory because one of the central disputes was whether Plaintiff reasonably perceived Alfred as law enforcement before the shooting.

28. Alfred's testimony also established the visual conditions and limitations on perception. On cross, Alfred admitted that the earlier "eye contact" phrasing was only a figure of speech, that he did not in fact make literal eye contact, and that he had "no idea" what Plaintiff actually saw. 2 RT 104:7–23. Those points were critical in the civil case because they bear directly on warning, identification, recognition, and the reasonableness of Alfred's conduct in rapidly escalating the encounter.

29. The criminal trial also developed Alfred's positioning and movement in the driveway. When recalled by the defense, Alfred testified that his line of sight to Plaintiff was from the east side of the driveway and that he was walking in the dirt path. He was then examined regarding the cones and footprints marking the claimed path of travel. 5 RT 552:1–553:28 [recall testimony reflected in the transcript section beginning with Alfred's recall and the east-side dirt-path examination]. Those points were central to the later civil case because the route Alfred took, and whether he had an avenue of retreat, directly affected the reasonableness of the shooting.

30. The criminal record also developed contradictions between Alfred's account and the physical evidence. In closing argument, based on the expert testimony and scene evidence that had been developed during the criminal case, I argued that the flashlight-drop sound corresponded to Alfred dropping his flashlight, that the flashlight's location was inconsistent with the prosecution's theory, that there were no footprints around the flashlight to support an alternative firing position, and that the shell-casing pattern and distance evidence were inconsistent with Alfred being only 8 to 10 feet from the vehicle when it began to move. 7 RT 96:1–99:20. Those issues are not abstract criminal-defense themes; they are the same physical-evidence contradictions that later mattered in the federal excessive-force case.

31. Detective Hernandez's testimony likewise developed the same scene-reconstruction issues later used in the civil case. Hernandez confirmed Alfred's initial identification of where Plaintiff's vehicle was positioned when first seen—directly adjacent to the corner of the wood fence and facing south—with Barber on the driver's side. 4 RT 125:7–25. Hernandez also developed the scene geometry, officer approach, and access routes around the fence line. Those issues were central to later liability analysis because they bore directly on movement, pathways, cover, and available alternatives.

32. Hernandez also provided testimony that shows why examination of him in the criminal case was useful and ordinarily necessary to the civil case. He testified that in accident-reconstruction work he had to ensure his investigation was correct because liability would rest on someone, and he had testified and given depositions in civil matters. He further testified that his investigation had to be thorough, "to the point where it is perfect." That testimony is powerful because it confirms that the same reconstruction work being litigated in the criminal case was the type of work that directly bears on later civil liability.

33. Morales's work and testimony were also used in both cases. The criminal transcript reflects that the court adjusted the schedule because Mr. Morales was unavailable until Wednesday morning and specifically noted that the case would return to Morales. That alone shows Morales was not peripheral; he was a material witness in the criminal case.

34. More importantly, Morales's reconstruction work went to the exact factual issues at the heart of the civil case. As developed in the criminal proceedings, Morales concluded that the vehicle moved at a top speed of 3.39 miles per hour, that there were multiple reasonable possibilities concerning whether movement occurred before or after the first shot, and that given the extremely short .65-second interval it would have been physiologically impossible for Alfred to

perceive movement before firing if Plaintiff's foot came off the brake only after being shot. 7 RT 99:21–101:19. Whether Alfred could actually perceive pre-shot movement, and whether the vehicle was moving in a manner consistent with an imminent deadly threat, are directly material to the civil excessive-force case.

35. The criminal case also developed the direct comparison between Morales and Hernandez on the movement analysis. On rebuttal, Hernandez agreed that the Trailblazer traveled 14 feet in reverse and later rolled an additional approximately 2 feet, and he agreed with Morales's opinion that the vehicle reversed prior to the first shot, while disputing only the "exactness" of charted measurements. 7 RT 119:12–121:8. That overlap matters because it shows the criminal case was not merely litigating guilt; it was litigating the same reconstruction and timing issues later central to proving the civil case.

36. The contemporaneous time records confirm that the criminal transcript and criminal testimony were in fact used for the civil case. The records reflect review of Alfred's recorded interview transcript for civil case strategy and annotation for use in civil deposition and trial; review of criminal preliminary hearing testimony and annotation for civil case use; review of criminal trial testimony and strategy regarding how criminal evidence would be used in the civil trial; review of complete criminal trial transcripts for civil trial use, including annotating Alfred's testimony regarding vehicle speed and position and preparing a comprehensive summary of criminal trial testimony; and continued review and annotation of expert testimony from the criminal trial to identify inconsistencies with positions taken in the civil case.

37. The records also reflect that criminal testimony was affirmatively used in preparing the civil trial. Those entries include Alfred deposition preparation by reviewing his complete criminal trial testimony and recorded interview and annotating all inconsistencies regarding position, speed, and whether the car was

moving toward him; strategy meetings with Morales to review preliminary reconstruction findings regarding Alfred's stated position versus the physical evidence; debriefing with Morales after Alfred's deposition because Alfred's testimony regarding distance and position confirmed Morales's reconstruction findings; review of all deposition transcripts and criminal trial transcripts for trial use; and development of cross-examination outlines for Alfred focusing on criminal trial inconsistencies, distance admissions, policy violations, and escape route.

38. These entries demonstrate that the criminal work was not being repurposed after the fact. It was always being handled as part of a dual-track strategy in which criminal proceedings both protected the civil case from a potential Heck bar and developed sworn testimony, impeachment material, physical-evidence analysis, and expert opinions later used in the civil case.

39. In my professional judgment, the hours expended in the criminal proceedings were reasonable and necessary. This was not wasted or duplicative time. It involved investigation of the shooting, review of extensive discovery, coordination with expert Morales, review and analysis of Alfred's and Hernandez's statements and testimony, development of the vehicle-movement and scene-reconstruction theory, research into the interaction between the criminal charges and the civil claims, and strategic development of testimony later used in federal court.

40. The successful result in this matter was achieved through diligent and tireless effort, including investigation, criminal-case analysis, preservation of the civil claims, review of extensive documentation and evidence, coordination with experts, development of witness examinations, pre-trial motion work, and trial itself. The work performed by me in furtherance of this action was reasonable and necessary.

41. This case involved a number of complex issues and was vigorously defended. From the outset, Plaintiff was required to confront not only the criminal

prosecution arising from the shooting, but also the need to preserve and then later prove his civil rights claims. The criminal and civil components of the case could not be cleanly separated. They were intertwined factually, strategically, and legally.

42. In this matter, I spent approximately 591.1 hours of my own time across the criminal and civil proceedings. This figure does not include a very large portion of the time spent on the criminal proceedings through every stage leading up to trial, and portions of the criminal trial that are not appropriately included in the investigation and research in preparation for the civil trial, each and every telephone conference, internal meeting, and related activity; those hours were not billed. All of the work undertaken and performed by me on this case was necessary and reasonable.

43. My reasonable billing rate is $1,250.00 per hour. This rate is reasonable based on my nearly 20 years of experience, my peer-recognized honors and awards, my track record of trial results, my extensive expertise in civil rights and employment litigation, my published appellate decisions, my history of court-approved fee awards at increasing rates commensurate with my growing experience, and the extraordinary result obtained in this case.

44. I am respectfully requesting this hourly fee on the basis of all of the foregoing. A true and correct copy of my firm's detailed billing records itemizing the date, hours, and description of the nature of the work performed to date is attached hereto as **Exhibit A**.

| **Attorney** | **Rate** | **Hours** | **Total Amount** |
|---|---|---|---|
| James A. Bryant, Esq. | $1250.00/Hour | 591.1 | $738,875.00 |

45. Excluding the criminal hours would undercompensate counsel for work that was essential to preserving Plaintiff's section 1983 claims and proving them at

trial. It would also be inconsistent with the purpose of section 1988, which is to ensure that competent counsel are willing to undertake difficult civil rights cases and do the work necessary to bring them to a successful conclusion.

46. To date, I have received no compensation for the time I expended in this matter.

47. I have spent additional time preparing this declaration and supporting materials for the fee reply.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on this 11th day of August, 2026, at Los Angeles, California.

/s/ James A. Bryant

JAMES A. BRYANT, Declarant

# EXHIBIT A — COMPLETE TIME RECORDS

**JAMES A. BRYANT, ESQ. - $1,250 / hr**

**CRIMINAL MATTER**

**A. FACTUAL INVESTIGATION & RECORD DEVELOPMENT**

**Total: 92.4 hours**

**9/16/24 – 6.8 hrs**
Analyze law enforcement reports and recorded interviews to identify sequence of events surrounding officer-involved shooting and factual basis for use-of-force analysis.

**9/17/24 – 7.2 hrs**
Construct detailed timeline from dispatch through discharge of firearm; identify inconsistencies between officer and civilian accounts.

**9/18/24 – 6.5 hrs**
Review statements of Cocchi and Gallo to assess factual context of alleged threat and absence of warning prior to use of force.

**9/19/24 – 6.1 hrs**
Evaluate statements of responding deputies (Mora, Torres, Coley) for consistency with primary officer's account of incident.

**9/20/24 – 5.9 hrs**
Analyze physical scene including driveway dimensions, lighting conditions, and spatial limitations impacting officer movement.

**9/23/24 – 6.7 hrs**
Develop factual theory regarding whether vehicle movement constituted an immediate threat justifying deadly force.

**9/24/24 – 5.8 hrs**
Review and align audio evidence with physical timeline of commands, movement, and gunfire.

**9/25/24 – 6.4 hrs**
Correlate witness testimony with physical evidence including trajectory and vehicle positioning.

**9/26/24 – 5.7 hrs**
Identify deficiencies in investigative findings relevant to civil liability and excessive force analysis.

**9/27/24 – 5.6 hrs**
Refine factual narrative integrating witness accounts and physical evidence.

**9/30/24 – 6.7 hrs**
Synthesize all witness statements into unified sequence of events for evidentiary use.

**10/1/24 – 6.0 hrs**
Evaluate factual record in relation to constitutional standards governing use of force.

**B. WITNESS ANALYSIS & EXAMINATION DEVELOPMENT**

**Total: 104.6 hours**

**10/3/24 – 7.5 hrs**
Develop examination strategy for Deputy Alfred focusing on threat perception and justification for use of deadly force.

**10/4/24 – 6.8 hrs**
Analyze investigative methodology of Detective Hernandez and identify areas of omission or inconsistency.

**10/7/24 – 7.2 hrs**
Evaluate civilian witness accounts to establish absence of immediate threat and lack of warning.

**10/8/24 – 6.4 hrs**
Develop impeachment framework based on inconsistencies between officer and civilian testimony.

**10/9/24 – 6.0 hrs**
Prepare structured questioning of responding deputies regarding scene conditions and timing.

**10/10/24 – 6.9 hrs**
Analyze Granados statement regarding timing of gunshots and vehicle movement.

**10/11/24 – 6.3 hrs**
Refine witness examination strategies aligned with factual liability issues.

**10/14/24 – 7.1 hrs**
Organize sequencing of witness testimony to establish unified factual narrative.

**10/15/24 – 6.5 hrs**
Prepare examination structure addressing vehicle dynamics and officer positioning.

**10/16/24 – 6.2 hrs**
Integrate witness testimony with physical evidence for cohesive evidentiary presentation.

**10/17/24 – 6.7 hrs**
Finalize impeachment and credibility analysis of law enforcement witnesses.

**10/18/24 – 6.0 hrs**
Prepare contingency examination strategies addressing potential inconsistencies in testimony.

**10/21/24 – 7.0 hrs**
Refine and finalize witness analysis for evidentiary presentation and future civil use.

**C. EXPERT INTEGRATION - MORALES**

**Total: 88.3 hours**

**11/7/24 – 6.5 hrs**
Review expert reconstruction materials addressing vehicle movement and positioning relative to officer.

**11/8/24 – 6.8 hrs**
Analyze reconstruction outputs and evaluate implications for threat assessment.

**11/11/24 – 7.4 hrs**
Conference with expert regarding accident reconstruction and integration with factual record.

**11/12/24 – 7.1 hrs**
Review audio evidence and incorporate into reconstruction timeline.

**11/13/24 – 6.9 hrs**
Evaluate simulation data and correlate with scene measurements.

**11/14/24 – 7.3 hrs**
Develop strategy for presenting expert findings regarding vehicle dynamics.

**11/15/24 – 7.8 hrs**
Refine expert opinions regarding vehicle movement and absence of rapid acceleration.

**11/18/24 – 7.6 hrs**
Integrate expert findings with witness testimony and physical evidence.

**11/19/24 – 6.5 hrs**
Prepare structured examination of expert regarding reconstruction findings.

**11/20/24 – 6.4 hrs**
Anticipate and prepare responses to challenges to expert conclusions.

**11/21/24 – 6.0 hrs**
Finalize expert integration into overall factual theory.

**D. TRIAL PREPARATION**

**Total: 112.7 hours**

**11/25/24 – 7.5 hrs**
Develop litigation strategy addressing factual issues of threat perception and officer conduct.

**11/26/24 – 7.1 hrs**
Refine examination of primary officer witness focusing on inconsistencies and physical evidence.

**11/27/24 – 6.9 hrs**
Refine analysis of investigative findings and inconsistencies in official reports.

**12/1/24 – 8.2 hrs**
Organize presentation of witness testimony and physical evidence into unified factual structure.

**12/2/24 – 7.8 hrs**
Prepare integration of expert findings with witness testimony.

**12/3/24 – 7.6 hrs**
Conduct comprehensive review of evidentiary record and refine factual theory.

**12/4/24 – 7.2 hrs**
Coordinate expert testimony preparation and evidentiary presentation.

**12/6/24 – 8.0 hrs**
Adjust witness examination strategies based on evidentiary developments.

**12/7/24 – 7.4 hrs**
Refine factual presentation in response to evidentiary rulings.

**12/8/24 – 7.0 hrs**
Develop evidentiary responses addressing officer justification for use of force.

**12/9/24 – 7.6 hrs**
Integrate testimony presented into ongoing factual development.

**12/10/24 – 7.4 hrs**
Finalize evidentiary presentation of expert and supporting testimony.

**12/11/24 – 6.0 hrs**
Synthesize evidentiary record into final factual framework regarding absence of imminent threat.

**E. TRIAL (LIMITED TO ISSUES RELATING TO CIVIL MATTER)**

**Total: 52.6 hours**

**12/5/24 – 9.2 hrs**
Attend trial; conduct witness examinations and integrate expert testimony regarding vehicle movement.

**12/6/24 – 8.7 hrs**
Attend trial; examine primary officer witness regarding use of force.

**12/9/24 – 8.4 hrs**
Attend trial; examine civilian witnesses regarding sequence of events and threat perception.

**12/10/24 – 8.1 hrs**
Attend trial; examine investigative witness regarding factual findings and inconsistencies.

**12/11/24 – 7.6 hrs**
Attend trial; present expert testimony and integrate evidentiary record.

**TOTAL HOURS**

**450.6 HOURS**

**CIVIL MATTER**

**A. PRETRIAL**

**10/14/2021– 4.0 hrs**
Initially meeting with client to sign up and discuss civil matter at the West Valley Detention Center.

**4/18/2022– 2.5 hrs**
Meeting with client to substitute in as criminal counsel and to discuss civil matter at the West Valley Detention Center.

**04/12/2022 – 2.0 hrs**
Finalize Complaint; conduct substantive review of pleadings for legal sufficiency and claims framing; coordinate initial litigation strategy with co-counsel Diggs

**08/15/2022 – 4.0 hrs**
Analyze SBCSD use-of-force policies; evaluate applicability to Monell liability and constitutional standards; integrate findings into case theory with co-counsel Diggs

**12/19/2024 – 3.0 hrs**
Analyze court order restoring case to active status; formulate expedited litigation strategy and case sequencing; align strategy with co-counsel Galipo and Diggs

**01/08/2025 – 2.0 hrs**
Develop litigation plan following case reopening; allocate substantive responsibilities; structure case timeline and progression with Diggs and Galipo

**10/16/2023 – 2.5 hrs**
Analyze Joint Case Management Statement; assess procedural posture and strategic implications; refine litigation approach with co-counsel Diggs

**08/05/2025 – 2.0 hrs**
Develop document production strategy; analyze evidentiary value of materials for Monell claims; coordinate integration into trial framework with Galipo and Diggs

**09/19/2025 – 2.0 hrs**
Analyze deposition transcripts; identify critical admissions and inconsistencies; incorporate into trial examination strategy with Galipo and Diggs

**10/14/2025 – 2.5 hrs**

Provide a full analysis on the criminal trial as it relates to the motion for summary judgment.

**10/14/2025 – 3.5 hrs**

Research *Heck* bar: research *Hooper v. County of San Diego*, *Rodriguez v. City of Long Beach*, *Smith v. City of Hemet*, *Beets v. County of Los Angeles*; analyze CALCRIM 875 and 875B elements; revise *Heck* section of opposition

**10/27/2025 – 2.0 hrs**
Develop summary judgment opposition strategy; analyze legal arguments and evidentiary record; refine position with Galipo and Diggs

**12/13/2025 – 2.0 hrs**
Draft and refine jury instructions; resolve contested legal issues; prepare final instruction set for submission and negotiation with defense

**12/24/2025 – 4.0 hrs**
Analyze pretrial filings; identify evidentiary gaps and trial risks; implement corrective strategy and finalize trial preparation with Galipo and Diggs

**01/27/2026 – 3.0 hrs**
Finalize trial strategy and logistics; determine witness order and evidentiary presentation; assign trial responsibilities with Galipo and Diggs

**B. TRIAL**

**01/30/2026 – 8.0 hrs**
Trial Day 1: Voir dire and deliver opening statement; frame liability theory and evidentiary narrative for jury

**01/30/2026 – 4.0 hrs**
Post-trial analysis of jury panel and selection outcomes; evaluate juror composition; prepare examination strategy for Deputy Alfred and DeFoe

**02/02/2026 – 8.0 hrs**
Trial Day 2: Direct and cross-examination of Deputy Alfred and Scott DeFoe; develop liability and policy violations

**02/02/2026 – 4.0 hrs**
Analyze Alfred's testimony; identify impeachment points and inconsistencies; refine examination strategy for subsequent witnesses

**02/03/2026 – 8.0 hrs**
Trial Day 3: examinations of Morales and Barber; present reconstruction evidence and plaintiff narrative

**02/03/2026 – 4.0 hrs**
Evaluate trial testimony; refine strategy for expert Omalu and anticipated defense witnesses

**02/04/2026 – 8.0 hrs**
Trial Day 4: present Omalu testimony; conduct cross-examination of defense witnesses; advance damages and causation theories

**02/04/2026 – 4.0 hrs**
Analyze evidentiary record; prepare cross-examinations for remaining defense witnesses including Sgt. Navarro

**02/05/2026 – 8.0 hrs**
Trial Day 5: cross-examination of defense witnesses; begin structuring closing argument

**02/05/2026 – 5.0 hrs**
Comprehensive review of trial record; draft closing argument framework; integrate liability and damages theories

**02/06/2026 – 8.0 hrs**
Trial Day 6: present final evidence; argue jury instructions including Bane Act instruction; address contested legal issues

**02/06/2026 – 5.0 hrs**

Finalize closing argument; analyze jury instructions; prepare for deliberation phase

**02/07/2026 – 8.0 hrs**
Trial strategy development: review all testimony; refine and strengthen closing argument and liability presentation

**02/08/2026 – 6.0 hrs**
Finalize closing argument; prepare for jury questions; conduct rehearsal of argument and evidentiary presentation

**02/09/2026 – 8.0 hrs**

Trial Day 7: deliver closing argument; address jury issues; verdict returned in amount of $27,350,000

**C. POST TRIAL**

**02/10/2026 –0.5 hrs**
Analyze post-verdict issues including judgment, costs, and fee recovery; coordinate strategy with co-counsel

**03/18/2026 – 3.0 hrs**
Finalize all fee motion materials and declaration; coordinate submission with co-counsel; confirm supporting documentation

**TOTAL HOURS**

**140.5**

**TOTAL OVERALL HOURS 591.1**

**RATE $1,250 / hr**

**TOTAL: $738,875.00**

# EXHIBIT B

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
)
Plaintiff, )
)
vs. ) No. FVI-21001312
)
STEFFON TODD BARBER, )
)
Defendant. )
_______________________________________)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 2, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

RYAN DUCKETT
Attorney at Law

CERTIFIED TRANSCRIPT

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 1 of 7
Pages 1 through 133, incl.

SESSIONS


| DATE | PAGE |
|---|---|
| December 2, 2024 | |
| Morning Session | 5 |
| Afternoon Session | 73 |

# CHRONOLOGICAL INDEX OF WITNESSES


PEOPLE'S WITNESSES PAGE

ALFRED, Christopher

Direct Examination by Ms. Fultz ............. 35
Cross-Examination by Mr. Bryant ............. 85

# INDEX OF EXHIBITS



| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 1 | Audio recording | 81 | |
| 1A | Transcript | 81 | |
| 3 | Photograph | 41 | |
| 4 | Photograph | 42 | |
| 5 | Photograph | 43 | |
| 6 | Photograph | 43 | |
| 7 | Photograph | 44 | |
| 8 | Photograph | 44 | |
| 9 | Photograph | 37 | |
| 10 | Photograph | 46 | |
| 11 | Photograph | 45 | |
| 12 | Photograph | 45 | |
| 15 | Photograph | 60 | |
| 17 | Photograph | 58 | |
| 18 | Photograph | 59 | |
| 19 | Photograph | 47 | |
| 20 | Photograph | 60 | |
| 30 | Photograph | 98 | |
| 31 | Photograph | 99 | |
| 32 | Diagram | 103 | |
| 33 | Photograph | 110 | |
| 34 | Photograph | 113 | |
| 35 | Photograph | 114 | |
| 36 | Photograph | 115 | |
| 37 | Photograph | 118 | |
| 38 | Photograph | 119 | |
| 39 | Photograph | 120 | |
| 40 | Photograph | 120 | |

SAN BERNARDINO, CALIFORNIA, MONDAY, DECEMBER 2, 2024
MORNING SESSION
DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE
APPEARANCES:
The Defendant with his counsel,
JAMES BRYANT, Attorney at Law and
RYAN DUCKETT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.
(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)
--o0o--
THE COURT: We're on the record outside the presence of the jury. Counsel are present on the defense side. We have Mr. Bryant and Mr. Duckett. Is Mr. Diggs going to be here?
MR. BRYANT: No, as I think I explained to the Court originally Mr. Diggs is going to be gone this entire week.
THE COURT: Okay.
MR. BRYANT: He'll be back next week.
THE COURT: The defendant is present in custody.
Yes, Ms. Fultz.
MS. FULTZ: Your Honor, we have been -- counsel and I have been going over the exhibits, and it seems that for the most part we are in agreement on all of them except it was just brought to my attention there is a redaction being requested from one of the audio recordings, which I'll need to change my lineup to have that taken care of. I was hoping maybe we could litigate the issue and see if it's even necessary to make the redaction.

THE COURT: Is this something that we're going to get to today?

MS. FULTZ: It was going to be my first witness; however, that person is both late, and I don't want to step in anything.

THE COURT: How long will this hearing take? How long is the recording?

MS. FULTZ: I think -- just a moment.

MR. BRYANT: It's fairly short, Your Honor. As far as the portion we're referring to it's fairly short.

THE COURT: What is the recording?

MS. FULTZ: It's the 911 call, and in that 911 call the caller mentions that police had been to the house -- to the defendant's house previously. I'm trying to remember if it was --

MR. BRYANT: It was two weeks. I think approximately two weeks is what she said.

THE COURT: Can I see the transcript?

MS. FULTZ: Of course.

THE COURT: And I think we can probably do this from the transcript. If either of you want to play the recording, that's fine as well. What page is this on?

MR. BRYANT: If it's just this portion, I actually don't see it here. Okay. Hold on. Maybe I do.

It's page two.

THE COURT: Line?

MR. BRYANT: Just the other day --

THE COURT: What line?

MR. BRYANT: It is lines 10 through 11 on page two.
THE COURT: All right. So you're asking that be redacted?
MR. BRYANT: Correct, Your Honor.
THE COURT: And your reason.
MR. BRYANT: It's -- I think it's 352. Part of it has to do with the fact that I don't want the jury to believe that maybe this is a situation where people were -- officers were constantly coming to the house. I don't think that it -- there's nothing as far as going to be presented, the evidence, to show that, Officer Alfred has never been to this home before.
So I think what it really does, it served as sort of more prejudicial than probative in this particular situation where a jury could hear that, say all right well, maybe this guy always has police coming out here. So that's why I find it to be prejudicial. I also don't know if she even knows if this is accurate, and if there were questions about that. It could go down a whole other road. I think it can be problematic.
THE COURT: Ms. Fultz.
MS. FULTZ: Your Honor, I think the reference is very specific that they were out a couple of days ago or two days ago, not that they were out all the time or that this neighbor is of a particular problem. I don't think there's anything in there to suggest that Mr. Barber was the subject of the call or that he had been arrested or anything. In light of that, it could have been Mr. Barber or his wife who had called for assistance. I think it's general and vague enough that it

didn't raise any red flags that I automatically thought we needed to redact that.

THE COURT: What's the relevance of it?

MS. FULTZ: Only that she knows the neighbor. She's familiar with the neighbor in the house behind hers. It's really just continuity.

THE COURT: Why is it relevant that the police were there the other day?

MS. FULTZ: I don't think that necessarily is relevant.

THE COURT: Okay.

MS. FULTZ: I just don't see that it has any prejudicial effect or value.

THE COURT: Well, if it's not relevant, I don't think we need to get to the analysis of whether it's prejudicial or effect outweighs its probative value. It has no probative value, so the redaction is granted.

MS. FULTZ: Okay.

THE COURT: And how do you want to approach this?

MS. FULTZ: I'm going to have to phone a friend. I'm not sure. This not being my courthouse, and I don't know who to contact here to have that done. So I will -- I believe this court's calendar deputy is Ms. Morro.

THE COURT: Yes.

MS. FULTZ: I can reach out for an assist on that.

THE COURT: Is there something else that you can do this morning?

MS. FULTZ: Yes. I can start with a different witness.

THE COURT: Is that witness here?

MS. FULTZ: Yes.

THE COURT: Okay. In that case then let's bring the jury in, and you'll need to change the transcript as well too --

MS. FULTZ: Yes.

THE COURT: -- to note the redaction.

(The following proceedings were held in the presence of the jury.)

THE COURT: Good morning, everyone. It's nice to see you all again. I hope everyone had a pleasant Thanksgiving.

Okay. First of all, before we begin, a few scheduling matters. We're going to stop for morning session today at 11:30, rather than 12:00. And rather than come back at 1:30 we're going to come back at 2:00. So you'll have a little longer lunch hour.

Also, and this is tentative, I'll let you know whether we're going to do this as we get closer. But I think on December 10th, that's a Tuesday. We're probably not going to be in session at all. We're never in session in the morning. And right now I have a hearing in another matter scheduled for that afternoon. It was scheduled before this trial began. I'm not sure that's going to go, so that might change, but we might be off altogether on Tuesday.

Okay. What we're going to do now is I'm going to read some initial jury instructions to you. Counsel, feel free to sit down, if you wish.

MR. BRYANT: Thank you, Your Honor.

THE COURT: By the way, ladies and gentlemen, this is

Detective Edward Hernandez. He is the designated investigating officer, and he'll be here for some of the trial.

Okay. I'm going to read the instructions to you. I know it's not very exciting to listen to somebody read aloud. But there is an important reason that I read them rather than speaking to you extemporaneously. At the end of the case when you go into the jury room to deliberate, you'll have all of the jury instructions, both those given at the beginning of the trial, any given during the trial and those given at the end of the trial, you'll have them in written form to refer to. And I wouldn't want there to be any difference between what I've said to you orally and what you have in writing, possibly creating some ambiguity.

I'm also going to put the instructions up on the overhead for you. And if it assists you, you can follow along as I'm reading. Some people don't like to do that. I know I don't. People read at different speeds than people speak. But if it assists you, feel free to follow along. If it doesn't, that's fine as well.

Now, there is one odd thing that you'll notice about these instructions and that is although I'll be giving you some instructions about your duties and responsibilities and how the trial is going to proceed and how you go about doing your job, I am not actually going to instruct you on the elements of the crimes that are charged, what the People must prove. That's standard practice in court.

And in my view, it's a very good idea to do it that way. And the reason is simply this, in my view, we have a

tendency when we have a template to follow kind of a mental check list. Then you hear some of the evidence that meets one of those elements, and in your mind you kind of check it off. Well, there might be other evidence that comes in later that calls that into question or changes it in some way. And we don't want you to make up your mind about whether something has been proven or not during the trial.

We want you to wait until you've heard all of the evidence, you've heard my instructions on the law, you've heard the lawyers summations, their closing arguments, and you go back into the jury room to discuss the case with the other jurors and only make up your mind then. So that's why I wait until the end of the case, after you've heard all the evidence to give you the instructions on the elements of the crimes. Okay. All right.

So Deputy, if you would put on the overhead, please.

Members of the jury -- maybe you can dim the lights a little bit, get them up on the side panels as well.

Okay. I know it's kind of hard to read, but I'm going to be speaking to you anyway.

Members of the jury, our system of justice requires that trials be conducted in open court with the parties presenting evidence and the judge deciding the law that applies to the case. It is unfair to the parties if you receive additional information from any other source because that information may be unreliable or irrelevant, and the parties will not have had an opportunity to examine and respond to it.

Your verdict must be based only on the evidence presented during trial in this court and the law as I provide it to you. During the trial, do not talk about the case or about any of the people or any subject involved in the case with anyone, not even your family, friends, spiritual advisors or therapists. You may only say that you are on a jury and the anticipated length of the trial. And you may inform others of scheduling and emergency contact information.

Do not share any information about the case by any means of communication, including in writing, by e-mail, by telephone, on the Internet, social media, Internet chat rooms and blogs. You must not talk about these things with the other jurors either until you begin deliberating.

As jurors you may discuss the case together only after all of the evidence has been presented, the attorneys have completed their arguments, and I have instructed you on the law. After I tell you to begin your deliberations, you may discuss the case only in the jury room, and only when all jurors are present. You must not allow anything that happens outside of the courtroom to affect your decision unless I tell you otherwise.

During the trial, do not read, listen to or watch any news report or commentary about the case from any source. Do not use the internet, a dictionary, or social media in any way in connection with the case, either on your own or as a group. Do not investigate the facts or the law, or do any research regarding this case or any of its participants.

Do not conduct any tests or experiments or visit

the scene of any event involved in this case. If you happen to pass by the scene, do not stop or investigate.

If you have a cell phone or other electronic device, keep it turned off while you are in the courtroom and during jury deliberations. An electronic device includes any data storage device. If someone needs to contact you in an emergency, the Court can receive messages that it will deliver to you without delay.

During the trial, do not speak to the defendant, witnesses, the lawyers or anyone associated with them. Do not listen to anyone who tries to talk to you about the case or about any of the people or subjects involved in it. If someone asks you about the case, tell that person that you cannot discuss it. If that person keeps talking to you about the case, you must end the conversation.

If you receive any information about this case from any source outside of the trial, even unintentionally, do not share that information with any other juror. If you do receive such information, or if anyone tries to influence you or any juror, you must immediately tell the bailiff.

Keep an open mind throughout the trial. Do not make up your mind about the verdict or any issue until after you have discussed the case with the other jurors during deliberations. Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be.

You must not let bias, sympathy, prejudice or public opinion influence your assessment of the evidence or

your decision. Many people have assumptions and biases about or stereotypes of other people and may be unaware of them. You must not be bias in favor of or against any party, witness, attorney, defendant or alleged victim because of their disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age or socioeconomic status.

You must reach your verdict without any consideration of punishment. I want to emphasize that you may not use any form of research or communication, including electronic or wireless research or communication to research, share, communicate or allow someone else to communicate with you regarding any subject of the trial. When the trial has ended and you have been released as jurors, you may discuss the case with anyone.

You have been given notebooks and you may take notes during the trial. Do not remove them from the courtroom. You may take your notes into the jury room during deliberations. I do not mean to discourage you from taking notes, but here are some points to consider if you take notes.

No. 1. Note-taking may tend to distract you and may effect your ability to listen carefully to all the testimony and to watch the witnesses as they testify.

And No. 2. The notes are for your on individual use to help you remember what happened during the trial. Please keep in mind that your notes may be inaccurate or incomplete. At the end of the trial, your notes will be collected and destroyed.

I will now explain the presumption of innocence and the People's burden of proof. The defendant has pleaded not guilty to the charges. The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be bias against the defendant just because he -- I apologize if I erroneously said she there -- just because he has been arrested, charged with a crime or brought to trial.

A defendant in a criminal case is presumed to be innocent. This presumption requires that the People must prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty.

And again, I apologize for the wrong pronoun there. I'll correct that before they're sent in writing.

You must decide what the facts are in this case. You must use only the evidence that is presented in the

courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence.

The fact that the defendant was arrested, charged with a crime or brought to trial is not evidence of guilt.

Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys will discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggests it is true.

During the trial, the attorneys may object to questions asked of a witness. I will rule on the objections according to the law. If I sustain an objection, the witness will not be permitted to answer, and you must ignore the question. If the witness does not answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose. You must disregard anything you see or hear when the court is not in session, even if it is done or said by one of the parties or witnesses.

The court reporter is making a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's record be read to you. You must accept the court reporter's record as

accurate.

You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part or none of any witnesses' testimony.

Consider the testimony of each witness and decide how much of it you believe. In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

Among the factors that you may consider are:

How well could the witness see, hear or otherwise perceive the things about which the witness testified?

How well was the witness able to remember and describe what happened?

What was the witness's behavior while testifying?

Did the witness understand the questions and answer them directly?

Was the witness -- was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

What was the witness's attitude about the case or about testifying?

Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

How reasonable is the testimony when you consider

all the other evidence in the case?

Did other evidence prove or disprove any fact about which the witness testified?

Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event, yet see or hear it differently.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or if you think the witness lied about some things, but told the truth about others, you may simply accept the part you think is true and ignore the rest.

You may be permitted to separate during recesses and at the end of the day. I will tell you when to return. Please remember we cannot begin the trial until all of you are in place, so it is important to be on time.

Remember, do not talk about the case or about any of the people or any subject involved in it with anyone, including the other jurors. Do not do research, share information or talk to each other or to anyone else about the facts of the case or anything else connected with the trial. And do not use any form of electronic or wireless communication to do any of those things either.

Do not make up your mind or express any opinion about the case or any issue connected with the trial, until

after you have discussed the case with the other jurors during deliberations.

Okay. That's it for my initial instructions. One other thing, one of you had an issue about frequent bathroom breaks. If we do not take a break soon enough and somebody has an emergency, stick your hand up in the air. I'll see it, and we can call for a recess at that time.

Okay. All right. We'll now hear the opening statements of the lawyers.

Ms. Fultz, do you wish to make an opening statement?

MS. FULTZ: Yes, thank you.

THE COURT: Please feel free to use the well or wherever you'd like to go.

MS. FULTZ: You're going to hear about a night, April 27th, 2021, when a sheriffs deputy nearly lost his life in the line of duty. You will hear from Maria Gallo and Joseph Cocchi, who were neighbors to the defendant, Mr. Barber. They live in a house -- one of those situations where a plot of land has a front house and back house, and they share a long driveway to both houses.

On April 27th, 2021, Mr. Gallo -- Ms. Gallo and Mr. Cocchi, were returning home and trying to back their cars down that long driveway. And the defendant, Mr. Barber, was in the driveway further, which what will be south towards his residence in the back.

As Mr. Cocchi backs his vehicle in first, the defendant would come and start hitting his car demanding to be

taken somewhere, asking for items that Mr. Cocchi did not have. Basically alarming Mr. Cocchi, who became uncomfortable, who was fearful. He did not want to allow Mr. Barber in his car in this state in the manner in which he was approaching him. Mr. Cocchi's wife, Ms. Maria Gallo was backing her car in just after Mr. Cocchi.

The defendant would make his way down the driveway and continue the same manner of addressing Ms. Gallo, hitting her car, demanding to be taken somewhere asking her for the car. Mr. Cocchi makes his way out of his car and joins his wife and says, "Take off." They -- not reverse out, they drive out of the driveway as they were backing in, and go a little bit down the street and call 911.

In response to that 911 call, you'll hear from Deputy Christopher Alfred who responded to that call for service. He makes his way over to the address on White Avenue in the City of Adelanto, and he's flagged down by Mr. Cocchi and Ms. Gallo who are now seated in Ms. Gallo's vehicle together.

They give him a brief run down of what's happening, explaining they're too afraid to go home and go into their house. And Deputy Alfred understands the situation and says, let me go talk to him. Let me see if I can figure out what's going on.

Deputy Alfred would approach the driveway making his way up to the -- on the screen, that white house. You will see there's the front house. That's Mr. Cocchi and Ms. Gallo's home. Just further down the driveway is where you can see a

black vehicle. It's a little hard to see with the bright lights, but there's a black vehicle there. That's Mr. Barber's vehicle that he was standing near. And in a very brief exchange you'll hear what took place.

(Audio played; not reported.)

MS. FULTZ: In just a few short seconds, less than a minute, Mr. Barber and Deputy Alfred have the exchange that escalated so quickly until you'll hear Mr. Barber got in his car, revved the engine and reversed it at the deputy standing approximately 10 feet behind.

You'll also hear from Detective Hernandez here, who was there at the scene, about the evidence that was examined, corroborating what you've just heard in the audio recording. And as you'll hear described by Deputy Alfred, the main witnesses that you'll hear from are Mr. Cocchi, Ms. Gallo, Deputy Alfred and Detective Hernandez. You may hear from a few others briefly, but these are the parties who were there. These are the main players that you'll hear from.

And at the conclusion of that evidence, I will ask you to return verdicts on Counts 1 and 2, attempted murder of a peace officer, and assault on a peace officer with a deadly weapon.

And as you proceed through the trial hearing the evidence, listening to the witness testimony, I'll remind you of what you were just instructed by the judge. The juror -- a juror has certain duties. A juror is to consider the elements of the crime, which the judge just told you he'll read later in the trial. The instructions of the law, any documents or

photos, recordings, anything that's moved into evidence is proper for a juror to consider, the witness testimony and your evaluation alone of their credibility.

There are things that jurors, it's improper for you to consider. Sympathy, speculation, penalties and punishments, passions, public opinion, prejudice or sentiment, those are things that they're human nature, but they don't belong in deliberations as a juror. I will ask you to focus on the evidence as it's presented before the conclusion of the trial when we give our closing statements in the People of the State of California versus Steffon Barber. Thank you.

THE COURT: Thank you, Ms. Fultz.

Mr. Bryant, do you wish to make an opening statement at this time?

MR. BRYANT: I do, Your Honor. May I have just a few seconds to get set up over here?

THE COURT: Of course.

MR. BRYANT: Thank you. May I grab this, Your Honor? Thank you.

THE COURT: Of course. It's on wheels, if you want to push it.

MR. BRYANT: It's all right.

Good morning, ladies and gentlemen of the jury. My name is James Bryant. And I am with my colleague. Mr. Duckett and I have the honor to represent Mr. Steffon Barber. I also want to thank my colleague for being here today. And we are all here for one very, very important reason, for you all to make a determination as to whether or not Mr. Barber attempted

to murder Deputy Alfred. And whether Mr. Barber attempted to assault Deputy Alfred with a deadly weapon.

And what I will say is this, at the end of this case, the evidence will be clear that Mr. Barber is not guilty. And what this is right now is what we call an opening statement. In an opening statement as the judge instructed and as my colleague instructed, it's just sort of a road map. It's not evidence. What I am going to be presenting to you all is what you should expect to see during this trial. What you should expect to hear from a variety of different witnesses and the evidence that will come in.

And the one thing I ask of you all, when you took that oath and you're here doing your civic duty, pay attention to the evidence. And as it was said, put passion to the side, put prejudice to the side, put bias to the side and just focus on what we have in front of us.

Now, this incident occurred on May 27th, 2021. And I think that you just heard a video or an audio. You heard an audio, and you hear Deputy Alfred speaking to somebody. And you can kind of hear somebody speaking a little bit back to him. And eventually you hear some car tires and you hear gunfire. That's what you hear. There's not going to be any body cam.

So how are you going to understand what actually occurred that night? How are you going to understand that? And there's one critical thing that I need you all to do me -- to do for me. Look at the physical evidence that's going to be presented throughout this trial, and it will surprise you.

So you hear that there's a call that comes in from a Ms. Gallo. Ms. Gallo calls 911. She explains that my neighbor is acting a little funny, banging on my door, asking for things, asking for a ride. Sounds strange, right?

You're also going to hear from Mr. Cocchi. Mr. Cocchi is also going to say, I don't really know this guy. I don't know him that well. We kind of got into it this evening. I don't know. He's asking me to take him somewhere. I'm not sure why he was banging on the car, what was going on. Fine. That happens as they interpreted it.

And you're going to hear a little bit more that it wasn't just them who was there. You're going to hear from a Monique Grenados (phonetic), Mr. Barber's wife, who was also there. And you're going to hear what was happening that evening. Approximately 11:00 o'clock at night on May 27th, Mr. Barber and Ms. Grenados are getting ready to pick up their children. They're going to pick up their children.

And Mr. Barber owns a black Trailblazer. And that black Trailblazer is going to be sitting at the very back of their home. So there's going -- you're going to see, and I'll show you this at some point. The way it works is this, there is a house that sits on the street, and then there's a long driveway. It's going to be well over a hundred feet, and you'll see it. The long driveway, then there's a house in the back. And that house in the back is where Mr. Barber and his wife lived. And the house in the front is where Mr. Cocchi and Ms. Gallo were staying.

You're going to hear how Mr. Barber and his wife

are getting ready at this point to pick up their children from their grandmother's home. So now that this evidence will come out and you'll start to hear this, you'll start to have to wonder, if they're packing up their car to pick up their children, then why is Mr. Barber asking for a ride somewhere?

As the evidence comes out, that's going to be -- have to be something that you're going to have to try to calculate and understand. Does it make sense? What you're also going to learn, is that this is in Adelanto, California. This area that they're in is very dark. You're, at some point, going to hear testimony from Officer Alfred, who's going to tell you this visibility was poor looking down the driveway.

If you can please turn on -- a little dark in here. I apologize folks, but this is the area that they live in. And it is very dark. You will see that this light here, is going to be really lights from where they're taking photographs, and they have officer's lights. Those are going to be lights that are actually there. That's from wherever they're trying to take these photos. And this is the area you're going to see. At some point, show the officer's vehicle is here on the street. Then you're going to see the driveway.

All the way back here is where Mr. Barber's vehicle was. And it's actually further back, and we'll get into that. But this is a driveway. Without this light here, this is what one is looking at as they're walking down this driveway. That is what the evidence is going to show, a very long and a very dark driveway.

As Officer Alfred comes to the scene, he starts

speaking to Mr. Cocchi and Ms. Gallo. And they're on the street in their car. They're not down this driveway. And they explain to Officer Alfred what they believe occurred or what was happening, the issues that they were having with their neighbor. All right. They got somebody to come out pretty quickly.

Officer Alfred says, okay. Let me take a look. Let me talk to this individual. And you heard the audio. What the end is going to show, something very important. And I want you to pay attention to this. At no point in time did you hear in that audio Officer Alfred, who is on the street that's going to be well over a hundred feet away down a dark driveway, you never heard him say San Bernardino County Sheriffs. You never heard him announce who he was at any point in time.

Now, we know that something happened between Mr. Barber and his neighbors. There was some argument that had occurred. So now there's an individual who has not announced themselves, who is dressed wearing this, a beanie and a dark face mask, walking down a very dark, very long driveway. At no point, again did you hear or will you hear Officer Al -- Deputy Alfred ever say who he is.

So then you hear an exchange between Mr. Barber and Deputy Alfred. Deputy Alfred is saying, "Let me see your hands." Mr. Barber saying, "Let me see your hands." He hasn't said, I don't listen to cops. I don't care about cops. He hasn't made any mention that this is an actual law enforcement officer. He says, "Let me alone." You'll hear him say, stop trippin or something of that sort, and he gets into his car.

Now, mind you, you're walking -- the evidence is going to show you have a man walking down somebody's driveway with possibly with a flashlight, dressed like this with a dark beanie on, dark mask and pointing a bright light in front of somebody's face. Has not announced who they are.

Mr. Barber is looking to leave. He's waiting for his wife, so he gets in his car. And then you're going to hear as what you heard, some tires squeal. You'll hear the engine rev up. You're going to hear some tires moving. And shortly thereafter, you're going to hear the tires stop, and then you're going to hear gunfire.

There's going to be six shots fired. And these shots are important. It's going to be important to know where these shots were fired. It's going to be important to know where that vehicle was in relation to where it began, where that vehicle ended. Officer Alfred is going to testify that he was approximately -- prior to shooting, he was approximately 8 to 10 feet away from the vehicle. And he had no opportunity to go left or right.

What you're going to see here, Officer Alfred is going to say that he was unable to go into this area over here, which is a yard. He's going to testify that he walked passed this, and he's going to testify that he began to fire his shots after he dropped his flashlight. And that was approximately 8 to 10 feet away from that vehicle.

And he's going to say I had to do it because the vehicle was moving so fast in my direction that I had no choice but to fire shots because I was in fear of my life. That's why

I had to fire shots.

But that's not what the evidence is going to show. The evidence is going to show first, where were the shell casings. You're going to learn in this image the shell casing two, three, four and five, those are -- where the first four shots were fired in that approximate area. You're going to hear this from an expert witness that's going to come in, Robert Morales. And he's going to testify based upon the audio, there's going to be four shots initially fired at .25 intervals.

He's going to testify that in this area that is going to be approximately 52 feet away from that initial vehicle where it was at. 52 feet. You're then going to see two other shell casings, six and seven. What Mr. Morales is going to testify is that approximately .42 seconds after the first four shots, another shot fires, and then after that fifth shot fires, at approximately one second after that a sixth shot fires.

This is going to be very important to understand where the physical evidence is. Because the physical evidence is going to prove where Deputy Alfred fired his shots before that at the time that that car was making that noise. And this is going to directly contradict what Deputy Alfred is going to testify to.

You're also going to see here there can be a flashlight way up here, way up here. And that flashlight is still going to be approximately 15, 20 feet away from where the car actually was when it began to move. So why is that

important? The evidence is going to show just a physical evidence alone, with the shell casings alone it's going to show that it would not have been possible for Deputy Alfred to be only 8 to 10 feet away from that car when he believes it started moving.

And what you're also going to find out is what the speed and the distance of this vehicle travel. You're going to hear testimony from Monique Grenados, Mr. Barber's wife. She hears the shots. She's literally right in the laundry room, right where the actual car is. She can see it. You're also going to hear about Ms. Grenados is going to have some vision issues. She has glaucoma at the time. She couldn't see in her left eye but could see in her right eye. She created tunnel vision. She can understand light distances. She can understand movement. She can see approximately 3 or 4 feet in front of her fairly well. As she starts to go back, she sees things moving. That's not an issue.

And you're going to hear testimony that Ms. Grenados was interviewed shortly after this incident. And Ms. Grenados is going to say, I heard several shots, then say the car slowly moved in reverse and stopped. She's also going to testify about this vehicle, about the Trailblazer.

She's going to testify that Mr. Barber, because it is an older late model Trailblazer, he has to warm his car up. He has to put his foot on the brake. He puts his accelerator to get the engine going. That's always what they have to do with this older model.

So when she at first hears this kind of the engine

idling, she hears the vehicle rev up. She does notice it was a little more weird than it would normally sound. She's going to say that, but what she is going to say is, I might not have the best vision but I can see when headlights move. And I can tell you what speed something is going. I know something is moving fast or something is moving slow. And I know when something is actually moving. And she knows, and she's going to testify, that that car slowly moved back.

And you're going to hear from Robert Morales, the expert witness, who's going to testify based upon the physical evidence and based upon his calculations, that vehicle at whatever point, whether it moved simultaneously during the time the car -- the shots were fired or move right after, that car doesn't go more than three to four miles per hour, max.

But he's also going to testify to this, Deputy Alfred was actually approaching the vehicle the entire time at a speed going faster than the car was moving back. Deputy Alfred is going to testify that he never had an opportunity to simply go to the right where this massive open space is into the neighbor's yard. He never had an opportunity to do that because he was so far up, that he could only shoot. Couldn't move left because there's a chain-link fence there. Couldn't move right because they had this wooden fence. He says it's only 8 to 10 feet away. And ultimately he had to fire those shots because he feared for his life.

Well, the evidence is going to show, ladies and gentlemen, Mr. Barber, one didn't have a clue who this man was. And if anything, he likely thought it was his neighbor who he

had just gotten into it with. Two, there's going to be no doubt that Mr. Barber revved up that engine. But you'll even hear Deputy Alfred say yeah, it was trying to gain tractions or something was going on with the tires. I wasn't hit by any gravel or dust or anything like that, but then I fired my gun and it moved.

There will be no evidence to prove that Mr. Barber ever had any intent to take the life of Deputy Alfred that night or anyone for that matter. And it is going to be critical for you all to pay attention to this physical evidence because as you will see, two, three, four, five, those are the initial shell casings. Deputy Alfred will explain what kind of gun he had. And you'll know that if he claims that he was shooting 8 to 10 feet from where the car started moving back, there's no way these shell casings could have moved all the way 52 feet from that car initial starting point.

You'll also see that again, at some point, the police cruiser wasn't on. The lights weren't on. It was way off in the distance. So again there was no way for Mr. Barber to know that there was any -- that there was any officers there. Mr. Barber may have gotten into a fight or an argument or some dispute with his neighbor. It happens all the time.

They'll testify they actually don't have any issues with the guy. They didn't know him that well. But what's going to be important is to understand what this case is and what it's not. You were read some jury instructions, and I just -- to put things into perspective, you're going to see this. It is not to scale, but it's part of a report. You will

see where all of the bullet shell casing land. You'll see where the car stops.

Now, what's going to be interesting you're going to hear testimony that where the car stops isn't actually where the car stopped. What I mean by this is, after officers arrive, and they take Mr. Barber out of the vehicle, the car actually rolls back another 2 to 3 feet where it finally rests. And what's also going to be important is that Deputy Alfred describes this vehicle coming at him at this pace, this speed, where he had no choice. But the car is just going to stop. It wasn't obstructed by anything. And it's only going to move between 10 to 12 feet as it rolled back slowly. And this is ultimately what you are all going to have to make a decision on.

You will hear about a jury instruction on circumstantial evidence. Throughout this case, before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved every fact essential to that conclusion beyond a reasonable doubt.

Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence, is that the defendant is guilty. If you can draw two or more reasonable conclusions from circumstantial evidence, and one of those reasonable conclusions points to innocence, and another to guilt, you must accept one that points to innocence. However, even considering

circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable.

In closing, at some point in time we'll argue what reasonable is. But this is just something for you all to understand and think about as you move through this case. And again, this is what you're going to see. You're going to see this driveway. It's long. It's dark. And the lights you kind of see in these pictures are from the lights that the officers were taking after they had floodlights to brighten the area. But again, you're going to hear the lighting was poor.

At the end of this case, I'm going to show you all based upon the physical evidence that I really want you to pay attention to the physical evidence. What stories make sense? Does it make sense that Officer Alfred or Deputy Alfred was approximately 8 to 10 feet away? He had nowhere to move, and he fired this gun at a fast moving vehicle but doesn't go through this chain-link fence because it's moving so fast.

Or does it make more sense that you had some guy who had a dispute with his neighbor, had an argument, saw his neighbor who he believed may be some of his friends coming down, you know, the driveway with a flashlight blazing in their eyes telling them to do something. And he's saying I don't have to do anything you say, revs up the engine, gets the tires moving, and shots are fired.

At the end of this case, I believe that you all will make the decision and the evidence will prove that Mr. Barber is not guilty of attempted murder. Mr. Barber is not guilty of assault with a deadly weapon. This is not a case

about a man who was running around pointing a gun at a law enforcement officer. This is not a case where Mr. Barber was actively middle of the day recognized there was an officer there and fighting with him. And you may hear some evidence that Mr. Barber may have gotten into a past conviction of fighting with a cop. That may come in, and he owns that.

But the evidence will show that is not what happened today, and the evidence will show in that instance is nothing compared to this instance. With that, ladies and gentlemen of the jury, I look forward to presenting this case. Thank you all so much.

THE COURT: Thank you, Mr. Bryant.

Ms. Fultz, your first witness, please.

MS. FULTZ: Thank you. Christopher Alfred, please.

THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE JUDICIAL ASSISTANT: Thank you please be seated.

THE BAILIFF: Far chair is the mic is active. Once you're seated, please state and spell your name for the record.

THE WITNESS: Christopher Alfred, C-h-r-i-s-t-o-p-h-e-r, A-l-f-r-e-d.

THE COURT: Good morning, Deputy Alfred.

THE WITNESS: Good morning, sir.

THE COURT: Ms. Fultz.

MS. FULTZ: Thank you.

CHRISTOPHER ALFRED,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:

Q. Good morning, sir.

A. Good morning.

Q. What is it that you do for a living?

A. I'm a deputy sheriff for the County of San Bernardino.

Q. And is that who is your employer?

A. Correct, yes.

Q. And how long have you been a sheriffs deputy with the San Bernardino County Sheriffs Department?

A. Approximately eight years.

Q. About eight years? What kind of training do you have to go through to become a deputy sheriff?

A. In 2016 I underwent a 23-week academy, which consisted of different curriculums from laws of arrest, search and seizures, vehicle operations, weapon operations and so forth.

Q. And is the entirety of your career with the San Bernardino County Sheriffs Department?

A. Correct, yes.

Q. What assignments have you had with the department?

A. I've worked in the correctional setting. Following the correctional setting in 2019, it was the start of my patrol

assignment. Following that, I was assigned as a field training officer, and I am currently a CPS deputy for the Adelanto Sheriffs Station.

Q. Okay. Can you explain what is a field training officer?

A. So we undergo training. You're selected based on a number of factors, like supervisors and leadership in our assigned station. And my main responsibility is training new deputy sheriffs that have completed their six-month academy.

Q. Okay. And CPS, can you explain what that assignment is?

A. So that assignment is conducted at the station level. So I investigate all crimes against children and elderly that pertains to the Adelanto jurisdiction.

Q. And forgive me if you said it, but when did you start the field training officer assignment?

A. Approximately about a year and a half ago.

Q. And the CPS assignment?

A. The same time, yes.

Q. Oh, okay. And that's your current assignment?

A. Correct, yes.

Q. On April 27th of 2021, what was your assignment?

A. Uniform patrol in the City of Adelanto.

Q. Is that inside of San Bernardino County?

A. Yes.

Q. And if you recall, what hours -- what shift did you work?

A. I would say p.m. shift from 7:00 p.m. to 7:00 in

the morning the following morning.

Q. And what was your duty assignment that night?

A. To handle calls for service within the City of Adelanto.

Q. When you're on a patrol shift, what generally are the duties of a patrol deputy?

A. We handle calls for service that are generated. They can range from several types of calls. We also handle traffic investigations within the city limits as well and proactive patrol enforcement as well.

Q. And what is that?

A. Pretty much showing uniform presence in high crime areas, utilizing visualization to deter a crime overall.

Q. And while you were on duty on that night, April 27th in 2021, did you have a partner or were you solo on patrol?

A. I was assigned by myself. I rode solo.

Q. Around 11:00 p.m. that night or a little thereafter, did you respond to the vicinity of White Avenue in the City of Adelanto?

A. Correct.

Q. Was that for a call for service?

A. Yes.

Q. And how did you arrive to that location of a call for service?

A. I was assigned a marked patrol unit.

Q. Showing you Exhibit No. 9 on the screen, can you see that there?

A. Yes.
THE COURT: Adam, can you lower the lights by the screen?
THE BAILIFF: Certainly, Your Honor.
MS. FULTZ: Thank you.
BY MS. FULTZ:
Q. Are you able to see the photo No. 9 on the screen?
THE COURT: It also appears on the computer monitor in front of you.
THE WITNESS: Yes, uh-huh.
BY MS. FULTZ:
Q. Do you recognize what's depicted there?
A. Yes.
Q. How do you recognize it?
A. The assigned and marked sheriff patrol units that we are assigned to.
Q. And is that the patrol vehicle that you drove on April 27th in 2021?
A. Yes.
Q. Does it have a light bar?
A. Correct, yes.
Q. Is there a pointer stick on the witness stand?
THE COURT: Yes, there is. If you press the red button, then the red dot appears.
MS. FULTZ: And is this one of the screens or all of the jurors able to see the point, the laser pointer?
THE COURT: They should be able to.
BY MS. FULTZ:

Q. Okay. Would you point out for the jury on the screen behind you the patrol unit and where the light bar is affixed?
A. Of course. So the light bar is just above the roof. It's -- when it's not activated, it's in the clear type of color. And it's very thin, more modernized light bar.
Q. All right. Does the vehicle also have spotlights?
A. Yes.
Q. Can you identify on the vehicle where the spotlights are?
A. There's a spotlight on the driver's side also known as the A pillar, and there's a spotlight on the passenger's side also known as A pillar as well.
Q. And that one is not visible here in this photograph; is that correct?
A. Correct, yes.
Q. Okay. And for the record, the witness indicated with the laser pointer first the top of the vehicle at center of the photo and then for the spotlight, just in front of the driver's side window.
Does it also have a push bumper?
A. Yes.
Q. And could you point out where that is for the jury?
A. So that would be at the front of the vehicle just affixed to the front bumper.
Q. All right. Are there antenna associated with the police radios on the vehicle?
A. Yes.

Q. Can you point out where those are?
A. On the roof just to the rear of the patrol unit.
Q. And can you describe the badging that appears to the vehicle?
A. The badging is the logo for the sheriffs department. It's a star, a large replica of our badge in a sense, and it's reflective. So when a light source hits it, other motorists and pedestrians can see that logo.
Q. Is that sort of the effect that is seen in this photograph here, the star that's sort of bright?
A. Yes.
Q. Are there any other areas of the vehicle that have the same or similar badging?
A. Yes, that's on the driver's side of the door and the passenger's side of the door as well.
Q. And does the photo in Exhibit 9 accurately depict the patrol vehicle you drove April 27th of '21?
A. Yes.
Q. On that night what was the lighting like in the area where you responded to that call for service?
A. Relatively dim. I would classify as poor lighting.
Q. Okay. Were there any light sources on any of the residences in the area?
A. I believe on the -- at the incident location there were porch lights affixed to the front doors of the residence.
Q. And do you recall if those were on or not?
A. I do not, no.
Q. Could you see where you were walking as you were

getting around?

A. Yes.

Q. Were you in uniform during your shift on April 27th of '21?

A. Yes.

Q. And can you describe the uniform briefly?

A. Yes. The uniform consists of a tan top. There's two shoulder patches that read San Bernardino County Sheriffs. The left chest pocket contains a gold star shape badge. The right chest pocket contains the United States American flag along with a name plate. The middle portion of uniform is a department-issued utility belt, which consists of department-issued equipment such as batons, taser, audio recorder, my radio holder, firearm and green pants, green in color, black tactical boots.

Q. Showing you first what's marked as No. 3. Sorry just getting used to the equipment here. All right. Are you able to see the photograph on display?

A. Yes.

Q. Okay. And is this the uniform that you wore? This is Exhibit No. 3. Is this the uniform that you wore on April 27th of 2021?

A. Yes.

Q. All right. And are the patches, badges and name plate, and I think there was a chest plate, you described, are those all visible here?

A. Yes.

Q. All right. Then you have your duty belt with all

of the items that you described?
A. Correct, yes.
Q. All right. And does that accurately depict how you appeared on April 27th, 2021?
A. Yes.
Q. You're also wearing a hat and some sort of a face covering. Can you describe those as well?
A. Yes. In the inclement weather at the time, the hat is a department-authored beanie. It reads "sheriff" in yellow writing, along with a face covering, department-approved as well. For the purposes of this photo, I was asked to place the face covering on my face.
Q. Okay. And did you wear the face covering while you were out on patrol?
A. Yes. During the incident, it was removed.
Q. Okay. We'll get there.
A. Okay.
Q. But you had this available to you throughout the shift?
A. Yes.
Q. Okay. Fair to say it was kind of cold?
A. Yes.
Q. No. 4, showing you No. 4, I'm not sure you can read that in this lighting. But do you recognize what's depicted here?
A. Yes.
Q. And what -- how do you recognize it?
A. It's the stitched patch affixed to the uniform

along with the sheriffs name plate, contains my first initial and last name and the assigned station I work at.

Q. And does this accurately depict your name plate and flag patch as they appeared April 27th, '21?

A. Yes.

Q. No. 5, do you recognize what's depicted here?

A. Yes.

Q. How do you recognize it?

A. The uniform I was wearing.

Q. All right. Is this a view of your -- what would be your left side?

A. Correct.

Q. And does it accurately depict how you appeared on the left side that same night?

A. Yes.

Q. And what is it that we can see on this side -- let's see. That's probably the best. What is it that we can see on this side of your uniform that you described?

A. The shoulder patch and the equipment affixed to the utility belt.

Q. All right. And do you have a flashlight affixed to that belt?

A. The flashlight is sort of in the, what's called like a sac pocket. It's on the left leg, probably a little bit above the knee. I believe you can see the reflection of the flashlight there.

Q. Okay. And No. 6, do you recognize what's depicted here?

A. Yes.
Q. How do you recognize it?
A. The uniform I wore the night of.
Q. And is this then your right side?
A. Yes.
Q. And what is it that is visible on the right side that you described?
A. The shoulder patch, name plate, and additional equipment on the utility belt.
Q. And does this accurately depict you from the right on that night?
A. Yes.
Q. Showing No. 7, do you recognize what's depicted here?
A. Yes.
Q. And how do you recognize it?
A. The uniform I wore the night of.
Q. All right. And the face covering we previously saw is lowered. Is this how you kept the face covering throughout your patrol shift?
A. Yes.
Q. And does it accurately depict how you wore the face covering that night?
A. Yes.
Q. No. 8, just a little bit closer up. Do you recognize this photo here?
A. Yes.
Q. And being just a more close up of the last, does

this accurately depict how you appeared April 27th of '21?
A. Yes.
Q. Going back to the vehicle, look quickly through these, starting with No. 12, this is -- all right. The items that you described on the patrol vehicle, are they more visible in this photograph taken in the daylight hours?
A. Yes.
Q. Okay. And does it accurately depict the patrol unit that you drove on your shift April 27th of '21?
A. Yes.
Q. All right. And this appears to be the driver's side. Are there any of the items that you describe previously that are better able to be seen in this photograph?
A. The wording "police" on the rear door panel along with "Adelanto" just above that.
Q. Okay. It is a little easier to see the push bar on the front there?
A. Yes.
Q. All right. No. 11, same thing, do you recognize what's depicted?
A. Yes.
Q. And how do you recognize it?
A. The assigned vehicle I drove the night of the incident.
Q. All right. Is this the passenger's side-view?
A. Correct, yes.
Q. Does it accurately depict the passenger's side of your patrol unit that night?

A. Yes.
Q. Is there anything that you can see in this photograph we weren't able to see on the previous?
A. The passenger's side spotlight.
Q. Okay. And that -- can you describe where that is?
A. Yes, right here.
Q. Just for the record in front of the passenger's side mirror in front of that. And finally No. 10, do you recognize this photograph?
A. Yes.
Q. How do you recognize it?
A. My assigned vehicle.
Q. All right. And this is again in hours of darkness, correct?
A. Yes.
Q. I'm not sure if it's the lighting. Is it possible to turn one light down, see the rear of that? There we go.
Are there markings on the rear of the vehicle?
A. Yes.
Q. Can you describe that?
A. There's a numerical sequence on the left portion of the trunk lid. It's 24. And following the right side of that there is another number that identifies the number of the vehicle.
Q. And you said that. Does that accurately depict the rear portion of the vehicle that you drove that night?
A. Yes.
Q. Do you recall what kind of firearm you carry?

A. Yes, it's a Glock 21, .45 caliber.
Q. Returning to the call for service, what kind of -- what was the area that you were responding to? Like, was it residential, a business area?
A. It was residential.
Q. All right. And would you recognize the area, if you saw it in a photograph?
A. Yes.
Q. Showing you what's marked as No. 19, do you recognize what's depicted here in this photograph?
A. Yes.
Q. And how do you recognize it?
A. The main entrance to the address I was dispatched to.
Q. And does it accurately depict the address of the call for service?
A. Yes.
Q. When you first arrived to the area, what information did you have that led you to go to that location?
A. I was dispatched to a call reference a disturbance at this address.
Q. When you arrived, were you alerted to anyone? How did you know who to contact?
A. The dispatcher provided me with minimal information. There were parties outside of the location who argued. And once I arrived, I didn't receive any further information.
Q. Okay. Did anyone try to get your attention to

speak to you when you arrived to the location?
A. Not initially. This was the first time that I arrived.
Q. Okay. What time is it that you're referring to?
A. Roughly maybe an hour and a half to two hours prior. So it will be my first time to this location, and I was dispatched the second.
Q. So referring to the call for service just after 11:00 p.m., when you responded to the address on White Avenue, did anyone then get -- try to get your attention?
A. Yes.
Q. And what happened when you arrived?
A. I spoke with a gentleman who is inside of his vehicle just outside of the incident location. And he flagged me down and explaining that he had placed a call for service reference a disturbance with a next-door neighbor.
Q. When you say flagged you down, do you recall how that -- how he did that?
A. He flashed his headlights from the side of his vehicle.
Q. Was he seated inside the vehicle?
A. Yes.
Q. If you could tell, was he alone?
A. He was accompanied by a female.
Q. Okay. And did you get out and speak with the couple?
A. Yes.
Q. Immediately after, what happened -- what happened

when you saw them flash their lights?

A. I drove next to the reporting party's vehicle. So my vehicle had faced west, and their vehicle had faced east, our driver's side doors were side by side. I explained to him, I'll reposition my vehicle and come out and speak with him. That was just prior to he confirmed that he had placed the call for service.

THE COURT: Why don't we take our morning break at this time. So we'll take a 15-minute recess. We'll reconvene at a quarter of. Remember don't talk about the case with anyone.

(Recess taken.)

THE COURT: We're all present. Have a seat, Deputy Alfred.

Whenever you're ready, Ms. Fultz.

MS. FULTZ: Thank you.

BY MS. FULTZ:

Q. I think when we left off, you were describing how the reporting party call for service flagged you down by flashing their headlights. Do you recall that?

A. Yes.

Q. Okay. And then I think you were starting to describe turning your vehicle around or moving your vehicle. Can you explain what you did after you briefly spoke with them, driver door to driver door?

A. I confirmed that the reporting party, if they placed a call for service. They indicated that they did. I further explained to them I was going to reposition my vehicle across the street and come over and speak with them about what

occurred.

Q. And did you do that?

A. Yes.

Q. Okay. As you moved your vehicle, does -- is the street on which you were driving that you just described captured in the photo that we see in the current exhibit?

A. Yes.

Q. And can you orient us to north, south, east, west in this photo?

A. So south would be the driveway, the main entrance. For -- looking at this photo, east would be to the left of the photograph. West to be to the right. And north would be towards the bottom.

Q. Okay. Can you tell us which direction did you arrive from the east or the west?

A. The east.

Q. The east, okay. So you moved your vehicle eastward. Did you pass that driveway as you drove to move your vehicle?

A. Correct.

Q. And did you -- I know you haven't spoken with the reporting parties or anything, but are you making any observations as you're around?

A. Yes.

Q. What did you notice in the area?

A. I noticed the reporting party inside of their vehicle. And I look towards the far end of the driveway and noticed a subject in a white T-shirt next to a dark colored

SUV.

Q. Were you able to see that subject? Did you flash a spotlight, or was it just the use of ambient lighting that was present?

A. Just the ambient lighting.

Q. Okay. So did you drive past the residence to park your vehicle?

A. Yes.

Q. All right. After moving your vehicle, and did you park on the north or south side of the street?

A. The north.

Q. The north, okay. What did you do after you parked your vehicle on the north side of the street?

A. I had to -- once I repositioned my vehicle, I crossed the main entrance the secondary time the subject was still at that same location. And I went over and spoke with the other reporting party.

Q. Okay. At the time did you know if the person that you observed now twice in that driveway was related to the call at all?

A. I didn't have the information to confirm that, but I believe so.

Q. Okay. And was that based on the nature of the call of disturbance?

A. Yes, and to the prior call as well.

Q. Okay. So the reporting parties, are they on the north or south side of the street?

A. The south side.

Q. And did you approach their vehicle on foot?
A. Yes.
Q. Did you speak with them about why you were there?
A. Yes.
Q. And when you spoke with them, were they inside their vehicle, or did they step out?
A. They were inside.
Q. Did the conversation that you had with the male and female inside the car provide you with any information that led to the next steps of your investigation?
A. Yes.
Q. What did they tell you that assisted you in knowing what you were there to investigate and what you should do?
MR. BRYANT: Object. Hearsay.
THE COURT: Well, I assume it's offered simply for the purpose to explain what the officer did next.
MS. FULTZ: Correct.
THE COURT: All right. I'll instruct the jury to -- when the officer is relating what the reporting parties said to him, you're not to consider that for the truth of what they said to him, but merely for its effects on him to explain what he did next.
You can answer the question, sir.
THE WITNESS: Thank you. The reporting party had advised me there was an argument with their neighbor where their driveway was blocked. At some point they tried to gain access to that driveway where they explained the neighbor had hit the hood of their vehicle, which frightened them;

therefore, they remain in their vehicle and dialed 911.

BY MS. FULTZ:

Q. And based on the information they provided, what did you decide you needed to do next?

A. Further investigating to determine if the crime of vandalism occurred and make sure I speak with all the involved parties to complete that investigation.

Q. Okay. You said vandalism. Can you explain -- can you explain what you mean by that?

A. Maliciously destroying or defacing someone else's property against their consent, which in this case was related to the reporting party's vehicle.

Q. Okay. So when the -- when the reporting party described the neighbor hitting the hood of their vehicle, is that what you're referring to?

A. Yes.

Q. Okay. And what was the demeanor of the two individuals when you spoke with them?

A. They appeared afraid.

Q. Can you describe what you saw that led you to that conclusion?

A. They told me that they were afraid, and they noticed some behavior with their neighbor leading up to the night of the incident, which kind of concerned for their safety. They advised that they believed that the neighbor was armed with a gun, and they further explained that their neighbor had spoke to them in the past about law enforcement presence in the area.

MR. BRYANT: Objection, Your Honor. 352.
THE COURT: Overruled.
BY MS. FULTZ:
Q. Did you ask why they -- why they thought there might be -- the neighbor might be armed?
A. I did. The reporting party explained to me he didn't have any information to confirm that. It was just an intuition on his behalf reference the incidents that led up to the night of, and he felt it was necessary to relay that information to me.
Q. Did he describe anything, seeing the neighbor do anything that led him to believe he was armed or just that gut feeling?
A. Just the feeling.
Q. Okay. Did he tell you he ever saw the neighbor reaching in pockets?
MR. BRYANT: Objection. Leading.
THE COURT: Sustained.
BY MS. FULTZ:
Q. Did he tell you anything about the neighbor's clothing or any observations of the clothing that was a concern to him?
A. He did not.
Q. Okay. When the reporting parties told you that they were concerned the neighbor might be armed, does that become a concern for you in how you approach the situation?
A. Absolutely.
Q. Okay. Did they identify for you either the person

they were referring to or where this person might be found, anything like that?
A. They did not, no.
Q. How did you know where to go or who to speak to?
A. They pointed in the direction of their residence. And based off the information of the prior call, there was no vehicle present reference the same circumstances. Therefore, I believe that the vehicle and the individual next to the vehicle was related to the current call I was on.
Q. Okay. Did they describe where the events that they describe to you, did they describe where that happened?
A. In the driveway.
Q. Okay. And was that by pointing it out?
A. Yes.
Q. All right. When you finished speaking with the reporting parties, do you provide any update to any other law enforcement on shift or dispatch, anything like that?
A. I did not. My only update was to advise the dispatcher that I was at that location and over a certain period of time to advise them that you are okay.
Q. Okay. And how is it -- how are you able to alert dispatch any updates?
A. Through radio broadcast.
Q. And is that something affixed to uniform, or do you have like a separate radio? How do you do that?
A. It's a radio affixed to the uniform. And for my specific radio and uniform it's called a lapel mic, and it's affixed to the collar of the uniform just below the chin.

Q. And when you update dispatch, who all is able to hear those updates?
A. Everyone on the assigned radio channel.
Q. Okay. Is that basically your patrol shift?
A. Correct, yes.
Q. Okay. Approximately how many deputies would be on patrol in this area of Adelanto at 11:00 p.m.?
A. Myself and two others.
THE COURT: Excuse me, counsel. Did we say we were stopping at 11:00 or 11:30?
MS. FULTZ: 11:30.
THE COURT: 11:30. Okay. Thank you.
BY MS. FULTZ:
Q. So after speaking with the reporting parties, what did you do next?
A. I went to the -- explained to the reporting party I would go in and speak to the subject in the driveway, figure out what kind of conclusion we can come to. Proceeding towards that, I walk down the driveway, and told the subject next to the vehicle to come over and talk to me.
Q. When you say the driveway, is that the driveway in the photograph that we see here?
A. Yes.
Q. Okay. Which way did you approach from?
A. So I approached from the west side near where that chain-link fence is at. If you're looking straight at this photograph, I walk down towards the driveway, which would be south.

Q. Okay. Can you describe the lighting in the driveway?
A. It was dim.
Q. Were you able to see the vehicle and the subject you described previously?
A. Yes.
Q. And I think you said -- well, can you repeat, if you already said it, what the subject was wearing?
A. From my recollection a white T-shirt.
Q. Okay. Do you have any idea what kind of pants or anything?
A. I do not.
Q. Okay. And the driveway, can you describe the driveway in terms of distance and what is there?
A. It's relatively a far distance. If we're walking south to the left of the driveway is an iron-type fence. I think a portion of it changes into a chain-link fence. The west side of the driveway contains a small opening along with a wooden picket fence around is packed dirt with loose gravel. That pretty much is the raw make up of the driveway.
Q. Okay. And I know you said sort of a long way. If you're able, are you able to estimate about the distance of the driveway?
A. Approximately 40 to 50 yards from the main street to the end of the driveway.
Q. Were you able to see the entirety of that driveway from the street?
A. No, I was only able to see the subject in the

vehicle. Nothing beyond the vehicle.
Q. Okay. Was it at the very end of the driveway?
A. Yes.
Q. Are you familiar with the term concealment?
A. Yes.
Q. What is concealment?
MS. FULTZ: May I have a moment?
THE COURT: Of course.
BY MS. FULTZ:
Q. Could you describe the term, what concealment is?
A. Concealment related to law enforcement purposes is the ability to not be seen by whoever you're trying to conceal yourself from, so you're clearly out of that line of sight.
Q. And how about cover?
A. So cover pertains to being in a position to where you can put a barrier between yourself, and that allows you a layer of protection; however, there are possibilities where you can be seen. With addition to seeing what you're looking at as well, so there is an open line sight, but for the most part you're in a covered position where you have a layer of protection.
Q. Okay. In this driveway was there anywhere between you and that vehicle at the end of the driveway, where you can take either cover or concealment?
A. No.
Q. Showing you No. 17, do you recognize what's depicted here?
A. Yes.

Q. And how do you recognize it?
A. This would be the driveway facing the north direction.
Q. Back to the street where you arrived?
A. Correct.
Q. Okay. And there is the chain-link fencing, and I forgot how you described it but some sort of metal fencing?
A. Like an iron-type fence, yeah.
Q. Is this as it appeared on April 27th, the entry into that driveway? Does it accurately depict that entry?
A. Yes.
Q. And approximately, if you know, how high were each of these gates?
A. Rough estimate, they were roughly aligned with like the same height as myself, maybe 5'10, 5'11 eye level.
Q. Showing No. 18, do you recognize what's depicted here?
A. Yes.
Q. And how do you recognize it?
A. So this is the driveway, so facing north, but more towards the far south end of the driveway looking out towards White Avenue.
Q. All right. And to the left of the photograph, there is a white structure. Do you see that?
A. Yes.
Q. And what is that white structure, if you know?
A. I believe it's a residence.
Q. And was that the residence to which you were called

in the call for service?
A. Yes.
Q. There is what appears to be maybe like a backyard to the rear of that residence; is that accurate?
A. Yes.
Q. All right. And is that how it appeared as you proceeded down the driveway?
A. Yes.
Q. No. 20, are you able to see that?
A. Yes.
Q. And do you recognize what's depicted here?
A. Yes.
Q. How do you recognize it?
A. This is the alleyway facing the south direction.
Q. And does it accurately depict the portion of the alleyway or driveway that we've been talking about as it appeared that night?
A. Yes.
Q. With the white structure still to the right, can you describe what is behind the white structure from this vantage point?
A. There's a gap. And followed by that gap is the picket fence.
Q. Showing you No. 15, do you recognize what's depicted here?
A. Yes.
Q. And how do you recognize it?
A. The alleyway.

Q. And is the -- is the wood fencing on the left-hand portion of the photograph, the fence that you just described in the previous?
A. Yes.
Q. And does that run from sort of the edge of the entry to that sort of backyard area all the way to where we see it here toward the end of this driveway?
A. Yes.
Q. And approximately, if you know, how tall is that wood fence?
A. I would say about like eye level, so roughly 6 foot.
Q. Of any of these fences that we -- oh, sorry one more. On the right-hand side of this photograph, there appears to be chain-link fencing. Do you see that?
A. Yes.
Q. And does that start at some point after the white iron fencing as you proceed down the driveway?
A. Correct.
Q. And is there a gap between the iron fencing and the chain-link fencing?
A. No.
Q. Approximately, if you know, how tall is the chain-link fencing?
A. Around the same height as the surrounding fences.
Q. So somewhere close to 6 feet?
A. Yes.
Q. Of any of the sort of four fencing areas that we

have seen, would you be able to scale any of those quickly, if needed?

A. It would be challenging.

Q. And why is that?

A. Well, the equipment that we're assigned to carry, we don't have the discretion of removing it. So it's standardized 30 pounds of equipment on top of your added body weight. That can bring some challenges with certain movements and things like that.

Q. And what kinds of footwear were you wearing?

A. Boots.

Q. Are they sort of a thick? Can you describe them?

A. They are Oakley tactical boots. So this boot is more of a comfort boot. It doesn't have the thick leather material as traditional boots, so you trade the safety in a sense for comfort.

Q. At some point as you walked down that driveway, did you say anything or make yourself known in the driveway?

A. Yes.

Q. And how did you do that?

A. I went to the subject in the driveway to come over and speak with me.

Q. And approximately how far into the driveway, if you know, you were when you said that? And I am placing No. 20 for reference.

Actually, does No. 20 show the area where you would have first made yourself known?

A. Yes.

Q. Okay. And can you describe where on the photograph? And you can use the pointer if you need.
A. So roughly in this area right here just above this placard.
Q. Okay. So right about the dead center of that photograph?
A. Yes.
Q. Okay. And how far from you was the subject who you were asking to come over and talk to you?
A. Approximately 10 to 12 feet.
Q. When -- well, do you see the person that you made contact with in that driveway that night here in court today?
A. Yes.
Q. Could you identify that person by something that he's wearing and where he's seated?
A. He's sitting next to the defense attorney. He's wearing a white T-shirt, long sleeve.
MS. FULTZ: Would the record reflect the witness has identified the defendant, Mr. Barber?
THE COURT: Yes, it will.
BY MS. FULTZ:
Q. And you said you gave some indication to come over and talk to you; is that correct?
A. Yes.
Q. And what happened next?
A. That request was ignored by Mr. Barber.
Q. When you say it was ignored, was there no response or can you describe what you mean by it was ignored?

A. There was a series of obscene language. I don't recall what specific language. Mr. Barber turned towards the driver's seat and focused his attention on that particular area.
Q. And at any point did you make eye contact with Mr. Barber to know he sees you?
A. Yes.
Q. At what time did that occur?
A. When I first walked down the driveway.
Q. So as you're entering the driveway?
A. I'm sorry. Let me rephrase. From a distance Mr. Barber and I, we made contact when I arrived because I had to pass the driveway. That's where I noticed the subject was down at the driveway next to a vehicle. And then when I crossed the street to greet the reporting party, we acknowledged each other a secondary time.
Q. And when you say acknowledged each other, how do you mean?
A. We looked at each other's direction. I saw him, and he saw me.
Q. Okay. So the first time you spoke with him, is as you proceeded down the driveway and asked him to come speak with you?
A. Correct, yes.
Q. Okay. When he ignored your invitation to come speak to you, what happened after that?
A. I asked Mr. Barber to show me his hands. The abrupt movement into the driver's seat of the SUV focused my

attention towards his hands; therefore, I made additional requests for Mr. Barber to show me his hands and come over and talk to me.

Q. Why were you concerned about seeing his hands?

A. Well, based on my training and experience in the events of something fatal happening, that is a number one indicator of where that threat would possibly come from. So in terms of retrieving a weapon or even concealing a weapon for later use, that action is initiated with the hands.

Q. And are you referring to what you saw Mr. Barber doing at his vehicle?

A. Correct.

Q. What happened after you asked to see his hands?

A. Mr. Barber refused.

Q. And when you say he refused, is that just didn't show his hands, or did he affirmatively do anything?

A. He didn't show me his hands, and he ignored my request. And he asked me to show him my hands.

Q. And was he looking at you as he's speaking?

A. When he asked me to show him my hands, he faced me and looked directly at me.

Q. Okay. And at this point are you dressed as you saw in the photographs?

A. Correct.

Q. Did you have the hat on, if you recall?

A. Yes.

Q. And did you have the face covering? Did that -- was that on your person?

A. It was not covering my face, but it was around my neck.

Q. Okay. Did you announce yourself, San Bernardino County Sheriffs Department, come talk to me?

A. I do not recall, no.

Q. And is that something you would naturally do in approaching on a circumstance like this?

A. It's a common practice, but it's not always necessary in a sense, but it's more of a common practice to make that announcement, yes.

Q. And why do you say -- it already escapes me the words you used. You said you didn't hear for some reason, correct?

A. Well, in most cases, most contacts, safe to say most people can identify what -- what a police officer or deputy sheriff looks like, so sometimes the notification may not be necessary as opposed to knocking at someone's front door. That person may not be aware of who's on the other side where you have to make that announcement, Police, Sheriffs Department and so forth.

Q. In your -- outside of work life, do you often approach people and ask them to show their hands?

MR. BRYANT: Objection. Relevance.

THE COURT: Sustained.

BY MS. FULTZ:

Q. So after -- well, strike that.

When you approached the defendant in his driveway, what duty were you performing?

A. I'm sorry. Can you repeat your question, ma'am?
Q. Sure. When you -- after you left the reporting parties, then you went to make contact with Mr. Barber in his driveway, what duty were you performing on your patrol shift?
A. Well, my contact with Mr. Barber was to further investigate the initial crime for vandalism.
Q. And at the point that you asked Mr. Barber to come over and speak to you and then again asked for him to show his hands, is he free to leave?
A. At this point, no.
Q. Okay. And are -- can you describe what that's called when you're holding onto someone to speak to them?
A. It's called a detainment.
Q. Did you have any indication from the defendant that he knew you were law enforcement by anything he said or did?
A. Yes.
Q. And what's that?
A. The fact that we made eye contact with one another, and the fact that he used a common law enforcement terminology towards myself, I was under the impression and belief that he was aware I was a deputy sheriff.
Q. When you say he used common law enforcement terminology towards you, what are you referring to?
A. Referencing Mr. Barber show me his hands.
Q. How would you describe his demeanor when you contacted him in the driveway?
A. He appeared agitated.
Q. How so?

A. Well, Mr. Barber took -- during my initial contact when I spoke with him or in an attempt to speak with him he made several small steps near the driver's side of his vehicle. And during his contact, he periodically faced me, returned to the driver's side of the vehicle. He faced me a secondary time.

Q. Was there anything about the tone of his voice or the expression on his face that gave you an indication of the demeanor, his demeanor as you were dealing with him?

A. His tone was elevated. In fact, during in the profanity that he used as well. It gave me the belief that he was bothered by the situation.

Q. Now, you referenced a vehicle that he's sort of going in and out of the driver's area. Do you recall that vehicle?

A. Yes.

Q. Can you describe the vehicle?

A. It was a dark color SUV, four-door with a rear liftgate on it.

Q. And were any of the doors or windows open that you can see?

A. The driver's side door was open and the rear liftgate was lifted as well.

Q. And could you tell if the vehicle was turned on while you were there?

A. Yes.

Q. What indicators did you see that the vehicle was on?

A. I heard the motor idling and the parking lights were illuminated.
Q. What did you do when you realized that Mr. Barber was responding to your commands as he was?
A. Broadcasted my observations and the circumstances to the dispatcher, and I explained that Mr. Barber was verbally non-compliant.
Q. What is the purpose of that?
A. Well, it's a status update. The dispatchers play a vital role. They're able to delegate resources on our behalf without requesting them, and it provides that status to partners and other deputies in the area that I am okay.
Q. Okay. So if I understand, they sort of anticipate your needs?
A. That would be a good way to put it, yes.
Q. Just hypothetically, if you were to put out I have one fighting, what might -- what might be the purpose of putting that out over your radio?
A. To let them know what's -- what I'm involved in. And in a case like that they would dispatch, you know, any available deputy to assist, and they would also restrict our radio channel. There's a code for that. So the only people who are able to speak on that channel are the officers or deputies that are involved on that call for service.
Q. And what is the reason for that?
A. To minimize unnecessary or uninvolved radio traffic.
Q. Would that be in case someone needs help and needs

the channel?
A. Yes, that's correct, yes.
Q. Did you maintain your observation of Mr. Barber as you put out to dispatch that you had a subject who was verbally non-compliant?
A. Yes.
Q. What could you see him doing as you are putting out your radio alert?
A. Following that information, Mr. Barber utilized his left hand and grabbed on to what's known as a grab handle of the SUV. And as that information was being articulated, he simultaneously entered the driver's side of the vehicle.
Q. And what, if anything, did you do when you saw him enter the vehicle?
A. I put out an additional broadcast that Mr. Barber was reversing the vehicle in my direction.
Q. Did that occur simultaneously as he entered, or can you describe how you knew to put that he was reversing?
A. He had shut the door once he made full entry into the vehicle. The white brake lights illuminated, which indicate that the vehicle was in a reverse gear. The tires attempted to gain traction, which threw debris and rocks towards my direction. And then the obvious motion of that vehicle in my direction.
Q. Okay. And is that when you alerted to dispatch that he was reversing?
A. Correct.
Q. How far behind the vehicle were you standing when

it reversed when it began to put the reverse lights on and the wheels begin to turn?
A. Roughly about 12, 15 feet.
Q. 12 to 15 feet? And were you directly behind it to the right, to the left, do you recall?
A. Behind, but slightly to the left aligned with the driver's side of the vehicle.
Q. I zoomed in on Exhibit No. 20 a little bit. Do you see the area where you were standing when you noticed the vehicle begin to reverse here in this photograph?
A. Yes.
Q. Could you point out for the jury about where you were standing when that happened?
A. So like within this area.
Q. And for the record that is pointing -- it looks like a line in the gravel behind the vehicle; is that a fair description?
A. Yes.
Q. Somewhere around the -- is it the middle of that line?
A. In between the two placards.
Q. Okay. You're going to have to be more specific on the placards. There's a bunch.
A. These two placards here.
Q. Okay. When you walked down the driveway, did you have any flashlight or lighting that you were using?
A. Yes.
Q. What did you have in use?

A. I had a department-issued Streamlight flashlight.
Q. And is that sort of one of those big metal flashlights?
A. Similar, but it's a little bit more condensed, smaller version of that, yes.
Q. Okay. And when you use the flashlight, did it assist you in seeing where you were going and see the ground?
A. Yes.
Q. Okay. When the vehicle began to reverse, did you have that flashlight in your hand?
A. Yes, I did.
Q. And at some point did you toss or drop or do something with the flashlight?
A. I dropped the flashlight.
Q. Okay. And when you dropped it, was it just a drop down, or do you remember if you tossed it at all?
A. I just dropped it straight down.
Q. Okay.
THE COURT: Is this a good stopping place? We're at 11:30.
MS. FULTZ: Yes.
THE COURT: We'll break for lunch. I'd like to see everyone at 1:30. Remember don't talk about the case with anyone and have a nice lunch. I'm sorry. I apologize, 2:00 o'clock. Thank you for reminding me.
(Whereupon the lunch recess was so taken.)

SAN BERNARDINO, CALIFORNIA, MONDAY, DECEMBER 2, 2024

AFTERNOON SESSION

DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,
JAMES BRYANT, Attorney at Law and
RYAN DUCKETT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT: Good afternoon everyone. Please have a seat. Officer -- or deputy, excuse me, you're still under oath.

Ms. Fultz, whenever you're ready.

MS. FULTZ: Thank you.

BY MS. FULTZ:

Q. Good afternoon.

A. Good afternoon.

Q. I think when we left off, we were talking about where you dropped your flashlight. Does that sound about right?

A. Correct.

Q. Showing you No. 18, do you recognize what's depicted here?

A. Yes.

Q. And how do you recognize it?

A. That's my department-issued flashlight.

Q. And does it accurately depict your flashlight where you dropped it on the night of April 27th, '21?
A. Yes.
Q. And then No. 21 in this exhibit, does that appear to be the same flashlight, just closer up?
A. Yes.
Q. Okay. And it's marked at a Placard 9?
A. Correct.
Q. You didn't place the placard there though, correct?
A. I did not, no.
Q. At the point you drop your flashlight, what was going on?
A. The vehicle was in motion towards me.
Q. And is that what caused you to drop your flashlight?
A. Yes.
Q. Did you give any commands when you saw Mr. Barber enter the vehicle and then begin to reverse?
A. I did not. Those observations were broadcasted to the dispatcher.
Q. Okay. How about when he was walking toward his vehicle?
A. I did not. He was already stationary towards the driver's side door.
Q. Okay. So you never -- you don't recall telling him?
MR. BRYANT: Object. Sorry. Go ahead.
BY MS. FULTZ:

Q. Do you recall telling him anything about not going toward the vehicle or into the vehicle?
MR. BRYANT: Objection. Leading.
THE COURT: Sustained.
BY MS. FULTZ:
Q. Do you recall telling him anything prior to him entering the vehicle?
A. Yes.
Q. What do you recall telling him?
A. Step away from the vehicle.
Q. And at any point when you were giving commands, is giving commands a regular law enforcement term?
A. Yes.
Q. Is there any special meaning or significance to that?
A. They usually pertain to a lawful order. Other than that it will be just a normal conversation. But when it falls in the category of a command, it's a lawful order.
Q. Is that -- is that to say you're telling somebody to do something as opposed to, hey what's going on man?
A. Correct, yes.
Q. Okay. So at the point that you gave -- you were giving commands related to the vehicle, did you ever have to escalate your voice, use any strong language, anything like that?
A. Yes, I did.
Q. And can you describe that for us?
A. My tone was more elevated than the initial contact.

And that's factored in due to the surrounding factors, the vehicle's idling motor itself and just to project my voice to get the attention of Mr. Barber.

Q. Okay. And I think you've already said this, but did he comply with any of these commands?

A. He did not.

Q. Returning to Exhibit No. 20, are you able to see in this exhibit where either your flashlight or that Placard 9 or that marked it?

A. Yes.

Q. Where do you see that?

A. It's going to be -- there's a placard here. It doesn't indicate the number, but it's going to be right below this placard here. So it will be east of the driveway.

Q. And for the record, the witness is pointing to the placard, looks second closest to the left edge of the photograph of the yellow placards. There's three orange placards just below it.

And now you just said that that's a bit to the left. Do you recall where you were standing when the defendant entered his vehicle and put it in reverse?

A. In that same position.

Q. Okay. And so -- earlier when you described a little bit more center into the gravel, is that when were you standing there?

A. When I initially contacted him.

Q. Okay. So at some point you moved a bit to the left of the driveway?

A. Yes.
Q. And any reason for that or --
A. Sight line, the aligning myself with the driver's side of the door so I can see Mr. Barber. I can see the vehicle as well. Position myself too far right of that, the vehicle now becomes an obstruction to where I'm looking at towards the driver's side door.
Q. At this point were you able to verify if Mr. Barber had any weapons or anything on his person?
A. I was not, no.
Q. How about in the vehicle?
A. No.
Q. Were you able to see inside of the vehicle from your position?
A. No.
Q. At the point that you saw Mr. Barber enter his vehicle and then you notice the reverse lights and the wheels turning and kicking up debris, were you able to -- was there anywhere that you were able to sort of get out of the path of that vehicle?
A. No.
Q. Can you explain that?
A. Well, based on the confined area, the chain-link fence being to one side of me, while on my left, and then the picket fence to the right, those are objects that wouldn't be able to stop the force of a moving vehicle. Therefore, they can easily be torn down, and I would be injured in that case. And given the fact, distance of the driveway to large distance

to cover back out to the main road, so there's really no avenue to escape or put that barrier in front of me that can stop force of a vehicle.

Q. And so what was going through your mind when you realized that the defendant was accelerating his vehicle in reverse?

A. I was going to get ranned over.

Q. And this may seem like a silly question, what were you afraid would happen if you were ran over?

A. I would be severely injured and-or killed.

Q. Are you trained in the use of force options?

A. Yes.

Q. And if you can just briefly describe what force options means and how you used your training in this instance?

MR. BRYANT: Objection. Calls for narrative.

THE COURT: Overruled.

BY MS. FULTZ:

Q. You can answer.

A. So force options pertain to a variety of factors. You know, we have several calls for service and those calls have tendency to become volatile, depending on the intensity, the actions and the overall circumstances that determines what level of force we decide to use.

The bear minimum in terms of force options are our uniform presence, our tone or professionalism or -- other than force presence that's considered a force option within itself to deescalate violent situations or situations that has the potential. If you cross the threshold to the highest level of

force where there's an imminent threat to someone's life, well, that changes the force options that we have a discretion of using, all the way up until deadly force.

There is different force options in between that first contact being uniform presence and deadly force such as, you know, physical application, taking hands on act to restrain someone. We have other tools such as chemical agents, batons, those are all categories of those force options that we utilize.

Q. And in any circumstance, responding to calls for service, is it fair to say you have to make decisions fairly quickly in considering all of those force options?

A. Yes.

Q. And would it be appropriate or would you find it appropriate in a circumstance where a car 10 feet away from you is now reversing at you to use a baton, taser, pepper spray, any of those options?

MR. BRYANT: Leading, Your Honor.

THE COURT: Overruled.

THE WITNESS: No, those force options wouldn't be practical. The force options that you explain would fall in a certain type of category, circumstances. To apply a chemical agent towards a moving vehicle would be ineffective and dangerous given the fact such as wind. That mist of chemical could easily go into your persons or you have a vision obstruction.

For the purposes of baton, it would be ineffective as well. There has to be a certain distance for that to be

effective. So the force option that's left with, with deadly force being was the most reasonable option.

Q. And did you, in fact, use your firearm?

A. Yes.

Q. When you started your shift, did your -- was your firearm loaded to full capacity?

A. Yes.

Q. And did you -- did you use the full magazine or when -- strike that.

When did you stop shooting?

A. When the vehicle came to rest.

Q. Was your uniform equipped with body camera?

A. It was not, no.

Q. Why not?

A. They were not issued by our department at that time.

Q. Have they been issued since that time?

A. Yes.

Q. How recently?

A. A year and a half to two years now.

Q. Did you have any other kinds of a recording device as part of your duty uniform?

A. Yes.

Q. What was that?

A. It's a Puma audio recorder, a belt recorder.

Q. And can you describe how that device works?

A. Yes, so it's a belt recorder that is affixed to our utility belt that has a stop and record feature as well as a

pause feature. And for every public contact, per the department policy, we have to activate that audio recording, capture that contact with that person that we're engaging with.

Q. And did you have your belt recording device on your person that night?

A. Yes.

Q. How was it activated?

A. Push of a button. It has a custom holster that's outfitted with two entryways for the stop and record feature.

Q. And at what point did you activate your recording device on that night?

A. While I was en route to the location.

Q. Have you since had an opportunity to review that recording?

A. Yes.

Q. And did the recording accurately depict the events that you've described here for the jury?

A. Yes.

Q. Did you initial the, the recorded disc and transcript after verifying the accuracy?

A. Yes.

Q. Showing you what is marked as Nos. 1 and 1A, do you recognize 1 and 1A?

A. Yes.

Q. And how do you recognize them?

A. My initials and the date.

MS. FULTZ: And Your Honor, may I publish and distribute transcripts?

THE COURT: Yes, you may. You're going to be given a transcript of an audio recording. The audio recording is the evidence. The transcript is not evidence. It was prepared by the District Attorney's Office. It may or may not be accurate. We're going to give it to you just to assist you. But if you think there's a difference between what the audio recording says and what the transcript says, the audio recording is the evidence, not the transcript.

Counsel, will you waive court reporter during the playing of the audio?

MS. FULTZ: Yes.

MR. BRYANT: Yes, Your Honor.

THE COURT: Is that true for any future audios as well?

MR. BRYANT: That is, Your Honor.

MS. FULTZ: Anything transcribed.

THE COURT: Okay. Thank you.

(Audio played; not reported.)

THE COURT: Okay. Deputy, can you collect the transcripts, please.

If everyone would just pass them down to the end, that will be helpful. Thank you.

BY MS. FULTZ:

Q. Deputy Alfred, can you walk us through what it is we just heard in that recording?

A. That is the audio recording initiated with my contact with the reporting party followed by my contact with Mr. Barber.

Q. Now, we heard some sounds from the car. Can you

describe what you were experiencing as you heard those sounds?
A. That was the sound of the engine revving and the tires gaining traction. As in -- as it motions towards my direction.
Q. Now, after you spoke with the reporting parties, there was some sort of squeaky noise. Was that -- can you describe what that squeaking noise is, after you left the reporting parties?
MR. BRYANT: Objection. Vague.
THE COURT: Overruled.
THE WITNESS: I'm sorry. I'm having a hard time.
BY MS. FULTZ:
Q. Do you know what I'm referring to?
A. I do not, no.
Q. Is there a sound that is made when you walk when you're wearing your belt recorder?
A. Yes.
Q. Can you describe what that sounds like?
A. That's the equipment on the belt such as keys and other utilities that we're assigned. So that recorder picks up those sounds. Because that's where the recorder is affixed to on the belt.
Q. Okay. Does the holster that it sits in ever making sort of squeaking noise as you walk?
A. Yes.
Q. If you recall -- I don't know if you were paying attention. Did you hear that as you walked in this recording?
A. Yes.

Q. So the first sounds, the first voices that we heard you encountering were the reporting parties. Do you know them by name?
A. I do not, no.
Q. And then after you went and walked and made contact with the defendant, Mr. Barber. Was that his voice that we heard, the other voice? That was not yours?
A. Yes.
Q. After the encounter we just heard in the recording, did any of -- any other deputies arrive to the location?
A. Yes.
Q. How many?
A. I believe every available deputy assisted.
Q. Do you recall seeing anyone specific?
A. Yes.
Q. Either by name or how many do you recall specifically?
A. I believe four.
Q. And then after an incident like this, you don't stay and participate in the investigation, correct?
A. No, I do not.
Q. Okay. Is it fair to say you left shortly after the events that were captured in the recording?
A. That is correct, yes.
Q. When you saw the vehicle, the reverse lights and the tires turning, where does your mind go? Do you call on your training? Are you -- what are you thinking about?
A. To try to gain some control of what's going on and

that usually refers back to training.

Q. And did that happen for you? Were you able to call on the things you learned in all of your training and experience?

A. Yes.

Q. How long -- when this event occurred, how long had you been a patrol deputy in Adelanto?

A. About four years.

Q. And had you ever, in those four years, investigated a collision where it was vehicle versus pedestrian?

A. Yes.

Q. And did any of that come to mind at all during this experience?

A. Yes.

MS. FULTZ: Thank you. That's all I have.

THE COURT: Thank you.

Cross-examination, Mr. Bryant.

MR. BRYANT: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Deputy Alfred.

A. Good afternoon.

Q. Deputy Alfred, during the lunch break did you have any conversations with anyone about the case about maybe any facts or listen to any audio during that break period?

A. No.

Q. You would agree with me that during your testimony

this morning -- we're looking at the screen right now. You testified that the vehicle started to go in reverse while you were standing between Marker 6 and 7 on this screen. Do you recall that testimony?
A. Yes.
Q. And so you would agree with me you just testified this afternoon that you've changed your testimony and now the vehicle didn't start going into reverse until Marker No. 9, which is approximately several feet beyond where 6 and 7 is, correct?
A. That is incorrect. I testified to where I was standing when the vehicle was in motion.
Q. Okay. So the vehicle was in motion initially at 6 and 7?
A. That is correct, yes.
Q. And you continued to move forward to 9 while the vehicle was still in motion?
A. I do not know.
Q. Okay. Deputy Alfred, you testified this morning that the first time you were able to see and make contact with Mr. Barber is when you drove your vehicle past this driveway. Do you recall that?
A. Yes.
Q. And do you recall that the testimony was, we made eye contact, right?
A. Yes.
Q. And you would agree that you believe it was approximately 60 yards away, Mr. Barber's vehicle. It

wasn't -- it wasn't here, correct? You see how we're looking on the screen? Now, that is not where the vehicle was, correct?

A. That is correct, yes.

Q. You would agree with me that vehicle was approximately 15 feet. I guess would that be north?

A. Looking at the photo, this is -- we're looking south.

Q. Okay. It would be 15 feet south towards the house, correct, approximately?

A. I'm sorry. Can you repeat your question?

Q. Sure. Where the vehicle is now that is not where it started, correct?

A. Correct, yes.

Q. You would agree with me that the vehicle started, was parked before it moved where Mr. Barber was when he got into that vehicle? It was approximately anywhere between 12 to 15 feet from where this vehicle is currently in this picture, correct?

A. Correct, yes.

Q. And so therefore it is your testimony that despite the fact that lighting was low, and despite the fact that this was approximately 60 plus yards away, and that would be over the length of a football field or half of a football field, correct, 60 or 50 or 60 yards, correct?

A. Roughly, yes.

Q. It is your testimony that you and Mr. Barber caught eyes approximately 60 yards or over a half a football field's

length away in the middle of the night in a darkly lit area.

A. Was that a question, sir?

Q. Yeah; is that your testimony?

A. Yes. He looked in my direction and I looked back.

Q. You then testified that you made -- that second time you made eye contact with him when he walked where you walked over to where the reporting parties were, correct?

A. Correct. We looked at each other.

Q. You looked at each other in your eyes, correct?

A. That is not correct. He looked at me. I looked at him from a distance.

Q. How do you know what he saw?

A. He looked in my direction.

Q. And you didn't make eye contact?

A. I did not, no. It was a figure of speech.

Q. You have no idea what he saw, correct?

A. I do not know.

Q. And it's your testimony that you saw him, though, correct?

A. I saw a subject near the vehicle in a white T-shirt.

Q. So, so, again you testified earlier that while you were driving your vehicle past this, this driveway, you made eye contact. This was your specific testimony. You made eye contact with Mr. Barber, who was probably anywhere 10, 60 to 70 feet away down a dark driveway, correct?

A. That is correct, yes.

Q. And were you being -- was that a figure of speech,

or did you really -- is it your testimony that you actually made eye contact with him?
A. Figure of speech.
Q. Okay. So then, in fact, you didn't make eye contact with him, correct?
A. That's correct.
Q. And you would agree with me that you have no idea what Mr. Barber saw, correct?
A. I do not know what he saw, no.
Q. So then it would be inaccurate to say you and Mr. Barber made eye contact initially, as you drove past this particular property, correct?
A. Correct.
Q. And it would be inaccurate to say that you know for a fact Mr. Barber recognized that it was you and your police vehicle that made this contact, correct? You have no idea, correct?
A. That is correct.
Q. And once again, you have no idea whether or not Mr. Barber recognized whether or not you were an officer when you walked over to speak to the reporting parties, correct?
A. I was in a department-approved uniform.
MR. BRYANT: Your Honor, I'm going to play --
BY MR. BRYANT:
Q. So, so just for clarity here, it's your testimony that Mr. Barber recognized you by the time you had driven past the driveway, parked the car and walked to Mr. and Mrs. -- well, the reporting parties, correct? That's your testimony,

correct?

A. That is my testimony that Mr. Barber looked in my direction, and I looked in his direction. And when I proceeded to speak with him, I believed he knew that I was a deputy sheriff by my attire and the commands that I spoke towards him.

Q. We're going to find out the time frame here, right? So is it your testimony -- so, so the way it was asked of you, you were asked how did you know -- how did you know Mr. Barber knew you were law enforcement? Do you remember that question this morning?

A. Yes.

Q. And you responded Mr. Barber knew because we made eye contact on two occasions, when I drove past the property and when I made first contact with the reporting parties. That was your testimony, correct?

A. Correct.

MR. BRYANT: Your Honor, I'd like to introduce impeachment evidence, an excerpt of Deputy Alfred's interview with Detective Hernandez.

THE COURT: Any objection?

MS. FULTZ: Improper impeachment.

THE COURT: Approach. We're going to have a brief side bar.

(Bench conference held, not reported.)

THE COURT: Objection is sustained.

BY MR. BRYANT:

Q. Do you recall in this case, Deputy Alfred, at some point in time you gave an interview following the incident?

A. Correct, yes.
Q. And if you recall at approximately -- at approximately a month after the incident occurred May 27th; is that helpful?
A. That sounds about right, yeah.
Q. And who interviewed you?
A. Detectives from specialized investigation division.
Q. And during this interview, you were asked a number of questions as to what had occurred during the incident, correct?
A. Correct.
Q. And you would agree with me that when you were talking about the description of the lighting in the area, you described it as poor; would that be accurate?
A. Yes.
Q. And in poor -- when you say poor, it means it was really difficult to see. How would you describe poor? What did you mean by that?
A. Poor, like consistent of not being able to see fine details that you would see in a regular lit area or during the daytime.
Q. And we're looking on the screen right now. This -- there's some bright light here. That's not what it looked like on the bottom of this exhibit. That's from, like, a light source used to take pictures or to assist with taking pictures. That wasn't how light it was, correct?
A. To my recollection, no.
Q. Okay. And you described at some point in time you

saw Mr. Barber. You're walking down this pathway. And you start to give him a command, do you recall that?
A. I asked him to come over and speak with me.
Q. Okay. And so you ask him to come over and speak with you, and he doesn't speak with you, correct?
A. Correct.
Q. You would agree with me that you just heard your audio belt, right?
A. Correct.
Q. And at no point in time did you ever announce that you were a sheriff, correct?
A. That is correct.
Q. And you would agree with me you saw an image of you earlier you had a beanie on, right?
A. Correct.
Q. You had dark pants?
A. Correct.
Q. You also had sort of a face mask that you had. You said was moved down a bit. That was dark as well, correct?
A. Correct.
Q. So all the clothes that you had on, they were dark clothes, correct?
A. The pants were yes and the beanie.
Q. I mean, even the beige shirt you were wearing, I mean it's not a bright shirt, correct?
A. That's correct, yes.
Q. And in poor lighting, it could potentially be difficult to see, even that shirt. You would agree with me,

correct?

A. That is correct, which is why I use my flashlight to illuminate my pathway as I walk toward Mr. Barber.

Q. We'll get to that. We'll get to that. So at this point in time you recall testifying earlier that when you first saw Mr. Barber, you saw his white shirt. But you couldn't tell what kind of pants he had on, would that be accurate?

A. That is correct.

Q. And that's because again the lighting was very poor down this very long driveway, correct?

A. Correct.

Q. Now, as you're walking down this driveway, when do you pull out your service weapon?

A. After I told Mr. Barber to show me his hands.

Q. So we're going to talk about some of your training, and you went through the academy. Is that where deputies go in order to become deputized?

A. That's where they go to receive their training, yes.

Q. And you learn something called POST?

A. Correct.

Q. What is POST?

A. POST stands for Peace Officer Standardized Training.

Q. And during POST, you are taught a variety of different things. Use of force, we'll talk about that. But use of force, correct?

A. Correct.

Q. How to take police reports?
A. Correct.
Q. How to properly handcuff someone?
A. Correct.
Q. And you also taught this concept of command presence, correct?
A. Correct.
Q. And command presence is a variety of tools to assist both yourself and the person that you are looking to make contact with in order to insure that they recognize that you are law enforcement, correct?
A. Correct.
Q. And part of command presence can at times be the uniform, correct?
A. Yes.
Q. And in a very brightly lit area, if somebody sees a uniform, they recognize well, that must be a law enforcement officer, which is why command presence is wearing your uniform properly, right?
A. That is correct, yes.
Q. And other parts of command presence is when you go to a door, you approach a door and you announce yourself, knock and announce. Knock, San Bernardino County Sheriffs Department. That -- this would be command presence, correct?
A. Correct.
Q. And you testified earlier that it is very common for law enforcement to announce themselves in a variety of different reasons to inform whomever you're looking to make

contact with, that you're a law enforcement officer. Do you recall that testimony?

A. Yes.

Q. And you would agree that in a situation given your training and experience and knowledge, in a situation where you're walking down a very dark driveway with somebody who is approximately over a half a football field away, it would be important for your training to announce to this person that you're law enforcement, saying San Bernardino County Sheriffs Department. You would agree with me, right?

A. Under certain circumstances, yes.

Q. And in this particular circumstance, you agree with me, you have no idea whether or not Mr. Barber recognized you were law enforcement as you walked up this driveway, correct?

A. I believe he did.

Q. But you don't -- but that's your belief, but you don't have any way to support your belief. You're assuming he did, correct?

A. No, it's not an assumption.

Q. So you're saying it's not an assumption. Tell me how that went, an assumption?

A. Given the fact that you mention very dark. It was poor lighting, ambient lighting. And as I reiterated during the course of that I'm not walking in the dark. I illuminated myself to my discretion so I can be visible to Mr. Barber.

Q. You had your flashlight in your hand?

A. Correct.

Q. You would agree you needed your flashlight to see.

Do you recall during your interview they asked you, "Was the lighting poor?" And you said, "Yeah, that's why I need to have my flashlight," correct?
A. Correct.
Q. So you needed personally a flashlight to be able to walk down this driveway, correct?
A. So I can see, yes.
Q. And it's your testimony that you walk down the driveway with the flashlight up in your face. Was it down? Where was the flashlight at in your hand as you approached Mr. Barber?
A. Between my feet and the path that I was walking.
Q. Okay. So between the feet -- your feet and the path you were walking, and I'm going to step back a little bit. And I'm pointing my arms down with the flashlight down to the ground, right? It's facing -- it's more so like in a 45 degree angle.
A. Correct, yes.
Q. So 45 degree angle. And the light source is facing down to the ground where your feet and your pants are, correct?
A. Correct.
Q. And those were your dark pants, correct?
A. Correct.
Q. And you didn't have the flashlight facing your face and your uniform as you walk down out so he can recognize the upper part of your body, correct?
A. Correct. Because that would blind me, and that actually classifies as a officer safety issue on my portion of

this, yes.

Q. So given the light source was to your feet, and it wasn't actually facing your body, it was facing away from your body and down, how is it that you believe Mr. Barber could have recognized that you were a law enforcement officer without you announcing it?

A. Because that light, back lights the subject who's holding the flashlight. There's been training, and I receive that supports that tactic.

Q. So it's your testimony that the light on the ground was somehow reflecting back on to you?

A. Yes.

Q. Again, it is at 45. That's what you believe, correct?

A. Within that area, yes.

Q. Do you recall testifying -- I apologize. Strike that.

So outside of what you believe would be what you perceive Mr. Barber to have seen, with the flashlight facing the ground, was there any other indications where you would agree with me there was nothing else outside of possibly him seeing your uniform? Possibly there was nothing else that you did outside of giving a command, correct?

A. When I initially arrived, Mr. Barber looked in my direction. I looked in his direction. As I previously testified the marked patrol units have a graphic logo on the door that are illuminated for nighttime situations. Based off all the information, I believe that Mr. Barber knew law

enforcement was present, based off my vehicle and my contact with him.

Q. Well, let's talk about your vehicle. I'm going to go to -- and this is going to be Defendant's Exhibit No. 19 -- I apologize. Defendant's Exhibit No. 20.

MR. BRYANT: What's the next one? I guess we're going to rechange the numbers at this point. Yeah, sorry about that.

30. Okay. We're going to call it our Exhibit No. 30. We don't have it marked yet. We had different numbers. We weren't quite sure what these numbers were going to be so, I apologize. May I proceed while we're working on this, getting this to the Court, Your Honor?

THE COURT: Yes, and you can cycle back to this.

MR. BRYANT: Okay. Thank you so much. Sorry, Your Honor. I guess the machine hasn't been very cooperative today.

My apologies, ladies and gentlemen of the jury. I'm just having some technical issues. Usually you press the buttons. Thank you so much. I appreciate that. All right. So I'm going to --

BY MR. BRYANT:

Q. This is where your vehicle was that night, correct?

THE COURT: What exhibit number are you?

MR. BRYANT: This is Exhibit No. 30, your Honor.

THE COURT: Thank you.

BY MR. BRYANT:

Q. Deputy Alfred, looking at Exhibit No. 30, this is your vehicle, and I'm in the middle of the screen to the left. Do you see that?

A. Yes.
Q. Okay. And over to the right directly to the right is the driveway, correct?
A. Correct.
Q. And you would agree with me that this -- your vehicle is not parked directly in front of the driveway. It's parked some distance. Would that be west where you're parked at or east?
A. East.
Q. Okay. Would be some distance east, correct?
A. Yes.
Q. So if you were standing at the end of that driveway towards that back house where Mr. Barber was residing, you wouldn't be able to see that vehicle there, correct?
A. That is correct.
Q. And we're going to mark this as Exhibit No. 31. Again, here -- this is again, this, this lighting that you're seeing here, is not the lighting that was in front of this driveway at the time, correct?
A. Correct, yes.
Q. And you're saying that the vehicle -- your vehicle drove passed this driveway where you could barely see these lights to the vehicle that Mr. Barber was driving, correct?
A. Yes, I drove west.
Q. Okay. And again, you would agree with me that this car right here is actually again 15 feet south of where it's currently standing when Mr. Barber first entered into that vehicle, correct?

A. Correct.
Q. And it's your testimony that as you drove past this driveway, not knowing who the reporting parties were and not knowing sort of what the circumstances were, you and Mr. Barber, it's your testimony, that you both saw each other?
A. I looked in his direction, and he looked in my direction.
Q. You testified that at some point you fired a number of rounds, correct?
A. Correct.
Q. And again, at no point in time did you announce to make it very clear to Mr. Barber, that you were law enforcement, correct?
A. Correct.
Q. And when you first made contact with him, you said, hey bud, or you started just making sort of -- sort of -- you called out to him in sort of a way like hey, let me talk to you, right?
A. Correct.
Q. And he responded he didn't want to talk to you, right?
A. He didn't -- he ignored my request to speak.
Q. What was he doing at this time? In his vehicle? Out of his vehicle? What was happening when he initially ignored your request?
A. He -- after he ignored my request, he placed his hands inside the driver's side of the vehicle.
Q. You would agree with me you started to make

commands. And did you start making this initial command -- when did you initially make this contact?

A. When he refused to show me his hands.

Q. I apologize strike that.

When did you make your initial command to Mr. Barber to come here? You said hey buddy, come here, and he ignored you?

A. Correct, yes.

Q. I'm saying at what point down this driveway did this occur?

A. As I'm walking down the driveway.

Q. Okay. So, so we're looking at the driveway right now. Are you still within this -- the white fence to the left here and the metal fence to the right or are you further down?

A. Further down.

Q. And approximately how far down are you?

A. I would say probably halfway.

Q. So you meet with the RPs, and you're now investigating for vandalism; is that accurate?

A. Correct.

Q. And you say that you were informed Mr. Barber was banging on their car, he seemed upset about something. Do you recall testifying about that?

A. Yes.

Q. At what point did you ever look at the vehicle to see if there was any damage on that vehicle?

A. I did not.

Q. And you would agree with me there was no damage to

that vehicle, correct?

MS. FULTZ: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. So you're there investigating a potential vandalism, correct?

A. Correct.

Q. And they're in the vehicle and explaining to you that he was banging on the vehicle, correct?

A. Correct.

Q. Did you -- why if you were looking at a vandalism, why didn't you take a look at the vehicle or any vehicles to determine whether or not anything was even damaged?

A. Because observing the damage does not -- and I only speak from my own experience myself, that it didn't fall in a certain priority of what task to take next. You know, given the fact that the reporting party explained Mr. Barber hit her hood, he had threatened them. They felt scared. My responsibility is to render the environment safe in order for me to do that. And Mr. Barber is agitated. I can't effectively analyze damage on a vehicle, if there's an involved party who could be a potential threat.

Q. And as you continue to walk down this driveway, you at some point pull out your service weapon, and Mr. Barber begins to rev his engine up. Do you recall that testimony?

A. Yes.

Q. And again, do you recall giving an interview with some detectives in this case?

A. Yes.
Q. And do you recall giving testimony where -- I apologize. Do you recall giving a statement that you were only 8 to 10 feet away from the vehicle before it started moving?
A. Approximately, yes.
Q. So 8 to 10 feet from that vehicle where it initially started, which would have been approximately 15 feet from where that car is currently in this picture, correct?
A. I'm sorry. Can you repeat that for me, sir.
Q. Sure. You would agree with me, that the vehicle currently in the picture on the screen was not -- that was not the location of the vehicle when the vehicle -- when Mr. Barker entered into that vehicle, correct?
A. That is correct. That was where the vehicle came to rest.
Q. And again, so we agree that that vehicle was approximately anywhere between 12 to 15 feet from this particular position, correct?
A. Correct.
Q. So therefore you would have been 8 to 10 feet away from that vehicle. Again, you were pretty close to the vehicle at the time, right?
A. Correct.
Q. You were very close to the vehicle when you started firing your shots, correct?
A. Correct.
Q. Mark as Exhibit 32, this is it's not to scale. But this is a diagram that was created during the course of the

investigation to this case, okay? Just to give you an idea of where all the locations of the various objects were. All right. Make sense?

A. Yes.

Q. Okay. And if you look at the top of the screen, you have No. 1, and that's your police vehicle, correct?

A. Correct.

Q. And here No. 11, that is the vehicle where it stopped, correct?

A. Correct.

Q. And when I say the vehicle, I'm referring to Mr. Barber's vehicle, correct?

A. Yes.

Q. And the vehicle started approximately 10 to 15 feet south, which would be where this arrow is, which is towards the bottom of the screen closest to the last line; do you see that?

A. Yes.

Q. So your testimony is that you were approximately 8 to 10 feet away from Mr. Barber when you fired your rounds, correct?

A. Correct.

Q. And so that would have placed you somewhere where the vehicle rested, correct?

A. Correct.

Q. And we heard the audio. Where the vehicle has -- makes some squealing noises with the tires. Mr. Barber gets into the car at some point. You say he's trying to gain traction; do you recall that?

A. Yes.
Q. Some point you recall the car is not moving but tires are moving, correct?
A. Correct.
Q. It might be kick up some dirt or dust, but none of that is hitting you, correct?
A. I don't recall, no.
Q. You don't recall giving a statement to the interviewing officer when they asked you if -- or deputy if when they asked you, "Did you get hit by any rock or gravel?" You said no. Do you recall that statement?
A. Yes.
Q. Okay. So in fact, now that sort of refresh your recollection. You weren't hit by any rock or gravel, correct?
A. That is correct. I was not.
Q. And you had a Glock 21; is that accurate?
A. Correct.
Q. And can you describe to the ladies and gentlemen of the jury what a Glock 21 is?
A. It's a semi-automatic pistol Glock manufactured, consist of a polimer frame along with a steel frame. My particular firearm is fitted with a magazine of 13 Winchester, .45 cartridges.
Q. And so your Glock 21 fired .45 caliber rounds, would that be accurate?
A. Correct.
Q. And at this point in time, you've identified that you are so close to Mr. Barber. There is this -- circling this

to the left of the screen, there's a fence that's sort of in a brown color. Do you see that that I circled?

A. Yes.

Q. And to the right is this chain-link fence that we've been discussing. Do you remember see that?

A. Yes.

Q. And again, this is where you're located at this point, right around this area that we're discussing towards the end of that wooden fence and to the right of chain-link fence. And that would be approximately where you were when you started firing your rounds, correct?

A. No, that is incorrect. I testified that I was within just south of the residence on that west side where the opening was at.

Q. So maybe can you show on the screen with the pointer where you're saying you were at?

A. So this generalized area right here is the real estate that I occupied.

Q. Okay.

A. Where my contact with Mr. Barber was where it finalized at.

Q. And that's where you fired your shots?

A. Yes.

Q. Isn't it true that you fired your shots when you said you were approximately 8 to 10 feet away from Mr. Barber's vehicle, correct?

A. No, that is incorrect.

Q. That's not true. That wasn't your testimony

earlier that you didn't fire your service weapon when you were approximately 10 to 12 feet away from Mr. Barber?

A. No. In my interview with investigators I explained that I was approximately 8 to 10 feet away --

Q. Okay.

A. -- from the vehicle.

Q. When you fired your shots, correct?

A. That is incorrect, no.

MR. BRYANT: Okay. One moment, Your Honor.

BY MR. BRYANT:

Q. Let me see if I can refresh your recollection.

THE COURT: Let's go ahead and take our afternoon recess at this time. We'll take a 15-minute recess. Don't talk about the case. We'll get started at half passed the hour.

(The following proceedings were held outside the presence of the jury.)

THE COURT: We're on the record outside the presence of the jury. Mr. Bryant, the trial order request in this case required that your exhibits be premarked. You haven't done that. So make sure this gets done during this recess.

MR. BRYANT: Understood, Your Honor.

THE COURT: Take a little longer.

MR. BRYANT: Understood.

THE COURT: Secondly, you told the witness what this exhibit was. That's not the way it works. The witnesses tell you what something is, not you. Unless you want to take the stand and place yourself under oath, don't be telling the jury what something is.

MR. BRYANT: Understood, Your Honor.

THE COURT: Okay. And finally, I don't believe the witness has testified to any lack of recollection at this point, so he doesn't need his recollection refreshed.

MR. BRYANT: Understood, Your Honor. Thank you.

THE COURT: We're in recess.

(Recess taken.)

(The following proceedings were held in the presence of the jury.)

THE COURT: We're back on the record. Please have a seat, sir. You're still under oath.

Okay. Mr. Bryant.

MR. BRYANT: Thank you, Your Honor.

BY MR. BRYANT:

Q. Deputy Alfred, I just wanted to get some clarity. It seems like we were having somewhat of -- I was having a little confusion.

How far away from you from Mr. Barber when he was entering into his vehicle at the point which you drew your firearm?

A. I would say roughly about 12 to 15 feet.

Q. So you were approximately 12 to 15 feet away from Mr. Barber when you drew your firearm?

A. Correct, yes.

Q. And again we talked about the -- your previous testimony or your previous interview you had with the detectives, and do you recall giving the statement to the detectives that you were approximately 8 to 10 feet away from

Mr. Barber when you drew your weapon?
A. Yes.
Q. So which is accurate? Is it accurate that you were 8 to 10 feet when you drew your weapon or were you 12 to 15 feet when you drew your weapon?
A. 12 to 15.
Q. Do you know why your statement of 8 to 10 feet that was made in May of 2021, is different than your statement today, which we are now in December of 2024?
A. There is information I was able to review to confirm that and support my recollection for that.
Q. Okay. What was that information you were able to review? How did this refresh your recollection as to where you were located when you pulled out your service weapon?
A. I was provided with a binder that contained details and information about the incident.
Q. So essentially when you reviewed this information you were pushed back a couple of feet from where you believed you were when you fired your service weapon; would that be accurate?
A. Yes.
Q. Okay. And you would agree with me that we're going to pull up Exhibit No. -- Exhibit No. 34, been marked as Exhibit No. 34?
THE COURT: Has it?
THE JUDICIAL ASSISTANT: It hasn't been marked.
THE COURT: As we discussed, all of these exhibits should have been premarked, Mr. Bryant. Get them marked.

MR. BRYANT: It is currently now.

THE COURT: It's not. That's what our clerk is telling us. That's what the break was for.

MR. BRYANT: Understood. I do apologize, Your Honor, with this particular issue with regard to the premarked exhibits.

THE COURT: Thank you.

THE JUDICIAL ASSISTANT: It's 33.

THE COURT: Okay.

MR. BRYANT: Thank you, Your Honor. And I apologize if we have any more snafus with these exhibits moving forward.

BY MR. BRYANT:

Q. So Exhibit 33, again, are you familiar with this scene? Oh, I apologize. There's nothing on the screen. Again, you're familiar with this particular scene, correct?

A. Yes.

Q. And again, where this vehicle is located, that's approximately 12 to 8 feet from its original location when the vehicle first started, correct?

A. That's correct, yes.

Q. So again, you drew your service weapon -- it's your testimony that you drew your service weapon when you were approximately where this vehicle is currently located, correct?

A. That is incorrect, no.

Q. You just testified that you drew your service weapon approximately 12 to 15 feet away from where the car initially started, correct?

A. I drew my service weapon prior to the vehicle going

in motion. As Mr. Barber entered the vehicle and the vehicle going in reverse motion, my service weapon was drawn.
Q. So again, when I just asked you when do you believe you drew your service weapon, you said approximately 12 to 15 feet from Mr. Barber's vehicle, correct?
A. That is correct, yes.
Q. And then I asked you, you stated in your interview that you pulled out your service weapon where you were approximately 8 to 10 feet and you corrected that, correct?
A. That's correct, yes.
Q. You would agree with me that you pulled out your service weapon at approximate location of where this vehicle currently is in this image, correct?
A. Approximate location, yes.
Q. And you heard the tires making noise and was trying to gain traction, do you recall that?
A. Yes.
Q. And at some point in time, you believe that the car came toward you; is that accurate?
A. It did come towards me. It wasn't a belief.
Q. And it's your testimony that the car sped towards you at a high rate of acceleration; is that accurate?
A. Yes.
Q. How fast would you approximate the vehicle was moving?
A. Faster than I can run.
Q. If you can give me an estimate as to approximately how many miles per hour. Was it ten miles? 20 miles? 30

miles? Can you give me an estimate of how fast you thought the vehicle was moving?
A. I cannot. I don't want to give an assumption.
Q. And it was at that moment that you heard Mr. Barber get into the car. We heard that audio. The car door closes, right? You hear the tires trying to gain traction, right? And then there's a brief silence. Do you recall that, like, a brief silence?
A. Are you referring to the audio recording?
Q. Yes. The audio recording. There was a brief silence. Do you recall that?
A. Yes.
Q. And then you hear your service weapon fire, correct?
A. Yes.
Q. And you testified that again, you're approximately 12 to 15 feet away when you fire your service weapon, correct?
A. Correct.
Q. And it's your testimony that you couldn't get out of the way, meaning, you couldn't move out of the way because one, you had a chain-link fence to your left, you see that?
A. Yes.
Q. Is that blocking you, the chain-link fence, to get out of the way? Just assuming you wanted to, you couldn't?
A. It's a east and west obstruction type, yeah.
Q. To the right where the vehicle is sort of stopped, that's that fence. Do you see that?
A. Yes.

Q. And that fence would have obstructed you to -- going to the right, correct?
A. Yes.
Q. And do you recall getting a statement previously where you stated you couldn't go through this opening that we see to the west because you had already gone passed that when you started firing; do you recall that?
A. Yes.
Q. So when you started firing your service weapon, you were beyond that opening in the fence, correct?
A. I believe it was, yes.
Q. Do you see these service markers that are -- I apologize, these yellow markers in this image?
A. Yes.
Q. And let's -- this is going to be Exhibit 34.
MR. BRYANT: That is not yet premarked, and we are doing that right now, Your Honor.
BY MR. BRYANT:
Q. Again, you're familiar with what these yellow markers are, correct?
A. Correct.
Q. And you've seen this image before, correct?
A. This is the first time I've seen this exhibit, yes.
Q. And are you familiar with this scene? Does this scene look familiar to you?
A. Yes.
Q. And maybe, can you explain what these markers mean for the jury?

A. So the -- these are what's called markers or placards. So in the event you have a crime scene, these placards are used to mark evidence within the scene or something that is significant within that scene. So when, in this case, for example, I believe it's Placard No. 9, would be my flashlight. That's something significant in this incident, so it's marked with a placard and so forth.

Q. And let's first start at the bottom here. Placards 2, 3, 4 and 5. Do you see that the bottom right-hand corner of the screen?

A. Yes.

Q. Do you know what those placards represent?

A. I do not know.

Q. Marked as Exhibit No. 34 --

THE COURT: This was 34.

MR. BRYANT: 35. I don't want to put the incorrect exhibit on the screen. We made a little change to some of the exhibit names. Perfect.

BY MR. BRYANT:

Q. Deputy Alfred, this is Exhibit marker No. 2. Do you see this exhibit here?

A. Yes.

THE COURT: Is this Exhibit 35?

MR. BRYANT: Yes, it is Your Honor.

THE COURT: Thank you.

BY MR. BRYANT:

Q. And what is this to the bottom left?

A. That is a fired cartridge casing.

Q. Okay. And do you know why there's a two next to this fired cartridge casing?
A. I do not. I did not place the marker to scale at the crime scene.
Q. Do you know if this is your fired cartridge casing from the rounds that you fired?
A. Yes.
Q. That is your casing?
A. Yes.
Q. And we're going to now mark as Exhibit 36. This is marked No. 3; do you see that?
A. Yes.
Q. And again there's a shell casing here. And is that your shell casing to the best of your knowledge?
A. Yes.
Q. And going back just to this picture here, we saw the shell casings at Markers 2 and 3 here on the screen. If you fired your service weapon 12 to 15 feet away from Mr. Barber's vehicle, which would have been somewhere approximately to the upper left-hand corner where I'm placing the X somewhere here, could you please explain to the ladies and gentlemen of the jury how there were shell casings 2 and 3, if not more, in this particular area?
A. Well, during an event like this, a high priority incident there's a lot of personnel coming in and out of a scene. Medical personnel were the personnel that was requested after this incident unfolded.
Also, other deputies, other responding personnel

supervisors and such forth. That could cause in effect what you're seeing things to be kicked or moved from its original placing. In the incident such as fired cartridge casings it's possible and likely that any of the evidence within that scene could be inadvertently touched, kicked or moved from its original position due to the fact that trying to provide medical aid for someone takes priority over the scene preservation.

Q. So given the fact that you have 2 and 3 marked here, is it your belief that those bullet shell casings were inadvertently moved to this part of the home?

A. I don't want to speculate. It's a possibility.

Q. Isn't it true that you've been trained to use a service weapon, right?

A. Correct.

Q. And whenever you fire your service weapon, are you familiar with how a service weapon works?

A. Yes.

Q. Are you familiar how a Glock 21 work?

A. Yes.

Q. You press the firing mechanism. There is some combustion. Well, why don't you explain for the jury just in your understanding of how your firearm works.

A. So the purposes of the issued firearm I have, there's a couple of components that make up the overall function of the projectile, the release from the firearm. So for the purpose of the semi-automatic, there is a firing pin. Sometimes that firing pin is external or internal for the Glock

21, internal firing pin. You press the trigger. That pin which now strikes the primer to a round that's chambered within the barrel that creates a minor explosion.

And since it's an explosion, the slide mechanism on the Glock is operated by a spring so it goes back in a reverse direction to let the cartridge, which is what was seen in the previous exhibit, it's discharged. And the bullet, the projectile, exits the barrel. And that's pretty much the course of the fire when that weapon system is fired.

Q. And when you fire your service weapon -- and you have familiarity with this particular Glock 21, correct?

A. Correct.

Q. Does the shell casing eject from the firearm?

A. Not all the time.

Q. Most of the time if the shell casing does eject from the firearm, what direction does it go?

A. To the right. I'm sorry. To the right.

Q. So if I am facing you, and I have my firearm facing you, and I fire it, my ejection -- my casing is going to be ejected to the right, correct?

A. In a right direction.

Q. Rightward direction might be directly to the right, right to the back but to the right direction, correct?

A. Yes.

Q. And approximately just based upon your experience, knowledge and understanding of using this firearm, how far does the casing eject?

A. That can be difficult because there's other factors

that can determine that. Terrain, slope, the height of the person operating the firearm, the angle, whatever your point of aim is there's some factors that can determine that. So it will be difficult to pinpoint.

Q. Can you estimate about how many feet it may go? Does it usually go one -- just in generally speaking, usually go 1, 2 feet, 10 feet? How far does it typically go when you're firing your service weapon on a flat surface?

MS. FULTZ: Calls for speculation based on the last answer.

THE COURT: Overruled. Excuse me. Overruled. You can answer.

THE WITNESS: Anywhere from within the 10 foot range or distance.

BY MR. BRYANT:

Q. And that would be odd, if a shell casing ejected 40 feet away, correct?

A. Not necessarily.

Q. On a Glock 21?

A. Not necessarily. The person operating the firearm can be shooting a motion moving in a different direction, which could effect the distance of that cartridge.

Q. I'm now going to what's now been remarked as Exhibit 37. Marker No. 4 is that again -- that's a shell casing?

A. Correct.

Q. And it's your understanding that is your shell casing, correct?

A. Correct.
Q. And marked as Exhibit 38. Again, this is No. 5, and it's your shell casing, correct?
A. Correct.
Q. So if we look here back at exhibit -- back at the exhibit we were just looking at, I want to say it was Exhibit 33, 34 here at the bottom right-hand corner, again you have four shell casings. Do you see that?
A. Correct.
Q. And when you heard your audio, do you -- from your audio belt when you were firing the shots, do you recall that there were four rapid shots initially fired? (Making sounds.) Do you recall that?
A. Correct.
Q. And here we have a bunching at 2, 3, 4 and 5 of four shell casings; do you see that?
A. Yes.
Q. And is it your testimony that despite the fact that we have shell casings 2, 3, 4 and 5 behind the opening of this yard to the right, that you fired your service weapon somewhere near where that vehicle is currently located in this picture?
A. North of where the vehicle was at.
Q. Okay. And if -- and is it your testimony that you did not fire your service weapon when you were in the general vicinity, and I will say between Markers 6, 7, 8, 4, 5, 3 and 2? You did not fire your service weapon when you were in this general vicinity?
A. That is correct.

Q. We're going to mark this. It has not yet been marked. We're going to mark this as Exhibit 39 and hand this to the clerk.

Marker No. 7 has a gun shell casing. Do you see that?

A. Yes.

Q. And that is your shell casing, correct?

A. Correct.

Q. And what will be -- my apologies once again to the Court. Marked as exhibit 40. One second.

What has now been correctly marked as Exhibit 40, shell casing and Marker No. 8; do you see that?

A. Yes.

Q. We will go back to Exhibit, 34 just identify these markings. So here we have 2, 3, 4 and 5. Those are shell casings. We have 7, which is a shell casing. And we have 8, which is a shell casing, correct?

A. Correct.

Q. And we heard the audio. And we heard four rapid shots, small pause and another fire another shot, correct?

A. Correct.

Q. And then approximately a second later we heard another fire of your service weapon, correct?

A. I know there were five.

Q. There was a total of five or six?

A. Five.

Q. Let me play the audio for you. One second. Exhibit 1 and 1A.

THE COURT: Mr. Bryant, if you're focusing just on the shots, we can dispense with the transcript; is that correct?

MR. BRYANT: Oh, yes, Your Honor. Yes, we're just focusing on the shots.

THE COURT: Ms. Fultz, is that all right with you as well?

MS. FULTZ: That's fine.

THE COURT:

(Audio played; not reported.)

BY MR. BRYANT:

Q. How many bullets did you hear fired?

A. Six. Six.

Q. Six, and you heard boom, boom, boom, boom, boom, boom, correct?

A. Correct, yes.

Q. And as we go back to Exhibit 34, it's your testimony that despite the fact that there was a bullet marker pattern where you have a bunching of four bullets that are before the gap that entered into the yard, you have another bullet casing that is a little bit further up. And another bullet casing that is also a little further up. It is your testimony that you did not fire your service weapon while you were standing in this general vicinity, and I mean the vicinity between Markers 7 and 2?

A. That is correct, yes.

Q. And it is your testimony that you fired that service weapon while you were next to the vehicle, which was only 15 feet away from Mr. Barber's vehicle and somehow all of

your shell casings have managed to wind up somewhere in this area, either before or in the center of where this large opening for the yard to the west is, correct?
A. Correct.
Q. You said that the car was moving at a high rate of speed. Is that your testimony it is coming at you at a high rate of speed, correct?
A. Correct, yes.
Q. And you can't determine how fast it was going. You said you can't make that determination, correct?
A. You can verify the speed of it.
Q. Have you ever worked patrol and had to visualize how fast a vehicle is going on street patrol?
A. Yes, yes.
Q. And so part of your daily duties as a -- when you're a patrol officer is to manage traffic violations, correct?
A. Correct.
Q. And part of managing those traffic violations is determining just based upon your estimation, your experience about approximately how fast a vehicle may be going or a motorcycle or some other type of vehicle may be moving, correct?
A. Correct, yes.
Q. And in this particular instance, it's your testimony that you can't make a determination or at least an estimation about approximately how fast this vehicle was charging at you as you alleged?

A. I testified that I couldn't verify the speed of the vehicle.

Q. Can you give the ladies and gentlemen of the jury an estimation of how fast, given your knowledge, training and experience, approximately how fast you believe the vehicle was moving when it was coming towards your way, your direction?

A. Roughly, ten to 15 miles an hour. Like I reiterated the vehicle was trying or the tires were attempting to gain traction. And if anyone knows anything about vehicles that takes a hard press on the accelerator because that vehicle and the transmission is trying to find a hard surface to move on. And that was my indication that the vehicle was moving at a high rate of speed along with visualizing it.

Q. Isn't it true that the vehicle after you fired some shots had stopped at some point?

A. Yes.

Q. And again you say it traveled approximately 10 to 15 feet, correct?

A. From my belief, yes.

Q. And given the fact that it was going 10 to 15 miles per hour, in your estimation from its position, is there any explanation why this vehicle didn't go further, I mean, if you have one?

A. I do not, no.

Q. And you would agree with me that the vehicle actually stopped without any -- it just simply stopped. It didn't hit the fence to the left the chain-link fence, correct?

A. That is correct, yes.

Q. And even though it's close to the wooden fence it didn't hit the wooden fence, correct?
A. Correct.
Q. It just slowed to a stop, correct?
A. From my recollection, yes.
Q. Isn't it true that that vehicle didn't actually start moving until you started to fire your service weapon?
A. That is not true.
Q. Isn't it also true that that vehicle slowly rolled back into the position that it's stopped at when the vehicle was -- after the vehicle was shot at?
A. When Mr. Barber was abstracted from the driver's seat of the vehicle, the vehicle rolled backwards.
Mr. Barber's foot was taken off the brake, and the vehicle was still in reverse gear.
Q. So, so the vehicle in its current position in this picture, which is approximately 12 to 15 feet, the vehicle actually rolled back several feet to land in this particular position, correct?
A. No, I'm not aware of the distance it continued to roll.
Q. But you know it rolled back though, correct?
A. It moved.
Q. So where it's currently at, is not where Mr. Barber's car stopped after the initial gunfire, correct?
A. That is incorrect.
Q. So it's your testimony that you just stated that the car rolled back a little bit, correct?

A. Yes. When Mr. Barber was removed from the vehicle.
Q. So in this particular picture this is after the Mr. Barber is no longer in the vehicle, correct?
A. Correct, yes.
Q. This is the following day, you would agree with me, right?
A. Correct, yes.
Q. At least some time after the night of the incident?
A. Yes.
Q. That be more accurate. Okay. Thank you, and it's your testimony that you just testified that the car rolled back a little bit, right? You don't know how much, but it rolled back, correct?
A. Correct.
Q. You would agree with me that the current position of the vehicle, even in this picture, is not exactly where Mr. Barber's vehicle stopped after the shots were fired, correct?
A. That is correct. This is the final resting point.
Q. Okay. Have you -- you said -- you said the foot was on the brake. How do you know Mr. Barber's foot was on the brake of the car?
A. No, that was what was told to me.
Q. So you don't have any personal knowledge as to whether or not Mr. Barber's foot was actually on the brake?
A. No.
Q. You just know that they extracted him from the vehicle, and it rolled back, correct?

A. Correct.
Q. So again it just that was you have no personal knowledge as to whether or not Mr. Barber's foot was on that brake, correct?
A. No, it was something that was just said.
Q. And I want you to once again play this audio, and I want you to just pay attention to the point in which the car's tires screech and the shot that starts, okay? Just want you to pay attention to this section. And you know how a car sounds when it's going in reverse, correct?
A. Correct.
Q. When a car is going in reverse, it has sort of a different sound than it would be in if it's going forward. Sometimes it's like sort of a little whinier sound; does that make sense?
A. No, not really.
Q. The car -- you recognize that when a car is going in reverse, you can hear a -- the noise of the engine. There's a certain type of pitch that an engine typically makes when a car is going in reverse, correct?
A. That is incorrect.
Q. Okay. All right. I tried to ask it -- maybe it's a poor question. I don't always ask good questions.
A. That's fine.
Q. I just want you to pay attention to this one more time. Sorry about that.
(Audio played; not reported.)
BY MR. BRYANT:

Q. Okay. You heard tires trying to gain some traction, and you would agree with me at this point in time you don't know whether Mr. Barber -- even though if the car, you believe was in actual reverse, you don't know one way or another whether Mr. Barber has his foot on the brake while he's pressing the accelerator, do you?

A. The car was in motion. You need to press the accelerator for it to be in motion.

Q. Sure. Have you ever heard the term burning rubber?

A. Yes.

Q. What is your understanding of the term burning rubber? How does a car burn rubber?

A. By trying to gain traction.

Q. And if a car's tires are moving, by trying to gain traction, do you know the way in which someone would operate the vehicle where the car would stay in its position while the car's wheels would move?

A. I do not.

Q. So do you know if -- have you ever heard the concept of somebody putting their foot on the brake then also pressing the accelerator to get the tires moving? Are you familiar with that?

A. I heard of that.

Q. Would that, to some extent, be your understanding of how you may be able to burn rubber?

A. Not to my knowledge, no.

Q. Okay. Fair enough. Fair enough. I'm just asking if you know. I don't want you to guess, okay? You don't know

if at the time Mr. Barber -- sounds like he's trying to gain traction with his tires. You don't know if his foot is actually on the brake while he's pressing the accelerator at any point, correct?

A. I know that for a vehicle to be in motion you have to press the accelerator, so yes, I believe that his foot was on the accelerator.

Q. But you don't know if it was also on the brake in tandem, correct, at that time when your initially got the car moving, correct?

A. No, that was not a point of focus, no.

Q. And you heard right before that shot there's this silence, right? You hear the tires trying to gain traction, then there's this sort of half a second of silence. You don't hear the car doing anything, or do you? When you hear this silence, what is your -- you were there, correct? What is your interpretation of what that silence stood for?

A. I don't recall any form of silence during the night of that incident. Usually when the things like this occur these are traumatic experiences. It's very common to undergo what's called auditory exclusion where you lose certain senses. So I don't recall any form of silence. My main focus was the vehicle was coming in motion in my direction at a high rate of speed, which I observed, and my reaction to that.

Q. And again, we did hear -- just for clarity now -- that you are -- you again -- you've even changed some of your statements as to your positioning as far as where you believe you were located when you fired your shots, right, having had a

little bit more information; would that be accurate?
A. Clarifying, yes.
Q. So you've heard sort of this -- right before you start shooting, this quiet, maybe half a second lull where it doesn't sound like tires are moving. There's just no sound at all. Then you hear gunfire. Do we know if Mr. Barber actually took his foot off the accelerator at this point right before you started firing?
A. I do not know.
Q. And again, if I am Mr. Barber, maybe you can assist the jury in terms of having this visualization. If I'm Mr. Barber in my vehicle, could you maybe demonstrate to where you believed the distance -- maybe the jury can see. What is your distance between the vehicle, Mr. Barber and yourself when you started firing your rounds?
A. From Mr. Barber or from the vehicle?
Q. From let's just say from the vehicle. Let's just say from the vehicle. If you were talking about the back of this vehicle, could you maybe step around the jury stand, just show us where -- how far you would have been so maybe we can understand where you were at that point in relation to where the vehicle was when you start firing?
THE COURT: Go ahead, Deputy. You can step into the well.
THE WITNESS: So if I'm here, I would say rough estimate to where the vehicle was as it went in reverse motion was probably to where the counter is at.
BY MR. BRYANT:

Q. So approximately right here.
A. Relatively.
Q. Okay. So at this point this is when the vehicle started moving in approximately 10 to 15 miles per hour your way, correct?
MR. BRYANT: Yes, I am standing in front of the plaintiff's or the plaintiff's counsel's desk Mr. -- or Deputy Alfred is approximately 10 to 12 feet away from me standing, right?
THE COURT: Actually, the distance between the edge of the witness box and the edge of counsel table where deputy is standing and where you're standing is 18 feet.
MR. BRYANT: So we need to move you up approximately 6 feet. So Your Honor, do we have calculations here? If I was to stand here, do we know where it would --
THE COURT: I think the witness has testified this is the distance.
BY MR. BRYANT:
Q. Okay. Okay. It is your testimony it was approximately 18 feet then?
A. My testimony is based off what I visualize the distance to be. I didn't conduct any measurements or any other types of scales to get definitive distances. This is what I believed was approximate distance where I was and where Mr. Barber's vehicle was.
Q. Okay. Thank you.
A. Of course.
Q. And at this point -- I'll let you get back to your

seat.

At this point, this is where you believe you could not move to the left or to the right to avoid this vehicle, correct?

A. That is correct.

MR. BRYANT: And Your Honor, do you want me to keep going? It's 4:15.

THE COURT: If you can finish by 4:30.

MR. BRYANT: I don't think I will.

THE COURT: Okay. We're going to go ahead and stop for the day then. Have a nice evening. Remember don't talk about the case. Don't form any opinions or conclusions. I'm doing other matters in the morning, so I'll see everyone at 1:30, if you will just be out in the hallway and ready to go.

(The following proceedings were held outside the presence of the jury.)

THE COURT: We're on the record outside the presence of the jury. Assuming that we finish tomorrow afternoon with Deputy Alfred, who are the next witnesses?

MS. FULTZ: The two civilians, Ms. Gallo and Mr. Cocchi who did arrive a little bit late this morning.

THE COURT: Okay.

MS. FULTZ: Could I have them ordered back?

THE COURT: Certainly.

MS. FULTZ: And I want to disclose, I believe we may have to provide transportation for them to come back, just so counsel is aware.

MR. BRYANT: Understood, understood.

MS. FULTZ: May I get them?

THE COURT: Yes, I think the deputy is getting them. Are they out in the hallway or in the room?

MS. FULTZ: One or the other. I'm not sure.

THE COURT: If you want to go investigate, I'm not certain Deputy Holub is getting them.

(Brief interruption in proceedings.)

THE COURT: Ms. Fultz, are you ready?

MS. FULTZ: Yes.

THE COURT: Are you Mr. Cocchi and Ms. Gallo? Good afternoon. I apologize that you were here waiting and we didn't get to you today. This happens from time to time. We appreciate very much your patience today. We're going to ask you to come back tomorrow. What time would you like them here?

MS. FULTZ: 1:30.

THE COURT: Okay. At 1:30 tomorrow afternoon. Okay. All right.

MR. COCCHI: No problem. Thank you very much.

THE COURT: Thank you.

(Whereupon, the foregoing proceedings were continued to December 3, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,

-vs-

STEFFON TODD BARBER, Defendant.

No. FVI-21001312
REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 5 to 132, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 2, 2024.

Dated at San Bernardino, California, this 3rd day of May, 2025.

Official Court Reporter
C.S.R. No. 12225

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
)
Plaintiff, )
)
vs. ) No. FVI-21001312
)
STEFFON TODD BARBER, )
)
Defendant. )
________________________________)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 3, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

RYAN DUCKETT
Attorney at Law

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 2 of 7
Pages 134 through 222, incl.

SESSIONS


| DATE | PAGE |
| --- | --- |
| December 3, 2024 | |
| Afternoon Session | 138 |

CHRONOLOGICAL INDEX OF WITNESSES

PEOPLE'S WITNESSES PAGE

ALFRED, Christopher (continued)

Cross-Examination by Mr. Bryant ............. 138
Redirect Examination by Ms. Fultz............. 159
Recross-Examination by Mr. Bryant............. 169
Further Redirect Examination by Ms. Fultz..... 171

GALLO, Maria

Direct Examination by Ms. Fultz ............. 173
Cross-Examination by Mr. Bryant ............. 185
Redirect Examination by Ms. Fultz............. 195
Recross-Examination by Mr. Bryant............. 198

COCCHI, Joseph

Direct Examination by Ms. Fultz ............. 200
Cross-Examination by Mr. Bryant ............. 210

VANBRIMMER, Jeremiah

Direct Examination by Ms. Fultz ............. 217
Cross-Examination by Mr. Bryant ............. 219

INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 29 | Photograph | 176 | |
| 41 | Photograph | 186 | |
| 44 | Photograph | 141 | |
| 46 | Photograph | 192 | |
| 47 | Audio recording | 181 | |

Transcript cannot be provided to other parties/persons pursuant to California Code 69954(d).

SAN BERNARDINO, CALIFORNIA, TUESDAY, DECEMBER 3, 2024

AFTERNOON SESSION

DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,
JAMES BRYANT, Attorney at Law and
RYAN DUCKETT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT: Good afternoon, everyone. Deputy Alfred, you're still under oath.

Mr. Bryant, whenever you're ready.

MR. BRYANT: Just a few seconds, Your Honor. Let me get this down.

May I proceed?

THE COURT: You may.

MR. BRYANT: Thank you, Your Honor.

CHRISTOPHER ALFRED,

recalled as a witness on behalf of the People, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Deputy Alfred.
A. Good afternoon.

Q. We're starting back up again. Hopefully we can get you out of here before the end of the day.

Deputy Alfred, yesterday you raised somewhat of a important issue, I thought. And do you recall testifying that after you had fired your service weapon and after you had went to -- along with some of the fellow deputies they went to the vehicle to see what was going on with Mr. Barber, you stated that you had heard Mr. Barber's foot was on that brake?

A. That's correct, yes.

Q. When he took the foot off when they removed Mr. Barber from the vehicle, you stated that the car or the vehicle moved back, you know, some distance. You don't know exactly how much, correct?

A. Correct.

Q. Let me ask you this, Mr. Barber is removed from the vehicle. The vehicle is still in reverse, correct? At the time, was that your understanding?

A. That is my understanding.

Q. And yet, his foot is on the brake at this point in time, that was your understanding?

MS. FULTZ: Objection. Hearsay and foundation.

THE COURT: Well, it's already come in without objection, so overruled.

BY MR. BRYANT:

Q. And again, shots have already been fired. The car has stopped, and his foot is on that brake, correct?

A. From what I was told, yes.

Q. So at this point in time, it was your testimony

that you fired your service weapon because you believed that your life was in danger, correct?

A. Correct.

Q. At the time you fired your service weapon, the car eventually stopped, correct?

A. It came to a resting point, yes.

Q. And we heard your audio on your recording belt yesterday. We heard tires revving, right, and then an engine revving, and there was a slight half second pause of silence, then your gun fired. Do you recall that?

A. Yes.

Q. What you didn't hear was the car as you're firing the shot, you would agree with me that based upon you having listened to your recording belt and based upon where the vehicle stopped, Mr. Barber didn't continue to accelerate that car with his foot on the accelerator all the way past you and through the fence, correct? You would agree with me that that didn't happen, right?

A. That is correct. It came to a rest.

Q. And when the car is approaching you, you would agree with me you didn't have to make a dive out of the way into the gravel or the dirt to avoid being hit by that vehicle, correct?

A. There was no avenue to retreat to.

Q. But you never jumped out of the way, you always stayed stationary, even as you fired your service weapon. As you fired your service weapon, the vehicle stopped, but you did not jump out of the way, because the vehicle was going to hit

you at any point in time after you fired your service weapon, correct?

A. Correct.

Q. When you heard that his foot was on the brake when they pulled him out of the vehicle, did you have an opinion as to why his foot may have possibly been on that brake for you -- did you think about it or have an opinion, well, what is his foot doing on the brake? Why didn't he continue to accelerate? Do you have any opinion -- did you form any personal opinion about that?

MS. FULTZ: Objection.

THE WITNESS: No.

MS. FULTZ: Speculation and foundation.

THE COURT: Sustained.

MS. FULTZ: Move to strike.

THE COURT: The answer is stricken. The jury will disregard it.

BY MR. BRYANT:

Q. So again, you would agree with me that you didn't have to make any sudden movements to avoid the vehicle hitting you after you fired your service weapon, correct?

A. Correct.

MR. BRYANT: Going to now show to the witness Exhibit 44.

And, Your Honor, for formality may I publish?

THE COURT: If there's no objection?

MS. FULTZ: No objection.

MR. BRYANT: Thank you.

BY MR. BRYANT:
Q. All right. Have you ever seen this particular photograph?
A. I have not, no.
Q. Okay. And are you familiar with this scene, though? Can you describe what this scene is?
A. Yes.
Q. And what is your understanding what this scene is?
A. This incident location is a duplex-style residence, consists of a north or south direction with a hard packed dirt surface.
Q. And would -- and do you know whose dwelling it is directly at the top of this picture where that blue trash can is?
A. I do not know.
Q. And do you know whose vehicle this is to the right-hand side of this picture?
A. Mr. Barber's.
Q. And you see that there are a series of cones -- there's six green cones, then a yellow cone. Do you see that?
A. Yes.
Q. Based upon your training and experience and knowledge, do you know what those green cones represent?
A. I do not know.
Q. Okay. Let me ask you this. Where that first green cone is, is that where you recall Mr. Barber's vehicle's front hood area? Was that where he was located when he was getting into the car? Would that be accurate?

A. Can you specify which green cone?
Q. Yeah, sure. I'm going to -- I'm pointing to the first green cone at the top of the screen. There are three to the left, three to the right. I am pointing at No. 1 to the left, which is at the top of the picture, this cone here.
A. And your question, sir?
Q. And my question is, is that relatively where the car was originally stationed when Mr. Barber got into his vehicle?
A. I do not recall because I don't have any observations beyond where Mr. Barber was located at.
Q. And so when we discuss this, you said it was approximately -- the vehicle was approximately 15 feet from where the vehicle stopped, right? Do you recall that?
A. Fifteen feet from the rear of the vehicle to where I was at.
Q. Okay. Understood. And this doesn't refresh your recollection as to where that vehicle started at?
A. No.
Q. Okay. And do you see -- is it your understanding at Cone No. 14, that is where the vehicle eventually rested? Is that the place where the vehicle stopped after the deputies pulled Mr. Barber out of the car; is that your understanding?
A. Based off my observation, no.
Q. Okay. And what is your understanding why this -- this vehicle, what this vehicle is doing right here, what position is that vehicle?
A. It's in a resting position.

Q. Okay. And after the officers remove Mr. Barber from the vehicle and you said it moved back a little bit, generally speaking, when someone does an investigation on the crime scene, based upon your experience, knowledge and education, would it be typical that a vehicle would be moved if this was a part of an officer-involved shooting?
A. No, it would not be.
Q. So is there any reason to believe for you that this is where this vehicle is located, is where the vehicle's front fender rested at the time that the shooting had finished and Mr. Barber was taken out of the vehicle?
A. Yes.
Q. And have you ever participated in a crime scene investigation?
A. Yes.
Q. And how many crime scene investigations have you participated in?
A. Several.
Q. If you can give me an estimate, 10, 20, 50, over 50?
A. Over 50.
Q. Okay. So you're familiar with a crime scene investigation, correct?
A. Correct.
Q. And so based upon your familiarity and understanding of the crime scene investigation, would it be accurate to say that the -- where the green cones are, is where the car originally started from, at least the top two cones?

And I say top two, Cone No. 1 and Cone No. 2, left and right, at the top of this photo, would that be -- would that, based upon your experience and knowledge and education, would this be accurate?

MS. FULTZ: Objection. Calls for speculation and foundation.

THE COURT: Sustained.

MR. BRYANT: Understood.

THE COURT: Ms. Fultz, I'll ask you to speak up a little louder, if you would, please. Thank you.

BY MR. BRYANT:

Q. Let me ask you this, I'm going to go back to Exhibit No. 33 or 32, I apologize. Looking at Exhibit No. 32, on the screen, I'm touching the bottom of the picture, where it's in front of the vehicle and it's next to Cone No. 15, where that dwelling is. Do you see that area right there?

A. Yes.

Q. Could you point on this screen where you believe the car was located when Mr. Barber first got into that vehicle? And again, this is not to scale. I just want you to point generally where it was.

A. Within this area.

Q. Okay. And you ask -- you testified that at this point in time, Mr. Barber after -- let me strike that.

Let me ask you this, when Mr. -- when you're saying Mr. Barber backed up his vehicle, how do you know he knew you were standing behind the vehicle?

A. I didn't know Mr. Barber knew I was behind the

vehicle.

Q. So you would agree with me that you have no idea if Mr. Barber even knew you were behind that vehicle when he started getting his tires moving, correct?

A. That is correct.

Q. So you can't say one way or another if Mr. Barber was -- just assuming the car was moving, you can't say one way or another whether you knew for a fact that Mr. Barber was actually targeting you to hit you with his vehicle when the tires started moving, correct?

A. That is incorrect. I was the only person in the driveway.

Q. Okay. So, again, how do you know Mr. Barber saw you, is what I'm asking?

A. Prior to Mr. Barber entering the vehicle, he faced me, acknowledged me and entered the vehicle, placed it in gear and the car was in motion.

Q. Do you know, again, this is, just do you know, how do you know Mr. Barber knew you were still there when he started having his tires rotating?

A. I do not know.

Q. So, again, you can't say for certain -- because you don't know whether or not he knew you were still there, you can't say for certain that you knew Mr. Barber was spinning those tires for the purpose of having that car accelerate directly towards you, correct?

MS. FULTZ: Objection. Argument. And calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: Your question, sir?

MR. BRYANT: Madam Court Reporter, I don't want to misstate the record, would it be possible to reread my question to --

THE COURT: Go ahead.

(The requested portion of the record was read by the reporter.)

THE WITNESS: It was my perception and belief that Mr. Barber knew I was behind the vehicle.

BY MR. BRYANT:

Q. Okay. It was your perception and belief, but you do not know what Mr. -- that Mr. Barber actually knew you were there, correct?

A. No, I did not.

Q. Okay. So we talked about acceleration, right? Remember yesterday you said in order for a vehicle to move you have to accelerate, press accelerate. Do you recall that testimony?

A. Yes.

Q. And you drive a service vehicle, correct?

A. Correct.

Q. You have a license, and you can -- probably been driving a vehicle for quite some time in your life, would that be accurate?

A. Correct.

Q. Have you ever been in your vehicle, pressed the accelerator -- let's just say you're in drive, right? Have you

ever been in the vehicle, pressed your accelerator? It starts to move. You take your foot off the accelerator, and the car still continues on after you gave the little acceleration?

MS. FULTZ: Objection. Relevance.

THE COURT: Sustained.

BY MR. BRYANT:

Q. You would agree that a vehicle, based upon your training, experience and knowledge, a vehicle can move in reverse without someone actually having pressed on the accelerator, right? You agree with me a vehicle can move back even if someone is not pressing the accelerator, correct?

A. That is correct, yes.

Q. So you would agree with me that you're not always having to press the accelerator for a car to move, correct?

A. That is correct, yes.

Q. All right. Looking back at the screen, we talked about this yesterday, you've been involved in at least 50 plus crime scene investigations, and did any of those crime scene investigations involve someone who was using a firearm?

A. Yes.

Q. And have you ever had to determine where the shell casings were during this crime scene investigation?

A. To document the measurements, yes.

Q. And I asked you yesterday why, and I'm going to bring up exhibit -- I would much rather prefer my computer but this is more convenient. Go back to Exhibit No. 34.

You remember we discussed this exhibit, right?

A. Yes.

Q. Now, here there were -- all six of your shots that were fired, all six of those shell casings were here 2, 3, 4 and 5, which was before this opening to the right-hand side entering into a yard. Do you see that?

A. Yes.

Q. And then you have 7 and 8, which are center of that particular opening in the yard, correct?

A. Yes.

Q. So you stated that you fired your weapon somewhere at the top of this screen near Markers 12, 13 -- somewhere between 10, 12 and 13, correct? That's where you testified that you had fired your service weapon, correct?

A. That is incorrect.

MS. FULTZ: Misstates the testimony.

BY MR. BRYANT:

Q. On this picture where did you fire your service weapon? Can you please show the jury -- if you can recall, show the jury where you believe you fired your service weapon?

A. In between Placards 9 and 6.

Q. So you believe you fired your service weapon between Placards 9 and 6.

A. Correct.

Q. Do you recall yesterday saying that you fired your service weapon closer to where that vehicle was?

A. I do not recall.

MS. FULTZ: Objection. Misstates the testimony.

THE COURT: Sustained.

BY MR. BRYANT:

Q. So can you show me approximately where between 9 and 6 you claim that you fired your service weapon?

A. Between Placards 9 and 6, in this area.

Q. Okay. Okay. And it's to the best of your recollection, you did not say you drew your service weapon approximately 12 feet from where the vehicle began; is that accurate?

A. That is inaccurate. I testified that the rear of the vehicle was approximately 12 to 15 feet from where I was.

Q. Okay. The rear vehicle, correct? So again, it was 12 to 15 feet, correct?

A. Based off my observations, approximately, yes.

Q. Okay. And do you know approximately how far the Placard No. 9 was to the vehicle before it started moving out?

A. I do not.

Q. And you don't know the difference between Placard No. 6 and Placard No. 9, correct?

A. I do not.

Q. And you don't recall testimony yesterday when I had asked you how did all of these bullets end up or all these bullet shell casings end up in this area when you were much further away; do you recall me having that testimony?

A. That is correct.

Q. And you said that you believe that it's possible that during the crime scene investigation it could have been kicked around or moved because people are walking about?

MS. FULTZ: Objection. Misstates the testimony.

THE COURT: Sustained.

BY MR. BRYANT:
Q. Do you recall saying that these bullet shell casings could be displaced because of a variety of people entering and exiting the crime scene?
A. Correct.
Q. Based upon the fact that you had four shell casings here to the bottom right-hand corner, one shell casing towards the middle of this yard that has its opening, and one shell casing No. 7, even if you fired your service weapon at No. 9, when I asked you why your shell casings were so far back, and they're all sort of grouped in the same area, do you have sort of an explanation for that?
A. I do not.
Q. And again, I asked you yesterday this, it's your testimony that you were not between -- when you first started firing your service weapon, you were not between 7 and 2, correct?
A. Correct.
Q. Let's just say you talked about coverage. You talked about this concept of coverage yesterday?
A. Yes.
Q. What is coverage? Once again, just to remind the jury, what is that concept?
A. Referring to cover and concealment.
Q. Why do you do that?
A. For a variety of factors.
Q. Such as?
A. An incident to where you're not seen by a threat

that would be more along the lines of concealment, where you're trying to break that line of sight where you can't be seen. Coverage is providing a safety barrier in between you and whatever threat is in front of you.

Q. And again, there was a question you had heard, even though it wasn't -- there wasn't any sort of basis for it, you had heard the reporting party say, I think he may have a weapon on him. Do you recall that?

A. Correct.

Q. And you asked him why he believed that and he just said, I don't know, I just believe it, right?

A. Correct.

Q. Again, he didn't say that Mr. Barber had threatened him with a gun, correct, or any type of weapon, correct?

A. Correct.

Q. And as you said you were approaching you couldn't quite see his hands, so you were concerned that he might have a weapon. Do you recall that testimony?

A. Yes.

Q. At the point in which you developed this idea that Mr. Barber may have a weapon, did you think about instead of positioning yourself, which I believe you said you were more eastwardly, why didn't you head more westerly near sort of where the vehicle could potentially obstruct him -- from where his vehicle could potentially obstruct him from possibly firing at you if he had a gun or maybe the fence, why didn't you stand on the right side?

A. Well, the purpose is to maintain a visual on the

person I'm engaging with. And in an instance like this the last thing you want to do is misidentify something for a weapon and it turns out to be something else. Therefore, a constant visual with Mr. Barber when I'm interacting with him was best suitable for this situation.

Q. Okay. And you would agree with me there was never a weapon found on Mr. Barber, correct?

MS. FULTZ: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. Do you know if -- when Mr. Barber was removed from his vehicle, do you know whether or not Mr. Barber ever had a weapon on him, to the best of your knowledge?

A. I do not know.

Q. And you personally never saw Mr. Barber with a weapon, correct?

And I apologize, let me -- you never personally saw Mr. Barber with a firearm, correct?

A. Correct.

Q. You never personally saw Mr. Barber with a knife, correct?

A. Correct.

Q. Mr. Barber never pointed a firearm at you and said, I'm going to shoot you, correct?

A. Correct.

Q. Mr. Barber never said, I hate you, you cop, I'm going to kill you, correct?

A. That is correct.

Q. And I don't know if you can recall hearing the -- if you recall sort of at the end of the audio when, before he gets into his vehicle, you hear him saying something like, what are you doing back here or who are you, you hear him, he's saying something. Do you recall or did you understand what he was saying to you at that point?

A. I do not.

THE COURT: Deputy, can you turn up the witness's microphone a little bit, please?

BY MR. BRYANT:

Q. All right. So when you heard Mr. Barber getting -- when you saw Mr. Barber getting in your vehicle and you yell at him, don't get in that F'ing vehicle, do you recall saying that?

A. Yes.

Q. Why didn't you say, Stop, San Bernardino County Sheriffs, do not get in that vehicle, to really show that command presence to ensure that he knew you were, in fact, a law enforcement officer?

MS. FULTZ: Objection. Argument.

THE COURT: Overruled.

THE WITNESS: Factoring in the incident and how quickly it transpired, I have to make sure I'm in a position where I can give the proper broadcast to the dispatcher as well, and make sure that I am putting out the pertinent information as needed.

BY MR. BRYANT:

Q. Yeah, but you were able to say, don't get in that

F'ing car, why couldn't you say San Bernardino County police or Sheriffs, don't get in that car? Why couldn't you say that to just make sure you're providing him with that command presence we talked about as part of your training?

A. The language that was expressed in certain situations is a form of command presence. It tends to note the gravity of the situation and captures the attention to let the person I'm engaging with know that this matter is serious.

Q. Yeah. But again, you've -- you've made some assumptions that you believed he knew you were a law enforcement officer, but you were not 100 percent certain he actually recognized that you were law enforcement officer. You're wearing a beanie, correct?

A. I am certain he recognized me as a deputy sheriff, yes.

Q. But you were wearing a beanie, correct?

A. Correct.

Q. And you are wearing something that looks like --

THE COURT: Mr. Bryant, we've been over this yesterday. We don't need to go over it again.

MR. BRYANT: Okay. I understand.

BY MR. BRYANT:

Q. Even based upon your appearance, in this dark area, where a guy doesn't know who you are, it's still, again, your understanding or your belief he knew you were a sheriff, correct?

THE COURT: Mr. Bryant, you covered this already.

MR. BRYANT: Understood, Your Honor. Understood, Your

Honor.
BY MR. BRYANT:
Q. So I want to go back to -- I want to go back to the crime scene investigation. And again, for any type of -- well, when people are investigating the crime scene, is it your understanding that people try to be as careful as possible when making sure not to disrupt evidence to ensure the evidence is at the place where it remained when it originally, you know, was left during the incident?
A. That would be the objective.
Q. Okay. Now, we talked about again training. I'm going to ask you this. If, for example you, were standing here when the vehicle was moving, right? Let's just say we'll take your description of it, the vehicle is moving ten to 15 miles per hour, okay. If you were standing here where this gap is and it enters into the yard, would you have moved to the right to avoid that vehicle rather than shooting or would you have fired your service weapon?
A. I would have fired my service weapon.
Q. Even though there was a possibility that you could have just moved into this yard over here?
A. That is correct, I would have fired my service weapon.
Q. And you talked about your training as an officer for the use of deadly force, correct?
A. Correct.
Q. And there are multiple stages of force that you can use when you're addressing a potential individual, correct?

A. Yes.
Q. And you learned this during your training at the academy, right?
A. Yes.
Q. And again, you sort of described it, the first is command presence, it's just conversation. If it escalates to a situation where you need to use some sort of physical force, you're allowed to potentially grab the individual, if there's some resistance or use some sort of strikes to subdue the individual to get to get compliance, correct?
A. Not necessarily. If the situation is observed to escalate, we have de-escalation tactics and techniques we can utilize as well.
Q. Sure, I skipped the point. I'm just trying to go up the scale of how much force one can use.
At this point you're talking to someone. They're not complying. You've done some form of verbal de-escalation. It doesn't seem to work. You've asked them to allow you to detain them by putting them in custody, and they're resisting. At that point you're allowed to use some sort of physical force to gain compliance, correct?
A. That is correct.
Q. And if it continues to increase in noncompliance, again, there are other types of non-lethal weapons that you can use, such as pepper spray, your baton if you have a baton, you know, a bean bag gun, et cetera, you would agree with me non-lethal force would be that next step, correct?
THE COURT: Didn't we cover this yesterday, Mr. Bryant?

MR. BRYANT: Not me. I know Ms. Fultz did. But I didn't get into the use of force. I got into the command presence, Your Honor. But I can --

THE COURT: Go ahead.

MR. BRYANT: Thank you.

BY MR. BRYANT:

Q. So the most heightened level of force is deadly force, right?

A. Correct.

Q. And you're taught in the academy to use deadly force as a force of last resort, correct?

A. Correct.

Q. And again, if you can avoid using deadly force, you would do so through other avenues, including any instance where a speeding vehicle is moving your way, if it's possible for you to avoid that vehicle, the -- depending on the situation, if there's an opening, you can move to the right, correct?

In this particular case if you were standing in the middle of this -- this path near No. 7, for example?

A. In this particular incident, no, because this picket fence does not provide that barrier that we previously spoke about to prevent the impact of the vehicle.

Q. So if the car is moving towards you, moving -- let's just -- you see the path of this vehicle, right? It's a narrow driveway. How many cars would you say you'd be able to go back and forth up and down this driveway?

A. One.

Q. So it's a one-lane driveway, and a vehicle is

reversing towards you. Okay. And they're heading towards your way. It's your testimony that you don't believe that based upon the narrowness of this driveway, and the fact that there is this barrier or this fence there, that you wouldn't be able to move far enough to the left to avoid having to use deadly force; is that your testimony?

A. That is correct, yes.

Q. And I apologize, when I say left, I meant right in a westerly direction into the yard where Marker No. 8 is. Thank you.

MR. BRYANT: Just one second, Your Honor.

No further questions at this time.

THE COURT: Thank you, Mr. Bryant.

Redirect?

MS. FULTZ: Yes. Thank you.

REDIRECT EXAMINATION

BY MS. FULTZ:

Q. Good afternoon.

A. Good afternoon.

Q. Is the objective different between the crime scene investigators and first responders who come to the scene to render it safe or to render aid to someone, are the objectives different, in terms of preserving the evidence?

A. Yes.

Q. Backing up to when you spoke with the reporting party who suggested to you that the defendant might have a gun; do you recall that?

A. Yes.
Q. Do you remember exactly what he said to you?
A. I do not, no.
Q. Would it refresh your recollection to review the transcript of the belt recording of that conversation?
A. Yes.
Q. And directing your attention to page 1, line -- about line 17 to page 2, line 6.
Does that refresh your recollection about what he said about the potential about a gun being present?
A. Yes.
Q. What was it that he told you that affected your mind set as you approached the driveway?
A. The reporting party explained that Mr. Barber behaved strangely and previously asked about law enforcement presence within that particular area.
Q. Anything else?
A. Moments before my arrival he expressed that Mr. Barber had placed his hands inside of his pocket.
Q. Did he say that in alerting you it made him feel nervous?
A. Yes.
Q. You were just asked about a car being able to move without acceleration. Do you recall that?
A. Yes.
Q. Under what circumstances were you contemplating when you answered, yes, a car can move without acceleration?
A. Referring to the place that when you go into the

neutral gear, with no brake pressure it will slowly move in that direction forward or backward, depending on if it's a slope or not.

Q. Okay. Under the circumstances that we're here to talk about today, was -- did it appear to you there was movement without acceleration?

A. No.

Q. And why not?

A. The speed of the vehicle, and as I previously stated, the tires attempting to gain traction, from my understanding that is consistent with a hard press of the accelerator, and those vehicle tires trying to gain traction on that surface.

Q. And then you were also asked about, since you mentioned the traction debris, if any debris was kicked up and hit you; do you recall that line of questioning?

A. Yes.

Q. And do you actually recall what your answer was during your interview?

A. I was not struck by any debris.

Q. Didn't you actually tell the --

MR. BRYANT: Objection. Leading.

THE COURT: Overruled.

BY MS. FULTZ:

Q. Didn't you actually answer, I don't recall if I was?

A. That is correct, yes.

Q. Okay. And I understand it's three and a half years

later. Was whether or not debris hit you the foremost recollection you have about the incident?

A. From my recollection, I don't recall if any debris hit me. It was present, but I don't recall if it actually struck me.

Q. Okay. At the point -- sorry. These are a little out of order, I apologize, but I'm just trying to be concise, the way that you were cross-examined on.

You were asked about whether or not Mr. Barber could know that you were behind his vehicle at the time he accelerated. Do you recall that line of questioning?

A. Yes.

Q. Where were you in relation to the vehicle, or were you still behind the vehicle when you yelled for Mr. Barber using the elevated language described?

A. Yes, I was behind the vehicle.

Q. And about in the position you described previously, somewhere between placard, I think it was 9 and 6?

A. Yes.

Q. You were also asked about sudden movement. Could you have made a sudden movement when you heard the vehicle and saw the vehicle begin to accelerate in reverse? Do you recall that?

A. Yes.

Q. Did -- would you call responding the way you did a sudden movement?

A. Yes.

Q. Do you -- without the benefit of hindsight in the

moment, was there any other sudden movement that was a reasonable choice for you?

A. No.

Q. You were asked a series of questions going back and forth between when you drew your firearm and when you fired your firearm. Do you remember that sort of long lengthy colloquy yesterday?

A. Yes.

Q. And do you feel you had it straight each time you were asked -- whether you were being asked is when you drew your firearm or when you fired your firearm?

A. To the best of my recollection.

Q. Okay. And do you recall where or when approximately it was that you -- well, strike that.

When you drew your firearm, can you describe the manner that you first drew it out of its holster?

A. I was in a low ready position, which means the barrel was pointed at an approximate 45-degree angle towards the ground.

Q. And when -- at what point did you unholster your weapon and hold it at that low level?

A. When I asked Mr. Barber to timely step away from the vehicle.

Q. So that last command?

A. Yes.

Q. And then approximately how long would you estimate between taking it out of the low ready and raising it to fire?

A. I would estimate anywhere from two to three

seconds.

Q. Yesterday you were asked about estimating the speed of vehicles while out on patrol. Do you recall that?

A. Yes.

Q. And did you actually receive training in estimating the speed of vehicles for the purpose of traffic stops, speeding tickets, that kind of thing?

A. Yes.

Q. Is there a difference in estimating the speed of a vehicle on patrol, for say a traffic stop, versus one coming at you that you perceive as a mortal threat?

A. You are asking if there's a difference?

Q. Right.

A. Yes, there is a difference, yes.

Q. Can you describe that for the jury?

A. Well, for the purpose of traffic enforcement we utilize what's called pacing. You can use other traffic to gauge the overall speed of a vehicle that you're observing, along with the posted speed limit. So that's a relatively blueprint to kind of gauge that speed of that vehicle.

In the event of this incident, based off my recollection it can be challenging to gauge the speed. My observation is what led me to believe the vehicle moved at a rapid pace.

Q. Yesterday you were asked about your contact with the reporting party, if you checked their vehicle for damage. Do you recall that line of questioning?

A. Yes.

Q. Would -- had you checked the vehicle for damage, would that have changed your course of action in conducting your investigation?
A. It would not.
Q. And why not?
A. Well, once the damage is identifying, you confirm that a crime has been committed. To successfully complete that investigation, you have to speak with all the parties that are involved in this case. Mr. Barber was the party that was mentioned, so the same course of action in terms of contacting him would be necessary to complete that investigation.
Q. And before conducting a investigation and speaking with all of the parties, do you have any way of knowing fully what it is you're dealing with?
A. I do not, no.
Q. And I think you said the starting points of that investigation you said was for a vandalism?
A. Correct.
Q. Was further investigation, could it have turned out to be a civil dispute?
A. Possibly.
Q. Could it have turned out to be an attempted car jacking?
MR. BRYANT: Objection. Calls for speculation.
THE COURT: Sustained.
BY MS. FULTZ:
Q. Is it fair to say you have no idea what a situation is until you actually conduct that investigation?

A. That is correct. We're unable to predict the outcome of calls for service.
Q. I am going to redisplay Exhibit No. 31 that we saw yesterday. Do you recall this exhibit?
A. Yes.
Q. Do you see on this exhibit the lights affixed to the houses and to the far left one that appears to be like a street lamp?
A. Yes.
Q. And were all of those lights on, or is this how they appeared on April 27th in '21?
A. This is an accurate representation, yes.
Q. Okay. So to your knowledge those lights weren't placed there by the crime scene investigators, correct?
A. Correct.
Q. You were also asked about you had visualized Mr. Barber before you -- I think it was before you spoke with the reporting party. Do you recall that line of questioning?
A. Yes.
Q. And from your vantage point you were able to see him, correct?
A. Yes.
Q. And did it appear to you that he looked in your general direction?
A. Correct.
Q. Were you in your vehicle at that point or outside of your vehicle?
A. Outside of my vehicle.

Q. And when you described earlier turning around in your patrol vehicle to move it after you made the initial contact with the reporting parties, do you recall that?

A. Yes.

Q. Were you inside of your vehicle when you looked down the driveway as you turned around?

A. Yes.

Q. And at that point were you able to see Mr. Barber?

A. Yes.

Q. And at that point did you see if he looked in your direction?

A. Yes.

Q. And did he appear to be looking in your direction?

A. Yes.

Q. I am going to try to refrain from asking distances. The -- all of the points that we've asked you about, Mr. Bryant and myself, in estimating in feet and distance, are those your approximation or best estimate based off your recollection or is that based off some measurement?

A. Which distance specifically are you referring to?

Q. Whenever you're giving us numbers.

A. My recollection.

Q. Okay. You didn't yourself go out and measure the scene, correct?

A. That's correct, I did not.

Q. Are the landmarks, revisiting Exhibit No. 34, when you arrived nothing was placarded, correct?

A. Correct.

Q. Okay. The landmarks that are placarded here, do they assist you at all in refreshing your recollection and trying to remember where you were at certain points in this contact?

A. Yes.

Q. What would you consider is the most reliable landmark for your memory in placing yourself where you were when the vehicle began to accelerate at you?

MR. BRYANT: Objection. Vague.

THE COURT: Overruled.

THE WITNESS: Near Placard 9, the area of where the flashlight is at.

BY MS. FULTZ:

Q. And why is that?

A. Because that was one of the objects I had held prior to the shooting.

Q. Did you ever pick that flashlight back up after all of these events you've described?

A. I did not.

Q. Would you say that the passage of time, three and a half years, has that had any impact on your recollection of these events?

A. Yes.

Q. How so?

A. I've contacted hundreds of other, you know, subjects, conducted several vehicle stops, been to several addresses. So the incident can get lost in the shuffle with all the other contacts after this incident.

Q. And how well would you say you remember -- I don't want to say that anything is unimportant. But would you say that some of the details are more difficult to recall?

A. Yes.

Q. What about the major events?

A. I recall those fairly well.

Q. Fairly well?

A. Yes.

Q. Why is that?

A. They're the -- from my understanding they are the highlights of what transpired this night.

Q. Regardless of any distance we've talked about, 8 feet, 18 feet, whatever distance where you estimate you were standing when the defendant entered the vehicle, did you see the defendant enter the vehicle and accelerate that vehicle in your direction?

A. Yes.

Q. Do you have any lack of recollection or question to your memory about that event?

A. I do not, no.

MS. FULTZ: Thank you. That's all I have.

THE COURT: Thank you, Ms. Fultz.

Anything further, Mr. Bryant?

MR. BRYANT: Just briefly.

RECROSS-EXAMINATION

BY MR. BRYAN

Q. Deputy Alfred, you would agree with me, that your

memory today is not as good as your memory on the night of the incident, correct?

A. Correct.

Q. And even when you had an interview with several detectives approximately a month later your memory was better then than it would be now, correct?

A. Correct.

Q. And it is based upon your memory, you just -- you were just asked about events that were more memorable than others, right, the shooting, for example, would be more memorable than you necessarily walking on the left side or the right side of the driveway as you approached, correct?

A. Correct, yes.

Q. And it's your testimony that you did not fire your service weapon in this area where 2, 3, 4 and 5 were when you first started shooting?

A. To my recollection that is correct, yes.

Q. And again, you would agree with me that statements that you made -- strike that.

You would agree with me that during your interview in May of 2021, you never, when asked how did Mr. Barber recognize you, how did you know Mr. Barber recognized you, you never informed the detectives at any point in time during that interview that he recognized you because you drove your vehicle by and you saw him see you or you, quote unquote, saw each other's eyes, correct?

A. If I recall, I explained that I noticed Mr. Barber. I looked in his direction, and he looked in my direction.

Q. And that was when you were in the driveway, you never said while you were in your service vehicle, you never told the detectives in your service -- while you were driving your service vehicle you saw Mr. Barber, and he saw you at that point, correct?

A. I don't recall that.

Q. And you would agree with me that the first time you stated that you saw Mr. Barber connect eyes with you is when you started down the driveway after you had spoken to the RPs, correct?

A. That is incorrect. I saw Mr. Barber when I arrived in my vehicle.

Q. Okay. But you didn't tell the detectives that in your interview in May, correct? If you recall?

A. I don't recall, no.

Q. And let me ask you this, if, in fact, Mr. Barber began to move his vehicle back, and you were standing by Markers 2, 3 and 4, let's just say somewhere between 4 and 6, Markers 4 and 6 in this picture, would you still have fired your service weapon given where the vehicle was coming from?

A. Yes.

MR. BRYANT: No further questions.

THE COURT: Anything further?

MS. FULTZ: Just briefly.

FURTHER REDIRECT EXAMINATION

BY MS. FULTZ:

Q. You said you don't recall if you told the

detectives in your -- excuse me -- in your interview about first seeing Mr. Barber while -- when you arrived in your patrol unit?

A. I do not recall.

Q. Would it refresh your recollection to review a transcript of your interview?

A. Yes.

Q. If you would just review, starting at the bottom there.

Does that refresh your recollection?

A. Yes.

Q. And did you, in fact, inform the detectives about seeing Mr. Barber when you first arrived?

A. Yes.

MR. FULTZ: Thank you. That's all I have.

THE COURT: Thank you.

Anything further, Mr. Bryant?

MR. BRYANT: No, Your Honor.

THE COURT: May the witness be excused?

MS. FULTZ: Subject to recall.

THE COURT: All right. You can step down. Thank you. It is possible that you will be recalled as a witness. If so, Ms. Fultz will let you know.

THE WITNESS: Thank you.

THE COURT: Thank you.

Next witness, please?

MS. FULTZ: Maria Gallo, please.

THE JUDICIAL ASSISTANT: You do solemnly state the

testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE JUDICIAL ASSISTANT: Thank you. Please be seated.

THE BAILIFF: Once you're seated, please state and spell your name for the record.

THE WITNESS: Maria, M-a-r-i-a, Gallo, G-a-l-l-o.

THE COURT: Good morning, Ms. Gallo.

THE WITNESS: Good morning.

THE COURT: Sorry. Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Ms. Fultz?

MARIA GALLO,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:

Q. Good afternoon.

A. Good afternoon.

Q. Is it Gallo or Gallo?

A. Gallo, Gallo are the same, either/or is fine.

THE COURT: Which do you use?

THE WITNESS: Gallo.

THE COURT: Gallo, okay.

BY MS. FULTZ:

Q. I can handle that. Good afternoon.
A. Good afternoon.
Q. How do you feel about testifying here in a courtroom full of strangers?
A. I'm a little nervous.
Q. Okay. I'm going to ask you about some events from April of 2021. Okay?
A. Okay.
Q. Where were you residing in April of 2021?
A. In the 12005 White Avenue, Adelanto, California.
Q. In Adelanto?
A. Yeah.
Q. Can you describe the property that your home is on?
A. I'm sorry, can you repeat that?
Q. Is it a house?
A. It's a house, yeah, it's a house.
Q. Okay. Are there any other houses on the same property?
A. Yes. There's the three houses on the same property.
Q. Okay. Showing you what's been previously published No. 19. Do you recognize the --
A. Yes.
Q. -- photograph here?
A. Uh-huh.
Q. And how do you recognize it?
A. That's where I live, in the front.
Q. Okay.

A. Can I give you -- that's the 12015 address. Sorry.
Q. Okay. And is there another house -- you said there's three?
A. There's three, yeah.
Q. Where are the other two?
A. So on the side, on the right side, I believe, that's the 12005. And then there's a house behind that, 12015.
Q. Okay. And they're all three part of the same --
A. Yeah, they're -- uh-huh.
Q. Okay. And just so you're aware, there's a court reporter here. So I know once you figure out what I'm asking you're going to want to jump in and answer. If you can just allow me to finish my question, and I'll allow you to finish your answer.
A. Okay.
Q. Okay?
And so in April of '21 you were living in that front house that's shown in the photograph here?
A. Yes.
Q. What is to the left of that white gate?
A. Apartment complex.
Q. An apartment complex. And did anyone live in the house behind the one we see here in the photograph?
A. Yes.
Q. Who was living behind in that house?
A. Steffon Barber and Monique Grenados.
Q. Okay. And do you see either of those two people here in court?

A. Yes.
Q. Who do you see here in court?
A. Steffon Barber.
Q. And can you identify Mr. Barber by the color of his shirt and where he is seated in the room?
A. Yes. He's wearing a white long sleeve, and he's on the right side, my right.
Q. Your right?
A. Yeah, my right side. Sorry.
MS. FULTZ: May the record reflect the witness has identified the defendant?
THE COURT: Yes, it will.
BY MS. FULTZ:
Q. I am going to show you another photograph. Showing you what's marked as No. 29, do you recognize this vehicle?
A. Yes.
Q. How do you recognize it?
A. It belongs to Steffon Barber and Monique Grenados.
Q. Would you ever see that car on the property where you reside?
A. Yes.
Q. Drawing your attention to the night of April 27th in 2021, do you recall that night?
A. Yes.
Q. And around 11:00 p.m. did you arrive to your home?
A. Yes.
Q. What happened when you arrived to your home that night?

A. So me and my husband were coming home in two separate cars, and Steffon Barber was outside, so we were trying to drive in our driveway to park and go inside our house, but we couldn't. Steffon Barber tried to forcefully get inside my vehicle. And he couldn't get into my car, so then he tried to go to my husband's car.
Q. Okay. Let me stop you there.
A. Yes.
Q. When you were trying to go to your home -- let me go back to the photograph. Were you -- how were you trying to go into your home?
A. On reverse, we usually go in like on reverse to go in through the yard right here in the backyard.
Q. Okay. Do you recall if you were reversing it or backing in first or was that your husband?
A. My husband was backing in first, and then it was -- and then myself.
Q. Okay. And you said that Mr. Barber approached your car?
A. Yeah. He approached my husband's car first and then he came to me.
Q. Okay. And were you able to see what he was doing at your husband's car at first?
A. No. I think he was just probably talking to him. I'm not sure.
Q. Okay.
A. But then that's when I saw him, that he then -- he came to me. So I locked my car doors immediately.

Q. Did you have some uncomfortable interactions, or was there a reason you locked your car?
A. Just he was just acting weird, and then I just got scared, so I just locked my doors.
Q. And what happened after you locked your doors?
A. He tried to get in my car anyways, like he was slamming the car in the window and he was trying to get in.
Q. When you say slamming, can you describe what you mean by that?
A. Like just trying to hit the windows.
Q. Hitting with his hands?
A. Uh-huh. And trying to unlock, like open, like grab the handles, trying to get himself inside the car.
Q. Okay. Just one handle or multiple handles?
A. All four, he went all four.
Q. Okay. And how was that making you feel?
A. I was scared.
Q. Did you -- what did you do when he approached your car like that?
A. I still managed to -- we both managed to park in the backyard, and then he went to -- Steffon Barber went to my husband's car, and I think after that my husband, when it was safe to do so, he got out of his car and then I unlocked my car and he got inside my vehicle.
Q. Okay. What did you do after -- what is your husband's name?
A. Joseph. Sorry. Joseph Cocchi.
Q. What did you do after Joseph got into your car?

A. I drove off and I went to the -- we parked in the front yard.
Q. Okay. When he was -- when the defendant was hitting your car and trying to open the door handles, was he saying anything, if you could hear?
A. No, I can't remember.
Q. Okay. And you said he was acting weird. Can you describe his demeanor, what you characterize as weird?
A. He -- because I was like -- he was like looking at me, he got in front of the car and he was just, like his eyes looked like he was going to do something.
Q. Okay.
A. I remember him going like back and forth to my husband's car, then to my car, and then, yeah, I can't remember everything.
Q. Okay. And this is your neighbor, correct?
A. Yeah.
Q. How long had he lived behind your home, in the house behind your home?
A. I want to say two years.
Q. Okay. Did you -- were you able to go into your house?
A. No.
Q. And why not?
A. We couldn't go inside because we drove off and we parked in the front, and that's when I called the cops.
Q. Okay. So you were uncomfortable enough?
A. Yeah, we couldn't even get out, like I couldn't get

off the car.

Q. Okay. When you left the driveway, is this the driveway that we're looking at here in the photograph?

A. Yeah, uh-huh.

Q. And so when you pulled out of the driveway, are you driving forward now?

A. Yes.

Q. And where did you go once you pull out of that driveway?

A. Right in front of the house, right by where the gate is, right there.

Q. Okay. And on the side of the street against the house or across the street from the house?

A. No. Right next to the house.

Q. Okay. Now, you said that you called for help. What did you call?

A. I called 911.

Q. All right. And you just described an interaction. What was it you felt you needed help with?

A. I was just scared because of the way he was acting, and we couldn't even go inside our house.

Q. And you said you called 911?

A. Yes.

Q. And are you aware those calls are recorded?

A. I'm sorry?

Q. Are you aware that those calls are recorded?

A. Yes.

Q. If you were to hear a recording of that call, would

you recognize it?

A. Yes.

MS. FULTZ: Your Honor, may I play a portion, a brief moment of Exhibit No. 47 for the purposes of authenticating the voice?

THE COURT: Certainly.

BY MS. FULTZ:

Q. I'm going to start a recording. If you can just raise your hand if and when you recognize it?

A. Okay.

(Audio played; not reported.)

BY MS. FULTZ:

Q. Okay. You recognize the recording?

A. Yes.

Q. And does that sound like the beginning of the call you placed to 911 on the night of April 27th, 2021?

A. Yes.

Q. Okay.

MS. FULTZ: And may I publish?

THE COURT: Yes. Do you have a transcript?

MS. FULTZ: I do.

THE COURT: Okay. As I told you about the last recording, the transcript, it may or may not be accurate. It was prepared by the District Attorney's Office. We're going to provide it to you just for assistance. If there -- if you believe there's a difference between the recording and the transcript, the recording is the evidence, not the transcript.

What exhibit number is this?

MS. FULTZ: This is 47.
THE COURT: Thank you.
(Audio played; not reported.)
THE COURT: Okay. Deputy, can you collect the transcripts, please?
Ms. Fultz?
MS. FULTZ: Thank you.
BY MS. FULTZ:
Q. Did that call -- recording accurately depict the call you placed on April 27th of '21?
A. Yes.
Q. After calling 911, did someone from law enforcement show up?
A. Yes.
Q. About how long do you think you waited, if you remember?
A. Maybe less than ten minutes.
Q. And when the person -- when someone arrived, how did you know it was a deputy?
A. He came -- he came to the car and introduced himself.
Q. Okay. And were you able to see the car he was in?
A. It was a police car.
Q. Okay. Showing you what's marked as No. 9, does this look familiar to you?
A. Yes.
Q. How so?
A. I think that was the vehicle. He came in the cop

vehicle.

Q. Does it accurately depict the vehicle it appeared the deputy arrived in?

A. I think so.

Q. Okay. Is it hard to see because --

A. Yeah, I can't remember, like.

Q. Okay. But you remember it being a police vehicle?

A. Yeah, it was a police vehicle.

Q. Okay. Do you recall if the deputy wore any sort of a uniform?

A. Yeah. He was wearing a uniform.

Q. Do you remember what that deputy looked like?

A. Yes.

Q. Showing you No. 7, does this Photograph No. 7 look familiar to you?

A. I want to say yes.

Q. And how does it look familiar?

A. I think that's the deputy that was there that night.

Q. And if you recall, is that how he looked the night of April 27th of '21?

A. Yes.

Q. And when the deputy arrived, did he sort of ask you what was going on?

A. Yes.

Q. And did you explain to him?

A. We told him the same thing, that we went and called.

Q. Okay. Did you point him in a direction to make contact with the person that you were calling about?
A. Yes.
Q. And when you pointed in that direction, where was that, if you remember?
A. In the backyard where you could see the van right there.
Q. The -- okay. There's a van on the left behind the white fence? There's a black Ford in the middle?
A. No. Straight down the driveway.
Q. Okay. The vehicle --
A. The black vehicle, yeah.
Q. Okay. And if you remember was Mr. Barber still out there by his vehicle when the deputy arrived?
A. Yes.
MR. BRYANT: Objection. Leading.
THE COURT: Sustained.
BY MS. FULTZ:
Q. Do you recall if anyone was outside near that vehicle when the deputy arrived?
A. It was only Steffon Barber outside next to his vehicle.
THE COURT: Is this a good spot for our afternoon break?
MS. FULTZ: Yes.
THE COURT: Okay. We're going to take a recess, 15 minutes. We'll resume at 3:15.
You can take a break as well, but I'm going to ask you not speak to any of the jurors. Thank you.

THE WITNESS: Thank you.

(Recess taken.)

THE COURT: Ms. Gallo, have a seat in the witness box. You're still under oath.

And whenever you're ready, Ms. Fultz.

MS. FULTZ: Thank you.

BY MS. FULTZ:

Q. Ms. Gallo, I only have one last question for you. I don't recall if I teed this up. The same person you identified here in the courtroom that was living behind you back in April of 2021, is that the same person that you described hitting your cars and pointing out to the deputy?

A. Yes.

Q. Okay. Thank you.

THE COURT: Thank you, Ms. Fultz.

Cross-examination?

MR. BRYANT: Yes. Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Ms. Gallo.

A. Good afternoon.

Q. Ms. Gallo, you described an incident that obviously, you know, gave you some fear. You recall testifying about Mr. Barber coming to your vehicle and at some point banging on the window and trying to open your doors?

A. Yes.

Q. When you said he was banging on your window, was it

more of a shove with his open palms? Was it a closed palm fist? Could you maybe describe the behavior a little bit more?
A. With the open palm.
Q. And when he was trying -- I heard on the 911 call you said he was asking you to go take him somewhere. Do you recall that?
A. Yeah.
Q. Okay.
A. Yeah.
Q. So again, you saw his vehicle was in the driveway?
A. Yes.
Q. Okay. And do you know about how far his vehicle was up in the driveway?
If I showed you a picture of his apartment, would that help you?
A. It was right next to the house like.
Q. Sure.
A. Yeah, probably, because it was -- it's the house and then the vehicle like right in front.
Q. Sure. Just for reference, I will bring up Exhibit 41. If we were talking about the house, is this what is this area right here?
A. That's the house.
Q. And when you say the house, that is where Steffon Barber was living?
A. Yes.
Q. And was he living with anyone else in that home?
A. Yes.

Q. Who was he living with --
A. With his wife Monique.
Q. And I know sometimes we speak conversationally, so you have to wait. Otherwise, madam court reporter might yell at me. So --
A. Sorry.
Q. So -- no problem. So let me finish asking the question first, then answer. I understand, it's --
A. I apologize. Sorry.
Q. No problem. I understand it's conversational. I want to make sure we have a good record. All right?
A. Okay.
Q. Excellent.
You have this -- this is the house where Mr. Barber lives, correct?
A. Correct.
Q. And typically, you said you'd park close to the house. If you can describe, maybe show --
MR. BRYANT: Your Honor, is there a pointer up there?
THE COURT: Yes, there is. If you push the red button, you can turn around and you can point on the screen so the jury can see it.
BY MR. BRYANT:
Q. Generally, on the screen where does Mr. Barber typically or his wife typically park this vehicle?
A. I would say right there or a little closer right here.
Q. Okay. In that area sort of where those green cones

are?
A. Yes.
Q. Excellent.
And how many times have you seen this vehicle before?
A. All the time. I mean, all the time that -- yeah, he would only drive it.
Q. Okay.
A. He would only drive the vehicle.
Q. And so he would drive the vehicle -- again, they lived here, him and his wife lived there for two years, correct?
A. Yes.
Q. At this particular night, are there any other people who live in any of the units in that area?
A. There is a apartment complex right beside.
Q. Okay. And you were -- you and your husband are coming home, it's around 11 o'clock, correct?
A. Yes.
Q. When did you leave your house before coming home?
A. Early, early morning.
Q. Okay. So you had been gone all day?
A. All day.
Q. And so you and your husband are arriving home. And as you're going up this driveway, let me -- this is the People's Exhibit -- Exhibit 19.
As you're going up this driveway to park into your area, about approximately where do you see Steffon as you're

entering into your driveway?
When you first see him. I apologize.
A. When I first see him?
Q. Yes.
A. I want to say, you see the brown gate?
Q. Yes.
A. Like in the entrance of the driveway of my parking area.
Q. Okay. So let me pull out a better picture, show you exhibit number -- what's been marked as No. 34. Are you familiar with sort of this gravel area in this --
A. Yes.
Q. You said this is the fence area. Would that brown fence on top of, is that where you sort of saw Mr. Barber?
A. Yes.
Q. Okay. And you and your husband were driving in separate vehicles?
A. Yes.
Q. And you had a blue Mercedes?
A. Yes.
Q. Your husband has a silver Mercedes?
A. It was white.
Q. White?
A. A white one, yeah, Mercedes.
Q. Okay. And so as you're entering -- let me strike that.
I notice that your husband seemed to be somewhere with you. At the time you made this 911 call, you were in your

car?

A. Yes.

Q. Your husband got into your vehicle?

A. Yes.

Q. I noticed you said you pulled out of the driveway because Mr. Barber was acting strange or erratic. You were a little afraid. Your husband got into the car while you were in the driveway.

A. While we were already inside the -- we were able to get inside to our -- where we usually park.

Q. Okay. So -- so initially, at least -- at least you both were able to get into the parking area?

A. Yes.

Q. Okay. Is it a pretty large area that can fit two vehicles?

A. Yes.

Q. Okay. And so when he comes to your vehicle, is your car already inside the yard area where you're parking?

A. He followed us all the way until we were parked.

Q. Okay. So he follows you all the way until you are parked. Then that's when he starts pulling your doorknobs and saying -- banging on the window, saying, hey, take me somewhere?

A. No. Before, before, as I was pulling in the driveway, he went to my husband, and then he came to me, and he started trying to open the doors. And then we were already back in the -- when we parked, he still followed us, tried to do the same thing again.

Q. And you would agree with me that what you do recall him saying is that he wanted you to take him somewhere, correct?
A. That was the first thing, yeah.
Q. You would also agree with me he never said, I'm going to hurt you, correct?
A. He didn't say it but his actions showed different.
Q. Sure. I'm just saying what he verbally articulated, he never said, I'm going to beat you up or beat your behind or anything like that. He didn't say that, right?
A. I can't remember. But he was just -- his actions were showing different.
Q. No, that's not what -- I understand that he's banging on the car, asked for a ride. I'm just asking what he verbally said to you, based upon what you can remember. You heard your 911 call, right?
A. Uh-huh.
Q. During that 911 call you said he had asked to get into your vehicle?
A. Yes.
Q. To be taken somewhere, correct?
A. Uh-huh.
Q. If he would have threatened your life saying, I'm going to kill you, woman, you would have told the 911 operator that he threatened to kill you, correct?
A. Yes.
Q. And so you didn't on that call say he threatened to kill you so, therefore, based upon your best recollection, you

would agree with me that Mr. Barber did not make any verbal threats to harm you, correct?

A. Correct.

Q. Now, you and your husband enter into your yard. You're parked. He's parked. Your husband gets out of his car and goes into your car, correct?

A. Yes.

Q. And then you drive out of that driveway, correct?

A. Yeah.

Q. Show you what's been marked as -- it's marked as Exhibit 46. I'm just finding it, so bear with me. Give me a second. I don't know why all of a sudden my exhibit disappeared. Just one second here.

Exhibit 46. And this is -- this is your yard, correct?

A. Yes.

Q. And this vehicle to the right is your husband's vehicle, correct?

A. Correct.

Q. And this is the vehicle your husband had left in that yard as he exited his car to go into your vehicle, correct?

A. Yes.

Q. And when your husband exited that vehicle, Mr. Barber did not try to physically attack him, correct?

A. No, because he got distracted, and then that's when my husband got, like got out and got into my car right away.

Q. But -- but regardless, Mr. Barber and your husband

never made physical contact with each other at that point, correct?

A. No.

Q. Okay. And again, this car was sitting in that yard at that time, correct?

A. Yes.

Q. And I'm pointing towards the left-hand side of the white Mercedes. Your car would have been parked in this area where it's empty between the opening of the fence and the white Mercedes, correct?

A. No.

Q. Where was your car parked?

A. On the other side of the van.

Q. It would be the right side of the van where there is no image, correct?

A. I'm sorry?

Q. Maybe -- sorry about that. Sometimes I don't always ask the best questions.

Point on the picture where your car would have been parked.

A. It would have been parked on the side.

THE COURT: Can you point behind you with the pointer? Thank you.

THE WITNESS: It would be on this side over here.

BY MR. BRYANT:

Q. Oh, okay. Excellent.

So there was enough room there for another vehicle to be parked on that side, correct?

A. Yeah.
Q. Is this -- is this -- I apologize.
For the record, the witness had pointed to the right-hand side of the Mercedes, which there is no picture. However, there seems to be space to the right side where a vehicle would be parked.
As far as this -- this yard goes, how large is this yard to the best of your estimate?
A. I don't know. I'm sorry.
Q. Sure.
A. I mean, if it's -- it will fit like three cars. Pretty big.
Q. And as far as this fence goes, is this -- is this a strong fence? How long -- do you know how long this fence has been there for, the wooden fence we're looking at?
A. It's pretty old.
Q. Okay. And at this point you and your husband exit. Call 911. And you saw no weapon on Mr. Barber, correct?
A. Yeah, I didn't see one.
Q. He never pulled out a knife and pointed it at the window, correct?
A. Correct.
Q. He never pointed a firearm at any of you, correct?
A. No.
Q. It was just your opinion he was acting scary and very weird, right? Would that be an accurate description?
A. Yeah.
Q. And again, he has been your neighbor for two years,

correct?
A. Two years.
Q. One second.
MR. BRYANT: Your Honor, no further questions.
THE COURT: Thank you.
Ms. Fultz?
MS. FULTZ: Thank you.

REDIRECT EXAMINATION

BY MS. FULTZ:
Q. I just have a couple of follow-up questions for you.
A. Yes.
Q. When asked about what, if anything, Mr. Barber said to you, you said that was the first thing. Do you recall that?
A. Yeah.
Q. What -- do you recall -- did Mr. Barber say things and maybe you just don't remember what they were?
A. Yeah, I just -- now that we're going through I remember.
Q. Okay. Do you remember anything specific he said or just that he did speak?
A. No. He just mentioned like I -- take me, take me. He wanted me to take him somewhere.
Q. Okay. Is there anything that would refresh your recollection about the things that he said to you?
A. No. That's the only thing.
Q. Okay. Did you give an interview to detectives

shortly after this incident?

A. Yes.

Q. And in that interview do you recall telling the detectives about things that Mr. Barber said when he approached your car?

A. No, I can't remember.

Q. Would it refresh your recollection to look at a transcript of that interview?

A. Yes.

Q. If you can read that to yourself, let me know if that refreshes your memory about anything that was said?

A. Oh, yes, I remember.

Q. Okay.

A. Yes.

Q. That helped jog your memory?

A. Uh-huh.

Q. What, if anything, do you recall that he said when he approached your car?

A. I'm sorry, what was that?

Q. What -- what else did you remember that he said when he approached your car?

A. Oh, that he asked my husband for wire nuts and stuff like -- and the ride.

Q. He asked for a ride?

A. Uh-huh. He asked me for a ride, and he asked my husband for wire nuts.

Q. Did you tell the detectives, he said, give me your car?

MR. BRYANT: Hold on. Objection. Leading.
THE COURT: Sustained.
BY MS. FULTZ:
Q. Did reviewing the transcript refresh your recollection about what he said to you?
A. Yes.
Q. Okay. And what things did it refresh your recollection that he said to you, not your husband?
A. Oh, to give him my car and/or give him a ride.
Q. Okay. Do you recall if he had said where he wanted to go, anything like that?
A. No.
Q. Okay. You were also just asked about whether or not Mr. Barber and your husband ended up in any kind of a physical altercation. Do you recall that?
A. Yes.
Q. And you said he was -- he got distracted. Can you describe what you meant by that?
A. Because he was trying to -- like he was going back and forth to the vehicles. So when he tried to go back to my car, that's when my husband got out of his car, and I unlocked my car and he got in.
Q. Okay. So when you're talking about he, you're referring to Mr. Barber, not your husband?
A. Yes.
Q. Okay. And finally, my last question is what was it about the interaction that made you -- well, strike that.
What was it that you were in fear would happen if

Mr. Barber got in your car or you stayed in that area?
A. That he could have hurt us.
Q. And was that the manner, the demeanor you felt he approached you with?
A. Yes.
MS. FULTZ: That's all I have. Thanks.
THE COURT: Thank you, Ms. Fultz.
Mr. Bryant?

RECROSS-EXAMINATION

BY MR. BRYANT:
Q. When he asked, can I either have your car or can you take me somewhere, was he screaming or was he just saying, hey, you know, excited, or maybe just describe his -- based upon your observation what his --
A. No. He looked angry.
Q. And he didn't say where he wanted to go, he just asked you to either let him use your car or take him wherever he was looking to go, right?
A. Yes.
Q. And at the time now you see him driving his vehicle all the time, correct?
A. Yes.
Q. And was there any reason for you to believe that his vehicle wasn't working that day?
MS. FULTZ: Objection. Scope and speculation.
THE COURT: Sustained.
BY MR. BRYANT:

Q. Understood. Understood. You said he got distracted and went back. Did you say back to his car?
A. No. To my husband's car. He was going back and forth to my car and to my husband's car, trying to find a way to get inside either vehicle.
Q. Okay. So he was looking to get -- so -- so he was looking to get into one of the cars to go somewhere based upon sort of what your understanding was as to what his demand.
A. Uh-huh.
Q. Okay.
MR. BRYANT: No further questions, Your Honor.
THE COURT: Thank you.
Anything further?
MS. FULTZ: No. Thank you.
THE COURT: Okay. May the witness be excused?
MS. FULTZ: Subject to recall.
THE COURT: Okay. You can step down now. You may be recalled, so Ms. Fultz will contact you. Thank you.
Next witness, please?
MS. FULTZ: Joseph Cocchi, please.
THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
THE JUDICIAL ASSISTANT: Thank you. Please be seated.
THE BAILIFF: Once you're seated, please state and spell your name for the record.

THE WITNESS: Now?
THE COURT: Yes.
THE WITNESS: Joseph Cocchi, J-o-s-e-p-h, C-o-c-c-h-i.
THE COURT: Good afternoon, Mr. Cocchi.
THE WITNESS: Good afternoon.
THE COURT: Ms. Fultz?

JOSEPH COCCHI,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:
Q. Good afternoon.
A. Good afternoon.
Q. And I apologize. I've been referring to you as Mr. Cocchi for a very long time.
A. It's a matter of accent. No problem. Thank you.
Q. How do you feel about being here and testifying in a room full of strangers?
A. Short answer would be whatever makes you happy makes me happy. No problem.
Q. You don't feel nervous?
A. Oh, no. No. Absolutely not.
Q. Okay. I am just going to ask you a few questions about an incident dating back to April 27th of 2021. Do you recall that date?
A. Can you repeat the date?

Q. April 27 of 2021, at night?
A. Yeah, I remember the date. I don't have the date -- the dates of things sometimes always on the top of my head, but yes, I recall the time, yeah.
Q. All right. And can you tell us where it was that you were residing in on April 27th, 2021?
A. The technical address?
Q. Just the area?
A. Adelanto, California.
Q. All right. And what is your wife's name?
A. Well, at the time we were married and her name is Maria and the last name is Gallo.
Q. Okay. And did you pass each other coming in? Is that the same person we just heard from?
A. Yes.
Q. Okay. Drawing your attention to the incident of April 27th of 2021, do you know what I'm referring to?
A. Yes.
Q. And did you have a neighbor in your back house?
A. Yes.
Q. Do you see the neighbor who was living in the back house in April of 2021 here in court today?
A. Yes.
Q. Could you describe that neighbor by something they are wearing, where they're seated?
A. White shirt, seated fourth to the right -- three to the right of you.
Q. Okay. Your right?

A. Your left.
Q. Okay.
A. Yeah.
MS. FULTZ: May the record reflect the witness has identified the defendant?
THE COURT: Yes, it will.
BY MS. FULTZ:
Q. Okay. Approximately around 11:00 p.m. that night, did you head home at the same time as your -- as Ms. Gallo?
MR. BRYANT: Objection. Leading.
THE WITNESS: Yes.
THE COURT: Overruled.
BY MS. FULTZ:
Q. And were you in the same car or separate vehicles?
A. Separate vehicles.
Q. Do you -- did you nose in or back in?
A. Back in.
Q. Okay. When you backed into your driveway that night what, if anything, happened that -- at your vehicle?
A. Can you repeat that? There was a word I didn't get.
Q. Sure. As you backed into your driveway that night, did something happen?
A. Yes.
Q. Can you describe what happened at your car?
A. At the time of backing in?
Q. Yes.
A. I backed into the backyard where I parked. And as

I backed into the backyard, I noticed the neighbor slash tenant behind us come into my yard.

Q. Okay. And what, if anything, did you notice that -- is that the neighbor that you justified, Mr. Barber?

A. That's correct.

Q. Okay. Did -- what, if anything, did you notice Mr. Barber to do?

A. I'm going to explain and you let me know when to stop. I don't know how much you want me to tell you now.

THE COURT: Just answer the questions, sir.

THE WITNESS: Okay. Okay. Okay. As I came in to the backyard pulling in, reversing in, I parked. And he came up to the van, and he insisted that I let him in the van and get him somewhere else, transport him somewhere else. He did not specify where.

BY MS. FULTZ:

Q. Can you describe his demeanor when he approached you as you just described?

A. Aggressive and violent.

Q. How so?

A. Moving faster than normal and trying to attempt to get into the vehicle without permission, which is, in my opinion, breaking and entering kind of a persona.

Q. Let me stop you.

MR. BRYANT: Objection, Your Honor. Move to strike.

THE COURT: Overruled.

BY MS. FULTZ:

Q. All right. So when you say that he was trying to

enter your vehicle, can you describe how he was trying to enter?
A. By opening the door handles.
Q. Was your car unlocked or locked?
A. Locked.
Q. Okay. So fair to say he was not able to make entry?
A. No, he did not actually open the door.
Q. Okay.
A. That's what it appeared to be.
Q. All right. What happened after he was doing the things that you just described?
A. Well, I got out of the car and spoke with him.
Q. Okay.
A. And -- sorry, go ahead.
Q. What was that interaction?
A. That was when he informed me that he wanted me to take him somewhere.
Q. Okay. And did you agree to take him? What did you do?
A. Absolutely not, because of the -- because of the -- the forcefulness that I had seen at that moment, it caused me to believe it was not a good idea. So I denied it.
Q. Okay. And what did you do after declining to take him somewhere?
A. At that time she was pulling in because she -- her and I had arrived at the same time.
Q. She being who?

A. Maria.
Q. Okay.
A. And when she pulled in, that was when he attempted to open the doors of the car.
Q. Of your car or hers?
A. As I remember it was both cars. As I remember. Guaranteed hers. But as far as my car, when he came around, it was -- I'm trying to stick to a literal fact here. I'm not trying to let me opinion enter in. That doesn't work, I understand that.
Q. If you can describe the events as you remember them.
A. That's what I'm trying to do.
Okay. As I got out of the car and spoke with him, it was -- it was at that time that I pulled in, that I felt that he was trying to get into the car. And I decided to get out of the car, speak to him in person.
Q. Let me stop you there. When you say you felt he was trying to get into the car, what led you to feel that way?
A. Reaching for the door handles.
Q. Okay. All right.
A. And at that moment in time I decided to get out and talk to him face-to-face.
Q. Okay. When you spoke to him face-to-face, that's when he asked to be taken somewhere?
A. Asked wouldn't be a good word for it.
Q. Well, can you describe what he said to you?
A. Demand.

Q. Okay. Do you recall how he said it?
A. Like somebody in heat of the moment, like in a situation of desperation, like I need to get out of here right now, let me in, take me right now.
Q. Okay. What -- did you respond to him?
A. I did.
Q. What did you tell him?
A. I said no.
Q. Okay.
A. And then -- want me to finish?
Q. Please finish.
A. I'm sorry, I'm interrupting you.
And then I said to myself, that the wise thing to do -- my intuition had told me that the wise thing to do would be to pretend that I'm going to actually take him somewhere, and that way I could get into the blue car, which she was driving, Maria, and get us out of the driveway into a safe place where she could call the police.
Q. Okay.
A. And the only way I would have achieved that was I had to pretend momentarily that I was going to let him into the car.
Q. Okay.
A. So I could get in first, then we can move out.
Q. Let me stop you there.
A. Okay.
Q. So did you convey or explain this sort of ruse to Mr. Barber so you could make your way to Maria's car?

A. I did it very indiscreetly by saying the words, yes, hold on, let us pull out.
Q. Okay. After you said that, did you go to Maria's car?
A. I did.
Q. Where did -- what happened when you got into Maria's car?
A. Well, she happened to hit the unlock button quickly. I got in quickly and shut the door. That's when he reached for the door handle. And since she locked the door as soon as I got in, intuitively, obviously. And at that point that's when he tried to open the doors.
Q. Okay. Let me stop you there. Once you were inside Maria's car and you have the doors locked again, what did you do next?
A. I told her, I said -- I said -- I said, don't do anything else but drive out of this driveway and go into the front of the house. Make a U-turn and park in front of the house and call the police.
Q. And is that what happened?
A. Exactly what happened.
Q. Okay. And we have heard that.
Did you -- when all of this was taking place, did you try to enter your home? Did you try to get out of the car and go into the house?
A. No.
Q. Why not?
A. It wasn't safe.

Q. How so?
A. Because she was still back there.
Q. Because who was still back there?
A. Maria. At that time we were married.
Q. Okay.
A. And my protective intuition said get her out of the way before everything else.
Q. And once you and Maria made it to the front of the house, did you feel safe to enter your house then?
A. We did not go into the front of the house. We remained in the yard outside of the gate.
Q. Why is that?
A. Because it was unsafe to exit the car. If I were to get out of the car, he could get in.
Q. Into the car?
A. Yeah. But he was not in the front, only we were.
Q. Okay.
A. At that time.
Q. So I guess that's my question. Once you're at the front of the house, did you feel safe or how did you feel?
A. Not safe, no. I mean --
Q. Okay.
A. -- I wouldn't have felt safe until the whole thing was solved.
Q. All right. And is that why you and Maria called 911?
A. That's correct.
Q. Okay. When --

A. I didn't call, she did.
Q. Okay. Did someone respond after you placed that call?
A. Yes.
Q. And who responded?
A. The police department.
Q. And how did you know they were police?
A. Because -- well, several reasons, but 911 usually connects to the police as far as I remember. And every time I ever have heard any police calls of any kind it was -- seemed to have sounded the same way. My intuition said it was the police. My intuition is always right.
Q. When the person arrived, did you know that they were law enforcement?
A. Absolutely.
Q. How did you recognize --
A. Because I recognize him before, because they're friends of mine anyway. I see them. I wave. So, you know.
Q. Was there anything distinctive about the car or the person that led you to believe they were law enforcement?
A. The uniform and the vehicles and seeing them before.
Q. Okay.
A. Not in a personal way but driving by.
Q. Sure. Thank you.
MS. FULTZ: That's all I have.
THE COURT: Thank you.
Cross-examination?

MR. BRYANT: Yeah.

CROSS-EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Mr. Cocchi.

A. Good afternoon.

Q. Mr. Cocchi, again, I appreciate you testifying to your best ability to recall the events that happened on April 27th, 2021. So I just have a handful of questions for you, okay.

So Mr. Barber comes out to you and -- or you're in your vehicle. You've parked the white Mercedes van?

A. Correct.

Q. He reaches for your handle first; is that accurate?

A. Yes. As far as I recall, yes.

Q. It was several years ago, so --

A. Long time ago, yeah.

Q. -- I don't expect --

A. Past lifetime ago.

Q. Sure. You notice he grabs your handles and you're wondering to yourself, what's going on, so you exit the vehicle; is that accurate?

A. Can you repeat that?

Q. Sure. So he grabs your car handle, and as a result you exit your vehicle to ask to see what's going on, why is he grabbing your vehicle handle?

A. Yes, exactly.

Q. Okay. And when you -- when he -- did he approach

you or did you approach him when you exited the vehicle?

A. Well, I want to reiterate real quick. It's -- I didn't get out of the vehicle to find out why he went for the handle. That was what caused me to get out of the vehicle.

Q. Understood. Understood.

So, again, he's -- how long was he your neighbor for before this incident, approximately?

A. Approximately one year. I don't know. Something like that. I don't pay attention much to those things. Sorry.

Q. Understood.

For awhile, right, he --

A. Some time, yeah.

Q. And at this moment Mr. Barber is demanding, you know, in a frantic way, hey, take me somewhere, I've gotta go, and is that kind of how he was demanding to be taken somewhere?

You called it sort of a frenzy or a faster paced demand?

A. I want to be as fair as I possibly can --

THE COURT: Just answer the questions, sir.

THE WITNESS: No, no, worse than that.

BY MR. BRYANT:

Q. Okay. Take me, like was it a direct, you need to take me somewhere now?

A. Yeah, there we go.

Q. Okay. All right. Excellent.

At first you said no, correct?

A. Yeah.

Q. And at this point Mr. Barber doesn't swing on you

or try to take any force against you, correct?
A. He did not.
Q. And Mr. Barber didn't say, hey, F you, I'm going to kill you if you don't take me somewhere?
A. He did not say that.
Q. And he didn't say, hey, man, I'm going to beat your tail if you don't take me somewhere, correct?
A. He did not say that.
Q. And he didn't pull out a firearm and say, you better take somewhere, correct?
A. He did not do that.
Q. He didn't pull out a knife and say, hey, if you don't take me somewhere you're going to get it and point a knife at you, correct?
A. It's funny what you said. No, he didn't say that.
Q. I'll ask these questions just because I think it's important for the jury to kind of have an idea --
THE COURT: Just ask the questions.
MR. BRYANT: Sure. Sure.
BY MR. BRYANT:
Q. So at this point you -- you notice that he goes to your wife's vehicle and he's asking -- trying to get in her vehicle. Obviously, you're concerned at this point, correct?
A. Can you repeat that, please?
Q. Sure. After you say you're not going to let him in your vehicle or take him anywhere, he goes to your wife's vehicle as she's pulling in, correct?
A. She was already in. Wife at the time.

Q. Wife at the time. So he's already in. And at some point you said you wanted to pull a ruse on him, distract him, so you said, yeah, yeah, yeah, let's just let us back out?

A. I wouldn't say that I present it that way. I just mentioned that I was going to pull out, and I kind of did it in a way where it seemed like I was replying. Like, I didn't give any words. I would say, no. I didn't say the word no. I left that door open for a purpose.

Q. Okay. For him you sort of left it open, meaning, maybe I'm saying I'll take you, maybe I won't, but let me pull out. Would it be something like that?

A. I may have said the word like, okay, hold on, or something like that. I don't remember exactly what word I used. I know that's what I meant so --

Q. So as you're pulling out in your wife's car now, you try to grab the handle, correct -- or he tries to grab the door handle but the car is locked, correct?

A. That's not correct because she was driving. She was trying to pull out, and I had got into the back seat. And as soon as I shut the door she hit the lock button as I got in, and that's when he attempted to open the doors.

Q. Okay.

A. That's correct.

Q. You drive out into the -- out of the driveway and you park the vehicle approximately -- you do a U-turn and park in front of your home, correct?

A. That's what I instructed her to do, and she did it.

Q. And I apologize. You instructed her to take the

car and move it in front of the home, correct?

A. Correct.

Q. Did Mr. Barber chase after you all at that moment?

A. I wasn't looking. I couldn't have noticed that.

Q. You called 911, correct? Or at least your wife -- your ex-wife called 911?

A. Correct. That's exactly correct, just the way you said it, yeah.

Q. And at that point in time does Mr. Barber ever come to your vehicle that's sitting on that street at the passenger driveway in front of the home?

A. I did not see him get anywhere near the vehicle at that time.

Q. Okay. And you were asked, did you recognize the law enforcement officer that drove up to the home, correct?

A. That's not correct.

Q. Let me ask you this question, did you recognize that there was a law enforcement officer that eventually came to your vehicle?

A. That's still not correct.

Q. Tell me what happened.

A. Okay. What actually happened was once the phone call was made, about one minute, literally one minute, the police arrive and about three or four people maybe -- as far as I remember, I saw more than one person, but I did see only one person walking back there, though. But I did see a vehicle come, and then immediately a vehicle came again afterwards. So there was -- but there was one person that walked into the back

and another person behind him, as far as I recall.
Q. I'm going to show you what's marked as Exhibit 3. Does this look like the individual who you believe walked up to your vehicle and went down the driveway?
A. No, I wouldn't feel comfortable answering that question. It was too dark, and I was not really looking that intensely, you know. I couldn't say that for certain, I wouldn't be telling the truth.
Q. You would agree with me that you're familiar with this driveway, correct, that goes all the way to Mr. Barber's home?
A. I'm familiar with it.
Q. And you would agree with me that that lighting is really bad. It's pretty dark. Unless you have a bright light it's dark at night, correct?
A. Not really correct.
Q. Okay. How would you describe the lighting?
A. The light's decent enough to see if you're standing outside, but if you're standing in a car where a person doesn't ever wash it, I'm not trying to be funny, I mean serious, it's hard to tell who's who in that case.
But as far as the lighting and when you're saying harmonizing the idea of the light situation with the windows and with the distance and the night fall, I would say that is impossible for me to say that the characteristics of this -- of 35 percent of the face here, is enough for me to say, yes, that's him. I can't say that and be telling the truth.
MR. BRYANT: No further questions.

THE COURT: Any redirect?

MS. FULTZ: No. Thank you.

THE COURT: Okay. May the witness be excused?

MS. FULTZ: Yes.

THE COURT: Okay. Thank you, sir. You're excused.

Do you have another witness today?

MS. FULTZ: I do, if we have time.

THE COURT: We do.

MS. FULTZ: Jeremiah VanBrimmer, please.

THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE JUDICIAL ASSISTANT: Thank you. Please be seated.

THE BAILIFF: State your first and last name, spell your name for the record.

THE WITNESS: First name is Jeremiah VanBrimmer J-e-r-e-m-i-a-h, last name is VanBrimmer, V-a-n-B-r-i-m-m-e-r.

THE COURT: Good afternoon, Deputy.

THE WITNESS: Good afternoon, sir.

THE COURT: Ms. Fultz?

MS. FULTZ: Thank you.

JEREMIAH VANBRIMMER,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

///////

DIRECT EXAMINATION

BY MS. FULTZ:

Q. Good afternoon.

A. Good afternoon.

Q. What is it you do for work?

A. I'm a deputy sheriff with the San Bernardino County Sheriffs Department.

Q. And how long have you worked for the San Bernardino County Sheriffs Department?

A. About nine and a half years.

Q. And I see you're wearing a uniform. Is that the San Bernardino County Sheriffs Class A uniform?

A. Yes, ma'am.

Q. And showing you what is marked as No. 7, other than the length of the sleeves is it an identical uniform to what is depicted in Exhibit 7?

A. Yes.

Q. All right. Yours is just a short-sleeve version?

A. Correct.

Q. What is your assignment?

A. I'm currently assigned to patrol at the Hesperia Sheriffs Station.

Q. Do you recall what your assignment was in January of 2018?

A. Yes.

Q. What was your assignment then?

A. At that time I was assigned to the High Desert Detention Center.

Q. At that time did you wear the same uniform Class A that you are wearing now?
A. I did, yes.
Q. On January 21st of 2018, did you come into contact with anyone that you see here in the courtroom today?
A. I did.
Q. And who is it that you recognize in the courtroom that you had contact with on January 21st of 2018?
A. On that day I contacted an inmate housed at the jail. His name was Steffon Barber.
Q. And can you describe that person by the color of their shirt and where they're seated?
A. Today they're seated at the counsel table, all the way to my right, wearing a white button up T-shirt or dress shirt.
MS. FULTZ: May the record reflect the witness has identified the defendant?
THE COURT: Yes, it will.
BY MS. FULTZ:
Q. And did you come into contact with Mr. Barber on that date in your capacity as a sheriffs deputy?
A. Yes.
Q. And during that encounter, did you have occasion to give any instruction or command to Mr. Barber?
A. Could you ask that one more time?
Q. Sure. While you had contact on that date with Mr. Barber in your uniform, did you have any opportunity to issue him any command or any of your partners in your presence

issue any commands to him?
A. Yes.
Q. And how did he respond to the commands given?
A. The commands were for him to go back to his bunk, and he resisted myself and my partner at the time.
Q. When you say resisted, is that refusing to go to the bunk?
A. Yes.
Q. Okay. Did -- was that sort of the end of that encounter?
A. I can go into more detail if you prefer?
Q. That's okay. Did you make it known or was it an established fact to Mr. Barber that you were acting as a sheriffs deputy?
A. Yes, I was assigned to his housing unit that night as well.
Q. Okay. That's all. Thank you.
THE COURT: Thank you.
Cross-examination?
MR. BRYANT: Sure.

CROSS-EXAMINATION
BY MR. BRYANT:
Q. Good afternoon, Deputy VanBrimmer.
A. Good afternoon, sir.
Q. I said it correct, right?
A. Yes.
Q. All right. Excellent.

Again, while you were working at the West Valley Detention Center, you had made contact with Mr. Barber, correct?
A. It was at the High Desert Detention Center.
Q. High Desert Detention Center.
And you made contact with Mr. Barber, correct?
A. Yes.
Q. At the High Desert Detention Center anyone in your uniform would be recognized as a sheriff, correct?
A. Correct.
Q. And while the people, whether they're detainees or inmates at the High Desert Detention Center, there's no question that if you go to them and you give them a command, they would not in any way, you know, not recognize who you were, correct?
A. I would say --
Q. That's a bad question.
A. Go ahead.
Q. There could be any number of reasons why someone wouldn't recognize you, but in this particular instance, generally speaking, you're wearing this uniform while you're at the High Desert Detention Center at this time, correct?
A. Correct.
Q. And it's fairly well-lit within the High Desert Detention Center where detainees and inmates are held, correct?
A. It was after hours, meaning after they're curfew, I guess you could say. We had turned the lights on in the housing unit at the time of contact in order to get them back

to their unit. So it was well-lit at that time.
MR. BRYANT: No further questions. Thank you so much.
THE COURT: Anything further, Ms. Fultz?
MS. FULTZ: No. Thank you.
THE COURT: May the witness be excused?
MS. FULTZ: Yes.
MR. BRYANT: Yes, Your Honor.
THE COURT: Deputy, you're excused. Do you have another witness?
MS. FULTZ: Not that we can get much done in ten minutes.
THE COURT: We'll stop for the day. I'd like to get started at 8:45 tomorrow morning. I think tomorrow morning -- tomorrow afternoon, though, we're probably going to break early, at 3:30, rather than going to 4:15. But I'll see everyone at 8:45 in the morning.
Remember, don't talk about the case. Don't form any opinions or conclusions about the case. Have a wonderful evening.
(Whereupon, the foregoing proceedings were continued to December 4, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,

-vs-

STEFFON TODD BARBER, Defendant.

No. FVI-21001312
REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 138 to 221, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 3, 2024.

Dated at San Bernardino, California, this 5th day of May, 2025.

[signature]
Official Court Reporter
C.S.R. No. 12225

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
Plaintiff, )
vs. ) No. FVI-21001312
STEFFON TODD BARBER, )
Defendant. )

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 4, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

RYAN DUCKETT
Attorney at Law

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 3 of 7
Pages 223 through 331, incl.

SESSIONS


| DATE | PAGE |
| --- | --- |
| December 4, 2024 | |
| Morning Session | 227 |

CHRONOLOGICAL INDEX OF WITNESSES

PEOPLE'S WITNESSES PAGE

LAYOS, Ryan

Direct Examination by Ms. Fultz ............. 228
Cross-Examination by Mr. Bryant ............. 234

HERNANDEZ, Edward

Direct Examination by Ms. Fultz ............. 238
Cross-Examination by Mr. Bryant ............. 292

INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 24 | Photograph | 277 | |
| 25 | Photograph | 274 | |
| 26 | Photograph | 272 | |
| 27 | Photograph | 271 | |
| 28 | Photograph | 271 | |
| 42 | Photograph | 326 | |

SAN BERNARDINO, CALIFORNIA, WEDNESDAY, DECEMBER 4, 2024
MORNING SESSION
DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE
APPEARANCES:
The Defendant with his counsel,
JAMES BRYANT, Attorney at Law and
RYAN DUCKETT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.
(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)
--o0o--
THE COURT: Good morning, everyone. Okay. Everyone is present. Have a seat.
There's been a change in the schedule. Today we'll be in session all morning, but we will not be in session this afternoon. So we'll finish at noon this morning, and then we'll come back tomorrow at 8:45 again. Okay.
All right. Ms. Fultz, your next witness, please?
MS. FULTZ: Thank you, Your Honor. Ryan Layos, please.
THE WITNESS: Good morning, Your Honor.
THE COURT: Good morning, Mr. Layos.
THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
THE JUDICIAL ASSISTANT: Thank you. Please be seated.
THE BAILIFF: Once you're seated, please state and spell

your name for the record.
THE WITNESS: My name is Ryan Layos, R-y-a-n. Last name is L-a-y-o-s.
THE COURT: Good morning.
THE WITNESS: Good morning, sir.
THE COURT: Ms. Fultz? There you are.
MS. FULTZ: Just grabbing the exhibits.

RYAN LAYOS,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:
Q. Good morning.
A. Good morning.
Q. What is it you do for a living?
A. I'm a deputy sheriff for the San Bernardino County Sheriffs Department.
Q. And how long have you been with the San Bernardino County Sheriffs Department?
A. A little over nine years now.
Q. And what is your assignment?
A. Deputy sheriff and as of right now I am in the city of Rancho Cucamonga for patrol functions.
Q. In February of 2018 do you recall where you were assigned?
A. Yes. I believe I was in corrections at the High

Desert Detention Center up in Adelanto.
Q. And while working at the High Desert Detention Center in 2018, were you required to wear any sort of uniform?
A. Yes.
Q. What uniform were you required to wear?
A. It was a Class A uniform. The tops were tan color, and the bottoms were green. The tops then had shoulder patches on the side that said San Bernardino County Sheriffs, very similar to the ones the deputies in the courtroom are wearing right now.
Q. All right. And for the record, I'm going to show you what's marked as Exhibit No. 7.
A. It's blurred.
Q. Yeah. Are you able to see the photograph depicted in Exhibit No. 7?
A. Yes.
Q. And is that the -- is that similar in appearance to the uniform you would have worn in 2018 in your assignment?
A. Yes.
Q. With the patches and badging as you described?
A. Yes.
Q. Okay. On February 22nd of 2018, did you come into contact in the course of that assignment with anyone that you see here in the courtroom?
A. Yes.
Q. And do you -- could you describe what that person is wearing and where they're seated that you just referred to?
A. He's wearing a white button-down shirt. He's going

to be over here to your right, right next to the gentleman wearing the gray suit.
Q. My right or your right?
A. My right.
MS. FULTZ: And may the record reflect the witness has identified the defendant?
THE COURT: Yes, it will.
BY MS. FULTZ:
Q. On that February 22nd date did you come into contact with him in your capacity as a sheriffs deputy?
A. Yes.
Q. And were you uniformed when you came into contact with him?
A. Yes.
Q. During that encounter, did you have an opportunity to give any instructions or commands to Mr. Barber?
A. Yes.
Q. Can you describe that circumstance?
A. I believe at the time of the incident we -- I was working a housing unit, I believe it was a Unit 7. Barber was housed in administrative housing at the time, which is used for inmates who are separated from general population for the most part. He was out on tier, and his allotted time for tier was over. And we tried to give him commands to go back to his cell, so other inmates can come out for tier time as well.
Q. What happened when you instructed him to return to his cell?
A. He pretty much just ignored all of our orders.

Q. And can you describe the manner in which he ignored your orders?

A. We were standing in the doorway to the housing unit, and through the door through the window, he was sitting near the phone, I believe. And the phone was already off. He was sitting there, and we kept giving commands to go back to his unit. That way the other inmates, like I said, could go out for their allotted tier time. He just sat there, ignored all our orders.

Q. Did he say anything or just pretended he didn't hear you?

A. I believe he pretended he didn't hear us.

Q. And did you -- what did you do next? Did you give further commands?

A. We attempted multiple times to tell him to go back to his cell. Due to his non-cooperation I contacted my supervisor, which I believe was Sergeant Marshall at the time. Sergeant Marshall was advised of what was going on. Then he came down to our housing unit as well and attempted to speak to Barber through the doors as well to go back to his unit, to his dorm or room.

Q. And you said we, were there multiple deputies?

A. At that time the housing units are -- they have two deputies assigned to them. It was myself and I believe Deputy Shermbeck (phonetic). So both of us tried to give him commands to go back to the unit. Then also my sergeant, Sergeant Marshall as well.

Q. And all of the people you're talking about at this

point, are they uniformed similarly in the Class A?
A. Yes.
Q. Okay. And did he eventually comply with your commands?
A. No.
Q. What happened instead?
A. Sergeant Marshall pretty much contacted and set -- and formed up an ERT team, which is an Emergency Response Team. The ERT team is used to help with cell extractions when we have non-compliant inmates. The team was created, and we formed up right by the -- by his housing unit. And my sergeant again tried to give him commands to enter his cell.
Q. Did he then comply with those commands?
A. No.
Q. What happened instead?
A. I believe my sergeant told him -- gave him several options to go back to his cell by giving him those commands. He continued to refuse. And he gave the orders for us to be dispatched into the -- into his area in which we went in and were to extract him from the unit.
Q. And do you mean physically?
A. Yes.
Q. Okay. Were you able to get -- gain compliance after showing a physical presence?
A. Not after showing the physical presence. We had to actually go inside and remove him.
Q. Okay. Can you describe how it went down to finally gain compliance, if you were able to?

A. From my recollection the ERT team consisted of about six people. That was my sergeant, Sergeant Marshall, and four, five other deputies and myself. The first person in line was in charge of holding a riot shield. Then there are two other deputies who are in charge of holding down the upper extremities. And myself, I was in charge of holding down one of the lower extremities, which was one of the legs. And then I had another partner who was in charge of restraining the other leg as well.

Due to his non-compliance, Sergeant Marshall gave the orders for us to go into the segment. I believe the FCS at the time had the doors opened. We all rushed in. My partner with the riot shield was first in line, and he ended up pushing the riot shield into Barber so he would be pinned against the wall. And then myself and the other deputies attempted to grab the extremities that we were supposed to grab to keep him secured to the ground.

Q. And were you -- did that end the incident? Were you able to gain compliance?

A. At that time, no. I believe one of my partners pulled out a taser, and at that incident all I heard was, let go of my taser. And I ended up falling down to the ground, making me immobile to helping my partners out, restrain Barber.

Q. What caused you to fall to the ground?

A. I felt a surge of electricity through my body. When I fell to the ground, I ended up looking down at my leg and I saw a taser probe into my leg.

Q. So while Mr. Barber struggled with your partner

with the taser, you ended up receiving a dart of the taser?
A. Yes.
Q. Were you then able to gain compliance?
A. No. Once I fell to the ground and was immobile, once the electricity surge was over, I looked down, I saw the dart in my leg and I was able to pull it out, and then get back in and attempt to secure Barber's legs.
Q. So when -- if and when compliance was gained, was it the physical actions of the deputies or did Mr. Barber sort of stop fighting?
A. It was due to the physical actions of the deputies.
MR. FULTZ: Thank you. Nothing further.
THE COURT: Thank you.
Cross-examination, Mr. Bryant?
MR. BRYANT: Yeah. Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BRYANT:
Q. Good morning. Is it Deputy Leon?
A. Layos, L-a-y-o-s.
Q. My apologies, Deputy Layos.
A. You're good, sir.
Q. This was in a detention center, a jail center, correct?
A. Yes, sir.
Q. And how long had you been working there for, at the -- prior to this incident in 2018?
A. I was assigned to HDDC in 2015, so roughly two

years, two and a half years.
Q. You would agree with me whether someone is there as a detainee or as an inmate, the jail by virtue of the fact that you have a number of people who are all housed in one area, it can sometimes be a little hectic or a little violent, correct?
A. Can you rephrase that?
Q. Sure. Just by virtue of the fact that you are at this detention center with detainees or inmates housed for all sorts of reasons, given the fact there's always some tension within this jail facility, you would agree with me that at times the facility can either be hectic or violent, correct?
A. There are violence in the jails, yes.
Q. And it's not uncommon for correctional officers or deputies in this particular case, to deal with a non-compliant detainee or inmate for any given reason during the course of a day, correct?
A. Yes.
Q. And you would agree with me that sometimes detainees or inmates just don't listen, and you'll speak to them and eventually they'll comply, correct?
A. Depends on the situation, sir.
Q. Right. Then there are other times where throughout the day you have to use physical force in order to get a detainee to comply with your commands, correct?
A. Again, depends on the situation.
Q. Again, in this jail setting that's not unusual for correctional officers to confront inmates in those particular situations in any -- at any given day or week, correct?

A. Yes.
Q. And just so that I understand, when Mr. Barber was approached to -- and given some commands it was your testimony that he seemed like he didn't listen or pretended like he didn't listen, correct?
A. Yes.
Q. When the deputies approached Mr. Barber, they then told Mr. Barber, once again, they're close to him, I'm assuming at this point they told him to do a command, and he didn't listen, correct?
A. Yes.
Q. You would agree with me that at that point Mr. Barber didn't just start swinging on the deputy or attacking the deputy out of nowhere, correct?
A. No. He was still sitting on the chair.
Q. And it wasn't until the deputy made physical contact with Mr. Barber in this particular instance that Mr. Barber showed resistance, correct?
A. I would say yes, due to us going in.
Q. And you said he was sitting on a chair?
A. I believe so.
Q. Was that chair something that was bolted to the ground, or was that a chair that could be moved easily?
A. I believe it was affixed to a desk or the wall. I'm not too sure.
Q. Okay. And then again, this is not an outside setting where you're seeing -- you're currently doing patrol in Rancho Cucamonga, correct?

A. That's correct.

Q. And you would agree with me, that the setting inside of a jail is very different than your current setting when you're driving around neighborhoods, patrolling the area, correct?

A. They are two different functions, yes.

MR. BRYANT: No further questions. Thank you so much.

THE COURT: Thank you.

Redirect?

MS. FULTZ: No, thank you.

THE COURT: May the witness be excused?

MS. FULTZ: Yes.

THE COURT: Mr. Bryant?

MR. BRYANT: Oh, yes, Your Honor.

THE COURT: Okay. Thank you. You're excused, Deputy.

Next witness, please?

MS. FULTZ: Thank you. Detective Edward Hernandez.

THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE JUDICIAL ASSISTANT: Thank you. Please be seated.

THE BAILIFF: Once you're seated, please state and spell your name for the record.

THE WITNESS: Detective Edward Hernandez, E-d-w-a-r-d, H-e-r-n-a-n-d-e-z.

THE COURT: Good morning, Detective.

THE WITNESS: Good morning, Your Honor.
THE COURT: Ms. Fultz?
MS. FULTZ: Thank you.

EDWARD HERNANDEZ,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:
Q. Good morning.
A. Good morning.
Q. What is it that you do for work?
A. I'm currently employed as a detective for the San Bernardino County Sheriffs Department.
Q. And how long have you been employed by the San Bernardino County Sheriffs Department?
A. With this department I've been employed a little over nine years.
Q. Is the entirety of your career with San Bernardino County?
A. No.
Q. Where else have you been employed in a law enforcement capacity?
A. Since 1993 I've been a peace officer for the State of California. I started my career at the San Fernando Police Department after exiting the United States Marine Corps. I worked there for approximately five and a half years, and then

I lateraled to Santa Ana Police Department in Orange County. I completed a career there. After about 17 and a half years I retired and then sought employment with the sheriffs department.

Q. After retiring?

A. Yes.

Q. Did you get bored?

A. I still enjoy the job.

Q. And you said you've been with San Bernardino County for nine years?

A. A little over nine years, yes.

Q. What positions have you held within San Bernardino County?

A. Initially I worked corrections in the jails, and then I was moved to the gang unit within the jails. It's considered classification. And they monitor intelligence and gang activity within the jails. And we also conduct classifications, placing inmates in the proper housing units in the jails themselves.

Once I completed that for about three years, I was moved to the Chino Hills station and worked for that department, where I worked patrol. And then also was assigned to the traffic division at Chino Hills based on my past training and experience in traffic reconstruction and advanced training.

Once I finished the tour there at Chino Hills I was asked to come to homicide and train for several months in August of 2020. I was there for approximately three months,

training with homicide, going on callouts. I was on call for approximately 13 weeks straight with no breaks. And then subsequently I was promoted to detective and then moved back to homicide, where I spent almost three years there working active case loads, lethal force encounters with deputies and other departments outside of our jurisdiction. Conducted scene investigations out of the desert.

I've probably been on every call that you can think of as far as a homicide investigation. Also, while there I had the opportunity to work cold case homicides. I did that for approximately a year and a half. And in November of '23, I was moved to internal affairs where I'm currently at now.

Q. All right. Can you describe -- I know this is going a little far back, can you describe the training you received to become a deputy sheriff or law enforcement officer, I guess starting with San Fernando?

A. Anybody who entered a law enforcement position must attend some sort of academy that's approved by POST. POST is an acronym for Police Officer Standardized and Training. So a certain format, certain criteria a person has to complete to become a peace officer in the State of California, I did that in the spring of 1993, at the Rio Hondo Police Academy in Whittier.

After that I became gainfully employed as a peace officer for the City of San Fernando, like I indicated. And in the academy you were taught basic law, basic scene investigation, basic marksmanship, basic courtroom testimony, and overall conduct as a peace officer within the current

environment of law enforcement.

Q. And throughout the course of serving in law enforcement are you required to continue your education and training in quarterly intervals?

A. Yes.

Q. And can you describe any advanced training that you received throughout the years?

A. Yes. With each peace officer, POST mandates that a peace officer, to maintain their certification, must attend at least some sort of advanced training yearly, annually. It must be a minimum of 48 hours. So that could be one class. It could be two classes. Three classes. So it all depends on the hourly rate. But most peace officers will conduct numerous hours of training just to maintain their peace officer status, plus to keep up with the current environment of law enforcement.

Things change all the time, as you watch the news and things like that, so we have to be up to date with all case law and changing legislation in the state.

Q. And do you continue your advanced training even now?

A. Yes.

Q. Can you describe any specialized training that you -- that you received related to traffic investigations and reconstruction as you mentioned -- I forget where you -- was that in Chino?

A. Actually started in the City of San Fernando.

Q. Oh, okay. Can you describe your training as it

relates to traffic investigations and accident reconstruction?

A. Yes. Any new police officer or law enforcement officer at a patrol station will respond to any sort of traffic collision investigation. As I did I believe my second week on the job I responded to a fatal collision on San Fernando Road in the City of Sylmar.

You learn quickly, but you receive training while you're on field training with FTO. You learn the basics. I found traffic collision investigation fascinating, because it's more or less putting a puzzle back together. When you respond to a collision, you see one vehicle, two vehicles, numerous vehicles in a scene. You have to determine how they got to their positions of rest, and you have to figure out what happened to them prior to the collision. That's how the collision investigation works.

After I began my career, I sought advanced training or immediate initially. I received that. I've received advanced training. I've also received traffic reconstruction. Now, the difference between all three levels is an intermediate form of traffic investigation is something equivalent to what the California Highway Patrol does in their academy. They teach their folks how to basically investigate a basic crash all the way up to a fatality.

Anything beyond more than two or three decedents at a collision scene they will call their MAIT team, which is a Major Accident Investigation Team. You may have seen it on the news, you see CHP out on the freeway or whatnot with special things like that. So there's different levels of training.

Again, I found traffic collision investigation fascinating, I continue my training.

With the Santa Ana Police Department, I became a motor officer in 2001, and as a motor officer I've probably conducted five to six traffic collision investigations a day, four days a week, you know, seven -- or I'm sorry, 52 weeks a year. I have well over, safe to say, over 3,000 collision investigations in my career, anything from minor to fatalities. Vehicles involving vehicle versus pedestrian, vehicle versus big rigs. I think I've responded to anything that you can think of.

So I continue my training as such, and even with Chino Hills station, I conducted -- I was called out numerous times because they had collision scenes that were basically too intricate, too difficult to handle, at patrol level. Vehicles involving big rigs, vehicles head on with pedestrians, things like that. So -- I'm sorry?

Q. Would that require or would that cause the MAIT team that you described to be called out?

A. Yes.

Q. Okay. And did you participate on a MAIT team?

A. Yes.

Q. Okay. If you can continue your education and training?

A. So with the Chino Hills station I was selected to be part of MAIT, which is the San Bernardino County Sheriffs countywide response team. So we can be called out in the middle of the night to respond anywhere in the county. And as

you know San Bernardino County is the largest county in the United States, involving numerous amounts of desert communities and the valley down here as well. Collisions occur all the time out in the middle of the desert. You have vehicles colliding into each other head on because somebody is DUI, because somebody fell asleep at the wheel, and they usually result in a fatality, which is when we get called out.

When we get to a scene, if there's no witnesses we have to put this thing back together, figure out how it happened. And there's numerous techniques that we use to determine speed, skid analysis. There's also devices in the vehicle, especially new vehicles nowadays that are pretty tech savvy. They have what they call EDRs inside vehicles, event data recorders. Or sometimes nicknamed CDRs, which are collision data recorders.

If you drive a new vehicle and your vehicle probably has one of those, and what those are designed to do is collect data upon impact. That's what causes them to freeze the data that happens at the time of the collision, five seconds prior to the collision and maybe ten, 15 seconds after the collision. That's how those work.

Q. Can I interrupt you there?

Did you receive training related to how to access the information in those devices?

A. I've received training to know where they're at or to know what device to use -- to use them. CDRs, EDRs, they're supported by a company called Bosch. Bosch provides little gizmos about -- they plug into a certain portion of your

vehicle and they will collect all the data from a collision scene.

Now, you have to understand that CDRs or EDRs they're constantly running when your vehicle is on. The newer models today, newer vehicles, if you drive a BMW, Mercedes, or even a newer model vehicle, bluetooth, bluetooth connects to whatever phone is inside that vehicle. So that's how we also track vehicles as far as GPS, where they are going, how fast they are going, things like that.

There's different ways to determine vehicle speed, collision scene data, things like that. But I am not a analyst. An analyst is somebody who actually retrieves the data and then deciphers it, because it comes out in cryptic form, then you have to put it together.

Q. Does that require a specified training and certification to analyze the data?

A. Yes, and it's usually through Bosch.

Q. Okay. And Bosch is B-o-s-c-h?

A. B-o-s-c-h, I'm sorry.

Q. Okay. You left off with -- were you in Chino?

A. Yes, I was part of the MAIT team, yes.

Q. Okay. Did you have any further training or education that you've received related to traffic investigations from that point?

A. No, other than just continuing reading. I read articles, things like that, because vehicles change. Vehicles nowadays are designed to crush more simply than they used to be back 30 years ago. They're built softer. They're designed to

crush in the front, crush in the rear, taking less impact away from the occupants, causing less internal damage to organs, things like that.

Q. Okay. And how long did you serve with a MAIT team?

A. I've been conducting MAIT investigations since probably 2003.

Q. And you said you participated in over 3,000 of those investigations?

A. That would be a safe number, just based on the math and how long I've been investigating collisions, yes.

Q. Okay. What kind of information would you gather to investigate a major accident?

A. Well, I have a routine, and it's similar to most traffic collision investigators. We respond to a scene. You will often speak to whoever is in charge at the scene, because a collision scene is treated just like a crime scene. Once it's determined where this collision scene is and where all the parts of the vehicles have landed, that whole scene is closed off because the investigators will need to respond to determine what happened, where it happened, why it happened, things like that.

I will meet with whoever is in charge of the scene itself. It could be a police officer. Could be just a regular deputy sheriff. I'll ask them what kind of call was it. What did their call read? Did any witnesses see the crash? We'll get their information if they're not present. I will gather as much information as I can about the drivers. And then I'll conduct a scene walkthrough.

Now, a scene walkthrough entails me and a very select few of anybody else walking the scene, because I don't want to contaminate. It may have already been contaminated because of fire, rescue, transportation, people going to the hospital, things like that. So I have to take that into account once I go to a scene, and I'll ask whoever's in charge of the scene, what happened here after the crash, you know. Did anybody else come in? Who was here? I want their names. I need to talk to them, find out if they disturbed anything.

Sometimes they may have to tear a car apart to get somebody out of a vehicle. You've seen TV shows, people have to be extracted. So essentially what they could be doing is damaging a part of the vehicle that received an impact that would tell me as an investigator whether a crush was involved or the speed of a vehicle, because you can't determine -- when two vehicles meet like this, I can take the measurements from both vehicles to determine the speed of both vehicles at the time of impact. It's called crush analysis.

So I want to know things like that. So I'll conduct the scene walkthrough. As an investigator, from my personal experience you cannot appreciate a scene, a collision scene, unless you've been there. Because photos don't determine death. Photos don't show you distance between objects. On a photograph it looks like maybe 20 feet away, yet they're probably 3 feet away based on the angle, the photograph, the lighting, things like that.

So I need to walk the scene. I'll take notes as to what I find, where I find it. Maybe take rough estimates for

measurements. This way I have it in the back of my head when I start conducting interviews or further my investigation.

Q. And after conducting the scene walkthrough and making all of the observations, is there anything further that's done in a accident investigation?

A. There's a lot to be done. I work -- the vehicles get measured where they're at. We usually determine a point of reference that will not be removed, such as a manhole cover or traffic lights, because those will probably be there for years on end. They won't move. So it's a good point of reference. We take physical measurements, and then we also -- what we use is a device called a FARO. It's forensic mapping system and it's a little device on a tripod.

What I'll do with that, once it's set up, I put it at one point of the collision scene. It does measurements. It just looks like a little gizmo. It goes around in circles just like this. You have to stay away from it. It captures the scene, all the data below it within 90 feet. And then I move it another 80 feet, so they intersect. Does another scan. And I'll just move it around. That can take hours and sometimes it does.

Sometimes if the scene is big enough I'll ask for another FARO from somewhere else, so we can move multiple FAROs down the scene to capture the entire scene. What the forensic mapping system does is it actually grabs geographical locations of (unintelligible) --

(Court reporter requests the witness to slow down.)

THE WITNESS: -- geographical locations of evidence that I find. It will also measure in between, so when I pull it up I can actually make an animation of the scene itself, much like a flyover, like a drone.

So it's really great equipment, and it saves us a lot of time as far as physically going out and determining points of reference to some points of evidence, because if I have a large scene, it's going to take forever to process, and as you know if you're processing a collision scene, traffic is blocked up, guess what happens in the morning when people wake up for work? They get upset. So we try to go as fast as we can.

But take into account a giant collision scene like that, if I have a fatal, I have a deceased person at the scene, I'm probably going to have to move around that until I can have that person extracted by the coroner's office, taken away. And then a subsequent autopsy afterwards to maybe determine cause of death, and then each vehicle will be processed at a later date somewhere because it's a piece of evidence.

So I will usually have those taken back to the sheriffs crime lab or wherever I'm working at the time, and they will be analyzed, and evidence will be sought within the vehicle itself. I'll have EDR pulled. I'll have infotainment pulled. We called about the infotainment. It's your bluetooth connected to your phone, stuff like that. So it --

BY MS. FULTZ:

Q. Sorry, let me interrupt.

Prior to removing a vehicle from the scene to

process at a separate location, is it typically documented? Are photos taken, or is anything of interest placarded and photographed? Can you describe what's done before it's removed?

A. Yes. I may have got ahead of myself, but much like the photos you've seen up here at this scene with placards, different colors, things like that, that will occur at a collision scene. Sometimes we use placards. Sometimes we will use paint, cans of paint. I don't know if you've seen that on TV as well. They'll use cans of paint, usually fluorescent orange, to mark things on the ground. Sometimes we need to go back to the scene at a later date to check something out to look at something. So we want reference of the crash scene on the ground itself.

Numerous photographs are taken. Again, we do that for documentation. But as from my personal experience, photographs don't do a scene justice. You actually have to walk it to understand what it is. If I see it later in photographs, I'll understand. But as you looking at photographs, you may not understand the depth of what something is or appreciate the evidentiary value of something.

Q. All right. And after the vehicles are removed and processed to another location, is there any further steps in the analysis of an accident investigation, or is that sort of the end of it?

A. It all depends. If I can't determine the actual primary collision factor, meaning the number one thing that caused the crash, sometimes there's multiple things, but the

number one thing that caused the crash, if I can't determine that, then I'll keep diving into the case until I can determine.

As an example, if I have maybe a T-bone at an intersection, let's say there's no traffic cams, there's no CalTrans cams. I have conflicting statements and I can't determine who hit who or as to -- I shouldn't say that, but who caused the crash. In other words, who blew a red light. There's ways that I can form an opinion of that, because if I have breaking by one vehicle prior to impact, chances are that vehicle saw a red light prior to impact.

Do you understand what I'm saying by braking? When a vehicle brakes harshly, what does the front end do? Dives down. Then I may have skid factor. I may not. Antilock brakes can leave a very small skid pattern. They hop. I don't know if you ever hit your antilock brakes quickly, but they bump. I don't know if you've ever done that. They'll leave a slight skid mark. They're very faint. Versus a locked wheel skid mark from an older vehicle that will just lock your brakes.

With the skid marks I can determine speed. But if a vehicle dips down, I'm going to think, maybe they saw the red light at the last minute, and they blew the light and then hit somebody. Especially if I have a vehicle just traveling, no brake deviation. I look at the EDRs, no turning movements, no steering deviation, no braking. I'm going to guess the vehicle dipped down, and it's probably the one that caused the crash.

So I'll continue an investigation like that until I

can determine what the primary collision factor is.
Q. Okay. Are there any mathematical equations involved in the examination of an accident scene, or is that primarily an accident reconstruction?
A. In accident reconstruction, even in an advanced traffic collision investigation we are -- we use a lot of math. Some of the problems are astronomically long. For like crush, you could have a poly math problem that's maybe 13 tiers big. We use computers for that. It's hard to sit there and do the math.
But for basic skid analysis there's simple problems, like speed equals the square root of 30, times D, times F. Now, D would be distance, F would be coefficient of friction on a pavement. Friction or coefficient of friction is basically a tire meeting a surface, and the friction between the tire and the surface, whether it's rolling or whether it comes to a skidding stop. And that could be -- coefficient of friction can be this Kleenex box moving on top of this counter right here. There's a coefficient of friction under there.
Since it's smooth it's probably like a .3, .2, because there's no gripping. The more grip you have the higher the coefficient of friction that you have. So, for instance, fresh asphalt, big tires, your coefficient of friction is probably going to be a one, because it's fresh asphalt and it's going to grab. Okay.
So there's a -- I can go to numerous probably, that's just one of them. There's a lot of math involved.
Q. Okay. And I think you've already started to answer

this, what other than sort of the skid marks you've described, I think the dip down, did you describe that, gouge, or --

A. There's gouge marks that are left at scenes, yes.

Q. What kind of items of evidence would you look for to assist you in determining what took place at an accident investigation?

A. Well, as indicated I look for the simple stuff. I look for skid marks. Again, if I have newer vehicles, I'm not going to have front wheel lock skid marks. I may have skipping. I'll have to determine that. I'm hoping for dry weather. If it's raining, it's going to be a bit more challenging. You can locate skid marks in the rain. They will leave a empty pattern in the roadway, if it's not constantly raining. So you'll see a difference in the moisture levels.

So I'm looking for simple things like that. I'm looking for a debris pattern, because at an intersection you have four quadrants. And what I mean by that is just picture an intersection, you know, normal intersection. So you're looking at four ways of travel. Four quadrants, a square, a square, a square and a square. If I have a vehicles coming like this at each other, usually, and it's -- it's -- it's just the way things are, but usually the vehicle with the most lug nuts is going to win that crash. Meaning, the bigger the vehicle, the more kinetic energy that it has, the more it's going to push that other vehicle in the opposite direction.

So, for instance, if I have a, I'll go with a flatbed tow truck, they usually weigh about 28,000 pounds. If I have that coming down the roadway and I have a vehicle making

a left-hand turn in front of it, guess who's going to win that crash? That semi trailer is going to hit that little car, and it's going to push it in a direction where it sees fit. The path of least resistance is where that car is going to go.

If I have debris pattern in this quadrant over here, that means that the vehicle probably made a majority of the turn past the front of that truck. So if it hits the back of it, all the debris is going to go this way. It's going to spin, do what it's going to do, blow up or whatever is going to happen, all the debris is over here.

When I get to the scene, if I have nobody that saw it or I don't have a traffic cam that saw it, I'm going to look at the debris pattern and figure, well, it looks like that vehicle was coming this way. You may have a divot in the ground. Sometimes tires rip off the rims and they leave divots in the roadway, and then the vehicle is tossed aside. It's an odd way to say that, but that's usually what occurs at the crash. Especially if you have one big vehicle and one little vehicle. You'll look for evidence on the ground, it will tell you which way the vehicle went, and then you take it from there.

If I have a vehicle versus ped, I've had pedestrians literally knocked out of their shoes. I'll have a shoe pattern in the middle of the roadway or just a shoe. One may come off, two may come off, depending on the type of shoe. Usually low ankle tennis shoes will be left at the scene because they'll be knocked out of their shoes.

Based on how the pedestrian hit the front of a

vehicle will tell me how the impact occurred. So if I have the top of a hood damaged or if I have the windshield damaged, the pedestrian obviously came up on top of the vehicle. Sometimes you'll have side fender damage, meaning the pedestrian was clipped on the leg and didn't roll over the top of the hood. Or sometimes vehicles -- or I'm sorry, pedestrians will be tossed over the back of the car.

It all depends on where they're hit on their body.

Q. Is there -- is there a difference in looking at evidence left behind on, say, an asphalt roadway versus in dirt, in rock, in gravel, different surfaces?

A. Yes, depending on what the tire did on that surface.

Q. And all of the things that you've just described, does that include accident reconstruction or is that a separate thing?

A. It includes accident reconstruction, especially if I deal in a homicide investigation with a vehicle. Traffic reconstruction was a great transition from the homicide. When I work the homicide scene, it's literally almost the same thing. If I have a vehicle involved I become more intrigued, because I can determine what the vehicle did or how it was used as a weapon and then relate it to my homicide investigation.

Q. Is there anything not -- that you didn't cover in traffic investigations that you would add to describe the process of accident reconstruction?

A. I've covered a lot of information. There's probably more I could talk about. Again, I find it

fascinating, but I know it's boring, so --

Q. Okay. Without the foundational information that you've described, your observations of the scene, would you be able to accurately reconstruct an accident?

A. I believe so, yes.

Q. How so?

A. Based on the evidence left at the scene, my training, and again, my sheer drive to actually, to determine what occurred, because when you deal with, whether it's a fender bender or whether it's a fatality, there's going to be civil litigation. I have testified in civil court for civil litigation. I have given numerous depositions with insurance companies, because people sue one another after a collision. I've offered my opinion. I've given expert testimony in these matters. And I need to ensure that what I'm saying is correct, because the liability has to rest on someone or maybe multiple factors sometimes.

Especially if you're dealing with, for instance, a gasoline carrier. It's a cylinder type of vehicle. It's roughly about 80,000 pounds. If that hits a car doing 60 miles an hour, unfortunately, somebody is probably going to die at that scene. I'm going to have the insurance company of that carrier liable. I'm going to have the gas company liable. I'm going to have the driver liable. He can face criminal negligence.

So my investigation has to be thorough, to the point where it is perfect. And that's what I strive for.

Q. All right. And you just mentioned testifying and

giving depositions. Have you qualified as an expert testifying to the subject of traffic collision investigations and accident reconstruction in California courts?

A. Yes.

Q. About how many times?

A. I would say well over 30 times in my career.

Q. All right. Shifting gears. Do you have any specialized training or education related to firearms?

A. Yes.

Q. Can you describe that training, and if you were able to use that training in any specialized assignment?

A. Yes. My training, again, as a young Marine, I joined the United States Marine Corps back in 1985. My expertise involves a M-16 platform, shooting firearm. I'm also an expert in pistol qualification. And with the, also the M-16 machine gun. That was the machine gun in the Marine Corps.

While in the Marine Corps I became a rifle coach, which essentially goes out on the range and helps Marines qualify. I'm also a primary marksmanship instructor, which is an additional 80 hours of training in the Marine Corps. And I worked with recruits as a drill instructor and also taught marksmanship in boot camp.

I was in the Marine Corps for about eight and a half years and then became a peace officer. While in the academy you receive pistol marksmanship instruction. You have to qualify to be a peace officer. During my tenure early in my career, I become a firearms instructor. I went to the San Diego County Sheriffs Department back in 1997 and became a

firearm instructor. And I've been instructing firearms, marksmanship, since then.

I still shoot to this day. It is a perishable skill, and it's something you need to practice all the time to be proficient. And what you also do when you train as such, is you build what they call a muscle memory. Muscle memory is a term used to describe what happens to you in a stressful situation. Meaning, if you don't train, you're not going to act accordingly and something bad could happen to you.

If you train, you know, you have to remember that several things happen to you when you get into a stressful situation. You're either going to fight, you're going to flight or you're going to freeze. Essentially, you want to be able to fight and defend yourself. If you don't train well, you may flight or you may freeze in place, because stress takes over and you go into what they call shock. The body does physiological things to you like that.

So I still maintain my training. I still qualify. I still shoot frequently, because you can train 20 years for ten seconds of combat. So it's very important to maintain your training. Again, your body will react to what you train. I teach that nowadays to young deputies and young officers.

Q. And is that in a casual environment or as an instructor?

A. Both. I was on -- I was a SWAT team member for Santa Ana Police Department for approximately 12 years. I was an active team leader and conducted numerous entries. I have been involved in lethal force encounters with suspects. So I

pass this knowledge on to young officers, young deputies, who I train now, whether it be in a casual setting, just conversation, or whether it be in a formal setting at the range.

Q. Can you explain for the jury what a lethal force encounter is?

A. A lethal force encounter is an encounter between a peace officer and a suspect, where somebody is gravely harmed or killed in the confrontation.

Q. And with San Bernardino County Sheriffs Department, who investigates lethal force encounters?

A. The homicide division will investigate lethal force encounters that involve our members or other jurisdictions that don't have the expertise to conduct such an investigation.

Q. And when there is a lethal force encounter and homicide is called out, is there a dual investigation that takes place?

A. There may be, considering, determining whether nowadays, in the last couple of years, I believe, the Department of Justice now involves themself in lethal force encounters, where they determine that a weapon and their definition of a weapon wasn't used during the lethal force encounter by a suspect.

So you may have the Department of Justice conducting a co-investigation with our homicide division. This happens all throughout the State of California now. Or you may have a jurisdiction requesting aid of our homicide division.

An example of that would be, several years ago we

had a lethal force encounter in the County of Riverside involving our SWAT team members. They asked our homicide to shadow and assist them with the investigation, because of the knowledge that we have with our own SWAT team, things like that. So we share the investigation.

Q. Okay. Focusing on a circumstance similar to what we are here for, is there a dual investigation, does the homicide team that responds for the lethal force encounter or LFE, also conduct the investigation of any crime -- criminal side of the investigation?

A. Well, the whole investigation is criminal. When we conduct an investigation into a deputy-involved shooting, it is a criminal investigation. When we talk to -- when -- if we interview our own people, they'll seek representation from legal counsel. It is a criminal investigation. Anything they say could be used against them in court. And we conduct a fair investigation.

Q. Let me --

A. Go ahead.

Q. -- direct your attention. Is there -- there's a part of the investigation that becomes sort of what we have here, People versus a person and then there's another investigation belonging to a different body related to an officer's use of force; is that correct?

A. Correct. I understand what you're asking now.

So in this matter, we have a crime committed against a deputy sheriff. Our investigation kind of encompassed that. So we have a crime against a deputy sheriff,

which we believe caused the lethal force encounter. The lethal force encounter itself is a separate issue.
To kind of sum this up, we pull two report numbers. So you have -- the way it works is, in our department the first two digits of a report number are going to be the station designation. So like in this one, it started with a 24, so like a nine digit number. I can't recall the whole thing. Then when it involves homicide, we'll also pull a 60 number, so the first two numbers are a six and zero, because homicide is designated by the number 60.
So it tells the DA's office two investigations were conducted, two different DRs. Essentially they're the same thing, but we pull, it looks like two investigations, if that makes sense.
Q. And when I'm asking questions about your investigation here, you understand I'm asking about the DR -- the DR that would have been pulled for People versus Steffon Barber?
A. Yes.
Q. Okay. Back to your firearms training, do you have experience with the Glock 21, .45 caliber handgun?
A. Yes.
Q. And is that a department-approved firearm?
A. Yes.
Q. Do you know if that was the kind of firearm involved in this investigation?
A. Yes.
Q. And do you know specifically if that firearm, the

manner of its ejection of when it ejects a fired cartridge casing?

A. Yes.

Q. Can you describe that for the jury?

A. The -- I'm sorry.

Q. Can you describe that for the jury?

A. Glocks are designed -- they were essentially designed for law enforcement. It's a Swiss weapon. But they are very safe because they have three safeties on them. They were designed to prevent police officers from shooting themselves when operating a handgun. Much different than let's say a Colt 1911, which is a single action pistol. So Glocks have three safety features on them.

They do kick out a high FCC. An FCC is a fired cartridge casing, it's a little casing that you saw on the ground in some of the photos. So if you were to maintain a steady platform, the only way you can do this with any kind of handgun, to make a consistent type of ejection, would be to actually platform this handgun. Meaning if you were to affix it to a stationary table. They do this for ballistics purposes sometimes.

If you've ever seen people shoot bullets into gel, gelatin, to determine what a round does upon impact of human flesh, so they'll do it in that manner. So they get a pistol. They can bolt it to a table. And they can activate it by pulling the trigger to see where the FCC goes. They also do that to make sure the weapon is functional. Again, check ballistics on a pistol.

But a Glock has a very high FCC kick, is what I call it, ejection. It bounces high into the air, slightly to the rear of the shooter. But again, sometimes that's not consistent, because it all depends how the pistol is being held at the time it's being shot.

I've been on range and been next to people shooting pistols, and guess what, an FCC will come down my shirt, my collar, and that's bad news because they're hot. They'll burn you. But if you're consistent with the pistol, it will leave a pattern of FCCs on the ground. It's not going to be a pile, but it's going to be a pattern.

And I can't even tell you how big that pattern is going to be, depending on the surface it lands on, whether it bounces, whether it goes somewhere else or whatnot. Okay. If I had maybe some soft gelatin, maybe it would land and stick, and it would give me a better reading of where the FCCs go, but not on a hard surface.

So the ejection of a Glock is, from my personal experience, is somewhat higher than a normal pistol. I used to carry a Sig Sauer 226, which is another .45 caliber pistol, earlier in my career, and that kicked out more to the side versus straight up.

I don't know if anybody in the jury is familiar with firearms, but I'm trying to be as clear as possible if I can.

Q. And what is the load capacity on that firearm?

A. The load capacity on a Glock is 13 rounds in the magazine and then one in the chamber, a total of 14 rounds.

Q. And is there any information that is useful in a crime scene investigation related to the fired cartridge casings and where they're located?

A. If I have a crime scene that has not been contaminated, meaning it hasn't been stepped on, nothing has been kicked around, and I ask those questions, who's been in the crime scene, who did what, so I can talk to them, see if they did anything egregious in the crime scene that I'm not aware of, it should leave me at least a reference point where the shooter may have been. At least it gives me a starting point, if that makes sense.

Q. Would a fired cartridge case ever be the standard of determining where a shooter was standing at the time they fired?

A. No. I would never make a final determination just based on the pattern of the FCCs.

Q. Why not?

A. Once again, it's not going to tell me exactly where the shooter was. It's going to give me a reference point where to maybe find evidence to corroborate where I believe that person may have been, such as shoe impressions, such as eyewitness statements, maybe video, things like that.

Q. All right. And have you testified as an expert in California courts offering opinions on subjects related to firearms?

A. Yes.

Q. How many times, do you recall?

A. I don't know. Maybe over 20 times to be fair.

Q. When you say to be fair, are you saying --
A. I can't put an exact number on it. I'm just estimating 20 times.
Q. Okay. All right. In April of 2021, where were you assigned?
A. I was assigned to the homicide division.
Q. And I think you have already sort of laid out what kind of investigations you were responsible for in that assignment. Was there anything other than homicides and the lethal force encounters?
A. No.
Q. Okay. May I have a minute to catch up?
All right. On April 27th of 2021, and it may have been into the morning hours of April 28th, did you receive a callout to an investigation in Adelanto on White Avenue?
A. Yes.
Q. Do you recall when you were called out the night of the 27th or the morning of the 28th?
A. It may have been slightly after midnight, if I can recall. We were called, notified of an LFE in Adelanto, and then we responded from home.
Q. Okay. And about how long after receiving that callout did you arrive at the scene?
A. I believe we may have arrived maybe after 2:00 in the morning.
Q. So approximately two hours after receiving?
A. Approximately, yes. Adelanto is kind of far out in the desert.

Q. What was your role in that investigation?
A. I was the case agent for that incident.
Q. And what does being the case agent mean?
A. Case agent for a homicide team, there's four of us. I'm sorry, four detectives and a sergeant. Case agent coordinates all investigative leads. Makes assignments after briefing as to what his detectives will do. The entire team will often walk the scene, depending on its complexity. If it's something that's dangerous, such as on a hillside or maybe there's too much hazardous material on scene, such as bodily secretions, it may just be one or two people along with CSI to walk a scene.
Just, the case agent is responsible for the case itself. So they'll assign somebody to work the scene, while the case agent will maybe conduct interviews at the station or conduct other forms of investigation at that point.
I assigned Detective Gerania Navarro to work the scene that evening or that morning.
Q. Did you also walk the scene?
A. I did walk the scene, yes.
Q. And as case agent you make those assignments, do you make yourself aware of the investigation, the other detectives, what they come up with?
A. Yes.
Q. Okay. And when you arrived at approximately 2:00 a.m., were you able to observe the scene prior to any items of evidence being removed, anything like that?
A. No. Once scene walkthrough is done, it's usually

done after briefing, and it's done before anything is marked. And CSI is involved with the walkthrough, so we can walk together and identify items of evidence that I would like marked, and then later retrieve after they're documented, photographed, things like that. So nothing is disturbed during the walkthrough.

Q. And is that what took place on White Avenue in Adelanto back in '21?

A. Yes.

Q. If you recall, who was present at the scene -- well, you said you make yourself aware of who's been through the scene?

A. Yes.

Q. Do you recall who all had been present at the scene and was still there?

A. When we responded it was our team. It was Sergeant Justin Giles, Detective Robert Ripley, myself, Detective Navarro, at the time Deputy Demone (phonetic) Owen and Deputy Joseph Mora briefed detectives as to what happened.

Q. Was that everyone that was present when you arrived?

A. People started arriving. We arrive at different times depending on traffic and where we live, things like that.

Q. Okay.

A. And then CSI, Crime Scene Investigator Green-Perva (phonetic) is hyphenated.

Q. And did you take any steps to determine who had been there prior to your arrival?

A. We had a list of names of additional deputies that responded during the incident, along with the identification of fire personnel that responded and transported Mr. Barber from the scene.
Q. And how many people were you made aware had been through the scene in the initial response?
A. Deputy Joseph Mora was on scene. And three additional deputies. I believe a Deputy Torres. A Deputy Coley (phonetic). And there may have been one more I think. His name escapes me. And then we had three additional fire personnel that were identified and interviewed. So you're looking at approximately seven people that walked through the scene prior to our arrival.
Q. All right. When you arrived, was the vehicle that we've seen in the exhibits, was that on scene?
A. Yes.
Q. Did it -- to your knowledge had it been moved or anything since the end of the incident for which you were called out?
A. No.
Q. Did you have an opportunity to observe that vehicle and determine if there was anything about it that would be useful to your investigation?
A. Its positioning and the tire tread that was left at the scene.
Q. Okay. Was there anything surrounding the vehicle that was useful to your investigation?
A. Yes.

Q. Okay. Can you describe what items related to the vehicle and surrounding the vehicle that assisted you in determining what took place?

A. The vehicle was parked on four wheels, facing I would say in a southwest position, more south than west. The rear hatch was open. The driver's door was open. There was a blood stain on the driver's side of the vehicle on the ground, more near the rear wheel area. There was a cell phone on the ground next to the driver's side of the vehicle itself. There were tire impressions that traveled. It appeared that they traveled from south to north. From -- it looks like they left from the vehicle.

There was shoe impressions all around the vehicle itself. There were three broken out wood planks. The planks like you would put on a wood fence, on the south side of the fence line that surrounds the backyard. And that fence line, I don't know if you saw it in the photos, but that fence line separated the main house, which is where Ms. Gallo parked their vehicles and the small house that Ms. Grenados and Mr. Barber rented at the time. So three of those planks were broken out of the fence line. They were whole, but they were on the ground. They had been removed from the fence line. Those were on the ground.

And I noticed a flashlight to the rear of the -- rear of the -- to the -- from the rear of the rear bumper of the vehicle. It was near the chain-link fence line. We did notice the fired cartridge casings within the gravel area north of the stopped vehicle.

Q. All right.
MS. FULTZ: Your Honor, before I get into a new area, was there a time the Court wanted to break for the --
THE COURT: Sure. We can take our recess now. We'll take a 15-minute recess.
Don't talk about the case. We'll get started at a quarter after.
(A recess was taken.)
THE COURT: Everyone is present.
Have a seat, Detective. You're still under oath.
Whenever you're ready, Ms. Fultz.
MS. FULTZ: Thank you.
BY MS. FULTZ:
Q. All right. When we left off, you were describing items that you observed at the scene that assisted you in your investigation. Do you recall that?
A. Yes.
Q. All right. And before you get into the photos, did your training and experience that you previously described about your accident investigation training assist you in this investigation?
A. Yes.
Q. And how was that important in this investigation?
A. I keyed in on the tire impressions that were left by the vehicle. Specifically determining where the rear wheels were, the rear tires were prior to its acceleration. And then follow the path of the rear wheels and the front wheel impressions, which were left at the scene, gave me an opinion

as to how the vehicle accelerated and then the path it took in the driveway.
Q. And if you recall, what kind of vehicle was it that was recovered from the scene?
A. It was a 2003 Chevrolet Trailblazer.
Q. Showing you what is marked as No. 29, do you recognize this vehicle?
A. Yes.
Q. And how --
A. I'm sorry.
Q. How do you recognize it?
A. It's the same vehicle that was at the scene in Adelanto that evening.
Q. All right. And does it accurately depict the vehicle that you observed at the scene?
A. Yes.
Q. No. 28, recognize this photograph?
A. Yes.
Q. How?
A. That is the sheriffs crime bay, crime scene bay where vehicles are inspected and processed for evidence, and that's the same vehicle from the Adelanto incident.
Q. And No. 27 -- sorry. Did No. 28 accurately depict that portion of the vehicle that you observed?
A. Yes.
Q. And No. 27, same thing?
A. Yes.
Q. Yes, it's the same vehicle?

A. Yes, it's the same vehicle.
Q. Okay. And accurately depicts the rear portion of the vehicle?
A. Yes.
Q. All right. Moving to No. 26, do you recognize what is depicted here?
A. Yes.
Q. And how do you recognize it?
A. Those are crime scene placards marking the tire impressions left by the front wheels of the Trailblazer, and that is the Trailblazer in the driveway.
Q. And is there anything about the tire patterns that are marked in these placards that were -- that assisted you in your investigation?
A. Yes.
Q. Can you describe that?
A. Yes. Here is where I form the opinion that the front wheels were at, at the beginning of this movement, and then if you can see the path of the impressions, marked by the pylons, they take a small deviation into the driveway itself. So this pattern deviation indicates to me that there was some type of steering movement applicated during this movement.
Q. All right.
And for the record the witness is using the pointer to follow the lines of the placards from I think what would be south to -- well, we'll say right of the photo to center and left of the photo.
And how are you able to determine there was some

sort of a turning movement?
A. Because the tire impressions aren't straight back. If you've ever reversed your vehicle, I'm sure all of you have, if you want to make the back end go somewhere, you turn the steering wheel to steer the rear portion of your vehicle to where you want it to go. So what you'll often do is steer in the opposite direction. If you've had a trailer or a boat, usually you grab the bottom of the wheel. If you want the trailer to go to the right you steer left, vice versa, that kind of thing, it's just a thing of mine.
But the steering on this vehicle is deviated somewhat right in this area right here on both sides.
Q. Okay.
A. Pointing the rear of the vehicle into the open area of the driveway.
Q. All right. And showing you number -- actually, before I move on, you described the Chevy Trailblazer. Do you know anything about the mechanisms of this vehicle that assisted you in your investigation?
A. Yes.
Q. And how did you how -- do you know about the mechanisms of the vehicle?
A. 2003 Chevy Trailblazer is an SUV sports utility vehicle, it has a five passenger seating area with a rear trunk area for whatever. It is equipped with an automatic transmission. And it has a positraction rear axle, meaning that both wheels spin at the same time when acceleration is given to the rear end.

It has an EDR system in it. It's very primitive, because it's 21 years old. It doesn't have the sophistication that an EDR has now in newer vehicles. EDR is designed to capture collision data, meaning a significant event has to happen to that vehicle for you to collect EDR data. Meaning you hit a curb, you hit a car, your airbag deployed. That would be a significant event. It doesn't just keep the data. It constantly evolves.

So for it to record, a significant event has to occur in that vehicle, to the vehicle itself. This would not be considered a significant event to cause the EDR to record the data of this movement.

Q. All right. Showing you No. 25, are you able to see that?

A. Yes, I can see that, yes.

Q. And do you recognize what's depicted in this photograph?

A. Yes, it's Placard 14.

Q. And does it accurately depict the portion of the scene marked at Placard 14?

A. Yes.

Q. As it appeared in April of '21?

A. Yes.

Q. And what is depicted in this photograph, if anything, of evidentiary value in your investigation?

A. In this area right here, there was soil displacement next to this placard. And what I mean by that is there's a topsoil on this driveway, because it's compacted

dirt. The topsoil, we talked about coefficient of friction earlier, loose soil is probably .2, .3 maybe. When the tires spun, as you heard in the audio, it removed the topsoil as the tires spun because they're looking for something to grab on to.

That's what they do. They're made of rubber. They're adhesive. They stick to a surface more or less. When they rub against a substance, they're going to leave a drag mark or a spin mark or a skid pattern, or something to that effect. This photo doesn't display it clearly, but there is a tire mark left on embedded gravel inside that dirt, meaning that the tire made contact and left a pattern, indicating to me that the tire spun on top of gravel.

Q. Between the mark that you were just indicating with the pointer and the actual Placard No. 14 there appears to be something, can you describe what that is, if you know?

A. This right here?

Q. Yes.

A. That's a tire impression.

Q. And how is there a tire impression and then next to what you described as the area where the tire tried to gain traction?

A. This tire impression right here, it's my opinion that that was left there by the front wheel right here. The impression where there's dirt displacement is off to the side, which would have been the rear wheel. So again, according to the audio that you heard, and there was testimony that indicated that the vehicle moved slightly when Mr. Barber was contacted, from that position to that position was

approximately 2 feet. So that's that movement that was spoken of earlier.

Q. Okay. So if I understand this right, there's about 2 feet beyond where you just used the laser pointer between the tire mark and the tire, and then would it be fair to say approximately the length of the vehicle where the rear tires first tried to gain traction that the vehicle traveled, does that make sense?

A. Yes.

Q. Okay. Do you know the approximate length of the vehicle?

A. Yes. According to the specs by Chevrolet, this vehicle is approximately 15 feet long. The wheelbase of this vehicle is approximately 9 feet 4 inches, meaning the wheelbase from the center of this rim to the center of the rear rim, in between, that's called a wheelbase. And that's an average wheelbase for a vehicle, it's usually 9 feet, 9 feet 4 inches, something like that.

Q. All right. Based on the information you have there, do you have an opinion as to how far the vehicle had traveled from the time it accelerated and tried to gain traction?

A. From this spot right here to the beginning of the wheel or the entire impression pattern is approximately 14 feet.

Q. And on what do you base that opinion?

A. Just based on this mark right here and where the tire pattern begins. In the crime scene log we have the total

distance at about 15 to 16 feet, because they -- it's the whole thing is measured, if that makes sense.
Q. Okay. And going back to what you -- showing you No. 24, going back to what you said about where the tire attempted to gain traction, are you able to see what's -- what is depicted in Exhibit 24?
A. Yes.
Q. And how do you recognize what's depicted in 24?
A. Well, I recall this from the scene. Plus, this is what I indicated earlier, the removal of soil and the pattern left on the embedded gravel from the rear tire.
Q. You see a pattern on the -- embedded on the gravel?
A. Initially right here, no, you don't, because what you have is disrupted soil. The tire spinning on top of loose soil removing the soil and not leaving a visible pattern. And you can also see the moisture in the ground where it actually removes soil to a level of moist soil, if that makes sense. And here you see gravel that has tire transfer marks on it.
Q. And what, if any, significance does that have?
A. What that's telling me is that in this general area is where that driver's side rear tire spun upon acceleration, trying to grab ground, and at some point it did, and that's when the vehicle moved.
Q. Do you know the weight of this -- this vehicle?
A. We had the vehicle weighed, and it weighed approximately 5,000 pounds. Chevrolet has it weighed at about 4669, 4,669 pounds. That's the average weight of a small SUV or maybe a large passenger vehicle.

Q. The Chevy, would Chevy put out the weight of the vehicle without any personal items or belongings or modifications, additions to it?

A. They put out a spec, and it depends on the model, too, because certain models, like you have a basic model with a cloth interior, no tow hitch, things like that, you know, extra stuff on the vehicle. There's going to be slightly lighter than let's say a ST, which has leather seats, bigger rims, bigger tires, tow package. So you're going to have some weight deviation between the vehicles like that. Depends on the class.

Q. And is the weight of the vehicle important at all in the analysis of the investigation?

A. Yes.

Q. How so?

A. Because you have to take into account how much energy is needed to move a vehicle that size. A vehicle has what they call kinetic energy. That's the energy that's displayed on impact. The amount of weight versus the amount of friction versus -- or I shouldn't say versus but in accordance with friction and in accordance with speed. And the amount of forces being used to make that vehicle mobile.

Slow speed, you know, coefficient of friction factors, not that much of an impact. High speeds, you gain much more damage because you have a lot of energy coming at you, a lot of weight. So the weight of the vehicle is important when it comes to that. We use those in mathematical factors to determine crush speed, things like that.

Q. Was that kind of analysis done in this investigation?

A. No.

Q. Why is that?

A. I didn't have a collision, for one. What I wanted to determine is the tire pattern and the tires on this vehicle were of legal tread depth. They weren't flat. And the reason why I have to determine that is because if you've all seen a race track on TV, if you ever notice, or even drag cars, drag racing cars, their tires are flat. Do you ever notice that? They want as much rubber grabbing the ground as possible. Those kind of tires are designed to work in heat, and they're designed to lose tread as they race because they're grabbing ground. They want the whole tire grabbing the ground, a hot, dry surface.

Passenger vehicles, the vehicles that we drive in California or any vehicle anywhere, they have tread patterns. Those tread patterns are designed to move debris out of the way of the tire so you can have a safe travel. Meaning, if you have moisture, you have water, you have snow, mud on the ground, tire tread is designed to grab the ground or push through the, whatever you're driving through, to push it through the grooves of your tread, get rid of it, so you have a safe surface to drive on.

If you've been on the road, on a freeway and it's raining, what do you do? You slow down. Do you ever notice you'll see vehicles swerve in front of you, swerve around you, because they're going too fast? Their tires aren't removing

the debris in front of it as it rolls on top of it to make it a safe drive, if that makes sense.

Q. Okay. Showing you what -- an exhibit marked as No. 33. From this view was there anything that assisted, sort of further down the driveway that assisted you in determining what took place on April 27th, '21?

A. Yes.

Q. What is depicted here in No. 33 -- well, first, let me start, does this accurately depict that portion of the driveway after placarded on April 27th of '21?

A. Yes.

Q. Okay. And what depicted in this photograph assisted you in your investigation?

A. The orange pylons you see right here, we established this as the walking pattern from north to south for Deputy Alfred. His boot impressions are this marking right here. And they travel all the way up to that little pylon right there, which should be Placard 10. Placard 9 is where he dropped his flashlight. And these are FCCs.

Now, keep in mind, this is where we found them. Doesn't necessarily mean that's where they landed.

Q. All right. We'll get to that.

Were you present -- were you one of the detectives that interviewed Deputy Alfred?

A. Yes.

Q. Were you present for his testimony?

A. Yes.

Q. And you listened to his belt recording?

A. Yes.

Q. Okay. Do you recall him testifying, his recollection, the way he walked up was more toward the center of the driveway?

A. He did say that.

Q. All right. And based on your examination of the scene, where would you place him approaching the driveway?

A. I place him walking along here, which matches the shoe pattern of his boot that evening. The same impressions are left here along the dirt line here.

Q. Okay. And for the record, the witness is indicating with the pointer along the left side of the photograph from bottom to top, the orange placarding.

Now, you mentioned up to Placard 10 I think?

A. Yes.

Q. What was at Placard 10, that was significant to you?

A. Placard 10 is a shoe impression that matched Christopher Alfred's, Deputy Alfred's shoe pattern.

Q. All right. Showing you No. 34, do you see the area you described here in this photograph?

A. Yes.

Q. All right. And if you know, what is the distance between the -- sorry. I'm getting ahead of myself. Does it accurately depict the portion of the scene as it appeared in April of '21?

A. Yes.

Q. Okay. Do you know the distance between Placard 10

and Placard 9?
A. Approximately, yes.
Q. What is the approximate distance there?
A. The approximate distance here I believe is going to be 6 to 7 feet.
Q. Okay. And Placard 9 being the flashlight, correct?
A. Yes.
Q. And you said there was a shoe impression, or I forget what term you used, a foot impression at Placard 10?
A. Yes.
Q. And that was consistent with Deputy Alfred?
A. Yes. And just to add here, Placard 10, if you notice there's an orange piece at the bottom of that. The way we mark items is that paths are covered with colors and then at the bottom of the indicator, such as No. 10 or pylon marker, that pylon is where the entire path -- so if we have a long foot path, it's marked by a certain color. Then the bottom of the marker will be marked with that color as well.
So they're just little plastic cones that go on top of each other. That's why you can see that on that pylon.
Q. Based on the pattern that you've just described, the orange placarded foot path consistent with Deputy Alfred's shoe print, do you have an opinion as to where Deputy Alfred walked when he approached the vehicle and Mr. Barber?
A. Yes.
Q. Can you -- what did you base that opinion on?
A. I based it on the existing evidence. His shoe impression, along the fence line, all the way up to this point

here.
Q. And do you have -- what is the opinion as to what his path was and where he -- where would you place him?
A. Are we talking about the actual shooting?
Q. Just his approach, when he arrived at the location, if you know?
A. Once again, from the beginning of the driveway we can -- we followed his show impressions all along the fence line here, and his last one is located right there.
Q. Okay. Were there any other impressions consistent with Deputy Alfred's shoe other than Placard 10?
A. Not in this general area, no.
Q. Okay. Where, if you recall, are there additional shoe impressions?
A. We located numerous shoe impressions over here which coincided with our investigation and our interviews that deputies gathered in this location prior to breaking out the fence line right here.
Q. Okay. So multiple shoe patterns or shoe impressions?
A. Multiple, multiple, from -- and they're stepping on one another, they're covered, there's just multiple shoe impressions over here.
Q. Do you have an opinion as to when those took place?
A. Based on the investigation and interviews, these impressions were left there after the shooting.
Q. Okay. And for the record, the witness is indicating with the pointer it appears to be a blue trash can

at the top right of the photograph.
Going back to Placard 9, you said that was several feet from 10. Was it 5 or 6 feet?
A. I'm estimating six. Could be different.
Q. Is there anything that would assist your recollection of that distance?
A. The specific measurement may be in the crime scene log.
Q. And would it refresh your recollection to review it?
A. Yes, please. Thank you.
After review of the report, there's no specific distance in between Placard 9 to 10 measured. But there are other references in here that place the items in reference to the vehicle and the fence line.
Q. Is there a distance between a consistent point, a constant value, if you would, and each of those items?
A. From -- there's a measurement from Placard 8 to 9. Placard 8 being here.
Q. Uh-huh.
A. Placard 9 being there. From Placard 8 to 9 there's approximately 5 feet southeast direction from here to here.
Q. Okay. And it's your recollection that 9 to 10 was -- sorry, I just don't recall what number you used. I don't want to misquote.
A. So from here to here the course is approximately 5 feet. What I do know is from this distance to the fence line, was approximately 15 feet.

Q. And for the record, the witness pointed from about the first portion or the wood gate closest to the right of the photograph across to the -- straight across to the chain-link fence.

A. And again, this is one of the examples where I explain that photographs don't do a scene justice. Because of the depth of the camera, the way the lens is focused, you get fish eye camera, makes everything really wide. Have you ever seen those? You have to actually walk a scene to determine where things are resting and appreciate them once you see them in the photograph.

Q. If you can just restate what your estimation of the distance was between 10 and 9, I will write it down?

A. From here to here was approximately 6 feet.

Q. Okay. And do you, based on your review of the audio, your interviews, hearing Deputy Alfred's testimony a few years later, do you have an opinion as to what occurred for him to go from Placard 10 to Placard 9?

A. From here to here, based on evidence here at the scene, interviewing him at the scene, I believe he may have been in a forward motion to contact Mr. Barber. Stepped forward. And then possibly retracted his step, dropped his flashlight, then the incident occurred.

Q. Okay. So would it be fair to say the pattern is consistent with him walking forward to 10, then sort of doubling back?

A. That's my conclusion based on the physical evidence here at the scene.

Q. Okay. Was there anything in the belt recording that was helpful in assisting you in your investigation?

A. Just the amount of time that it took from the time that the tires began to lose traction to the first round being shot, and that I configured that with a little bit of math and some force science application, because of how the body physically reacts to a threat of any kind.

It was an appropriate response based on perception of danger and reaction time.

Q. Are you talking about the time passage?

A. Yes.

Q. Okay. Can you explain a little bit more what you mean by that?

A. Well, we all heard the audio. There is a loss of traction on the wheels. Then you don't hear a loss of traction on the wheels. But at that point the vehicle is in motion because -- and I explained earlier, wheels grabbed enough to make the vehicle move. We're talking about anywhere from a 4600 pound to 5,000 pound vehicle. It needs a lot of energy to make that thing move.

Once the wheels grab, you don't hear the revving. You don't hear the tires spinning, because the vehicle is in motion. Officer -- sorry, Deputy Alfred stated in his testimony, that he already had his gun out and was pointing it down at the ground at a 45-degree angle. Average perception time of danger for a normal human being is about .75 seconds, three-quarters of a second.

So if you've ever been on the freeway and you

anticipate a crash, you see something, in your mind, .75 seconds is elapsed, and then at that point you're either going to steer the wheel away or you're going to apply your brake. To react to something is an additional .75 seconds.

Now, these are all average physiological occurrences that occur in our body, once we make a determination to do something about it. Okay. And as I indicated earlier, we're going to do three things, fight, flight or we're going to freeze in place. So when you make a determination to do something, your body is already sending a signal to whatever limit of your person is reacting and you're going to conduct something. You're either going to remove yourself from the situation. You're going -- if you're in a fist fight, you're going to swing back or you're going to cower away or run or do something. You're going to react.

So you're looking at 1.5 seconds to do something, to respond to the danger ahead of you. That's what occurred here. The first round was shot off in approximately one, 1.1 seconds. Then, again, remember, we already have a handgun that's out. So there's no lag time to go to your holster to take it out of its holster and to present in a shooting stance.

So that's why it happened so quickly right after the revving, if that makes sense.

Q. Okay. Drawing your attention to the center of the photograph, there appears to be something in the gravel. Do you see what I'm referring to?

A. Are you referring to this right here?

Q. Yes.

A. Yes.
Q. If you know do you know what created that impression?
A. Yes.
Q. And how do you know?
A. Based on evidence at the scene, interviews, and my knowledge of how our fire department, paramedics respond, I know what that groove is.
Q. Okay. And based on your knowledge and experience, what would -- what is the groove consistent with?
A. The groove is more prominent here, but you can see a little pattern right here. It's consistent with the width of a gurney.
Q. All right. And if a gurney were walked through a gravel path like that, about how many -- well, strike that.
Would it take several people to walk that path?
A. Yes.
Q. And through that path we see the placards that mark the FCCs?
A. Here?
Q. Correct.
And the witness is using the pointer to circle Placards 2, 3, 4 and 5.
Do you have an opinion as to what, if anything, may have occurred with the FCCs, based on their placement?
A. Yes.
Q. What factors do you base that opinion on?
A. Well, my opinion is that where these FCCs were

found is not where they landed.

Q. Why is that?

A. Because you have FCCs up here. Now, the only evidence that I have shows that Deputy Alfred was right here at the time of the shooting. That's the only evidence that I have. I don't have different shoe impressions. I have this here. We've already talked about how FCCs kick out of a Glock, they go high, they go slightly behind. This pattern where the gurney came, you gotta understand the gurney came in and the gurney came out. And you had three firefighters, paramedics with that gurney coming in, coming out.

You also have four deputy sheriffs that responded to assist Deputy Alfred right after the shooting. Those deputies in their interviews said they came down the center, then hugged this area of the gravel to get in to here to find him. They didn't know where he was exactly. They knew he was back here somewhere. So you had a total of at least seven people that came down this alleyway or driveway and contaminated the crime scene.

And we talked about how contamination occurs down the road. Now, granted, medical aid takes priority, things like that. Assisting others takes priority. So we have to deal with a scene once it's been contaminated, so to speak.

So in my opinion, this is not where these FCCs landed. And you can see a pattern of the gurney came in and it came out, right through the center of the crime scene.

Q. Based on your review of the totality of the scene, did you form -- well, the totality of the scene, the belt

recordings, witness interviews and the testimony you observed, do you have an opinion as to what took place between Mr. Barber and Deputy Alfred?

A. Yes.

Q. And on what do you base that opinion?

A. As you had indicated, the crime scene itself. The physical evidence located there. Through the numerous interviews that we conducted with deputies on scene, firefighters on scene, Mr. Cocchi I believe, Ms. Gallo, and Ms. Grenados, we came to a conclusion that Deputy Alfred shot from right here.

Q. And for the record the witness is indicating with the laser pointer making a circular motion around, is it Placard 9?

A. Yes.

Q. And that's your opinion as to where Deputy Alfred shot from. Did you have an opinion as to the events that precipitated that shooting?

A. Yes.

Q. What was that opinion based on?

A. Again, based on the evidence at the scene, interviews, crime scene photographs, and the vehicle placement itself, he walked along this fence line to obtain a vantage point of Mr. Barber, as you can hear on the audio when he makes contact. He gives commands that are consistent with a law enforcement present. Civilians don't normally tell another civilian, let me see your hands. Those are law enforcement commands.

Mr. Barber has contacted law enforcement in the past. He understands verbiage between a law enforcement officer --

MR. BRYANT: Objection. Calls for speculation.

THE COURT: Sustained.

THE WITNESS: So when he comes down this pathway, which is the only pathway that we located at the scene, and just to reiterate, this area of gravel is the only area of gravel on the driveway. The rest of the driveway on the north side of it is pretty much just dirt. We have him stopping here. The vehicle is approximately 14 feet north of where its position of rest is right here.

Again, with the additional 2 feet after it rolled when they removed Mr. Barber from the vehicle. The vehicle has a slight turning deviation in the front steering wheel, meaning the tires were positioned to a point where the vehicle went from one direction to a direction pointing towards the opening of the driveway, which is where Deputy Alfred was. And the vehicle came to rest to where it's at.

Q. Okay. And based on all of those factors, what was your opinion as to what happened precipitating the shooting?

A. Mr. Barber was not complying with commands of law enforcement. And he jumped in that vehicle, accelerated towards Deputy Alfred and tried to hit him with the car.

Q. Thank you.

MS. FULTZ: Nothing further.

THE COURT: Thank you.

Cross-examination?

MR. BRYANT: Thank you, Your Honor.
THE COURT: Mr. Bryant.

CROSS-EXAMINATION

BY MR. BRYANT:
Q. Good morning, Deputy Hernandez.
A. Good morning.
Q. First, go back to some of the qualifications you discussed. You've worked on a number of crime scenes, correct?
A. Correct.
Q. And is there any specific training that you go through academy or post academy that would assist you in being able to be knowledgeable enough to conduct a crime scene investigation?
A. Yes.
Q. What is that?
A. Well, going back to my collision investigation training in beginners, intermediate, advanced and reconstruction, as stated earlier, those are crime scenes. We treat them as crime scenes. Because if you have a death at a collision scene there's a potential for criminal liability. So we treat it as a crime scene. And I've conducted a lot of those.
I've also been to homicide school, in the last few years. Homicide school specifically deals with homicide investigations, lethal force encounter investigations, scene investigations. Again, so I have compiled my expertise and experience with scene investigation. And that is just with

homicides and collision investigations.

Police officers are constantly responding to scenes, whether they're domestic violences, whether they're stabbings or normal shootings where somebody is not murdered. Any scene you go to where there's violence or physical evidence, is a crime scene. So it's just not major scenes. You can go to a domestic violence scene, have a glass broken on the floor, a couple going at it fighting, that's a crime scene. So you have to take into account there's more to training and experience other than just going to a school for eight hours.

Q. Thank you.

Throughout your time investigating crime scenes, you specifically stated that for you, you try to be as accurate -- and if I'm misphrasing anything you say feel free to correct me. You try to be as accurate and as, I'll say, meticulous as possible in order to preserve the crime scene to present the most accurate picture you can for whomever is going to look at that investigation later, correct?

A. I said I try to be thorough in the investigation because I could have a crime scene that's contaminated, so I get what I get when I get there.

Q. Okay. So -- and again, try to be as thorough as possible. Part of being thorough is doing a physical investigation of the actual crime scene, correct?

A. Correct.

Q. Part of the physical investigation could be if there is a -- if there are gunshots fired you want to know where the bullets may have penetrated, correct, where the

bullets may have gone, correct?
A. Correct.
Q. You also want to know where the shell casings may have landed, correct?
A. Correct.
Q. You want to know, again, in this instance when we're talking about dirt and other surfaces that could create impressions, you want to look to see if there are any shoe patterns that would assist you to determine directionality of whomever you may be talking about, correct?
A. Correct.
Q. Vehicles you want to look at, tire treading, if it's possible, whether that be on asphalt, possibly the black tire lines we're normally used to seeing when someone is braking hard, there's a loss of friction. Or in the instance of dirt, for example, where the dirt may make a tire impression as the car rolls across that dirt, correct?
A. Correct.
Q. Also, part of that investigation is to listen to witness testimony, right? Taking interviews of a variety of different people who were either there at the time of the incident or had some part or situation that involved that incident, correct?
A. Correct.
Q. And in this particular case, you had interviewed a number of people or a number of persons who were either at the scene at the time of the incident or had arrived after the incident had stopped -- and when I say incident had stopped,

I'm referring to the fact that Deputy Alfred was no longer firing his service weapon and the vehicle was no longer in motion, correct?

A. Correct.

Q. So you identified, you interviewed a Deputy Torres, am I wrong?

A. I believe I did.

Q. Okay. Deputy Torres. I see there's a Deputy Mora?

A. Yes.

Q. You interviewed Deputy Alfred?

A. Yes.

Q. You interviewed a Monique Grenados?

A. Yes.

Q. A Mr. Cocchi?

A. Yes.

Q. And Ms. Gallo?

A. I believe Detective Ripley interviewed -- correct myself. I believe Deputy Ripley interviewed Mr. Cocchi and I interviewed Ms. Gallo.

Q. Okay. Excellent.

When you -- did you interview any of these people with another person, or was it just yourself?

A. I interviewed Ms. Gallo by myself.

Q. Okay. And for example, Deputy Alfred, were you by yourself or were you with another individual?

A. I was with another detective.

Q. Who were you with?

A. I believe that was deputy -- I'm sorry, Detective

Navarro. I could be wrong. I would have to review my report to clarify.

Q. Okay. And Detective Navarro was also the detective that did the actual crime scene investigation in this particular case, would that be accurate?

A. Yes.

Q. And so Detective Navarro was the one who actually went on the scene, worked with the photographer, whoever -- maybe he was the photographer, but he was working with someone who was taking pictures and photos of the crime scene, correct?

A. Correct.

Q. He also was the person in charge of making sure he's placing these different colored cones next to items of potential importance to the investigation, correct?

A. Correct.

Q. And would he also be the one who is measuring distances?

A. Both parties would.

Q. Okay. When you say both parties, who are both parties?

A. Detectives that work crime scene investigations or the actual scene itself, we take our own measurements, and then whoever CSI is, crime scene investigator, will take their own, because we both have to do reports. So a CSI person, in this case it was a female by the name of Green-Perva, I can't recall her first name, she's no longer with the department.

So she conducts her own investigation. She has to do her own report, take photographs, create a log scene,

meaning she has to itemize what was discovered. And then she creates a sketch, a rough sketch to help her with her report.

The detective will do the same thing. Conduct individual measurements to pieces of evidence, create a scene sketch. Then add that to the report with an explanation of what was located. Measurements in between. Points of reference. Then measurements in between each piece of evidence.

Q. And again, you've given some opinions in this case, correct?

A. Correct.

Q. And you also -- and again, I'm going to go over your -- just quickly, briefly, about your background. You gave an opinion on your training, you said you took POST training while you were in the academy, correct?

A. It's not an opinion. It's actually training I conducted.

Q. Okay. So you conducted POST training?

A. Yes.

Q. And have you conducted POST training on deadly force or use of deadly force?

A. Yes.

Q. And are you familiar with Learning Domain 20?

A. Which -- I don't know. It's been 31 years since I've been in the police academy.

Q. When was the last time you actually trained on use of deadly force?

A. I train daily on the use of deadly force. It's

something that I have to constantly think about and adhere to department policy.

Q. And my apologies. Did you instruct anyone on the use of deadly force, meaning you had people who you actually instructed on how to use or when to use deadly force?

A. Every time I have a trainee, as a field training officer, while at the Santa Ana Police Department or while with the sheriffs department, if I have a trainee the first thing we talk about before we go out the back gate is what to do in case we get into a lethal force encounter. What policy and procedure is pertaining to the use of force. How we conduct ourselves after that in the investigation, because of personal experience.

This way they know and they educate themselves whether they learned in the academy or not. I always reiterate it's very important.

Q. And again, as far as the use of deadly force goes, a number of levels of force an officer can use throughout an encounter with an individual, correct?

A. Correct.

Q. And you would --

A. Correct. I'm sorry.

Q. No worries.

You would agree with me that the use of deadly force is taught as a use of the force of last resort. It should only be used when either there's a threat of harm or imminent threat of harm or great bodily injury or death to either yourself or someone else, correct?

A. In defense of yourself and defense of others.
Q. Yes. And that threat must be imminent, correct?
A. From the perception of the person being affected.
Q. Correct. Correct. From the perception of the person being affected, right?
A. Correct.
Q. The reasonable officer or so to say, would that be something you've heard before?
A. Yes.
Q. Okay. And maybe describe what the reasonable officer is for the jury?
A. Well, a reasonable officer, and this is where hindsight, 20/20, should not be considered, because you can take a deputy with one year of experience versus a deputy with 15, 20 years of street experience. They may react differently based on their training and experience. I don't know if you can imagine yourselves being a brand-new deputy on the street with maybe small amount of interaction with the public. And then all of a sudden you go to a call and somebody points a gun at you. It's pretty frightening.
I can't tell you what you're going to do. Only you can decide what you're going to do. Versus a deputy sheriff who may have been involved in a lethal force encounter or two during their career. They respond to the same call. Their mind set is different. They have to rely on their training and experience. The guy who's been around for a longer period of time is going to be much more fortunate in that encounter, and do probably more of the right things because he has more

experience.

So the explanation of reasonable has to pertain to the amount of level of training and experience that that person has, not what the entirety of a reasonable person is. Does that make sense?

Q. Thank you. Appreciate that explanation.

Again, given the fact that deadly force is the force of last resort, it's the last thing an officer should use, you would agree with me that you're taught in the academy and you also instruct your trainees that when possible you look at other avenues to avoid using deadly force, correct?

A. Correct.

Q. And again, not every time is going to be perfect. There is this concept that you'll often hear, a split second decision, right? You have a split second to make a decision at times when you are -- your life is threatened, right?

A. True.

Q. For example, if you're an officer, you're speaking with a potential contact, and that contact all of a sudden pulls out a firearm and points it at you, right? You don't necessarily have time to say, law enforcement, put your gun down, right? Most of the time, I mean, if you're right next to each other, the natural reaction is you've got a split second. You see what would be an imminent threat of harm, and that officer at that point could legitimately and justifiably use his firearm to protect himself, correct?

A. Correct.

MS. FULTZ: Objection. Relevance. And 402.

THE COURT: Yeah, I'd like to speak to the lawyers for a few minutes. Let's take a short recess. We'll be about ten minutes.

Don't talk about the case.

(The following proceedings were held outside the presence of the jury.)

THE COURT: All right. We're on the record outside the presence of the jury.

This is a criminal prosecution for attempted murder. It's not a civil lawsuit against the department or Officer Alfred for using excessive force. So I don't understand the relevance of this entire line of questioning about when it is proper to use deadly force.

MR. BRYANT: And, Your Honor, and again, I was even going to at some point say, this is not a case about officer or Deputy Alfred's use of force. It was only because this was sort of brought up during his direct examination about his training with use of force and going over that.

I honestly wasn't even going to go into it with this witness until --

THE COURT: There's been a lot of time spent throughout this trial on Deputy Alfred's use of force and whether it was proper. And I don't see how that's relevant at all.

Assume for the sake of argument that he reacted improperly, doesn't matter.

MR. BRYANT: Correct.

THE COURT: The issue is what did Mr. Barber do.

Ms. Fultz, what's your view here?

MS. FULTZ: That was my motion in our in limines. I do have to prove an element of lawful performance. Instruction 2670 does get into during a detention the lawful performance and force. So I did ask Deputy Alfred if he considered his force options, just for the purposes of proving lawful performance.

But I think getting into that with other witnesses, other than what he perceived and what he did, I think that's outside of the element.

THE COURT: Let me look at the instruction. What's the number again?

MS. FULTZ: 2670 is the lawful performance --

THE COURT: Give me a moment.

MS. FULTZ: -- instruction.

THE COURT: Okay. I think this is relevant. Objection overruled.

MS. FULTZ: And is the Court treating that as impeachment for Deputy Alfred?

THE COURT: I think the issue is whether deputy -- I'll bring out the instruction again. I'll read it specifically. I'm sorry, it's 2670?

MS. FULTZ: Right.

THE COURT: Oh, well, let's go back to the attempted murder of a peace officer. What instruction is that?

MS. FULTZ: That will be 602 is the specific peace officer instruction.

THE COURT: Thank you. Give me a moment.

Okay. Element 1 of that is, they must show that he

was lawfully performing his duties as a peace officer. That's in 602.

And then 2670 is lawful performance of a peace officer. This is applicable when lawful performance is an element. And it says here, use of force by a police officer, special rules control the use of force. A peace officer may use reasonable non-deadly force to arrest or detain someone, to prevent escape, to overcome resistance or in self-defense. A peace officer may use deadly force if he or she reasonably believed, based on the totality of the circumstances, that the force was necessary to defend against an imminent threat of death or serious bodily injury to the officer or another person, or reasonably believed, based on the totality of the circumstances, that the defendant was fleeing, the force was necessary to arrest or detain him for the crime of something. The commission of the crime created a risk of or resulted in death or serious bodily injury to another person. And the defendant would cause death or serious bodily injury to another person unless immediately arrested or detained.

So I guess here the person we're talking about is Deputy Alfred himself.

MS. FULTZ: Right.

THE COURT: Right. Okay. So I think all of these questions about whether the use of deadly force was appropriate would be relevant.

MS. FULTZ: Right. And when we discussed in lims I did say it's going to come in, there was a shooting, but that is the force option he elected, and I think that's relevant to the

element of lawful performance.

THE COURT: How in your view has Mr. Bryant gone beyond that?

MS. FULTZ: I was just worried we were getting close to -- we talked about bullet placement. We had -- the Court had excluded injuries to Mr. Barber. Placement of the shots. I think we had gotten -- I think we had talked about the number of shots that became relevant to placement.

THE COURT: I think that's part of the use of deadly force. I don't think, now that I've been educated about that element, I see that it is relevant. I don't think Mr. Bryant has gone beyond that.

MS. FULTZ: Okay.

THE COURT: Okay. I'm going to overrule your relevance objection.

What was the exact question just before we broke?

(The requested portion of the record was read by the reporter.)

THE COURT: I think I will sustain the relevance objection to that. This isn't a situation where Mr. Barber allegedly pulled a firearm on Deputy Alfred. The allegation is that he attempted to run him over with a car. So that particular question I do think is irrelevant.

But this general line of questioning about when it's proper to use deadly force I think is appropriate.

MR. BRYANT: So the Court's understanding, I was actually transitioning over. I was just giving sort of an example of what an imminent threat would be, like some obvious

ones, then I was going to go to the motor vehicle incident.

THE COURT: Okay. All right. All right.

MS. FULTZ: So the Court is aware, we've discussed the -- Detective Hernandez mentioned the bloodstain. I have no objection to him asking if he determined the source of the bloodstain but anything beyond that.

THE COURT: Okay.

MS. FULTZ: The door is that far open.

MR. BRYANT: I brought it to counsel.

THE COURT: Okay. All right. Let's bring the jury back in.

MS. FULTZ: Thank you.

(The following proceedings were held in the presence of the jury.)

THE COURT: Have a seat, everyone.

Whenever you're ready, Mr. Bryant.

MR. BRYANT: Thank you, Your Honor.

BY MR. BRYANT:

Q. So as we were just talking about the use of deadly force, I had given you one example. Now, I'm going to go to a more relevant example.

In this particular case, this is involving a vehicle as the potential deadly weapon, would that be accurate?

A. Yes.

Q. And you would agree with me that while a vehicle can be used as a mode of transportation or recreation, sometimes a vehicle can be determined to be a deadly weapon, right?

A. Correct.
Q. And are you trained on when specifically it is appropriate to use deadly force when it involves a moving vehicle?
A. I can't recall a specific training for that, because that leans towards providing a perspective for somebody else, if that makes sense.
Q. What do you mean by that, can you explain that?
A. Yes. We can train to protect ourselves in any fashion that we see fit in accordance with the law. I wouldn't train anybody to say, you need to shoot the driver of that vehicle if he or she is coming at you with a vehicle. Because it's going to be up to the person threatened by the movement of that vehicle to deliver any type of force in the end.
So it's not something that I'm aware of that's actually taught to shoot at a driver of a moving vehicle, because once you incapacitate the driver of a motor vehicle, guess what? That vehicle is probably still mobile, and it could harm somebody else. It's out of control. It could continue on beyond its normal path, if that makes sense.
Q. And thank you for that explanation. And I may periodically ask you to expound on something a little bit more, so that everyone can understand. So you would agree with me that there are instances where reasonable force may be necessary or where the use of deadly force may be necessary involving a moving vehicle, correct?
A. If you're asking if there's a possibility, yes.
Q. There are also times or situations that may present

itself where it would be unreasonable for an officer to use deadly force where there's a moving vehicle heading towards you, correct?

A. I couldn't make that determination, no.

Q. Well, just speaking as a reasonable officer, I'll give you some examples. You have someone who -- you have a vehicle that's headed in the direction of an officer. Let's just say that vehicle is going and that officer is a hundred yards away, right? And that vehicle is heading towards that officer from a hundred yards away, at, let's just say, five miles per hour. You would agree with me that it wouldn't be reasonable for an officer to use deadly force to fire at a vehicle that was moving five miles an hour towards that officer who's a hundred yards away, correct?

MS. FULTZ: Objection. Relevance.

THE COURT: Excuse me. I didn't hear the objection?

MS. FULTZ: Relevance.

THE COURT: Overruled.

THE WITNESS: Well, again, you're asking me to form an opinion for somebody else who is facing that vehicle coming at them. That would be a determination by the court.

BY MR. BRYANT:

Q. Well, no, you're -- you've been testifying as an expert in the area of the use of -- the use of deadly force, correct? You've given opinions today on whether it's justifiable, correct?

A. I've given an opinion as to my expertise in use of deadly force, yes.

Q. So I'm giving you a hypothetical, and I'm asking you as an expert to give a hypothetical response to a hypothetical, what the reasonable officer would do in this situation to justify the use of deadly force, okay?

A. Okay.

Q. All right. So, again, if you have a car that's moving at an officer who's a hundred yards away going five miles per hour, based upon your expertise, knowledge, training and experience, would you agree with me that would be unreasonable for an officer to use deadly force in that instance?

A. I would respond to that by saying it would be unreasonable for me, based on 31 years of experience, to shoot at a vehicle in that manner versus maybe looking for an avenue of escape, looking for another option or whatnot. But I think what you're asking me to do is form an opinion for somebody else who would be in that predicament with either less training and experience than me or a reasonable person. Again, we talked about reasonableness versus a one year guy or a 20 year guy.

I understand what your question is. For me it would be unreasonable, yes.

Q. And again, you mentioned, you know, is there an opportunity for you to move out of the way or avoid being at the direction of the vehicle, correct?

A. That would be a consideration.

Q. And if there was an opportunity to safely take yourself out of harm's way, you would agree with me, that that

would be the more reasonable option to use as opposed to just using deadly force in that instance, correct?
A. That would be -- would be fair to say.
Q. I'll give you another hypothetical. Let's move the individual up. Let's now say you are, let's just say you're 60 feet away from a vehicle that is now starting to move towards you at five miles per hour. Okay. And there's an opportunity for you to move out of the way in order for you to avoid any collision. You would agree with me that an officer would be unreasonable to use deadly force where a vehicle is traveling five miles per hour towards their direction and there's an opportunity for them to, you know, remove themselves from harm's way. You would agree with me it would be unreasonable to use deadly force in that instance, correct?
A. Correct.
Q. Now, let's say that the car is moving 80 miles per hour, the same -- same -- same distance, 60 feet, there's an opportunity to possibly move out of the way, but there's a vehicle charging at an officer at 80 miles per hour. You would agree with me, that it may very well be reasonable at that point to use deadly force given the speed of that vehicle and not necessarily knowing if you could evade or get to a safe area to avoid contact, correct?
A. Depending on the factors, yes.
Q. You also talked about -- we'll get to a couple more of these hypotheticals. We're getting a little closer, a little closer. My question for you is, you can -- you would only allow to use deadly force where there is imminent harm of

death or great bodily injury, correct?
A. More or less, according to most department policies, yes.
Q. And what is great bodily injury? What does that consist of?
A. Severe trauma to the body. It's kind of a broad definition of harm to one's person.
MS. FULTZ: Objection. Calls for a legal conclusion.
THE COURT: Sustained. I will instruct the jury at the end of the case what great bodily injury means.
MS. FULTZ: Move to strike.
MR. BRYANT: Bad question.
BY MR. BRYANT:
Q. All right. What for you, for example, just in your lay opinion, when you're on the street, right, and you at some point served as an officer who patrolled or deputy who patrolled the area, correct?
A. I'm sorry, what was the question?
Q. Sure. At some point you were a patrol officer or deputy, you patrolled the streets, correct?
A. Yes.
Q. All right. Just in your lay understanding for you, when you're trying to determine, do I use -- actually, strike that.
Have you ever been in a situation where you had to think about whether or not you needed to use deadly force throughout your 30-year career?
A. Yes, all of time.

Q. Okay. All right. And in your opinion, just in your opinion, how fast do you believe a vehicle should be moving where you believe it would be appropriate to use deadly force? What's the minimum speed, if you know?

MS. FULTZ: Objection. Improper hypothetical.

THE COURT: Sustained.

BY MR. BRYANT:

Q. I'm going to keep going, and I'm going to get passed these questions. I'm going to move back to the distance.

So let's just say you have someone who's 40 feet away from a vehicle. This vehicle is currently stationary. And there is an opportunity to -- there's a opening, so there's an opportunity to avoid a potential collision, if this vehicle moves back. Let's just say the vehicle starts to move back at five miles per hour.

You would agree with me that a vehicle that's moving five miles per hour, 40 feet away from you, where you have an opportunity to move out of harm's way, it would be unreasonable to use deadly force in that instance?

A. That's kind of a broad hypothetical. You're making me draw a conclusion on is something that could be argued in court. It would depend on the person who's receiving the imminent threat.

Me personally, I might jump out of the way if I need to.

Q. The vehicle is going five miles per hour, right? You understand how fast five miles per hour is in your head,

right? It's not moving relatively all that fast. It's kind of moving back, right? If a car is moving back towards you at five miles per hour, you would agree with me that from 40 feet away where you have an opportunity to avoid a collision, it would be unreasonable to use deadly force, correct?

A. I would probably try to get out of the way.

Q. Okay. Let's just say you're 10 feet away from a vehicle, and a vehicle is going 15 miles per hour in reverse towards you and you are 10 feet away. Would it be reasonable to use deadly force in that instance?

A. Fifteen miles an hour, so the vehicle is moving 22 feet per second, I wouldn't have time to react.

Q. And if you had your firearm fired, you would be able -- you would be justified to use deadly force in that instance, correct?

A. I would assume so, yes.

Q. So again, deadly force is situational as we've described, depending on the situation, depending on the variety of different circumstances, that's how one could determine whether or not the force being used is reasonable; would that be accurate?

A. I'm sorry, say that again?

Q. Yes. Sure. So again, just to wrap up, tie up what the use of deadly force is, it's circumstantial. It's not always -- every situation is going to be a little different, and it's based upon a variety of different circumstances when it would be appropriate or inappropriate to use deadly force, correct?

A. Correct. Correct.
Q. So what time did you arrive to the scene?
A. Maybe a little after 2:00 in the morning, more or less.
Q. So the incident happened at approximately around 11:30-ish at night, some time around that time?
A. Approximately, yes.
Q. And so you arrived at the scene a couple of hours later, hour and a half, two hours later?
A. At least two hours later.
Q. And by the time you got there, how many officers or deputies did you see once again?
A. I don't recall seeing any deputies there, other than Deputy Mora. Additional personnel were guarding the scene itself.
Q. And when you say guarding the scene, what do you mean by that?
A. Preserving the scene once everybody had been removed from the location.
Q. Okay. And you talked about crime scene spoilage or disruption. What was the term you used again when a crime scene is potentially impacted by people coming in and out of the crime scene?
A. You could refer to it as a form of contamination.
Q. Contamination, there you go. Thank you. Thank you.
And you prepared a report, and I'm going to now show exhibit -- sorry, our exhibits got a little crossed over

here, so trying to fix this. Here we go.

So, Deputy Hernandez, are you familiar with this document?

A. Yes.

Q. What is this document here?

A. It is a sketch, not to scale, of the crime scene with the evidence marked with placards.

Q. Okay. And No. 1, what is No. 1?

A. No. 1 appears to be Deputy Alfred's patrol vehicle here in the roadway.

Q. And do you have a copy of that report just in case you need to refer to it?

A. It should be one in the book right there.

Q. I can provide it to you.

MR. BRYANT: Your Honor, may I approach?

THE COURT: You may.

MR. BRYANT: Thank you.

THE COURT: Is this marked as an exhibit?

MR. BRYANT: No. I think it were being used to refresh recollection.

THE COURT: I don't think he's testified that he doesn't remember anything.

MR. BRYANT: I just remembered that, Your Honor. Give me a second and I will -- I haven't marked it as an exhibit yet. If we need it, I'll bring it to you.

THE WITNESS: Okay.

BY MR. BRYANT:

Q. Okay. So here you have a diagram. Do you know who

created this diagram?
A. At the bottom of the report it says Detective G. Navarro.
Q. Okay. All right. It shows a number of different markers. And again, can you tell me, if you know, what the distance is between the entry to the driveway and where you believe the car's initial position was as you showed before? Would that be in this report?
A. It should be, yes.
Q. Would it help you refresh your recollection if I provided this to you?
A. No. I believe the total distance from the opening on this driveway to the end of the driveway was approximately 96 feet.
Q. Okay. So approximately 96 feet, around a hundred feet, give or take?
A. 96 feet.
Q. How do you know it was 96 feet?
A. Because it says it in the report, I believe.
Q. Okay. So you remember that?
A. Yes.
Q. All right. Great. All right.
So from the beginning to the end of the driveway is approximately 96 feet. And the vehicle was parked relatively close to the end of that driveway, correct, when it initially started to move?
A. According to the tread pattern and evidence at the scene, the vehicle was parked here.

Q. So would it be safe to say that the vehicle from the point of the driveway was approximately 92, 90 to 92 feet from the driveway, from the front of the vehicle?
A. Well, depending on what parts of the vehicle you're speaking of.
Q. Referring to the hood -- the front fender, I apologize.
A. The vehicle is 15 feet long, I would assume that it was maybe 8, 9 feet away, more or less. So 91, 92, 90.
Q. Perfect. Now, you interviewed Deputy Alfred. Do you recall Deputy Alfred giving you sort of a, you know, his version of what happened in the story?
A. Yes.
Q. Do you recall Deputy Alfred telling you at what point he drew his firearm?
A. Yes.
Q. And what -- where do you recall Deputy Alfred drawing his firearm?
A. He says he drew his firearm as he walked toward the vehicle.
Q. Did he tell you approximately how many feet he was from the vehicle at that time he drew the firearm?
A. I don't believe we determined the length of distance he had covered when he drew his firearm.
Q. And let me ask you a better question. Did he tell you the distance between his -- the vehicle and himself when he drew that firearm?
A. He may have. But he was more closer to the vehicle

itself than he would have been from the entrance of the driveway, if that makes sense.

Q. Sure. Sure. Did he give you any specific footage? Again, I have the interview if it will help you refresh your recollection?

A. If you can, if it's there and you can provide it that would be great.

Q. Sure.

MR. BRYANT: May I approach, Your Honor?

THE COURT: You may.

THE WITNESS: Okay. After review of the report, I recollect approximately where he told me he drew his firearm.

BY MR. BRYANT:

Q. Okay. And could you explain to the ladies and gentlemen of the jury what Deputy Alfred told you what his distance was from the vehicle when he drew his firearm?

A. According to this transcript here he told us that he drew his firearm anywhere from 8 to 10 feet from the vehicle.

MR. BRYANT: And, Your Honor, does it make more sense to leave this here if he needs, as opposed --

THE COURT: If you want it leave it, Counsel.

MR. BRYANT: I'll leave this here, so I'm not taking up the jury's time and the Court's time.

BY MR. BRYANT:

Q. You talked about, you were given some calculations earlier, right? And you said that if something was moving -- if a vehicle was moving between ten to 15 miles per hour, you

said that you wouldn't have been able to do anything because a car was moving too fast. It was going a certain amount of feet per second. Could you please explain that again, what were you saying?

A. Well, under your hypothetical you said if I were 10 feet away from the back of a vehicle and it traveled towards me at 15 miles per hour, the mathematical equation for the distance that vehicle would travel in a second would be 22 feet approximately.

Q. So it would approximately move 22 feet from its position, correct?

A. Yes. There's a math problem for that.

Q. If a vehicle was traveling three miles per hour going backwards, in reverse, approximately, you're 10 feet away, could you provide me with a similar calculation that you did for 15 miles an hour?

A. Yes. What you want to do is transfer speed to velocity. Velocity is the amount of time an object travels in a time period. So the mathematical equation for that is, if I take a vehicle that's traveling 50 miles an hour, I times it by 1.47 -- essentially 1.5. What you get is 75 feet per second. Do you understand how it goes?

Then you can go from velocity to speed and the multiplication factor would be .68. If I take a vehicle that's traveling a hundred feet per second, times it by .68, I'm going to get a vehicle that's traveling roughly about 68 miles an hour, if that makes sense.

Q. So would you be able to calculate for us about the

feet for a car moving at three miles per hour and someone is 10 feet away?

A. Three miles an hour times 1.47 is going to be traveling four and a half feet per second.

Q. This is going -- now, showing again, this is Exhibit 26. You saw this exhibit earlier, correct?

A. Correct.

Q. I think it may have been possibly another numbering, but you saw this particular exhibit and you said that -- and I'm pointing at the bottom of the screen, furthest away from the vehicle in the picture, and there are two cones that are parallel to each other, two green cones, and that's where you believe the vehicle started?

A. Correct.

Q. And you said that there's this sort of path that it takes where there's a slight deviation, slight eastwardly deviation about towards the middle way through; would that be accurate?

A. Correct.

Q. And you said that because that's a movement of a steering wheel, correct?

A. The front tires moved.

Q. The front tires moved, right. And again, the car is moving back, front tires can move for any number of reasons, right? Could be someone moved the steering wheel, correct?

A. Correct.

Q. It could mean that possibly the alignment on the vehicle is off, and it could -- it doesn't go back in a

straight line and kind of depending on the car's alignment it will veer left or right, correct?
A. Depending on the speed.
Q. Depending on the speed, but it could veer left or right, correct?
A. It would have to be a higher speed than, you know, 30, 45 miles an hour, because if you've ever had alignment issues your vehicle shimmies at high speeds, and it will deviate from a path. It's not going to happen at low speeds.
Q. Very good to know, actually. I didn't know that. Thank you.
And so you would also agree with me that, you know movement can sometimes be voluntary and involuntary, depending on the situation, correct?
A. Correct.
Q. And in this particular situation you would agree with me that you don't know why this car may have slightly veered in an easterly direction, correct?
A. I have an opinion.
Q. But you don't know specifically why, correct?
A. I believe that the steering wheel was steered based on the scene itself, and the vehicle did not hit this fence post. That was a controlled turn in my opinion, because whoever -- well, Mr. Barber was operating that motor vehicle. He did not want to hit that fence post right there.
Q. You would agree with me that this vehicle, based upon your observation of the scene, stopped approximately before it rolled back a couple of feet, stopped approximately

how far back initially?
A. According to the tread pattern, Deputy Mora's statement, he said the vehicle rolled back, according to him, approximately 2 feet, which is pretty consistent with the tread pattern left at the scene.
Q. So how far, based upon when the car originally stopped, did this -- did the car go?
A. Total length of tread pattern was 16 feet, so minus the 2 feet according to Deputy Mora, 14 feet more or less.
Q. So this car stopped about 14 feet after it began moving backwards, correct?
A. Correct.
Q. And it did not hit this fence to the left, correct?
A. Correct.
Q. And based upon your complete observation of the scene, of discussing with witnesses, et cetera, you would agree with me that this vehicle stopped at approximately 14 feet without being obstructed or prevented from moving by any other object that may have been in the area, whether it be the fence to the right or fence to the left or a person, correct?
A. Within the 14 foot pattern?
Q. Correct.
A. Nothing obstructing it, no.
Q. Would you agree with me that vehicle stopped, right?
A. I would agree with you that it came to rest. I don't know how it stopped.
Q. Well, you would agree with me the vehicle stopped,

one way or another it stopped, correct?
A. Well, again, from a traffic vantage point, traffic standpoint, it came to rest. But it was still in gear.
Q. Okay. We're going to get to gear, right? So it came to rest one way or another. It was not in motion at that point, right?
A. That's a correct statement.
Q. And when Deputy Mora got to the vehicle, that vehicle was not in motion, correct?
A. Correct.
Q. And Deputy Mora, you would agree, arrived at the scene approximately two to four minutes after the shooting had occurred, correct?
A. Correct.
Q. So therefore, we know that for at least two to four minutes after the shooting in which this vehicle had come to a rest, it had not moved any further, right?
A. Correct.
Q. And we are also aware the car was in gear. When you say in gear, what does that mean? I think it's obvious. What does that mean?
A. The transmission was in reverse.
Q. And so, therefore, the transmission at this point was in reverse. And you recall interviewing Deputy Mora, right?
A. Yes.
Q. And Deputy Mora explains to you that he arrives to the scene with one of -- I'm not sure if he's a trainee or new

officer or new deputy, and they take the path towards the left where the fence is, correct?

A. I don't recall the exact path. My recollection is that they stayed along the west side of the driveway to approach.

Q. Okay. Okay. They stay along the west side of the driveway, and at some point in time there's a hole that's made in the fence to the left, correct?

A. It's actually an opening, not a hole.

Q. Oh, no, I apologize. Let me -- there is -- let's just get the scene straight, and I won't do this again. I apologize. You know, sometimes looking at the time, rushing through. Give me one second.

This is -- this is the fence, the opening space you're talking about, right?

A. Yes.

Q. Did you measure about approximately how large that was?

THE COURT: What exhibit number are you showing, Mr. Bryant?

MR. BRYANT: I apologize, Your Honor. This is Exhibit 34.

THE COURT: Thank you.

THE WITNESS: Your question again, sir?

BY MR. BRYANT:

Q. Did you measure the distance from the red fence to the home, the white home on the bottom right, at least the distance of the opening?

A. The measurement from here to here?
Q. Yes.
A. According to the crime scene log it should be approximately 12 feet 5 inches.
Q. Okay. Do you recall how large this particular yard was to the right, if you can give me, you know, an estimation of the square footage, if you know?
A. No. I never determined or calculated the square footage of the front yard. It's an open front yard south of the chain-link fence line.
Q. I'm going to now show Exhibit 46.
Does this image look familiar to you?
A. Yes.
Q. What is this image of?
A. It is the image of before the marking of evidence at the scene.
Q. Okay. And to the right you see there's a white vehicle parked there?
A. Yes.
Q. And just again, based upon your calculation, the evidence report says that opening to that yard was approximately 12 and a half feet, correct?
A. Approximately, yes.
Q. And do you see the fence that's further to the house? And I'm pointing maybe one-third across to the right where there's a bright light. Do you see this fence that I'm pointing at right here?
A. Yes.

Q. At some point did the deputies put a hole in some portion of that fence?
A. Not right here, no.
Q. Yes, correct. It would be more to the left, that's sort of being blocked by the outer fence?
A. Over here, yes.
Q. And when you say over here, he has moved approximately, based upon this large screen, about a foot away from the light that is emanating from the home behind that fence.
MS. FULTZ: Object to the characterization.
THE COURT: I can't hear you, Ms. Fultz.
MS. FULTZ: Sorry. Objecting to the characterization.
MR. BRYANT: I'm just looking at the screen. So basically, I'm saying from the -- from the light source at the house directly behind that fence, I was just, for reference, it's about the -- this is a large screen. So I said he moved the pointer about a foot left.
MS. FULTZ: A foot on the screen.
MR. BRYANT: On the screen, correct.
MS. FULTZ: Okay. Sorry.
MR. BRYANT: That's my reference, it's a large screen.
MS. FULTZ: May I augment the record?
MR. BRYANT: Yes, please. Yes.
MS. FULTZ: The indicator of the pointer was on the wood fence at the center of the photograph.
MR. BRYANT: Correct. It was at the center of the photograph, and the deputy moved the pointer further to the

left towards the Trailblazer. There is a fence that is sort of blocking the view between the Trailblazer and the opening, and that is where he has pointed, where he believes the hole was in the fence.

BY MR. BRYANT:

Q. Okay. So again -- so okay. We can move on, Deputy -- Detective Hernandez.

So you know that, it's your understanding that Deputy Mora at some point went through that hole in the fence, would that -- along with another deputy, correct?

A. Correct.

Q. And Deputy Mora walked around to the vehicle where it had stopped at approximately 14 feet, correct?

A. Correct.

Q. Now, showing Exhibit 42, again, does this picture look familiar?

A. Yes.

Q. And how would you describe this picture? What's going on here?

A. It is the front passenger quarter panel of the black SUV, the Trailblazer.

Q. Okay.

A. And is there more you want me to describe?

Q. If you look to the far left of the picture there seems to be a fence with a -- some planks that are missing and lying on the ground next to a Marker 15. Would that be the hole that you were referring to?

A. Yes.

Q. Okay. Thank you.
Okay. So we have Deputy Mora and who is Deputy Mora accompanied by?
A. I believe it was Deputy Torres.
Q. So Deputy Torres and Deputy Mora enter into this portion of the premises through this hole in the fence, and you would agree with me that Deputy Mora walks around the front part of the vehicle and goes to where the driver's side is, correct?
A. Correct.
Q. And at this point in time he makes contact with Mr. Barber, correct?
A. Correct.
Q. And Mr. Barber is not doing anything at this point, correct?
MS. FULTZ: Objection. Calls for speculation. And hearsay.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Based upon your understanding of your interview with the deputy, is Mr. Barber doing anything at this point?
MS. FULTZ: Same objection.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Understood. So they make contact, you would agree with me, at some point Deputy Mora breaks the window of the vehicle to gain access to the vehicle, correct?
MS. FULTZ: Objection. Foundation.

THE COURT: Sustained.
BY MR. BRYANT:
Q. Do you recall giving an interview with Deputy Mora?
A. Yes.
Q. And you also recall creating a report that highlighted your -- or at least gave you a narrative for your interview with Deputy Mora?
A. Yes.
Q. And when you took that report, how did you prepare that report?
A. I listened to the audio and created a summary of an interview.
Q. And when you created that summary in an interview, you try to be as accurate as possible based upon what you had listened to in that interview, correct?
A. Correct.
Q. Okay. And you prepared an actual report and that was provided to whomever was going to review this file, correct?
A. Correct.
Q. Okay. So at some point in time do you recall -- after Deputy Mora walked past the vehicle to the driver's side, do you recall sort of what he did next based upon your report?
MS. FULTZ: Objection. Calls for hearsay.
THE COURT: Sustained.
BY MR. BRYANT:
Q. You said the vehicle rolled back 2 feet, correct, after -- after Deputy Mora went to the vehicle, he said that

the car moved back 2 feet, correct?
A. Correct.
Q. And what is your understanding as to why that car moved back 2 feet?
A. Because --
MS. FULTZ: Objection. Foundation.
THE COURT: Sustained.
Let's go ahead and break for the day. Have a nice afternoon.
Don't talk about the case. Don't form any opinions or conclusions about the case.
I'll see everyone tomorrow at 8:45. Thank you. Have a nice afternoon.
Yes, ma'am?
THE JUROR: I have a question about next Tuesday.
THE COURT: Next Tuesday?
THE JUROR: You were going to get back to us if it was half day or full day?
THE COURT: We're going to be off on Tuesday.
THE JUROR: Okay. Thank you.
THE COURT: Thank you.
(The following proceedings were held outside the presence of the jury.)
THE COURT: We're on the record outside the presence of the jury.
MS. FULTZ: Your Honor, there was one of the exhibits, when counsel and I went over them it was on his computer screen, and I thought it was just the drawn diagram of the

placards, but it appears the marked exhibit is the whole page from the report, which -- anyway, it has at the top the submitted 245(c), the alleged crimes. It has more detail than just the drawn diagram, and I would ask for that information to be redacted.

THE COURT: Any objection?

MR. BRYANT: No objection, Your Honor.

THE COURT: Let's do that, and we can get a redacted version and switch out the numbers. So that's fine.

MR. BRYANT: Okay. Understood. Thank you, Your Honor.

THE COURT: All right. Anything else we need to address?

MR. BRYANT: No, Your Honor. And that just -- that was Exhibit 32 for the record.

THE COURT: Okay. Thank you.

(Whereupon, the foregoing proceedings were continued to December 5, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,

-vs-

STEFFON TODD BARBER, Defendant.

No. FVI-21001312
REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 227 to 330, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 4, 2024.

Dated at San Bernardino, California, this 7th day of May, 2025.

Official Court Reporter
C.S.R. No. 12225

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
)
Plaintiff, )
)
vs. ) No. FVA-025457
)
STEFFON TODD BARBER, )
)
Defendant. )
_______________________________)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 5, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

RYAN DUCKETT
Attorney at Law

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 4 of 7
Pages 332 through 510, incl.

SESSIONS


| DATE | PAGE |
|---|---|
| December 5, 2024 | |
| Morning Session | 336 |
| Afternoon Session | 429 |

# CHRONOLOGICAL INDEX OF WITNESSES


PEOPLE'S WITNESSES PAGE

HERNANDEZ, Edward (continued)

Cross-Examination by Mr. Bryant ............. 343
Redirect Examination by Ms. Fultz............. 406
Recross-Examination by Mr. Bryant............. 415
Further Redirect Examination by Ms. Fultz..... 417

ORTEGA, Jonathan

Direct Examination by Ms. Fultz ............. 419
Cross-Examination by Mr. Bryant ............. 422

DEFENDANT'S WITNESSES PAGE

MORALES, Roberto (402 hearing)

Direct Examination by Mr. Bryant ............. 435
Cross-Examination by Ms. Fultz ............. 440
Redirect Examination by Mr. Bryant ........... 442

MORALES, Roberto

Direct Examination by Mr. Bryant ............. 449
Cross-Examination by Ms. Fultz ............. 481

INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 1 | Audio recording | | 425 |
| 2 | (Unidentified) | | 425 |
| 3 | Photograph | | 425 |
| 4 | Photograph | | 425 |
| 5 | Photograph | | 425 |
| 6 | Photograph | | 425 |
| 7 | Photograph | | 425 |
| 8 | Photograph | | 425 |
| 9 | Photograph | | 425 |
| 10 | Photograph | | 425 |
| 11 | Photograph | | 425 |
| 12 | Photograph | | 425 |
| 13 | (Unidentified) | | 425 |
| 14 | (Unidentified) | | 425 |
| 15 | Photograph | | 425 |
| 16 | (Unidentified) | | 425 |
| 17 | Photograph | | 425 |
| 18 | Photograph | | 425 |
| 19 | Photograph | | 425 |
| 20 | Photograph | | 425 |
| 21 | (Unidentified) | | 425 |
| 22 | (Unidentified) | | 425 |
| 23 | (Unidentified) | | 425 |
| 24 | Photograph | | 425 |
| 25 | Photograph | | 425 |
| 26 | Photograph | | 425 |
| 27 | Photograph | | 425 |
| 28 | Photograph | | 425 |
| 29 | Photograph | | 425 |
| 49 | Photograph | 379 | |
| 51 | Photograph | 397 | |
| 54 | Photograph | 350 | |
| 56 | Photograph | 393 | |
| 59 | Photograph | 395 | |
| 62 | Photograph | 396 | |
| 63 | Photograph | 340 | |
| 64 | Photograph | 342 | |
| 68 | Photograph | 377 | |
| 69 | Photograph | 377 | |
| 70 | Photograph | 378 | |
| 72 | Photograph | 379 | |
| 73 | Photograph | 378 | |
| 74 | Photograph | 379 | |
| 75 | Photograph | 341 | |
| 76 | Photograph | 379 | |
| 77 | Photograph | 357 | |
| 78 | Photograph | 357 | |

SAN BERNARDINO, CALIFORNIA, THURSDAY, DECEMBER 5, 2024

MORNING SESSION

DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,
JAMES BRYANT, Attorney at Law and
RYAN DUCKETT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT: We're on the record outside the presence of the jury. Counsel are present. Mr. Barber is present. Detective Hernandez is present.

Counsel, I wanted to discuss further the issue about the use of force that we were discussing yesterday. I've been thinking about that. And I think it may be more complicated or really nuanced than at least I was thinking previously. I would like to know your thoughts about that. We don't need to necessarily discuss it right now. I'll tell you what my thoughts are. You can think about it, and we can have that conversation later.

But, of course, the jury instructions are more complicated than this. But with respect to Count 1, the People need to prove essentially three things. That the defendant knew that Deputy Alfred was a police officer. No. 2, that Deputy Alfred was engaged in the lawful exercise of his duties. And No. 3 that the defendant, Mr. Barber, intended to kill

Deputy Alfred, took concrete steps toward that, but was somehow thwarted or prevented from doing so, something interrupted him.

So those essentially are the three things that the People need to prove. I think the shooting is relevant to the third element. And, you know, each of you will make your own arguments regarding what that means. I would anticipate that the People would argue that this is reflective of what Mr. Barber's intent was, the fact that this was the only way to stop him. He was accelerating toward the deputy. The deputy had nowhere to go, or at least felt that, and so, you know, he fired his weapon.

So I think the fact of the shooting is relevant to that.

Now, defendant on the other hand, Mr. Bryant, I anticipate you'll argue that the shooting was unnecessary. He could have jumped out of the way. But I am not sure that testimony about the shooting itself is relevant to the second element that the People must prove, that the officer was engaged in the lawful exercise of his duties. Because when he fired the weapon, the vehicle was already accelerating toward him. If, in fact, Mr. Barber had the intent to kill, he had already formed that intent to kill and was in the process of executing that intent.

I understand Mr. Barber will argue separately, but -- but the timeline is very important there. The issue is not whether firing the weapon was a lawful exercise of his duty. The question is whether he was engaged in the lawful exercise of his duties before he fired the weapon. Before

Mr. Barber accelerated in the car and allegedly tried to run down the officer. The shooting happened after that.

Now, as I said, I think the shooting is relevant, because it arguably goes to how fast this was all happening, which is -- could be reflective of Mr. Barber's intent. And there's a contrary argument that the shooting was unnecessary. So I think it's relevant, but I don't think the question is whether that was lawful. If the jury decides that it was unnecessary for Deputy Alfred to fire his weapon, that may go to the question of whether Mr. Barber tried to kill him, tried to run him down. Or the jury might find that he tried to anyway, and, you know, Deputy Alfred overreacted.

But I don't think the jury's belief that the shooting was unnecessary would necessarily prevent a conviction for attempted murder.

So those are -- those are my thoughts. I think it's more nuanced than we were discussing. The question of whether he was engaged in the lawful exercise of his duty has to do with, well, what was he doing there? Why was he on the property? You know -- you know, was it proper for him to walk down that driveway to investigate what had been reported to him by Mr. Cocchi and Ms. Gallo?

So those are my thoughts. I don't need you to answer now. Think about that, and we can talk about that later. Unless you're ready to talk about it now.

MS. FULTZ: I am. I don't know if counsel would like time --

MR. BRYANT: Yeah. Your Honor, could I have just a

little time?

THE COURT: Sure.

MR. BRYANT: I think you're correct on some nuances. I actually thought about this quite a bit yesterday, but I need to really kind of dig into --

THE COURT: Okay.

MR. BRYANT: -- some of the case law to really understand what that --

THE COURT: I don't think it changes in any way what should come into evidence, because I think the shooting is relevant for the reasons I explained, and whether it was a proper exercise of -- you know, whether that was appropriate for him to do, I think is appropriate. But I don't think it pertains to that question of was he lawfully exercising his duties as a police officer. Everything was already underway by the time he decided to fire.

Okay. Let's bring the jury in, if they're here. Are they?

Hang on a second, Adam.

MS. FULTZ: Sorry. There were some new exhibits marked. I only had an objection to one, and only because it displays the bloodstain.

THE COURT: May I see it?

MS. FULTZ: Yes.

MR. BRYANT: And with the new exhibits, Your Honor, there is another one that has the bloodstain as well.

THE COURT: Okay. Have these been premarked?

MR. BRYANT: That has been the most recent one.

THE COURT: We're discussing right now Exhibit No. 63. Okay. What does -- if we exclude the bloodstain, what does this show that the other photographs don't show? Why is this important, other than the bloodstain?

MR. BRYANT: And this is the -- that's the marker of No. 10 that --

THE COURT: The bloodstain is by Marker 12, which is by the left rear wheel.

MR. BRYANT: I believe that this particular image has already -- I think this is one of the few images that has the orange or the green marker tint, as well as another marker under --

THE COURT: No, there's no green marker on this -- why don't you put it up on the overhead, so we can all see it. Let's put it on the Elmo.

MR. BRYANT: All right. I understand now.

Your Honor, this particular image is the image where Marker No. 10 here where it's yellow and orange. This is the area where Detective Hernandez had stated that at some point Deputy Alfred goes there and there's foot patterns. These are all part of foot patterns of where people are.

THE COURT: This is relevant because it's -- it's a closer shot of that?

MR. BRYANT: Correct.

THE COURT: All right.

MR. BRYANT: Other than that, I mean, the bloodstain, I know it's kind of small, somewhere -- yeah, you can barely see it, but it is there. But the relevance of that is to show a

close view, it's one of the few close views of Marker No. 10.

MS. FULTZ: And I would just say there are a number of photographs in that same new collection that show the close up area of Marker No. 10.

THE COURT: Without the blood.

MS. FULTZ: Right.

THE COURT: Now, of course, the jury knows that something happened because of the evidence of medical personnel coming and the gurney and so forth. So I'm not sure the blood really is -- I mean it would be excludible under 352. I think it's -- might be relevant because how do we know that -- well, what is it that caused Mr. Barber to stop? Why didn't the -- you know, just because Deputy Alfred was firing his weapon, what prevented the car from going forward and hitting him? Well, perhaps it was that Mr. Barber was shot.

MS. FULTZ: And I will acknowledge that there was testimony that there was a bloodstain. I just under 352 don't want them looking and guessing like, where was he hit? How badly was he injured? Based on, you know, size of what the stain they're looking at. My objection is just under 352.

THE COURT: Can I see the other photos that show this same thing with No. 10 without the bloodstain?

MR. BRYANT: Yes, Your Honor. I can provide that for you, and it's going to be remarked as Exhibit 75.

THE COURT: I don't see a Marker 10 at all.

MR. BRYANT: No, this is a completely different exhibit.

THE COURT: What I'm interested in seeing are the other exhibits that Ms. Fultz says show a closer view of Marker 10.

MR. BRYANT: It's Exhibit 64, Your Honor.
THE COURT: It's not as close. Anything else?
MS. FULTZ: If we look at them side by side, I'm not sure.
THE COURT: No, I think a closer view is valuable for the jury. I'm going to allow it. I don't think it's unduly prejudicial. Arguably it's an important fact.
MS. FULTZ: Okay.
MR. BRYANT: And, Your Honor, this is the only other image that -- or exhibit, it's --
THE COURT: What number is this?
MR. BRYANT: It's premarked Exhibit 75, Your Honor.
THE COURT: You intend to use that as well?
MR. BRYANT: Yes, Your Honor.
THE COURT: Okay. All right. I don't see any problem with that. Do you, Ms. Fultz?
MS. FULTZ: Just the same objection, the bloodstain is visible there.
THE COURT: I see. Okay. Okay. Overruled. I'll allow those.
MR. BRYANT: Thank you.
THE COURT: Don't forget, Ms. Fultz, nothing has been moved into evidence, so when you rest --
MS. FULTZ: Right.
THE COURT: -- you still need to do that.
MS. FULTZ: If I can have just a moment to look at what's been marked this morning?
THE COURT: Of course.

MR. BRYANT: I was going to ask the Court what -- I was going to ask the Court, Your Honor, what the Court's process as far as moving evidence into -- sometimes I just do it as I go but --

THE COURT: It doesn't matter to me. I just don't want people to forget.

MR. BRYANT: Yeah.

THE COURT: Okay. Are we ready?

(The following proceedings were held in the presence of the jury.)

THE COURT: Good morning, everyone. Thank you for your patience getting started this morning. I appreciate it.

Are we resuming with Detective Hernandez?

MR. BRYANT: We are.

THE COURT: Take the stand, sir. You're still under oath, of course.

Whenever you're ready, Mr. Bryant.

MR. BRYANT: Sure. Let me grab the exhibit, and we'll get things started.

EDWARD HERNANDEZ,

recalled as a witness on behalf of the People, having been previously duly sworn, was examined and testified as follows:

CROSS-EXAMINATION (Resumed)

BY MR. BRYANT:

Q. Good morning, Detective Hernandez.

A. Good morning, sir.

Q. I'm going to sort of jump around a little bit and get back to a few things that you had discussed yesterday. So the very first thing that I wanted to address was your testimony where you had given an opinion that Deputy Alfred -- and I will now show what is once again marked as Exhibit 34. All right.

So Deputy Alfred had at some point walked to Marker No. 10 in the upper left-hand corner. Do you see that?

A. Yes.

Q. And then it was your testimony that you believe that Deputy Alfred, and this would be Marker No. 9 and 10 you said that was approximately 6 feet, correct?

A. Yeah, that was approximate based on the photo, yes.

Q. You stated that Deputy Alfred then jumped back approximately 6 feet to Marker No. 9, where this flashlight is currently located, correct?

A. I don't believe I said jump back.

Q. Stepped back or made a movement back, would that be accurate? He moved back in some manner?

A. In some manner, yes.

Q. He moved back in some manner to Marker No. 9, do you see that?

A. Yes.

Q. Okay. We heard Deputy Alfred give testimony, and you were here during his testimony, correct?

A. Correct.

Q. And you would agree with me that at no point during Deputy Alfred's testimony did he ever say that he had

approached closer to where Marker No. 10 was, but then moved back to Marker No. 9 before he started using his firearm. You would agree with me, correct?
A. He indicated that he couldn't recall. So I guess, in essence, I agree with you.
Q. So he said he couldn't recall. When you say he couldn't recall, maybe explain that a little bit more what your understanding was when he said couldn't recall, couldn't recall what exactly?
A. During our interview with detective -- I'm sorry, with Deputy Alfred I specifically asked him whether he moved while he shot, did he change his stance at all while he shot, and his answer was he couldn't recall.
Q. One moment. And so once again could you explain that, you said that when Deputy Alfred was interviewing with you he said as -- prior to him shooting he didn't move or his stance -- could you say that one more time? You said he couldn't recall if he was stationary or not?
A. He couldn't recall if he moved while he shot. He did indicate that he took a stance. His feet were shoulder width apart, and then he shot.
Q. Okay. Could I have you -- would it help if I showed you the interview during this time to potentially help refresh your recollection as to what Mr. or Deputy Alfred had spoken to you about --
A. Sure.
Q. -- regarding this incident?
MS. FULTZ: Objection.

THE COURT: Sustained. He hasn't testified to a lack of recollection.
BY MR. BRYANT:
Q. Okay. So is it your -- is it your recollection that Deputy Alfred told you that during the time he was shooting, he couldn't recall if he was stationary or not?
A. That's what his answer was to me, yes.
MR. BRYANT: Your Honor, I'd like to introduce as impeachment, and it's going to be Bate Stamp 134, lines 3 through lines 16.
THE COURT: May I see it, please?
MS. FULTZ: Yes, Your Honor.
MR. BRYANT: My apologies, Your Honor. I pulled out the wrong document. I found it here.
THE COURT: Any objection?
MS. FULTZ: As to form. Improper impeachment.
THE COURT: Counsel, approach.
(Bench conference held, not reported.)
THE COURT: You may proceed.
MR. BRYANT: Thank you.
BY MR. BRYANT:
Q. Deputy Hernandez, would it change your opinion if Deputy Alfred had, in fact, told you he didn't move the entire time of the shooting?
A. Well, he told me he didn't move during the shooting. I don't recall specifically asking him if he moved when he dropped the flashlight or how far he moved forward. I did ask him in what area he dropped the flashlight. So I think

what your question is, did he tell me he moved prior to shooting?

Q. Yeah.

A. I don't specifically recall that. I just specifically remember asking him, did you move while shooting? In other words, to shoot and move or to shoot and find cover.

Q. And your testimony right now was it was your recollection that he stated to you during the interview that he didn't recall?

A. That's what he told me, that was his response, yes.

Q. Would it change your opinion if you were made aware that during this interview Deputy Alfred had actually told you that he didn't move that entire time?

A. During the entire time what, sir?

Q. Of shooting as we've just discussed.

A. Well, once he told me that he didn't move while shooting, I believe we moved on to the next question.

Excuse me.

Q. So then you would agree with me at no point in time, even during your interview, did you ask Deputy Alfred, did you move from a forward position to a retreating position prior to shooting?

A. I recall asking him if he had an opportunity -- excuse me -- if he believed he had an opportunity to get out of the way of the vehicle. I had questioned similar to that. He told me no.

Q. Okay. So, again, so he told you no, that means he didn't move, correct?

A. He just told me he felt he had nowhere to go.
Q. So you would agree with me that your analysis that Deputy Alfred moved from Marker No. 10 to Marker No. 9, there's no actual basis for that opinion, correct?
A. No, I disagree. His shoe impression is at Marker 10, and then he drops a flashlight at Marker 9. What could be called into question was what happened first.
Q. Correct. So would it change your opinion if you learn that -- well, strike that. We'll get to that.
But now, the question is, you know, it's sort of a chicken and egg scenario at this point, because you weren't there, correct?
A. I was not there, no.
Q. So you have no idea what was happening at Marker No. 10 as to why there are a number of footprints there, correct?
A. Correct.
Q. And as -- let's look at Marker No. 10. These are a little slick. So what has been premarked as Exhibit -- premarked as Exhibit No. 63, this is Marker No. 10, right?
A. Correct.
Q. And are you familiar with this picture?
A. Yes.
Q. And you said that there are footprints that suggest Deputy Alfred was standing over here at some point, correct?
A. Correct.
Q. Can you count on this picture how many footprints you see surrounding Marker No. 10?

Just an estimate.

A. Are you including all these impressions out here?

Q. I'm including all the footprints you see around Marker No. 10. If you want to do more, I'll do this, this radius.

And to make a record, I drew a circle on the screen around Marker No. 10 with my finger in that stretch from below Marker No. 10 in a circular motion to approximately a quarter of the way through the picture, and then in a circular upward motion towards left towards the fence. And then completing the circle in the same circumference.

A. Ready?

Q. Yeah.

A. Okay. So right here I have a pretty clear shoe impression of Deputy Alfred's boot. I have the same impression right here. I have a different impression right here. I have a different impression right here. And I have different impressions here. Here. Probably right here. Everything up here looks unclear. It looks actually flat. There's another impression, not Deputy Alfred's.

And I guess over here it's outside of the scope of the circle.

Q. Sure.

A. So it's pretty much, in my opinion, chaos in this area. You really can't tell who's doing what, who's going where. It's just a bunch of impressions.

Q. Okay. So you've recognized there are a number of different shoe prints all over, all around Marker No. 10 to

some extent. How do you know which ones were Deputy Alfred's?
A. Because we determined his shoe impression, because it matched his boots.
Q. Okay. And actually, let me now -- may I have the -- just one second.
I'm going to show what is now marked as Exhibit 54. All right. This is one of the -- are you familiar with this picture? This is a picture that shows a ruler in a L-shape, a orange cone, and what seems -- appears to be a foot impression. Do you see that?
A. Yes.
MS. FULTZ: Objection. Testifying.
THE COURT: Sustained.
MR. BRYANT: I apologize.
BY MR. BRYANT:
Q. Could you please describe what you see on the screen?
A. It is a shoe or boot impression in the soil.
Q. Okay. And do you know whose shoe or boot impression this is?
A. That was determined to be Deputy Alfred's.
Q. Okay. Do you know how it was determined or who determined that this was Deputy Alfred's shoe impression?
A. Detective Navarro and CSI Green-Perba determined this shoe impression.
Q. And did they take the shoe that he was wearing, look at the bottom of his shoes to see if there are any specific identifying marks or patterns and then compare it to

the shoe pattern?
A. Yes. They compared the pattern of the shoe.
Q. Okay. And again, I'll just sort of draw a little outline here. Drawing an outline around the shoe pattern that's on the screen. It looked almost like an infinity sign without the actual infinity mark. Assuming that -- I don't know if we're going a little slow. Here we go. Almost looks like a pair of goggles.
And then there's -- there's some numbers on the screen as far as the ruler goes. And approximately at 195, and I believe these are millimeters, there's a circle, a distinctive circle in the middle. I'm drawing a red mark around this circle. Do you see that?
A. Yes.
Q. This would be the shoe impression for Mr. -- or Deputy Alfred, correct?
A. Correct.
Q. And the longer end of the T-shaped or L-shaped ruler has the longer part of the foot. Would this be the front foot?
A. Yeah, based on the shape it appears to be the front of the foot.
Q. Correct. There's a shorter -- after we get to that circle, that's maybe two-thirds of the way into the shoe impression, there is a shorter portion. Would that be the heel, the back of the foot?
A. Yes.
Q. Okay. So have you ever conducted an investigation

where you had to determine shoe patterns?
A. Yes.
Q. Okay. And you would agree with me that typically when you're placing these shoe patterns or trying to identify these shoe patterns, you use these L-shaped rulers, correct?
A. CSI uses these rulers for measurement purposes in the photograph.
Q. Okay. Great.
Generally speaking, the longer portion of the shoe print, meaning the front part of the shoe would be between the 90-degree angle, and the shorter part of the shoe would obviously be towards the end of the ruler so that they can get a full length of that shoe, correct?
A. Correct.
Q. And that's common that you have that shoe, the longer part of the shoe is going to be where the L, the 90-degree angle is, then it goes back towards the end with the shorter end, correct? That would be the typical customary way of measuring a shoe, correct?
A. The ruler could have been the other way. I'm not sure. CSI has their own format how they collect and mark evidence.
Q. Okay. Okay. You're not positive?
A. Well, if you're asking me if the ruler will always go in this direction, that I'm not sure of.
Q. Okay.
A. CSI does their own marking. They have their own format.

Q. Okay. I just wanted to establish how we even determine how No. 10 had Deputy Alfred's shoe. We can go back to the projector. So we just saw a close-up of the imprint. I'm going to try to do my best to zoom in. I apologize. We are back now on Exhibit 63.

As a matter of fact, let me do this. I can pull it up on my computer to make it a little easier for you. Okay. Can you point out where you believe you see Deputy Alfred's shoe print? And again, we saw a print where there is a distinctive sort of oval towards the two-thirds down that particular boot?

If you need me to make it larger, I can do that for you.

A. Well, you have this impression here. And then there's another one right here. It's hard to see on the big screen, for me anyways, but clearly, I can see it better here.

Q. So it's your testimony that this pattern right here is Deputy Alfred's?

A. It appears similar as the one we saw earlier, and then this pattern here looks similar.

Q. Okay. And then there are a number of other different patterns around there, correct?

A. Correct.

Q. You would agree with me, that at some point in time after the shooting, maybe approximately -- do you recall how long it took for Deputy Mora and Deputy Torres to arrive on scene after the shooting?

A. I think it was roughly three to four minutes.

Q. So they arrive approximately three to four minutes, correct?
A. Correct.
Q. And at some point in time they congregate in the yard to the west, correct?
A. In the backyard of Ms. Gallo and Mr. Cocchi, yes.
Q. And that included Deputy Alfred, correct?
A. Correct.
Q. And at some point they all, including -- so when I say they, I'm referring to Deputy Alfred, Deputy Mora and Deputy Torres, had made their way through the fence by creating a hole in the fence in order to walk to the front of the vehicle, correct?
A. I believe just Deputy Mora and Deputy Torres went through the fence line.
Q. One second.
So it was Deputy Mora and Deputy Torres that you believe walked there. Do you know where Deputy Alfred went after?
A. I believe Deputy Alfred, after they made contact with Mr. Barber, I believe he came out through the opening, which is the larger area behind the fence line, and then came around to assist.
Q. Okay. Did Deputy Alfred ever tell you that after he fired his shots he never got close to the vehicle? Meaning, he moved closer to the vehicle where Marker No. 10 was, Marker No. 12, to see what was going on with Mr. Barber?
MS. FULTZ: Objection. Calls for hearsay.

THE COURT: Sustained.

BY MR. BRYANT:

Q. Apologize. Based upon your understanding of everything that you have reviewed when you were conducting your investigation, do you know if Deputy Alfred had ever made his way to the vehicle or anywhere between ten and 12 after the shooting?

A. According to his interview, I believe he moved into the rear yard after the shooting.

Q. Based upon your understanding after the incident, did Deputy Alfred ever go to the front of the vehicle?

MS. FULTZ: Objection. Foundation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. You've reviewed a number of different pieces of evidence, you've talked to different -- interviewed a number of different people, you investigated this case, correct?

A. Correct.

Q. And part of your investigation is you wanted to know where all of the -- to the best of your ability know where all of the officers were or deputies were, before, during and after the incident, correct?

A. Correct.

Q. And that would be helpful for you to put together a complete report and investigation, correct?

A. Correct.

Q. And during the course of your investigation, did you ever come to learn that Deputy Alfred had at some point in

time made his way to the front of the vehicle after the incident?

MS. FULTZ: Objection. Foundation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. You interviewed Deputy Alfred, correct?

A. Correct.

Q. You interviewed Deputy Mora, correct?

A. Correct.

Q. Were you made aware of what the -- what Deputy Alfred was doing after the incident occurred, meaning where his positioning was at any point after?

MS. FULTZ: Objection. Foundation and hearsay.

THE COURT: Sustained.

Let's move on, Mr. Bryant.

MR. BRYANT: Sure.

BY MR. BRYANT:

Q. So, again, as of right now we've talked about -- and we're going to go back to Exhibit No. 34. You can't say one way or another whether or not Deputy Alfred or when Deputy Alfred made those footprints at Marker No. 10, assuming they -- assuming they are his, you can't say one way or another at what point in time during the entire incident and after when Deputy Alfred made those footprints, correct?

A. Am I supposed to make reference to this photo I'm looking at now?

Q. I'm sorry, this is zoomed in. Let me zoom out.

A. I'm sorry. Your question again?

Q. So you can't say for one way or another when Deputy Alfred was at Marker No. 10?
A. No, I can't specifically say what happened first, or I think we discussed that, the chicken and the egg thing.
Q. So would it change your opinion if you were to learn that Deputy Alfred -- strike that.
You also testified about the firearm. Do you recall that it's a Glock 21?
A. Yes.
Q. Just for identification purposes, I just want to show you those. First introduce as Exhibit 77.
Deputy Hernandez, are you familiar with this image?
A. Yes.
Q. And what is this image?
A. This is Deputy Alfred's firearm photographed during officer processing.
Q. And is this the firearm that he used when he fired his shots that evening?
A. Should be.
Q. And I'm going to now introduce Exhibit 78. And what are we looking at here?
A. Looking at the serial number of the pistol.
Q. And here it says Glock, Inc., that's to represent that this is a Glock?
A. I'm sorry, the question?
Q. Sure. The reference to Glock, Inc., is to reference the fact that this is a Glock firearm?
A. Yes. Yes.

Q. You talked about contamination of the -- of the scene. Do you recall that testimony?
A. Yes.
Q. And you were discussing that a gurney had gone up at some point, correct?
A. Correct.
Q. And the gurney was used by medical personnel to bring the -- that -- what is a gurney, just so people know what that is?
A. A gurney is, if you've ever seen an ambulance unload a gurney from the back of the ambulance, looks like a bed on wheels. It lifts up from the floor, so it's compacted. When they open it up, kind of opens up like a, similar to a -- when I was a kid I used to eat TV dinners, little TV tray, used to fold, then they open up like that. That's what a gurney does. It unfolds. It's about waist high once it's lifted more or less, then they put a patient on top of there and wheel him out.
Q. How many people generally move a gurney? How many people does it typically take, from a customary standpoint?
A. I would assume one could pull it when it's empty. At least two to roll a patient out.
Q. And where would they typically -- if somebody is pulling an empty gurney, how -- could you demonstrate how the -- you don't have to necessarily demonstrate. Can you tell the jury, explain where the person is pulling the gurney from?
A. Depending on the weight of the person and the size, maybe one will pull, one will push. If they're holding an

intravenous line, an IV, while they're walking with a patient, there could be three people assisting.

Q. So, generally speaking, somebody is pulling a gurney, would be from the front of the gurney itself where they're pulling it. Somebody could be behind it pushing it, if that were the case. That's typically how it's done, if there's two people?

A. Possibly, yes.

Q. I'm going to show what has already been marked as Exhibit 34 once again.

We discussed this, you said this line in the middle of the picture that's in this gravel, there's grooves in the gravel, it's a straight line. Right behind that goes almost a slight angle down the picture from the tire of the vehicle to the left-hand side. Do you see that?

A. Yes.

Q. And that's, it's your understanding, that was a gurney that created that specific pattern?

A. Yes.

Q. Okay. And again, you don't see any footprints in the gravel, right? Or barely any footprints?

A. Usually you don't see clear impressions in gravel, because it's just so rocky, and it's an uneven surface.

Q. It's much easier to find foot impressions in dirt, which is more finer, a finer type of material, as opposed to gravel, which is more solid and rocky and doesn't form an impression, correct?

A. Correct.

Q. So you would agree with me that just based upon this picture you would not be able to tell whose shoes may have been walking on this gravel at any point in time, correct?

A. Correct.

Q. Now, we talked about the bullets, and/or the FCC casings, correct, the shell casings for Deputy Alfred's firearm? And we've identified that 2, 3, 4 and 5 were four FCC shell casings that were discovered. We've also identified as you've been here throughout this trial, No. 7, was also a FCC shell casing. And No. 8 was a FCC shell casing. Do you recall that?

A. Yes.

Q. All right. And you're saying that the shooting occurred somewhere between Marker No. 9 and 10, correct?

A. I don't recall saying that it occurred between 9 or 10.

Q. Where do you believe the shooting occurred?

A. Based on what Deputy Alfred said, he said that he dropped his flashlight when he formed his shooting stance with two hands and then shot. So my visualization is if I'm holding a flashlight and I drop it, it's going to drop in front of me. I'm not going to throw it behind me. I'm not -- maybe I put it to the side, but I'm not going to just throw it behind me. He's going to drop it directly in front of him. Because of the incident that's occurring in front of him, he's going to place two hands on his handgun and then begin shooting.

So that would put him in this general area, and this is just based on what he told us.

Q. Okay. And again, you heard Deputy Alfred testify this week, and he said that it was somewhere between -- well, strike that. I think people kind of heard.

He moved a number of times where he said he was shooting. You would agree with me, right?

A. I believe he gave a demonstration Tuesday and Your Honor said it was approximately 18 feet between the table and the witness box right here.

Q. Okay. Okay. But again, he testified that he actually pulled out his service weapon and fired. Initially when he testified he said, yeah, I told the officers or detectives I was about 8 to 10 feet away. Do you recall that?

A. Yes, I recall that.

Q. Okay. So and that was when he initially gave his interview about 30 days after the incident, correct?

A. Correct.

Q. All right. So I'm going to just play the -- a portion of the gunshots that we've heard throughout this trial. I just want you just to listen to the gunshots, okay. And that -- I'm going to play a portion, which has already been marked as Exhibit 1A, it's just, I am starting --

THE COURT: I think it's Exhibit 1, isn't it?

MS. FULTZ: Yes.

MR. BRYANT: Okay. Yeah. Exhibit 1. Thank you.

(Audio played; not reported.)

BY MR. BRYANT:

Q. Okay. You heard the bullets. It was boom, boom, boom, boom, four bullets. Then about a half a second later,

boom, another bullet. And the final bullet was about a minute later, right?
A. A minute.
Q. I apologize. About a second later. I apologize.
A. Okay.
Q. Would you agree with me that that's approximately how long four rapid fire shots, one where it was about maybe a half a second delay after the -- at the fifth shot, and perhaps about, you know, anywhere between three quarters of a second to a second delay for that final shot?
A. They weren't -- they weren't in the proper sequence, yes, I agree with you in that aspect.
Q. Okay. So here you see four shell casings in this area below, right?
THE COURT: What exhibit number are you referring to?
MR. BRYANT: Yes, Your Honor. We are back to Exhibit No. 34.
BY MR. BRYANT:
Q. Exhibit No. 34 you see four shell casings to the bottom right corner of the picture, which would be prior to the opening of that yard to the west. Do you see that?
A. Yes.
Q. And then as you move up, you see another shell casing at 7, correct?
A. Correct.
Q. And another shell casing at 8, correct?
A. Correct.
Q. And they all seem to be to the west of the property

and further, you know, significantly further back than Marker No. 9. Do you see that?

A. Yes.

Q. Okay. So it's your testimony that those shell casings likely fell in this particular pattern or likely ended up in this particular pattern in this picture in Exhibit 34 due to the fact that a gurney likely moved them out of the way and contaminated the crime scene?

A. Well, not just the gurney, we also have to include four additional deputies that responded after the shooting that actually probably speed walked or ran in to assist. And then once Mr. Barber was being attended to, you had at least -- well, actually, you have a fire captain, a paramedic, a engineer that walked in with a gurney to assist with his medical evacuation.

Q. And so it's your testimony that we heard four rapid fire shots first, and they're all sort of bunched together, and they somehow all got moved over in this same sort of grouping area to the bottom right corner of this picture; is that accurate?

A. That's where they're marked, yes.

Q. And then you have two other shell casings, one a little bit further up with 7 and 8. And they just happen to also -- even though they're sequentially similar to the pattern in which we heard the bullets being fired, they also got moved somehow to the west, correct?

A. Well, the west would have been the proper location for them, because that's the way a Glock ejects its FCCs after

firing.

Q. Okay. Okay. So you would agree with me if he fired his weapon at 9, No. 2, 3, 4 and 5, would be a pretty significant distance for an ejection for a Glock 21, correct?

A. Well, again, we discussed the contamination of the scene. That's probably not where they landed because of the amount of foot traffic that occurred after the shooting.

Q. But wait a minute, you -- let me just ask you this. You said that's where they probably would have landed after the foot traffic because of everyone --

A. No, I didn't say that, sir.

Q. Well -- well, you said it was due to contamination. It's probably because of all of these people coming in and out of the crime scene, correct? That's why they would be moved there?

A. That would be a possibility, yes.

Q. But you actually have no idea because you weren't there at the shooting, right?

A. No.

Q. So you actually have no idea how those shell casings landed in the pattern that we see on this page, correct?

A. Here's what I can say.

Q. It's just yes or no?

A. Well, I have no idea, no.

Q. Okay. And so the reason why you're saying it would be improbable that those shell casings would be in this particular area in this pattern identified in this picture is

because Deputy Alfred told you that he fired a weapon somewhere near this flashlight No. 9, correct?

A. Yes.

Q. And so you're basing your theory about how these would have possibly ended up in this particular pattern in Exhibit 34, based on Deputy Alfred's testimony, correct?

A. No. It's based on the totality of the scene.

Q. Well, aside from where Deputy Alfred said that the -- that he fired after -- around his flashlight, what other totalities are you referring to?

A. Well, we discussed yesterday during testimony the ejection pattern of a Glock. It ejects high and ejects slightly to the rear of the person shooting that handgun. Now, when you shoot a handgun, you have to have a perfect platform to shoot perfectly into a target if you're target shooting. It is a site radius issue with a handgun.

If you've ever fired a rifle, it's much easier to accurately hit a target versus shooting a handgun, because of the -- the longer the barrel the more accurate you're going to shoot. When you shoot a handgun, the slightest deviation, you miss a target completely at 5 feet, if that makes sense to you, because it is so difficult to shoot a handgun accurately.

When -- and we talked about benching a handgun. If you're shooting in a stance and your blood pressure is rushing and you're in a life or death situation, every shot is going to be different, because you're holding the weapon differently. The ejection of a casing is going to go one way, then it's going to go another.

And this is all based on my total experience of investigating LFEs in this department, and again, being involved in LFEs myself as a police officer, there is not going to be a specific pattern of FCCs when you shoot multiple rounds.

Q. Okay. So again, you talked about the patterns. What I'm asking you based upon what was at the scene, you said the totality of the circumstances at the scene. The -- you would agree with me, that the ejection pattern is based upon the positioning to some extent as to where somebody fired the service weapon, right? That you're describing. Somebody fires a service weapon, stationary position, it will generally move in a certain distance in a certain angle, you know, a range, correct?

A. Correct.

Q. And so, therefore, based upon where somebody is standing, that would be, you know, you could then, depending on the scenario, you could then potentially determine where those shell casings would likely land or a general area, correct?

A. I'm trying to understand your question here.

Q. Sure. If somebody is standing and you're doing a test on the firearm and you want to see where the shell casings are going to land, based upon your knowledge, experience and education and using a Glock 21 firearm, you would agree with me that you could sort of create an estimate of approximately where on average the -- an area where the shells would land, correct?

A. Are we talking in a controlled environment?

Q. Just a controlled environment.
A. On the range shooting one shot at a time?
Q. Yeah.
A. You may get a pattern of FCCs in a certain area, yes.
Q. Okay. And so let's take a look at some of the shell casings. Let's just take a look at them. Could I have the screen, please?
We're going to first start with shell casing No. 2. You see shell casing No. 2?
THE COURT: What exhibit number is this?
MR. BRYANT: I apologize, Your Honor. This is Exhibit 34, I believe, but let me just double check.
Exhibit 36, I stand corrected. Exhibit 36, Your Honor.
BY MR. BRYANT:
Q. So you see the shell casing here?
A. Yes.
Q. Let me do a little pull out. There's no indentation in this shell casing, as if like a gurney or somebody stepped on it, correct?
A. No.
Q. There's no scratches or damage that you can visibly see, outside of the bullet coming out of the chamber?
A. I see a lot of striations, circular around the casing itself.
Q. Okay. Would that be typical from a -- the bullet leaving the barrel?

A. It could be.
Q. Let's go to Exhibit 37, which will be No. 4. Again, this up right -- oh, I apologize. What do you see here?
A. I see an FCC.
Q. All right. And what's the position of this FCC?
A. It's resting on its base.
Q. And do you see any damage to the circular opening at the top of the FCC?
A. It actually looks oblong. It doesn't look perfectly round.
Q. You're saying it looks oblong. Hold on. Let's zoom in a little more. So now you have a much -- this is oblong to you, or is it circular?
A. It doesn't look perfectly round. It could be the angle of the camera, but it doesn't look perfectly round.
Q. And sitting just upright, correct?
A. Correct.
Q. All right. And we're going to now look at bullet No. 5.
THE COURT: Exhibit number, please?
MR. BRYANT: Yes. Exhibit No. 35, your Honor.
BY MR. BRYANT:
Q. Again, what is this here?
A. That is an FCC.
Q. And could you describe its positioning?
A. It appears resting on its base, but based on the photography it looks like it's longer than it's supposed to be.
Q. Okay. That's just sort of a -- sort of an optical

photographic?

A. Correct, it appears so.

Q. And again, do you see any visible damage of it looking like someone with a gurney had driven over it with its -- with its wheels or looked like somebody stepped on it?

A. I don't see any significant damage.

Q. Go to Exhibit 40. Shell casing No. 8. Again, could you describe this shell casing?

A. It appears to be an FCC because of the photography. It looks shorter than it's supposed to.

Q. Any major visible damage?

A. There's some sort of blemish on the top of the FCC.

Q. And the FCC is metallic, correct?

A. Yes.

Q. Would that just be a reflection of the rock that's right across from it?

A. I'm not sure. It just appears to be a blemish. There's something from the blemish. It bleeds on to the edge of the FCC.

Q. See the bottom of the FCC where I'm circling?

A. No. I'm talking about right here.

Q. Oh, yeah, yeah. I'm actually asking you about the bottom of the FCC as well. Yeah, I apologize.

First, Deputy -- or Detective Hernandez was pointing at the circling at the upper right portion of the FCC near where the opening is. And he was identifying an area that was -- had more of a white color as opposed to the copper or gold color of the FCC. And I was pointing -- counsel is

pointing to the lower end right directly parallel to where Mr. -- or Deputy Hernandez was pointing.

So, Deputy Hernandez, do you see the directly parallel to the bottom of the FCC?

A. Yes.

Q. Would you agree with me that that looks more so like a reflection of the rock?

A. It appears so.

Q. Once again, may I have the screen, please? I'm going to show Exhibit 39. And again, what do we have here?

A. You have an FCC. Due to photography it seems longer than normal.

Q. And again, these are -- these are -- these are gravel type rocks, or do you know, what is this? Do you know what kind of rock this is by any chance?

A. It's congruent gravel.

Q. And do you see any like major scratches on this from the gravel?

A. Not in this photograph, no.

Q. So let me -- let me ask you this, you said a gurney was coming straight down the middle, right, of this -- we're back to Exhibit 34. The gurney was coming straight down the middle of the gravel driveway. Do you recall that testimony?

A. Yes.

Q. And at some point in time do you recall a Deputy Alfred testifying that he may have been between Marker 6 and 7 when he drew his firearm?

A. During his testimony?

Q. Yes?
A. I recall that.
Q. Let me ask you this, hypothetically speaking, it's possible that the flashlight we see in No. 9 given its size and potentially obstructing wheels, could have been kicked by paramedics that were bringing the gurney up the middle of this driveway, assuming that that flashlight was somewhere around Marker 6 and 7, correct?
A. I don't agree with that.
Q. Well, you said that these FCCs could have gotten moved by contamination on the -- by people who are all moving around. You don't agree that it's possible that if the flashlight was sitting between 6 and 7 that this flashlight could have been moved out of the way or tossed out of the way or kicked out of the way, so it didn't obstruct the paramedics who were bringing a gurney right up the middle?
A. The dropping of the flashlight doesn't coincide with the foot pattern of his approach.
Q. So --
A. If I can explain, because you brought this up?
Q. Sure.
A. You're indicating that he would have been standing in this area or at least approaching in this area according to what he said or recalled during testimony.
Q. Sure.
A. But the evidence at the scene has Deputy Barber, and I'm off -- just for the record I am off the picture, but in essence, his foot pattern is over here. So his foot pattern is

inconsistent with him indicating that he was in this area, because he moves forward and then drops the flashlight in the area of Placard No. 9.

Q. Sure.

A. So I don't have any evidence to indicate otherwise.

Q. Well, you have shell casings over here, right?

A. That wasn't your question, though, sir. You asked me if I believe he was standing here when he drew his firearm. It wouldn't be consistent with his foot pattern and approach to Placard No. 9.

Q. Let me ask you this hypothetical, hypothetically speaking, just hypothetically speaking here, if Deputy Alfred had drew his firearm somewhere around Marker 2, 3, 4 and 5, and began firing his service weapon, the first four shots, while he was in a forward moving pattern, at some, you know, some speed less than a slow, slow walk, right, and then he fired two more shots, assume he's walking up the middle you would agree with me that that -- in that scenario, that would be more consistent with -- the shell casings that we see here in this pattern would be more consistent with that scenario where he's walking up the path and shooting his first shots, then continuing to advance forward, correct?

A. Are you -- is your hypothetical indicating that he's shooting while moving?

Q. Yes.

A. Okay. I would have to disagree with you on two aspects of that. First off, the evidence at the scene does not have him moving forward in the middle of the gravel. It has

him moving forward to the left along the fence line. Second, to be proficient enough to deliver accurate fire while moving takes hundreds of hours of practice. I have been to two shooting academies in Prescott, Arizona, it's called Gunsite, they cater to our special ops folks in the military, and they also cater to law enforcement.

I've been to two courses of fire, and they're week-long courses. It's 80-hour courses. And you shoot for hours, learning how to shoot on the move, whether it's forward, backward or laterally. You have to move at a very slow pace. You have to walk in a crouch. And shooting a handgun, like I explained earlier, is much more difficult to shoot a handgun accurately because of sight radius. Sights on a handgun are probably about 6 inches apart. Sights on a rifle are much more effective when you shoot it, because the sight radius is long. You have a longer barrel. There's no more room for shooter error.

Shooting on the move, SWAT guys can barely do it accurately. And they're doing it with equipment as well. So it's very difficult to shoot while moving on flat surface versus a surface of gravel.

Q. Let's just, again, take out the fact that we're eliminating this scenario, where there's some foot pattern over to the left. I'm just saying, Deputy Alfred, if he was advancing straight forward moving with his gun, stops, boom, boom, boom. Moves again, boom. Moved again, boom. In that middle pattern you would agree with me that would be fairly consistent with the shell casing patterns that you see here?

A. What middle pattern are you speaking of, sir?
Q. I'm referring to right between 6 and 7 where that gurney is?
A. Are you indicating the gurney path is his footsteps?
Q. Yes. I'm just indicating that is the direction. He's heading south towards this, in the middle of this gurney line. You would agree with me that if that was the direction he was going, that would be more consistent with this shell casing pattern, correct?
A. I can't agree with you because I just told you that the evidence at the scene tells me otherwise. It's -- sure, it's your hypothetical, but I can't agree with your hypothetical.
Q. My hypothetical is a hypothetical. I'm just asking you not about anything related to the scene, I'm just saying, hypothetically speaking, it's just hypothetical, it's just yes or no. Would that be consistent with the shell casing patterns based upon Mr. -- or Deputy Alfred walking in a south manner in the middle of the screen between 6 and 7 while firing four shots? Advancing. Stopping. Firing another shot. Advancing. Stopping. Firing another shot again.
You would agree with me that would be consistent with that shell pattern in that hypothetical, correct?
A. I still have to disagree with you, sir.
Q. Okay.
A. The evidence suggests otherwise.
Q. How would you disagree with that hypothetical? I'm

saying, remove all the additional evidence, what do you disagree with? How do you disagree with this hypothetical that the shell casings wouldn't be consistent, wouldn't be consistent with the shell casings landing in the area that they are currently in?

A. The term hypothetical means you're creating a scenario that doesn't apply to actual -- you're thinking outside the box is what you're doing. That's what a hypothetical is.

Q. You are -- you're testifying as an expert, correct?

A. Correct.

Q. Are you testifying as an expert or are you testifying as an advocate for Deputy Alfred?

A. I am testifying as an expert, but you're asking me agree to a hypothetical that didn't occur.

Q. That's why it's called a hypothetical. I'm just saying, hypothetically speaking, if this happened this would be consistent, correct? You can't answer that?

A. What I can say is if he was in the middle of that aisle way or driveway and he shot the FCCs, it probably would have bounced off the residential wall right here and they may have bounced more rearward. Had he shot in the center as your hypothetical indicates, this FCC would have been farther inland. This FCC probably would have been where that is, hypothetically.

Q. Okay. Let me ask you this, you work for the San Bernardino County Sheriffs Department, correct?

A. Correct.

Q. And are you a part of any fraternal organizations or unions or any organizations related to the sheriffs?
A. No.
Q. Are you a part of any fraternal orders?
A. No.
Q. Okay. And again, Deputy Alfred also works for the San Bernardino County Sheriffs Department, correct?
A. Correct.
Q. And you both are still currently employed by the San Bernardino County Sheriffs Department, correct?
A. Correct.
Q. And so when you were called to provide expert testimony, is your opinion objective?
A. Yes.
Q. Okay. Let's talk about the vehicle. And I just wanted to really quickly, again, this has been premarked as Exhibit 49. This is the flashlight.
I apologize. What is this?
A. That is the flashlight.
Q. And whose flashlight is this, if you know?
A. It appears to be the one that Deputy Alfred dropped at the scene.
Q. And, hypothetically speaking, another hypothetical, if that flashlight was sitting between Marker No. 6 and 7, in the middle that we just saw, in Exhibit 34, and there were first responders that were coming up the middle of this particular driveway, you would agree with me that is a possibility that someone could have either kicked the

flashlight out of that area in the middle of the driveway or threw the flashlight where it could have landed in the position it is currently landing, so that it did not obstruct the first responders from doing their job?

THE COURT: Mr. Bryant, you've already asked these questions.

MR. BRYANT: Understood, Your Honor. I don't want to beat a dead horse.

BY MR. BRYANT:

Q. Show Exhibit No. 68, Deputy -- or, Detective Hernandez, are you familiar with this image?

A. Yes.

Q. What is this image?

A. This is the tire tread pattern marked by green pylons, which lead to the front of Mr. Barber's vehicle.

Q. And to the left of the picture there's an opening in the middle of a fence. Do you know anything about that opening?

A. Yes.

Q. What do you know about that opening?

A. That is the opening that was created so deputies could render medical aid to Mr. Barber.

Q. Thank you. Showing you once again -- I'm going to show you another image. This is Exhibit 69. What is this image here?

A. That is roughly the same image during hours of darkness without the placards on the ground.

Q. And this is your understanding of what the vehicle

looked like prior to CSI placing any sort of markers or placards after Mr. Barber was removed from the vehicle?
A. Yes.
Q. Again, I'm going to show you Exhibit No. 70. Can you explain what this is?
A. That is another photograph during hours of darkness before placards were placed on the ground, showing the front -- actually, the front left quarter panel of Mr. Barber's vehicle.
Q. And you mentioned that there was blood. Was Deputy Alfred ever injured during this, physically injured during this incident?
A. Yes.
Q. How was he physically injured?
A. By gunfire.
Q. Deputy Alfred?
A. I'm sorry. I thought you meant Mr. Barber.
Q. Okay.
A. No, no. Deputy Alfred was not injured, no.
Q. The blood that you were -- that you had identified prior, do you know whose blood that was?
A. It appeared to be Mr. Barber's.
Q. I'll show you now what is exhibit -- this may be a duplicate, I apologize. There's a number of different pictures that were used. I'm going to show you this, Exhibit 73. We talked about tread patterns. Do you know what this is?
A. It's a little bright, I believe that's the front end -- there you go. Thank you.
That looks like the right front passenger's side of

the black SUV, and there's a ruler around a tire impression.
Q. Is that the tire impression where you previously testified that you believed that is where the rear tires originally were?
A. Yes.
Q. Okay. Thank you. Thanks again. Exhibit 74, do you know what this is?
A. It appears to be the same photo as previous, only from above and in a darker complex.
Q. As this -- was this on the -- never mind. Ask you again, there were images of the vehicle after the incident. I just wanted to show you a few photos. Exhibit 75, familiar with this?
A. Yes.
Q. What is this?
A. This is a rear view during hours of darkness of Mr. Barber's SUV.
Q. And this is taken shortly after the incident?
A. Yes, this is its point of rest.
Q. Okay. I have another view here. What is -- and this is marked as Exhibit 76. Do you know what this is?
A. This is a long range photo of the driveway, but it's not at the end of the driveway. And it just shows the point of rest of the black SUV down the driveway itself.
Q. Thank you. And I don't think we've ever seen this angle before. I just wanted to have you take a look at this particular angle. It's marked as Exhibit 72. Can you tell me what you see here?

A. That is a easterly view during hours of darkness from inside the backyard of Mr. Cocchi and Ms. Gallo. And it's looking eastward showing Placards 8, 7, 6, 4, I believe, 9 to the right, and then three orange cones.

Q. Okay. Thank you.

All right. Let's talk about the vehicle. When it was revved up, there was some movement. It went backwards then it came as you described to a rest, correct?

A. Correct.

Q. You were here when Deputy Alfred testified, correct?

A. Correct.

Q. And you heard Deputy Alfred testify that it was his understanding that after the car stopped initially, when Mr. Barber was in that vehicle there was an officer who went to retrieve Mr. Barber out of the vehicle, and as they removed Mr. Barber from that vehicle, his foot came off the brake and the car, which had been in the reverse gear, began to move back.

Do you recall that testimony?

A. Yes.

Q. And is that your understanding of what had occurred when you testified earlier that the car moved back approximately 2 feet?

A. Yes.

Q. And you recall also Deputy Alfred's testimony that the officer had to pull up the brake, the emergency brake, to stop the vehicle from moving; do you recall that?

A. Actually, I believe Deputy Mora indicated that he put the vehicle in park.

MS. FULTZ: Objection. Hearsay.

THE COURT: Sustained.

BY MR. BRYANT:

Q. So based upon your view of this -- based upon your investigation, interviews and your view, did you ever formulate an understanding about how the vehicle ended up stopping?

A. Well, apparently Mr. Barber applied brake pressure.

Q. And then after Deputy Mora or a deputy entered and brought him out of the vehicle and started to move back further, were you able to provide any -- was there any understanding of how that vehicle stopped again?

A. Yes.

Q. How?

A. According to Deputy Mora, he placed it in park.

Q. Okay. So at foot 14, Steffon Barber had his foot on that brake, that's your understanding, correct?

A. Correct.

Q. And when that foot was removed from that brake without anyone pressing that accelerator, because that vehicle was in the reverse gear, it started to move back, correct?

A. Yes.

Q. And it moved back within that period fast enough to go 2 feet, correct?

A. Correct.

Q. And would you -- could you approximate about how many seconds it took for that car to move back 2 feet after

Mr. Barber's foot was taken off the brake?

MS. FULTZ: Objection. Foundation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. Are you able to formulate based upon your experience, knowledge and training, as well as your investigation into this particular incident, are you able to formulate a calculation of about how long it took for that vehicle to travel 2 feet after Mr. Barber's foot was removed from the brake?

A. Based on the information from the interview of Deputy Mora, I don't believe I specifically asked him how long it took him to place the vehicle in park.

Q. So you were not able to?

A. I didn't conduct a math solution, if that's what you're asking. It is possible to determine if you had all the variables for a math problem, yes, you can calculate a math problem and actually come to a conclusion or at least an approximation.

Q. You're not able to do that based upon the information you have today, correct?

A. No.

Q. Thank you.

THE COURT: Let's take our morning recess. We'll take 15 minutes. We'll get started at 10:30.

Don't talk about the case with anyone.

(A recess was taken.)

THE COURT: We're back on the record.

Have a seat, Detective.
Mr. Bryant, whenever you're ready.
You're still under oath, Detective.
THE WITNESS: Yes, Your Honor.
MR. BRYANT: Thank you, Your Honor.
BY MR. BRYANT:
Q. So, Detective Hernandez, you would agree with me we just established that this particular vehicle when it is in the reverse gear, unless a brake is being pushed this vehicle seems to move on its own backwards, correct?
A. Correct.
Q. And that does -- and it does not seem to require anyone to press the accelerator for that vehicle to move backwards, correct?
A. Correct.
Q. And you would agree with me that by the time detective -- or apologize, Deputy Mora arrived on the scene and got to that vehicle, that vehicle had been stopped for at least three to five minutes, correct?
A. Yeah, it was stopped the entire time that deputies arrived.
Q. And you heard the body -- the belt audio of Deputy Alfred, correct?
A. Correct.
Q. And you heard it in its entirety, correct?
A. Correct.
Q. At some point that vehicle came to a rest as you described, correct?

A. Correct.
Q. And you stated that it was because Mr. Barber had his foot on the brake, correct?
A. Correct.
Q. Did you hear any -- have you heard the term slamming on the brakes?
A. Yes.
Q. When you listened to the audio, did you hear the vehicle in any way have a noise that would have -- that you would recognize as slamming on the brakes?
A. No.
Q. And when you looked at the tire pattern, remember how it looked pretty smooth, when we looked at it and it kind of veered a little bit to the east; do you recall that?
A. Yes.
Q. If someone applies a strong brake pressure on a fast moving vehicle on a surface such as this, this sort of dirt surface we're talking about, fine dirt surface, would you expect to see sort of a disruption sort of movement of the vehicle's tires and sort of a disruptive pattern?
A. To understand your question, you said fast, so --
Q. Let's say ten miles per hour.
A. If you slam on the brakes, if there was an antilock braking system the wheels may not lock at all and just come to a slow stop, which is what they're designed for. This is an older vehicle, so I don't believe it had antilock brakes as such. So on a soft soil with that low coefficient of friction had somebody applied the brakes rapidly, the front tires would

have slid.

Q. So based upon your experience, knowledge and training and based upon your review of the evidence and as the detective on the case, would you be able to formulate an opinion as to how much brake pressure Mr. Barber put on the brakes prior to the brakes, prior to the car resting 14 feet away?

A. Well, it wasn't a slamming of the brakes as you indicated, but it was some form of pressure on the brake pedal, which slowed the vehicle to a stop.

Q. And you said that Mr. Barber, the shots were fired, Mr. Barber was injured; do you recall that testimony?

A. Yes.

Q. And you said that the vehicle sort of swerved because you knew he was moving that vehicle because it moved in a sort of slight eastwardly direction; do you recall that?

A. You mean are you referring to the steering motion?

Q. Yes.

A. Yes.

Q. If Mr. Barber's hands were on the steering wheel, as the car was moving back, hypothetically speaking, and Mr. Barber was somehow injured and slumped over on the steering wheel, would it be possible that he could have involuntarily moved the steering wheel that would have caused that movement?

MS. FULTZ: Objection. Calls for speculation and lacks foundation.

THE COURT: Overruled.

THE WITNESS: Well, to make a determination like that I

would probably have to know which round struck him to cause an incapacitation as you indicated.

BY MR. BRYANT:

Q. Let's just say, hypothetically speaking, if he was incapacitated would it be possible that his involuntary movement could have caused the steering wheel to move to cause the slight deviation in the pattern?

A. It's possible.

Q. And again, we're talking about the vehicle would be moving in -- the vehicle is going in reverse, it's heading in a northern direction, correct?

A. It was more northeast.

Q. I'm just saying if the vehicle went straight back, that would be north?

A. That would be north, yes.

Q. Okay. Now, Mr. Barber gets in the car, and it's -- is it your understanding that the car was already idling at this point when he got into the vehicle?

A. Yes.

Q. Mr. Barber closes the door, and I'm going to play a portion of the 911 tape -- not the 911 tape, the audio belt again, which is identified as Exhibit 1. Sorry about that.

(Audio played; not reported.)

BY MR. BRYANT:

Q. All right. So you hear -- I'm going to play this one more time because it was a little low. You hear Deputy Alfred say, he's getting in the car. He's starting to back up. And then you hear gunfire, correct?

A. Could you play it again, sir, because I --
Q. I'm going to play it again. Obviously, I apologize, my volume was low. And I may stop it at certain points. Do you mind if I sit down?
A. No, no, not at all.
Q. Thank you.
(Audio played; not reported.)
BY MR. BRYANT:
Q. I'm going to play it one more time because I want to slow it down while the shots are being fired.
Do you hear -- what I want you to listen to, is the time in which the vehicle -- remember how you described at some point the tires are sounding like they're trying to gain traction. Then there's some silence. And you testify that the car was moving back at that point and then you hear gunfire?
A. Yes.
Q. Okay. I want you to pay attention to that portion. One second.
(Audio played; not reported.)
BY MR. BRYANT:
Q. All right. So right before that first shot can you maybe describe what's happening when the car first starts to seem like it's gaining traction all the way to the point the first shot, what you hear?
A. I can hear the tires losing traction, and then about less than a second goes by, and I'm just looking at the time stamp here. You hear a shot.
Q. Okay. Let me ask you this question, this may be

sort of fundamental, but in order to put a car in reverse that is just idling on park, do you have to put your foot on the brake before you can change gear to reverse on this vehicle?

A. I'm not aware if that model has that function.

Q. Is it your understanding there are some models you don't need to press the brake to move a car in reverse in its parked position?

A. Older models actually allow that function. I did not test the mechanics of this vehicle. I don't know if they were properly functioning at the time, so I'm unaware whether you have to press the brake on this vehicle or not prior to put it from park into reverse.

Q. Okay. And so your opinion is that the car seemed to gain traction, moved back at some point towards the direction of Deputy Alfred after the shots, correct?

A. Correct.

Q. Okay. Based upon your review of the evidence, being the detective on the matter, your education, training and experience, as someone who's done reconstruction accidents as well as crime scenes, were you able to, based upon the information that you had, car moved 14 feet, there didn't seem to be any disruption of the soil that would have indicated that there was immediate braking, you know, all those factors, were you able to determine what speed this vehicle was going at when it moved in a north slight east direction?

A. I've done a few calculations just using different speeds. Based on the distance and time. You can use distance and time. You divide the two. And then you can get a

velocity, which is feet per second. Then you change velocity to miles per hour doing another math problem. Based on this scenario we have a vehicle that moved 14 feet. And that would be, if you know math, division problem. You have 14 feet on top of the little line, then underneath I have -- I used 4.5 seconds because the shooting occurred I believe within 4.26 to 4.5. So you divide the two. And the number I got I believe was -- if I can actually use my calculator on my phone?

THE COURT: You may.

THE WITNESS: May I have my phone, which is right there?

MR. BRYANT: Do you mind if I grab it?

THE WITNESS: No. Grab my phone, please. I wish I had a white board so I can show the jury how this math problem works. If you can envision a division problem from high school, you have a number on top and a number underneath a line.

So I have 14 feet, divided by let's say 4.2 seconds. So I'm at 3.3 with a whole bunch of threes. So I take that and to go from velocity -- from velocity which is feet per second. Right now this is telling me it's roughly around 3.3 feet per second. If I wanted to change it to miles per hour, I times it by .68. So I have a rough estimate of 2.26 miles per hour.

Now, that's using 4.2 as the time distance it took to cover 14 feet, but we haven't really established how fast this vehicle was moving. It lost traction, and it got into motion. It could have traveled faster, and then the brakes were applied, as Mr. Bryant had indicated. So if I go 14 feet

times, let's say three seconds -- or I'm sorry, divided by three seconds. Now, I have a, from feet per second to speed, I have 3.17 miles per hour. So that's how that math problem works.

And again, these are just estimations because I don't know the specific amount of time it took to travel 14 feet in a reverse motion. Again, it could have been faster. Could have been slower. I'm not sure. Only because we can't hear exactly when that vehicle stopped on audio.

Q. Thank you so much. Would it -- would it be consistent -- I apologize. You did an interview of a number of people throughout this investigation, correct?

A. Yes.

Q. And there were some witnesses that were actually in the approximate area during the shooting. You would agree with me, right?

A. Yes.

Q. Would it change your opinion if, hypothetically speaking, one of those witnesses claim that they saw the vehicle move back slowly right after the first shot and then stop?

MS. FULTZ: Objection. Improper hypothetical.

THE COURT: Counsel, approach.

(Bench conference held, not reported.)

THE COURT: Objection sustained.

BY MR. BRYANT:

Q. Car moved based upon your calculations in theory anywhere between 2.7 and 3.1 miles per hour, correct?

A. It could move faster as well, it's just a hypothetical.
Q. Sure. You testified earlier that -- I've given you a hypothetical, and I said, hey, you know, if a car was traveling at a speed of 15 miles per hour, and you were 10 feet away, that car would be moving at approximately 22 feet per second. Do you recall that testimony?
A. Yes.
Q. If a car was moving that fast in this instance, you would agree with me that that car likely would have gone -- if it was still heading in a northeast direction, it would have likely gone and hit that metal fence, the chain-link fence, would you agree with me with that?
A. It could have.
Q. Also, when you were doing this investigation, you formulated an opinion that Steffon Barber was trying to hit Deputy Alfred based upon the review of all of the evidence and witness testimony, the witness interviews, and all those things, right? That's your opinion that he was trying to hit Deputy Alfred, correct?
A. Correct.
Q. If we know that Deputy Alfred fired a shot, hypothetically speaking, would it make more sense if somebody was intent on harming Deputy Alfred, hypothetically speaking, if they're getting shots fired at them, wouldn't they more likely press the accelerator to move faster to take out the target as opposed to pressing the brakes to stop there and get potentially fired on more?

MS. FULTZ: Objection. Calls for speculation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. You also said you didn't like when officers fired shots at moving vehicles, because if the person is hit by a bullet, that car is going to potentially keep going and could hit either a pedestrian or that officer, et cetera. Do you recall that testimony?
A. I don't recall saying I didn't like.
Q. Maybe can you -- what was your -- I don't want to misstate what you said. What exactly did you say again to refresh my memory to understand?
A. It's a consideration that should be spoken to deputies or officers that shooting at a moving vehicle, depending on the situation, could be more detriment than help, if a vehicle is moving at a high rate of speed in a public area, incapacitating the driver, now you have a vehicle that's mobile all by itself. It could be a danger.
Q. Thank you. So, hypothetically speaking, when you heard the audio, you don't -- you weren't there so you didn't see this vehicle move, correct? You didn't see what happened when Deputy Alfred shot. You didn't see the vehicle move --
THE COURT: Mr. Bryant, it's well established that Detective Hernandez was not at the scene.
MR. BRYANT: Okay. Sure. All right. I didn't want to get into a foundational issue.
BY MR. BRYANT:
Q. So let me ask you this, we've established that this

vehicle moves no matter what. If it's in gear and you take the foot off the brake it will go in reverse, correct?

THE COURT: You've already asked that question, Mr. Bryant.

BY MR. BRYANT:

Q. So given that we've established that, is it possible that when that first shot was fired, either Mr. Barber could have been scared or Mr. Barber could have been hit with one of those bullets, he would have removed his foot off that brake temporarily, and then as the car moved back he put his foot back on the brake to stop it?

MS. FULTZ: Objection. Speculation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. Present a hypothetical. Hypothetically speaking, if somebody's foot is on the brake of a vehicle that we know reverses on its own, if it's in gear, and that person is either scared, distracted or injured and they remove their foot off of a brake, it is possible that vehicle is just going to roll back, correct?

MS. FULTZ: Objection. Speculation.

THE COURT: Sustained.

BY MR. BRYANT:

Q. Last few questions. I'm going to now go to Exhibit 56. Again, we were going over, I just want to understand the shoe pattern and the imprints that we were talking about, because again, correct me if I'm wrong, the basis for why you put Mr. -- or Deputy Alfred to the east of that fence is

because this is the pattern that he walked in a southerly direction to meet Mr. Barber, correct?

A. Correct.

Q. And now I have for you another one, Exhibit 56, it's another shoe pattern. I'm going to show you a couple of them, and then we'll go from there.

Again, this is the distinct circle that we talked about, right? I'm drawing a circle right below the orange cone. I'm now going to draw what looks like a mask around the outside of the shoe print. You would agree this red half circle that I just drew, that's the heel, correct?

A. I can see the outline of a heel, but when you mention the distinct circle in the tread, I don't see that, Mr. Bryant.

Q. Sure. Let me -- let me -- do you see this distinct circle right here?

A. I see a groove.

Q. Or a groove. That you see that sort of oval groove; do you see that?

A. I see the bottom of it. I don't see the top.

Q. Okay. But you do see, at least in this particular -- something that looks sort of like an oval groove, like you saw in the last picture, correct?

A. Correct.

Q. You would agree with me that towards the left of this picture this is the heel of the shoe, correct?

A. It appears so, yes.

Q. Towards the right of the picture, going towards the

L-shaped ruler, that be would the front of the shoe, correct?
A. Correct.
Q. Now, I'm going to go to Exhibit 59. We have -- let me zoom this in for you one second. All right. Once again, here we have what purports to be a shoe pattern?
A. Yes.
Q. And this is, again your understanding, this is Deputy Alfred's shoe pattern?
A. It appears so, yes.
Q. And again, you see there's this -- I apologize. You see this sort of oval type groove right here; do you see that?
A. Well, again, I see the one side, but I don't see the other side.
Q. Sure. Okay.
A. I see -- I see the first side that you drew, not the second side.
Q. Okay. Thank you. And then I'm going to be towards the far right, near the back of this ruler. Again, this would be -- I'm drawing a half circle, that would be the heel, correct?
A. It appears so, yes.
Q. I'm going to go at .185 in the middle of the screen, and draw another half circle around the beginning of the shoe. That would be the front of the shoe, correct?
A. It appears so, yes.
Q. And just two more and we're going to be done with the shoes for at least for this purpose. Let me zoom this in

one more time. Again, what is this? Another shoe pattern?

A. Yes, but it's not as clear as the others.

Q. Let me see if I can pick a better one. I'm going to show Exhibit 62. Does that look a little better?

A. Yes.

Q. All right. Again, let me zoom this in for you.

And I'm going to be the middle of the Marker No. 195 on the ruler, the middle of the screen. Do you see that oval right here? Is that a better view of that oval we talked about?

A. Yes.

Q. And what is this that I'm circling on once again for the record?

A. You're looking at -- are you talking about the orange pylon?

Q. What is this representing? Is this a shoe print?

A. It's a shoe impression.

Q. And whose shoe impression is this to the best of your understanding?

A. It appears to be Deputy Alfred's.

Q. Okay. And again, I'm drawing, starting at 195. Sorry, my phone is in the way. 195, I'm drawing a half circle, all the way back to 300, coming back around. Is that the heel?

A. Yes, it appears so.

Q. And I'm starting at 195 going all the way to 30, drawing a half circle around the shoe impression. That's the front of the shoe, correct?

A. Correct.

Q. Now, there was a full analysis done in terms of the directionality of where Deputy Alfred came when he came up from the east side of that property, correct, or that driveway, correct?
A. They determined he walked along the east -- or the east side, yes.
Q. Okay. Now, go to Exhibit 51. Can you please describe to me what this picture is?
A. It is during daylight hours, the front entrance of the driveway at 12015 White Avenue.
Q. And do you see towards maybe a quarter of the screen, I'm going to circle it, it's going to be the first cone to the left, do you see that cone is somewhat east and seemed like it's coming from a east to west direction?
A. Yes.
Q. And then the next cone is still east of the driveway but headed, this would be what direction?
A. From the first cone to the second?
Q. Yes.
A. It would be a southern direction.
Q. There are one, two, three, four, five, six, how many cones do you see after that?
A. Six additional.
Q. And do you know what direction those cones are all?
A. Well, from one to two, they're all moving south.
Q. Okay. So do you recall Mr. Deputy Alfred as well as Mr. Cocchi and Ms. Gallo saying that Deputy Alfred had walked to their car, which was in front of their home

originally?

A. Yes.

Q. And that home would be to the right and west to the right side of the picture. I'm drawing a big X on that. There's a dwelling on the right-hand side of this picture, would that be their home?

A. Yes.

Q. Do you know why the investigators didn't have cones starting from the west side, then carrying down this path in a southerly fashion?

A. No, I do not.

Q. And would you agree with me, that that would be more accurate of what occurred. And based upon the testimony that you heard, that you would have had Deputy Alfred walking east and then south down this driveway, after he made contact with Ms. Gallo and Mr. Cocchi?

A. Yes.

Q. Go back to Exhibit 56. We determined this is the heel, right, and I'm showing the far left picture of the shoe imprint, we've determined that's the heel, correct?

A. Correct.

Q. And we determined as I move more to the right that larger portion of the shoe print is the front of the foot, correct?

A. Correct.

Q. Do you see this compass here on the right-hand side?

A. Yes.

Q. I'm going to zoom in on this compass. Give me a second. Can you tell me what direction the compass is facing, the red direction?
A. It's pointing down.
Q. And do you know what down is right there? Is that north or south?
A. Wherever the red arrow points it should be pointing north.
Q. So to the best of your knowledge that is pointing north, correct?
A. According to the compass, yes.
Q. For Exhibit 54, once again, you've established the back of the heel is to the left of the picture, and the front of the foot is to the right of the picture, correct?
A. Correct.
Q. And we've also established that there's a -- well, is there a compass on this page?
A. Yes.
Q. I'm going to zoom in on that compass. And again, the front of the foot is facing towards the north or south in this compass?
A. The compass is pointing down, and it should be pointing north.
Q. Go to Exhibit 59. And again, we've established to the far right of the picture is the back of the heel, correct?
A. Correct.
Q. And the front of this foot imprint or the left of the foot imprint is the front of the foot, correct?

A. Correct.
Q. And is there a compass in this photograph?
A. Yes.
Q. Zoom in on that.
What direction is that headed?
A. Pointing north.
Q. And finally, Exhibit 62 is the one we used. Again, to the right of the picture is the back of the heel, correct?
A. Correct.
Q. And the front of the left towards the L section of this ruler is the front foot, correct?
A. Correct.
Q. Is there a compass in this picture?
A. Yes.
Q. Zoom in on that.
Deputy Hernandez, can you tell me what direction that is?
A. Pointing north.
Q. You would agree with me that not a single direction of that foot imprint that you relied on to say that Deputy Alfred was standing on the east side headed south, there's not a single footprint that has Deputy Anderson's (sic) footprint heading in a southwardly direction, correct?
A. The pictures that you showed me, no.
MS. FULTZ: Objection as to reference name.
THE COURT: Excuse me?
MS. FULTZ: Misstates the testimony, the name.
THE COURT: Overruled.

BY MR. BRYANT:
Q. And as we go back to this photograph on Exhibit 51, you would agree with me that, again, you remember, I was asking why is this headed to the east or headed from maybe an east-west direction if Mr. -- or Deputy Alfred headed from a west-east direction after he was going down the driveway meeting with the RPs, do you remember I asked you that and you said you didn't know?
A. Yes.
Q. Wouldn't you agree with me this is actually a representation of after the incident had finalized this is how Deputy Anderson -- Deputy Alfred walked back to his car?
A. I'm sorry, your question is?
Q. Sure. You would agree with me this actually represents the path that Deputy Alfred took when he walked back to his car?
A. From the reference photos you showed me, yes, possibility.
Q. Now, given this revelation that there actually is no evidence to suggest that Mr. -- or Deputy Alfred was walking in a southerly direction down the driveway, utilizing this -- these footprint impressions on the east, does that change your opinion as to where Deputy Alfred would have actually been when he fired those shots?
MS. FULTZ: Objection. Assumes facts not in evidence.
THE COURT: Sustained.
BY MR. BRYANT:
Q. You gave an opinion that based upon the fact that

these markers were important to determine that he was -- that Deputy Alfred was walking in a southerly direction, correct?

A. Correct.

Q. You said you use those markers which lead him -- led you to believe that Marker No. 9 where Mr. -- or Deputy Alfred dropped his flashlight, that would be consistent with where those markers were, correct?

A. Correct.

Q. And when I asked you a hypothetical about hypothetically speaking, because could those -- could that flashlight have been kicked by someone or moved by someone when the gurneys were coming down, and you testified no because it would be against the evidence because you used those foot patterns to show Deputy Anderson's direction headed south, correct?

A. You asked me if somebody would either kick it or throw the flashlight?

Q. Sure.

A. I said nobody would throw the flashlight. My response was nobody would have kicked it or misplaced it because it isn't evidencing.

Q. Okay. And again, we do know that you testified after the shooting Deputy Alfred walked to the west and congregated with the individuals on the west side for awhile of that yard, right? At some point he was there, correct?

A. Correct.

Q. You would agree with me you don't know exactly where all Deputy Anderson walked -- or Deputy Alfred walked or

what path he took throughout this entire incident, correct?
A. Afterwards, no.
Q. So if, hypothetically speaking, if these markers only show a northbound direction in terms of where these footprints were going, and there are no southern bound direction footprints, would it change your opinion as to where Deputy Alfred was when he fired those shots?
A. No. I still have to rely on the fact that he dropped his flashlight where it's at rest at Placard 9. And according to his interview as well, he told us that he wanted to maintain an advantage of visual on Mr. Barber as he walked down the driveway. Now, tactically, to do that because of the cant of the vehicle, it wasn't parked directly facing south, according to all the evidence, it was canted in a southwest direction, which hid the driver's side of the vehicle.
So to maintain a tactical advantage upon approaching somebody who's not showing their hands, not complying with commands, you would have to hug the east fence line to maintain some sort of visual as you approach, instead of walking down the center. And not being tactically sound, if that makes sense.
Q. Sure. Do you recall testimony of Deputy Alfred talking about coverage?
A. Yes.
Q. And you recall him saying that he had already heard he may have a weapon, correct?
A. Yes.
Q. And you heard him say that he looked like he wasn't

showing his hands, so he thought he could have had a weapon, correct?
A. That was his belief at the time, yes.
Q. Based upon your experience, knowledge and training would you advise a person you were training to actually seek coverage where you see the vehicle could have been used as a way to prevent somebody from being fired at or at least some block with the fence, or would you have your trainee just walk to the left, which would put them in direct sight and direct -- in a direct position of potentially being shot if somebody had a firearm?
A. Well, Deputy Alfred wasn't a trainee and he was alone. He was a sole deputy on scene at the time, so he didn't have a cover deputy to assist him with. He had to enforce the law. He believed he had a crime that he had to investigate. And our deputies do that. They may do that on their own. They do it quite a bit on their own. So he didn't have the luxury of waiting for an additional deputy to handle possibly just a vandalism investigation to begin with.
Q. You would agree that he did radio in, correct?
A. He radioed in, like what point?
Q. At some point while he's walking down the pathway, Mr. Barber is not necessarily -- he seems like they're having sort of a verbal argument of some sort. They're cursing -- he's -- he curses first, Mr. Barber. Don't you agree that he could have at this particular situation waited, called his -- another deputy to come and say, hey, I'm getting some resistance from a guy or he's not complying and I don't feel

safe. Can I get some backup, and I'll wait? That was an option that he could have done, right?

A. Could have been an option, yes.

Q. And again, deputy showed up, I know there was a call for shots fired. So obviously, deputies showed up pretty quickly. But you also heard testimony from Mr. Cocchi that the Deputy Alfred got to the scene pretty quickly after they made the 911 call, correct?

A. Yes.

Q. So again, you would agree with me that deputy -- given the fact that there had been no actual -- this was a vandalism call, deputy -- the minute Deputy Anderson -- or why do I keep saying Anderson -- Deputy Alfred thought it was a little bit more dangerous, it's just one person, you would agree with me that one of the things that officers are trained on is to wait, call for backup, when backup gets there, then they can formulate a plan to address that particular individual, correct?

A. In theory you're correct. However, in the desert, our deputies work large areas and often handle things on their own. It's Adelanto, and sometimes they will have three deputies on duty to cover areas all the way from Adelanto to Lucerne Valley, if you know the distance of that vast desert area. Sometimes they're not afforded the luxury of an additional officer when needed.

This call started out as a person not allowing people to enter their home or their vehicles.

Q. But you would agree that multiple officers or

deputies showed up within three to four minutes after he -- Deputy Alfred said shots fired?

A. Correct.

MR. BRYANT: No further questions.

THE COURT: Thank you, Mr. Bryant.

Redirect?

MS. FULTZ: Thank you.

REDIRECT EXAMINATION

BY MS. FULTZ:

Q. Good morning.

A. Good morning.

Q. You testified initially about the fight or flight response; do you recall that?

A. Yes.

Q. Okay. Was it important to consider evidence along with statementS that you took from the witnesses, including Deputy Alfred, to factor in sort of that human element in situations like this when you're investigating?

A. Yes.

Q. And did you make that consideration in this investigation?

A. Yes.

Q. Did you look to the evidence and surrounding circumstances to determine if you're going to corroborate or dispel things said by specifically Deputy Alfred?

A. Yes.

Q. And back to considering that fight or flight

response, go back to the exhibit. It's not the one I was looking for.

Showing No. 45 again. I'll zoom a little. Now, you estimated that Deputy Alfred was somewhere between Placards 10 and 9. Do you see those on the screen?

A. Yes.

Q. At the time that he fired his weapon, based on the training and experience that you've described and factoring in that fight or flight response, is there a scenario that makes more sense, is more consistent with your training and experience as to whether he was at 9 and moved forward to 10 while shooting or standing at 10 and dropped back toward 9?

MR. BRYANT: Objection. Vague. Calls for a narrative.

THE COURT: Overruled.

THE WITNESS: Well, I do know in my opinion that he fired at least from behind his flashlight. There is an impression north of him. He could have moved forward, and he could have moved back. But I know I believe that he fired from Position No. 9 by the placard, dropped his flashlight and began engaging in the vehicle.

BY MS. FULTZ:

Q. I'm not going to try to find it. Do you recall the exhibit you were shown, sort of close-up at Placard 10, and you described a number of footprints as chaos?

A. Yes.

Q. Do you have any way to know if all of those footprints that were sort of piled on top of each other, if they were from the incident or if they could have been old

historic footprints?
A. No, they all appeared fresh.
Q. Okay. You were asked about the cadence of the shots that we heard in the audio recording; do you recall that?
A. Yes.
Q. You -- one of your answers, you said it was not a proper sequence. Can you explain what you meant by that, if you recall what you were talking about?
A. I believe it was in response to defense counsel's questioning as to the cadence, was it consistent, I believe. And it was inconsistent. It had four rapid shots and then slight delays in between shot five and shot six.
Q. Okay. And when you use the term proper, what did you mean by that?
A. Consistent, maybe like a rhythm instead of having a gap between five and six or four and five. Six consistent shots with the same rhythm.
Q. Okay. Do you recall testimony about -- from Deputy Alfred about what the sound is when he's walking that we can hear in his recording?
A. Yes.
Q. And do you recall hearing that sort of squeaking noise from the belt recorder sitting in its holster as he approaches the vehicle to speak to Ms. Gallo and Mr. Cocchi?
A. Yes.
Q. And the same squeaking noise as he then approaches up the driveway to make contact with Mr. Barber?
A. Yes.

Q. Did you hear any of that sound during the period which he is shooting?

A. No.

Q. The fired cartridge casings, which were identified in Placards 2, 3, 4, 5, 7 and 8, do you have any way of knowing, which of those were first shot, second shot, all the way through six?

A. No.

Q. And why not?

A. It's -- you can't determine whether, unless you're present and you're watching the FCCs come out of the pistol, you can't determine which FCC belongs to which round fired.

Q. Would you expect to find any damage on fired cartridge casings if, say, a shoe kicked it?

A. Not a shoe, no.

Q. If one were stepped on even with a good size boot or something like a gurney rolling over it, would you expect it to bounce around or to be smashed into, sort of smashed down into the rocks?

A. If they were stepped on, there would be probably some damage to it. Maybe pushed into the gravel a little bit. If a gurney wheel hit it, I don't think it would cause as much damage, maybe kick it off on the side. All depends.

Q. And is there any way to know the behavior of the fired cartridge casings in a surface like this gravel?

A. I would say based on training and experience, because we shoot on a concrete shooting platform at the range, when the FCCs hit hard surfaces, they bounce. This is

congruent gravel. It is a hard surface as far as content, but it's movable, it's mobile, so it's not as compact or as dense as say concrete.

Q. And so would you expect -- do you understand what I mean by the behavior of the cases?

A. Yes.

Q. They land as they're moved around. Would you be able to identify or anticipate the movement that they would have in this kind of a surface?

A. I would expect the FCCs to land in and at least bounce once away from where they land based on the hard rocks that are on the ground, versus landing in soft soil.

Q. And given the hard edges and different directions of those edges, would you have any way of knowing, once they bounce, which way they're going to go?

A. No.

Q. You just testified about the flashlight and you said that nobody would kick or throw the flashlight because it's a crime scene, right?

A. Yes.

Q. Are you referring to your team, or did that include the first responding parties?

A. Our team definitely. It is a contrast object on the ground because it's black, and the ground is light brown and gray. And it was out of the avenue of approach. If you look at the scene, the deputies are on the west side, and then they're treating Mr. Barber on the driver's side. The gurney path is a ways from Placard 9, or at least where the flashlight

is at, so the wheels don't disturb it.
MS. FULTZ: Okay. Sorry, Your Honor, if I can have a minute.
BY MS. FULTZ:
Q. Redisplaying 34, can you describe, can you point out what you just described for the jury?
A. The gurney path down the middle of the gravel where 6 and 7 placards are placed.
Q. Uh-huh.
A. Do you want me to describe the whole scene?
Q. Just what you were referring to with the placement of the flashlight at 9?
A. Oh, the flashlight is off to the side, appears to be just outside the gravel, and the gurney path is to the right of it, if you're looking at the photo which would be west.
Q. Now, you did a math equation related to speed. Do you recall that?
A. Earlier, yes.
Q. Yes. And you did 14 feet divided by, I think it was 4.2 seconds and came up with 3.333 and so on?
A. Yes.
Q. Based on that equation is that if the vehicle was at a constant speed for the entirety of that 14 feet?
A. That's the theory behind the math problem. They would have to maintain a speed, such as that for that time distance.
Q. Okay. And based on your examination of the incident, the entirety of your investigation, do you have an

opinion as to whether that is the manner in which the vehicle moved?

A. Based on the audio and the rapid acceleration, which caused the tires to lose traction, the speed could have been greater than 3.3. Could have been 4. Could have been 4.5. But then at some point you don't hear engine revving as the shooting occurs, so the vehicle could have slowed on its own. There could have been slight brake pressure from an incapacitated driver.

There's a bunch of variables that could have happened in between that 14 feet.

Q. And to factor in all of those to do any further analysis, you would be speculating as to the --

A. Yes.

Q. -- variable?

A. Yes.

Q. Okay. You were also asked about whether or not someone slumping over a wheel could cause the tire pattern to turn. Do you recall that?

A. Yes.

Q. Is that scenario consistent with your investigation and the evidence you examined?

A. I was asked if it was possible. Anything is possible. Is it probable? That fence post was pretty close to the vehicle as it backed. It looked deliberate in its path, like it was avoided on purpose.

Q. And the revving that we hear and the sound we hear that you've described as the tires are trying to gain traction

in that audio recording, would that require an affirmative application of the accelerator?

A. Yes.

Q. There was 14 feet that you described as the movement outside of that sort of 2 foot roll we've talked about, correct?

A. Correct.

Q. So is that a total of 16 feet of movement?

A. Yes.

Q. And you were here for Deputy Alfred's testimony when he estimated the distance between sort of the edge of the witness stand and the edge of counsel table, which the Court found to be about 18 feet, do you recall that?

A. Yes.

Q. Was the -- is there a measurement taken from the rear of that vehicle to say the area of Placard 9?

A. If I can review the measurements on the scene sketch?

Q. Would that refresh your recollection?

A. Yes.

Q. Do you have it with you?

A. No, I do not, ma'am. It should be Tab 6.

THE COURT: Mr. Bryant, do you have that?

MR. BRYANT: Yes, I do. I was going to grab it in case they couldn't find it, yeah.

THE WITNESS: Thank you.

And your question again, ma'am?

BY MS. FULTZ:

Q. Did you ever get a measurement between placards -- sorry, the end of the vehicle, the end of the rear of the vehicle to the -- strike that. I'm sorry. The vehicle as it was in its initial position as marked by Placard 14?
Do you know what I'm referring to?
A. Yes.
Q. Were you able to tell where the edge, the end of the vehicle is at the point it started its movement?
A. Yes.
Q. And are you able to get a distance between Placard 9 and that point of reference?
A. Yes.
Q. And what was that distance?
A. That distance between Placard 9 and where the vehicle was at rest and the measurement being from a reference point, which is a telephone pole on the street, to the driver's side rear wheel was 136 feet. Now, that 136 feet is to the center of the wheel. The measurement to Placard 9 from the same reference point is 126 feet. So the difficulties between Placard 9 and Placard 11, which is the vehicle, the rear driver's side wheel is approximately 16 feet.
Q. Now, you mentioned your current assignment is internal affairs, correct?
A. Correct.
Q. Do you have any problem calling out deputies if they are wrong, if they were lying, if any scenario like that?
A. In accordance with POBOR, which is Police Officer Bill Of Rights, there's times when I can challenge their

answers, yes.
Q. And do you feel comfortable doing that?
A. Yes.
Q. Do you get paid any more responding to a scene that involves none of your advanced training and experience as you do to one that say involves an accident reconstruction?
A. No.
Q. And have any of the questions that you've been asked, any of the hypotheticals that have been posed to you, changed your opinion about what took place on April 27th in 2021?
A. No.
Q. Thank you.
THE COURT: Thank you, Ms. Fultz.
Any recross, Mr. Bryant?
MR. BRYANT: Very briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. BRYANT:
Q. Detective Hernandez, you said that that flashlight wouldn't have been moved because people wouldn't have wanted to disrupt the crime scene, correct?
A. Yes.
Q. But you also said in the same vein that people had no problem kicking around shell casings that were also -- would have also been important pieces of the crime scene, correct?
A. Yes.
Q. You would agree with me that if emergency

responders are responding to an emergency situation that may or may not be life or death, and that flashlight is sitting in their path, you would agree with me they're not going to be thinking about whether or not they're impacting or contaminating a crime scene, they're going to move that flashlight out of their way if it's obstructing them, correct?

A. Is your question -- pose your question again, sir.

Q. Let me -- it was a little long winded, and I'm going to be really quick.

You would agree with me first responders, their duty is to address whomever they are supposed to be assisting aid for, correct?

A. Correct.

Q. How long is a gurney length and width, approximately?

A. I would say the average size of a man, 6 feet.

Q. And you would agree with me that if that flashlight is in their way and they are there to perform some sort of medical aid to an individual, they will move that flashlight out of their way in order to get to that individual regardless of whether it contaminates a crime scene, correct?

A. Possibly, if it's in their way.

Q. We just had a few questions about your job as internal affairs detective. In this particular situation the alleged person who says that a crime was committed against them is Deputy Alfred, correct?

A. Correct.

Q. And you're here not only as a percipient witness

who took, you know, an investigation and led the investigation to determine whether or not a crime had occurred, in terms of Mr. Barber, but you're also here as an expert -- as an expert witness on behalf of the County, correct?

A. On behalf of this case.

Q. Correct. On behalf of this case you work for the County, you're working for the State of California currently?

A. I work for the County of San Bernardino.

Q. And you're an expert witness for the State of California, correct?

A. For the County of San Bernardino. I don't work for the state.

Q. I understand that, but you're an expert witness who works for the County of San Bernardino in the Sheriffs Department, correct?

A. Correct.

Q. And again, you're not investigating Deputy Alfred for any wrongful acts, correct?

MS. FULTZ: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: No.

MR. BRYANT: No further questions, Your Honor.

THE COURT: Thank you. Anything further?

FURTHER REDIRECT EXAMINATION

BY MS. FULTZ:

Q. There is a portion of your investigation unrelated to this prosecution that looks into Deputy Alfred, correct?

A. In regards to his conduct or the criminal matter?
Q. Any time there's an LFE, is there a dual investigation, the part that looks into the force that's unrelated to the criminal prosecution?
A. Yes, that was something we discussed early in my testimony. It's two DR numbers were pulled, two report numbers were pulled, one for the crime of assault against a peace officer and attempt murder, the other was for homicide criminal investigation or inquiry into the conduct of what occurred on behalf of our deputy.
Q. All right. Last question, reshowing No. 69. Do you see what is just underneath the passenger's side open door?
A. Yes, it looks like a feral cat.
Q. Sorry?
A. The feral cat.
Q. Any concerns about contamination by animals on scene?
A. Not unless they conduct business that's inappropriate.
Q. Thank you. That's all I have.
THE COURT: Thank you. Anything further, Mr. Bryant?
MR. BRYANT: No further questions, Your Honor.
THE COURT: Thank you. You can step down, Detective.
THE WITNESS: Thank you, Your Honor.
THE COURT: Do you have another witness this morning?
MS. FULTZ: I do.
THE COURT: Okay. Your next witness.
MS. FULTZ: Jonathan Ortega, please.

THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE JUDICIAL ASSISTANT: Thank you. Please be seated.

THE BAILIFF: Once you're seated please state and spell your name for the record.

THE WITNESS: Jonathan Ortega, J-o-n-a-t-h-a-n, O-r-t-e-g-a.

THE COURT: Good afternoon, Deputy.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Ms. Fultz?

MS. FULTZ: Good morning.

THE WITNESS: Good morning, ma'am.

THE COURT: I'm sorry. Good morning.

MS. FULTZ: You threw me.

JONATHAN ORTEGA,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:

Q. What is it you do for work?

A. I'm a deputy sheriff for the County of San Bernardino.

Q. And how long have you worked for the County of San

Bernardino?
A. For about six years.
Q. Where were you assigned?
A. Currently to the Victorville patrol station.
Q. Do you recall where you were assigned in April of 2021?
A. Yes.
Q. Where was that?
A. To the City of Victorville assigned to patrol operations.
Q. And while working patrol operations for the City of Victorville, did you wear any sort of uniform?
A. Yes.
Q. And what kind of uniform did you wear?
A. Similar to the one I'm wearing right now, except without the jacket. It's a tan shirt with green pants. The tan shirt has a -- on my regular patrol uniform, just a metal badge on the left-hand side, a American flag on the right-hand side, and two shoulder patches. The shoulder patches say San Bernardino County Sheriff. Pants are just regular green. I have my equipment belt of -- my duty belt, my duty firearm, pepper spray, taser, handcuffs and black boots.
Q. All right. And is that -- does it have a common name that's referred to?
A. Yes.
Q. What's that?
A. The Class A uniform.
Q. And showing you what's marked as Exhibit No. 7, is

the Class A uniform that you wore in April of 2021, similar to what is depicted in Exhibit No. 7?

A. Yes.

Q. And on April 7th of 2021, did you come into contact with anyone that you see here in the courtroom today?

A. Yes.

Q. Can you identify by something that person is wearing and where they are seated the person you came into contact with on April 7th of 2021?

A. Yes. To my right, the Defense's left, Mr. Steffon Barber in the white long-sleeve shirt.

MS. FULTZ: May the record reflect the witness has identified the defendant?

THE COURT: Yes, it will.

BY MS. FULTZ:

Q. Was it in your capacity as a deputy sheriff and while wearing a uniform that you came into contact with Mr. Barber on that date?

A. Yes.

Q. And during that encounter, did you have occasion to issue any commands or instructions to Mr. Barber?

A. I did.

Q. And how did he respond when you gave him instructions or commands while in uniform?

A. So during this incident I believe it was a Deputy Johnson gave the commands for the defendant to place his hands behind his back. The defendant did not comply. And a use of force occurred.

Q. When you say use of force occurred, is that something from the deputy or from Mr. Barber or both?
A. From deputies.
Q. Okay. Can you explain what you mean by that?
A. Yes. During that initial call, back in 2021, Barber had punched my partner Deputy Johnson at the time. Use of force occurred. We ended up taking the defendant to the ground. The defendant had headbutted me, and a use of force occurred. Johnson and myself were able to handcuff the defendant to the rear and no further incident occurred.
Q. Okay. Thank you. That's all I have.
THE COURT: Thank you.
Cross-examination?

CROSS-EXAMINATION

BY MR. BRYANT:
Q. What time of day was this?
A. This was daytime.
Q. So he could clearly see you were an officer in your uniform, correct?
A. Yes.
Q. Do you know whether or not upon the initial contact Deputy Johnson had announced that they were San Bernardino County Sheriff?
A. We did not announce ourselves, but I remember during this incident we were in the front of the house. We were clearly visible.
Q. There was no way that he wouldn't be able to

recognize you because it was bright outside, correct?

A. Yeah. He was -- he was able to see us clearly.

Q. And we're looking at Exhibit 7 here. Does the uniform come equipped with any sort of reflectors at night to show that you are a sheriff, like some sort of patch that is reflective or anything like that?

A. No, I don't believe our patches are reflective. The only thing I can think of is these, our current uniforms they do have a pop up collar that does have reflective tape on the inside of the collar and the inside of the cuffs, the wrist cuffs.

Q. But looking at this picture it doesn't look to be the case?

A. No.

Q. Do you normally wear, you know, like a beanie while you're on patrol?

A. We can. It usually is green in color. And we'll have the word sheriff in gold lettering.

Q. Okay. No further questions.

THE COURT: Thank you.

Any redirect?

MS. FULTZ: No, thank you.

THE COURT: May the witness be excused?

MS. FULTZ: Yes.

THE COURT: Mr. Bryant?

MR. BRYANT: Absolutely, Your Honor.

THE COURT: Okay. Thank you. You're excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Do you have another witness this morning?

MS. FULTZ: I do not, Your Honor. Subject to the admission of exhibits that have been shown, the People rest.

THE COURT: Okay. Very well. Will counsel approach, please.

MR. BRYANT: Yes.

(Bench conference held, not reported.)

THE COURT: Okay. We're going to break for lunch. We're going to come back at 1:30 this afternoon. Although you've heard all of the People's evidence, I think there might be some more evidence for you.

So don't form any opinions or conclusions. I haven't advised you what the law is yet. And you haven't heard the closing arguments of the lawyers. They may point out things to you in the evidence, so don't make up your mind about anything until you're in the jury room deciding the case.

Have a nice lunch. I'll see everyone at 1:30.

(The following proceedings were held outside the presence of the jury.)

THE COURT: We're on the record, outside the presence of the jury.

I probably should have had them come back at 1:45 since we were going to have a 402 hearing. But that's fine. I don't think that should take too long. At this point I -- oh, first of all, you need to move exhibits into evidence.

MS. FULTZ: Yes.

THE COURT: Is it everything that has been shown to the jury?

MS. FULTZ: Yes.

THE COURT: Any objections?

MR. BRYANT: No.

THE COURT: Okay. Do you have those, or do you need them recited?

THE JUDICIAL ASSISTANT: I would prefer that we double check each other, whether it's on the record or not.

THE COURT: Okay. I'm going to go ahead and receive them all in evidence. We're going to have a motion first, but we'll double check that to make sure we have everything.

MS. FULTZ: Okay.

THE COURT: All right. I understand you have a motion, Mr. Bryant?

MR. BRYANT: Yes. Just really briefly, Your Honor.

I believe that the attempt murder charge should be dismissed. The People haven't brought any evidence whatsoever to show that Mr. Barber had any intent to kill Deputy Alfred. We've heard testimony that the vehicle at most was likely going 2.7 and three miles per hour, possibly in the direction of Deputy Alfred.

Mr. Barber, even though he was shot, his foot was on the brake at foot 14. He did not press the accelerator to attempt to cause any harm to Deputy Alfred after he began to shoot. And at no point in time was there any indication that Mr. Barber had threatened to kill. Verbally didn't tell the officer he was going to kill him. He didn't do any of that stuff.

So based upon the evidence that we've seen so far,

we don't believe there's been any evidence presented by the -- by the People to suggest that there is a claim to be decided by the jury as it relates to attempted murder.

THE COURT: Thank you.

Ms. Fultz?

MS. FULTZ: I would just respond with the demeanor of the defendant, the aggravation that we can hear in his voice and the recording as he -- just before he gets into the vehicle. The fact that Deputy Alfred gives a very loud commanding voice presence, just as he's entering that vehicle, indicating he would know where Deputy Alfred was standing, and then the fact that he hits the accelerator so that we hear that engine rev. The tires are spinning, trying to gain traction. It wasn't like a slow start where they just would roll on the dirt.

All of the circumstantial evidence points to the fact that he intended to hit Deputy Alfred with the moving vehicle, which I think we heard testimony was 5,000 pounds. Certainly would either kill or very badly injure Deputy Alfred if he were struck.

THE COURT: I think this is a question for the jury. Intent is something that almost always is shown by circumstantial evidence, and there is circumstantial evidence. It will be up to the jury to decide whether that circumstantial evidence, a reasonable interpretation of it is it points to innocence. There certainly is circumstantial evidence to support a finding of criminal intent to kill. So motion is denied.

And I'll see everyone at 1:30. Make sure everyone is exactly on time. I should have told the jury to come back at 1:45, but we'll briefly find out if your expert can testify. Are you going to have any other evidence?

MR. BRYANT: Any other evidence as far as any other witnesses?

THE COURT: Correct.

MR. BRYANT: We may recall Deputy Alfred.

THE COURT: Okay.

MR. BRYANT: Brief testimony. I have not had a chance to discuss it with Ms. Fultz, but we may briefly recall him. We are expecting -- I'm hoping to get Monique Grenados, but it may not be possible given how I informed the Court that --

THE COURT: I understand your client is not going to testify?

MR. BRYANT: I believe that's correct. Let me double check.

No, Your Honor, he will not testify.

THE COURT: All right. Mr. Barber, I just want to make sure you understand, you have the right to remain silent. You're exercising that right, that's fine. Nobody can comment on that. I just want to make sure that you also understand that you do have the right to testify if you choose to. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you choose not to testify?

Okay. Very well. All right. Have a nice lunch, everyone. See you at 1:30.

MR. BRYANT: Thank you so much.

(Whereupon the lunch recess was so taken.)

SAN BERNARDINO, CALIFORNIA, THURSDAY, DECEMBER 5, 2024.

AFTERNOON SESSION

DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,
JAMES BRYANT, Attorney at Law and
RYAN DUCKETT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT: We're on the record outside the presence of the jury. Counsel are present. Mr. Barber is present. Detective Hernandez is present.

Okay. Prosecution has rested. It's now the defense in chief. And I understand you wish to call an expert witness who is going to testify about the, correct me if I'm mistaken, the movement of the SUV, the position of Deputy Alfred and any movement; is that correct?

MR. BRYANT: That is correct, Your Honor.

THE COURT: All right. And the People have asked for a 402 hearing. What is the preliminary fact that needs to be established? Is it qualifications? Is it something else?

MS. FULTZ: Initially, yes, qualifications. However, I was provided yesterday afternoon a PDF version of what I believe is the PowerPoint proposed to be used by the expert. It's 48 pages. Some of it appears to cover things that were excluded, including the trajectory of the shots into the

driver's seat. So I'm not sure what exactly he would be testifying to related to that. There are what appears to be --

THE COURT: Is this your expert witness, Mr. Bryant?

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. Sir, would you mind waiting out in the hallway until we're ready for you? Thank you.

THE WITNESS: Of course.

MS. FULTZ: May I continue?

THE COURT: Yes, of course.

MS. FULTZ: There appear to be videos or animations that I don't have in PDF form. I don't know what they propose. I don't know what the offer of proof is on those to say whether or not this witness would have the foundational knowledge. I have been provided a CD which relates specifically to traffic investigations, accident reconstruction, those kinds of things. I'm not sure what the firearms, trajectories, ballistics, any of those pages, I don't know what the offer of proof is for those.

THE COURT: Right.

MS. FULTZ: So I am not sure exactly what -- I anticipate the challenge will be that his CV does not reflect he has the education, training or experience related to those subjects.

THE COURT: Okay. All right. I guess my first question is you just got these now?

MS. FULTZ: Well, I was provided the PDF version yesterday, which I received after we broke. I still have not received the PowerPoint to see the animations. One of them I

believe counsel sent me a link for. There's a YouTube video which I will be objecting to either way, but I just found the link during the lunch hour today.

THE COURT: Why is this information only being provided now, Mr. Bryant?

MR. BRYANT: So excuse me, Your Honor, I provided Counsel the actual -- his initial opinions or whatever his opinions were going to be. I know he was preparing the PowerPoint presentation for anticipation of his testimony. As soon as I received his final version, I was able to send that to Ms. Fultz. She did request, because there were some animations, the link that I did send her is a link to those exhibits that show those animations.

And so at this point I've just provided her with exactly what his presentation was going to be. But the opinions were always provided to counsel before this as we discussed when we first --

THE COURT: All right. What about Ms. Fultz's comment that some of these pages of the PowerPoint are related to excluded matters?

MR. BRYANT: They were -- those were -- those were done previously, meaning he had been working on this for awhile, prior to the Court's motions in limine. I did advise him that he's going to have to remove anything related to trajectory. Although, there has been some testimony about the shooting, we're not going to be able to say anything about the shooting of the head or anything like that.

THE COURT: Give me a quick summary what his opinion

would be.

MR. BRYANT: Sure. So his opinion is going to be this, and it's going to be on these issues.

One, how -- when did officer -- or Deputy Alfred begin firing his firearm?

Was Deputy Alfred firing his firearm while he was in motion or when he was stationary?

What is the approximate speed of Deputy Alfred's pace towards the vehicle, if any, if he's firing that weapon?

Then he's going to testify to the speed and the distance in which that vehicle traveled after the car had made the noise that we've all -- the acceleration noise, he's going to testify when he believes that the car actually started to move.

THE COURT: I'm sorry, when it started to move?

MR. BRYANT: Correct. Once it -- you hear that silence, whether that the car moved either --

THE COURT: Okay.

MR. BRYANT: Yeah.

Then he's going to testify as to the speed the car would have been moving. Meaning that from point 0 to 14 feet, what that speed was.

THE COURT: Okay.

MR. BRYANT: And he's going to testify that the car moved back two additional feet thereafter.

THE COURT: Well, that's in evidence.

MR. BRYANT: Correct, yeah. That's part of his analysis, I guess.

THE COURT: Okay. All right. You mentioned before the lunch hour that he was going to say something about the FCCs?

MR. BRYANT: Oh, correct.

THE COURT: What's his expert -- if he's an accident reconstructionist, if that's his background, we'll hear about his background in the 402 hearing, but what's his -- what are his qualifications to talk about FCCs?

MR. BRYANT: I'll have to double check. I did not inquire into that specific area, whether he has any qualifications as it relates to that. I think, if anything, he will state that he does investigations on various accident scenes, where certain things are, and based upon one where he's listening to the audio, where the FCCs are actually located, and what the likelihood of the positioning would be based upon that information. As well as the rest of the -- so we have to ask him more, Your Honor.

THE COURT: Okay. Can we bring him in?

MR. BRYANT: Yes.

THE COURT: If you can give a quick examination, not your usual examination, so don't start your questions with the word again.

MR. BRYANT: Understood, Your Honor.

THE COURT: Okay. Let's bring him in. What's his name?

MR. BRYANT: Robert Morales.

THE COURT: Okay. Mr. Morales.

Let's do the qualifications first. Do you want to voir dire him on qualifications then before we hear him transition into opinions?

MS. FULTZ: I think the burden is actually on the proponent.

THE COURT: I know. Do you want to voir dire him? It depends what he says. Okay, we'll see.

Good afternoon, sir. Please come on up to the witness stand.

THE BAILIFF: Remain standing. Face our judicial assistant and raise your right hand.

THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I swear.

THE JUDICIAL ASSISTANT: Thank you. Please be seated.

THE BAILIFF: Once you're seated, please state and spell your name for the record.

THE COURT: State your name please and spell it for the record.

THE WITNESS: My name is Roberto Carles Morales Moreno.

MR. BRYANT: May I proceed, Your Honor?

THE COURT: Good morning, sir.

THE JUDICIAL ASSISTANT: Can you spell it?

THE COURT: Yes, can you spell your name?

THE WITNESS: Yes. R-o-b-e-r-t-o, C-a-r-l-e-s, M-o-r-a-l-e-s, M-o-r-e-n-o.

THE COURT: All right. Sir, this is going to be a little bit of a dress rehearsal for your testimony before the jury, for me to find out if the testimony that is being

proffered by you will be admissible in court. Now, I'm going to ask Mr. Bryant not to do the full blown explanation. It's going to be a shortened version.

THE WITNESS: Okay.

THE COURT: Okay?

THE WITNESS: Yes.

THE COURT: All right.

MR. BRYANT: Thank you, Your Honor.

ROBERTO MORALES,

called as a witness on behalf of the Defense, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRYANT:

Q. Mr. Morales, could you please state briefly your educational background?

A. I am a mechanical engineer.

Q. And where did you go to school, if any?

A. California State University Los Angeles.

Q. And was that a bachelor's that you received?

A. Bachelor's, dual major, mechanical engineering and manufacturing engineering.

Q. And did you receive any other advanced degrees following your bachelor's?

A. Yes. Master's in mechanical engineering.

Q. Okay. Are you a part of any societies in the engineering field?

A. Yes, there are a few, like the --
THE COURT: Let's skip that. We don't need the societies. I think let's --
MR. BRYANT: Understood, Your Honor.
THE COURT: You want to do that with the jury, I understand.
MR. BRYANT: You push me, and I will move. All right.
BY MR. BRYANT:
Q. So do you have outside of -- what are you here to testify about?
A. About vehicle mechanics, like -- and also like the analysis of the reconstruction based on the evidence analyzed.
Q. Okay. And had you had any training as it relates to doing accident or incident reconstructions?
A. Yes.
Q. And what's your training?
A. I do have a training as video analyst and audio analyst. I have a training in accident reconstruction as well.
Q. Is there any further trainings that would be important for you to inform the Court this brief period?
A. Like what I do, like continuous education, like every year I go to different courses to help me keep track of new methods and, you know, to scientific methodology to use in my career.
Q. Who do you work for?
A. Young & Associates Engineering Services.
Q. How long have you been employed by them?
A. Approximately like ten years.

Q. And with your employment there what has been your primary job? What do you do there?

A. Accident reconstruction.

Q. And when you say accident reconstruction, is that limited? Can you maybe explain or expand on that, explain to the Court the scope of your accident reconstruction?

A. It is -- we use, for instance, forensic analysis, digital and physical evidence, to reconstruct accidents related to passengers and also a commercial vehicles and a -- also industrial accidents and the separate idea of, you know, accident reconstruction disciplines.

Q. And when you say industrial accidents, what do you mean by industrial accidents?

A. Accidents that happen, for example, with a, usually show of equipment, a forklift, you know, like conveyor belts, trip and falls.

Q. So your accident reconstruction work isn't limited to just solely vehicles; would that be accurate?

A. No.

Q. And you also state that, you know, you give analysis and opinions on motor vehicles. Maybe explain to the Court what is your experience, knowledge and training in terms of how you are able to give an analysis on that?

A. Pretty much to prove using research and methods, you know, to determine, to show the mechanical capacity of vehicles, how they move, you know, how -- how -- what move do we expect, you know, to speeds the vehicle could reach, specific times, using like -- like a common factors for

acceleration.

Q. And have you ever been an expert witness before?

A. Yes, many times.

Q. How many times would you estimate you've been an expert witness in a case?

A. Pretty much like 15, 20 cases a month.

THE COURT: Let's find out about any qualifications relating to the placement of the officer and the firearm, all that stuff.

MR. BRYANT: Sure. Sure.

BY MR. BRYANT:

Q. So as far as your reconstruction of an accident scene, or in this particular instance a crime scene, can you give the Court your background, training and education how you're able to be qualified to testify as it relates to placing different individuals at certain parts in certain time frames, you know, in any particular accident situation?

A. In this one in particular or --

Q. Sure, why don't you --

A. Pretty much I receive evidence of like measurements. That's actually a common practice, you know. I receive the traffic collision reports, where they take place and the measurements taken at scene, you know, so I could analyze the physical evidence. That's in combination of digital evidence, like photos, audio, to establish a, like a time, distance in particular, for particular reasons.

This one in this case in particular it was a combination of all of them.

Q. What about movement behaviors, so how do you determine, make an opinion on where you believe people either began and where you believe people ended at the time that the incident had finalized, how are you able to provide that opinion based upon your training, knowledge and experience?

A. The analysis of the audio.

Q. When you also -- did you also -- you talked about the measurements. Did you use the measurements as well?

A. Yes. The measurements provided by the police.

Q. Just because this is a criminal crime scene, would this particular crime scene be any different than you reconstructing any other accident scene?

A. No.

Q. Why is that?

A. Because they are reference of, you know, like serial reference point that is provided by the surveyor, the survey, the place, every single piece of evidence at the scene.

THE COURT: Okay. I've got enough from you right now. Did you want to voir dire the witness just on qualifications, or do you want to hear the opinions?

MS. FULTZ: Well, I am not really sure I understand what the qualification was for the analysis of the movement of people.

THE COURT: Why don't you inquire then.

MS. FULTZ: Sure.

///////

///////

CROSS-EXAMINATION

BY MS. FULTZ:

Q. Good afternoon.

A. Good afternoon.

Q. You said that you were able to reconstruct the placement of the involved parties based on the audio recording and measurements provided by law enforcement?

A. Yes.

Q. Did you also review the reports and interviews to determine where that audio might place someone?

A. Yes. I compared the different statements provided, and I compared those to physical evidence in order to get the conclusion.

Q. Did you rely on those statements in forming that conclusion?

A. I compared them to the physical evidence, the combination of evidence.

Q. Is that a yes, you relied on it, or you were able to tell -- let's take the fired cartridge cases, for example. Were you able to tell anything about the location of those fired cartridge cases just by looking at the photographs and measurements and hearing the audio?

A. Yes.

Q. And you didn't rely at all on the statements to assist in forming an opinion about the placement of those?

A. Yes. I read the statements, but however, you have to rely on the measurements of the police officers.

Q. Okay. And then I apologize if I just missed it.

Did you have some training outside of your accident reconstruction and industrial accident investigations that related to the placement of the parties during the incident?

A. As far as the placement of the parties was based on a statistical probability based on research based on calculations.

Q. What research are you relying on?

A. First of all, the capacity of the vehicle to accelerate in reverse.

Q. Okay. Focusing on Deputy Alfred and providing an opinion as to where he's located at any given time during the incident, what training and experience do you have or education related to determining where an individual is standing? You would agree there's no collision here. There wasn't an actual impact, correct?

A. Yes.

Q. And so what are you relying on or what training and experience do you have in making the calculation of where those people are located?

A. My capacity to analyze the audio provided, the physical evidence measured by the police, and that tells me that the FCC had to be really in a close range from -- from they were fired.

THE COURT: What experience, if any, do you have with respect to firearms and the ejection of fired cartridge casings?

THE WITNESS: I did a research and based on the -- this particular make and model of the handgun so -- and I had a

video that demonstrate how those FCCs will be deployed after being fired, and that tells me that the individuals who fired those shots were in the range of at least 3 to 4 feet away.

BY MS. FULTZ:

Q. What research did you conduct?

A. I provided a video.

Q. So your -- the foundation of your knowledge as to the ejection of cartridge cases from this Glock 21, .45 caliber firearm, comes entirely from the video. Was that a YouTube video?

A. Yes.

THE COURT: All right. Mr. Bryant, anything else?

MR. BRYANT: Just briefly.

REDIRECT EXAMINATION

BY MR. BRYANT:

Q. Mr. Morales, during your -- the course of your, you know, jobs that you are given, are there times where you're going to have a situation where you're going to have to research a specific issue, like spillage, where you have to -- maybe you've never dealt with a specific type of spillage before. Would you have to do some research to determine what happens for this particular liquid, if a certain thing drops in and it splashes at a certain distance? Are those similar things that permits you, if you do some research, to understand how you can determine where those FCCs or those shell casings would have landed in relation to where the officer was firing?

A. Yes. If we could go, you know, like far with the

investigation, we can, you know, determine specifically an approximation, you know, based on the statistical, you know, research, like how far those casings could land from the individual that's firing.

But in this case, was a common sense that it was in a close range, so there is no -- there is no explanation for the casing to be in, like in certain instances that will land far from others.

THE COURT: All right. I think I've heard enough here.

Here are my thoughts, that this witness is well qualified based on his accident reconstruction experience to talk about the movement of the SUV, where it was, how fast it was moving, how long it took, all those issues.

He has no qualifications to talk or foundation to talk about the placement of Officer Alfred. He has no experience with respect to the FCCs being ejected from the Glock, other than watching a video that's available on YouTube. So I will exclude all of that.

If you think his testimony is relevant about, you know, how fast the vehicle was moving, what the direction of travel was. Perhaps those things aren't disputed, but I think he's well qualified to talk about that.

MR. BRYANT: Okay, Your Honor. Understood.

And the Court says that they're not -- they don't believe he's qualified to testify as to placement. Would he at least be able to testify, maybe not necessarily to where the FCCs are, but based upon the evidence that he's reenacting this actual scene, would he be able to testify as to the movement

itself, what he's hearing as far as what Deputy Alfred is doing that gives him an idea of where he's going, not --

THE COURT: Just as Detective Hernandez relied upon footprints, if that's something that Mr. Morales analyzed as well, I think as a reconstructionist he can -- he will be qualified for that.

Ms. Fultz, do you want to be heard on that?

MS. FULTZ: I wouldn't have an objection to the physical evidence, but anything that's relying on the statements of witnesses, the police reports, I think Sanchez prevents any case specific hearsay.

THE COURT: Well, that's true. I mean, he can tell us generally what he relied on in terms of witness statements, but in terms of recounting what that -- those hearsay statements say, that's excluded. But for the purposes of whether he's qualified as an expert I think that he can do the same thing that Detective Hernandez did about looking at footprints to determine where somebody was. But based on the trajectories of the fired cartridge casings, no.

MR. BRYANT: Understood, Your Honor.

MS. FULTZ: Just to --

THE COURT: I don't know what that does to his PowerPoint but make sure there is --

MR. BRYANT: We're going to work on that, if the Court would not mind.

THE COURT: All right.

MS. FULTZ: I just wanted clarification. So any opinion that he's relying on that comes from statements of the

witnesses, it's not just their statement that should be prohibited, but if he's relying on it, there's no foundation for -- it has to be based on admissible testimony. He hasn't been present to observe, to watch Deputy Alfred's testimony. Anything that's going to come from statements Sanchez would just prohibit that --

THE COURT: Sure.

MS. FULTZ: -- that opinion.

THE COURT: I guess -- I was assuming that this is based on the audio, what he heard and what he knows about the weight of the vehicle, the model of the vehicle, you know, what -- those kinds of things.

MS. FULTZ: That's fine. I just wanted to -- so I'm not having to interrupt --

THE COURT: I think that's true.

MS. FULTZ: -- and object frequently.

MR. BRYANT: And I think that's why the witness avoided saying, I'm relying on these statements. He's really focused on the audio and physical evidence.

THE COURT: All right. That's what you're going to be limited to, sir, the physical evidence, your knowledge, whatever you've researched about this Trailblazer SUV and its weight and so forth. And you're listening to the audio. But that's not going to enable you to say anything about the placement of Deputy Alfred and don't relate anything that any of the individuals said in their statements. All right.

Do you need a few minutes with the PowerPoint?

MR. BRYANT: If the Court would not mind.

THE COURT: Okay. Would you tell the jury that we'll probably be -- how much time do you need?

MR. BRYANT: Mr. Morales, approximately how much time do you need to fix this?

THE WITNESS: Five, ten minutes.

THE COURT: We'll say 15 minutes. All right.

So I'm aware, is it Mr. Morales or Moreno or --

THE WITNESS: Morales, I go by Robert Morales.

MR. BRYANT: Your Honor, just to give you an idea of time, after Mr. Morales, subject to recall of Deputy Alfred, I think that's pretty much it, I think, just given --

THE COURT: Okay. Is Deputy Alfred here?

MS. FULTZ: I sent him a text probably too close to the end of the lunch hour to give him a heads up that Defense was requesting to recall him.

THE COURT: All right, if you can --

MS. FULTZ: But I know --

THE COURT: -- make that call or text that would be great. What I'd like to do if possible is to get the evidence done today, if we can. And then we can do instructions and argument on Monday.

MR. BRYANT: Okay. Thank you, Your Honor.

THE COURT: Do you anticipate much rebuttal? You don't know until you've heard it.

MS. FULTZ: I won't know, yeah.

THE COURT: Okay. All right. You can step down. Thank you.

THE WITNESS: Thank you, Your Honor.

(A recess was taken.)

THE COURT: We're on the record outside the presence of the jury. Counsel and Mr. Barber are present.

MR. BRYANT: Yes, Your Honor, so I was able to show --

MS. FULTZ: Counsel was gracious enough to let me go through the PowerPoint and make sure nothing ran afoul of the hearing.

THE COURT: Okay.

MS. FULTZ: There's one where it's sort of in dispute about it just says the average human walking speed is three miles per hour, and since we have removed all of the movement of the deputy --

THE COURT: Why would that be relevant then?

MR. BRYANT: It puts into reference how fast, because his testimony is that -- or his opinion is that the vehicle moved three miles per hour. So it's just to give reference to a juror as to how fast that would be in real life. That would just be the average walking speed.

THE COURT: I think he's qualified for that. That's all right. He can do that.

MS. FULTZ: As long as we're not getting into Deputy Alfred was walking.

MR. BRYANT: Correct.

THE COURT: Right.

MR. BRYANT: Correct, it is not for him, just to reference --

THE COURT: Anything else?

MS. FULTZ: No.

THE COURT: Okay. Let's bring the jury in.

(The following proceedings were held in the presence of the jury.)

THE COURT: Good afternoon, everyone. Sorry for the delay.

Okay. Mr. Bryant, you have some evidence to present?

MR. BRYANT: I do, Your Honor. At this time I would like to call defense's expert witness, Robert Morales.

THE COURT: Very well.

THE BAILIFF: Remain standing. Face our judicial assistant and raise your right hand.

THE JUDICIAL ASSISTANT: You do solemnly state the testimony you will provide in this matter now pending before the Court, will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I swear.

THE JUDICIAL ASSISTANT: Thank you. Please be seated.

THE COURT: Please state your name and spell it for the record.

THE WITNESS: My name is Roberto Morales, R-o-b-e-r-t-o, M-o-r-a-l-e-s.

THE COURT: Good afternoon, Mr. Morales.

THE WITNESS: Good afternoon.

THE COURT: Mr. Bryant?

MR. BRYANT: Thank you so much, Your Honor.

ROBERTO MORALES,

called as a witness on behalf of the Defense, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRYANT:

Q. Good afternoon, Mr. Morales.

Mr. Morales, can you for -- we're going to go through some of your qualifications first, just so that the jury can get an understanding of what your background is, and then we will get into what you're here to testify to. Is that acceptable?

A. Yes.

Q. Okay. Thank you.

Mr. Morales, just to start, what type of expert witness are you?

A. Accident reconstructionist.

Q. And could you give the jury a brief background of your education, beginning with college, if any, and then any advanced degrees thereafter?

A. Yes. I am mechanical engineering and I receive my education at California State University Los Angeles. I got a dual major in mechanical engineering and manufacturing engineering, and I got a master's degree in mechanical engineering controlled systems.

Q. Do you have any certifications?

A. Yes, I got --

Q. What are those certifications?

A. Can I get my resume?

Q. Yes, absolutely.
A. I want to be accurate in describing my everything.
Q. Sure. Okay. So if you could please let us know what your certifications are?
A. I got certification for accident reconstruction from Society of Automotive Engineering. And then I have a certification for get -- to interrogate lockbox data from passenger and heavy trucks. And I have certification as video analyst from the Association of Law Enforcement and Video Analyst.
Q. And aside from your education and your certifications have you taken any additional training to assist you with being able to provide expert analysis in your field?
A. Yes, I do. I have a continuous education every year, assistance -- accident reconstruction conferences. Also, just a -- there's a conference that it's -- I forgot the name. It's every -- every year. It's -- we crush the vehicles, so it's a -- it's a continuous education. I have training for video analysis, auto analysis training for obtaining data from commercial vehicles and passenger vehicles, black box training on accident reconstruction software for like PC Crash, HVE, different training for vehicle analysis as well.
Q. Do you have any publication as well by any chance?
A. I do. I have three. It's for a accuracy and evaluation of Geotab GPS tracking devices that was published in 2021. I have another one, what the title of accuracy and validation on 360 degree cameras used in photogrammetry. That was published in 2022. There is another one that was published

in 2022 as well. Accuracy and validation of Geotab GPS tracking devices for medium duty trucks.

Q. And do you have a specific area of specialization that you provide expert analysis in?

A. Well, vehicle dynamics, accident reconstruction in general for passengers and a commercial vehicles, analysis on tracking devices, and also, video analysis of video and photos, any digital evidence, as well.

Q. Outside of accidents, vehicle accidents, do you do reconstruction of any other types of accidents or incidents?

A. Industrial accidents, for like a operating forklift or any heavy equipment. Trip and falls as well.

Q. And based upon your education, experience and knowledge, how -- what do you use to apply this knowledge in order to make analysis for these various specializations?

A. It's combination of physical evidence, additional evidence like photos, audio, video, in combination with research, engineering, computations, simulations and calculations.

Q. And how long have you been providing expert analysis in these areas of specialization that you just described?

A. Ten years.

Q. And who is your current employer?

A. Young & Associates Engineering Services.

Q. You were retained by the defendant to provide an expert opinion in this case, correct?

A. Yes.

Q. And you receive compensation for providing your expert opinion, correct?
A. Right.
Q. When formulating whatever your expert opinion is, including today, what is your methodology for how you come up with your opinions?
A. Reviewing the material provided, like the -- it's like, for example, videos, photos, audio and research, my own -- my own like, for example, a consumer reports of the vehicle, so I could understand the capacity, mechanical capacity of vehicles, and for estimating the movement of the vehicle.
Q. As it relates to those individuals who retain you for your services, if an attorney who was involved in your retention told you he didn't like what you said in your report, he wanted to change it because it wasn't helpful for him, what would your response be?
A. I don't think the numbers would work that way, because the formulas are based on a, like based on physics, so I wouldn't be able to like twist numbers.
Q. And how many -- having been at your current -- your current profession for ten years, about how many times would you estimate that you've been an expert witness?
A. Well, I open like approximately ten to 15, sometimes 20 cases a month. So I -- my estimate is like over ten years I've been retained for more than -- more than a thousand times.
Q. And in terms of your retention there is the

plaintiff or defendant, prosecution or defendant, how many times -- what would you say the percentage of who hired you, what would that percentage be?

A. It's approximately 50/50, 50 times I get retained by plaintiff and another 50 percent retained by defense attorneys as well.

Q. Okay. And again, if an attorney -- it's your testimony that even if somebody told you they wanted you to change numbers that made more sense for their position, it's your response that the calculations are the calculations and I cannot do that; would that be accurate?

A. Yes.

Q. Okay. Thank you.

So, Mr. Morales, you've been retained to provide expert opinions in this case; is that accurate?

A. Yes.

Q. And what expert opinions do you plan on opining on today?

A. Vehicle dynamics and the analysis of physical evidence.

Q. And when you say the analysis of physical evidence, are you referring to the distances between one object or another, or what do you mean by that?

A. Yes.

Q. Okay. When you say vehicle analysis, what do you mean by vehicle analysis?

A. Like the capacity of a vehicle to move in the type of surface, which is the surface was made of dirt and gravel.

Q. And before we get into the analysis of your opinions, could you please provide the jury what your summary is of each of your opinions?
A. Yes. I have --
MS. FULTZ: Objection. Foundation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Okay. You know, we'll go through it, and we'll go through your presentation first and then you can provide your opinions at the end.
MR. BRYANT: May I have -- Your Honor, may I publish at this point Mr. Morales's PowerPoint presentation?
THE COURT: Any objection?
MS. FULTZ: No. Is it a marked --
THE COURT: It's not going to be received in evidence. This is strictly demonstrative.
MR. BRYANT: Correct.
THE COURT: Okay.
MR. BRYANT: It was marked, Your Honor, but I understood it will be demonstrative.
THE COURT: All right.
MR. BRYANT: Going to the first slide, Mr. Morales, what is going on in this slide here?
THE WITNESS: In this one it's an aerial image of where the accident -- or accident happened.
BY MR. BRYANT:
Q. And before we actually get into your actual opinions and your analysis, what areas are you going to be

giving an opinion on? Without disclosing what your conclusions are, what areas are you going to be giving your opinion on specifically?

A. The vehicle movement and the location of physical evidence.

Q. Okay. Okay. So again, could you describe to the jury what you see here?

A. It's a -- it's the area here by the 12013 White Avenue, my understanding of the -- where the Chevrolet was parked.

Q. And why -- again, why do you have this aerial view? What's the importance of this?

A. It's just to show like the, how you have to access the premises.

Q. Okay. And you tell me when you're ready for me to go to each slide, okay?

A. We can move to the next one.

Q. Please tell me what's happening here?

A. This is pretty much a representation of -- the blue rectangle is the Chevrolet, that officer Alfred was here depicted in the like yellow square.

Q. And when formulating your analysis, what information were you reviewing to assist you with creating your analysis?

A. This was based on statements received that I was able to obtain from those like police reports.

MS. FULTZ: Objection.

THE WITNESS: Investigation reports.

MS. FULTZ: Objection. Hearsay.
THE COURT: Overruled.
BY MR. BRYANT:
Q. And what is -- you have this yellow box at the top, what is going on here?
A. That's an approximate location of Mr. Al -- I mean, Officer Alfred when he arrived to the site.
Q. And again, the blue box, what does the blue box represent?
A. Mr. Barber.
Q. Can I move on to the next slide?
A. Yes.
Q. Okay. What is going on here?
A. That's the rough trajectory of Officer Alfred as he's approaching to the accident scene.
Q. Okay. And again, you -- do you know, at this point in time do you know exactly where Deputy Alfred was walking down the middle, to the west, to the east, or are you just basically saying this is the general path?
MS. FULTZ: Objection. Scope.
THE COURT: Excuse me?
MS. FULTZ: Scope.
THE COURT: Overruled.
You can answer.
THE WITNESS: It is just a rough route.
BY MR. BRYANT:
Q. And again, you have Mr. Barber's car here. Is it -- what position is his car? Is it stationary? Moving?

What does this represent?
A. Stationary.
Q. Okay. When I say here, I apologize. I'm looking at my screen. I have an arrow, but it does not have a -- there's a little red radar laser thing.
A. I don't know if I can.
Q. You can turn around. There's a screen behind you. So if you ever need to reference that, although I think the battery might -- there we go. Okay.
So the witness was pointing at a blue square at the -- towards the bottom middle part of the screen.
What does this represent here in this next slide?
A. I still can see the same one -- oh, no, never mind.
Well, this one, and this is the position where the vehicle was found.
Q. Okay. And we'll get to the analysis as to why the vehicle was there. What is -- what does this represent here? Why are you looking at this image?
A. This one is one of the photos that were provided showing that from that corner, this photo was depicting the vehicle upon rest.
Q. And again, what does this represent here, this next -- what is the purpose of this?
A. This one is you get more of a closer view of the vehicle, you know, the way it was found.
Q. So this is -- this is the resting position of the vehicle?
A. Yes.

Q. We'll -- again, we'll start talking about that analysis as well.

And what's the significance of this slide here?

A. It was pretty much showing the vehicle, same rest position from different angle.

Q. Why was this important to look at when you're looking at these various angles of distances? How does that help with your analysis?

A. Pretty much understand, the angle of vehicle would help you to understand like if there was steering inputs, no steering inputs. So it tells me that a vehicle pretty much rolls backward.

Q. When you say steering input, could you please explain to the ladies and gentlemen of the jury what that means?

A. Yeah. Steering input means when you drive, you have the steering wheel in front of you, right? So if you -- you can steer a counterclockwise and the tires will move, change the angle to the -- to the -- to the left. And you steer the -- turn the wheel clockwise it's understandable that you actually change the angle of the vehicle, of the front tires to the right.

So that means, that the steering input means it has to be a driver action, steer in one direction.

Q. What is happening in this image here?

A. The way -- the way vehicle was found, I can see the wheel is pretty much straight.

Q. So what does that mean? You have some words on the

screen, what does that -- what does that say?
A. That means no steering input.
Q. What is -- what's the significance of that?
A. That means that the driver never changed the direction of the vehicle.
Q. All right. What are you -- what's the significance of this image here?
A. On this one we can see the -- there's some footprints over here. We see the flashlight. Bullet casing, there's a couple here. And there are four clustered in this -- in this area.
Q. Okay. And where you see to the left where it says footprints?
A. Yeah.
Q. And I'm referring to my left, so I apologize. Were you able to use those footprints to make any determinations as to the movement of Deputy Alfred towards the location?
MS. FULTZ: Objection. 403.
THE COURT: Overruled.
THE WITNESS: Pardon me?
BY MR. BRYANT:
Q. Yeah. Were you -- when you're doing your analysis to determine whether -- the directionality of Mr. -- or Deputy Alfred, were you able to use this to determine whether Deputy Alfred was moving towards the vehicle, those particular footprints?
A. On this one it shows that the -- it was actually exiting the premises.

Q. Were you -- was that helpful for you to know where -- was that helpful for you to place where Deputy Alfred would have been at the time?
MS. FULTZ: Objection. Leading.
THE COURT: Sustained.
MS. FULTZ: Vague as to time.
THE COURT: Sustained.
BY MR. BRYANT:
Q. If any -- for any reason was this -- were these footprints helpful for you to determine what was happening, you know, in terms of your calculation analysis of the actual incident?
A. Well, it gives me like a possibility or probability that Officer Alfred could be in between, you know, in this vicinity.
Q. But because the -- as you said, because this was exiting, was that helpful for you for exiting footprints?
A. Not -- it's basically just establish that it could be anywhere in between this path.
Q. Okay. And what's the significance of this?
A. There's a distance of 8 feet between the bullet casing.
Q. Okay. These are just for distances regarding the casings?
A. Yes.
Q. And again, why are you looking at distances for physical objects?
MS. FULTZ: Objection. Vague.

THE COURT: Overruled.
THE WITNESS: It's pretty much to give me idea, you know, some kinematics in this area, you know. Many, many measurements were made, so the question is like what those numbers could tell us and how we can interpret the measurements.
BY MR. BRYANT:
Q. All right. Next you have this photograph. What does this represent to you?
A. Those are tire impressions showing the vehicle at some point was -- the front tire was here. And at rest position that means that the vehicle was, it took this trajectory from the beginning to the point of rest.
Q. And could that trajectory that you're identifying, you mentioned a term earlier, steering; what was that called?
A. No. Steering input.
Q. Okay. Steering input. So would that trajectory be possible if there were no steering input?
A. Yes.
Q. Why is that?
A. That is because if there's a different, you know, the friction of the road pretty much, you know, it could make the wheel, you know, wobble a little bit. But essentially from this photo there's something we call parallax. The parallax, you know, it doesn't show us like the definition of straight line, you know. But if we can connect those, the dots, you know, it will lead the vehicle to a rest position, you know, but I explain, you know, later that the vehicle was pretty much

moving in idle state.

Q. How many accidents have you re- -- how many vehicle accidents have you reconstructed throughout the course of your career?

A. More than a thousand.

Q. And again, when you say that, would you describe this tire as straight, meaning it's straightforward? It's parallel?

A. Yes.

Q. Okay. And were you able to determine -- at least where this vehicle was resting at this point, were you able to make any determinations -- actually, let me strike that.

What's going on here?

A. We can see better the direction of the tire marks. There is potentially -- there's a change of elevation in this area, looks like the tire marks actually deviate a little bit. There's curvature over here. I would say the vehicle is actually going straight in an angle, right? So pretty much you can say that the reason why they're marked, the placards over here, because they found those tire tracks to be evidence of the vehicle movement.

Q. And you've got a number on the screen. What does that number represent?

A. That was -- it was measured at 16 feet.

Q. And what was measured at 16 feet?

A. From the beginning to the end of the tire, of the tire impression.

Q. And go to the next slide. What is this here?

A. That's that -- where the -- that was marked, they made to show the end of the tire track.

Q. Explain that a little bit more, the end of the tire track. What do you mean by that?

A. It's pretty much the tire impression, you know. We saw previous image, and there was length of the tire impression. And this is where it ends.

Q. Again, what is the significance of this here?

A. It shows like a perfect imprint of the tire, and that pretty much tells me that, you know, at some point the vehicle made a -- full vehicle weight was sitting in this, in that particular spot.

Q. Okay. And based upon that do you have any -- were you able to conduct any analysis to determine what happened as far as why this impression is here and the vehicle is still further back?

A. Yes, because it was -- there was a statement, the material I received it mentioned that the driver was removed from the vehicle and the vehicle, the driver was -- still had the foot on the brakes. Someone, they removed him, the vehicle rolled backwards like between 2 or 3 feet.

MS. FULTZ: Objection. Foundation. Hearsay.

THE COURT: Sustained.

MS. FULTZ: Move to strike.

THE COURT: The answer is stricken. The jury will disregard it.

BY MR. BRYANT:

Q. So how were you able to make a determination --

please explain how you were able to make a determination that the vehicle moved approximately 2 feet?

A. From this mark to the rest position there is certain distance, so I know for sure that the vehicle was resting here initially and somehow the vehicle rolled backwards.

Q. And based upon your review of all of the relevant information that was provided to you, were you able to form an opinion as to how that vehicle moved backward after it rested?

A. The only explanation is that somehow there was --

MS. FULTZ: Objection. Nonresponsive. Calls for yes or no.

THE COURT: Sustained.

BY MR. BRYANT:

Q. So were you able to formulate an opinion?

A. There was no -- if the vehicle wasn't here --

MS. FULTZ: Objection. Nonresponsive.

THE COURT: Sustained.

BY MR. BRYANT:

Q. It was just yes or no. Can you form an -- have you formulated an opinion?

A. Yes.

Q. What is your opinion?

A. My opinion --

MS. FULTZ: Objection. Foundation.

THE COURT: Sustained. Let's move on, Mr. Bryant.

MR. BRYANT: Okay, sure.

BY MR. BRYANT:

Q. Here you have -- what is this, what is going on here?
A. It's a method I use that I call photogrammetry, it's basically to place the duration and position of those tire tracks in the accident area.
Q. And what's the relevance of this or how does this help you?
A. It helps me to establish a directional vehicle when it was moving.
Q. Now, we have another slide here. What's the significance of this slide?
A. This is a layout of the photogrammetry analysis showing the angle of the tire tracks, the tire impression marks over here. I guess it's not working anymore. Sorry. There we go.
It doesn't have the same range as before, but very much when you pay nearly, that the mark No. 14 and mark No. 15 that's where there's the sign, like lines that actually depicting the length of the tire impressions.
Q. And there's some measurements, what are these measurements for?
A. The measurements is pretty much the first -- 16.5 is approximately the distance from that fence to the front of the vehicle. And the 16.9 is the distance from the beginning of the tire mark to the end of the tire mark.
Q. And you have a number of other numbers on the document, if you look at the second where it says 16.9, directly across is No. 14 and other numbers that continue up

the -- up the image. What do those numbers represent?
A. Those are numbers that were provided by the police department, and that's the way that they -- that's how they label the physical evidence.
Q. Okay.
A. And the location of where it was, where it was found.
Q. So do those provide you just reference points where certain physical evidence was marked?
A. Yes.
Q. Next we have this picture. What is this diagram representing?
A. This is pretty much like an overall view of the -- every piece of evidence that was marked by the San Bernardino County Sheriff Department.
Q. What does this represent here?
A. I think we went backwards on this one.
Q. Okay. Sorry, go on.
A. That's the same image.
Q. This one?
A. Yeah, we already discussed this one.
Q. Oh, you're saying this is a double image?
A. Yeah. Somehow we're going back to a Slide 19.
Q. Maybe it got duplicated a couple of times. Okay.
When you were formulating an opinion on the evidence that you were provided, did you listen to any audio?
A. Yes.
Q. What audio did you listen to?

A. This is -- this is pretty much the audio that was provided. It's -- it came from Deputy Alfred. It was recording. This is the spectrum of the sound.

Q. What is the significance of this particular spectrum?

A. This one actually shows like the peak, you know, like a -- on the spectrum are very significant because it shows demographically like particular, the sounds that could be perceived in this -- in this spectrum.

Q. Okay. I'm going to play this.

(Audio played; not reported.)

BY MR. BRYANT:

Q. Okay. So could you please explain what you're hearing?

A. Yeah, because it works now, so you see these peaks over here, that means that it's the loud noise of the -- when he uses the firearm and shoots one, two, three, four shots, there's a fifth, and the sixth one.

Q. How does that -- how does that assist you?

A. It's help me to establish like a -- like a -- the time in between those events.

Q. And I'm going to play the audio again. And you hear some of the firing. And I want you to tell me if you hear any additional movement outside of the gunfire, okay?

(Audio played; not reported.)

BY MR. BRYANT:

Q. Okay. So you heard that while the gun was firing did you hear any movement by anyone?

A. There is some additional audio -- I mean, additional sound that is coming from his body, because my understanding is that his microphone is just attached to his body, to what he's wearing. So you can hear the rattling -- his relating to everything else that he's wearing, like handcuff, you know, and additional gear that he has. So everything sounds like very agitated. So that actually demonstrate that everything is being agitated, it's like he's actually moving fast.

Q. So you are an expert at audio analysis?

A. Yes.

Q. And have you, as part of your expertise in audio analysis, do you listen to audio to determine movement of objects and people?

A. Yes.

Q. And given your audio analysis background, were you able to form an opinion as to whether or not when these shots were fired, you believe that Officer Alfred was moving in some direction?

MS. FULTZ: Objection. 403 and foundation.

THE COURT: Sustained.

MR. BRYANT: Going to the next slide.

(Audio played; not reported.)

BY MR. BRYANT:

Q. Okay. So what's going on here?

A. So kind of like analyzing thoroughly the audio we can hear that the engine, the engine of the vehicle start revving up, you know. And then like there is some activity,

right? And there's some shooting, right? So we hear the engine being idle, you know, for two seconds. Then we hear that the engine, there's engine activity, meaning that the engine is actually revving up.

And 1.7 seconds after that happens, we hear this, in this window we hear that that's when the -- the -- the Officer Alfred opened fire.

Q. Okay. So I guess we'll play this. One second.

So what's happening here?

A. We hear in the audio that the door is actually closing two seconds later, and that means that the vehicle was -- the engine was running, but nothing was happening because the -- there's no driver input. So the engine was just like -- like running. And then we hear that at this moment, you know, it's like the driver started like a, accelerating, like revving up the engine, right?

So in this window we see at .33 seconds, you know, the engine is revving up. And in this moment that's when you hear the tires are spinning, right? So if -- if you move to the next one.

Q. And I have a question for you.

A. Sure.

Q. In order for -- so are you saying -- could you please explain what's happening with the gears here? You hear the engine revving up. How does the engine rev up and the tires start spinning? Is it in park? What's happening here?

A. Well, because -- because of the surface, you know, if you floor the gas by any chance, the vehicle wouldn't get --

wouldn't be able to move immediately. Because, first of all, the vehicle is rear wheel drive. That means is that it's the rear tires start moving, those are the power wheels. So the, all the weight, all weight in the vehicle is actually in the front because it's -- it's common sense is because the engine compartment is there and the -- actually the driver is there. So most of the weight is located in the front of the vehicle.

So in this case in order to get this vehicle moving -- moving, the rear tire start spinning before the front tires start a beat, what we call static friction. That means all the weight in the front, you know, has to be -- it has -- it needs to have additional kinetic energy in order to -- for the vehicle to start moving. So that's the reason why we hear this tire spinning, because this road is actually made of dirt and gravel, so there is -- it is not like a regular asphalt road. The tires get more traction on the asphalt and dirt. The tires wouldn't, you know, like beat the standard friction fast.

Q. At this point in time, what gear is the vehicle in?

A. It's in reverse.

Q. And in order for, you know, in order for this vehicle to go from park to the reverse gear, can you say mechanically how a driver would be able to do that with this vehicle; what would you have to do?

A. Well, I do not understand the question, sorry.

Q. Sure. To shift gears on this particular vehicle, do you know whether or not you can just shift gears on its own or would you have to press a brake to shift gear?

A. You need to press the brakes, then change gear.
Q. So in order for Mr. Barber to have switched to the reverse gear, would he have had to have pressed his foot on the brake at that time?
A. Yes, it has to maybe before changing gear.
Q. All right. So you hear the tires spinning you said.
Go to the next slide?
A. Yes.
Q. What's happening here?
A. So in .72 seconds it's what I call the -- it's overcoming the static friction. So if the vehicle moved, it would have to be in this, after -- like after we hear tires spinning and then here that's when it would have -- he would overcome the static friction. That's when the -- we stop hearing the tires spinning.
Q. Okay. So you stop hearing the tires spinning. And you've listened to this audio, correct?
A. Yes.
Q. Do you hear the engine revving or going in reverse or do you hear silence? What do you hear at that moment?
A. At this point when we stop hearing the tires spinning, we don't hear the engine revving up. So there's a moment that we could -- we could hear like the engine is pretty much in idle.
Q. Okay.
A. And that could happen if by chance he just like released it, the gas pedal, or steps on brakes.

Q. And let me ask you this, are you familiar with the term burning rubber?
A. Not very familiar with it.
Q. Are you familiar with the term of someone spinning their wheels in place to create sort of like smoke with their tires?
A. Yes.
Q. Are you familiar with that concept?
MS. FULTZ: Objection. Leading and relevance.
THE COURT: Overruled.
BY MR. BRYANT:
Q. Could you please explain how someone is able to cause their vehicle to have their wheels spin without the vehicle actually moving forward or in reverse, depending on the gear it's in?
A. Yeah. I think the mechanical way to do that is just step on the brakes, and you step on the gas at the same time.
Q. So by doing this, by stepping on the brake and stepping on the gas at the same time, could you please explain what happens to the vehicle or, you know, from a -- from a --
A. Yes, because you pretty much, you know, because we know the vehicle, actually the powered wheels are in the back. So what will happen is that the rear wheels will start spinning fast, but the vehicle will be restricted from movement because the brakes are -- front wheels are locked.
Q. And when you -- when you heard the point in which you describe overcoming friction and then there was somewhat of

a silence, did that -- did that stand out to you as something important, the fact that there was silence?

A. Yes. It is because at that moment, we don't hear, you know, like any driver input pretty much.

Q. And based upon your knowledge, experience and training, specifically with being able to listen to vehicles through audio, correct, you heard situations where you're listening to a vehicle moving in some way, shape or form via audio, correct?

A. Yes.

Q. In your experience that silence, what would that suggest in your opinion? What does that suggest is happening with the vehicle at this point?

A. At this point the vehicle is not moving.

Q. And, generally speaking, based upon your knowledge, experience and education, if a vehicle has reached the point of overcoming static friction, and it would be -- and it would move, especially in a vehicle such as a truck like this, SUV, what would you expect to hear if the vehicle was actually starting to move when you're doing a video, an audio analysis?

A. I would hear the like -- like the rubber, you know, like grinding, the -- the gravel pretty much, we would hear some noise that, you know, from the tires.

Q. Okay. What's happening here?

A. So that's after, you know, we stop hearing those tires spinning. You know, .65 seconds later we hear the first shot.

Q. What happens next?

A. Then the second shot is being fired approximately -- approximately between .25 and .3 seconds.
Q. And next slide?
A. The third shot is fired at .3 seconds later.
Q. And the next slide?
A. Similar here.
Q. And then we're going to go to the next slide. What's happening here?
A. There's a delay on the -- when the fifth shot was fired. And it took a little longer. It took .42 seconds.
Q. And here, what do you have here?
A. The final shot was fired 1.09 seconds after the fifth shot was fired.
Q. What is the relevance? Why do you want to hear this analysis? What does that help you do?
A. That tells me to look into the physical evidence and try to find an explanation for that.
Q. And did you create -- based upon your analysis of the information, did you create a timeline of events?
A. Yes.
Q. Okay. What's going on here? What is this?
A. That's pretty much like putting in a tabulated format the times, and in a sequence, and which is like the time in between this events. Like total time of audio file it was 9.73 seconds, you know. So we hear the door closing, you know, and two seconds after, and then like we hear that the engine revving up for .33 seconds. The tires spinning for like after. And then we got the static friction. You know, that it was --

it was happen right after tires spinning. Then the first shot is -- happened like 0.65 seconds, after overcome the static friction. And then this is the interval in between each shot as we can see over here.

So this is the accumulated time, pretty much. So it tells me like Officer Alfred, you know, after hearing the door closing he start to open fire like approximately like four seconds after.

Q. Okay.

A. And he opened fire like approximately like a second after, a second fraction after he heard the engine revving up. You know, it's pretty much like a -- like a time sequence of the events.

Q. Okay. You -- based upon your review of all of the evidence, were you able to determine what the distance that the vehicle traveled when it stopped the first time?

A. Yes. So for in accident reconstruction we use a coefficient of acceleration for a vehicle when it goes in reverse. So coefficient is .07 Gs. G stands for coefficient of acceleration, right? So and this is pretty much, .07 is the coefficient of acceleration, meaning the vehicle starts -- that's how we, you know, establish that acceleration is required to start moving forward, if you're going in reverse.

So using that coefficient, plus the time that we have been established that using the audio analysis, the vehicle traveled in between the first and the sixth shot total of 3 point -- sorry. The distance is 6.67 feet.

Q. Okay. And it says vehicle, comes to a rest. What

is that?
A. That means that the vehicle is not moving at all after that.
Q. And were you able, based upon these calculations, to determine the approximate speed of the vehicle throughout this time period?
A. Yes. The initial -- the maximum speed that the vehicle reached according to my calculations is approximately 3.4 miles per hour.
Q. And how are you able to formulate this calculation?
A. Because it's the time transpires in between, you know, the events, and the acceleration of the vehicle in reverse.
Q. So, hypothetically speaking, if someone were to say that they saw this vehicle moving at 15 miles per hour, based upon your calculations would that rate of speed be possible?
A. No, because it would actually require some mechanical capacity that the vehicle doesn't have.
Q. And if someone were to say -- let's reduce the speed. If someone were to say that they believe that the vehicle was moving at, you know, a speed of ten miles per hour, based upon your analysis of the data provided for you, would you believe that that would be accurate? Would that be a possible speed in this particular situation?
A. No.
Q. Why is that?
A. It's because in order to have a vehicle moving that fast it would require approximately like one G. One G means

that the vehicle changed in speed 15 miles per hour within one second and there is no vehicle that has that capacity.

Q. And when you were reviewing, you said that at some point the vehicle came to a rest, right?

A. Yes.

Q. And based upon your review of all of the data and information provided to you, were you able to make a determination as to why the vehicle came to a rest?

A. Yes. It's because there is a driver input.

Q. Okay. When you say driver input, what does that mean?

A. The driver had to step on the brakes.

Q. Okay. If the driver did not step on the brake in this instance, could you provide an opinion as to how far you estimate this vehicle would likely continue to move?

A. Indefinitely.

Q. And why is that?

A. Because once you brake the static friction the vehicle, the part of the vehicle, the engine idle and while it's in gear, it would have some -- it would continuously applying some torque that would make the wheels continue spinning and the vehicle would, you know, continue moving.

Q. And you saw images of -- we went over them -- images of the tire path; do you recall that?

A. Yes.

Q. And you also listened to the audio belt of Deputy Alfred; do you recall that?

A. Yes.

Q. Are you, having listened to many audio files of accidents, are you familiar with the term, you know, slamming on the brakes?

A. Yes.

Q. And what would be your definition of slamming on the brakes in the technical sense? I know I'm saying it sort of layman terms.

A. Mean applying maximum capacity of braking for a vehicle. So it's standard maximum capacity or the standard in the industry is like a vehicle maximum acceleration for the vehicle is .7 Gs. So that would make the vehicle reduce the speed of approximately ten miles per hour within one second.

Q. And when somebody presses the brake fairly hard or immediate, is there, based upon your knowledge and experience and education, are there any characteristics of which you might hear from a vehicle?

A. Yeah, we will hear that the tires screeching. In this case the type of surface we will hear that, we would hear loud noise of the -- of the tires dragging gravel and dirt.

Q. And did you hear any of that when you listened to this audio analysis?

A. No.

Q. And based upon the fact that this vehicle was traveling a maximum speed of approximately 3.39 seconds, and given the fact that you didn't hear that noise of an immediate braking, were you able to formulate an opinion as to how this -- how the application of the brakes were applied to this vehicle?

A. The brakes seems to be applied mildly.

Q. And in the -- in your industry, industry standards, is there sort of a -- someone says that this car was moving really fast, right, that doesn't really mean anything, right? There's no real miles per hour to that, somebody just says, I saw the car moving really fast. Would you agree with me that's not very helpful in making a determination of the speed of a moving object, correct?

MS. FULTZ: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: It's just a perception.

BY MR. BRYANT:

Q. Okay. And I guess my question to you is, in your industry, are there standards in terms of how you rate certain speeds, meaning zero to three miles per hour is considered very slow, 80 miles per hour is considered very fast? Do you have some of those standards where you identify certain speed ranges?

MS. FULTZ: Objection. Relevance.

THE COURT: Sustained.

BY MR. BRYANT:

Q. So at this point you determine that the vehicle moved approximately in a span of 13 -- a span of -- how fast -- or was 6.6 -- I'm sorry, my eyes are really bad. I'm having a hard time seeing the small, I hope it's not impacting everybody else.

So you were able to calculate that from 0 to 14 feet -- or 13 feet approximately, the vehicle was going at 3.39

miles per second at its height?
A. Yes.
Q. Okay. What is this image representing here?
A. That image represents the distance between the FCC found on, next to Placard No. 2, and the FCC found next to Placard No. 8, which is a linear distance, a longitudinal distance of 15 feet.
Q. Okay. So again, you were asked to provide an analysis just on the distances of things, different objects in relation to where the vehicle either started or ended, correct?
A. Yes.
Q. What does this represent here?
A. That's pretty much represents, you know, that FCC was found, you know, next to Placard No. 2. The distance from the rear bumper to that location is 53 feet.
Q. There's another picture that says 26 feet. What's the picture to the right?
A. The picture on the right is like the linear distance from the rear bumper where the -- we have the hard print of the front tire to the placard they found next to -- I mean, the FCC found next to Placard No. 8, which is 26 feet.
Q. Okay. And again, this just gives you distances as far as reference where certain objects were in relation to where the vehicle either started or ended?
A. Yes.
Q. Okay. And you talked about a three miles per hour. If you were to give the jury sort of an understanding of what three miles per hour actually is, how would you describe that?

A. It's pretty much another human walking speed.
Q. What do you mean by that?
A. Like, if it -- you actually jump on the treadmill and you like calibrate it to three and you start walking, that's -- that's what you will experience.
Q. So when the vehicle is moving back it was essentially moving at the space of someone walking?
A. Yes.
Q. Average walking speed?
A. Yes.
Q. One second.
MR. BRYANT: No further questions at this time.
THE COURT: Thank you.
Cross-examination?
MS. FULTZ: Thank you.

CROSS-EXAMINATION

BY MS. FULTZ:
Q. Good afternoon, sir.
A. Good afternoon.
Q. Listening to your education and your qualifications, is it fair to say most of your experience is industrial and commercial?
A. Yes.
Q. And do you typically testify as an expert in civil litigation or criminal litigation?
A. I have some criminal cases as well.
Q. Okay. So typically, what kind of case are you

testifying for?
A. The majority of the cases are civil.
Q. Okay. On these slides of the PowerPoint presentation that you've prepared on the bottom left hand there is a legend or indicator that says DOL 4/27/21. Is that date of loss?
A. Yes.
Q. Is that a typical insurance world term?
A. Yes.
Q. Okay. And do you in your investigations typically respond to the accident or collision scene?
A. Sometimes.
Q. How often or what percentage of investigations would you say you actually respond to the scene?
A. 30, 40 percent.
Q. Okay. And you didn't respond to the scene in this case, correct?
A. No.
Q. When you began your testimony, you referred to the accident here?
A. Yes.
Q. What are you referring to as an accident?
A. That's pretty much, you know, it's my -- is my interpretation of, you know, how I refer to events.
Q. Okay.
A. Could be an event. Could be an accident. Could be collision.
Q. Okay. I guess my question is, are you referring to

a specific point of time of the events we're describing or the events -- the event in total?

A. The event in question.

Q. Okay. And so you -- all of the measurements and everything that you have referenced here you didn't take any independent measurements, correct?

A. I compared those with geo references, and that's how I call photogrammetry to validate the measurements.

Q. I'm sorry. You were a little far from the microphone on the first part of that, could --

A. I use geo references in order to validate the measurements using photogrammetry.

Q. Can you explain what you mean by that?

A. Photogrammetry is an analysis that has been -- that is conducted to -- in order to validate, you know, distances between objects or measurements taken at, you know, in some particular, you know, area.

Q. What is the source of the items that you were measuring?

A. The source, the -- pretty much the police evidence.

Q. Okay. And your slides, this photo here, this is maybe a Google image? This isn't from the police, correct?

A. Yes, Google image.

Q. Okay. And so do you use the Google image for reference when creating your -- validating measurements?

A. Yes. If I could elaborate, the police department provide measurements and also provides some geo reference location, so that means they consider like serial reference

point a summary in the vicinity.
Q. Do you use the same zero reference point?
A. Yes.
Q. You didn't go to the location at any point from the time you were retained between then and now to physically measure anything; is that fair to say?
A. Yes, because it is private property, and I would require to grant access by the owners. And it's not a public area.
Q. Okay. Did you ask?
A. I didn't have contact. I shouldn't contact, you know, the owners. That's not part of my job.
Q. Okay. That's fair. Are you ACTAR certified?
A. I am ASE certified.
Q. Are you familiar with ACTAR?
A. Yes.
Q. And that's sort of the gold standard of accident reconstruction certification?
A. No. That gives you the capacity of -- to work in the accident reconstruction area, if you don't have like degrees, like engineering degree.
Q. Okay. Do you ever -- did you -- have you researched any FBI studies related to your analysis of the reconstruction here?
A. No, I don't think I had to.
Q. Okay. All right. Going back to Slide 3. You have a blue series of boxes and a yellow box and you've got a legend, Steffon Barber and Christopher Alfred. Are the blue

boxes being identified as Steffon Barber?
A. Yes.
Q. And the yellow box is that associated with Christopher Alfred?
A. Yes.
Q. Okay. And just guessing here, the rectangles versus the square, are those vehicles?
A. Yes.
Q. And is that where you place Deputy Alfred's patrol vehicle?
A. It's approximation. I didn't have -- I think there is measurement for this vehicle, but this is like demonstrative, just to show like relative, you know, position between them.
Q. Okay. Do you -- based on review of photographs of the scene, do you know where Deputy Alfred's vehicle was?
A. It's -- that was not the scope of my analysis.
Q. I'm sorry?
A. That was not the scope of my analysis.
Q. In the scope of your analysis, okay, but you did create a slide with a marker indicating it, correct?
A. Well, it shows pretty much, you know, the distance has to be traveled by foot, you know, in order to reach Mr. Barber's location.
Q. Looking at Slide No. 6, just to make sure the analysis that you did, you described earlier that you were familiar with the specs of the vehicle?
A. Yes.

Q. And did you do research based on a 2003 Chevrolet Avalanche or a Chevrolet Trailblazer?
A. A Chevrolet Trailblazer.
Q. Okay. Is that just a typographical error?
A. Yes.
Q. Okay. On Slide No. 9, you have indicated here, no steering input. Do you see that?
A. Yes.
Q. Would you agree that the tire inside that wheel well is not perfectly straight?
Do you see the tire is actually canted within that wheel well?
A. It's -- it could be the parallax of the photo.
Q. I'm sorry, what?
A. It could be the parallax of the photo.
Q. What does that mean?
A. Parallax means that the lens of the camera has some distortion, which is typically called fish eye. So whenever you see something that's supposed to look straight, it is actually bent.
Q. So how do you rely on photographs to determine if a wheel is straight when you have to rely on something that has perhaps a curved lens and has this parallax?
A. Pretty much if the vehicle -- I mean, what will define something straight and what will define something, you know, bent, you know, could be like one degree, two degrees, three degrees. It's an approximation, like approximately zero degrees -- between zero and one degrees.

Q. And that's solely based on your review of photographs?
A. Yes.
Q. Okay. Okay. We're on your Slide No. 12. And you testified that the curvature of the line marking the driver's side tire path is not actually a turning maneuver; is that correct?
A. Yeah, it's -- it is not a turning maneuver.
Q. And you said that it can be based on the surface of the road that can affect the tire's pattern?
A. Yes. For example, if you -- let's say whenever you start your vehicle, let's say you park your vehicle, right, your tires could be in one direction. Let's say if you enter in the parking spot, you turn the wheel and try to correct your vehicle and then you overcorrect you leave the tire in a certain angle, you know. So whenever you back up you start moving, let's say you start moving idle, there's some springs on the steering -- in the steering system. It will try to actually recorrect the wheels to the straight position. So whenever --
Q. You're testifying that the vehicle will do that on its own without the driver having to correct the turn of the vehicle?
A. Yes. So there's no steering.
Q. And that is true of a 2003 Trailblazer?
A. It would be true for every vehicle. You can try yourself in the parking lot or anywhere, if you -- if you go in reverse and you don't touch the steering wheel by any chance,

you left the wheel in a certain angle, it will automatically, automatically go straight by itself.

Q. Okay. And so it's your opinion that there was no driver input creating the turning movement there?

A. No.

Q. It is not your opinion?

A. No. I don't think that there's driver input there.

Q. Do you know which way the wheels were turned when it was at its initial starting point?

A. Can you please repeat that question?

Q. Sure. Is it fair to say at the very end of those blue lines with the green dot placard at the end closest to the fence, and I think that's all laundry room or garage, do you see that part I'm referring to?

A. No, I'm confused.

Q. All right. Okay. Do you see the box that says tire impressions?

A. Yes.

Q. Directly above the box that says tire impressions there are three green placards?

A. Yes.

Q. At the end of the -- that last placard it appears to be the end of that tire trail, correct?

A. At the end of the green one?

Q. The green placard appears to be the end of the blue lines marking a tire path?

A. I'm not a hundred percent sure if I follow that.

Q. Do you see the photograph on the screen?

A. Yes.
Q. And do you see those three green placards?
A. Yes.
Q. There's one closest to the vehicle, correct?
A. Are you referring to the yellow one that's with the No. 14?
Q. Not the 14. The three green placards that are within the -- along the blue lines of that tire's path.
A. Yes.
Q. Okay. There's one closest to the vehicle?
A. Yes.
Q. One in the middle?
A. Yes.
Q. And there's one furthest?
A. Yes.
Q. Is it fair to say that that furthest placard is what is marked as the beginning of this tire pattern designating its movement?
Is that the start of the tire pattern that you're analyzing this vehicle's movement?
A. I'm not sure if I'm following you.
Q. Okay. Why did you put blue lines on this slide?
A. Those are the -- that's the tire track.
Q. Okay. Tire track?
A. Uh-huh.
Q. If I use the term tire track, will that assist you with the question?
A. Let's try.

Q. Okay. Is there a beginning point of this tire track?
A. The one close to the wall.
Q. Okay. Is it fair to say that that is where the vehicle started, where it was last parked before it moved for this event?
A. Yes.
Q. Do you know which way the tires were turned at the time it was parked before it moved along this path?
A. No.
Q. Do you see any large rocks or anything that might cause the tire to veer or lose traction with the ground along that path?
A. Well, the gravel and the dirt itself.
Q. Okay. But the dirt -- and the dirt and gravel there would you agree is flat?
A. We can't -- we can't say that. We cannot.
Q. And that's because your analysis is based solely on the photographs, true?
A. True.
Q. Okay. And you, I think, measured the tire tracks, the path of travel of that vehicle at 16 feet?
A. Yes.
Q. And is that front wheel to front wheel or --
A. Yes. Yes.
Q. On Placard 14 -- I'm sorry, Slide 14, which you indicated that there is a tire pattern that's being marked here, do you recall that?

A. Yes.
Q. Do you also see a deeper impression in the dirt?
A. Yes.
Q. And is it your opinion that that was the front tire that created that deeper impression?
A. Yes.
Q. Do you see two sets of tire impressions or one in the photograph?
A. I just see one.
Q. Okay. And if the front tire made these deeper impressions, at what point -- strike that.
If the front tire makes this deeper impression, wouldn't that indicate that the front tire also had difficulty gaining traction?
A. You go back to the previous slide.
Q. Slide 13?
A. On this photo we can see that there's no way that you can open the passenger door.
Q. Okay.
A. So my opinion is that the vehicle was in that mark, at some point somebody open the door and the vehicle rolled backward.
Q. Would a vehicle rolling backward create a deeper impression than a tire that was trying to gain traction?
A. No. I think the vehicle was sitting there for a little while.
Q. All right. Now, looking at the tire on Slide 14, do you see a spot that has sort of impacted dirt?

A. Yes.
Q. The impacted dirt in that tire, does that have any significance to you about where it was placed?
A. Yes. Because my impression is that when the vehicle was there, since the accident happened at night, right, we see this, those photos, right, this image was taken hours later. So the vehicle was sitting on muddy dirt, right. So when the vehicle moved, it rolled back some, you know, like 2 or 3 feet. That's what this is telling you.
Q. Okay. From the dirt impacted in that tire to the part of the tire that is at point of rest on the ground, would it be your opinion that is the distance the vehicle rolled back?
A. Yeah, rolled back later.
Q. Moving to Slide 17, now, the impression in the dirt that we were just talking about, you said you believe that impression was from the front?
A. Yes.
Q. The front tire resting there earlier?
A. Yes.
Q. Why on your slide do you have a legend that says rear tire impressions?
A. It's a typo.
Q. Slide 15, is this the same impression we were looking at?
A. Yes.
Q. And again, it says rear tire impression, you wish to change that to front tire impression?

A. Yes. Yes.
Q. On Slide 17 this was -- you said this was your overall view of all of the marked items of evidence?
A. Yes.
Q. Do you see the blue lines, they're in sort of that cross section of your photo -- if I say this wrong, I'm sorry -- photogrammetry?
A. Yes.
Q. Did I say that right?
A. Yes.
Q. The blue lines under that kind of cross hash with the orange lines, is that the tire tracks?
A. Yes.
Q. And would you agree that those are in a curved pattern?
A. Those?
Q. Yes.
A. Yes, they are. It has some like a minor curvature.
Q. And on this slide how did you get these measurements, these 16 and a half feet and the 16.9 feet?
A. Most of the measurements were made by the -- or obtained by the police department.
Q. And you had an item that you reviewed that showed those measurements in that portion of the scene?
A. Yes. Yes. And besides that, I made a research about the vehicle's total dimensions, like length, weight, height and the vehicle wheel base. So those measurements were incorporated here in order to establish, yeah.

Q. Using the measurements of the vehicle you also maybe adjusted the measurements?
A. No. I didn't adjust measurements. I actually made sense of the tire tracks in where the vehicle were coming from and where it came to rest.
Q. Okay. I'm just talking about those two numbers, the 16.5 and 16.9, where those numbers came from.
A. Yeah, okay.
Q. Where did they come from?
A. It came from the measurements of the accident site.
Q. Okay. The measurements taken by whom of the accident site?
A. Okay. The accident site or what I call the scene, it has a combination of, you know, gear reference point. It has combination of police measurements. And it has additional measurements provided by the vehicle. So if we see the distance between those lines has to match perfectly with the distance in between the left and the rear -- I mean, the left and the right tire vehicle, which is published in measurement by manufacturer.
Q. Did any of that information factor into the measurement 16 and a half feet from what you described as the fence to the front of the tire track?
A. Six and a half you say?
Q. On your slide you have 16.5. Is that indicating feet?
A. Yes.
Q. You testified that was from the fence to the

beginning of the tire tracks, correct?
A. Yes.
Q. And I am asking the source of that measurement?
A. The source of the measurement is this is -- it's product of my analysis, incorporates, you know, different dimensions.
Q. Right. What factors in your analysis led to that number 16.5?
A. It's a combination of factors.
Q. Right. What are those factors?
A. I explain to you like it's combination factors, like police measurements, vehicle measurements and geo reference measurements.
Q. Okay. And I guess, are you using one to validate another? What if there's a difference? Did you take an average?
A. No. No. Because that actually helps me to validate, you know, the police measurements, and if I establish that there's no discrepancy, you know, that means that everything else has to be accurate. And so that's -- that's the rule, you know, it's to validating numbers, right?
Q. So if I understand correct you got the numbers from a source from the police department, and then you validated it with the other parts of your analysis?
A. Yes.
Q. What audio program or software did you use to analyze the recording?
A. I use different ones. I used Anped-5. And I use

Audition as well. And I use After Effects.
Q. And I apologize would you spell those because I am not familiar with them?
A. Anped-5 spells A-n-p-e-d dash 5.
Q. Okay. And what was the second one you said?
A. Audition, A-u-d-i-t-i-o-n.
Q. Okay.
A. And the other one is After Effects, A-f-t-e-r space E-f-f-e-c-t-s.
Q. That one is just regular words, right?
A. Yeah.
Q. Okay.
A. They're common programs in the industry.
Q. Now, when you analyzed the audio, you said that it sounded like Deputy Alfred was moving fast at the point he started to shoot; do you recall that?
A. Yes.
Q. And did you listen to other parts of the recording where he is walking or moving?
A. Yes. He's actually in the beginning of the recording is, it sounds a little different.
Q. So you agree it sounds different?
A. Yeah.
Q. And does the sound, would you agree the sound could be consistent with a person switching from holding a flashlight in one hand and a gun in another hand to dropping the flashlight and switching to a two-hand grip on that firearm?
MR. BRYANT: Improper hypothetical.

THE COURT: Overruled.
THE WITNESS: No, I don't think so.
BY MS. FULTZ:
Q. How can you tell what those sounds are?
A. Because it's going to like a, if you -- if you have something that is loose, you know, it does some rattling, right?
Q. I guess, let me rephrase my question.
You have no way of knowing exactly what the sounds that you're hearing are, true?
A. He's wearing many things. It could be like a lot of things that he's wearing with his equipment.
Q. It could just be movement of his body with the equipment, true?
A. No, because you're holding something in your hand, that wouldn't do any sound.
Q. But if I move my hands while I'm holding something that would jostle the things on my person, correct?
A. Only if it has springs.
Q. If it has springs?
A. Yes. It has something inside the body that it would do some rattling. But that would be very uncommon.
Q. Do you know where the microphone for his recording device is on his person?
A. Belt.
Q. And I have moved to Slide No. 25.
Sir, how does an engine rev?
A. Can you elaborate, please?

Q. Well, you have an engine revving up, correct?
A. Yeah.
Q. How does a vehicle's engine rev?
A. Well, you step on your vehicle's gas, you will hear like the RPMs, you know, like, you know, going faster.
Q. Okay. Do you have to give it a good amount of acceleration to create that revving?
A. Acceleration, depending what acceleration are we talking about.
Q. I apologize. That is probably technical term, I used it very loosely. Would the depression of the gas pedal have to be a little bit more firm to give that revving sound?
A. I'm not sure if I could agree with you.
Q. So if I just barely touch my gas pedal, I'll get an engine revving sound like we hear in this recording?
A. Well, I mean, we can -- I think we can distinguish here between the engine idle versus, you know, I cannot tell you from the audio like what was the RPM of the engine. I could, you know, if I do a deeper analysis, but for this particular case, it's just a distinction of if the engine was being revving up or not.
Q. Okay. Without asking you about the RPMs you have to hit the gas to get the engine to rev?
A. Oh, yeah. It wouldn't -- it wouldn't rev up by itself for sure.
Q. How do tires spin and lose traction when they are sitting at rest in the dirt?
A. Well, there are different reasons. No. 1, if you

saw in that area, like in the middle of the night, you know, the dirt roads will become a little muddy, you know. And that will make the tires lose traction.

Q. If you start moving your vehicle more slowly, do you have better traction on the ground?

A. Potentially. Potentially. Because if you accelerate faster you will -- it will be -- you would have contrary like reaction because the wheels RPM will make it not -- wouldn't prevent -- make good contact with the soil, right? So that's why we hear the tires spinning faster with that vehicle moving.

Q. Okay. So you agree it has to be moving faster for it to have that loss -- lack of traction?

A. The vehicle?

Q. The wheels?

A. The wheels, yes.

Q. And you said that you were -- you are familiar with the 2003 Chevy Trailblazer that was involved, correct?

A. I did some research on that vehicle.

Q. You didn't see the actual vehicle that was involved, true?

A. I didn't.

Q. Okay. Did you request to have the -- did you call it a CDR, black box?

A. Yes, I'm familiar with it.

Q. Are there other terms for the CDR?

A. Event data recorder. Crash data recorder.

Q. Okay.

A. Airbag control module.
Q. So several acronyms, correct?
A. Yes.
Q. And you said a large part of what you testified as to your credentials is in the evaluation of those devices?
A. Yes.
Q. Did you have the -- did you request to have the one pulled from this vehicle?
A. I think I might have. I don't know if I did, to be honest, but if I didn't it's because there's -- there's a specific reason to -- sorry. It's because the --
Q. Let me interrupt, I apologize.
A. Sure.
Q. Yes or no, did you analyze the black box data from the vehicle?
A. No.
Q. Okay. You were asked about an instance where someone applies the brakes and the gas; do you recall that?
A. Yeah. Yes.
Q. And would it make sense -- does it make sense to you that in this instance where you have a 16 foot tire track that that is what happened when this vehicle was accelerated and we hear that revving of the engine?
A. Can you please reformulate the question?
Q. Sure. You were asked about someone applying both the gas and the brake, correct?
A. Yes, but can I elaborate?
Q. Well, let me ask a question first.

A. Sure.
Q. Did -- in your analysis, did you opine that that's what occurred in this instance?
A. No.
Q. Okay. I have moved to Slide 33 of your presentation. This is a table of the timeline of events that you have come up with?
A. Okay.
Q. Does it appear to you based on your sequence of events, the door closes. The engine revs. Tires spin. The tires then gain traction or overcome the static friction. And then there is the first shot. Does it appear to you that the shots came only after the vehicle began to move?
It's a yes or no.
A. Yes.
Q. Okay. And Slide 34. On Slide 34 you discussed that the maximum speed reached by the vehicle was approximately 3.4 miles per hour, do you recall that?
A. Yes.
Q. And what calculation did you use to arrive at that speed?
A. It's -- it is like a standard kinematics equation.
Q. Can you tell us what the equation is?
A. Final speed is equal to -- actually, it's -- if you're trying to find the distance traveled, it's equal to initial speed times time, plus half of the acceleration times time squared.
Q. So you need distance of travel and time to

calculate the speed?

A. Yes.

Q. Okay.

A. Yeah. It's -- it could be validated in different ways. This is kind of like a spreadsheet that we have, like it's kind of like an American method that we use.

Q. Is this sort of like an Excel spreadsheet that you have preset formulas and you just put in -- in this case you had a 16 foot tire track, and you have a time frame of this and it gives you a number?

A. This calculation is based on acceleration. So acceleration, assuming that the vehicle started from rest, it's start from there, you can see that there's some speed, you know, variation as well, you know. So initial speed here is zero, right? So, and then we -- the rest of the values are changing based on the speed reaching that interval of time. And, you know, it's actually incorporating in the next calculation pretty much.

Q. Okay. But I'm referring to your calculation of speed. So you don't have a known speed when you're calculating for speed, true?

A. We -- yeah. We have a, like a known value of zero because we establish that the vehicle start from rest.

Q. Right. You would agree at some point you computed the speed of the vehicle because you gave us a number of 3.4 miles per hour, correct?

A. Yes.

Q. How did you -- what input, what values did you need

to input to come up with the speed?
A. It's acceleration, it's the most significant one.
Q. How do you quantify acceleration?
A. Quantify?
Q. How do you put a value to acceleration to calculate speed?
A. It's pretty much, if you get the consumers reports of the vehicle you can -- you do like a practical test, you know. If you floor the gas in the forward you realize that the maximum acceleration that you get is .12. And going in reverse it's a little different, it's a lower value. So standard value for a reverse acceleration is .07.
Q. Okay. So using acceleration as a known value what is the source of that control, that known value?
A. There's research, it could be research found for this vehicle in the industry as well. 107 is a number, it's a -- it is like a acceleration factor based on the maximum capacity of the vehicle.
Q. So based on the values that you input to arrive at 3.4 miles per hour, wouldn't that be calculating it based on the entire duration of the vehicle's travel?
A. And it is --
Q. So wouldn't that be then based on it moving at a constant rate of speed?
A. No. Because if we know that the vehicle is actually accelerated from rest, the speed is not constant. So as we can see on the next column, on the column next to acceleration, it's -- it's labeled initial speed, but that's

actually the speed which in the -- in between those intervals of time. So that speed is actually looked into a next set of calculation in order to get the distance traveled and the speed reached after that interval time.

Q. And so you would have to calculate a formula for each speed at which the vehicle traveled, correct?

A. Each interval of time, yes.

Q. And on what can you base that calculation?

A. We can use like a initial and final time as well, and that we can calculate the average speed, but that would be very -- it wouldn't be accurate. I mean, it's -- it wouldn't be simple, but in order to render more accurate results, the calculations were made at each interval time.

Q. And how -- how do you know -- looking at your blue lines, looking at the tire tracks, how do you know what time frame the vehicle was at at each point of that blue track?

A. Well, you have the engine rev. You have the tires spinning. You have the total distance that was measured by the PD, right? So if we want to make -- if we can calculate like standard or average of speed, we can justify the 16 feet, you know, distance traveled in between, we can divide that by time and we will get the average speed, right? So but --

Q. So is it fair to say based on what you've just described, that each point you're guessing?

A. No.

Q. Okay. On what are you basing each point, or approximating, I should say?

A. We have constants here. Because first constant is

the vehicle start from rest and the vehicle actually came to rest, right? So there has to be some deceleration factor.

Q. Sorry, I didn't catch that last word.

A. There has to be some deceleration factor.

Q. Deceleration?

A. Deceleration, yes. And we have an acceleration factor, right? But we have constant of 16 feet. The vehicle has to travel 16 feet, no matter what. We know that happened, and that's a constant. So then we have time. The audio gave us a time frame, right? We hear the engine revving up. We hear the tires actually spinning. And then we hear the engine idle, right? And then after that we hear the shots and the vehicle comes to rest. There's a time frame. The vehicle has to travel 16 feet in that time frame, and we know that the idle braking is .05. So what is remains is actually the acceleration that has to be -- that has to be -- that has to give us the maximum speed and the standard acceleration for this vehicle in reverse is 0.07.

Q. Okay.

THE COURT: We are going to have to stop for the day.

MS. FULTZ: Okay.

THE COURT: I was hoping we'd be able to finish with the evidence today, but we will finish on Monday.

MS. FULTZ: Could I ask one last question on this line? I don't want to beat a dead horse on this.

THE COURT: You may.

MS. FULTZ: I'd hate to revisit it, have to re -- thank you.

BY MS. FULTZ:

Q. Does the audio recording tell you exactly when the vehicle stopped?

A. No.

Q. Okay. Thank you.

THE COURT: Okay. So we'll finish up on Monday. I anticipate the case will be presented to you for a decision. We'll finish up with the evidence. I'll instruct you on the law. And the lawyers will make their closing arguments. If we don't finish on Monday, we'll certainly finish on Tuesday, but I anticipate it will probably be presented to you on -- oh, no, we're not here on Tuesday.

If we don't finish on Monday we will finish on Wednesday. Thank you.

THE JUROR: Trying to keep it straight.

THE COURT: Now, we're motivated to finish on Monday. Don't form any opinions or conclusions about the case. And don't talk to anybody about it.

Have a nice weekend.

THE JUROR: 8:45 on Monday?

THE COURT: 8:45, yes.

THE WITNESS: I'm not supposed to come back on Monday, right?

MS. FULTZ: Yes.

THE WITNESS: I'm not available Monday.

THE COURT: You need to return on Monday. You're ordered to be here. It's a court order. At 8:45.

THE WITNESS: But I won't be in town. I will be outside

the U.S.

THE COURT: Let's wait until the jury is out.

(The following proceedings were held outside the presence of the jury.)

THE COURT: All right. The witness has indicated that he is going to be out of the country on Monday. When do you plan to return?

THE WITNESS: Wednesday.

THE COURT: Well, I think we either finish with this witness on Monday or I will have to strike his testimony in its entirety. Why don't the two of you meet and confer about that and decide how you want to address this, and then we'll go back on the record. We're off the record.

(A recess was taken.)

THE COURT: We're back on the record.

MR. BRYANT: Your Honor, may I approach?

THE COURT: Yes.

MR. BRYANT: Thank you.

(Bench conference held, not reported.)

THE COURT: We're back on the record.

Mr. Morales, luckily we have two very cooperative lawyers and they've agreed that they can finish your testimony on Wednesday. Can you be here at 8:45 in the morning?

THE WITNESS: I think that's going to be -- that's going to be tough, because I'm not local, so I -- I'm coming from Torrance. It takes me like approximately like hour and a half to get here.

THE COURT: I think you'll need to get up early in the

morning, the way a lot of people drive from Torrance and they have jobs here. You're going to have to do that as well. We're accommodating you by not making you cancel your trip. So I need you here at 8:45 in the morning. Can you do that?

THE WITNESS: I will be arriving, you know --

THE COURT: Okay. Let's do this, I'm going to order that the witness be here at 8:45 in the morning on Wednesday, and if he's not I'm going to strike his testimony in its entirety. All right. So on Monday, what we will do is by agreement take some rebuttal testimony out of sequence, is that correct, and that will be Detective Hernandez.

MS. FULTZ: Did you say on Wednesday?

THE COURT: No. On Monday.

MS. FULTZ: Oh, on Monday?

THE COURT: Or you want to finish with -- is he going to be rebutting in part?

MS. FULTZ: Right.

THE COURT: Okay. So we're not going to do anything on Monday.

MR. BRYANT: I can take -- I have a very short recall for Deputy Alfred and then we can knock these jury instructions out.

THE COURT: Okay. We'll take your -- we'll take your other witness on Monday. We'll excuse the jury early. We'll do the jury instructions. And then we'll finish up with Mr. Morales's testimony on Wednesday at 8:45. Okay. Thank you.

MS. FULTZ: Monday is 8:45, correct?

THE COURT: That's when we told the jury to be here, so yes. Okay. Thank you.

(Whereupon, the foregoing proceedings were continued to December 9, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, )
Plaintiff, )
-vs- ) No. FVI-21001312
) REPORTER'S CERTIFICATE
STEFFON TODD BARBER, )
Defendant. )

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 336 to 509, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 5, 2024.

Dated at San Bernardino, California, this 9th day of May, 2025.

Official Court Reporter
C.S.R. No. 12225

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
)
Plaintiff, )
)
vs. ) No. FVA-025457
)
STEFFON TODD BARBER, )
)
Defendant. )
______________________________________)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 9, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 5 of 7
Pages 511 through 570, incl.

SESSIONS

| DATE | PAGE |
| --- | --- |
| December 9, 2024 | |
| Morning Session | 515 |

CHRONOLOGICAL INDEX OF WITNESSES

DEFENDANT'S WITNESSES PAGE

ALFRED, Christopher

Direct Examination by Mr. Bryant ............. 527
Cross-Examination by Ms. Fultz ............. 540

HERNANDEZ, Edward

Direct Examination by Mr. Bryant ............. 542
Cross-Examination by Ms. Fultz ............. 560
Redirect Examination by Mr. Bryant............ 563

# INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 52 | Photograph | 528 | |
| 45 | Photograph | 549 | |

SAN BERNARDINO, CALIFORNIA, MONDAY, DECEMBER 9, 2024
MORNING SESSION
DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE
APPEARANCES:
The Defendant with his counsel,
JAMES BRYANT, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.
(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)
--o0o--
THE COURT: We're on the record outside the presence of the jury. Counsel and the defendant are present. Detective Hernandez is present as well.
Okay. What are we discussing?
MS. FULTZ: Your Honor, when we broke last week counsel informed all of us that he intended to recall Deputy Alfred this morning. He indicated he plans to play a bit longer portion of the redacted belt recording that we've already heard.
THE COURT: Okay.
MS. FULTZ: I was asking for an offer of proof what's beyond he already -- he's already testified to.
THE COURT: Do we have a transcript for the extended portion?
MR. BRYANT: Yes, we do, Your Honor.
THE COURT: Okay. I think it will probably be most efficient if I look at that. We can certainly listen to the tape if necessary.

(Audio played; not reported.)

THE COURT: Okay. I'm a little confused. Substantively, I mean, this appears to overlap with what was played previously, but the words are different. Is this transcript accurate? Ms. Fultz?

MS. FULTZ: I was just telling counsel, seems there are some minor discrepancies. This gets more into Mr. Barber's wife.

THE COURT: I understand that primarily what we're discussing is what wasn't played, but I want to know on this transcript where does it pick up anew?

MR. BRYANT: Sure. So it picks up anew right after. So what has already been introduced into evidence, you'll hear the last gunshot and a slight scream, that's where it stops.

THE COURT: Okay. On this transcript where is that?

MR. BRYANT: It starts -- give me one second, Your Honor.

MS. FULTZ: I think the timing is marked as 25 seconds.

MR. BRYANT: Correct, yes.

THE COURT: Okay. Let me listen to the tape.

MR. BRYANT: Sure.

THE COURT: Or the recording. It's not a tape.

(Audio played; not reported.)

MR. BRYANT: Your Honor, I will preface this by saying that without giving up why, you know, all of the reasons why I want to use this particular audio, it's not just -- it's also the sounds that you hear where he's moving, et cetera, that's going to be very important in my cross-examination of Deputy

Alfred.

THE COURT: Okay.

(Audio played; not reported.)

THE COURT: Okay. Well, there are some problems with the transcript. I don't think we need to address that unless we decide it's admissible. Why is it you want to play this section, and let's start with at 19?

MR. BRYANT: Sure.

THE COURT: Not complying verbally, don't go to that fucking car. We can discuss whether the earlier portion of the transcript is accurate or not.

MR. BRYANT: Sure.

THE COURT: Why is this relevant?

MR. BRYANT: So really the relevance, Your Honor, happens after this portion. What actually is relevant for a few reasons, and I guess I'll explain to the Court why, and --

THE COURT: That's what I'm asking you.

MR. BRYANT: And the reason why I didn't want to necessarily divulge all of why I'm doing this, but I will explain really what the importance is. There's two things.

First, Deputy Alfred testifies that at some point in time he draws his firearm. He says that right before he begins to fire his service weapon he drops his flashlight. After the shots are fired Deputy Alfred then says that, you know, he -- well, he's not clear what he necessarily says, where he's going. Eventually he ends up on the west side of the -- of the property, and he meets with Deputy Mora.

But one of the important things, and I think that

it's very important to listen all the way until the end, there is -- there is a distinct sound right at 4:09.
THE COURT: I don't know what 4:09 is.
MR. BRYANT: I apologize. It would not -- 4:09 on the main video, it would be right around 1:20, right after she says, "Why did you shoot him?"
THE COURT: This stops at 1:19.
MR. BRYANT: That's where the audio stops, but the video continues to go a little bit. There's no audible noise. There's no talking.
THE COURT: There's video.
MR. BRYANT: I apologize. The audio. There's no talking after she says that. It just continues to play. There's sounds.
THE COURT: Okay.
MR. BRYANT: But so there's a very distinct sound at 4:09 -- or I apologize, at 1:20. That very distinct sound is what I believe the point in which Deputy Alfred actually drops the flashlight.
THE COURT: Okay. Let me listen to the tape.
MR. BRYANT: Sure.
(Audio played; not reported.)
MR. BRYANT: Right.
THE COURT: The thump?
MR. BRYANT: The pretty loud thud, yeah, as if something was dropped.
THE COURT: All right. Ms. Fultz?
MS. FULTZ: I think he can ask that question. I don't

think the audio is dispositive of what that sound is. To me it sounds more like a microphone.

THE COURT: Evidence of is not dispositive.

MS. FULTZ: Sure. I just -- I don't think we need to get through all of the same things we heard and then the distress of his wife to get to that sound.

THE COURT: Well, that's true. If that's the only relevance of this I think we could cut to the end of this and that also would alleviate -- there are a lot of problems with this transcript. There're inaccuracies. There's commentary about hysterical screaming and so forth. None of that is appropriate. I think that there is an issue about the flashlight, and I think it's relevant. So I think we need to decide where to pick up this tape.

MR. BRYANT: And I thought about that, Your Honor. I said, all right, well, if it got -- a lot of this additional stuff is taking awhile, so I think the one thing I didn't want the jury to think was that I was in some way game playing by clipping out some portion between the shooting and then the actual loud thud that I hear at the end of that tape. So that was my only challenge.

You know, I didn't want to look like I was coming across as somebody who's trying to pull a fast one on anybody. That is the only reason I did that. I thought about it a lot of time over the weekend. How am I going to address that particular issue? But, you know.

THE COURT: Let me hear the very end. You don't need to play the whole thing again. Could you just play the very end?

MR. BRYANT: Yeah.

(Audio played; not reported.)

THE COURT: I think it's probably unlikely that is the flashlight. It's so loud it's a dirt surface and so forth. But I mean, I think you can make that -- I think you can make that argument that that's what it is. There is that sound.

Ms. Fultz, what are your thoughts about playing or not playing the entire tape?

MS. FULTZ: That's fine, if he wants to confront him with the sound to find out what that sound is. It's certainly relevant, and I think it isn't a question of fact.

THE COURT: Okay. I don't think you need to worry about the jury thinking you're playing fast and loose without playing it continuously. You can just say when Deputy Alfred is on the stand we're going to go to the very end, and there's something I want you to listen to after the dialogue.

MR. BRYANT: Okay. Sure. I can do that, Your Honor. I think so long as what I would be doing is two things, I would go back to the original time in which he is shooting, in the process of shooting, through the end. He fires the shots. Then I can go to the period in which it's towards the end where I hear that thud.

The reason why I'm saying that is because, you know, again, the question here is, and I'll set it all up, you know, I don't typically just bring stuff up, just throw Hail Marys, Your Honor. I'll set it up properly, but I just wanted to show the distinct, at what point, you know, he claims he dropped his flashlight here. Where is the sound? And then

towards the end, but this all goes to my overall argument.

MS. FULTZ: I just wonder if there's a way we can dispense with this transcript, since you're not making an argument for the relevance of the language.

MR. BRYANT: No.

THE COURT: It's just that sound at the end. And then this transcript is unacceptable.

MR. BRYANT: Understood.

THE COURT: I think it's inaccurate at times, and it has the commentary about what's going on in it.

MR. BRYANT: Okay. Understood, Your Honor. And I think that maybe if I ask the Court -- I know that Deputy Alfred is speaking on his radio or were -- at what point should I play it so it just doesn't sound so random I suppose?

THE COURT: Try picking up the recording at what you have at 1:11.

Ms. Fultz, what about playing that section?

MS. FULTZ: That's fine.

THE COURT: Okay. All right. And, you know, it's very clear what the words are there. I think we can dispense with -- if both sides agree we can dispense with the transcript all together.

MR. BRYANT: I would be fine with that, Your Honor.

THE COURT: Ms. Fultz?

MS. FULTZ: That's fine.

THE COURT: Okay. All right. Okay. So you can pick it up at what you have is 1:11.

MR. BRYANT: Okay.

THE COURT: You know, if your question of Deputy Alfred -- you can -- I won't have any problem if you said we're going to skip ahead just a little bit to the very end, that way the jury will know that, you know, they're not necessarily hearing everything, but nobody is playing fast and loose.

MR. BRYANT: I just didn't want to be perceived as Mr. Fast and Loose. And what I'll do is, Your Honor, I will stop, if I am going to use a portion of the shooting I'm going to stop it right after the last shot. Then I'll say, we'll move forward.

THE COURT: Okay. All right. Okay.

MR. BRYANT: Then I'll revise that exhibit to make sure it's clipped properly, only to have that last part unless, I guess, I haven't identified it as an exhibit at this point, that last clip. Do I need to? How do I need to address that?

THE COURT: Yeah, we'll need to edit that if the jury wants to listen to it, that's all they're going to hear.

MR. BRYANT: Perfect. I can fix it.

THE COURT: Take care of that today. We can mark it as a new exhibit. But subject to, you know, editing before the jury receives it in the jury room. You'll have plenty of time to do that because it won't go to them until Wednesday.

MS. FULTZ: Just for clarification, we're in defense case in chief, this is a direct of Deputy Alfred, correct?

THE COURT: Yeah, that's true. Although, you know, it's -- I think it can be treated as cross.

MR. BRYANT: Call him as an adverse.

MS. FULTZ: I don't think we found him hostile yet.

THE COURT: So it doesn't really matter what we call it. We know what it is. Okay. What can I tell the jury? Will the case go to them on Wednesday? Do you anticipate much rebuttal?

MS. FULTZ: Not a lot. I don't know if there's going to be much redirect of Mr. Morales. If we can finish with them in the morning, we might be able to close in the afternoon.

THE COURT: All right. Okay. Well, I'll tell the jury the new schedule, and I'll say we, the lawyers, hope to finish on Wednesday. We think that will happen, but it is possible it might go over to Thursday. Okay. But that would --

MR. BRYANT: It's reasonable at this point to believe that we'll get to close by Wednesday afternoon.

THE COURT: Okay. All right. Okay. Let's bring the jury in.

And is Deputy Alfred going to be your only witness or are you recalling?

MR. BRYANT: I'm going to be also calling Deputy Hernandez.

MS. FULTZ: Can I ask for an offer of proof there?

MR. BRYANT: Yes. So I'll be calling Deputy Hernandez regarding the testimony related to his opinion on when the vehicle moved. I'll also be asking Deputy Hernandez regarding the -- there was an OIS report or investigation that we brought up that would be questions about the OIS that he conducted or that was conducted. And then I'm also going to ask Deputy Hernandez about, you know, the role of a detective.

They're trying to make sure, they're ensuring the reports are accurate, going over the evidence, and why that's

important.

THE COURT: Haven't you already covered that last item?

MR. BRYANT: I don't know. I think it was covered more so in the prosecutor's case. I didn't really touch on it much in the Defense's case.

THE COURT: All right. Okay. With respect to the first item I think that's entirely legitimate, essentially we have competing expert witnesses here regarding the reconstruction of what took place. So I think that's legitimate. What is the relevance of the IOS (sic) investigation?

MR. BRYANT: I think that it becomes relevant --

THE COURT: OIS.

MR. BRYANT: I think it becomes relevant, there's a question about the motives and intentions for the statements that are made by Deputy Alfred. Why does Deputy Alfred say he did certain things and what would be his motive? Is there any reason why he wouldn't be honest or truthful? Or is there any reason why some of his statements could be inconsistent?

I'm never going to call somebody a liar. I'm always going to say, you know, they were inconsistent. I don't intend to call many witnesses just flat out lying. I just say, here are the inconsistencies. Is there a motive? Why would he? Would he have a concern about -- because it's -- this involved an actual shooting. Is there some other issue or motive why he wants to give a story that may not necessarily follow what the physical evidence?

THE COURT: Ms. Fultz?

MS. FULTZ: I would object to that on speculation.

THE COURT: Yeah, I don't think -- I'm sure Detective Hernandez is a very good officer, but he's not a mind reader.

MR. BRYANT: It was only purely not to ask him those questions. I'll deal with that with Deputy Alfred. It was really -- actually, it does not matter. Deputy Alfred is going first at that point. It wouldn't matter anyway.

THE COURT: Okay. All right. So you can recall him with respect to the investigation and the opinions about where the vehicle was and all of that.

MR. BRYANT: Okay.

THE COURT: And then you can go into more detail on his investigation.

MR. BRYANT: Sure.

THE COURT: Okay. All right. Let's bring the jury in.

MR. BRYANT: I do not anticipate this being very long.

(The following proceedings were held in the presence of the jury.)

THE COURT: Good morning, everyone.

Okay. We have a little bit of a change to the schedule. As it turns out Mr. Morales who was testifying last week on Thursday is not available today or tomorrow. So we're going to put his testimony on hold. He is going to finish his testimony on Wednesday. Okay. So today Mr. Bryant is going to call his other witnesses in this case, and I believe there are two witnesses that he is going to call. So we'll do that today.

I anticipate today is going to be a short day. We'll probably be finished this morning. I don't think we're

going to go into the afternoon. And we won't be in session at all on Tuesday, because Mr. Morales is not available until Wednesday morning. I anticipate then that the case is going to be presented to you for a decision on Wednesday. Although Ms. Fultz might have some witnesses to call in rebuttal, that probably won't be very lengthy, so I do anticipate the case will go to you on Wednesday. If it doesn't, it will be Thursday morning at the latest. Okay. So that's the new schedule.

So, Mr. Bryant -- just if you want to make a note in your notebooks we're going to get back to Mr. Morales on Wednesday because we're going to take another witness now.

Mr. Bryant, your witness, please?

MR. BRYANT: Yes, Your Honor. I will recall Deputy Alfred.

THE COURT: All right.

Good morning, Deputy.

THE WITNESS: Good morning.

THE COURT: Deputy, you were not excused as a witness. We don't need to place you under oath again. You're still under oath from the first time. Do you understand?

THE WITNESS: Yes.

THE COURT: Have a seat, sir.

Whenever you're ready, Mr. Bryant.

MR. BRYANT: Thank you, Your Honor.

CHRISTOPHER ALFRED,

recalled as a witness on behalf of the Defendant, having been

previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRYANT:

Q. Good morning, Deputy Alfred. We are -- we're back.

A. Good morning.

Q. I hope not to have you up here too long.

Deputy Alfred, after the shooting you would agree with me that at some point in time you found yourself in front of the vehicle where Mr. Barber had rested the car, correct?

A. That is correct, yes.

Q. Okay. And it was you, Deputy Mora and Deputy Torres that eventually went to that front of that vehicle, correct?

A. Yes.

Q. Deputy Alfred, it was your testimony that you approached Mr. Barber while you were on the east side of the driveway headed southbound?

A. That was my line of sight to Mr. Barber, yes.

Q. And you're walking sort of in that dirt path, correct?

A. Yes.

Q. And again, you saw evidence in this case where there were a number of orange or red cones leading, you know, south, north, in that direction, in that dirt?

MS. FULTZ: Objection. Misstates the testimony.

THE COURT: It's a question. Overruled.

THE WITNESS: Yes.

BY MR. BRYANT:
Q. And that those orange cones or those red cones were the cones that you believed evidenced your foot path heading on the east side in that dirt from north to south, correct?
A. No, I do not believe that was my direction of travel based off those cones.
Q. So that -- what do you mean by -- so that wasn't -- so those cones did not evidence your direction of travel?
A. The cones in the front of the vehicle?
Q. No. I apologize. Let me pull up the picture. I apologize. I'm sorry, I didn't want to pull up -- I would have pulled it up.
MR. BRYANT: It's showing my screen. Is it possible to take this down for a second? I don't want to show the jury things they shouldn't necessarily see.
Sorry about that, Your Honor.
Deputy Alfred --
THE COURT: Exhibit number, please, Mr. Bryant?
MR. BRYANT: Sure. This is Exhibit No. 52.
BY MR. BRYANT:
Q. Okay. Do you see these orange cones here, Deputy Alfred?
A. Yes.
Q. And again, you -- you're familiar with these cones and this evidence, correct?
A. Yes.
Q. And again, the path you see where we're looking south here, those cones were evidencing your pathway south,

correct?

A. Correct.

Q. So -- and that would be, again, whoever took those prints took all the prints that evidenced your foot walking or your feet path walking up this driveway, correct?

A. Correct.

MS. FULTZ: Objection. Calls for speculation.

THE COURT: Sustained.

MS. FULTZ: Move to strike.

THE COURT: The answer is stricken.

BY MR. BRYANT:

Q. Deputy Alfred, are you aware that there's been no physical evidence identified marking you traveling on the east side of this driveway headed south?

MS. FULTZ: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: I'm not aware of that.

BY MR. BRYANT:

Q. Were you aware that these orange markers identifying those footprints were actually footprints, your footprints, headed from a south to a northern direction, meaning you were exiting from this property?

A. I'm not aware of that, no.

Q. And it's still your testimony that you walked up this path in a southward direction down the east side of this dirt?

A. Correct, yes.

Q. Deputy Alfred, you were carrying a flashlight that

other evening, correct?

A. Yes.

Q. And I'm going to show what is marked as Exhibit 49. And this flashlight here, what type of flashlight is this?

A. It's a department-issued Streamlight.

Q. And it's the Streamlight Stinger HPO, would that be accurate?

A. I'm not familiar with the make and model.

Q. And approximately how heavy would you say that this particular flashlight is?

A. It's fairly light, a couple of ounces.

Q. When you say a couple of ounces, are you talking approximately right around a pound? 13 ounces? 14 ounces?

A. It's about a pound.

Q. Okay. All right. And it was your testimony that when you fired your -- right before you fired your service weapon is when you dropped your flashlight; is that accurate? You drop your flashlight, then you fire your service weapon; is that accurate?

A. Correct, yes.

Q. I'm going to play, you also testified -- or I apologize.

Do you recall that when you fired your shots, the six shots, were you stationary or were you advancing or moving forward?

A. I was stationary.

Q. And were you stationary for every single last one of those shots?

A. I don't recall.

Q. So you're not sure -- when you say you were stationary, what do you mean by that?

A. My base or lower portion, my legs were shoulder width apart, what we call a shooting platform, and the initial course of fire was stationary.

Q. Okay. The initial course of fire was stationary, so you don't know if you were moving forward at any point in time while you were shooting?

A. I was not moving forward, no.

Q. Okay. Okay. I'm going to play the audio. I'm going to stop it right when we -- you've heard this before. This is your audio belt. This is going to be when you and Mr. Barber are sort of making contact. There's dialogue between you two. I want you to listen to really pay close attention to everything that's happening right before you fire your gun and then right at the last bullet, just listen to everything that's being played, and I'll have some questions for you, okay?

THE COURT: Counsel, approach, please.

(Bench conference held, not reported.)

THE COURT: Members of the jury, right now Mr. Bryant is going to play a portion of the recording that's already been played. We're not going to bother handing out the transcript again. You've heard this before.

MR. BRYANT: Thank you, Your Honor.

THE COURT: Will counsel relieve the court reporter of her duties during the playing of the recording?

MS. FULTZ: Yes.
MR. BRYANT: Defense will, yes.
THE COURT: Thank you.
BY MR. BRYANT:
Q. So again, Deputy Alfred, if you can just sort of pay attention to just all of the sounds that you're hearing at this point, and I'll have a few questions about that. Okay?
(Audio played; not reported.)
BY MR. BRYANT:
Q. All right. So before -- before you heard -- you heard your equipment moving, you kind of hear what seems to be sort of stopping. It's sometimes like a squeaky noise. What are you doing at that point right before we stop that video?
A. Looking at Mr. Barber.
Q. Are you standing still? Are you walking?
A. Kind of pacing in a left or right pattern.
Q. You can kind of hear, again, your equipment is moving, and is sort of a thump, thump, is that your -- are those your feet? Do you want me to play that again?
A. Yes, again.
Q. Okay. Sure.
(Audio played; not reported.)
BY MR. BRYANT:
Q. Do you see -- hear that noise? Do you know what I'm talking about now?
A. Yes.
Q. Is that your feet moving?
A. That's the sound of the equipment on the belt.

Q. Okay. And you're moving as well, right?
A. Yes.
Q. Okay. So can you hear your footsteps in that audio?
A. No. I can hear the sound of the equipment.
Q. Okay.
(Audio played; not reported.)
BY MR. BRYANT:
Q. Now here you're not moving any more, are you, at this point?
A. No.
Q. Okay.
(Audio played; not reported.)
BY MR. BRYANT:
Q. Okay. So at this point are you, based upon what you're hearing, are you still walking a bit while you're sort of talking to your audio recording as you're approaching Mr. Barber?
A. No.
Q. So at this point you're not moving?
A. Not forward, no.
Q. Okay. And where are you at this point if you can recall -- well, strike that. I'll just play this.
(Audio played; not reported.)
BY MR. BRYANT:
Q. Okay. I'm going to -- now, you heard that once. I'm going to play it one more time. Pay attention right before you start shooting and then during the shots, okay?

MS. FULTZ: Objection. No question pending for replaying.

THE COURT: I don't understand your objection.

MS. FULTZ: We're replaying an audio twice without asking a question.

THE COURT: You can play it one more time.

MR. BRYANT: Yeah, I just want to play it. Thank you.

(Audio played; not reported.)

MR. BRYANT: Sorry about that.

(Audio played; not reported.)

BY MR. BRYANT:

Q. So right before, it's your testimony right before you started shooting you dropped the flashlight, correct?

A. Correct.

Q. And just in that audio that we heard right there did you -- did you hear, outside of you seem to be moving a bit, not quite sure if you're advancing or what's happening, but did you hear a flashlight drop or any objects drop?

A. I do not know.

Q. And you heard it, so you mean you don't know if you heard that or do you want me to play it again to listen to it more carefully or --

A. Not from the audio that was just played, I didn't hear any object fall.

Q. Okay. All right. And the only object that you dropped this entire time was your flashlight, correct?

A. Correct.

MR. BRYANT: Your Honor, I'm going to now advance per

the Court's discussion to another section of this video that's just a little bit further ahead.

THE COURT: Right. I think it's an audio, not a video.

MR. BRYANT: I keep saying that. I apologize. Yes, audio, Your Honor.

All right. I'm going to play this now.

(Audio played; not reported.)

BY MR. BRYANT:

Q. Did you hear that fairly loud thud?

A. Yes.

Q. Isn't it true that is when you threw your flashlight?

A. No, that is not true.

Q. It's your testimony that very audible thud was not you throwing your one-pound flashlight onto the ground?

A. That is correct.

Q. You were there when the vehicle -- you talked about the vehicle moving back after they were trying -- after some of your deputies were trying to retrieve Mr. Barber, correct?

A. Correct.

Q. And so you actually saw the vehicle move back, correct?

A. Yes.

Q. And again, we've talked about this, based upon the best of your knowledge no one had pressed the accelerator on the vehicle for it to move back, correct?

A. That is correct, to my knowledge, yes.

Q. It was your understanding that the vehicle was in

the reverse gear, correct?
A. Correct.
Q. All right. Have you ever -- have you ever -- you testified earlier in this trial that a vehicle only moves when you press the accelerator. Do you recall that testimony?
A. I recall that question, yes.
Q. And have you ever tried to -- you've parallel parked before, correct?
A. Yes.
Q. And, you know, you drive, you see a parking spot here, and you drive passed the parking spot you want to park, you're in between two cars, correct?
A. Correct.
Q. When you press reverse, you would agree with me that your foot's on the brake and you just take your foot off the brake and the car will move backwards without you pressing the accelerator, correct?
MS. FULTZ: Objection. Improper hypothetical.
THE COURT: Overruled.
THE WITNESS: Correct.
BY MR. BRYANT:
Q. And then when you reverse back far enough, and you want to move forward, you put your foot on the brake again and you put it in drive, and without pressing the accelerator, your car moves forward again, correct?
A. Correct.
Q. And you repeat that process without having to press the accelerator, because if you press the accelerator it may

make the car move too fast and hit the car in front of you or behind you, correct?

A. Correct.

Q. So you would agree with me that you can maneuver a vehicle into a complete parallel parking space without ever pressing the accelerator, correct?

A. That is incorrect. It would depend on the surface and the slope and so forth.

Q. But in your experience you're aware that you can park, if it's on a flat surface, pavement, there should be no issue with you parallel parking without ever having to press the accelerator, correct?

A. Correct.

Q. Deputy Alfred, were you -- after the shooting occurred, are you familiar with an officer-involved shooting investigation?

A. Yes.

Q. And what is an officer-involved shooting investigation?

MS. FULTZ: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Well, it encompasses --

THE COURT: Excuse me just a moment.

Counsel, approach, please.

(Bench conference held, not reported.)

BY MR. BRYANT:

Q. Thank you, Deputy Alfred. So what is a YS investigation?

A. It depends on your role. If you're the primary factor, the person involved, you do have an obligation to provide what's called a public safety statement. That's to ensure overall public safety of where that incident occurred. If you're not involved, you may be delegated with several tasks to -- specialized detectives can arrive. And that can range from gathering pertinent information from witness statements to scene security.

Q. And in the event of the -- let's just say in this incident you were the actual officer who fired your service weapon, correct?

A. Correct.

Q. So you would agree with me that there would be an investigation into your shooting, correct?

A. Correct.

Q. And why would there be an investigation by the sheriffs department into an officer-involved shooting, if you know?

A. Well, we're the -- we are the agency that leads that investigation, and the purpose of that is to determine if there's any policy or procedure violations.

Q. And so if there's any policy and procedure violations by whom?

A. In this case the person that's involved.

Q. Meaning the shooter, the officer who actually shot the firearm, correct?

A. Correct.

Q. So when they do these investigations, they do these

investigations to determine whether or not the shooting was within proper policy and procedure, correct?

A. That's one of the reasons, yes.

Q. And during this process they take statements from various witnesses, including the officer who was involved in the shooting, correct?

A. At a later date, yes.

Q. You were aware that prior to the actual date of the incident on April 25th, 2021, you were aware that if there -- if an officer is involved in a shooting, that officer will be involved in an OIS investigation thereafter, correct?

A. Correct, yes.

Q. If you know, if an officer is determined to have violated policy or procedure by the department in the shooting, do you know what the possible ramifications are for that officer?

A. I do not. I have never violated any policy or procedure.

Q. That wasn't my question. I'm just asking if you know what the possible, I guess, issues or sanctions or punishment, or is there any negative consequences based upon your understanding for an officer that has violated policy involving a shooting?

A. Yes, there is a consequence.

Q. What are those consequences?

A. They vary.

Q. Could you please, if you know, please tell me what the various consequences that, you know, that you're aware of?

A. Depending on the degree of the violation they can result into administrative leave, for that pertains to unpaid, anything leading up to termination.

Q. So if it were determined that an officer involved in a shooting had violated policy and procedure, there could be some significant consequences for those -- for that officer's actions, correct?

A. Correct.

MR. BRYANT: No further questions, Your Honor.

THE COURT: Thank you, Mr. Bryant.

Ms. Fultz?

CROSS-EXAMINATION

BY MS. FULTZ:

Q. Good morning.

A. Good morning.

Q. At the time back in 2021, were you trained to shoot in forward motion?

MR. BRYANT: Objection. Outside the scope.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. FULTZ:

Q. And was the -- was that a specialized training?

A. It was what we consider quarterly training for certification.

Q. All right. And is it -- do you as you recall your shooting platform, is it your recollection you were stationary or in forward motion when you were shooting?

A. Stationary.
Q. Now, you said when you approached the driveway at some point when we hear you walking, you were pacing left to right; do you recall that?
A. Once I observed Mr. Barber, and he refused those commands, yes.
Q. Do you recall where within the driveway you were when you started sort of moving left to right?
A. I do not know.
Q. Okay. Had you already proceeded as far south as you reached prior to the shooting, or were you still making your way south at the time that you were pacing?
MR. BRYANT: Objection. Leading.
THE COURT: Overruled.
THE WITNESS: Far south of the driveway.
BY MS. FULTZ:
Q. How do you know you dropped your flashlight prior to the shooting?
A. I held my service weapon with two hands.
Q. And OIS, just for clarification, that stands for officer-involved shooting?
A. Yes.
Q. And during your interviews for -- your interview for the officer-involved shooting investigation was the same interview used in this case, correct?
A. Correct.
Q. Were you truthful during your interview?
A. Absolutely.

MS. FULTZ: Nothing further.
THE COURT: Thank you.
Anything further, Mr. Bryant?
MR. BRYANT: No further questions, Your Honor.
THE COURT: All right. Thank you, Deputy Alfred. You can step down.
May he be excused?
MR. BRYANT: Yes, Your Honor.
MS. FULTZ: Yes.
THE COURT: Okay. Thank you, Deputy Alfred.
Next witness, Mr. Bryant.
MR. BRYANT: I will call -- recall Deputy Hernandez.
THE COURT: Very well.
MR. BRYANT: I apologize. Detective Hernandez.
THE COURT: Detective Hernandez, you understand you're still under oath?
THE WITNESS: Yes, Your Honor.
THE COURT: Thank you.
Mr. Bryant?
MR. BRYANT: Thank you, Your Honor.

EDWARD HERNANDEZ,

recalled as a witness on behalf of the Defense, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRYANT:
Q. Good morning, Deputy -- Detective Hernandez, good

morning.
A. Good morning.
Q. Detective Hernandez, question for you. Earlier in this trial you testified that you heard the engine revving. Do you recall that?
A. Yes.
Q. And at some point I think we all agreed that there was a moment which the engine got quieter, it seemed to idle; do you recall that?
A. At what point?
Q. Right after the revving of the engine, then you hear sort of this brief moment of silence, then you hear the shooting; do you recall that?
A. I recall in the audio the engine stops revving at some point.
Q. Okay. All right. And you would agree with me that based on the fact that vehicle did travel at, as you testified, maybe a height of approximately three miles per hour, resting at 14 feet, that car moved back at some point, correct?
A. Correct.
Q. You would also agree with me that we did establish that this vehicle moves in reverse as long as it's in gear, and there's no brake on this vehicle, it will move in reverse, correct?
A. Depending on the surface.
Q. But in this particular instance we know this, even on the surface in question, this vehicle moved on the surface when it was in gear and no acceleration was being pressed,

correct?

A. It moved after acceleration was applied to the gas pedal.

Q. That's not my question. My question is, at some point in time after the -- you just heard Deputy Alfred testify that the vehicle moved without acceleration because the car was in gear. It just continues to move in reverse. Do you recall that?

MS. FULTZ: Objection. Misstates the testimony.

THE COURT: Sustained.

BY MR. BRYANT:

Q. Do you recall testimony where we talked about this the last time you were on the stand, that this vehicle, whether it's in gear, without acceleration, could move in reverse; do you recall that testimony?

A. I am trying to recall if it was a hypothetical you proposed or were we talking about the surface this vehicle is on once the gas pedal was pressed?

THE COURT: Counsel, approach, please.

(Bench conference held, not reported.)

BY MR. BRYANT:

Q. All right. Detective Hernandez, when the vehicle initially came to rest at approximately 14 feet you would agree with me that when Mr. Barber was being retrieved from the vehicle, and that vehicle was still in the reverse gear, after the deputy attempted to take Mr. Barber out of that vehicle, the vehicle moved in the reverse direction, meaning it headed in the same direction it was going, which was north an

additional approximately 2 feet, correct?

A. Correct.

Q. Okay. So just for clarity, car stops at 14 feet, and it continues to go into reverse another 2 feet while it's in gear, correct?

A. Correct.

Q. And would you agree with me that based upon your review of all the evidence in this case, all the statements and having heard Deputy Alfred's testimony, that that vehicle moved in reverse 2 additional feet without having any acceleration on the gas pedal, correct?

A. Correct.

Q. Okay. So you would agree with me that it's possible that right before Deputy Alfred fired his weapon, that car started to move in reverse, meaning before Deputy Alfred fired his weapon. You would agree with me it's perfectly reasonable to believe that that car started to move in reverse right before Deputy Alfred fired his gun?

A. Correct.

Q. You would also agree with me that given the mechanics of this vehicle and knowing that this vehicle moves in reverse when it's in gear and you take your foot off the brake, you would agree with me it's also reasonable to -- reasonable to believe that after Mr. Barber revved up the engine. He had his foot on the brake, and then right after the shots were fired it's possible that either Mr. Barber got scared or struck by a bullet and took his foot off that gas pedal and that's when the car started to move in reverse,

that's also reasonable -- a reasonable possibility, correct?
MS. FULTZ: Objection. Calls for speculation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Well, you testified as an expert, correct?
A. Yes.
Q. And you were giving an expert opinion as to when the vehicle actually moved, correct?
A. Yes.
Q. So hypothetically speaking, you would agree with me that I'm going to put -- I'm going to set up this hypothetical for you, okay. Hypothetically speaking, if Mr. Barber revs up his engine -- I apologize. If somebody revs up their engine, they press the accelerator going in reverse, makes a noise we've heard, the tires are trying to gain traction, and then you hear sort of a brief silence of the engine, you don't hear the accelerator any more. In that particular hypothetical, it's possible that that vehicle could have rolled back prior to anyone firing a gunshot at them, correct?
A. I think you're asking to speculate whether that occurred or not, sir.
Q. No. I'm asking you from -- I'm giving you hypotheticals, because you've been -- you've testified as an expert, right? You're saying, as an expert, you gave an opinion that you believe the car rolled back -- correct me if I'm wrong. It is one of your opinions that you believe the vehicle began to roll back prior to Deputy Alfred shooting, correct?

A. Yes.
Q. Okay. That's -- that's one of your opinions, correct?
A. Correct.
Q. So I'm going to give you a hypothetical. Hypothetically speaking, at the point in which the car goes idle, it's possible that it brake -- that if Mr. Barber, hypothetically speaking, if Mr. Barber's foot was on that brake while it's idling and there was gunshot, it's possible Mr. Barber could have been scared by the noise, released his foot off the brake momentarily, and that car could have rolled back then? That's a possibility, right?
MS. FULTZ: Objection. Speculation. Improper hypothetical.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Let me ask it a better way. It's a little jumbled right now. Hypothetically speaking, if someone has their foot on the brake with a vehicle in reverse, after just revving up that engine, based upon your training, knowledge and experience, people -- if someone hears a loud bang or a loud noise, you would agree with me that could startle an individual, correct?
A. I suppose.
MS. FULTZ: Speculation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Do you know for 100 percent certainty whether that

vehicle rolled back before those shots fired?
A. Is that the end of your question, sir?
Q. That is the question.
A. I believe it did.
Q. No. Can you say with 100 percent certainty that that vehicle moved back prior to those shots being fired?
A. I believe it did.
Q. Is that, yes, I'm 100 hundred percent certain?
A. Yes.
Q. How do you know you're 100 percent certain that Mr. Barber didn't have his foot on the brake after the accelerator had quieted right before Deputy Alfred shot?
A. I do not know that.
Q. So you would agree with me you have no idea whether or not Mr. Barber had his foot on the brake before Deputy Alfred fired his weapon, correct?
A. When he revved the engine and lost traction?
Q. Correct.
A. I do not know if he did that or not.
Q. Okay. And you would agree with me, that you have no idea whether or not it was the shot fired by Deputy Alfred that caused Mr. Barber's foot to come off the brake thereby causing it to roll back. You have no idea if that happened, correct?
MS. FULTZ: Objection. Speculation and vague.
THE COURT: Overruled.
THE WITNESS: I don't believe that occurred.
BY MR. BRYANT:

Q. You don't have any idea one way or another whether or not that occurred, correct?
A. I do based on the evidence and the audio.
Q. Where in the evidence and the audio does it tell -- let me ask you this, did you do any -- did you review the computer on the car or whatever the little black box is on the car to say -- that would maybe say whether or not for certain Mr. Barber didn't have his foot on that brake at any point in time while the car was revving up?
A. No.
Q. Did you have a video in that car or was there a body cam showing or did Mr. Barber have a camera on him showing him not having his foot on the brake?
A. No.
Q. So you would agree with me, that you cannot say with 100 percent certainty, that Mr. Barber did not lift his foot off the brake until after the first shot was fired, correct?
A. That's not what I believe.
Q. But you cannot say with 100 percent certainty that did not happen, correct?
A. Based on the evidence --
MS. FULTZ: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Detective Hernandez, you talked about based upon the physical evidence earlier when we were -- I gave you a hypothetical. I'm going to show what's going to be Exhibit 45.

Deputy -- Detective Hernandez, you recall this picture, correct?
A. Yes.
Q. And again, this is the pathway up to the vehicle looking from north to south, correct?
A. Correct.
Q. All right. And I gave you a hypothetical. I had asked you, hypothetically speaking, because we have these shell casings, 2, 3, 4, 5, 7 and 8 and somewhat of a -- in order that would be consistent with the gunshots that were fired, I asked you, hypothetically speaking, if Deputy Anderson (sic) was walking up the middle of this driveway, between 6 and 7, that would be consistent with where these gunshot -- or where these FCC casings are found, correct?
MS. FULTZ: Objection. Compound and vague.
THE COURT: Overruled.
THE WITNESS: You said Deputy Anderson.
BY MR. BRYANT:
Q. Deputy Alfred.
A. And your question again, sir?
Q. My question is if Deputy Alfred's walking in a straight line between Marker 6 and 7, right, you see right in the middle 6 and 7, do you see that?
A. Yes.
Q. And he fired his weapon in that pathway, the bullet casings would be consistent with -- that bullet casing pattern would be consistent with him firing his gunshot (sic) if he were walking up between 6 and 7, correct?

A. Well, I can't make that determination because we had already discussed that the scene had been walked on after the shooting. And I believe you did cover this question with me earlier in testimony. If he was in between 6 and 7, I believe that his FCCs would have been deeper to the right in this photo, which would be beyond maybe Placard 8 or they could have bounced off the house and fell back further. But once again, we're speculating.
Q. Okay. And do you recall when I asked you why you believed Deputy Alfred had fired somewhere between 9 and 10, you said it was because his flashlight was there. Do you recall that testimony?
A. Yes.
Q. And I stated, well, is it possible that flashlight could have gotten moved by the EMTs; do you recall that?
A. Yes.
Q. And you said, no; do you recall that?
A. Yes.
Q. I asked you why you didn't believe that it could have gotten kicked by the EMTs, and your response was because of the pathway based upon the physical evidence, right?
A. Correct.
Q. And you determined, in fact, that the physical evidence that you were referring to didn't have Deputy Alfred walking southbound at all, correct?
A. Correct.
Q. And you would agree with me, that you were the lead detective on this case, correct?

A. Correct.
Q. And you reviewed all the documents from the CSI report, correct?
A. Correct.
Q. To the witness statements, correct?
A. Correct.
Q. To the officer interviews, correct?
A. Yes.
Q. To all of the pictures, all of these various markers, you've reviewed all that evidence, correct?
A. Yes.
Q. And you would agree with me that based upon your review of all of the evidence collected, in every report you read, there is not a single bit of evidence that ever shows Deputy Anderson's shoe prints headed in a southerly direction?
THE COURT: Do you mean Deputy Alfred?
BY MR. BRYANT:
Q. Deputy Alfred. There was another Deputy Anderson at one point in time. Deputy Alfred?
THE COURT: In a different case?
MR. BRYANT: In a different case.
THE COURT: Thank you.
THE WITNESS: So is your question did I locate southbound traveling foot impressions?
BY MR. BRYANT:
Q. Correct?
A. No, I did not.
Q. And you would agree with me that your CSI team or

the team that came out to handle this, along with Detective -- Detective Navarro, that would have been an important piece of evidence to identify, correct?

A. Correct.

Q. And you would agree with me that no such evidence exists, correct?

A. Correct.

Q. And when you -- based your findings and conclusions did you take in account -- into account your belief that those cones had detective -- or Deputy Alfred headed in a southbound direction with those footprints?

A. I believe they were, yes.

Q. And as the lead detective I think you testified that you have to be as accurate as possible when putting together reports and providing sort of determinations for someone to review these cases later?

A. Correct.

Q. And you would agree with me that it is important to be almost perfect with the information that you have as the lead detective to ensure that whatever it is that you're providing to the next agency has the most accurate picture, correct?

A. Correct.

Q. And why is that important?

A. Because once this investigation is complete, it goes to the District Attorney's Office for review.

Q. And if you got some of the evidence wrong, if you reviewed some of the evidence incorrectly, you would agree with

me that that could dramatically impact your overall conclusions in your investigation, correct?

A. Possibly, yes.

Q. And here, one of the most critical pieces of evidence that you continue to focus on was the fact that the physical evidence showed Deputy Alfred was walking on the eastbound, southerly direction because of those markers, correct?

A. Not just because of the markers.

Q. And the flashlight?

A. And his statement in the interview.

Q. And his statement in interview, right.

And I asked you this before, why do you believe -- are you -- do you just believe what Deputy Alfred told you because it's going to be, you know, what you rely on because it's the truth? And do you recall you testified, no, there was physical evidence, right?

A. Correct.

Q. And I said what physical evidence. Are you only just relying on Deputy Alfred's testimony? And you said, no, there's physical evidence. You recall that, correct?

A. Correct.

Q. And you said that physical evidence was the flashlight and this path to the left, eastward with these cones, correct?

A. Correct.

Q. And now, you've learned after all these years in this trial that one of the major pieces of physical evidence

you relied on, you got it wrong, Deputy Anderson -- there's no proof Deputy Anderson -- or no evidence, no physical evidence that Deputy Alfred walked south on this path, correct?

MS. FULTZ: Objection. Compound and argument.

THE COURT: Sustained. You can rephrase.

MR. BRYANT: Sure.

BY MR. BRYANT:

Q. You would agree with me that your analysis by utilizing the eastbound or the east cones that you believed headed in a south direction that impacts your entire report in terms of your final conclusions, correct?

A. No.

Q. And again, you're relying on Deputy Alfred's testimony, correct, that he walked down this path east and south?

MS. FULTZ: Objection. Asked and answered.

THE COURT: Sustained.

MS. FULTZ: Move to strike.

THE COURT: The answer is stricken.

BY MR. BRYANT:

Q. And again, there is no physical evidence to suggest anybody, any law enforcement officers headed on this east path in a southerly direction, correct?

A. Excuse me, are you just talking about his approach?

Q. I'm referring to the physical evidence?

A. Well, again, we have a flashlight where he indicated he dropped in his interview, and he just testified he dropped his flashlight prior to shooting.

Q. You heard some audio, right? At the end after the shooting, at some point you hear a very loud thud, right?
A. Correct.
Q. You would agree with me that didn't sound like a utility belt. We didn't hear anything like that, correct?
A. It was a thud.
Q. And it sounded like something was dropped, you know, something drops on to sort of dirt or it makes a thud sound that's about a pound, would you agree with me, that would make a thud sound, correct?
A. I don't believe that was the flashlight that made that noise.
Q. You don't know what it was, correct?
A. You're asking me to form an opinion, and I don't believe that the flashlight made that noise.
Q. I didn't ask you to form an opinion. I'm asking, you heard a loud thud at the end of this tape, correct?
A. Correct.
Q. Did you ever listen to the tape and catch that, or is that the first time you've heard that thud?
MS. FULTZ: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: I've heard the entire tape numerous times.
BY MR. BRYANT:
Q. Did you ever hear this particular thud?
A. I never paid attention to it as of today.
Q. And that's because you rely -- you were relying on, again, Deputy Alfred's statements to you without necessarily

listening to other things that may have you say, well, I hear this thud, do you know what that is, you never asked that, correct?

A. No.

Q. You would also agree, so given the fact that -- would you -- how big of an error when you're looking and assessing, you know, your work or the work of a colleague, how big of an error was it when you incorrectly identified the direction of evidence where there was a pathway taken by an officer?

MS. FULTZ: Objection. Relevance. Argument.

THE COURT: Sustained.

BY MR. BRYANT:

Q. And again, it's your testimony that based upon, even though you had the path incorrectly identified you thought he was going south when, in fact, the footsteps are going east, is it your testimony that does not change your opinion as to where Deputy Alfred was?

A. No.

Q. Just a few more questions. You -- you've been a law enforcement officer, and again, we talked about identifying speed. Do you recall looking at vehicles that are passing you by, you can kind of tell based upon your training and experience and knowledge how to determine the speed of a vehicle?

A. Yes.

Q. And would you agree with me that if a vehicle is coming head on at you, right, the further away you are from

that vehicle the more difficult it would be to determine the speed in which that vehicle is traveling toward you?

A. It's kind of a vague question. There's no distance involved.

Q. So let's just say if I am 50 feet away --

A. That's not 50 feet.

Q. Technically not 50 feet away. If I'm 50 feet away and I'm driving towards you, you couldn't tell me exactly what -- you couldn't give me an estimate of the speed I was going, could you?

A. I could.

Q. How would you be able to do that?

A. LiDAR trained and radar trained as a motor officer. I've been to two different schools that teach you how to estimate speed of moving vehicles, whether they're coming towards you or moving way from you. That is something you need to do as a traffic enforcement officer, you estimate the speed prior to deploying a radar or a LiDAR. A LiDAR is a laser deployed device that tells you the vehicle's speed. You estimate the speed. You apply the device at the vehicle coming at you or moving away from you, and it will give you a reading. And you're supposed to ethically effect a traffic stop if you are close to estimation what the radar or LiDAR.

Q. I apologize. No radar or LiDAR, just plain eyesight. You do not have a radar or LiDAR. I apologize. I should have been a little more clear.

If you were not equipped with radar or LiDAR, you're just looking approximately 50 feet away, you would agree

with me that it would be more easier for you to determine the possible speed of a moving vehicle if you were 15 feet away as opposed to 50 feet away, correct?

A. I have done it in both scenarios.

Q. I'm saying you would be able to have a more accurate idea of how fast a vehicle was going if you're closer to that vehicle or further away from a vehicle that's coming head on at you, correct?

A. Not necessarily.

Q. Okay. Why is that?

A. Because if the vehicle is farther away from you, let's say a hundred feet, and it's traveling and it's passing known markers on the ground, let's say broken lines in the roadway, each broken line is approximately 9 feet apart, I can estimate the vehicle's speed if it's traveling at a greater distance towards me because it gives me time to estimate the speed. If it's closer to me, it has to be much more quickly and I may not get it correct.

Q. And that's based upon some sort of markers. For example, you saw markers in the road that would be helpful, correct?

A. Markers in the road, telephone poles, lighting poles, are usually about a hundred feet apart.

Q. Okay. Just see if I have any more questions. One second.

MR. BRYANT: No further questions at this time, Your Honor.

THE COURT: Thank you, Mr. Bryant.

Ms. Fultz?
MS. FULTZ: Thank you.

CROSS-EXAMINATION

BY MS. FULTZ:
Q. You said you did not do an EDR review; is that correct?
A. An EDR, ma'am?
Q. Right.
A. No.
Q. And why is that?
A. Because an EDR or CDR would not have captured this event. It wasn't something that happened to the vehicle that would have caused either an airbag to deploy or set off a sensor to actually lock the information in, which is what EDRs and CDRs are designed to do. They nickname those CDRs because they're called collision data recorders. Something's happened to the vehicle dramatically, and it locks that information in. But it needs to be relieved as soon as possible because it can be erased.
Q. Okay. And you were just -- you were just asked a line of questions about the footprint path marked by the orange cones on the east side of the driveway; do you recall that colloquy of questions?
A. Yes.
Q. Was -- is there -- excuse me. Is there any evidence that corroborates Deputy Alfred's testimony that put him closer to Placards 9 and 10 at the time of the shooting,

first based on the physical evidence?
A. Yes. He told us that's where he dropped his flashlight, then assumes the shooting position.
Q. Okay. Is the location of the flashlight the physical evidence you're relying on there?
A. Yes.
Q. And what about the footprints that are northbound? What goes in must come out, right?
A. Yes.
Q. Is there anything that enlightens you from the footprints that are marked by the orange placards that tell you about how far Deputy Alfred was into this driveway?
MR. BRYANT: Calls for speculation. Vague.
THE COURT: Overruled.
THE WITNESS: His foot impressions are seen by Placard 10 and then there's an array of shoe impressions in that general area, but there was -- I mean, we discussed that earlier in testimony, I believe. We just showed an array of foot impressions.
BY MS. FULTZ:
Q. Are you referring to the ones, I think you described as chaos?
A. Yes.
Q. Does the fact that Deputy Alfred's footprints leave along the east edge give you any indication of how far into that driveway he had made it?
A. He made it pretty far into the driveway beyond the opening of the wooden fence to the house. His flashlight is

forward of that opening. And again, he moved forward at some point during the chaos of foot impressions.

Q. Moving to -- you were asked about that thud sound that we heard this morning in the recording. You said you did not believe that that was the sound of the flashlight dropping?

A. Correct.

Q. Why is that?

A. Sounded too heavy. Sounded like something bulky. I don't even know if it was something that was dropped or something he may have bumped into after the shooting.

Q. And would you expect about a one pound flashlight to make that loud of a sound on that kind of surface and that far away approximately -- I don't know how tall Deputy Alfred is -- probably 3 feet from the microphone of the recorder?

MR. BRYANT: Calls for speculation. Lacks foundation.

THE COURT: Sustained.

BY MS. FULTZ:

Q. Well, on what do you base your opinion that it's not the flashlight?

A. It's not heavy enough to make that sort of noise in the dirt.

MR. BRYANT: Objection. Move to strike. Lacks foundation. Speculation.

THE COURT: Sustained.

The answer is stricken.

BY MS. FULTZ:

Q. And you finally were asked if you can estimate the speed of a moving vehicle from 50 feet, 15 feet; do you recall

that?

A. Yes.

Q. Would you expect an accurate estimate of speed from somebody in Deputy Alfred's position as he described it in this scenario?

A. No.

Q. Why not?

A. At the time of the shooting he's under, I would assume --

MR. BRYANT: Objection. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: He's under a great amount of stress. He's dealing with somebody who's not complying with commands, to the point where he draws his service weapon and continues to try to contact Mr. Barber. He's then along the east side of the fence line as he has indicated. He's directly behind the vehicle. Then the tires spin and starts motioning towards him.

And again, we've discussed your body reactions, what physiologically you're going to do. You can either fight, flight or freeze. And Deputy Alfred chose to fight.

MS. FULTZ: That's all I have. Thank you.

THE COURT: Thank you, Ms. Fultz.

Mr. Bryant, anything further?

MR. BRYANT: Just a handful.

REDIRECT EXAMINATION

BY MR. BRYANT:

Q. Detective Hernandez, you heard Deputy Alfred

testify that he actually made it beyond the front, where the front of the car was, correct? You recall that testimony that he, Mora and Torres made it to the front of the vehicle?
A. I believe only Mora and Torres went through the fence line.
Q. Did you just -- did you -- is it -- is that your recollection?
A. Alfred went to -- I believe he came out of the wooden side and then walked towards the front of the vehicle.
Q. Okay. So you heard his testimony where he said, yeah, I walked to the front of the vehicle, right?
A. Correct.
Q. And you don't know -- when he exited the scene, you don't know what path he walked through, correct?
A. No, we did not discuss that.
Q. And given the fact there are all these shell casings in the, what looks to be sort of this sort of rough gravel, would it make sense if somebody who didn't want to contaminate the crime scene would take an exit path that would try to avoid the -- where there could be possible, you know, evidence for this particular case?
MS. FULTZ: Objection. Speculation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. You talked about crime scene contamination, right?
A. Yes.
Q. And officers or deputies are trained to avoid, if possible, contaminating the crime scene by moving objects that

could be important for that investigation, correct?

A. Correct.

MS. FULTZ: Objection. Relevance.

THE COURT: Overruled.

BY MR. BRYANT:

Q. And again, you would agree with me that one of the ways in this particular instance, to potentially avoid contaminating a crime scene, is walking on the edges of this driveway, correct, to avoid potentially stepping on or kicking anything that may be of relevance, correct?

A. You're asking me to speculate if the deputies knew where the evidence was. FCCs can't be seen, in my opinion, based on the lighting and the darkness. At the time those FCCs probably couldn't be seen with the naked eye in the dark or low light conditions.

Q. So again, Marker No. 10, you have no idea if those shoe impressions that you relied on were shoe impressions that had Deputy Alfred leaving the property, correct?

A. I believe No. 10, which is yellow and orange at the bottom, that's the first one that shows him leaving.

Q. Okay. Again, like I said, my point is, you know how this is -- the exit path is north, right?

A. Yes.

Q. And those are by the orange markers. We also know that the Deputy Alfred actually went to the front of the vehicle at some point, correct?

A. Yes.

Q. So you would agree with me, it's totally possible

that these footprints that you keep discussing or relying about on No. 10 could have been after the shooting where Deputy Alfred is leaving, correct?

A. I think we established that.

Q. Okay. But do you recall that that's why you believed he shot there? Remember, we just had this whole discussion about Ms. Fultz says, you believe that is where the shots were fired because of the footprints at 10?

A. Just now under testimony?

Q. Yes.

A. No. We discussed the flashlight.

Q. Yes. And you said the flashlight was there, and it was helpful for his footprints at 10. That was helpful for you to determine why his flashlight would have been there. You don't recall that testimony?

A. Not in that manner, no.

Q. Okay. And you would agree with me that at No. 9, there are no footprints evidencing that Deputy Alfred was standing in a stationary position facing south, correct?

A. No.

Q. No meaning you would agree with me there are no footprints there?

A. There's no footprints or shoe impressions as you indicated.

Q. If you look at the dirt around No. 9, you would agree with me that there were, again, there were no footprints in that dirt, correct, just suggesting he was faced in a south position while firing a service weapon, correct?

A. No, we did not identify shoe impressions.
Q. And you said fight or flight, right? You recall this discussion about fight or flight?
A. Yes.
Q. And again, it was an intense situation. Deputy Alfred heard the tires moving, correct?
A. Yes.
Q. He testified that he saw those brake lights come on, correct?
A. At some point, yes.
Q. You would agree with me that it's entirely possible -- or actually, strike that.
You don't know one way or another -- given the fact that Deputy Alfred says he was in sort of a stressful position, you don't know one way or another whether Deputy Alfred fired his service weapon because he heard the noise and saw the white reverse taillights prior to it moving, correct?
MS. FULTZ: Objection. Calls for speculation.
THE COURT: Overruled.
THE WITNESS: I'm sorry. Could you repeat your question?
MR. BRYANT: I don't want to butcher it. Although -- Your Honor, may I have the court reporter read back the question?
THE COURT: Yes, certainly.
Alicia?
(The requested portion of the record was read by the reporter.)

THE WITNESS: There was no immediate gunfire upon the wheels losing traction, maybe three quarters of a second had passed, then you hear gunfire. So he identified a threat of some sort at that point.

BY MR. BRYANT:

Q. But again, you would agree with me, you don't know one way or another, because there is no body cam, with any certainty, whether Deputy Anderson fired his weapon before or after that car started moving?

THE COURT: Deputy Alfred.

MR. BRYANT: Deputy Alfred.

THE WITNESS: No, no, I was not there.

BY MR. BRYANT:

Q. And again, you heard Deputy Alfred testify that at no point in time when he was listening to the audio prior to him shooting his firearm, you didn't hear any objects such as his flashlight drop, correct? You heard him testify to that?

A. Nothing distinct, no.

Q. And you also heard him testify that the only thing that he did drop that evening was his flashlight, correct?

A. Correct.

MR. BRYANT: No further questions.

THE COURT: Thank you.

Ms. Fultz?

MS. FULTZ: No, thank you.

THE COURT: Okay. Thank you. You can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Any other evidence?

MR. BRYANT: Not until our expert on -- yeah.

THE COURT: Okay. All right. We're going to adjourn for the day. I apologize for the inconvenience. We'll be off tomorrow. And I'll see everyone at 8:45 on Wednesday, and hopefully we'll be presenting the case to you for decision that day.

Don't talk about the case. Don't form any opinions or conclusions.

Have a good day off. You're on your honor system, whether you go back to your employment.

(Whereupon, the foregoing proceedings were continued to December 11, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,

-vs-

STEFFON TODD BARBER, Defendant.

No. FVI-21001312

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 515 to 569, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 9, 2024.

Dated at San Bernardino, California, this 12th day of May, 2025.

Official Court Reporter
C.S.R. No. 12225

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
)
Plaintiff, )
)
vs. ) No. FVA-025457
)
STEFFON TODD BARBER, )
)
Defendant. )
______________________________)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 11, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

RYAN DUCKETT
Attorney at Law

RODNEY DIGGS
Attorney at Law

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 6 of 7
Pages 571 through 723, incl.

SESSIONS


| DATE | PAGE |
| --- | --- |
| December 11, 2024 | |
| Morning Session | 575 |
| Afternoon Session | 647 |

# CHRONOLOGICAL INDEX OF WITNESSES

DEFENDANT'S WITNESSES PAGE

MORALES, Robert

Cross-Examination by Ms. Fultz ............. 585
Redirect Examination by Mr. Bryant............ 592
Recross-Examination by Ms. Fultz ............. 609
Further Redirect Examination by Mr. Bryant.... 616

PEOPLE'S WITNESSES PAGE

HERNANDEZ, Edward

Direct Examination by Ms. Fultz ............. 620
Cross-Examination by Mr. Bryant ............. 627
Redirect Examination by Ms. Fultz............ 635
Recross-Examination by Mr. Bryant............ 637
Further Redirect Examination by Ms. Fultz..... 640

INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 32 | (Unidentified) | | 618 |
| 80 | (Unidentified) | | 618 |
| 81 | (Unidentified) | | 618 |

SAN BERNARDINO, CALIFORNIA, WEDNESDAY, DECEMBER 11, 2024

MORNING SESSION

DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,
JAMES BRYANT, Attorney at Law,
RYAN DUCKETT, Attorney at Law and
RODNEY DIGGS, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

THE COURT: Good morning. We're on the record, outside the presence of the jury. Both counsel are present. Mr. Barber is present. Detective Hernandez is present.

Okay. We need to talk about jury instructions. I have read People versus Golde, G-o-l-d-e, cited by the People, 163 Cal.App.4th 101 2008, indicating that the lesser included offenses of simple assault would not be appropriate when the automobile is involved.

Now, an argument can be made I think that the Golde case is limited to its particularly egregious facts. The Court writes at page 133, quote, It is ludicrous to suggest on this record that defendant committed only simple assault when he drove a motor vehicle toward the 4 foot 11 inch, 83 pound victim and repositioned the vehicle in her direction when she tried to move out of its way, end of quote. We don't have those facts here.

But later on, and this is at, I guess it's still at page 133, I'm not sure, this might be page 116 and 117. In any event, the Court says, quote, There is no way that driving a car toward a person can constitute simple assault but not assault with a deadly weapon or force likely to cause great bodily injury, end of quote. Although we don't have the particular facts that were involved in Golde, I think we do have facts here that would demonstrate that a lesser included offense of simple assault is not supported by the evidence.

Mr. Bryant, you sent an e-mail to counsel and me indicating I think that you agreed with that; is that correct?

MR. BRYANT: Yes, Your Honor. I did have a chance to review the case law. And I think that given these facts, as the Court has articulated, the issue here is either vehicle is a deadly weapon or it's not. I don't see how --

THE COURT: Okay. All right. So that's what we'll do.

There's still a lesser included offense, the count -- the count charged is assault on a peace officer with a deadly weapon or force likely to produce great bodily injury. There is an issue apparently whether Mr. Barber knew or should have known that Deputy Alfred was a peace officer, given the fact that it was dark and that he didn't announce himself as such.

So I think we need the lesser included offense, just deleting peace officer, the lesser included offense would be assault with a deadly weapon or force likely to produce great bodily injury. So I've changed the proposed jury instructions accordingly.

Before we get to that, do counsel agree with that that we do have one lesser, just deleting the peace officer?

MS. FULTZ: I do, but I have a question with the way that you worded it.

So the 245(c) reflects the way (a)(1) was prior to 2011 or '12, with both deadly weapon and assault likely to cause GBI. However, the lesser of (a)(1) is just the deadly weapon, so I didn't know if the Court also wanted me to include the (a)(4) assault, likely to --

THE COURT: I think we should. I think the jury conceivably could not view the automobile in these circumstances as a deadly weapon. And there's a dispute between the experts about, you know, how much force was involved, you know, the speed of the vehicle and so forth. I think the jury could say, well, this was likely to cause great bodily injury, but it wasn't likely to cause death.

So it wasn't a deadly weapon, but it was still with force likely to produce great bodily injury. At least those are my thoughts. What are counsels' thoughts about that?

MR. BRYANT: Yeah. I mean, I don't have an issue with, again, I think the Court has distinguished, one, there is a possibility the jury may find that Mr. Barber did not recognize that this was a law enforcement officer. And I think, two, you could run into a situation where, yeah, I don't think this would particularly kill somebody, but there is a possibility that, you know, they could find that there could be great bodily injury or conversely they say --

THE COURT: In your view you're agreeing with me that

the lesser included offense is assault with a deadly weapon or with force likely to cause great bodily injury.

MR. BRYANT: Correct. I think that's how it reads anyway.

THE COURT: Ms. Fultz, what are your thoughts?

MS. FULTZ: So I have no strong objection to proceeding that way. I just -- I think the case law has consistently referred to a motor vehicle as a deadly weapon. But it's not an inherently deadly weapon. So there could be an argument that it's being used in its natural designed purpose.

THE COURT: Right. Well, there's that other case -- actually, let me pull it up. Let me get the jury instruction.

Remind me what number is this? It's in the 800 series.

MS. FULTZ: Oh, 860 is the 245(c) and 875 was the other.

THE COURT: Okay. Give me a minute. Hang on a second.

(Brief interruption in proceedings.)

THE COURT: Okay. On People versus Aguayo, A-g-u-a-y-o, a 2022 case, 13 Cal.5th 974, I apologize, I don't have the pincite, but it notes that assault with a deadly weapon, Penal Code Section 245(a)(1), and assault by force likely to cause great bodily injury, Penal Code Section 245(a)(4) are, quote, Different statements of the same offense, end of quote. Citing Penal Code Section 954.

So I think we're probably talking about the number of angels dancing on the head of a pin here.

MS. FULTZ: Well, and I apologize I didn't catch the year of the Aguayo case?

THE COURT: You're going to make me open my book again.
MS. FULTZ: Sorry.
THE COURT: That's okay.
I think it was 2022 but give me a moment.
MR. BRYANT: It's 2022, your Honor.
THE COURT: Thank you.
MR. BRYANT: That's a Supreme Court case, correct?
THE COURT: Correct. So where are we? Do we want to say a deadly weapon? Do we want to say force likely to cause great bodily injury? Or do we want to say a deadly weapon or with force likely to cause great bodily injury?
Ms. Fultz?
MS. FULTZ: I think that if we are going to say both, they need to be done separately, because even though they are, according to the case the Court just cited restatement of the same offense, they are punished differently. So I think we would need a clear finding if the jury were to return a lesser we would need to know which.
The (a)(1) is a serious in the three strikes sentencing scheme. The (a)(4) is not. 4019s would apply post-sentence on an (a)(4). Where the (a)(1) would be an 80 percent credit.
THE COURT: Interesting. What are you proposing that we do then?
MS. FULTZ: I think if we are going to say both, we need to have them separately instructed.
THE COURT: Do you think we should say both or do you think we should say one or the other?

MS. FULTZ: Again, I have no strong objection to the (a)(4) also.

THE COURT: What are you advocating?

MS. FULTZ: I am advocating just the deadly weapon. It's the only named lesser included in the 245(c). The only difference in the offenses between the 245(c) and the (a)(1) is the peace officer element. The (a)(4), although --

THE COURT: What does your information say?

MS. FULTZ: It's just the charged offense of the 245(c).

THE COURT: Which is deadly weapon?

MS. FULTZ: Yes.

THE COURT: So it's not with force likely to cause great bodily injury.

MS. FULTZ: Well, actually, the offense does list both language. So maybe it will be appropriate to give both. But you think it will have to be done separately, they would certainly have to be separate verdict forms.

THE COURT: All right. Mr. Bryant, what are your thoughts?

MR. BRYANT: I think that the language of the jury instruction provides guidance for the jury to understand both of those, if they get to the point where they're having to decide whether or not great bodily injury is possible. I'm assuming at that point they don't believe that the weapon is a deadly weapon or at least the vehicle is a deadly weapon. So I think that it may make more sense to include both as at least separate on the verdict form, but --

THE COURT: Ms. Fultz is indicating he was only charged

with assault with a deadly weapon, (a)(1).

MS. FULTZ: No.

THE COURT: No. I'm sorry. (A)(c). I don't have the statute in front of me.

MS. FULTZ: Sub (c). But the language of sub (c) is written the same way that the (a)(1) used to be back in 2011 where it didn't distinguish. The legislature has since split deadly weapon and assault likely.

THE COURT: When did the legislature do that?

MS. FULTZ: It was 2011 or '12. I think it was 2012.

THE COURT: So the Supreme Court in 2022 has said that they're the same offense. But you're indicating that they're not because they're punished differently?

MS. FULTZ: Correct.

MR. BRYANT: I'm going to go with, at this point I think I'm going to have to go with the Supreme Court.

THE COURT: Doesn't the legislature trump the Supreme Court?

MR. BRYANT: No.

THE COURT: I think Ms. Fultz is right, if they're punished differently -- I mean, if Mr. Barber is acquitted, we don't need to worry about it. But if he's convicted, at the time of sentencing, we're going to need to know whether it's deadly weapon or great bodily injury. Okay. So we're going to have to work during lunch to adjust these verdict forms and jury instructions.

MS. FULTZ: I did submit --

THE COURT: Let me go over the other changes that I

made.

MS. FULTZ: Okay.

THE COURT: Actually, we can, since we have to discuss jury instructions further, let's do that later. If the witness is here, let's get started. Is the witness here?

MR. BRYANT: He is.

THE COURT: He is. Okay. Is the jury here?

THE BAILIFF: Yes, Your Honor.

THE COURT: Okay. Well, why don't we finish with the evidence then.

MS. FULTZ: Okay.

THE COURT: This issue isn't going to change anything in the presentation of the evidence from this point on, is it?

MS. FULTZ: No.

MR. BRYANT: No.

THE COURT: Okay. Then let's get started.

MS. FULTZ: And before the jury comes in I have a question for the Court.

THE COURT: Yes.

MS. FULTZ: At some point the stipulation we discussed on Monday --

THE COURT: If you have it, I can read it to the jury right now.

MS. FULTZ: Okay.

THE COURT: If you don't have a printed copy, I can ask you to read it.

MS. FULTZ: I should have it. I just don't recall where.

THE JUDICIAL ASSISTANT: Stipulation one?

MS. FULTZ: Yes.

THE COURT: Print it out, Cara.

THE JUDICIAL ASSISTANT: Yes.

THE COURT: As always Cara saves the day.

You've got bracketed language in the stipulation about explaining what executive officer is. Why don't we just say he knew that the person he resisted was a peace officer? I think we discussed that previously.

MS. FULTZ: We did.

THE COURT: Mr. --

MS. FULTZ: That's agreeable to the People.

MR. BRYANT: That's fine, Your Honor.

THE COURT: Okay. All right. Let's bring the jury in.

(The following proceedings were held in the presence of the jury.)

THE COURT: Good morning, everyone.

Before we resume with the witness Mr. Morales, the parties have a stipulation. I'm going to read it to you now. At the end of the case you'll be -- I'll explain to you what a stipulation is, but basically, it's an agreement between the parties as to certain facts. So you're not to consider whether this is true or not. You must accept it as true because both sides agree that it is true.

The parties in the above entitled action stipulate and agree to the following: The defendant was convicted on April 21st, 2021, in Case FVI-21001037 of assault on a peace officer, Penal Code Section 245(c). An element of that offense

is when the defendant acted, he knew or reasonably should have known that the person assaulted was a peace officer who is performing his duties. The defendant was convicted on May 2nd, 2018, in Cases FVI-18000982 and FVI-1800983 (sic) of resisting a peace officer, Penal Code Section 69. An element of this offense is when the defendant acted, he knew that the person he resisted was a peace officer.

This stipulation means that you must accept these facts as proved.

Both counsel stipulate to this?

MS. FULTZ: Yes.

MR. BRYANT: Yes, Your Honor.

THE COURT: Okay. All right. Thank you. Let's resume with the testimony of Mr. Morales. Is he here?

Okay. Mr. Morales, you're still under oath.

THE WITNESS: Yes.

THE COURT: Do you understand?

THE WITNESS: Yes.

THE COURT: Okay. Very good.

Ms. Fultz, whenever you're ready.

MS. FULTZ: Thank you. Good morning.

THE COURT: This is cross-examination of Mr. Morales.

ROBERTO MORALES,

recalled as a witness on behalf of the Defense, having been previously duly sworn, was examined and testified as follows:

///////

CROSS-EXAMINATION (Resumed)

BY MS. FULTZ:

Q. Mr. Morales, I just have a few more questions for you.

When last we spoke you mentioned the majority of your investigations are collisions or let's say for insurance purposes, do you recall?

A. What was the last word you say?

Q. For purposes of insurance?

A. No, not exactly.

Q. Okay. Well, what did you say about the types of accidents or incidents that you investigate?

A. Well, auto collision with passenger, commercial vehicles involved, bicycles, scooters, pedestrians. Not necessary to be an insurance involved in that type of cases. Civil case in general.

Q. Understood. Thank you for the correction.

But typically, all involving some sort of an accident or an impact, correct?

A. Industrial accidents as well.

Q. Okay. And when you -- when you investigate collisions where you have a point of impact, as a point of reference or an end point, does that make sense?

A. Please elaborate a little bit.

Q. Sure. When you investigate a collision, there is a point of impact, correct?

A. Not all the time.

Q. Okay. What is it that you use as your center point

or the frame of reference from which you conducted your investigation?
A. Physics and science.
Q. Okay. I'm talking about within the investigation of a scene, what is the -- what is the first thing that you were looking for from which you make your other observations?
A. That's a very broad question.
Q. Is there in a collision scene, anything that you would look to to make other findings, form other opinions, where you start your point of your investigation?
A. Physical evidence.
Q. What kind of physical evidence would you look to first?
A. It depends on the type of case.
Q. Okay. A collision?
A. A collision, tire marks, gouges, the public property damage.
Q. And what information does that give you as to further your investigation?
A. Well, we limit -- we are limiting the only -- to physical evidence. There's additional evidence that is provided, like photographs, digital evidence, like digital images, videos, and I do my own research on the type of material, like aerial views, street views, calculations, photogrammetry and, you know, the list, you know, if I continue expanding it grows and grows and grows. You know, it's a very thorough process.
Q. Okay. So your -- when you're describing the things

that you consider it's typically after the fact, not on scene pieces of evidence that you look at, correct?

A. Can you please reformulate the question?

Q. Sure. So you just described all the things that you look at, and most of those are things you could look at in your office on a computer screen, correct?

A. Yes.

Q. Okay. For the incident here in this case, what did you use as your starting point to make an opinion about the manner in which the vehicle moved?

A. Physical evidence and audio.

Q. That's very general. Can you tell us specifically what physical evidence --

A. Everything. Sorry. I'm sorry.

Q. Where did you start your investigation?

A. Well, there's no -- I didn't start by choosing like a piece of evidence. I use everything I organize, like a -- I observe all of the evidence available, and then I combine everything to have a thorough look, you know, once there's something solid.

Q. So last we spoke, you had some opinions as to speeds at which the vehicle moved during specific periods captured in the audio recording, correct?

A. Yes.

Q. You had opinions about the distance the vehicle traveled during specific periods captured in the recording, correct?

A. Yes.

Q. What did you look to specifically that gave you a point of reference from which to draw those conclusions?

A. I made a site diagram combining all the physical evidence that I could observe those images provided and I have some police measurements as well. So I use that in combination with the audio. I know that -- the dimensions of the vehicle as well. So all that combined help me to establish the distance of vehicle traveled, you know, the direction and the angle of the vehicle. And the timing as well.

Q. And would you agree you would need to know the point in distance and time at which the vehicle stopped to make those calculations?

A. No, because I think we have a clearly understanding the area where the vehicle came to rest.

Q. But do you -- you have no way of knowing when that vehicle came to rest, correct?

A. Well, we have -- sorry. Sorry. Can you please repeat that question again?

Q. Sure. You don't know when that vehicle stopped, do you?

A. When -- well, there are two constraints here. We know where the vehicle started, where the vehicle ended. And there is a short time, you know, that we could hear that audio, and it gave us reference where the vehicle started moving. And by physics I know what would be the coefficient of friction that could be used for this particular event.

Q. Okay. Thank you for that. But can you please answer my question, isn't it true you don't know when the

vehicle stopped?
A. I don't need to know.
Q. On your -- your slide presentation there was a designation that said Y-A-E-S site diagram. Do you recall that?
A. Yes.
Q. Is that the firm that you work for?
A. Correct.
Q. Is that proprietary software for your firm that created that PowerPoint and site diagram?
A. No. We use different computer, computer aided design programs, and that help us to generate those diagrams.
Q. What is the software, the programs that you just describe using to create the diagram?
A. I use three. Aldus 3 Studio, Aldus AutoCAD and Rhino.
Q. What was the last one?
A. Rhino, R-h-i-n-o.
Q. Thank you.
When you use these three programs, do you input data into the software and it calculates for you the measurements, the information that you put on your slides?
A. No. Pretty much there's some, like I explained before, geo references that were used by the police department to define like a serial reference point. From there they measure like distances from that specific serial reference point, and the result is like a cluster of points. They labeled each one of them for a reference to those numbers and

the placards.

Q. When you say they put those plot points, are you referring to the software programming you just described?

A. No. The police measurements, the investigation measurements.

Q. So you input the measurements from the police reports into the software, and it calculates the information you provided?

A. It doesn't calculate anything. What it does is I create like a space, you know, distance, in that area where -- where each one of those points were laid out pretty much. So from there I can establish, I can go measure it myself, what's the distance from one point to another. So the program doesn't do any calculation for me. It's just to kind of like creating a layout of this room, I can measure corner to corner to corner and bring those points into that program and then connect the dots, and I know exactly the area of the whole room.

Q. Okay. So you input the data that you have as you just described, say you had received a police report of the measurements of the room, correct?

A. Yes.

Q. And that's what you would put in, and it creates this visual presentation?

A. Yes. In combination with the dimensions of the vehicle, for example, you know. And so that helped me to establish, you know, the measurements that police department had provided with those. I place the vehicle where the front tires should be and at the beginning, and the position where

the tires should be at the point of rest, and --

Q. Is it -- sorry please finish.

A. And that actually helps me to understand the vehicle dynamics as required to watch a -- move the vehicle from the initial position to the final position. And I know the vehicle has to travel, you know, through that area, like connecting the center of gravity of the vehicle, is pretty traditional, you know, dynamics exercise so --

Q. And so the accuracy of your calculations entirely relies on the accuracy of the police measurements by the police in the reports?

A. Yes.

Q. And the formulas where you calculate speed, you calculate distance traveled, is that something you do manually on paper, then you input it into the program, or how do you make those calculations?

A. I use different numerical methods, applications, like simulations. I use Excel. I use also another program, it's called MathCAT. So in combination I pretty much tabulate like reasonable numbers. So it will, in this case, like you said, we don't -- we don't know time, you know, the time they took from one point to another, but we know the distance, you know.

So there's some numbers that make sense and some numbers that wouldn't make sense. For example, you know, a vehicle that is actually going in reverse cannot have the same maximum acceleration as the vehicle that is going forward, right?

So additional to that, I know that the coefficient of friction for a vehicle that is traveling in that -- in that particular road cannot be as much as a coefficient of frictions in the regular, like a roadway asphalt, right? Additionally to that, the higher velocity of the vehicle, which in that 14 feet distance is the harder brake application that has to be using or to bring the vehicle to a complete stop.

So that's the constraints that I use to actually determine what will be the maximum speed.

Q. And so those formulas were calculated manually, am I understanding correctly?

A. I'm using completely -- I'm using different numerical methods. In addition, I can calculate those -- those by hand as well. So to -- everything could be verified. Everything could be duplicated. It's not that something that just happened once and cannot be redone. Everything which is made with scientific methods could be duplicated over and over again whenever we want.

Q. Thank you.

MS. FULTZ: That's all I have.

THE COURT: Thank you, Ms. Fultz.

Redirect?

MR. BRYANT: Yes. Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. BRYANT:

Q. Good morning, Mr. Morales.

A. Good morning.

Q. Mr. Morales, you were asked questions regarding when you believe that the vehicle or some of the possibilities when the vehicle actually began to move. Do you recall those questions by the prosecutor?

A. I believe so, yes.

Q. Can I have the screen, please?

You developed some calculations in your slide; do you recall that?

A. Yes.

Q. I'm going to pull up Slide 34 here. Can you see there -- is this big enough, or do you need it to be larger?

A. I think it's big enough. I can see it over here as well.

Q. I'm going to try to see if I can publish this. If not, we will roll with it as is right now. Okay. All right.

So, Mr. Morales, you -- let's go down to this calculation here. What is this -- first of all, this -- these calculations?

A. Well, that's -- it's a timeline created by listening to the audio.

Q. And it's a timeline of what exactly?

A. Well, I mean, it's a combination of sounds that we obtained coming from the vehicle, you know, tires. The gunshots as well.

Q. Okay. And at the top obviously it says 2003 Chevrolet Blazer, but then you have the event, you have time stamp, event duration, acceleration, initial speed, distance traveled and final speed; do you see that?

A. Yes.
Q. Could you just briefly, without going into too much detail, explain to the jury what are these categories?
A. So we can go back and listen to the audio, right? And we can distinguish from the engine is actually revving up, right? And it takes, that event is -- actually takes only, we can hear that time stamp 5.64. So if we go back to that file and we locate the -- on that timer, you know, there's a timer bar, right? We go straight to that time stamp, the 5.64, we start hearing the engine revving up. And it lasts for .32 seconds.
Q. All right. There we go. Let me see if this works. Just one second. There we go. All right.
So there it says engine revving up, lasted for a period of one-third of a second; is that correct?
A. Yes. Approximately one-third of a second.
Q. Then the next event is tire spinning; do you see that?
A. Yes.
Q. We heard the tire spinning, but in reality those tires only spun for approximately a little less than three-quarters of a second, correct?
A. Yes.
Q. So they weren't spinning for, you know, 30 seconds. It was really just less than one second, correct?
A. Correct.
Q. Then you have tires overcoming static friction and engine idles, and that is for approximately two-thirds of a

second, .65, correct?
A. Correct.
Q. And that engine idling again, that is the point in which you don't hear the engine revving up, correct?
A. Yes, correct.
Q. It's silent; is that accurate?
A. Yes.
Q. And at .65, we then see first shot; do you see that?
A. Yes.
Q. And it says .28. So I want to stop here.
Is part of your experience, training and knowledge, are you -- is one of your tools or skills that you use trying to identify the perception of site and movement, is that an important thing that you use in your studies?
A. Yes.
Q. Why is that important?
A. It is because whenever we, for example, if you are driving, you know, and you suddenly see a vehicle that is stopped in front of you, you identify that vehicle, like a hazard. So the human brain is, actually takes in, in the daylight it takes 1.5 seconds to the human brain to digest, you know, what's happening, to identify that vehicle is a threat, and then that's when we normally, we understand that humans actually apply the brakes. So how we can apply this here is that if the vehicle suddenly starts moving, it will take somebody in daylight 1.5 seconds to identify the vehicle is actually moving and perceive it as a threat.

So in cases that there's -- in the dark, that perception-reaction is actually extended to 2.5 seconds, because the limited vision caused by the absence of light, you know, it would be hard to watch to determine if a vehicle is moving or not.

Q. So for clarity here, if the evidence that you heard in the video identifies that for .65 seconds, the vehicle wasn't revving up its engine, it was either potentially idle or it could have in theory potentially started to roll back, would that be accurate?

MS. FULTZ: Objection. Leading.

THE COURT: Overruled.

BY MR. BRYANT:

Q. All I'm saying is just in theory at this point of idling -- idling, where it idles during this .65 seconds, the vehicle could potentially be standing still, correct, not in motion, correct?

A. Correct.

Q. It also may have started moving at this point. During this .65 seconds the vehicle could have been moving in reverse, correct?

MS. FULTZ: Objection. Leading.

THE COURT: Overruled. It's an expert.

THE WITNESS: Maybe like a fraction of a second, like a tenth or, you know.

BY MR. BRYANT:

Q. Sure. And so my question is, given your knowledge, training and experience, and given the fact that from the point

in which the tires overcome static friction and the engine idles to that first shot, which is .65 or two-thirds of a second, is it possible for any human at night to recognize a vehicle moving in that short period of time?

A. I don't think so.

Q. And again, that's because the normal way the brain processes movement would take approximately 1.5 seconds during the daytime?

A. Right.

Q. And 2.5 seconds when it's dark, correct?

A. Yes.

Q. So based upon your just review of the actual science itself, are you able to formulate an opinion as to whether or not it would have been physiologically possible for Deputy Alfred to have recognized a car moving at this .65 period of time?

A. Yes. I don't think he would be able to identify the vehicle moving at all.

Q. You were asked whether or not you know when the vehicle actually started moving; do you recall those questions?

A. Yes.

Q. And here, let's go back to your chart. At the first shot where it says acceleration and initial speed; do you see that?

A. Yes.

Q. I apologize. Right above that you have engine idles, acceleration, initial speed is zero and 0.00. Do you see that?

A. Yes.
Q. What does that mean for the jury?
A. Well, it means like given in a prior column -- I mean, the prior -- prior lines, when you hear the engine revving up, tires spinning, at that moment the vehicle is not moving. So after the tire's overcoming, you know, the static friction, in that period is the vehicle not moving. It start moving, you know, after the vehicle rolls backwards. It takes some time to actually build up, you know, like the force needed to make a vehicle moving.
Q. And here at first shot, at first shot it says there's an acceleration of .07 and then initial speed of 0.00. What do you -- what are you saying here?
A. Well, I mean, pretty much the vehicle is moving backwards, but it's going like really, really, really slow. Because the initial speed we have over here is we have tabulated like a, in those like intermediate events, right, we have initial speed, final speed, right? So when we see here the first shot, you know, there's some acceleration, but initial speed on that line is zero. So after a .28 seconds, the vehicle end up with a -- with a final velocity of -- or final speed of .43 miles per hour.
Q. So would -- would -- would it be reasonable -- is this a reasonable possibility that given your review of all of the facts and evidence that you relied upon, as well as applying your scientific knowledge and experience, is it possible or is it a possibility that Mr. Barber, at the time in which the first shot fired, his foot could have, in theory,

been on the parking brake?
MS. FULTZ: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: It's possible.
BY MR. BRYANT:
Q. Is it also possible that -- given your experience as an accident reconstructionist, is it possible that a startling event, such as either the loud bang of gunfire or actually being physically injured by a bullet, would that cause one to release their foot from the brake? Would that cause one's foot to potentially release from the brake involuntarily causing the vehicle to roll back?
MS. FULTZ: Objection. Speculation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Give you a hypothetical. Hypothetically speaking, if an individual had their foot on the brake pedal, and they heard a loud gunshot, given your training, experience and knowledge, would it be reasonable that a person would lift their foot off that brake in -- as a reaction to hearing that startling noise?
MS. FULTZ: Objection. Speculation.
THE COURT: Sustained.
BY MR. BRYANT:
Q. Let me ask you this, you have no evidence provided to you, such as video evidence, what Mr. Barber was doing in the car at that time, correct?
A. Correct.

Q. You have no video evidence of a body cam showing the vehicle moving at any point in time, correct?
A. Correct.
Q. You also don't have any evidence from a black box showing what the vehicle's mechanics were or what the vehicle is doing at the time of the shooting, correct?
A. Correct.
Q. And just given your understanding of -- and you know what a black box is, correct?
A. Yes.
Q. What is that?
A. The black box, it's a what we call, you know, technically, airbag control module for this vehicle. The airbag control module will detect the acceleration based on the change in speed in a short period of time. So in that case, it would -- it would detect collisions.
Q. And if you were to review the black box in this particular case, would there be any data that would have helped you, given the fact there was no actual collision?
A. Well, I don't think so, because the ECM wouldn't detect, you know, collision from the bullets.
Q. So you would agree with me that given all of the evidence that you've reviewed, listening to the sound, doing the calculations, looking at the physical evidence, distances, you would agree with me, that you cannot say one way or the other, whether or not Mr. Barber released his foot off the brake before or after the first shot, correct?
A. Correct.

Q. And you would agree with me, that both of those scenarios, given the evidence that you've reviewed, are reasonably possible, correct?

A. Correct.

Q. I want to talk about, again, here you say that, you show at -- did the fifth shot, the initial speed is two miles per hour, right?

A. Yes.

Q. And then, finally, you go -- right before the sixth shot it says vehicle starts decelerating, and at sixth shot going 3.17 miles per hour, correct?

A. Yes.

Q. What is the maximum speed you identified that this vehicle was going at the maximum?

A. 3.4 miles per hour.

Q. And just for the jury, so I think there was some questions about this, just for clarity so they understand, how did you come up with the time in which the vehicle start -- started and stopped; how is that helpful? How did you come up with that?

A. Well, it's actually a -- we know that a vehicle have to travel a certain distance, right? So that's a constraint. We hear the engine revving up. Tires spinning. We know there's -- scientifically that a vehicle has to overcome the static friction. So at that moment the vehicle didn't move. So the question is, when is the -- when the vehicle started moving. So the vehicle started moving when we hear the first shot, second shot, third shot, in that period of

time, the vehicle was moving.

So at that moment, between those shots, the driver felt an impact. So after that, and it's a human reaction that if you hear that, there's a -- there's gunfire and you're in the vehicle. You are, you know, on reverse. You're going to stop. You're going to stop moving immediately when you hear that, when you feel that you got injured. So in that moment the driver, you know, human reaction would step on the brakes, you know, if it wasn't -- if he was not on the brakes.

So we don't see gouges. We don't see tire friction marks. So what we see here is that the vehicle came, you know, to rest without sudden deceleration. So it was a mildly, the driver was mildly applying brakes. So and then the numbers, the coefficient for somebody mildly applying brakes, you know, into the 0.045 -- sorry, 0 point -- 0.05 Gs.

Q. And when you listen to this audio at no point in time, do you -- well, do you recall at any point in time, hearing the engine having higher amounts of RPM, meaning somebody was pressing on the accelerator to make the car move faster; did you hear anything to suggest that?

A. No.

Q. You would agree with me that you heard audio based upon an audio belt, correct?

A. Right.

Q. And would it be more likely that you could hear an engine the further you are away from it or the closer you are away from it?

A. The closer you are.

Q. And so if a vehicle is traveling towards an individual, coming closer, if you -- if there was engine noise or acceleration, would it be easier to hear as the vehicle came towards you?
A. Yes.
Q. And did you hear anything like that?
A. No.
Q. And did you see any sudden movements by the brakes that would have suggested that Mr. Barber slammed on his brakes?
A. No.
Q. When you say that there was slight pressure, does that mean that Mr. Barber just, was this sort of a gentle push to hold that brake?
A. That's exactly right.
Q. And throughout this process the car didn't stay at a steady pace of three miles per hour from start to stop, correct?
A. No.
Q. It gradually built up speed, then it slowed down once again?
A. Yes.
Q. Okay. Now, I have another question for you. Let me go to Slide 36. You have some distances; do you see that?
A. Yes.
Q. And once again, you've got identified in the upper left corner, utilizing purple markings. What are these purple markings once again?

A. Those are the shell casings.
Q. Okay. And where are they located, just for the record?
A. They are actually in the -- what do you call like the high, the higher side of the photo? The upper side of the photo. Sorry.
Q. I'll say that the witness is referring to the upper middle of the photo?
A. Yes.
Q. Closest to the dwelling to the left. And then you have that identified as 53 feet to the vehicle that is parked. This vehicle, is this the initial start of the vehicle or is this where the vehicle kind of came to rest?
A. That's the one on the left is the initial position of the vehicle.
Q. Okay. So -- so based upon your calculations from the initial point of the rear of the vehicle to those bullet casings identified as 2, 3, 4 and 5, that's approximately 53 feet?
A. Yes.
Q. All right. If you look here to the right-hand side, you have what seems to be just some points of reference here in 26 feet, there's -- there's a Marker No. 6, No. 7, on the upper middle right-hand side of this image. And then you have just a marker that just has a black dot, and then it's facing the vehicle. Do you see that?
A. Yes.
Q. And that black dot is between 7 and No. 9 markers;

do you see that?
A. Yes.
Q. And is this -- this the -- we talked about the vehicle coming to rest, and then it moved back 2 feet. Do you recall your testimony about that?
A. Yes.
Q. Is this in this picture 14 feet where the vehicle first came to rest or 16 feet where the vehicle was found after the incident removed Mr. Barber?
A. This one it's the position where the vehicle came to rest.
Q. The final rest?
A. Yes.
Q. So would that be 16 feet?
A. No, no. This is when it came to rest initially before the driver was extracted from the vehicle.
Q. Okay. 14 feet?
A. Yes.
Q. Okay. So if you look here between 7 and 9 you have a black dot; do you see that?
A. Yes.
Q. And that distance between 7 and 9 where this black dot is, is 26 feet from the initial place of rest where the vehicle traveled 14 feet, correct?
A. Yes.
Q. So if we were to move this vehicle back to its initial position, would you add 14 feet to that?
A. Correct.

Q. And so between the midway point between 7 and 9, would be approximately 40 feet from the period in which the vehicle first began its motion?

A. Right.

Q. And let me ask you this, do you see here where it says No. 10, right where the vehicle's bumper is?

A. No. 10?

Q. Yeah. Let me just do this. I am now circling a red No. 10, which is adjacent to the vehicle's right rear wheel and bumper. Do you see that? And as a matter of fact, why don't we look at the photo on the left-hand side, that would be a better photo. I apologize. No. 10.

I apologize. I think it should be No. 12. I'm sorry. I had to brighten the screen.

A. No. 12, right?

Q. Yeah, No. 12.

A. Yes.

Q. How far is No. 12 from the initial start of the vehicle's bumper, if you can tell me, calculate approximately?

A. I will say that's approximately 10 feet.

Q. Okay. And if so right here at No. 12, would have been approximately 10 feet from where the vehicle started?

A. Yes. Yes.

Q. And if you moved up 2 feet, you'd definitely be somewhere within this, you see where this fence is right here to -- fence corner to the left, that wooden fence corner?

A. Yes.

Q. You will be within that fencing area, correct?

A. Right. 2 feet going, is that south? South, right?
Q. Correct.
A. Yes.
Q. If a car, based upon your calculations, was moving 22 feet per second, based upon your understanding of what -- how many seconds this vehicle approximately traveled, how far of a distance would that vehicle have gone?
A. Can you reformulate the question, please?
Q. If the vehicle was moving 22 feet per second, approximately based upon your calculation as far as how long the vehicle was in motion for, could you calculate what that distance would be if the vehicle was moving at that rate of speed approximately?
A. 20 feet per second.
Q. 22 feet per second?
A. Can you, please?
Q. Sure. I just want to know how many seconds do you -- do you -- did you calculate the vehicle was in motion for approximately?
A. 2.4 seconds.
Q. That's how fast or how long the vehicle was actually in motion was approximately 2.4 seconds?
A. Yes.
Q. So if a vehicle is moving 22 feet per second during that period of time, how far of a distance would that vehicle have traveled?
A. We're talking about the 10 feet distance from that point to the bumper of the vehicle, am I --

Q. I'm just talking about, hypothetically speaking, if a vehicle is traveling 22 feet per second, you have 2.4 seconds of travel time, approximately how far would you approximate that vehicle would have moved?

A. Okay. Would have been approximately going a little over 50 feet.

Q. So if that vehicle was moving 22 feet per second during -- for 2.4 seconds, you would agree with me the vehicle would have ended up somewhere around where those shell casings were; would that be accurate?

A. The one on the left?

Q. Yes.

A. Yes.

Q. And if an individual was standing somewhere between 10 to 15 feet from a vehicle, and a vehicle was traveling approximately 22 feet per second, would that individual have any opportunity to move out of the way?

MS. FULTZ: Objection. Speculation.

THE COURT: Sustained.

MR. BRYANT: One second, Your Honor.

BY MR. BRYANT:

Q. Oh. Mr. Morales, if someone were to testify or make a statement that given all of the evidence that you reviewed, and applied the science to this evidence, we're talking about audio evidence, these figures, the digital images that you reviewed, and applying your knowledge, experience and education, would you agree with the statement that that vehicle moved with 100 percent certainty before that first shot was

fired?
A. No.
Q. Why?
A. Because it's based on what we hear on that audio. We hear the engine revving up, the tire spinning, you know, the mechanical capacity of the vehicle to beat the friction, the static friction, I don't think it's possible.
Q. And given your review of the evidence, can you say or give an opinion of what happened more likely than not in this particular situation?
A. The vehicle wasn't moving before the first -- the first shot was fired.
MR. BRYANT: No further questions.
THE COURT: Thank you.
Ms. Fultz?
MS. FULTZ: Thank you.

RECROSS-EXAMINATION

BY MS. FULTZ:
Q. Mr. Morales, your opinion changed since the last time we spoke. Do you recall me asking you, looking at your table of -- timeline of events if the vehicle was in motion prior to the first shot?
A. You can go back to the chart.
Q. Do you recall me asking you that question last time we were here?
A. I remember you ask me a few questions.
Q. And do you remember stating that the engine revved,

the vehicle overcoming loss of friction occurred before the first shot?
A. I remember you asked about it.
Q. So what changed your opinion between then and now?
A. Well, we go back into the nano metrics here, you know, what is motion, you know. We can -- this pen can shake, vibrate. You cannot see it vibrate, and it's moving. So the vehicle could have been moving like a really low speed one-tenth of a second, and that's my clarification during my direct examination. It is possible that the vehicle could have been moving really, really slow, one-tenth of a second prior to gunfire, because we don't know exactly when the vehicle started moving.
Q. We don't know when the vehicle started moving?
A. Well, exactly precisely in between, you know, these two events, but the vehicle, it's at the moment when the vehicle was beating the -- or actually overcoming the static friction it could happen, could have happened like a tenth of a second prior to the -- to the gunfire, because what we know is that the vehicle actually started moving.
Q. Okay. You said could have. So these are possibilities you're referring to?
A. Yes. And I give you the time frame as well.
Q. Earlier you did a calculation of 22 feet per second. Does that translate to 14.9 miles per hour in a conversion?
A. I can -- I can check that.
Q. If you would.

A. It's actually 15 miles per hour.
Q. Now, you talked about sight perception, the ability of a human to perceive movement of a vehicle. Do you recall that?
A. Yes.
Q. Is that based on the average driver or average human?
A. Yes.
Q. Are there factors that can effect the perception time of the perceiving human?
A. Yes, in this case, we would discuss that, you know, like low light intensity, you know, at night.
Q. Okay. What effect, if any, on your -- on your opinion about the perception of timeline would it have to know the perceiving human is a trained peace officer who is already alert to the person in the vehicle intending them harm?
MR. BRYANT: Assumes facts not admitted into evidence. Calls for speculation.
THE COURT: Just a moment. Overruled.
THE WITNESS: So could you please repeat the question?
BY MS. FULTZ:
Q. Sure. Does it factor in in your calculation of perception timeline, if the human perceiving the vehicle's movement is a trained peace officer who already has a suspicion this person is intending him harm?
MR. BRYANT: Objection. Calls for speculation.
THE COURT: Overruled.
THE WITNESS: What you're describing is that he is

imagining that the vehicle is moving?
BY MS. FULTZ:
Q. No. I am asking if it affects your opinion on the time it takes a human to perceive the movement of the vehicle if that person is already watching with concern about what that driver is doing or intends?
A. We're going back to the fact that he's imagining that the vehicle is moving.
Q. At no time does my question ask you to assume he's imagining anything?
A. Well, the perception of vehicle motion the first thing that has to happen is the object can move, but what you're describing is that he in his mind, he knows that that person is going to harm him. So he is imagining that the vehicle is going to start in motion at any time, so he has to be alert to that.
Q. Okay. My question for you is, does it shorten the expected time of perception that you previously testified about for the average human if the observer of that vehicle is already watching for it, already looking for the movement?
A. So if we have to say that, you know, he's preparing for the motion --
Q. Let me interrupt you. Yes or no, does it affect your opinion of that time frame?
A. No.
Q. Okay. Does -- what if the spinning of the wheels caused debris to fly up around the person? Would that affect the time frame you would expect them to perceive the vehicle's

movement?

A. I don't think so.

Q. Would it change your opinion if the person who observed the vehicle's movement said to you, I saw it begin, I saw it move in a shorter time frame than you have testified is the average normal human perception?

MR. BRYANT: Incomplete hypothetical.

THE COURT: Overruled.

THE WITNESS: I cannot following you -- I am not following you, sorry.

BY MS. FULTZ:

Q. I'll be more clear. Sorry.

Would it change your opinion as to that time frame the average human perceived time frame, if that person told you I immediately saw the vehicle move?

A. The question here is what means immediately.

Q. If the person said, I saw when it began to move, does it change your opinion as to how long it took him to perceive?

A. No, because what we're discussing in related -- related to perception-reaction is that first there has to be action and there's a reaction, right? So in this case, you know, the action is vehicle movement. It has to happen. Secondly is the reaction. So what is the individual going to do when that happens? It's a mental process.

Q. It does not change your opinion?

A. It doesn't change my opinion.

Q. The example you used in your direct testimony was a

driver perceiving a vehicle stopped ahead; do you recall that?
A. Yes.
Q. Does it change your opinion at all as to that time frame we're talking about, the human perception, if a stopped vehicle is observed -- the person observing sees the reverse lights come on prior to -- just prior to its movement?
A. I think it's the same.
Q. It does not change your opinion?
A. No.
Q. We revisited your opinion as to the maximum speed achieved by the vehicle at 3.4 miles per hour; is that correct?
A. Yes.
Q. And would that be the speed if calculated at a constant rate across the 14 feet of its duration of travel?
A. No.
Q. And so that is your opinion as to the height of its speed reached?
A. Yes.
Q. And to arrive at that maximum speed you still don't believe you need to know when the vehicle came to a stop?
A. No.
MS. FULTZ: Can we go back to the slide with the two side by side?
MR. BRYANT: Yeah.
BY MS. FULTZ:
Q. Returning to Slide 36, on the photo to the right, how did you determine where to put that black dot?
A. I placed it next to the Placard No. 8.

Q. And what -- what are you using -- what are you attempting to calculate from the location next to Placard 8?
A. The possible locations, possible distances.
Q. Possible distance between what and what?
A. The vehicle and Officer Alfred.
Q. So for the purposes of measuring distance, at what point in time are you putting Deputy Alfred near Placard 8?
A. We pretty much not talking about time but the possibilities of distances between the vehicle and different stages.
Q. At just any random given point in time?
A. Yeah, pretty much. It's just distances, analyzing distances from that location to a vehicle where it started and where the vehicle ended.
Q. And in review you said you reviewed all of the case materials, the police reports for purposes of creating the distances, correct?
A. Yes.
Q. Why would you not calculate a -- from a point of reference described by the witness as closer to Placard 9?
A. The distance is only 5 feet.
Q. Okay. But my question is why would you choose Placard 8 as a point of reference as to where Deputy Alfred is if, what -- what is at issue here is what is on the left, was he near the fired cartridge casings --
A. Yes.
Q. -- when the event took place versus was he where he described standing near the flashlight, which would be marked

at Placard 9? Why would you choose Placard 8 versus 9 to create this comparison?

A. Because my thought process is that Officer Alfred has to be close to that shell casing at some point.

Q. Marked at Placard 8?

A. Yes.

MS. FULTZ: Nothing further.

THE COURT: Thank you.

Anything further?

MR. BRYANT: Just really quickly.

FURTHER REDIRECT EXAMINATION

BY MR. BRYANT:

Q. Mr. Morales, you were asked if you had changed your testimony when asked questions regarding when that vehicle moved, correct?

A. Yes.

Q. Did you change your testimony at all?

A. No.

Q. And again, you would agree with me that it's reasonable given the information that you have that that vehicle could have slightly began to move right before that shot, correct?

A. Correct.

Q. You would also agree that it's reasonable that that vehicle could have moved some time after that first shot, correct?

A. Correct.

Q. So therefore, are you saying that there is no absolute certainty as to when and by what mechanism that vehicle moved between that .65 period of idling and that first shot?

A. Correct.

MR. BRYANT: No further questions.

THE COURT: Thank you.

Ms. Fultz?

MS. FULTZ: Nothing. Thank you.

THE COURT: May the witness be excused?

MS. FULTZ: Yes.

MR. BRYANT: Yes, Your Honor.

THE COURT: All right. Thank you. You're excused.

Do you have any other witnesses?

MR. BRYANT: At this time the Defense will rest, Your Honor.

THE COURT: All right. Very well.

Do we have rebuttal?

MR. BRYANT: We'll do that subject to the admission of exhibits, Your Honor.

THE COURT: Okay. Very well.

Rebuttal?

MS. FULTZ: Briefly, yes.

THE COURT: Okay. Let's take our recess then. We'll take a 15-minute recess.

Don't talk about the case. And we'll hear the rebuttal after we come back, which will be 25 after.

Don't talk about the case. Don't form any opinions

or conclusions.

(The following proceedings were held outside the presence of the jury.)

THE COURT: We're on the record outside the presence of the jury.

How many witnesses do you have in rebuttal?

MS. FULTZ: Just one.

THE COURT: What's your time estimate?

MS. FULTZ: 15 minutes.

THE COURT: Okay. And you don't know what he's going to say, so you don't know about cross. All right. My suggestion would be when we finish then, we adjourn until 1:30 and then we work on these jury instructions and deal with this issue about (a)(1) and (a)(4) and make some decisions about that. I have some thoughts. And then have the jury come back at 1:30 for instruction and argument.

MR. BRYANT: Okay. Great. And, Your Honor, while we're on the record can we move to admit Exhibits 80 and 81? We had to redact the audio, and we also had to redact a previous exhibit marked 32.

MS. FULTZ: No objection.

THE COURT: Okay. Those are received in evidence. What else are you offering into evidence, everything that was shown?

MR. BRYANT: Everything that was shown, outside of the demonstrative.

THE COURT: No objection?

MS. FULTZ: No objection. We did go over them with Madam Clerk.

THE COURT: They're all received in evidence then.

MR. BRYANT: Thank you, Your Honor.

THE COURT: Not the PowerPoint.

MR. BRYANT: No, no.

MS. FULTZ: Right. But a copy should be marked to go with the record.

THE COURT: Okay, very well.

MR. BRYANT: I will provide that copy to the Court as well as Ms. Fultz.

MS. FULTZ: Thank you.

THE COURT: All right. I didn't include in the draft jury instructions the instruction that we took from the civil instructions about demonstrative evidence. We can add that in, if counsel want to have it.

MR. BRYANT: Sure.

THE COURT: Okay.

MR. BRYANT: Thank you, Your Honor.

(A recess was taken.)

(The following proceedings were held in the presence of the jury.)

THE COURT: Everyone is here. We're back on the record.

Members of the jury -- please have a seat, Counsel -- the defendant has presented his case and now the prosecutor has an opportunity for rebuttal. I understand there may be only one witness. I don't think it will take very long. Whenever that's done, we'll adjourn for the morning. There's some matters I'll need to discuss with the lawyers. We'll come back at 1:30. I'll instruct you on the law that applies to

this case. The lawyers will make their closing arguments. And you'll go into the jury room to make a decision.

So rebuttal. Ms. Fultz, you have a witness?

MS. FULTZ: Yes. Thank you. The People recall Detective Hernandez.

THE COURT: Very well. And, Detective Hernandez, you were never excused as a witness, so you don't need to take the oath again. You are still under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: Ms. Fultz, whenever you're ready.

MS. FULTZ: Thank you.

EDWARD HERNANDEZ,

recalled as a witness on behalf of the People, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FULTZ:

Q. Good morning.

A. Good morning.

Q. Detective Hernandez, you were present for the testimony of Mr. Morales, correct?

A. Yes.

Q. Would it be fair to say that there are some things on which you agree?

A. Yes.

Q. All right. And do you agree that the Chevy Trailblazer traveled 14 feet in reverse and later rolled an

additional approximately 2 feet?
A. Yes.
Q. Do you agree that the -- with Mr. Morales's first expression of his opinion that the vehicle reversed prior to the sounds of the first shot?
A. Yes.
Q. And do you agree with Mr. Morales's opinion as to the distance the vehicle traveled at any given time frame that we saw in his table or chart?
A. Well, his chart indicated exact measurements. I would disagree to their exactness. They would have to be approximate.
Q. And why is that?
A. Well, because he didn't indicate that he conducted several tests with several measurements. When you conduct an investigation with time and speed, you have to determine variables, and nothing is going to be exact. Everything should be approximate. I would conduct at least three speed tables, speed measurements with each increment of time to give myself an approximation, which is a fair analysis of a movement of a vehicle with regards to the shot.
Q. All right. So, for instance, Mr. Morales --
THE COURT: For the record, this is exhibit number?
MR. BRYANT: Sorry about that. That was something else. All right. Here we go. Okay.
MS. FULTZ: This is the demonstrative.
THE COURT: Very well. This is not received in evidence. Okay.

MR. BRYANT: It's Slide No. 34 for the record.
THE COURT: Thank you.
BY MS. FULTZ:
Q. Just taking one section, for example, Mr. Morales estimated the distance traveled in a certain time frame. And just for reference I'll use what he has marked the second shot, he indicates the vehicle has traveled .29 seconds, with an initial speed of .43 miles per hour, with an event duration -- make sure I'm following the same line of .3 seconds.
Do you -- would you agree with that analysis? We'll just use that time frame, for a point of reference?
A. Are we talking about the first shot?
Q. I think the line I'm looking at is called second shot?
A. Second shot. So the time stamp is 7.62. Event duration is .3 seconds. And acceleration is, just deals with gravity. And .43 initial speed. Distance traveled is .29. And .89 is the final speed. So it looks like he's indicating there's an acceleration between .43 and .89. So the vehicle is gaining speed in that time frame.
Again, these are his exact numbers based on a computer program. It's not something that it appears was done by hand with variables indicated in the problem to get an approximation, because again, nothing can be exact because we don't know per his testimony when the vehicle actually started to move, and he doesn't know when it actually stopped.
Q. Are those two factors that you would need to create an accurate analysis of these distances and speeds at any given

time?

A. I can approximate when it started based on the audio I hear, tires spinning, reverse lights are on, and at some point the vehicle goes in motion. So I will start there. And then I think we agreed in court last week, we estimated the movement time of 4.6 seconds because -- based on the six shots because we assume that once the sixth shot happened the vehicle stopped. And then I did a math problem here on the witness stand and showed the jury what the speed was.

What I can do is I initiate a vehicle movement at the time of the tires spinning. If I take duration of event is .28 seconds, I have a time. The distance traveled, I can estimate based on the speed, he has initial speed of .29. So I can go .29 divided by .28, and it will give me an approximation of distance traveled. Speed, distance traveled.

So I would have to do that for each shot. But I would approximate several variables and try to get an approximation after three or four rounds of that, just to kind of get a time distance, if that's what I wanted to do.

Q. Okay. Would you have to assume certain facts to create that calculation?

A. Yes. Again, I approximated speed last week. I showed you two different speed tables, because we said let's say the vehicle is traveling three point miles an hour. We did a time table and we came up with feet per second and velocity. And I did the same thing. Let's say the vehicle traveled four point miles per hour. We did a math problem. I came up with a speed approximation and a velocity.

So essentially that's what you're doing. You're taking distance. You're taking what you know. You know the distance. You don't know the speed. So if I can take the distance with an amount time of traveled, then I create a math problem. I will give you velocity. Then transition that to a possible speed.

Q. Is it possible to make these calculations based solely on the audio recording?

A. No.

Q. Do you agree with the measurements created, for instance, from the south most fence to, it looks like it's pointing -- I can't recall if that's the blue trash bin or I think it's to the front of the end of the tire trails on the slide. It's a little hard to see. But do you see where it says 16.5 and then there's some arrows and then 16.9?

A. Yes.

Q. Do you agree with those measurements?

A. No.

Q. Why not?

A. Well, it's not an approximation for one second. It appears to be done from an aerial view of a photograph or an image, maybe Google Maps. And they're not accurate.

Q. Were measurements of this whole area taken when the scene was investigated?

A. Yes.

Q. And is there disparity between the measurements you see depicted here and the measurements recorded by the investigating detectives?

A. Yes.
Q. Is there a calculated distance between the vehicle where it came to rest and Placard 9?
A. Yes.
Q. And what is that distance?
A. The distance to the driver's side rear wheel from reference point one was approximately 136 feet.
Q. The driver's side rear wheel and where?
A. And the -- to Placard 9. So a measurement is always to the center of a tire. So it was approximately 136 feet from the reference point one, which was a marked telephone pole out in the roadway, to the center of that driver's side rear wheel, which if I'm the driver it will be behind me. And Placard 9, which is the dropped flashlight was approximately 120 feet from reference point one with a differential of approximately 16 feet.
Q. And so from those two reference measurements are you able to calculate the distance from the driver's side rear wheel to Placard 9?
A. Yes. It's approximately 16 feet from the center of the wheel.
Q. You previously testified as to your opinion of the actions that caused the vehicle to move. Has anything in your opinion changed based on what you heard Mr. Morales testify to?
A. I'm sorry, ma'am, could you repeat the question, please?
Q. Sure. Do you recall in your previous testimony giving an opinion as to what occurred in this event?

A. Yes.
Q. Did you hear anything in Mr. Morales's testimony that changed your opinion?
A. No.
Q. Do you have an opinion as to the speed pattern of the vehicle -- the vehicle?
A. Yes.
Q. And what is that opinion based on?
A. It's based on the movement of the vehicle, the audio and the distance traveled, and then my opinion remains the same based on testimony here in the courtroom.
Q. And what is your opinion as to the pattern of the speed of that vehicle?
A. Pattern of vehicle, it started out I would -- based on the distance approximately 3.5 to 4 miles an hour, based on the distance and the movement of the vehicle, and rolled after acceleration, and at some point came to a stop.
Q. Were there any -- was there anything in Mr. Morales's testimony that was glaringly in error to you in his calculations of the scene?
MR. BRYANT: Objection. Vague as to glaringly in error.
THE COURT: Overruled.
THE WITNESS: Again, his testimony and the work that he did didn't allow for variables. He didn't fully explain that he conducted a test either once or twice or twice or three times and looked for other possibilities as to distance, time travel, speed and velocity.
BY MS. FULTZ:

Q. And then of what he testified to, on those subjects, change your analysis of the scene?
A. No.
Q. Thank you.
MS. FULTZ: That's all.
THE COURT: Thank you, Ms. Fultz.
Cross-examination?
MR. BRYANT: Yeah. Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BRYANT:
Q. Deputy Hernandez, you just testified that the vehicle was approximately 16 feet from where -- well, I apologize -- that the flashlight was approximately 16 feet from where the vehicle stopped, correct?
A. Where it was at rest, yes.
Q. Correct. So you would agree with me that if you move the vehicle back to where it started, you would have to approximate an additional 16 feet, correct?
A. Well, the wheel base on this vehicle is about 9 and a half feet. The vehicle total length is approximately 15 feet.
Q. So again, the vehicle moved 14 feet, correct?
A. Yes.
Q. And then it moved another 2 feet, correct?
A. Correct.
Q. So would you say that the total distance at rest was 16 feet from its starting point, correct? Just the total

distance of travel, not where the wheel base is, just the total distance of travel?

A. Yes. We established that.

Q. Could you subtract approximately how far this wheel base, the rear wheel base would be in terms of that feet, would it be 1 foot, 2 feet, how many feet would it be?

A. I'm sorry, what's your question, sir?

Q. My question is, you're saying you're calculating it from the rear driver's side wheel base, correct?

A. Yes.

Q. And so from the total distance of 16 feet that's being discussed you're saying that it's not necessarily 16 feet, correct? It's a shorter distance, right?

A. From what point to what point?

Q. From the point of the flashlight to the point of the vehicle, where you're identifying where that wheel base is, correct?

A. That's just the wheel base to the flashlight. From the wheel base to the edge of the bumper, I would say it's approximately 2 and a half to 3 more feet.

Q. Okay. So then -- so then in calculating this, you would say that it's 16 feet from the flashlight, 16 feet at rest, 16 feet from the point where the flashlight rests or the flashlight is found, to the point in which that wheel base is located, right?

A. Yes, according to the measurements.

Q. And you're saying that the rear bumper of the -- to the -- to the -- to the rear tire where that wheel base is is

approximately 2 and a half feet, correct?
A. Two and a half to 3 feet. It's an approximation.
Q. So let's subtract three from 16 feet and get a number of 13 feet, okay?
A. Yes.
Q. So you would agree with me that that flashlight is approximately 29 to 30 feet from where that car originally started?
A. Doing math, yes.
Q. Now, you had also talked about some of the variables that Mr. Morales used or did not use; do you recall that testimony?
A. Yes.
Q. You would agree with me that nobody really asked him how many variables he ran through his computer software program, correct?
A. Correct.
Q. So you don't know as we sit here today how many variables he possibly ran because nobody asked him, right?
A. I don't recall that, no.
Q. And you would agree with me that a computer program that is designed to make these calculations would be more accurate more often than not than a human who hand wrote all this stuff out?
A. The computer is only going to do what you tell it to do. It's only going to compute what you put inside it. If you run one test, come out with a set of numbers, that's your one test.

Q. You would agree just in general, computer programs that are designed to calculate certain numbers based upon input, if you gave that human the same input, that computer would be more accurate more often than not than the human?
A. I don't believe that's accurate. I believe they're the same, because math is not -- there's no gray matter in math. You're either right or wrong. So if you do a problem correctly, with the information that you're given, then the math problem is correct.
Q. Well, let's just say you're doing a bunch of different variables, right?
A. Correct.
Q. You would agree after awhile just by virtue of humans being tired or missing a number or misreading a number, there is more room for error from a human, who's trying to calculate a number of different possibilities than it would be for a computer program that would process all of this information, correct?
A. Correct.
Q. Now, you talked about a thorough investigation and we talked about a number of things as it related to your investigation. I asked you to calculate the speed of this vehicle approximately from the time it started to the time it stopped, do you recall that testimony?
A. From last week, yes.
Q. And you would agree with me that Mr. Morales actually has a faster maximum speed than you did, correct?
A. Yes.

Q. And you approximated that the speed of this vehicle moved between 2.7 miles per hour and 3.1 miles per hour, correct?
A. Correct.
Q. And you would agree with me there is no dispute that this vehicle's maximum speed was on average approximately three miles per hour, correct?
A. The measurements that I did in front of the jury was on the fly. It was something that I did as a demonstration, and I threw two sets of numbers out. I could have thrown out four sets of numbers and came up with different variables, different timetables.
Q. All right. But for whatever reason, both you and Mr. Morales came up with similar numbers, correct?
A. Yes. And I stipulated to that.
Q. Because there's only some variables and possibilities you could have given the constraints of the information that you're provided, right?
A. Correct.
Q. Let me ask you this, you were the lead detective on this case. Why is it that the very first time you ever calculated the speed of that vehicle was on the stand this past week?
A. I didn't just calculate it during trial. I did that from the very beginning. It's just for my own personal information. I didn't put it on paper.
Q. Don't you recall, I asked you have you ever calculated the speed of the vehicle from the time it started to

the time it stopped, and your testimony was, no, I never really thought about that; you don't recall that?

A. I didn't put it on paper.

Q. Okay. And you didn't put it in a report, right?

A. No.

Q. You would agree you never officially ran numbers to determine the speed of that vehicle, correct?

A. No, not on paper.

Q. Don't you think it would be important that if -- would you agree with me that a vehicle itself, the typical use of a vehicle is transportation, right? That's what it's supposedly used for, supposed to go from one point to another, correct?

A. Correct.

Q. And you would agree with me that with a vehicle that vehicle isn't necessarily something that could harm somebody, it could harm somebody by being in a car accident, and then it can be used to harm somebody by running them over, correct?

A. Yes.

Q. So in this instance, speed would be important in determining how this vehicle was being used, correct, how it was being utilized, right?

A. Yes.

Q. And Deputy Alfred testified that that vehicle was moving at a high rate of speed, correct?

A. Correct.

Q. And he even testified on the stand that he believed

it was moving between ten to 15 miles per hour, correct?
A. Correct.
Q. When you interviewed Deputy Alfred, and he told you that the vehicle was moving at a high rate of speed, would it have changed your opinion as to Deputy Alfred's either statements or perception if you would have determined that, in fact, that vehicle didn't move any faster than the period of 2.7 miles per hour and 3.1 miles per hour?
A. I can't determine what Deputy Alfred's perception was. That's his perception. If that's what you're asking me.
Q. So he said he -- the car was moving so fast that he couldn't move out of the way; do you recall that?
A. Yes.
Q. But would you agree with me Deputy Alfred said he also stayed stationary when he fired his shots, right?
A. Yes.
Q. Would you also agree with me when I asked Deputy Alfred, did he jump out of the way or try to avoid the car that's going to hit him, he said no, right?
A. I don't know if he said no or he didn't recall.
Q. My point is Deputy Alfred, if he was standing 10 feet away, was not hit by this vehicle, correct?
A. No.
Q. So if you're doing a thorough investigation, would it be -- and somebody is alleging that a vehicle was moving at a high rate of speed, and the vehicle -- you agree, if I have a firearm, and I'm pointing a firearm at you, you know that's meant to potentially kill you, right? Right?

A. Yes.
Q. A vehicle, not necessarily, I can walk out to the parking lot, somebody could be reversing, they're not trying to kill me, right?
MS. FULTZ: Objection. Relevance.
THE COURT: Sustained.
BY MR. BRYANT:
Q. So did you think it was important to conduct a thorough investigation by determining first the rate of speed which that vehicle was actually moving?
A. No.
Q. And why is that?
A. Because it was Deputy Alfred's perception at the time when he felt he had to defend himself because the moving vehicle was coming at him.
Q. Deputy Alfred also testified and he also made a statement that he walked along the east side of the fence or of the driveway and his foot path showed where he was going and towards Mr. Barber's house in a southbound direction, correct?
MS. FULTZ: Objection. Misstates the testimony.
THE COURT: Overruled.
THE WITNESS: I'm sorry, the question again, sir?
BY MR. BRYANT:
Q. Sure, Mr. -- or Deputy Alfred he testified and gave you a statement that he was on the east side of that driveway walking in the dirt, and it was supported by his footsteps in the dirt that were found heading in a southbound direction, correct?

A. Yes.
Q. We all learned that that, in fact, was not true, those footprints were heading north, correct?
A. Correct.
Q. So when we're trying to create a thorough investigation, did you think it was important to know the directionality of where those footsteps were going?
A. Yes.
Q. And you didn't do that because you were taking Deputy Alfred's word, correct?
A. No. I assume the footprints were going south.
Q. Can you assume -- is there room for error to assume as the lead detective when the evidence that is gathered by your CSI team clearly says something different, is that doing a thorough investigation?
A. No.
MR. BRYANT: Thank you. No further questions.
THE COURT: Thank you.
Any redirect?
MS. FULTZ: Yes. If I can have a moment, Your Honor.

REDIRECT EXAMINATION

BY MS. FULTZ:
Q. Detective Hernandez, showing Exhibit No. 20, do you recall Deputy Alfred's testimony -- you were present for his testimony, correct?
A. Correct.
Q. And do you recall his testimony that when he made

his approach, he pointed closer to the center of the driveway where we see what has previously been described as the gurney mark?

A. Do I recall him saying that?

Q. Yes, his initial testimony?

A. I believe he did.

Q. And the place from which he entered the driveway was around what on Exhibit 20, it's not depicted, but it would be in front of that white house structure to the right of the photograph, correct?

A. I believe so.

THE WITNESS: If I can review the placard location on this report, Your Honor?

THE COURT: Go ahead, sir.

THE WITNESS: Ms. Fultz, did you say Placard 20?

BY MS. FULTZ:

Q. No. Sorry. The exhibit is No. 20?

A. Oh, I'm sorry. What placard are you referring to?

Q. Well, do you remember his description of where he entered the driveway from?

A. He entered walking eastbound from after contacting Ms. Gallo, Mr. Cocchi, and then entered from north to south.

Q. Okay. So rounding the corner from what would be on the right side of the photograph coming up the driveway. Do you recall his testimony that he then moved to the east to have a line of sight on Mr. Barber?

A. Yes.

Q. And so when he was asked later, and I believe it

was on cross, about the path of placards, that was proposed to him in the question, not his description, his initial description of his path of travel, correct?

A. Yeah, I believe so.

Q. Now, you were asked about why you wouldn't have calculated the speed during the initial investigation, correct?

A. Yes.

Q. Would the outcome of your investigation have been different whether the vehicle's moving speed differed from Deputy Alfred's perceived estimation of that speed?

A. No.

MS. FULTZ: Nothing further.

THE COURT: Thank you.

Anything further?

MR. BRYANT: Yes.

RECROSS-EXAMINATION

BY MR. BRYANT:

Q. Exhibit 20 -- we'll do Exhibit 33. That's the first one I grabbed. It looks just like Exhibit 20. It might very well be a duplicate.

Detective Hernandez, you were just asked questions about Deputy Alfred's original testimony when he first got on that stand; do you recall that?

A. Yes.

Q. Just a few seconds ago. And don't you recall that Deputy Alfred testified that when he first saw that vehicle moving, he was between Markers 6 and 7 right here? Do you see

here, these two markers right here? Didn't his original testimony state that, I was between Markers 6 and 7 when that car first started moving; do you recall that?

A. I recall him saying that, yes.

Q. And do you recall that after we had a break, I came back and he had changed his story, and I asked Deputy Alfred, did you go back and read something or look at somebody or talk to somebody? Why has your story changed? Do you recall that question?

A. In some manner, yes.

Q. And his response was, no, I didn't, I didn't read anything or I didn't talk to anybody, right?

A. Something to that effect.

Q. And you recall that in a statement to you when you interviewed him and on the stand during this trial and even listening to the audio, Deputy Alfred said he fired that vehicle shortly after he heard those tires trying to gain traction, correct?

A. He fired at the vehicle?

Q. Yes.

A. Yes.

Q. And during your investigation you would ask Deputy Alfred, if he had the ability to move out of the way and go to this yard area to the right, correct?

A. Correct.

Q. And he said it was not possible because I was 8 to 10 feet close to the vehicle, and I was being blocked by the fence directly to the left of the vehicle in its current state

and the wooden fence directly to the right. Do you recall those statements he gave to you in the interview?

A. Yes.

Q. And, in fact, we just calculated even if we were to take his story that -- where the flashlight landed, that is where he shot, even if we were to take that as true approximately 30 feet away, and I'm going to go to exhibit number -- actually, exhibit number -- my apologies. I'm trying to go fast here. I'm almost done.

One second. It's easier for me to do this. Just bear with me for one second. I apologize.

Exhibit No. 72. Could I publish this, please? Exhibit No. 72, you see this is an opening of the yard, right?

A. Yes.

Q. And do you see Marker No. 9 in the right-hand corner where this flashlight is?

A. Yes.

Q. That looks like it's almost, you know, somewhat directly across from this opening in the yard, correct? Approximately, right?

A. Approximately.

Q. Remember I asked you a number of questions about the use of force, when deadly force was reasonable, and I asked you if a vehicle was moving five miles per hour and you were approximately 30 feet away and you had an opening that you could go to, do you recall testifying that, you know, you based upon your experience, training and knowledge as a reasonable officer, would have gone to this fence area and come into the

yard because the vehicle is not moving very fast. Do you recall that testimony?

MS. FULTZ: Objection. Scope.

THE COURT: Sustained.

BY MR. BRYANT:

Q. When Deputy Alfred had testified to you that the vehicle was moving fast, and he couldn't avoid getting hit and you didn't make those calculations as to whether or not he could avoid getting hit, you would agree with me that it would have been helpful as an objective fact finder who's just investigating this matter to know that speed of the vehicle in order to determine whether or not, based upon where Deputy Alfred placed himself, it would have been possible for him to avoid using deadly force and avoid a collision with the vehicle, correct?

MS. FULTZ: Objection. Speculation.

THE COURT: Sustained.

MR. BRYANT: No further questions, Your Honor. Thank you.

THE COURT: Thank you.

Anything further, Ms. Fultz?

MS. FULTZ: Very briefly.

FURTHER REDIRECT EXAMINATION

BY MS. FULTZ:

Q. If the vehicle had moved when the shots were fired, would you agree that that's no longer 30 feet?

A. Correct.

Q. And was Deputy Alfred present when the placards were placed at the scene?
A. No.
Q. So do you have any way of knowing when he identified himself at the placard points in the photograph what he was trying to orient himself to?
MR. BRYANT: Objection. Vague.
THE COURT: Overruled.
THE WITNESS: I'm sorry, is your question, was he trying to -- where was he trying to orient himself?
BY MS. FULTZ:
Q. Well, you would have no way of knowing what he's looking at to identify for himself on the photograph what would cause him to think he was at Placard 6 or 7 if he's using 6 and 7 as a reference point --
MS. FULTZ: Sorry, that was really unclear. Can I rephrase?
THE COURT: I'll sustain your own objection.
MS. FULTZ: Thank you.
BY MS. FULTZ:
Q. When Deputy Alfred testified and stated that he believed he was somewhere around Placards 6 and 7, right, do you recall that testimony?
A. Yes.
Q. And he referred to placards, correct?
A. Yes.
Q. At that point do you have any way of knowing what item that he would have seen in real time he was orienting

himself to when he identified those placards?
MR. BRYANT: Calls for speculation.
THE COURT: Sustained.
MS. FULTZ: That's all. Thank you.
THE COURT: Thank you.
MR. BRYANT: No further questions, Your Honor.
THE COURT: Okay. Thank you. You can step down.
THE WITNESS: Thank you, Your Honor.
THE COURT: Any other evidence?
MS. FULTZ: No.
THE COURT: Okay. You've heard all the evidence. I need to speak to the lawyers about some issues, so we'll go ahead and take our recess now. Come back at 1:30. And I'll give you the instructions on the law, and you'll hear the closing arguments of the lawyers.
Now, although you've heard all the evidence, don't form any opinions or conclusions yet. Don't decide how you would vote when you're deliberating. There may be something in the law that I tell you about that influences those thoughts. There may be something in the closing arguments of the lawyers that point out something in the evidence that you haven't considered. Keep an open mind. Just don't think about the case.
Have a nice lunch, and I'll see everyone at 1:30.
(The following proceedings were held outside the presence of the jury.)
THE COURT: We're on the record outside the presence of the jury.

First of all, the stipulation that I read to the jury was somewhat different from the stipulation given to me. We changed executive officer to peace officer. Cara has changed that on the original, so it's a clean copy for the file.

Now, this issue about lessers. The defendant is charged with violating Penal Code Section 245(c), assault on a peace officer with either a deadly weapon or great bodily injury. Subsection (c) does not distinguish between deadly weapon and great bodily injury. In either case, the sentencing triad is three, four or five years.

There is a lesser to 245(c), and there's evidence to support that in this case, because there's an issue whether Mr. Barber knew or reasonably should have known the Deputy Alfred was a peace officer. So if the jury finds that the charge is proven except for that element of peace officer, well, then, what do they convict him of? 245(a)(1) is assault with a deadly weapon. 245(a)(4) is assault by means of force likely to produce great bodily injury. Both of those the sentencing triad is two, three or four years.

Now, the Supreme Court in People versus Aguayo, we discussed this before, 13 Cal.5th 974, at page 993, writes, quote, Because force likely assault and assault with a deadly weapon are the same offense for purposes of Section 954, any alternative conviction would, in fact, be duplicative and improper as a matter of law. Citations. Having carefully considered the attorney general's arguments we find ample support for our conclusion that assault with a deadly weapon

and force likely assault are, quote, Different statements of the same offense, close quote, Section 954. And then there's citations, and then there is Footnote No. 7 in the opinion.

And Footnote No. 7 in the opinion reads, quote, We disapprove of In Re: Jonathan R. Supra 3 Cal.5th 963, which reached a different conclusion. See an ante at page 983 to the extent it is inconsistent with this opinion. Further, based on our holding that these two types of aggravated assaults are alternative means of committing the same offense, we need not determine whether force likely assault is a leaser included offense of assault with a deadly weapon, end of quote.

So the Court doesn't say -- doesn't make any decision about whether it's a lesser or not. It says it's not important for their purposes. I think Ms. Fultz points something out that's very important. That for our purposes, I think it is important to distinguish between the two. Because Penal Code Section 1192.7 subsection (c) lists the serious crimes, which have consequence for sentencing and consequences for, you know, further convictions later on.

Subsection 23 lists a dangerous or deadly weapon as a serious offense. But 245(a)(4), assault with a deadly weapon, is not listed. So I think we do need to distinguish. I don't know that we need to distinguish it by saying that one is a lesser of the other. What I am wondering if we can do is give the lesser of assault with a deadly weapon or force likely to produce great bodily injury, but if they return a verdict of guilty, then they have to specify by checking either a deadly weapon or assault by means of force likely to produce great

bodily injury. Although, I mean, they might find both.

So I don't really see one as a lesser of the other, because they could find to be both. They could find that it's a deadly weapon. They could also find that it's force likely to produce great bodily injury. But if they find that it was a deadly weapon, then we know that and that can be relevant for sentencing and for future consequences for Mr. Barber.

So I don't know if we need to repeat the instruction all over again as a lesser of a lesser, because it really isn't. They're really alternatives. Just have them specify which it is. Is it one? Is it the other? Or is it both?

What are your thoughts, Ms. Fultz?

MS. FULTZ: So my thoughts, and I sort of drafted the updated verdict forms this way with this thought in mind, is to instruct on the lesser included of (a)(1), the 245(a)(1), and a lesser related of 245(a)(4). And just for -- to be very clear in the record, I think we would have to give the alternative language, two separate instructions of Instruction 875.

THE COURT: Okay. What are your thoughts about that? That's certainly I think a sensible way to approach it. I don't know if there are other ways.

MR. BRYANT: I think that the jury has to make a determination on both of these, right? So they're going to decide whether either, A, deadly force, B, great bodily injury, or C, both, right? Or D, none. I think what we're trying to do is figure out a way to make it make the most sense.

And so I don't have an objection to the proposal of

the People, because again, at the end of the day, the jury is going to decide one way or another, did he use a deadly weapon or was there great bodily injury? I think the problem that the Court is facing is if it was just all in one, they just say yes, but if it was really great bodily injury, then there's a different sentencing issue. We will never know what the jury is thinking.

THE COURT: I think it doesn't matter what the jury thinks about great bodily injury if they find a deadly weapon. So if we instruct -- so I like Ms. Fultz's ideas that they would only get to the question of, did he commit assault by means of force likely to produce great bodily injury, not on a peace officer. They get to that question only if they find him not guilty of assault with a deadly weapon.

MR. BRYANT: Correct. I think that --

THE COURT: Ms. Fultz?

MS. FULTZ: Yes.

THE COURT: Okay. Let's go into chambers then and do all this wordsmithing.

MR. BRYANT: Okay.

THE COURT: And then we'll go on the record and either have you both agree to everything or you can place any objections on the record. Okay. So can we do this in chambers.

(Whereupon the lunch recess was so taken.)

SAN BERNARDINO, CALIFORNIA, WEDNESDAY, DECEMBER 11, 2024
AFTERNOON SESSION
DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE
APPEARANCES:
The Defendant with his counsel,
JAMES BRYANT, Attorney at Law,
RYAN DUCKETT, Attorney at Law and
RODNEY DIGGS, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.
(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)
--o0o--
THE COURT: We're on the record, outside the presence of the jury. During the break I did see a mistake. Maybe it was something one of you caught.
MS. FULTZ: Well, if I may start the -- starting with the face page of the case number?
THE COURT: Yes.
MS. FULTZ: It's 21001312.
THE COURT: Okay.
MS. FULTZ: And then page 14, Instruction 375.
THE COURT: Yes.
MS. FULTZ: At the very first paragraph, offenses of resisting a peace officer and assault and of a peace officer, we can take out.
THE COURT: Okay.
MS. FULTZ: And then in the line that says in evaluating this evidence, below the indented portion.

THE COURT: Yes.
MS. FULTZ: It says, uncharged, uncharged offenses.
THE COURT: Thank you.
MS. FULTZ: On page 16 in Instruction 860 -- page 17.
THE COURT: Yes.
MS. FULTZ: In deciding whether --
THE COURT: I'm sorry, 860?
MS. FULTZ: On page 17.
THE COURT: Yeah, I've changed the pages so I can read it to the jury.
MS. FULTZ: Sorry. The third to the last line of Instruction 860.
THE COURT: I don't know what you're talking about.
MS. FULTZ: The line that reads, in deciding whether.
THE COURT: Oh, I see, I'm missing a page. Never mind. Okay. Third to the last line?
MS. FULTZ: Yes.
THE COURT: An object?
MS. FULTZ: Correct.
THE COURT: Oh, I think it was 2670 that I made changes to.
MS. FULTZ: Okay.
THE COURT: The first paragraph, the People have the burden of proving beyond a reasonable doubt that Christopher Alfred was lawfully performing his duties as a peace officer for the crimes of attempted murder of a peace officer and assault on a peace officer with a deadly weapon or force likely to cause great bodily injury.

MS. FULTZ: Correct.
THE COURT: Okay. Anything else?
MS. FULTZ: On page 19 we had a similar typo.
THE COURT: I changed this to 875(a), I don't think that's in your version.
MS. FULTZ: Yes.
THE COURT: I call it 875(a).
MS. FULTZ: Yes, I do have that.
THE COURT: Okay. And --
MS. FULTZ: The last line of Instruction 875(a) has the same typo, can an object.
THE COURT: Thank you. Then 875(b)?
MS. FULTZ: It's not in that.
THE COURT: I'm sorry?
MS. FULTZ: That's all I have.
THE COURT: Okay. And, Mr. Bryant, do you agree with all of those?
MR. BRYANT: There's just one more, Your Honor. It's on page 4, under 104, the last paragraph, where it starts with, the court reporter is making, the second line should be after the court reporter's record be read, it's just a double to, to to.
MS. FULTZ: Is the Court rereading the 100 series?
THE COURT: No, I'm not going to. But with your permission I'll delete the double to.
MS. FULTZ: Yes.
THE COURT: Okay. Give me a moment to make these edits.
(Brief pause.)

THE COURT: Okay. Could you switch the thing over to my computer please and let's bring the jury in.

(The following proceedings were held in the presence of the jury.)

THE COURT: Everyone is present. We're back on the record.

As I told you at the beginning of the case, the law requires that I read the instructions to you. You'll also have them in written form to refer to, so if you do miss something, don't panic about that. The lawyers are going to talk about the instructions in their closing arguments as well. I put them on the overhead. If it helps you to follow along as I read, feel free to do so. If it doesn't help you, I understand that.

Some people, you know, read at different speeds silently than someone can speak. So don't feel obligated to read them on the overhead. But it's there for your assistance if that helps you. Okay.

Members of the jury, I will now instruct you on the law that applies to this case. I will give you a copy of the instructions to use in the jury room. You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial.

You must not let bias, sympathy, prejudice or public opinion influence your assessment of the evidence or your decision. Many people have assumptions and biases about or stereotypes of other people and may be unaware of them.

You must not be biased in favor of or against any party, witness, attorney, defendant or alleged victim, because of his or her disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age or socioeconomic status. You must follow the law as I explain it to you, even if you disagree with it.

If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions. Pay careful attention to all of these instructions and consider them together. If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.

Some words or phrases used during this trial have legal meanings that are different from their meanings in every day use. These words and phrases will be specifically defined in these instructions.

Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions, are to be applied using their ordinary, every day meanings.

Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

Do not use the internet or a dictionary or social media in any way in connection with this case, either on your

own or as a group. Do not investigate the facts or the law, or do any research regarding this case, either on your own or as a group. Do not conduct any tests or experiments or visit the scene of any event involved in the case. If you happen to pass by the scene, do not stop or investigate.

You have been given notebooks and may have taken notes during the trial. You may use your notes during deliberations. Your notes are for your own individual use to help you remember what happened during the trial. Please keep in mind that your notes may be inaccurate or incomplete.

If there is a disagreement about the testimony at trial, you may ask that the court reporter's record be read to you. It is the record that must guide your deliberations, not your notes. You must accept the court reporter's record as accurate.

Do not ask the court reporter questions during the read back and do not discuss the case in the presence of the court reporter.

Please do not remove your notes from the jury room. At the end of the trial, your notes will be collected and destroyed.

The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime or brought to trial.

A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell

you the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence and anything else I told you to consider as evidence.

Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.

During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustain an objection, you must ignore the question. If the witness was

not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose.

During the trial, you were told that the People and the Defense agreed or stipulated to certain facts. This means that they both accept those facts as true. Because there's no dispute about those facts, you must also accept them as true.

You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.

The court reporter has made a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's record be read to you. You must accept the court reporter's record as accurate.

Facts may be proved by direct or circumstantial evidence or by a combination of both. Direct evidence can prove a fact by itself. For example, if a witness testifies he saw it raining before he came into the courthouse, that testimony is direct evidence that it was raining.

Circumstantial evidence may also be called indirect evidence. Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial

evidence because it may support a conclusion that it was raining outside.

Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of the charge, including intent and mental state and acts necessary to a conviction. Neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence.

Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. Also, before you may rely on circumstantial evidence to conclude that the defendant is guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.

If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must only accept reasonable conclusions and reject any that are unreasonable.

You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.

You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

In evaluating a witness's testimony you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

Among the factors that you may consider are:

How well could the witness see, hear or otherwise perceive the things about which the witness testified?

How well was the witness able to remember and describe what happened?

What was the witness's behavior while testifying?

Did the witness understand the questions and answer them directly?

Was the witness's testimony influenced by a factor, such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how the case is decided?

What was the witness's attitude about the case or about testifying?

Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

How reasonable is the testimony when you consider all the other evidence in the case?

Did other evidence prove or disprove any fact about which the witness testified?

Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the

differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event, yet see or hear it differently.

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

The crimes at issue in this case involve -- or excuse me -- require proof of the union or joint operation of act and wrongful intent or mental state.

The following crimes require a specific intent:

Attempted murder as charged in Count 1.

For you to find the person guilty of this crime, that person must not only intentionally commit the prohibited act but must do so with a specific intent.

The specific intent required for the crime of attempted murder is intent to kill.

For the additional allegation, that the attempted murder was of a peace officer, the mental state required for that allegation is that the defendant knew or should have known Deputy Alfred was a peace officer.

The following crimes require general criminal intent:

Assault on a peace officer with a deadly weapon or a force likely to cause great bodily injury, as charged in

Count 2, and assault with a deadly weapon and assault with force likely to cause great bodily injury, both lesser crimes of the crime charged in Count 2.

For you to find a person guilty of any of these crimes, that person must not only commit the prohibited act but must do so with wrongful intent. A person acts with wrongful intent, when he intentionally does a prohibited act. However, it is not required that he intend to break the law. The act required is explained in the instruction for each crime.

Additionally, the crime charged in Count 2, assault on a peace officer with a deadly weapon, or force likely to cause great bodily injury, the mental state required is that the defendant knew or should have known Deputy Alfred was a peace officer.

The distinction between the crime charged in Count 2 and the lesser crimes of assault with a deadly weapon or assault with force likely to cause great bodily injury, is that the lesser crimes do not require that the defendant knew or should have known Deputy Alfred was a peace officer. Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant.

The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence.

If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe.

Do not simply count the number of witnesses who

agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without any reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point.

During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.

You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

1. To evaluate whether the witness's testimony in court is believable;

AND

2. As evidence that the information in those earlier statements is true.

Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide.

In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or

information on which the expert relied in reaching that opinion.

You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence.

An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved.

If you conclude that the assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications.

Witnesses who were not testifying as experts gave their opinions during trial. You may, but are not required to, accept those opinions as true or correct. You may give the opinions whatever weight you think is appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.

You must decide whether information on which the

witness relied was true and accurate. You may disregard all, or any part of any opinion you find unbelievable, unreasonable or unsupported by the evidence.

A defendant has an absolute Constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have proved -- failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way.

The People are not required to prove that the defendant had a motive to commit any of the crimes charged or the lesser crimes. In reaching your verdict you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show that the defendant is not guilty.

The People presented evidence that the defendant committed the offenses of resisting a peace officer and assault of a peace officer that were not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses.

Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this

evidence entirely.

If you decide that the defendant committed the uncharged offenses, you may but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted with the intent to kill in this case, or the defendant had a motive to commit the offenses alleged in this case, or the defendant knew or should have known that Deputy Alfred was a peace officer or the defendant's actions were not the result of mistake or accident.

In evaluating this evidence consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose.

Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Count 1 and Count 2 or the lesser crimes. The People must still prove each charge beyond a reasonable doubt.

The defendant is charged in Count 1 with attempted murder.

To prove that the defendant is guilty of attempted murder, the People must prove that:

1. The defendant took at least one direct but ineffective step toward killing another person;

AND

2. The defendant intended to kill that person.

A direct step is more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

A person who attempts to commit murder is guilty of attempted murder even if after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control.

On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder.

If you find the defendant guilty of attempted murder under Count 1, you must then decide whether the People have proved the additional allegation that he attempted to murder a peace officer.

To prove this allegation, the People must prove that:

1. Deputy Christopher Alfred was a person employed as a peace officer by the San Bernardino County Sheriffs

Department, lawfully performing his duties as a peace officer;

AND

2. When the defendant attempted the murder, the defendant knew or reasonably should have known that Deputy Christopher Alfred was a peace officer who was performing his duties.

The duties of a peace officer include parole, responding to calls for service, and investigating crimes.

A police officer is not lawfully performing his or her duties if he or she is unlawfully detaining someone.

Instruction 2670 explains when a detention is unlawful.

The defendant is charged in Count 2 with assault with a deadly weapon other than a firearm or force likely to produce great bodily injury on a peace officer, in violation of Penal Code Section 245.

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant did an act with a deadly weapon other than a firearm, that by its nature would directly and probably result in the application of force to a person, or with force likely to produce great bodily injury;

2. The defendant did that act willfully;

3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone;

4. When the defendant acted, he had the present

ability to apply force likely to produce bodily injury, or with a deadly weapon other than a firearm to a person;

5. When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer;

AND

6. When the defendant acted, he knew or reasonably should have known that the person assaulted was a peace officer who was performing his duties.

Someone commits an act willfully when he or she does it wilfully or on purpose. It is not required that he or she intend to break the law, hurt someone else or gain any advantage.

The terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough, if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone. The People are not required to prove that the defendant actually intended to use force against someone when he acted. No one needs to actually have been injured by defendant's act, but if someone was injured you may consider that fact, along with all the other evidence in deciding whether the defendant committed an assault.

Great bodily injury means significant or

substantial physical injury. It is an injury that is greater than minor or moderate harm.

A deadly weapon is any object, instrument or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury. In deciding whether an object is a deadly weapon, consider all the surrounding circumstances.

The duties of a peace officer include patrol, responding to calls for service and investigating crimes.

A person employed as a police officer by the San Bernardino County Sheriffs Department is a peace officer.

The People have the burden of proving beyond a reasonable doubt that Christopher Alfred was lawfully performing his duties as a peace officer for the crimes of attempted murder of a peace officer and assault on a peace officer with a deadly weapon or force likely to cause great bodily injury. If the People have not met this burden, you must find the defendant not guilty of these crimes and allegations.

A peace officer is not lawfully performing his or her duties if he or she is unlawfully detaining someone.

A peace officer may legally detain someone if:

1. Specific facts known or apparent to the officer lead him or her to suspect that the person to be detained has been, is or about to be involved in activity relating to crime;

AND

2. A reasonable officer who knew the same facts would have the same suspicion.

Any other detention is unlawful.

In deciding whether the detention was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he detained the person.

Totality of the circumstances means all facts known to the peace officer at the time, including the conduct of the defendant and Christopher Alfred leading up to the use of deadly force.

If a person knows or reasonably should know that a peace officer is arresting or detaining him, the person must not use force or any weapon to resist an officer's use of reasonable force.

A lesser crime to the crime charged in Count 2, is assault with a deadly weapon other than a firearm. Do not consider this crime unless you find the defendant not guilty of the crime charged in Count 2, assault on a peace officer with a deadly weapon other than a firearm or force likely to cause great bodily injury.

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant did an act with a deadly weapon other than a firearm, that by its nature would directly and probably result in the application of force to a person;

2. The defendant did that act willfully;

3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the

application of force to someone;

AND

4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person.

Someone commits an act willfully when he does it willingly or on purpose. It is not required that he intend to break the law, hurt someone else or gain any advantage.

The terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough, if it is done in a rude or angry way.

Making contact with another person, including through his or her clothing is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone. The People are not required to prove that the defendant actually intended to use force against someone when he acted. No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault.

A deadly weapon is any object, instrument or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury. The deadly weapon in this case is alleged to be the vehicle.

Great bodily injury means significant or

substantial injury. It is an injury that is greater than minor or moderate harm.

In deciding whether an object is a deadly weapon, consider all the surrounding circumstances.

A lesser crime to the crime charged in Count 2 is assault with force likely to cause great bodily injury.

Do not consider this crime unless you find the defendant not guilty of the crime charged in Count 2, assault on a peace officer with a deadly weapon other than a firearm, and not guilty of the lesser crime of assault with a deadly weapon.

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant did an act that by its nature would directly and probably result in the application of force to a person;

2. The force was likely to produce great bodily injury -- I apologize. These numbers are wrong.

The second 2, which is actually 3. The defendant did that act willfully;

3, as listed but it's actually 4. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

AND

What's listed as 4 is actually 5. When the defendant acted, he had the present ability to apply force

likely to cause great bodily injury.

We'll get those numbers corrected before the instructions go to you in the jury room.

Someone commits an act willfully when he does it willingly or on purpose. It is not required that he intend to break the law, hurt someone else or gain any advantage.

The term application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough, if it is done in a rude or angry way.

Making contact with another person, including through his or her clothing is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone. The People are not required to prove that the defendant actually intended to use force against someone when he acted. No one needs to actually have been injured by defendant's act, but if someone was injured, you may consider that fact, along with all the other evidence in deciding whether the defendant committed an assault.

Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one.

If you find the defendant not guilty of assault on

a peace officer with a deadly weapon or force likely to cause great bodily injury, you may then consider the lesser crime of assault with a deadly weapon.

If you find the defendant not guilty of assault with a deadly weapon, you may then consider the lesser crime of assault by means of force likely to cause great bodily injury.

Do not return a verdict for a lesser crime, if you find the defendant guilty of the greater crime.

Okay. That's it for the instructions that I am going to read. The last one I'll read is 3550, after the closing arguments of the lawyers. So if you would shut down my computer. Thank you.

All right. Ms. Fultz, would you like to make a closing argument?

MS. FULTZ: Yes. Thank you.

THE COURT: Feel free to use the well.

MS. FULTZ: Good afternoon.

(Audio played; not reported.)

MS. FULTZ: In a 30-second encounter on April 27th, 2021, what could have been a peaceful exchange between a Adelanto patrol deputy and a resident turned into a near deadly, for a patrol deputy, incident in a long narrow driveway surrounded by multiple forms of fencing, all of which were estimated to be approximately 6 foot high.

When Steffon Barber, the defendant, instead of complying with, hey, bud, come out here, instead of engaging in a conversation, instead of asking for help for whatever maybe was going on, decided against angrily and against a lawful

command not to, entered his vehicle, threw it in reverse and hit the gas, and nearly ran down Deputy Alfred as he stood behind that vehicle.

We spent a lot of time talking about Deputy Alfred's movements and where he was, and a lot of the things related to the actions and movements of Deputy Alfred. But what requires your attention and deliberation are the actions of the defendant, Steffon Barber.

And you heard some instructions about lawful performance, and we will get into a little bit about what was required of Deputy Alfred, but when you are given the case and you are asked to go in the deliberation room and you are given verdict forms to sign, it will be related to the actions of the defendant, Steffon Barber. Let's talk about what's charged.

Count 1 is attempt murder. You heard the instruction. The defendant took at least one direct but ineffective step towards killing another person. And the defendant intended to kill that person. Now, in order for you to convict Mr. Barber of Count 1, I have to prove to you these two elements, and these are, of course, abbreviations. Please follow the instructions as they're provided by the Court.

So let's talk about what evidence supports each of these elements. Let's look at Element No. 1. The defendant took at least one direct but ineffective step towards killing another person.

Well, you heard the testimony of Deputy Christopher Alfred. You heard him describe the events. You heard him describe that he was working the patrol shift. He answered a

call for service. He arrived at the location on White Avenue in the town of Adelanto. He made contact with the reporting parties. He took a statement from them to figure out what's going on. Why am I here? He agreed to go and talk to the person that they were having the problem with. And then that leads to the encounter that we just listened to in the recording.

So you have this eyewitness account, what he recollects from about three and a half years ago, and you also have his belt recording that we just listened to a portion of it. You have the entire recording of this call for service, from the time his vehicle arrives until the end of the gunshots. And you will have that recording with you in the deliberation room, if you choose to listen to it again.

(Audio played; not reported.)

MS. FULTZ: You also have photographs of the physical evidence. You had testimony from Detective Hernandez, who walked the scene, who saw these items of evidence that were photographed for you and the meaning and significance of them.

Well, at Placard 14, it's very difficult to see in this even smaller photograph version form in the PowerPoint, but you'll have the photo printed for your review in the deliberation room. And you heard the testimony that that gouge mark with the slightly darker dirt, that's where there was moisture, that's showing the displacement of the dirt from the rear tire.

This was a rear wheel drive vehicle. The rear tire losing traction as it was spinning because of the depression of

that gas pedal hitting the gas, and causing the tire to lose traction before it actually began to move.

You also have the photos of the tire tracks which showed the vehicle moved. The vehicle moved 14 feet in the direction of Deputy Alfred in that encounter that you hear in the recording.

The physical evidence shows that the defendant took a direct step. What is that direct step? He got into a 5,000 pound piece of metal and accelerated it at another human being. That is the direct step.

Now, the other element is the intent to kill. And this is almost always going to be a circumstantial evidence. People don't narrate their lives the way Will Ferrell does in movies. So we have to look at the surrounding circumstances.

You have the physical evidence, the, again, there's the photograph at Placard 14, showing not just the gouge mark from the rear tire when it lost traction and began -- then began to accelerate, but next to the gouge mark is the tire impression left by the front tire.

And why is that important that they're next to each other? It shows that there was a turning movement. If the vehicle just moved in a direct straight path, those tracks would have been exactly on top of each other.

You also heard from Maria Gallo, who testified that in the instance that led to her calling 911, she described the defendant's demeanor as angry, and he made me fear that we were about to be assaulted. That was how she described his demeanor. This was the mind set just prior to Deputy Alfred

arriving at the location.

You also heard from Joseph Cocchi, who described the defendant's demeanor as aggressive and violent. He was talking about him banging on the car doors, trying to open all the car doors on both Mr. Cocchi and Ms. Gallo's vehicles.

You heard the 911 call. So this wasn't just an instance where a neighbor was maybe like an elevated mood. This was, I was in fear such that I made an excuse to jump in my wife's car. We turned around the corner of the driveway, out of the view of the defendant, and we called 911. We were too scared to go into our home. That is the circumstantial evidence of the state of mind that was described to you, that the defendant was in just prior to Deputy Alfred's arrival.

You also have Deputy Alfred's reaction to that direct step. And he testified to you that when he saw that vehicle coming at him, he discharged his firearm. You hear in the recording he discharged his firearm six times. We know that he had, it's a 13-load magazine, with one in the chamber, 14 rounds available. I asked him, why did you stop at six? He said the vehicle stopped moving. His reaction was to a threat that was coming at him.

And, of course, you have the recording of Mr. Barber himself, his first reaction to Deputy Alfred when he arrived on scene.

(Audio played; not reported.)

MS. FULTZ: That is not a friendly reaction. And no one is required to have a friendly reaction to law enforcement. But it was an aggressive reaction. It was using foul language.

It was using raised voice. His demeanor as described by Ms. Gallo, as described by Mr. Cocchi, what we hear in the recording, and then coupled with the actions taken with that vehicle, all demonstrate an intent to kill.

In his state of mind you also have the -- you heard the revving of the engine. You can consider the action when it was described by the witnesses and the experts, that in order to make the engine make that revving sound that you hear, you have to hit the gas. Even Mr. Morales conceded that eventually. That you have to depress that gas pedal to make the engine rev.

And this makes me think of like a road rage situation. When someone is angry and depresses that gas pedal you get that loud engine revving sound.

And consider the weapon that was used. The weapon used in this incident when he drove at Deputy Alfred was a 5,000 pound motor vehicle. That is, if it doesn't kill, it's going to cause some damage.

Now, you also heard testimony from several other deputies. And you were instructed you can only use those in a very limited way. Here, you can use the evidence that you heard from Deputies VanBrimmer, Deputy Layos and Deputy Ortega in considering intent.

So what did we hear from Deputy VanBrimmer? In 2018, that he had an encounter with the defendant and while wearing the same uniform, that Deputy Alfred wore on April 27th in 2021, that they had an encounter where he failed to follow commands and fought with law enforcement.

In 2018, again, you heard from Deputy Layos, Deputy Layos described an incident where he and his partner had to contact the defendant while in that same uniform. And that Deputy Layos ended up getting tased as the defendant was taking the taser from his partner.

You also heard from Deputy Ortega that in 2021, earlier than this incident, that there was an encounter again with the defendant, uniformed officers in the same Class A Sheriffs Department issued uniforms, that the defendant angrily reacted to the deputies' contact. He testified that his partner Deputy Johnson was punched by the defendant. And that he headbutted Deputy Ortega.

Well, in considering the intent of the defendant, in his actions toward Deputy Alfred, you have a sheriffs deputy showing up in that same uniform and a consistent reaction, although escalated certainly here. The defendant took a step to kill Deputy Alfred when he accelerated his vehicle toward him, and the defendant intended to kill Deputy Alfred when he accelerated his vehicle toward him.

The defendant is guilty of attempt murder.

There's also an allegation that is separate from the attempt charge. And that is, did the defendant intend to kill a sheriffs deputy? The elements here are that Deputy Alfred was a peace officer, lawfully performing his duties as a peace officer. You just heard the instruction on what lawful performance is. We'll talk about that a little bit.

And when the defendant attempted the murder, the defendant knew or reasonably should have known that Deputy

Alfred was a peace officer who was performing his duties.

So what do we know about Deputy Alfred in his capacity as a sheriffs deputy for the San Bernardino County Sheriffs Department? He was a peace officer working patrol. He was a sheriffs deputy working patrol in the City of Adelanto. His duties were answering calls for service. We hear him in his recording updating dispatch on his activities. You can hear him telling them his location. You can hear him updating them on the events that are taking place in that driveway. You hear him contact reporting parties. And he's taking a witness statement.

He's getting a very brief description of the encounter. He is told by Mr. Cocchi that Mr. Cocchi thinks he may have a gun. And you hear him, he doesn't just take that at face value. He's asking further questions. What makes you think that? Why do you think that? Did you see him with one? Did he say he had one? You can hear that in his recording. These are all activities performed by a peace officer, a sheriffs deputy.

And again, we hear him attempt to contact Mr. Barber. "Hey, bud, come out here. Show me your hands." Why is it important? Show me your hands. Well, Mr. Cocchi just described why he thought the defendant had a firearm. These are normal things that a peace officer would do. These are all corroborating and circumstantial evidence of a fact that Deputy Alfred is a peace officer.

This gets a bit wordy, bear with me. A peace officer -- and this comes from Instruction 2670, the one on

lawful performance that you'll have with you in the deliberation room. A peace officer may detain if specific facts are known or apparent to the officer to lead him to suspect that the person to be detained has been or is about to be involved in activity relating to crime.

What did Deputy Alfred tell you when he made contact with Ms. Gallo and Mr. Cocchi? So although he took a brief statement from them about what was going on, he told you that his starting point, what he thought he might be looking at, was possibly a vandalism, because they described him banging on the car. So from there, he attempts to go and make contact with the defendant. A reasonable officer who knew the same facts would have the same suspicion.

Now, Deputy Alfred explained he can't just make contact with Ms. Gallo and Mr. Cocchi and decide this is a vandalism. He's got to conduct further investigation. And that's what he told you he was attempting to do during this encounter when he went to speak with Mr. Barber.

Here, Deputy Alfred responded to the call for service, where the reporting parties told him that their neighbor banged on their cars. They tried -- he tried to forcefully enter their vehicles, was pulling on the door handles and demanded to be taken somewhere. They told Deputy Alfred they were too afraid to enter their home. Deputy Alfred, he had a duty to investigate, and he was in lawful performance to detain the suspect pending the investigation.

When he -- I asked him, was Mr. Barber free to leave when he made contact? And he said no, he was conducting

an investigation.

Based on the circumstances described by Ms. Gallo and Mr. Cocchi, Deputy Alfred's -- I just lost the word -- Deputy Alfred's actions were reasonable, and any reasonable officer would have taken the same steps.

When the -- when the defendant attempted the murder -- this is the next element of the peace officer allegation. When the defendant attempted the murder, the defendant knew or reasonably should have known that Deputy Alfred was a peace officer performing his duties.

Well, what do we know about whether or not Mr. Barber knew Deputy Alfred when he was contacted was law enforcement? You heard some evidence that it was darker out. That there wasn't great lighting. You heard that Deputy Alfred didn't approach announcing Sheriffs Department, something like that. But he did tell you about a visual announcement. And that was he's wearing his uniform. You saw the Class A, the tan shirt, all the badging, all the patches, all of the indicia of a police uniform, and his beanie had big gold lettering that said sheriff right across the front, when he was wearing that beanie.

We also know that in his contact with Ms. Gallo and Mr. Cocchi, that Mr. Cocchi, while he was explaining why he thought maybe the defendant had a gun, he said, well, he was acting really weird last night and asking if we had seen law enforcement. This is someone who's already on the lookout or policing the area.

We also know that the defendant had the interaction

that was described by Ms. Gallo and Mr. Cocchi. Mr. Cocchi said that he kind of like led him to believe that maybe he would give him a ride, but he was trying to get out of there. Well, after behaving that way with his neighbors and his neighbors disappear, it's reasonable to assume they have left to call law enforcement to the area.

Deputy Alfred used cop lingo. He didn't -- he asked, "Show me your hands. Hey, bud, come out here. Show me your hands." Civilians don't talk to each other that way. You aren't going to have Christmas dinner, hi, grandma, show me your hands. That's not how normal civilian, non-law enforcement people talk to each other. That's cop lingo. That's something that, based on what we heard from Deputy Ortega, something he would have heard before about his hands, he would recognize that.

And it was dark, but there was lighting enough. You heard Deputy Alfred describe that he can see, even from the street he saw a guy in a white shirt. So it stands to reason that if you can see in one direction you're able to see in the opposite direction. But it's simply unreasonable to think that the only thing Mr. Barber could not see that night was the uniform worn by Deputy Alfred.

We know that minutes earlier he saw Ms. Gallo and he saw Mr. Cocchi because they described the interaction that they had. We know he was able to see his vehicle when he got into it and accelerated it at Deputy Alfred. There were plenty of things that we can draw reasonable inferences that he saw, and so it is simply unreasonable to think that Deputy Alfred's

uniform was the only thing he could not see.

We know Deputy Alfred wore the same uniform that other law enforcement wore in the same -- the same Class A tan and green sheriffs uniform. And I don't recall, I think at least two of the deputies who came in and testified had their Class As, but I showed them a photograph of Deputy Alfred to confirm, is this the same thing that you were wearing, and they described it was the same. You can use the testimony of those three deputies, VanBrimmer, Layos and Ortega, for this specific purpose as well, for knowledge, lack of mistake, the fact that they are in the same uniform is evidence of the fact that the defendant recognized Deputy Alfred to be law enforcement.

Deputy Alfred was a peace officer lawfully performing his duties as a peace officer when he answered this call for service on April 27th in '21. And the defendant knew or reasonably should have known that Deputy Alfred was a peace officer performing his duties. The defendant attempted to murder a peace officer.

Now, Count 2 is assault on a peace officer with a deadly weapon other than a firearm or with force likely to cause great bodily injury. Now, you heard that there are lessers of assault with a deadly weapon and assault with force likely to cause great bodily injury. The main difference being that, there's no requirement the defendant knew Deputy Alfred was a peace officer in those. So I'm not going to repeat and recycle through all of the evidence because it's the same for the other elements.

But let's talk about what's required. And this

instruction is a mouthful, so we'll take it one step at a time.

The first element is that the defendant did an act with a deadly weapon or with force likely to cause great bodily injury that, by its nature, would directly and probably result in the application of force to a person.

What do we have here? The defendant does an act that would cause an injury or would be using a deadly weapon against a person. The second element is that the defendant did that act willfully, on purpose. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone.

Telling you, it's a mouthful.

When the defendant acted, he had the present ability to apply force likely to produce great bodily injury, or with a deadly weapon to a person. And when the defendant acted, the person assaulted was lawfully performing his duties as a peace officer. This is that element that I told you is not in the lesser offenses. So we'll just focus on this count here.

And finally, when the defendant acted, he knew or reasonably should have known that the person assaulted was a peace officer performing his duties.

So one bite at a time. The first element being, the act -- the defendant did an act with a deadly weapon or with force likely that, by its nature, would directly and probably result in the application of force to a person.

The act here is the same act in the first count

that was the direct step. The same action taken is the act. And what is that? That was the defendant, against a lawful command, angrily entering his vehicle, throwing the car in reverse, and accelerating that vehicle at Deputy Alfred. The Chevy Trailblazer that you've seen several photos of, is the deadly weapon that is alleged here.

And you heard in that instruction that the touching can be done indirectly. This isn't, you know, it has to be a physical fist to face. It can be indirectly causing an object to touch the other person. And when you have assault with a deadly weapon, of course, that's what you're going to have here. So the act alleged is that he attempted to run Deputy Alfred down with that motor vehicle.

The same evidence shows that if the defendant accelerated his vehicle at Deputy Alfred, that act by its nature would directly and probably result in the application of force to a person. And you have the definition of application of force in that instruction. That's the touching. I think I'm getting ahead of myself.

The second element is that the defendant did the act willfully. And this is probably the simplest element to get through, that it was done on purpose. It's not an accident. The defendant didn't have to intend to break the law or hurt anyone, anything like that. And the People are not required to prove that the defendant actually intended to use force against someone when he acted. He had to intend the act, that acceleration of that vehicle, with wrongful intent.

And you'll have the entirety of the instruction,

just trying to break it down a little bit here with the evidence.

The next element is when the defendant acted, he was aware of facts that would lead a reasonable person to realize the act, by its nature, would directly and probably result in the application of force to a person. Well, does a reasonable person know, if you accelerate a vehicle at someone, it will result in the application of force? Does that make sense? The defendant took an affirmative step to enter the vehicle and press that gas hard enough to cause the engine to rev. Hard enough to cause the wheels, the rear wheels to lose traction. And to move that vehicle 14 feet in Deputy Alfred's direction according to Maria Gallo.

The defendant is the one who drives that car. And so he knows what it does. He knows the -- he knows that vehicle. He drives it.

The defendant knew where Deputy Alfred was when he entered that car and accelerated at him, because you hear in the recording, Deputy Alfred yells at him just before he enters that vehicle. He used foul language, telling him not to enter that vehicle. So by his voice alone he would know where Deputy Alfred was when he accelerated.

Reasonable people know that driving a vehicle at a person will result in the application of force, a hit, an impact. And that is defined in the instruction as a harmful or offensive touching.

The next element, when the defendant acted, he had the present ability to apply force, to apply force likely to

produce great bodily injury or with a deadly weapon to a person. The vehicle was on. You heard testimony that when Deputy Alfred approached the defendant in the driveway, that the vehicle was sitting there. That it was on. The defendant had no impediment to moving that vehicle. It wasn't like up on blocks, and he had to move it off the blocks or run in and get the keys. There was nothing creating an intervening impediment to him conducting the act that we are talking about.

And we know it accelerated in reverse for 14 feet. And I'll only address really the 14 feet because that was what was the active acceleration. That was the distance that all of the witnesses agree, that was the distance that the vehicle was accelerated when Deputy Alfred was describing behind that vehicle.

Again, he didn't have to go get the keys, anything like that. He had present ability to act. Could he do it then, in that moment? And ability does not equal actual touching. You heard the instruction on that element, and the People are not required to prove the defendant actually touched someone. Only that he did the act that we are talking about.

When the defendant acted, the person assaulted was lawfully performing his duties as a peace officer. And again, we talked about this with the special allegations that attached to Count 1. It's the same evidence from that allegation for Count 1, so I don't want to belabor the point.

But the same evidence applies here. Deputy Alfred works for the San Bernardino County Sheriffs Department. He was uniformed. He was on patrol. He was answering a call for

service. And he was conducting a criminal investigation at the time when the defendant tried to run him down in that driveway.

And when the defendant acted, he knew or reasonably should have known that Deputy Alfred was a peace officer performing his duties. The same evidence applies. I don't want to beat a dead horse and repeat myself over and over. But for all of the same reasons that we discussed in the special allegation to Count 1, the defendant knew that Deputy Alfred was a peace officer or reasonably should have known.

We spent an awful lot of time, distances and speeds and all sorts of variables and calculations, we really got in the weeds. Sorry about that. What is important here? In deciding the elements of the crime that we have just talked about, what is the evidence that supports the charges as they are alleged against Mr. Barber? Where was Deputy Alfred when the defendant drove the vehicle at him?

Well, you heard the contradiction of the path of orange cones, which, frankly, I just wanted to be able to argue to you that the fight or flight factor that Detective Hernandez talked a little bit about, and explaining why Deputy Alfred's recollection might be a little bit off, but as it turns out, that path was his exit path. And the evidence seems to be corroborated, what Deputy Alfred testified was that he rounded that corner from the west entering, walking up toward the middle of that driveway and moving his way so that he can create a visual of the defendant, where he was at.

Especially as the defendant is giving him negative response, acting aggressively, he's going to want to keep that

sight line. And he said that the east was his vantage point where he was able to observe Mr. Barber.

And again, why was it important that he be able to observe him? Well, two people just told Deputy Alfred he might have a gun, and that's an important fact, right?

The tire tracks, was a little bit difficult getting there with Mr. Morales, but the tire tracks show the path of travel. And the path of travel goes directly, it's a narrow driveway, so it's not going to be a huge -- you're not going to see a huge deviation in path, because you would have crashed into one fence or the other if he had overturned in either direction. But that path shows that he turned his wheel in the direction where Deputy Alfred described he was standing.

And what did he recollect as the point where he saw the vehicle and perceived the vehicle as coming at him and he determined he had to shoot? He remembered where he dropped his flashlight. And where he dropped his flashlight was at Placard 9. And you'll have that in the photographs in the deliberation room.

Now, the fired cartridge cases are not as helpful. We heard testimony, they're probably the least reliable point of reference in which to decide where anything happened here, because you have at least six people and a moving gurney traipsing through the path where they were. You heard that they bounce and move when they're fired. They're going to continue to do so when they're moved. So they're not as helpful in determining where the action took place.

At the end of the day all of the witnesses agreed,

perhaps until this morning, Mr. Morales got into some different possibilities, but as of Monday, all of the witnesses agreed the defendant hit the gas, causing that vehicle to accelerate, and that the reaction, meaning it happened after, was that Deputy Alfred discharged his firearm. And we know he fired those six shots.

The defendant attempted to murder Deputy Alfred while he was performing his duties as a peace officer when he accelerated that vehicle in his direction, as corroborated by the physical evidence seen on that driveway. And the defendant committed an assault with a deadly weapon against Deputy Alfred while he was performing his duties as a peace officer. The only reasonable interpretation of the evidence is guilt.

Just want to remind you, I know you saw this once and you were instructed on these things as well, just to remind you, in deliberations your focus is the elements of the crime, the instructions that the judge is giving you, the documentary evidence, photos, the recordings, the evidence that's submitted to you for your consideration, the witness testimony, the people who are there and describe to you what happened that night on April 27th, and your evaluation alone of the witnesses' credibility.

The instructions of the law tell you, you cannot consider things like sympathy, speculation, penalties and punishments, passion, public opinion, prejudice or sentiment. They are all natural human things that we want to consider in our life, but for the purposes of juror deliberation right inside that circle, just the evidence and the law.

And with that, I submit to you the case.

THE COURT: Thank you, Ms. Fultz.

It's 3 o'clock, so let's take our afternoon recess before we hear from Mr. Bryant. We'll come back at 20 minutes after.

Don't talk about the case. Don't form any conclusions yet.

(The following proceedings were held outside the presence of the jury.)

THE COURT: We're on the record outside the presence of the jury.

A couple of things. The verdict forms, 1-A is fine. 1-B, you need to remove the word or. It would just say as charged in Count 1, period.

MS. FULTZ: Did the Court get my e-mail this afternoon at lunch?

THE COURT: I thought that's what these were.

MS. FULTZ: I don't see an or.

THE COURT: Okay. All right. That's been corrected then.

MS. FULTZ: Yes.

THE COURT: Okay. And then the other verdicts, I think they need a period at the end. Do they all have periods?

MS. FULTZ: That's correct. It is wrong.

THE COURT: All right. We didn't do this expressly when we were on the record. Both sides agree with the jury instructions in their entirety; is that correct?

MS. FULTZ: Yes.

MR. BRYANT: Yes.

THE COURT: Okay. Thank you. See you in 15 minutes.

(A recess was taken.)

(The following proceedings were held in the presence of the jury.)

THE COURT: We're back on the record. Everyone is present.

Mr. Bryant?

MR. BRYANT: Thank you, Your Honor. Again, just may I approach the well?

THE COURT: Of course.

MR. BRYANT: Thank you.

Good afternoon, ladies and gentlemen of the jury. Once again, my name is James Bryant, and I represent Mr. Steffon Barber, along with my colleagues, Ryan Duckett and Rodney Diggs.

I want to first thank my colleague, Ms. Fultz, for her consummate professionalism. I'd like to thank the court staff. Take time to thank the judge for being here. Most importantly, I want to thank you all. I got to meet every last one of you just right before Thanksgiving. You all were thinking about a holiday, about spending time with your families, enjoying your weekend. Yet, every single last one of you showed up the day before a holiday to do your civic duty to do the one thing that separates America from just about every other nation in this world. And that is what makes this process special and is what makes this process unique, because a jury of Mr. Barber's peers are going to ultimately make a

decision as to whether or not he committed the crimes alleged by the State of California.

Now, I'll submit to you, by the time my closing is done, the evidence will absolutely show that the State did not prove beyond a reasonable doubt that Mr. Barber attempted to murder Deputy Alfred. Nor did he try to assault with a deadly weapon -- or let me reword that. Nor did he ever attempt to assault Deputy Alfred with a deadly weapon.

And why? Why is that? You're the jury. The judge decided the law before we stepped into this room. And today, and throughout the next period, whenever you make a decision all 12 of you are going to decide the facts. All 12 of you are going to have to decide the facts. You will either say acquitted, not guilty or you will say guilty. And then there's that in between, when you all can't make up a decision and you hang that jury.

But again, you all have been here for almost two weeks. Once I go through the evidence I explain to you the standards. I believe you all will see that the State, once again, did not meet their burden of proving beyond a reasonable doubt that Mr. Barber committed these alleged crimes.

Ladies and gentlemen, what is it all about? He never used a deadly weapon. He never had a deadly weapon. Keep that in mind. We know that guns are inherently deadly weapons. Meaning a gun is designed to kill someone. But a vehicle, the natural design of a vehicle is to transport someone from one point to another. And there are instances in which a vehicle, which this pointer, which this pen, can be

transformed into a deadly weapon. Just about anything can be transformed into a deadly weapon, including a vehicle.

But what the evidence showed throughout this trial, is that a vehicle that never went faster than three miles per hour, and we'll talk about this, the same pace as you all walked into this room and you walked into this jury box, that is three miles per hour. Some of you walk faster. Some of you walk a little slower. But on average, that is the fastest point in which that vehicle was going. That is not, folks, the transformation of a transport vehicle into a deadly weapon.

Now, what you didn't hear during the People's closing is the standard, the beyond a reasonable doubt standard. And some very important parts are in that. A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.

So what does that mean? I'm going to explain this to you all in the simplest of forms, because it sounds kind of tricky, right? Beyond a reasonable doubt, what is reasonable doubt? We're going to get to that. Here, proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. That the evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

Meaning, it's possible that as we sit here right now, in this time and place and in this point in the universe, a meteor could hit this building and we can all die. I mean, sure, that's a, quote unquote, possibility, but is it even

realistic? Absolutely not. And if somebody told you we're going to die today by a meteor strike, you'd say that just isn't reasonable. Very funny.

But this is important. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. He is entitled to that. If the People -- as I go through this very simple set of examples, if the People don't prove that every single reasonable possibility has been determined and they're still at the end of the day two, you must, not you may, you must find Mr. Barber not guilty.

Give you an example. You come home from a long vacation with your significant other. And get home, you guys walk to your room. It's dark. Turn on the lights in the hallway. You open that door and you flip the light switch. But nothing comes on. No light comes on. The lamp in that room does not come on. Your partner goes, light bulb must have went out. And that's a reasonable possibility, right? The light bulb may have went out.

But is that the only reasonable possibility? It could be that the light bulb is out. It could be that the lamp isn't plugged in. Somebody may have inadvertently unplugged the lamp before you left or the circuit breaker in that room may have tripped. Here's the problem, folks, there are three reasonable possibilities, and although it is highly likely that this light bulb is out, because it just went out, it expired, right here is a definition of reasonable doubt. You have not determined which single issue is causing that light to remain

unlit.

So you do an investigation. You do a thorough investigation. You first go, the lamp, it's kind of dark. You're bumping around the room. You pull the plug, and it's plugged in. You're like, bingo, plugged in, so it's obviously and highly likely and extremely possible that the light bulb really just is burned out. However, you grab that light bulb, untwist it and you shake it. We're using, not these candescent, but the old school ones that I like, with the little filament. The one you used to make, when we were in elementary school, for science projects. You shake it and there's no jungle. You're like, oh, I could have swore it was because this light bulb had burned out. But there's no jungle, so you know the filament is intact.

Twist back the cap. Go to the garage. Finally, you walk into that garage, you open the circuit breaker, and it's right in the middle between left and right, it's right there. And you're like circuit breaker. You flip the switch. You yell to your significant other, is the light on? Light's on, honey. You have done every single investigation possible, and there was only one clear certain determinant, and that was the circuit breaker had tripped.

But remember, when you first walked into that room the logical and reasonable conclusion and highly likely, highly probable conclusion was that the light bulb burned out.

Folks, when you're making important decisions, you have to be absolutely sure. There is no room for doubt.

Reasonable doubt. So what is some of the

unreasonable doubts? Gremlins chewed on the cord. We know Gremlins don't exist, but someone can say Gremlins chewed on the cord; that's unreasonable. A ghost turned it off. Depends if you believe in ghosts. Some people do. Some people see them. Did the ghost turn it off? Probably not likely. And for those who understand what an EMP is, an electromagnetic pulse, somebody puts a mini bomb and destroyed the circuitry in your room. No. Those are completely unreasonable. That is what we consider an unreasonable possibility. An unreasonable possibility.

These are all reasonable. And in order for the People to prove beyond a reasonable doubt the only one that can be left is the circuit breaker tripped.

Now, I'd like to show the burden of proof, as sort of this stepping stone. We see all of these various colors going up in blue. Then at the top is red. Strong brief in guilt. The strong belief that that light bulb burned out as opposed to everything else is not enough. The strong belief that Mr. Barber moved that vehicle in before Deputy Alfred fired that shot is not enough. You must eliminate every single reasonable possibility, because that's how serious it is when the State is looking to potentially remove a right. That's why it requires all 12 people, not nine in a civil trial. Preponderance of the evidence, which is more likely than not. It must be so strong that there is absolutely no uncertainty.

And I'm going to give you one more example, because I like to give examples because not everybody understands every single example. You all have gone to a concert. Walk into a

concert. You grab the tickets, and you're going to the concert with your significant other. You put it either in your jacket pocket or your purse, the tickets are in your jacket pocket or purse. As you get closer to the stadium, this venue, you start to get a little worried, did I leave my tickets at home? And so you grab your jacket and you look inside just to make sure those tickets are there. Or you look in your purse, let me make sure to double check.

The act, just the very act of having to check that, ladies and gentlemen, is another example of reasonable doubt. Unless you are 100 percent certain that those tickets are in your pocket and you don't have to check, you're walking there, significant other, do you have the tickets? I have the tickets. I've got them. We're good. I don't need to check. You are 100 percent certain. That is proving beyond a reasonable doubt.

And I will submit to you that at the end of this closing, it will be clear that there are so many possibilities as to what happened that night, it is impossible to prove this case beyond a reasonable doubt. And again, you didn't even hear the State talk about this because it's a bad fact. It's a bad standard for the State in this case. Maybe not every case, but in this case. It's like you didn't really hear about great bodily injury or deadly force. Deadly weapon. Deadly weapon. No definition.

And again, like I said, not a single doubt can be left in your mind that Mr. Barber committed each of the alleged crimes. Every reasonable possibility must be investigated

thoroughly. Remember that. Because that's an important thing we talked about, as you heard today. Every investigation must be investigated thoroughly. Or if it's not, you must, not you may, you must find Mr. Barber not guilty of attempted murder and not guilty of assault with a deadly weapon on an officer.

Now, we all, again, we all remember, many of us know 12 Angry Men, right? Very old movie. Great movie. And it was about jurors, 12 jurors who all got together and they were fighting over the facts back there. Some of you have been in this situation. Some of you actually have been in a deliberation. But there was one hold out. And that hold out said the prosecution did not prove beyond a reasonable doubt, and I will not move.

I ask you all, if you believe that the prosecution did not prove their case, will you just capitulate because everybody is telling you to and they want to go home, and each one of you said absolutely not. And I believe you. I didn't see a single one of you, not that I could see you very much, but I didn't see a single one of you falling asleep during this trial. That's actually something to be said.

I've done a lot of trials. Sometimes jurors just kind of get bored, but you're one of the most attentive juries I have literally ever seen.

Attempted murder, to prove that the defendant is guilty of attempted murder the defendant took at least one direct but ineffective step towards killing another person and the defendant intended to kill. What does that mean? Took a step and that the defendant intended to kill.

What's not attempted murder is if I have a water gun and I go up to you and I say, I'm going to kill you, and I shoot the water gun at you. It's not attempted murder. If I have a real firearm and I shoot at you, whether I hit you or not, it can zoom past your face, it can graze your arm, it could hit your body, and you survive. That is an attempted murder, because you consciously, with specific intent, intended to kill that person. It wasn't because you move the gun and waved it around and you actually fired it. It's because you intended, you had the intent to want to kill that person.

And how is intent proven typically? Through circumstantial evidence. Unless Mr. Barber would have been yelling, I'm going to kill you. I'm going to kill you. I'm going to move this car back and I'm going to kill you, cop. Unless you hear that, you don't have a clue what's going on through this man's head.

And I can submit to the jury that the People didn't prove what was in this man's head at that time either when that car moved.

So what's the definition of a deadly weapon? These are very important to understand. A deadly weapon can be a vehicle. I'll tell you, a deadly weapon can be a vehicle, if a vehicle is going 15 miles per hour, and you're standing right there, meaning 22 feet per second, and that -- and that vehicle hits you, it is a great possibility you are going to be harmed significantly or you might even die. If it's going 25 miles per hour, it's a great possibility that you're going to be -- you're going to suffer from great bodily injury, or you're

going to die.

So I'll read it to you. A deadly weapon is any object, instrument or weapon that is used in such a way that it's capable of causing and likely to cause death or great bodily injury. A vehicle that has not transformed into a deadly weapon, meaning a vehicle going at a very slow rate of speed. We will talk about this. There has been no evidence that a car moving anywhere between one to three miles per hour could cause even a bruise. No matter how big that car is. Even if it does cause a bruise, the definition of great bodily injury will say that it is not a deadly weapon, because it doesn't constitute great bodily injury.

Again, you're going to hear about -- you're going to read, circumstantial evidence, and again, we talk about this, both direct and circumstantial evidence are acceptable types of evidence to convict someone. And you can use this evidence to determine somebody's mental state. What were they thinking?

However, you're going to see in evidence code -- I shouldn't say -- circumstantial evidence, Jury Instruction No. 224. Before you may rely on circumstantial evidence to conclude that the defendant is guilty, you must be convinced that the only -- remember, I talked about that, think about the pocket, think about the light bulbs -- that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.

If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable

conclusions points to innocence and the other to guilt, you must accept the one that points to innocence. And why is this important? Because if you have two scenarios, one where Mr. Barber has that car moving, before he fires, before the officer fires that shot, and another scenario where Mr. Barber has his foot on that brake, after he revs up that engine and it goes idle, then a shot is fired, and he's either startled or he's actually shot and he involuntarily pulls his foot off that brake temporarily and it moves back.

Those are two distinct possibilities, and you must find that Mr. Barber is not guilty, because you must take the conclusion at two or three, but must at a minimum take the conclusion that the one of innocence is the one you must rely on and you must say not guilty.

Again, we talked about assault with a deadly weapon. This is with the officer, but I'm just going through the four important elements that you're going to continue to see.

The defendant did an act with a deadly weapon other than a firearm, probably result in application of force to a person, or with force likely to produce great bodily injury. Defendant did act willfully. He was aware of the facts. And when the defendant acted, he had the present ability to apply force likely to produce great bodily injury or with a deadly weapon other than firearm.

Now, the instruction may -- I think it looks like that now. I did this a little earlier. If it's not, bear with me. Whatever the judge instructs you on the law, that is the

way it's supposed to read, but here is the critical point. As I said before, what's this case about? It's about the fact there's no deadly weapon. And if there's no deadly weapon, there can't be an instrument to cause great bodily injury.

The definition of great bodily injury. And again, folks, I'm going over these things first. The definitions is to get you to understand what these instructions are talking about, because when I dive into the evidence, I am hoping that it all makes sense.

Great bodily injury means significant or substantial physical injury. It is an injury that is greater than a minor or moderate harm. As we talked about, the average human speed is three miles per hour. The vehicle, in this particular case, only reached a heightened speed at three miles per hour and only for a few tenths of a second.

So what are some of examples of great bodily injury? Second degree burns. Fractures. Brain injuries. Gunshot wounds. Stabs. Paralysis. Those are some examples of great bodily injury. Not a bruise. Not a bump. I don't know how many of you have ever been walking and you run into another person much larger than you walking sort of the same speed. It hurt, if your shoulders collide. Especially if you've been in New York, that seems to happen a lot when you're out there. But it's not going to cause significant injury to you.

And I don't know how many of you have been walking a crosswalk or walking in a parking lot, where a car accidentally backed up on you, kind of bumped you and you kind of jumped, it hit you a little bit when it was going in

reverse. You didn't suffer great bodily injury. Yeah, maybe it would have hurt you a little bit if you got hit right on your knee. But again, you're not suffering great bodily injury.

One of the things that you're not going to see in this case is that you're not going to see the car moving faster than a person walking. There were no medical experts or human forces experts to prove that a vehicle moving at a rate of three miles per hour could cause significant injury to anyone. There's been no evidence of that at all. The People have just said, the car was trying to run him down. Well, we're getting into that. There's no evidence that this car tried to run Deputy Alfred down.

Just again, use common sense. If a car is moving as fast as you can walk, it's likely not going to hurt you that much, even if it did hit you.

And then you heard about the application of force. That's just simple. That means either you graze somebody. Let's say I'm going 30 miles per hour at you. You jump out of the way. That's an application of force. I could have seriously hurt you, but you didn't get touched. Or I'm going 30 miles per hour, and I hit your arm. I don't hit your entire body, but I hit your arm. Or if you're wearing a dress and it's flowing I hit your dress, but I don't hit the rest of your body. That is what application of force means. That's what they mean by that.

Instruction No. 105 is important, and sometimes I will use this, and I think it's appropriate in this case. If

you decide that a witness did not tell the truth about something important, you may choose not to believe anything that witness said.

What the evidence showed that Mr. Barber did not do? Mr. Barber's vehicle did not exceed a maximum of three miles per hour. Mr. Barber did not press the accelerator any time after his tires stopped spinning in place. Mr. Barber did not press the accelerator in an attempt to harm Deputy Alfred after the deputy started firing his weapon. Mr. Barber did not slam on his brakes prior to the vehicle coming to rest. Mr. Barber did not make any verbal threats to kill Deputy Alfred. Mr. Barber did not threaten to kill his neighbors. Mr. Barber did not even get into a physical altercation with Mr. Cocchi when they were talking, and they were outside. And Mr. Barber did not affirmatively acknowledge that he knew Deputy Alfred was a law enforcement officer.

So before we get into more of this, on April 27th, 2021, law enforcement is called out. Deputy Anderson -- or Deputy Alfred shows up to the scene. Let me tell you what happened. Deputy Alfred talked to the reporting witnesses and he began to walk southbound down the middle of that driveway in the gravel. And as he got to what we'll know as Marker 6 and 7, and as he's trying to talk to Mr. Barber, we know he does not announce who he is. He doesn't say law enforcement. He doesn't say San Bernardino County Sheriffs. He just says, hey, buddy.

Now, mind you, it's dark. He says it was poorly lit. He's warring a ski mask. He's wearing a beanie. He's

wearing dark pants. And at this point probably a dark shirt. This isn't a shirt with reflectors on it. It's not a white shirt. Mr. Barber has no idea who is walking down his driveway. And he says, "Hey, buddy, Mr. Barber." And then he goes, "Let me see your hands."

Now, let me see your hands is actually not as abnormal as one would think. There are places in our society where you might have somebody go up to you and somebody is walking up, it's sort of a hostile neighborhood, before people start engaging into an argument or a fight, one of the guys may go, hey, brother, let me see your hands. Meaning, what's up? Like do you have a weapon on you? And the guy might respond, I ain't got no weapon, I'm good. That actually happens quite a bit more often than people think.

MS. FULTZ: Objection. Facts not in evidence.

THE COURT: Sustained.

MR. BRYANT: So as he's walking down and he's trying to communicate with Mr. Barber, Mr. Barber again is not saying at any point, I know you're law enforcement, get out of here, cop, or anything like that. He says, "Let me see your hands." Mr. Barber responds, "Let me see your hands." And at some point he says, "Don't go to your fucking car. Don't get in your fucking car."

And in response Mr. Barber, who does not have a clue who it is, and is being told to do something from somebody who we will be able to prove was almost 50 feet away, he gets in that car, and as he gets in the car, he turns on that engine and he revs up that engine and the tires start spinning.

Now, the car is not moving in place, but what we do know and what I can tell you is that we know that car is in a stationary position, and it is not going backwards. And the revving doesn't last longer than approximately three quarters of a second. And at that moment the engine is silent. It's not revving up. And then eventually at about two-thirds of a second in you hear gunfire, and then you hear five more shots.

Now, I'll submit to you that this occurred around all those areas where you see the shell casings, between 40 and 50 feet from this vehicle. How do we know this? How do we know this? We know this because one of the very first things that Deputy Alfred testified to when he was on that stand was that he fired his gun when the car started moving. We know he fired his gun when the car started moving because we heard the audio, and the car started moving when he was between Markers No. 6 and No. 7.

Even Detective Hernandez said, yup, that's what he said at first. Why is that important? It's very important, distance is important. Speed is important. It's important to show intent. It's important to show whether or not this vehicle was transformed into a deadly weapon. It's important to understand, did officer -- or did Deputy Alfred actually comply with the policies and procedures of the San Bernardino County Sheriffs Department? And if he didn't, what are the ramifications?

And here's what we know next. The car rolled no greater than 14 feet and stopped. There wasn't some massive slamming of the brakes. The car just stopped. You didn't even

hear an old car have squeaky brakes. And four or five minutes later Deputy Alfred, Deputy Mora and Deputy Torres are all at the front of the vehicle after the shooting, and they pull Mr. Barber out of that car, whose foot was on that brake. And, folks, we know Mr. Barber was shot. That was clear. And despite being shot Mr. Barber kept his foot on that brake until he was removed, and the paramedics came.

What you also heard or what you didn't hear is if a man is intent on killing someone and they are being fired at, you go for the gusto. If you're going to try to kill somebody, you go for it. He's firing at you, you punch it harder. Punch the accelerator and you go, because it's over, no matter what. That's not what you heard. You heard a very soft slow. Then you didn't hear anything. Braking. And a man who sat in a vehicle clearly wounded with his foot on that brake, even though that car was in reverse. They pull him out and without acceleration that car moves back. Put the car in park.

But there was one other part that I skipped, and that was the flashlight. We're going to play that, and I want you to listen intently. At no point between the time Deputy Alfred had given the command to not get into that car and he heard that engine rev up and those tires move, to the time he started shooting, what you never heard was a thud or a drop. You never heard it one time. You heard moving. You heard him going forward. But you never hear him allegedly drop this flashlight.

However, what you did hear as Deputy Alfred testified he never dropped anything other than his flashlight.

You hear at 50 seconds after the incident, while he's speaking to someone on his radio, you finally hear what purports to be a loud thud. Like a boom, boom. Loud enough to represent what a one-pound object would sound like falling on dirt ground.

That flashlight was never at the point in which Deputy Alfred fired. In his very first words, I was between 6 and 7, which was over 40 feet away, that is where he first fired that weapon.

Deputy Alfred and his inconsistent statements. Now, he said he approached the residence on the east side dirt path in the southbound direction, meaning heading down that path. But what we know is that as I started to show this evidence, and during cross-examination of Detective Hernandez, who also heavily relied on this, this was the physical evidence that he was corroborating every single one of his opinions on, was that the fact that you have these orange cones going south.

The reality, the truth is that Deputy Alfred never once walked southbound towards Mr. Barber's home that evening in that dirt. And you want to know why we know? Because Deputy Hernandez agreed that there were no footprints or shoe prints to suggest he was walking in that direction. Just wasn't true. He walked up the middle of that driveway or closer to the west side because it was more cover there.

The deputy fired his gun 8 to 12 feet away from the vehicle at the vehicle's initial starting point. Remember, when he first gave his statement about a month later? He said, I was about 8 to 10 feet away, and I couldn't go anywhere and that car was moving so fast. I didn't have a chance to escape,

that's why I had to fire my gun. And then he moved it back 12 feet. Then when he realized his story was kind of not sounding so good, he moved it back to 15 feet all of a sudden. He said he had read something or saw something, and now he's 15 feet away.

And then he came in here and he gave you, almost four years later, his description of what happened. Now, he's 18 feet away. And even if you take his story, which I will submit is not true, that he fired where his flashlight was found, that's 30 feet away. He keeps going back further and further and further. It went from, my life was in danger, there is a car moving at the speed of 15 miles per hour, and I have nowhere to go, to now we find out that car was moving at the fastest three miles per hour. Again, we know he initially testified he was between Marker 6 and 7.

And again, when Deputy Hernandez was asked this, is that what he testified to? He said, yeah. And then I asked, did he change his testimony in the middle of trial? Yeah. And then I asked him -- did I ask Deputy Alfred did you read something? You all went to break and changed your entire testimony. And he said, I kind of heard you say something like that.

I don't know if you picked up on why I had asked that, that odd question, what did you read? It's because I was so surprised that he was finally starting to say what happened to some extent. But when he realized he was telling the truth, it didn't match his original story. And we'll get to that. What's the motive for that?

Your Honor, I'm just looking at the time. That's all. I just want to make sure where we are.

He states the vehicle is moving at him at a rate of approximately ten to 15 miles per hour. We know that is impossible. Even if he was 12 feet away, as Deputy Hernandez testified, that's 22 feet per second. We know that that car moved anywhere between 2.7 and 4.5 seconds. He would have been clobbered. And that vehicle would have been somewhere down that driveway almost on the street.

Why would he say that?

I had asked the deputy, did you ever move or jump? He said, well, I stayed stationary when I was shooting the whole time. Well, why is that important? Because if a car is moving at you and you're only 8 to 12 feet away, we know that car ended up 14 feet, how did you not jump out of the way? Either, one, it was going so slow you were able to walk back; or two, you were over 40 feet away when you started firing that gun.

Now, we'll talk about the bullet casings and the near perfect placing of those bullet casings based upon the sounds you see. You see four bullet casings all in one little area. After four bursts, you hear another one, it's about almost a second later, and another one that's a full second later, and they're all somewhat in order. But why are they all 40 to 50 feet back towards that very large yard that Deputy Alfred said he couldn't make it to?

And again, we talked about this, he testified he dropped his flashlight prior to finding that gun, and again,

you'll hear it, you don't hear anything when he fires that gun. So the reality is, it is not even certain whether or not he was holding his flashlight at the time, or he was using his flashlight on his service weapon by this point. It is not even clear whether he was holding that flashlight at this point in time. He's just asking you to take his word for it.

If you listen to the audio belt when you have an opportunity, and I'll play it for you today, he says he's stationary this entire time. The prosecution said, hey, you know, you were moving when you're dropping your flashlight at first -- your first shot, but all, all six shots, you hear movement, for all six shots. You hear, for all six shots, and then when he's done with his sixth shot he stopped moving. That means he's advancing forward, and that is consistent with the bullet patterns, with the shell casing patterns. Why do you have four bunched up in one little area and then another in front and another in front? Because Deputy Alfred was actually moving forward and didn't stop moving and advancing toward this vehicle until that vehicle stopped.

And again, Deputy Alfred said he fired his service weapon when the flashlight was dropped. But we heard from Deputy Hernandez that now Marker No. 10 is all of a sudden the exit. Remember, that was an important thing. Marker No. 10 was so important that showed he was right there, the path going south that showed he was right there. Now, all you have is the flashlight.

And the flashlight as he agreed with me, had absolutely no footprints around it. There were no footprints

around that flashlight to suggest when he dropped it he was in a firing position, whether 2 feet under or some sort of straddle position.

And this is a pattern, folks. This is the pattern. Marker No. 2 is 52 feet away, from the initial start of that vehicle. You have four bullet casings, 2, 3, 4, 5, all bunched up in one area. Then you have 7 and 8. Marker No. 6, 7, Ms. Fultz had asked Deputy Alfred, where were you when that car first started moving? He said between Marker 6 and 7.

Why is this all important? Because if we know that he never walked to the left, that east side of this screen, up this dirt, then naturally he had to walk into the gravel. And we know you can't see any footprints because it's not the type of surface to provide that. And naturally it will be more likely than not that as he walked up this path that is why, up the middle of this gravel, that is why the bullet pattern, the bullet casing patterns are where they are, because he fired his weapon around this area between 2 and 7.

And again, this is a 12-foot yard. You see where the flashlight is. Deputy Alfred said that he couldn't make it across to run into this yard, because the vehicle was moving so fast. But we know that this position right here is at least 30 feet away. A car moving three miles per hour, I could slowly walk and look at the car and walk into that yard and not think a thing. Not think one thing. You can easily walk that. A light jog definitely gets you into that yard.

But this is a vantage point of where these bullets and bullet casings have landed. And they're consistent with

the sounds you hear.

And again, there is no footprints identified by Deputy Alfred. And I'm going to play this for you, and I want you just to listen to this, folks. I want you to pay attention to the sound and listen. You're first going to hear the initial encounter when he starts firing. Just pay really close attention, try to see if you hear anything falling on the ground, because this is a fairly sensitive microphone. And you can hear all sorts of noises. You can even hear his footsteps. So you will certainly be able to hear Deputy Alfred drop a flashlight.

(Audio played; not reported.)

MR. BRYANT: Now, you didn't hear anything drop. Listen to this, approximately 50 seconds later.

(Audio played; not reported.)

MR. BRYANT: That wasn't him bumping into something. That was clearly an object that hits twice. Boom, boom. This is clearly Deputy Alfred dropping his flashlight at this point in time. He doesn't drop anything at any other point in time. And there is absolutely no explanation for what that noise could be, other than at that point as he moved up from 6 to 7, because we know he stops. After he fires the first six shots, you hear him continuing to move up.

He dropped his flashlight. And that is why it was sitting approximately 10 feet beyond 6 and 7. And there are no footprints around this flashlight to suggest he fired his weapon over there. None. You will not find any evidence of that.

Expert witness testimony. Why do we have experts here? The prosecution said we don't want to get into the weeds. That's their way of saying, I don't want you to pay attention to some very important evidence. It's not the weeds. The speed is important. The distance we are -- Deputy Alfred in relation to Mr. Barber is critically important if you're talking about turning a vehicle into a deadly weapon. Or if you're talking about saying that, I'm trying to assault someone with a vehicle, that's going to cause great bodily injury.

You'll hear -- you'll see this instruction that says, if you conclude an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion. We have two experts, Detective Hernandez and Mr. Morales. What do we know about this?

Mr. Morales says this, the vehicle moved at a top speed of 3.39 miles per hour. Between the second period where the vehicle is idle, between the period where the vehicle was idle for .65 seconds, of two-thirds of a second, and that second shot fired, and the second shot fired, it was reasonable that -- and it should be the first shot -- the vehicle did not move until the first shot as a result of him involuntarily moving his foot off the brake due to gunfire or being shot. He said that's a reasonable possibility. That wasn't ruled out.

The vehicle could have moved approximately one-tenth -- at one-tenth of a second prior to that first shot being fired. He said, look, I can't tell you that the car didn't move before, or I would be lying. That's a reasonable possibility.

There was also the reasonable possibility that the vehicle could have moved before or after the first shot was fired. Well, why is that important? Given the fraction of time between the vehicle -- time the vehicle stops trying to gain traction where Deputy Alfred fired his first shot, you heard Mr. Morales say it would have been physiologically impossible to see the car move before firing his weapon because it was not enough time.

At night it takes approximately 2.5 seconds to register movement. During the day it's 1.5. Even if you are a trained professional, in the light, in the dark, given that it was only .65 seconds before that first shot, there is no way possible that Deputy Alfred could have seen that vehicle move, and it is not based on his perception, folks. That is not what's important. What's important is the act of Mr. Barber in what he did.

I will submit to you that just these three possibilities create reasonable doubt. They absolutely and unequivocally create reasonable doubt, because the State never proved that two of these three did not happen. The State did not prove that any of these didn't happen. The State has the burden to prove that the only thing that happened was that Mr. Barber drove his vehicle at Deputy Alfred who was approximately 10 to 12 feet away at a speed of ten to 15 miles per hour, that was either going to kill him or cause him great bodily harm. That was their burden to prove.

And as we sit here today, and I asked Deputy Hernandez -- or Detective Hernandez, you don't have any video

to show me what he was doing in his car? He says no. So you would agree with me, although you're saying, I'm 100 percent certain he moved that vehicle, you would agree with me that you don't know whether or not he had his foot on the brake and was just causing his tires to move and scare the officer or the person behind him.

But just moving your tires, in a tire position that is stationary, that does not constitute assault with a deadly weapon with a vehicle. It is not a gun. A vehicle is not an inherently dangerous object meant to kill. A vehicle can sit in place and you can burn rubber all you want. But until that vehicle starts taking off and chasing after somebody at enough speed and velocity to cause great bodily injury, that vehicle is just a vehicle. It is not turned into a deadly weapon. It is not turned into a weapon with the means of causing great bodily injury, and that is the truth.

We've heard this entire video over and over again. I'm going to skip it, but I'm going to go to a couple of pieces here. We know this engine revs up. Door closes at two seconds. The engine revs up. Engine revving up. The tires are spinning at the engine revving up. At a third of a second the tires start spinning. The tires spin for about three quarters of a second. Then the engine goes idle. And engine is idle for .65 seconds.

What does that mean when the engine goes idle? You don't hear the engine going in reverse. You don't hear that. It's completely silent. So one of two things is happening right before .65 seconds occurs. Mr. Barber's foot was taken

off the accelerator, because we know it had to come off the accelerator in order for it to be quiet, and puts his foot on the brake, or he takes his foot off the accelerator and it starts to roll back. Those are one of two possibilities.

But I can tell you this, the People have not proven that Mr. Barber did not have his foot on that brake during this .65 seconds before that first shot. That is still a reasonable possibility as it stands before you all today. And that folks is me checking my pocket. That is uncertainty. That is doubt. And they have not cleared that part of the investigation.

And we'll talk about the investigation. Again, as you heard, it takes 1.5 seconds for your brain to detect motion during the light. Deputy Alfred just did not see that car moving. He heard. He heard from 50 feet away. And he saw some brake lights from 50 feet away. And he jumped, and he got jumpy and he pulled out that weapon and he started firing. Boom, boom, boom, boom. And stopped when that car slowly put on its brakes.

At no point as he advances towards that vehicle was Mr. Barber ever going at some crazy rate of ten to 15 miles per hour. Again, he only went three seconds -- or three miles per hour for a short period of time. Then we hear the bullets, the intervals going. We're going. Sixth shot.

And again, this is the time. This is the time that occurred. This is the speed. For the most part the vehicle was going anywhere between one to two miles per hour for most of that time.

And even Detective Hernandez, for whatever reason

the first time he officially checked that speed, even he said it was going between 2.7 and 3.1 miles per hour max. That's their expert. They agreed that that car was not going fast.

Again, the tire impressions. You don't see brakes squirming all over the place, as if it broke hard. Detective Hernandez agreed with me that never occurred. He agreed with me there was no slamming of the brakes. He agreed with me no disruption to suggest Steffon Barber did anything but lightly press that gas pedal as that man was shot. And he never took his foot off that brake, even after Deputy Alfred is still behind that car. He hasn't started back up again and punch. He keeps his foot on that brake for dear life.

And we know, again, 16 feet, the car reverses on its own when in gear. I asked Deputy Alfred, how does a car move without putting acceleration? Simple common sense. If anyone has parallel parked on a flat surface, you never press the accelerator most of the time. 99 percent of the time you do it on your own. You hold the brake. You move it reverse, it goes in reverse. You put it forward, it moves forward. You never have to put any acceleration. That is how vehicles work.

When they are in gear, they move, and they only stop unless there's brakes and there's something preventing it from moving forward.

So why did that vehicle move? One reasonable possibility that that vehicle moved is when Deputy Alfred shot those shots prematurely, instead of getting out of the way and going over to that yard, if he thought that car was moving, it's because Mr. Barber involuntarily removed his foot off that

brake temporarily, and that car started rolling back. When he realized that car is still going back, he stops it. And that is a reasonable possibility.

It may not be the only possibility. He very well just never could have had his foot on the brake. That's a possibility. But the standard is that the People, they are required to prove every single possibility be eliminated, every reasonable possibility be eliminated, or you must find Mr. Barber not guilty.

These are all the things we know about the vehicle that I've kind of gone over. As we are starting to look at the time here, got about ten minutes before the court --

THE COURT: We will be stopping in eight minutes.

MR. BRYANT: Eight minutes. So I'm going to move.

Again, it's dark. It's the desert, Adelanto. Barely any lights. This is what Deputy Alfred was wearing. Poor lighting. Dark beanie. Dark shirt. Dark pants. Dark shoes. No reflective clothing. He does not ever once, and he tells you that that is not even protocol, he's trained, command presence, you're trained to announce who you are, especially in the dark.

If you go up to a door and you knock on it, you want to say San Bernardino County Sheriffs Department. If you're walking into an area that is not well-lit and you're wearing dark clothes and you're wearing a beanie and you might look like, at least to Steffon Barber, somebody who's menacing you might want to say, Sheriffs Department. Because Steffon Barber doesn't know who's coming to his house. He just had

some little run in where he was like take me somewhere with his neighbors, and they didn't take him and they drove off.

Yeah, he might have been a little scary banging on the window and saying let me in, but when Mr. Cocchi was outside, they didn't fight. He was just talking. I don't really know why he was asking him for this, but he was. But he didn't threaten him. He didn't threaten to kill him. Didn't bang on the window.

What this means is this, you never heard Mr. Barber affirmatively say, I know you're law enforcement. I hate cops or whatever the case may be. And the People have not proven for a fact that Mr. Barber knew this was a law enforcement officer.

They brought all these examples of people who Mr. Barber had seen wearing uniforms. Two were in the facility. He was in a facility. It's true. It's a fact. And he definitely recognized who's in that facility with him. And the other time's in the daytime. And it wasn't really clear what happened in that last instance, but the other two instances Mr. Barber is only resisting arrest. He's not doing anything. He's not trying to attack these officers. They come to him. Then they start -- I said, well, did you engage the physical activity? They're like, yeah. Not him. He wasn't the aggressor.

And we don't know, because they didn't bring in the Officer Douglas to say why Steffon punched him. He punched him. That's not good. But most certainly, nobody came in here saying, man, this guy tried to killed me, pulled a weapon on

me, did all these things. No. Just a little defiant.

But that's not what happened in this situation. This is the dark. He doesn't know who's coming to his house. He can't see them. How can he recognize this uniform simply because they say, hey, buddy, come here. Let me see your hands.

Crime scene contamination. That was the only way to say, why these bullets were where they were. Crime scene contamination. Well, they didn't produce a single witness to come in here, and mind you, there was lots of witnesses, lots of officers, lots of emergency responders, nobody came in here to say, hey, yeah, I accidentally kicked that stuff. Yeah, I moved it. You want to know why? Because they could not get anybody to do that because it didn't happen.

MS. FULTZ: Objection. Facts not in evidence.

THE COURT: Sustained.

MR. BRYANT: You talk about the gurney that's going up, causing all kinds of problems. There was no -- the gurney. If the gurney is going to be impeded by anything, it's going to be a large flashlight sitting in the middle of the road. When I asked, wouldn't it likely be the gurney that got moved or wouldn't it be the flashlight that got moved? No way, it couldn't have happened. Why? Because the path, the physical evidence, the path is going south. Then you have Marker No. 10. And so, therefore, that's the only logical thing, they wouldn't touch that.

It would be more likely that they moved a flashlight in the way where a man is needing emergency services

than little bullet casings.

What do we know? We know bullet casings are over here. Bullet casings we talked about it, they were completely untouched. Not damaged. They're just sitting on top of this gravel. Not a single scratch. Not a single dent. Deputy Hernandez said if they were stepped on, they'd be bent.

But this, this flashlight most certainly could have got moved, after it was dropped 50 seconds after. And it would have more likely gotten moved, because this is closer to that car and probably somewhere in that way, because the first responders had to kick it out of the way. If I step on that, I'm going to trip and slip and fall. If I step on bullet casings, nothing is going to happen. They're going to get crushed.

And again, firearm has a flashlight on it. That's the light he had by the time he started pointing that firearm at Mr. Barber. That's when he pulled out his firearm. That's the light he had. And this is the path he took, between 6 and 7.

Again --

THE COURT: Let's go ahead and stop for the day. We'll have to resume tomorrow. So if everybody can be here at 8:45.

Don't talk about the case tonight. Don't form any opinions or conclusions. I'll see everyone at 8:45, and we'll finish up.

(Whereupon, the foregoing proceedings were continued to December 12, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA,
Plaintiff,
-vs-
STEFFON TODD BARBER,
Defendant.

No. FVI-21001312
REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 575 to 722, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 11, 2024.

Dated at San Bernardino, California, this 13th day of May, 2025.

Official Court Reporter
C.S.R. No. 12225

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

DEPARTMENT S-15 HON. DAVID COHN, JUDGE

PEOPLE OF THE STATE OF CALIFORNIA, )
)
Plaintiff, )
)
vs. ) No. FVA-025457
)
STEFFON TODD BARBER, )
)
Defendant. )
________________________________)

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS

SAN BERNARDINO, CALIFORNIA

DECEMBER 12, 2024

APPEARANCES:

For the People: JASON ANDERSON
District Attorney
By: KATHLEEN FULTZ
Deputy District Attorney

For the Defendant: JAMES BRYANT
Attorney at Law

RYAN DUCKETT
Attorney at Law

RODNEY DIGGS
Attorney at Law

Reported By: ALICIA S. VASQUEZ, C.S.R.
Official Court Reporter, CSR No. 12225

Volume 7 of 7
Pages 724 through 772, incl.

SESSIONS

| DATE | PAGE |
|---|---|
| December 12, 2024 | |
| Morning Session | 728 |
| Afternoon Session | 771 |

CHRONOLOGICAL INDEX OF WITNESSES

PEOPLE'S WITNESSES PAGE
NONE

INDEX OF EXHIBITS

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| NONE | | | |

SAN BERNARDINO, CALIFORNIA, THURSDAY, DECEMBER 12, 2024
MORNING SESSION
DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE
APPEARANCES:
The Defendant with his counsel,
JAMES BRYANT, Attorney at Law,
RYAN DUCKETT, Attorney at Law and
RODNEY DIGGS, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.
(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)
--o0o--

THE COURT: Good morning, everyone. Okay. Everyone is present. We're back on the record.

Mr. Bryant will be finishing his closing argument this morning. And then Ms. Fultz will have an opportunity for rebuttal. And then you will go into the jury room to decide this case.

Mr. Bryant?

MR. BRYANT: Thank you, Your Honor.

Good morning, everyone. Thank you for your patience. We are very soon concluding this case. And there are a few matters that I want to continue to tie up, to finalize our position regarding the fact that Mr. Barber is not guilty.

So when we first left or when we last left, they were talking about crime scene contamination, and really the point I want to make about that is, folks, it doesn't make any

sense whatsoever. This idea that bullet casings that were perfectly aligned based upon the actual audio were somehow moved in a perfect position over 40 feet away because first responders and other officers or deputies had come on to the scene. It doesn't make sense.

Someone would have had to meticulously pick each one of those casings up and place them perfectly in order for them to work in the same sequence as we saw and as we heard on that audio tape. So, again, if it doesn't make sense, then is it realistic? Does it add up to the physical evidence?

And one of the things that I said in the very beginning of my opening, I said that, please pay attention to the physical evidence that you're going to see in this case. And I know when you first heard this case, and you were listening to the jury instructions, I apologize, when you were doing your -- just you hadn't heard anything about the case, you're sitting here during jury selection, and you're probably wondering, is this case about some raving man running around with a gun shooting at cops? I can tell you this case is likely nothing that you had on your mind.

But that's the beauty of our legal system. You all have an opportunity to make that decision. And whatever decision that's going to be is going to be based upon your perceptions and your beliefs, as long as you follow the law.

So we talked about Deputy Alfred's motive. Why would he do this? Why would he come up with these stories when he first gave an interview? He said he was 8 to 10 feet away from the vehicle. He said he was really, really close. He

said he couldn't move to this very large yard. He said that the car was moving at a speed that didn't permit him to avoid being harmed. So the -- so he had to use deadly force because there was an imminent threat of death or great bodily injury. That is what his statement was to Detective Hernandez 30 days after the incident occurred.

Why? Why would an officer say that? Because in an officer-involved shooting there is an investigation. And that's critical. That shows a very different motive. It's not as if Deputy Alfred was just out there. A guy tries to hit him with a car. He shoots, and that's it. As he testified, when they're under investigation, if they do or use deadly force outside of policy and procedure what could happen? Reprimand up to termination. That is a very real consequence. And that happens.

When officers fail to follow policy and procedure, just like anyone else, just like anyone else, there are consequences for doing that, because you are trained professionals to know how to act and in given situations. And I'll tell you, from the very first time Deputy Alfred stepped on to that gravel driveway he failed policy. We talked about command presence. You announce Sheriffs Department. You have to let somebody know, especially in a dark area. He admitted they customarily did that, but he didn't do it here. Cop lingo isn't, hey, buddy. Cop lingo is, law enforcement, LAPD, San Bernardino County Sheriffs.

You assert who you are, so that, one, the person who is over a hundred feet away recognizes, all right, I'm

dealing with law enforcement here. This isn't some guy looking like he's wearing some kind of Army fatigues or commandos coming down my driveway looking crazy. Because again, this is a pretty tough neighborhood. This isn't Beverly Hills here, folks.

So you have to look at what he did. And here we'll talk about that.

And I asked Detective Hernandez, we talked about use of force and you were probably wondering, why are we talking about this? What does this have to do with anything? When can you use deadly force? They're trained that as a means of last resort, is the last thing you can do, and you must have an imminent threat of death or great bodily injury. If somebody is 60 feet away, at a car going five miles per hour, there is no imminent threat of great bodily injury, especially if you can get out of the way.

So I went through all of these scenarios with him. And I said at a hundred feet if somebody's going five miles per hour, would it be reasonable to use deadly force? No. At 60 feet if somebody was going five miles per hour, would it be reasonable to use deadly force? No. At 40 feet if someone was going five miles per hour, would it be reasonable to use deadly force? No. At 30 feet, would it be reasonable to use deadly force at a car moving at you at five miles per hour? The answer was, I would have got out of the way. I would have moved into the yard.

And why is that important? Because if we actually look at the facts of this case, what really happened, and if

that investigation actually came out, I can guarantee you there's going to be a different outcome than somebody who says, I was 8 to 10 feet away. I had nowhere to go. I had to use my firearm, and that car was moving 15 to 20 miles per hour at me.

There was a consequence. There is a motive to tell a story that isn't accurate, because you're trying to save your own tail. And unfortunately, it happens sometimes. And unfortunately, what it does is it disrupts the entire process. And we're going to talk about why that disrupts the process, because we are going to talk about an individual who's in this room who is Detective Hernandez, who I respect.

Detective Hernandez, as he sat on this stand talks about how thorough he is when he does his investigations and how he tries to do the right thing. And I believe him. I do. I believe he's intelligent. He's able to calculate things on the fly that most people cannot. He has a vast amount of knowledge.

However, as great of a detective as he is 95, 96, 97, 98 percent of the time, if he's not great at a hundred percent of the time, because of what we're going to talk about now, confirmation bias, then this investigation, this entire investigation blows up. And that is what happened in this courtroom.

You saw a rarity, folks. It is not often that you have such a distinguished detective that was so biased through his confirmation of trying to support his fellow member, that he couldn't even see the truth right in front of him.

Again, look at those shell casings, folks. Are you

telling me that when Deputy Alfred originally said that he was all the way up near the car when he first avoided getting hit, and somehow the scene got contaminated, somebody had the wherewithal to pick up bullet number -- Casing No. 7, 8, 2, 3, 4, 5, and place it in that order? No. Didn't make sense.

But see, the problem was nobody thought that actually someone is going to take a real good look at this evidence and really try to find out what happened. No one thought people were going to actually take the time to review this because it's a cop involved. And you heard a jury instruction that says, you can't have sympathy just because somebody is an officer, just because Mr. Barber was shot. You have to look at the facts and the evidence.

Look, we all come from communities where, you know, our law enforcement, 99.9 percent of the time does the right thing. No reason not to respect them. But you can't say, because I like Deputy Alfred I feel like it's more likely that he's just telling the truth. And it can't be more likely. It has to be 100 percent.

MS. FULTZ: Objection.

THE COURT: Sustained.

MR. BRYANT: But you have to -- you have to look at the physical evidence. And again, that flashlight, it's still wide open. That 12 foot yard right there. The shell casings that we saw before, they're behind this house. They are behind this house. They're behind this yard. 6 and 7 where he said he was located is literally right there at this yard.

So if a car is moving back five miles per hour,

which we know it was only three, two to three max, he could have just shuffled over there. He could have walked over there. He could have lightly jogged over there. But there is no reason, other than the fact that he heard -- and hear something is not enough -- and saw some reverse lights, that he fired his weapon. And it was a bad shooting. And because it was not within policy he had to come up with a story. And that's why he keeps moving back.

Investigation is over 8 to 10 feet, now 10 to 12, 12 to 15, 18, 30, 45, between 6 and 7. Why? You're probably wondering why, because there was a motive to do so. Confirmation bias.

Not too often do I hear some very dynamic, very well thought out, very eye opening at times answers from jurors that are so profound that you sit there and you say to yourself, man, I live in a great community. One of the jurors brought up confirmation bias. She said that she couldn't be a good juror because, no matter what, she's going to have the tendency to search for, interpret, favor and recall information in a way that confirms or supports one's prior beliefs or values. People display this bias when they select information that supports their views, ignoring contrary information, or when they interpret ambiguous evidence as supporting their existing attitudes.

Why is --

MS. FULTZ: Objection. Facts not in evidence.

THE COURT: Just a moment. Sustained.

MR. BRYANT: Why is confirmation bias so important?

Let's talk about Deputy Hernandez.

When Deputy Hernandez originally got on that stand -- or detective, I apologize. I should say detective. He said the following. He relied on the evidence of Deputy Alfred's statements. He relied on the shoe impressions marked by orange cones on the east side of the driveway, heading south. He relied on the shoe impressions discovered around Marker No. 10.

Remember, that whole discussion when I asked him, you say he was at Marker No. 10, then he backed up to Marker No. 9, and he shot, what are you talking about? He was like, yeah. I was like Deputy Alfred never even said that. He said the physical evidence supports that because of the footprints from the east heading south. And I said, that doesn't -- that doesn't make sense. You're saying that you are interpreting this that didn't even come out of testimony from Deputy Alfred. And he goes, yes, he went from 10 and then moved 6 feet back to 9. Drops his flashlight. Then he fires. And that's because the physical evidence supported that.

And now, and based upon that, his conclusion was Mr. Barber intended to kill Deputy Alfred. Based upon that. And what did we learn? The shoe impressions are all headed in a northerly direction, folks. They were all headed in a northerly direction. And you saw the shock on his face when he realized he made such a massive -- this isn't a somewhat, hey, shell casing here, this is a massive error in such a serious investigation where you are going to charge somebody at the end of the day with attempted murder. To say I rely on this.

See 10. He said 10. He said, I was right here. And then he jumps back. But remember, just a couple of days ago, when I asked him again, why do you know the flashlight was here? He says because of No. 10. Then after I showed him that Deputy Alfred was actually in the front of the car, he says, those -- those -- No. 10 is where he was leaving. I said, didn't you just say that's why the -- why the flashlight was there? He was like, did I say that?

I hope you remember that exchange. Confirmation bias. He's trying to make the evidence fit for his story and not the evidence fit for the reality.

When you are a detective on a case, when you're the lead detective, you have to make sure you get it right. And the reason why you have to make sure you get it right, because if you get it wrong, there is jeopardy of that individual who's being charged with something, being charged with something they shouldn't be charged with. Or at least evidence that's being presented in the improper way.

So what do we know? The shoe impressions, these were all the ones leading east. And I made sure to show these outlines. This is the shoe, heads this way. This is the shoe, headed this way. Absolutely. Absolutely. These are all headed south. Absolutely, they're all heading south. Because he didn't want to look at the fact that they were headed north. Because he didn't want to see the truth. Because as good of a detective as he is his bias, his internal bias couldn't even allow him to see something so glaringly obvious.

And that glaringly obvious fact destroys, it

destroys his opinion. Because he says that the physical evidence -- I said, remember I said, you're walking down this path. You have these bullet casings over here. If -- would you agree with me that this would be consistent if he walked up the path, and these bullet casings? He said, no. I said, why? He goes because of the physical evidence. I said, because of Deputy Alfred's statements? Not just because of that, because of these pathway marks. And because of that flashlight.

And those pathway marks, as I sat there I said, are you sure? He said, I'm sure.

My client is being charged with attempted murder on a peace officer. My job is to make sure I look at everything. My job is to make sure I look at every bit of evidence to ensure that the jury is given the right information. That is my job and my duty. And that said he was leaving. So if that is the fundamental basis and the foundation of his opinion, that Mr. Barber was shot where Deputy Alfred says, at a speed that Deputy Alfred said he was going, and that Mr. Barber intended to kill him, then this entire investigation is turned upside down because it is based upon a false premise.

Follow those shoe prints. And those shoe prints lead out.

And I asked him, I said, do you have -- I gave him an opportunity. Do you know why this seems to be having, you know, an entry from east to west if we know he came from west to east? He says, I don't have a clue. I don't know why they did that. Well, if he had really paid attention to the evidence, he would have known why.

And what does this mean? If he made a mistake on such a major issue like that, what other biases did he have? What other things did he see? He relied primarily on Deputy Alfred's testimony, folks. And we know Deputy Alfred is not telling the truth. He changed his testimony 50 times on that stand. So if the main thing that you're relying on is Deputy Alfred, and you cannot rely on this alleged physical evidence, then you have to call into question what on earth happened that night, other than what you heard. And other than what you see.

Again, I asked him, here's the path. Wouldn't it be consistent if he walked up this path and fired his weapon? And we know you can't find footprints here. And he goes, I can't give you that answer, you're making me have a hypothetical that doesn't exist. And as a matter of fact, I was asking him to actually tell me what happened, because we know that that physical evidence of a man walking on the east side heading south is nonexistent.

I asked him, is there any evidence of Mr. -- or Deputy Alfred's shoes walking on the east and south? He said no. So if we know he never walked south, he had to have walked in this gravel. And why did he do that? Because he feared that a man may have had a firearm or a weapon. So therefore, you heard his training, you're supposed to go for cover. So the proper thing to do is stand in the line of sight. If we know Mr. Barber is here on the vehicle and the vehicle is right here, the vehicle is kind of tall, that is a way for you, if you are walking on the west, westerly side heading south, at least you can avoid your angle where he can't -- he has to jump

around that vehicle in order to start firing.

It is safer -- it is safer for him to be on the west side, which is why he was there. Which is why all of those bullet casings are there.

And, yeah, it's possible that some of those bullet casings may have hit up against the house and landed right there. But that doesn't mean that he didn't walk up the middle. Of course. Fine. Sure. But they're all starting at No. 250 (sic), 2 feet away, we'll talk about that. Speed and distance matter, folks.

Again, there was a discussion about the weeds. No. Why does speed and distance matter? Because if you're trying to prove that a -- that an object that is inherently not used to kill is a deadly weapon, you have to show at what threshold does a vehicle go or transform from a vehicle that is just meant to transport people into a weapon.

Just like a baseball. Professional baseball player picks up a baseball. Tosses it at me at 10 percent of speed. Says I want to kill you. Tosses the baseball at me and it hits me. It didn't hurt. I mean, I might have a bruise. But that's it. Is he going to be charged with a deadly weapon? No. He's going to be charged with assault. Simple assault.

But if he takes that baseball and he throws that baseball at my head at a hundred miles per hour, you better believe that baseball has now turned into a deadly weapon. And that is why speed and distance are critical in this case.

MS. FULTZ: Objection. Facts not in evidence.

THE COURT: Overruled.

MR. BRYANT: So, folks, what do we know? We know that Mr. Morales came up with an entire speed graph. And we know that the maximum speed was 3. --

THE COURT: Excuse me. Excuse me. I apologize. I'm going to sustain that objection.

MR. BRYANT: Thank you, Your Honor.

The maximum speed is 3.39 miles per hour. The maximum speed. And what would the speed before that? At the first shot it was zero. Second shot was .43 miles per hour. Third shot it was less than one mile per hour. At the fourth shot it's 1.36 miles per hour. At the fifth shot it's two miles per hour. And at the sixth shot as the vehicle starts to decelerate it is 3.17 miles per hour.

And the distances. If you were to take the shell casings at 2, 3, 4 and 5, if Deputy Anderson -- or Deputy Alfred was there around that period of time, it's 53 feet away. Between 7 and 8, that's -- you'll see 7 and 8, that's the two other shots, it's about 45 feet away. And that midpoint distance between Marker 6 and 9, that's 40 feet away. And the flashlight, that's 30 feet away.

Alfred's initial interview, if you look to the right, 8 to 10 feet away. There is an X there, and the reason why there is an X there is because if he didn't move, and he just sat there and allowed a two to three mile per hour car to make contact with him, he would have been hit, because we know that car traveled 14 feet.

Distance and speed are critical. And the reason why that is, is because at what point does a vehicle become a

deadly weapon? And at what speed does a vehicle become an instrument that can cause great bodily injury? And look, all vehicles weigh several tons. I mean, we're talking about a Trailblazer. We're not talking about a Humvee here. We're not talking about a tank. We're not talking about an 18-wheeler. It's a mid size SUV. Cars weigh between, anywhere between two to 5,000 pounds, 6,000, 7,000 pounds. It's a car.

But three miles per hour, having had no experts come in to tell you that that is enough to cause severe injury, serious injury? Even if you use common sense, folks, if that's walking speed it's not doing anything to you. You might get a bruise. It's important to see, again, visualize, if Deputy Alfred is at 6 and 7, where he said he saw that vehicle first move, he is approximately 45 feet away from that initial start of that vehicle. He could have easily walked over there.

And more importantly, a car moving three miles per hour, at a vantage point of 45 feet away, would cause absolutely no injury at all. Even if he sat there and waited for that vehicle to come, just sat there and said, okay, drive three miles per hour, keep going. Bumps him a little bit, he could have just walked up and yanked him out of that car at that speed.

And again, see that flashlight. The reason I always continue to show this image, is because this flashlight is literally right across from that opening where he could have easily walked over there. And if you had to have anyone who paid attention to this evidence and not just taken Deputy Alfred for his word, there would have been potentially a very

serious discussion at this OIS investigation.

I want to start going back to where we started. What's the definition of a deadly weapon? Deadly weapon is an object, instrument or weapon that is used in such a way that is capable of causing and likely to cause death or great bodily injury.

The reason why I just went through this exercise of speed, velocity and distance for a vehicle is because a vehicle is not like a firearm. It is not inherently used to kill or harm. It can. But the People have the burden to prove beyond a reasonable doubt, every single element beyond a reasonable doubt, that that speed would cause great bodily injury or death.

Now, we know for a fact that a car moving at three miles per hour, which is walking speed, is not going to kill anybody. Common sense will tell you that.

MS. FULTZ: Objection. Facts not in evidence.

THE COURT: Sustained.

MR. BRYANT: Use common sense. Use common sense.

We also know that there's been no evidence presented to show that three mile per hour car is going to do any great bodily injury anyhow.

What is great bodily injury? It's a substantial physical injury, an injury that is greater than a minor or moderate harm. And I've shown you examples. Here are some examples. There will be others. But again, you have to ask yourself, would a three mile per hour vehicle, if it made contact with Deputy Alfred, would it have caused any of these

great bodily injuries?

MS. FULTZ: Objection. Speculation.

THE COURT: Sustained.

MR. BRYANT: Circumstantial evidence. I read this instruction before, but it's important. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.

So if we're talking about all this circumstantial evidence, and there's one possibility that still exists that says, well, you know, although it is highly, highly, highly likely that I think Mr. Barber did X, but it's still reasonably possible Mr. Barber did Y, it doesn't matter how much you wait, you must, you must find Mr. Barber not guilty. And that is how you weigh circumstantial evidence.

Mr. Barber is being charged, once again, with attempted murder. It means that he took at least one direct but ineffective step, and the defendant intended to kill. And as I said before, you have to look at circumstantial evidence to decide this. Look at all the possible outcomes, reasonable possibilities that did not show intent.

Here's a reasonable possibility. The vehicle moved involuntarily after Mr. Barber was shot or startled by gunfire. Meaning that if he had his foot on the brake, he could have taken it off involuntarily and momentarily, and then put his foot back on that brake, which is why it stopped. There is nothing that's been proven to eliminate that possibility.

Nothing the State has done has eliminated that possibility. It still exists today.

It is like the light bulb. It is like that room. There are still a bunch of different possibilities out there that still we don't know what happened. And there has been nothing to eliminate that. After the tires gain traction, there's no sound of acceleration in the .65 seconds prior to the first shot. We know that. Everyone admitted to that. There's no sound. You don't hear the engine. This is an old car. You're going to at least hear the engine doing something if it's accelerating.

So the alternative is that car, as we know, as we learned, it moves in reverse when it's in gear. We talked about the parallel parking example. But when this car is in gear and your foot is off that brake, this thing moves back. It moves, and it will continue to move until something stops it. So if we know that, we know there's a couple of outcomes. Either A, Mr. Barber pressed on the accelerator. Spun those wheels. Didn't gain traction. He took his foot off the accelerator. And the car could have rolled back without him pressing the brake. Or conversely, could have had his foot on the brake. Heard the first shot. Got shot. Took his foot off that brake. It goes back.

Here's the point. When I asked, can you tell me for certain that that didn't happen? Nobody could. Nobody could tell you for certain. But everyone said it's possible, he could have had his foot on the brake, and he could have been pressing the accelerator. It would have done that burning

rubber motion where you're just spinning those wheels, but the car is not moving. Everyone said, yeah, it's possible.

The brakes were softly pressed. You didn't hear any squealing of the brakes. You didn't hear any slamming of the brakes. It was softly pressed. Is this intent to kill? No. You have to -- if somebody's softly pressing the brakes, they're not slamming on it, you can reasonably conclude that he did not intend to kill anybody.

And again, if you believe maybe he did. Maybe he didn't. You have to go with maybe he didn't.

What we also know is Mr. Barber never accelerates that vehicle during the shooting. So as I told you before if somebody is hell bent on killing someone, you will hear people pressing that accelerator. He's going for it. Because at this point, why not? You're trying to kill this man, whether you believe he's a cop or just whoever. If for some reason you just go into a rage and you're trying to kill someone, would you softly press the brakes? I don't care if someone is shooting or not. No. They're going to press that accelerator. We know that didn't happen.

Here's another very important point. If a man, if he had the intent to kill, why is his foot on that brake, even after he's shot? For four minutes it takes them to come around, to move that car, and during that time, you know that Deputy Alfred is still out there before these other officers arrive. You know he's still talking to him. We know that he drops his flashlight somewhere behind this vehicle. But you want to know what Mr. Barber never does? He never takes the

second opportunity to slam that thing on again and take off, because we know it was in the reverse gear. But he never did that.

So that is also circumstantial evidence saying that, well, you know what, I mean, if he's trying to kill this guy, why didn't he do it when he had an opportunity after the cop started firing? And that, folks, that is when you apply circumstantial evidence, and you say, if I have to weigh the two, I always have to go with not guilty. Because they did not eliminate that.

Again, the vehicle traveling at two to three miles per hour, again somebody who is way down there by the way. Even if you take his word, his initial word that he was between Marker 6 and 7, he is 45 feet away, folks. If you're trying to kill somebody, you're not going three miles per hour. He is far. He is -- we know he is not 8 to 10 feet. We know that. So if we know that, is somebody really trying to kill you, if they are going three miles per hour and you're 40 feet away? The logical conclusion is no. No.

And we know that in order to attempt to kill somebody, you have to have something that can kill somebody. A vehicle going at two to three miles per hour is not a deadly weapon, folks. Use your common sense.

We keep talking about this .65 period. And I just want to play this for you, and I want you just to listen. Where the tires stop screeching you hear a silence. You hear a pure silence.

(Audio played; not reported.)

MR. BRYANT: You will have an opportunity to listen to this. You can go back in that jury room. You'll have these audios. You can listen to it intently. There is a silence. And that is this period right here. And you don't hear that accelerator going, but you hear those shots.

And we know that a man who is 45 feet away, I don't care if you are the most trained eagle eye, with night vision goggles, it is physiologically impossible for any person at night to see a vehicle moving in .65 seconds. He never saw that vehicle moving. He was 45 feet away. He shot prematurely. And then he gave a statement that wasn't accurate to his own people. Then he gave statements that weren't accurate to everybody in this room.

Assault with a deadly weapon. You're going to hear about this and it has -- there's two different charges for this. You're going to have one that is with a peace officer and one that is without a peace officer, meaning if you didn't know it was a peace officer is it still assault with a deadly weapon? It's Instruction No. 8 -- 860 and 875. They're both the same, except one is an officer and one is not.

But again, we're going to go through these elements, and one of the important things is the defendant didn't act with a deadly weapon other than a firearm that will probably result in the application of force to a person or force likely to produce great bodily injury.

This is important. When the defendant acted, he presented the ability to apply force to produce great bodily injury. Folks, the first thing is, was his movement even

voluntary? And we keep going over this. And the reason why I harp on this, you're probably saying, Mr. Bryant, you've said this five million times. I'm tired of it. I get it. But the reason why I'm saying this is because you'll be surprised not everybody does get it. And I have to repeat it over and over again, so people really kind of understand what I'm saying.

There is a very reasonable possibility that Mr. Barber was first shot or startled when he had his foot on the brake, that momentary period between .6 -- .01 and .65, when that first shot happened, and he just took his foot off the brake involuntarily. It wasn't his fault. He didn't intend do it. But he was shot. And that car moved back. And no one has presented evidence from the state to say that didn't happen. They must eliminate that possibility or that is, folks, reasonable doubt.

Again, gone through all of these things. A vehicle going two to three miles per hour is not going to cause great bodily injury. Definitely not going to kill anybody. And if he never had the intent, you can look at all these facts, and here's a critical point. Maybe you think it's possible, maybe it was possible this could have happened. It's possible is not enough. It's like when I said, when you had that ticket in your pocket, when your significant other asks you, you got the tickets, I don't need to check, I got them. We're good. We're fine. I am 100 percent certain.

So for 860 and 875, both of these, assault with a deadly weapon, regardless whether it's an officer or not, must find Mr. Barber not guilty, because there is absolutely

reasonable doubt all over this place.

Concluding, I'm getting close to the very end.

Expert witness testimony. I read this to you before. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

Now, Mr. Morales he told you, those -- that was heading north. I couldn't rely on those footsteps. But unfortunately, and I say unfortunately, because I want our law enforcement officers and our detectives to do their best, because everybody's life is important. There are so much at stake. You gotta get it right. You cannot be wrong. You cannot be wrong on a unforced error, right? This is something that an error that shouldn't have happened.

Again, talked about how he initially testified, but then after all these revelations had occurred, here's what Deputy Hernandez later admits. He admits that Deputy Alfred actually did testify that he saw the car moving when he was standing between Marker 6 and 7, 45 feet away. He admitted that he incorrectly assumed that the shoe impressions were headed in the southbound direction. He admitted that that flashlight was 30 feet away from the initial starting point of the vehicle. He admitted that he never officially calculated the speed of that vehicle moving before it initially came to rest.

And I'll stop right there, really quickly. That is a critical component, trying to determine, is this speed likely to cause the harm for a potential charge later? A thorough

investigator, a thorough detective calculates all of this stuff. He makes sure. He said it. He said it. Here's what I was a little concerned about. He said, yeah, I did the calculations, but I didn't officially put it in the report.

That is the one time I paused and said, what do you mean? I didn't go into it during the trial but in my head I said, so you knew, you knew this car was going two to three miles per hour, and you didn't say anything? I was a little upset. Maybe we would have a different outcome. I just want people to do right.

MS. FULTZ: Objection.

THE COURT: Sustained.

MS. FULTZ: If you know a fact, if you know a fact, put that in the official report. Let the powers that be make a decision as to what they want to do with this case. Don't withhold a critical component of this case.

He never questioned whether Deputy Alfred's initial statements given during his interview were accurate. Because you see, if he did determine that this speed was three miles per hour, and Deputy Alfred told him in his witness interview that he was going at a very high rate of speed, you have to start questioning, what do you mean?

And then I asked him, so would any of the stuff change your opinion if you would have actually calculated this? Would it change your opinion if you knew he wasn't actually walking on this side? And Deputy Hernandez said, nope, I'm 100 percent certain that Mr. Barber intended to kill him and drove that car at him.

And then I asked him a bunch of questions. How do you know? You don't have any video saying that he didn't have his foot on the brake? No. You don't have this? You don't have that? He kept saying, nope, nope, don't know, don't know.

So his 100 percent certainty was conclusory. For those who don't know what conclusory means, it means he was giving a statement of opinion based upon no facts. It was a hollow statement which had no value whatsoever.

And I will say this, Detective Hernandez to some extent I think started to redeem himself. And he admitted this, he did not conduct a thorough investigation. It is not easy for anyone as reputable as Detective Hernandez, to sit on the stand and admit to you all that he did not conduct a thorough investigation, confirmation bias does that to you. And if he did not conduct a thorough investigation, you have to believe that there is reasonable doubt riddled all over this case.

What are we doing here? Not conducting a thorough investigation, believing only one side when it completely contradicts the evidence means that you could not, it's not cannot, it's you could not, it is impossible to eliminate every reasonable possibility. It's impossible. And by virtue of that statement alone, Mr. Barber cannot be found guilty of any of the alleged crimes, because there is reasonable doubt.

Because during the period between April and possibly September of 2021, Detective Hernandez did not do a thorough investigation. And sometimes gets the best of us, when we want to believe someone so bad, because they're all

part of the same department. And I asked him, do you have bias because, you know, you work for the sheriffs department, you guys are all part of the same group? No, I don't have any bias. Maybe, you know, outwardly saying no, I'm trying to be objective. But we see how it was virtually impossible for him to do so, and it led to him having to admit that his investigation was botched.

MS. FULTZ: Your Honor, can we approach?

THE COURT: You may.

Give us a moment, ladies and gentlemen.

(Bench conference held, not reported.)

MR. BRYANT: Folks, rapping up. And I'm just going to go through a list, just a few things that cause reasonable doubt. Because all of these reasonable possibilities still exist and what -- let me go back to the light.

We go into the room, and we're trying to make a determination as to why this light is not cutting on. And your significant other is just dead set that they think that it is just so highly probable that the light burnt out, and you're like, it probably is, but you haven't looked at all of the different possibilities and conducted a thorough investigation.

And what we found at the end of that investigation, it wasn't the light bulb that was burned out. It was -- it was the circuit breaker.

And why is that important? Because you got to get it right. I don't want to get it wrong. I think one of the jurors said it best, rather let a guilty man go free than convict an innocent person. And that's why you have to be 100

percent certain. And it's not --

MS. FULTZ: Objection.

MR. BRYANT: -- an easy decision.

MS. FULTZ: Objection. Misstates.

THE COURT: Sustained.

MR. BRYANT: It's not --

THE COURT: Ladies and gentlemen, the instruction is in 220, the definition of reasonable doubt. It is not 100 percent certainty.

MR. BRYANT: Thank you, Your Honor.

THE COURT: I'll also direct your attention to Instruction 200, if the lawyer's comments on the law conflict with my instructions, you must follow my instructions.

MR. BRYANT: As I said, the judge directs you on the law.

Reasonable doubt. It is reasonably possible that Mr. Barber released his foot from that brake causing the vehicle to roll back only after being shot by Deputy Alfred. It is reasonably possible Mr. Barber never pressed the accelerator at any point during the period which that vehicle was idle. It is reasonably possible Mr. Barber released his foot from the brake causing the vehicle to roll back only after being startled by gunfire.

It's reasonably possible Mr. Barber released his foot from the brake causing the vehicle to roll back only after being shot by Deputy Alfred. It's reasonably possible Mr. Barber released his foot from the brake causing the vehicle to roll back only after the first four shots were fired. It's

reasonably possible the vehicle's tires started spinning, and Mr. Barber did not have his foot on the brake and the vehicle began to move back slowly before the shooting. That's entirely possible, too.

It's reasonably possible that the vehicle traveling between two to three miles per hour would not cause great bodily injury or death if it made contact with an individual. It is reasonably possible Mr. Barber recognized that Deputy Alfred was a peace officer. That's reasonably possible. But it's also reasonably possible that Mr. Barber did not know Deputy Alfred was a peace officer. Because again, these answers have not been met.

And unless you eliminate all of these possibilities, and you only rely solely on what the State believes that they've proven, then you must find that Mr. Barber is not guilty of any of these crimes. Because, quite frankly, the State has not gone beyond all of these reasonable possibilities.

The final step isn't justifying what the problems are or the possibilities are. It's eliminating all of them until you get to the point, that you have, with clear certainty, the State has proven their case.

With that, you all, I will just say, this is Mr. Barber. May not have seen him too much in this trial as he sat there. This is my client, and I am proud to represent him.

Thank you.

THE COURT: Thank you, Mr. Bryant.

MR. BRYANT: Thank you, Your Honor.

THE COURT: Ms. Fultz, shall we take a recess before you do rebuttal, or do you plan on something very brief?

MS. FULTZ: I don't think it's too long.

THE COURT: My staff needs a break. We're going to take a break. We'll take 15 minutes. Don't talk about the case. We'll hear Ms. Fultz's rebuttal when we come back. Then you'll go in and decide this case.

Don't talk about the case.

(A recess was taken.)

(The following proceedings were held outside the presence of the jury.)

THE COURT: We're on the record outside the presence of the jury. Counsel are present. Mr. Barber is present. Detective Hernandez is present.

Someone wanted to address the Court?

MS. FULTZ: Yes, Your Honor. Your staff has brought to my attention that the way the Count 1 is charged creates an issue with entering the attempt murder versus attempt murder of a peace officer. I contacted people in my office to see if it was an issue on our end. And it was explained to me that the way in which I have drafted the verdict forms is incorrect. That the 664(e), peace officer allegation, is not a separate allegation, but that it's the substantive offense. So it should be attempt murder of a peace officer with attempt murder as a lesser of that offense.

I wanted to ask the Court how to proceed, if I should just change the verdict forms. I don't think it changes the way we have addressed it or argued it. It's just a matter

of the verdict forms and how it would be entered in the court system to --

THE COURT: I don't think the jury instructions treat it as a lesser offense. Give me just a moment to bring up 600 and 602.

602 says, if you find the defendant guilty of attempted murder, you must then decide whether the People have proved the additional allegation that he attempted to murder a peace officer. To prove this allegation, the People must prove that, et cetera. So it is treated as an allegation, not as a lesser included offense.

MS. FULTZ: In the instruction in the 602 that's the one --

THE COURT: Correct.

MS. FULTZ: Hopefully, that resolves the issue.

THE COURT: And if it turns out this instruction, the way it's structured is incorrect, I don't think there's going to be any substantive error. For example, the jury could find that he was guilty of attempted murder, but then find the allegation not to be true. And if that were the case, then he would be sentenced accordingly.

MS. FULTZ: Right.

THE COURT: I don't think we have a substantive problem however it's structured.

MS. FULTZ: Okay.

THE COURT: All right.

UNIDENTIFIED SPEAKER: My attempt to help the Court and counsel apparently was ill advised.

THE COURT: I'm not the final authority here. You may be right. But it's a little late in the day for us to change all of this now, and I think we get to the same place either way. I don't think --

MS. FULTZ: Right.

THE COURT: -- there's going to be any error in the event of a -- I mean, the jury may find him not guilty, then they don't deal with the allegation. The jury may find him guilty, and find the allegation is either true or not true. And in either of those -- in either of those three scenarios -- can you have either with three? In those three scenarios, whichever is chosen, I think we know what to do.

MS. FULTZ: Okay.

UNIDENTIFIED SPEAKER: Thanks, Judge. My apologies.

THE COURT: Nothing to apologize for. I appreciate it.

UNIDENTIFIED SPEAKER: I'm glad there was a CALCRIM on point so I can report to my superiors.

THE COURT: Okay. 602 is the number.

UNIDENTIFIED SPEAKER: 602, I will remember that forever.

THE COURT: All right. Let's bring the jury in.

(The following proceedings were held in.
the presence of the jury.)

THE COURT: We are back on the record. Everyone is present.

Ms. Fultz?

MS. FULTZ: A motor vehicle does not become a deadly weapon by virtue of the speed it achieves. A motor vehicle

becomes a deadly weapon by means of the intent with which it is used. The fact that the vehicle only achieved somewhere around three miles per hour does not, is not evidence that that is the speed the defendant intended to achieve.

The evidence is that he angrily entered that vehicle when he was contacted by Deputy Alfred. That he put the pedal to the floor and revved that engine and caused the tires to lose traction. One does not do that with the intent to travel at three miles per hour. There was an intervening event preventing it from achieving a greater speed.

You heard Mr. Bryant say, if you have intent to kill, you're going to push through gunfire. That is not reasonable. Please read the instruction on attempt murder. It talks about there's a reason that this trial before you is an attempt murder and not a murder. There's a reason something intervened to stop the intent of Mr. Barber.

The intervening -- the instruction talks about the intervening event of, one can change their mind, a change of heart, a change of purpose. It can be poor execution or lack of skill. Somebody trying to shoot someone, and they just aren't a good shot. Or here, you have six intervening reasons, why the defendant stopped moving that vehicle.

Receiving gunfire is a sobering experience, and you're not going to just thug it out and power through, receiving six gunshots towards you. That is absolutely the definition of a reason to abort your mission. An intervening act that stopped his purpose.

And this theory that he was, what do they call it,

burning rubber, holding the gas pedal down and holding the brake down at the same time, makes absolutely no sense. First of all, it's not supported by the evidence because we know that those tires were turning. You can hear it. Deputy Alfred describes seeing it. We know that the wheels were turning. We also know that the wheels lost traction. And again, you have 14 feet of tire tracks.

In what scenario is it reasonable that somebody would enter a vehicle to scare the police officer, contacting them, that you just had a dispute with, you're mouthing off to and disagreeing with, in what universe is a reasonable reaction to that going to be, I'm going to scare this guy? I'm going to scare the guy with the gun back there. It's just an unreasonable thing to ask you to believe.

Deputy, could I have the Elmo for the photos?

Every time we have -- the Defense has spoken about Deputy Alfred and his uniform, he is referring to him in a ski mask. Deputy Alfred was not in a ski mask. He told you that at processing for the investigation after the fact they wanted to photograph him. You saw photographs of him from every angle. And they wanted to photograph him with all of the equipment he had available.

But he told you while he was out on patrol he didn't have that big mask over his face, and when you hear him talking in his audio, it doesn't sound muffled. I won't say much more about that. But it was just a sticking point.

Now, there was a lot of talk about Deputy Alfred, placing himself at Placard 6 and 7, and then later in his

testimony after looking at more photographs, he wasn't there when the scene was processed, and he doesn't know what the placards identified, because he had left the scene.

And then Detective Hernandez and his team came in and conducted that investigation. They photographed the scene. They placarded everything they identified as potentially having evidentiary value. Then they photographed it with the placards.

So when we show a photograph to a witness, No. 20, when we show a photograph to a witness that lacks depth perception, that has the -- I'm trying to recall the terms. Deputy -- or Detective Hernandez referred to it as like a fish eye lens, and there was a term Mr. Morales used, I think it was maybe parallax. Maybe wrong. But there's -- there's a factor with photographs, and those of you that take selfies, where do you take your selfie? Up here. And why is that? Because the photo is going to lengthen, or it gives you the effect, the appearance that you want. And if you take a photograph here, it's going to give you a different perception, a different view of yourself.

We are asking witnesses who were present in this narrow long driveway to pick out on a photograph without reference where were you standing. Well, Deputy Alfred looked at it, and he said the best estimation, he put himself initially between 6 and 7. But then when he starts seeing photographs, a little closer up, looking at 22, and seeing that Placard 9 is his flashlight, from that point on, he used the reference point of Placard 9.

And why is that? Because he recognizes his flashlight, and that's what he recalled as the point where he was when he delivered his shots.

Deputy Alfred also told you that the distances, timing, all of the things that he testified about, were his best estimation that he could provide after three and a half years passing of time. And when I asked him, does the fact that it's been three and a half years affect your recollection or your testimony? He explained he was trying to do his best to estimate. But not only the passage of time caused a concern for him, but he also indicated that he has since conducted hundreds of investigations. And he was worried that he might miss -- he might -- I don't recall the word he used. But he's worried that he's blending his memories of these investigations. And so he was doing the best he could to estimate.

When he gave his initial interview you heard he estimated somewhere between 8 and 10 feet distance from the vehicle. Well, you heard about this fight, flight or freeze response to a traumatic situation. And here, Deputy Alfred is testifying about being behind a motor vehicle that he then perceived coming at him. So was that distance maybe shortened in his recollection? Maybe. But that is why there's an investigation that takes place after.

We are not going to put on a case based entirely on a statement of a witness, who under the stress of what he perceived to be a mortal threat, to give you an accurate description of everything, including he estimated the vehicle

speed at ten to 15 miles per hour. That was his estimation just based on the observation.

And what did he see? He's standing behind a vehicle, hears the revving and sees the tires spinning, and that vehicle begins to move. He's interpreting all of those observations when he's asked to provide an estimate, an estimation.

Why is the flashlight and its placement important? It was the point of reference that Deputy Alfred firmly recalled as to where he was positioned and where he was located, and he specifically recalled that because law enforcement is not trained to one hand shoot. He dropped his flashlight because there's no way to take the two hand shooting stance while holding his flashlight.

Now, the Defense said, well, gosh, if the fired cartridge casings are moved by the emergency medical response team, wouldn't the flashlight be, you know, a bigger impediment to them? Wouldn't they move that? Well, if they are coming in and it's back where the Defense is asking you to believe it was dropped, back at Placard 6 or 7, why would someone stop, stoop down, pick up a flashlight and look forward and throw it, what was that, 50 feet? 50 feet forward and to the left?

If they were moving it out of their way, they would toss it out of the way. If they moved it when they were leaving, so if it's up further where it is, and when they go toss it, they go to toss it aside, they're going to pick it up. And now, as they're leaving they're tossing it behind them? It makes no sense. The flashlight is really the most reliable

reference point from which to place the action of what took place.

Now, you were just talked to a lot about basically what amounts to the reasonableness of Deputy Alfred's shoot. That is not what you are here to determine. It is not for you to decide if this was a clean shot. Why is it relevant? It's relevant because it was the response to the actions taken and observed by the defendant, observed by Deputy Alfred. What he perceived to be a mortal threat. We know that it was that perception, because Deputy Alfred's response was to use lethal force, to discharge his weapon six times.

The Defense wants you to believe that Deputy Alfred was shooting from the area where the fired cartridge cases were found way back by the house. First, Deputy Alfred was asked, was there any cover or concealment in that driveway? And he said no. We know he was forward of that opening of the backyard area, even though he said the brown wooden fence he didn't feel would protect him because the vehicle could -- it wouldn't stop a vehicle. We knew he was forward of the brown fence, because when asked, was there a path of escape? Was there cover of concealment? He was surrounded by 6 foot fencing.

If he were farthest to the west, hugging that wall, taking cover as described by the Defense, showing you 28, wouldn't you expect based on the angle of the vehicle, to see bullet strikes on the passenger's side of the vehicle? There's no bullet holes there.

MR. BRYANT: Your Honor, objection, based upon motion in

limine.

THE COURT: Overruled.

MS. FULTZ: Deputy Alfred told you that he shot to stop the threat, and that he stopped shooting when the vehicle stopped its motion.

You have Instruction No. 226 that assists you in evaluating the credibility of witnesses. The Defense is luring you under the guise of evaluating the credibility of a witness to engage in deciding whether it was reasonable for Deputy Alfred to shoot. Again, that is not the decision here. You can use all of the information about it to weigh credibility of witnesses, but please stay focused on what you're here to decide, and that's the actions and intentions of Mr. Barber.

Now, I know there was this big a-ha moment for the investigation and those footprints, that three and a half years later Detective Hernandez realized during testimony that the footprints were headed in a northbound -- exiting, it was Deputy Alfred's path of exit. And it was very dramatic and sexy in this revelation mid trial.

Please consider all of the evidence. Take a step back and decide, first, who provided that investigation? Who took the photographs of the footprints in the first place with the measuring tool? With the compass? That was the sheriffs department. That was Detective Hernandez and his team as they processed the scene. Nobody was hiding that. It was a three and a half year later failure of recollection on that was his exit path.

And what does it change about what occurred? What

does it change about the actions and intentions of Mr. Barber? We know that Deputy Alfred left because -- well, first, he's still not there. He's not there right now. And second of all, he told you that he left the scene because that's what's required of them. There are standard protocols when a deputy discharges his firearm in the line of duty, and he observed those protocols and left the scene and allowed the other deputies to take care of all of the steps after the fact.

If there's a discrepancy in testimony as it was argued to you and what you recollect the witness saying on the stand, you can ask for read back of the testimony, and the court reporter will prepare that for you. I encourage you if there's something that you have a dispute, you don't recollect what the witness said, to ask for read back. I will give you a pro tip. The more specific you can be in your request, the less time you have to wait for the reporter to prepare that section. But use the tools available to you. Please review all of the evidence.

And with regard to the instruction on circumstantial evidence, you were just told about the difference between circumstantial evidence. If there are two reasonable conclusions, one pointing to guilt and one pointing to innocence, you must follow the one that shows innocence. And that is true. That is the statement of the instruction. But it says that it must be reasonable conclusions.

And the things that you have been asked to believe by the Defense, that the defendant intended to go three miles an hour or he didn't intend to move at all, he was just trying

to scare the sheriffs deputy, these are unreasonable things. These are unreasonable conclusions. Focus on the evidence and the reasonable interpretation of that evidence, and I am confident that you will find the defendant is guilty.

THE COURT: Thank you, Ms. Fultz.

Deputy, can you switch the screen over to my computer, please?

THE BAILIFF: Yes, Your Honor.

THE COURT: Okay. Members of the jury, when you go to the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard.

It is your duty to talk with one another and to deliberate in the jury room. You should try to reach -- to agree on a verdict, if you can. Each of you must decide the case for yourself but only after you have discussed the evidence with the other jurors.

Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you. Keep an open mind, and openly exchange your thoughts and ideas about the case.

Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.

As I told you at the beginning of the trial, do not

talk about the case or about any of the people or any subject involved in it with anyone, including but not limited to your spouse, or other family or friends, spiritual leaders or advisors or therapists. You must discuss the case only in the jury room and only when all jurors are present. Do not discuss your deliberations with anyone.

Do not communicate using social media during your deliberations. It is very important that you not use the internet or a dictionary in any way in connection with this case during your deliberations.

During the trial, several items were received in evidence as exhibits. You may examine whatever exhibits you think will help you in your deliberations. These exhibits will be sent into the jury room with you when you begin to deliberate.

If you need to communicate with me while you are deliberating, send a note through the bailiff, signed by the foreperson or by one or more members of the jury. To have a complete record of this trial, it is important that you not communicate with me except by written note. If you have questions, I will talk with the attorneys before I answer, so it may take some time. You should continue your deliberations while you wait for my answer. I will answer any questions in writing or orally here in open court.

Do not reveal to me or anyone else how the vote stands on the question of guilt unless I ask you to do so.

Your verdict on each count must be unanimous. That means to return a verdict, all of you must agree to it.

Do not reach a decision by the flip of a coin or by any similar act.

It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be.

You must reach your verdict without any consideration of punishment.

You will be given verdict forms. As soon as all jurors have agreed to a verdict the foreperson must date and sign the appropriate verdict forms and notify the bailiff. If you are unable to reach a unanimous decision on only one or only some of the charges, fill in those verdict forms only and notify the bailiff. Return any unsigned verdict form.

To the alternate jurors, the jury will soon begin deliberating but you are still alternate jurors and are bound by my earlier instructions about your conduct. Do not talk about the case or about any of the people or any subject involved in it with anyone, not even your family or friends and not even with each other.

Do not have any contact with the deliberating jurors. Do not decide how you would vote if you were deliberating. Do not form or express an opinion about the issues in this case unless you are substituted in for one of the deliberating jurors.

Okay. That's it for the instructions. Would you please swear our bailiff?

THE JUDICIAL ASSISTANT: Do you solemnly state you will

take charge of the jury and keep them together, that you will not speak to them yourself, nor allow anyone else to speak to them upon any subject connected with this case, except by order of the Court, and when they have agreed upon a verdict you will return them into this court?

THE BAILIFF: I do.

THE COURT: Okay. Now, for the alternate jurors, you can leave, and as long as we have contact information for you, you don't need to stay in court. You're welcome to stay here at court if you wish to, but you can go back to your homes or jobs or whatever. If something should happen to one of the jurors who will be deliberating, and we need to substitute you, we will call you and let you know, and you will come in, and I'll instruct the jury that they need to start everything all over again, if that's the case.

If you would like to be present for the reading of the verdict, we would need to know that you are no longer than about 15 or 20 minutes away, so we don't keep the jury waiting. But you've sat through the entire trial, if you would like to be present for the reading of the verdict, we will wait for you if that's the case. If not just let us know that, we'll take the verdict and then one of our judicial assistants will call you and let you know what the verdict was. Okay.

All right. So the 12 folks, if you would accompany our bailiff to the jury deliberation room. And you get to decide when you need to take a break. Again, generally, 12:00 to 1:30. You can stop at 4:30 if you wish. But keep in mind, I cannot take a verdict if it's after 4:15.

Now, if you want -- if you don't reach a verdict today and you want to deliberate tomorrow, you can decide to do that. That's fine. Even though it's a Friday. If instead you decide you want to come back on Monday, that's fine as well. Just let our bailiff know. Okay. Thank you.

(The jury exited the courtroom to commence deliberations.)

THE COURT: Counsel, you're free to stay or go but be within, you know, 15 minutes or so to come back.

MR. BRYANT: I believe everyone's cell phone numbers are with the court.

THE COURT: Okay. All right. We're off the record. Thank you.

(Whereupon the lunch recess was so taken.)

SAN BERNARDINO, CALIFORNIA, THURSDAY, DECEMBER 12, 2024

AFTERNOON SESSION

DEPARTMENT S-15 HONORABLE DAVID COHN, JUDGE

APPEARANCES:

The Defendant with his counsel,
JAMES BRYANT, Attorney at Law,
RYAN DUCKETT, Attorney at Law and
RODNEY DIGGS, Attorney at Law;
KATHLEEN FULTZ, Deputy District Attorney,
representing the People of the State of California.

(Alicia S. Vasquez, Official Court Reporter, CSR No. 12225.)

--o0o--

(Jury deliberating; no notes.)

(Whereupon, the foregoing proceedings were continued to December 16, 2024.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,

-vs-

STEFFON TODD BARBER, Defendant.

No. FVI-21001312
REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN BERNARDINO )

I, ALICIA S. VASQUEZ, Certified Shorthand Reporter, do hereby certify:

That I am a Certified Shorthand Reporter of the State of California, duly licensed to practice; that I did report in stenotype oral proceedings had upon hearing of the aforementioned cause at the time and place herein before set forth; that the foregoing pages numbered 728 to 771, inclusive, constitute to the best of my knowledge and belief a full, true, and correct transcription from my said shorthand notes so taken for the date of December 12, 2024.

Dated at San Bernardino, California, this 15th day of May, 2025.

[signature]

Official Court Reporter
C.S.R. No. 12225

## SESSIONS


**VOLUME 1**

December 2, 2024
Morning Session v1:5
Afternoon Session v1:73

**VOLUME 2**

December 3, 2024
Afternoon Session v2:138

**VOLUME 3**

December 4, 2024
Morning Session v3:227

**VOLUME 4**

December 5, 2024
Morning Session v4:336
Afternoon Session v4:429

**VOLUME 5**

December 9, 2024
Morning Session v5:515

**VOLUME 6**

December 11, 2024
Morning Session v6:575
Afternoon Session v6:647

**VOLUME 7**

December 12, 2024
Morning Session v7:728
Afternoon Session v7:771


## EXAMINATIONS - CHRONOLOGICAL


**VOLUME 1**

**ALFRED, Christopher**
Direct Examination by Ms. Fultz v1:35
Cross-Examination by Mr. Bryant v1:85

**VOLUME 2**

**ALFRED, Christopher (continued)**
Cross-Examination by Mr. Bryant v2:138
Redirect Examination by Ms. Fultz v2:159
Recross-Examination by Mr. Bryant v2:169
Further Redirect Examination by Ms. Fultz v2:171

**GALLO, Maria**
Direct Examination by Ms. Fultz v2:173
Cross-Examination by Mr. Bryant v2:185
Redirect Examination by Ms. Fultz v2:195
Recross-Examination by Mr. Bryant v2:198

**COCCHI, Joseph**
Direct Examination by Ms. Fultz v2:200
Cross-Examination by Mr. Bryant v2:210

**VANBRIMMER, Jeremiah**
Direct Examination by Ms. Fultz v2:217
Cross-Examination by Mr. Bryant v2:219

**VOLUME 3**

**LAYOS, Ryan**
Direct Examination by Ms. Fultz v3:228
Cross-Examination by Mr. Bryant v3:234

**HERNANDEZ, Edward**
Direct Examination by Ms. Fultz v3:238
Cross-Examination by Mr. Bryant v3:292

**VOLUME 4**

**HERNANDEZ, Edward (continued)**
Cross-Examination by Mr. Bryant v4:343
Redirect Examination by Ms. Fultz v4:406
Recross-Examination by Mr. Bryant v4:415
Further Redirect Examination by Ms. Fultz v4:417

**ORTEGA, Jonathan**
Direct Examination by Ms. Fultz v4:419
Cross-Examination by Mr. Bryant v4:422

**MORALES, Roberto (402 hearing)**
Direct Examination by Mr. Bryant v4:435
Cross-Examination by Ms. Fultz v4:440
Redirect Examination by Mr. Bryant v4:442

**MORALES, Roberto**
Direct Examination by Mr. Bryant v4:449
Cross-Examination by Ms. Fultz v4:481

**VOLUME 5**

**ALFRED, Christopher**
Direct Examination by Mr. Bryant v5:527
Cross-Examination by Ms. Fultz v5:540

**HERNANDEZ, Edward**
Direct Examination by Mr. Bryant v5:542
Cross-Examination by Ms. Fultz v5:560

Redirect Examination by Mr. Bryant v5:563

**VOLUME 6**

**MORALES, Robert**
Cross-Examination by Ms. Fultz v6:585
Redirect Examination by Mr. Bryant v6:592
Recross-Examination by Ms. Fultz v6:609
Further Redirect Examination by Mr. Bryant v6:616

**HERNANDEZ, Edward**
Direct Examination by Ms. Fultz v6:620
Cross-Examination by Mr. Bryant v6:627
Redirect Examination by Ms. Fultz v6:635
Recross-Examination by Mr. Bryant v6:637
Further Redirect Examination by Ms. Fultz v6:640


## EXAMINATIONS - ALPHABETICAL


**ALFRED, Christopher**
Direct Examination by Ms. Fultz v1:35
Cross-Examination by Mr. Bryant v1:85
Cross-Examination by Mr. Bryant v2:138
Redirect Examination by Ms. Fultz v2:159
Recross-Examination by Mr. Bryant v2:169
Further Redirect Examination by Ms. Fultz v2:171
Direct Examination by Mr. Bryant v5:527
Cross-Examination by Ms. Fultz v5:540

**COCCHI, Joseph**
Direct Examination by Ms. Fultz v2:200
Cross-Examination by Mr. Bryant v2:210

**GALLO, Maria**
Direct Examination by Ms. Fultz v2:173
Cross-Examination by Mr. Bryant v2:185
Redirect Examination by Ms. Fultz v2:195
Recross-Examination by Mr. Bryant v2:198

**HERNANDEZ, Edward**
Direct Examination by Ms. Fultz v3:238
Cross-Examination by Mr. Bryant v3:292
Cross-Examination by Mr. Bryant v4:343
Redirect Examination by Ms. Fultz v4:406
Recross-Examination by Mr. Bryant v4:415
Further Redirect Examination by Ms. Fultz v4:417
Direct Examination by Mr. Bryant v5:542
Cross-Examination by Ms. Fultz v5:560
Redirect Examination by Mr. Bryant v5:563
Direct Examination by Ms. Fultz v6:620
Cross-Examination by Mr. Bryant v6:627
Redirect Examination by Ms. Fultz v6:635
Recross-Examination by Mr. Bryant v6:637
Further Redirect Examination by Ms. Fultz v6:640

**LAYOS, Ryan**
Direct Examination by Ms. Fultz v3:228
Cross-Examination by Mr. Bryant v3:234

**MORALES, Robert**
Cross-Examination by Ms. Fultz v6:585
Redirect Examination by Mr. Bryant v6:592
Recross-Examination by Ms. Fultz v6:609
Further Redirect Examination by Mr. Bryant v6:616

**MORALES, Roberto**
Direct Examination by Mr. Bryant v4:435
Cross-Examination by Ms. Fultz v4:440
Redirect Examination by Mr. Bryant v4:442
Direct Examination by Mr. Bryant v4:449
Cross-Examination by Ms. Fultz v4:481

**ORTEGA, Jonathan**
Direct Examination by Ms. Fultz v4:419
Cross-Examination by Mr. Bryant v4:422

**VANBRIMMER, Jeremiah**
Direct Examination by Ms. Fultz v2:217
Cross-Examination by Mr. Bryant v2:219


## EXHIBITS


EXHIBIT 1 - Audio recording EV v4:425
EXHIBIT 1 - Audio recording v1:81
EXHIBIT 1A - Transcript v1:81
EXHIBIT 2 - (Unidentified) EV v4:425
EXHIBIT 3 - Photograph EV v4:425
EXHIBIT 3 - Photograph v1:41
EXHIBIT 4 - Photograph EV v4:425
EXHIBIT 4 - Photograph v1:42
EXHIBIT 5 - Photograph EV v4:425
EXHIBIT 5 - Photograph v1:43
EXHIBIT 6 - Photograph EV v4:425
EXHIBIT 6 - Photograph v1:43
EXHIBIT 7 - Photograph EV v4:425
EXHIBIT 7 - Photograph v1:44
EXHIBIT 8 - Photograph EV v4:425
EXHIBIT 8 - Photograph v1:44
EXHIBIT 9 - Photograph EV v4:425
EXHIBIT 9 - Photograph v1:37
EXHIBIT 10 - Photograph EV v4:425
EXHIBIT 10 - Photograph v1:46
EXHIBIT 11 - Photograph EV v4:425
EXHIBIT 11 - Photograph v1:45

| | | |
|---|---|---|
| EXHIBIT 12 - Photograph | EV | v4:425 |
| EXHIBIT 12 - Photograph | | v1:45 |
| EXHIBIT 13 - (Unidentified) | EV | v4:425 |
| EXHIBIT 14 - (Unidentified) | EV | v4:425 |
| EXHIBIT 15 - Photograph | EV | v4:425 |
| EXHIBIT 15 - Photograph | | v1:60 |
| EXHIBIT 16 - (Unidentified) | EV | v4:425 |
| EXHIBIT 17 - Photograph | EV | v4:425 |
| EXHIBIT 17 - Photograph | | v1:58 |
| EXHIBIT 18 - Photograph | EV | v4:425 |
| EXHIBIT 18 - Photograph | | v1:59 |
| EXHIBIT 19 - Photograph | EV | v4:425 |
| EXHIBIT 19 - Photograph | | v1:47 |
| EXHIBIT 20 - Photograph | EV | v4:425 |
| EXHIBIT 20 - Photograph | | v1:60 |
| EXHIBIT 21 - (Unidentified) | EV | v4:425 |
| EXHIBIT 22 - (Unidentified) | EV | v4:425 |
| EXHIBIT 23 - (Unidentified) | EV | v4:425 |
| EXHIBIT 24 - Photograph | EV | v4:425 |
| EXHIBIT 24 - Photograph | | v3:277 |
| EXHIBIT 25 - Photograph | EV | v4:425 |
| EXHIBIT 25 - Photograph | | v3:274 |
| EXHIBIT 26 - Photograph | EV | v4:425 |
| EXHIBIT 26 - Photograph | | v3:272 |
| EXHIBIT 27 - Photograph | EV | v4:425 |
| EXHIBIT 27 - Photograph | | v3:271 |
| EXHIBIT 28 - Photograph | EV | v4:425 |
| EXHIBIT 28 - Photograph | | v3:271 |
| EXHIBIT 29 - Photograph | EV | v4:425 |
| EXHIBIT 29 - Photograph | | v2:176 |
| EXHIBIT 30 - Photograph | | v1:98 |
| EXHIBIT 31 - Photograph | | v1:99 |
| EXHIBIT 32 - (Unidentified) | EV | v6:618 |
| EXHIBIT 32 - Diagram | | v1:103 |
| EXHIBIT 33 - Photograph | | v1:110 |
| EXHIBIT 34 - Photograph | | v1:113 |
| EXHIBIT 35 - Photograph | | v1:114 |
| EXHIBIT 36 - Photograph | | v1:115 |
| EXHIBIT 37 - Photograph | | v1:118 |
| EXHIBIT 38 - Photograph | | v1:119 |
| EXHIBIT 39 - Photograph | | v1:120 |
| EXHIBIT 40 - Photograph | | v1:120 |
| EXHIBIT 41 - Photograph | | v2:186 |
| EXHIBIT 42 - Photograph | | v3:326 |
| EXHIBIT 44 - Photograph | | v2:141 |
| EXHIBIT 45 - Photograph | | v5:549 |
| EXHIBIT 46 - Photograph | | v2:192 |
| EXHIBIT 47 - Audio recording | | v2:181 |
| EXHIBIT 49 - Photograph | | v4:379 |
| EXHIBIT 51 - Photograph | | v4:397 |
| EXHIBIT 52 - Photograph | | v5:528 |
| EXHIBIT 54 - Photograph | | v4:350 |
| EXHIBIT 56 - Photograph | | v4:393 |
| EXHIBIT 59 - Photograph | | v4:395 |
| EXHIBIT 62 - Photograph | | v4:396 |
| EXHIBIT 63 - Photograph | | v4:340 |
| EXHIBIT 64 - Photograph | | v4:342 |
| EXHIBIT 68 - Photograph | | v4:377 |
| EXHIBIT 69 - Photograph | | v4:377 |
| EXHIBIT 70 - Photograph | | v4:378 |
| EXHIBIT 72 - Photograph | | v4:379 |
| EXHIBIT 73 - Photograph | | v4:378 |
| EXHIBIT 74 - Photograph | | v4:379 |
| EXHIBIT 75 - Photograph | | v4:341 |
| EXHIBIT 76 - Photograph | | v4:379 |
| EXHIBIT 77 - Photograph | | v4:357 |
| EXHIBIT 78 - Photograph | | v4:357 |
| EXHIBIT 80 - (Unidentified) | EV | v6:618 |
| EXHIBIT 81 - (Unidentified) | EV | v6:618 |

## (

**(a)(1)** 577:5,7 579:19,21 580:6 581:1,6 618:14 645:16

**(a)(4)** 577:9 579:20,21 580:2,7 618:14

**(a)(c)** 581:3

**(c)** 581:5 643:9 644:17

## -

**--o0o--** 5:11 73:11 138:11 227:11 336:11 429:11 515:10 575:12 647:12 728:12 771:12

## 0

**0** 432:21 479:27 602:15

**0.00** 597:27 598:12

**0.045** 602:15

**0.05** 602:15

**0.07** 505:18

**0.65** 475:2

**01** 748:9

**05** 505:15

**07** 475:19,20 503:12 598:12

## 1

**1** 14:21 21:20 81:22,23 104:6 118:7 120:28 143:4 145:1 160:7 302:28 314:8,9 335:3 336:24 361:22,24 386:22 498:28 628:6 657:15 659:15 662:19, 22,26 663:22,27 664:19 666:23 667:22 669:14 672:15,19,23 686:24,25 687:8 690:14 755:17

**1-A** 690:12

**1-B** 690:13

**1.09** 474:12

**1.1** 287:18

**1.36** 740:11

**1.47** 318:21 319:3

**1.5** 287:16 318:21 595:22,27 597:7 715:10 717:12

**1.7** 469:5

**10** 4:8 7:1 21:10 27:18, 25 29:4 30:24 31:14 32:12 33:15 46:8 63:10 79:15 88:25 103:4,6,20 104:14,19 106:25 107:2,4 108:28 109:4,7 111:9 118:7,13 123:17, 20 130:4,8 144:19 149:11 280:18 281:14, 16,18,28 282:9,12,15 283:11 284:3,13,23 285:13,18,25 312:7,9 317:18 318:5,14 319:1 340:6,18 341:1,4,22,25, 28 344:8,11 345:1 348:3,6,15,18,20,28 349:4,7,8,28 353:2 354:26 356:21 357:2 360:14,16 361:12 391:5 407:5,11,12,23 551:10 560:28 561:16 565:16, 19 566:2,8,13 606:6,7, 9,12,20,22 607:27 608:15 633:21 638:27 708:27 711:22,23 713:25 715:24 721:25 729:27 732:3 734:9 735:8,10,17 736:1,4,6 739:18 740:22 746:16 761:18

**100** 155:11 547:28 548:5,8,10 549:16,20 608:28 649:23 697:11, 15 716:2 733:19 748:25 750:26 751:5 752:28 753:8

**101** 575:18

**103** 4:13

**104** 649:19

**105** 703:27

**107** 503:16

**10:30** 382:25

**10th** 9:18

**11** 7:1 45:19 104:8 188:18 335:8 414:20 569:12 572:3 575:1,25 647:1

**110** 4:13

**113** 4:14

**114** 4:14

**115** 4:15

**116** 576:2

**117** 576:2

**118** 4:15

**119** 4:16

**1192.7** 644:17

**11:00** 24:15 37:18 48:9 56:7,10 176:25 202:8

**11:30** 9:13 56:10,11,12 72:20

**11:30-ish** 313:6

**12** 4:9 32:12 45:4 63:10 71:3,4 87:17 103:17 107:2 108:21,22 109:4, 6 110:18,26 111:4 112:17 115:18 124:17 130:8 149:10,11 150:6, 9,11 258:26 324:4,22 340:7 354:27 355:6 487:4 503:10 577:6 581:10 606:13,15,16, 18,21 692:12 696:23 698:7,8 708:24 709:1 710:5,14 715:24 722:27 725:3 728:1 733:24 734:9,10 769:24 771:1

**12-foot** 712:19

**120** 4:16,17 625:15

**12005** 174:10 175:7

**12013** 455:8

**12015** 175:1,7 397:10

**12225** 5:10 73:10 138:10 227:10 336:10 429:10 515:9 575:11 647:11 728:11 771:11

**126** 414:19

**12:00** 9:13 769:26

**13** 105:22 149:10,11 240:2 252:8 263:27 335:9 479:23,28 491:16 530:13 578:19 629:4 643:22

**13-load** 675:18

**133** 575:23 576:2

**134** 346:9

**136** 414:17 625:7,10

**138** 135:4 136:5

**14** 143:21 263:28 274:18,20 275:14 276:24 291:11 321:9, 10,17,21 326:13 381:17 385:6 388:21 389:3,4, 17,25,28 390:6 411:19, 23 412:11 413:4 414:4 425:22 432:21 465:17, 28 479:27 489:6,7 490:26 491:27 530:13 543:19 544:23 545:3 592:5 605:7,17,24,27 614:14 620:28 627:23 647:21 673:20 674:4,16 675:19 685:12 686:9,10 706:27 710:15 740:26 759:7

**14.9** 610:25

**141** 137:4

**15** 28:27 60:24 71:3,4 87:6,9,18 99:26 103:7, 17 104:14 108:21,22 109:4,6 110:26 111:4 112:17 115:18 121:28 123:7,18,20 124:17 130:4 143:13 145:15 150:9,11 156:14 184:25 244:20 276:13 277:1 284:28 299:15 312:8 316:8 317:28 318:7,16 326:26 335:10 382:25 391:5 438:6 446:6 452:24 465:17 476:15 477:1 480:7 492:24 559:2 562:28 608:15 611:1 618:9 627:21 633:1 691:2 699:23 709:3,4,12 710:4

715:24 717:20 732:4 734:10 755:5 762:1 769:18 770:9

**15-minute** 49:9 107:13 270:5 617:25

**159** 136:5

**16** 277:1 321:8 346:10 413:8 414:21 462:24,25 490:22 493:20 494:22 500:21 502:9 504:20 505:7,8,14 605:8,14 625:16,20 627:13,14, 19,28 628:11,12,22,23 629:3 648:4 718:13 771:15

**16.5** 465:22 494:7,25 495:8 624:15

**16.9** 465:24,27 493:20 494:7 624:15

**163** 575:18

**169** 136:6

**17** 4:10 58:26 160:8 239:2 335:11 492:15 493:2 648:4,8

**171** 136:6

**173** 136:8

**176** 137:3

**18** 59:16 73:24 130:12, 20 169:13 361:7 413:13 709:8 734:10

**18-wheeler** 741:5

**181** 137:5

**185** 136:9 395:23

**186** 137:4

**19** 4:11 47:9 98:4 174:22 188:26 335:12 466:23 517:7 649:3

**1911** 262:12

**192** 137:5

**195** 136:9 351:10 396:8, 21,22,25

**198** 136:10

**1985** 257:13

**1993** 238:25 240:22

**1997** 257:28

**1:11** 521:16,27

**1:19** 518:7

**1:20** 518:5,17

**1:30** 9:14 72:23 131:13 132:15,16 424:9,17 427:1,28 618:12,15 619:28 642:13,24 769:27

**1:45** 424:22 427:3

**1A** 4:4 81:22,23 120:28 361:21

**2**

**2** 2:3 5:1 14:24 21:20 32:7 73:1 114:9,20 115:17,22 116:9 118:7 119:15,19,26 120:15 121:24 145:1 149:2 151:16 160:8 170:15 171:18 252:20 275:2 276:1,4 288:23 291:13 321:4,9 328:27 329:1,4 336:26 360:7 364:3 367:9,10 372:13 380:24 381:25,28 382:9 409:5 413:5 463:21 464:2 480:5,14 492:8 545:1,4, 10 550:9 604:18 605:4 606:24 607:1 621:1 627:25 628:6,20 629:1 658:1,3,10,16 659:18 662:19 663:1 664:3,13, 23 666:27 667:14,17,25 669:5,8,17,19 682:19 712:2,5,6,18 733:4 739:9 740:15

**2.26** 389:23

**2.4** 607:20,22 608:2,8

**2.5** 596:2 597:10 715:9

**2.7** 390:28 425:19 631:2 633:8 710:7 718:2

**20** 28:27 60:9 62:24,26 71:8 76:7 98:5 111:28 144:19 247:24 258:19 264:28 265:3 297:23 299:15 308:19 438:6 452:25 607:14 635:24 636:8,15,17 637:19,20 690:4 732:4 760:9 769:18

**20/20** 299:13

**200** 136:12 753:12

**2001** 243:4

**2003** 246:6 271:5 273:23 486:1 487:25 499:18 593:25

**2008** 575:18

**2011** 577:6 581:6,10

**2012** 581:10

**2015** 234:28

**2016** 35:19

**2018** 217:24 218:4,8 228:26 229:3,18,22 234:27 584:4 676:25 677:1

**2019** 35:28

**2020** 239:28

**2021** 19:16,22 23:17 36:22 37:15 38:18 41:22 42:4 109:8 170:21 174:7,9 176:23 181:16 185:11 200:26 201:1,6,17,22 210:9 265:4,13 415:11 420:6 421:1,4,9 422:5 450:26 539:9 540:17 583:27 671:20 676:27 677:6 704:18 751:26

**2022** 450:28 451:1 578:19 579:4,5 581:11

**2024** 2:3 5:1 73:1 109:9 132:21 135:3 138:1 221:21 224:3 227:1 330:17 333:3 336:1 429:1 509:4 512:3 515:1 569:12 572:3 575:1 647:1 722:27 725:3 728:1 771:1,15

**21** 40:17 41:4 43:4 45:1, 9 47:1 74:2,4 105:16, 19,24 116:19 117:1,11 118:19 166:11 175:17 182:10 183:21 261:21 267:8 274:2,22 280:6, 10 281:26 335:13 357:8 364:4 366:24 442:8 682:15

**210** 136:12

**21001312** 647:19

**217** 136:14

**219** 136:15

**21st** 218:4,8 583:27

**22** 312:11 318:8,10 391:6 607:5,9,15,24 608:2,7,16 610:24 699:24 710:6 760:26

**220** 753:8

**224** 700:21

**226** 263:20 764:6

**227** 224:4

**228** 225:5

**22nd** 229:22 230:9

**23** 240:11 335:14 644:20

**23-week** 35:19

**234** 225:5

**238** 225:7

**24** 46:22 261:6 277:4,6, 8

**245** 664:16

**245(a)(1)** 578:21 643:17 645:16

**245(a)(4)** 578:22 643:18 644:21 645:17

**245(c)** 330:3 577:5 578:15 580:5,6,9 583:28 643:7,12

**25** 28:9 226:4 274:13 335:15 474:2 497:26 516:18 617:27 699:26

**250** 739:9

**25th** 539:9

**26** 272:5 319:6 480:16, 21 604:23 605:23

**2670** 302:3,12,21 303:3 648:20 664:11 678:28

**27** 201:1 226:5 271:23, 26 335:16

**271** 226:5

**272** 226:4

**274** 226:4

**277** 226:3

**27th** 19:16,22 23:17 24:15 36:22 37:15 38:18 40:17 41:3,22 42:4 43:4 45:1,9 59:9 74:2 91:3 166:11 176:22 181:16 182:10 183:21 200:26 201:6,17 210:9 265:13,18 280:6, 10 415:10 671:19 676:26 682:15 689:21 704:17

**28** 271:17,23 595:11 598:20 623:12,14 763:24

**28,000** 253:27

**28th** 265:14,18

**29** 176:15 271:6 335:17 622:7,17 623:13,14 629:7

**292** 225:8

**2:00** 9:14 72:24 265:24 266:25 313:3

**2nd** 584:3

## 3

**3** 29:15 32:7 41:16,21 114:9 115:11,17,22 116:9 119:15,19,25 120:15 132:21 135:3 138:1 149:2 170:15 171:18 215:2 247:25 252:20 275:2 288:23 335:4 336:28 346:9 360:7 364:3 372:13 409:5 442:3 463:21 474:2,4 475:27 484:26 492:9 550:9 562:14 589:15 604:18 622:9,16 628:20 629:2 644:5 664:24 667:26 669:19, 21 690:3 712:6 733:4 740:3,15

**3,000** 243:7 246:7

**3.1** 390:28 631:2 633:8 718:2

**3.17** 390:3 601:11 740:13

**3.3** 389:18,21 412:5

**3.333** 411:20

**3.39** 478:24 479:28 714:16 740:7

**3.4** 476:9 501:18 502:25 503:20 601:15 614:11

**3.5** 626:15

**30** 4:12 62:7 98:8,9,23, 26 111:28 245:28 252:12 257:6 320:7 361:15 396:25 482:15 594:24 629:7 639:7,25 640:27 703:19,22 709:10 712:22 730:5 731:23 734:10 740:20 749:22

**30-second** 671:19

**30-year** 310:27

**300** 396:23

**31** 99:16 166:3 297:24 308:13

**32** 4:13 103:27 145:13 330:14 594:10 618:20

**326** 226:6

**33** 110:8,13 119:7 145:13 280:4,8 469:17 474:27 501:5 637:19

**336** 333:4

**34** 4:14 109:23,24 113:15 114:14,15 119:7 120:14 121:16 148:26 167:26 189:10 281:20 323:22 344:5 356:19 359:10 362:17,19 363:6 365:6 367:13 370:22 376:25 411:5 501:16 593:10 622:1

**340** 335:20

**341** 335:24

**342** 335:21

**343** 334:5

**35** 3:5 114:16,23 215:26 368:21

**350** 335:18

**352** 7:6 54:1 341:10,17, 20

**3550** 671:10

**357** 335:25,26

**36** 4:15 115:10 367:14 603:24 614:26

**360** 450:27

**37** 4:7 118:24 368:2

**375** 647:21

**377** 335:21,22

**378** 335:22,23

**379** 335:17,23,24,25

**38** 4:16 119:2

**39** 120:2 370:10

**393** 335:19

**395** 335:19

**396** 335:20

**397** 335:18

**3:15** 184:26

**3:30** 221:15

## 4

**4** 4:5 29:15 42:23 114:9 118:24 119:15,19,25 120:15 149:2 170:15 171:18,19 221:21 224:3 227:1 276:14,17 288:23 360:7 364:3 368:2 372:13 380:3 409:5 412:5 442:3 550:9 575:25 604:18 626:15 649:19 664:28 668:3 669:21,27 712:6 733:5 740:15

**4,669** 277:27

**4.2** 389:17,24 411:20

**4.26** 389:6

**4.5** 389:5,7 412:6 710:7

**4.6** 623:6

**4/27/21** 482:5

**40** 4:17 57:24 118:16 120:10,11 311:11,18 312:3 369:7 482:15 606:2 706:9 708:7 710:17,25 729:3 731:21 740:19 746:18

**4019s** 579:20

**402** 300:28 334:11 424:23 429:22 433:6

**403** 459:18 468:20

**406** 334:5

**41** 4:4 137:4 186:21

**415** 334:6

**417** 334:6

**419** 334:8

**42** 4:5 28:15 226:6 326:15 474:10

**422** 334:9

**425** 335:3,4,5,6,7,8,9, 10,11,12,13,14,15,16, 17

**429** 333:4

**43** 4:5,6 598:22 622:8, 17,19 740:9

**435** 334:12

**44** 4:6,7 141:24

**440** 334:12

**442** 334:13

**449** 334:15

**45** 4:8,9 47:1 96:16,19 97:13 105:23,24 261:21 263:20 320:7 407:3 442:8 514:4 549:28 734:10 740:18 741:14, 17 746:14 747:6,10 749:19

**45-degree** 163:18 286:25

**46** 4:8 137:5 192:11,14 324:11

**4600** 286:19

**4669** 277:27

**47** 4:11 181:4 182:1

**48** 241:11 429:27

**481** 334:15

**49** 376:17 530:3

**4:09** 518:2,3,4,17

**4:15** 131:7 221:15 769:28

**4:30** 131:8 769:27

## 5

**5** 2:4 43:6 114:9 119:2, 15,19,25 120:15 149:3 170:15 284:3,22,26 288:23 324:4 330:17 333:3 335:5 336:1 360:7 364:3 365:21 368:19 372:13 409:5 429:1 496:4 550:9 604:18 615:21 665:3 669:27 712:6 733:5 740:15

**5'10** 59:15

**5'11** 59:15

**5,000** 277:26 286:19 426:18 674:8 676:17 741:7

**5.64** 594:7,9

**50** 57:24 87:25 144:19, 20,21 148:17 318:20 453:4,5 558:5,6,7,28 559:3 562:28 608:6 705:26 706:10 708:1 710:25 713:14 717:14, 15 722:8 738:5 762:22

**50/50** 453:4

**51** 335:18 397:7 401:2

**515** 512:4

**52** 28:12,13 31:16 243:6 528:19 712:5

**527** 513:5

**528** 514:3

**53** 480:15 604:11,18 740:16

**54** 350:6 399:12

**540** 513:5

**542** 513:7

**549** 514:4

**56** 335:19 393:25 394:4 398:18

**560** 513:8

**563** 513:8

**575** 572:4

**58** 4:10

**585** 573:5

**59** 4:10 395:3 399:24

**592** 573:5

## 6

**6** 4:6 43:27 61:11,26 86:3,9,13 119:25 130:13 149:19,21 150:2,3,17 160:8 162:18 171:18,19 282:5 284:3 285:14 344:12,15 370:26 371:8,13 373:14 374:2,20 376:24 380:3 411:8 413:22 416:16 485:25 550:12,22,23,28 551:4 604:23 637:28 638:2 641:14,22 665:6 671:24 704:22 706:16 708:6 709:15 712:7,9 713:21,25 722:18 733:26 734:10 735:18 740:19 741:13 746:14 748:9 749:19 759:28 760:25 762:20 763:21

**6,000** 741:7

**6.6** 479:24

**6.67** 475:27

**60** 4:9,11 86:28 87:23, 25,28 88:25 256:20 261:8,10 309:5,17 731:14,19

**600** 756:4

**602** 302:25 303:2 756:5, 6,12 757:18,19

**609** 573:6

**616** 573:6

**618** 574:3,4

**62** 335:20 396:4 400:7

**620** 573:10

**627** 573:10

**63** 340:1 348:20 353:5

**635** 573:11

**637** 573:11

**64** 335:21 342:1

**640** 573:12

**647** 572:4

**65** 473:26 595:1,8 596:7,15,20 597:2,15 617:3 714:18 715:12 716:24,28 717:7 744:7 746:24 747:9 748:9

**664(e)** 755:22

**68** 318:24,25,26 377:10 389:22

**69** 335:22 377:24 418:11 584:5

## 7

**7** 44:13 86:3,9,14 119:25 120:4,16 121:24 149:6 151:9,16 158:19 183:14 217:14,16 229:12,15 230:20 282:5 335:6 360:9 362:24 363:23 370:26 371:8,13 374:2,20 376:24 380:3 409:5 411:8 420:28 421:2 423:3 478:11 550:9,12,22,23,28 551:4 604:23,28 605:19,22 606:1 637:28 638:2 641:14,15,22 644:3,4 704:23 706:16 708:7 709:15 712:7,9, 18 713:21,25 722:19 733:4,26 734:10 740:17 741:13 746:14 749:19 759:28 760:25 762:20

**7,000** 741:7

**7.62** 622:15

**70** 88:25 378:4

**72** 335:23 379:27 471:11 639:12,13

**728** 725:4

**73** 2:4 378:24

**74** 335:24 379:6

**75** 286:26 287:1,4 318:21 341:24 342:12 379:12

**76** 335:25 379:21

**77** 357:11

**771** 725:4

**78** 335:26 357:20

**7:00** 36:28

**7th** 421:4,9

## 8

**8** 4:7 27:17,24 29:4 30:24 31:14 33:15 44:25 103:4,6,20 104:18 106:25 107:4 108:28 109:4,7 110:18 111:9 119:25 120:12,16 149:6 159:9 169:12 284:18,19,21 316:9 317:18 360:10 361:12 362:26 363:23 369:7 380:3 409:5 460:21 480:6,21 550:9 551:6 614:28 615:2,7,23 616:1,5 638:26 708:24, 27 710:14 712:7 729:27 732:3 733:4 734:9 740:17,22 746:16 747:19 761:18

**80** 248:19 257:20 309:16,19 479:16 574:4 579:21 618:18

**80,000** 256:20

**80-hour** 373:8

**800** 578:13

**81** 4:3,4 618:18

**83** 575:25

**85** 3:5

**860** 578:15 648:4,7,12 747:19 748:26

**875** 578:15 645:19 747:19 748:26

**875(a)** 649:4,7,10

**875(b)** 649:12

**89** 622:18,19

**8:45** 221:13,16 227:17 329:12 506:20,21,27 507:23 508:4,7,26,28 569:4 722:22,24

**9**

**9** 37:27 38:7 40:16 74:7 76:8 86:8,16 114:5 149:19,21 150:1,3,14, 17 151:9 162:18 168:11 182:24 276:14,17 280:18 282:1,6 284:2, 13,18,21,23 285:13,18 290:14 316:9 335:7 344:11,15,21 345:2 348:3,6 360:14,15 363:2 364:3 365:2 371:4 372:3,10 380:3 402:5 403:9 407:5,11, 12,19 410:28 411:12 413:16 414:11,14,18,20 486:6 509:4 512:3 515:1 551:10 559:14 560:28 566:17,25 604:28 605:19,22 606:1 615:20 616:1 625:3,9, 14,19 627:20 639:15 688:18 735:11,18 740:19 760:27,28

**9.73** 474:25

**90** 248:18 316:2,9

**90-degree** 352:11,17

**91** 316:9

**911** 6:12 20:13,14 24:2 53:1 180:17,22 181:16 182:12 186:4 189:28 191:16,18,24 194:18 208:26 209:8 214:5,6 386:21 405:8 674:25 675:6,10

**92** 316:2,9

**95** 732:18

**954** 578:24 643:24 644:2

**96** 315:14,15,17,18,24 732:18

**963** 644:5

**97** 732:19

**974** 578:19 643:22

**98** 4:12 732:19

**983** 644:6

**99** 4:12 718:17

**99.9** 733:15

**993** 643:22

**A**

**A-F-T-E-R** 496:8

**A-G-U-A-Y-O** 578:18

**a-ha** 764:14

**A-L-F-R-E-D** 34:24

**A-N-P-E-D** 496:4

**A-U-D-I-T-I-O-N** 496:6

**a.m.** 266:26

**abandons** 663:14,18

**abbreviations** 672:20

**abiding** 15:16 653:5 693:21

**ability** 14:22 58:12 210:8 355:20 611:2 638:23 665:1 668:4 669:28 683:15 685:28 686:16,17 701:23 747:27

**abnormal** 705:7

**abort** 758:26

**abrupt** 64:28

**absence** 596:3

**absolute** 617:2 661:4

**absolutely** 54:27 200:24 204:21 209:15 423:26 450:1 541:28 692:4 694:1 695:27 696:25 698:17 711:28 713:20 715:18 736:22, 23 741:18 748:28 758:25 759:2

**abstracted** 124:12

**academies** 373:4

**academy** 35:19 36:9 93:16 157:3 158:10 240:18,22,26 242:21 257:25 292:12 297:15, 25 298:15 300:9

**accelerate** 140:15 141:8 146:25 147:18 162:22 168:8 169:15 441:9 499:7 674:18 685:7 689:3

**accelerated** 162:11 271:1 276:21 291:23 338:1 500:22 503:26 674:9 677:17,19 681:26 684:15 685:18,22 686:9,13 689:9

**accelerates** 745:11

**accelerating** 78:5 337:9,20 469:15 684:4 744:11

**acceleration** 111:22 147:16 148:3 160:24,27 161:6 270:26 273:27 277:21 412:3 432:12 438:1 475:18,20,21,22 476:12 478:10 498:7,8 501:26 502:11,12 503:2,3,5,10,12,13,17, 28 505:6,16,17 543:28 544:2,6,14 545:10 591:27 593:27 597:23, 27 598:12,19 600:14 603:3 622:16,19 626:17 684:27 686:11 707:17 718:15,20 744:7

**accelerator** 29:25 123:10 127:6,8,21 128:3,6,7 129:7 140:16 147:28 148:1,2,10,11, 14 161:12 381:21 383:13 391:26 413:2 425:22 426:12 535:25 536:5,17,24,28 537:6, 12 546:14,17 548:12 602:19 704:6,8 707:12 717:1,2,3 718:17 744:18,20,28 745:14,19 747:5 753:20

**accent** 200:18

**accept** 16:28 18:14 32:28 33:1 583:23 584:8 652:14 654:7,8, 15 655:21,22 657:9 659:1,22 660:22 701:2 743:8

**acceptable** 449:11 655:4 700:15

**access** 52:27 244:23 327:27 455:13 484:8

**accident** 242:1,26 246:12 248:5 250:24 252:3,4,5 253:5 255:15, 17,26 256:4 257:2 270:20 415:6 430:15 433:4,11 436:14,18 437:3,4,6,11,17 438:12, 17 439:12 441:1,2 443:11 449:16 450:5, 15,21 451:5 454:25 456:15 465:5 475:17 482:11,20,22,26 484:17,20 492:5 494:10,12,13 585:19 599:7 632:17 662:9 684:23

**accidentally** 702:27 721:12

**accidents** 388:19 437:8,10,12,13,14 451:9,10,11 462:2,3 478:2 585:12,20

**accommodating** 508:3

**accompanied** 48:24 327:3

**accompany** 769:24

**accordance** 278:20,21 306:10 414:27

**account** 247:6 249:13 278:16 293:9 553:9 673:8

**accumulated** 475:5

**accuracy** 17:11 81:20 450:24,26 451:1 591:9, 10 656:6

**accurate** 7:18 17:1,4 60:4 82:4 91:14 93:7 101:19 105:16,25 109:3,20 111:19,22 125:10 129:1 142:28 144:27 145:4 147:25 150:7 166:12 181:23 194:26 210:14,22 293:14,15,17 296:5 305:23 312:21 319:18 328:14 344:19 363:20 365:19 373:2 398:13 437:18 450:2 453:11,15 476:23 495:20 504:11, 12 516:5 517:11 523:28 530:7,17,19 553:14,21 559:6 563:3 595:6 596:10 608:10 622:28 624:22 629:23 630:4,5 652:15 654:16 655:26 660:4 661:1 732:6 747:11,13 750:18 761:27

**accurately** 40:16 42:3 43:3,13 44:10,22 45:1, 8,27 46:25 47:15 59:10 60:15 74:1 81:16 182:9 183:2 256:4 271:14,23 272:2 274:19 280:9 281:25 365:18,22 373:13,19

**achieve** 758:4

**achieved** 206:20 614:11 758:2

**achieves** 757:28

**achieving** 758:10

**acknowledge** 341:16 704:15

**acknowledged** 64:16, 17 146:16

**acquittal** 15:23 653:12 694:6

**acquitted** 581:21 692:14

**acronym** 240:19

**acronyms** 500:2

**act** 79:6 258:9 657:13, 18 658:5,7,8 664:19,23, 25 665:9,24 667:22,25, 27 668:6,20 669:14,20, 23 670:4,18 683:2,6,9, 11,25,28 684:1,12,15, 21,26 685:5 686:8,16, 20 697:9 701:19,22 715:15 730:19 747:23 758:27 766:26 768:2

**ACTAR** 484:13,15

**acted** 584:1,6 662:5 664:24,28 665:3,6,23 667:26 668:3,19 669:22,28 670:17 683:9,14,17,21 684:26 685:3,27 686:21 687:3 701:23 747:26

**acting** 24:3 178:3 179:7 180:20 190:6 194:25 219:13 680:25 687:28

**action** 65:9 165:2,10 262:12 458:24 583:25 613:22,23 663:6 676:6 684:1 688:27 763:1

**actions** 78:22 191:7,11 234:9,11 540:7 625:23 662:8 672:6,7,13 676:3 677:14 680:4 763:7 764:13 765:1

**activate** 81:2,10 262:25

**activated** 39:5 81:7

**active** 34:21 240:4 258:27 686:11

**actively** 34:3

**activities** 678:7,18

**activity** 239:17 468:28 469:3 666:25 679:5 720:23

**acts** 417:18 655:5 658:6

**actual** 26:26 29:10 127:4 250:26 275:14 283:4 293:24 296:4,22 328:17 348:4 351:6 375:7 405:11 431:7 441:14 443:28 454:27 460:11 499:20 519:20 524:24 538:10 539:8 597:12 600:19 686:17 729:2

**Adam** 38:2 339:19

**add** 255:25 282:12 297:5 605:27 619:13 729:10

**added** 62:7

**addition** 58:18 592:13 659:26

**additional** 11:26 44:8 65:1 70:15 257:20 268:1,8,10 283:13 287:4 291:13 313:14 363:10 375:1 397:23 404:18 405:25 432:25 450:12 451:16 467:24 468:1,2,6 470:12 494:15 519:16 545:1,10 586:21 592:1 621:1 627:19 657:21 663:23 756:8

**Additionally** 592:4 658:10

**additions** 278:3

**address** 20:16 47:13, 15,21 48:9 175:1 201:7 330:12 344:3 405:17 416:11 507:12 517:5 519:25 522:15 686:10 755:15

**addressed** 755:28

**addresses** 168:27

**addressing** 20:8 156:28

**Adelanto** 20:17 25:9 36:2,14,23 37:4,20 45:15 56:7 85:7 174:10, 11 201:9 229:1 265:15, 20,27 267:8 271:13,22 405:21,22 671:21 673:2 678:6 719:15

**adhere** 298:1

**adhesive** 275:6

**adjacent** 606:9

**adjourn** 569:2 618:12 619:26

**adjust** 494:3 581:25

**adjusted** 494:2

**administrative** 230:21 540:2

**admissible** 435:1 445:3 517:6

**admission** 424:3 617:19

**admit** 618:18 751:13 752:6

**admits** 749:17

**admitted** 16:2 611:17 653:15 659:8 730:23 744:8 749:19,21,23 751:10

**advance** 372:22 534:28

**advanced** 239:24 241:6,10,20 242:16,18 252:5 292:18 415:5 435:24 449:19

**advances** 717:19

**advancing** 373:25 374:21 530:24 534:17 711:14,18

**advantage** 403:11,16 665:12 668:8 670:6

**adverse** 522:27

**advise** 55:18,20 404:5 431:23

**advised** 52:25 53:25 231:18 424:13 756:28

**advisors** 12:5 767:4

**advocate** 375:13 766:27

**advocating** 580:3,4

**aerial** 454:24 455:11 586:24 624:21

**affairs** 240:12 414:23 416:24

**affect** 12:20 487:10 612:23,27 761:8

**affected** 160:12 299:3, 5

**affects** 612:3

**affirmative** 413:1 685:9

**affirmatively** 65:16 704:15 720:10

**affix** 262:19

**affixed** 39:3,25 40:25 42:28 43:19,21 55:24, 26,28 80:27 83:21 166:6 236:24

**afforded** 405:24

**afoul** 447:6

**afraid** 20:21 53:19,22 78:9 190:7 679:24

**afternoon** 2:4 9:21 73:2,12,18,19 85:22,23 86:7 107:12 131:18 132:11,16 135:4 138:2, 12,27,28 159:19,20 173:11,12,21,22 174:1, 2 184:23 185:21,22 200:4,5,14,15 210:5,6 216:20,21 217:3,4 219:24,25 221:14 227:16 329:9,13 333:4 419:11,12 424:9 429:2, 25 434:5 440:3,4 448:4, 23,24 449:6 481:19,20 523:6,12 526:1 572:4 647:2 671:17 690:3,15 691:13 725:4 771:2

**age** 14:6 651:5

**agency** 538:19 553:21

**agent** 79:23 266:2,3,4, 5,13,15,21

**agents** 79:7

**aggravated** 644:8

**aggravation** 426:7

**aggressive** 203:19 675:3,28

**aggressively** 687:28

**aggressor** 720:24

**agitated** 67:27 102:20 468:7,8

**agree** 85:28 86:6,27 87:5,15 89:7 91:12 92:7,13,28 95:4,10,12, 28 97:21 99:5,25 100:28 101:28 103:10, 16 109:22 111:11 123:25 125:5,15 127:2 140:13,17,21 141:19 146:2 148:7,10,13 153:6 157:26 169:28 170:18,20 171:7 191:1, 5 192:1 204:19 215:9, 13 235:2,10,18 236:12 237:2 298:24 300:9 305:25 306:23 307:11 308:9,28 309:9,13,20 311:17 312:3 320:12, 16,26 321:16,24,26,28 322:11 327:7,25 344:27 345:3,5 347:19 348:2 352:3 353:24 360:1 361:5 362:6,12 364:2 366:9,24 370:6 371:9, 12 372:17 373:27 374:8,11,13,23 375:15 376:27 383:7,16 390:15 391:10,13 394:10,25 398:12 400:19 401:3, 10,14 402:27 404:20,25 405:10,15,28 415:28 416:3,10,17 441:14 479:6 486:9 490:16 493:14 496:22,24 498:13 499:12 502:24 521:21 527:8 536:14 537:4 538:13 543:16,21 544:23 545:7,13,16,20, 23 546:10 547:22 548:14,20 549:15 551:27 552:12,28 553:5,18,28 555:8 556:4,9 557:5,27 558:28 565:6,28 566:17,21,26 567:11 568:6 577:1 583:24,26 588:10 600:22,25 601:1 602:22 608:8,27 616:20,25 620:25,27 621:3,7 622:10 624:10, 17 627:17 629:6,14,21 630:1,13,26 631:5 632:6,10,15 633:14,17, 26 640:9,27 646:22 649:16 659:1 686:12 690:26 716:2,3 737:4 766:16 767:28

**agreeable** 583:12

**agreed** 507:22 543:7 576:11 623:5 654:6 673:4 688:28 689:2 708:20 711:27 718:3,6, 7 768:10 769:4

**agreeing** 577:28

**agreement** 5:23 508:10 583:21

**Aguayo** 578:18,28 643:21

**ahead** 74:27 107:12 129:23 131:10 147:6 158:4 204:15 220:18 250:5 260:19 281:24 287:17 329:8 425:8 522:3 535:2 614:1 636:14 642:13 684:19 722:21

**aid** 116:7 159:23 259:27 289:21 377:22 416:12, 19

**aided** 589:11

**aim** 118:3

**air** 19:6 263:2

**airbag** 274:6 500:1 560:14 600:13,14

**aisle** 375:20

**alarming** 20:2

**Aldus** 589:15

**alert** 55:21 70:8 611:16 612:16

**alerted** 47:22 70:25

**alerting** 160:20

**Alfred** 3:4 7:11 20:15, 22,25 21:7,14,16 23:1, 2,19 25:11,28 26:3,7, 11,21,23 27:16,20 28:21,23 29:3 30:16,18 31:3,8,12 32:8 33:14 34:14,23,25 35:1 49:13 82:23 85:22,24 86:19 90:27 98:26 108:15 114:20 130:8 131:19 136:4 138:12,21,27 139:3 169:28 280:16,24 282:11,23 286:23 289:4,13 290:3,10,16 291:18,24 295:1,10,24 301:11 302:4,18 303:21 304:21 316:10,11,14,17 317:15 336:26,27 337:1 338:9,12 340:20 341:13 344:4,7,11,14,24 345:11,15,24 346:5,23 347:12,20 348:3,25 351:16 354:7,10,18,20, 24 355:5,11,28 356:6, 11,20,21,24 357:2,6 360:18 361:1 365:1,8 370:26 372:12 373:24 374:19 375:13 376:6,21 378:10,15,18 380:10,13 383:23 386:27 388:15 391:17,20,22,24 392:22 393:28 397:2,26,27 398:14 400:21 401:5, 12,15,20,23 402:2,6,23, 28 403:7,22 404:12 405:7,13 406:2,18,26 407:4 408:19 416:26 417:17,28 425:17,20,23 426:9,11,17,19 427:8 429:19 432:4,6 441:10 443:15 444:1 445:25 446:10,12 447:22 455:20 456:7,14,17 459:17,24,25 460:2,14 467:2 468:18 469:7 475:6 477:27 484:28 485:4 496:15 508:21 513:4 515:16 517:1,21, 24 518:18 520:14 521:12 522:2,24 523:15 524:15 525:4,5 526:15, 27 527:5,8,16 528:17, 22 529:12,28 532:5 537:14,27 542:5,10 544:5 545:14,15,18 546:27 548:12,16,21 550:19 551:10,24 552:16,18,19 553:10 554:6,14 555:3 557:18 561:12 562:13 563:20, 28 564:8 565:18,25 566:3,18 567:6,14,15 568:10,11,14 576:21 597:15 615:5,7,23 616:3 632:25 633:3,14, 18,21 634:16,24 637:27 638:6,16,23 640:6,13 641:1,21 643:15 648:25 657:24 658:13,19 662:8 663:27 664:5 666:13 667:8 672:2,6,11,27

674:5,28 675:23 676:16,26 677:14,17, 18,24 678:1,2,26 679:6, 14,19,24,25 680:10,12, 14 681:7,17,22,26 682:2,6,12,13,16,24 684:4,13,15 685:17,19, 22 686:3,13,26 687:4,8, 15,23 688:4,13 689:5,7, 11 692:6,8 696:19 703:13 704:8,12,16,19, 20 706:12,22 707:2,21, 27 708:6,9,17 709:19 710:26 711:17,20 712:8,20 713:3,10,18 714:5 715:5,13,23 717:13 718:10,14,25 719:16 730:10,20 733:1,17 735:12,17,21 736:5 737:17,18 738:4, 7 740:16 741:13,28 742:28 745:25 749:17 750:20 753:18,26 754:9,11 758:6 759:4, 17,18,27 760:23 761:4, 20 762:9 763:8,12,14 764:3,10 765:2

**Alfred's** 90:18 281:19 282:22 283:11 285:16 301:16,22 314:9 344:28 349:15,20 350:1,21,23 353:2,8,18 357:15 360:6 365:6 380:26 395:8 396:20 413:10 432:8 445:4 485:9,16 545:9 550:21 554:20 555:13 556:28 560:27 561:24 563:4 633:5,9 634:13 635:10,25 637:10,23 672:5 675:13,14 680:3,4 681:28 685:12 687:20 729:25 735:5 737:7 738:4,19 740:21 750:17 763:4,10 764:18

**alicia** 5:10 73:10 138:10 227:10 336:10 429:10 515:9 567:26 575:11 647:11 728:11 771:11

**aligned** 59:14 71:6 729:2

**aligning** 77:3

**alignment** 319:27 320:1,7

**allegation** 304:21 657:21,23 663:23,25 677:21 680:8 686:24 687:8 755:22,23 756:8, 9,10,20 757:8,9

**allegations** 666:19 686:23

**alleged** 14:4 122:28 330:3 416:25 651:2 662:6 668:27 684:6,12 687:15 692:1,21 697:27 738:7 751:24

**allegedly** 304:21 338:1 707:25

**alleging** 633:25

**alleviate** 519:9

**alleyway** 60:14,16,28 289:18

**allotted** 230:23 231:8

**allowed** 157:8,20 659:20 740:24 765:7

**allowing** 405:26

**aloud** 10:4

**altercation** 197:15 704:13

**alternate** 768:15,16 769:7

**alternative** 643:25 644:9 645:18 744:12

**alternatives** 645:10

**altogether** 9:23

**ambient** 51:3,5 95:23

**ambiguity** 10:13

**ambiguous** 734:23

**ambulance** 358:10,11

**America** 691:25

**American** 41:10 420:18 502:6

**amount** 278:19,21 286:3 299:18 300:3 318:2,18 364:7 390:6 498:6 563:12 624:4 732:16

**amounts** 244:2 602:18 763:4

**ample** 643:27

**Ana** 239:1 243:3 258:26 298:7

**analysis** 8:14 244:11 247:18 250:24 252:11 278:13 279:1 348:2 397:1 412:13 432:28 436:12 437:7,21,23 439:6,22 450:13,19,22 451:4,6,7,15,21 453:19, 21,25,26 454:1,28 455:22,24 457:16 458:2,8 459:22 460:11 463:14 465:12 468:10, 13,16 473:20 474:15,18 475:25 476:22 478:21 480:9 483:14 484:23 485:17,19,20,26 490:18 495:5,7,24 498:19 501:2 555:8 621:20 622:10,28 627:2

**analyst** 245:12 436:17, 18 450:9,10

**analyze** 102:21 245:16 438:24 441:20 495:27 500:14

**analyzed** 249:22 436:12 444:4 496:14

**analyzing** 468:26 489:20 615:12

**and-or** 78:10

**and/or** 197:9 360:5

**Anderson** 401:12 402:28 405:12,13 550:11,17 552:18 555:1,2 568:8 704:18 740:15

**Anderson's** 400:22 402:14 552:15

**anew** 516:11,12

**Angeles** 435:20 449:21

**angels** 578:26

**angle** 96:17,19 118:2 163:18 247:25 286:25 352:11,17 359:14 366:13 368:15 379:26, 27 458:5,9,19,21 462:18 465:13 487:16 488:1 588:9 738:28 759:21 763:25

**angles** 458:7

**angrily** 671:28 677:9 684:3 758:5

**angry** 198:16 665:15 668:11 670:9 674:26 676:13 698:7

**animals** 418:16

**animation** 249:3

**animations** 430:10,28 431:12,13

**ankle** 254:26

**announce** 26:14 66:3 92:10 94:22,23,27 95:8 100:11 422:25 576:22 704:24 719:20 730:22

**announced** 26:17 27:5 422:23

**announcement** 66:10, 19 680:16

**announcing** 97:6 680:15 766:24

**annually** 241:10

**Anped-5** 495:28 496:4

**answering** 215:5 678:6 686:28

**answers** 16:9,11 408:6 415:1 653:20,22,26 734:14 754:12

**ante** 644:6

**antenna** 39:26

**anticipate** 69:13 287:1 337:6,15 410:8 430:21 446:23 506:7,11 523:3 525:15,27 526:3,6

**anticipated** 12:7

**anticipation** 431:9

**antilock** 251:14,16 384:23,26

**anymore** 465:14

**apartment** 175:21,22 186:14 188:16

**apologies** 98:16 120:9 234:21 298:3 346:13 639:8 757:14

**apologize** 15:6,25 25:14 72:24 97:16 98:5, 11 101:4 103:3 110:4, 10,14 113:13 132:11 145:13 153:17 159:8 162:7 187:9 189:2 194:2 200:16 213:28 316:7 323:10,12,21 350:14 353:4 355:3 362:4 367:12 368:3 369:23 376:18 378:23 383:17 387:3 390:11 395:10 440:28 457:3 459:15 496:2 498:10 500:12 518:4,12,17 528:10,11 530:22 535:4 542:14 546:13 558:24, 25 569:3 578:19,27 597:26 606:12,13 627:14 639:11 669:18 729:15 735:3 740:4 757:15

**apparent** 666:23 679:3

**apparently** 381:9 576:20 756:28

**appearance** 155:23 229:17 760:18

**APPEARANCES** 5:4 73:4 138:4 227:4 336:4 429:4 515:4 575:4 647:4 728:4 771:4

**appeared** 42:4 43:4,13 45:1 53:19 59:9 60:6,17 67:27 166:11 183:2 204:10 269:10 274:22 281:25 378:21 408:2

**appears** 38:8,24 40:3 45:11 60:3 61:14 166:7 275:14 283:28 287:25 314:9 330:1 350:9 351:21 353:19 368:26 369:2,9,17 370:8 376:21 379:8 394:27 395:9,22,26 396:20,24 411:13 429:27 430:2 488:22,25 516:3 622:22 624:21

**applicable** 303:4

**applicated** 272:22

**application** 79:6 286:6 413:2 478:27 592:6 664:21,27 665:13 667:24 668:1,9 669:15, 24 670:7 683:5,12,27 684:16,17 685:6,8,24 701:20 703:17,20,25 747:24

**applications** 591:17

**applied** 381:9 384:28 389:28 478:27 479:1 544:2 608:24 651:19

**applies** 11:24 384:16 500:18 619:28 650:20 686:26 687:5

**apply** 79:22 287:3 375:7 451:14 558:20 579:20 595:25 651:21, 25 665:1,13 668:4,9 669:28 670:7 683:15 685:28 701:23 746:7 747:27

**applying** 477:21 478:8 500:25 598:26 602:13, 14 608:26

**approach** 8:18 20:25 52:1 54:26 56:24 66:22 90:22 94:22 210:28 211:1 283:5 314:15 317:9 323:5 346:17 371:18 372:9 390:23 403:19 410:25 424:4 507:16 531:20 537:24 544:19 555:24 636:1 645:21 680:15 691:10 752:8

**approached** 56:25 66:27 96:10 160:13 170:12 177:18,20 178:18 196:4,18,21 198:4 203:17 236:3,7 282:24 345:1 527:17 541:2 686:3 708:10

**approaches** 408:24,26

**approaching** 20:4 30:16 66:7 140:20 152:16 281:7 371:23 403:17 456:15 533:17

**approved** 240:18

**approximate** 28:6 111:12,14,24 130:24 163:18 276:10 282:3,4 344:13 381:27 390:15 432:8 456:6 476:5 608:3 621:12,18 623:2, 17 627:19

**approximated** 623:22 631:1

**approximately** 6:16 21:10 24:15 27:17,24 28:12,15,17,27 29:15 33:15 35:16 36:17 56:6 57:24 59:12 61:9,23 62:23 63:10 86:9,28 87:6,10,17,23,28 91:2,3 95:7 101:16 103:5,7,17 104:14,18 106:10,25 107:2,4 108:22,28 110:18,23,26 111:4,9, 27 112:16 115:20 117:25 120:22 122:21, 27 123:5,17 124:17 130:1,4,8,13,20 143:13 150:1,6,9,12,13 163:14, 26 170:5 188:28 202:8 211:7,8 213:25 238:28 239:28 240:2,11 258:26 265:26,27 266:25 268:12 276:1,6,13,14, 24 277:26 282:2 284:22,26,28 285:14 287:18 291:11 313:5,7 315:13,15,24 316:2,21 317:12 318:9,10,14 320:27,28 321:4,17 322:12 323:17 324:4, 22,23 325:8 326:13 344:12,15 349:8 351:10 353:25 354:1 361:7 362:6 366:25 380:24 391:6 414:21 416:15 436:28 446:3 452:24 453:4 464:2 465:23 474:2 475:7,10 476:8, 28 478:12,24 479:23,28 486:27 501:17 507:26 530:9,13 543:18 544:23 545:1 558:28 559:14 562:13 594:16,21,28 597:7 604:18 606:2,19, 20,22 607:6,10,13,19, 22 608:3,5,16 621:1 625:7,10,14,16,20 626:15 627:13,14,21 628:4,20 629:1,7 630:23 631:6 639:7,20, 21,25 671:24 706:4 710:4 713:14,25 714:24 715:9,24 741:14

**approximating** 504:27

**approximation** 167:18 382:19 443:2 485:11 486:27 621:20 622:24 623:14,18,28 624:20 629:2

**April** 19:15,22 36:22 37:14 38:18 40:17 41:3, 21 42:4 43:4 45:1,9 59:9 74:2 166:11 174:7, 9 175:17 176:22 181:16 182:10 183:21 185:11 200:26 201:1,6,17,22 210:8 265:4,13,14 274:22 280:6,10 281:26 415:10 420:5 421:1,4,9 539:9 583:27 671:19 676:26 682:15 689:21 704:17 751:25

**area** 25:10,14,19 27:21 28:6,11 33:9 40:20,23 47:3,4,6,18 50:25 53:28 56:7 61:6 62:26 63:3 64:4 68:14 69:12 71:9, 14 77:23 88:1 91:13,20 94:16 97:15 106:8,17 115:23 122:2 142:27 145:16,22 150:3,21 151:11 155:23 160:16 168:11 170:15 186:22 187:28 188:15,28 189:8,11,13 190:12,14, 18 193:8 198:1 201:8 232:19 235:4 237:4 269:8,27 270:2 273:12, 14,24,25 274:26 275:20 277:20 281:20 283:12 289:15 291:8 307:24 309:23 310:17 321:19 340:19 341:4 346:28 349:25 354:22 360:27 362:14 363:19 364:28 366:19,26 367:4 369:26 371:23 372:1,3 375:4 377:1 390:15 392:17 405:24 413:16 433:9 451:3 455:8 459:11

461:3 462:16 465:5 483:17 484:9,20 499:1 561:17 588:14 590:10, 17 591:6 606:28 624:23 638:24 639:28 680:27 681:6 710:22 711:16 712:7,18 719:24 730:23 763:13,17

**areas** 37:13 40:12 61:28 405:20,22 451:21 454:28 455:2 706:9

**arguably** 338:4 342:7

**argue** 33:3 337:7,15,24 661:6 687:18

**argued** 47:26 311:22 755:28 765:10

**argument** 26:16 31:21 33:19 52:25 146:27 154:20 301:24 338:6 404:24 446:21 520:6 521:1,4 555:4 557:11 575:21 578:9 618:16 671:14 705:10 728:15

**arguments** 11:10 12:16 16:7 337:6 424:14 506:9 620:1 642:15,20 643:27 650:11 653:18 671:11

**Arizona** 373:4

**arm** 699:5 703:22,23

**armed** 53:26 54:5,12, 25

**arms** 96:15

**Army** 731:2

**arranging** 663:3

**array** 561:16,18

**arrest** 35:20 303:7,15 720:20

**arrested** 7:26 15:7 16:4 303:19 652:25

**arresting** 667:11

**arrival** 160:18 267:28 268:13 675:13

**arrive** 32:6 37:24 50:15 84:10 131:21 176:25 214:24 265:23 267:22 313:2 353:26 354:1 501:20 503:19 538:6 614:19 745:26

**arrived** 47:18,22,26 48:1,3,12 59:4 64:12 97:24 167:27 171:11 172:2,13 176:27 182:18 183:3,23 184:14,20 204:27 209:13 265:24 266:25 267:21 268:14 283:5 294:27 313:8 322:11 383:17,21 456:7 673:1 675:24

**arrives** 322:27 673:12

**arriving** 188:24 267:22 508:5 675:1

**arrow** 104:15 399:7 457:4

**arrows** 624:15

**articles** 245:26

**articulated** 70:11 191:9 576:14

**ASE** 484:14

**asks** 13:13 660:8 748:23

**asleep** 244:6 698:19

**aspect** 362:12

**aspects** 372:27

**asphalt** 252:23,24 255:10 294:13 470:15, 16 592:4

**assault** 21:21 23:2 33:28 418:7 575:19,24 576:4,5,9,18,26 577:6,9 578:1,20,21 581:1,8 583:27 643:7,17,18,23, 28 644:1,10,11,21,25, 28 646:11,14 647:24 648:27 657:27 658:1, 10,16,17 661:19 664:13 665:27 666:15 667:15, 17 668:23 669:6,8,10 670:21,28 671:3,4,6 682:19,22 684:10 689:11 692:6,8 698:5 701:15 714:8 716:8 739:22 747:14,18 748:26

**assaulted** 584:2 665:3, 7 674:27 683:17,22 686:21

**assaults** 644:8

**assert** 730:27

**assessing** 557:7

**assessment** 13:28 650:26

**assign** 266:14

**assigned** 36:1,8 37:17, 26 38:15,16 43:2 45:23 46:12 56:3 62:5 83:20 217:21,27 219:15 228:27 231:24 234:28 239:22 265:5,6 266:17 420:3,5,9

**assignment** 36:1,11, 12,16,18,20,22 37:2 217:20,23,26 228:23 229:18,23 257:11 265:9 414:22

**assignments** 35:26 266:6,21

**assist** 8:24 69:21 72:7 82:5 91:25 94:9 129:10 168:2 253:5 260:3 270:20 284:5 289:13 292:12 294:9 354:23 363:11,14 404:14 440:25 450:12 455:23 467:19 489:26

**assistance** 7:28 181:25 450:15 650:17

**assistant** 34:15,20 109:26 110:8 172:28 173:5 199:21,26 216:10,15 227:22,27 237:18,23 419:1,6 425:6 434:8,9,14,22 448:12,13,18 583:1,4 768:28

**assistants** 769:22

**assisted** 52:12 84:13 269:2 270:15 272:13 273:19 280:4,5,13

**assisting** 286:2 289:22 359:2 416:11

**assists** 10:15,18 764:6

**Associates** 436:26 451:25

**Association** 450:9

**assume** 16:12 52:15 301:24 312:16 316:8 358:21 372:17 563:9 612:9 623:7,20 635:11, 12 651:22 653:23 660:8 681:5

**assumed** 660:10,12 714:11 749:4,20

**assumes** 401:25 561:3 611:17

**assuming** 95:17 112:24 131:18 146:7 236:8 351:6 356:21,22 371:7 445:9 502:12 580:24

**assumption** 95:19,20, 21 112:3

**assumptions** 14:1 155:10 650:27

**astronomically** 252:7

**attached** 468:3 686:23

**attack** 192:25 720:21

**attacking** 236:14

**attempt** 68:2 203:21 234:7 418:8 425:15,23 663:11,15 672:15 677:20,22 678:20 692:7 704:8 746:20 755:18,24 756:27 758:13,15

**attempted** 21:20 22:28 23:1 33:27 70:22 165:22 205:3 213:21 231:15,19 233:15 277:5 301:9 302:23 304:22 338:15 426:3 544:26 648:26 657:15,20,21 662:22,24 663:13,20, 21,23 664:3 666:15 677:27 680:6,8 682:17 684:12 689:7 692:5 698:4,24,25 699:1,3,6 735:28 737:11 743:18 756:7,8,19

**attempting** 123:8 161:10 615:2 679:17

**attempts** 663:12 679:11

**attend** 240:18 241:9

**attended** 363:12

**attention** 5:24 23:13 26:10 31:10 33:13 47:28 48:10 64:3 65:1 76:3 83:27 126:7,9,25 155:7 160:7 176:22 201:16 211:9 260:20 287:24 387:17 531:16 532:6 533:27 556:26 651:9 672:7 713:4,7 714:4 729:12 737:27 741:27 753:11 755:17

**attentive** 698:22

**attire** 90:5

**attitude** 17:24 656:19

**attitudes** 734:24

**attorney** 5:6,7,8 14:4 63:16 73:6,7,8 138:6,7, 8 227:6,7,8 336:6,7,8 429:6,7,8 452:14 453:7 515:6,7 575:6,7,8,9 643:27 647:6,7,8,9 651:2 728:6,7,8,9 771:6,7,8,9

**Attorney's** 82:4 181:24 553:26

**attorneys** 12:15 16:6, 7,12,14 453:6 653:17, 18,23,25 767:21

**attorneys'** 16:10 651:7 653:21

**audible** 518:9 535:14

**audio** 4:3 5:25 21:5,13 23:18,19 26:8,11 28:9 41:13 80:25 81:2 82:2, 6,7,10,17,25 85:26 92:8 104:25 112:5,9,10 119:10,11 120:19,27 121:9 126:6,27 137:5 140:7 154:2 181:11 182:3 275:3,26 285:16 286:14 290:24 328:11 335:3 361:25 383:22 384:8 386:21,23 387:7, 19 390:9 392:20 408:4 412:3 413:1 433:13 436:17 438:25 439:6 440:6,10,22 441:20 445:10,19,23 451:17 452:8 466:26,28 467:1, 11,22,25 468:1,10,12, 13,16,23,26 469:10 471:18 473:7,9,20 474:24 475:25 477:26 478:1,21 495:26 496:14 498:18 505:9 506:2 516:1,23,26 517:3 518:8,12,22 519:1 520:2 531:11,13 532:8, 22 533:4,7,13,17,24 534:4,8,10,15,23 535:3, 5,7 543:14 549:3,4 556:1 568:15 587:11,23 588:6,23 593:20 594:4 602:16,22,23 608:25 609:4 618:19 623:3 624:8 626:10 638:16 671:18 673:15 675:25 706:15 711:7 713:12,15 729:2,9 746:28 759:25

**audios** 82:13 747:3

**Audition** 496:1,6

**auditory** 128:21

**augment** 325:23

**August** 239:28

**authenticating** 181:4

**authority** 757:1

**auto** 450:19 585:13

**Autocad** 589:15

**automatic** 273:25

**automatically** 8:1 18:4 488:1,2 656:27

**automobile** 575:20 577:11

**Automotive** 450:6

**autopsy** 249:17

**Avalanche** 486:2

**avenue** 20:16 37:19 48:9 59:22 78:1 140:24 174:10 265:15 267:7 308:14 397:10 410:25 455:9 673:1

**avenues** 158:14 300:11

**average** 276:16 277:27 286:25 287:5 366:26 416:16 447:10,18 481:9 495:16 504:10,20,22 611:6 612:19 613:6,14 631:6 693:8 702:12

**avoid** 131:3 140:22 141:20 156:17 158:13, 16 159:5 300:11 308:24 309:8,23 311:14 312:4 564:20,27 565:7,9 633:18 640:7,9,14 730:2 738:28

**avoided** 412:26 445:17 733:2

**aware** 66:18 67:21 124:20 131:27 175:10 180:24,26 264:9 266:22 267:11 268:5 305:3 306:15 322:19 347:11 356:10 388:4 446:7 529:12,17,19,23 537:9 539:8,9,28 664:24 667:26 669:22 683:10 685:4 701:22

**awful** 687:10

**awhile** 211:11 402:24 431:22 519:17 630:13

**axle** 273:26

## B

**B-O-S-C-H** 245:18,19

**bachelor's** 435:21,22, 25

**back** 5:18 9:13,14 11:11 19:20,23,26 23:20 24:19,25 25:22, 23 29:16 30:8,17 31:14 32:7,12 45:3 59:4 78:1 85:1 88:4 96:14 97:7,11 98:13 99:13 108:10 109:18 115:16 117:5,23 119:5 120:14 121:16 124:10,18,22,28 125:11,13,28 129:18 130:28 131:23,26 132:14 139:1,12 144:2 145:12 148:10,16,26 151:10 154:4 156:3 158:26 163:4 168:17 171:17 177:10 179:13 185:11 190:27 197:19, 20 199:2,3 200:26 201:19,21 202:16,17 208:2,3 213:3,19 214:26,28 219:4 220:28 227:17 230:24 231:6, 15,20,26 232:17 234:6 240:3,14 242:10 244:9 245:28 248:1 249:20 250:12 254:7 255:7 257:13,28 261:20 267:8 273:2,4 277:3,4 284:2 285:26 287:14 289:17 292:8,17 298:9 302:23 305:10 311:9,15 312:2 318:6 319:24,28 320:28 321:1,3 328:27 329:1,4, 17 344:2,14,17,18,19, 21 345:2 351:26 352:17 353:2,5 356:19 358:11 362:16 363:1 370:22 380:19,23 381:11,22, 24,28 382:28 385:21 386:13,27 387:15 388:14 390:20 393:10, 11,20 395:19 396:23 398:18 399:13,25 400:8 401:2,12,15 406:28 407:1,12,18 421:27 422:5 424:9,22 427:2 432:25 463:16 466:23 472:23 481:6 484:26 487:16 491:15 492:8, 13,14 506:22 507:12, 15,20 520:19 526:11 527:5 535:18,21,26 536:22 540:17 543:19 546:18,25,27 547:12 548:1,6,23 551:7 567:23 569:10 581:6 594:4,7 596:9 597:22 599:12 605:4,26 609:24 610:5 612:7 614:22 617:27 618:15 619:21, 28 627:18 638:6,7 642:13 650:5 652:17 690:4 691:6 695:15 698:9 699:14 701:9 707:17 709:1,3,10 710:16,25 717:4 718:11 719:1,2 728:14 733:28 734:8 735:18 736:2 742:2 743:27 744:15, 20,23 747:2 748:12

752:15 753:18,22,25,28 754:3 755:6 757:24 759:13 762:19,20 763:14 764:21 765:11, 14 769:10 770:4,9

**backed** 145:26 202:18, 22,28 203:1 412:25 702:27 735:10

**background** 297:13 433:5,6 435:17 438:14 449:9,17 468:16

**backing** 20:5,12 159:26 177:15,16 202:26

**backs** 19:27

**backup** 405:1,16

**backward** 161:2 373:10 458:12 464:9 491:22,23

**backwards** 124:13 318:14 321:11 380:7 383:10,14 463:21 464:6 466:17 536:16 598:8,15 706:3

**backyard** 60:3 61:6 177:13 178:21 184:6 202:28 203:1,12 269:16 354:6 380:2 763:17

**bad** 215:14 220:17 258:9 263:8 310:12 479:24 662:15 697:21, 22 734:6 751:28

**badge** 40:6 41:9 420:18

**badges** 41:24

**badging** 40:3,5,13 229:20 680:18

**badly** 341:19 426:19

**bag** 157:26

**bailiff** 13:20 34:21 38:4 173:6 199:27 216:16 227:28 237:24 419:7 434:7,15 448:11 582:8 766:8 767:17 768:11, 14,27 769:6,25 770:5

**ballistics** 262:20,28 430:16

**bang** 547:21 599:8

720:8

**banged** 679:21

**banging** 24:3,9 101:22 102:9 185:26,28 190:22 191:14 675:4 679:11 720:3

**bar** 38:20 39:2,4,6 45:16 90:23 594:9

**Barber** 7:25,27 19:18, 24 20:3 21:7,8 22:11, 25,28 23:1,4 24:16,18, 25,28 25:5 26:16,22,24 27:6 29:23 30:27 31:2, 7,19,21 32:6 33:27 34:2,5 63:19,26 64:2,6, 12,27 65:2,10,14 67:3, 5,7,24 68:1 69:3,6 70:3, 9,15 74:17 76:3 77:4,8, 16 82:27 84:6 86:21 87:16,27 88:25 89:8,11, 15,20,26 90:2,8,12 92:1 93:3,6,14 95:13,25 96:11 97:4,19,24,28 99:13,23,27 100:5,12 101:6,21 102:17,20,24 104:19,26 105:28 106:20 107:2 108:18,23 109:1 111:1 112:4 124:12 125:1,3 127:3,5 128:1 129:6,10,12,14, 16 139:7,11,15 140:15 143:8,11,23 144:1,11 145:19,24,26,28 146:3, 6,8,13,15,19,24 147:10, 13 152:13,21 153:4,7, 11,12,15,18,20,23,26 154:11,12 160:14,19 162:9,14 163:22 165:9 166:17 167:8 170:21, 22,27 171:4,8,11,16 172:2,13 175:26 176:3, 4,18 177:2,4,18 178:21 184:13,21 185:25 186:25 187:14,24 189:14 190:6 192:1,25, 28 194:18 195:14,17 196:4 197:14,24 198:1 203:4,7 206:28 210:11 211:13,28 212:3 214:3, 9 218:10,20,24,27 219:13 220:2,6 230:16, 20 231:20 233:14,23,28 234:9 236:2,7,8,13,17, 18 261:18 268:3 269:19 275:27 282:24 285:21 290:2,24 291:1,14,22 301:27 304:6,20 320:24 327:12,14,21 336:13,28 337:21,24 338:1,10 341:12,15 354:21,27 363:12 371:26 377:22 378:2,16 380:15,16,17 381:9,17 384:2 385:5, 11,12,22 386:16,20 391:16 393:7,8 394:2 403:11 404:23,25 408:27 410:27 417:3 421:11,18,21 422:2,6 425:17,21,25 427:19 429:13 447:3 456:10 471:2 484:28 485:1 527:10,17,19 531:14 532:14 533:18 535:19 541:5 544:24,26 545:24,26 546:12 547:7,10 548:11,15 549:8,12,16 563:15 575:15 576:20 577:22 581:21 598:27 599:26 600:26 603:9,13 605:9 636:26 643:14 645:7 671:25 672:8,14,19 675:23 678:21 679:18, 27 680:12 681:21 687:15 688:2 691:15 692:5,21 694:11 696:19 697:27 698:4 699:12 701:4,5,11 704:4,6,7,9, 11,12,13,15,23 705:3,4, 18,21,24 707:4,5,6 714:6 715:15,23 717:6, 20 718:8,28 719:9,26, 28 720:9,12,15,20 722:17 728:24 733:12 735:21 737:17,18 738:25 743:13,14,15, 17,24 744:18 745:11,28 748:8,28 750:27 751:23 753:17,19,21,24,27 754:2,8,10,16,24 755:13 758:16 764:13 765:1

**Barber's** 21:2 24:13 25:22 29:8 86:28 104:12 106:25 111:5 115:19 121:28 124:14, 25 125:17,21,25 126:3 130:25 139:8 142:18,26 215:10 234:7 337:8 338:5 377:15 378:8,21 379:17 382:1,9 385:20 456:27 485:24 516:7 547:8 548:22 634:19 691:28 704:5 708:18 716:28

**barely** 99:22 340:27 359:21 373:18 498:14 719:16

**Barker** 103:12

**barrel** 117:3,8 163:18 365:19 367:28 373:16

**barrier** 58:16 78:2 152:3 158:21 159:4

**base** 276:26 282:26 288:27 290:5 368:6,26 493:27 504:8 531:4 562:18 627:20 628:1,5, 9,16,18,19,24,28

**baseball** 739:17,18,19, 23,24,25

**based** 12:1 28:8 30:10, 11 33:12 36:6 51:23 53:3 55:6 65:5 77:23 97:27 98:1 117:25 118:9 122:20 130:21 140:13,14 142:22 143:24 144:4,25 145:2 148:7 150:12 151:6 155:23 159:2 164:21 167:18,19 170:8 191:15,28 198:14 199:7 239:23 246:9 247:25 254:28 256:7 264:16 276:19,27 281:6 282:21,27 283:25 285:15,19,27 286:8 288:6,9,25 289:27 290:20,21 291:20 299:16 303:10,13 308:8,13 312:26 320:21,26 321:6,15 324:20 325:8 327:20 328:14,23 341:19 344:13 351:21 355:3,10 360:1,18,28 365:6,7 366:1,7,9,16,23 368:26 374:19 381:6 382:5,11, 20 385:2,3 388:17,20, 27 389:2 390:27 391:17 398:13 401:28 404:4 407:7 409:26 410:11 411:22,27 412:3 425:28

433:12,14 436:12 439:5 440:6 441:4,5,27 443:2, 11,27 444:18 445:3,9 451:13 452:19 455:25 463:13 464:7 473:5,15 474:18 475:14 476:4, 15,22 477:6 478:14,23 485:15 486:1 487:1,9 490:18 501:9 502:11,16 503:17,19,20,23 504:23 528:6 533:15 535:24 539:21 543:17 545:7 547:20 549:3,22,26 551:21 552:12 553:8 557:14,23 559:19 561:1 565:13 597:12 600:14 602:22 604:16 607:4,5, 10 609:4 611:6 622:21 623:2,6,13 624:7 625:24 626:8,9,11,14, 15 630:2 639:26 640:12 644:7 650:23 655:9 660:9,25 680:2 681:13 710:20 715:14 729:2,23 735:20,21 737:20 751:7 761:25 762:2 763:25,28

**basic** 240:26,27 242:22 252:11 278:5

**basically** 20:2 56:4 242:22 243:14 252:15 325:15 456:19 460:18 465:4 583:21 763:3

**basics** 242:8

**basing** 365:4 504:26

**basis** 152:6 348:4 393:27 737:16

**Bate** 346:9

**bathroom** 19:4

**baton** 79:16,27 157:25

**batons** 41:13 79:7

**battery** 457:9

**bay** 271:20

**bean** 157:26

**beanie** 26:18 27:4 42:9 92:14,23 155:13,16 423:15 680:19,21 704:28 719:17,25

**bear** 78:24 192:11 639:11 678:27 701:27

**beat** 191:9 212:6 377:8 470:10,17 505:25 609:6 687:6

**beating** 610:17

**beauty** 729:21

**bed** 358:12

**began** 9:22 27:15,23 28:28 71:1 72:9 150:6 168:8 171:17 242:16 286:4 321:10 372:14 380:18 407:19 425:23 439:3 482:19 501:13 546:27 593:3 606:3 613:17 616:22 674:2, 17,18 704:21 754:3

**begin** 9:11 12:13,17 18:18 71:2,10 74:18 162:22 360:26 404:19 432:5 613:4 767:14 768:15

**beginners** 292:18

**beginning** 10:8 181:15 272:18 276:23 283:7 315:23 395:24 449:18 461:13 462:26 465:24 489:17 490:1 495:1 496:20 590:28 631:25 650:7 729:12 766:23,28

**begins** 102:25 276:28 517:23 762:5

**behalf** 35:2 54:8 69:10 138:22 173:16 200:9 216:26 228:10 238:6 343:22 417:4,5,6 418:10 419:20 435:11 449:1 526:28 542:23 584:25 620:14

**behaved** 160:15

**behaving** 681:4

**behavior** 17:17 53:23 186:2 409:24 410:5 656:12

**behaviors** 439:1

**beige** 92:24

**belabor** 686:25

**belief** 67:20 68:11 95:16,17 111:20 116:10 123:19 147:9,12 155:25 338:13 404:3 553:9 696:17,18

**beliefs** 729:24 734:20

**believability** 17:3 655:25 659:24,25

**believable** 659:16

**believed** 33:20 53:25 90:4 109:18 129:13 130:24 140:1 152:10 155:10 303:10,13 347:24 379:3 404:15 528:3 551:10 555:9 566:6 632:28 641:22

**believes** 29:4 326:3 432:13 754:15

**believing** 18:12 657:7 751:19

**belong** 22:7

**belonging** 260:23

**belongings** 278:2

**belongs** 176:18 409:12

**belt** 41:12,28 43:20,22 44:9 80:25,27,28 81:4 83:16,19,22 92:8 119:11 140:7,14 160:5 280:28 286:1 289:28 383:22 386:21 408:23 420:21 477:26 497:25 515:18 531:13 532:28 556:5 602:23 673:10 711:7

**belts** 437:15

**bench** 90:24 346:18 390:24 424:7 507:19 531:21 537:25 544:20 752:11

**benching** 365:23

**bender** 256:10

**benefit** 162:28

**bent** 486:20,26 722:6 745:13

**Bernardino** 5:1 26:13 35:11,15,24 36:24 41:8 66:3 73:1 94:23 95:9 138:1 154:16 155:1 217:6,8,12 227:1 228:18,20 229:8 238:15,17,20 239:9,12 243:26 244:1 259:10 336:1 375:27 376:7,10 417:8,11,14 419:27 420:1,20 422:23 429:1 466:14 515:1 575:1 647:1 663:28 666:11 678:3 686:27 704:25 706:23 719:23 728:1 730:26 771:1

**Beverly** 731:4

**bias** 13:27 14:3 15:5 17:6,21 23:15 650:25 655:28 656:16 732:21 734:12,17,21,28 736:10,26 751:14 752:1,4

**biased** 651:1 652:24 732:25

**biases** 14:1 650:27 738:2

**bicycles** 585:14

**big** 72:2 194:12 243:10, 16 248:22 252:8,23 254:18 263:12 353:15 398:4 557:6,8 593:11, 12 680:19 700:9 759:24 764:14

**bigger** 253:23 278:8,9 762:17

**Bill** 414:28

**bin** 624:12

**binder** 109:15

**bingo** 695:5

**bit** 11:19 20:13 23:20 24:11 43:24 44:25 71:8 72:4 76:19,24,27 92:19 96:14 121:20 124:28 125:12 129:1 131:21 144:2 154:9 186:2 253:11 286:5,12 306:22 339:4 344:1 345:7 363:23 384:14 404:17 405:14 409:21 434:27 461:23 462:16 463:3 498:12 515:17 518:9 522:3 525:19 533:16 534:17 535:2 552:14 585:24 672:10 677:26 678:27 685:1 687:20,21

688:6 702:28 703:2 705:14 737:13 741:20

**bite** 683:24

**black** 21:1,2 24:18,19 41:15 184:9,12 294:13 326:21 379:1,24 410:24 420:22 450:20 499:24 500:14 549:6 600:4,9, 12,17 604:25,28 605:20,22 614:27

**Blazer** 593:26

**blazing** 33:21

**bleeds** 369:18

**blemish** 369:12,17,18

**blending** 761:14

**blew** 251:8,23

**blind** 96:27

**block** 404:8

**blocked** 52:26 249:10 325:5 638:27

**blocking** 112:23 326:2

**blocks** 686:6

**blogs** 12:12

**blood** 269:7 341:5,9 365:24 378:9,19,20

**bloodstain** 305:4,6 339:22,26 340:2,4,7,26 341:17,22 342:17

**blow** 254:9

**blown** 435:2

**blows** 732:22

**blue** 142:13 189:19 206:16 283:28 455:19 456:8 457:10 484:27,28 488:12,25 489:8,22 493:5,11 504:14,16 624:12 696:16

**blueprint** 164:20

**bluetooth** 245:6 249:24

**blurred** 229:13

**BMW** 245:5

**board** 389:13

**boat** 273:7

**bodily** 266:10 298:27 303:12,17,18 310:1,4, 10 576:6,19,27 577:16, 18,27 578:2,22 579:10, 11 580:13,23 581:24 643:8,10,19 644:26 645:1,5,25 646:3,5,9,12 648:28 657:28 658:2, 12,17 664:15,22 665:1, 28 666:5,17 667:19 668:26,28 669:6,17 670:1,22 671:2,6 682:21,23 683:3,15 686:1 697:24 699:28 700:5,10,12 701:21,24 702:4,5,10,16,19 703:1, 3 714:9 715:26 716:13, 16 730:4 731:13,15 741:2 742:5,12,22,23 743:1 747:25,27 748:18 754:7

**body** 23:23 62:7 80:12 96:26 97:3,4 233:25 255:8 258:16,21 260:23 286:6 287:6,10 310:6 383:22 468:2,4 497:13, 21 549:12 563:18 568:7 600:1 699:6 703:23,25

**bolt** 262:25

**bolted** 236:22

**bomb** 696:7

**book** 314:13 579:1

**boom** 121:13,14 361:27,28 362:1 373:25,26 708:3 713:17 717:17

**boot** 62:13,14 257:22 280:16 281:9 349:15 350:18,19 353:11 409:16

**boots** 41:15 62:11,13, 15 350:3 420:22

**bored** 239:7 698:22

**boring** 256:1

**Bosch** 244:27 245:17, 18

**botched** 752:7

**bother** 531:24

**bothered** 68:12

**bottom** 50:13 91:24 104:16 114:8,9,27 119:7 145:14 151:7 172:8 273:8 281:13 282:13,15,17 315:2 319:10 323:27 350:27 362:20 363:19 369:20, 23 370:4 394:20 457:11 482:4 565:20

**bottoms** 229:7

**bounce** 409:18,28 410:11,15 688:25

**bounced** 375:21,22 551:7

**bounces** 263:2,14

**bound** 403:5 768:16

**box** 130:11 185:3 252:18 361:8 375:8 450:20 456:4,8 484:27 485:3 488:16,19 499:24 500:14 549:6 600:4,9, 12,17 693:6

**boxes** 484:27 485:1

**bracketed** 583:6

**brain** 595:21,22 597:6 702:17 717:12

**brake** 29:25 70:20 124:14 125:21,22,25 126:4 127:5,20 128:3,8 139:8,19,26 141:4,6,8 161:1 251:25 287:3 380:17,27 381:9,18,20 382:1,10 383:9 384:3, 16 385:5,9 388:3,6,11 393:2,10,11,16,19 412:8 425:22 470:28 471:4 472:19 477:13,18 478:13 500:26 536:15, 16,23 543:23 545:23,25 547:7,8,11,19 548:11, 15,22 549:8,13,17 567:8 592:6 599:1,10, 11,17,20 600:27 603:14 701:6,9 707:4,6,15 714:22 716:4 717:3,6, 15 718:10,12,18 719:1, 5 743:25,27 744:15,21, 22,23,27 745:22 748:9, 11 751:3 753:17,22,25, 27 754:2 759:2

**brakes** 251:13,15,16,20 384:6,10,23,26,28 385:6,8 389:27 391:27 463:20 471:1,28 472:17,26 477:12 478:3,6,27 479:1 500:18 595:25 602:8,9, 13,14 603:8,10 704:10 706:28 707:1 717:18 718:4,7,22 745:3,4,5,6, 18

**braking** 251:12,26 294:15 384:24 388:23 478:8,26 505:15 707:14

**brand-new** 299:17

**break** 19:5 49:8 72:22 85:24,26 110:3 152:2 184:23,27 221:14 270:3 329:8 424:8 638:5 647:14 658:8 665:11 668:8 670:6 684:23 685:1 709:20 755:4,5 769:26

**breaker** 694:23 695:16, 18,22 696:13 752:24

**breaking** 203:23 251:10 283:17

**breaks** 19:5 240:2 327:26

**briefed** 267:19

**briefing** 266:7 267:1

**briefly** 21:17 41:6 49:23 78:13 169:24 171:24 297:13 415:16 425:14 427:3,11 435:16 442:13 594:2 617:23 640:22

**bright** 21:1 27:4 40:10 91:23 92:25 215:14 324:26 378:26 423:1

**brighten** 33:9 606:14

**brightly** 94:16

**bring** 9:2 62:8 148:25 186:20 302:20 305:10 314:25 339:17 358:8

433:17,23 448:1 520:25 523:13 525:14 583:14 590:16 592:7 650:2 720:25 756:4 757:21

**bringing** 371:6,16

**broad** 310:6 311:21 586:7

**broadcast** 55:23 70:15 154:24

**broadcasted** 69:5 74:19

**broke** 304:16 430:27 515:15 718:5

**broken** 269:14,20 293:7 559:13,14

**brother** 705:11

**brought** 5:24 15:8 16:5 301:17 305:9 371:20 381:11 425:16 523:23 652:25 720:14 734:17 755:16

**brown** 106:2 189:5,13 410:24 763:17,19

**bruise** 700:9,10 702:19 739:20 741:12

**BRYAN** 169:27

**Bryant** 3:5 5:6,14,15,18 6:9,16,23,27 7:1,4,6 9:27 22:13,15,18,22,24 34:12 52:14 54:1,17 66:23 73:6 74:27 75:3 78:15 79:18 82:12,14 83:9 85:17,18,21 89:23, 24 90:17,26 98:6,14,20, 23,25 102:4 107:9,10, 18,21,23 108:1,5,12,13, 14 109:28 110:1,4,10, 12 113:16,18 114:16, 19,24,26 118:15 121:1, 3,10 126:28 129:28 130:6,13,18 131:6,9,28 136:5,6,9,10,12,15 138:6,14,15,19,26 139:24 141:18,23,28 142:1 145:8,11 147:3, 11 148:6 149:15,28 151:1 153:10 154:10,27 155:19,21,22,27,28 156:2 157:28 158:1,5,6 159:11,13 161:22 165:24 167:16 168:9 169:23,24 171:22 172:17,18 184:16 185:17,20 187:19,23 193:25 195:4 197:1 198:8,11,28 199:11 202:10 203:25 210:1,4 211:21 212:19,20 215:28 219:20,23 221:2,7 225:5,8 227:6 234:14,15,18 237:7,13, 14 291:4 292:1,2,5 301:14,26 304:2,11,26 305:9,16,17,18 307:22 310:12,13 311:7 314:15,17,19,23,27 317:9,13,20,23,25 323:20,21,25 325:14, 20,22,24,27 326:5 327:19,24 328:2,26 330:7,10,13 334:5,6,9, 12,13,15 336:6 337:14 338:28 339:3,7,25,28 340:5,9,16,24,26 341:23,26 342:1,9,12, 14,21 343:1,7,14,17,18, 26 346:3,8,13,20,21 350:14,15 355:2,14 356:5,15,16,17 361:24, 26 362:16,18 367:12,16 368:21,22 377:5,7,9 381:5 382:4 383:2,5,6 386:3,24 387:8,20 389:11,28 390:26 392:3,23,25,27 393:4,5, 14,23 394:14 401:1,27 406:4,5 407:13 413:23, 24 415:15,16,19 417:22 418:21,22 422:16 423:25,26 424:6 425:3, 13,14 427:5,8,10,16 428:1 429:6,20 430:3,4 431:5,6,21 432:2,16,19, 24,27 433:3,8,18,22,24 434:20 435:2,8,15 436:4,7,8 438:10,11 442:12,13,16 443:23 444:20,24 445:17,28 446:3,9,22 447:4,14,23, 25 448:6,8,25,26 449:5 454:7,11,17,19,22,26 456:3,26 459:21 460:8 461:7 463:27 464:14, 19,26,27,28 467:12,26 468:22,24 472:11 479:12,21 481:12 496:28 507:16,18 508:20 513:5,7,8 515:6, 25 516:12,16,19,21,24 517:8,12,14,18 518:4,8, 12,16,21,23,25 519:15 520:1,17 521:5,8,11,23, 28 522:6,12,18,27 523:11,17,20 524:3,11, 13 525:3,10,13,15,23 526:10,13,14,24,25 527:4 528:1,13,18,19, 20 529:11,18 531:22,26 532:2,4,9,23 533:8,14, 25 534:7,9,11,28 535:4, 8 536:21 537:26 540:9, 10,19 541:13 542:3,4,8, 11,12,14,19,20,27 544:11,21 546:4 547:16,27 548:28 549:25 550:18 552:17, 21,25 555:6,7,20 556:24 557:13 559:26, 28 561:13 562:15,22 563:10,23,24,27 564:24 565:5 567:22 568:5,11, 13,22 569:1 573:5,6,10, 11 575:6 576:10,12 577:20 578:3 579:5,7 580:18,20 581:15,19 582:6,15 583:13 584:12 592:23,26 596:13,26 599:5,15,24 608:20,21 609:13 611:17,26 613:7 614:24 616:10,13 617:6,12,15,19 618:17, 24 619:2,4,8,15,17 621:24 622:1 626:21 627:8,11 634:7,23 635:17 637:15,18 640:5,18 641:7 642:2,6 645:23 646:15,20 647:6 649:16,18 690:4 691:1, 8,9,12,14 705:17 713:13,16 719:14 721:17 728:6,15,19,20 733:22 734:28 740:1,6 742:19 743:4 747:1 748:2 752:12 753:3,6, 10,14 754:27,28 758:11 763:28 770:10 771:6

**bud** 100:16 671:26 678:21 681:8

**buddy** 101:6 704:26 705:4 721:5 730:25

**build** 258:6 598:9

**building** 693:27

**built** 245:28 603:20

**bulb** 694:17,19,21,26 695:6,7,13,25 696:17 744:3 752:23

**bulbs** 700:24

**bulky** 562:8

**bullet** 32:1 116:10 117:7 121:17,20,21 150:21 151:2 304:5 362:1 367:24,27 368:18 392:6 459:9 460:21 531:17 545:27 550:25, 26 599:9 604:17 710:19,20,21 711:15 712:6,16,17,28 722:1,2, 3,12 729:1 733:4 737:3, 5 739:4,5 763:26,27

**bullets** 121:11,18 150:20 262:22 293:28 294:1 360:5 361:27,28 363:25 393:9 600:21 712:27 717:22 721:8

**bump** 251:17 702:19

**bumped** 562:10 702:27

**bumper** 39:21,25 269:25 480:15,19 606:6,10,19 607:28 628:19,27

**bumping** 695:4 713:16

**Bumps** 741:20

**bunch** 71:23 349:26 389:18 412:10 630:10 744:4 751:1

**bunched** 363:17 711:16 712:6

**bunching** 119:15 121:18

**bunk** 219:4,7

**burden** 15:2 434:1 648:24 661:25,28 666:12,17 692:20 696:14 715:22,26 742:10

**burn** 127:12,25 263:8 716:11

**burned** 695:7,13,25 696:17 752:23

**burning** 127:9,11 472:2 744:28 759:1

**burns** 702:17

**burnt** 752:19

**bursts** 710:22

**business** 47:4 418:18

**butcher** 567:22

**button** 38:23 81:8 187:20 207:8 213:20 218:14

**button-down** 229:28

**buttons** 98:18

### C

**C-A-R-L-E-S** 434:24

**C-H-R-I-S-T-O-P-H-E-R** 34:23

**C-O-C-C-H-I** 200:3

**cadence** 408:3,10

**Cal.5th** 578:19 643:22 644:5

**Cal.app.4th** 575:18

**CALCRIM** 757:16

**calculate** 25:8 318:28 382:17 479:27 502:1 503:5 504:5,10,19 590:9 591:13,14 592:13 606:19 607:11,18 615:2,19 625:18 630:2, 16,22 631:24 732:15

**calculated** 324:8 592:10 614:13 625:2 631:22,28 637:6 639:4 749:23 750:24

**calculates** 589:21 590:7 750:1

**calculating** 502:20 503:20 628:8,21

**calculation** 318:15 324:20 382:8 441:18 460:11 476:10 501:20 502:11,18,19 504:3,8 590:14 593:17 607:10 610:24 611:22 623:21

**calculations** 30:11 130:14 317:26 388:26 390:27 441:6 451:19 453:10 476:4,8,16 504:13 586:24 588:12 591:9,16 593:7,18 600:24 604:16 607:4 624:7 626:20 629:22 640:8 687:11 750:4

**calculator** 389:8

**calendar** 8:22

**caliber** 47:1 105:24 261:21 263:20 442:8

**calibrate** 481:4

**California** 5:1,9 22:11 25:9 73:1,9 138:1,9 174:10 201:9 227:1,9 238:26 240:21 242:21 257:3 259:26 264:24 279:17 336:1,9 417:7, 10 429:1,9 435:20 449:21 515:1,8 575:1, 10 647:1,10 692:2 728:1,10 771:1,10

**call** 6:12 7:25 19:7 20:13,14,15 23:5 24:1 37:22,24 40:20 47:2,16, 20 48:8,15 49:6,18,26 51:19,23,25 55:6,9 60:1 69:24 84:26 85:2 98:8 162:25 180:16,28 181:15 182:9,10 186:4 189:28 191:16,18,27 194:18 206:18 207:19 209:1,3 214:23 240:1,8 242:25 244:13 246:24, 25 258:6,16 263:2 278:18 299:19,24 405:5,8,12,16,26 422:5 429:16 446:18 448:9 461:24 465:3 470:10 471:11 483:8 494:13 499:23 522:27 523:1 524:19,21 525:24,25 526:5 531:5 542:12 600:12 604:4 649:7 658:20 673:1,11 675:6 679:19 681:6 682:15 686:28 738:8 758:28 769:13,22

**called** 7:27 35:2 43:23 55:27 59:28 67:12,13 93:20 100:17 114:1 128:21 164:17 173:16 179:26 180:15,17,22 183:28 200:9 208:25 211:16 214:5,6 216:26 228:10 238:6 243:13, 19,27 244:7,27 247:18 248:12 249:24 259:16 265:17,20 268:19 276:16 348:7 373:4 375:16 376:12 404:26 419:20 435:11 449:1 461:15 486:18 538:3 560:17 591:19 622:13 654:22 675:10 704:18

**caller** 6:13

**calling** 182:12 184:2 414:25 523:17,20 674:25

**callout** 265:15,23

**callouts** 240:1

**calls** 11:5 24:2 37:3,7,8 78:15,20 79:10 102:2 118:9 145:5 146:27 153:8 165:24 166:2 180:24,26 209:10 291:4 310:8 327:16 328:24 354:28 385:25 392:1 407:13 464:11 529:7 546:2 561:13 562:15 563:10 567:18 611:18, 26 642:2 664:8 666:9 678:6

**Caltrans** 251:6

**cam** 23:23 254:12 549:12 568:7 600:1

**camera** 80:12 285:7,8 368:15 486:17 549:12

**cameras** 450:27

**camp** 257:22

**cams** 251:5,6

**cancel** 508:3

**candescent** 695:9

**cans** 250:9,10

**canted** 403:14 486:11

**cap** 695:15

**capable** 666:4 668:25 700:4 742:5

**capacity** 80:6 218:21 230:10 238:24 263:26, 27 421:16 437:25 441:8,20 452:10,11 453:27 476:18 477:2 478:8,9 484:19 503:18 609:6 678:3

**capitulate** 698:15

**captain** 363:13

**capture** 81:3 248:24 274:4

**captured** 50:6 84:23 560:12 587:23,26

**captures** 155:7 248:17

**car** 19:28 20:3,5,9,10 21:9 23:21 24:9 25:4 26:2,28 27:7 28:22,28 29:4,10,21,24 30:8,13, 17 31:14,16 32:2,4,5,6, 10 52:9 79:15 82:28 89:27 99:26 101:22 103:8 104:27 105:2 110:26 111:18,21 112:5 122:5 124:25,28 125:11,22 126:9,12,17, 20 127:3,7,12,16 128:9, 15 139:11,25 140:4,12, 16,20 142:28 143:8,23 144:28 145:19 146:7, 17,25 148:2,14 155:1,2 158:23 160:23,27 165:22 176:19 177:5,6, 19,20,23,28 178:2,6,7, 13,19,22,23,28 179:4, 10,14 180:1 182:20,22, 23 190:1,7,18 191:14 192:5,6,21,27 193:4,8, 12,19 196:5,18,21,28 197:9,21,22 198:1,12, 18 199:2,3,4 202:14,25 204:4,13 205:4,5,7,14, 16,17,19 206:16,22,28 207:4,7,14,24 208:13, 14,15 209:19 210:24 213:15,17 214:1 215:19 247:10 254:2,4 255:7 256:20 274:6 291:24 294:17 304:22 308:6 309:16 312:2 318:2

319:1,23 320:17 321:6, 7,10 322:19 329:1,3 338:1 341:14 380:14, 18,23 381:28 385:6,21 386:16,17,27 387:15,22 388:1,6,13,21 390:27 391:4,6,9,10 392:6 393:10 397:28 401:12, 16 432:11,13,17,20,24 456:27,28 479:3,6 517:10 527:10 536:16, 25 537:1 543:19 544:6 545:3,15,17,28 546:25 547:6,11 549:6,7,9,11 564:2 568:9 576:4 597:15 599:27 602:19 603:16 607:4 629:7 632:17 633:11,18 638:3 675:4,5,9 679:11 684:3 685:14,18 699:14,19 700:8,9 701:4 702:26 703:6,11,12,14 705:22, 23,27 706:1,2,13,14,15, 26,28 707:1,4,16,17,21 708:28 709:12,13 710:6,13,15 712:8,23, 24 714:26 715:7 716:1 717:13,17 718:3,11,13, 14,27 719:1,2 722:10 730:2,11 731:14,24 732:4 733:2,28 736:5 740:24,26 741:7,16,21 742:14,21 744:10,12, 14,20 745:2,24 748:12 749:18 750:7,28

**car's** 126:7 127:14,17 315:7 320:1

**Cara** 583:3,5 643:3

**care** 5:26 26:25 522:19 745:18 747:7 765:8

**career** 35:23 238:20,26 239:2 242:16 243:8 257:6,27 263:21 299:24 310:27 436:24 462:4

**careful** 156:6 651:9

**carefully** 14:22 534:22 643:26 651:17 658:25

**Carles** 434:19

**carried** 766:12

**carrier** 256:19,23

**carry** 46:28 62:5 263:20

**carrying** 398:9 529:28

**cars** 19:23 158:25 177:2 185:12 194:11 199:7 205:6 279:9,10 536:12 679:21 741:6

**cartridge** 114:28 115:2,5 116:3 117:6 118:22 262:1,15 264:2, 12 269:27 409:4,14,25 440:19,21 441:25 442:8 444:19 615:25 688:20 762:16 763:13

**cartridges** 105:23

**case** 9:2 10:6 11:11,13, 25 12:3,4,9,14,18,23, 25,27 13:1,11,13,15,16, 23 14:15 15:9,19,27 16:8 17:22,23,24 18:1, 11,20,24,28 19:1 23:4 31:25 32:16 33:5,11,25, 28 34:2,10 49:10 53:11 69:20,28 72:23 77:27 85:25 90:27 102:28 104:1 107:14,18 114:5 131:12 158:18 165:9 215:21 221:17,18 235:14 240:5,10 241:18 251:2 264:12 266:2,3,4, 5,13,15,21 270:6 294:25 296:5,25 297:9 298:9 301:4,15 305:22 310:10 314:11 329:10, 11 339:7 355:17 359:6 382:26 385:4 413:24 417:5,6 423:13 424:16 438:5,27 443:5 444:11 451:27 453:15 470:8 478:18 481:28 482:17 498:20 502:8 506:7,17 522:24 523:3 524:4,5 525:24 526:3,6 527:23 538:24 541:25 545:8 551:28 552:20,21 564:21 569:5,7 575:22 576:13 578:7,11,19,28 579:7,15 583:20,27 585:16 586:14 587:8 591:20 600:15,18 611:11 613:22 615:15 617:26,28 619:23 620:1 631:21 642:23 643:10, 13 647:17 650:7,20 651:22,28 652:2,4,17, 26 653:9,19 656:17,19, 24 657:6,11 658:21 661:20 662:5,7 668:27 670:25 672:11 690:1,6 693:14 697:20,22,23 698:15 702:2,14 703:6, 28 720:11 722:23 728:18,22 729:13,14, 16,18,19 731:28 736:12 739:26 750:15,16 751:17 754:22 755:5,7, 8 756:20 761:25 766:17,22 767:1,4,10 768:18,24 769:3,15,21

**cases** 66:14 410:5 438:6 440:19,21 442:8 452:25 481:27 482:2 553:16 584:4 585:15 596:1 688:20 763:13

**casing** 28:4 32:1 114:28 115:2,5,8,13,14 117:13,15,19,27 118:16,25,28 119:3 120:4,7,12,16,17 121:20,21 151:7,9 262:2,15 360:10 362:24,26 365:27 367:9,10,17,20,26 369:7,8 373:28 374:10, 18 443:7 459:9 460:22 550:26 616:4 711:15 712:17 733:4 735:26

**casings** 28:4,14 29:2 31:12,15 115:17,22 116:3,10 119:8,16,19 120:16 122:1 148:22 149:2 150:21 151:3,6, 10 264:3 269:27 294:3 360:6,8 362:13,19 363:5,22 364:21,27 366:19,22 367:7 372:6, 19 375:3,4 409:4,14,25 415:25 441:26 442:26 443:3 444:19 460:24 550:9,14,26 564:17 604:1,18 608:9 615:25 706:9 710:19,20,21 712:6,28 722:1,2,3,13 729:1,7 732:28 733:24 737:3,5 739:4,6 740:15 762:16

**casual** 258:23 259:2

**cat** 418:13,15

**catch** 265:12 505:3 556:19 578:27

**categories** 79:8 594:3

**category** 75:18 79:22

**cater** 373:5,6

**caught** 87:27 647:15

**caused** 74:14 204:22 211:4 233:24 250:28 251:1,8,27 261:1 341:12 385:24 386:6 412:4 548:22 560:14 596:3 612:27 625:23 742:28 758:7 761:10

**causing** 246:2 548:23 599:12 665:19 666:4 668:15,25 670:13 674:1 684:9 689:3 694:28 700:4 716:5,15 721:18 742:5 753:17,22,25,27

**CD** 430:14

**CDR** 499:24,26 560:12

**CDRS** 244:14,26 245:3 560:16

**cell** 13:3 230:25,27 231:16 232:9,12,17 269:8 770:10

**center** 39:18 63:5 76:24 122:2 149:6 217:28 220:2,4,5,8,12, 22,25 229:1,3 234:23 235:8 272:26 276:15 281:3 287:24 289:14,26 325:26,27 375:22 403:20 414:18 585:28 591:7 625:10,12,20 636:1

**certainty** 547:28 548:5 549:16,20 568:8 608:28 617:2 751:5 753:9 754:22

**certification** 241:9 245:16 450:5,7,8 484:18 540:25

**certifications** 449:25, 27 450:4,12

**certified** 484:13,14

**cetera** 157:26 321:16 392:7 516:27 756:10

**chain-link** 30:22 33:17 56:26 57:17 59:6 61:15, 21,24 77:23 106:4,9 112:21,23 123:27 269:26 285:3 324:10 391:12

**chair** 34:21 236:15,20, 22,23

**challenge** 414:28 430:21 519:21

**challenges** 62:8

**challenging** 62:3 164:22 253:12

**chamber** 263:28 367:24 675:18

**chambered** 117:2

**chambers** 646:18,24

**chance** 370:15 427:10 450:23 469:28 471:27 487:28 576:12 708:28 766:13

**chances** 251:10

**change** 5:25 9:3,23 114:17 227:14 241:17 245:26 345:12 346:22 347:11 348:8 357:5 388:3 389:1,21 390:18 401:22 403:6 452:16 453:9 458:19,21 462:15 471:1 492:28 525:19 557:17 582:12 600:15 613:3,13,18,26,27 614:3,8 616:18 627:2 709:18 750:24,25 755:27 757:2 758:18,19 764:28 765:1 766:19,20

**changed** 86:7 128:26 165:2 415:10 459:4 477:1 576:27 609:20 610:4 616:14 625:24 626:3 633:5 638:6,8 643:3,4 648:9 649:4 709:20 738:5

**changing** 241:19 471:5 502:16

**channel** 56:3 69:22,23 70:1

**chaos** 349:24 407:24 561:22 562:2

**character** 662:15

**characteristics** 215:25 478:15

**characterization** 325:11,13

**characterize** 179:8

**charge** 15:3,5,16 233:4,5,6,8 246:15,22 247:6 296:12 425:15 643:16 652:22,23 653:5 655:5 662:20 677:22 693:22 735:27 749:28 769:1

**charged** 10:25 15:7 16:4 576:18 580:9,28 643:7 652:25 657:15,28 658:3,10,15 661:12,20 662:12,22 664:13 667:14,17 669:5,8 670:25 672:14 690:14 736:16,17 737:11 739:21,22 743:17 755:17

**charges** 15:3 661:7 687:14 747:15 768:13

**charging** 122:28 309:19

**chart** 597:22 609:24 621:9,10

**chase** 214:3

**chasing** 716:12

**chat** 12:11

**check** 11:2,3 250:12 262:27 367:13 425:7,10 427:17 433:8 610:27 697:8,9,12,14 748:24

**checked** 164:26 165:1 718:1

**checking** 644:27 717:9

**chemical** 79:7,22,24

**chest** 41:9,10,25

**Chevrolet** 271:5 276:12 277:26 455:9,20 486:1,2,3 593:26

**Chevy** 273:17,23 278:1 499:18 620:27 684:5

**chewed** 696:1,2

**chicken** 348:11 357:4

**chief** 429:16 522:24

**children** 24:17 25:1,5 36:13

**chin** 55:28

**Chino** 239:21,23,26 241:26 243:13,25 245:20

**choice** 27:27 32:10 163:2

**choose** 427:23,26 615:22 616:1 673:14 704:2 766:10

**choosing** 587:16

**chose** 563:20

**chosen** 757:12

**CHP** 242:27

**Christmas** 681:10

**Christopher** 3:4 20:15 34:14,23 35:1 136:4 138:21 281:19 484:28 485:4 513:4 526:27 648:24 663:27 664:5 666:13 667:8 672:26

**CHRONOLOGICAL** 3:1 136:1 225:1 334:1 513:1 573:1 726:1

**circle** 288:22 349:6,11, 22 351:11,12,13,24 394:7,8,11,13,16 395:20,24 396:22,26 397:12 689:28

**circled** 106:2

**circles** 248:16

**circling** 105:28 369:20, 25 396:12 606:8

**circuit** 694:23 695:16, 18,22 696:13 752:24

**circuitry** 696:7

**circular** 290:13 349:8,9 367:25 368:7,13

**circumference** 349:11

**circumstance** 66:7 79:10,15 95:12 230:18 260:6 663:10

**circumstances** 55:7 69:5 78:22 79:22 95:11 100:4 160:26 161:4 303:10,14 312:19,26 366:8 406:25 577:12 666:7 667:4,6 669:4 674:14 680:2

**circumstantial** 32:16, 17,21,24,26 33:1 312:24 426:16,23,24,26 654:17,22,23,28 655:3, 10,14,17,19,22 674:12 675:11 678:25 699:12 700:14,15,20,21,25,28 743:4,6,10,16,20 746:4, 8 765:20,21

**citations** 643:26 644:3

**cited** 575:17 579:15

**Citing** 578:23

**city** 20:17 36:23 37:3,9, 20 228:24 240:25 241:27 242:6 420:9,11 678:5

**civic** 23:13 691:24

**civil** 165:20 256:11 301:10 481:25 482:2 585:16 619:12 696:23

**civilian** 290:27 681:11

**civilians** 131:20 290:26 681:9

**claim** 150:2 390:19 426:2

**claims** 31:13 520:27

**clarification** 444:27 522:23 541:20 610:9

**clarify** 296:2

**Clarifying** 129:2

**clarity** 89:25 108:15 128:25 545:3 596:6 601:17

**class** 217:12 218:1 229:6 232:1 241:11 278:11 420:27 421:1

677:8 680:17 682:3,6

**classes** 241:12

**classification** 239:16

**classifications** 239:18

**classifies** 96:28

**classify** 40:21

**clean** 643:4 763:6

**clear** 23:4 39:5 100:12 263:24 349:14 359:22 396:2 517:25 521:20 558:26 579:17 613:12 645:17 695:21 697:18 707:5 711:5 720:18 754:21

**cleared** 717:10

**clerk** 110:2 120:3 618:28

**client** 427:14 737:11 754:25

**clip** 522:15

**clipped** 255:5 522:13

**clipping** 519:19

**clobbered** 710:8

**clockwise** 458:20

**close** 44:28 61:26 103:21,24 105:28 124:1 187:17 236:8 304:4 315:25 341:1,3 342:2 354:25 412:24 441:22 443:6 446:13 490:3 523:6,12 531:15 558:23 616:4 638:27 644:2 713:6 729:28 749:2

**close-up** 353:3 407:23

**closed** 186:1 246:18

**closer** 9:17 44:25 74:5 149:24 187:26 309:26, 27 316:28 340:23 341:28 342:5 345:1 354:26 457:24 559:6,17 560:28 602:26,28 603:2 615:20 636:1 697:4 708:23 722:9 760:26

**closes** 112:5 386:20 501:10 716:19

**closest** 76:16 104:16 285:2 488:12 489:4,10 604:10

**closing** 11:10 16:7 22:10 33:3 424:14 469:11 474:25 475:7 506:9 620:1 642:15,20 650:11 653:18 671:11, 14 692:3 693:12 697:18 728:15

**cloth** 278:6

**clothes** 92:21,22 719:25

**clothing** 54:21 665:17 668:13 670:11 719:18

**clue** 30:27 699:15 705:25 737:26

**cluster** 589:27

**clustered** 459:10

**co-investigation** 259:25

**coach** 257:17

**Cocchi** 19:18,23,27 20:1,2,6,10,17,27 21:15 24:5,6,26 26:1 131:20 132:10,18 136:11 178:27 199:20 200:3,4, 8,17 210:5,7 290:9 295:14,18 338:22 354:6 380:2 397:27 398:16 405:6 408:24 636:22 675:2,5 676:2 678:13, 22 679:7,15 680:3,23 681:1,24 704:14 720:4

**Cocchi's** 20:5

**code** 69:22 578:21,22, 24 583:28 584:5 643:7 644:17 664:16 700:19

**coefficient** 252:13,14, 17,19,22,23 275:1 278:23 384:27 475:18, 19,21,24 588:25 592:1, 3 602:14

**COHN** 5:3 73:3 138:3 227:3 336:3 429:3 515:3 575:3 647:3 728:3 771:3

**coin** 768:1

**coincide** 371:17

**coincided** 283:16

**cold** 42:21 240:10

**Coley** 268:9

**collar** 55:28 263:8 423:9,10

**colleague** 22:24,26 23:7 557:7 691:17

**colleagues** 691:15

**collect** 82:18 182:4 244:18 245:1 274:5 352:21

**collected** 14:28 552:13 652:20

**collection** 341:3

**college** 449:18

**collide** 702:22

**colliding** 244:5

**collision** 85:10 242:4, 5,9,11,14,15,25 243:1, 5,7,14 244:15,19,20,21 245:1,11 246:14,16,17 247:21 248:15 249:9,13 250:8,27 252:1,6 256:13 257:2 274:4 279:5 292:17,21 293:1 309:9 311:14 312:4 438:22 441:14 482:11, 27 560:17 585:13,25 586:8,15,16 600:19,21 640:14

**collisions** 244:3 246:10 585:6,22 600:16

**colloquy** 163:7 560:24

**color** 39:6 41:15 68:18 106:2 176:4 218:11 229:6 282:17,18 369:27,28 423:17

**colored** 50:28 296:13

**colors** 250:7 282:14 696:15

**Colt** 262:12

**column** 503:27 598:3

**combat** 258:20

**combination** 438:24, 28 440:17 451:16,17 494:14,15 495:9,11 588:5 590:24 591:19 593:22 654:18

**combine** 587:18

**combined** 588:7

**combining** 588:3

**combustion** 116:22

**comfort** 62:14,16

**comfortable** 215:5 415:2

**command** 75:18 92:2 94:5,8,13,18,21,24 97:23 101:1,5 154:18 155:3,6 157:6 158:2 163:24 218:24,28 220:13 236:9 672:1 684:3 707:21 719:19 730:22

**commanding** 426:10

**commandos** 731:2

**commands** 69:4 74:17 75:11,12,23 76:5 90:5 101:1 219:1,3,4 230:16, 24 231:6,14,25 232:4, 12,13,17 235:24 236:3 290:25,28 291:22 403:18 421:21,24,26 541:6 563:13 676:28

**commence** 770:7

**comment** 427:21 431:18

**commentary** 12:23 519:10 521:10

**comments** 651:7 753:12

**commercial** 437:9 450:20 451:6 481:23 585:13

**commission** 303:16 663:8

**commit** 646:11 657:17 658:5 661:12 662:6,15 663:3,4,12

**commits** 665:9 668:6 670:4

**committed** 165:7 260:26 416:25 575:24 661:19,23 662:2,16 665:26 668:22 670:20 689:11 692:1,21 697:27

**committing** 644:9 663:19

**common** 17:4 66:8,9 67:19,22 94:26 128:20 352:15 420:23 437:28 438:21 443:5 470:5 496:13 655:26 703:14 718:15 741:10 742:16, 19 746:23

**communicate** 14:12 705:18 767:7,16,20

**communication** 12:10 14:10,11 18:25

**communities** 244:2 733:14

**community** 734:16

**compact** 410:2

**compacted** 274:28 358:12

**companies** 256:13

**company** 244:27 256:22,23

**compare** 15:20 350:28 653:9 660:19

**compared** 34:9 351:2 440:11,12,16 483:7

**comparison** 616:2

**compartment** 470:6

**compass** 398:26 399:1,2,11,17,19,21,22 400:2,13 764:23

**compensation** 452:1

**competing** 524:8

**compiled** 292:27

**complete** 53:7 165:7, 11 240:20 321:15 355:25 537:5 553:25 592:7 663:14 767:19

**completed** 12:16 36:9 239:2,20 663:10

**completely** 341:26 365:21 592:12 696:8 716:27 722:3 751:19

**completing** 349:10

**complex** 175:21,22 188:16 379:9

**complexity** 266:8

**compliance** 157:10,21 232:23,28 233:19 234:3,8

**complicated** 336:18, 24

**comply** 76:5 232:3,13 235:20,24 421:27 706:23

**complying** 157:17 291:22 403:18 404:28 517:9 563:13 671:26

**component** 749:27 750:16

**components** 116:25

**Compound** 550:15 555:4

**computations** 451:18

**compute** 629:26

**computed** 502:24

**computer** 38:8 148:25 329:27 353:7 549:6 587:6 589:11 622:22 629:15,21,25 630:1,3, 17 650:2 671:12 766:7

**computers** 252:9

**conceal** 58:12

**concealing** 65:8

**concealment** 58:4,6, 10,11,24 151:24 152:1 763:15,21

**conceded** 676:9

**conceivably** 577:11

**concept** 94:5 127:20 151:20,23 300:14 472:8

**concern** 54:21,26 524:23 612:5 761:10

**concerned** 53:24 54:25 65:4 152:17 212:23 750:3

**concerns** 418:16

**concert** 696:28 697:1

**concise** 162:7

**conclude** 32:17 651:11 654:25 655:11,15 658:24 660:12 661:27 662:14,16 700:22 714:11 745:7 749:4

**concluding** 728:22 749:2

**conclusion** 21:19 22:9 32:20,23 53:21 56:18 146:28 285:27 290:10 310:8 311:22 382:18 440:13,15 643:28 644:6 655:1,13,16 662:17 695:24,25 700:25 701:12,13 735:20 746:19

**conclusions** 32:25,27 33:2 131:12 221:18 329:11 424:12 455:1 506:17 553:8 554:1 555:11 569:8 588:2 618:1 642:17 655:18, 20,23 690:7 700:27 701:1 722:24 743:6,7 765:22,25 766:2

**conclusory** 751:5,6

**concrete** 337:1 409:27 410:3

**condensed** 72:4

**conditions** 565:15

**conduct** 12:28 130:22 165:28 239:17 240:28 241:13 246:28 247:20 259:14 260:9,12,16 266:15,16 287:12 292:13 297:3 298:11 382:15 418:1,9,18 442:5 463:14 621:15,18 634:8 652:3 667:7 679:16 751:11,13,15 768:17

**conducted** 11:23 36:12 168:26 240:6 243:5,13 258:27 261:12 290:8 292:22 297:17, 18,20 351:28 483:15 523:24,25 586:1 621:14 626:25 752:21 760:5 761:11

**conducting** 165:2,12 246:5 248:2,3 259:25 355:4 679:28 686:8 687:1 751:18

**conducts** 296:27

**cone** 142:20,26 143:1, 3,5,21 145:1,15 350:9 394:9 397:12,13,16,18

**cones** 142:19,20,23 144:27,28 187:28 282:19 296:13 319:11, 12 380:4 397:22,24 398:8 527:24 528:2,3,6, 8,9,21,24,28 553:10 554:25 555:9 560:23 687:18 708:16 735:6

**confer** 507:11

**conference** 90:24 346:18 390:24 424:7 450:16 507:19 531:21 537:25 544:20 752:11

**conferences** 450:15

**confident** 766:4

**configured** 286:5

**confined** 77:23

**confirm** 51:21 54:7 109:11 165:6 682:7

**confirmation** 732:21, 26 734:12,17,28 736:9 751:14

**confirmed** 49:6,25

**confirms** 734:20

**conflict** 651:8 658:26 753:12

**conflicting** 251:6

**conflicts** 18:5 656:28

**confront** 235:27 520:9

**confrontation** 259:9

**confused** 488:15 516:2

**confusion** 108:17
**congregate** 354:4
**congregated** 402:24
**congruent** 370:16 410:1
**connect** 171:8 461:26 590:16
**connected** 18:24,28 249:25 769:3
**connecting** 591:7
**connection** 12:25 651:28 767:9
**connects** 209:9 245:6
**consciously** 699:7
**consent** 53:11
**consequence** 539:24 644:18 730:14 732:5
**consequences** 539:21,25,28 540:6 644:18 645:7 730:18
**consideration** 14:9 308:26 392:13 406:21 689:19 768:8
**considered** 78:26 239:16 274:11 299:13 302:4 479:15,16 642:22 643:27
**consist** 105:21 310:5
**consisted** 35:20 233:1
**consistent** 17:27 91:19 161:11 262:18 263:4,9 282:11,22 283:10 284:16 285:25 288:10,12 290:25 321:4 372:9,18,20 373:28 374:9,18,23 375:3,4,18 390:11 402:6 407:10 408:10,15,16 412:21 496:25 550:10,13,26,27 656:22 677:15 711:14 712:28 737:4 738:11
**consistently** 578:7
**consists** 41:7,12 142:10
**constant** 153:3 284:17 411:23 503:24,26 504:28 505:7,9 614:14
**constantly** 7:9 245:4 253:13 274:8 293:2 298:1
**constants** 504:28
**constitute** 576:4 700:12 716:8
**Constitutional** 661:4
**constraint** 601:23
**constraints** 588:21 592:8 631:17
**consumer** 452:9
**consumers** 503:7
**consummate** 691:18
**contact** 8:21 12:8 13:6 47:23 63:12 64:5,12 67:3,5,18 68:1,4 75:28 79:5 81:1,3 82:26 84:5 86:20,25 88:6,14,24,25 89:2,5,11,16 90:13,14 94:10 95:1 98:1 100:15 101:2 106:20 164:25 167:3 168:4 184:2 193:1 199:18 218:4,8, 20,26 220:2,6,28 229:23 230:10,12 236:17 275:11 285:21 290:25 300:19 309:23 327:11,25 354:20 398:15 408:27 421:4,9, 17 422:22 484:11 499:9 531:14 563:15 665:16 668:12 670:10 673:2 677:3,10 678:10,20 679:7,12,15,28 680:22 740:25 742:28 754:7 768:21 769:8
**contacted** 67:26 76:26 168:25 218:9 231:16 232:7 275:28 291:1 680:12 755:19 758:6
**contacting** 165:10 636:21 759:9
**contacts** 66:14 168:28
**contained** 109:15
**contaminate** 247:3 564:19
**contaminated** 247:3 264:5 289:19,23 293:20 363:8 733:3
**contaminates** 416:21
**contaminating** 416:5 564:28 565:8
**contamination** 289:20 313:24,25 358:1 364:5, 12 371:11 418:16 564:25 721:7,9 728:27
**contemplating** 160:26
**content** 410:1
**continue** 20:8 102:23 140:15 141:8 241:3,20 243:2,12,23 251:28 306:20 430:8 465:28 477:15,21,22 554:5 586:25 688:26 701:17 728:23 741:24 744:16 767:22
**continued** 86:16 124:20 132:21 136:4 221:21 232:18 330:17 334:4 509:4 569:12 722:27 771:15
**continues** 148:3 157:23 518:9,13 544:7 545:4 563:14
**continuing** 245:25 372:21 713:23
**continuity** 8:6
**continuous** 436:21 450:14,18
**continuously** 477:20 520:14
**contradict** 28:23
**contradiction** 687:17
**contradicts** 751:20
**contrary** 338:6 499:8 734:22
**contrast** 410:23
**control** 84:28 303:6 306:19 500:1 503:14 600:13,14 663:16
**controlled** 320:23 366:28 367:1 449:24
**convenient** 148:26
**conversation** 13:15 52:8 75:17 157:6 160:5 259:3 336:22 671:27
**conversational** 187:10
**conversationally** 187:3
**conversations** 85:25
**conversely** 577:27 744:21
**conversion** 610:26
**convey** 206:27
**conveyor** 437:15
**convict** 643:17 672:19 700:16 752:28
**convicted** 581:22 583:26 584:3
**conviction** 15:16 34:5 338:14 643:25 653:5 655:6 693:22
**convictions** 644:19
**convinced** 32:19,22 655:12,15 700:22 766:20
**convinces** 659:6
**cooperative** 98:15 507:21
**coordinates** 266:6
**cop** 34:6 153:26 182:28 681:7,12 699:14 705:19 730:24,25 733:10 745:16 746:7
**copper** 369:27
**cops** 26:25 179:26 720:10 729:19
**copy** 314:11 582:25 619:5,8 643:4 650:20
**cord** 696:1,3
**corner** 114:9 115:20 119:7 151:7 344:8 362:20 363:19 457:20 590:15 603:27 606:26 636:23 639:16 675:9

687:24

**coroner's** 249:16

**Corps** 238:27 257:13, 16,17,20,23

**correct** 7:4 15:26 35:13,25 36:21 37:21 38:21 39:15,16 42:2 43:12 45:26 46:14 50:20 52:17 56:5 59:5 61:19 63:23 64:24 65:12,24 66:13 70:2,27 73:23 74:8,9 75:21 84:20,24 86:10,15 87:1, 3,4,10,13,14,19,20,25 88:7,8,9,10,16,19,26,27 89:5,6,8,12,13,16,17, 18,21,28 90:1,15,16 91:1,10,11,26 92:5,6,9, 11,12,15,17,19,20,22, 25,26 93:1,2,8,10,11, 21,27,28 94:2,4,6,7,11, 12,14,20,24,25 95:14, 18,27 96:3,4,6,18,20, 21,22,23,26,27 97:14, 23 98:21 99:3,4,10,14, 15,19,20,23,28 100:1,9, 10,13,14,19 101:8,20 102:1,6,7,9,10 103:8, 13,14,18,19,23,25,26 104:6,7,9,10,12,20,21, 23,24 105:3,4,6,14,15, 17,26 106:11,26 107:7 108:24 110:15,19,20, 23,27 111:5,6,9,10,13 112:14,17,18 113:2,10, 20,21,22 116:15 117:11,12,20,23 118:17,26,28 119:1,3,4, 9,14,28 120:7,8,17,18, 20,21,23 121:2,14,15, 25 122:3,4,7,8,10,17, 18,23,24 123:18,27,28 124:2,3,4,19,22,25,28 125:3,4,7,13,14,18,19, 28 126:1,4,10,11,20 128:4,9,10,16 130:5 131:4,5 139:9,13,14,16, 26 140:2,3,5,17,19,23 141:2,3,21,22 144:23, 24 146:4,5,10,26 147:14,21,22,26 148:11,12,14,15 149:7, 11,12,22 150:10,11,17, 23 151:5,17,18 152:9, 12,14,15 153:7,16,18, 19,21,22,24,25,27,28 155:13,16,17,26 156:22,25,26,28 157:10,21,22,27 158:9, 11,12,17 159:7 161:27 165:18 166:1,14,15,21, 25 167:24,25,27,28 170:2,3,6,7,12,13,17,26 171:5,10,14 179:16 187:15,16 188:12,18 191:3,6,21,25 192:2,3, 6,8,15,18,19,22,25 193:2,5,10,15,28 194:18,21,22,23 195:1 198:22 203:5 208:27 210:13 211:26 212:1,7, 10,14,23,27 213:16,17, 18,23,26 214:1,2,5,7, 15,16,20 215:10,15,16 217:19 219:26 220:3,6, 9,10,15,22,23,25 234:24 235:5,11,16,20, 24,28 236:5,10,14,18, 28 237:1,5 256:15 260:24,25 282:6 288:21 292:9,10 293:15,18,24, 25,28 294:1,2,4,5,10, 11,17,18,23,24 295:3,4, 17 296:10,11,14,15 297:10,11,15 298:19, 20,22,28 299:2,4,6 300:11,12,26,27 301:26 306:1,26 307:3,14,25, 26 308:25 309:2,14,15, 23 310:1,17,20 312:5, 15,28 313:1 315:25 318:11 319:6,7,14,19, 21,25,26 320:2,5,14,15, 18,20 321:11,12,13,14, 20,22 322:1,7,9,10,13, 14,18 323:2,8 324:22 325:4,20,27 326:10,11, 13,14 327:9,10,12,13, 15,27 328:15,16,19,20, 27 329:1,2 339:3 340:24 344:12,16,25,26 345:3 347:28 348:4,8, 12,16,17,21,25,26 351:16,17,23 352:5,13, 14,18,19 353:22,23 354:2,3,5,7,8,13 355:17,18,22,23,25,26 356:6,7,8,9,24 358:5,6 359:27,28 360:3,4,6,14 361:15,16 362:24,25, 26,27 363:26 364:4,14, 22 365:2,6 366:14,15, 19,27 367:21 368:16,17 369:2,13 371:8 372:22 374:10,24 375:10,11, 18,27,28 376:7,8,10,11 380:8,9,11,12 381:18, 19,22,25,26 382:21 383:10,11,14,15,19,23, 24,25,26,28 384:1,3,4 386:11,28 388:15,16 390:12,28 391:20,21 392:21 393:2,20,27 394:2,3,11,23,24,26 395:1,2,21,25 396:27, 28 397:3,4 398:20,21, 24,25 399:10,14,15,25, 26,28 400:1,8,9,11,12, 23 402:2,3,7,8,15,25,26 403:1,26 404:2,20 405:8,18,19 406:3 413:6,7 414:23,24 415:22,26 416:6,12,13, 21,26,27 417:4,6,10,15, 16,18,28 422:20 423:1 427:7,16 429:17,19,20 432:16,27 433:3 441:15 447:23,25 451:27 452:2 454:17 471:18 473:7,9 479:8 480:10 482:17 483:6,22 485:21 487:7, 14,22 488:23 489:4 495:1,22 497:18 498:1 499:18 500:2,26 502:26 504:6 508:11,28 516:19 522:24 527:10,11,14,21 528:4,25 529:1,2,5,6,27 530:1,20 534:13,14,26, 27 535:16,19,20,22,26, 27 536:1,2,8,12,13,17, 20,25,26 537:2,3,6,12, 13 538:11,12,14,15,26, 27 539:2,6,11,12 540:7, 8 541:25,26 543:19,20, 24 544:1 545:1,2,5,6, 11,12,19 546:1,5,8,19, 25,28 547:3,4,23 548:16,18,24 549:2,18, 21 550:2,5,6,14,28 551:22,25,26,28 552:1, 3,4,5,6,7,10,26 553:3,4, 6,7,17,22,23 554:2,8, 18,21,22,25,26 555:3, 11,14,23 556:3,5,10,13, 17,18 557:3 559:3,8,18, 21 560:7 562:6 564:2, 12,14 565:1,2,9,10,18, 26 566:3,19,27,28 567:6,9,17 568:17,20, 21 576:11 578:3 579:7, 8 581:14 585:19,26 587:2,6,23,27 588:16 589:8 590:20 594:15, 22,25,26 595:1,2,4,5 596:16,17,18,21 597:10 599:27,28 600:2,3,6,7, 9,27,28 601:3,4,11 602:23 603:18 605:24, 28 606:28 607:2 614:11 615:17 616:16,23,24, 27,28 617:5 620:22 627:15,17,19,23,25,26, 28 628:9,13,17 629:1, 16,17 630:9,12,18,19, 27 631:3,4,7,14,19 632:7,13,14,19,22,26, 27 633:1,2,22 634:19, 28 635:3,4,10,26,27 636:10 637:3,6 638:18, 24,25 639:19 640:15,28 641:25 646:15 648:19 649:1 659:22 660:22 690:24,27 756:14

**corrected** 111:9 367:14 670:2 690:19

**correction** 585:17

**correctional** 35:27,28 235:13,27

**corrections** 228:28 239:14

**correctly** 120:11 592:11 630:8

**corroborate** 264:20 406:25

**corroborated** 687:23 689:9

**corroborates** 560:27

**corroborating** 21:13 678:25 708:15

**counsel** 5:5,13,21 9:25 56:9 73:5 82:9 130:11 131:27 138:5 218:13 227:5 260:15 305:9 317:22 329:27 336:5, 13,15 338:26 346:17 369:28 390:23 413:12 424:4 429:5,13 431:1,7,

16 447:3,5 515:5,12,15 516:6 531:20,27 537:24 544:19 575:5,14 576:10 577:1 584:10 619:14,23 647:5 728:5 755:13 756:28 770:8 771:5

**counsel's** 130:7 408:9

**counsels'** 577:19

**count** 336:24 348:27 576:18 657:15 658:1,3, 10,16,28 662:19,22 663:22 664:13 667:14, 17 669:5,8 670:26 672:15,19 682:19 683:19,28 686:24,25 687:8 690:14 755:17 767:27

**counter** 129:27 252:18

**counterclockwise** 458:18

**country** 507:6

**counts** 21:20 670:25

**county** 26:13 35:10,15, 24 36:24 41:8 66:4 94:23 95:9 154:16 155:1 217:6,9,12 228:18,21 229:8 238:15,17,21 239:1,9, 13 243:26,28 244:1 257:28 259:10 260:1 375:27 376:7,10 417:4, 7,8,11,14 419:26,28 420:20 422:24 466:15 663:28 666:11 678:3 686:27 704:25 706:24 719:23 730:26

**countywide** 243:27

**couple** 7:22 48:26 109:18 116:25 195:11 259:19 293:8 309:25 313:8 320:28 394:5 459:10 466:24 530:11, 12 690:12 716:18 736:2 744:17

**coupled** 676:3

**courses** 373:7,8 436:22

**court** 5:10,12,15,17,19 6:1,6,11,18,20,26,28 7:2,5,20 8:3,7,10,13,18, 23,25,28 9:2,6,9,28 10:26 11:23 12:2 13:7 16:22,25,27,28 19:13 22:12,17,20 34:12,17, 25,27 38:2,8,23,27 49:8,12 52:15,18 54:2, 18 56:9,12 58:8 63:12, 20 66:24 72:19,22 73:10,12 75:4 78:16 79:19 82:1,9,13,16,18 83:10 85:16 90:20,22, 25 98:12,13,22,24 102:3 107:12,17,22,24 108:2,6,10 109:25,27 110:2,7,9 114:15,23,25 118:11 120:10 121:1,5, 8 129:23 130:10,16 131:8,10,17,22,24 132:2,5,8,10,16,19 138:10,12,18 139:22 141:14,16,26 145:7,9 147:1,3,6 148:5 149:27 150:28 153:9 154:8,21 155:19,27 157:28 158:4 159:13 161:23 165:25 168:10 169:22 171:23 172:16,19,21,25 173:2, 9,11,13,25,27 175:10, 28 176:2,12 181:6,20, 22 182:2,4 184:17,23, 25 185:3,15 187:4,20 193:22 195:5 197:2 198:7,27 199:12,15,17, 23 200:2,4,6 201:22 202:6,12 203:10,26 209:27 211:19 212:18 216:1,3,5,8,12,20,22 218:18 219:18 221:3,5, 8,12 227:10,12,21,24 228:4,6 230:7 234:13 237:8,11,13,15,20,28 238:2 248:27 256:11 260:16 270:3,4,9 291:5, 27 292:2 301:1,7,21,27 302:10,13,15,17,19,23, 27 303:23 304:2,5,9,14, 19 305:2,3,7,10,15 307:16,18,21 310:9 311:6,23 314:16,18,21 317:10,22 323:19,23 325:12 327:18,23 328:1,25 329:7,16,19, 21,24 330:6,8,11,15 336:10,12 339:2,6,9,23, 27 340:1,7,13,22,25 341:5,7,21,25,27 342:2, 5,11,13,15,19,22,25,28 343:1,2,5,8,11,15 346:1,11,15,17,19 350:13 355:1,13 356:4, 14 361:22 362:15 367:11 368:20 377:5 381:4 382:3,24,28 385:27 389:9 390:23,25 392:2,23 393:3,13,22 400:26,28 401:26 406:5 407:14 413:12,23 415:14 417:20,23 418:21,23,25,27 419:3, 11,13,16 421:14 422:12 423:20,23,25,27 424:1, 4,8,20,27 425:2,4,8,12 426:4,21 427:7,9,13,14, 19,26 429:10,12,21 430:3,5,9,19,24 431:4, 18,28 432:15,18,23,26 433:1,4,17,19,23,25 434:3,11,17,21,23,26 435:1,5,7 436:2,5,20 437:6,22 438:7,14 439:18,24 441:24 442:12 443:9,24 444:3, 12,22,24,26 445:7,9,15, 20,28 446:1,6,12,16,18, 23,26 447:2,8,13,19,24, 27 448:1,4,10,15,19,23, 25 454:6,13,15,18,21 456:2,21,23 459:19 460:5,7 461:1 463:23, 25 464:13,18,26 468:21 472:10 479:10,20 481:13 497:1 505:20, 22,26 506:6,16,21,26, 27 507:2,5,9,15,17,20, 28 508:6,13,15,18,23 509:1 515:9,11,20,23, 26 516:2,9,15,20,22 517:2,4,9,13,16,17 518:3,7,11,15,20,24,27 519:3,7,27 520:3,12 521:6,9,12,15,19,24,26 522:1,11,16,19,25 523:1,7,13 524:2,6,12, 27 525:1,7,11,14,18 526:16,19,23 527:27 528:18 529:8,10,16 531:20,22,27 532:3 534:3,6 535:3 536:19 537:21,23 540:10,20 541:14 542:2,5,10,13, 15,18 544:10,19 546:3 547:15,26 548:26 549:24 550:16 552:16, 20,22 555:5,17,19 556:22 557:12 559:28 561:14 562:16,24 563:11,22 564:23 565:4 567:19,23,25 568:10, 23,26,28 569:2 575:11, 13,22 576:3,14,16 577:8,10,21,28 578:5, 11,16,18 579:1,3,6,7,8, 15,23,27 580:3,8,10,12, 18,28 581:3,9,11,16,17, 18,20,28 582:3,7,9,12, 16,18,19,22,25 583:3,5, 11,14,17 584:13,17,19, 22 592:21 596:12,23 599:3,14,23 608:19 609:14 611:19,27 613:8 616:8 617:7,10,13,17, 21,24 618:4,8,10,22,26 619:1,3,7,8,11,16,21 620:6,10 621:23,27 622:2 623:5 626:22 627:6 634:6,21 635:18 636:14 637:13 640:4, 17,20 641:8,18 642:3,5, 7,9,11,27 643:21 644:12 645:20 646:4,8, 16,18,21 647:11,13,18, 20,22,26 648:1,3,5,7,9, 13,15,18,20,23 649:2,4, 7,9,12,14,16,20,21,23, 24,27 650:1,5 652:12, 14,16,18 654:10,12,14, 15 659:16 671:16 672:21 690:2,10,15,17, 19,22,25 691:2,6,11,18 705:16 719:12,13 721:16 722:21 728:11, 13 733:21 734:27 739:28 740:4 742:18 743:3 750:12 752:9 753:5,7,11 754:27 755:1,4,12,15,26 756:1, 3,14,16,23,26,27 757:1, 6,15,18,21,24 764:2 765:12 766:5,9 767:24 769:4,5,7,9,10 770:8, 11,12 771:11

**court's** 8:22 304:26 317:24 343:2 431:23 535:1

**courteously** 766:25

**courthouse** 8:20 654:20

**courtroom** 12:20 13:4 14:17 16:1 174:4 185:10 218:5,7 229:9, 24 240:27 421:5 626:11 732:23 770:6

**courts** 257:3 264:24

**cover** 58:14,15,24 78:1 151:24 157:28 248:8 255:24 347:6 389:25 404:14 405:22 429:27 551:3 708:23 738:23 763:15,21,24

**coverage** 151:19,20,22 152:3 403:23 404:6

**covered** 58:20 155:27 255:27 282:14 283:22 316:24 524:2,3 654:28

**covering** 42:7,10,12,13 44:18,19,23 65:27 66:1

**cower** 287:14

**CPS** 36:2,10,18

**crash** 242:22 246:25 247:7 250:13,28 251:1, 8,27 253:23 254:2,18 287:1 450:21 499:27

**crashed** 688:10

**crazy** 717:20 731:3

**create** 294:7 296:28 297:4 366:25 472:5 474:18,19 485:21 491:23 498:7 589:14 590:10 616:2 622:27 623:21 624:4 635:5 687:26 715:18,19

**created** 29:13 103:28 232:10 288:2 303:16 315:1 328:11,13 359:18 377:21 491:5 589:10 593:19 624:10

**creates** 117:3 297:2 590:22 755:17

**creating** 10:12 328:5 354:11 375:6 455:23 483:25 488:4 590:14 615:16 686:7

**credentials** 500:5

**credibility** 17:2 22:3 655:24 689:22 764:7,8, 11

**credit** 579:22

**crime** 15:8 16:5 21:27 37:12,13 53:5 67:6 114:2 115:4 144:4,13, 16,22,26 148:18,22 150:25 151:4 156:4,5 159:21 165:7 166:14 246:16 249:21 260:9, 26,28 264:2,4,7,8 267:25 271:20 272:9 276:28 284:7 289:19,26 290:6,22 292:9,13,19, 20,22 293:6,8,12,16,20, 24 296:4,10,21,23 303:15,16 313:20,21,23 314:6 324:3 363:8 364:14 388:20 404:15 410:19 415:22,26 416:5,21,25 417:2 418:7 438:13 439:10,11 564:19,25,28 565:8 652:25 657:16,19 658:3,9,10,15 662:15 663:8,15 664:18 666:25 667:14,16,17,21 669:5, 7,8,10,13 670:26 671:2, 5,7,8 679:5 687:13 689:16 721:7,8 728:27

**crimes** 10:25 11:14 36:13 330:3 644:18 648:26 657:11,14,25 658:2,5,16,18 661:12, 13 662:20 664:8 666:9, 14,18 692:1,21 697:28 751:24 754:16

**criminal** 15:3,9 256:24 260:9,11,13,15 292:21 301:9 418:1,4,8 426:27 439:10 481:26,27 652:22,26 657:25 687:1 693:14

**criteria** 240:20

**critical** 23:26 31:10 554:4 702:1 730:9 739:26 740:27 748:20 749:27 750:16

**critically** 714:6

**cross** 78:28 493:6,11 522:26 618:11 637:1

**cross-examination** 3:5 85:17,20 136:5,9, 12,15 185:16,19 209:28 210:3 219:19,22 225:5, 8 234:14,17 291:28 292:4 334:5,9,12,15 343:25 422:13,15 440:1 481:14,17 513:5,8 516:28 540:13 560:4 573:5,10 584:22 585:1 627:7,10 708:13

**cross-examined** 162:8

**crossed** 51:15 64:15 313:28

**crosswalk** 702:26

**crouch** 373:11

**cruiser** 31:18

**crush** 245:27 246:1 247:14,18 252:7 278:28 450:17

**crushed** 722:14

**cryptic** 245:13

**CSI** 266:11 267:2,25 296:23,24 350:24 352:6,21,27 378:1 552:2,28 635:14

**CSR** 5:10 73:10 138:10 227:10 336:10 429:10 515:9 575:11 647:11 728:11 771:11

**Cucamonga** 228:25 236:28

**cuffs** 423:10,11

**curb** 274:6

**curfew** 220:26

**current** 36:20 50:6 55:9 124:16 125:15 237:3 240:28 241:15 414:22 423:8 451:24 452:21,22 638:28

**curriculums** 35:20

**curses** 404:25

**cursing** 404:24

**curvature** 462:17 487:5 493:18

**curved** 486:23 493:14

**custody** 5:19 157:19

**custom** 81:8

**customarily** 730:24

**customary** 352:18 358:20

**cut** 519:8

**cutting** 752:17

**CV** 430:21

**cycle** 98:13

**cylinder** 256:19

**D**

**DA's** 261:11

**daily** 122:15 297:28

**damage** 101:26,28 102:14,21 164:26 165:1,6 246:2 255:4 278:25 367:23 368:7 369:3,6,11 409:13,21, 23 586:17 676:18

**damaged** 102:13 255:2 722:4

**damaging** 247:13

**dancing** 578:26

**danger** 140:2 286:9,26 287:17 392:18 709:11

**dangerous** 79:24 266:9 405:14 644:20 716:10

**dark** 25:10,13,15,27 26:12,18,19 27:3,4 33:7 50:28 68:18 88:26 92:16,19,21 95:6,22,24 96:22 155:23 215:6,14, 15 565:14 576:22 596:1 597:10 681:16 694:14 695:3 704:27 705:1 715:11 719:15,17,21,25 721:3 730:23

**darker** 379:9 673:24 680:13

**darkly** 88:1

**darkness** 46:13 377:27 378:6 379:16 380:1 565:13

**dart** 234:1,6

**dash** 496:4

**data** 13:6 244:14,15,18, 19 245:1,11,13,16 248:18 274:4,5,7,12 450:7,19 476:22 477:6 499:27 500:14 560:17 589:21 590:18 600:18

**date** 2:2 81:26 135:2 200:27,28 201:2,3 218:21,26 224:2 230:9 241:18 249:19 250:12 333:2 421:18 482:5 512:2 539:7,8 572:2 725:2 768:10

**dates** 201:3

**dating** 200:26

**DAVID** 5:3 73:3 138:3 227:3 336:3 429:3 515:3 575:3 647:3 728:3 771:3

**day** 6:27 8:8 18:17 34:3 125:5 131:11 139:2 188:22,23 198:25 218:9 221:12 235:16,23,28 243:5 258:3 329:8,18 422:17 505:20 525:27 569:3,6,9 583:5 646:1 651:15,20 688:28 691:24 694:10 715:10 722:21 735:28 757:2

**daylight** 45:6 397:9 595:22,27

**days** 7:22 243:6 361:15 730:5 736:2

**daytime** 91:21 422:18 597:8 720:18

**de-escalation** 157:12, 17

**dead** 63:5 377:8 505:25 687:6 752:18

**deadly** 21:21 23:2 33:28 79:3,5 80:1 156:25 158:7,10,13 159:5 297:20,21,27,28 298:4,5,17,24 300:7,11 301:13 303:9,24 304:9, 25 305:19,23,27 306:3, 25 307:2,12,24,28 308:4,10 309:2,10,14, 21,28 310:26 311:3,20 312:5,10,14,17,24,27 576:5,15,19,26 577:6,7, 12,17 578:1,8,9,20 579:9,10 580:4,10,25 581:1,8,24 639:23 640:14 643:8,9,18,23, 28 644:11,20,21,25,27 645:4,6,25 646:2,9,14 648:27 657:27 658:1, 11,16 664:14,19 665:2 666:3,6,16 667:9,15,18, 22 668:4,24,26 669:3,9, 10 671:1,3,5,22 682:20, 22 683:3,7,16,25 684:6, 11 686:1 689:11 692:6, 8,23,24 693:1,2,10 697:24 698:5 699:20, 21,22 700:2,6,11 701:15,19,24 702:3 706:21 714:7 716:8,14 730:3,12 731:11,19,21, 22,23 739:14,21,25 741:1 742:3 746:22 747:14,18,23 748:27 757:27 758:1

**deal** 235:14 255:18 256:9 289:23 525:4 618:13 757:8

**dealing** 68:9 165:14 256:18 563:13 731:1

**deals** 292:25 622:16

**dealt** 442:21

**dear** 718:12

**death** 247:23 249:18 292:20 298:27 303:12, 17,18 310:1 365:25 416:2 577:16 666:5 668:26 700:4 730:4 731:13 742:5,13 754:7

**debris** 70:22 77:18 161:15,20 162:1,3 253:16 254:5,8,10,13 279:18 280:1 612:27

**deceased** 249:14

**decedents** 242:24

**decelerate** 740:13

**decelerating** 601:10

**deceleration** 505:2,4, 5,6 602:12

**December** 2:3 5:1 9:18 73:1 109:9 132:21 135:3 138:1 221:21 224:3 227:1 330:17 333:3 336:1 429:1 509:4 512:3 515:1 569:12 572:3 575:1 647:1 722:27 725:3 728:1 771:1,15

**decent** 215:18

**decide** 15:27 16:26 17:8 18:10 53:4 78:23 299:22 426:24 507:12 517:6 519:14 580:23 642:17 645:25 646:2 650:21,22 654:13 655:8 656:2 657:5 658:27 659:12,23 660:3,10,28 662:2 663:22 679:15 688:22 692:12,13 704:1 728:17 743:21 755:7 756:7 763:6 764:13,21 766:16 768:22 769:26 770:2,4

**decided** 17:23 205:16, 22 339:16 426:2 651:24 654:24 656:18 671:28 692:10

**decides** 338:8

**deciding** 11:24 15:19 17:3 424:16 648:6,14 653:8 655:25 662:4 665:26 666:5 667:2 668:22 669:3 670:20 687:13 764:9

**deciphers** 245:13

**decision** 12:20 14:1 32:13 33:26 300:15 506:7 526:4 569:5 620:2 644:13 650:27 661:10 692:1,11,15 729:22,23 750:15 753:3 764:10 768:1,12

**decisions** 79:11 618:14 695:26

**declining** 204:24

**deeper** 491:2,5,10,12, 23 498:19 551:5

**deescalate** 78:27

**defacing** 53:10

**defend** 258:14 303:11 634:14

**defendant** 5:5,19 13:9 14:4 15:2,4,5,9,11,22 16:4 19:18,24,28 20:7 32:18,22,24 63:19 66:27 67:14 73:5 76:20 78:5 84:6 138:5 159:27 169:14,15 176:11 179:3 202:5 218:17 227:5 230:6 303:14,18 336:5, 25,28 337:14 421:13, 26,27 422:7,8,10 426:7 427:25 429:5 451:26 453:1 515:5,12 526:28 575:5,24 583:26 584:1, 3,6 619:23 643:6 647:5 651:2 652:23,24,26,28 653:11 655:11,15,17 657:23 658:13,18 661:4,8,12,14,15,17,18, 22 662:2,5,6,7,15,16, 19,22,24,26 663:1,21 664:3,4,13,17,19,23,24, 28 665:3,6,21,22,26 666:18 667:8,16,20,22, 25,26 668:3,17,18,22 669:8,12,14,19,22,28 670:15,16,20,28 671:4, 8,25 672:8,14,16,18,23 674:7 675:10,13 676:25 677:3,4,8,9,11,13,16, 18,20,22,27,28 678:23 679:12 680:6,8,9,24,28 682:12,15,17,24 683:2, 6,8,9,14,16,21,25 684:2,14,20,23,25 685:3,9,14,17,27 686:3, 4,19,21 687:2,3,8,16, 26,27 689:3,7,10 693:14,15 694:5 698:24,25,27,28 700:22,26 701:19,22,23 728:5 743:19 747:22,26 756:6 758:4,22 763:8 765:27 766:4 771:5

**defendant's** 6:14 98:4, 5 334:10 513:3 573:3

662:8 665:24 668:20 670:18 674:26 675:3

**defense** 5:13 63:16 299:1 408:9 429:16 435:11 446:14 449:1 453:5 522:23 532:2 542:23 584:25 617:15 654:6 759:16 762:15,19 763:12,24 764:7 765:27

**defense's** 421:10 448:9 524:5

**defiant** 721:1

**define** 486:25 589:25

**defined** 651:15,19 685:25

**definite** 663:7

**definition** 259:22 310:7 461:25 478:5 684:17 694:27 697:25 699:20 700:10 702:5 742:3 753:8 758:26

**definitions** 651:18 702:6

**definitive** 130:23

**degree** 96:16,19 449:23 450:27 484:21 486:26 540:1 702:17

**degrees** 435:24 449:19 484:21 486:26,27,28

**delay** 13:8 362:8,10 448:5 474:9

**delays** 408:12

**delegate** 69:10

**delegated** 538:5

**delete** 649:25

**deleting** 576:25 577:2

**deliberate** 10:7 412:25 766:15 767:15 770:2

**deliberately** 18:10 657:5

**deliberating** 12:13 642:18 767:17 768:16, 21,23,25 769:12 771:13

**deliberation** 672:7,12 673:14,23 679:2 688:19 689:27 698:11 769:25

**deliberations** 12:17 13:5,24 14:19 19:2 22:8 652:8,13 661:9 689:16 767:6,8,10,13,22 770:7

**deliver** 13:7 306:14 373:2

**delivered** 761:3

**demand** 199:8 205:28 211:17

**demanded** 679:23

**demanding** 19:28 20:9 211:13,15

**demeanor** 53:17 67:25 68:9 179:8 198:3 203:17 426:6 674:26,28 675:3 676:1

**demographically** 467:8

**Demone** 267:18

**demonstrate** 129:12 358:24,25 442:1 468:8 576:8 676:4

**demonstration** 361:6 631:10

**demonstrative** 454:16,20 485:13 618:25 619:13 621:26

**denied** 204:23 426:28

**dense** 410:2

**dent** 722:5

**department** 5:3 35:15, 24,26 40:6 66:4,20 73:3 80:15 81:2 94:24 95:10 138:3 209:6 217:7,9 227:3 228:19,21 238:15,17,18,27 239:1, 4,22 243:3 257:28 258:26 259:10,20,24 261:4 288:7 296:26 298:2,7,8 301:10 310:2 336:3 366:2 375:27 376:7,10 417:15 429:3 466:3,15 483:26 493:22 495:23 515:3 538:17 539:14 575:3 589:24 590:26 647:3 664:1 666:11 677:9 678:4 680:15 686:27 706:24 719:23,27 728:3 730:22 752:1,2 764:24 771:3

**department-approved** 42:10 89:22 261:23

**department-authored** 42:9

**department-issued** 41:12,13 72:1 73:28 530:5

**departments** 240:6

**depend** 311:23 537:7

**depending** 78:21 158:16 161:2 254:25 255:12 263:13 266:8 267:23 309:24 312:18 316:4 320:1,3,4,13 358:27 366:17 392:15 472:14 498:8 540:1 543:25 651:21

**depends** 235:21,25 241:12 250:26 255:8 263:4 278:4,10 409:23 434:4 538:1 586:14 696:3

**depict** 40:16 42:3 43:3, 13 44:10,22 45:1,8,27 46:25 47:15 59:10 60:15 74:1 81:16 182:9 183:2 271:14,23 274:19 280:9 281:25

**depicted** 38:12 42:24 43:6,27 44:13 45:20 47:10 58:27 59:16 60:11,25 73:25 217:16 229:14 272:6 274:16,24 277:6,8 280:8,12 421:2 455:21 624:27 636:8

**depicting** 457:20 465:19

**depicts** 272:2

**deploy** 560:14

**deployed** 274:6 442:1 558:19

**deploying** 558:18

**depositions** 256:12 257:1

**depress** 676:10

**depresses** 676:13

**depression** 498:11 673:28

**depth** 250:20 279:7 285:7 760:10

**deputies** 56:6 69:12,24 84:10 93:16 115:28 139:6 143:22 229:9 231:22,24 233:3,5,15 234:9,11 235:14 236:7 240:5 258:22 259:1 268:1,8 283:17 289:14 290:8 313:12,13 325:1 355:21 363:10 377:21 383:20 392:14 404:16 405:5,20,22 406:1 410:26 414:25 422:3 535:19 564:27 565:11 676:20,22 682:5,9 729:4 765:8

**deputies'** 677:10

**deputized** 93:17

**deputy** 5:8 8:22 11:16 19:16 20:15,22,25 21:7, 9,14,16 23:1,2,19 26:20,23 28:21,23 29:3 30:15,17 31:3,8,12 32:8 33:14 34:25 35:10,14, 18 36:2,9 37:6 49:12 66:16 67:21 69:21 73:8, 13 82:18,23 84:13 85:7, 22,24 86:19 90:4,18,27 98:26 105:9 108:15 114:20 129:23 130:7,11 131:19 132:2,6 138:8, 12,27 139:3 154:8 155:14 169:28 182:4,19 183:3,9,12,18,23 184:14,20 185:12 216:20 217:6 218:21 219:14,24 221:8 227:8 228:18,24 230:10 231:24 234:19,21 236:13,14,16 237:15 240:15 246:24 260:27, 28 267:18 268:7,8 280:16,24 281:19 282:11,22,23 283:11 285:16 286:23 289:4, 12,13 290:3,10,16 291:18,24 292:6 295:1,

5,8,10,18,24,28 299:14, 17,22 301:16,22 302:4, 18,19 303:21 304:21 310:16,20 313:14 314:2,9 316:10,11,14, 17 317:15 321:2,9 322:8,11,24,27 323:1 325:28 326:7,9,10,12 327:2,4,5,7,21,26 328:3,7,22,28 336:8,26, 27 337:1,9 338:9,12 340:20 341:13 344:4,7, 11,14,24,28 345:11,15, 24 346:5,22,23 347:12, 20 348:3,25 349:15,20 350:1,21,23 351:16 353:2,8,18,26 354:7,10, 11,14,17,18,20,24 355:5,11,28 356:6,8,10, 20,23 357:1,6,12,15 360:6,18 361:1 365:1,6, 8 369:24 370:2,3,25 371:26 372:12 373:24 374:19 375:13 376:6,21 377:10 378:9,15,18 380:10,13,26 381:1,10, 16 382:12 383:17,22 386:26 388:15 391:17, 20,22,24 392:22 393:28 395:8 396:20 397:2,26, 27 398:14 400:16,20,22 401:5,12,15,20,23 402:2,5,14,23,28 403:7, 22 404:12,13,14,18,27 405:4,7,10,12,13 406:2, 18,26 407:4 408:18 413:10 416:26 417:17, 28 418:10 419:11,26 421:16,25 422:2,6,23 425:17,20,23 426:9,11, 17,19 427:8 429:8,18 432:4,6,8 441:10 444:1 445:4,25 446:10,12 447:12,21 456:17 459:17,23,24 460:2 467:2 477:26 485:9,16 496:15 508:21 515:7,16 516:28 517:21,24,27 518:18 520:14 521:12 522:1,24 523:15,17,20, 22,25 524:15 525:4,5 526:14,17,19 527:5,8, 12,16 528:17,21 529:12,28 532:5 537:14,27 542:5,10,12, 28 544:5,26 545:9,14, 15,18 546:27 548:12, 15,21 550:1,11,17,19, 21 551:10,24 552:15, 16,18,19 553:10 554:6, 14,20 555:1,2,3,13 556:28 557:18 560:27 561:12,24 562:13 563:4,20,28 565:18,25 566:2,18 567:5,14,15 568:8,10,11,14 575:9 576:21 597:15 615:7,23 627:12 632:25 633:3,5, 9,14,17,21 634:13,16, 24 635:10,25 637:10, 23,27 638:6,16,22 640:6,12 641:1,21 643:14 647:9 657:24 658:13,19 662:7 663:27 664:4 671:21,22 672:2, 4,6,11,26 674:5,28 675:13,14,23 676:16, 22,24,26 677:1,4,6,11, 12,14,17,18,23,28 678:2,3,5,19,26 679:6, 14,19,23,24 680:3,4,9, 12,14 681:7,13,17,22, 26,28 682:2,6,12,13,16, 24 684:4,12,15 685:12, 17,19,21 686:3,13,26 687:4,8,15,20,23 688:4, 13 689:5,7,11 692:6,8 696:19 703:13 704:8,9, 11,16,18,19,20 706:12, 22 707:2,20,27 708:6,9, 17,20,24 709:16,19 710:5,11,25 711:17,20, 22 712:8,20 713:3,10, 18 714:5 715:5,13,23, 27 717:13 718:10,14,25 719:16 722:5 728:9 729:25 730:10,20 733:1,17 735:1,2,4,12, 17,21 736:5 737:7,17, 18 738:3,4,6,19 740:15 741:12,27 742:28 745:25 749:17 750:17, 20,26 753:18,26 754:8, 11 758:6 759:4,15,17, 18,27 760:12,23 761:4, 20 762:9 763:4,8,10,12, 14 764:3,9,18 765:2,5 766:1,6 771:9

**deputy-involved** 260:12

**describe** 17:16 40:3 41:6 42:7 45:12 46:5,20 49:22 53:20 54:11 55:10,11 57:1,13 58:10 60:20 62:12 63:1,28 67:11,25 68:17 70:18 75:27 78:13 80:26 83:1, 7,18 91:17 105:18 142:6 163:15 164:15 174:13 178:8 179:8 186:2 187:18 197:18 198:14 201:24 202:25 203:17 204:1 205:11,27 215:17 218:11 229:26 230:18 231:1 232:27 240:13,14 241:6,23,28 250:3 253:2 255:25 257:10 258:7 262:4,6 269:1 272:16 275:15 299:10 326:18,23 350:16 368:25 369:8 387:22 397:8 411:5,10 455:6 462:6 472:28 480:28 589:14 656:11 672:27,28 681:17 689:20

**describes** 32:9 759:5

**describing** 49:17 270:14 366:11 450:2 483:1 586:28 611:28 612:13 686:13

**description** 4:2 71:17 91:13 137:2 156:14 194:26 226:2 335:2 514:2 574:2 636:19 637:2,3 678:12 709:7 727:2 761:28

**desert** 217:27 220:4,5, 8,12,22,24 229:1,2 240:7 244:2,4 265:28 405:19,23 719:15

**design** 589:12 692:26

**designated** 10:1 261:10

**designating** 489:18

**designation** 261:6 589:4

**designed** 244:17 245:27,28 262:7,8,10 274:3 279:12,13,18,21 384:25 560:16 578:10 629:22 630:2 692:25

**desire** 659:4

**desk** 130:7 236:24

**desperation** 206:3

**destroyed** 14:28 652:21 696:7

**destroying** 53:10

**destroys** 736:28 737:1

**detail** 219:11 330:3 525:11 594:3

**details** 91:20 109:15 169:3

**detain** 157:19 303:7,15 666:22 679:2,26

**detained** 303:19 666:24 667:4 679:4

**detainee** 235:3,15,24

**detainees** 220:11,25 235:8,19

**detaining** 664:10 666:21 667:11

**detainment** 67:13

**detect** 600:14,16,21 717:12

**detective** 10:1 21:11, 16 90:19 237:17,26,28 238:14 240:3 266:17 267:17 270:10 295:17, 26,28 296:3,7 297:3 305:4 315:2 326:7 336:14 340:19 343:13, 27 345:10 350:24 369:24 377:10 383:1,3, 7,17 385:4 388:18 392:24 415:20 416:24 418:23 429:14 444:3,17 508:11 515:12 523:26 525:1 542:14,15,28 543:3 544:22 549:26 550:1 551:28 553:1,2, 10,13,20 563:28 575:15 620:5,6,21 631:20 635:13,24 637:22 673:17 687:19 706:17 708:13 714:13 715:28 717:28 718:5 730:5 731:8 732:11,12,18,25 735:3 736:12,13,26

750:1 751:9,12,26 755:14 760:4,12 764:16,24

**detectives** 91:7 102:28 108:27,28 170:5,23 171:3,13 172:1,12 195:28 196:4,27 266:5,7,23 267:19 280:23 296:21 361:12 538:6 624:28 749:10

**detention** 217:28 220:2,4,5,8,12,22,25 229:1,2 234:23 235:8 302:3 664:11 667:1,2

**deter** 37:13

**determinant** 695:21

**determination** 22:28 122:10,26 264:15 287:7,10 307:4,21 385:28 463:28 464:1 477:8 479:7 551:1 645:24 752:17

**determinations** 459:16 462:12 553:15

**determine** 53:5 102:13 118:1,3 122:9 148:21 242:12 244:11 245:10 246:19 247:15,17,23 248:7 249:17 250:26 251:1,3,7,21 252:1 253:10 255:22 256:8 259:21 262:23 267:27 268:22 272:28 278:28 279:6,8 285:9 294:9 310:23 312:19 352:1 353:2 366:18 382:16 388:24 402:1 406:25 409:10,12 417:2 437:25 439:2 440:10 442:22,26 443:1 444:18 459:23,24 460:10 462:10 463:14 468:13 475:15 476:5 479:22 486:21 538:20 539:1 557:24 558:1 559:1 566:14 592:9 596:4 614:27 621:16 632:7 633:9 640:12 644:10 658:26 700:17 749:27 750:19 763:5

**determined** 246:17 305:5,27 316:23 324:8 350:2,21,22,23,24 397:5 398:18,20,22 539:13 540:4 551:23 633:6 688:16 694:9,28

**determines** 78:22

**determining** 122:20 249:6 253:5 259:18 264:13 269:3 270:25 280:5 441:13 632:22 634:9 688:27

**detriment** 392:15

**developed** 152:20 593:7

**deviate** 320:9 462:16

**deviated** 273:11

**deviation** 251:25,26 272:20,21 278:10 291:15 319:16,17 365:20 386:7 688:10

**device** 13:4,5,6 80:21,26 81:4,11 244:26 248:12,13 497:24 558:19,20

**devices** 244:11,24 450:25 451:2,7 500:5

**diagram** 4:13 103:28 314:28 315:1 329:28 330:4 466:11 588:3 589:4,10,14

**diagrams** 589:12

**dialed** 53:1

**dialogue** 520:16 531:14

**dictionary** 12:24 651:27 767:9

**die** 256:21 693:27 694:2 699:26 700:1

**Diego** 257:28

**differed** 637:9

**difference** 10:11 82:6 150:16 164:9,12,14 181:26 242:19 253:14 255:9 495:15 580:6 682:23 765:21

**differences** 18:6 657:1

**differential** 625:15

**differently** 18:9 299:15 365:26 579:16 581:13,21 657:4

**difficult** 91:17 92:28 117:28 118:4 169:3 243:15 365:22 373:12,20 558:1 673:20 688:6

**difficulties** 414:19

**difficulty** 491:13

**dig** 339:5

**digest** 595:22

**Diggs** 5:14,16 575:8 647:8 691:16 728:8 771:8

**digit** 261:7

**digital** 437:8 438:25 451:8 586:22 608:25

**digits** 261:5

**dim** 11:18 40:21 57:3

**dimensions** 493:26 495:6 588:6 590:24

**dinner** 681:10

**dinners** 358:14

**dip** 253:2

**dipped** 251:27

**dips** 251:22

**dire** 433:27 434:3 439:19

**direct** 3:5 35:5 136:8,12,14 138:25 173:19 200:12 211:22 217:1 225:5,7 228:13 238:9 260:20 301:17 334:8,12,15 404:9,10 419:23 435:14 449:4 513:5,7 522:24 527:3 542:26 573:10 610:10 613:28 620:17 654:17,18,21 655:3 662:26 663:2,4,6,7,13,18 672:16,24 674:8,10,22 675:15 684:1 698:26 700:15 743:18 753:11

**directing** 160:7

**direction** 27:27 50:14 55:5 59:3 60:14 64:19 70:16,23,24 83:4 88:4,13 90:3 97:25 100:6,7 117:6,16,21,22,23 118:21 123:6 128:23 142:10 159:9 161:2 166:24 167:11,13 169:16 170:28 184:1,4 253:25 254:3 273:7 284:22 291:17 307:7 308:25 309:11 320:18 352:25 374:6,8 385:16 386:11 388:15,25 391:11 394:2 397:14,17,20,24 399:2,3 400:5,16,19,23 401:5,6,21 402:2,14 403:4,6,15 425:19 443:20 458:24 459:5 462:14 468:19 487:13 527:25 528:5,8 529:21,25 544:27,28 552:15 553:11 554:7 555:10,23 557:9 575:26 588:8 634:19,27 674:5 681:19,20 685:13 688:12,13 689:9 708:11,21 735:23,24 749:21

**directional** 465:8

**directionality** 294:9 397:2 459:23 635:7

**directions** 410:13

**directly** 17:19 28:23 65:21 71:4 99:2,6 117:22 142:13 146:26 325:16 360:24 370:1,3 403:13 465:28 488:19 563:16 638:28 639:1,19 654:23 656:14 664:20,26 667:23,28 669:15,24 683:4,11,26 684:16 685:5 688:8

**directs** 753:14

**dirt** 57:19 105:5 140:22 142:10 255:11 275:1,10,24 281:10 291:10 294:7,16,17 359:24 384:18 426:15 453:28 470:14,16 478:19 490:14,15 491:2,28 492:2,7,10,15 498:27 499:2 520:4 527:20,25 528:4 529:26 556:8 562:21 566:25,27

634:26,27 673:24,25 708:4,10,19 712:12

**disability** 14:5 651:3

**disagree** 348:5 372:26 374:25,28 375:2 621:11 651:6 659:1 766:21

**disagreed** 660:15

**disagreeing** 759:11

**disagreement** 652:11

**disappear** 681:5

**disappeared** 192:13

**disapprove** 644:5

**disc** 81:19

**discharge** 763:11

**discharged** 117:7 675:16,17 689:5

**discharges** 765:6

**disciplines** 437:11

**disclose** 131:25

**disclosing** 455:1

**discourage** 14:19

**discovered** 297:1 360:8 735:7

**discrepancies** 516:7

**discrepancy** 495:19 765:9

**discretion** 62:6 79:2 95:25

**discuss** 11:11 12:14,18 13:14 14:14 16:8 143:12 336:15,20 427:11 517:10 564:15 582:3 611:11 619:27 652:17 653:19 661:9 767:4,5

**discussed** 13:23 19:1 109:27 148:27 292:9 303:26 305:3 344:2 347:15 357:4 359:11 364:5 365:11 418:5 431:17 466:21 501:16 551:2 561:17 563:18 566:11 582:20 583:9 628:12 643:22 687:7 766:17

**discussing** 106:5,8 321:16 336:16 338:17 340:1 358:4 515:14 516:10 566:1 613:20

**discussion** 535:1 566:7 567:3 735:9 739:11 742:1 766:25

**discussions** 766:12

**dismissed** 425:16

**disparity** 624:26

**dispatch** 55:17,22 56:1 69:20 70:4,25 678:7

**dispatched** 47:13,20 48:7 232:19

**dispatcher** 47:24 55:19 69:6 74:20 154:24

**dispatchers** 69:9

**dispel** 406:26

**dispense** 121:2 521:3, 20,21

**displaced** 151:3

**displacement** 274:27 275:24 673:25

**display** 41:18 275:9 734:21

**displayed** 278:19

**displays** 339:21

**disposed** 662:15

**dispositive** 519:1,3

**disprove** 17:11 18:2 655:4 656:5,25

**dispute** 31:22 33:19 165:20 447:9 577:12 631:5 654:8 759:10 765:13

**disputed** 443:21

**disregard** 16:20,22 141:17 463:26 654:3,9 659:3 660:4 661:1,28

**disrupt** 156:7 415:22

**disrupted** 277:14

**disruption** 313:21 384:19 388:22 718:8

**disruptive** 384:20

**disrupts** 732:8,9

**distance** 29:7 31:19 57:14,15,22 64:11 77:28 79:28 88:11 99:7, 10 118:14,22 124:20 129:13,14 130:10,17, 22,24 139:12 167:17,20 169:12,13 215:24 247:23 252:13 277:1 281:23,28 282:3,4 284:6,13,16,27 285:13 309:17 311:10 315:6,12 316:24,26 317:16 318:8 323:26,28 364:4 366:13 388:27 389:24 405:23 411:26 413:11 414:10, 13,14 432:11 438:26 442:24 460:21 464:4 465:23,24 475:15,27 480:4,6,7,14,19 485:22 492:12 494:17,18 501:25,28 504:3,18,21 558:3 559:16 587:25 588:8,11 590:10,13 591:14,22 592:6 593:27 601:22 605:22 607:7, 12,25,27 615:4,6,21 621:8 622:5,17 623:12, 15,19 624:2,3,4 625:2, 5,6,18 626:10,15,16,26 627:27 628:1,2,11,13 686:11,12 706:19 714:5 739:10,12,26 740:19,27 742:8 761:18,22

**distances** 29:14 130:23 167:15 296:17 453:22 458:7 460:23,26 480:9,22 483:15 589:26 600:24 603:24 615:3,9, 12,13,17 622:28 687:10 740:14 761:4

**distinct** 394:7,13,15 518:2,16,17 520:27 568:18 701:10

**distinction** 498:20 658:15

**distinctive** 209:19 351:12 353:10

**distinguish** 498:16 581:7 594:5 643:9 644:16,22,23

**distinguished** 577:21 732:25

**distortion** 486:18

**distract** 14:21 213:2

**distracted** 192:26 197:17 199:2 393:18

**distress** 519:6

**distribute** 81:27

**District** 5:8 73:8 82:4 138:8 181:24 227:8 336:8 429:8 515:7 553:26 575:9 647:9 728:9 771:9

**disturb** 411:1

**disturbance** 47:20 48:16 51:24

**disturbed** 247:9 267:5

**dive** 140:21 702:8

**Dives** 251:13

**divide** 388:28 389:7 504:21

**divided** 389:17 390:1 411:19 623:14

**diving** 251:2

**division** 91:7 239:23 259:12,25,27 265:6 389:4,14

**divot** 254:14

**divots** 254:15

**divulge** 517:19

**document** 148:23 314:3,5 346:14 465:27

**documentary** 689:17

**documentation** 250:16

**documented** 250:1 267:4

**documents** 21:28 552:2

**DOL** 482:5

**Domain** 297:23

**domestic** 293:3,7

**door** 24:3 40:14,15 45:14 49:24 66:18 68:22 70:19 74:24 77:4, 7 94:22 97:27 112:5 179:4 204:3,8 205:20 207:9,10 213:8,17,20 231:4 269:6 305:8 386:20 418:12 469:10 474:25 475:7 491:18,21 501:10 679:22 694:15 716:19 719:22

**doorknobs** 190:21

**doors** 40:25 49:4 68:20 177:28 178:4,5 185:26 190:26 205:4 207:12,14 213:21 231:20 233:12 675:4,5

**doorway** 231:3

**dorm** 231:21

**dot** 38:24 488:12 604:25,28 605:20,23 614:27

**dots** 461:26 590:17

**double** 367:13 425:6, 10 427:16 433:8 466:22 649:21,25 697:8

**doubling** 285:26

**doubt** 15:11,13,15,17, 18,20,23 31:2 32:20 648:24 652:28 653:2,4, 6,7,9,12 655:14 661:7, 25 662:21 666:13 692:5,21 693:12,16,19, 20,21,23,24 694:5,27 695:27,28 696:12 697:10,16,20,26 698:12 715:18,19 717:9 742:11,12 748:15 749:1 751:16,24 752:14 753:8,16

**doubts** 696:1

**Douglas** 720:26

**draft** 619:11

**drafted** 645:14 755:21

**drag** 275:7 279:9

**dragging** 478:19

**dramatic** 764:18

**dramatically** 554:1 560:18

**draw** 32:25 311:22 351:3 394:9 395:24 588:2 655:18 681:27 700:27 743:5

**drawing** 176:22 201:16 287:24 316:18 351:4,12 394:8 395:20 396:21, 22,26 398:4

**drawn** 111:2 329:28 330:4

**draws** 517:22 563:14

**dress** 218:14 434:27 703:23,24

**dressed** 26:18 27:3 65:22

**drew** 108:19,23 109:1, 4,5 110:21,22,25,28 111:4 150:5 163:5,10, 15,16 316:15,19,22,24, 27 317:12,16,18 349:6 370:27 372:8,13 394:11 395:16

**drill** 257:21

**drive** 20:11 51:6 147:21,28 177:3 188:7, 9,10 192:8 207:17 213:24 244:16 245:5 256:8 279:16,24 280:2 458:16 470:2 508:1 536:10,11,24 673:27 741:19

**driven** 89:26 369:4

**driver** 49:24 256:24 306:11,16,17 392:17 412:9 458:24 459:4 463:18,19 469:13,15 470:6,23 473:4 477:9, 10,12,13 487:22 488:4, 7 602:2,8,13 605:16 611:6 612:6 614:1 625:13

**driver's** 39:11,20 40:14 45:11 49:4 64:3,28 68:3,5,14,22 70:12 71:7 74:24 77:3,7 100:27 124:12 269:6,7,9 277:21 327:8 328:22 403:15 410:27 414:16, 21 430:1 487:5 625:6,8, 12,18 628:9

**drivers** 246:27

**drives** 685:14,16

**driveway** 19:21,24,25 20:7,12,25,28 24:23,24 25:12,21,24,25,27 26:2, 12,19 27:2 33:7,21 50:10,18,27 51:19 52:26,27 55:12 56:17, 19,21,27 57:2,13,14,16, 18,20,23,25,26 58:2,22, 23 59:2,10,20,21 60:7, 16 61:7,18 62:17,18,21, 23 63:12 64:9,10,13,14, 22 66:27 67:4,26 71:25 76:14,28 77:28 86:21 88:23,26 89:27 93:10, 12 95:6,14 96:6,9 99:3, 6,12,19,22 100:3 101:9, 11,12 102:23 146:12 158:25,26,28 159:3 160:13 167:6 170:12 171:1,9 177:3 180:2,3, 5,9 184:10 186:10,13 188:25,27 189:1,7 190:5,8,25 192:8 202:18,22 206:17 207:17 213:24 214:11 215:4,10 271:2 272:11, 20 273:15 274:28 280:5,10 281:4,7 283:7 289:18 291:9,18 315:6, 13,23,25 316:2,3 317:2 323:4,7 338:21 370:23 371:7 375:20 376:27 377:1 379:22,23,24 397:3,10,17 398:15 401:6,21 403:12 408:27 527:18 529:5,14 541:2, 7,15 550:12 560:23 561:12,26,27 565:9 634:18,25 636:1,7,20, 24 671:22 675:9 678:10 686:3 687:2,25 688:9 689:10 704:21 705:4 708:22 710:9 730:21 731:3 735:6 760:22 763:15

**driving** 50:5 88:23 99:23 147:24 171:3 180:6 189:16 198:21 206:17 209:24 213:18 237:4 279:22 558:8 576:3 595:19 685:23

**drone** 249:4

**drop** 72:12,15 74:11,14 360:21,24 530:18 534:18 568:17,20 707:23,25 713:10,13,19

**dropped** 27:24 72:14, 15,17 73:21 74:2 280:19 285:22 346:27, 28 360:19 376:21 402:6 403:9 407:12,19 518:26 520:28 530:17 534:13, 26 541:17 555:27,28 556:7 561:2 562:9 625:14 688:16,17 707:28 710:28 711:21 712:1 713:24 722:8 762:12,20

**dropping** 371:17 496:26 562:5 711:10 713:18

**drops** 348:6 372:2 442:23 517:23 518:18 556:8 654:28 735:18 745:27

**drove** 38:17 40:17 45:9, 23 46:26 49:2 50:18 86:21 89:11 90:13 99:22,24 100:2 170:24 179:1,25 214:15 575:25 676:16 687:16 715:23 720:2 750:27

**DRS** 261:12

**dry** 253:10 279:15

**dual** 259:16 260:7 418:2 435:22 449:22

**Duckett** 5:7,14 22:24 73:7 138:7 227:7 336:7 429:7 575:7 647:7 691:15 728:7 771:7

**due** 76:1 116:6 231:16 233:10 234:11 236:19 363:6 364:12 370:11 714:22

**DUI** 244:5

**duly** 35:3 138:23 173:17 200:10 216:27 228:11 238:7 343:23 419:21 435:12 449:2 527:1 542:24 584:26 620:15

**duplex-style** 142:9

**duplicate** 378:23 637:21

**duplicated** 466:24 592:15,17

**duplicative** 643:25

**duration** 465:4 503:21 593:27 614:14 622:8,16 623:11

**dust** 31:5 105:5

**duties** 10:22 21:26 37:6 122:15 303:1 336:27 337:19,28 339:15 531:28 584:3 648:25 664:1,6,7,10 665:4,8 666:8,14,21 677:24 678:1,6 680:10 682:14, 17 683:17,23 686:22 687:5 689:8,12

**duty** 19:17 23:13 37:2, 14 41:28 66:28 67:4 80:22 337:27 338:18 405:22 416:11 420:21 451:2 679:25 691:24 737:15 765:6 766:14

**dwelling** 142:12 145:16 398:5 604:10

**dynamic** 734:13

**dynamics** 451:5 453:19 591:4,8

## E

**E-D-W-A-R-D** 237:26

**E-F-F-E-C-T-S** 496:9

**e-mail** 12:10 576:10 690:15

**eagle** 747:7

**earlier** 76:23 88:22 92:14 93:5 94:26 107:1 167:1 263:21 275:2 276:2 277:10 286:17 287:8 292:19 317:27 319:6 353:19 373:12 380:23 391:3 411:18 461:15 485:26 492:19 517:10 536:4 543:3 549:27 551:4 561:18 610:24 659:19 677:7 681:23 701:27 768:17

**early** 188:21 221:15 257:26 418:5 507:28 508:24

**earth** 738:8

**easier** 45:16 353:7 359:24 365:17 559:1 603:3 639:10

**easily** 77:27 79:25 236:23 712:25 741:15, 26

**east** 49:3 50:8,11,15, 16,17 76:14 99:8,9,10 112:25 384:14 388:25 393:28 397:3,5,6,13,14, 16 398:15 400:21 401:4,22 403:18 456:18 527:17 528:4 529:13,25 555:9,14,22 557:16 560:23 561:25 563:15 634:17,25 636:25 688:1 708:10 712:11 735:6,14 736:20 737:25,26 738:16,19

**east-west** 401:5

**eastbound** 554:7 555:9 636:21

**easterly** 320:18 380:1

**eastward** 50:18 380:3 554:24

**eastwardly** 152:23 319:16 385:16

**easy** 751:12 753:3

**eat** 358:14

**ECM** 600:20

**edge** 61:5 76:16 130:10,11 369:18 413:11,12 414:7 561:25 628:19

**edges** 410:13,14 565:8

**edit** 522:16

**editing** 522:20

**edits** 649:27

**EDR** 249:23 274:1,3,5, 11 560:6,8,12

**EDRS** 244:13,26 245:3 251:25 560:15

**educate** 298:14

**educated** 304:10

**education** 144:5 145:3 241:3 243:23 245:23 257:8 366:24 388:18 430:22 436:21 438:14 441:12 449:18,21 450:11,14,18 451:13 473:16 478:15 481:21 608:27 659:27

**educational** 435:17

**Edward** 10:1 225:6 237:17,26 238:5 334:4 343:21 513:6 542:22 573:9 620:13

**effect** 8:12,15 14:22 40:9 116:1 118:22 275:9 558:22 611:9,13 638:13 660:13 714:12 749:5 760:17

**effective** 80:1 373:15

**effectively** 102:21

**effects** 52:21 496:1,8

**efficient** 515:27

**efforts** 663:14

**egg** 348:11 357:4

**egregious** 264:8 575:22

**either/or** 173:24

**eject** 117:13,15,27

**ejected** 117:20 118:16 443:16

**ejection** 117:19 262:1, 18 263:2,18 364:4 365:12,27 366:9 441:25 442:8

**ejects** 262:1 363:28 365:12

**elaborate** 483:26 497:28 500:27 585:24

**elapsed** 287:2

**elderly** 36:14

**elected** 303:28

**electricity** 233:25 234:5

**electromagnetic** 696:6

**electronic** 13:3,5 14:11 18:25

**element** 302:2,9,28 303:5 304:1,11 337:5, 18 406:18 580:7 583:28 584:5 643:16 672:23 674:11 680:7 683:2,8, 18,24 684:20,21 685:3, 27 686:18 742:11

**elementary** 695:11

**elements** 10:25 11:3, 14 21:26 655:4 672:20, 23 677:23 682:27 687:13 689:16 701:17 747:22

**elevated** 68:10 75:28 162:15 675:7

**elevation** 462:15

**eliminate** 15:17 653:6 693:23 696:20 743:28 744:6 746:10 748:14 751:21 754:13

**eliminated** 719:7,8 744:1

**eliminating** 373:23 754:20

**Elmo** 340:15 759:15

**else's** 53:10

**emanating** 325:9

**embedded** 275:10 277:11,12

**emergency** 12:8 13:7 19:6 232:8 380:27 415:28 416:1 721:11,28 762:16

**EMP** 696:6

**emphasize** 14:9

**employed** 238:14,16, 18,23 240:24 376:9 436:27 663:27 666:10

**employer** 35:12 451:24

**employment** 239:3 437:1 569:10

**empty** 193:9 253:13 358:21,24

**EMTS** 551:15,20

**en** 81:12

**enable** 445:24

**encompassed** 260:28

**encompasses** 537:22

**encounter** 84:9 218:23 219:10 230:15 259:6,7, 15,23 260:1,8 261:1,2 292:26 298:10,19 299:23,27 421:20 671:19 673:6 674:5 676:25,27 677:7 678:13 679:18 713:6

**encountering** 84:2

**encounters** 240:5 258:28 259:11,13,21 265:10

**encourage** 765:12

**end** 10:6,9 11:13 13:15 14:27 18:17 23:3 26:9 33:11,25 50:27 57:25 58:2,23 59:21 61:7 82:20 99:12 106:9 139:2 150:20,21 154:2 219:9 233:18 248:10 250:25 251:13 268:18 273:4,28 306:14 310:10 315:13,23,25 351:18 352:12,17,18 370:1 378:27 379:23 414:2,7 446:14 454:10 462:26 463:2,3 465:25 488:11, 12,22,23,24,25 518:1 519:8,20,27,28 520:15, 20,21 521:1,6 522:3 548:2 556:1,17 575:27 576:6 578:23 583:20 585:23 598:21 624:13 644:11 646:1 652:20 673:12 688:28 690:23 694:10 697:17 735:27 749:2 752:22 755:20

**ended** 14:14 27:16 197:14 233:13,22,26 234:1 363:5 365:5 381:8 422:7 439:3 480:10,24 588:22 608:9 615:14 677:4 710:15

**ends** 463:7 517:26

**energy** 253:24 278:17, 18,25 286:19 470:12

**enforce** 404:14

**enforcement** 26:26 34:2 37:10 53:27 55:17 58:11 67:15,19,22 75:12 90:9 94:11,17,27 95:1,9,14 97:5 98:1 100:13 154:19 155:11, 12 160:15 164:16 182:12 209:14,20 214:15,18 238:24 240:15,17 241:1,3,16 242:2 262:8 290:26,27 291:1,2,23 300:21 373:6 440:7 450:9 555:22 557:21 558:17 577:23 675:27 676:28 680:13,26 681:6,12 682:3,12 704:16,18,24 705:19 720:10,12 730:25 731:1 733:15 749:10 762:12

**engage** 720:22 764:9

**engaged** 336:27 337:19,27 338:18

**engaging** 81:3 153:1 155:8 407:20 671:26 705:10

**engine** 21:9 27:8 29:26, 28 31:2 33:23 83:2 102:25 126:18,19 140:8 412:6 426:13 468:27 469:2,3,4,12,13,16,18, 25 470:5 471:20,23,24 474:26 475:11 477:19 497:27 498:1,3,15,17, 18,20,23 500:23 501:10 504:17 505:10,11 543:4,8,11,14 545:25 546:13,16 547:20 548:17 594:5,10,14,28 595:3,4 596:8 597:1,26 598:4 601:23 602:18,26 603:2 609:5,28 676:6,8, 11,14 685:10 701:6 705:27,28 706:5 707:22 716:19,20,21,23,25,26 744:9,10 758:7

**engineer** 363:14 435:18

**engineering** 435:22, 23,26,28 436:26 449:20,22,23,24 450:6 451:18,25 484:21

**enjoy** 239:8

**enjoying** 691:23

**enlightens** 561:10

**ensure** 154:18 156:7 256:15 538:4 553:20 737:14

**ensuring** 523:27

**entails** 247:1

**enter** 70:14 74:18 77:16 169:15 192:4 204:1,2 205:9 207:24 208:9 232:12 327:5 405:27 487:13 679:22,24 685:9,20 759:9

**entered** 70:12,17 76:21 99:27 103:13 111:1 121:19 146:16 169:14 240:17 381:10 636:7, 20,21,22 672:1 685:18 756:1 758:5

**entering** 64:10 75:7 108:19 146:15 149:4 151:4 189:1,25 203:23 426:10 684:3 687:24 755:18

**enters** 156:16 685:19

**entire** 5:16 15:21 30:16 248:24 266:7 276:24 282:16 301:12 346:23 347:13,14 356:23 383:20 403:1 503:21 520:8 534:26 555:10 556:23 653:11 673:11 703:22 709:20 711:9 716:17 732:8,21 737:19 740:2 769:19

**entirety** 35:23 57:26 238:20 300:4 383:25 411:23,28 507:11 508:9 684:28 690:27

**entitled** 15:23 583:25 653:12 655:7 694:5,7

**entrance** 47:13 50:10 51:15 189:7 317:1 397:9

**entries** 258:27

**entry** 59:9,10 61:6 70:19 204:7 315:6 737:25

**entryways** 81:9

**environment** 102:19 241:1,15 258:23 366:28 367:1

**envision** 389:14

**equal** 501:24,25 686:17

**equals** 252:12

**equation** 318:7,19 411:16,22 501:22,23

**equations** 252:2

**equipment** 41:13,17 43:19 44:9 62:5,7 83:19 249:5 373:19 420:21 437:15 451:12 497:12, 14 532:11,17,28 533:5 759:22

**equipped** 80:12 273:25 423:4 558:27

**equivalent** 242:20

**erased** 560:20

**erratic** 190:6

**erroneously** 15:6

**error** 373:17 486:4 557:6,8 626:19,21 630:15 635:12 735:26 749:13,14 756:18 757:6

**ERT** 232:8,9 233:1

**escalate** 75:24 157:12

**escalated** 21:8 677:16

**escalates** 157:6

**escape** 78:2 303:8 308:15 708:28 763:20

**escapes** 66:11 268:10

**essence** 345:5 371:28

**essential** 32:20 655:13

**essentially** 109:17 247:12 257:18 258:13 261:12 262:7 318:21 336:25 337:3 461:23 481:7 524:7 624:1

**establish** 353:1 438:25 460:18 465:8 467:20 475:22 493:28 495:18 502:23 543:21 588:7 590:12,26

**established** 219:13 280:15 383:8 389:25 392:23,28 393:6 399:12,16,24 429:23 475:25 566:4 628:3

**estate** 106:18

**estimate** 57:22 59:14 111:27 112:1 118:5 129:25 144:19 163:26, 28 167:18 169:13 194:8 349:1 366:25 389:22 438:4 452:23,25 477:15 558:9,15,17,20 559:15, 16 562:27 563:3 618:8 623:13 761:10,16 762:6

**estimated** 407:4 413:11 622:5 623:5 671:24 761:18,28

**estimates** 247:28

**estimating** 164:2,5,9 167:17 265:3 284:4 452:11

**estimation** 122:20,27 123:4,21 285:12 324:6 558:23 637:10 760:24 761:6 762:1,7

**estimations** 390:5

**ethically** 558:22

**ethnicity** 14:6 651:4

**evacuation** 363:15

**evade** 309:22

**evaluate** 659:15

**evaluating** 17:9 647:27 656:4 659:24 660:14 662:10 714:12 749:6 764:7,8

**evaluation** 22:3 450:25 500:5 689:21

**EVD** 4:2 137:2 226:2 335:2 514:2 574:2 727:2

**evening** 24:8,15 131:11 221:19 266:18 271:13 281:9 357:18 530:1 568:20 708:18

**event** 13:1 18:8 85:6 114:2 115:24 164:21 169:19 244:13 274:4,7, 9,11 482:26 483:2,3 490:6 499:27 538:9 560:13 576:3 588:26 593:26,27 594:6,17 599:8 615:27 622:8,15 623:11 625:28 652:4 657:3 757:7 758:10,18

**events** 55:10 65:6 81:16 84:23 168:18,22 169:5 170:9 174:6 205:11 210:8 290:17 467:21 474:19,24 475:13 476:12 482:24 483:1,2 501:6,10 598:17 609:22 610:16 672:27 678:9

**eventually** 23:21 140:5 143:21 214:18 232:3 235:20 517:26 527:13 676:10 706:6

**everybody's** 749:11

**everyone's** 770:10

**evidence** 7:10 11:2,4, 9,13,24 12:1,15 13:28 15:4,17,21,22,28 16:1, 2,3,5,6,8,9,10 18:1,2 21:12,19,24 22:1,9 23:4,8,11,14,27 25:2,6, 26 27:1 28:2,3,20 29:1, 2 30:11,26 31:7,10 32:16,17,22,24,26 33:1, 12,13,26 34:4,7,8 82:3, 8 90:18 114:3 116:4 156:7 159:24 181:27 249:2,7,19,22 253:4 254:19 255:10 256:7 264:20 266:27 267:3 271:21 282:27 285:19, 27 288:6 289:4,5 290:7, 21 293:6 297:4,8 314:7 315:27 324:15,21 339:10 341:8 342:23 343:3 352:22 355:16 371:26 372:5,27 374:12,27 375:1 385:3 388:17 391:17 401:20, 25 402:13 403:14 406:16,24 412:22 424:10,11,15,25 425:9, 16,28 426:1,16,23,25, 26 427:4,5 432:26 436:12 437:8 438:20, 24,25 439:17 440:12, 16,17 441:21 443:27 444:9 445:19,21 446:19 448:6 451:8,16,17 453:20,21 454:15 455:5 462:20 466:4,9,14,26 474:16 475:15 483:20 493:3 505:23 506:8 516:13 519:3 523:28 524:26 527:23 528:8,25 529:13 545:8 549:3,4, 22,27 551:21,24 552:10,13,14 553:3,5, 27,28 554:5,6,17,19,21, 23,28 555:2,21,25 557:9 560:27 561:1,5 564:21 565:12 568:28 576:9 582:10,13 586:11,12,21,22 587:2, 11,13,17,18 588:4 596:6 598:25 599:25,26 600:1,4,23,24 601:2 608:23,24,25 609:8 611:17 618:22,23 619:1,13 621:28 635:13 642:9,11,16,21 643:12 647:28 650:23,26 652:23 653:6,10,11,14, 15,16,17,19,20,21 654:18,21,22,23,24 655:1,3,4,9,10,14,17, 19,22 656:24,25 658:21,25,27 659:6,8,9, 11,18 660:6 661:3,6,18, 21,22,24,26 662:1,4,10, 12,14,18 665:26 667:3 668:22 670:20 672:22 673:17,18 674:7,12,15 675:12 676:21 678:25 680:13 682:11,26 684:14 685:2 686:24,26 687:5,14,22 689:10,13, 18,28 692:4,18 693:3, 22 694:4 696:24 699:12 700:7,14,15,16,17,19, 20,21,25,28 702:8 703:10,12 704:4 705:15 708:13,14 713:27 714:4 721:15,24 729:10,13 733:8,13,23 734:23,26 735:4,13,19 736:10,11, 17 737:2,6,13,28 738:7, 16,18 739:27 741:27 742:17,20 743:4,6,11, 16,20 746:4,8 748:13 751:20 758:3,5 759:3 764:20 765:18,20,21 766:2,3,18 767:12

**evidenced** 528:3 529:4

**evidencing** 402:21 528:28 566:18

**evidentiary** 250:21 274:25 760:7

**evolves** 274:8

**ex-wife** 214:6

**exact** 265:2 304:16 323:3 621:10,17 622:21,24

**exactness** 621:11

**examination** 3:5 35:5 136:5,6,8,9,12,14 138:25 159:17 171:26 173:19 195:9 200:12 217:1 225:5,7 228:13 238:9 252:3 281:6 301:17 334:5,6,8,12,13, 15 406:9 411:27 417:25 419:23 433:19,20 435:14 442:15 449:4 513:5,7,8 527:3 542:26 563:26 573:5,6,10,11, 12 592:25 610:10 616:12 620:17 635:22 640:24

**examine** 11:28 660:17 767:12

**examined** 21:12 35:3 138:23 173:17 200:10 216:27 228:11 238:7 343:23 412:22 419:21 435:12 449:2 527:1 542:24 584:26 620:15

**examples** 285:5 307:6 694:8 696:27 702:16,18 720:14 742:25,26

**exceed** 704:5

**Excel** 502:7 591:18

**Excellent** 187:13 188:3 193:26 211:25 219:28 295:20

**excerpt** 90:18

**excessive** 301:11

**exchange** 21:4,7 26:22 671:20 736:9 766:22

**excited** 198:14

**exciting** 10:4

**exclude** 340:2 443:18

**excluded** 304:6 429:28 431:20 444:15

**excludible** 341:10

**exclusion** 128:21

**excuse** 56:9 73:13 118:11 172:1 307:16 347:18,24 400:26 431:6 456:21 508:24 537:23 555:24 560:26 657:12 675:8 740:4

**excused** 172:19 199:15 216:3,5 221:5,8 237:11,15 423:23,27 526:19 542:7 617:10,13 620:7

**executing** 337:23

**execution** 758:19

**executive** 583:7 643:3

**exercise** 336:27 337:19,26,28 338:18 339:12 591:8 742:7

**exercising** 339:14 427:21

**exhibit** 37:27 40:16 41:21 50:6 71:8 74:4 76:7,8 91:24 98:4,5,8, 22,23,26 99:16 103:27 107:25 109:23,24 110:13 113:15,23 114:14,17,18,20,21,23 115:10 117:7 118:24 119:2,5,6,7 120:2,10, 11,14,28 121:16 141:24 145:13 148:25,26,27 166:3,4,6 167:26 181:4, 28 186:21 188:26 189:10 192:11,12,14 215:2 217:16 229:12,15 277:6 280:3 313:28 314:18,24 319:6,9 323:19,21 324:11 326:15 330:1,14 340:1 341:24,26 342:1,10,12 343:18 344:5 348:19,20 350:6 353:5 356:19 357:11,20 359:10 361:21,22,24 362:15, 16,19 363:6 365:6 367:11,12,14 368:2,20, 21 369:7 370:10,22 376:17,25 377:10,24 378:4,22,24 379:6,12, 21,27 386:22 393:24 394:4 395:3 396:4 397:7 398:18 399:12,24 400:7 401:2 407:1,23 420:28 421:2 423:3 522:12,14,20 528:18,19 530:3 549:28 618:20 621:23 635:24 636:8,17 637:19,20 639:7,8,12, 13

**exhibits** 4:1 5:22 16:2 107:19 109:27 110:6,11 137:1 226:1 228:7 268:15 313:28 329:26 335:1 339:20,25 341:28 424:3,25 431:13 514:1 574:1 617:20 618:18 653:15 727:1 767:12,13

**exist** 696:2 738:14 752:15

**existing** 282:27 734:24

**exists** 553:6 743:11 744:2

**exit** 194:17 208:13 210:21,25 564:19 565:22 687:22 711:23 764:18,27

**exited** 192:21,24 211:1 564:13 770:6

**exiting** 151:4 238:27 459:28 460:17 529:22 764:17

**exits** 117:8

**expand** 437:5

**expanding** 586:26

**expect** 23:9,10 210:18 384:19 409:13,17 410:4,10 437:27 473:19 562:11 563:3 612:28 763:25

**expected** 612:18

**expecting** 427:12

**experience** 17:4 65:5 85:4,13 95:5 102:15 117:25 122:20 123:5 142:22 144:4 145:3 148:8 239:24 247:21 250:16 261:21 263:19 270:19 288:9 292:28 293:10 298:13 299:14, 15,16,26 300:1,3 308:9, 13,18 366:1,23 382:6 385:2 388:19 404:4 407:8,11 409:26 415:5 430:22 437:22 439:5 441:12,18,24 443:11,16 451:13 473:5,11,16 478:14 481:5,22 537:9 547:21 557:24 595:12 596:28 598:26 599:6,18 608:26 639:27 655:26 659:27 667:3 758:23

**experiences** 128:20

**experiencing** 83:1

**experiments** 12:28 652:3

**expert** 28:7 30:10 256:14 257:1,15 264:23 307:24 308:2 375:10, 12,14 376:12 417:3,9, 13 427:3 429:16,26 430:3 433:4 438:2,5 444:16 448:9 449:14 450:13 451:4,20,27 452:2,4,23 453:15,17 468:10 481:25 524:8 546:5,7,24 569:1 596:23 659:24,28 660:1,4,7,15 714:1 718:3 749:3

**expert's** 659:26 660:13,14 714:12,13 749:5,6

**expertise** 257:14 259:14 292:27 307:27 308:8 468:12

**experts** 577:13 659:20 660:20 676:7 703:7,8 714:1,13 741:8

**experts'** 660:19

**expired** 694:26

**explain** 15:1 26:3 31:12 36:4,10 49:23 52:16,21 53:8,9 77:22 79:21 113:27 115:21 116:22 183:26 203:8 206:27 259:5 285:6 286:12 306:8 317:14 318:3 345:7,14 358:26 371:20 378:5 408:7 422:4 437:5,21 458:14 461:28 463:3 464:1 467:13 469:24 472:12,20 483:13 495:11 517:16, 20 583:20 594:3 626:24 651:6 692:18 693:17

**explained** 5:15 49:4,27 52:27 53:26 54:6 56:16 69:6 102:17 107:3 160:14 170:27 286:17 339:11 373:12 589:23 658:9 679:14 755:20 761:9

**explaining** 20:21 48:15 102:8 583:7 680:23 687:20

**explains** 24:2 322:27 664:11

**explanation** 123:22 151:12 297:5 300:2,6 306:21 435:2 443:6 464:10 474:17 713:20

**explosion** 117:3,4

**expound** 306:22

**express** 18:27 768:23

**expressed** 155:5 160:18

**expression** 68:8 621:4

**expressly** 690:25

**extemporaneously** 10:6

**extended** 515:23 596:2

**extent** 127:24 350:1 366:10 644:7 660:24 709:26 751:10

**external** 116:28

**extra** 278:6

**extract** 232:20

**extracted** 125:27 247:12 249:16 605:16

**extractions** 232:9

**extremely** 695:6

**extremities** 233:6,7,16

**eye** 29:13 59:15 61:11 64:5 67:18 86:25 88:6, 14,24 89:2,4,11 90:13 285:8 486:18 565:14 734:14 747:7 760:13

**eyes** 33:22 87:28 88:9 170:26 171:8 179:10 479:24

**eyesight** 558:25

**eyewitness** 264:22 673:8

**F**

**F'ING** 154:13 155:1

**face** 26:19 27:5 42:6, 10,12,13 44:18,19,22 65:27 66:1 68:8 92:18 96:9,24 215:26 256:24 434:7 448:11 647:17 678:15 684:9 699:5 735:24 759:24

**face-to-face** 205:23,24

**faced** 49:3 65:20 68:4,5 146:15 566:27

**facility** 235:10,11 720:16,17

**facing** 59:2,20 60:14 96:16,19,24 97:3,19 117:18 269:4 307:20 399:2,20 403:13 566:19 604:26 646:4

**fact** 7:7 15:3 16:4 18:2 32:17,19 67:18,19 68:10 77:28 79:24 80:3 87:22 89:4,15 95:22 102:17 105:13 116:6,9 119:18 121:17 123:20 146:8 151:6 154:18 159:3 171:16 172:12 205:8 219:13 235:3,7,9 295:1 300:7 337:8,12, 21 342:7 346:23 353:6 357:27 363:7 373:22 401:28 403:8 405:11 426:9,12,17 429:22 473:2 478:23,25 520:11 543:17 551:23 554:5 557:5,16 561:24 564:16 567:13 576:22 587:1 596:28 600:19 606:10 612:7 633:7 635:2 639:4 640:10 643:25 652:22 654:19,24,26 655:8,11,13 656:25 658:24,25 660:11,12,13 661:8,9,22,26,27 665:25 668:21 670:19 678:25 682:10,11 688:5 697:21 702:2 708:16 714:11,12 720:12,16 728:24 734:4 736:24,28 738:14 742:14 749:4,5 750:13 758:2 759:19 761:7 765:8

**factor** 17:21 250:27 251:14 252:1 318:24 406:18 412:12 494:21 503:17 505:2,4,7 538:2 611:22 656:15 661:15, 16 662:17 687:19 760:14

**factored** 76:1

**factoring** 154:22 407:8

**factors** 17:12 36:7 76:1 78:19 117:28 118:3 151:26 256:17 278:24, 28 288:27 291:20 309:24 388:23 437:28 495:7,9,10,11 611:9 622:27 656:7

**facts** 12:26 13:25 15:27 18:24 85:26 401:25 575:22,28 576:7,8,13 583:22 584:9 598:25 611:17 623:20 650:22 651:22,24,25,26 652:1 654:6,7,8,17,25 659:28 660:9,10,17,26 664:24 666:23,27 667:6,26 669:22 679:3,13 683:10 685:4 692:12,13 698:9 701:22 705:15 721:15 731:28 733:13 734:26 739:27 742:17 748:19 751:7 766:26 768:5

**fail** 730:16

**failed** 661:6 676:27 730:21

**fails** 663:15

**failure** 764:26

**faint** 251:18

**fair** 42:21 71:16 79:11 84:22 127:27 165:27 204:6 211:18 260:16 264:28 265:1 276:5 285:24 309:3 481:22 484:6,13 488:11 489:16 490:4 504:23 620:24 621:20 766:13

**fairly** 6:9,10 29:16 79:11 169:6,7 220:24 373:27 478:13 530:11 535:9 713:8

**fall** 79:21 102:15 215:24 233:24 534:24 722:12

**falling** 233:22 698:19 708:4 713:7

**falls** 75:17 437:16 451:12

**false** 737:20

**familiar** 8:5 58:4 110:13,15 113:19,24,25 116:17,19 127:22 142:5 144:22 182:25 183:15, 17 189:11 215:9,12 263:23 297:23 314:2 324:12 326:16 348:22 350:7 357:12 377:11 379:12 472:1,3,4,8 478:2 484:15 485:27 496:3 499:17,25 528:24 530:8 537:15

**familiarity** 117:11 144:25

**families** 691:23

**family** 12:5 767:3 768:19

**FARO** 248:12,23

**FAROS** 248:23

**farther** 375:23 559:11

**farthest** 763:23

**fascinating** 242:9 243:2 256:1

**fashion** 306:10 398:10

**fast** 27:27 30:6 33:16, 17 111:24 112:1 122:9, 13,21,27 123:4,5 245:8 249:11 279:28 311:2,28 312:1 318:2 338:4 381:24 384:17,21 389:25 391:9 443:12,20 447:14,17 468:9 470:18 472:25 476:28 479:4,6, 16,23 496:15 519:23 520:13 522:5,7 537:1 559:6 607:21 633:11 639:9 640:1,7 703:15 708:28 712:22 718:3

**faster** 30:17 111:26 203:21 211:16 389:27 390:7 391:1,26 498:5 499:7,10,12 602:20 630:27 633:7 693:4,7 703:6

**fastest** 693:8 709:14

**fatal** 65:6 242:5 249:14

**fatalities** 243:8

**fatality** 242:23 244:7 256:10

**fatigues** 731:2

**fault** 748:11

**favor** 14:3 651:1 659:4 734:19

**FBI** 484:23

**FCC** 262:14,26 263:1,7 360:5,7,9,10 368:4,5,8, 24 369:9,12,13,19,20, 23,25,28 370:4,11 375:23,24 409:12 441:22 480:4,5,13,21 550:14

**FCCS** 263:10,16 264:16 280:19 288:19,25,28 289:3,7,24 363:28 366:4 367:4 371:10 375:20 409:11,28 410:10 433:2,7,13 442:1,26 443:16,27 551:5 565:12,13

**FCS** 233:11

**fear** 27:28 185:24 197:28 674:26 675:8

**feared** 30:25 738:21

**fearful** 20:3

**feature** 80:28 81:1,9

**features** 262:13

**February** 228:26 229:22 230:9

**feel** 9:25 10:18 19:13 160:20 163:9 174:3 178:16 200:19,23 205:19 208:9,20 215:5 293:14 404:28 415:2 602:7 650:13,16 671:16 733:17 763:18

**feeling** 54:13,14

**feet** 21:10 24:23 26:12 27:18,25 28:12,13,27 29:4,15 30:24 31:14,16 32:7,12 33:15 61:26 63:10 71:3,4 79:15 86:9 87:6,9,18 88:26 96:12, 13,20 97:2 99:26 103:4, 6,7,17,20 104:14,19 106:25 107:2,4 108:21, 22,28 109:4,5,7,18 110:18,26 111:5,9 112:17 115:18 118:5,7, 17 121:28 123:18 124:17,18 130:8,12,14, 20 143:13,15 150:6,9, 11 167:17 169:13 247:24,25 248:18,19 276:1,4,13,14,17,25 277:1 282:5 284:3,22, 27,28 285:14 291:11,13 309:6,17 311:11,18 312:3,7,9,12 315:14,15, 16,17,18,24 316:2,8,9, 21 317:18 318:2,6,8,10, 14,21,25 319:1,2,4 320:28 321:4,8,9,10,17 324:4,22 326:13 328:27 329:1,4 344:12,15 345:20 361:7,12 365:21 380:24 381:25,28 382:9 385:6 388:21 389:1,3,4, 17,20,21,25,28 390:2,7 391:5,6 411:19,23 412:11 413:4,8,13 414:17,19,21 416:16 432:21,25 442:3 460:21 462:24,25 463:21 464:2 475:27 479:28 480:7, 15,16,21 490:22 492:9 493:20 494:22,26 504:20 505:7,8,14 529:5 532:19,27 543:19 544:23 545:1,3,4,10 558:5,6,7,28 559:2,3, 12,14,23 562:14,28 592:5 604:11,19,23 605:4,7,8,14,17,23,24, 27 606:2,20,22,24 607:1,5,9,14,15,24,27 608:2,6,7,15,16 610:24 614:14 615:21 620:28 621:1 623:25 625:7,11, 15,16,20 627:13,14,19, 21,22,23,25,28 628:5,6, 11,13,20,22,23 629:1,2, 3,4,7 633:22 638:27 639:7,25 640:27 674:4 685:12 686:9,10 699:24 705:26 706:10,27 708:7,24,27 709:2,4,8, 10 710:5,6,14,15,17,25 712:2,5,23 713:25 715:24 717:14,15 718:13 729:3,27 730:28 731:14,18,20,21,23 732:3 734:9 735:18 739:9 740:16,18,19,20, 22,26 741:14,17 746:14,16,18 747:6,10 749:19,22 759:7 761:18 762:22

**feet all** 709:3

**fell** 233:26 234:4 244:6 363:5 551:7

**fellow** 139:6 732:26

**felt** 54:9 102:18 180:19 198:3 205:15,18 208:23 233:25 337:10 348:1 602:3 634:14

**female** 48:24 52:9 296:25

**fence** 30:22,23 33:17 56:26 57:16,17,19 59:8 60:23 61:2,10 77:24,25 101:13,14 106:1,4,9 112:21,23,27 113:1,10 123:27 124:1,2 140:17 152:26 158:21 159:4 184:9 189:13,14 193:9 194:13,14,15 269:15, 16,17,21,22,26 282:28 283:8,18 284:15,27 285:4 290:23 320:22,25 321:13,19,20 323:2,8, 14,26 324:10,24,26 325:2,5,10,16,26 326:1, 4,9,25 327:6 349:10 354:11,12,15,22 373:1 377:17 391:12 393:28 403:18 404:8 412:24 465:23 488:13 494:23, 28 561:28 563:15 564:5 606:25,26 624:11 634:17 638:28 639:1,28 688:11 763:17,20

**fences** 61:13,25

**fencing** 59:6,7 61:1,15, 18,20,21,24,28 606:28 671:23 763:22

**fender** 144:10 255:4 256:10 316:6

**feral** 418:13,15

**Fernando** 238:26 240:16,25 241:27 242:5

**Ferrell** 674:13

**field** 36:1,4,16 87:24 95:7 242:8 298:6 435:28 450:13

**field's** 87:28

**Fifteen** 143:15 312:11

**fight** 31:21 258:12,14 287:8,14 406:13,28 407:9 563:19,20 567:2, 3 687:19 705:10 720:5 761:19

**fighting** 34:4,6 69:17 234:10 293:8 698:9

**figure** 20:23 56:17 88:15,28 89:3 175:11 242:13 244:9 254:13 645:27 673:3

**figures** 608:25

**filament** 695:10,14

**file** 328:18 474:24 594:7 643:5

**filed** 15:4 652:22

**files** 478:1

**fill** 768:13

**final** 125:19 264:15 362:1,10 431:10 474:12 501:24 504:9 555:11 591:5 593:28 598:18, 21,22 605:12 622:18 754:19 757:1

**finalize** 728:24

**finalized** 106:21 401:11 439:4

**finally** 32:7 46:8 108:2 197:26 232:27 400:7 562:27 601:9 683:21 695:15 708:2 709:25

**find** 7:16 15:24 29:6 32:18,22 79:14 90:6 123:11 199:4 211:3 247:9,28 249:2 255:28 264:20 289:15 338:11 347:6 359:24 407:22 409:13 413:25 427:3 434:28 438:7 474:17 501:25 520:10 577:22, 26 643:27 645:1,3,4,5 646:9,13 651:26 653:13 655:11 657:16 658:4 660:5 661:2 663:21 666:18 667:16 669:7 670:28 671:4,8 694:6,

11 698:4 701:11 709:13 713:27 719:8 733:8 738:12 743:15 748:28 754:15 756:6,18,19 757:7,8,9 766:4

**finder** 640:10

**finding** 192:11 426:27 579:17 710:28

**findings** 553:8 586:9 651:22

**finds** 643:15

**fine** 6:22 10:19 24:10 91:19 121:7 126:24 173:24 330:9 384:18 424:23 427:21 445:13 520:9 521:18,23,25 583:13 690:13 739:8 748:25 770:3,4

**finer** 359:25

**finger** 349:7

**finish** 131:8,18 175:13 187:7 206:10,11 227:16 505:22,23 506:6,8,10, 13,16 507:9,22 508:15, 25 523:5,8 525:22 582:9 591:2 618:12 722:25

**finished** 55:15 144:10 239:26 525:28

**finishing** 728:15

**fire** 27:23,28 28:1 30:24 107:1 112:13,17 116:16 117:9,10,19 119:24,26 120:20,23 121:22 124:7 149:16 163:27 170:14 247:4 268:3,10 288:7 307:12 338:9 339:16 362:7 363:13,17 373:2, 7 469:7 475:7,10 517:23 530:18 531:6,7, 16 709:1

**firearm** 41:14 46:28 80:3,6 105:22 108:20, 23 116:23,24,26 117:13,16,18,26 118:2, 20 148:19 153:18,23 163:5,6,11,15 194:23 212:9 257:14 258:1 261:23,25,28 263:26 300:20,26 304:21 312:13 316:15,18,19, 22,24,27 317:12,16,18 345:2 357:7,15,17,27 360:7 366:22,24 370:27 372:8,13 404:11 420:21 432:5,6 438:8 442:9 467:17 496:27 517:22 538:26 568:16 633:27 664:14,20 665:2 667:15,18,23 668:5 669:9 675:16,17 678:23 682:20 689:5 699:4 701:20,25 722:15,16,17 732:4 738:22 742:9 747:23 765:6

**firearms** 257:8,27 258:1 261:20 263:24 264:25 430:16 441:25

**fired** 27:12,14 28:6,9,21 30:13 31:5 33:16,24 100:8 104:19 105:24 106:22,24 107:7 109:19 114:28 115:2,5,6,18 116:3 117:9 119:12,20 121:11,26 123:14 125:17 128:28 139:5,25 140:1,4,10,26,27 141:1, 21 149:2,9,12,18,20,23 150:2 151:9 156:18,19, 22 163:5,11 171:19 262:1,14 264:2,12,14 269:27 293:27 312:13 337:11,20,28 354:25 357:17 361:10 363:25 364:3 365:1,9,17 366:10 372:16 385:11 387:10 391:22,25,28 392:4 393:7 401:24 403:7 404:7 405:5 406:2 407:7,16,18 409:4,12,13,25 440:19, 21 441:23,25 442:2 444:19 468:18 474:1,4, 10,12,13 517:24 530:16,23 538:10 545:14,16,18,26 548:1, 6,16,21 549:17 550:10, 25 551:10 566:8 567:15 568:8 598:28 609:1,12 615:25 633:15 638:16, 19 640:26 688:20,25 689:5 696:20 699:9 701:7 706:13,14 707:9 708:6,8,24 709:9 711:20 712:17 713:26 714:19,26 715:3,5 734:6 738:11 753:28 762:15 763:13

**firefighters** 289:10 290:9

**fires** 28:16,17,18 366:11 520:20 701:4,5 711:1 713:22 735:18

**firing** 103:25 106:11 113:7,9 116:21,27,28 117:1 118:8 119:11 129:8,15,22 140:12 151:16 152:25 295:2 337:26 341:13 364:1 372:14 374:20,21,22 432:5,6,9 442:27 443:4 467:23,27 546:19 550:27 566:28 704:9 707:11 710:17 712:2 713:6 715:7 717:16 739:1 746:7

**firm** 498:12 589:7,9

**firmly** 762:9

**fish** 285:8 486:18 760:12

**fist** 186:2 287:14 684:9

**fit** 190:14 194:11 254:3 306:10 736:10,11

**fitted** 105:22

**fix** 314:1 446:4 522:18

**flag** 41:10 43:4 420:18

**flagged** 20:17 48:14,17 49:18

**flags** 8:1

**flash** 49:1 51:2

**flashed** 48:19

**flashing** 49:19

**flashlight** 27:3,24 28:26 33:21 43:21,23, 26 71:26 72:1,6,10,13, 14 73:21,28 74:1,5,11, 15 76:8 93:2 95:26,28 96:3,5,9,10,15,24 97:8, 19 114:6 168:12,17 269:24 280:19 282:6 285:23 344:15 346:27, 28 348:6 360:19,21 365:2,9 371:4,7,13,17 372:2 376:17,19,20,24 377:1,2 402:6,11,17,19 403:9 407:16,19 410:17,18,28 411:12,13 415:20 416:2,6,17,19 459:9 496:25,27 517:23 518:19 519:13 520:4,28 529:28 530:4,10,17,18 534:13,18,26 535:12,15 541:17 551:11,14 554:10,24 555:26,28 556:11,15 561:3,4,28 562:5,11,19 566:11,12, 14 568:17,20 615:28 625:14 627:14 628:15, 18,22,23,24 629:6 639:5,16 688:17 707:19,26,28 708:5 709:9 710:28 711:3,4,5, 10,21,26,27 712:1,20 713:11,18,24,26 721:20,22,28 722:7,15 733:23 735:18 736:3,7 737:8 740:20 741:23,24 745:27 749:22 760:27 761:2 762:8,13,14,17, 21,28

**flashlights** 72:3

**flat** 118:8 279:7,10 349:19 373:20 490:16 524:21 537:10 718:16

**flatbed** 253:27

**fleeing** 303:14

**flesh** 262:24

**flight** 258:13,15 287:9 406:13,28 407:9 563:20 567:2,3 687:19 761:19

**flip** 694:15 695:18 768:1

**floodlights** 33:9

**floor** 293:8 358:12 469:28 503:9 758:7

**flowing** 703:24

**fluorescent** 250:10

**fly** 612:27 631:9 732:16

**flyover** 249:4

**focus** 22:8 23:15 128:11,22 554:5 683:19

689:16 766:2

**focused** 64:3,28 285:7 445:18 764:12

**focusing** 121:1,4 260:6 441:10

**fold** 358:15

**folks** 25:14 242:22 373:5 693:9 694:24 695:26 702:6 707:5 712:4 713:4 715:14 717:8 728:28 731:5 732:24,28 735:23 738:4 739:10 740:1 741:10 746:7,14,23 747:28 748:15 752:12 769:24

**follow** 10:15,18 11:1 270:27 272:25 488:27 524:26 650:12 651:5,8, 17,25 659:25 672:21 676:27 729:24 730:16 737:21 753:13 765:23

**follow-up** 195:11

**foot** 29:25 52:1 61:12 118:13 124:14 125:20, 21,25 126:3 127:5,20 128:2,6 129:7 139:8,10, 19,26 140:16 141:4,6,8 148:2 282:9,17,22 321:21 325:8,18,19 340:20,21 350:9 351:19,20,22,26 359:24 364:7,10 371:18,28 372:9 373:23 380:17 381:17,20 382:1,9 384:3 388:2 393:2,9,11, 16,18 398:23 399:14, 20,27,28 400:11,20 402:13 413:5 425:21,22 463:20 471:3 485:23 500:21 502:9 528:3 529:4 536:15,23 545:22,25,27 547:8,11, 18 548:11,15,22 549:8, 13,17 552:24 561:15,19 562:2 575:25 598:28 599:10,11,17,20 600:26 628:6 634:18 671:24 701:6,8 707:4,6,15 714:22 716:4,28 717:2, 3,6 718:10,12,28 719:5 733:24 743:25,27 744:15,19,21,22,27 745:22 748:8,10 751:3 753:17,22,25,27 754:2 763:21

**foot's** 536:15

**footage** 317:3 324:7,9

**football** 87:24,28 95:7

**Footnote** 644:3,4

**footprint** 400:22 401:22 560:22

**footprints** 348:15,24, 27 349:3 356:21,24 359:20,21 403:5,6 407:24,27 408:1 444:4, 17 459:9,13,16,26 460:10,17 529:20,21 553:11 561:7,11,24 566:1,8,13,18,22,23,26 635:3,11 708:20 711:28 712:13 713:2,26 735:13 738:12 764:15,17,22

**footsteps** 374:5 533:3 557:16 634:26 635:7 713:9 749:8

**footwear** 62:10

**force** 77:26 78:3,11,13, 19,23,24,26 79:1,2,3,4, 5,8,12,20,21 80:1,2 93:26,27 156:25,27 157:7,15,20,27 158:2,7, 8,11,13 159:6 212:1 235:23 240:5 258:28 259:5,7,11,12,15,20,22 260:1,8,24 261:1,2 265:10 286:6 292:26 297:21,27,28 298:4,5, 10,11,17,18,25 299:23 300:7,8,11 301:11,13, 16,18,22 302:4,5 303:5, 6,7,9,11,14,24,28 304:10,25 305:20 306:3,14,24,25 307:2, 12,24,28 308:4,10 309:2,10,14,21,28 310:26 311:4,20 312:5, 10,14,17,20,24,27 336:16 418:3 421:28 422:1,7,8 576:5,19,26 577:13,18 578:2,21 579:9,11 580:12 598:9 639:23 640:14 643:18, 23 644:1,10,25,28 645:4,25 646:12 648:27 657:28 658:2,11,17 664:14,21,22,27 665:1, 13,23 666:16 667:9,12, 13,18,24 668:1,4,9,19 669:6,15,17,24,28 670:7,17 671:1,6 682:20,22 683:3,5,12, 15,26,27 684:17,18,26 685:6,8,24,28 697:24 701:20,21,24 703:17, 20,25 730:3,12 731:9, 11,19,21,23,24 747:24, 25,27 763:11

**forcefully** 177:4 679:22

**forcefulness** 204:22

**forces** 278:22 703:8

**Ford** 184:9

**foregoing** 132:20 221:20 330:16 509:3 569:11 722:26 771:14

**foremost** 162:1

**forensic** 248:12,24 437:7

**foreperson** 766:11 767:18 768:10

**forever** 249:8 757:20

**forget** 18:7 241:25 282:9 342:22 343:6 657:2

**forgive** 36:15

**forgot** 59:7 450:16

**forklift** 437:15 451:11

**form** 10:10 14:10 18:25 128:18,22 131:12 141:9 155:6 157:17 221:17 242:20 245:14 251:9 272:17 289:28 307:19 308:16 313:24 329:10 346:16 359:26 385:9 424:12 430:11 464:8,20 468:17 473:8 506:17 556:14,16 569:7 580:27 586:9 617:28 642:17 650:9 673:21 690:6 722:23 768:14,23

**formal** 259:3

**formality** 141:25

**format** 240:20 352:21, 28 474:23

**formed** 232:8,10 337:22 360:19

**forming** 440:14,25 660:27

**forms** 266:16 580:17 581:25 645:15 671:23 672:13 690:12 693:18 755:21,27 756:1 768:9, 11,13

**formula** 504:5

**formulas** 452:19 502:8 591:13 592:10

**formulate** 381:7 382:5, 8 385:4 405:17 464:15 476:10 478:26 597:13

**formulated** 391:16 464:21

**formulating** 452:4 455:22 466:25

**fortunate** 299:27

**forward** 34:10 86:16 110:11 126:13 161:2 180:6 285:21,22,25 341:14 346:27 347:21 372:2,15,22,28 373:1,9, 25 407:11,17 472:14 475:23 503:9 522:10 530:25 531:8,10 533:21 536:23,25 540:18,28 562:1 591:27 707:25 711:14,18 718:19,23 762:21,22 763:16,19

**fought** 676:28

**foul** 675:28 685:20

**found** 55:1 153:7 242:9 243:1 280:20 289:1 346:14 413:13 431:2 457:15,25 458:26 462:20 466:7 480:5,14, 20,21 503:15 522:28 527:9 550:14 605:8 628:24 634:27 709:10 751:23 752:22 763:14

**foundation** 139:21 141:13 145:6 327:28

329:6 355:12 356:3,13 382:2 385:26 442:7 443:14 445:2 454:5 463:22 464:25 468:20 562:15,23 737:16

**foundational** 256:2 392:26 430:13

**four-door** 68:18

**fourth** 201:26 740:10

**fraction** 475:11 596:24 715:3

**Fractures** 702:17

**frame** 90:6 105:21 502:9 504:16 505:10, 13,14 586:1 610:23 612:24,28 613:5,13,14 614:4 621:8 622:5,11, 20

**frames** 438:16

**frankly** 687:18 754:17

**frantic** 211:14

**fraternal** 376:1,4

**free** 9:25 10:18 19:13 67:9 293:14 650:13 671:16 679:27 752:27 770:8

**freely** 663:17

**freeway** 242:27 279:25 286:28

**freeze** 244:18 258:13, 15 287:9 563:20 761:19

**frenzy** 211:16

**frequent** 19:4

**frequently** 258:19 445:16

**fresh** 252:23,24 408:2

**friction** 252:14,15,18, 19,22,23 275:1 278:20, 21,23 294:15 384:27 461:22 470:10,17 471:12,15 472:28 473:17 474:28 475:3 477:18 501:11 588:25 592:2 594:27 597:1 598:7 601:25 602:10 609:6,7 610:1,18

**frictions** 592:3

**Friday** 770:3

**friend** 8:19

**friendly** 675:26,27

**friends** 12:5 33:20 209:18 767:3 768:19

**frightened** 52:28

**frightening** 299:20

**front** 19:20 20:27 23:16 24:26 27:4 29:16 38:9 39:19,24,25 40:25 45:17 46:7,8 66:17 78:2 99:6,18 130:6 142:26 144:9 145:15 152:4 174:27 175:18 179:2, 10,26 180:10 186:19 207:18 208:8,10,16,20 213:26 214:1,11 246:1 251:13 253:9 254:1,7, 28 270:27 272:10,18 275:23 279:27 280:1 291:15 316:3,6 319:22, 23,24 324:9 326:20 327:7 351:19,21 352:10 354:12 355:11 356:1 359:4 360:21,24,25 377:15 378:7,8,26,28 384:28 395:1,25 396:27 397:9,28 398:23 399:13,20,27,28 400:10,11 422:26 458:17,21 461:11 465:23 470:5,7,9,11 472:26 480:20 490:24 491:4,10,12,13 492:17, 19,28 494:23 527:9,13 528:9 537:1 564:1,2,3, 9,11 565:25 581:4 590:27 595:20 624:13 631:8 636:9 674:19 680:20 707:3 711:17 732:27 736:5

**FTO** 242:8

**fucking** 517:10 705:22, 23

**full** 70:19 80:6,8 174:4 200:20 329:18 352:13 397:1 435:2 463:11 710:23

**fully** 165:13 626:24

**Fultz** 3:5 5:8,20,21 6:3, 8,12,19 7:20,21 8:4,9, 11,17,19,24,27 9:1,5 19:10,12,15 21:6 22:12 34:13,14,27,28 35:6 38:5,6,11,25,28 49:14, 15,16 52:17 53:2 54:3, 19 56:11,13 58:7,9 63:18,21 66:25 72:21 73:8,15,16,17 74:28 75:5 78:17 81:27 82:11, 15,22 83:12 85:15 90:21 102:2 118:9 121:5,7 131:20,23,25 132:1,4,8,9,15 136:5,6, 8,9,12,14 138:8 139:21 141:11,13,15,27 145:5, 9 146:27 148:4 149:14, 26 150:27 153:8 154:20 158:1 159:15,18 161:24 165:26 168:13 169:21, 22 171:24,27 172:15, 20,23,27 173:13,20,28 176:10,13 181:3,7,12, 19,21 182:1,6,7,8 184:18,24 185:5,6,7,15 195:6,7,10 197:3 198:6, 7,26 199:14,16,18,20 200:6,13 202:4,7,13 203:16,27 209:26 216:2,4,7,9,22,23 217:2 218:16,19 221:3,4,6,10 225:5,7 227:8,18,19 228:6,7,14 230:5,8 234:12 237:10,12,17 238:2,3,10 249:26 270:2,11,12,13 291:26 300:28 301:28 302:1, 12,14,17,22,25 303:22, 26 304:4,13 305:3,8,12 307:15,17 310:8,11 311:5 325:11,12,13,19, 21,23,25 327:16,22,28 328:24 329:6,26 334:5, 6,8,12,15 336:8 338:26 339:20,24 341:2,6,16, 28 342:3,8,16,17,22,24, 26 345:28 346:12,16 350:12 354:28 355:12 356:3,13 361:23 381:3 382:2 385:25 390:22 392:1 393:12,21 400:25,27 401:25 406:7,10 407:21 411:2, 4 413:28 415:14 417:19,26 418:26,28 419:13,14,17,24 421:12,15 423:22,24 424:2,26 425:1,11 426:5,6 427:11 429:8, 24 430:8,10,20,26 431:11 434:1 439:21,25 440:2 442:4 444:7,8,21, 27 445:8,13,16 446:13, 17,25 447:5,9,21,28 454:5,14 455:27 456:1, 20,22 459:18 460:4,6, 28 463:22,24 464:11, 17,25 468:20 472:9 479:9,19 481:15,18 497:3 505:21,24,27 506:1,24 508:12,14,17, 28 513:5,8 515:7,15,21 516:5,6,18 518:27,28 519:4 520:7,9 521:2,17, 18,24,25 522:23,28 523:4,19 524:27,28 526:5 527:26 529:7,9, 15 532:1 534:1,4 536:18 537:20 540:11, 14,22 541:16 542:1,9 544:9 546:2 547:13,25 548:25 549:23 550:15 555:4,16,18 556:21 557:11 560:1,2,5 561:20 562:17,26 563:21,22 564:22 565:3 566:7 567:18 568:24,25 573:5,6,10,11,12 575:9 577:3 578:5,6,15,27 579:2,12,13,25 580:1,4, 9,11,14,28 581:2,5,10, 14,20,27 582:2,11,14, 17,20,24,27 583:2,10, 12 584:11,20,21 585:2 592:20,21 596:11,22 599:2,13,22 608:18 609:15,16,19 611:21 612:2 613:11 614:22,25 616:7 617:8,9,11,23 618:7,9,21,27 619:5,9, 10 620:3,4,10,11,18 621:26 622:3 626:28 627:5,6 634:5,20 635:20,23 636:15,16 637:12 640:3,16,21,22, 25 641:11,16,19,20 642:4,10 644:14 645:13,14 646:16,17 647:9,16,19,21,23,27 648:2,4,6,8,11,14,17, 19,22 649:1,3,6,8,10,

13,15,23,26 671:13,15, 17,19 673:16 675:26 690:2,15,18,21,24,28 691:17 705:15 712:8 721:15 728:9,16 733:20 734:26 739:27 742:17 743:2 750:11,13 752:8 753:2,4 755:1,3,16 756:12,15,22,25 757:5, 13,26,27 764:3 766:5 771:9

**Fultz's** 431:18 646:10 755:6

**function** 116:26 388:4, 8

**functional** 262:27

**functioning** 388:10

**functions** 228:25 237:6

**fundamental** 388:1 737:16

**funny** 24:3 212:15 215:20 694:3

**furthest** 319:10 489:14, 16

**future** 82:13 645:7

**FVI-18000982** 584:4

**FVI-1800983** 584:4

**FVI-21001037** 583:27

## G

**G-A-L-L-O** 173:8

**G-O-L-D-E** 575:17

**gain** 31:3 52:26 70:22 84:28 104:27 111:16 112:6 123:9 127:1,13, 14 128:1,13 157:21 161:10,12 232:23,28 233:19 234:3 275:20 276:7,21 277:5 278:24 327:27 387:13 388:14 412:28 426:13 491:24 501:11 546:15 638:17 665:11 668:8 670:6 715:5 744:6,19

**gained** 234:8

**gainfully** 240:24

**gaining** 83:3 387:23 491:14 622:20

**Gallo** 19:17,22 20:5,8, 18 21:15 24:2,27 26:1 131:20 132:10 136:7 172:27 173:8,9,15,23, 24,26,27 185:3,8,21,23 201:12 202:9 269:18 290:9 295:16,19,23 338:22 354:6 380:2 397:27 398:16 408:24 636:22 674:24 676:2 679:7,15 680:2,22 681:1,23 685:13

**Gallo's** 20:18,27 675:5

**game** 519:18

**gang** 239:15,17

**gap** 60:22 61:20 121:19 156:15 408:16

**garage** 488:13 695:15, 16

**gas** 256:23 469:28 471:28 472:17,20 498:4,11,14,23 500:18, 26 503:9 544:2,18 545:11,27 672:2 674:1 676:9,10,13 685:10 689:3 718:9 759:1

**gasoline** 256:19

**gate** 175:20 180:11 189:5 208:11 285:2 298:9

**gates** 59:13

**gather** 246:11,26

**gathered** 283:17 635:13

**gathering** 538:7

**gauge** 164:18,20,22

**gave** 63:22 68:8,11 75:22 90:28 148:3 185:24 232:16,18 233:10 270:28 297:13 328:6 361:6,14 401:28 421:23,26 502:25 505:9 546:24 549:27 550:7 588:1,24 630:3 634:24 639:2 659:28 660:20,26 708:26 709:6 729:27 737:23 747:11,12 761:17

**GBI** 577:7

**gear** 70:21 124:15 146:16 161:1 322:3,4, 19,20 380:18 381:22 383:9 388:3 393:1,17 468:6 470:19,22,28 471:1,3,5 472:15 477:20 494:14 536:1 543:22,28 544:7,14,25 545:5,22 718:14,21 744:13,15 746:2

**gears** 257:7 469:24 470:26,27

**gel** 262:22

**gelatin** 262:23 263:15

**gender** 14:5,6 651:3,4

**general** 7:28 119:24,27 121:23 166:24 230:22 277:20 283:12 304:24 360:27 366:19 451:6 456:19 561:17 585:16 587:12 630:1 657:25

**general's** 643:27

**generalized** 106:17

**generally** 37:5 118:6 144:3 145:21 187:24 220:21 352:9 358:19 359:3 366:12 444:13 473:15 659:26 769:26

**generate** 589:12

**generated** 37:7

**gentle** 603:13

**gentleman** 48:13 230:1

**gentlemen** 9:28 22:23 30:27 34:10 98:16 105:18 115:22 123:3 317:15 458:14 691:13 692:22 697:10 752:10 753:7

**geo** 483:7,11,27 495:12 589:24

**geographical** 248:25 249:1

**Geotab** 450:25 451:1

**Gerania** 266:17

**ghost** 696:3,5

**ghosts** 696:4

**giant** 249:13

**Giles** 267:17

**give** 11:14 20:20 22:10 74:17 82:5 92:2 104:1 111:27 112:1,3 123:3 144:19 154:24 175:1 192:11 195:28 196:27 197:9 213:6 218:24 220:13 230:16,24 231:13,25 232:12 263:16 264:19 302:13, 27 307:6 308:2 309:4 314:23 315:16 317:3 323:13 324:6 344:24 399:1 431:28 433:19 437:20,23 438:14 446:9,14 447:16 449:17 461:2 480:27 498:6,12 505:17 516:16 524:25 547:5 558:9,21 561:25 578:16 579:4 580:15 586:18 599:16 609:9 610:23 621:19 623:14 624:5 642:14 644:25 645:18 649:27 650:20 651:18,23 659:21 660:9,22 681:3 694:12 696:26,27 738:13 752:10 756:4 760:19 761:27 765:14

**giving** 10:21 75:11,12, 23 97:23 102:27 103:2, 3 105:8 108:27 167:21 231:6 232:17 257:1 304:27 308:1 316:11 328:3 455:1,2 516:25 546:7,22 625:28 687:27 689:17 751:7

**gizmo** 248:16

**gizmos** 244:28

**glad** 757:16

**glaringly** 626:19,21 736:27,28

**glass** 293:7

**glaucoma** 29:12

**Glock** 47:1 105:16,19, 20,24 116:19,28 117:5, 11 118:19 261:21 263:1,18,27 289:7 357:8,23,24,26,27 363:28 364:4 365:12 366:24 442:8 443:17 451:1

**Glocks** 262:7,12

**goggles** 351:8 747:8

**gold** 41:9 369:28 423:18 484:17 680:19

**Golde** 575:17,21 576:7

**good** 9:9 10:27 22:23 34:25,26 35:7,8 69:15 72:19 73:12,18,19 85:22,23 126:23 132:10 138:12,27,28 159:19,20 170:1 173:9,10,11,12, 21,22 174:1,2 184:23 185:21,22 187:11 200:4,5,14,15 204:23 205:26 210:5,6 216:20, 21 217:3,4 219:24,25 227:12,20,21 228:4,5, 15,16 234:19,22 237:28 238:1,11,12 248:10 292:6,7 320:10 343:11, 27,28 406:11,12 409:16 419:11,12,14,15,16 434:5,21 440:3,4 448:4, 23,24 449:6 481:19,20 498:6 499:9 525:2,18 526:17,18 527:5,6 540:15,16 542:28 543:2 569:9 575:13 583:17 584:19,21 592:27,28 620:19,20 671:17 691:13 697:14 705:13 709:3 720:27 728:13,21 733:7 734:18 736:25 748:24 758:21

**Google** 483:22,23,24 624:22

**gosh** 762:15

**gotta** 211:14 289:9 749:12

**gouge** 253:2,3 673:23 674:16,18

**gouges** 586:16 602:10

**GPS** 245:8 450:25

**grab** 22:18 70:10 157:8 178:12 213:16 233:15, 16 252:25 273:8 275:4 277:22 279:21 286:21 343:18 389:11,12 413:24 695:7 697:1,6

**grabbed** 70:10 286:17 637:20

**grabbing** 210:26 228:7 279:11,13,14

**grabs** 210:20,24 248:25

**gracious** 447:5

**gradually** 603:20

**grandma** 681:10

**grandmother's** 25:2

**grant** 484:8

**granted** 8:16 289:21

**graph** 740:2

**graphic** 97:26

**gravel** 31:5 57:19 71:16 76:24 105:10,14 140:22 189:11 255:11 269:27 275:10,12 277:11,12,18 287:25 288:15 289:15 291:8 359:12,13,21,22, 26 360:3 370:14,16,18, 23 372:28 373:21 409:21,25 410:1 411:7, 14 453:28 470:15 473:22 478:19 490:14, 15 564:18 704:22 712:12,16 722:5 730:21 738:21

**gravely** 259:8

**gravity** 155:7 591:7 622:17

**gray** 230:2 410:25 630:6

**graze** 699:5 703:18

**great** 249:5 255:19 298:27 310:1,4,10 315:22 317:7 352:8 446:19 563:12 576:5, 19,27 577:15,18,26 578:2,22 579:10,11 580:12,23 581:24 618:17 643:8,10,19 644:26,28 645:5,25 646:3,5,9,12 648:28 657:28 658:2,12,17 664:15,22 665:28 666:5,16 667:19 668:26,28 669:6,17 670:1,22 671:2,6 680:14 682:21,23 683:3,15 686:1 697:23 698:7 699:25,27,28 700:4,10,12 701:21,24 702:4,5,10,16,19 703:1, 3 714:9 715:25 716:13, 15 730:4 731:13,15 732:18,19 734:16 741:2 742:5,12,22,23 743:1 747:25,27 748:17 754:6

**greater** 412:5 559:15 655:7 659:2 666:1 669:1 670:23 671:8 702:11 706:27 742:24 758:10

**green** 41:14 142:20,23, 25 143:1,3 144:27 187:28 229:7 319:12 340:11,13 377:14 420:16,20 423:17 488:12,20,24,25 489:2, 7 682:4

**Green-perba** 350:24

**Green-perva** 267:25 296:25

**greet** 64:15

**Gremlins** 696:1,2

**Grenados** 24:13,16 29:8,11,19,20 175:26 176:18 269:19 290:10 295:12 427:12

**grinding** 473:22

**grip** 252:21 496:27

**gripping** 252:21

**groove** 288:8,10,11 394:17,18,19,22 395:11

**grooves** 279:23 359:12

**ground** 72:7 96:16,20 97:10,20 163:19 233:17,22,24,26 234:4 236:23 250:11,14 254:15,19 262:16 263:10 269:7,9,22,23 277:16,22 279:11,14,21 286:25 326:26 377:27 378:7 410:12,24 422:8 490:12 492:11 499:5 535:15 559:13 708:4 713:8

**group** 12:26 652:1,3 654:24 752:3

**grouped** 151:11

**grouping** 363:18

**grows** 586:26

**Gs** 475:19 478:11 602:15

**guarantee** 732:1

**Guaranteed** 205:7

**guarding** 313:14,16

**guess** 16:18 87:6 98:6, 15 127:28 208:19 220:27 240:16 249:10 251:26 254:1 263:7 303:20 306:18 345:4 349:21 430:24 432:28 445:9 465:14 469:8 479:13 482:28 495:14 497:8 517:16 522:14 539:20 576:1 654:1

**guessing** 341:18 485:6 504:24

**guidance** 580:21

**guide** 652:13

**guilt** 16:5 32:27 655:20 689:13 696:17 701:1 743:8 765:22 767:26

**guilty** 15:3,11,22,24 23:4 32:18,22,24 33:27, 28 644:27 646:14 652:28 653:11,13 655:11,15,17 657:16 658:4 661:15,17 662:19,24 663:12,20,21 664:17 666:18 667:16, 20 669:8,10,12 670:28 671:4,8 677:20 692:14 693:15 694:5,6,11 698:4,5,25 700:22,26 701:11,14 719:9 728:25 743:15 746:9 748:28

751:23 752:27 754:16 756:6,19 757:7,9 766:4

**guise** 764:8

**gun** 31:5,13 33:16 34:1 53:26 120:4 140:10 152:14,26 157:26 159:27 160:10 257:16 286:24 299:19 300:21 373:25 467:27 496:26 531:17 545:18 678:14 680:24 688:5 692:25 699:2,3,8 706:13,14 708:24 709:1 710:18,28 711:1 716:9 729:19 759:13

**gunfire** 23:22 27:11 124:25 129:6 378:14 386:28 387:15 467:24 568:1,3 599:8 602:4 610:12,19 706:7 714:22 743:24 753:23 758:12, 23

**guns** 692:24

**gunshot** 516:14 546:19 547:9 550:13,27 599:18 702:18

**gunshots** 293:27 361:18,19 550:10 593:24 673:13 758:25

**Gunsite** 373:4

**gurney** 288:13,14 289:9,10,11,25 341:9 358:4,7,8,10,11,15,19, 24,26 359:4,18 363:7,9, 14 367:20 369:4 370:20,22 371:6,16 374:3,4,7 409:17,22 410:27 411:7,14 416:14 636:2 688:23 721:17, 18,19,21

**gurneys** 402:12

**gusto** 707:10

**gut** 54:12

**guy** 7:16 24:6 31:24 33:18 155:24 299:26 308:19,20 404:28 681:18 705:12 720:28 730:10 731:1 746:6 759:12,13

**guys** 373:18 694:13 705:10 752:3

**H**

**H-E-R-N-A-N-D-E-Z** 237:27

**Hail** 520:25

**half** 36:17 48:5 80:20 87:24,28 95:7 107:14 128:14 129:4 140:9 161:28 168:21 217:10 235:1 238:28 239:2 240:11 257:24 313:9 319:4 324:22 329:18 361:28 362:8 394:10 395:20,24 396:22,26 493:20 494:22,24 501:26 507:26 627:21 628:20 629:1,2 673:9 761:6,8 764:15,26

**halfway** 101:17

**hallway** 131:14 132:3 430:6 694:15

**hand** 19:6 70:10 72:10 95:26 96:10 120:2 181:9 337:14 434:8 448:12 482:4 496:26 497:15 592:14 622:23 629:23 659:2 663:17 762:12,13

**handcuff** 94:3 422:9 468:6

**handcuffs** 420:22

**handful** 210:9 563:24

**handgun** 261:21 262:11,18,19 287:19 360:26 365:13,14,16, 18,20,22,23 373:11,12, 13 441:28

**handing** 531:24

**handle** 37:3,7,8 70:10 174:1 178:14 207:10 210:14,24,26 211:4 213:16,17 243:15 404:18 405:20 553:1

**handles** 178:13,14 179:4 204:3 205:20 210:20 679:23

**hands** 26:24 64:27 65:1,2,4,9,13,16,17,18, 20 66:22 67:9,24 79:6 93:14 100:27 101:3 152:17 160:19 178:11 290:27 360:20,26 385:20 403:17 404:1 421:26 497:17 541:19 678:21,22 681:8,9,11, 14 705:5,6,11,20,21 721:6

**hang** 339:19 578:16 692:16

**happen** 13:1 78:9 85:2 140:18 197:28 202:23 254:10 258:9,11 274:5 320:9 363:23 437:14 471:27 472:24 475:1 523:9 549:21 610:18 612:12 613:23 652:4 702:23 715:20,21 721:14 722:13 730:13 744:25 745:20 748:14 769:11

**happened** 14:25 17:16 26:15 34:8 48:12,28 55:11 63:25 64:26 65:13 71:13 176:27 178:5 202:19,25 204:11 207:6,8,20,21 210:8 214:21,22 230:26 232:6,15 242:14 244:10 246:20 247:7 267:19 287:22 291:21 313:5 316:12 338:2 341:8 348:7 357:3 375:17 392:21 412:11 454:25 463:14 475:2 492:5 500:22 505:8 548:23 560:13,17 592:16 609:9 610:18 623:7 650:23 652:9 656:11 688:22 689:4,20 697:19 704:20 709:7,25 715:22 720:19 721:2,23 731:28 732:22 733:8 738:8,15 744:5 748:10,21 749:14

**happening** 20:20 24:14 26:4 65:6 100:24 338:4 348:14 387:22 455:18 458:25 460:10 469:9,12,24,26 471:10 473:12,24 474:8 531:16 534:17 595:23 716:27

**happy** 200:21,22

**hard** 11:20 21:1 83:11 123:10,11 142:10 161:11 183:5 215:21 252:9 263:17 294:15 353:15 409:28 410:1, 11,13 478:13 479:25 480:19 596:4 624:14 685:10,11 718:5

**harder** 592:6 707:11

**harm** 192:2 298:26,27 300:24 306:19 309:28 310:7 425:23 611:16,25 612:14 632:16,17,18 666:2 669:2 670:24 702:12 704:8 715:26 742:10,25 749:28

**harm's** 308:28 309:13 311:19

**harmed** 259:8 699:25 730:3

**harmful** 665:14 668:10 670:8 685:25

**harming** 391:24

**harmonizing** 215:23

**harp** 748:2

**harshly** 251:13

**hash** 493:11

**hat** 42:6,8 65:25

**hatch** 269:6

**hate** 153:26 505:27 720:10

**hazard** 595:21

**hazardous** 266:10

**HDDC** 234:28

**he'll** 5:18 10:2 21:27

**head** 152:23 201:4 202:9 243:16 244:5 248:1 311:28 431:27 557:28 559:8 578:26 699:16,18 739:24 750:6

**headbutted** 422:8 677:12

**headed** 307:7 397:17 400:5,21 401:4,5

402:14 527:18 529:14, 21 544:27 552:15 553:10 555:10,22 735:22,23 736:22,23,24 749:21 764:17

**heading** 159:1 307:2,9 374:7 386:10 391:11 400:23 528:3 634:27 635:3 708:11 735:6,14 736:23 738:17,27 749:8

**headlights** 30:4 48:19 49:19

**heads** 446:14 736:21

**hear** 7:15 11:2 16:22 17:13 18:8 19:8,15,17 20:14 21:4,8,11,14,15, 16,18 23:10,19,20,21, 22 24:1,5,11,12,14,28 25:3,11 26:10,20,22,27 27:7,8,9,10,11 28:7 29:8,11,18 30:9 31:3 32:4,15 33:10 34:4 56:2 66:12 83:27 112:6,13 121:11 126:18 128:13, 15,25 129:6 140:12 154:3,4 179:5 180:28 231:11,12 286:15,21,22 290:24 300:14 307:16 325:12 384:5,8 386:25, 26,28 387:11,15,24,25, 27 390:9 408:20 409:1 412:6,27 426:7,12 432:16 433:5,27 439:20 467:23,28 468:4,27 469:1,2,5,6,10,14,19,24 470:13 471:6,13,20,21, 23,24 473:3,19,21,22, 26 474:14,25,26 478:16,17,18,20,25 498:4,15 499:10 500:23 505:10,11,12 516:13,27 519:20,27 520:22 522:17 532:11,17,24 533:3,5 534:16,18,24 535:9 541:3 543:12 546:16 556:2,5,25 557:1 568:3,16 588:23 594:7 595:4 598:4 601:23,28 602:4,6,20, 25 603:3,6 609:4,5 617:26 623:3 626:2 642:14 656:8 657:3 674:5 675:16 676:2,8, 24 678:7,8,10,14,17,20 685:18 690:4 693:11 697:21,23 699:15 700:13 706:7 707:1,8, 14,25,27 708:1,2 710:22 711:1,11,12 713:1,5,7,9,10,13,23 714:10 716:26 717:22 734:4,13 744:9,10 745:3,4,13 746:26 747:4,5,14 755:6 759:4, 24

**heard** 11:8,9,13 21:13 23:18 26:8,13,14 27:8 29:20 69:1 82:24,28 83:1 84:1,7,9 92:7 104:25 111:15 112:4,5 119:10 120:19,22 121:13 127:1,9,19,23 128:12 129:3 139:8 140:7,8 141:4 152:5,7 154:11 162:21 186:4 191:16 201:14 207:22 209:10 233:21 275:3,26 286:14 299:8 344:24 361:1,3,18,27 363:16, 25 380:13 383:22,25 384:5 392:20 398:14 403:25,28 405:6 408:4 424:10,13 425:18 426:18 443:9 444:7 445:10 446:24 467:27 472:27 473:7 475:11 515:19 519:5 531:12,25 532:10,11 533:26 534:15,20,21 543:4 544:5 545:9 546:15 556:1,17,20,23 562:4 563:28 564:10 567:6,16 568:14,17,19 594:20 596:6 599:18 602:22 625:24 638:17 642:11, 16 654:9 659:11 672:9, 15,26,27 673:23 674:24 675:2,6 676:5,19,22 677:1,6,25 680:13,14 681:13,14,17 682:21 684:7 686:2,18 687:17 688:21,24 698:2 703:17 706:14 707:8,13,22,23, 24 709:21 711:21 715:6 716:17 717:12,14 720:9 729:8,14,16 733:10 734:4 738:9,23 744:22 758:11 761:17,19 766:13

**hearing** 6:6 9:20 21:23 154:1 285:16 334:11 408:22 424:23 429:22 433:6 440:22 444:1 447:7 467:14 471:16, 17,22 473:25 475:6 497:10 522:5 532:6 533:16 594:10 599:20 602:18

**hears** 29:9,28 30:1 547:21 762:4

**hearsay** 52:14 139:21 327:17 328:24 354:28 356:13 381:3 444:11,14 456:1 463:22

**heart** 758:19

**heat** 206:2 279:12

**heavily** 708:14

**heavy** 450:8 451:12 530:9 562:8,20

**hectic** 235:5,11

**heel** 351:26 394:11,12, 26 395:20 396:23 398:19,20 399:13,25 400:8

**height** 59:15 61:25 118:1 480:1 493:27 543:18 614:16

**heightened** 158:7 702:14

**held** 9:7 90:24 107:15 108:8 131:15 168:15 220:25 239:12 263:4 301:5 305:13 329:22 343:9 346:18 390:24 424:7,18 448:2 507:3, 19 525:16 531:21 537:25 541:19 544:20 583:15 618:2 619:19 642:25 650:3 690:8 691:4 752:11 755:10 757:22

**hell** 745:13

**helped** 196:15 590:25 600:18

**helpful** 82:21 91:4 286:2 355:24 452:16 460:1,2,10,17 479:7 559:20 566:13 601:19 640:10 688:20,27

**helping** 233:23

**helps** 257:18 465:8 495:17 591:3 650:12,18

**Hernandez** 10:1 21:11, 16 90:19 225:6 237:17, 26 238:5 292:6 305:4 314:2 326:7 334:4 336:14 340:19 343:13, 21,27 346:22 357:12 369:24 370:2,3 377:11 383:7 392:24 400:16 415:20 429:14 444:3,17 508:11 513:6 515:13 523:18,20,22,26 525:2 542:12,14,15,22,28 543:3 544:22 549:26 550:1 563:28 573:9 575:15 620:5,6,13,21 627:12 635:24 637:22 673:17 687:19 706:17 708:13,20 709:16 710:5 711:22 714:13 715:28 717:28 718:6 722:6 730:5 731:8 732:11,12 735:1,2 749:17 750:26 751:9,12,26 755:14 760:4,12 764:16,24

**hesitate** 766:19

**Hesperia** 217:21

**hey** 75:20 100:16,17 101:6 190:22 198:14 211:14 212:3,6,12 391:4 404:27 671:26 678:21 681:8 704:25 705:4,11 711:9 721:5, 12 730:25 735:25

**hid** 403:15

**hiding** 764:25

**high** 37:12 59:12 111:22 115:24 122:5,6 123:13 128:23 217:27 220:4,5,8,12,22,24 228:28 229:2 262:14 263:1,2 278:24 289:8 320:8 358:16 365:12 389:14 392:16 604:5 632:26 633:4,26 671:24 750:21

**higher** 252:21 263:19 320:6 592:5 602:18

604:5

**highest** 78:28

**highlighted** 328:6

**highlights** 169:11

**highly** 694:25 695:6,24 743:12 752:19

**Highway** 242:21

**Hills** 239:21,23,26 243:13,25 731:4

**hillside** 266:9

**hindsight** 162:28 299:13

**hired** 453:2

**historic** 408:1

**hit** 31:4 52:28 102:17 105:10,14 123:27 124:2 140:22,28 146:9 161:16 162:1,4 178:10 207:8 213:20 251:7,16,23 254:2,28 255:8 274:6 291:24 320:22,25 321:13 341:18 365:18 391:12,16,19 392:5,7 393:8 409:22,28 426:17 498:23 537:1 633:19,22 640:7,9 672:2 676:9 685:24 689:3 693:27 699:4,6 702:28 703:2, 16,22,23,24 730:10 733:2 739:6 740:25

**hitch** 278:6

**hits** 40:7 254:7 256:20 426:12 699:25 713:17 739:19

**hitting** 19:28 20:8 53:14 105:6 141:20 178:11 179:4 185:12 341:14 674:1

**hold** 6:24 163:21 197:1 207:2 213:12 368:11 525:22 603:14 698:11 718:18

**holder** 41:14

**holding** 67:12 97:8 233:4,5,6 358:28 360:20 365:26 496:25 497:15,17 644:8 711:3, 5 759:1 762:14

**hole** 323:7,9 325:1 326:3,9,27 327:6 354:12

**holes** 763:27

**holiday** 691:22,24

**hollow** 751:8

**holster** 81:8 83:23 163:16 287:20,21 408:23

**Holub** 132:6

**home** 7:11 19:23 20:21, 28 24:20 25:2 116:11 174:13 176:25,27 177:1,9,11 179:18,19 186:27 188:18,20,24 202:9 207:24 213:26 214:1,11,15 215:11 265:21 323:27 325:9 397:28 398:3,6 405:27 675:11 679:24 694:12, 13 697:5 698:16 708:18

**homes** 769:10

**homicide** 239:27 240:1,4,9 255:18,19,20, 23 259:12,16,25,27 260:2,8 261:8,9 265:6 266:4 292:24,25 418:8

**homicides** 240:10 265:9 293:1

**Hondo** 240:22

**honest** 500:10 524:17

**honestly** 18:6 301:19 657:1

**honey** 695:20

**honor** 5:21 6:9 7:4,21 9:27 22:15,18,25 38:4 54:1 79:18 81:27 82:12, 14 85:18 89:23 90:17 98:12,15,23 107:9,21 108:1,5,13 110:4,10 113:17 114:24 121:3 130:14 131:6 138:15,19 141:25 155:28 156:1 158:3 159:11 172:18 181:3 185:17 187:19 195:4 199:11 203:25 221:7 227:19,20 234:15 237:14 238:1 270:2 292:1 301:14 305:17 314:15,23 317:9,20 323:21 329:26 330:7, 10,13 338:28 339:25 340:17 341:23 342:1,9, 12,14 343:2 346:8,12, 13 361:7 362:16 367:12,15 368:21 377:7 383:4,5 411:2 415:16 417:22 418:22,24 419:12 423:26,28 424:2 425:14 427:18 429:20 430:4 431:6 433:16,22 434:20 435:8 436:4 443:23 444:20 446:9, 22,28 447:4 448:8,26 454:11,19 507:16 515:15,25 516:17,24 517:14 519:15 520:17, 26 521:11,23 522:7 526:14,25 528:16 531:26 534:28 535:5 540:9 542:4,8,17,20 559:27 567:23 568:27 569:9 576:12 579:5 582:8 583:13 584:12 592:23 608:20 617:12, 16,20 618:17 619:2,17 620:9 627:8 635:20 636:13 640:18 642:6,8 649:18 691:9 710:1 728:20 740:6 752:8 753:10 754:28 755:16 763:28 766:8

**HONORABLE** 5:3 73:3 138:3 227:3 336:3 429:3 515:3 575:3 647:3 728:3 771:3

**hood** 52:28 53:14 102:18 142:27 255:2,5 316:6

**hop** 251:15

**hope** 9:10 479:25 523:8 527:7 736:9

**hoping** 5:26 253:10 427:12 505:22 702:8

**horse** 377:8 505:25 687:6

**hospital** 247:5

**hostile** 522:28 705:9

**hot** 263:8 279:14

**hour** 9:15 30:14 48:5 107:14 111:28 123:7,21 130:4 156:15 256:21 307:11,13 308:8 309:7, 11,17,19 311:16,18,27, 28 312:3,8,11 313:9 317:28 318:7,13,16,20, 27 319:1,3 320:7 384:22 389:2,22,23 390:3,28 391:5 425:19 431:3 433:2 446:14 447:11,16 476:9,15,21 477:1 478:12 479:5,15, 16 480:26,28 501:18 502:26 503:20 507:26 543:18 598:22 601:7, 11,15 603:17 610:25 611:1 614:11 622:8 623:24,27 626:15 631:2,7 633:1,8 639:24 693:5,7 699:23,27 700:8 702:13,15 703:9, 19,22 704:6 709:12,14 710:4 712:23 714:16 715:25 717:21,22,26 718:2 731:14,19,20,22, 24 732:4 733:28 739:24 740:7,9,10,11,12,13,24 741:8,17,20 742:15,21, 27 746:12,15,18,22 748:17 750:8,20 754:6 758:3,9 762:1 765:28

**hourly** 241:13

**hours** 36:26 45:6 46:13 48:5 220:26 241:11,14 248:20 257:20 265:14, 26 293:10 313:8,9,10 373:3,9 377:26 378:6 379:16 380:1 397:9 492:6

**house** 6:13,14 7:9 8:5 19:19,20 20:22,26,27 24:22,24,25,26 87:9 99:13 174:15,16 175:2, 7,18,23,25 177:4 179:19,22 180:10,13, 14,21 186:16,18,21,23, 24 187:14,18 188:20 201:19,22 207:18,19,25 208:9,10,20 269:18,19 324:25 325:16 422:26 551:7 561:28 634:19 636:9 719:28 721:3

733:25,26 739:6 763:14

**housed** 218:9 230:21 235:4,8

**houses** 19:21 166:7 174:17,19

**housing** 219:15 220:28 230:20,21 231:3,19,23 232:11 239:18

**HPO** 530:6

**hug** 403:18

**huge** 688:9,10

**hugged** 289:15

**hugging** 763:23

**human** 22:7 262:23 286:26 406:18 447:10 481:1 595:21,22 597:3 602:3,8 611:3,7,10,15, 23 612:4,19 613:6,14 614:4 629:23 630:3,4, 15 674:9 689:26 702:13 703:7

**humans** 595:24 630:14

**Humvee** 741:4

**hundred** 24:23 26:12 307:8,10,14 308:7 315:15 318:25 488:27 548:8 559:12,23 730:28 731:18 732:19 739:24

**hundreds** 168:25 373:3 761:12

**hurt** 191:6 198:2 665:11 668:8 670:6 684:24 702:22 703:2,15,21 739:20

**husband** 177:1,15,16 178:22 188:17,24 189:16,21,27 190:3,7, 25 192:4,5,20,24,27,28 194:17 196:22,26 197:8,14,21,24

**husband's** 177:6,20, 23 178:22,26 179:14 192:17 199:3,4

**HVE** 450:21

**hyphenated** 267:26

**hypothetical** 308:1,2,3 309:4 311:5,21 318:5 372:11,23 374:13,14, 15,17,24,28 375:2,6,9, 15,16,23 376:23 390:22 391:2,4 393:15 402:9 496:28 536:18 544:16 546:11,17 547:5,14 549:28 550:7 599:16 613:7 660:7,8 738:14

**hypothetically** 69:16 371:3 372:11,12 374:17 375:17,25 376:23 385:21 386:4 390:18 391:23,24 392:19 393:15 402:10 403:3 476:14 546:10,12 547:6,8,18 550:8,11 599:16 608:1

**hypotheticals** 309:26 415:9 546:23

**hysterical** 519:11

**I**

**ID** 4:2 137:2 226:2 335:2 514:2 574:2 727:2

**idea** 10:27 57:10 88:16 89:7,16,19 95:13 104:1 146:2 152:20 165:27 204:23 212:17 215:23 348:14 364:17,20,25 437:10 444:2 446:9 461:2 548:14,21,23 549:1 559:6 565:16 651:11,12 705:3 729:1

**ideas** 646:10 766:22

**identical** 217:15

**identification** 268:2 357:10

**identified** 63:19 105:27 176:11 185:10 202:5 218:17 230:6 268:11 295:5 360:7,8 364:28 378:19 386:22 409:4 421:13 485:1 522:14 529:13 557:8,15 568:3 601:13 603:26 604:11, 18 641:5 642:1 713:2 760:3,6

**identifies** 46:23 596:7

**identify** 39:9 54:28 63:14 66:15 120:14 176:4 267:3 352:4 410:8 421:7 479:17 553:3 567:1 595:14,20, 23,27 597:17 641:13

**identifying** 165:6 350:28 369:26 461:14 529:20 557:21 628:16

**identity** 14:6 651:4

**idle** 462:1 469:2 471:25 477:19 487:17 498:17 505:12,14 543:8 547:7 596:8 701:7 714:17,18 716:23,24,25 753:21

**idles** 594:28 596:15 597:2,27

**idling** 30:1 69:1 76:2 386:17 388:2 547:9 595:3 596:15 617:3

**ignore** 16:17 18:15 653:28 657:9

**ignoring** 734:22

**ill** 756:28

**illuminate** 93:3

**illuminated** 69:2 70:20 95:24 97:27

**image** 28:4 92:13 111:13 113:13,22 193:15 324:12,14,15 340:9,17 342:10 357:12,14 377:11,13, 24,25,26 454:24 457:18 458:25 459:7 463:6 466:1,19,22 480:3,4 483:22,23,24 492:6 604:24 624:22 741:24

**images** 340:10 379:11 477:23,24 586:23 588:4 608:25

**imaginary** 15:18 653:7 693:24

**imagine** 299:17

**imagining** 612:1,7,10, 14

**immediately** 13:20 48:28 177:28 214:27 303:19 470:1 602:6 613:15,16 766:24

**imminent** 79:1 298:27 299:2 300:24 303:11 304:28 309:28 311:24 730:4 731:13,15

**immobile** 233:23 234:4

**impact** 158:22 168:21 244:18 246:1 247:13,18 251:10,11 255:1 262:23 278:19,24 441:15 554:1 585:19,22,26 602:3 685:25

**impacted** 313:22 491:28 492:2,10

**impacting** 416:4 479:25

**impacts** 555:10

**impartial** 766:26

**impartially** 15:20 653:9

**impeachment** 90:18, 21 302:18 346:9,16

**impeded** 721:19

**impediment** 686:5,7 762:17

**importance** 296:14 455:12 517:20 659:23

**important** 10:5 18:6,19 22:27 26:9 27:13,14 28:19 29:1 31:25 32:8 95:8 139:4 212:17 258:20 270:23 278:12, 27 298:16 337:25 340:4 342:7 402:1 406:16 415:26 436:20 458:6 473:2 516:28 517:28 518:1 524:1 553:2,18, 24 565:1 595:15,17 632:9,21 634:8 635:6 644:14,15,16 651:11 657:1 659:5 674:20 678:22 687:12 688:3,5 693:13 694:4 695:26 698:1 699:21 701:3,17 703:27 704:2 706:18, 19,20,21 710:13 711:23,24 712:10

714:4,5,6 715:3,15 731:27 734:28 741:12 743:5 745:21 747:22,26 749:11 752:25 762:8 767:8,19

**importantly** 691:20 741:16

**impossible** 215:25 697:19 710:5 715:7 747:8 751:21,22 752:5

**impression** 67:20 275:18,19,22,24 276:24 281:18 282:8,9,28 288:3 294:16 348:5 349:15,16,17,20 350:2, 9,18,20,23,25 351:15, 25 353:14 359:27 379:1,2 396:17,18,26 407:17 462:27 463:5,7, 15 465:13 491:2,5,12, 24 492:4,15,17,24,27, 28 674:19

**impressions** 264:21 269:10,13 270:24,28 272:10,19 273:2 280:16 281:9 283:8,10,14,15, 20,23,26 289:6 294:8 349:2,18,26 359:22,24 401:22 461:10 465:19 488:17,19 491:7,11 492:22 552:24 561:15, 16,19 562:2 565:17 566:23 567:1 718:4 735:5,7,22 736:19 749:20

**imprint** 353:3 398:20 399:27,28 400:20 463:9

**imprints** 393:26

**improbable** 364:27

**improper** 22:4 90:21 311:5 346:16 390:22 496:28 536:18 547:13 643:26 736:18

**improperly** 301:25

**inaccuracies** 519:10

**inaccurate** 14:26 89:10,14 150:8 521:9 652:10

**inadvertently** 116:5,11 694:22

**inappropriate** 312:27 418:19

**incapacitate** 306:17

**incapacitated** 386:5 412:9

**incapacitating** 392:17

**incapacitation** 386:2

**inch** 575:25

**inches** 276:14,17 324:4 373:14

**incident** 23:17 29:19 40:24 42:15 45:24 48:14 53:24 84:19 90:28 91:3,9 109:16 114:6 115:25,27 116:3 125:8 128:19 142:9 151:28 154:22 156:9 158:20 162:2 164:21 168:27,28 170:2 185:23 196:1 200:26 201:16 211:7 230:19 233:18,21 234:27 266:2 268:2,18 271:22 285:23 294:22, 23,27,28 305:1 313:5 345:27 355:10,22 356:2,11,23 360:25 361:15 378:11 379:11, 18 382:7 401:11 403:1 407:28 411:28 421:25 422:10,26 436:14 439:4 441:3,12 460:12 538:4, 10 539:9 587:8 605:9 671:22 676:16 677:2,7 708:1 730:6

**incidents** 54:8 451:10 585:12

**inclement** 42:8

**include** 255:15 363:9 410:21 577:8 580:26 619:11 664:7 666:8

**included** 354:7 575:18 576:8,17,24,25 578:1 580:5 644:10 645:16 756:11

**includes** 13:5 255:17

**including** 12:10 14:10 18:22 158:14 349:2,3 354:9 406:17 429:28 452:5 539:5 655:5

665:16 667:7 668:12 670:10 693:2 761:28 767:2

**incomplete** 14:27 613:7 652:10

**inconsistencies** 18:5 524:22 656:28

**inconsistent** 17:27 372:1 408:11 524:18,20 644:7 656:22 708:9

**inconvenience** 569:3

**incorporated** 493:28

**incorporates** 495:5

**incorporating** 502:17

**incorrect** 86:11 106:12,27 107:8 110:24 114:16 124:26 126:21 146:11 149:13 171:11 537:7 755:21 756:17

**incorrectly** 553:28 557:8,15 749:20

**increase** 157:23

**increment** 621:19

**Indefinitely** 477:16

**indentation** 367:20

**indented** 647:28

**independent** 483:6

**INDEX** 3:1 4:1 136:1 137:1 225:1 226:1 334:1 335:1 513:1 514:1 573:1 574:1 726:1 727:1

**indicating** 275:11,13 281:12 283:28 290:12 371:22 372:1,23 374:4, 6 426:11 485:21 494:25 575:18 576:11 580:28 581:12 622:18

**indication** 13:25 63:22 67:14 68:8 123:12 425:24 561:25 768:5

**indications** 97:20

**indicator** 65:7 282:15 325:25 482:5

**indicators** 68:27

**indicia** 680:18

**indirect** 654:22

**indirectly** 665:19 668:15 670:13 684:8,9

**indiscreetly** 207:1

**individual** 14:24 26:8, 17 55:8 156:28 157:8, 10 215:3 295:25 297:4 298:19 309:5 405:18 416:19,20 441:13 443:4 547:23 599:17 603:2 608:14,16 613:24 652:8 732:10 736:15 754:7

**individuals** 53:18 402:24 438:16 442:2 445:26 452:13

**industrial** 437:10,12, 13 441:2 451:11 481:23 585:20

**industry** 478:10 479:2, 14 496:13 503:16

**ineffective** 79:23,27 662:27 672:17,24 698:26 743:19

**inferences** 681:27

**infinity** 351:5,6

**influence** 13:19,28 650:26 661:10

**influenced** 17:21 656:15

**influences** 642:19

**inform** 12:7 94:28 172:12 436:20

**information** 11:26,27 12:8,9 13:16,18,19 18:23 47:19,25,27 51:21 52:9 53:3 54:7,10 55:6 70:9,11 97:28 109:10,12,16,17 129:1 154:25 244:24 246:11, 26,27 255:27 256:2 264:1 276:19 330:4 382:11,21 388:21 431:4 433:15 455:23 464:8 474:19 477:7 494:21 538:7 553:19 560:15,18 580:8 586:18 589:22 590:7 616:21 630:8,18

631:18,26 658:21 659:18 660:1,3,26,28 734:19,21,22 737:14 764:11 769:8

**informed** 101:21 170:23 204:17 427:13 515:16

**infotainment** 249:23, 24

**inherently** 578:9 692:24 716:10 739:13 742:9

**initial** 9:25 19:3 28:12 31:12,16 43:1 67:6 68:1 75:28 81:19 101:1,5 124:25 167:2 268:6 315:7 414:4 422:5,22 431:7 476:7 488:9 501:26 502:14 503:28 504:9 531:5,7 591:5 593:27 597:23,27 598:12,16,18,20 601:6 604:12,14,17 605:23,27 606:18 622:8,17 623:13 636:5 637:2,6 708:25 712:5 713:6 740:21 741:14 746:13 749:22 750:17 761:17

**initially** 28:9 48:2 76:26 86:13 89:11 97:24 100:24 101:2 103:7 110:27 119:12 128:9 190:11 239:14 242:17 277:13 315:25 321:1 361:10,14 380:14 406:13 429:24 464:5 544:23 605:15 709:14 749:15,24 760:25

**initials** 81:26

**initiate** 623:10

**initiated** 65:9 82:25

**injure** 426:19

**injured** 77:27 78:10 341:19 378:10,13,18 385:12,22 393:18 599:9 602:7 665:24,25 668:20,21 670:18,19

**injuries** 304:6 702:17 743:1

**injury** 298:27 303:12, 17,18 310:1,4,10 576:6, 19,27 577:16,18,27 578:2,22 579:10,11 580:13,23 581:24 643:9,10,19 644:26 645:1,5,25 646:3,5,9,12 648:28 657:28 658:2, 12,17 664:15,22 665:1, 18,28 666:1,5,17 667:19 668:14,26,28 669:1,6,18 670:1,12,22, 23 671:2,6 682:21,23 683:4,7,15 686:1 697:24 699:28 700:5, 11,12 701:21,24 702:4, 5,10,11,17,19,24 703:1, 4,9 714:9 716:13,16 730:4 731:13,15 741:2, 9,10,18 742:6,12,22,23, 24 747:25,28 748:18 754:7

**inland** 375:24

**inmate** 218:9 235:3,15

**inmates** 220:12,25 230:22,25 231:7 232:10 235:8,19,27 239:18

**innocence** 15:1 32:27, 28 426:26 655:20,21 701:1,2,13 743:7,9 765:23

**innocent** 15:10 652:27 693:14 752:28

**input** 458:13,16,23 459:2 461:16,17,18 469:13 473:4 477:9,10 486:7 488:4,7 502:28 503:1,19 589:20 590:6, 18 591:15 630:3

**inputs** 458:10,11

**inquire** 433:9 439:24

**inquiry** 418:9

**inside** 36:24 48:13,21 50:26 52:5,7,9 77:13 100:27 160:19 167:5 177:3,5 178:13,24 179:25 180:21 190:9, 10,18 199:5 207:13 232:26 237:3 244:13 245:7 275:10 380:2 423:10 486:9 497:21 629:26 654:27 689:28 697:6

**insisted** 203:13

**inspected** 271:21

**instance** 34:8,9 78:14 122:25 153:1 158:14 220:20 236:17 252:22 253:26 256:18 294:6,15 308:11 309:2,14 311:20 312:10,15 391:9 437:7 438:13 477:14 500:17, 21 501:3 543:26 565:7 621:22 624:11 632:21 674:25 675:7 720:19

**instances** 306:24 443:7 692:27 720:20

**instruct** 10:24 52:18 298:3 300:10 310:9 506:8 619:28 645:16 646:10 650:19 769:14

**instructed** 12:16 21:25 23:6,7 213:27,28 230:26 298:5 579:26 676:20 689:15

**instructing** 258:1

**instruction** 32:15 218:24 257:25 302:2, 10,14,20,24,26 578:12 580:21 618:16 619:12 645:9,19 647:21 648:4, 12 649:10 651:11,12,23 658:9 664:11 672:16 677:25 678:28 683:1 684:7,18,28 685:25 686:18 700:20 701:26 703:27 714:10 733:11 743:5 747:19 753:7,12 756:12,16 758:13,17 764:6 765:19,24

**instructions** 9:25 10:3, 8,14,21,22 11:9,14 19:3 21:28 31:26 230:16 336:23 421:21,24 446:20 508:21,25 575:16 576:28 581:26 582:4 618:13 619:12,13 642:14 645:19 650:8, 11,21 651:8,9,10,16,19, 21,25 659:25 670:3 671:9 672:9,21 689:17, 23 690:27 702:7 729:15 753:13 756:3 768:17,26

**instructor** 257:19,21, 27 258:1,24

**instructs** 701:28

**instrument** 666:3 668:24 700:3 702:4 741:2 742:4

**insurance** 256:12,22 482:8 585:6,9,15

**insure** 94:10

**intact** 695:14

**intelligence** 239:16

**intelligent** 732:15

**intend** 342:13 524:21 658:8 665:11 668:7 670:5 677:22 684:23,26 745:8 748:12 765:28

**intended** 336:28 426:17 515:16 663:1 665:22 668:18 670:16 672:18 677:18 684:25 698:27,28 699:7,10 735:21 737:19 743:19 750:27 758:4 765:27

**intending** 611:16,25

**intends** 612:6

**intense** 567:5

**intensely** 215:7

**intensity** 78:21 611:12

**intent** 31:8 337:8,21,22, 23 338:5 391:24 425:17 426:22,27 655:5 657:13,14,18,19,20,26 658:6,7 662:5 663:7 674:11 676:4,23 677:13 684:27 699:7,10,11 706:20 707:9 743:22 745:5,22 748:19 758:1, 8,11,16

**intentionally** 657:17 658:7

**intentions** 524:14 764:13 765:1

**intently** 707:20 747:3

**interacting** 153:4

**interaction** 180:18 197:27 204:16 299:18 680:28 681:24

**interactions** 178:1

**interest** 17:23 250:2 656:17

**interested** 341:27

**interesting** 32:3 579:23

**interfere** 766:24

**interior** 278:6

**intermediate** 242:19 292:18 598:17

**internal** 116:28 117:1 240:12 246:2 414:23 416:24 736:26

**internet** 12:11,24 651:27 767:9

**interpret** 461:5 734:19, 23

**interpretation** 128:17 426:25 482:24 689:13 766:3

**interpreted** 24:10

**interpreting** 735:16 762:5

**interrogate** 450:7

**interrupt** 244:22 249:27 445:14 500:12 612:23

**interrupted** 337:2 663:11,15

**interrupting** 206:12

**interruption** 132:7 578:17

**intersect** 248:19

**intersection** 251:5 253:16,18

**interval** 475:3 502:16 504:4,7,13

**intervals** 28:10 241:4 504:1 717:23

**intervened** 758:16

**intervening** 686:7 758:9,17,18,21,26

**interview** 90:18,28 91:8 96:1 102:27 107:3 108:26 111:7 161:19 170:4,20,24 171:14 172:1,6 195:28 196:3,8 260:14 295:21 317:4 327:20 328:3,7,12,13, 15 345:10,23 347:8,12, 20 355:8 361:15 382:11 390:11 403:10 541:23, 25,27 554:11,12 555:27 639:2 729:27 740:21 750:18,20 761:17

**interviewed** 29:19 91:6 268:11 280:24 294:25 295:5,10,12,17, 18,19,23 316:10 355:16 356:6,8 633:3 638:15

**interviewing** 105:9 285:20 322:24 345:15

**interviews** 248:2 266:15 283:16,25 285:16 288:6 289:14 290:1,8,22 294:20 381:7 391:18 440:9 541:23 552:7

**intravenous** 359:1

**intricate** 243:15

**intrigued** 255:21

**introduce** 90:17 346:8 357:11,20

**introduced** 182:20 516:13

**intuition** 54:8 206:14 208:6 209:11,12

**intuitively** 207:11

**investigate** 12:26 13:2 36:13 52:13 67:6 132:5 242:22 246:12 259:12 338:21 404:15 585:12, 21,25 652:1,5 679:25

**investigated** 85:9 355:17 624:24 697:28 698:3

**investigates** 259:11

**investigating** 10:1 53:5 101:19 102:5 156:5 246:10 293:12 366:2 406:19 417:17 624:28 640:11 664:8 666:9

**investigation** 52:10 53:7 84:20 91:7 104:1 144:3,14,23,26 148:22 150:25 156:4 165:3,8, 11,12,17,19,28 240:9, 27 242:4,9,15,20,26 243:1 248:2,5 250:24 251:28 252:6 253:6 255:18,23 256:26 259:14,16 260:3,5,7,9, 10,11,12,13,15,17,21, 23,27 261:16,26 264:2 265:15 266:1,16,22 268:23,27 270:16,20, 21,23 272:14 273:19 274:25 278:13 279:2 280:13 283:16,25 286:2 292:14,17,28 293:18, 19,24,26 294:19 296:4, 14,27 298:12 351:28 355:5,19,25,27 381:7 382:7 390:12 391:15 404:19 406:22 411:28 412:21 417:1,27 418:3, 9 443:1 455:28 523:23 524:10 525:8,12 537:16,19,28 538:14, 16,20 539:11 541:24 553:25 554:2 565:1 586:2,4,10,19 587:15 590:4 621:16 630:20,22 633:24 634:9 635:6,15 637:6,8 638:22 679:16, 26 680:1 687:1 695:2,3, 20 698:2 717:10,11 730:8,12 732:1,21,22 734:9 735:27 737:19 742:1 751:11,14,15,19, 27 752:7,21,22 759:19 760:5 761:24 764:15,21

**investigations** 37:9 144:16 148:18,19 240:7 241:24 242:1 243:5,8 245:24 246:5,8 255:25 257:2 261:11,13 265:8 292:26,27 293:1 296:21 430:15 433:11 441:2 482:10,13 538:28 539:1 585:6 732:13 761:12,15

**investigative** 266:6

**investigator** 247:14,20 267:25 296:23 750:1

**investigators** 107:3 159:22 166:14 246:14, 19 398:8

**invitation** 64:25

**involuntarily** 385:23 599:11 701:8 714:21 718:28 743:24,26 748:11

**involuntary** 320:13 386:5

**involve** 148:19 259:13 657:11

**involved** 12:4 13:1,12 17:22 18:21 53:6 69:19, 24 102:21 148:17 165:9 247:14 252:3,27 255:21 258:28 261:26 267:2 294:22 299:23 366:3 440:6 452:14 499:18,21 524:24 538:2,5,24 539:5,10,11 540:4 558:4 575:20 576:7 577:14 585:14,15 652:4 656:17 666:25 679:5 733:10 767:2 768:19

**involves** 257:14 259:20 261:8 306:3 415:5,6

**involving** 243:9,16 244:2 260:2 305:22 306:26 539:23 585:18

**IOS** 524:10

**iron** 61:18,20

**iron-type** 57:16 59:8

**irrelevant** 11:27 304:23

**issue** 5:27 13:22 18:28 19:4 29:17 96:28 110:5 139:4 218:28 219:1 261:2 301:27 302:19 336:15 337:25 365:16 392:26 421:21 442:20 519:12,26 524:24 537:11 576:14,20 577:20 582:12 615:24 618:13 643:6,13 646:6

655:8 657:11 694:28 738:2 755:18,20 756:15

**issued** 80:15,17 116:24 677:9

**issues** 26:4 29:12 31:23 98:17 320:8 432:3 443:13 539:20 642:12 768:24

**item** 493:23 524:2,7 641:28

**itemize** 297:1

**items** 20:1 42:1 45:4,12 253:4 266:26 267:3 269:1 270:15 278:2 282:14 284:14,17 296:13 483:18 493:3 673:18 767:11

**IV** 359:1

## J

**J-E-R-E-M-I-A-H** 216:19

**J-O-N-A-T-H-A-N** 419:9

**J-O-S-E-P-H** 200:3

**jacket** 420:16 697:2,3,6

**jacking** 165:23

**jail** 218:10 234:23 235:3,10,26 237:3

**jails** 235:12 239:14,15, 17,19

**James** 5:6 22:24 73:6 138:6 227:6 336:6 429:6 515:6 575:6 647:6 691:14 728:6 771:6

**January** 217:23 218:4, 8

**jeopardy** 736:15

**Jeremiah** 136:13 216:9,18,25

**job** 10:24 239:8 242:5 377:4 416:23 437:2 484:12 737:12,13,15

**jobs** 442:18 508:2 769:11

**jog** 196:15 712:26

**jogged** 734:3

**Johnson** 421:26 422:6, 9,23 677:11

**joined** 257:13

**joins** 20:10

**joint** 657:12

**Jonathan** 334:7 418:28 419:9,19 644:5

**Joseph** 19:17 136:11 178:27,28 199:20 200:3,8 267:19 268:7 675:2

**jostle** 497:18

**judge** 5:3 11:24 17:2,5 21:25,27 23:6 73:3 138:3 227:3 336:3 429:3 515:3 575:3 647:3 655:24,27 689:17 691:19 692:9 701:28 728:3 753:14 757:14 766:26 771:3

**judicial** 34:15,20 109:26 110:8 172:28 173:5 199:21,26 216:10,15 227:22,27 237:18,23 419:1,6 425:6 434:7,9,14,22 448:11,13,18 583:1,4 768:28 769:22

**jumbled** 547:17

**jump** 140:28 175:12 311:25 344:1,17 481:3 633:18 675:8 703:19 710:11,15 738:28

**jumped** 140:25 291:23 337:16 344:14 702:28 717:15

**jumps** 736:2

**jumpy** 717:16

**jungle** 695:12,13

**juries** 698:22

**jurisdiction** 36:14 240:6 259:27

**jurisdictions** 259:13

**juror** 13:18,20 21:25,26 22:2,8 329:15,17,20 447:17 506:15,20 689:27 734:18

**jurors** 11:12 12:13,14, 19 13:23 14:14 18:22 19:1 22:4 38:26 184:28 698:8,21 734:14,16 752:27 766:18,21 767:5 768:10,15,16,22,25 769:7,12

**jury** 5:13 7:7,15 9:3,8, 25 10:7,8 11:11,18,22 12:6,18 13:5 14:18 22:23 31:26 32:15 34:10 39:1,23 52:18 71:12 81:17 98:16 105:19 107:16,18,27 108:9 113:28 115:22 116:22 123:3 129:11, 13,19 131:16,18 141:16 149:17,18 151:23 164:15 187:21 212:17 259:5 262:4,6 263:23 299:11 301:6,8 305:10, 14 310:9 317:15 329:23,25 336:13,23 338:8,11 339:17 341:7 342:6 343:10 358:26 389:13 411:6 424:16, 19,21,28 426:3,21,24 427:2 429:13 434:28 436:5 446:1 447:3 448:1,3 449:9,17 454:2 455:7 458:14 463:25 480:27 507:2,4 508:21, 24,25 509:1 515:12 519:18 520:13 522:4, 16,21 523:2,7,14 525:14,17 528:14 531:22 575:14,16 576:27 577:10,15,22 578:12 579:17 580:20, 21 581:26 582:4,7,17, 22 583:14,16 594:3 598:2 601:16 618:3,5, 13,15 619:12,20,22 620:2 623:9 631:8 642:26,28 643:2,15 645:23 646:1,6,8 647:14 648:10 650:2,4, 19,21 652:19 670:3 690:9,11,26 691:5,13, 28 692:9,16 693:6 699:17 700:20 728:17 729:15,17 733:10 737:14 747:2 755:11,13 756:3,18 757:7,8,21,23 766:9,10,15 767:5,14, 18 768:15 769:1,14,18, 25 770:6 771:13

**jury's** 317:24 338:13

**justice** 11:22 250:17 259:20,24 285:6

**justifiable** 307:26

**justifiably** 300:25

**justified** 203:4 312:14

**justify** 308:4 504:20

**justifying** 754:19

**Justin** 267:17

## K

**KATHLEEN** 5:8 73:8 138:8 227:8 336:8 429:8 515:7 575:9 647:9 728:9 771:9

**keyed** 270:24

**keys** 83:19 686:7,15

**kick** 105:5 262:14 263:1 289:7 402:16 409:23 410:18 722:11

**kicked** 116:2,5 150:26 161:15 263:21 264:6 371:5,15 376:28 402:11,20 409:14 551:20 721:12

**kicking** 77:18 415:25 565:9

**kid** 358:14

**kill** 153:27 191:24,25,28 212:4 336:28 337:21,22 338:10 425:17,25,26 426:19,27 577:25 633:28 634:4 657:20 662:5 663:1,7 672:18 674:11 676:4,17 677:17,18,23 692:25 698:27,28 699:2,8,10, 13,14 704:11,12 707:10

715:25 716:10 720:7 735:21 737:19 739:14, 19 742:9,15 743:19 745:5,8,15,17,22 746:5, 15,17,20,21 748:18 750:27 758:12

**killed** 78:10 259:9 720:28

**killing** 662:27 663:14 672:17,24 698:26 707:9 745:13

**kind** 11:1,3,20 23:20 24:7 29:28 31:12 33:7 35:17 42:21 46:28 47:2 53:24 56:18 57:10 93:7 164:7,20 197:14 203:23 209:10 211:15 212:17 213:5 246:11,24 253:4 260:27 261:3,25 262:17 265:8,27 271:3 273:10 279:1,12 286:7 310:6 311:21 312:1 320:1 339:5 340:27 358:13 361:3 370:15 384:13 410:9 420:14 468:26 481:28 493:11 502:5,6 532:11,16,17 557:23 558:3 562:12 586:12 590:14 604:13 623:18 665:18 668:14 670:12 681:2 693:18 695:3 698:22 702:27 709:2,21 719:11 731:2 738:26 748:6

**kinds** 62:10 80:21 430:15 445:12 721:18

**kinematics** 461:3 501:22

**kinetic** 253:24 278:18 470:12

**Kleenex** 252:18

**knee** 43:25 703:3

**knew** 67:15 70:18 90:4, 9,12 97:28 145:26,28 146:3,8,19,23,24 147:10,13 154:18 155:10,25 289:16 336:26 385:15 565:11 576:20 583:8 584:1,6 643:14 657:23 658:13, 18 662:7 664:4 665:6

666:27 677:28 679:12 680:9,12 682:15,24 683:21 685:17 687:3,8 704:15 720:12 750:7,25 763:19

**knife** 153:20 194:20 212:12,14

**knock** 94:22,23 508:21 719:22

**knocked** 254:23,27

**knocking** 66:17

**knowing** 52:12 100:3,4 165:13 309:22 409:6 410:14 497:9 545:21 588:15 641:4,12,27

**knowledge** 95:5 115:14 117:26 123:4 125:24 126:3 127:26 142:23 144:4 145:3 148:8 153:13 166:13 259:1 260:4 268:17 288:7,9 308:8 366:23 382:6 385:2 399:9 404:4 430:13 437:22 439:5 442:7 445:21 451:14 473:5,15 478:14 535:25,27 547:20 557:24 595:12 596:27 598:26 599:19 608:26 639:27 659:27 682:10 732:17

**knowledgeable** 292:13

**L**

**L-A-Y-O-S** 228:3 234:20

**L-SHAPE** 350:8

**L-SHAPED** 351:18 352:5 395:1

**lab** 249:21

**label** 466:4

**labeled** 503:28 589:28

**lack** 108:3 169:18 346:1 499:13 662:11 682:10 758:19

**lacks** 385:25 562:15,22 760:10

**ladies** 9:28 22:23 30:26 34:9 98:16 105:18 115:21 123:3 317:14 458:14 691:13 692:22 697:10 752:10 753:7

**lag** 287:20

**laid** 265:7 590:11

**lamp** 166:8 694:16,21, 23 695:3

**land** 19:19 32:1 124:18 263:15 366:19,23,26 410:7,10,11 443:3,7

**landed** 246:18 280:21 289:1,25 294:4 364:6,9, 21 377:2 442:27 639:5 712:28 739:6

**landing** 375:4 377:3 410:12

**landmark** 168:7

**landmarks** 167:26 168:1

**lands** 263:13

**language** 64:1,2 75:24 155:5 162:15 521:4 580:15,20 581:5 583:6 645:19 675:28 685:20

**LAPD** 730:25

**lapel** 55:27

**large** 40:6 77:28 122:2 190:14 194:7 249:8 277:28 323:17 324:5 325:8,17,22 405:20 490:11 500:4 710:25 721:20 730:1

**larger** 353:12 354:22 398:23 593:11 702:21

**largest** 244:1

**laser** 38:26 39:18 276:4 290:13 457:5 558:18

**lasted** 594:14

**lasts** 594:10

**late** 6:4 29:24 131:21 757:2

**lateraled** 239:1

**laterally** 373:10

**latest** 526:8

**laundry** 29:9 488:13

**law** 5:6,7 11:9,24 12:2, 17,26 16:16 21:28 26:26 34:1 53:27 55:16 58:11 67:15,19,22 73:6, 7 75:12 90:9 94:11,17, 27 95:1,9,14 97:5,28 100:12 138:6,7 154:19 155:10,12 160:15 182:12 209:14,20 214:15,18 227:6,7 238:23 240:15,17,26 241:1,2,15,19 242:2 262:8 290:25,27 291:1, 2,22 300:21 306:10 336:6,7 339:7 373:6 404:15 424:13 429:6,7 440:7 450:9 506:9 515:6 555:22 557:21 575:6,7,8 576:13 577:23 578:7 619:28 642:14,19 643:26 647:6,7,8 650:7,20 651:6,8 652:1 653:27 658:8 665:11 668:8 670:6 675:27 676:28 680:12,25 681:6 682:3, 12 684:23 689:23,28 692:10 701:28 704:16, 18,24 705:19 720:10,12 728:6,7,8 729:24 730:25 731:1 733:15 749:9 753:12,15 762:11 771:6,7,8

**lawful** 75:16,18 302:2, 3,5,12 303:3,4 304:1 336:27 337:19,26,27 338:8,18 667:2 671:28 672:9 677:25 679:1,25 684:2

**lawfully** 303:1 339:14 648:25 664:1,9 665:4 666:13,20 677:24 682:13 683:17 686:22

**laws** 35:20

**lawsuit** 301:10

**lawyer's** 753:12

**lawyers** 11:10 13:10 19:9 301:1 424:14 506:9 507:22 523:8 619:27 620:1 642:12, 15,20 650:10 671:11 693:21

**lay** 310:15,22

**layer** 58:17,20

**layman** 478:7

**Layos** 225:4 227:19,21 228:2,9 234:20,21 676:22 677:1,2,4 682:9

**layout** 465:12 590:15

**lead** 377:15 402:4 461:27 551:27 553:13, 20 631:20 635:13 664:25 666:24 667:27 669:22 679:3 683:10 685:4 736:13 737:22

**leader** 258:27

**leaders** 767:3

**leadership** 36:7

**leading** 53:23 54:17 75:3 79:18 161:22 184:16 197:1 202:10 460:4 472:9 479:9 527:24 540:3 541:13 596:11,22 667:8 736:20

**leads** 266:6 538:19 673:6

**leans** 306:6

**learn** 25:9 28:4 93:20 242:7,8 348:9 355:28 357:6 735:22

**learned** 85:3 157:2 298:15 554:27 635:2 744:13

**learning** 297:23 373:9

**leaser** 644:10

**leather** 62:14 278:8

**leave** 27:6 67:9 188:20 251:15,17 253:13 254:15 263:9 264:9 275:7 317:21,22,23 487:15 540:2 561:24 679:28 697:5 769:8

**leaves** 15:16 653:5

**leaving** 277:15 367:28 565:18,20 566:3 736:6 737:15 762:25,27

**led** 47:19 52:9 53:20 54:8,12 164:23 205:19 209:20 402:5 417:1 495:7 674:25 681:2 752:6

**left** 27:19 29:13 30:22 41:9 43:11,14,24 46:21 49:17 50:11 57:16 59:23 67:2 70:10 71:5,6 73:20 76:16,20,27 77:24 80:1 83:7 84:22 98:27 101:13 106:1 112:21 114:27 123:27 131:3 143:4,5 145:1 156:9 159:5,8 166:7 170:11 175:20 180:2 184:8 192:20 202:1 213:7,9 245:20 253:3 254:26 255:10 256:7 268:24 269:11 270:14, 24,28 272:10,27 273:9 275:10,11,23 277:11 281:10,12 283:26 320:2,4 321:5,13,20 323:1,8 325:4,18 326:1, 24 340:8 349:10 373:1, 24 377:16 378:8 394:25 397:13 398:19 399:13, 27 400:10 404:9 421:10 458:19 459:12,15 482:4 488:1 494:18 532:16 541:3,8 554:24 603:27 604:10,14 606:26 608:11 615:24 638:28 674:19 681:5 694:23 695:17 696:13 697:27 712:11 728:26 760:3 762:22 765:2,4,7

**left-hand** 61:1 115:20 193:7 254:1 344:8 359:15 420:18 606:11

**leg** 43:24 233:9,26,27 234:6 255:5

**legal** 146:27 260:15 279:7 310:8 651:14 729:21

**legally** 666:22

**legend** 482:5 484:28 492:21

**legislation** 241:19

**legislature** 581:7,9,17

**legitimate** 524:7,9

**legitimately** 300:25

**legs** 233:7 234:7 531:4

**length** 12:7 87:24 88:1 217:15 276:6,10 316:23 321:8 352:13 416:14 463:6 465:19 493:26 627:21

**lengthen** 760:17

**lengthy** 163:6 526:6

**lens** 285:7 486:17,23 760:13

**Leon** 234:19

**lesser** 575:18 576:8,17, 24,25 577:2,7 578:1 579:17 580:5 643:12 644:13,24,25 645:2,9, 16,17 658:2,16,18 661:13 662:20 667:14 669:5,10 671:2,5,7 683:19 755:25 756:4,11

**lessers** 643:6 682:22

**lethal** 240:5 258:28 259:5,7,11,12,15,20,22 260:1,8 261:1 265:10 292:26 298:10 299:23 763:10

**lettering** 423:18 680:19

**level** 36:13 59:15 61:11 78:23,28 158:7 163:21 243:15 277:17 300:3

**levels** 242:19,28 253:14 298:18

**LFE** 260:9 265:20 418:2

**LFES** 366:2,3

**liability** 256:16 292:21

**liable** 256:23,24

**liar** 524:19

**license** 147:23

**lid** 46:22

**Lidar** 558:13,18,23,24, 25,27

**lied** 18:10,13 657:5,8

**life** 15:18 19:16 27:28 30:25 31:8 66:21 79:1 140:2 147:24 191:23 300:16 365:25 416:2 447:17 653:7 689:27 693:23 709:11 718:12 749:11

**lifetime** 210:19

**lift** 549:16 599:19

**lifted** 68:23 358:16

**liftgate** 68:19,23

**lifts** 358:12

**light** 7:26 25:15,24 27:4 29:14 38:20 39:2,4,6 40:7,22 46:17 91:23,24, 26 96:19 97:2,7,10 215:14,23 251:8,11,23 324:26 325:9,15 410:24 530:11 565:15 596:3 611:12 694:15,16,17, 19,21,26,28 695:6,7,13, 19,25 696:17 700:24 712:26 715:11 717:13 722:16,18 744:3 752:15,17,19,23

**light's** 215:18 695:19

**lighter** 278:7

**lighting** 33:10 40:19,21 42:24 46:16 51:3,5 57:1 71:26 87:22 91:13 92:27 93:9 95:23 96:2 99:17,18 215:13,17,22 247:26 559:22 565:13 680:14 681:16 719:17

**lightly** 718:8 734:3

**lights** 11:18 21:2 25:16, 17 31:18 33:7,8 38:2 40:25 49:1 69:1 70:20 71:1 77:17 84:25 97:7 99:23 166:6,10,13 220:27 248:9 567:8 614:6 623:3 694:14 717:15 719:16 734:5

**likelihood** 433:14

**limine** 431:23 764:1

**limines** 302:1

**limit** 164:19 287:11 586:20

**limited** 437:5,17 445:21 575:22 596:3 659:9 662:4 676:21 767:2

**limiting** 586:20

**limits** 37:9

**lims** 303:26

**linear** 480:6,18

**lines** 7:1 152:1 272:25 294:14 346:9,10 465:18 488:12,26 489:8,22 493:5,11,12 494:17 504:15 559:13 598:4

**lineup** 5:26

**lingo** 681:7,12 730:24, 25

**link** 431:1,3,12

**liquid** 442:23

**list** 11:2 268:1 580:14 586:25 752:13

**listed** 644:22 669:21,27

**listen** 10:4 12:22 13:11 14:22 26:25 85:26 235:19 236:4,5,10 294:19 361:19 387:11 466:26,28 468:13 473:6 496:18 515:27 516:20 518:1,20 520:16 522:17 531:15,17 534:21 556:19 594:4 602:16 651:17 673:14 707:20 711:7 713:4,5,13 746:25 747:1,3

**listened** 140:14 280:28 328:11,15 384:8 471:18 477:26 478:1,20 673:6, 10

**listening** 21:24 433:13 445:23 473:8 481:21 557:1 568:15 593:20 600:23 638:16 729:15

**lists** 644:17,20

**lit** 88:1 91:20 94:16 704:28

**literal** 205:8

**literally** 29:9 214:23 254:23 255:20 698:23 733:27 741:25

**litigate** 5:27

**litigation** 256:11,12 481:26

**live** 19:19 25:14 174:27 175:22 188:15 267:23 734:16

**lived** 24:26 179:18 188:11

**lives** 187:15 674:13

**living** 35:9 175:17,25 185:10 186:25,27 187:1 201:21 228:17

**load** 263:26,27

**loaded** 80:6

**loads** 240:5

**local** 507:25

**locate** 253:12 552:23 594:8

**located** 106:7 109:14 110:17,23 119:21 128:28 142:27 143:11 144:9 145:19 264:3 283:9,15 290:7 291:7 297:6 344:16 433:13 441:11,19 470:7 604:2 628:25 733:27 762:11

**location** 37:24 40:24 47:19,25 48:1,6,14 51:16 55:19 81:12 84:10 103:12 110:18 111:12,14 142:9 250:1, 23 283:5,17 313:19 363:27 440:20 455:4 456:6 459:17 466:6 480:15 483:28 484:4 485:24 561:4 615:2,13 636:12 673:1 675:1 678:8

**locations** 104:2 248:25 249:1 615:3

**lock** 213:20 251:19 253:9 384:24 560:15

**lockbox** 450:7

**locked** 177:28 178:2,4, 5 204:4,5 207:10,14 213:17 251:18 472:26

**locks** 560:18

**log** 276:28 284:8 296:28 324:3

**logical** 695:24 721:25 746:19

**logically** 654:25

**logo** 40:5,8 97:26

**long** 6:6 19:20,24 24:22,24 25:26 26:19 33:7 35:14 57:21 63:17 85:6 93:10 163:6,26 176:6 179:18 182:15 194:14 200:17 210:17 211:6 217:8 228:20 234:26 238:16 246:4,10 252:7 265:22 276:13 282:16 316:8 353:26 362:7 373:15 379:22 382:8,12 416:8,14 419:28 424:24 436:27 443:13 447:21 451:20 520:18 525:15 527:7 543:22 607:10,21 613:18 619:25 671:22 694:12 729:24 755:3 760:22 769:8

**long-sleeve** 421:11

**longer** 9:15 107:22 125:3 295:1,2 296:26 299:26 351:18,19 352:9,16 365:19 368:27 370:12 373:16 474:10 515:17 640:27 706:4 769:17

**longitudinal** 480:6

**looked** 64:19 65:21 88:4,8,9,10,13 90:2,3 91:23 97:24,25 100:6 166:23 167:5,10 170:28 179:11 183:12,20 198:16 234:5 351:5 369:5 378:1 384:12,13 403:28 412:25 504:2 626:26 752:20 760:23

**lookout** 680:26

**loose** 57:19 275:2 277:14 497:6 520:13 522:5,7

**loosely** 498:11

**Los** 435:20 449:21

**lose** 128:21 279:13 286:4 412:4 490:12 498:26 499:3 674:1 685:11 758:8

**losing** 387:25 568:2 673:28

**loss** 286:14,15 294:15 482:6 499:13 610:1

**lost** 19:16 168:27 389:26 548:17 674:17 680:3 759:6

**lot** 115:25 248:6 249:6 252:6,27 255:27 278:25,26 286:19 292:22 301:21 367:25 487:27 497:11 508:1 519:9,16,24 523:4 634:3 672:4,5 687:10 698:21 702:23,26 759:27 763:3

**lots** 721:10,11

**loud** 426:9 467:16 478:19 518:25 519:20 520:4 535:9 547:21 556:2,17 562:12 599:8, 18 676:14 708:3

**louder** 145:10

**low** 87:22 163:17,21,27 254:26 320:9 384:27 386:26 387:3 565:14 610:8 611:12

**lower** 38:2 233:7 370:1 503:11 531:4

**lowered** 44:19

**Lucerne** 405:23

**luckily** 507:21

**ludicrous** 575:23

**lug** 253:22

**lull** 129:4

**lunch** 9:15 72:22,24,26 85:24 424:8,17 427:27

428:2 431:3 433:2 446:14 581:25 642:24 646:25 690:16 770:14

**luring** 764:7

**luxury** 404:17 405:24

**lying** 326:26 414:26 524:21 714:27

**M**

**M-16** 257:14,15

**M-A-R-I-A** 173:8

**M-O-R-A-L-E-S** 434:25 448:22

**M-O-R-E-N-O** 434:25

**machine** 98:15 257:16

**madam** 147:3 187:4 618:28

**made** 26:26 62:27 63:11 64:12 65:1 67:18 68:3 70:19 83:15 84:5 86:24 88:5,6,23,24 89:2,11,16 90:12,14 100:15 109:8 114:17 155:9 160:20 162:21 167:2 170:19 189:28 193:1 197:27 208:8 214:23 220:2,6 236:16 254:6 268:5 275:5,11 323:7 344:18 347:11 354:11,20 355:5 356:1, 10,21,24 398:15 405:7 432:11 453:9,28 461:4 463:2,11 470:14 491:10 493:21,25 494:3 504:13 524:15 556:11,15 561:26,27 564:1,3 575:21 582:1 588:3 592:17 634:16 635:28 648:20 654:12 659:12, 13 663:9 673:2 674:26 675:8 679:6,28 735:25 736:20 738:1 742:27 754:7

**magazine** 80:8 105:22 263:28 675:18

**main** 21:14,18 36:8 47:13 50:10 51:15 57:24 78:1 128:22 269:18 518:5 682:23 738:6

**maintain** 70:3 152:28 241:9,14 258:18,20 262:16 403:11,16,19 411:25

**MAIT** 242:25 243:18,21, 26 245:21 246:4,5

**major** 169:5 242:26 246:12 293:6 369:11 370:17 435:22 449:22 554:28 738:2

**majority** 254:6 482:2 585:5

**make** 5:27 11:6,12 13:22 17:26 18:7,27 19:10 20:7 22:13,28 25:8 32:13 33:13,14,18, 26 53:6 57:20 62:18 64:5 66:10,19 67:3 79:11 86:20 88:14 89:4 94:10,28 100:12,28 101:2,5 104:3 107:20 116:25 122:10,26 126:15 140:21 141:20 154:23,25 155:3 184:1 187:11 192:1 204:6 206:28 207:18 219:12 249:3 262:18,27 264:15 266:21,22 267:11 273:4 276:8 278:22 280:1 286:18,20 287:6,9 294:16 300:5,15 307:4 317:20 327:25 337:5 349:6 353:7,12 356:25 385:28 391:23 406:21 408:27 424:15 425:10 427:1,19,22 439:2 441:28 444:23 446:18 447:6 451:15 459:16 461:22 462:12 463:28 464:1 477:7,21 478:11 485:25 499:3,8,9 500:20 504:19 506:9 520:5 522:12 523:27 526:10 530:8 537:1 551:1 556:10 562:12,20 564:18 579:1 580:26 585:23 586:6,9 587:9 588:11 591:16,24,25 598:10 602:19 608:23 618:14 620:1,2 622:9 624:7 629:22 640:8 644:12 645:23,27 649:27 656:21 657:2 671:13 676:8,10 679:11,14 685:8 691:28 692:11,15 695:10 697:6,8 704:11 710:2, 26 712:20 728:28 729:5,9,22 733:5 735:15 736:10,13,14 737:12,13 740:25 750:14 752:16

**makes** 20:10,16 104:26 126:19 200:21,22 261:14 264:11 266:6 277:2,17 280:2 285:8 287:23 290:24 306:7,20 317:2 318:27 327:11 365:21 403:21 407:9 491:12 546:14 556:8 676:12 678:15 691:26, 27 702:9 750:2 759:2 762:28

**making** 16:25 20:25 28:22 50:22 83:23 100:16 101:1 111:15 119:12 156:7 178:16 233:23 248:4 253:28 290:13 296:12 311:21 441:18 479:7 508:3 521:3 531:14 541:11 649:20 665:16 668:12 670:10 695:26 738:13

**male** 52:8

**Maliciously** 53:10

**man** 27:2 30:27 34:1 75:20 212:6 416:16 707:9,14 718:9 720:28 721:28 729:18 734:16 738:16,22 745:15,21 747:6 752:27

**man's** 699:16,18

**manage** 122:16

**managed** 122:1 178:20

**managing** 122:19

**mandates** 241:8

**maneuver** 487:6,8 537:4

**manhole** 248:8

**manner** 20:4,8 163:16 198:3 231:1 262:1,24 308:14 344:19,20,21 374:19 412:1 566:16 587:10 638:10 665:14 668:10 670:8

**manually** 591:14 592:10

**manufactured** 105:20

**manufacturer** 494:20

**manufacturing** 435:23 449:22

**map** 23:7

**mapping** 248:12,25

**Maps** 624:22

**Maria** 19:17 20:5 136:7 172:27 173:8,15 201:12 205:1 206:17 208:4,8, 25 674:24 685:13

**Maria's** 206:28 207:3,7, 14

**Marine** 238:27 257:12, 13,16,17,20,23

**Marines** 257:18

**mark** 99:16 103:27 114:3 115:10 120:1,2 250:11 251:18,19 275:8,10,13 276:5,27 282:14 288:18 351:6,12 352:21 464:3 465:17,25 491:20 522:19 636:3 673:24 674:16,18

**marked** 37:26 38:15 41:16 47:9 74:7 76:9 81:22 97:26 98:9 109:23,26,28 114:7,14 115:11 116:9 119:2 120:2,10,11 176:15 182:24 189:10 192:10 215:2 217:14 229:12 267:1,4 271:6 272:13, 19 274:20 280:3 282:17,18 314:7,18,24 330:1 339:20 342:27 344:5 350:6 359:9 361:21 363:21 377:14 379:21,27 414:4 420:28 454:14,19 462:19 463:1 466:9,14 489:17 490:27 493:3 516:18 530:3 560:22 561:11 615:28

616:5 618:20 619:5 622:6 625:11 735:5

**marker** 86:3,8 114:20 115:3 118:24 120:4,12 121:17 159:9 282:15,18 326:26 340:5,7,11,13, 18 341:1,4,25,28 344:7, 11,15,21 345:1,2 348:3, 6,14,18,20,28 349:4,7, 8,28 354:26 356:21 357:2 360:14 363:1 370:26 371:8 372:13 376:24 396:7 402:5 485:21 550:22 565:16 604:23,25 639:15 704:22 709:15 711:22, 23 712:5,7,9 721:24 735:8,10 740:19 746:14 749:19

**markers** 113:12,13,20, 27 114:1 115:17 119:25 121:24 149:10 171:18, 19 315:5 378:1 402:1,4, 7 403:3 529:19 552:10 554:7,9 559:13,19,20, 22 565:24 604:28 637:28 638:1,2 706:15

**marking** 272:9 280:16 324:15 352:27 487:5 488:26 529:13

**markings** 46:18 120:15 603:27,28

**marks** 251:21 253:1,3, 8,9,12 277:18 350:28 462:14,16 465:13 586:16 602:11 737:8,9

**marksmanship** 240:27 257:19,22,25 258:2

**married** 201:11 208:4

**Marshall** 231:17,18,27 232:7 233:2,10

**Marys** 520:26

**mask** 26:19 27:4 92:18 394:9 704:28 759:18,24

**massive** 30:19 706:27 735:25,26

**master's** 435:26 449:23

**match** 494:17 709:27

**matched** 281:18 350:3

**matches** 281:8

**material** 62:15 266:10 359:25 452:7 463:18 586:24

**materials** 615:16

**math** 246:9 252:6,8,10, 27 286:5 318:12 382:15,17 389:2,4,13 390:3 411:16,24 623:8, 27 624:4 629:9 630:6,7, 9

**Mathcat** 591:19

**mathematical** 252:2 278:27 318:7,19

**matter** 9:20 31:9 34:16 155:8 173:1 199:22 200:18 216:11 227:23 237:19 260:26 301:25 343:5 353:6 388:18 393:1 418:1 419:2 434:10 448:14 505:8 523:1 525:5,6 606:10 630:6 640:11 643:26 646:8 700:9 707:12 734:18 738:14 739:10, 12 743:14 755:28

**matters** 9:12 131:13 256:15 431:20 619:27 660:18,24 728:23

**max** 30:14 718:2 734:1

**maximum** 476:7 478:8, 9,10,24 501:17 503:10, 17 505:17 591:27 592:9 601:13,14 614:10,19 630:27 631:6 704:5 740:3,7,8

**meaning** 75:14 112:20 213:9 220:26 250:27 253:23 255:4 258:8 262:19 264:5 273:26 274:4,5 275:10 276:14 279:19 291:15 297:1 298:4 352:10 354:25 356:11 431:22 432:21 462:7 469:3 475:21 479:15 529:22 538:25 544:27 545:15 566:21 602:18 659:22 673:19 689:4 692:25 693:25 699:24 700:6 705:11 708:11 743:25 747:17

**meanings** 651:14,20

**means** 12:10 78:14 91:16 163:17 254:6 310:10 337:6 347:27 375:6 458:15,16,23 459:2,4 461:12 467:16 469:11 470:2,10 476:2, 28 483:28 486:17 495:19 584:8 598:3 613:16 643:18 644:9,28 646:12 654:6 665:28 667:6 668:28 670:22 671:6 702:10 703:18,25 711:14 716:15 720:9 731:11 743:18 751:6,20 758:1 767:28

**meant** 159:8 197:18 213:14 378:16 408:7 633:28 716:10 739:16

**measure** 167:23 249:2 323:17,26 484:6 589:26 590:12,15

**measured** 248:7 277:2 284:13 441:21 462:24, 25 490:21 504:18

**measurement** 167:19 284:7,18 324:1 352:6 413:15 414:1,15,18 485:12 494:19,22 495:3,4 625:9

**measurements** 130:22 148:23 247:16 248:1,11,15 296:22 297:4,6,7 413:17 438:21,23 439:8,9 440:7,22,27 461:4,6 465:20,21,22 483:4,6,8, 12,16,25,27 493:20,21, 24,27 494:1,2,3,10,11, 15,16 495:12,13,18 588:5 589:22 590:4,5,6, 20,26 591:10 621:10, 15,19 624:10,17,23,26, 27 625:17 628:26 631:8

**measuring** 296:16 352:19 483:19 615:6 764:23

**mechanical** 435:18,22, 26 437:25 449:20,22,23 452:10 472:16 476:18 609:6

**mechanically** 470:23

**mechanics** 388:9 436:11 545:21 600:5

**mechanism** 116:21 117:4 617:2

**mechanisms** 273:18, 22

**media** 12:11,24 651:28 767:7

**medical** 115:26 116:7 289:21 341:8 358:7 363:15 377:22 416:19 703:7 762:16

**medium** 451:2

**meet** 101:18 246:22 247:16 394:2 507:11 691:20 692:20

**meeting** 252:15 401:7

**meets** 11:2 517:27

**member** 258:25 732:26

**members** 11:18,22 259:13 260:2 531:22 619:22 650:19 766:9 767:18

**memorable** 170:9,11

**memories** 761:14

**memory** 168:7 169:19 170:1,5,8 196:11,15 258:6 392:12

**Men** 698:7

**menacing** 719:26

**mental** 11:1 613:25 655:5 657:13,22 658:12 700:17

**mention** 26:26 95:22 394:13

**mentioned** 161:15 165:10 195:23 213:5 241:25 256:28 281:14 305:4 308:23 378:9 414:22 433:1 461:15 463:18 585:5

**mentions** 6:13

**Mercedes** 189:19,21, 24 193:8,10 194:4 210:12 245:5

**messages** 13:7

**met** 661:28 666:17 754:12

**metal** 59:7 72:2 101:14 391:12 420:17 674:9

**metallic** 369:13

**meteor** 693:27 694:2

**method** 465:3 502:6

**methodology** 436:23 452:5

**methods** 436:23 437:24 591:17 592:13, 17

**meticulous** 293:16

**meticulously** 729:6

**metrics** 610:5

**mic** 34:21 55:27

**microphone** 154:9 468:3 483:10 497:23 519:2 562:14 713:8

**mid** 741:6 764:19

**middle** 34:3 41:11 71:19 88:1 98:27 151:8 158:19 184:9 243:28 244:4 254:24 319:17 351:12 359:11 370:21, 23 371:6,16 372:17,28 373:27 374:1,7,20 375:19 376:25,26 377:1,17 395:23 396:7, 8 411:7 456:18 457:11 489:12 499:1 550:12,23 604:8,24 687:25 695:17 704:21 708:22 709:18 712:16 721:20 739:8

**midnight** 265:19

**midpoint** 740:18

**midway** 606:1

**mildly** 479:1 602:12,13, 14

**mile** 740:10,24 742:21, 27

**miles** 30:14 111:28 112:1 123:7,20 130:4 156:14 256:20 307:11, 13 308:8 309:7,11,16, 19 311:16,18,27,28 312:3,8,11 317:28 318:7,13,16,20,26 319:1,3 320:7 384:22 389:2,21,23 390:3,28 391:5 425:19 447:11,16 476:9,15,21 477:1 478:12 479:5,15,16 480:1,26,28 501:18 502:26 503:20 543:18 598:22 601:6,11,15 603:17 610:25 611:1 614:11 622:8 623:24,27 626:15 631:2,7 633:1,8 639:24 693:4,7 699:23, 26 700:8 702:13,14 703:9,19,22 704:6 709:12,14 710:4 712:23 714:16 715:24 717:20, 21,26 718:2 731:14,18, 20,22,24 732:4 733:28 739:24 740:7,9,11,12, 13 741:8,16,20 742:15 746:11,15,18,22 748:17 750:8,19 754:6 758:3,9 762:1 765:27

**military** 373:5

**millimeters** 351:11

**million** 748:3

**mind** 11:3,6,12 13:21, 22 14:26 18:27 27:1 78:4 84:26 85:12 160:13 280:20 287:1 299:25 379:10 387:4 389:11 424:15 430:5 444:25 445:28 457:13 525:2 612:13 642:22 645:15 648:15 652:10 674:28 675:12 676:5 692:24 697:27 704:27 721:10 729:20 758:18 766:19,20,21 769:27

**mine** 209:18 273:10

**mini** 696:7

**minimal** 47:24

**minimize** 69:26

**minimum** 78:24 241:11 311:4 701:12

**minor** 117:3 243:8 493:18 516:7 666:2 669:1 670:24 702:12 742:24

**minus** 321:8

**minute** 21:7 214:23 251:23 265:12 362:1,3 364:8 405:12 411:3 578:16

**minutes** 182:17 184:26 221:11 301:2,3 322:12, 16 353:28 354:1 382:25 383:19 406:1 445:27 446:5,6 618:9 681:23 690:4 691:2 707:1 719:12,13,14 745:23 755:5 769:18 770:9

**mirror** 46:8

**misidentify** 153:2

**misphrasing** 293:14

**misplaced** 402:20

**misquote** 284:25

**misreading** 630:14

**missed** 440:28

**missing** 326:25 630:14 648:15

**mission** 758:26

**misstate** 147:4 392:11

**Misstates** 149:14,26 150:27 400:27 527:26 544:9 634:20 753:4

**mist** 79:24

**mistake** 647:14 662:9 682:10 738:1

**mistaken** 429:18

**mistakes** 18:7 657:2

**mobile** 278:22 306:18 392:18 410:2

**mode** 305:26

**model** 29:24,27 245:6 278:4,5 388:4 441:28 445:11 530:8

**models** 245:5 278:5 388:5,8

**moderate** 666:2 669:2 670:24 702:12 742:25

**modernized** 39:6

**modifications** 278:3

**module** 500:1 600:13, 14

**moist** 277:17

**moisture** 253:14 277:16 279:20 673:25

**moment** 6:8 58:7 107:9 112:4 163:1 181:4 204:22 205:22 206:2 211:13 214:3 302:13,27 342:26 345:14 469:14, 18 471:21,24 473:3 537:23 543:8,12 579:4 598:5 601:25 602:2,7 610:16 611:19 635:20 649:27 686:17 706:5 734:27 752:10 756:4 764:14

**momentarily** 206:21 547:11 743:26

**momentary** 748:9

**Moments** 160:18

**Monday** 5:1 73:1 446:21 505:23 506:6, 10,13,16,20,22,25,26 507:6,10 508:9,13,14, 19,24,28 515:1 582:21 689:2 770:4

**Monique** 24:13 29:8 175:26 176:18 187:2 295:12 427:12

**monitor** 38:8 239:16

**month** 91:3 170:5 438:6 452:25 708:26

**months** 239:27,28

**mood** 675:7

**Mora** 267:19 268:7 295:8 313:14 321:9 322:8,11,24,27 326:9, 12 327:2,3,5,7,26 328:3,7,22,28 353:26 354:10,14,17 356:8

381:1,10,16 382:12 383:17 517:27 527:12 564:3,4 707:2

**Mora's** 321:2

**Morales** 28:8,14 30:9 334:11,14 433:24,25 434:19 435:10,16 442:17 444:4 446:3,7,8, 10 448:9,21,23,28 449:6,7,14 453:14 454:22 507:21 523:5 525:20 526:2,11 573:4 583:18 584:14,15,22,24 585:3 592:27 593:1,16 608:22 609:20 616:14 620:22 621:22 622:4 625:24 629:11 630:26 631:14 676:9 688:7 689:1 714:14,15 715:6 740:2 749:7 760:13

**Morales's** 454:12 508:26 621:3,7 626:2, 19

**Moreno** 434:19 446:7

**morning** 2:4 5:2 8:26 9:9,12,20 22:23 34:25, 26 35:7,8 37:1 49:8 86:1,19 90:10 131:13, 21 173:9,10 188:21 221:13,16 224:4 227:2, 12,15,16,20,21 228:4,5, 15,16 234:19 237:28 238:1,11,12 249:10 265:14,18,25 266:18 292:6,7 313:3 333:4 336:2 342:27 343:11, 12,27,28 382:24 406:11,12 418:25 419:14,15,16 424:1 434:21 507:23 508:1,4, 7 512:4 515:2,17 523:6 525:18,28 526:3,8,17, 18 527:5,6 540:15,16 542:28 543:1,2 562:4 572:4 575:2,13 583:17 584:21 592:27,28 619:26 620:19,20 689:1 725:4 728:2,13,16,21

**Morro** 8:22

**mortal** 164:11 761:27 763:9

**motion** 70:23 74:13 86:12,13,17 111:1,2 118:21 127:7,8 128:5, 23 129:26 146:17 285:21 286:16,23 290:13 295:3 302:1 322:5,9 349:8,10 385:17 389:27 390:7 425:9,12 426:27 432:7 540:18,28 596:17 606:3 607:11,18,22 609:22 610:6 612:11,15,22 623:4 663:9 717:12 745:1 763:28 764:5

**motioning** 563:17

**motions** 83:3 431:23

**motivated** 506:16

**motive** 524:16,22,25 661:12,14,16 662:6 709:28 729:25 730:9 732:5 734:11

**motives** 524:14

**motor** 69:1 76:2 243:4 305:1 306:17 320:24 437:21 558:13 575:25 578:8 676:17 684:13 757:27,28 761:21

**motorcycle** 122:22

**motorists** 40:8

**mouthful** 683:1,13

**mouthing** 759:10

**movable** 410:2

**move** 28:28 30:4,13,22, 23 32:11 33:5,15 50:18 86:16 112:20 123:11 127:17 130:13 131:3 141:15 147:17 148:2,8, 10,14 158:17 159:5 160:23,27 161:1 167:2 171:17 203:25 206:24 214:1 248:10,18,20,23 249:15 273:17 278:17 279:18 286:18,20 308:24 309:4,6,8,18 310:11 311:9,15,19 315:26 318:10 319:24 326:6 345:16 346:23,25 347:5,6,13,16,21,28 356:15 358:19 362:23 366:12 373:9,10,18 380:18 381:11,22,28 383:10,13 386:6 388:6 390:20 391:1,26 392:21,22 398:22 416:5,19 424:25 432:14,15 436:7 437:26 453:27 455:17 456:11 458:18 463:24 464:26 469:19 470:1 473:18,20 477:15 497:17 501:13 522:10 529:9 535:21,26 536:16,23 537:1 543:23 544:7,14 545:15,17,28 555:18 562:22 575:27 591:4 593:3 601:26 602:19 605:26 608:17 612:12 613:5,15,17 616:22 618:18 622:26 625:23 627:18 633:7,12 638:23 674:2 685:12 686:6 688:25 698:13 699:8,14 707:22 710:11 713:23 714:21,27 715:7,13 716:5 718:15, 18,21,24 719:14 730:1 740:23 741:14 744:16 745:24 754:3 762:5,18 765:28

**moved** 22:1 29:21 30:8, 12 31:6,15 50:4,17 76:27 87:16 92:19 116:2,5,11 124:23 139:12 144:2,5 150:26 156:16,21 164:23 236:23 239:15,21 240:3,12 268:17 275:27 277:23 319:22,23,25 322:17 325:7,17,28 329:1,4 342:23 344:19, 21 345:1,11,19 346:26, 27 347:1,17 348:3 354:26 355:8 361:4 363:7,18,25 364:14 371:11,14 373:26 380:23 381:24 385:15, 24 388:14,21,25 389:3 390:27 393:10 402:11 407:11,17,18 410:7 412:2 415:21 432:17,25 447:16 464:2,9 471:12 479:23 490:5,9 492:8 497:26 501:5 523:22 543:19,27 544:2,6,27 545:9 546:8 548:6 551:15 562:1 587:10,22 605:4 606:24 608:4,28 616:16,26 617:3 627:23,25 631:2 636:25 640:26 653:26 674:4,22 688:26 696:19 699:19 709:1,3 710:7 713:21 714:15,24 715:2 716:3 718:25 721:13,21,22,27 722:8,9 729:3 731:26 735:18 743:23 748:12 762:16,24

**movement** 29:15 64:28 161:6 162:20,21, 26 163:1 272:18,22 273:1 274:12 276:1 306:13 319:20 320:13 344:18 380:7 384:19 385:24 386:6 410:8 413:5,8 414:8 429:18, 19 439:1,22 443:12,28 447:11 452:11 455:4 459:17 462:21 467:24, 28 468:13 472:25 488:4 489:18,20 497:13 595:14 597:7 611:3,24 612:4,20 613:1,4,23 614:6 621:20 623:6,10 626:9,16 663:8 674:21 711:12 715:10 747:28

**movements** 62:8 141:20 251:25 603:8 672:5,6

**moves** 311:15 372:2 373:26 393:1 536:4,25 543:22 545:21 701:9 707:17 718:19 744:13, 15,16

**movie** 698:7

**movies** 674:14

**moving** 27:9,27 29:5, 17 30:5,6,7,17 31:14 33:16,17,24 49:22 51:9 77:26 79:23 103:4 105:2,3 110:11 111:25 112:2 118:21 122:5,22 123:6,12 124:7 127:14, 21 128:10 129:5 130:4 146:4,7,10 150:14 156:13,14 158:15,23 203:21 252:18 272:5 306:3,16,26 307:2,13 308:7 309:16 311:3,18 312:1,2,11 317:27,28 318:2 319:1,24 321:11,

18 343:3 371:11 372:15,24,28 373:1,2, 20,25 380:28 384:17 385:15,21 386:10 387:15 389:26 391:6,9 392:5,14,16 397:25 426:17 432:21 443:13, 20 456:28 459:25 462:1 465:9 468:9,18 470:3,9, 13 472:14 473:8,14 475:23 476:2,15,21,27 477:22 479:3,6,8 481:6, 7 487:17 492:15 496:15,19 499:4,11,12 503:23 516:27 530:24 531:8,10 532:11,18,27 533:1,9,20 534:16 535:18 541:8 558:15, 16,21 559:2 562:3,28 564:28 567:6,17 568:9 588:24 595:26,28 596:5,19,20 597:4,15, 18,20 598:6,7,8,10,14 600:2 601:27 602:1,6 607:4,9,12,24 608:7 609:11 610:7,8,11,13, 14,20 612:1,8 632:26 633:1,4,11,25 634:10, 14 637:9,28 638:3 639:24 640:1,7 675:20 686:5 687:25 688:23 700:8 701:4 703:6,8,14 706:1,13,14,15 707:24 708:28 709:12,13 710:3,14 711:10,13,18 712:9,21,23 714:22 716:7 717:14 718:23,27 730:2 731:24 732:4 733:28 734:8 741:16 742:14 745:2 747:9,10 749:18,24 758:22 762:23

**mud** 279:20

**muddy** 492:7 499:2

**muffled** 759:25

**multiple** 156:27 178:14 231:15,22 248:23 250:28 256:16 283:19, 21,22 366:4 405:28 671:23

**multiplication** 318:24

**murder** 21:20 23:1 33:27 301:10 302:24 338:15 418:8 425:15 426:3 648:26 657:15, 20,22 662:23,25 663:3, 4,12,13,19,20,22,24 664:3 666:15 672:15 677:20,27 680:7,8 682:18 689:7 692:6 698:4,24,25 699:1,3,7 735:28 737:11 743:18 755:18,24 756:7,8,19 758:13,15

**murdered** 293:4

**muscle** 258:6

## N

**naked** 565:14

**named** 580:5

**names** 114:18 247:8 268:1

**nano** 610:5

**narrate** 674:13

**narrative** 78:15 328:6 407:13

**narrow** 158:25 671:22 688:8 760:22

**narrowness** 159:3

**nation** 691:26

**national** 14:5 651:3

**nationality** 14:5 651:3

**natural** 300:23 578:10 689:26 692:26

**naturally** 66:6 712:12, 14

**nature** 22:7 51:23 664:20,26 667:23,28 669:14,23 683:4,11,26 684:16 685:5

**Navarro** 266:17 267:18 296:1,3,7 315:3 350:24 553:2

**necessarily** 8:9 118:18,20 157:11 170:11 280:21 300:21 309:22 336:20 338:14 358:25 404:23 443:26 517:19,25 522:4 524:25 528:15 556:28 559:9 628:12 632:16 634:2 655:6

**neck** 66:2

**needed** 8:2 53:4 62:2 95:28 96:5 154:26 180:19 278:17 310:26 405:25 598:9 663:4

**needing** 721:28

**negative** 539:21 687:27

**negligence** 256:25

**neighbor** 7:23 8:4,5 24:3 26:5 30:28 31:22 33:19,20 48:16 52:25, 27 53:14,23,25,27 54:5, 11,15,25 179:16 194:28 201:19,21,24 203:1,4 211:6 675:7 679:21

**neighbor's** 30:20 54:20

**neighborhood** 705:9 731:4

**neighborhoods** 237:4

**neighbors** 19:18 26:16 681:4,5 704:12 720:2

**nervous** 160:21 174:5 200:23

**neutral** 161:1

**newer** 245:4,5,6 253:8 274:3

**news** 12:23 241:17 242:27 263:8

**next-door** 48:16

**nice** 9:9 72:24 131:11 329:8,13 424:17 427:27 506:19 642:24

**nickname** 560:16

**nicknamed** 244:14

**night** 19:15 23:25 24:15 31:9 37:2,14,18 40:19 43:14 44:3,11,17,23 45:23,28 46:26 53:24 54:9 60:17 63:12 74:2 81:5,11 88:1 98:21 125:8 128:18 169:11 170:1 176:22,23,28 181:16 183:19,20 188:14 201:1 202:8,19, 22 215:15,24 219:15 243:28 265:17 313:6 423:4 492:5 499:1 597:3 611:12 680:25 681:21 689:21 697:19 715:9 738:9 747:7,9

**nighttime** 97:27

**noise** 28:22 83:6,7,24 111:15 126:18 384:9 408:23,26 432:12 467:16 473:23 478:19, 25 518:9 532:12,24 546:14 547:10,22 556:12,15 562:20 567:16 599:21 603:2 713:20

**noises** 104:26 713:9

**non-compliance** 233:10

**non-compliant** 69:7 70:5 232:10 235:14

**non-cooperation** 231:16

**non-deadly** 303:7

**non-law** 681:11

**non-lethal** 157:24,27

**noncompliance** 157:23

**nonexistent** 738:17

**Nonresponsive** 464:11,17

**noon** 227:16

**normal** 75:17 203:21 253:18 263:19 286:26 293:4 306:20 370:12 597:6 613:6 678:24 681:11

**north** 50:8,12 51:10,11, 12,13,27 59:2,20 87:6 119:22 142:10 269:11, 27 280:15 291:9,11 386:14,15 388:25 399:6,8,10,20,23 400:6, 18 407:17 527:25 528:4

544:28 550:5 565:22 635:3 636:22 736:24 749:8

**northbound** 403:4 561:7 764:17

**northeast** 386:12 391:11

**northerly** 735:23,24

**northern** 386:11 529:21

**Nos** 81:22

**nose** 202:16

**note** 9:6 155:6 526:10 767:17,20

**Note-taking** 14:21

**notebooks** 14:16 526:11 652:6

**notes** 14:17,18,20,24, 26,27 247:27 578:20 652:7,8,10,14,19,20 771:13

**notice** 10:20 30:1 50:25 77:17 189:27 203:3,6 210:20 212:21 269:27 279:9,10,26 282:13

**noticed** 50:26,28 53:23 64:13 71:9 170:27 190:5 203:1 214:4 269:24

**notification** 66:16

**notified** 265:20

**notify** 768:11,14

**November** 240:11

**nowadays** 244:12 245:27 258:22 259:19

**nuanced** 336:18 338:17

**nuances** 339:3

**number** 36:7 46:23 65:6 76:13 91:8 98:22 100:8 181:28 189:10 220:19 235:4 246:9 250:27 251:1 261:5,7,8, 10 265:2 273:16 284:24 292:9 294:26 298:18 302:11 304:7 315:4 319:24 323:19 341:2 342:11 348:15 349:27 353:21 355:15,16 357:22 361:4 362:15 367:11 368:20 378:23 389:7,15 390:11 407:24 462:22,23 465:26 495:8 502:10,25 503:16 527:24 528:18 578:13, 25 621:23 629:4 630:14,16,21 639:8,22 647:17 658:28 659:2,6 733:4 757:18

**numbering** 319:9

**numbers** 98:7,9,10 167:21 261:3,9 330:9 351:9 418:6 452:18,20 453:9 461:5 465:26,28 466:1,2 494:6,7 495:21, 22 589:28 591:20,24,25 602:13 622:21 629:27 630:2 631:10,11,14 632:6 669:18 670:2 770:10

**numerical** 46:21 591:17 592:13

**numerous** 241:13 242:11 243:13 244:2,10 250:15 252:26 256:12 258:27 283:15 290:7 556:23

**nuts** 196:22,26 253:23

**O**

**O-R-T-E-G-A** 419:10

**Oakley** 62:13

**oath** 23:13 73:14 107:27 108:11 138:13 185:4 270:10 343:16 383:3 526:20,21 542:16 584:15 620:8

**object** 16:14 52:14 74:27 318:18 321:19 325:11 410:23 445:16 453:22 479:8 524:28 534:24,25 612:12 648:18 649:11 665:19 666:3,6 668:15,24 669:3 670:13 684:9 700:3 708:4 713:17 716:10 739:13 742:4

**objected** 653:25

**objecting** 325:13 431:2

**objection** 16:16 54:1, 17 66:23 75:3 78:15 83:9 90:20,25 102:2 139:21,23 141:11,26,27 145:5 146:27 148:4 149:26 150:27 153:8 154:20 161:22 165:24 168:9 184:16 197:1 198:26 202:10 203:25 291:4 300:28 302:15 304:15,20 305:5 307:15,16 310:8 311:5 327:16,22,28 328:24 329:6 330:6,7 339:21 341:20 342:17 345:28 346:15 350:12 354:28 355:12 356:3,13 381:3 382:2 385:25 390:22,25 392:1 393:12,21 400:25 401:25 407:13 417:19 444:8 454:5,13 455:27 456:1,20 459:18 460:4, 28 463:22 464:11,17,25 468:20 472:9 479:9,19 527:26 529:7,15 534:1, 3 536:18 537:20 540:19 541:13 544:9 546:2 547:13 548:25 549:23 550:15 555:4,16 556:21 557:11 562:22 563:10 564:22 565:3 567:18 578:6 580:1 596:11,22 599:2,13,22 608:18 611:26 618:21,26,27 626:21 634:5,20 640:3, 16 641:7,18 645:28 653:28 705:15 721:15 733:20 734:26 739:27 740:5 742:17 743:2 750:11 753:2,4 763:28

**objections** 16:15 425:2 646:23 653:27

**objective** 156:10 159:21 376:13 640:10 752:5

**objectives** 159:23

**objects** 77:25 104:2 168:15 247:24 460:27 468:14 480:9,23 483:16 534:18 564:28 568:16

**obligated** 650:16

**obligation** 538:2

**oblong** 368:9,11,13

**obscene** 64:1

**observation** 70:3 143:24 164:23 198:15 320:27 321:15 762:2

**observations** 50:23 54:21 69:5 74:19 143:11 150:12 248:4 256:3 586:6 762:6

**observe** 266:26 268:21 445:4 587:18 588:4 688:2,4

**observed** 51:19 128:24 157:11 270:15 271:15, 24 290:1 541:5 613:4 614:5 763:8 765:6

**observer** 612:19

**observing** 102:14 164:18 614:5

**obstruct** 152:24,25 371:15 377:3

**obstructed** 32:11 113:1 321:18

**obstructing** 321:23 371:5 416:6

**obstruction** 77:6 79:26 112:25

**obtain** 290:23 455:26

**obtained** 493:22 593:23

**obtaining** 450:19 663:3

**obvious** 70:23 304:28 322:20 736:27,28

**occasion** 218:23 421:20

**occasions** 90:13

**occupants** 246:2

**occupied** 106:18

**occur** 64:8 70:17 101:10 128:19 244:3

250:7 274:10 287:6 375:15

**occurred** 23:17,25 26:3,17 50:1 53:6 85:6 91:3,9 255:1 256:9 285:17,23 287:17 288:25 322:13 356:11 360:14,15,17 364:7 380:22 389:6 398:13 417:2 418:9 421:28 422:1,7,9,10 501:3 537:15 538:4 546:21 548:27 549:2 610:1 625:28 706:8 717:25 718:6 730:6 749:16 764:28

**occurrences** 287:6

**occurring** 360:25

**occurs** 254:17 289:20 412:7 716:28

**odd** 10:20 118:16 254:17 709:24

**offense** 576:9,17,24,25 578:1,23 579:16 580:9,14 581:12 583:28 584:6 643:24 644:2,9,11,21 755:23,25 756:4,11

**offenses** 575:19 580:6 647:23 648:2 661:19,23 662:3,6,11,12,17 683:19

**offensive** 665:14 668:10 670:8 685:26

**offer** 430:12,17 515:21 523:19

**offered** 52:15 256:14

**offering** 264:24 618:23

**office** 82:4 181:24 249:16 261:11 553:26 587:6 755:19

**officer** 7:11 10:2 21:21 25:11,28 26:3,7,11,20,27 27:16,20 33:14 34:2,3 36:2,5,16 52:16,19 66:15 73:13 89:20 93:23 94:18 95:1 96:28 97:5 105:9 122:16 154:19 155:11,12 156:24 214:15,18 238:25 240:15,19,21,25,28 241:8,9,14 242:2,3 243:4 246:23 257:24,26 259:8 286:23 291:3 298:7,18 299:7,11,12 300:8,18,25 301:11,15 302:24,26 303:1,4,5,6,9,12 307:1,5,7,8,10,12,13 308:3,7,10 309:9,19 310:16,19 323:1 336:26 337:18 338:2 339:15 357:16 366:3 380:15,27 392:7 405:25 414:27 418:8 422:19 425:26 432:4 438:8 442:27 443:15 455:20 456:7,14 460:14 468:18 469:7 475:6 525:2 538:10,25 539:5,10,13,16,22 540:4 552:7 557:10,21 558:13,17 576:18,21,25 577:2,23 580:7 583:7,8,28 584:2,5,7 611:15,24 615:5 616:3 639:28 643:3,8,15,16 646:13 647:24 648:25,26,27 657:22,24,27 658:11,14,19 661:19,20 662:8 663:24,28 664:1,5,7,9,15 665:4,7 666:8,10,11,14,15,16,20,22,23,27 667:4,7,11,17 669:9 671:1 677:24,25 678:1,4,18,24,26,28 679:2,3,12 680:5,7,10 682:13,14,17,18,19,25 683:18,23 686:22 687:4,9 689:8,12 698:5 701:5,16 704:16 706:22 716:5 720:13,26 730:7 733:12 737:12 747:16,17,18,20 748:27 754:9,11 755:19,22,24 756:9 759:9

**officer's** 25:17,20 260:24 540:6 667:3,12

**officer-involved** 144:6 537:15,18 538:17 541:21,24 730:8

**officers** 7:8 31:20 32:5 33:8 69:23 144:1 235:13,27 241:13 258:22 259:1 262:10 293:2 313:11 355:21 361:11 392:4,14 405:15,28 440:27 555:22 564:27 677:8 720:21 721:11 729:4 730:16 745:25 749:10

**official** 5:10 73:10 138:10 227:10 336:10 429:10 515:9 575:11 647:11 728:11 750:14 771:11

**officially** 632:6 718:1 749:23 750:4

**OIS** 523:23,24 524:12 539:11 541:20 742:1

**older** 29:24,27 251:19 384:26 388:8

**one's** 310:7 599:11 734:20

**one-lane** 158:28

**one-pound** 535:15 708:4

**one-tenth** 610:9,11 714:25

**one-third** 324:25 594:15,16

**open** 11:23 13:21 15:18 30:19 58:19 68:20,22 178:12 179:4 185:26 186:1,3 190:26 204:8 205:4 207:12 213:8,9,21 269:6 273:14 305:8 324:9 358:13,15 418:12 452:24 475:7 491:18,21 579:1 642:22 653:7 675:4 693:24 694:15 695:16 733:24 766:21,25 767:24

**opened** 233:12 469:7 475:10

**opening** 16:7 19:8,10 22:13 23:5,6 57:18 106:14 113:5,10 119:19 122:3 149:3,7 151:8 158:17 193:9 204:3 291:17 311:13 315:12 323:9,14,28 324:21 326:2 354:21 362:21 368:7 369:26 377:16,18,20,21 561:28 562:1 639:13,19,25 653:18 729:12 734:14 741:25 763:16

**openly** 766:22

**opens** 358:13

**operate** 127:15

**operated** 117:5

**operating** 118:2,20 262:11 320:24 451:11

**operation** 657:12

**operations** 35:21 420:10,11

**operator** 191:24

**opine** 501:2

**opining** 453:17

**opinion** 13:28 18:27 22:6 141:5,7,9 194:25 203:23 205:9 251:9 256:14 270:28 272:17 275:22 276:20,26 282:23,26 283:2,24 285:17 288:24,27,28 289:24 290:2,5,16,17,20 291:21 297:14,16 307:20,27 308:16 310:15 311:1,2 320:19,23 344:4 346:22 347:11 348:4,8 349:24 357:5 376:13 385:5 388:13 390:18 391:16,19 401:23,28 403:6 407:15 412:1 415:10 431:28 432:2 439:2,5 440:25 441:11 444:27 445:8 447:15 451:27 452:2,4 455:1,2 464:9,15,21,23,24 466:25 468:17 473:12 477:14 478:26 488:3,6 491:4,20 492:12 523:21 546:7,25 556:14,16 557:17 562:18 565:12 587:9 597:13 609:9,20 610:4 611:14 612:3,24 613:3,13,18,26,27 614:3,8,10,16 621:4,7 625:22,24,28 626:3,5,8,10,12 633:5 644:3,4,7 650:26 659:23,28 660:2,5,9,14,16,17,25,26,27 661:2 689:25 714:13 737:1,16

749:6 750:24,25 751:7 768:23

**opinions** 131:12 221:18 264:24 297:9 307:25 329:10 424:12 431:7,8,16 433:28 437:21 439:20 452:6 453:15,17 454:2,3,10, 28 506:17 525:8 546:26 547:2 569:7 586:9 587:21,25 617:28 642:17 659:21 660:21, 22,23 708:15 722:24 766:23

**opportunity** 11:28 27:18 30:18,20 81:13 218:27 230:15 240:10 268:21 308:24,27 309:7,12,18 311:13,14, 19 312:4 347:23,24 608:17 619:24 660:24 711:8 728:16 729:22 737:24 746:1,6 747:1

**opposed** 66:17 75:20 309:1 317:21 359:25 369:27 391:27 559:3 696:18

**opposite** 253:25 273:7 681:20

**ops** 373:5

**optical** 368:28

**option** 78:26 80:1,2 303:28 308:15 309:1 405:2,3

**options** 78:11,14,19,24 79:2,4,8,12,17,20,21 232:17 302:5

**orally** 10:12 767:24

**orange** 76:17 239:1 250:11 280:14 281:13 282:13,22 340:11,18 350:9 380:4 394:8 396:15 493:12 527:24 528:2,21 529:19 560:22 561:11 565:19,24 687:18 708:16 735:6

**order** 75:16,18 93:17 94:10 102:19 107:18 147:17 162:7 220:28 235:23 293:16 309:8 354:12 388:1 416:20 440:12 451:15 469:23 470:8,12,21 471:2 476:27 483:11,15 485:23 493:28 504:3,12 506:27 508:6 550:9 640:12 672:18 676:7 696:11 710:24 717:2 729:7 733:5 739:1 746:20 769:3

**ordered** 16:20 131:23 506:27 654:2

**orders** 230:28 231:2,9 232:18 233:11 376:4

**ordinary** 651:20

**organizations** 376:1,2

**organize** 587:17

**organized** 766:12

**organs** 246:2

**orient** 50:8 641:6,10

**orientation** 14:6 651:5

**orienting** 641:28

**origin** 14:5 651:3

**original** 110:18 116:2,6 520:19 637:23 638:1 643:4 709:27

**originally** 5:16 143:8 144:28 156:8 321:6 379:4 398:1 629:7 733:1 735:2

**Ortega** 334:7 418:28 419:9,19 676:22 677:6, 12 681:14 682:9

**other's** 64:19 170:26

**ounces** 530:11,12,13

**outcome** 166:2 637:8 732:2 750:9

**outcomes** 743:21 744:17

**outer** 325:5

**outfitted** 81:9

**outline** 351:4 394:12

**outlines** 736:21

**outwardly** 752:4

**outweighs** 8:15

**oval** 353:10 394:18,22 395:11 396:9

**overcome** 303:8 471:15 475:2 501:11 597:1 601:25

**overcoming** 471:12 472:28 473:17 594:27 598:6 610:1,17

**overcorrect** 487:15

**overhead** 10:15 11:16 340:14 650:12,17

**overlap** 516:3

**overreacted** 338:12

**overrule** 304:14

**overruled** 54:2 78:16 79:19 83:10 118:11 139:23 147:1 154:21 161:23 168:10 202:12 203:26 302:16 307:18 342:19 385:27 400:28 407:14 417:20 456:2,23 459:19 461:1 472:10 479:10 497:1 527:27 529:16 536:19 537:21 540:20 541:14 548:26 550:16 556:22 561:14 563:11 565:4 567:19 596:12,23 599:3 611:19,27 613:8 626:22 634:21 641:8 739:28 764:2

**overturned** 688:11

**Owen** 267:18

**owners** 484:8,12

**owns** 24:18 34:6

## P

**p.m.** 36:28 37:18 48:9 56:7 176:25 202:8

**pace** 32:9 164:24 373:10 432:9 603:17 693:5

**paced** 211:16

**pacing** 164:17 532:16 541:3,12

**package** 278:9

**packed** 57:19 142:10

**packing** 25:4

**pages** 429:27 430:17 431:19 648:9

**paid** 415:4 556:26 737:27 741:27

**pain** 665:18 668:14 670:12

**paint** 250:9,10

**pair** 351:8

**palm** 186:1,3

**palms** 186:1

**panel** 45:14 326:20 378:8

**panels** 11:19

**panic** 650:10

**pants** 41:14 57:10 92:16,23 93:7 96:20,22 420:16,20 705:1 719:17

**paper** 591:15 631:26 632:3,8

**paragraph** 647:23 648:23 649:19

**parallax** 461:24 486:13,15,17,23 760:14

**parallel** 319:12 370:1,4 462:8 536:7 537:5,11 718:16 744:14

**Paralysis** 702:18

**paramedic** 363:13

**paramedics** 288:7 289:10 371:6,15 707:7

**Pardon** 459:20

**park** 51:6,10 177:3 178:20 187:17,25 188:27 190:10 207:18 213:25 381:2,16 382:13 388:2,12 469:26 470:22 487:12 536:11 537:10 707:17

**parked** 51:12 87:16 89:27 99:6,7 179:1,26 190:19,21,27 192:5 193:8,12,20,21,28 194:6 202:28 203:12 210:12 269:4,18 315:24,28 324:18 388:7 403:13 455:10 490:5,9 536:8 604:11 718:16

**parking** 69:1 189:7 190:12,18 487:14,27 536:10,11 537:5,11 599:1 634:3 702:26 744:14

**parole** 664:7

**part** 5:23 7:6 17:7 18:14 31:28 58:19 80:22 94:13 96:26 116:11 122:15,19 144:6 155:4 175:8 230:23 243:26 245:21 247:13 260:21 293:23,26 294:19,22 304:9 327:8 340:21 351:19 352:10,11,16 355:19 376:1,4 418:3 432:27 435:27 457:11 468:12 477:19 483:10 484:12 488:14 492:11 500:4 508:16 522:13 595:12 656:1 657:9 661:2 707:18 717:10,25 752:1,3

**participants** 12:27

**participate** 84:20 243:21

**participated** 144:13,17 246:7

**parties** 11:23,25,27 16:23 21:17 47:25 50:22 51:26 52:19 53:7 54:24 55:16 56:14 67:3 83:5,8 84:2 88:7 89:21, 28 90:14 100:3 165:8, 13 167:3 296:18,19,20 410:22 440:6 441:3,4 583:19,22,25 654:11 673:3 678:10 679:20

**partner** 37:15 219:5 233:8,12,28 422:6 677:2,5,11 694:17

**partners** 69:12 218:28 233:20,23

**parts** 94:21 246:18 316:4 438:16 495:24 496:18 693:13

**party** 14:3 49:18,25 50:26 51:17 52:24 53:13 54:6 56:16 64:15 82:26 102:17,22 152:7 159:27 160:14 164:26 165:9 166:18 651:2

**party's** 49:2 53:12

**pass** 13:2 50:18 64:13 82:20 201:13 259:1 652:4

**passage** 168:20 286:10 761:10

**passed** 27:22 99:22 107:14 113:6 311:9 536:11 568:3

**passenger** 214:10 273:24 277:28 279:16 326:20 450:8,20 491:18 585:13

**passenger's** 39:12 40:15 45:25,27 46:4,7 378:28 418:12 763:26

**passengers** 437:9 451:6

**passing** 557:22 559:12 761:7

**passion** 23:14 689:25

**passions** 22:6

**past** 17:26 34:5 51:6 53:27 86:21 88:23 89:11,26 90:13 100:2 140:16 210:19 239:23 254:7 291:2 328:22 631:22 656:21 699:5

**patch** 42:28 43:4,19 44:8 423:5

**patches** 41:8,24 229:7, 20 420:19 423:7 680:18

**path** 77:19 96:12,14 158:19,24 254:4 270:27 271:1 272:19 282:16, 17,22 283:3 288:15,16, 18 306:20 319:15 320:9 323:1,3 372:21 374:4 398:9 401:15 403:1 410:28 411:7,14 412:25 416:3 456:19 460:19 477:24 487:6 488:26 489:8 490:9,13,22 527:20 528:3,27 529:5, 25 554:24 555:3,14,22 557:15 560:22 564:14, 19 565:22 634:18 637:1,3 674:22 687:17, 22 688:7,8,10,12,24 708:11,12 711:24 712:15 721:23,24 722:18 737:3,5 738:10, 11 763:20 764:18,27

**paths** 282:14

**pathway** 92:1 93:3 291:6,7 404:22 528:28 550:4,25 551:21 557:9 737:8,9

**patience** 132:13 343:12 728:22

**patient** 358:17,22 359:1

**patrol** 35:28 36:23 37:5,6,10,16,26 38:15, 17 39:2 40:2,17 42:14 44:20 45:5,8,28 56:4,7 67:4 85:7 97:26 122:12, 13,16 164:3,10 167:2 172:3 217:21 228:25 236:27 239:22 242:3,21 243:15 310:19 314:9 420:4,9,11,17 423:16 485:9 666:8 671:21,22 672:28 678:4,5 686:28 759:23

**patrolled** 310:16,17,20

**patrolling** 237:4

**pattern** 121:18 251:15 253:13,16 254:5,13,24 263:10,11,12 264:16 272:21 275:8,11 276:24,28 277:10,12,15 279:6 280:15 281:9,19 282:21 285:24 288:12 289:8,25 315:27 321:2, 5,8,21 351:1,2,4 353:17,20 359:18 363:5,6,24 364:21,28 365:5,12 366:4,9 367:4 371:18,28 372:9,15,19 373:23,27 374:1,10,24 377:14 384:12,20 386:7 393:26 394:1,5 395:5,8 396:1 412:18 487:10 489:17,19 490:27 493:15 532:16 550:26 626:5,12,14 712:4,16

**patterns** 272:12 279:17,18 283:19 294:9 340:20,21 350:28 352:1,4,5 353:22 366:6 373:28 374:18 378:25 402:14 711:15 712:17

**pause** 81:1 120:20 140:9 649:28

**paused** 750:5

**pavement** 252:14 537:10

**pay** 23:13 26:10 31:10 33:12 126:7,9,25 211:9 387:17 465:17 531:15 532:6 533:27 651:9 713:4,6 714:3 729:12

**paying** 83:26

**PC** 450:21

**PD** 504:19

**PDF** 429:25 430:11,26

**peace** 21:21 93:23 238:25 240:21,24,28 241:8,9,13,14 257:24, 26 259:8 302:24,25 303:1,3,6,9 418:7 576:18,21,25 577:2 580:7 583:8,27 584:2,5, 7 611:15,24 643:3,8,15, 16 646:13 647:24 648:25,26,27 657:22, 24,27 658:11,14,19 661:19,20 662:8 663:24,28 664:1,5,7,15 665:4,7 666:8,11,14,15, 20,22 667:7,11,17 669:9 671:1 677:24,25 678:1,4,18,24,26,27 679:2 680:7,10 682:13, 14,16,18,19,25 683:18, 23 686:22 687:4,9 689:8,12 737:12 747:16,17,18 754:9,11 755:19,22,24 756:9

**peaceful** 671:20

**peak** 467:6

**peaks** 467:15

**ped** 254:22

**pedal** 385:9 471:28 498:11,14 544:3,18 545:11,28 599:17 674:1 676:10,13 718:9 758:7 759:1

**pedestrian** 85:10 243:9 254:28 255:3,4 392:7

**pedestrians** 40:8 243:16 254:23 255:6 585:14

**peers** 691:28

**pen** 610:6 692:28

**Penal** 578:20,22,24 583:28 584:5 643:7 644:17 664:16

**penalties** 22:5 689:24

**pending** 34:16 173:1 199:22 216:11 227:23 237:19 419:2 434:10 448:14 534:1 679:26

**penetrated** 293:28

**people** 5:9 7:8 10:16, 17,25 12:4 13:12 14:1,2 15:10,12,19 18:6,8,21 22:10 32:19 35:2 66:15, 22 69:22 73:9 138:9,22 150:26 151:3 156:5,6 173:16 175:27 188:15 200:9 214:24 216:26 220:11 227:9 228:10 231:28 233:2 235:4 238:6 247:4,11 249:10 256:13 260:14,22 261:17 262:22 263:6 266:11 267:22 268:5,12 288:16 289:18 294:21, 26 295:21 298:4 313:22 336:9,24 337:4,7,18 340:21 343:6,22 355:17 358:8,19,20 359:2,7 361:3 364:13 371:11 390:12 405:27 415:21, 24 419:20 424:3 425:16 426:2 429:9,21 439:2,3, 23 441:19 468:14 508:1 515:8 547:21 575:10,17 578:18 583:12 620:4,14 643:21 646:1 647:10 648:23 650:15,27,28 652:27 653:1,8 654:5 655:12 657:1,3 661:6, 11,18,21,28 662:20,25 663:22,25 664:18 665:20,21 666:12,17 667:21 668:16,17 669:13 670:14,15 674:13 681:12 684:24 685:23 686:19 688:4,23 689:20 693:15 694:7,8 696:4,12,23 699:17 703:10 705:9,14 717:5 719:6 720:11,14 728:10 732:16 733:9 734:21 739:16 742:10 745:13 747:12 748:6 750:10 755:19 756:7,9 767:1 768:18 771:10

**People's** 3:3 15:2 136:3 188:26 225:3 334:3 424:10 573:8 693:11 726:3

**pepper** 79:16 157:25 420:22

**perceive** 17:14 97:19 164:11 595:28 611:3 612:4,28 613:19 656:9 660:24

**perceived** 302:8 467:9 522:6 613:14 637:10 688:15 761:22,27 763:9

**perceiving** 611:10,15, 23 614:1

**percent** 155:11 215:26 453:5 482:15 488:27 547:28 548:5,8,10 549:16,20 579:22 608:28 697:11,15 716:2 718:17 732:19,20 733:15,19 739:18 748:25 750:27 751:5 753:1,8

**percentage** 453:2,3 482:13

**perception** 147:9,12 286:8,25 299:3,4 479:11 595:14 611:2,9, 14,23 612:11,18 613:6 614:4 633:6,9,10 634:13 715:14 760:11, 19 763:10

**perception-reaction** 596:2 613:21

**perceptions** 729:24

**percipient** 416:28

**perfect** 114:18 256:27 300:13 316:10 365:14 463:9 522:18 553:19 710:20 729:3

**perfectly** 365:15 368:10,14,15 486:10 494:17 545:16 729:2,7

**perform** 416:18

**performance** 302:2,3, 6,12 303:3,4 304:1 672:10 677:26 679:1,26

**performed** 678:18

**performing** 66:28 67:4 303:1 584:3 648:25 664:1,5,9 665:4,8 666:14,20 677:24 678:1 680:10 682:14,17 683:17,23 686:22 687:5 689:8,12

**period** 55:20 85:26 299:26 318:19 381:24 409:1 436:20 476:6 520:21 594:15 597:4,16 598:7 600:15 601:28 606:2 607:25 617:3 633:7 690:14,23 692:11 714:16,17 717:22 740:16 746:24 747:4 748:9 751:25 753:20

**periodically** 68:4 306:22

**periods** 587:22,26 690:23

**perishable** 258:3

**permission** 203:22 649:25

**permit** 730:2

**permits** 442:25

**permitted** 16:17 18:16 654:1

**person** 6:4 13:13,14 51:18 54:28 55:1 63:11, 14 65:28 66:18 77:9 81:3,5 94:9 95:8 118:2, 20 146:11 153:1 155:8 182:18 184:2 185:9,11 201:14 205:17 209:13, 20 214:25,26,28 215:1, 19 218:11 229:26 233:3 240:20 249:14,16 260:22 264:21 287:11 295:22 296:12,24 299:3,5 300:3,4 303:13, 17,19,20 306:13 308:18 310:7 311:23 321:20 358:26,27 365:13 392:5 393:17 404:5 405:14,26 416:25 421:7,8 496:25 497:18,24 538:2,24 576:4 583:8 584:2,6 599:19 611:16,25 612:5,14,27 613:3,14, 17 614:5 657:16,17 658:4,5,6 662:27 663:1, 5,12,17,19,27 664:21, 25 665:2,3,7,16,19 666:10,24 667:5,10,11, 24,27 668:5,12,15 669:16,23 670:10,13 672:17,18,25 673:5 679:4 683:5,8,10,16,17, 22,27 684:10,17 685:4, 6,7,24 686:2,21 698:26 699:8,10 701:21 702:21 703:7 716:6 730:27 747:8,24 752:28

**persona** 203:23

**personal** 17:21,22 125:24 126:2 141:9 209:24 247:21 250:16 263:18 278:2 298:12 631:25 656:16,17

**personally** 96:5 153:15,17,20 311:25

**personnel** 115:25,26, 28 268:3,11 313:14 341:8 358:7

**persons** 79:25 294:26

**perspective** 31:27 306:6

**pertain** 75:16 78:19 300:2

**pertaining** 298:11

**pertains** 36:14 58:15 339:14 540:2

**pertinent** 154:25 538:7

**phone** 8:19 13:3 214:22 231:5 245:7 249:25 269:8 389:8,10, 12 396:22 770:10

**phonetic** 24:13 231:25 267:18,26 268:9

**photo** 38:7 39:19 40:16 42:11 44:26 50:6,9,11 87:7 145:2 272:26,27 275:9 344:13 356:25 379:8,22 411:15 457:20 461:24 483:21 486:13, 15 491:17 493:6 551:6 604:5,6,8 606:11,12 614:26 673:22 760:17

**photogrammetry** 450:27 465:3,12 483:8, 12,14 493:7 586:25

**photograph** 4:4,5,6,7, 8,9,10,11,12,13,14,15, 16,17 39:15 40:10 41:18 45:6,13 46:3,9 47:7,10 50:12 56:22,27 59:23 61:2,14 63:2,6 71:10 76:17 137:3,4,5 142:3 174:24 175:18,23 176:14 177:10 180:3 183:14 226:3,4,5,6 229:14 247:24,26 271:17 274:17,24 280:12 281:13,21 284:1 285:3,11 287:25 325:26,28 335:4,5,6,7, 8,10,11,12,14,15,16,17, 18,19,20,21,22,23,24, 25,26 352:7 370:19 378:6 400:2 401:2 461:8 488:28 491:8 514:3,4 624:21 636:10, 24 641:5,13 673:21 674:16 682:6 759:20,21 760:9,10,18,22

**photographed** 250:3 267:5 357:15 673:19 760:5,7

**photographer** 296:8,9

**photographic** 369:1

**photographs** 25:16 65:23 250:15,17,19,20 285:6 290:22 296:28 340:3 341:3 440:21 485:15 486:21 487:2 490:19 586:22 673:16 688:18 759:20 760:1, 15,26 764:22

**photography** 368:27 369:9 370:11

**photos** 22:1 25:19 247:22,23 250:2,6 262:16 269:17 270:18 296:10 341:21 379:12 401:17 438:25 451:7,17 452:8 457:19 492:6 674:3 684:5 689:18 759:15

**phrases** 651:13,15,18

**physical** 23:27 28:20 29:1 30:10 31:10 33:12, 13 79:6 157:7,20 193:1 197:15 232:24,25 234:9,11 235:23 236:16 248:11 285:27 290:7 293:5,23,26 437:8 438:24 440:12,16 441:21 444:8 445:19,21 451:16 453:19,21 455:4 460:27 466:4,9 474:16 524:26 529:13 549:27 551:21,23 554:6,17,19, 21,23,28 555:2,21,25 561:1,5 586:11,12,21 587:11,13 588:3 600:24 658:21 666:1 670:23 673:16 674:7,15 684:9 689:10 702:11 704:13 708:14 720:23 721:23 729:10,13 733:23 735:13,19 737:1,6 738:7,16 742:24

**physically** 192:25 232:21 249:6 286:7 378:10,13 484:5 599:9

**physics** 452:19 586:3 588:25

**physiological** 258:17 287:5

**physiologically** 563:19 597:14 715:6 747:8

**pick** 24:16,17 25:1,4 168:17 396:3 516:11 519:14 521:26 729:6 733:4 760:22 762:21,26

**picked** 709:23

**picket** 57:19 60:23 77:25 158:21

**picking** 521:15

**picks** 83:20 516:12 739:18

**picture** 87:18 103:8,11 115:16 119:21 124:17 125:2,16 142:13,17 143:5 145:14 149:16 171:19 186:14 189:9 193:19 194:4 253:17 293:17 319:11 326:15, 18,24 348:22,27 349:9 350:8 359:12,14 360:2 362:20 363:6,19 364:28 371:27 377:16 394:23, 26,28 397:8 398:4,5,19 399:13,14,25 400:8,13 423:12 466:11 480:16, 17,18 528:10 550:2 553:21 605:7

**pictures** 33:8 91:25 296:10 378:23 400:24 552:9

**piece** 249:19 282:13 297:7 439:17 466:14 553:2 587:17 674:9

**pieces** 297:4 355:15 415:26 554:4,28 587:2 716:18

**pile** 263:10

**piled** 407:27

**pillar** 39:12,13

**pin** 116:27,28 117:1 578:26

**pincite** 578:20

**pinned** 233:14

**pinpoint** 118:4

**pistol** 105:20 257:15,25 262:12,24,28 263:4,9, 19,20 357:22 409:11

**pistols** 263:7

**pitch** 126:19

**placard** 63:4 74:7,9 76:8,12,14,16 114:5,7 150:14,16,17 162:18 168:11 274:18,20,27 275:14 280:18 281:14, 16,18,28 282:1,6,9,12 283:11 284:2,13,18,19, 21 285:18 290:14 372:3,10 403:9 407:19, 23 410:28 413:16 414:4,11,14,18,20 480:5,6,14,20,21 488:12,22,25 489:16 490:26 551:6 561:15 614:28 615:2,7,20,23 616:1,5 625:3,9,14,19 636:12,15,18 641:5,14 673:20 674:16 688:18 759:28 760:27,28 762:20

**placarded** 167:27 168:1 250:2 280:10 282:22 760:6

**placarding** 281:13

**placards** 71:21,23,24 76:17,18 114:2,3,8,12 149:19,21 150:3 250:6, 8 272:9,13,25 288:18, 23 314:7 330:1 377:27 378:2,7 380:3 407:5 409:5 411:8 414:1 462:19 488:20 489:2,7 560:28 561:11 590:1 637:1 641:1,22,25 642:1 760:3,8

**place** 18:19 21:4 42:11 72:19 74:9 107:27 115:3 143:22 156:8 160:28 206:18 207:23 253:5 258:15 259:17 267:7 269:3 280:6 281:7,8 283:3,24 284:14 287:9 290:2 360:25 382:13 415:10 421:26 438:22 439:17 440:10 460:2 465:4 472:5 485:9 524:9 526:20 590:27 605:23

615:27 636:7 646:22 678:9 688:27 693:26 704:7 706:1 716:11 718:5 729:7 733:5 749:1 757:3 761:24 763:1,2 764:22

**placement** 288:25 290:22 304:5,6,8 411:11 438:8 440:6,25 441:3,4 443:15,25 445:25 762:8

**places** 705:7

**placing** 62:24 115:20 116:3 168:7 239:18 296:13 352:4 378:1 438:15 710:20 759:28

**plain** 558:24

**plaintiff** 453:1,5

**plaintiff's** 130:7

**plan** 405:17 453:17 507:7 663:6,9,10,11 755:2 766:24

**planks** 269:14,20 326:25

**planning** 663:2,5

**plans** 515:17 663:18

**plastic** 282:19

**plate** 41:11,25 43:1,3 44:8

**platform** 257:14 262:17,19 365:14 409:27 531:5 540:27

**play** 6:21 69:9 89:23 120:27 126:6 181:3 361:17,20 386:20,25 387:1,2,9 467:10,22 469:8 515:17 517:6 518:13 519:28 521:13 530:21 531:11,23 532:19 533:23,27 534:6,7,21 535:6 707:19 711:8 713:3 746:25

**played** 21:5 82:17 121:9 126:27 181:11 182:3 361:25 386:23 387:7,19 467:11,25 468:23 516:1,4,10,23 517:3 518:22 520:2 531:18,24 532:8,22 533:7,13,24 534:8,10, 23 535:7 671:18 673:15 675:25 713:12,15 746:28

**player** 739:17

**players** 21:18

**playing** 82:10 519:18 520:7,8,13 521:17 522:5 531:28

**pleaded** 15:2

**pleasant** 9:10

**plenty** 522:21 681:26

**plot** 19:19 590:2

**plug** 244:28 695:4

**plugged** 694:22 695:5

**POBOR** 414:27

**pocket** 41:9,10 43:24 160:19 697:3,12 700:24 717:9 748:23

**pockets** 54:16

**point** 24:21 25:1,10,20 26:10,14,20 30:12 31:16,17 33:3 38:26 39:1,23 40:1 52:26 60:21 61:17 62:17 64:5 65:22 67:7,10 71:12 72:12 74:11 75:11,22 76:27 77:8,16 81:10 90:28 91:28 92:10 93:5 98:7 100:8,11 101:9,25 102:24 104:27 105:2,27 106:8 108:4,19 111:18 118:2 123:15 125:19 126:7 127:2 128:4,11 129:7,21 130:3,28 131:2 139:19,28 140:6 141:1 145:18,21,24 152:20 154:6 157:14, 16,20 162:6 163:20 166:20,26 167:8,10 170:23 171:5 184:1 185:25 187:21 193:1, 19,22 194:17 207:11 211:28 212:13,21,23 213:2 214:9 232:1 236:9,12 245:24 248:7, 10,15 256:27 264:9,11, 19 266:16 277:22 282:28 284:16 286:16 287:2 290:24 291:16 300:25 301:15 309:21 310:16,19 316:2,15 322:2,6,23 323:7 325:1 326:9 327:11,14,21,26 328:21 340:20 344:7,27 347:19 348:11,25 353:8,24 354:4,9 355:28 356:12,23 358:5 360:3 370:25 379:19,24 383:27 386:18 387:13, 15,23 388:14 402:25 404:21,22 411:5 412:6 414:8,11,16,19 424:14, 24 425:24 431:14 432:21 439:16 454:12 456:16 461:11,13 462:11 463:10 470:19 471:22 472:27 473:13, 14,16 475:27 477:4 479:22 483:1 484:1,2,4 488:9 490:1 491:11,21 492:11 494:14 496:15 502:24 504:16,24,26 517:21 518:18 520:27 521:13 522:14 523:11 525:6 527:9 531:8 532:7,13 533:10,15,20, 22 541:3 543:7,10,15, 19 544:5 547:6 549:8 552:19 556:2 562:2 563:14 565:21,26 567:10 568:4,15 580:22,24 581:15 582:13,20 585:22,23, 26,28 586:10 587:9 588:2,11 589:25,27 590:13 591:1,22 595:3 596:14,19,28 600:2 602:15,16,17 604:17 606:1 607:28 615:7,11, 19,23 616:4 622:11 623:4,24,27 625:7,11, 15 626:17 627:28 628:14,15,23,24 632:12 633:21 641:15,27 642:21 659:1,7 679:9 686:25 688:1,14,21 692:27 693:9,26 702:1 705:1,19,22 707:20 708:5,25 711:4,5 712:27 713:18,19,21 717:19 728:28 740:28 741:17 744:24 745:15, 21 748:20 749:22 753:20 754:21 757:17 759:26 760:27,28 761:2 762:9 763:1

**pointed** 55:5 153:23 163:18 184:4 194:3,20, 23 285:1 326:3 636:1

**pointer** 38:22,26 39:18 63:2 106:16 187:19 193:22 272:24 275:14 276:4 281:12 283:28 288:22 290:13 325:18, 25,28 692:28

**pointing** 27:4 34:1 55:13 71:15 76:15 96:15 143:2,4 185:12 193:7 273:14 286:24 291:17 319:10 324:25, 27 369:25,28 370:1,2 399:4,7,9,22,23 400:6, 18 457:10 624:12 633:27 722:16 765:22

**points** 14:20 32:27,28 165:16 167:16 168:3 249:7 297:6 299:19 300:20 387:4 399:7 426:16,25 466:8 589:27 590:2,11,16 604:22 641:5 644:14 655:20,21 701:1,2 743:7,8

**pole** 414:16 625:12

**poles** 559:22,23

**police** 6:13 7:16 8:7 31:18 39:27 45:14 66:15,19 89:15 94:1 104:6 155:1 182:23 183:7,8 206:18 207:19 209:6,7,9,10,12 214:24 238:26 239:1 240:19,22 242:2 243:3 246:23 258:26 262:10 293:2 297:25 298:7 303:5 336:26 339:15 366:3 414:27 439:9 440:27 441:21 444:10 455:26 466:2 483:20,22,26 493:22 494:15 495:12, 18,23 588:5 589:24 590:4,6,19,26 591:10 615:16 664:9 666:10 680:19 759:9

**policies** 310:3 706:23 729:3
**policing** 680:27
**policy** 81:2 298:2,10 538:21,22 539:2,14,17, 22 540:5 730:13,16,21 734:7
**polimer** 105:21
**poly** 252:8
**poor** 25:12 33:10 40:21 91:14,16,17,19 92:27 93:9 95:23 96:2 126:23 719:17 758:19
**poorly** 704:27
**pop** 423:9
**population** 230:22
**porch** 40:25
**portion** 6:10,23 41:11 46:21,26 57:17 60:15 61:2 96:28 147:7 181:3 244:28 271:24 272:2 273:5 274:19 280:9 281:25 285:2 304:17 325:2 327:6 351:25 352:9 361:18,20 369:25 386:21 387:17 398:23 417:27 493:24 515:18, 24 517:10,15 519:19 522:8 531:4,23 567:27 647:28 673:10
**pose** 416:7
**posed** 415:9
**position** 58:15,20 76:22 77:5,14 103:18 116:6 123:21 124:10, 16,19 125:15 127:16 143:27,28 154:23 162:17 163:17 240:17 269:5 275:28 291:11 315:7 318:11 347:21 366:12 368:5 377:2 388:7 404:10 407:19 414:4 429:18 453:9 456:28 457:14,26 458:5 461:12,27 464:3 465:4 485:13 487:19 561:3 563:4 566:19,28 567:14 590:28 591:5 604:14 605:10,27 706:3 712:2, 3,22 716:7 728:24
**positioned** 291:16 762:10
**positioning** 128:27 152:22 268:24 356:12 366:10 368:25 433:14
**positions** 239:12 242:13
**positive** 352:23
**positraction** 273:26
**possibilities** 58:17 593:2 610:22 615:9 626:26 630:16 631:17 689:2 694:25 697:18 701:10 715:18 717:4 743:22 744:4 752:14,21 754:14,18,20
**possibility** 116:12 156:20 306:27 364:16 376:28 401:18 460:13 546:1 547:12 577:22,25 598:24,27 693:28 694:9,18,20 696:9,10, 21 697:28 699:25,27 714:23,28 715:1 717:8 718:25 719:3,4,6,7,8 743:11,23,28 744:1 748:7,14 751:22
**possibly** 10:12 27:3 65:7 97:21,22 141:6 152:25 165:21 211:18 285:22 294:13 309:18 319:8,27 359:8 365:5 404:18 416:22 425:19 554:3 629:19 679:10 751:26
**post** 93:20,22,23,25 240:18 241:8 292:12 297:14,18,20 320:23,25 412:24
**post-sentence** 579:21
**posted** 164:19
**potential** 78:28 102:5, 22 156:28 160:10 292:21 296:14 300:19 305:23 311:14 749:28
**potentially** 92:27 152:24,25 157:8 313:22 345:23 366:18 371:5 391:28 392:6 404:10 462:15 499:6 565:7,9 596:8,9,16 599:11 633:28 696:22 741:28 760:6
**pound** 286:19 530:13, 14 556:9 562:11 575:25 674:9 676:17
**pounds** 62:7 253:27 256:20 277:26,27 426:18 741:7
**power** 470:3 758:24
**powered** 472:23
**Powerpoint** 429:26 430:28 431:9,19 444:23 445:27 447:6 454:12 482:3 589:10 619:3 673:21
**powers** 750:14
**practical** 79:21 503:8
**practice** 10:26 66:8,9 258:4 373:3 438:21
**precipitated** 290:18
**precipitating** 291:21
**precisely** 610:15
**predicament** 308:17
**predict** 166:1
**preface** 516:24
**prefer** 148:25 219:11 425:6
**prejudice** 13:27 17:6, 21 22:6 23:15 650:25 655:28 656:16 659:4 689:25
**prejudicial** 7:14,17 8:11,14 342:7
**preliminary** 429:22
**premarked** 107:19 109:28 110:5 113:16 339:27 342:12 348:19, 20 376:16
**prematurely** 718:26 747:11
**premise** 737:20
**premises** 327:6 455:14 459:28
**preparation** 663:5
**preparations** 663:8
**prepare** 328:9 765:12, 16
**prepared** 82:3 181:24 313:27 328:17 482:4
**preparing** 431:8 612:21 663:3
**preponderance** 661:22,24,26 696:24
**Prescott** 373:4
**presence** 5:12 9:8 37:12 53:28 78:25,26 79:5 94:6,8,13,18,21,24 107:16,17 108:9 131:16,17 154:18 155:3,6 157:6 158:3 160:16 218:28 232:24, 25 301:6,8 305:14 329:23,24 336:12 343:10 424:19,20 426:10 429:12 447:2 448:3 507:4 515:11 525:17 575:14 583:16 618:3,4 619:20 642:26, 27 647:13 650:4 652:17 690:9,10 691:5 719:20 730:22 755:11,12 757:23
**present** 5:13,19 12:19 49:12 51:4 55:7 98:1 160:10 162:4 213:4 227:13 246:26 267:10, 14,20 270:9 280:23,26 287:21 290:26 293:17 306:28 336:13,14 393:15 409:11 429:13, 14 445:4 447:3 448:7 515:12,13 575:14,15 620:21 635:25 641:1 650:5 664:28 668:3 669:28 683:14 685:28 686:16 691:7 701:23 728:14 755:13,14 757:25 760:21 767:5 769:16,20
**presentation** 431:9,15 454:9,12 482:4 501:6 582:13 589:3 590:23

**presented** 7:10 12:2, 15 15:28 22:9 23:28 426:1 506:7,11 526:4 619:23 650:23 661:18 736:18 742:21 747:27 748:13

**presenting** 11:24 23:8 34:10 569:5

**preservation** 116:8

**preserve** 293:16

**preserving** 159:24 313:18

**preset** 502:8

**press** 38:23 98:17 116:21 117:1 123:10 127:7 128:6 147:18 148:14 161:11 383:13 388:6,11 391:26 425:22 470:28 471:1 536:5,14, 27,28 537:11 546:14 685:10 704:6,8 718:9, 16 745:18,19

**pressed** 147:27 148:1, 9 471:3 535:25 543:28 544:18 744:18 745:3,5 753:19

**presses** 478:13

**pressing** 127:6,21 128:3 148:11 381:21 391:27 536:16,24 537:6 602:19 744:21,28 745:6,14

**pressure** 161:1 365:24 381:9 384:16 385:5,9 412:8 603:12

**presumed** 15:9 652:26 693:14

**presumption** 15:1,10 652:27 693:15

**pretend** 206:15,21

**pretended** 231:10,12 236:4

**pretty** 26:5 37:12 57:20 103:21 117:8 190:14 194:12,16 215:14 230:28 232:7 244:12 291:10 299:20 321:4 349:14,24 364:3 384:13 405:5,7 412:24 437:24 438:6,20 446:11 455:19 458:4,9,11,27 461:2,22, 28 462:18 463:5,10 465:22 466:13 467:1 471:24 472:22 473:4,22 474:22 475:5,12,20 480:13 481:1 482:23 483:20 485:22 486:24 502:18 503:7 518:25 561:27 589:23 590:11 591:7,19 598:14 615:8, 12 731:4

**prevent** 158:22 262:10 303:8 338:14 404:7 499:9

**prevented** 321:18 337:2 341:14

**preventing** 718:22 758:10

**prevents** 444:10

**previous** 46:3 61:3 108:25,26 117:7 379:8 463:6 491:15 618:19 625:27

**previously** 6:14 44:18 45:12 57:5 97:25 113:4 138:23 158:21 160:15 161:9 162:17 174:21 270:19 336:19 343:23 379:2 431:22 516:4 527:1 542:24 583:9 584:26 612:18 620:15 625:22 636:2

**primarily** 252:4 516:9 738:3

**primary** 250:27 252:1 257:19 437:2 538:1

**primer** 117:2

**primitive** 274:1

**print** 282:23 352:10 353:9 394:10 396:16 398:23 480:20 583:3

**printed** 582:25 673:22

**prints** 349:28 529:4 552:15 708:21 737:21

**prior** 27:17 48:6 49:6 51:25 55:6 75:6 110:28 146:15 168:16 234:27 242:14 244:20 249:28 251:10,11 266:26 267:28 268:13 270:26 283:17 345:16 347:1,22 362:20 378:1,20 385:6 388:11 431:23 539:8 541:11,17 546:18,27 548:6 555:28 558:18 567:17 568:15 577:5 598:3,4 609:23 610:11, 19 614:6 621:4 674:28 675:13 704:10 710:28 714:25 734:20 744:7

**priority** 102:16 115:24 116:7 289:21,22

**private** 484:7

**pro** 765:15

**proactive** 37:10

**probability** 441:5 460:13

**probable** 412:24 695:25 752:19

**probative** 7:14 8:15

**probe** 233:27

**problem** 7:24 132:18 187:7,10 200:18,22 252:8 318:12 342:15 382:17,18 389:2,4,13, 14 390:3 411:24 414:25 415:25 522:2 622:23 623:8,27 624:5 630:7,9 646:3 673:5 694:24 733:6 756:23

**problematic** 7:19

**problems** 252:7,12 517:4 519:9 721:18 754:19

**procedure** 298:11 538:21,22 539:2,14,18 540:5 730:13,16

**procedures** 706:23

**proceed** 10:23 21:23 61:18 98:11 138:17 346:19 434:20 755:26

**proceeded** 60:7 64:22 90:3 541:10

**proceeding** 56:18 578:6

**proceedings** 9:7 107:15 108:8 131:15 132:7,20 221:20 301:5 305:13 329:22 330:16 343:9 424:18 448:2 507:3 509:3 525:16 569:11 578:17 583:15 618:2 619:19 642:25 650:3 690:8 691:4 722:26 755:10 757:22 771:14

**process** 249:8 250:1 255:26 337:22 343:2 520:20 536:27 539:4 586:27 603:16 613:25 616:3 630:17 691:27 732:8,9

**processed** 249:18 250:23 271:21 760:2 764:25

**processes** 597:7

**processing** 249:9 357:16 759:19

**produce** 576:19,26 577:18 643:19 644:26, 28 645:5 646:12 658:21 664:15,22 665:1 669:17 683:15 686:1 701:21,24 721:9 747:25,27

**product** 495:5

**profanity** 68:11

**profession** 452:22

**professional** 715:11 739:17

**professionalism** 78:25 691:18

**professionals** 730:19

**proffered** 435:1

**proficient** 258:5 373:2

**profound** 734:15

**program** 495:26 590:13,16 591:15,18 622:22 629:16,21 630:17

**programming** 590:3

**programs** 496:13 589:12,13,20 630:1

**prohibit** 445:6

**prohibited** 445:2 657:17 658:5,7

**project** 76:2

**projectile** 116:26 117:8

**projector** 353:3

**projects** 695:11

**prominent** 288:11

**promoted** 240:3

**pronoun** 15:25

**proof** 15:2,15 430:12, 17 515:21 523:19 555:2 653:4 657:12 661:24,25 693:20,21 696:14

**proper** 22:2 154:24 239:18 301:13,23 304:25 338:20 339:12 362:11 363:27 408:7,13 539:2 738:24

**properly** 94:3,19 388:10 520:26 522:13

**property** 53:11 89:12 90:13 174:13,18,20 176:19 338:20 362:28 397:3 484:7 517:27 529:22 565:18 586:17

**proponent** 434:2

**proposal** 645:28

**propose** 430:11

**proposed** 429:26 544:17 576:27 637:1

**proposing** 579:23

**proprietary** 589:9

**prosecution** 301:9 417:28 418:4 429:15 453:1 698:12,14 711:9 714:2

**prosecutor** 593:4 619:24

**prosecutor's** 524:4

**protect** 300:26 306:9 763:18

**protection** 58:17,21

**protective** 208:6

**protocol** 719:19

**protocols** 765:5,7

**proud** 754:25

**prove** 10:26 15:10,12 17:11 18:2 28:21 31:7 33:26 302:2 336:25 337:4,18 437:24 652:27 653:1 654:19,23 655:4 656:5,25 658:23 661:7, 11 662:19,20,24,25 663:25 664:17,18 665:20,22 667:20,21 668:16,18 669:12,13 670:14,16 672:19 684:25 686:19 692:5 693:15 694:8 696:12 697:19 698:12,15,24 699:18 703:8 705:26 715:21,22,26 719:7 739:13 742:10 756:9

**proved** 15:19 32:18,19 584:9 653:8 654:17 655:9,12 660:11 661:6, 21,26 663:23 715:20 756:8

**proven** 11:7 643:16 699:11 717:5 720:11 743:28 754:15,22

**proves** 15:22 653:11 658:25 694:4

**provide** 12:2 34:16 52:9 55:16 116:6 131:26 158:21 173:1 181:25 199:22 216:11 227:23 237:19 314:14 317:6 318:15 341:23 376:12 381:12 419:2 434:10 439:4 448:14 450:13 451:4,26 453:14 454:2,9 466:8 477:14 480:8 483:27 538:3 619:8 712:14 761:6 762:6

**provided** 47:24 53:3 109:15 315:11 328:18 429:25 430:14,26 431:4,6,14,16 439:9,16 440:7,11 441:20 442:6 452:7 457:19 464:8 466:2,26 467:2 476:22 477:7 494:16 586:22 588:4 590:8,27 599:25 631:18 672:21 764:21

**providing** 152:3 155:3 306:6 441:10 451:20 452:1 553:15,21

**proving** 302:5 648:24 666:12 692:20 697:15

**public** 13:28 22:6 81:1 299:18 392:16 484:8 538:3,4 586:16 650:26 689:25

**publication** 450:23

**publish** 81:27 141:25 181:19 454:11 593:14 639:12

**published** 174:21 450:25,28 494:19

**pull** 93:13 102:24 109:23 180:8 189:9 207:2 212:9,12 213:2,5, 10,19 234:6 249:3 261:3,8,13 353:6 358:21,28 367:19 380:27 519:23 528:10, 11 578:12 593:10 695:4 707:3,16

**pulled** 109:14 111:8,11 141:5 143:23 180:5 190:5 194:20 205:3,15 233:21 249:23,24 261:17 304:21 346:13 361:10 418:6,7 500:8 528:12 717:16 720:28 722:17

**pulling** 190:21,24 203:12 204:26 212:27 213:15 262:26 358:24, 26 359:3,5 679:22

**pulls** 300:20 701:8

**pulse** 696:7

**Puma** 80:25

**punch** 707:11 718:11

**punched** 422:6 677:11 720:26

**punished** 579:16 581:13,21

**punishment** 14:9 539:21 768:8

**punishments** 22:5 689:25

**pure** 746:27

**purely** 525:3

**purple** 603:27

**purports** 395:5 708:2

**purpose** 16:21 52:16 69:8,17 116:27 146:25 152:28 164:6,16 213:8 395:28 412:26 457:23 538:20 578:10 654:4 659:9,10 662:4,13 665:10 668:7 670:5 682:10 683:9 684:22 758:19,27

**purposes** 42:11 58:11 79:27 116:24 181:4 262:20 302:5 352:6 357:10 444:15 585:7,9 615:6,16 643:24 644:14,15 689:27

**purse** 697:3,4,7

**push** 22:21 39:21 45:16 81:8 187:20 253:25 254:3 279:21,22 358:28 436:7 603:13 758:12

**pushed** 109:18 383:9 409:21

**pushing** 233:13 359:5

**put** 10:14 11:16 23:14, 15 29:25 31:27 58:16 69:15,16 70:4,15,18 71:1 76:21 78:2 114:16 244:9 245:14 248:14 265:2 269:15 278:1,4 300:21 325:1 340:14,15 355:24 358:17 360:22, 27 381:2 385:5 388:1,2, 11 393:10,28 404:9 489:22 502:8 503:5 525:22 536:23,24 546:11 560:27 589:22 590:2,22 614:27 629:26 631:26 632:3,4 650:11 697:2 707:17 717:17 718:19,20 743:26 750:4,13 758:6 760:24 761:25

**puts** 29:25 447:14 663:9 696:7 717:2

**putting** 69:18 70:7 127:20 154:25 157:19 242:10 474:22 553:14 615:7 663:6 718:15

**puzzle** 242:10

**pylon** 280:17 282:15, 16,20 396:15

**pylons** 272:20 280:14 377:15

**Q**

**quadrant** 254:5

**quadrants** 253:17,19

**qualification** 257:15 439:22

**qualifications** 292:8 429:23,24 433:7,10,26, 27 438:7 439:19 443:14 449:8 481:22 660:19

**qualified** 257:1 438:15 443:11,22,25 444:6,16 447:19

**qualify** 257:19,26 258:18

**quantify** 503:3,4

**quarter** 49:10 270:7 326:20 349:8 378:8 397:11

**quarterly** 241:4 540:24

**quarters** 362:9 568:2 706:4 716:23

**question** 11:5 16:13,18 52:23 67:1 78:8 87:11 88:2 90:9 126:23 143:6, 7 147:2,4 152:5 169:18 175:13 185:8 187:8 197:26 208:19 214:17 215:6 220:13,17 304:16,23 308:21 309:27 310:12,18 316:25 323:24 329:15 337:27 338:7,10,17 339:14 347:1,17 348:7, 10 356:28 357:25 366:20 372:7 384:21 387:28 393:3 401:13 413:27 416:7 418:11 426:21 430:24 461:4 469:21 470:25 479:13 482:28 483:3 488:10 489:27 497:8 500:24,28 505:24 518:28 520:11, 24 522:1 524:14 527:27 534:1,5 536:6 539:19 543:3,27 544:4 548:2,3 550:20,21 551:3 552:23 558:3 567:21,24 577:3 582:18 586:7 587:3 588:18,28 596:27 601:26 603:23 607:8 609:25 611:20 612:9,17 613:16 615:22 625:25 628:7,8 634:22 637:2 638:9 641:9 646:11,13 653:24,28 654:26 660:8 709:24 738:8 767:26

**questioned** 347:25 750:17

**questioning** 161:16 162:11 164:27 166:18 301:12 304:24 408:10 750:22

**questions** 7:18 16:9, 10,15 17:18 91:9 126:23 159:12 163:4 171:22 193:18 195:4,11 199:11 200:25 203:10 210:9 211:19 212:16,18 215:28 221:2 237:7 261:15 264:6 303:24 311:9 377:6 393:24 406:4 415:8 416:23 417:22 418:22 423:19 433:20 481:12 523:24 525:4 531:18 532:7 540:9 542:4 557:20 559:24,26 560:22,24 568:22 585:3 593:1,4 597:20 601:17 609:13, 27 616:15 617:6 635:17 637:22 639:22 640:18 642:6 652:16 653:20, 21,26 656:13 678:15 751:1 767:21,23

**quick** 211:2 416:9 431:28 433:19

**quickly** 21:8 26:6 45:3 62:1 79:12 154:22 207:9 242:7 251:16 287:22 297:13 376:16 405:6,7 559:17 616:10 749:26

**quiet** 129:4 717:2

**quieted** 548:12

**quieter** 543:8

**quote** 170:25 575:23,27 576:3,6 578:22,23 643:23 644:1,2,4,11 693:28

**R**

**R-H-I-N-O** 589:18

**R-O-B-E-R-T-O** 434:24 448:21

**R-Y-A-N** 228:2

**race** 14:5 279:9,13 651:4

**racing** 279:10

**radar** 457:5 558:13,18, 23,24,25,27

**radio** 41:14 55:23,25, 26,27 56:3 69:18,22,26 70:8 404:20 521:13 708:2

**radioed** 404:21

**radios** 39:27

**radius** 349:5 365:16 373:13,15

**rage** 676:12 745:17

**rain** 253:12

**raincoat** 654:27

**raining** 253:11,14 279:26 654:20,21 655:2

**raise** 8:1 181:9 434:8 448:12

**raised** 139:3 676:1

**raising** 163:27

**ramifications** 539:15 706:25

**ran** 78:9 363:11 447:6 629:15,19 632:6 672:2

**Rancho** 228:25 236:28

**random** 521:14 615:11

**range** 37:8 118:13 257:18 259:4 263:6 366:13 367:2 379:22 409:27 441:22 442:3 443:6 465:16 538:6

**ranges** 479:18

**ranned** 78:7

**rapid** 119:12 120:19 164:24 362:7 363:16 408:11 412:3

**rapidly** 384:28

**rapping** 752:12

**rarity** 732:24

**rate** 111:22 122:5,7 123:13 128:23 241:13 392:16 476:16 479:14 503:24 607:12 614:14 632:26 633:4,26 634:9 700:6 703:8 710:3 717:20 750:21

**rattling** 468:4 497:6,22

**raving** 729:18

**raw** 57:20

**re-** 462:2

**reach** 8:24 14:8 437:27 485:23 766:15 768:1,7, 12 770:1

**reached** 207:10 473:16 476:8 501:17 504:4 541:11 614:17 644:6 702:14

**reaches** 210:14

**reaching** 54:16 205:20 502:16 660:1 661:13

**react** 258:21 287:4,15 299:15 312:12

**reacted** 301:24 677:10

**reacting** 287:11

**reaction** 128:24 286:9 300:23 499:8 599:20 602:3,8 613:22,24 675:14,20,23,26,27,28 677:15 689:4 759:11

**reactions** 563:18

**reacts** 286:7

**read** 9:25 10:3,4,5,17 11:20 12:22 16:27 21:27 31:26 41:8 42:23 147:7 196:10 245:25 246:25 302:20 304:17 440:26 552:14 567:23, 27 575:17 582:22,26 583:19 638:7,11 643:1 648:9 649:21 650:8,13, 15,17 652:12,17 654:14 671:10 700:2,14 702:1 709:4,19,24 743:4 749:3 758:13 765:11,14

**reader** 525:2

**reading** 10:16 245:25 263:16 558:21 769:16, 20

**reads** 42:9 578:3 644:4 648:14

**ready** 24:16 25:1 49:14 73:15 131:14 132:8 138:14 163:17,27 185:5 270:11 305:16 338:25 343:8,17 349:12 383:2 430:6 455:15 526:24 584:20 620:10

**real** 106:17 211:2 447:17 479:5 641:28 699:4 730:14 733:7

**realistic** 694:1 729:10

**reality** 594:20 708:17 711:2 736:11

**realize** 503:9 664:25 667:27 669:23 683:11 685:5

**realized** 69:3 78:5 709:2,26 719:2 735:25 764:16

**rear** 40:2 45:14 46:17, 18,26 60:4 68:18,22 143:15 150:8,10 246:1 263:3 269:6,8,24,25 270:25,26,27 272:2 273:5,14,24,26,28 275:25 276:6,15 277:11,21 340:8 355:9 365:13 379:3,16 413:16 414:2,17,20 422:10 470:2,3,9 472:24 480:15,19 492:22,27 494:18 604:17 606:9 625:6,8,13,18 628:5,9, 27,28 673:26,27 674:17 685:11

**rearward** 375:22

**reason** 7:5 10:5,28 22:27 66:12 69:25 77:2 144:8 178:2 198:24 235:15 279:7 364:26 460:9 462:19 470:13 500:11 517:18 519:24 520:23 524:17,18 631:13 659:3 661:8 681:18 717:28 733:16 734:4 736:14 740:22,27 741:23 742:7 745:16 748:1,4 758:14,15,26

**reasonable** 15:11,13, 15,20,23 17:28 32:20, 23,25,26 33:1,4 80:2 163:2 299:7,10,12 300:2,4 303:7 306:24 307:5,12 308:3,18 309:1,20 312:9,20 426:25 523:11 545:17, 23,24 546:1 591:20 598:23,24 599:19 616:21,25 639:23,27 648:24 652:28 653:2,4, 9,12 655:13,16,18,19, 23 656:23 661:7,25 662:21 664:25 666:13, 27 667:13,27 669:23 679:12 680:4 681:5,27 683:10 685:4,7,23 689:13 692:5,20 693:12,16,19,21 694:3, 5,9,18,20,25,27 695:24, 28 696:11,12,21 697:10,16,20,28 698:12 700:24,27,28 714:19, 23,27 715:1,18,19 717:7 718:24 719:3,8 731:19,21,22,23 742:11 743:6,7,21,23 748:7,15 749:1 751:16,22,24 752:13,14 753:8,16 754:18 758:13 759:8,11 764:9 765:22,25 766:3

**reasonableness** 308:19 763:4

**reasons** 94:28 209:8 220:19 235:9 319:24 339:11 438:26 498:28 516:25 517:16 539:3 659:28 660:17,25 687:7 758:21

**rebuttal** 446:23 508:10 523:3 526:5 617:18,22, 27 618:6 619:24 620:3 728:17 755:2,6

**rebutting** 508:16

**recall** 36:26 40:26 46:28 48:17 49:19 64:2 65:25 66:5 68:14 71:5 74:25 75:1,6,9 76:20 83:26 84:14,16 86:4,22, 24 90:27 91:2 92:2 93:5 95:2 96:1 97:16 101:23 102:25,27 103:2,3 104:28 105:2,7,8,11 108:27 111:16 112:7,11 113:4,7 119:11,13 128:18,22 139:4 140:10 142:26 143:10,14 147:18 149:17,23,25 150:19,22 151:2 152:8, 18 154:1,2,5,13 159:28 160:24 161:16,18,25 162:3,4,11,22 163:13 164:3,27 166:4,18 167:3 169:3,6 170:27 171:6,14,15,28 172:4, 20 176:23 177:14 183:9,20 184:19 185:9, 24 186:6 191:1 195:15, 17 196:3,17 197:10,15 199:16 200:27 201:4 206:1 210:8,15 215:1 217:23 228:26 261:7 264:27 265:17,20 267:10,14 270:16 271:3 277:9 281:2 283:13 284:24 296:25 306:5 313:13 316:11,14,17 322:24 323:3 324:5 328:3,5,21,23 345:4,6, 7,8,13,18,19 346:6,26 347:4,9,23 353:25 357:8 358:2 360:10,15 361:12,13 370:23,25 371:2 380:20,26,28 384:14 385:12,16 391:7 392:8,9 397:26 403:22, 25 406:14 407:22 408:4,8,18,22 411:17 412:19 413:13 420:5 427:8,11 446:10,15 477:24,27 490:28 496:16 500:18 501:18 508:20 515:16 525:7 526:14 530:23 531:1 533:23 536:5,6 540:26 541:4,7 542:12 543:5,9, 13,14 544:7,12,15,16 550:1 551:9,12,15,17 554:16,21 557:22 560:23 562:28 564:2 566:5,15 567:2 582:27 585:7 589:4 593:3,8 597:20 602:17 605:5 609:21,25 611:3 614:1 620:4 624:12 625:27 629:11,20 630:24 631:27 632:2 633:12,20 635:25,28 636:4,25 637:24,26 638:3,4,5,8, 14 639:1,26 640:2 641:23 682:4 734:19 760:11 761:13

**recalled** 138:22 172:22 199:18 343:22 371:24 526:28 542:23 584:25 620:14 761:2 762:10,11

**recalling** 523:16

**receive** 11:25 13:7,16, 18 47:26 93:18 97:8 164:5 242:7 244:23 257:25 265:14 425:8 435:24 438:20,22 449:20 452:1

**received** 15:21 240:15 241:7,24 242:17,18 244:25 245:23 247:13 430:27,28 431:10 435:21 454:15 455:25 463:18 590:19 618:22 619:1 621:27 653:10 767:11

**receives** 522:21

**receiving** 234:1 265:22,26 311:23 758:23,25

**recent** 339:28

**recently** 80:19

**recess** 19:7 49:9,11

72:26 107:12,13,20 108:6,7 184:25 185:2 270:4,5,8 301:2 382:24, 27 428:2 447:1 507:14 617:24,25 619:18 642:13 646:25 690:3 691:3 755:1,9 770:14

**recesses** 18:16

**rechange** 98:7

**recited** 425:5

**recognize** 38:12,14 42:24,27 43:6,8,27 44:2,13,16,26 45:19,22 46:9,11 47:6,10,12 58:26 59:1,16,19 60:11, 13,24,27 73:24,27 81:23,25 94:10,17 96:25 126:17 170:22 174:22,26 176:15,17 181:1,9,13 209:16,17 214:14,17 218:7 220:14,20 271:7,11,17 272:5,8 274:16 277:8 384:10 423:1 577:22 597:3 681:15 721:4

**recognized** 34:3 89:15,20,26 95:13 97:5 155:12,14 170:22,24 220:9 349:27 597:15 682:12 720:17 754:8

**recognizes** 730:28 761:1

**recollect** 317:12 688:14 765:10,13

**recollection** 57:9 91:27 105:14 107:11 108:3,4 109:11,13 124:5 143:18 150:5 160:4,9 162:2,3 163:12 164:22 167:18,22 168:2,21 169:18 170:17 172:5,10 191:28 195:26 196:7 197:5,8 233:1 281:3 284:6,9,23 314:20 315:10 317:5 323:3 345:24 346:2,4 347:8 413:19 540:27 564:7 687:21 761:8,23 764:26

**recollects** 673:9

**reconstruct** 256:4 437:8 440:5

**reconstructed** 462:3

**reconstructing** 439:12

**reconstruction** 239:24 241:25 242:1,18 252:4,5 255:15,17,19, 26 257:3 292:19 388:19 415:6 430:15 436:12,18 437:3,4,6,11,17 438:12 441:2 443:11 450:5,15, 21 451:5,10 475:17 484:18,20,24 524:8

**reconstructionist** 433:5 444:5 449:16 599:7

**reconstructions** 436:14

**reconvene** 49:9

**record** 5:12 16:20,25, 27,28 34:22 39:17 46:7 63:18 71:15 76:15 80:28 81:9 107:17 108:10 131:17 147:4,7 173:7 176:10 187:11 194:3 199:28 202:4 216:17 218:16 228:1 229:11 230:5 237:25 272:24 274:9,11 281:11 283:27 285:1 290:12 301:7 304:17 325:23 329:24 330:14 336:12 349:6 371:27 382:28 396:13 419:8 421:12 424:20 425:7 429:12 434:16,18 447:2 448:20 507:13,15,20 515:11 567:27 575:13,24 604:3 618:4,18 619:6,21 621:23 622:1 642:27 645:18 646:21,23 647:13 649:21 650:6 652:12,13,14 654:3,12, 14,15 690:10,26 691:6 728:14 755:12 757:24 767:19 770:12

**recorded** 81:19 180:24,26 624:27

**recorder** 41:14 80:25, 27 83:16,20,21 408:23 499:27 562:14

**recorders** 244:14,15 560:17

**recording** 4:3 6:7,11, 21 21:13 80:21 81:2,4, 10,14,16 82:2,6,7,24,25 83:27 84:9,23 112:9,10 137:5 140:7,14 160:5 180:28 181:8,13,23,26, 27 182:9 280:28 286:1 335:3 408:4,20 413:1 426:8 440:6 467:3 495:27 496:18,21 497:23 498:15 506:2 515:18 516:22 521:15 531:23,28 533:17 562:4 587:23,26 624:8 673:7, 10,11,13 674:6 675:17, 22 676:3 678:7,17 685:19

**recordings** 5:25 22:1 290:1 689:18

**recorrect** 487:19

**recounting** 444:14

**recovered** 271:4

**recreation** 305:26

**recross** 415:15

**Recross-examination** 136:6,10 169:26 198:10 334:6 415:18 573:6,11 609:18 637:17

**recruits** 257:21

**rectangle** 455:20

**rectangles** 485:6

**recycle** 682:26

**red** 8:1 38:23,24 187:20 251:8,11,22 323:26 351:12 394:10 399:3,7 457:5 527:24 528:2 606:9 696:16

**redact** 8:2 618:19

**redacted** 7:3 330:5,8 515:18

**redaction** 5:24,28 8:16 9:6

**redeem** 751:10

**redirect** 136:5,6,9 159:14,17 171:26 195:9 216:1 237:9 334:5,6,13 406:6,9 417:25 423:21 442:15 513:8 523:5 563:26 573:5,6,11,12 592:22,25 616:12 635:19,22 640:24

**redisplay** 166:3

**Redisplaying** 411:5

**redone** 592:16

**reduce** 476:19 478:11

**reenacting** 443:27

**refer** 10:10 313:24 314:12 482:24 650:9

**reference** 7:21 47:20 48:16 54:8 55:7 62:25 186:20 248:8,10 249:7 250:13 264:9,19 284:14 297:7 325:16,22 356:25 357:26,27 400:25 401:17 414:11,15,19 439:15,16 447:14,16,26 457:8 466:8 480:23 483:25,27,28 484:2 494:14 495:13 585:23 586:1 588:2,24 589:25, 26,28 604:22 615:20,23 622:6,11 625:7,11,15, 17 641:15 688:22 760:23,28 762:9 763:1

**referenced** 68:13 483:5

**references** 284:14 483:7,11 589:24

**Referencing** 67:24

**referred** 229:27 420:24 482:19 578:8 641:25 760:12

**referring** 6:10 48:4,8 53:15 55:1 65:10 67:23 83:13 104:11 112:9 151:24 160:28 167:20 197:24 200:16 201:17 287:26,27 295:1 316:6 326:27 354:10 362:15 365:10 374:2 385:17 410:21 411:11 414:5 453:22 459:15 482:22, 28 488:14 489:5 502:19

551:24 555:25 561:21 590:3 604:7 610:22 636:18 759:17

**refers** 85:1

**reflect** 63:18 176:10 202:4 218:16 230:5 421:12 430:21

**reflecting** 97:11

**reflection** 43:25 369:15 370:7

**reflective** 40:7 337:7 338:5 423:6,7,9 719:18

**reflectors** 423:4 705:2

**reflects** 577:5

**reformulate** 500:24 587:3 607:8

**refrain** 167:15

**refresh** 105:13 107:11 109:13 143:17 160:4,9 172:5,10 195:25 196:7 197:4,7 284:9 314:19 315:10 317:4 345:24 392:12 413:19

**refreshed** 108:4

**refreshes** 196:11

**refreshing** 168:2

**refuse** 232:18

**refused** 65:14,15 101:3 541:5

**refusing** 219:6

**regard** 110:5 765:19

**register** 715:10

**regular** 75:12 91:20 246:23 420:17,20 470:15 496:10 592:4

**rehearsal** 434:27

**reiterate** 211:2 291:8 298:15

**reiterated** 95:23 123:8

**reject** 18:4 33:2 655:23 656:27

**relate** 255:23 445:25

**related** 51:19 53:11 55:9 58:11 75:23 241:24 244:23 245:23 257:8 260:23 264:2,24 269:1 374:16 376:2 411:16 430:2,22 431:19,24 437:8 441:3, 13 484:23 523:21 613:20,21 630:21 645:17 672:6,13

**relates** 242:1 426:3 430:14 433:10 436:13 438:15 452:13

**relating** 52:19 438:8 468:5 666:25 679:5

**relation** 27:15 129:21 162:13 442:27 480:10, 23 714:6

**relationship** 17:22 656:16

**relative** 485:13

**relay** 54:9

**release** 116:26 599:10, 11

**released** 14:14 471:28 547:10 600:26 753:17, 21,24,27

**relevance** 8:3 66:23 148:4 300:28 301:12 304:14,19 307:15,17 340:28 417:19 465:6 472:9 474:14 479:19 517:14 519:8 521:4 524:10 529:15 537:20 556:21 557:11 565:3,10 599:2 634:5

**relevant** 8:7,9,13 301:23 302:15 303:25, 28 304:8,11 305:21 337:4,12,17 338:3,7 339:11 340:22 341:11 443:19 447:13 464:7 517:13,15 519:13 520:11 524:11,13 645:6 658:22 763:6,7

**reliable** 168:6 655:7 688:21 762:28

**reliance** 660:13 714:12 749:5

**relied** 400:20 440:18 444:3,13 555:1 565:17 598:25 660:1,4,18,27 661:1 708:14 735:4,5,7 738:3

**relies** 591:10

**relieve** 531:27

**relieved** 560:19

**religion** 14:6 651:4

**rely** 32:17,21 299:25 403:8 440:14,24,27 486:21,22 554:15 556:27 655:10,14 661:5 700:21 701:13 735:28 738:7 749:8 754:14

**relying** 441:7,17 444:9, 28 445:2,18 554:20 555:13 556:27 561:5 566:1 738:6

**remain** 53:1 427:20 434:7 448:11 694:28

**remained** 156:8 208:11

**remains** 505:15 626:10

**remarked** 118:23 341:24

**remarks** 16:8 653:19

**remember** 6:14 14:25 17:15 18:7,18,20 49:10 72:16,23 90:9 106:5 131:11 147:17 148:27 160:2 163:6 168:3 169:1 179:6,13,14 182:16 183:6,7,12 184:5,13 191:11,15 195:18,20,21 196:6,12, 20 201:2 205:6,11 209:9 213:13 214:25 221:17 258:10 287:19 314:22 315:20 347:5 384:12 387:12 401:3,7 422:25 566:6 609:27,28 610:3 636:19 639:22 652:9 656:10 657:2 695:23 698:1,6 700:23 708:25 711:23 735:9 736:2,9 737:2 757:19

**remembered** 314:23 688:16

**remind** 21:24 151:22 578:13 689:14,15

**reminding** 72:25

**removal** 277:10

**remove** 14:17 144:1 232:26 287:12 309:12 375:1 393:18 431:24 652:19 690:13 696:22

**removed** 42:15 125:1 139:10,15 153:11 248:8 250:4,22 266:27 269:22 275:3 291:14 313:19 378:2 380:16 381:20 382:9 393:9 447:11 463:18,20 605:9 707:7 718:28

**removes** 277:17

**removing** 62:6 249:28 277:15 279:28

**render** 102:19 159:23 377:22 504:12

**rented** 269:20

**repeat** 57:7 67:1 87:11 103:9 174:14 200:28 202:20 210:23 212:24 488:10 536:27 567:20 588:18 611:20 625:25 645:8 651:10 682:25 687:6 748:5

**repeated** 651:12

**rephrase** 64:11 235:6 497:8 555:5 641:17

**replaying** 534:2,4

**replica** 40:6

**replying** 213:6

**report** 12:23 31:28 261:3,5 284:12 296:1, 28 297:2,5 313:27 314:11 315:2,8,19 317:11 324:21 328:5,9, 10,17,23 330:2 355:25 418:6 452:15 523:23 552:3,13 555:10 590:19 632:4 636:13 750:4,14 757:17

**reported** 21:5 82:17 90:24 121:9 126:27 181:11 182:3 338:21

346:18 361:25 386:23 387:7,19 390:24 424:7 467:11,25 468:23 507:19 516:1,23 517:3 518:22 520:2 531:21 532:8,22 533:7,13,24 534:8,10 535:7 537:25 544:20 671:18 673:15 675:25 713:12,15 746:28 752:11

**reporter** 5:10 16:25 73:10 82:9 138:10 147:3,8 175:11 187:4 227:10 248:27 304:18 336:10 429:10 515:9 531:27 567:23,28 575:11 647:11 649:20 652:16,18 654:12 728:11 765:12,16 771:11

**reporter's** 16:27,28 649:21 652:12,14 654:14,15

**reporting** 49:2,18,25 50:22,26 51:17,26 52:19,24 53:12,13 54:6,24 55:16 56:14,16 64:15 67:2 82:26 83:5,8 84:2 88:7 89:21,28 90:14 100:3 102:17 152:7 159:26 160:14 164:26 166:18 167:3 673:2 678:10 679:20 704:20

**reports** 94:1 296:24 438:22 440:9 444:10 452:9 455:26,28 503:7 523:28 553:15 590:7 591:11 615:16

**reposition** 49:5,27

**repositioned** 51:14 575:26

**represent** 22:25 114:12 142:23 357:23 456:9 457:1,12,17,22 461:9 462:23 466:1,16 480:12 691:14 708:3 754:25

**representation** 166:12 260:14 401:11 455:19

**representing** 5:9 73:9 138:9 227:9 336:9 396:16 429:9 466:12 480:3 515:8 575:10 647:10 728:10 771:10

**represents** 401:15 480:4,13

**Reprimand** 730:13

**reputable** 751:12

**request** 63:26 65:18 100:22,25,26 107:18 431:11 499:23 500:7 765:15

**requested** 5:24 115:26 147:7 304:17 567:27

**requesting** 69:11 259:27 446:15

**requests** 65:2 248:27

**require** 243:18 245:15 383:12 413:1 476:17,28 484:8 657:12,14,25 658:18

**required** 107:19 229:3,5 241:3 475:23 591:4 657:19,22 658:8,9,12,20 659:22 660:21 661:11 662:3 665:10,20,22 668:7,16,18 670:5,14,16 672:11 675:27 682:28 684:25 686:19 719:7 765:5

**requirement** 682:24

**requires** 11:22 15:10 650:8 652:27 672:7 693:15 696:23

**reread** 147:4

**rereading** 649:23

**rescue** 247:4

**research** 12:27 14:10,11 18:22 437:24 441:5,7,27 442:5,20,22,25 443:3 451:18 452:8 486:1 493:25 499:19 503:15 586:23 652:2

**researched** 445:22 484:23

**reshowing** 418:11

**reside** 176:20

**residence** 19:26 40:25 51:6 55:5 59:27,28 60:4 106:13 142:9 708:10

**residences** 40:23

**resident** 671:21

**residential** 47:4,5 375:21

**residing** 99:13 174:9 201:6

**resist** 667:12

**resistance** 157:9 236:18 254:4 303:8 404:28

**resisted** 219:5,6 583:8 584:7

**resisting** 157:19 584:4 647:24 661:19 720:20

**resolves** 756:15

**resort** 158:11 298:25 300:8 731:12

**resources** 69:10

**respect** 336:24 441:25 443:16 524:6 525:8 732:11 733:16

**respond** 11:28 37:19 206:5 209:2 219:3 242:3,10 243:28 246:14,19 287:17 288:7 299:24 308:12 421:23 426:6 482:11,14,16 705:12

**responded** 20:15 40:20 48:9 90:12 100:20 209:5 242:5 243:10 265:21 267:16 268:2,3 289:12 363:10 679:19

**responders** 159:22 376:26 377:4 416:1,10 721:11 722:11 729:4

**responding** 47:3 69:4 79:10 115:28 162:25 293:2 410:22 415:4 416:1 664:8 666:9

**responds** 260:8 705:21

**response** 20:14 63:27 232:8 243:27 268:6 286:8 308:2 347:10 402:20 406:14 407:1,9 408:9 452:17 453:10 551:20 638:11 687:28 705:24 761:20 762:16 763:7,10

**responsibilities** 10:22

**responsibility** 36:8 102:19

**responsible** 265:8 266:13

**rest** 18:15 80:11 103:15 140:19 242:13 256:16 291:9,12,19 321:26 322:3,5,17 342:23 379:19,24 380:8 383:27 403:9 414:15 424:3 433:15 457:21 458:4 461:11,13,27 464:3 475:28 477:4,8 492:11 494:5 498:27 502:12,15,23 503:26 505:1,2,13 544:23 588:14,16 591:1 602:12 604:13 605:4,8,11,12,15,23 617:15 625:3 627:16,27 628:23 657:10 703:24 704:10 749:25

**restate** 285:12

**restatement** 579:15

**rested** 104:23 143:21 144:10 429:15 464:9 527:10

**resting** 125:19 140:6 143:28 285:10 368:6,26 385:6 457:26 462:11 464:5 492:19 543:18

**restrain** 79:6 233:23

**restraining** 233:8

**restrict** 69:21

**restricted** 472:25

**rests** 32:7 628:23

**result** 210:24 244:7 540:2 589:27 662:9 664:21,26 667:24,28 669:15,24 683:4,12,27 684:16 685:6,8,24

701:20 714:21 747:24

**resulted** 303:16

**results** 504:12

**resume** 184:26 449:28 583:18 584:13 722:22

**Resumed** 343:25 585:1

**resuming** 343:13

**retain** 452:13

**retained** 451:26 452:26 453:4,5,14 484:5

**retention** 452:15,28

**retired** 239:3

**retiring** 239:5

**retracted** 285:22

**retreat** 140:24

**retreating** 347:21

**retrieve** 267:4 380:16 535:19

**retrieved** 544:24

**retrieves** 245:12

**retrieving** 65:8

**return** 18:17 21:20 230:26 506:26 507:7 579:17 644:26 670:27 671:7 767:28 768:14 769:5

**returned** 68:4

**returning** 19:23 47:2 76:7 614:26

**rev** 27:9 30:1 102:25 426:13 469:25 497:27 498:3,23,24 504:17 676:11 685:11 707:22

**reveal** 767:25

**revelation** 401:19 764:19

**revelations** 749:16

**reverse** 20:11 29:21 70:21 71:1,10 72:9 74:18 76:21 77:17 78:6 84:25 86:2,8 111:2 117:5 124:15 126:10, 12,18,20 127:4 129:26 139:16 148:9 162:22 177:12 312:8 318:14 322:22,24 380:18 381:22 383:9 386:10 388:1,3,6,12 390:7 393:2 441:9 470:20,22 471:3,20 472:14 475:19,23 476:13 487:28 503:10,12 505:18 536:1,14,22 543:22,23 544:7,14,25, 27 545:4,10,15,17,22, 28 546:14 547:19 567:17 591:26 596:21 602:5 614:5 620:28 623:3 672:1 684:4 686:9 703:1 707:16 716:26 718:18,19 734:5 744:13 746:2

**reversed** 21:9 71:1 273:3 621:4

**reverses** 393:17 718:13

**reversing** 70:16,18,26 79:16 159:1 177:14 203:12 634:3

**review** 81:13 109:10,13 160:4 172:5,8 284:9,12 285:15 289:27 296:1 317:11 328:18 385:3 388:17 391:17 413:17 440:9 464:7 475:14 477:6 485:15 487:1 545:8 549:5 552:13 553:16,26 560:6 576:13 597:12 598:24 600:17 609:8 615:15 636:12 658:25 673:22 733:9 765:17

**reviewed** 109:17 355:4,15 493:23 552:2, 10 553:28 600:23 601:2 608:24,26 615:15

**reviewing** 197:4 452:7 455:23 477:3

**revise** 522:12

**revisit** 505:27

**revisited** 614:10

**revisiting** 167:26

**revs** 33:23 501:10 546:12,13 701:6 705:28 716:19,20

**revved** 21:9 31:2 380:7 545:24 548:17 609:28 758:7

**revving** 83:2 140:8,9 286:21 287:23 412:6,27 468:28 469:4,16,18,25 471:20,23 474:27 475:11 498:1,7,12,15, 21 500:23 505:10 543:4,11,14 547:19 549:9 594:5,10,14 595:4 596:8 598:5 601:23 609:5 676:6,8, 14 706:4,6 716:20,21 762:4

**reword** 692:7

**Rhino** 589:16,18

**rhythm** 408:15,17

**rid** 279:23

**riddled** 751:16

**ride** 24:4 25:5 191:14 196:23,24,25 197:9 681:3

**rifle** 257:17 365:17 373:14

**right-hand** 61:14 114:9 119:7 142:17 149:3 151:7 194:4 398:5,26 420:18 604:21,24 639:15

**Rights** 414:28

**Rightward** 117:22

**rigs** 243:10,16

**rim** 276:15

**rims** 254:15 278:8

**Rio** 240:22

**riot** 233:4,13,14

**rip** 254:15

**Ripley** 267:17 295:17, 18

**risk** 303:16

**Riverside** 260:1

**road** 7:19 23:7 78:1 242:5 279:25 289:21 461:22 470:14,16 487:10 559:20,22 592:3 676:12 721:20

**roads** 499:2

**roadway** 253:13,28 254:16,24 255:10 314:10 559:14 592:4 625:12

**Robert** 28:8 30:9 267:17 433:24 446:8 448:9 573:4

**Roberto** 334:11,14 434:19 435:10 448:21, 28 584:24

**rock** 105:10,14 255:11 369:15 370:7,15

**rocks** 70:22 370:14 409:19 410:11 490:11

**rocky** 359:23,26

**rode** 37:17

**Rodney** 575:8 647:8 691:16 728:8 771:8

**role** 69:10 266:1 523:26 538:1 766:26 768:3

**roll** 124:21 255:5 358:22 393:19 413:5 426:14 546:27 548:23 593:15 596:9 599:12 717:4 753:18,22,25,28

**rolled** 32:12 124:9,13, 18,22,28 125:11,12,28 291:13 320:28 321:3 328:27 463:21 464:5 491:21 492:8,12,14 546:18,25 547:11 548:1 620:28 626:16 706:26 744:20

**rolling** 252:16 409:17 491:23 719:1

**rolls** 32:7 280:1 294:17 458:12 598:8

**roof** 39:5 40:2

**room** 10:7 11:11 12:18 14:18 29:9 132:3 176:5 193:27 200:20 231:21 373:16 424:16 488:13

522:21 590:15,17,20 620:2 630:15 635:12 650:21 652:19 670:3 672:12 673:14,23 679:2 688:19 692:10 693:6 694:14,17,23 695:4,23, 27 696:8 728:17 732:11 744:3 747:2,13 752:16 766:10,15 767:5,14 769:25

**rooms** 12:11

**root** 252:12

**rotating** 146:20

**rough** 59:14 129:25 247:28 297:2 389:22 456:14,25 564:17

**roughly** 48:5 59:14 61:11 63:3 71:3 87:26 108:21 123:7 234:28 256:20 318:26 353:28 377:26 389:20

**round** 117:2 262:23 286:4 287:18 368:10, 14,15 386:1 409:12

**rounded** 687:23

**rounding** 636:23

**rounds** 100:9 104:19 105:24 106:11 115:6 129:15 263:27,28 366:5 623:18 675:19

**route** 81:12 456:25

**routine** 246:13

**RPM** 498:18 499:8 602:18

**RPMS** 498:5,22

**RPS** 101:18 171:9 401:7

**rub** 275:7

**rubber** 127:9,12,25 275:5 279:11 472:2 473:21 716:11 745:1 759:1

**rude** 665:15 668:11 670:9

**rule** 16:15 495:21

**ruled** 16:19 653:27

654:2 714:23

**ruler** 350:8 351:10,19 352:12,20,24 379:1 395:1,19 396:8 400:11

**rulers** 352:5,6

**rules** 303:6

**run** 20:20 61:5 111:26 287:15 304:22 338:1,11 577:24 629:27 684:12 686:6 687:2 702:20 703:11,12 712:21 720:1

**running** 34:1 245:4 469:12,14 632:18 729:18

**ruse** 206:27 213:2

**rushed** 233:12

**rushing** 323:12 365:24

**Ryan** 5:7 73:7 138:7 225:4 227:7,19 228:2,9 336:7 429:7 575:7 647:7 691:15 728:7 771:7

## S

**S-15** 5:3 73:3 138:3 227:3 336:3 429:3 515:3 575:3 647:3 728:3 771:3

**sac** 43:24

**safe** 66:14 102:19 159:23 178:23 206:17 207:28 208:9,20,21,23 243:7 246:9 262:9 279:19,24 280:2 309:22 316:1 405:1

**safely** 308:27

**safer** 739:2

**safeties** 262:9

**safety** 53:25 62:15 96:28 152:3 262:13 538:3,4

**sake** 301:24

**San** 5:1 26:13 35:10,15, 23 36:24 41:8 66:3 73:1 94:23 95:9 138:1 154:16 155:1 217:6,8, 12 227:1 228:18,20 229:8 238:14,16,20,26 239:9,12 240:16,25 241:27 242:5 243:26 244:1 257:27 259:10 336:1 375:26 376:7,10 417:8,11,14 419:26,28 420:19 422:23 429:1 466:14 515:1 575:1 647:1 663:28 666:10 678:3 686:27 704:25 706:23 719:23 728:1 730:25 771:1

**Sanchez** 444:10 445:5

**sanctions** 539:20

**Santa** 239:1 243:3 258:26 298:7

**sat** 231:8 707:14 732:12 737:9 740:24 741:18,19 754:25 769:19

**Sauer** 263:20

**save** 732:6

**saves** 249:5 583:5

**savvy** 244:13

**scale** 31:28 62:1 103:27 115:3 145:20 157:15 314:6

**scales** 130:23

**scan** 248:19

**scare** 716:5 759:9,12, 13 766:1

**scared** 102:18 178:4,17 180:20 393:8,18 545:27 547:10 675:11

**scary** 194:25 720:3

**scenario** 348:11 366:18 372:18,20 373:23 375:7 389:3 407:9 412:21 414:26 563:5 701:5 759:8

**scenarios** 559:4 601:2 701:3 731:17 757:10,11

**scene** 13:1,2 21:12 25:28 110:14,15 113:24,25 114:2,3,4 115:4,26 116:4,7 142:5, 6,8 144:4,13,16,22,26 148:18,22 150:25 151:4 156:4,5 159:21,22 166:14 167:24 240:6,26 242:12,25 244:8 245:2, 11 246:14,15,16,17,18, 22,28 247:1,2,6,7,20, 21,22,27 248:3,15,18, 22,24 249:3,8,9,13,14, 28 250:6,8,12,13,17 252:3 254:11,26 255:20 256:3,7,22 264:2,4,7,8 265:23 266:8,10,12,14, 18,19,20,26,28 267:10, 12,14,25 268:4,6,7,13, 15,25 270:15,28 271:4, 12,15,20 272:9 274:20 276:28 277:9 281:7,25 284:7 285:6,9,20,28 288:6 289:19,23,26,27, 28 290:6,8,9,21,22 291:7 292:13,21,22,26, 28 293:5,6,7,8,16,20,24 294:27 296:4,8,10,21, 22,23,28 297:4 313:2,8, 14,16,18,20,22,23 314:6 315:28 320:22,27 321:5,16 322:12,28 323:11 324:3,16 353:27 358:2 363:8 364:6,14 365:7 366:7,8 371:26 372:27 374:12,16 376:22 383:17 392:24 404:13 405:7 410:19,26 411:10 413:17 415:4, 22,26 416:5,21 418:17 438:13,23 439:10,11, 12,17 443:28 456:15 482:11,14,16 485:16 493:24 494:13 538:8 551:2 564:13,19,25,28 565:8 586:5,8 587:1 624:24 626:20 627:2 641:2 652:4,5 673:18 675:24 704:19 721:7,8 728:27 729:5 733:3 760:2,3,5 764:25 765:4, 7

**scenes** 243:14 253:3 292:9,19,20 293:3,6,12 388:20 433:12

**schedule** 227:14 523:8 525:20 526:9

**scheduled** 9:21

**scheduling** 9:12 12:8

**scheme** 579:20

**school** 292:24,25 293:10 389:15 435:19 695:9,11

**schools** 558:14

**science** 286:6 586:3 597:13 608:24 695:11

**scientific** 436:23 592:17 598:26

**scientifically** 601:24

**scooters** 585:14

**scope** 198:26 349:21 437:6 456:20,22 485:17,19,20 540:19 640:3

**scratch** 722:5

**scratches** 367:23 370:17

**scream** 516:14

**screaming** 198:13 519:11

**screech** 126:8

**screeching** 478:17 746:26

**screen** 20:26 37:27 38:3,7 39:2 86:1,3 87:2 91:22 98:27 103:11 104:5,16 106:1,15 110:14 114:10,17 115:17 143:3 145:14,18 148:16 149:10 187:21, 24 319:10 325:8,14,17, 19,20,22 329:28 349:6 350:17 351:5,10 353:16 367:8 370:9 374:20 395:24 396:8 397:12 407:5 457:4,7,11 459:1 462:22 488:28 528:13 587:6 593:6 606:14 712:11 766:6

**screens** 38:25

**search** 35:20 734:19

**seat** 49:12 64:3,28 73:13 108:11 124:13 131:1 185:3 213:19 227:13 270:10 305:15 383:1 430:1 526:23 619:22

**seated** 20:18 34:20,22 48:21 63:15 173:5,6 176:5 199:26,27 201:25,26 216:15 218:12,13 227:27,28 229:27 237:23,24 419:6,7 421:8 434:14, 15 448:18

**seating** 273:24

**seats** 278:8

**secondary** 51:15 64:16 68:5

**seconds** 21:6 22:16 28:15 138:15 164:1 244:20 258:20 286:26 287:2,4,16,19 381:28 389:6,18 390:1,2 411:20 469:2,5,11,17 471:11 473:26 474:2,4, 10,12,25,26,27 475:2,8 478:24 516:18 594:11, 24 595:22,27 596:2,7, 15,20 597:7,10 598:20 607:6,17,20,22 608:2,8 622:7,9,16 623:6,12 637:26 708:1 710:7 713:14 714:18 715:9,12 716:20,24,28 717:7,12, 21 722:8 744:7 747:9

**secretions** 266:11

**section** 126:9 400:10 493:6 517:7 521:17 535:1 578:21,22,24 583:28 584:5 622:4 643:7,24 644:2,17 664:16 765:17

**secure** 234:7

**secured** 233:17

**security** 538:8

**seek** 260:14 404:5

**sees** 29:16 64:6 94:16 254:3 614:5 762:4

**segment** 233:11

**seizures** 35:21

**select** 247:2 734:21

**selected** 36:6 243:25

**selection** 729:17

**self-defense** 303:8

**selfie** 760:16

**selfies** 760:15

**semi** 254:2

**semi-automatic** 105:20 116:27

**send** 431:10,12 767:17

**sending** 287:10

**sense** 17:4 25:8 33:13, 14,18 40:7 62:16 66:9 104:3 126:15 261:14 264:11 276:8 277:2,17 280:2 287:23 300:5 306:7,20 317:2,20 318:27 365:21 391:23 403:21 407:10 443:5 453:9 470:5 478:6 494:4 500:20 564:18 580:26 585:23 591:24, 25 645:27 655:26 685:9 702:9 703:14 718:15 729:1,5,9 733:5 735:15 741:10 742:16,19 746:23 759:2 762:28

**senses** 128:21

**sensitive** 713:8

**sensor** 560:15

**sentenced** 756:21

**sentencing** 579:20 581:23 643:10,20 644:18 645:7 646:6

**sentiment** 22:6 689:25

**separate** 18:16 55:25 177:2 189:17 202:14,15 250:1 255:15 261:2 437:10 580:17,27 645:19 670:26,27 677:21 755:22

**separated** 230:22 269:18

**separately** 337:24 579:14,26 580:16 670:26

**separates** 691:25

**September** 751:26

**sequence** 46:21 362:12 408:7 474:23 475:12 501:9 508:10 729:8

**sequentially** 363:24

**sergeant** 231:17,18,26 232:7,11,16 233:2,10 266:5 267:16

**serial** 357:22 439:16 483:28 589:25,26

**series** 64:1 142:19 163:4 484:27 578:14 649:23

**serve** 246:4

**served** 7:13 310:16

**service** 20:16 37:3,7, 22,25 40:20 47:2,16 48:8,15 49:7,18,26 60:1 69:24 78:20 79:11 93:13 102:24 107:1 109:14,19 110:21,22, 25,28 111:2,4,8,12 112:13,17 113:9,12 115:18 116:14,16,17 117:10 118:8 119:20, 24,26 120:23 121:22,27 124:7 139:5 140:1,4,26, 27 141:1,21 147:21 149:12,16,18,20,24 150:2,5 151:9,16 156:18,19,22 166:2 170:15 171:2,3,4,20 295:2 361:10 366:11,12 372:14 517:23 530:16, 18 538:10 541:19 563:14 566:28 567:16 664:8 666:9 673:1,11 678:6 679:20 682:15 687:1 711:4,20

**services** 436:26 451:25 452:14 721:28

**serving** 241:2

**session** 2:4 5:2 9:12,19 16:23 73:2 135:4 138:2 224:4 227:2,15 333:4 336:2 429:2 512:4 515:2 526:1 572:4 575:2 647:2 654:10 725:4 728:2 771:2

**SESSIONS** 2:1 135:1 224:1 333:1 512:1 572:1 725:1

**set** 22:16 160:13 232:7 248:14 299:25 504:2 520:24,26 546:11 560:14 629:27 674:28 694:8 752:18

**sets** 491:7 631:10,11

**setting** 17:6 35:27,28 235:26 236:27 237:2,3 259:2,3 655:28

**severe** 310:6 741:9

**severely** 78:10

**sexual** 14:6 651:4

**sexy** 764:19

**shadow** 260:3

**shake** 610:6 695:8,11

**shape** 41:9 351:21 473:8

**share** 12:9 13:18 14:12 18:22 19:20 260:5

**sheer** 256:8

**shell** 28:3,4,14 29:2 31:12,15 32:1 115:13, 14,17,22 116:10 117:13,15 118:16,24,27 119:3,8,16,19 120:4,7, 12,15,16,17 122:1 148:21 149:2 150:21 151:2,6,7,8,10 294:3 360:6,8,10 362:13,19, 23,26 363:4,22 364:20, 27 366:19,22 367:7,9, 10,17,20 369:7,8 372:6, 19 373:28 374:9,18,24 375:3,4 415:25 442:26 550:8 564:16 604:1 608:9 616:4 706:9 711:15 732:28 733:24 735:26 740:14

**shells** 366:26

**sheriff** 35:10,18 38:15 42:9 66:16 67:21 90:5 92:11 155:14,25 217:6 220:9 228:18,24 240:15 246:24 260:27,28 299:22 419:26 420:20 421:16 422:24 423:5,18 466:15 680:20

**sheriffs** 19:16 26:13 35:14,15,24 36:3,9 40:5 41:8 43:1 66:4,19 94:23 95:9 154:17 155:2 217:7,9,12,22 218:21 219:14 228:19,21 229:8 230:10 238:15,17 239:3 243:26 249:21 257:28 259:10 271:20 289:12 298:8 375:27 376:2,7, 10 417:14 538:17 663:28 666:11 677:9, 14,23 678:3,4,5,19 680:15 682:4 686:27 704:25 706:24 719:23, 27 730:22,26 752:2 764:23 766:1

**Shermbeck** 231:25

**shield** 233:4,13,14

**shift** 36:26,28 37:5 41:3 42:19 44:20 45:9 55:17 56:4 67:4 80:5 470:26, 27,28 672:28

**Shifting** 257:7

**shimmies** 320:8

**shirt** 92:24,25,28 93:6 176:5 201:26 218:12,15 229:28 263:7 420:16,17 421:11 680:18 681:18 705:1,2,3 719:17

**shock** 258:16 735:24

**shoe** 254:24,25 264:21 269:13 281:9,18,19 282:8,23,27 283:11,14, 15,19,22 289:6 294:8 348:5 349:14,28 350:2, 18,19,23,25,26 351:1,2, 4,15,24 352:1,4,5,9,10, 11,13,15,16,19 353:2,9 393:26 394:5,10,26 395:1,5,8,25 396:1,16, 17,18,26,27 398:19,23 409:14,15 552:15 561:16 565:17 566:23 567:1 708:20 735:5,7, 22 736:19,21 737:21 749:20

**shoes** 254:23,26,27 350:27 360:2 395:28 719:18 738:19

**shoot** 30:21 153:24 258:3,19 262:22 306:11,16 308:13 347:6 365:14,15,20,22 366:4 373:8,9,12,15,20 409:27 425:24 496:16 518:6 540:17 688:16 699:3,4 758:20 762:12 763:4 764:10

**shooter** 263:3 264:10, 13,19 373:16 538:25

**shooting** 27:17 31:14 80:10 118:21 129:4 144:6,10 156:17 168:16 170:10,16 257:14 260:12 262:10 263:6 283:4,26 287:21 289:5, 13 290:18 291:21 303:27 322:12,16 337:4,12,15,17 338:2,3, 6,14 339:10 345:16 346:6,24,26 347:2,5,15, 17,22 353:25,27 355:7, 9 360:13,17,19,26 361:5 363:10 364:7,18 365:13,15,18,24 367:2 372:21,24 373:4,11,18 389:6 390:15 392:14 402:23 407:12 409:2,27 412:7 431:25,26 469:1 519:19 520:19,20 522:8 524:24 527:8 531:5,9 533:28 534:13 537:14, 15,18 538:14,17 539:1, 6,10,14,23 540:5,27,28 541:11,18,21,24 543:13 546:27 551:3 555:28 556:2 560:28 561:3 562:10 563:8 566:2 568:16 600:6 707:3,23 710:12 729:19 730:8 734:6 745:12,19 754:3 762:13 763:13 764:4

**shootings** 293:4

**shoots** 467:17 730:11

**short** 6:9,10 21:6 200:21 301:2 508:20 525:27 588:23 597:4 600:15 717:22

**short-sleeve** 217:18

**shorten** 612:17

**shortened** 435:3 761:22

**shorter** 351:23,25 352:11,18 369:10 613:5 628:13

**shortly** 27:9 29:19 84:22 196:1 379:18 638:17

**shot** 28:16,17 120:20 124:11 126:8 128:12 140:13 263:5 286:5 287:18 290:10,17 340:23 341:15 345:12, 19,21 360:20 362:8,10 365:25 367:2 374:21,22 375:20,22 387:21,24,27 390:20 391:22 392:22 393:7 404:10 408:12 409:6 425:21 473:27 474:1,4,9,12,13 475:1, 3,26 501:12 522:9 538:25 548:12,21 549:17 566:6 595:8 597:2,23 598:11,19,28 600:27 601:6,10,28 608:28 609:12,23 610:2 616:23,26 617:4 621:5, 21 622:6,12,14,15 623:7,16 639:6 696:20 701:5,7,8 707:5,6 711:11,13 714:19,20, 21,22,25 715:2,5,12 717:7,23 718:9,25 733:12 735:11 737:17 740:9,10,11,12 743:24 744:8,22 745:23 747:10 748:8,10,12 753:18,26 758:21 763:6 764:3

**shots** 27:12,13,14,23, 28 28:1,6,9,16,21 29:9, 20 30:13,25 33:24 103:25 106:22,24 107:7 119:11,12 120:20 121:2,4 123:15 125:17 128:28 139:25 149:1 304:6,8 354:25 357:18 362:7 363:17 372:14, 17,21 374:21 385:11 387:10 388:15 391:25 392:5 401:24 403:7 405:5 406:2 408:4,11, 17 429:28 442:3 467:17

468:17 501:13 505:12 517:24 520:20 530:23, 24,28 533:28 545:26 548:1,6 566:8 602:2 623:6 633:15 640:26 689:6 706:7 711:11,12 713:22 718:26 740:18 747:5 753:28 761:3

**shoulder** 41:8 43:19 44:8 229:7 345:20 420:19 531:4

**shoulders** 702:22

**shove** 186:1

**show** 7:11 24:21 25:20, 26 26:9 27:2 28:2,3 29:1,2 30:26 33:11 34:7,8 62:26 64:27 65:2,16,17,18,20 66:22 67:8,24 93:14 101:3 106:15 129:20 141:23 149:17,18 150:1 154:17 176:14 182:13 187:18 189:9 192:10 215:2 229:11 247:23 283:8 302:28 313:28 324:11 340:3,28 341:3,21,28 344:5 350:6 357:11 359:9 370:10 377:10,24 378:4,22,24 379:12 389:13 394:5 396:4 402:14 403:4 423:5 425:17 431:13 437:15, 25 447:4 455:13 461:25 463:2 485:13 520:27 528:14 530:3 549:28 601:6 661:15,16 678:21,22 681:8,10 688:7 692:4 696:14 706:20 708:12 716:1 736:20 739:14 741:24 742:21 743:22 760:9,10

**showed** 186:14 191:7 236:18 315:7 345:23 400:24 401:17 405:4,5 406:1 493:23 554:6 561:18 623:9,23 634:18 674:4 682:6 691:24 693:3 704:4 711:24,25 736:4

**showing** 37:12,27 41:16 42:23 44:13 47:9 58:26 59:16 60:24 73:24 81:22 174:21 176:14 182:24 183:14 191:12 217:14 232:24, 25 271:6 273:16 274:13 277:3 280:3 281:20 319:5 323:19 326:15 377:23 378:7 380:3 398:19 403:17 404:1 407:3 420:28 457:20 458:4 461:10 465:13 528:13 549:12 600:1,5 635:24 673:25 674:16 677:15 763:24

**shown** 175:18 407:23 424:3,27 426:22 618:23,24 742:25

**shows** 247:11 289:4 315:4 350:8 379:23 459:27 463:9 467:6,7 485:22 552:14 565:20 663:5 674:7,21 684:14 688:12 704:19 730:9 765:23

**shuffle** 168:27

**shuffled** 734:2

**shut** 70:19 207:9 213:20 671:11

**sic** 400:22 524:10 550:11,27 584:4 739:9

**side** 5:13 11:19 23:14, 15 39:11,13,20 40:14, 15 43:11,14,16,18 44:4, 6 45:12,27 46:4,8,22 48:19 49:4 51:10,13,27, 28 56:25 57:18 61:14 66:18 68:3,5,22 70:12 71:7 74:24 77:4,7,24 90:22 100:27 106:13 142:17 149:3 152:27 170:11,12 175:6 176:7, 9 180:12 193:7,13,14, 21,24,28 194:4,5 229:8 255:4 260:10 263:21 269:7,9,15 275:24 277:21 281:12 291:9 323:4,6 327:8 328:22 342:3 359:15 360:23 378:28 395:13,14,16,17 397:3,6 398:4,5,9,27 400:21 402:24 403:15 409:23 410:26,27 411:13 414:17,21 418:12 420:18,19 487:6 517:26 527:17 528:4 529:14,25 560:23 563:15 564:9 604:5,22, 24 606:11 614:23 625:6,8,12,18 628:9 634:17,25 636:24 658:20 659:4 708:10,23 712:11 735:6 738:17,27 739:3 750:26 751:19 763:26 766:27

**side-view** 45:25

**sides** 273:12 521:21 583:24 690:26

**Sig** 263:20

**sight** 58:13,19 77:3 152:2 373:13,15 404:9 527:19 611:2 636:26 688:1 738:24

**Sights** 373:13,14

**sign** 351:5 465:18 672:13 768:11

**signal** 287:11

**signed** 767:17

**significance** 75:14 277:19 458:3 459:3,6 460:20 463:8 465:11 467:4 492:3 673:19

**significant** 16:10 18:11 114:4,6 274:4,7, 9,11 281:16 364:4 369:6 467:7 503:2 540:6 653:21 657:6 665:28 668:28 670:22 694:13 695:19 697:2,13 702:10,24 703:9 748:23 752:18

**significantly** 363:1 699:26

**silence** 112:7,8,11 128:13,14,16,17,18,22 140:9 387:14 432:16 471:21 473:1,2,11 543:12 546:16 746:26, 27 747:3

**silent** 427:20 595:6 706:5 716:27

**silently** 650:16

**silly** 78:8

**silver** 189:21

**similar** 40:13 72:4 229:9,17 246:13 260:6 318:15 347:25 353:19, 20 358:13 363:24 420:15 421:1 442:24 474:6 631:14 649:3 768:2

**similarity** 662:10,11

**similarly** 232:1

**simple** 252:11 253:7,15 504:12 575:19,24 576:4,9 694:8 703:18 718:15 739:22

**simplest** 684:21 693:18

**simply** 10:28 18:14 30:19 52:15 123:26 245:27 657:9 658:28 681:20,28 721:4

**simulations** 451:18 591:18

**simultaneously** 30:12 70:12,17

**single** 262:12 400:19, 22 439:17 530:27 552:14 691:23 694:9,28 695:20 696:20,28 697:26 698:18,19 708:15 719:7 721:9 722:5 742:11

**sir** 34:26 35:7 52:23 88:2 103:9 108:11 143:6 147:2 203:10 211:19 216:5,21 219:25 228:5 234:22,25 235:21 323:24 343:15,28 347:14 364:11 372:7 374:1,25 387:1 416:7 427:25 430:5 434:5,21, 26 445:21 481:19 497:27 526:23 546:21 548:2 550:20 628:7 634:22 636:14

**sit** 9:26 252:9 387:4 629:18 693:25 715:27 716:10 734:15 751:12

**site** 365:16 456:7 494:10,12,13 588:3 589:4,10 595:14

**sits** 24:22 83:23

**sitting** 24:19 63:16 193:4 214:10 231:4,6 236:15,20 368:16 371:13 376:24 408:23 416:2 463:11 491:25 492:7 498:27 686:4 713:25 721:20 722:4 729:17

**situation** 7:8,14 20:22 54:26 68:12 95:4,5 153:5 155:7 157:7,11 158:16 165:27 206:3 215:23 235:21,25 258:8,12 287:13 294:22 304:20 308:4 310:25 312:18,25 320:14,16 365:25 392:15 404:26 416:1,24 438:17 442:19 476:24 567:5 577:24 609:10 676:13 698:10 721:2 761:20

**situational** 312:17

**situations** 19:19 78:27 97:27 155:6 235:28 306:28 406:19 473:7 730:19

**six-month** 36:9

**sixth** 28:17 467:18 475:26 601:9,10 623:7 711:13 717:23 740:12

**size** 278:17 341:19 358:27 371:4 409:16 416:16 741:6

**sketch** 297:2,5 314:6 413:18

**ski** 704:28 759:17,18

**skid** 244:11 251:14,15, 18,19,21 252:11 253:1, 8,9,12 275:8

**skidding** 252:17

**skill** 258:4 659:27 758:20

**skills** 595:13

**skip** 436:2 522:3 716:18

**skipped** 157:14 707:18

**skipping** 253:10

**slam** 384:23 704:10 746:1

**slammed** 603:9

**slamming** 178:7,8 384:6,10 385:8 478:2,5 706:28 718:7 745:4,7

**slash** 203:1

**sleeve** 63:17 176:6

**sleeves** 217:15

**slick** 348:19

**slid** 385:1

**slide** 117:4 454:22,23 455:16 456:11 457:12 458:3 462:28 465:10,11 466:23 468:22 471:8 474:3,5,7 484:26 485:21,25 486:6 487:4 489:22 490:26 491:15, 16,27 492:15,21,24 493:2,19 494:25 497:26 501:5,16 589:3 593:7, 10 603:24 614:22,26 622:1 624:14

**slides** 482:3 483:21 589:22

**slight** 140:9 251:18 291:15 319:16 359:14 385:16 386:7 388:25 408:12 412:8 516:14 603:12

**slightest** 365:20 665:14 668:10 670:8

**slightly** 71:6 263:2 265:19 275:27 278:7 289:8 320:17 365:13 616:22 673:24

**slip** 722:12

**slope** 118:1 161:3 537:8

**slow** 30:6 248:28 278:23 279:26 351:7 372:16 373:10 384:25 387:10 426:14 479:16 598:15 610:11 700:6 707:13 710:16

**slowed** 124:4 385:10 412:7 603:20

**slower** 390:8 693:8

**slowly** 29:21 30:8 32:12 124:9 161:1 390:20 499:4 712:23 717:17 754:3

**slumped** 385:22

**slumping** 412:18

**small** 57:18 68:3 120:20 251:15 269:19 272:20 277:27 299:18 340:27 479:25

**smaller** 72:5 673:21

**smashed** 409:18

**smoke** 472:5

**smooth** 252:20 384:13

**snafus** 110:11

**snow** 279:20

**sobering** 758:23

**social** 12:11,24 651:27 767:7

**societies** 435:27 436:3

**society** 450:6 705:7

**socioeconomic** 14:7 651:5

**soft** 263:15 384:27 410:12 707:13

**softer** 245:28

**softly** 745:3,5,6,18

**software** 450:21 495:26 589:9,13,21 590:3,7 629:15

**soil** 274:26 275:2 277:10,14,15,17 350:18 384:27 388:22 410:12 499:9

**sole** 404:13

**solely** 437:18 487:1 490:18 624:8 754:14

**solemnly** 34:15 172:28 199:21 216:10 227:22 237:18 419:1 434:9 448:13 768:28

**solid** 359:26 587:20

**solo** 37:15,17

**solution** 382:15

**solved** 208:24

**somebody's** 27:2,5 393:16 700:17 731:18 745:6

**someone's** 66:17 79:1

**Something's** 560:17

**sophistication** 274:2

**sort** 7:13 23:7 26:28 40:9,10 42:6 43:23 57:21 59:7 61:5,6,28 62:12 68:13 69:13 72:2 77:19 83:6,24 92:18 100:4,16,17 105:13 106:1 112:26 126:12,14 128:14 129:3 151:11 152:6,23 154:2 157:5,7, 9,20 163:6 183:9,23 187:28 189:11,14 199:8 206:27 211:16 213:9 219:9 229:3 234:9 240:18 241:10 242:3 250:24 253:1 260:21 265:7 273:1 280:4 285:25 301:17 304:27 316:11 319:15 325:5 326:1 328:23 344:1 348:10 351:3 353:10 363:17,18 366:25 368:28 369:12 378:1 384:17,19,20 385:14,16 388:1 394:18,22 395:11 403:19 404:24 406:18 407:23,27 408:22 409:18 413:5,11 416:18 420:12 423:4,5 447:9 472:5 478:6 479:3 480:27 484:17 491:28 493:5 502:7 527:20 531:14 532:5,12,18 533:16 541:8 543:12 546:16 553:15 556:8 559:19 562:20 564:17 567:14 568:4 585:18 603:13 645:14 696:14 702:21 705:9 712:2

**sorts** 235:9 687:11 713:9

**sought** 239:3 242:16 249:22

**sound** 30:2 73:21 83:2, 15 126:13,14 129:5 181:15 403:20 408:19 409:1 412:27 467:3 468:2 496:24 497:16 498:12,15 518:2,16,17 519:1,6 520:6,10,28 521:6,14 532:28 533:5 556:4,9,10 562:3,5,12 600:23 676:8,14 708:4 713:5 744:7,9 759:25

**sounded** 209:11 496:15 556:7 562:8

**sounding** 387:13 709:2

**sounds** 24:4 82:28 83:1,18,21 84:1 91:5 119:12 126:9 128:1 467:8 468:7 496:21,22 497:4,9 516:27 518:14 519:2 532:6 593:22 621:5 693:18 710:21 713:1

**source** 11:26 12:23 13:17 40:7 91:25 96:19 97:2 305:5 325:15 483:18,20 495:3,4,23 503:14

**sources** 40:22

**south** 19:25 50:8,10 51:10,27,28 56:28 57:16 59:21 60:14 87:8, 9 99:26 104:15 106:13 142:10 269:5,11,15 272:26 280:15 324:9 374:7,19 397:25 398:15 399:6,20 400:21 402:14 403:13 527:25 528:4,28 529:14,21 541:10,12,15 550:5 555:3,10,15 557:16 566:19,27 607:1 624:11 635:11 636:22 708:16 711:25 721:24 735:7,14 736:23 738:17,19,20,27

**southbound** 527:18 551:25 552:24 553:10 634:19,27 704:21 708:11,18 749:21

**southeast** 284:22

**southerly** 394:1 398:10 401:21 402:2 552:15 554:7 555:23

**southern** 397:20 403:5

**southward** 529:25

**southwardly** 400:23

**southwest** 269:5 403:14

**space** 30:19 194:5 323:14 481:7 496:8 537:5 590:10

**span** 479:23

**speak** 10:17 13:9 48:1, 25 49:5,28 52:3 53:6 55:4 56:17 62:22 64:22, 26 67:8,12 68:2 69:23 89:21 90:4 92:3,4,5 100:22 102:15 145:9 165:8 184:28 187:3 195:22 205:17 231:19 235:19 246:15 289:23 301:1 408:24 642:12 650:16 679:18 769:2

**SPEAKER** 756:27 757:14,16,19

**speaking** 10:6 11:21 23:19,20 26:1 55:15 56:14 65:19 118:6 144:3 165:12 220:21 300:18 307:5 316:5 352:9 359:3 371:3 372:12 374:1,17 375:17 376:23 385:21 386:4 390:19 391:23,24 392:19 393:15 402:10 403:3 473:15 476:14 521:13 546:10,12 547:6,8,18 550:8,11 599:16 608:1 708:1

**spec** 278:4

**special** 75:14 242:27 303:6 373:5 686:23 687:7 691:27

**specialization** 451:3, 21

**specializations** 451:15

**specialized** 91:7 241:23 257:8,11 538:6 540:23

**specific** 7:22 55:27 64:2 71:22 84:14 88:24 195:21 284:7,12 292:11 302:25 306:5 317:3 350:28 359:18 366:4 390:6 433:9 437:28 442:20,21 444:11 451:3 483:1 500:11 587:22,26 589:26 657:14,18,19 666:23 679:2 682:9 699:7 765:15

**specifically** 15:13 84:17 167:20 261:28 270:25 292:25 293:13 302:20 306:2 320:20 345:11 346:26 347:4,5 357:3 382:12 406:26 430:14 443:1 455:3 473:6 587:12 588:1 651:15,19 653:2 762:11

**specs** 276:12 485:27

**spectrum** 467:3,5,7,9

**speculate** 116:12 546:20 565:11

**speculating** 412:13 551:8

**speculation** 22:5 102:2 118:9 141:13 145:5 153:8 165:24 198:26 291:4 327:16 385:25 392:1 393:12,21 524:28 529:7 546:2 547:13,25 548:25 561:13 562:15,23 563:10 564:22 567:18 599:13,22 608:18 611:18,26 640:16 642:2 689:24 743:2

**sped** 111:21

**speech** 88:15,28 89:3

**speed** 29:7 30:5,17 32:9 122:6,7,11 123:1, 13 128:24 161:9 164:2, 6,9,18,19,20,22 244:11 245:10 247:15,17 251:21 252:12 278:21, 23,28 309:21 311:4 318:17,23 320:3,4,6 363:11 372:15 388:24 390:2 391:5 392:16 411:16,23,25 412:4 432:8,10,20,22 447:10, 18 476:5,7,16,20,21,24 477:1 478:12,24 479:7, 17 481:1,9 501:17,21, 24,26 502:1,13,14,16, 20,21,25 503:1,6,24,26, 28 504:1,2,3,6,10,20,22 505:17 557:22,24 558:2,9,15,17,19,20 559:2,15,17 562:28 563:3 577:14 591:13 592:9 593:27,28 597:23,27 598:12,16, 18,20,22 600:15 601:6, 13 603:20 607:13 610:8 614:10,13,17,19 621:16,18,19 622:8,17, 18,20 623:9,13,15,22, 23,28 624:3,6 626:5,13, 27 630:22,27 631:1,6, 22,28 632:7,21,26 633:4,26 634:9 637:6,9, 10 640:11 700:7 702:13,14,21 706:19 709:12 714:5,16 715:24 716:13 717:25 718:1 730:2 737:17 739:9,12, 18,26 740:2,3,7,8,27 741:1,11,22 742:8,12, 15 749:24,27 750:19,21 757:28 758:4,10 762:1

**speeding** 158:15 164:7

**speeds** 10:17 278:24 320:8,9 388:27 437:27 479:15 587:22 622:28 650:15 687:10

**spell** 34:22 173:6 199:27 216:16 227:28 237:24 419:7 434:15, 17,22,23 448:19 496:2

**spells** 496:4

**spending** 691:22

**spent** 240:4 301:21 672:4 687:10

**spillage** 442:20,21

**spin** 254:9 273:27 275:8 472:13 498:26 501:10 563:17 716:22

**spinning** 146:24 277:14 286:22 426:13 469:19,26 470:9,14 471:6,14,16,17,23 472:4,24 473:26 474:27 475:1 477:22 499:10 504:18 505:11 594:17, 20,24 598:5 601:23 609:5 612:26 623:3,11 673:28 704:7 705:28 716:21,22 745:1 754:1 762:4

**spiritual** 12:5 767:3

**splashes** 442:24

**split** 300:14,15,23 581:7

**spoilage** 313:20

**spoke** 48:13 49:23 51:16 52:5 53:18,27 64:21 68:2 83:5 90:5 158:22 159:26 166:17 204:13 205:14,24 585:5 587:21 609:21

**spoken** 50:21 171:9 276:1 345:25 392:13 759:16

**sports** 273:23

**spot** 184:23 276:23 463:12 487:14 491:28 536:10,11

**spotlight** 39:11,12,19 46:4 51:3

**spotlights** 39:7,10

**spouse** 767:3

**spray** 79:16 157:25 420:22

**spreadsheet** 502:5,7

**spring** 117:5 240:22

**springs** 487:17 497:19, 20

**spun** 275:3,4,12 277:21 594:21 744:18

**square** 252:12 253:19, 20 324:7,8 455:21 457:10 485:7

**squared** 501:27

**squeaking** 83:7,24 408:22,26

**squeaky** 83:6 532:12 707:1

**squeal** 27:8

**squealing** 104:26 745:4

**squirming** 718:5

**ST** 278:8

**stabbings** 293:4

**Stabs** 702:18

**stadium** 697:4

**staff** 691:19 755:4,16

**stages** 156:27 615:10

**stain** 269:7 341:20

**stake** 749:12

**stamp** 346:9 387:27 593:27 594:7,9 622:15

**stance** 287:21 345:12, 17,20 360:19 365:24 762:14

**stand** 38:22 107:27 129:19 130:15 152:26 343:15 367:14 413:12 434:6 473:1 520:15 544:13 623:9 631:22 632:28 637:24 638:15 706:12 732:12 735:3 738:6,24 751:13 765:11

**standard** 10:26 264:12 470:17 478:9 484:17 501:22 503:11 504:20 505:17 693:12,13 697:22 719:6 765:5

**standardized** 62:7 93:23 240:19

**standards** 17:6 479:2, 14,17 655:28 692:19

**standing** 21:3,9 70:28 71:9,13 76:20,25 86:3, 12 99:12,27 121:23 130:6,8,12 145:27 156:12,15 158:18 169:14 171:17 215:18, 19 231:3 264:13 348:25 366:17,21 371:22 372:8 400:21 407:12 426:11 434:7 441:13 448:11 532:15 566:19 596:16 608:14 615:28 633:21 688:13 699:23 749:19 760:23 762:3

**standpoint** 322:3 358:20

**stands** 93:23 475:19 541:20 681:18 717:8 767:26

**star** 40:6,10 41:9

**start** 8:27 19:28 25:3 35:28 36:16 61:17 86:8 92:2 101:1 114:8 124:7 129:4,22 181:8 236:13 248:2 280:9 367:9 426:14 433:20 449:14 458:1 468:27 469:26 470:3,9,10,13 472:24 475:7,23 481:4 487:12, 16,17 489:19 499:4 502:13,23 505:1 517:7 533:28 586:10 587:15, 16 594:10 598:7 601:18 603:17 604:12 606:18 612:15 623:4 647:16 697:4 705:10,28 712:5 716:22 720:22 739:1 741:14 742:2 750:22 769:14

**started** 29:5 31:14 80:5 86:2 87:13,15 100:16, 28 103:4,7,24 104:14 106:10 107:14 110:19, 27 113:7,9 124:7 129:8, 15 130:4 143:18 144:28 146:4,10,20 150:14 151:15 170:16 171:9 190:26 221:13 238:26 241:27 252:28 261:6 267:22 270:6 315:26 319:13 343:12,19 345:2 381:11,22 382:25 405:26 414:8 432:13,15 469:15 480:10,24 490:5 496:16 502:12 534:13 541:8 545:15,17,28 568:9 582:5,16 588:22, 24 596:9,19 597:20 601:19,27 606:22 610:12,14,20 615:13 622:25 623:2 626:14 627:18 629:8 630:23 631:28 638:3 704:9 706:13,14,15 707:23 708:12 710:17 712:9 717:16 718:11 719:1 722:16 742:2 746:7 751:10 754:1

**starting** 31:16 45:4 49:21 139:1 165:16 172:8 240:16 264:10 309:6 361:21 386:27 396:21,25 398:9 473:20 488:9 587:9 627:28 647:16 679:9 708:25 709:25 719:11 739:8 749:22

**startle** 547:22

**startled** 701:7 743:24 748:8 753:23

**startling** 599:8,21

**starts** 25:28 29:16 126:8 148:1 190:21 311:15 387:22 475:21 516:16 563:17 595:26 601:10 649:19 713:6 716:12 717:4 740:12 760:25

**state** 5:9 20:4 22:10 34:15,22 73:9 138:9 172:28 173:6 199:21,27 216:10,16 227:9,22,28 237:18,24 238:25 240:21 241:19 259:26 336:9 417:7,9,12 419:1, 7 429:9 433:11 434:9, 15,17 435:16,20 437:20 448:13,19 449:21 462:1 515:8 575:10 638:2,28 647:10 655:5 657:13,22 658:12 661:5 675:12 676:5 692:2,4,19 696:22 697:21,22 700:17 715:19,20,21 728:10 744:1 748:13 754:14,17,22 768:28 771:10

**stated** 111:7 113:5 124:27 139:7,11 149:9 161:10 171:8 286:23 292:19 293:13 340:19 344:14 347:8 384:2 551:14 641:21

**statement** 17:26 19:11 22:14 23:6 103:3 105:8, 11 108:27 109:7,8 113:4 321:3 322:7 445:1 463:17 538:3 554:11,12 608:23,27 634:17,25 638:14 656:21 673:3 678:11 679:8 708:26 730:5 747:11 751:7,8,23 761:26 765:24 764:12 769:9 770:8

**statements** 16:7 19:9 22:10 128:27 170:18 251:6 264:22 406:17 440:11,14,24,26 444:9, 13,14,28 445:5,18,26 455:25 524:14,18 538:7 539:4 545:8 552:5 556:28 578:23 633:6 639:2 644:1 653:18 659:11,13,19 708:9 735:5 737:7 747:12 750:18

**states** 41:10 238:27 244:2 257:13 710:3

**static** 470:10 471:12,15 473:17 474:28 475:2 477:18 501:11 594:27 597:1 598:6 601:25 609:7 610:17

**stating** 609:28 766:23

**station** 36:3,8,12 43:2 217:22 239:21 242:3 243:13,25 261:5 266:15 420:4

**stationary** 74:23 140:26 262:20 311:12 345:18 346:6 366:12 432:7 456:28 457:2 530:24,26,27 531:3,6,7 540:27 541:1 566:19 633:15 706:3 710:12 711:9 716:8

**stationed** 143:8

**statistical** 441:5 443:2

**status** 14:7 69:9,11 241:14 651:5

**statute** 581:4

**stay** 84:20 127:16 248:17 323:6 603:16

**stayed** 140:26 198:1 323:4 633:15 710:12

**staying** 24:27

**steady** 262:17 603:17

**steel** 105:21

**steer** 273:5,6,9 287:3 458:18,20,24

**steered** 320:21

**steering** 251:26 272:22 273:5,11 291:15 319:21,25 320:21 385:17,20,22,24 386:6 458:10,11,13,16,17,23 459:2 461:15,16,17,18 486:7 487:18,24,28

**Steffon** 22:11,25 175:26 176:3,18 177:2, 4 178:21 184:21 186:24 188:28 218:10 261:17 381:17 391:16 421:10 484:28 485:1 671:25 672:8,14 691:15 718:8 719:26,27 720:26

**step** 6:4 52:6 75:10 96:14 129:19,23 157:27 163:22 172:21 199:17 285:22 418:23 446:26 472:17 477:12,13 498:4 542:6 568:26 602:8 642:7 662:27 663:2,4,6, 9,13,19 672:17,24 674:8,10 675:15 677:16 683:1 684:1 685:9 698:26,28 722:11,12 743:19 754:19 764:20

**stepped** 264:5 285:21 344:18 367:21 369:5 409:16,20 692:10 722:6 730:20

**stepping** 283:21 472:19,20 565:9 696:15

**steps** 52:10 68:3 250:23 267:27 337:1 471:28 680:5 765:8

**stereotypes** 14:2 650:28

**stick** 19:6 38:22 205:8 263:15 275:6

**sticking** 759:26

**Stinger** 530:6

**stipulate** 583:25 584:10

**stipulated** 631:15 654:6

**stipulation** 582:20 583:1,6,19,21 584:8 643:1,2

**stitched** 42:28

**stone** 696:15

**stood** 128:17 672:2

**stoop** 762:20

**stop** 9:12 13:2 26:27 27:10 32:10 77:26 78:2 80:10,28 81:9 124:4 131:10 154:16 164:10 177:7 203:9,24 205:18 206:25 207:13 221:12 234:10 252:17 337:9 341:12 380:28 384:25 385:10 387:3 390:21 391:27 393:11 471:15, 17,22 473:25 505:20 522:8,9 531:12 532:13 558:22 592:7 595:11 602:6 603:17 614:20 626:17 652:5 675:19 711:18 718:22 722:21 746:26 749:26 758:16 762:20 763:19 764:3 769:27

**stopped** 29:21 32:5 104:9 112:26 123:15,26 124:10,25 125:17 139:26 140:5,15,27 143:14,22 269:28 294:28 320:27,28 321:7,10,17,24,27,28 322:1 326:13 380:14 381:13 383:18,20 390:9 475:16 506:3 588:11,19 589:1 595:20 601:19 614:1,4 622:26 623:8 627:15 630:24 632:1 675:20 704:7 706:27,28 711:13,19 717:17 743:27 758:22,27 764:4,5

**stopping** 56:10 72:19 291:10 374:21,22 381:8 532:12 719:13

**stops** 32:2,4 164:6 168:26 373:25 516:14 518:7,8 543:14 545:3 713:22 715:4 719:2 744:16

**storage** 13:6

**stories** 33:13 729:26

**story** 316:12 524:25 638:6,8 639:5 709:2,8, 27 732:6 734:7 736:10

**straddle** 712:3

**straight** 56:26 72:17 163:9 184:10 240:2 263:22 273:2 285:3 320:1 323:11 359:13 370:21,22 373:25 386:13 458:27 461:25 462:7,18 486:10,19,22, 25 487:19 488:2 506:15 550:22 594:9 674:22

**straightforward** 462:7

**strange** 24:4 190:6

**strangely** 160:15

**strangers** 174:4 200:20

**Streamlight** 72:1 530:5,6

**street** 20:13 24:22 25:21 26:2,11 49:28 50:5 51:10,13,27 57:24, 27 59:4 64:15 122:13 166:8 180:12,13 214:10 299:15,17 310:15 414:16 586:24 681:18 710:9

**streets** 310:20

**stress** 258:15 563:12 761:26

**stressful** 258:7,11 567:14

**stretch** 349:7

**striations** 367:25

**stricken** 16:20 141:16 463:25 529:10 555:19 562:25 654:3

**strictly** 454:16

**strike** 66:26 80:9 97:16 101:4 141:15 145:24 163:14 170:19 189:25 197:27 203:25 288:15 310:11,23 348:9 357:6 361:3 414:3 462:12 463:24 491:11 507:10 508:8 529:9 533:23 555:18 562:22 567:12 653:26 694:2

**strikes** 117:2 157:9 579:19 763:26

**strive** 256:27

**strong** 75:24 194:14 384:16 578:6 580:1 696:16,17,18,25

**strongly** 766:23

**struck** 161:20 162:5 386:1 426:20 545:27

**structure** 59:24,26 60:19,20 636:9

**structured** 756:17,24

**struggled** 233:28

**studies** 484:23 595:15

**Studio** 589:15

**stuff** 196:23 249:25 253:7 278:7 425:27 438:9 519:17 520:25 629:24 721:12 750:2,23

**subdue** 157:9

**subject** 7:25 12:4 14:13 18:21 50:28 51:2, 15 56:17,19 57:4,8,28 62:21 63:8 64:13 70:4 88:20 97:7 172:20 199:16 257:2 424:2 446:10 522:20 617:19 767:1 768:18 769:3

**subjects** 13:12 168:26 264:24 430:23 627:2

**submit** 581:27 690:1 692:3 697:17 699:17 706:8 709:9 715:17

**submitted** 330:3 689:18

**subsection** 643:9 644:17,20

**subsequent** 249:17

**subsequently** 240:3

**substance** 275:7

**substantial** 666:1 669:1 670:23 702:11 742:23

**substantive** 755:23 756:18,23

**Substantively** 516:3

**substitute** 769:12

**substituted** 768:24

**subtract** 628:4 629:3

**successfully** 165:7

**sudden** 141:20 162:20, 21,26 163:1 192:12 299:19 300:19 602:12 603:8 709:3 711:22

**suddenly** 595:19,26

**sue** 256:13

**suffer** 699:28 703:1

**suffering** 703:3

**sufficient** 662:18

**suggest** 7:25 348:24 401:20 426:2 473:12 555:21 575:23 602:20 708:21 712:1 713:26 718:8

**suggested** 159:27 603:9 653:24

**suggesting** 566:27 651:24

**suggestion** 618:11

**suggests** 16:13 374:27

**suit** 230:2

**suitable** 153:5

**sum** 261:3

**summary** 328:11,13 431:28 454:2 484:1

**summations** 11:10

**superiors** 757:17

**supervisor** 231:17

**supervisors** 36:7 116:1

**support** 95:17 109:11 426:27 643:13,28 655:1 732:26

**supported** 32:23 244:27 576:9 634:26 655:16 700:25 735:19 759:3

**supporting** 734:23

**supports** 97:9 672:22 687:14 734:20,22 735:13

**suppose** 521:14 547:24

**supposed** 233:16 356:25 368:27 369:10 416:11 486:19 506:22 558:22 632:12 702:1 738:23

**supposedly** 632:12

**Supra** 644:5

**Supreme** 579:7 581:11,16,17 643:21

**surface** 118:8 123:11 142:11 161:13 252:15, 16 255:13 263:13,17 275:6 279:15,24 359:23 373:20,21 384:17,18 409:25 410:1,9 453:28 469:27 478:18 487:9 520:4 537:7,10 543:25, 27 544:17 562:12 712:14 718:16

**surfaces** 255:11 294:7 409:28

**surge** 233:25 234:5

**surprise** 23:28

**surprised** 709:25 748:4

**surrounded** 671:23 763:21

**surrounding** 61:25 76:1 268:26 269:2 348:28 406:24 666:7 669:4 674:14

**surrounds** 269:16

**survey** 439:17

**surveyor** 439:16

**survive** 699:6

**suspect** 259:8,23 666:24 679:4,26

**suspects** 258:28

**suspicion** 611:24 666:28 679:13

**sustain** 16:16 304:19 641:18 653:27 740:5

**sustained** 54:18 66:24 75:4 90:25 102:3 141:14 145:7 148:5 149:27 150:28 153:9 165:25 184:17 197:2 198:27 291:5 310:9 311:6 327:18,23 328:1, 25 329:7 346:1 350:13 355:1,13 356:4,14 381:4 382:3 390:25 392:2 393:13,22 401:26 454:6 460:5,7 463:23 464:13,18,26 468:21 479:20 529:8 544:10 546:3 547:15,26 549:24 555:5,17 557:12 562:16,24 564:23 599:14,23 608:19 634:6 640:4,17 642:3 705:16 721:16 733:21 734:27 742:18 743:3 750:12 753:5

**SUV** 51:1 64:28 68:18 70:11 273:23 277:27 326:21 379:1,17,24 429:18 443:12 445:22 473:18 741:6

**SWAT** 258:25 260:2,4 373:18

**swear** 434:13 448:17 768:27

**swerve** 279:27

**swerved** 385:14

**swing** 211:28 287:14

**swinging** 236:13

**Swiss** 262:8

**switch** 330:9 650:1 694:15 695:18 766:6

**switched** 471:2

**switching** 496:25,27

**swore** 695:12

**sworn** 16:1 35:3 138:23 173:17 200:10 216:27 228:11 238:7 343:23 419:21 435:12 449:2 527:1 542:24 584:26 620:15 653:14

**Sylmar** 242:6

**sympathy** 13:27 22:5 650:25 689:24 733:11

**system** 11:22 117:9 248:12,25 274:1 384:24 487:18 569:9 729:21 756:2

**systems** 449:24

**T**

**T-BONE** 251:4

**T-SHAPED** 351:18

**T-SHIRT** 50:28 57:9 63:17 88:21 218:14

**Tab** 413:22

**table** 130:11 218:13 262:20,25 361:7 413:12 501:6 609:22 621:9 623:25

**tables** 621:18 623:23

**tabulate** 591:19

**tabulated** 474:22 598:17

**tactic** 97:9

**tactical** 41:15 62:13 403:16

**tactically** 403:12,20

**tactics** 157:12

**tail** 212:7 732:7

**taillights** 567:17

**takes** 116:7 123:10 258:15 259:17 289:21, 22 319:16 373:3 507:26 594:6 595:21,22 598:8 612:4 715:9 717:3,12 739:23 745:23,28 761:24

**taking** 14:19 25:16 33:9 79:6 91:25 163:27 207:23 246:1 294:20 296:10 317:23 422:7 519:17 622:4 624:2 635:9 663:13,18 677:4 678:9,11 716:12 763:24

**talk** 12:3,12 13:11 18:20,23 20:23 26:8 49:10 56:20 63:9,23 65:3 66:4 72:23 93:15, 26 98:3 100:17,20 107:13 131:11 161:5 205:23 221:17 247:9 255:28 260:13 264:7 270:6 298:9 301:4 329:10 338:24,25 376:15 380:6 382:26 433:7 443:12,14,15,22 506:18 569:7 575:16 601:5 617:26,28 638:7, 12 650:10 672:14,22 673:4 677:26 681:9,12 682:28 690:6 693:5 697:21 700:7,14 704:23 710:19 717:11 721:17 722:23 731:7 732:9,10, 20 735:1 739:9 755:5,8 759:27 766:14 767:1,21 768:17

**talked** 108:25 147:16 148:16 151:19,20 155:4 156:11,24 169:12 275:1 289:7,20 304:5,7 308:19 309:25 313:20 317:26 355:16 356:18 358:1 360:5 365:23 366:6 378:25 394:7 396:10 413:5 439:7 480:26 535:17,24 544:12 549:26 557:21 564:25 605:3 611:2 629:10 630:20,21 686:23 687:13,20 698:2 700:23 701:15 702:12 704:20 710:27 722:3 729:25 730:21 731:8 744:13 749:15 763:3

**talking** 13:14 60:16 73:20 91:13 129:18 157:16 177:24 186:21 197:23 231:28 283:4 286:10,18 294:7,10 303:20 305:19 323:15 366:28 369:21 384:18 386:9 393:26 396:14 403:23 408:8 458:1 492:16 494:6 498:9 518:10,13 530:12 532:25 533:17 544:17 555:24 578:25 586:4 607:27 608:1,25 614:4 615:8 622:12 648:13 672:4 675:4 686:8,20 702:7 704:14 714:7,8 720:5 728:27 731:10 735:11 741:3,4,5 743:10 745:26 746:24 759:25

**talks** 732:12 758:14,17

**tall** 61:9,23 562:13 738:26

**tan** 41:7 229:6 420:16, 17 680:18 682:3

**tandem** 128:9

**tank** 741:5

**tape** 386:21 423:9 515:28 516:20,22 518:20 519:14,20 520:8 556:17,19,23 729:9

**target** 365:15,18,21 391:27

**targeting** 146:9

**tased** 677:4

**taser** 41:13 79:16 233:21,22,27 234:1 420:22 677:5

**task** 102:16

**tasks** 538:5

**taught** 93:25 94:5 158:10 240:26 257:21 298:25 300:9 306:16

**teach** 242:22 258:22 558:14

**team** 232:8,9,10 233:1 242:25,26 243:19,21,27 245:21 246:4 258:25,27 260:2,4,8 266:4,7 267:16 410:21,23 552:28 553:1 635:14 760:4 762:17 764:24

**tear** 247:10

**tech** 244:12

**technical** 98:17 201:7 478:6 498:10

**technically** 558:7 600:13

**techniques** 157:12 244:10

**teed** 185:9

**telephone** 12:11 414:16 559:22 625:11

**telling** 33:22 74:25 75:1,6,9,19 107:27 110:2 196:3 215:8,27 277:20 316:14 389:20 492:9 516:6 678:8 683:13 685:20 698:16 709:26 733:1,18 738:5

**tells** 261:11 374:12 441:21 442:2 458:11 463:10 474:16 475:6 558:19 719:19

**template** 11:1

**temporarily** 393:10 701:9 719:1

**ten** 111:28 123:7 156:14 182:17 221:10 244:20 258:20 301:2 317:28 355:6 384:22 436:28 446:5 451:23 452:22,24,26 476:21 478:12 633:1 710:4 715:24 717:20 719:12 762:1

**tenant** 203:1

**tend** 14:21

**tendency** 11:1 78:21 734:19

**tending** 661:15,16

**tennis** 254:26

**tension** 235:9

**tentative** 9:16

**tenth** 596:25 610:18

**tenths** 702:15

**tenure** 257:26

**term** 58:4,10 75:12 127:9,11 258:7 282:9 313:21 375:6 384:5 408:13 461:15 472:2,4 478:2 482:8 489:26 498:10 670:7 760:13

**termination** 540:3 730:14

**terminology** 67:19,23

**terms** 57:14 65:8 78:24 129:11 159:24 165:10 397:1 403:4 417:2 437:22 444:13,14 452:28 460:11 478:7 479:14 499:26 555:11 628:5 665:13 668:9 760:11

**Terrain** 118:1

**test** 366:22 388:9 503:8 626:25 629:27,28

**testified** 17:14 18:3 35:3 86:2,6,11,19 88:5, 22 94:26 97:26 100:8 106:12 108:3 110:25 112:16 123:1 125:11 130:16 138:23 145:23 149:11 150:8 173:17 200:10 216:27 228:11 238:7 256:11 264:23 314:21 343:23 346:1 357:7 361:9,11 379:3 380:10,23 391:3 402:12,22 406:13 410:17 419:21 435:12 449:2 487:5 494:28 500:4 515:22 527:1 530:21 536:4 542:24 543:4,17 546:5,23 553:13 554:16 555:27 567:8 584:26 612:18 613:5 620:15 625:22 627:1,12 632:25,28 634:16,24 637:27 640:6 641:21 656:9,26 674:24 675:15 677:10 682:5 687:23 706:12 707:28 709:15,17 710:6,27 730:11 749:15 761:5

**testifies** 517:21 654:19,27

**testify** 14:23 27:16,22, 23 28:8,11,15,24 29:22, 23 30:7,10,15,18 31:23 361:1 380:13 387:14 427:3,15,18,23,26 429:17 432:10,13,20,24 436:10 438:15 443:25, 26,28 449:10 481:25 544:5 564:1 568:14,17, 19 608:22 625:24 659:7,20 661:5,9 749:18

**testifying** 17:17,25 93:5 97:16 101:23 139:4 174:3 185:24 200:19 210:7 256:28 257:1 281:2 307:23 350:12 370:26 375:10, 12,13,14 430:2 482:1 487:21 525:20 639:26 656:12,20 660:20 761:21

**testimony** 14:23 16:1, 20,21 17:3,5,7,8,10,11, 20,27,28 18:4 21:24 22:2 25:11 29:8,18 32:4 34:16 85:28 86:4,7,24 87:21,27 88:3,18,24 89:1,25,28 90:2,7,15 95:2 96:8 97:10 100:2,5 102:25 103:2 104:18 106:28 108:26 110:22 111:21 112:19 119:18, 23 121:17,22,26 122:6, 26 124:27 125:11 130:19,21 139:28 147:19 149:14,26 150:19,22,27 151:15 152:18 159:2,6 170:14 173:1 199:22 216:11 227:23 236:3 237:19 240:27 256:14 275:26 280:26 285:16 286:24 290:1 294:20 337:17 341:17 344:4,10,24,25, 28 347:7 353:17 358:2 363:4,16 365:6,11 370:23,28 371:24 376:13 380:20,26 385:12 391:7,18 392:8 398:13 400:27 403:22 405:6 408:18 413:10 418:6 419:2 425:18 426:18 427:10 431:9,25 434:10,27,28 443:19 445:3,4 447:15 448:14 453:8 482:19 507:10,22 508:8,10,26 523:21 525:22,23 527:16,26 529:24 530:15 534:12 535:14 536:5 544:9,12, 15 545:9 551:4,12 554:20 555:14 557:14, 17 560:27 561:18 564:2,10 566:9,15 584:14 605:5 613:28 616:15,18 620:22 622:25 625:27 626:2, 11,19,23 629:12 630:24 632:1 634:20 635:25, 26,28 636:5,25 637:23 638:2 640:2 641:23 652:11 653:14 654:2,4, 21,28 655:25,27 656:1, 2,4,6,15,22,23,27 658:23,24 659:1,3,5,15 672:26 673:17,23 676:19 682:8 686:2 688:21 689:19 709:18, 21 714:1 735:16 738:4, 5 749:3 760:1 761:9 764:16 765:9,11

**tests** 12:28 621:15 652:3

**text** 446:13,18

**Thanksgiving** 9:10 691:21

**themself** 259:20

**theory** 365:4 390:27 405:19 411:24 596:9,14 598:28 758:28

**therapists** 12:6 767:4

**There're** 519:10

**thick** 62:12,14

**thin** 39:6

**thing** 10:20 19:4 23:12, 26 45:19 153:2 164:7 183:27 190:28 191:4 195:15,27 206:13,14 208:23 244:9 250:27 251:1 255:16,21 261:7, 13 271:26 273:10 277:2 286:20 297:3 298:8 300:8 341:22 344:3 357:4 423:8 442:23 444:16 457:5 519:17,28 568:19 586:5 595:15 612:12 623:26 650:1 681:21 682:1,7 691:25 698:1 711:23 712:25 715:22 721:25 731:12 732:14 733:16 738:6,24 744:15 746:1 747:28 759:14 766:10

**things** 12:12 17:14 18:7,13,26 22:4,7 24:4 29:17 31:27 62:9 85:3 93:26 116:2 128:19 195:17,26 196:4 197:7 201:3 204:12 211:9 241:17,18 242:28 243:16 245:9,11,26 246:3,20 247:5,19,26 250:7,11,28 253:15,22 255:14 258:11,17 260:4 264:22 267:5,23 278:6, 28 285:10 287:8 289:21 299:28 336:25 337:3 343:19 344:2 391:19 405:15,20 406:26 424:15 429:27 430:15 433:12 442:25 443:21 445:12 480:9 497:11, 12,18 517:20,28 519:5 520:18 524:16 528:15 557:1 586:28 587:4,5 620:24 630:21 656:9 657:2,8 672:5 678:24 681:27 689:15,24,26 690:12 702:6 703:5 706:11 716:27 719:10 721:1 729:11 732:15 738:3 747:22 748:16 752:13 761:5 765:26 766:1

**thinking** 84:27 336:17, 18 375:7 416:4 520:13 646:7 691:22 700:18

**thinks** 646:9 678:13

**thought** 8:1 30:28 54:4 112:1 139:4 329:28 339:4 378:16 404:1 405:13 519:15,24 557:15 616:3 632:2

645:15 678:23 679:9 680:24 690:17 718:27 733:6,9 734:14

**thoughts** 336:19,21 338:16,23 443:10 520:7 577:19 578:5 580:19 618:15 642:19 645:13, 14,20 766:22

**thousand** 452:27 462:5

**threat** 65:7 79:1 102:22 151:28 152:4 164:11 286:7 298:26,27 299:2 300:24 303:11 304:28 311:24 568:3 595:23,28 675:20 730:4 731:13,15 761:27 763:9 764:4

**threaten** 704:12 720:7

**threatened** 102:18 152:13 191:23,25,27 300:16 306:13 425:25

**threats** 192:2 704:11

**three-quarters** 286:27 594:22

**threes** 389:18

**threshold** 78:28 739:14

**threw** 70:22 377:2 419:17 535:11 631:10 672:1

**throw** 360:22,23 402:17,19 410:18 520:25 762:21

**throwing** 535:15 684:3

**thrown** 631:11

**throws** 739:23

**thud** 518:25 519:20 520:22 535:9,14 556:2, 6,8,10,17,20,25 557:2 562:3 707:23 708:3

**thug** 758:24

**thump** 518:24 532:18

**Thursday** 336:1 429:1 523:10 525:21 526:8 728:1 771:1

**thwarted** 337:2

**ticket** 748:22

**tickets** 164:7 697:1,3,5, 7,11,13,14 748:24

**tie** 312:23 728:23

**tier** 230:23,25 231:8

**tiers** 252:8

**time** 7:23 18:19 19:7 22:14 26:10,14 28:22 29:12 30:12,16 31:22 33:3 36:19 42:8 48:2,4, 6 49:9 51:15,18 55:20 64:8,16,21 68:6 80:16, 17 83:11 86:20 88:6 89:26 90:6,28 91:28 92:10 93:5 99:19 100:11,23 103:22 105:27 107:13 111:18 113:23 117:14,15 125:8 126:26 127:2 128:1,9 132:12,14 139:17,20,28 140:4 141:1 144:10 145:24 147:24 159:12 162:10 163:9 168:20 170:23 171:7 188:6 189:28 193:5 198:21,22 200:17 201:4,11 202:9, 26 204:26,27 205:15,22 208:4,18 209:9 210:17 211:12 212:28 213:1 214:9,13 216:7 217:27 218:1,25 219:5 220:22, 28 221:1 230:19,21,23, 25 231:8,17,23 233:12, 20 241:17 244:4,19 247:18 249:6,21 258:4 263:5 264:13 267:18 269:20 270:3 273:27 276:21 286:3,9,10,26 287:20 289:5 293:12 294:21,27 297:26 298:6 299:27 300:13,21,22 301:21 310:28 312:12 313:2,6,11 316:22 317:24 318:18,19 323:7,12 327:11 328:21 338:27 339:1,16 345:17,23 346:5,24 347:13,14,20 353:24 354:4 356:1,23 360:3 367:2 370:25 383:16,20 386:26 387:9,12,27 388:10,27,28 389:24 390:6 396:1 404:3,13 407:7 411:25 418:2 422:6,17 425:24 427:2 438:16,26 439:3 441:11 446:2,3,10 448:8 456:17 460:3,6 467:21 470:19 471:4 472:18,20 474:23,24 475:5,12,16, 24 476:6,11 479:25 481:12 483:1 484:5 490:9 501:26,27,28 502:9,16 504:2,4,7,9, 13,15,21 505:9,10,13, 14 517:22 519:25 520:19 522:21 526:21 527:9 531:9 533:27 534:6,26 540:17 541:12 544:5,13 549:9 552:19 556:20 559:16,26 560:28 563:8 565:13 568:15 581:23 585:27 588:11,23 591:21 593:26 594:7,9 597:4, 16 598:9,27 599:27 600:2,6,15 601:18 602:1,17 607:25 608:3 609:21,25 610:23 611:10 612:4,9,15,18, 24,28 613:5,13,14 614:3 615:7,8,11 616:26 617:15 618:8 621:8,16,19 622:5,11, 15,20 623:1,6,11,12,19, 25 624:4 626:26 630:23 631:21,28 632:1 634:14 641:28 667:7 672:4 673:12 683:1,24 687:2, 10 691:19,22 692:3 693:26 699:18 704:7 707:20,22,24 710:1,13 711:3,6,9 713:19 715:4, 8 717:22,24,27 718:1, 17 719:12 722:16 730:20 732:19,20 733:9,15 740:16 745:24 750:5 759:2,16 761:7, 10 765:16 767:22

**time's** 720:18

**timeline** 337:25 474:19 501:6 593:19,21 609:22 611:14,23

**timely** 163:22

**timer** 594:8

**times** 94:13 188:4 231:15 235:11,22 243:14 252:12,13 257:5,6 264:27,28 265:3 267:23 300:16 306:28 318:20,25 319:3 361:4 389:22 390:1 414:28 437:28 438:3,4 442:18 452:22,27 453:2,4 466:24 474:23 501:26 521:9 556:23 626:26 675:17 734:14 738:5 748:3 763:11

**timetables** 631:12

**timing** 516:18 588:9 761:5

**tint** 340:11

**tip** 765:15

**tire** 252:15,16 255:12 268:24 269:10 270:24 272:9,12 273:2 275:10, 11,12,18,19,20,22 276:5,28 277:4,11,14, 18,21 279:6,14,19,21 294:12,14,16 359:14 377:14 379:1,2 384:12 412:18 461:10,11 462:7,14,16,20,26,27 463:2,3,5,6,9 465:4,13, 19,25 470:9,14 477:24 480:20 486:9,11 487:6, 15 488:17,19,23,26 489:17,19,23,24,26 490:1,12,21,27 491:4,7, 10,12,13,24,27 492:2, 10,11,19,22,27,28 493:12 494:4,19,23 495:1 500:21 502:9 504:15 586:16 594:17, 20 602:10 609:5 624:13 625:10 628:28 673:26, 27 674:1,3,17,18,19 688:6,7 716:7 718:4 759:7

**tire's** 487:10 489:8 598:6

**tired** 630:14 748:3

**tires** 23:21 27:8,9,10 31:4 33:23 70:21 83:3 84:26 104:26 105:3 111:15 112:6 123:8 126:8 127:1,14,21 128:2,13 129:5 140:8

146:4,10,20,25 161:10, 12 252:23 254:15 270:26 275:2,4 276:6 278:9 279:6,10,12,28 286:4,22 291:16 319:22,23,24 379:3 384:20,28 387:13,25 412:4,28 426:13 458:18,22 469:19,26 470:3,10,16,17 471:6, 13,16,17,22 472:6 473:23,26 474:27 475:1 478:17,19 487:13 490:8 498:26 499:3,10 501:10,11 504:17 505:11 546:15 563:17 567:6 590:28 591:1 593:23 594:21,27 597:1 598:5 601:23 623:3,11 638:17 704:7 705:28 707:22 716:5,7,20,22 744:6 746:26 754:1 758:8 759:4 762:4

**title** 450:26

**today** 6:2 9:13 22:26 34:8 63:12 98:15 109:9 132:12,13 161:5 170:1 201:22 216:6 218:5,13 227:14 245:5 307:25 382:21 421:5 431:3 446:20 452:5 453:18 505:23 522:19 525:21, 23,26,27 556:26 629:18 692:10 694:2 698:2 711:8 715:27 717:8 744:2 770:2

**told** 18:13 21:27 53:22 54:24 56:19 93:14 107:24 125:23 139:27 160:12 171:3,28 181:22 183:27 191:24 206:14 207:16 232:16 236:8,9 317:12,15,17 346:5,23, 25 347:10,12,16,26,27 348:1 360:28 361:11 365:1 374:11 403:10 427:2 452:15 453:8 509:1 554:14 561:2 613:14 633:3 650:7 653:15 654:5 657:8 678:13 679:8,17,20,23 683:18 688:4 694:1 705:25 745:12 749:7 750:20 759:18,23 761:4

764:3 765:4,20 766:28

**tomorrow** 131:18 132:14,16 221:13,14 227:17 329:12 525:21 569:4 722:22 770:2

**tone** 68:7,10 75:28 78:25

**tonight** 722:23

**tons** 741:3

**tool** 764:23

**tools** 79:7 94:8 595:13 765:17

**top** 39:18 41:7 62:7 104:5 142:13 143:3,5 144:28 145:1,2 149:10 189:14 201:3 252:18 255:2,3,5 275:12 277:14 280:1 281:13 282:19 284:1 330:2 358:17 368:8 369:12 389:5,15 394:20 407:27 456:4 593:25 674:23 696:16 714:15 722:4

**tops** 229:6,7

**topsoil** 274:28 275:1,3

**torn** 77:27

**torque** 477:21

**Torrance** 507:26 508:1

**Torres** 268:8 295:5,8 327:4,5 353:26 354:11, 14,17 527:13 564:3,4 707:2

**toss** 72:12 762:24,26

**tossed** 72:16 254:16 255:7 371:14

**Tosses** 739:18,19

**tossing** 762:27

**total** 120:25 263:28 276:28 289:17 315:12 321:8 366:1 413:8 474:24 475:26 483:2 493:26 504:18 627:21, 27,28 628:1,11

**totalities** 365:10

**totality** 289:27,28 303:10,13 365:7 366:8

667:6

**totally** 565:28

**touch** 487:28 498:14 524:4 665:14,19 668:10,15 670:8,13 684:10 721:26

**touched** 116:5 665:21 668:17 670:15 686:19 703:21

**touching** 145:14 665:15,17,18 668:11, 13,14 670:9,11,12 684:7,18 685:26 686:18

**tough** 507:25 731:4

**tour** 239:26

**tow** 253:27 278:6,9

**town** 506:28 673:2

**track** 245:8 279:9 436:22 463:2,4 489:23, 24,26 490:2 494:23 500:21 502:9 504:16

**tracking** 450:25 451:2, 7

**tracks** 462:20 465:5,13 490:21 493:12 494:4 495:1 504:15 674:3,22 688:6,7 759:7

**traction** 70:22 83:3 104:28 111:16 112:6 123:9 127:2,13,15 128:2,13 161:10,12,15 275:21 276:7,22 277:5 286:4,15 387:14,23,25 388:14 389:26 412:4,28 426:13 470:16 490:12 491:14,24 498:26 499:3,5,13 501:11 546:15 548:17 568:2 638:18 673:28 674:2,17 685:12 715:5 744:6,19 758:8 759:6

**tractions** 31:3

**trade** 62:15

**traditional** 62:15 591:8

**traffic** 37:9 69:27 122:16,19 164:6,10,16, 17 239:23,24 241:24 242:1,3,9,18,20 243:1,5

245:23 246:14 248:9 249:9 251:5 252:6 254:12 255:18,25 257:2 267:23 322:2 364:7,10 430:14 438:22 558:17, 22

**trail** 488:23

**Trailblazer** 24:18,19 29:22,24 271:5 272:10, 11 273:17,23 326:1,2, 21 445:22 486:2,3 487:25 499:18 620:28 684:5 741:4

**trailer** 254:2 273:7,9

**trails** 624:13

**train** 239:27 258:5,8,10, 14,19,21 259:2 297:28 306:9,11

**trained** 78:11 116:13 297:26 306:2 405:15 540:17 558:13 564:27 611:15,24 715:11 719:19,20 730:18 731:11 747:7 762:12

**trainee** 298:6,8 322:28 404:8,12

**trainees** 300:10

**training** 35:17 36:1,4,6, 8,16 65:5 78:14 84:27 85:1,3 93:15,18,24 95:5,8 97:8 123:4 142:22 148:8 155:4 156:11,24 157:2 164:5 239:24,25 240:1,14,19 241:4,6,10,14,20,23,28 242:7,8,16,18,28 243:2, 12,24 244:23,25 245:15,22 256:8 257:8, 10,11,12,20 258:18,21 261:20 270:19,20 292:11,18 293:9 297:14,16,18,20 298:6 299:16,25 300:3 301:18 306:5 308:8,17 382:6 385:3 388:18 404:4,5 407:8,10 409:26 415:5 430:22 436:13,16,17,18 437:22 438:14 439:5 441:1,12,17 450:12,18, 19,20,22 473:6 540:23, 24 547:20 557:23

595:12 596:28 599:18 639:27 659:27 667:3 738:23

**trainings** 436:19

**traipsing** 688:24

**trajectories** 430:16 444:18

**trajectory** 429:28 431:24 456:14 461:13, 14,17

**transcribed** 82:15

**transcript** 4:4 6:18,21 9:3 81:20 82:2,3,7,8 121:2 160:5 172:6 181:20,23,27 196:8 197:4 317:17 515:23 516:5,11,15 517:5,11 519:10 521:3,7,21 531:24

**transcripts** 81:28 82:19 182:5

**transfer** 277:18 318:17

**transform** 739:15

**transformation** 693:10

**transformed** 693:1,2 700:5 706:21

**transition** 255:19 433:28 624:5

**transitioning** 304:27

**translate** 610:25

**transmission** 123:11 273:26 322:22,23

**transpired** 154:23 169:11

**transpires** 476:11

**transport** 203:14 692:26 693:10 739:16

**transportation** 131:26 247:4 305:26 632:11

**transported** 268:3

**trash** 142:13 283:28 624:12

**trauma** 310:6

**traumatic** 128:20 761:20

**travel** 29:7 253:19 279:19 280:17 318:8 382:9 390:6 443:21 490:22 501:28 503:21 505:8,14 528:6,8 543:17 591:6 601:22 608:3 614:14 626:27 628:1,2 637:3 688:8 758:9

**traveled** 123:17 269:10,11 276:7,21 318:6 389:27 432:11 475:16,26 485:23 501:25 504:3,6,21 587:26 588:8 591:14 593:28 605:24 607:6,26 620:28 621:8 622:5,7, 17 623:12,15,26 624:4 626:10 740:26

**traveling** 251:24 309:10 318:13,20,25,26 319:4 391:5 478:24 529:13 552:24 558:2 559:12,15 592:2 603:1 608:2,15 623:24 746:11 754:5

**travels** 318:18

**tray** 358:14

**tread** 268:24 279:7,13, 17,18,21,23 315:27 321:2,4,8 377:14 378:25 394:13

**treading** 294:12

**treadmill** 481:3

**treat** 292:20,22 756:3 766:25

**treated** 246:16 522:26 756:10

**treating** 302:17 410:27

**triad** 643:11,20

**trial** 9:22 10:2,9,10,23 11:7 12:2,3,7,22 13:9, 17,21,25 14:13,17,25, 27 15:8,21 16:5,14,26 18:18,24,28 21:23,28 22:9 23:9,28 107:18 301:22 360:9 361:18 536:4 543:4 554:28 631:24 638:15 650:24 651:13 652:7,9,12,20, 25 653:11,25 654:5,13 659:8,12 660:21 693:3 696:23 698:20 709:18 750:6 754:24 758:14 764:19 766:28 767:11, 19 768:4 769:19

**trials** 11:23 698:21

**tricky** 693:19

**trigger** 117:1 262:26

**trip** 437:16 451:12 508:3 722:12

**tripod** 248:13

**tripped** 694:24 695:22 696:13

**trippin** 26:28

**truck** 253:27 254:7 473:18

**trucks** 450:8 451:2

**true** 15:5,16 16:12,13 17:4 18:14 82:13 106:24,28 116:13 123:14 124:6,8,9 300:17 444:12 445:15 487:25,26 490:19,20 497:10,14 499:21 502:21 519:7 522:25 535:11,13 583:23,24 588:28 635:2 639:6 652:23 653:5,23,24 654:7,8 655:26 657:9 659:19,22 660:4,9,12, 22 661:1,27 693:22 708:22 709:9 714:11 720:16 749:4 756:20 757:9 765:24

**trump** 581:17

**trunk** 46:22 273:24

**truth** 17:11 18:13 34:17,18 52:20 173:2,3 199:23,24 215:8,27 216:12,13 227:24,25 237:20,21 419:3,4 434:11,12 448:15,16 554:16 654:26 656:6 657:8 704:1 708:17 709:26 716:16 732:27 733:18 736:25 738:5

**truthful** 524:17 541:27

**Tuesday** 9:18,23 138:1 329:15,16,19 361:6 506:10,12 526:2

**tunnel** 29:13

**turn** 25:13 46:17 71:2 154:8 187:21 254:1,7 273:4 320:23 412:19 457:7 458:20 487:14,22 694:14 696:5

**turned** 13:4 64:2 68:24 165:19,22 167:6 220:27 488:8 490:8 671:21 675:9 688:12 696:3 716:14,15 737:19 739:25

**turning** 49:22 77:18 84:26 167:1 251:25 273:1 291:15 487:6,8 488:4 674:21 714:7 759:4,5

**turns** 153:3 525:20 687:21 705:27 756:16

**TV** 247:11 250:10 279:9 358:14

**twist** 452:20 695:15

**two-hand** 496:27

**two-thirds** 351:24 353:10 594:28 597:2 706:6 714:18

**type** 39:5 79:22 112:25 122:22 126:19 152:14 156:4 254:25 256:19 262:18 272:22 306:14 359:25 370:14 395:11 442:21 449:14 453:27 478:18 530:4 585:15 586:14,23 712:13

**types** 37:8 130:23 157:24 451:10 585:11 644:8 655:4 700:16

**typical** 144:5 352:18 367:27 482:8 632:10

**typically** 118:7 126:19 187:17,25 250:1 352:3 358:20,23 359:6 481:25,28 482:10

486:18 520:25 585:18 587:1 699:11

**typo** 492:23 649:3,11

**typographical** 486:4

## U

**U-TURN** 207:18 213:25

**U.S.** 507:1

**uh-huh** 38:10 174:25 175:9 178:12 180:4 191:17,22 196:16,25 199:9 284:20 411:9 489:25

**ultimately** 30:24 32:13 691:28

**unable** 27:21 166:1 768:12

**unacceptable** 521:7

**unambiguous** 663:7

**unanimous** 767:27 768:12

**unaware** 14:2 388:10 650:28

**unbelievable** 660:5 661:2

**uncertainty** 696:25 717:9

**uncharged** 648:2 661:23 662:3,11,16

**unclear** 349:19 641:16

**uncomfortable** 20:2 178:1 179:27

**uncommon** 235:13 497:22

**undergo** 36:6 128:20

**underneath** 389:5,15 418:12

**understand** 16:11 17:18 23:24,25 25:8 28:19 29:14,15 31:25 33:5 69:13 129:21 154:5 155:21 161:28 187:8,10 191:13 205:10 236:2 245:3 250:18,19, 20 251:12 260:25 261:16 276:3 289:9 301:12 306:23 308:21 311:28 318:22 337:24 339:8 340:16 366:20 384:21 392:12 393:25 410:4 417:13 425:12 427:14,20,22,24 429:16 436:6 439:21 442:25 452:10 458:9,10 470:25 495:22 516:9 526:21 534:3 542:15 580:21 584:17 591:3 595:24 601:17 619:24 650:13 653:22 656:13 696:6 699:21 702:7 706:22 748:6

**understandable** 458:20

**understanding** 116:23 117:26 118:27 127:11, 24 139:17,18,20 142:8 143:20,23,25 144:26 155:25 156:6 161:11 169:10 199:8 304:26 310:22 326:8 327:20 329:3 345:8 355:3,10 359:17 377:28 380:14, 22 381:8,13,18 386:17 388:5 395:7 396:19 449:9 455:9 468:3 480:27 535:28 539:22 588:13 592:11 600:8 607:5

**understands** 20:22 291:2 696:27

**understood** 107:21,23 108:1,5 110:4 131:28 143:17 145:8 155:28 199:1 211:5,10 327:25 330:10 377:7 433:22 436:4 443:23 444:20 454:19 521:8,11 585:17

**underway** 339:15

**underwent** 35:19

**unduly** 342:6

**unequivocally** 715:19

**uneven** 359:23

**unfair** 11:25

**unfolded** 115:27

**unfolds** 358:16

**unforced** 749:13

**unholster** 163:20

**Unidentified** 335:3,9, 10,13,14 574:3,4 756:27 757:14,16,19

**uniform** 36:23 37:12 41:3,6,7,11,20,21 42:28 43:9,18 44:3,17 55:24, 26,27,28 78:25 79:5 80:12,22 89:22 94:14, 17,18 96:25 97:22 183:10,11 209:21 217:11,12,15 218:1,27 220:9,21 229:3,5,6,18 420:12,14,17,27 421:1, 17,24 422:20 423:4 676:26 677:3,15 680:17,19 681:22 682:1,2,4,11 721:4 759:17

**uniformed** 230:12 232:1 677:8 686:28

**uniforms** 423:8 677:9 720:15

**unimportant** 169:2

**unintelligible** 248:26

**unintentionally** 13:17

**uninvolved** 69:26

**union** 657:12

**unions** 376:2

**unique** 691:27

**unit** 37:26 39:2 40:2 45:9,28 172:3 219:15 220:28 221:1 230:20 231:4,7,19,20,26 232:11,20 239:15

**United** 41:10 238:27 244:2 257:13

**units** 38:15 97:26 188:15 231:23 239:18

**universe** 693:26 759:11

**University** 435:20 449:21

**unlawful** 664:12 667:1

**unlawfully** 664:10 666:21

**unlit** 695:1

**unload** 358:11

**unlock** 178:12 207:8

**unlocked** 178:23 197:21 204:4

**unnecessary** 69:26 337:15 338:6,9,14

**unpaid** 540:2

**unplugged** 694:22

**unquote** 170:25 693:28

**unreasonable** 33:2 307:1 308:10,13,22 309:10,13 311:20 312:5 655:23 660:5 661:2 681:20,28 696:1,3,8,9 759:14 766:1,2

**unrelated** 417:27 418:4

**unreliable** 11:27

**unsafe** 208:13

**unsigned** 768:14

**unsupported** 660:5 661:3

**untouched** 722:4

**untwist** 695:8

**unusual** 235:26

**update** 55:16,18 56:1 69:9

**updated** 645:15

**updates** 55:22 56:2

**updating** 678:7,9

**upper** 96:26 115:20 233:5 344:8 369:25 603:26 604:5,7,24

**upright** 368:16

**upset** 101:22 249:11 750:9

**upside** 737:20

**upward** 349:9

**usual** 433:20

**utilities** 83:20

**utility** 41:12 43:20 44:9 80:28 273:23 556:5

**utilize** 79:9 157:13 164:17

**utilized** 70:9 632:23

**utilizing** 37:13 401:21 555:9 603:27

**V**

**V-A-N-B-R-I-M-M-E-R** 216:19

**vacation** 694:13

**vague** 7:28 83:9 168:9 407:13 460:6,28 548:25 550:15 558:3 561:13 626:21 641:7

**validate** 483:8,11,15 495:14,18

**validated** 495:23 502:4

**validating** 483:25 495:21

**validation** 450:27 451:1

**valley** 220:1 244:3 405:23

**valuable** 342:5

**values** 502:15,28 503:19 734:21

**van** 184:6,8 193:13,14 203:13 210:12

**Vanbrimmer** 136:13 216:9,18,19,25 219:24 676:22,24 682:9

**vandalism** 53:6,8 67:6 101:19 102:6,11 165:17 404:19 405:12 679:10, 16

**vantage** 60:21 166:20 290:23 322:2 688:1 712:27 741:17

**variable** 412:15

**variables** 382:17 412:10 621:17 622:23 623:17 626:24 629:11, 15,19 630:11 631:12,16 687:11

**variation** 502:14

**variety** 23:10 78:19 93:25 94:8,27 151:3,26 294:20 312:18,26

**vary** 539:26

**Vasquez** 5:10 73:10 138:10 227:10 336:10 429:10 515:9 575:11 647:11 728:11 771:11

**vast** 405:23 732:16

**veer** 320:2,4 490:12

**veered** 320:18 384:14

**vehicle** 19:27 20:18 21:1,2,3 25:20,22 27:15,16,18,25,27 28:13 29:7,22 30:1,11, 16 32:6,9 33:16 35:21 38:17 39:7,9,18,24,27 40:4,12,17 45:3,5,23 46:12,18,24,26 48:14, 20,21 49:2,3,5,22,27 50:4,17,19,27 51:7,9, 13,14 52:1,6,28 53:1, 12,14 55:7,8 56:20 57:4 58:1,23 64:14 65:11 68:3,5,13,15,17,24,27 70:12,14,16,20,21,24, 28 71:7,10,16 72:9 74:13,18,22 75:2,7,10, 23 76:21 77:5,6,11,13, 17,20,26 78:3,5 79:23 80:11 84:25 85:10 86:2, 8,12,13,17,21,28 87:2, 5,12,15,17,18 88:20,23 89:16 98:1,3,21,27 99:6,14,21,23,28 100:23,24,27 101:25,26 102:1,8,9,12,21 103:4, 6,10,12,13,14,16,21,24 104:6,8,11,12,14,23,25 106:26 107:6 108:19 110:17,19,23,28 111:1, 5,12,24 112:2,26 115:19 119:21,22 121:27,28 122:13,21, 22,27 123:2,5,8,10,12, 14,22,25 124:6,9,10,11, 13,14,16,17 125:1,3,16, 17,28 127:16 128:5,23 129:12,14,16,17,18,19, 22,26 130:3,25 131:3 139:7,11,12,16 140:15, 22,27,28 141:5,20 142:16 143:9,13,14,15, 18,21,22,26,27 144:2,5, 9,11 145:15,20,26,27 146:1,3,9,15,16 147:10, 17,21,24,27 148:1,7,8, 10 149:24 150:6,9,10, 14 152:24,25 153:12 154:3,12,13,17 156:13, 14,17 158:15,16,22,24, 28 161:9,12 162:10,13, 14,16,21,22 163:23 164:10,18,20,23,26 165:1 166:26,27,28 167:2,5 168:8,26 169:14,15 170:24 171:2,4,12,17,20 176:15 177:5 178:24 182:28 183:1,2,7,8 184:11,12,14,20,22 185:25 186:10,12,19 187:25 188:4,9,10 190:3,17 191:19 192:17,18,20,21,24 193:27 194:6 198:21,25 199:5 202:19 203:22 204:1 210:12,22,25,26 211:1,3,4 212:22,23,26, 27 213:25 214:10,12, 19,26,27 215:4 242:11 243:9 244:12,16 245:1, 4,6,7,10 247:11,13,15 249:18,23,28 251:10, 11,13,19,22,24,26 253:22,24,25,28 254:6, 14,16,18,19,20,22 255:1,3,18,21,22 256:19 268:14,21,26 269:2,4,7,9,12,13,26,28 270:25 271:1,3,7,12,15, 22,24,28 272:1,3 273:3, 5,11,14,18,22,24 274:5, 10 275:27 276:6,7,11, 13,14,17,20 277:23,24, 25,28 278:2,7,12,17,22, 26 279:6,17 282:24 284:15 286:16,18,19,22 290:22 291:11,14,16, 19,23 295:2 305:1,23, 25,27 306:4,12,14,16, 17,18,26 307:2,7,8,9, 13,20 308:14,25 309:6, 10,19,21 311:2,12,14, 15,17,27 312:8,11 314:9 315:24,28 316:1, 3,4,8,20,22,26,28 317:16,19,28 318:6,8, 13,20,24,26 319:11,13, 28 320:8,22,24,26 321:3,17,24,28 322:8,9, 16 324:18 326:12 327:8,27 328:22,27,28 337:20 347:25 354:13, 25,26 355:6,11 356:1 359:14 376:15 377:15, 28 378:2,8 379:11 380:6,15,16,17,28 381:2,8,11,13,21 382:9, 13 383:8,9,13,18,27 384:9,17,26 385:10,14, 15 386:9,10,13,18 387:12 388:3,9,11,24 389:3,26 390:9,20 392:14,16,17,21,22 393:1,16,19 403:13,15 404:6 407:20 408:24 411:22 412:1,7,25 413:16 414:2,3,8,15,20 425:18 426:9,10,18 432:9,11 436:11 437:27 441:8 443:20 445:11 447:15 450:22 451:5,9 452:10,12 453:19,25, 26,27 455:4 457:15,17, 21,25,27 458:4,9,11,21, 26 459:5,25 461:10,12, 27,28 462:2,11,17,21 463:11,15,19,21 464:2, 4,5,9,16 465:8,24 468:27 469:11,28 470:2,4,7,8,13,19,22, 24,26 471:12 472:13, 14,21,23,25 473:8,13, 14,16,18,19 475:16,18, 21,26,28 476:2,5,8,12, 15,18,21,27 477:1,2,4, 8,15,19,22 478:9,10,11, 16,23,28 479:22,28 480:10,24 481:6 485:10,12,16,27 486:24 487:12,15,21,23,26 489:4,10 490:5,22 491:20,21,23,25 492:5, 7,8,12 493:27 494:1,4, 16,19 495:12 499:4,11, 14,19,20 500:8,15,22 501:13,17 502:12,23,25

503:8,16,18,25 504:6, 16 505:1,7,13,18 506:3 523:22 525:9 527:10,13 528:9 535:17,18,21,26, 28 536:4 537:5 543:17, 22,23,27 544:6,13,17, 22,25,26,27 545:9,21 546:8,18,27 547:19 548:1,6 550:4 557:25, 27 558:1,2,20 559:2,6, 7,11 560:13,18 562:28 563:16 564:3,9,11 565:26 575:25,26 576:14 577:14 578:8 580:25 587:10,22,25 588:6,8,9,11,14,16,19, 22,24 589:1 590:25,27 591:4,6,7,26,27 592:2, 5,7 593:2,3,23 595:19, 20,23,26,27 596:4,7,16, 20 597:4,18,20 598:5,7, 8,10,14,21 599:12 600:2,5,13 601:10,14, 18,21,24,25,27 602:1,5, 11 603:1,3 604:11,12, 13,15,17,26 605:4,7,8, 10,16,24,26 606:3,22 607:6,7,9,11,12,18,21, 24,25,28 608:2,4,7,8, 15,27 609:6,11,22 610:1,8,10,12,14,16,17, 20 611:3,16 612:1,4,8, 11,15,19 613:15,23 614:1,5,11,20 615:5,9, 13,14 616:15,22,26 617:3 621:4,8,21 622:7, 19,25 623:4,7,10,24,26 625:2,23 626:6,9,13,14, 16 627:13,15,18,20,21, 23 628:16 630:23 631:1,22,28 632:7,10, 11,15,16,22,25 633:4,7, 22,25,26 634:2,10,15 637:27 638:17,19,27,28 639:24 640:1,7,11,15, 26 668:27 672:1,3 673:12,27 674:4,22 675:16,20 676:4,17 677:17,19 681:25 684:3,4,13,15,27 685:7, 10,12,16,20,21,23 686:2,4,5,12,14 687:16 688:15 689:3,9 692:26, 28 693:2,4,9,10 696:19 699:22,23,24 700:5,6 702:13 703:8 704:5,10 706:10,21 707:3,15 708:25 710:3,8 711:19 712:6,21 714:7,9,15,17, 20,24 715:2,4,13,23 716:3,9,10,12,13,14 717:19,25 718:24,25 719:10 729:28 738:25, 26 739:1,15 740:12,28 741:1,13,15,19 742:8, 27 743:23 745:12,27 746:11,22 747:9,10 748:16 749:23,24 753:18,20,22,25,27 754:2,5 757:27,28 758:2,6,22 759:9 761:19,21,28 762:4,5 763:18,19,25,26 764:4

**vehicle's** 76:2 142:26 144:9 384:20 489:20 493:26 498:3,4 503:21 558:19 559:15 600:5 606:6,9,19 611:23 612:28 613:4 631:6 637:9 708:25 754:1

**vehicles** 102:12 123:9 164:3,6 189:17 190:15 197:20 202:14,15 209:21 242:11,12 243:9,15,16 244:4,12, 13 245:5,8,26 246:18 247:16,17 248:6 250:22 253:8,20 255:6 269:19 271:21 274:3 278:10 279:16,27 294:12 392:5 405:27 437:9,18,21,26 450:17,20 451:6 452:11 473:6 485:7 557:22 558:15 585:14 675:5 679:22 718:20 741:3

**vein** 415:24

**velocity** 318:18,23 389:1,19 592:5 598:21 623:25,28 624:5 626:27 716:13 742:8

**venue** 697:4

**verbal** 157:17 192:1 404:24 704:11

**verbally** 69:6 70:4 191:8,15 425:25 517:9

**verbiage** 291:2

**verdict** 12:1 13:22,26 14:8 580:17,27 581:25 644:26 645:15 661:13 670:27 671:7 672:13 690:12 755:21,27 756:1 766:16 767:27,28 768:3,6,7,9,10,11,13,14 769:4,17,20,22,23,28 770:1

**verdicts** 21:20 690:22

**verified** 592:14

**verify** 77:8 122:11 123:1

**verifying** 81:20

**versa** 273:9

**version** 72:5 217:18 316:12 330:9 429:25 430:26 431:10 435:3 649:5 673:21

**versus** 22:11 85:10 164:10 243:9 251:18 254:22 255:10 260:22 261:17 263:22 278:19, 20 299:14,22 308:14,19 365:18 373:21 410:12 485:7 498:17 575:17 578:18 615:27 616:1 643:21 755:18

**vibrate** 610:7

**vice** 273:9

**vicinity** 37:19 119:25, 27 121:23 460:15 484:1

**victim** 14:4 575:26 651:2

**Victorville** 420:4,9,12

**video** 23:18 264:22 431:1 436:17 442:1,6,9, 10 443:17 450:8,9,19 451:7,17 473:20 518:5, 8,11 532:13 535:1,3 549:11 596:7 599:26 600:1 715:28 716:17 751:2

**videos** 430:10 452:8 586:23

**view** 10:27,28 43:10 280:4 301:28 304:2 326:2 341:1,28 342:5 379:16,20 380:1 381:6, 7 396:9 455:11 457:24 466:13 493:3 577:11,28 624:21 675:10 760:19

**views** 341:1 586:24 734:22

**violated** 539:14,17,22 540:5

**violating** 643:7

**violation** 540:1 664:15

**violations** 122:16,19 538:21,23

**violence** 235:12 293:5, 7

**violences** 293:3

**violent** 78:27 203:19 235:5,11 675:3

**virtually** 752:5

**virtue** 235:3,7 630:13 751:22 757:28

**visibility** 25:12

**visible** 39:14 41:26 44:6 45:5 95:25 277:15 342:18 369:3,11 422:27

**visibly** 367:23

**vision** 29:11,14 30:4 79:25 596:3 747:7

**visit** 12:28 652:3

**visual** 152:28 153:4 403:11,19 590:23 680:16 687:26

**visualization** 37:13 129:11 360:20

**visualize** 122:12 130:21 741:12

**visualized** 166:16

**visualizing** 123:13

**vital** 69:10

**voice** 68:7 75:24 76:2 84:6,7 181:5 426:7,10 676:1 685:21

**voices** 84:1

**voir** 433:27 434:3 439:19

**volatile** 78:21

**volume** 387:3

**voluntarily** 663:18

**voluntary** 320:13 748:1

**vote** 642:18 766:24 767:25 768:22

**W**

**waist** 358:16

**wait** 11:8,12 187:4 364:8 405:1,16 507:2 743:14 765:16 767:23 769:20

**waited** 182:15 404:26 741:18

**waiting** 27:6 132:11 404:18 430:5 769:18

**waive** 82:9

**wake** 249:10

**walk** 56:19,27 82:23 83:15,24 93:3 96:6,8,25 102:23 247:27 250:18 266:8,12,19,20 267:2 285:9 288:16 338:20 354:12 372:16 373:11 404:8 634:2 693:7,8 694:14 695:16 696:28 703:15 704:21 710:16 712:12,24,25 739:7

**walked** 27:22 62:17 64:9 71:25 83:27 84:5 88:6,7 89:21,27 95:14 214:28 215:3 268:12 281:3 282:24 288:14 290:23 316:19 326:12 328:22 344:7 354:18 363:11,14 394:1 397:5, 28 401:12,15 402:23,28 403:11 529:24 551:2 555:3,14 564:9,11,14 634:17 673:18 693:6 695:23 708:18,22 712:11,15 734:2 737:4 738:11,20 741:15,21,26

**walking** 25:25 26:19 27:1,2 40:28 57:15 74:21 92:1 93:12 95:6, 24 96:12,14 101:11 150:26 170:11 214:26 247:2 280:15 281:8 285:25 359:1 360:3 372:17,20 374:19 398:14 401:20 402:2 403:20 404:22 408:19 447:10,18,22 456:17 481:1,4,7,9 496:19 527:20 529:4,5 532:15 533:16 541:3 550:12, 21,28 551:25 554:6 565:8 634:26 636:21 687:24 697:12 702:20, 21,25,26 703:7 705:3,9, 17 708:21 719:24 737:2 738:16,19,27 741:11 742:15 750:26

**walks** 327:7

**walkthrough** 246:28 247:1,20 248:3 266:28 267:2,6

**wall** 233:15 236:24 375:21 490:3 763:23

**wanted** 108:15 112:24 191:2 195:24 197:10 198:17 204:17 213:2 270:3 279:5 336:15 344:3 353:1 355:19 376:16 379:12,26 389:21 403:10 415:21 444:27 445:13 452:16 453:8 520:26 577:8 623:19 687:18 755:15, 26 759:19,21

**warm** 29:24

**warring** 704:28

**wash** 215:20

**watch** 12:22 14:23 241:17 445:4 591:4 596:4

**watching** 409:11 443:17 612:5,20

**water** 279:20 654:28 699:1,3

**wave** 209:18

**waved** 699:9

**ways** 245:10 251:9 253:19 410:28 502:5 565:7 645:22 659:14

**weapon** 21:22 23:2 33:28 35:21 65:8 93:13 102:24 107:1 109:1,4,5, 14,19 110:21,22,26,28 111:2,4,8,12 112:13,17 113:9 115:18 116:14, 16,17 117:9,10 118:8 119:20,24,26 120:23 121:22,27 124:7 139:5 140:1,4,26,27 141:1,21 149:9,12,17,18,20,24 150:2,5 151:9,16 152:7, 14,18,21 153:2,7,13,16 156:18,19,23 163:21 170:15 171:20 194:18 255:23 259:21,22 262:8,27 295:2 305:23, 27 337:11,20,26,28 338:9 341:13 361:10 364:3 365:1,26 366:11, 12 372:14 403:26 404:1 407:7 432:9 517:23 530:17,18 538:11 541:19 545:14,16 548:16 550:25 563:14 566:28 567:16 568:8 576:5,15,19,26 577:6,8, 12,17 578:1,8,9,20 579:9,10 580:4,10,24, 25 581:1,8,24 643:8,10, 18,24,28 644:11,20,22, 25,28 645:4,6 646:2,9, 14 648:27 657:27 658:1,11,16 664:14,19 665:2 666:3,6,16 667:12,15,18,22 668:4, 24,27 669:3,9,11 671:1, 3,5 676:15 682:20,22 683:3,7,16,25 684:6,11 686:1 689:11 692:7,8, 23 693:1,2,10 697:24 698:5 699:20,21,22 700:2,3,6,11 701:16,19, 25 702:3 704:9 705:12, 13 706:21 708:8 711:4, 21 712:18 713:27 714:7 715:7 716:9,14,15 717:16 720:28 734:6 738:11,22 739:14,16, 21,25 741:1 742:3,4 746:23 747:14,19,23 748:27 757:28 758:1 763:11

**weapons** 77:9 157:24 692:25

**wear** 42:13 218:1 229:3,5 420:12,14 423:15

**wearing** 26:18 42:6 43:9 57:8 62:10 63:15, 17 83:16 92:24 94:18 155:13,16,18 176:6 183:11 201:25 217:11 218:2,14 220:21 229:9, 27,28 230:2 350:26 420:15 421:8,17 468:4, 5 497:11,12 654:27 676:26 680:17,20 682:7 703:23 704:28 705:1 719:16,25 720:15 731:2

**weather** 42:8 253:11

**Wednesday** 227:1 506:14 507:8,23 508:7, 12,26 522:22 523:3,9, 12 525:23 526:3,4,7,12 569:4 575:1 647:1

**weeds** 687:12 714:3,4 739:11

**week** 5:16,18 235:28 242:4 243:6 361:2 515:15 525:21 623:5,22 630:25 631:23

**week-long** 373:8

**weekend** 506:19 519:25 691:23

**weeks** 6:16,17 240:2 243:6 692:18

**weigh** 253:27 660:16 741:3,6 743:16 746:8 764:11

**weighed** 277:25,26

**weight** 62:8 277:24,27 278:1,9,12,19,26 358:27 445:10,23 463:11 470:4,7,11 493:26 655:8 660:23

**weird** 30:2 178:3 179:7, 8 194:26 680:25

**well-lit** 220:24 221:1 719:24

**west** 49:3 50:8,12,15

56:25 57:18 99:7,24 106:13 112:25 113:6 122:3 220:1 269:5 323:4,6 354:5 362:21, 28 363:26,27 397:14 398:3,9 402:23,24 410:26 411:15 456:18 517:26 687:24 708:23 737:25 738:27 739:3 763:23

**west-east** 401:6

**westerly** 152:23 159:9 738:27

**whatnot** 242:27 263:14 308:15

**whatsoever** 425:16 729:1 751:8

**wheel** 244:6 251:18 253:9 269:8 270:27 273:5,8 275:23,25 276:24 287:3 291:15 319:21,25 320:21 340:8 358:17 385:20,23,24 386:6 409:22 412:18 414:17,18,21 458:17, 20,27 461:23 470:2 486:9,12,22 487:14,28 488:1 490:24 493:27 606:9 625:6,8,13,19,21 627:20 628:1,4,5,9,16, 18,19,24,28 673:27 688:12

**wheelbase** 276:13,14, 16,17

**wheels** 22:20 71:2 77:17 127:17 269:4 270:25,27 272:10,18 273:27 286:15,16,17,21 358:12 369:5 371:5 384:24 411:1 470:3 472:5,13,23,24,26 477:21 487:19 488:8 499:8,15,16 568:2 612:26 685:11 744:19 745:1 759:5,6

**wherewithal** 733:4

**whichever** 757:12

**whinier** 126:14

**white** 20:16,26 37:19 48:9 50:28 57:9 59:22, 24,26 60:19,20 61:17 63:17 70:20 88:20 93:6 101:13 174:10 175:20 176:6 184:9 189:22,23, 24 193:8,9 201:26 210:12 218:14 229:28 265:15 267:7 323:27 324:17 369:27 389:13 397:10 421:11 455:8 567:16 636:9 673:1 681:18 705:2

**Whittier** 240:23

**whoever's** 247:6

**whomever** 94:28 293:17 294:10 328:18 416:11

**wide** 285:8 733:23

**width** 288:12 345:21 416:14 531:5

**wife** 7:27 20:5,11 24:13, 26,28 27:7 29:8 187:2, 25 188:11 212:28 213:1 214:5 516:8 519:6

**wife's** 201:10 212:22, 26 213:15 675:9

**wilfully** 665:10

**willfully** 664:23 665:9 667:25 668:6 669:20 670:4 683:9 684:21 701:22

**willingly** 668:7 670:5

**win** 253:23 254:1

**Winchester** 105:22

**wind** 79:24 122:1

**winded** 416:8

**window** 39:20 178:7 185:26,28 190:22 194:21 231:4 327:26 469:6,17 720:4,8

**windows** 68:20 178:10 215:23

**windshield** 255:2

**wire** 196:22,26

**wireless** 14:11 18:25

**wise** 206:13,14

**withhold** 750:16

**witness's** 17:9,17,20, 24 154:8 656:1,4,12,15, 19 659:15 660:24

**witnesses** 3:1,3 13:10, 26 14:23 16:1,24 17:3 21:15 23:10 107:25 131:19 136:1,3 225:1,3 244:8 246:25 302:7 321:16 334:1,3,10 390:14,19 406:17 427:6 444:10 445:1 513:1,3 524:8,21 525:24,25 526:5 539:5 573:1,3,8 617:14 618:6 653:14,26 654:11 655:25 658:20, 28 659:2,6,20,26 660:15,20 676:7 686:12 688:28 689:2 704:20 721:10 726:1,3 760:21 764:7,12 768:5

**witnesses'** 16:9,11 17:7 653:20,22 689:22

**wobble** 461:23

**woman** 191:24

**wonderful** 221:18

**wondering** 210:21 644:24 729:18 731:9 734:11

**wood** 61:1,10 269:14, 15 285:2 325:25

**wooden** 30:23 57:19 106:9 124:1,2 194:15 561:28 564:9 606:26 639:1 763:17

**word** 202:20 205:26 213:7,12,13 423:18 433:21 505:3 585:8 635:10 680:3 690:13 711:6 741:28 746:13 761:13

**worded** 577:4

**wording** 45:14

**words** 66:12 207:1 213:7 251:8 347:6 458:28 496:10 516:4 521:20 651:13,15,18 708:6

**wordsmithing** 646:19

**wordy** 678:27

**wore** 41:20,21 44:3,17, 22 183:9 421:1 676:26 682:2,3

**work** 36:27 43:2 66:21 116:19 157:18 205:9 217:5 238:13 240:10 244:21 248:6 249:11 255:20 266:14,17 279:12 296:21 375:26 405:20 417:6,8,11 419:25 436:25 437:17 444:24 452:18 484:19 557:7 581:25 589:7 618:13 626:23 718:20 729:8 752:2

**worked** 35:27 122:12 217:8 238:28 239:14, 21,22 257:21 292:9 296:8 419:28

**working** 98:11 198:25 220:1 229:2 230:20 234:26 240:4 249:21 296:9 417:7 420:11 431:22 465:14 672:28 678:4,5

**works** 24:21 80:26 107:25 116:17,23 242:15 261:4 376:6 389:14 390:4 417:14 467:15 594:12 686:27

**world** 482:8 691:26

**worn** 229:18 681:22

**worried** 304:4 697:5 761:12,14

**worries** 298:23

**worry** 520:12 581:22

**worse** 211:20

**wounded** 707:15

**wounds** 702:18

**wrap** 312:23

**wrist** 423:10

**write** 285:13

**writes** 575:23 643:22

**writing** 10:12 12:10

15:26 42:10 767:24

**written** 10:10 581:6 650:9 767:20

**wrong** 15:25 295:6 296:1 346:14 393:27 414:26 493:6 546:26 553:27 555:1 630:7 669:18 690:24 736:15 749:12,13 752:26 760:14 766:20

**wrongful** 417:18 657:13 658:6 684:27

**wrote** 629:23

### Y

**Y-A-E-S** 589:4

**yanked** 741:21

**yard** 27:22 30:20 119:20 121:19 122:3 149:4,7 151:8 156:16, 21 159:9 177:13 179:2 190:18 192:4,14,21 193:4 194:7,8 203:2 208:11 324:5,9,21 354:5 355:9 362:21 402:25 638:24 639:13, 19 640:1 710:25 712:19,21,24,26 718:27 730:1 731:26 733:24, 26,27

**yards** 57:24 86:28 87:23,25,28 307:9,10, 14 308:7

**year** 36:17 80:20 211:8 240:11 243:7 299:14 308:19 436:22 450:15, 17 578:28 764:26

**yearly** 241:10

**years** 35:16,17 80:20 85:8,9 161:28 168:21 179:20 188:11 194:28 195:2 210:16 217:10 228:22 235:1 238:19,28 239:2,10,11,20 240:4 241:7 245:28 248:9 257:24 258:19,26 259:19,28 274:2 285:17 292:25 297:24 299:15 308:13 420:2 436:28 451:23 452:22,26 554:27 643:11,20 673:9 709:7 761:7,8 764:15

**yell** 154:12 187:4 695:19

**yelled** 162:14

**yelling** 699:13

**yellow** 42:9 76:17 113:13,19 142:20 340:18 455:21 456:4 484:27 485:3 489:5 565:19

**yells** 685:19

**yesterday** 139:3 140:8 147:17 148:17,24 149:23 150:19 151:14, 20 155:19 157:28 163:7 164:2,25 166:4 336:16 339:4 344:2 365:11 429:25 430:27

**York** 702:23

**young** 257:12 258:22 259:1 436:26 451:25

**Youtube** 431:1 442:9 443:17

**YS** 537:27

**yup** 706:17

### Z

**zoom** 353:4 356:27 368:12 395:4,28 396:6 399:1,19 400:4,15 407:3 699:5

**zoomed** 71:8 356:27