LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEFFON BARBER, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO and CHRISTOPHER ALFRED,<br><br>Defendants | Case No. 5:22-cv-00625-KK-DTB<br><br>Assigned to:<br>District Judge Kenly Kiya Kato<br>Magistrate Judge David T. Bristow<br><br>**DECLARATION OF RENEE V. MASONGSONG IN SUPPORT OF PLAINTIFF'S REPLY TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>*[Exhibit thereto]* |

# DECLARATION OF RENEE V. MASONGSONG

I, Renee V. Masongsong, declare as follows:

1. I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California. I make this declaration in support of Plaintiff's Reply to Plaintiff's Motion for Attorneys' Fees.

2. Attached hereto as "Exhibit 1" is the Declaration of Gerald G. Knapton in the case *Trendsettah USA v. Swisher Int'l*, filed Aug. 30, 2023.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 15th day of October 2026 in Woodland Hills, California.

/s/ *Renee V. Masongsong*

Renee V. Masongsong

# EXHIBIT 1

MARK POE (S.B. #223714)
mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
rgaw@gawpoe.com
VICTOR MENG (S.B. #254102)
vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

THOMAS C. GOLDSTEIN (*pro hac*)
tgoldstein@goldsteinrussell.com
ERIC F. CITRON (*pro hac*)
ecitron@goldsteinrussell.com
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
Facsimile: (866) 574-2033

Attorneys for Plaintiffs Trendsettah USA, Inc. and Trend Settah, Inc.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| TRENDSETTAH USA, INC. and TREND SETTAH, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SWISHER INTERNATIONAL, INC.,<br><br>Defendant. | Case No. 8:14-CV-01664-JVS (DFMx)<br><br>**DECLARATION OF GERALD G. KNAPTON; Exhibits 1 to 6.**<br><br>**[REDACTED – SOUGHT TO BE SEALED]**<br><br>Judge: The Hon. James V. Selna<br>Courtroom: Courtroom 10C<br>Date: October 2, 2023<br>Time: 1:30 p.m. |

I, Gerald G. Knapton, make this declaration in support of Trendsettah's Motion for Attorneys' Fees and Expenses. I state and declare that the below sets forth the opinions that I have reached at this time in this action:

## BACKGROUND AND EXPERT QUALIFICATIONS

1. My background, qualifications as an expert on attorneys' fees issues, and relevant experience are fully set forth in **Exhibit 1**. In brief, I received my undergraduate education at Brown University and the University of California, Berkeley. I obtained my JD from the School of Law at the University of California, Los Angeles. Today, I am a senior partner of the law firm Ropers, Majeski APC, which has offices in Los Angeles (where I am based), Costa Mesa, Seattle, Minneapolis, Menlo Park, San Jose, Las Vegas, New York City, Boston, and Paris. I am licensed to practice before all courts of the State of California (since 1977), before all federal District Courts sitting in California, and before the United States Courts of Appeals for the 9th and 3rd Circuits.

2. For well over 20 years, in connection with hundreds of litigation matters, I have opined as an expert on the reasonableness and necessity of attorneys' fees. My work as an attorneys' fees expert frequently involves reviewing legal invoices and supporting work product. I have personally reviewed thousands of invoices for legal work, including numerous matters based in Los Angeles and Orange County, totaling far in excess of $5.0 billion in fees. Though I have opined as an attorneys' fees expert in all variety of matters, I have particular experience in cases, like this one, that involve a breach of contract for consumer products and Sherman Act claims. I have qualified and testified in person as an attorneys' fees expert in many lawsuits, including, as here, substantial documents cases and jury trials – followed by appeals.

3. I have also acted as an attorneys' fees expert for many other kinds of litigation, in both individual business disputes and class-action overtime cases, commercial disputes, consumer products cases, wage and labor matters, individual

and class actions involving statutory interpretation, pharmaceutical cases, patent-infringement suits, intellectual-property matters, environmental-contamination and compliance matters, notice-compliance matters (for "clean water act" and "catalyst" cases), accounting cases, "civil rights" cases, retail-credit compliance litigation, truth-in-lending lawsuits, discrimination lawsuits, Brown Act matters, FEHA matters, FSLA lawsuits, and a wide variety of individual actions.

4. My client base is similarly diverse and expansive. I have been retained as an attorneys' fees expert by law firms, judges (in bankruptcy matters), corporations, partnerships, insurance companies, cities, counties, the State of California, trustees, plaintiffs, defendants, and individuals at both the trial and appellate level. About half the time, I am retained to offer my opinion in support of a fee request; in the other half, I am engaged to offer my opinion in opposition to a fee request. My time and time by others at my firm is billed in this matter by the hour with no contingency or bonus depending on the outcome. I do not accept projects if I cannot offer my honest opinion on the matter.

5. In some cases, I only review hourly rates for "reasonableness" in light of the work performed and comparable market rates. In other cases, I also review invoices and work product submitted as part of a settlement or a motion for attorneys' fees. I have performed each type of analysis in dozens of cases for various clients, and I have reviewed hundreds of motions for attorneys' fees and their supporting invoices, many based on "attorneys' fee provisions," codes, statutes, or common law doctrines. Because of this work, I have deep experience and knowledge regarding the rack rates and discounted rates charged by small, medium, large, and very large law firms for litigation work in Los Angeles and Orange County state and federal courts. I have similarly deep experience and knowledge regarding the reasonable amount of time needed to accomplish litigation and trial-related tasks as well as related appeals.

6. I write and lecture frequently on the issue of determining reasonable legal fees in fee-shifting matters. My articles have been featured in the American Bar Association Magazine, National Law Journal, California Lawyer, Los Angeles Daily Journal, Law360, and numerous other publications.

7. I have qualified and testified in person as an attorneys' fees expert on about 70 occasions before juries and judges (including two in the Central District), and have offered my declarations dozens of times to Central District federal and California courts evaluating a request for fees under many kinds of fee-shifting mechanisms.

8. I was retained by Plaintiffs Trendettah USA Inc. and Trend Settah, Inc. ("TSI" or "Plaintiffs") to prepare my expert opinion on the reasonableness and necessity of the legal fees of its two law firms for their work in this matter.

**INTRODUCTION AND SUMMARY OF CONCLUSIONS**

9. This matter comes now before the Court for a determination of reasonable fees for the litigation after remand from the 9th Circuit in matter 20-56016 that follows an eight-day jury trial, extensive post-trial motions, appeals with motions for reconsideration or *en banc* review plus a petition for certiorari, and a motion to issue the mandate to this Court.

10. My understanding is that in the second appeal (No. 20-56016) the Ninth Circuit remanded with instructions for the Court to reinstate the jury's **$9,062,679** verdict on TSI's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

11. Based on my review of the records in this matter, it is my opinion that the reasonable and necessary lodestar for the work by the two law firms through April 18, 2023 is **$11,760,292**.

12. That is comprised of $9,298,980 for 8,754.1 hours of work by Gaw | Poe LLP, and $2,461,312 for 1,657.7 hours of work by Goldstein & Russell, P.C.

13. I understand that fees will be sought from Defendant under the fee-shifting language in section 16.3 of the Private Label Agreements (PLA).

14. The provision on fees in the PLA reads in part:

> 16.3 Attorneys' Fees. In the event that either party shall bring any action upon any default in performance or observance of any covenant herein, the party judicially determined to be in such default shall indemnify the other against, or shall expeditiously reimburse such other party for, reasonable attorney's fees (including disbursements) incurred in pursuit of such judicial determination…

**Summary of opinion:**

15. Based on my experience, review of the materials, and interviews with Trendsettah counsel, it is my opinion that the reasonable total lodestar is $11,760,292 in fees, for 10,411.8 hours of time for legal work from inception of the case through April 18, 2023 for the trial and appellate work by TSI's counsel.

16. The work descriptions that comprise this lodestar are shown in MS Excel® spreadsheets as **Exhibit 2** (for Gaw | Poe) and as **Exhibit 3** (for Goldstein & Russell) - which I understand will be filed separately under seal, so are not attached to this declaration.

17. This does not include any fees for time and fees for work past April 18, 2023, which I would expect Trendsettah's counsel to report by declaration with their reply brief in support of Trendsettah's fees motion.

**Staffing:**

18. The pre-trial and trial through post-trial motions were handled by three experienced Gaw | Poe attorneys, who were the core team, plus one additional attorney who was added for the trial, and five contract attorneys who were tasked with reviewing 626,232 pages of documents.

19. The client also engaged Goldstein & Russell, P.C., a prominent appellate firm from Bethesda, Maryland to assist with the appeal. Given the high stakes of the issues on appeal, it is my understanding that Gaw | Poe and the client deemed it important to have highly experienced appellate counsel to help develop strategy and presentation to an appellate panel. I understand that Gaw Poe located Goldstein & Russell and recommended that they be added to the team, and that they were thereupon engaged by TSI (the client). The main lawyers from Goldstein & Russell that worked on this matter were Thomas Goldstein, Eric Citron and Erica Evans, with additional assistance from Kevin Russell, Charles Davis, and Daniel Woofter. Their backgrounds are summarized in the firm's information set out in **Exhibit 5**.

20. My understanding is that although Gaw | Poe had done its own appeals in other cases (including the Ninth Circuit, the Fourth Circuit, and the Court of Appeal for California's First and Fourth Appellate Districts), the issues here were more complex and Gaw | Poe felt the matter necessitated attorneys with more experience and accomplishment in the specific field of distilling a trial court record for effective presentation of the issues on appeal. Presumably for similar reasons, Swisher added Gibson Dunn & Crutcher at the conclusion of the trial.

21. Goldstein & Russell also took an equal share of the brief writing. Across the two different appeals in this action, both Gaw | Poe and Goldstein & Russell would alternate the responsibility in taking the lead in drafting a brief, with the other firm then making revisions to that respective brief, exchanging the drafts many times until they were final. Goldstein & Russell also helped with the presentation of the oral arguments, working to develop themes, serving as mock judges in a handful of moots, and assisted at the oral argument before the Ninth Circuit panel for the first appeal and presented the oral argument before the Ninth Circuit panel for the second appeal. Goldstein & Russell also took the lead in opposing Swisher's petitions for certiorari to the U.S. Supreme Court.

## OVERVIEW OF THE LITIGATION

**The basic facts and gravamen of the lawsuit:**

22. This litigation concerns "cigarillos" and the claim that 200 million of them were not delivered as promised pursuant to attempted monopolization by Swisher International. To me, a central fact that may explain the motivation of Swisher is that the very same cigar was commonly priced at 3/$.99 if it was Trendsettah's product, but at 2/$.99 if it was Swisher's identical product, so it appears that a very high potential profit for Swisher was being left on the table for each package sold to Trendsettah.

23. According to the Court's minutes in ECF 99, "Swisher is a cigar manufacturer with its principal place of business in Florida…. In January 2011, Trendsettah, another cigar manufacturer, entered into a supply agreement (the "First Private Label Agreement") with Swisher to manufacture cigarillos for Trendsettah under its "Splitarillos" brand name…. In turn, Trendsettah would sell its Splitarillos-branded products to tobacco wholesalers and distributors. In early December 2011, Swisher notified Trendsettah that it was terminating the First Private Label Agreement because Trendsettah failed to meet certain minimum order requirements as specified in the agreement…. After discussions between the parties, the First Private Label Agreement was then amended to terminate on October 31, 2012. …In February 2013, after the First Private Label Agreement expired, Swisher and Trendsettah entered into a second supply agreement (the "Second Private Label Agreement") that was scheduled to terminate on February 1, 2014. Id. at 20-32. The parties did not renew the Second Private Label Agreement when it ultimately expired in February 2014."

*Attempts to Resolve the Matter*:

24. Settlement was attempted: Counsel flew to Miami for a full-day JAMS mediation before a retired justice of the Florida Supreme Court in December 2015 (four months before trial). Swisher refused to offer more than $100,000 to

settle the case. After Swisher's motion for summary adjudication on the antitrust claims was denied in January 2016, Swisher refused to participate in a magistrate-mediated settlement conference.

*The trial & results:*

25. After trial the jury awarded $14,815,494.00 in damages by Special Verdict (ECF No. 206 at 4), and this was trebled when the Court entered judgment on April 14, 2016 for **$44,446,482.00** pursuant to Section 4 of the Clayton Act (ECF No. 216).

26. The jury also awarded **$9,062,679** on TSI's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (ECF No. 206). I understand that in order to avoid double-counting, the awards were not made on an additive basis.

27. There was extensive post-trial activity and motion practice that resulted in vacatur of the antitrust portion of the jury's verdict.

*The appeals:*

28. Following the first entry of judgment, there was an appeal by Trendsettah and a cross-appeal by Swisher by which it contested its liability for the contract claims. Following those appeals, the Ninth Circuit ordered that the full jury verdict be reinstated. The memorandum opinion in Case No. 16-56823 (16-56827) was filed on February 8, 2019. It directed the district court to reinstate the jury's verdict in its entirety and awarded costs to TSI.

29. Swisher's petition for re-hearing and a motion for an *en banc* hearing was denied on April 18, 2019. A petition for certiorari was filed. The Ninth Circuit transferred the motion for appellate fees to the District Court on April 5, 2019. Swisher's motion for a stay pending a motion for certiorari was summarily granted resulting in Trendsettah's motion to issue the mandate. Trendsettah's motion for issuance of the mandate was granted on June 24, 2019.

30. Thereafter, on August 19, 2019, this Court issued an order granting Swisher's Rule 60 motion for relief from judgment. Over the next year, Trendsettah filed two motions for reconsideration or, in the alternative, for relief from the Court's Rule 60 order. Trendsettah ultimately stipulated to dismissal with prejudice, and Swisher began motion practice and post-judgment discovery in connection with its efforts to collect upon the $10+ million in attorney's fees awarded to it by the Court. Swisher also filed a motion for contempt against Trendsettah and its counsel in connection with its post-judgment discovery efforts.

31. With respect to the appellate work stemming from the Court's Rule 60 order, Trendsettah filed a petition for permission to appeal an interlocutory order, filed a mandamus petition, and also had full appellate briefing (including a successful defense against a Swisher motion to dismiss for lack of jurisdiction). Following that appeal the Ninth Circuit partially affirmed and partially reversed the Court's Rule 60 Order, reinstating the $9 million judgment on Trendsettah's successful breach of contract claims.

32. The parties each filed petitions for rehearing and rehearing *en banc*, which were both denied on May 25, 2022. A petition for certiorari was filed by Swisher and was denied by the U.S. Supreme Court on December 5, 2022. The Ninth Circuit issued its mandate that same day.

33. This case was originally filed on October 14, 2014 and Trendsettah's counsel have persevered for nearly nine years to get a favorable judgment. This litigation also struck me as one where Swisher's new counsel was extremely aggressive and may have gone over the permitted line at times[1]. I watched the video of the oral argument of the first appeal where counsel for Swisher was admonished in open court for having persistently mischaracterized the record, for which Swisher's counsel claimed to have felt "grievously distressed," and

---

[1] There were also *ad hominem* attacks in the briefing on one of the shareholders of Trendsettah.

"chastised." *See* https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000014645 at 26:45; 39:00.

34. This was relevant to me in assessing the time now presented by Trendsettah's counsel. In my experience, if the other side wants to make litigation more difficult and time-consuming they can usually do this, but it is not fair for them to first cause the complications and then complain about the time incurred to deal with these very complications.

35. I noted that both sides added prominent appellate specialists to the trial teams: Trendsettah added Thomas C. Goldstein and others from Goldstein & Russell, P.C. of Washington, D.C. Swisher International added Theodore J. Boutrous, Jr. from Gibson Dunn & Crutcher LLP and his team from the firm's Los Angeles and Washington, D.C. offices.

**ANALYSIS OF TRENDSETTAH'S HOURS**

36. Trendsettah's counsel have provided me extensive records of the time they devoted to this case, comprised of time entries broken down by task. The following is a narrative summary of work done over the 102 months of this litigation:

- Pursuing pre-litigation investigation of the claims;
- Researching and drafting pleadings;
- Researching and opposing Swisher's motion to transfer, motion for judgment on the pleadings, Swisher's motion for partial summary judgment, and motion to exclude expert report and testimony;
- Preparing for and taking or defending 15 party and third-party depositions in Jacksonville, Boston, San Francisco, Fresno, and Los Angeles;
- Responding to miscellaneous actions initiated by Swisher to enforce subpoenas against third-parties in the Northern and Eastern

Districts of California, Northern District of Indiana, and Northern District of Illinois;

- Preparing for and attending a full-day JAMS mediation in Miami;
- Drafting and responding to discovery;
- Reviewing, analyzing, and producing 626,232 pages of TSI documents;
- Reviewing and analyzing approximately 78,000 pages of documents produced by Swisher;
- Interviewing economic experts;
- Preparing and reviewing expert discovery;
- Working with expert to prepare multiple reports on liability and damages;
- Traveling to and making multiple appearances in the Central District of California from San Francisco;
- Researching and opposing Swisher's motion for partial summary judgment;
- Preparing for and attending the two-week jury trial;
- Post-trial motions including JMOL (later reversed);
- Motions to tax costs;
- First Appeal;
- Opening brief;
- Answer brief;
- Reply brief;
- Mediation;
- Rule 28j letters;
- Oral argument
- Brief in Opposition to Petition for Certiorari
- Motion to transfer consideration of legal fees;

- Opposition to stay;
- Motion for timely issuance of mandate;
- Motion for attorney's fees and expenses;
- Opposition to Swisher's Rule 60 motion;
- Filing two motions for reconsideration and/or Rule 60 relief
- Responding to Swisher's post-judgment discovery efforts and related motion practice;
- Petition for Permission to Appeal;
- Petition for Writ of Mandamus;
- Second Appeal;
- Opposition to Swisher Appellate Motion to Dismiss;
- Opening Brief
- Reply Brief
- Rule 28j letters
- Oral argument
- Petition for Rehearing and Rehearing En Banc
- Motion for timely issuance of mandate
- Brief In Opposition to Petition for Certiorari
- Motion to Amend Mandate
- Drafting post-remand motions and opposing Swisher's post-remand motions

37. In this analysis, I divide the compensable hours recorded by Trendsettah's counsel into two broad categories: (1) The time that was already deemed reasonable in the Court's February 27, 2017 fees order following the trial (ECF No. 340), and (2) the time that has been recorded by Trendsettah's counsel since that date. Because the time recorded for category (1) is already fixed, the following analysis relates to the time that has been recorded since.

**Our Computer Reports:**

38. My staff and I have prepared a chronological listing of all the time recorded by Trendsettah's counsel between January 29, 2017 and April 18, 2023 in two MS Excel® spreadsheets prepared under my supervision and control.

39. The spreadsheets (that I understand will be filed under seal) are **Exhibit 2** for the Gaw | Poe firm and **Exhibit 3** for Goldstein & Russell, P.C.

40. Each spreadsheet has a number of columns showing the date of the legal work, the total time for that date by that timekeeper, the timekeeper's name, the hourly rate to apply, the fee for that entry, and the full description of work performed.

41. In my opinion the descriptions of the work performed are clear and adequately inform the reader of what was done.

42. Having reviewed both the individual time entries recorded by Trendsettah's counsel, and the total time they devoted to the major litigation tasks that the case presented, it is my opinion that Trendsettah's counsel expended a reasonable amount of time both on individual matters, and to the larger tasks as a whole. Or, as the Ninth Circuit puts it, it is my opinion that Trendsettah's counsel performed and recorded only the amount and degree of work that "would have been undertaken by a reasonably prudent lawyer to advance or protect his client's interest in the case at bar." *Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003).

43. A further touchstone for the reasonableness of the hours expended by Trendsettah's counsel is to compare the number of hours they expended to the number of hours expended by Swisher's counsel. As the Ninth Circuit has explained, "there is one particularly good indicator of how much time is necessary . . . and that is how much time the other side's lawyers spent." *Democratic Party of Washington State v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004). I understand from Gaw | Poe LLP that even as of January 2021 (when Swisher had been deemed the prevailing party due to Trendsettah's voluntary dismissal) Swisher had, pursuant to

the fee-shifting provision in the PLAs, reported that it had reasonably recorded **11,792** hours solely in conjunction with the breach-of-contract claims. I further understand that with minor adjustments, the Court approved the reasonableness of that number of hours. (*See* ECF No. 621 at 10-11). Through that date, Trendsettah's counsel had recorded a total of **6,653.9** hours on the contract claims. *See* Ex. 2, Ex. 3, ECF No. 340 at 18. The fact that Trendsettah's counsel were able to ultimately prevail in this matter, while doing the same work that Akerman and Gibson Dunn did, but in just **56%** of the number of hours, speaks very favorably to the reasonableness of the total number of hours Trendsettah's counsel claim.

**Exclusion of Antitrust-Specific Hours:**

44. I understand from the Court's initial fee order (granting fees to Trendsettah with respect to only the contract claims) that the Court had recognized that the contract and antitrust claims were "inextricably intertwined as a factual matter." (ECF No. 340 at 9.) I further understand that the Court nevertheless excluded time "spent exclusively on antitrust claims." *Id.* at 10.

45. Given the nature of the issues that were presented following the first remand, I would not expect, and did not see, time entries that should be excluded as having been spent exclusively on antitrust claims. That is because following that remand, most if not all of the work by Trendsettah's counsel related to the propriety of **vacating** versus affirming the jury's verdict.

46. One wrinkle however, is posed by the time spent by Trendsettah's counsel on the first appeal and cross-appeal. There, Trendsettah was seeking to reinstate the antitrust claims, while Swisher was seeking to have the contract claims vacated. Those overlapping appeals present a somewhat intractable challenge in seeking to exclude time that was "spent exclusively on antitrust claims," as the Court previously ordered. (ECF No. 340 at 10.) Certainly for Goldstein & Russell's part, almost all of its work would have been "inextricably intertwined,"

because regardless of the scope of the appeal, it would still have needed to fully acquaint itself with the pre-trial and trial record, and draft briefs summarizing all of the main facts and litigation history. In contrast, Gaw | Poe LLP was already familiar with the pre-trial and trial record. Nevertheless, the Gaw | Poe attorneys were still required to expend significant time conferring with Goldstein & Russell, drafting and revising the briefing, and preparing for the oral argument.

47. In providing its time records to me, Gaw | Poe LLP identified 222.8 hours of time entries related to the first round of appeals that it had identified as exclusively relating to antitrust issues, and should be excluded on that basis. I have reviewed both that voluntarily excluded time, and the remaining Gaw | Poe time entries during the period of the first appeal, and am of the opinion that the exclusions are appropriate under the guidance provided by the Court's January 2017 fees order.

## HOURLY RATES

**<u>Qualifications of Trendsettah's Counsel</u>:**

48. The five lawyers at Gaw | Poe LLP who worked on this matter were trained at "Big Law" firms after their clerkships, externships and law school educations. According to the California Bar on-line records they are all admitted to practice law at the dates shown below:

| Lawyer<br>(SBN)<br>Year admitted | Background | Prior Firms |
|---|---|---|
| Mark Poe<br>(223714)<br>12/19/2002 | Stanford Law<br>9th Cir clerkship (Clifton) | Morrison & Foerster |
| Victor Meng<br>(254102) | Loyola Law<br>Extern Hon. Dean Pregerson | Morrison & Foerster |

| | | |
|---|---|---|
| 12/11/2007 | | |
| Randolph Gaw (2223718) 12/19/2002 | Stanford Law | O'Melveny & Myers Wilson Sonsini |
| Samuel Song[2] (245007) 12/5/2006 | UC Hastings Extern Hon. Martin Jenkins | Morrison & Foerster |
| Flora Vigo (239643) 12/7/2005 | UC Hastings | O'Melveny & Myers |

49. In addition, Gaw | Poe paralegal Rebecca Mance recorded a small amount of time on this matter. I understand that Ms. Mance has over 20 years of paralegal experience, in multiple jurisdictions. While the Real Rate Report referenced below does not report rates for paralegals for the Los Angeles market, I understand that Swisher claimed and had approved a 2017 rate of $315/hour for a paralegal with 29 years of experience. *See* Swisher Fees Mot. at 21, 23 n.8. That hourly rate for an experienced paralegal on complex litigation in the Los Angeles market is consistent with my experience, and I believe it to be reasonable.

50. Further detail on the experience and background of the Gaw | Poe lawyers is shown by the information that I have collected and included in **Exhibit 4**.

51. The lawyers of Goldstein & Russell who assisted Trendsettah are these:

[2] I am advised that Mr. Song joined Palo Alto Networks as in-house counsel in June 2022.

| Name/Date | Education/Clerkships | Experience |
| --- | --- | --- |
| Thomas C. Goldstein<br>Partner<br>(1995) | American University's Washington College of Law<br>D.C. Cir. clerk (Weld)<br>Elected fellow of the Academy of Appellate Lawyers<br>Harvard Law litigation clinic | Over 100 matters in Supreme Court.<br>Has argued nearly 50 matters before SCOTUS<br>Co-founder of SCOTUSblog |
| Eric Citron<br>Partner<br>(2007) | Yale Law<br>USDC clerkship (Robertson)<br>D.C. Cir. (Tatel)<br>US Supreme Court (O'Connor/Kagan) | Clerked for Justices Sandra Day O'Connor and Elena Kagan.<br>Clerked for Hon. James Robertson (USDC) and Hon. David Tatel (DC Cir.)<br>US DOJ Antitrust Dept. Experience |
| Kevin Russell<br>Partner<br>(1994) | Yale Law<br>US Supreme Court clerk (Breyer)<br>9th Cir clerk (Norris) | Argued 12 matters is Supreme Court. Counsel in 50 others.<br>Harvard Law litigation clinic<br>Stanford Law litigation clinic |
| Daniel Woofter<br>Partner<br>(2014) | Georgetown Law<br>4th Cir. (Harris)<br>E.D. Mich. (Levy) | Georgetown Supreme Court Institute<br>ABA Death Penalty Due Process Review Committee, chair |
| Charles Davis[3]<br>Associate<br>(2013) | Georgetown Law<br>(Ph.D. at University of North Carolina at Chapel Hill)<br>Ct. of Appeals D.C. Cir. (Henderson) and Federal Cir. (O'Malley) | Covington & Burling<br>Clerked for Hon. Karen Henderson (DC Cir) and Hon. Kathleen O'Malley (Federal Cir.) |

[3] I am advised that Mr. Davis joined Amazon as in-house counsel in January 2022.

| Name/Date | Education/Clerkships | Experience |
|---|---|---|
| Erica O. Evans<br>Associate<br>(2009) | George Washington Law<br>Managing editor of International Law Review | Prior experience at Gibson Dunn's appellate practice and the Office of the Solicitor General at the U.S. Department of Justice. |

52. Further detail on the experience and background of the Goldstein & Russell lawyers is collected in **Exhibit 5**.

**THE RULES FOR RATES AND FEES**

53. I understand that the settled and established guidance of the Ninth Circuit on what rates to apply in fee shifting situations is this: "The established standard is the 'rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.' *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210-11 (9th Cir. 1986)." *Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir. 1997).

54. The skill displayed by the TSI legal team is impressive. The lawyers have considerable experience with litigation. While the result at trial was a resounding success, TSI's lawyers also prevailed on all the major motions. And they did all this for what I view as a modest and economical expenditure of time.

55. The work on the appeals was also on the mark, as the Ninth Circuit reinstated the jury verdict in full on the first appeal and partially reinstated the judgment on the second appeal despite vigorous opposition from Swisher.

***This is a contingency fee retention*:**

56. I am informed that both Gaw | Poe and Goldstein & Russell are not charging for their time on an hourly basis for this matter. The lawyers took this matter on a contingency basis and they will be compensated in part by a small

percentage of the verdict and also by the amount of fees that are awarded by the Court for the reasonable time.

57. I review legal bills almost every day and, because of this, I have an understanding of what rates are for the Los Angeles area for legal work over the period at issue from 2014 to the present time. While I have personally reviewed far more than $5.0 billion in fees and have come to know what rates are being paid for legal work, it is helpful to have another objective source of information for rates. I have come to distrust rate *surveys* if other, more reliable and relevant information is available. And one is.

**Real Rate Report**

58. Starting in 2010 the TyMetrix/LegalVIEW actual "anonymized" billing data has been assembled and published each year by the Wolters Kluwer ELM Solutions company. The data is gathered for the most part from the TyMetrix360° electronic invoicing system.

59. In years past I have used the TyMetrix system for my own invoicing, and I also worked directly with the TyMetrix program managers on a very large project. During that project I came to understand exactly how the program worked and the steps that they took to verify the accuracy of their data. I am now familiar with the way the TyMetrix electronic billing system works, based on a set of rules that must be followed. The program requires that a set of rules with budgets, staffing and rates be agreed to by the law firm before the system will allow an invoice to be processed. If there are discounts (which is quite common) those discounts are factored in to the budget and rate data shown. Once the invoices are submitted the program processes the invoice for compliance with the agreed-upon rules and recommends a payment to be made by the client. **The payment data on hourly rates is what is captured by the Real Rate Report**.

60. The most recent iteration is the "2022 Real Rate Report" that became available on December 7, 2022. The entire 2022 Report is attached as **Exhibit 6**. It

is said to be a more than $155 billion-dollar database (**Exhibit 6** at 235). The data in the 2022 Report is taken from invoices for legal work from July 2018 through the Second Quarter of 2022 (*see* **Exhibit 6** at 8 and 231). It is my opinion that the rates shown are reflective of contemporaneous rates paid for legal work performed up to the end of June, 2022.

61. The explanation of how the data is derived is contained in pages 237, 238 and 241of **Exhibit** 6.

62. The Real Rate Report data is assembled by type of legal work and for major venues as well. This lawsuit was an antitrust and breach of commercial contract matter. This motion seeks fees for the only the time that is solely for contract/business litigation or "inextricably intertwined" time that is partially split between the antitrust judgment and the contract judgment.

**Proposed Rates for Gaw | Poe LLP**

63. During earlier proceedings the Court ruled that the category it deemed appropriate for work done by Gaw | Poe in this matter was "General Litigation," and since that ruling has not been appealed I will use the data in that category as the "law of the case" for this fee motion. In matters that have been pending for a few years it is the usual custom for courts to apply current rates to fee requests (*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 609 (9th Cir. 1997); *Rutti v. Lojack Corp.*, No. 06-cv-350-DOC-JCX, 2012 WL 3151077, at *11 (C.D. Cal. July 31, 2012)), so in the analysis below I use as a starting point the Real Rate Report's 2022 rates for the Gaw | Poe attorneys, using the same cohorts that the Court had established for those attorneys in the first fees order.

64. The Los Angeles statistical area is said to include Los Angeles, Long Beach and Anaheim (**Exhibit** 6, page 229). The 2022 rates for all Los Angeles litigation, based on 730 examples (the "n" numbers) identified for Litigation in Los Angeles is collected on page 16 of **Exhibit 6**:

## Section I: High-Level Data Cuts

**Cities**
By Matter Type

**2022 - Real Rates for Associate and Partner** | **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **Los Angeles CA** | Litigation | Partner | 322 | $516 | $725 | $1,045 | $799 | $739 | $702 |
| | | Associate | 408 | $400 | $615 | $855 | $642 | $606 | $564 |

65. Since this matter has been pending for over 102 months it is important to recognize that rates have increased about 3% or more each year during that time. The Gaw | Poe team worked on the matter from inception until the present and has not received any fees during those now over 102 months.

66. I understand that two of the Gaw | Poe lawyers (Mr. Meng and Mr. Song) became partners of the firm on January 1, 2017 (*i.e.*, *after* December 2, 2016, when I had submitted my prior fee declaration in conjunction with Trendsettah's prior fee motion).

67. As the 2022 Real Rate Report explains, the data it covers extends to work only through June of 2022, more than a year before this motion is set for hearing. Rates "exploded" for work done in 2022 with some firms adding about $200 per hour to their rates for contract litigation in major venues such as Delaware and New York. The average rate for Los Angeles in 2022 increased by $140 an hour for partner time and by $19 an hour for associate time. Given that the Real Rate Report data collection extends through Q2 of 2022, its data will not reflect the substantial bump in rates that many firms applied for work later in 2022, let alone new rate increases for 2023. According to invoices I have reviewed, as well as numerous articles in the legal press, rates for high-end work have continued their

steep upward trajectory into 2023. For example, in November 2022, a senior consultant from the Wells Fargo Legal Specialty Group was quoted in an article from The American Lawyer as stating: "We're seeing higher planned rate increases at this point than we've ever seen, and we've been tracking this for 15 years."[4]

68. This surge in rates from 2022 to 2023 is fully supported by the fee testimony submitted by Gibson Dunn in conjunction with its motion for sanctions in this very case. As shown on Exhibit 6 to the Swanson Declaration (ECF No. 702-4), the fees charged by partners and senior associates in that LA-based firm who worked on this matter (*i.e.*, Mr. Boutrous through Mr. Farag) increased by an average of [redacted] from 2022 to 2023. In light of the delay in payment of over 102 months by this point (or 87 months since the verdict was returned), the complex nature of this high-ticket commercial litigation, the high quality of the lawyers' work, the relatively low number of hours claimed in comparison to their opponents, and the fact that they are being paid on a contingency fee basis, in my opinion it is reasonable to make a similar adjustment to the rates for the attorneys from Gaw | Poe LLP for the year 2023.

69. Under that [redacted].

70. These reasonable rates for the Gaw | Poe attorneys are supported by two other real-world data points. First, they are consistent with the rates deemed to be reasonable for these lawyers more than three years ago in *AdTrader, Inc. v. Google LLC*, where the court deemed rates of $1,000/$855 to be "reasonable and

[4] Andrew Maloney, The American Lawyer, *Raising Billing Rates in 2023 Becomes a 'Singular Focus' for Law Firms* (Nov. 22, 2022), available at https://www.law.com/americanlawyer/2022/11/22/raising-billing-rates-in-2023-becomes-a-singular-focus-for-law-firms-405-113467 .

comparable to the fees generally charged by attorneys with similar experience, ability, and reputation." 2020 WL 1921774, at *8 (N.D. Cal. Mar. 24, 2020). Current 2023 rates of $1,222 and $1,000 for those lawyers would reflect an approximately 20% increase over the intervening three years. That magnitude of increase is [redacted] Gibson Dunn's billing records (ECF No. 702-4), which reflects that Gibson Dunn partners' rates increased by an average of [redacted] over that same three-year period.

71. The second supporting real-world data point is that, even the adjusted $1,222 rate for Gaw | Poe's *named* partners would [redacted] rate charged by senior associates from that firm who have long worked on this case, such as Ms. Yu, Mr. Eckman, and Mr. Kleinbrodt. *See* Swanson Decl. Ex. 6 (ECF No. 702-4). Similarly, the $1,000 rate proposed for the "junior" members of Gaw | Poe's team (the most junior of whom has been practicing for 16 years), would [redacted] for Gibson Dunn associate Viola Li ([redacted]), who has been practicing for just three years. *Id.*

72. With respect to the contract attorneys who were tasked with reviewing documents in this matter, my opinion is that as the Court determined in 2017, their rates should be on par with the first quartile of rates charged for Los Angeles litigation, or $400. *See* **Exhibit** 6 at 16. I note that this is [redacted] reported even for paralegals in 2023. Swanson Declaration (ECF No. 702-4).

**<u>Proposed Rates for Goldstein & Russell</u>**

73. The Court has not previously made a ruling as to the appropriate rates for the Goldstein & Russell attorneys. In my opinion, the hourly rates set forth in the Real Rate Report (which, as noted, top out at the "third quartile" of attorneys) do not properly capture the reasonable rates for counsel of "'of comparable skill,

experience, and reputation'" to the attorneys from Goldstein & Russell. *Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir. 1997) (quoting *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210-11 (9th Cir. 1986)). The firm is widely regarded as one of only a few truly elite appellate boutiques in the country, which perception is fully supported by the résumés and experience of its lawyers.

74. I further understand that in contrast to Gaw | Poe, a greater proportion of Goldstein & Russell's work is billed on an hourly basis, by clients who (by definition) deem those rates to be "reasonable" for the level of skill and experience that Goldstein & Russell bring to bear on the matters they work on. Accordingly, it is my opinion that the most reasonable rates to assign to Goldstein & Russell are those rates that the firm actually charges its paying clients. I am advised by Mr. Citron that the firm's hourly rates for 2023 are as follows:

- Thomas Goldstein: $2,180
- Kevin Russell: $1,520
- Eric Citron: $1,520
- Daniel Woofter: $1,080
- Charles Davis: $1,080[5]
- Erica Evans: $385

75. I further note that the reasonableness of Goldstein & Russell's hourly rates is supported by comparing those rates to the rates reported by Gibson Dunn (also an elite firm) in its recent motion for sanctions. *See* Decl. of Daniel Swanson, (ECF No. 702-4) (showing Mr. Boutrous's rate [redacted] Mr. Goldstein's, while showing seven out of eight other Gibson Dunn partners [redacted] Mr. Russell and Mr. Citron, and Gibson Dunn associates [redacted] Mr. Woofter and Mr. Davis).

[5] As of Mr. Davis's departure from the firm in December 2021.

## SUMMARY OF REASONABLE FEES

76. The following paragraphs summarize my opinions as to the reasonable fees to which Trendsettah is entitled under the PLAs' fee-shifting clause.

77. Beginning with the Court's 2017 order awarding fees to Gaw | Poe through the initial judgment, the amounts are:

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Randolph Gaw | 755 | $1,222 | $922,610 |
| Mark Poe | 843.4 | $1,222 | $1,030,635 |
| Victor Meng | 1125.2 | $1,000 | $1,125,200 |
| Samuel Song | 231.1 | $1,000 | $231,100 |
| Contract Attorneys | 1079.2 | $400 | $431,680 |
| **Totals** | **4,033.9** | | **$3,741,225** |

78. And below are the reasonable hours and rates for Gaw | Poe for their work from that point through April 18, 2023:

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Randolph Gaw | 442.3 | $1,222 | $540,491 |
| Mark Poe | 3345.9 | $1,222 | $4,088,690 |
| Victor Meng | 534.5 | $1,000 | $534,500 |
| Samuel Song | 217.6 | $1,000 | $217,600 |
| Flora Vigo | 174.9 | $1,000 | $174,900 |
| Rebecca Mance | 5 | $315 | $1,575 |
| **Totals** | **4,720.2** | | **$5,557,755** |

79. The following chart reports the reasonable hours and rates for Goldstein & Russell over the duration of this case:

| Timekeeper | Hours | Rate | Total |
|---|---|---|---|
| Thomas Goldstein | 169.4 | $2,180 | $369,292 |
| Kevin Russell | 10 | $1,520 | $15,200 |
| Eric Citron | 1185 | $1,520 | $1,801,200 |
| Daniel Woofter | 15.8 | $1,080 | $17,064 |
| Charles Davis | 218.3 | $1,080 | $235,764 |
| Erica Evans | 59.2 | $385 | $22,792 |
| **Totals** | **1,657.7** | | **$2,461,312** |

80. Combined, the reasonable hours and fees are as follows:

| Firm | Hours | Total |
|---|---|---|
| Gaw \| Poe LLP | 8,754.1 | $9,298,980 |
| Goldstein & Russell P.C. | 1,657.7 | $2,461,312 |
| **Totals** | **10,411.8** | **$11,760,292** |

81. As noted above, the overall reasonableness of the hours and total fees claimed by Trendsettah's counsel is well supported by the fact that Swisher's counsel had once been awarded a similar number of hours (11,792), and total fees of $7,956,246.60, as of two-and-a-half years ago, prior to the second appeal and the several motions that have been filed upon remand from that appeal. In other words, judging by the number of hours recorded, Trendsettah's counsel have done the same amount of work as Swisher's counsel, but substantially more efficiently.

82. It must be further noted that the difference in dollar value between the two awards is explained entirely by the fact that Trendsettah's counsel are to be compensated at *current* rates, *see In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994), while Swisher's award was based on the

historic rates for fees as it paid them to its counsel. As shown in Exhibit 6 to the Swanson Declaration in support of Swisher's sanctions motion, for example, when comparing strictly the 2023 rates, even senior associates at Gibson Dunn [redacted]. (ECF No. 702-4). This despite the fact that both founders of Gaw | Poe have equal or better academic credentials to such associates, and roughly a decade more litigation experience.

**CONCLUSION**

83. In my opinion the total reasonable and necessary lodestar is $11,760,292 in fees for 10,411.8 hours of time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 25th day of August, 2023 at Los Angeles, California.

Gerald G. Knapton